EXHIBIT 1

## ACTION BY UNANIMOUS WRITTEN CONSENT
### OF THE BOARD OF DIRECTORS OF
### RADIANCE DESIGN, INC.

The undersigned, constituting all of the members of board of directors of Radiance Design, Inc., a California corporation (the "Corporation"), do by this writing consent to and adopt the following resolutions without a meeting pursuant to Section 307(b) of the California Corporations Code:

### Winding Up and Dissolution of Corporation

RESOLVED, that the Corporation wind up its business and dissolve;

RESOLVED FURTHER, that the Plan of Liquidation attached hereto is hereby approved and the officers of the Corporation are hereby directed to wind up the Corporation's affairs and carry out the liquidation of the Corporation pursuant to such Plan;

RESOLVED FURTHER, that, when the Corporation has been completely wound up, its known debts and liabilities have been actually paid, the known assets have been distributed to the persons entitled thereto, and any other conditions in the Plan of Liquidation have been fulfilled, the members of this board shall sign the attached Certificate of Dissolution and shall file it with the California Secretary of State.

Dated: _January 2nd_, 1998

_Verdiell_  1/2/98
Jean-Marc Verdiell

_Frank Shum_  1/5/98
Frank Shum

EXHIBIT
**3**


PLAINTIFF'S
EXHIBIT 3
VERDIELL
10-15-03

-1-

MV 0024380

**ACTION BY WRITTEN CONSENT**

**OF SHAREHOLDERS OF**

**RADIANCE DESIGN, INC.**


The undersigned, as the holders of all outstanding shares of Radiance Design, Inc., a California corporation (the "Corporation"), do by this writing consent to and adopt the following resolutions, without a meeting, pursuant to Section 603(d) of the California Corporations Code:

<u>Winding Up and Dissolution of Corporation</u>

RESOLVED, that the winding up and dissolution of the Corporation is hereby approved;

RESOLVED FURTHER, that the Plan of Liquidation attached hereto is hereby approved and the officers of the Corporation are authorized to wind up the Corporation's affairs and carry out the liquidation of the Corporation pursuant to such Plan;

RESOLVED FURTHER, that the undersigned shareholders acknowledge and agree that, by their signatures below, they agree to and are personally bound by all of the terms, conditions, and provisions of the Plan of Liquidation, as a contract between the parties.


Dated: _January 2nd_, 1998

_____  1/5/98
Frank Shum

_____  1/2/98
Jean-Marc Verdiell

-1-

MV 0024381

## RADIANCE DESIGN, INC.
## PLAN OF LIQUIDATION

This Plan of Liquidation (the "Plan") shall govern the winding up, liquidation, and dissolution of Radiance Design, Inc., a California corporation (the "Corporation"). The Plan has been approved by the Corporation's board of directors, and Frank Shum ("Shum") and Jean-Marc Verdiell ("Verdiell") have approved the Plan as the Corporation's shareholders and have agreed to be individually bound by this Plan.

1. **Winding Up of Business**.

(a) **Opening of Bank Account**. The officers of the Corporation shall cause the Corporation's bank account with Union Bank to be opened, with signatures of both Shum and Verdiell required to make drawings of any amount. Shum and Verdiell agree to sign all checks the Corporation is required to issue under the terms of this Plan.

(b) **Cancellation of Line of Credit**. The officers shall cause the Corporation's line of credit with Comerica Bank to be terminated.

(c) **Collection of Accounts Receivable**. The officers of the Corporation shall attempt to collect all accounts receivable and shall deposit the funds collected in the Corporation's bank account.

(d) **Additional Corporate Expenditures**. No corporate expenditures shall be made by the Corporation in addition to the expenditures specifically authorized by this Plan without the approval of the Board of Directors (i.e., both Shum and Verdiell). The expenditures authorized by this Plan are as follows, and Shum and Verdiell agree to cause the Corporation to make such payments:

(i) payments required to be made under Section 2 of this Plan;

(ii) accounting fees in connection with the transactions contemplated by this Plan and the preparation of tax returns for the Corporation;

(iii) legal fees in connection with the transactions contemplated by this Plan;

(iv) document filing fees necessary to file a Certificate of Dissolution with the California Secretary of State;

(v) the minimum monthly payments due on Verdiell's AT&T VISA credit card and Citibank VISA credit card (the "Credit Cards"), for a maximum of three months. Verdiell acknowledges that the current balances on the Credit Cards are $5,984.95 for the Citibank VISA and $1,519.51 for the AT&T VISA, and Verdiell agrees not to charge any additional amounts to the Credit Cards.

(e) **Termination of Lease and Other Contracts**. The officers of the Corporation shall attempt to cause all contracts and agreements to which the Corporation is a party to be wound up and terminated. Such contracts include, but may not be limited to, the Corporation's sublease with Oxigraf and the ARPA contract. The Confidentiality and Proprietary

-1-

MV 0024382

Rights Agreements the Corporation entered into with Shum and Verdiell shall terminate upon the approval of this Plan.

(f) **Miscellaneous**. Verdiell shall cause the telephone number (650) 428-0826 to be transferred to Shum's name and Shum shall be responsible for paying charges on that line incurred after the transfer (with any prior charges being corporate obligations). The telephone number (650) 428-0742 shall remain in Verdiell's name and Verdiell shall be responsible for paying charges on that line incurred after this Plan is adopted (with any prior charges being corporate obligations). For a period of one year after the adoption of this Plan, Shum agrees to cause all e-mail messages received at "mverdiell@radiance-design.com" to be immediately forwarded to "parigo@aol.com". Verdiell agrees to pay any out-of-pocket costs incurred by Shum in connection with such forwarding. Otherwise, Shum and Verdiell shall each be responsible for paying all charges incurred with respect to their own e-mail accounts.

2.  **Distribution of Assets**.

(a) **Payment of Creditors**. The Corporation shall pay all creditors of the Corporation the full amounts owing to them, as indicated on the attached Vendor Balance Summary, and any additional amounts which accrue to creditors after the date of this Plan. If the Corporation's cash assets are insufficient to pay such amounts in full, the Corporation shall liquidate its property to generate additional cash, and each creditor shall be paid ratably.

(b) **Cash Reserve**. Prior to making further distributions of cash as provided below, the Corporation shall set aside and maintain in its bank account with Union Bank a cash reserve (the "Cash Reserve") in an amount deemed to be the Corporation's maximum potential tax liability (after filing a final tax return and paying all taxes calculated to be owed), as reasonably determined by the Corporation's accountant. In no event, however, shall the Cash Reserve be less than $3,000. If Verdiell is required to pay any amount in connection with his assumption of the Corporation's tax liability (as provided in Section 4 below), Verdiell shall be entitled to prompt reimbursement from the Cash Reserve. Upon final determination that the Corporation owes no additional taxes, and upon payment of all other creditors, all amounts remaining in the Cash Reserve shall be distributed (i) to Shum and Verdiell according to the provisions of paragraph (c) below if they have not yet received the full amounts to which they are entitled under that paragraph, and then (ii) to Shum and Verdiell in equal amounts. Shum and Verdiell agree to sign all checks required to be issued by the Corporation under this paragraph.

(c) **Payments to Shum and Verdiell**. After all known creditors have been fully paid and the Cash Reserve set aside, the Corporation shall make the following payments to Shum and Verdiell out of any cash remaining:

(i) Shum shall be paid $605.87, representing reimbursement of accrued charges for the lease of a computer, and $8,174.19 as reimbursement of other expenses, as indicated on the attached Vendor Balance Summary.

-2-

MV 0024383

(ii) Verdiell shall be paid $8,260.03 as reimbursement of expenses, as indicated on the attached Vendor Balance Summary;

If the Corporation's cash assets are insufficient to pay such amounts in full, Shum and Verdiell shall be paid the above amounts ratably. After payment of the above amounts in full, any remaining cash shall be distributed in equal portions to Shum and Verdiell, as shareholders of the Corporation. Shum and Verdiell hereby waive and cancel any accrued salaries and/or other compensation owed to them by the Corporation.

(d) <u>Distribution of Property</u>. After all known creditors have been fully paid, the Corporation shall distribute its property as follows:

(i) "Consumables" shall be distributed to Shum and Verdiell per the attached "Consumables Inventory" (with the first column being the total quantity held by the Corporation and the third column being the quantity to be received by Verdiell;

(ii) Verdiell shall have the option to choose either (A) or (B) below, within two weeks after the approval of this Plan. Unless otherwise agreed in writing, if Verdiell chooses alternative (A) but fails to make the required payment to Shum within such two-week period, then alternative (B) shall be implemented.

(A) pay Shum $4,860.05 ($267.55 plus $3,564.50 plus $1,028.00), and retain all of the "Small Tools" as listed on the attached Account QuickReport 6065 and all of the "NASA Assets" (consisting of the Newport Klinger positioning equipment, Thor Labs breadboard, and fixtures from NT Engineering); or

(B) from the "Small Tools," allow Shum to retain only the detector (consisting of the three ThorLabs components having a total value of $299.00), and retain the remaining three items on the Small Tools list himself; and distribute the "NASA Assets," except for Newport Klinger equipment, to himself and Shum, with each receiving specific items as may be agreed upon by Shum and Verdiell, which shall represent approximately equal value. The Newport Klinger equipment shall be divided in two sets of approximately equal value, one containing the Manual Controller (a value of $3,443) and one containing all the remaining Newport Klinger items (positioning equipment and miscellaneous hardware for a value of $3,330). Verdiell shall allow Shum to decide which of the Newport sets Shum retains and let Verdiell retain the other set.

(iii) Unless otherwise agreed upon in writing, all other assets shall be divided between Shum and Verdiell such that each party receives items of approximately the same total value. Verdiell and Shum shall have equal rights to independently exploit the intellectual property developed by the Corporation.

3. <u>Business Activities of Officers and Directors</u>. Shum and Verdiell acknowledge and agree that, after the approval of this Plan, each of them shall be entitled, without any liability or duty to account to the

-3-

MV 0024384

Corporation or to the other, to pursue any and all such other business activities as they shall desire, even if such activities are in competition with the business of the Corporation and even if they take, or attempt to take, a business opportunity that the Corporation could have itself pursued.

4. **Dissolution**. The officers are authorized to file a request for tax clearance certificate with the California Franchise Tax Board. Verdiell agrees to complete and execute form 3555 (Individual Assumption of Tax Liability) and to permit such form to be filed along with the request for tax clearance certificate. Shum and Verdiell agree to use good faith efforts to cause, within three months after the adoption of this Plan, the Corporation to be completely wound up, its known debts and liabilities to be actually paid, its known assets to be distributed to the persons entitled thereto, and any other conditions in this Plan to be fulfilled. When all of the above have occurred, Verdiell and Shum shall sign a Certificate of Dissolution and shall cause it to be filed with the California Secretary of State.

5. **Future Liabilities**. Shum and Verdiell agree that, to the extent of the distributions they receive from the Corporation upon its liquidation, each of them shall be responsible for paying one-half of any costs and liabilities which may in the future arise with respect to the Corporation's business, including but not limited to liabilities and costs that may result from any audits which may be conducted with respect to the NASA and/or DARPA contracts. If either person is required to pay the entire amount of any such cost or liability, the other person shall promptly reimburse such person for one-half of the amount paid.

6. **Records**. Verdiell shall furnish to Shum: (a) copies of all documents relating to the dissolution of the Corporation, (b) copies of all Corporate tax-related documents, and (c) a final accounting of the Corporation's books prior to the filing of the Certificate of Dissolution.

7. **General**. This Plan contains all terms and conditions agreed to relating to its subject matter and no other terms or conditions shall apply except as required by law. The terms of this Plan may not be amended except by written approval of Shum and Verdiell as shareholders and members of the Corporation's board of directors. Shum and Verdiell acknowledge that this Plan has been prepared by Thomas L. Bahrick, the Corporation's corporate counsel, pursuant to agreement independently reached by Shum and Verdiell, and that he has not represented either of them individually in connection with this Plan.

-4-

MV 0024385

## CERTIFICATE OF DISSOLUTION

The undersigned certify that:

1. They constitute a majority of the directors now in office of Radiance Design, Inc.

2. The corporation has been completely wound up.

3. The corporation's known debts and liabilities have been actually paid.

4. The known assets have been distributed to the persons entitled thereto.

5. The election to dissolve was made by the vote of all the outstanding shares.

6. The corporation is dissolved.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Date:_____, 199__

_____
Frank Shum, Director

_____
Jean-Marc Verdiell, Director

MV 0024386

EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4                    ---oOo---

5   FRANK T. SHUM,

6               Plaintiff,

7   v.                              No. C 02-03262 DLJ (EMC)

8   INTEL CORPORATION, JEAN-MARC

9   VERDIELL, LIGHTLOGIC, INC.,

10   LUMEN INTELLECTUAL PROPERTY

11   SERVICES, INC., and MAREK

12   ALBOSZTA,                        **Certified Copy**

13               Defendants.

14   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

15   AND RELATED COUNTER-CLAIM.

16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

17

18        VIDEOTAPED DEPOSITION OF FRANK T. SHUM
                  November 12, 2003
19               VOLUME I (Pages 1-228)

20

21

    Reported By:
22   MARY F. NELSON, CSR 3553

23

24

25                   TOOKER & ANTZ

                                                        1

DEPOSITION OF FRANK SHUM - VOL. I - 11/12/2003

1  September 8 memorandum --

2      A.   Yes.

3      Q.   -- you say you're writing the letter in hopes

4  that we can salvage the partnership of Radiance, Inc?

5      A.   Yes.                                          10:04:10

6      Q.   Were you able to salvage the relationship you

7  had with Mr. Verdiell at Radiance?

8      A.   No, we ended up dissolving the company.

9      Q.   In the first paragraph you say, in the first

10 paragraph --                                           10:04:23

11     A.   Mm-hmm.

12     Q.   -- you see the sentence that reads, "You have

13 indicated I have lost trust in you"?

14     A.   Yes.

15     Q.   And do you see the next sentence that says,    10:04:32

16 "This is an accurate statement and has probably --"

17 Excuse me, "This is accurate statement and has been

18 probably a key source of our difficulties"?

19     A.   Yes.

20     Q.   Is that an accurate statement, you lost trust in  10:04:45

21 Mr. Verdiell?

22     A.   Yes.

23     Q.   Did you regain your trust in Mr. Verdiell

24 between the time you wrote this memo and the time you

25 resolved -- dissolved the company?                     10:04:54

DEPOSITION OF FRANK SHUM - VOL. I - 11/12/2003

1     A.   Not to the point when we were starting the

2  company.  It was in terms of, in trust, can you measure

3  it what do you mean by it?

4     Q.   You said in this memo that you lost your trust

5  in Mr. Verdiell.                    10:05:12

6     A.   Yes, yes.

7     Q.   When did you lose your trust in Verdiell,

8  obviously, in Mr. Verdiell, obviously sometime prior to

9  September 8?

10     A.   Yes.                           10:05:17

11     Q.   Do you recall when it was?

12     A.   I'm not sure but I would say it was over a

13  series of events and it was best summarized at this point

14  in the memo.

15     Q.   By the time you wrote this memo on September 8th  10:05:27

16  you had lost trust in him, right?

17     A.   Yes.

18     Q.   Okay.  My question is were you able to salvage

19  your sense of trust in Mr. Verdiell before you dissolved

20  the company?                      10:05:39

21     A.   I would say we made a good effort after

22  September but then it went have very badly after October.

23  So for a period of time I felt we were working better

24  together as a result of this.

25     Q.   So you made some progress you're saying in    10:05:52

28

DEPOSITION OF FRANK SHUM - VOL. I - 11/12/2003

1   trying to restore your trust --

2      A.   Yes.

3      Q.   -- shortly after this --

4      A.   Yes.

5      Q.   -- until sometime in October?              10:05:57

6      A.   That's right.

7      Q.   And then after October things became worse

8   again?

9      A.   That's correct.

10     Q.   After October did things become even worse than   10:06:04

11  they were after September 8th?

12     A.   Yes, definitely.

13     Q.   And is that true in your sense of Mr. Verdiell

14  as well?

15     A.   Yes.                                       10:06:13

16     Q.   You also say in this letter that Mr. Verdiell

17  has been attacking you personally or your family.  Did

18  you see that reference?

19     A.   Yes.

20     Q.   What does that refer to, Mr. Shum?         10:06:26

21     A.   Again, the whole sentence, attacking -- yeah,

22  can I read the sentence to make sure I understand it

23  clearly?

24     Q.   Yes.

25     A.      "In some instances you have resorted    10:06:40

DEPOSITION OF FRANK SHUM - VOL. I  11/12/2003

1     Q.   When Mr. Verdiell indicated to you --

2     A.   Mm-hmm.

3     Q.    -- that he had told Mr. Alboszta, that he

4 Mr. Verdiell, was a inventor --

5     A.   Mm-hmm.                   13:23:37

6     Q.    -- what did you say to Mr. Verdiell?

7     A.   I was very unhappy with him.

8     Q.   No, what did you say to him?

9     A.   I don't remember exactly what I said to him.

10 But I can tell I was very unhappy with him that he caused  13:23:47

11 the, called into question the principal intellectual

12 property of the company at that time.

13     Q.   How did it call it into question?

14     A.   Because now he was claiming he was inventor and

15 now they had, it had to be withdrawn.  According to the  13:24:02

16 question of the inventorship of the patent.

17     Q.   Did you understand that, that what would make

18 the patent strong or valid was getting the inventorship

19 accurate?

20     A.   No.  My understanding was to list all the     13:24:27

21 possible, even people, list anybody who worked for the

22 company that could dispute the patent as inventors.  That

23 way there could be no dispute in the future.

24     Q.   Is that the advice you received from

25 Mr. Alboszta?                       13:24:46

1    disagreement about Mr. Verdiell's being an inventor to?

2        A.   No, I don't recall.

3        Q.   Only Mr. Verdiell, Mr. Alboszta?

4        A.   Yes.

5        Q.   And maybe Mr. Richard?  Or not Richard?        13:29:58

6        A.   Maybe.  Maybe.  I don't remember.

7        Q.   So just Mr. Verdiell and Mr. Alboszta for sure?

8        A.   Yes.

9        Q.   Was the patent withdrawn?

10       A.   Yes, it what was.                              13:30:30

11       Q.   When the patent application was withdrawn or

12   abandoned, did you ask Mr. Verdiell to refile it with

13   you?

14       A.   Yes.

15       Q.   When was that?                                 13:30:42

16       A.   I believe it was, the earliest I can remember --

17   I'm sorry, you're saying after it was withdrawn?

18       Q.   Yes.

19       A.   I remember several instances where I asked Marc

20   to refile it.  I don't remember if it was before or after  13:30:56

21   Marc, Marek had told me.  The sequence of event was Marc

22   had told me it had to be withdrawn and we went through a

23   series of discussions how we could refile it in both our

24   names, both as discussed in the buy-out agreements, at

25   least discussed in the buy-out agreement and verbally to   13:31:22

116

1  him after that.

2       Q.   And when you, when is the first time you asked

3  him to agree to refile?

4       A.   I would say it would be probably within a week

5  or first few days of him telling me that it was invalid      13:31:35

6  because his name was not on it.

7       Q.   What was his response?

8       A.   I think he agreed that we would do it, we would

9  refile.

10      Q.   At some point in time did he take a different      13:31:50

11  position and not agree to refile?

12      A.   Yes, definitely, during dissolution talks he did

13 not want the patent to be refiled in both our names.

14 During the buy-out agreements we had discussed refiling

15 in both our names, but, you know, either him owning it       13:32:11

16 all or me owning the patent.

17      Q.   So sometime between the buy-out discussions and

18 the dissolution discussions your testimony is that

19 Mr. Verdiell refused to refile?

20      A.   That's correct.                                    13:32:28

21      Q.   And what do you recall about when that took

22 place or how it took place?

23      A.   I would think it was between the buy-out -- I'm

24 sorry, it was after the buy-out and during the

25 dissolution talks with Marc.                                 13:32:47

117

1    business the way you thought best, correct?

2       A.   The Radiance business.

3       Q.   The Radiance business, thank you.

4       A.   That is correct.

5       Q.   Did you consider Mr. Verdiell to be a potential   15:25:18

6    competitor?

7       A.   Yes.

8       Q.   Did you tell Mr. Verdiell about Luminence?

9       A.   No, I did not.

10      Q.   Why?                                              15:25:28

11      A.   I didn't feel a need to.

12      Q.   The Plan of Liquidation has a reference in it

13   that I'm sure you're familiar with where it states that

14   you have no obligation to account to each other for your

15   future business activities.                              15:25:46

16      A.   Mm-hmm.

17      Q.   Are you familiar with that?

18      A.   The language seems familiar but I believe so.

19      Q.   In any event, did you understand that once the

20   Plan of Liquidation was signed --                        15:25:55

21      A.   Mm-hmm.

22      Q.    -- that you had no obligation to tell

23   Mr. Verdiell what you were doing in your effort to

24   continue Radiance business?

25      A.   That's correct.                                  15:26:08

173

1    Q.    And he had no obligation to tell you, did he?

2    A.    He did not.

3    Q.    Did you have an obligation, though, Mr. Shum,

4    before the Plan of Liquidation was signed to tell

5    Mr. Verdiell what you were doing?                    15:26:18

6    A.    No.

7    Q.    Why not?

8    A.    Because I was not representing us to any outside

9    investors, I was not doing anything that I was violating

10   my fiduciary duties to the company.  The fact I was      15:26:30

11   working on plan, it was something I was working on in my

12   head.  I did not reveal that to anybody or any investors

13   outside the company or take an opportunity away from the

14   company.  I was abiding by my duties to the company.

15   Q.    Well, you must have -- did you not talk to      15:26:50

16   anybody about Luminence before the Plan of Liquidation

17   was signed?

18   A.    I talked to my sister, her husband, and I

19   believe I talked to a person called Benny Chang.  I don't

20   know who else I might have.  That's all I can remember.   15:27:12

21   Q.    When is the first time you prepared any

22   PowerPoint slides for Luminence?

23   A.    You know, I don't remember.  I don't remember.

24   Q.    And what's the first time you began drafting a

25   business plan for Luminence?                         15:28:01

174

DEPOSITION OF FRANK SHUM - VOL. I - 11/12/2003

1    Q.    Anybody else have that concern or they expressed

2    that concern to you?

3    A.    The venture capitalists for sure expressed that

4    concern.

5    Q.    Did you provide Mr. Leonberger with a copy of      16:34:48

6    the Plan of Liquidation?

7    A.    No, I did not.

8    Q.    Did you provide the venture capitalists with the

9    Plan of Liquidation?

10   A.    I don't think so, no.                              16:35:01

11   Q.    Did Coudert Brothers advise you about the Plan

12   of Liquidation and what you could and could not do under

13   it?

14   A.    Yes.

15   Q.    Did they advise you as to what you could do or     16:35:09

16   could not do on patenting?

17   A.    Yes.

18         MR. TAYLOR:  And what did -- let's see if there

19   is an instruction, mr. wallach.  I'm going to ask a

20   question that's arguably covered by the privilege, but I  16:35:25

21   want to make sure we're not going to have an advice of

22   counsel waiver at the same time.

23   Q.    What was the Coudert Brothers's advice on what

24   you could or could not patent under the plan of

25   dissolution   qua?                                       16:35:37

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

1       A.      Yes.

2       Q.      And when you read it did you satisfy yourself

3    that the statements it contained were accurate?

4       A.      Yes.

5       Q.      Will you turn to Page 13?  And Paragraph 34,        16:51:33

6    there are two sentences.  The first one reads:

7               "On May 13, 2001 the plaintiff

8               Frank Shum was told by a colleague

9               that defendant Intel had purchased

10              defendant LightLogic for the sum of        16:52:03

11              $409,000,000.  This was the first

12              knowledge of the activities of

13              LightLogic and defendant Verdiell

14              since the dissolution of Radiance on

15              January 5, 1998."                          16:52:17

16              Do you see that?

17      A.      I do.

18      Q.      Okay.  So what this says, if I read it,

19   understand it correctly, is that the first knowledge you

20   had of the activities at LightLogic or Marc Verdiell        16:52:31

21   following the dissolution of Radiance Design on January

22   5, 1998, was the information you received on May 13,

23   2001; is that correct?

24      A.      I knew there was a company called LightLogic.  I

25   knew Marc was associated with LightLogic before this        16:52:52

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

1   date.  But the activities of stealing my technology I was

2   only aware of it on May 13.  That was the first

3   indication.

4      Q.   Okay.  Well, this statement reads:

5            "This was the first knowledge of          16:53:04

6            the activities of LightLogic and

7            defendant Verdiell."

8            So I take it that's not an accurate statement,

9   is it?

10     A.   Activities, I mean the activity of stealing.    16:53:13

11   That's how I interpreted it when I read it.

12     Q.   Well, what knowledge did you have before May 13,

13   2001 about Mr. Verdiell and LightLogic and what they were

14   doing in their business activities?

15     A.   I did not know what they were doing in their    16:53:32

16   business activity.

17     Q.   Nothing?

18     A.   No.

19     Q.   Did you know -- so let me back up.  You knew

20   there was a LightLogic, a company by the name of       16:53:41

21   LightLogic, correct?

22     A.   Yes.

23     Q.   Did you know what business they were in?

24     A.   No, I didn't.

25     Q.   And you knew that Mr. Verdiell was associated    16:53:48

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

1    with LightLogic; is that correct?

2         A.    That's correct.

3         Q.    And did you know what his position was?

4         A.    No, I don't know.

5         Q.    Did you know anything at all more about            16:53:59

6    LightLogic than what you've just testified to before you

7    spoke with this colleague on May 13, 2001?

8         A.    No, I did not know.

9         Q.    Did you make any effort whatsoever to find out

10   from friends or colleagues what Mr. Verdiell was doing     16:54:25

11   after January 5, 1998?

12        A.    I did not make any efforts, no.

13        Q.    Do you have mutual acquaintances, professionally

14   and otherwise?

15        A.    We have acquaintances, yes.                      16:54:44

16        Q.    Did you make a point not to ask them what

17   Mr. Verdiell was doing?

18        A.    I didn't see any need to.  I assumed he, you

19   know, I was moving on, and I assumed he was moving on.

20        Q.    So you didn't see any newspaper articles about   16:55:00

21   LightLogic or Mr. Verdiell?

22        A.    No, not, no.

23        Q.    Didn't run into him at a trade show?

24        A.    No.

25        Q.    Didn't see them at a conference that you         16:55:10

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

DEPOSITION OF FRANK SHUM - VOL. I   11/12/2003

1  attended together?

2      A.   No.

3      Q.   Did you know anyone who worked at LightLogic

4  other than Mr. Verdiell?

5      A.   I believe Bruce at one time mentioned that          16:55:27

6  Emmett, an acquaintance had went to work for LightLogic.

7      Q.   And did you have any communications with Emmett

8  from prior to May 13, 2001?

9      A.   No, I did not.

10     Q.   Were there any other people that you knew of who   16:55:46

11 were working at LightLogic?

12     A.   No.

13     Q.   In connection with the work you were doing for

14 Luminence or Ditech did you have occasion to run patent

15 searches?                                                   16:56:07

16     A.   Let me think about that for a second.  I had

17 filed for a patent at, at Ditech.  I didn't run a search

18 for it.

19     Q.   You know how to run on-line patent searches

20 don't you?                                                  16:56:35

21     A.   Yes, I do.

22     Q.   And you knew how to run on-line patent searches

23 back in 1997, correct.

24     A.   1997, I had done that, yes, I had done it

25 previously in 1997.                                         16:56:43

222

1      Q.   Okay.  Did you run any on-line patent searches

2  at all after January 5, 1998 to May 13, 2001?

3      A.   No, I didn't.  Any patent searches?

4      Q.   Any.  Ever go on line during that time period?

5      A.   I may have.  I don't remember.          16:57:02

6      Q.   So it's possible?

7      A.   Yes.

8      Q.   Okay.  And did you ever conduct an on-line

9  patent search for Mr. Verdiell?

10     A.   Before May 13th, no.                     16:57:13

11     Q.   Or for LightLogic?

12     A.   No.

13     Q.   Will you turn to Page 12.  The first sentence of

14  Paragraph 33 reads:

15          "Following the liquidation of           16:57:33

16          Radiance Design Shum was not in

17          contact with Verdiell, Lumen or

18          Gorman."

19          Is that an accurate statement?

20     A.   Yeah, I was not in contact.  I do remember    16:57:45

21  seeing Marc once at, in Palo Alto where I said hello but

22  that was it.  I'm not sure you would characterize it as

23  contact.

24     Q.   And where did you see him at Palo Alto?

25     A.   It was I believe on California Avenue at a sort  16:58:03

223

DEPOSITION OF FRANK SHUM - VOL. I   11/12/2003

### CERTIFICATE OF DEPOSITION OFFICER

1

2            I, MARY F. NELSON, pursuant to Section 30(e) of

3    the Federal Rules of Civil Procedure, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify the truth, the whole truth and nothing

6    but the truth in the within-entitled cause; that said

7    deposition was taken at the time and place therein

8    stated; that the testimony of the said witness was

9    reported by me and thereafter transcribed under my

10   direction into typewriting by computer; that the

11   foregoing is a full, complete and true record of said

12   testimony to the best of my ability; and that the witness

13   was given an opportunity to read and correct said

14   deposition and to subscribe same.

15

16            I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of the cause named in said

20   caption.

21                                _____
                                     DEPOSITION OFFICER

22

23            I hereby certify that this copy is a true and

24   exact copy of the original.

25   _____        _____
        DEPOSITION OFFICER            CERTIFICATION DATE

228

EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

---oOo---

FRANK T. SHUM,

        Plaintiff,

v.                                    No. C 02-03262 DLJ (EMC)

INTEL CORPORATION, JEAN-MARC

VERDIELL, LIGHTLOGIC, INC.,

LUMEN INTELLECTUAL PROPERTY

SERVICES, INC., and MAREK

ALBOSZTA,

        Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

AND RELATED COUNTER-CLAIM.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

Certified Copy

VIDEOTAPED DEPOSITION OF FRANK T. SHUM
November 14, 2003
VOLUME III (Pages 386-625)


Reported By:
MARY F. NELSON, CSR 3553




TOOKER & ANTZ

386

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1   any action one way or the other by their conduct, did

2   they, because you didn't know what they were doing?

3       A.   I didn't know what they were doing.

4       Q.   You did whatever you wanted to do with the

5   Radiance technology during that time period without          11:55:43

6   regard to what Mr. Verdiell was to doing and LightLogic

7   were doing?

8       A.   Repeat the question.

9       Q.   From the time period after the Plan of

10  Liquidation was executed to May 13, 2001, you took          11:55:52

11  whatever action you took with respect to the Radiance,

12  Inc. technology independently, and not because of

13  something that Verdiell or LightLogic was doing, correct?

14      A.   Correct.  I did what I could under the Plan of

15  Liquidation, that was valid to me under law.               11:56:15

16      Q.   But the answer to my question is you were not

17  affected in what you did by either LightLogic or

18  Mr. Verdiell, correct?

19      A.   Correct.

20          MR. TAYLOR:  It's five minutes to 12:00.  I        11:56:24

21  understand you have a telephone call.  Take a break.

22          mr. wallach:  I do, and thank you for that.

23          THE VIDEOGRAPHER:  Going off the record.  The

24  time is 11:56.

25          (Lunch recess, 11:56 p.m. to 1:44 p.m.)

479

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1  this agreement, but you're suggesting maybe some implied

2  part of this agreement, correct?

3      A.   Yes.

4          mr. wallach:  Objection.  Objection, also calls

5  for a legal conclusion.  But you may answer.            14:07:05

6          MR. TAYLOR:  Q.  Do you know, Mr. Shum, whether

7  the word "exploit" has any particular meaning in

8  intellectual property law?

9      A.   I'm not legal expert so I do not know what it

10 means in the legal intellectual property sense.        14:07:26

11     Q.   And did you rely on Coudert Brothers in that

12 regard?

13         mr. wallach:  Attorney-client privilege any

14 reference to what relationship he had with Coudert

15 Brothers is inappropriate.                             14:07:44

16         MR. TAYLOR:  Q.  Did you consult with Coudert

17 Brothers regarding the Plan of Liquidation?

18         mr. wallach:  You can answer that question.

19         THE WITNESS:  I did.

20         MR. TAYLOR:  Q.  And were they your lawyers for  14:07:52

21 purposes of advising you with regard to the Plan of

22 Liquidation?

23         mr. wallach:  You can answer that question.

24         THE WITNESS:  Yes.

25         MR. TAYLOR:  Q.  And did that include all       14:07:58

497

DEPOSITION OF FRANK SHUM - VOL. III   11/14/2003

1          MR. SCHMID:  Q.  Let me ask this:  At the time,

2   at the time you brought this lawsuit how many patents did

3   Intel have that you believe were based on your technology

4   that you developed?

5          A.    How many LightLogic patents?              15:03:13

6          Q.    Yeah.

7          A.    There were I believe like three to four issued

8   at the time, and there was numerous others I wasn't aware

9   of that was being filed or in the process of being filed.

10         Q.    Okay.  Now you also agree with me that     15:03:27

11  Mr. Verdiell if he wanted under the liquidation agreement

12  had every right to go out and put all the technology from

13  Radiance Design on the World Wide Web, correct?

14         A.    Yes.

15         Q.    He could just put it, post it and say, you know,  15:03:43

16  I want to do something right by mankind, I want to give

17  this to mankind, he could have done that, correct?

18         A.    Yes.

19         Q.    And you would have no claim or cause of action

20  against him, correct?                                 15:03:57

21         A.    Yes.

22         Q.    Okay.  So you would have no rights to go after

23  him for anything he did with that?

24              mr. wallach:  Calls for a legal conclusion as to

25  this past answer as well as to this answer.  You can  15:04:06

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

DEPOSITION OF FRANK SHUM - VOL. III  11/14/2003

1  answer the question.

2      MR. SCHMID:  Q.  That's correct, correct?

3   A.  Could you please repeat the question?

4      MR. SCHMID:  Q.  Yeah, that you would have no

5  claim against him if he did that, correct?          15:04:12

6   A.  If that was all he did, yes.

7   Q.  Well, I mean, and so if he put it on the World

8  Wide Web that would destroy any value of the technology

9  to you as far as marketing it, correct?

10  A.  Yes, looking back, yes, it would.          15:04:27

11  Q.  Okay.  And likewise, you could have done the

12  same thing, correct?

13  A.  I could have but I never would have.

14  Q.  Okay.  And why not?

15  A.  Because these of my inventions.  These are my          15:04:38

16  babies.  I'm not going to give them up.

17  Q.  So you wanted to keep these inventions out of

18  the public domain, correct?

19  A.  Yes.

20  Q.  What steps did you take to keep them out of the          15:04:48

21  public domain?

22  A.  I did not disclose it publicly.

23  Q.  Okay.  Did you disclose it to anyone?

24  A.  To --

25  Q.  And we're talking -- excuse me, not to interrupt  15:05:01

528

1    Q.   Okay.  But at some time it did occur to you,

2    correct?

3    A.   I think you putting it out today, yes.

4    Q.   Before that it never occurred to you?

5    A.   Or from a part of this day or maybe Mr. Taylor    15:12:18

6    had said something along that line.

7    Q.   All right.  Now by Mr. Verdiell patenting your

8    so-called inventions --

9         mr. wallach:  Objection to the form of the

10   question.                                             15:12:38

11        MR. SCHMID:  So-called?

12        mr. wallach:  Yes.

13        MR. SCHMID:   Well, we're contesting --

14        mr. wallach:  I know but "so-called" is a

15   derogatory term.                                      15:12:45

16        MR. SCHMID:  I'll used alleged inventions.

17        mr. wallach:  That's fine.

18        MR. SCHMID:  Q.  Your alleged inventions, he in

19   fact protected them from the public domain.  Do you agree

20   with that?                                            15:12:58

21   A.   He protected -- he claimed exclusive rights from

22   the public domain and from me.

23   Q.   Okay.  But as far as the rest of the world is

24   concerned those rights are at least protected from the

25   public domain, correct?                               15:13:11

DEPOSITION OF FRANK SHUM - VOL. III 11/14/2003

1      A.    Yes, they are protected from the public domain

2  and it would indicate that Marc had exclusive rights to

3  all that technology.

4      Q.    Okay.  So in actuality Mr. Verdiell did you a

5  favor, correct?                           15:13:23

6      A.    Absolutely not.

7      Q.    Well, did you, did you prosecute the patents?

8      A.    I did not.

9      Q.    Did you ever take any steps to patent them?

10     A.    Of course not.                      15:13:31

11     Q.    So in other words, right now if you go into the

12 patent office pursuant to these proceedings and the

13 patents are put in your name then you'll be the worldwide

14 owner of these patents; is that correct?

15     A.    Can you say that again?               15:13:44

16     Q.    If your lawsuit is correct and you are true the

17 inventor your name will go on these patents, correct?

18     A.    Yes.

19     Q.    And there you will hold the exclusive rights,

20 correct?                               15:13:55

21     A.    Under the dissolution agreement we would have

22 equal as access to them.  There would have to be some

23 provision provided for that if I was to do that.

24     Q.    Fair enough.  You'd share them with

25 Mr. Verdiell, correct?                15:14:04

1    A.   Yes, the dissolution agreement required that,

2   would require.

3    Q.   Okay.  So you'd share all the rights in any

4   ensuing patent with Mr. Verdiell, correct?

5    A.   I'm sorry, what do you mean by ensuing?        15:14:14

6    Q.   You share all rights in any patents no matter

7   who the inventor is with Mr. Verdiell?

8         mr. wallach:  Your question is in need of

9   restructuring.

10        MR. SCHMID:  Okay, I'll withdraw it.          15:14:29

11   Q.   If you are named as the inventor on these

12   patents you'd still share those rights 50/50 with Mr.

13   Verdiell, correct, the right to exploit those patents?

14   A.   If the dissolution agreement is valid and is

15   interpreted to be valid, yes.                       15:14:45

16   Q.   Okay.

17   A.   That, for example, that he did not, well, we're

18   alleging that he in fact negotiated that agreement in bad

19   faith, that the agreement may not be valid as such.

20   Q.   So I didn't see that cause of action in your    15:15:01

21   complaint, but are you saying you're trying to

22   invalidate the agreement?

23   A.   Again, that's my personal opinion.

24        mr. wallach:  Excuse me, calls for a legal

25   conclusion.  Answer.                                15:15:14

538

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1          THE WITNESS:  That's my personal, that's my

2  personal opinion.  I don't know exactly the language or

3  what the lawsuit is and everything.

4          MR. SCHMID:  Q.  Okay, fair enough.  At any

5  rate, so you guys would share in the -- assuming the    15:15:23

6  agreement is held to be valid you would share in the

7  value of the patents 50/50, correct?

8    A.   We would share the right to use the patent

9  50/50.

10    Q.   Okay.  So Mr. Verdiell would continue to be able  15:15:37

11  to use the patent, correct?  No matter whether you're the

12  inventor or he's the inventor?

13          mr. wallach:  Calls for a legal conclusion.  You

14  can answer if you have an understanding.

15          MR. SCHMID:  Q.  Under your understanding of the  15:15:50

16  agreement?

17    A.   Yes.

18    Q.   So in other words, Mr. Verdiell would still

19  continue to be able to use the patents and likewise Intel

20  would be able to use the patents, correct?    15:15:59

21          mr. wallach:  Calls for a legal conclusion.  If

22  you have an understanding you can answer.

23          THE WITNESS:  Yes, assuming that the dissolution

24  agreement is not invalidated --

25          MR. SCHMID:  Q.  Okay.    15:16:08

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1          A.    --or the company, yes.

2               MR. SCHMID:  Q.  Okay.  You would be entitled to

3    nothing that Mr. Verdiell received from Intel for the

4    patents, correct?

5               mr. wallach:  Objection, calls for a legal          15:16:22

6    conclusion.

7               THE WITNESS:  I'm sorry can you say that again?

8               MR. SCHMID:  Q.  You would be entitled to

9    nothing that Mr. Verdiell had received for the patents,

10   correct?                                                       15:16:24

11              mr. wallach:  Oh, what, I don't get it.  I'm

12   lost now.

13              MR. SCHMID:  Well, he's already said that Mr.

14   Verdiell has a right to use the patents, correct?

15              mr. wallach:  No, that's not what he said.          15:16:30

16              MR. SCHMID:  He didn't say that?

17              mr. wallach:  No, he didn't.

18              MR. SCHMID:  Okay.  Well, let me stand

19   corrected.  Did you not just say that Mr. Verdiell would

20   have the right to use the patents even if you are the          15:16:39

21   named inventor in the patents?

22              THE WITNESS:  Can you repeat the question so

23   I --

24              MR. SCHMID:  Q.  Yes.  Did you not just say that

25   Mr. Verdiell would have the right to use the patents even     15:16:49

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1    if you are the named inventor in the patents?

2        A.    That is correct.

3        Q.    Okay.  And therefore, Mr. Verdiell would be able

4    to sell those patent rights, correct?

5            mr. wallach:  Objection, calls for a legal        15:17:02

6    conclusion.

7        A.    Yes.

8        Q.    Just as you could, correct?

9        A.    Yes.

10       Q.    And therefore, he could sell them to Intel,      15:17:08

11   correct?

12           mr. wallach:  Objection, calls for a legal

13   conclusion.

14           THE WITNESS:  Let me think about that for a

15   second.                                                   15:17:19

16           MR. SCHMID:  Q.  Sure.

17       A.    Yes, but that's not what he did.

18       Q.    Okay.  So let's just take this through it's

19   logical steps.  You get, let's assume hypothetically that

20   you are proven to be the inventor.  Your name goes on all  15:17:42

21   the patents.  Despite that fact Mr. Verdiell as you just

22   said has a right to sell those patents.  He goes back to

23   Intel and says to Intel, I'm giving you the right to use

24   those patents.  You would have no beef with Intel then,

25   correct?                                                  15:18:02

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

DEPOSITION OF FRANK SHUM - VOL. III - 11/14/2003

1    Q.    Well, he made that very clear to you that he

2   refused to sign explicit language, correct?

3    A.    Yes.

4    Q.    There's no doubt in your mind that he did not

5   want to sign explicit language that would deny him the      16:58:18

6   right to file patents, correct?

7    A.    Can ask you the question again?

8    Q.    There's no doubt in your mind that at the time

9   you signed the liquidation plan that Mr. Verdiell was

10  refusing to sign any language that would be explicit in     16:58:31

11  denying him the right to file a patent on that

12  technology?

13   A.    Can you ask the question again?  I'm sorry.

14        MR. SCHMID:  Can we read it back, please.

15        (Record read.)                                         16:58:50

16        THE WITNESS:  Let me read this again.

17        MR. SCHMID:  Sure.

18        THE WITNESS:  Can you give me the question

19  again?

20        (Record read.)                                         16:59:36

21        THE WITNESS:  Yes.

22        MR. SCHMID:  Q.  Okay.  So at the time you

23  signed the liquidation plan you knew that Mr. Verdiell

24  wanted to have the right to go out and file a patent on

25  the technology?                                              16:59:49

DEPOSITION OF FRANK SHUM – VOL. III – 11/14/2003

1        A.    I did not know that.

2        Q.    Well, you knew he was fighting for that right,

3    correct?

4        A.    No, he was fighting for the right not to include

5    language.                                         16:59:58

6        Q.    Well, can you give me any explanation why he

7    would be resistant to express language that would deny

8    him the right to file a patent on the technology unless

9    he wanted to reserve that right to himself?

10       A.    I have no idea why he would do that.        17:00:15

11       Q.    And you didn't think about it at the time?

12       A.    I knew I was the inventor and that the law

13   protected me regardless.

14       Q.    So you went to the calc list and you said even

15   if Mr. Verdiell does file a patent I will go out and   17:00:31

16   challenge that patent.  Is that what you did?

17       A.    Of course not.  I knew he had no rights to do

18   it.

19       Q.    But that's how you thought you were protected by

20   virtue of the fact you thought you were the inventor,   17:00:43

21   correct?

22       A.    I knew I was the inventor and I knew, Marc and I

23   both knew I was the inventor of the technology, Marc knew

24   from -- that you cannot file for patent without the

25   people being on it, without the right inventors being on   17:00:56

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

## CERTIFICATE OF DEPOSITION OFFICER

I, MARY F. NELSON, pursuant to Section 30(e) of the Federal Rules of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me and thereafter transcribed under my direction into typewriting by computer; that the foregoing is a full, complete and true record of said testimony to the best of my ability; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

_____
DEPOSITION OFFICER

I hereby certify that this copy is a true and exact copy of the original.

_Mary F. Nelson_                    _____
DEPOSITION OFFICER                   CERTIFICATION DATE

625

EXHIBIT 4

**ORIGINAL**

1  GARY A. ANGEL, CSB No. 70006
   FREAR STEPHEN SCHMID, CSB No. 96089
2  LAW OFFICES OF GARY A. ANGEL
   177 POST STREET, EIGHTH FLOOR
3  SAN FRANCISCO, CA 94108
   TELEPHONE: (415) 788-5935
4  FACSIMILE: (415) 788-5958

5  Attorneys for Defendants
   LUMEN INTELLECTUAL PROPERTY
6  SERVICES, INC. AND MAREK ALBOSZTA

7

**FILED**

JUN 1 4 2004

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**R E C E I V E D**

8   JUN 1 4 2004

9   RICHARD W. WIEKING
    CLERK, U.S. DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
    OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11  FRANK T. SHUM,                              No. C02-3262 DLJ (EMC)

12          Plaintiff,                          STIPULATION AND ORDER
                                                OF DISMISSAL [PURSUANT
13  v.                                          TO F.R.C.P. RULE 41]

14  INTEL CORPORATION, JEAN-MARC
    VERDIELL, LIGHTLOGIC, INC., LUMEN
15  INTELLECTUAL PROPERTY SERVICES,
    INC., MAREK ALBOSZTA, JOHN C.
16  GORMAN, GORMAN & MILLER, and
    DOES 1 through 100,
17
            Defendants.                      /
18

19

20

21      Pursuant to Rule 41(a)(2), plaintiff FRANK T. SHUM, and defendants LUMEN

22  INTELLECTUAL PROPERTY SERVICES, INC., and MAREK ALBOSZTA hereby

23  stipulate to a dismissal with prejudice of Frank T. Shum's action against Lumen

24  Intellectual Property Services, Inc. and Marek Alboszta; plaintiff Frank T. Shum

25  further agreeing that any action(s) which Lumen Intellectual Property Services, Inc.

26  and Marek Alboszta may have as against Frank T. Shum and/or Luminance, LLC,

27  ///

28  ///

COPIES MAILED TO 15
PARTIES OF RECORD 15

1 | relative to any limitations period, are tolled for a period of two years from the date of

2 | the filing of this dismissal in the above-referenced court.

3 | DATED:  June __10__, 2004           Respectfully submitted,

4 |                                     SHOPOFF  & CAVALLO LLP

5 |

6 |                                     Jeffrey W. Shopoff/Gregory S.
                                        Cavallo, Attorneys for Plaintiff
7 |                                     FRANK T. SHUM

8 | DATED:  June __10__, 2004

9 |                                     LAW OFFICES OF GARY A. ANGEL

10 |

11 |                                    Gary A. Angel, Attorneys for
                                       Defendants LUMEN INTELLECTUAL
12 |                                    PROPERTY SERVICES, INC. AND
                                       MAREK ALBOSZTA

13 |

14 |                                    **ORDER**

15 |        IT IS SO ORDERED that defendants Lumen Intellectual Property Services,

16 | Inc. and Marek Alboszta are hereby dismissed from this action with prejudice,

17 | consistent with the terms of the stipulation set forth above.

18 | DATED:  June __10__, 2004

19 |

20 |                                    D. Lowell Jensen
                                       Judge of the United States District Court

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

Shum,

          Plaintiff,

  v.

Intel Corporation et al,

          Defendant.

Case Number: CV02-03262 DLJ

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 14, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

e. robert (bob)wallach
Law Offices of e. robert ( bob)wallach
P.O. Box 2670
San Francisco, CA 94126-2670

Gary A. Angel
Law Offices Of Gary A. Angel
177 Post Street
Eighth Floor
San Francisco, CA 94108

Gregory S. Cavallo
Shopoff & Cavallo LLP
353 Sacramento Street
Suite 1040
San Francisco, CA 94111

Stephen E. Taylor
Taylor & Co. Law Offices
1050 Marina Village Parkway, Suite 101
Alameda, CA 94501

Jeffrey W. Shopoff
Shopoff & Cavallo LLP
353 Sacramento Street
Suite 1040
San Francisco, CA 94111

Jan J. Klohonatz
Jennifer Lee
Taylor & Co. Law Offices
1050 Marina Village Parkway, Suite 101
Alameda, CA 94501

Frear Stephen Schmid
Law Offices Of Gary A. Angel
177 Post Street
Eighth Floor
San Francisco, CA 94108

Jeffrey W. Shopoff
Shopoff & Cavallo LLP
353 Sacramento Street
Suite 1040
San Francisco, CA 94111

Dated: June 14, 2004

Richard W. Wieking, Clerk

By: Frances Stone, Deputy Clerk

2

EXHIBIT 5

# Radiance Design          MEMO

To:       Marc Verdiell
Subject:  Resolving Current Conflicts
Date:     September 8, 1997

I am writing this letter in hopes we can salvage the partnership of Radiance Design. The conversations with Jenkins last week helped significantly in clearing the air. I have thought about that conversation and some thoughts have crystallized in my head. I would like to outline in hopes you will clearly see why I have such a difficult time with our working relationship over the last few months.

You have indicated I have lost trust in you. This is an accurate statement and has been probably a key source of our difficulties. I want to face this issue head on, so we can make a start to rebuild trust. Otherwise we will keep getting bogged down in peripheral issues and accusations. I want to be quite frank and honest. I am not trying to beat you down but rather make you understand what has lead to our current situation.

You have made statements that have been conflicting and have been a source of loss of credibility. For example once you had stated Lead Tin solder is a hard solder for bonding laser diodes when it was in your favor but when you don't like Remtech, you state that Lead Tin solder is a soft solder and not capable for the ring frames. Another example would be to insist that you encouraged me to complete the financials and pointed me to all the costs and Jenkins' financial worksheet. But later you state that you were unhappy because I didn't consult you when I did the financials. These are but two examples that leads me to believe that when you are under pressure you will make any argument to be right. If you start making it a requirement that our business advisor must have operations experience, I don't want to hear later that you want to pick a person who doesn't.

In some instances you have resorted to attacking me personally or my family rather than arguing on the merits of case. Attacking my sister and calling her friends "greedy" pretentious people has been one of the single most instance I can point to where my esteem of you has really fallen. First my sister has significant business experience and gather CEOs of two companies taking up their valuable time to help us. Many of our business contacts have come through her. Accusing my sister as having some secret plan with Alfred in taking over the company sounds desperate, paranoid and illogical. I think they both have successful businesses to expend their energies on rather than to waste their time with us. Saying you resent my sister is like if I said to you that I resent your wife. Saying my sister has too much influence translates to me that you don't respect me enough to have my own judgment. Just as I respect Falker's advice and his influence on you, I expect the same of you to my sister. You have not made a credible argument against her or her friend's advice. Rather you have attacked their character. My sister made the analogy of an egg hatching meaning that it is important to make sure that we have enough money to get to a stage where we have accomplished something. ie all the work we are doing is like the incubation period and the value of the work is not obvious to an investor until a significant mile stone is achieved or "hatched". Your comment to all this was that my sister just wanted to ridicule you when clearly (to me anyway) what she said is very reasonable. It is not what she said but how you reacted that made me be loose faith The source of our conflict has not been that she had given us bad advice but our inability to agree on the milestones and the money necessary to achieve them.

Another outcome of all this is that I have come to distrust your judgment in people. I understand there is certain personal chemistry between people that can not always be defined and sometimes may be based on a gut instinct, especially when you first meet somebody. However, if you are constantly calling people pretentious who might be slightly aggressive and know more than us, or start criticizing their demeanor, or being critical of known people to me such Rene or my sister. This makes me all the more unwilling to listen to your instincts for people.



DEFENDANT'S
EXHIBIT 37
SHUM
11-12-03

FS 0456

This points me to another issue. I feel you will not tolerate any challenges to your ideas. This may have been justified in your area field expertise or a visionary who paints broad stokes. But I feel it is not appropriate now in our current situation where we are no longer in your area of expertise and where execution and details are key. You have taken any probing for details or specifications as direct challenge to you personally. The reason our relationship worked well for the first two months was because I took a more passive role and accepted you judgments on faith. Typically, you have not been willing to go into specific details to justify your arguments. For example I still don't have a good answer to the gross margin of the current 980nm product. Although in broad terms, you are right in that we have inherently cheaper parts, the exact cost advantage is not clear. If you add up the piece parts of the current 980nm product, the total cost (no diode) is probably below $200. If you then claim that all cost is in the labor, assembly in Mexico would significantly diminish our advantage.   The question is not whether we have a cost advantage, we do, the question is really how long the current technology can last with cuts into their gross margin and with reductions in labor costs. I believe this is an extremely important question and will entirely determine our strategic planning. Broad statements without specifics are not acceptable.

If we are unable to correctly argue our strengths and the competition's weaknesses, we will start making decisions based on the wrong assumptions and will surely fail. For example, you believe that manual machines are incapable of producing large quantities (>10,000 per year).   You have stated that SDL was unwilling to take for orders for 10,000 units because they can not handle this volume on their manual machines. But in reality they are unwilling to take an order for 10,000 fiber DBRs because they don't have the packaging stability. I am sure, without any automation, SDL would eagerly take an order of 10,000 units of 980 nm pumps. The vision of automation is the correct one, but once again the details have been lacking. The question is not whether to use automation but when. The FC 150 without any sophisticated process development is no faster than the current non-optimal manual die bonder at Oxigraf. The only near term advantage it offers is higher accuracy for lensed parts or P-Down bonding. You claim leasing is not a significant cost yet it will require at least $250K per year ($150K lease, $80K person, $20K supplies) and lease guarantees that will not come for free. Marketing is a weak argument since the majority of packaging houses are manual and are able to obtain multi-million orders from their customers. I believe it is more important to convince the customer that the cost and quality targets can be meet whether manual or automated. Just because Lucent and Nortel have automation does not mean we should follow right away. We have never answered at what volume does automation make sense. Remember that Siemens still does the fiber alignment manually and is able to sell low cost components (<$200). The current die bonder at Oxigraf (or an Ultron version) is much more flexible for process development. For example, it is able to quickly bond on to different substrates, supply forming gas, and handle preforms.   The FC150 requires custom programing, $3000 Invar checks, forming gas is not available, and it will have difficulty in handling preforms.   The FC 150 can only be justified in the context of building products that require precision placement or 1st year production of over 50,000 units.

We need to form a comprehensive creditable strategy. We have limited money, time and resources; it is paramount in being able to articulate and prioritize our goals in the next year. Being able to define goals and priorities means being able to accept delays in schedules in less critical path products. Being able to tell customers that we will not build that product for now.

If we are only able to raise the $1mil to $2mil funding, I would limit my goals and the company resources to the following in order of priority:

    A.  9 Months  - A 980 nm Product ready to sell in that has passed mechanical qualification.
    B.  16 Months - Complete 6000 Hours Burnin and fully qualified 980nm product.
    C.  19 Months - Manual machines capability to produce 30,000 units / year.
    D.  WDM development.
    E.  Automation Processes

In my mind, Radiance would already be a tremendous success if it were able to achieve the first three goals alone and moderately successful if we are able to achieve only the first two. The last two goals are important for longer-term growth, but I feel they can be safely deferred to the second year or when the resources become available. Lack of focus and the inability to define realistic goals has been in my

experience the clearest path for failure. Being focused is not the expense of reason or market conditions. For example, if there is no competitive advantage in the 980nm market or there is an easy way to sneak in a WDM product, then we should be ready to refocus very quickly. My analogy is like trying to make several quick cuts with a sharp knife, rather than trying to make many cuts simultaneously with several blunt knifes. Having realistic goals does not mean utopian goals. Too many times I have felt you are trying to build perfection rather than a well-run business. You have given me the impression that you are setting standards that are not related to the business goals of the company. This has given me the impressions I could much faster if I was on my own.

You had previously read a prepared letter to me outlining some areas of your dissatisfactions. If you still feel those feeling are accurate and significant, please supply me a copy of it and I will be happy to address specifically to those areas your concern.

I do believe these problems are mainly related to human communications and mutual respect. They are solvable. However, it will not be easy. I recommend we find a CEO or acting CEO for now to help arbitrate disputes. I recommend asking Bruce McCall. In addition we should seek business relationship counseling as soon as possible.

FS 0458

EXHIBIT 6

US005977567A

# United States Patent [19]

## Verdiell

| [11] | Patent Number: | 5,977,567 |
|---|---|---|
| [45] | Date of Patent: | Nov. 2, 1999 |

[54] **OPTOELECTRONIC ASSEMBLY AND METHOD OF MAKING THE SAME**

[75] Inventor: Jean-Marc Verdiell, Palo Alto, Calif.

[73] Assignee: LightLogic, Inc., Palo Alto, Calif.

[21] Appl. No.: 09/003,114

[22] Filed: Jan. 6, 1998

[51] Int. Cl.⁶ .................................................. H01L 33/00
[52] U.S. Cl. .......................... 257/99; 257/81; 257/82;
257/680; 257/701; 257/432
[58] Field of Search ........................... 257/99, 81, 82,
257/680, 701, 702, 703, 705, 706, 432,
433, 434

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 3,908,184 | 9/1975 | Anazawa | 357/72 |
|---|---|---|---|
| 4,114,177 | 9/1978 | King | 357/19 |
| 4,119,363 | 10/1978 | Camlibel et al. | 350/96.2 |
| 4,233,619 | 11/1980 | Webb et al. | 357/74 |
| 4,357,072 | 11/1982 | Goodfellow et al. | 350/96.2 |
| 4,893,901 | 1/1990 | Thamberger | 350/221 |
| 4,926,545 | 5/1990 | Pimpinella et al. | 29/832 |
| 5,119,448 | 6/1992 | Schaefer et al. | 385/4 |

| 5,123,074 | 6/1992 | Yokota et al. | 385/95 |
|---|---|---|---|
| 5,163,108 | 11/1992 | Armiento et al. | 385/89 |
| 5,610,395 | 3/1997 | Nishiyama | 250/239 |
| 5,641,984 | 6/1997 | Aftergut | 257/433 |

*Primary Examiner*—Tom Thomas
*Attorney, Agent, or Firm*—Lumen Intellectual Property Services

[57] **ABSTRACT**

An optoelectronic assembly having an insulating substrate with a planar surface and a metal layer bonded to the planar surface such that selected regions of the substrate are exposed and a step is produced between the substrate and a top surface of the metal layer. An active optical device is mounted on the metal layer and a passive optical device is aligned with the active device using the step as a fiduciary for positioning the former. The metal layer provides an electrical path to the active device. The thickness of the metal layer is selected such that the heat generated by the active device is dissipated, the substrate does not interfere with the propagation of light along the first optical axis, and such that the in-plane coefficient of thermal expansion (CTE) of the metal layer is constrained by the substrate. The optoelectronic assembly is also suitable for mounting active devices provided with submounts or without.

23 Claims, 7 Drawing Sheets





EXHIBIT
16

PLAINTIFF'S
EXHIBIT 16
VERDIELL
10-16-03



*FIG. 1*



*FIG. 2*



**FIG. 3**



**FIG. 4**

Case4:02-cv-03263-DLJ   Document535-1   Filed04/04/08   Page54 of 77



**FIG. 5**



**FIG. 6**



*FIG. 7*



*FIG. 8A*



*FIG. 8B*



**FIG. 9**



**FIG. 10A**



**FIG. 10B**



**FIG. 11**



**FIG. 12**



**FIG. 13**



*Insulating Substrate*

**FIG. 14**

5,977,567

1

## OPTOELECTRONIC ASSEMBLY AND METHOD OF MAKING THE SAME

### FIELD OF THE INVENTION

This invention relates to an optoelectronic assembly and, more specifically, to a method and assembly for mounting active and passive optical devices and elements.

### BACKGROUND OF THE INVENTION

Optoelectronic components or active optical devices such as diode lasers, light-emitting diodes (LEDs) and photodiode detectors are used for printing, data storage, optical data transmission and reception, as well as pumping of high power lasers and a multitude of other applications. Optoelectronic packages are intended to provide a way for mounting passive and active optical elements and devices, as well as electrical components, in a robust structure which preserves proper alignment. Typically, an optoelectronic package includes an assembly upon which the optoelectronic components are mounted. The requirements of a package depend upon the application. In most cases, a package should provide precision alignment for the internal components, enable high speed electrical operation, provide for heat dissipation, match the coefficient of thermal expansion (CTE) between the mount and the device, and provide for simple external electrical connections and hermetic sealing. In addition, the package should be mechanically robust and be highly reliable. Clearly, satisfying all of these requirements calls for a judicious choice of materials and mounting techniques. In cases where numerous optical parts including other active devices and passive optical elements, e.g. lenses, gratings, fibers, mirrors and the like are intended to cooperate with each other, alignment of these parts with respect to each other is crucial.

These requirements have resulted in packages that are an order of magnitude-larger, costlier, and more difficult to manufacture than purely electronic packages. In fact, the cost of most optoelectronic devices is dominated by the package rather than the optical devices themselves. New optoelectronic technologies will not succeed in the marketplace if the cost of packaging remains as high as it is now.

In a laser-fiber coupler, for example, the relative positions of fibers, lenses, mirrors and lasers must be precisely adjusted and permanently fixed to maintain beam coupling efficiency. Single-mode optical fibers, for examples require optical as alignment tolerances of less than 1 $\mu$m while multi-mode optical fibers require optical alignment tolerances of less than 10 $\mu$m. To achieve precision alignment, the optoelectronic device is operated and monitored while the optical components are moved. The components are typically secured in place once a coarse alignment is achieved and then fine-tuned for optimal performance.

Precision alignment is complicated by the expansion and contraction of package materials during temperature fluctuations brought about primarily by the heat required to attach (solder) the individual active optical devices and variations in ambient temperature. Many prior art techniques use materials with varied coefficients of thermal expansion (CTEs). During thermal cycling the components of an optoelectronic device can drift out of alignment causing poor performance or even complete malfunction. Also, the mechanical stress produced can damage the components.

Existing packaging techniques often require that packages be manufactured individually. For example, individual constituent mechanical components of a package may be assembled into a finished device one at a time in an assembly

2

line process. Batch processing techniques have been developed which can fabricate large numbers of optoelectronic assemblies. These techniques, however, are usually limited in their ability to manufacture a wide variety of optoelectronic devices and result in performance sacrifices. This is chiefly due to a high number of parts and a reliance on 3-D alignment. For example, conventional TO cans and high performance butterfly packages are not planar and thus their production cannot be easily automated.

The cost of present devices is further increased by the fact that optoelectronic assemblies frequently reside on substrates which need to be mounted on other substrates to produce the final package. For example, optoelectronic components mounted on silicon, a frequently-used material, must be remounted when placed in an optoelectronic package. Silicon is problematic for high-speed optoelectronic packages because it is a rather lossy dielectric. Progress in the fields of optics and electronics yields ever faster optoelectronic devices and therefore, this characteristic of silicon is limiting. Also, silicon is a brittle material susceptible to cracking and chipping, a liability in mechanically demanding applications. Further, its thermal conductivity is far lower than that of conventional heatsinks such as copper.

The teachings of U.S. Pat. Nos. 4,357,072, 4,119,363, and 4,233,619 hinge on proper placement and alignment of the optical and electronic components in three dimensions. Under these circumstances, the alignment of a fiber to a laser or the alignment of a lens to a detector is very difficult. Each component must be actively positioned, incurring all the expense associated with active alignment. Due to their design, these packages preclude the use of batch process manufacturing techniques. Also, high speed operation is problematic since these packages use numerous electrical connections and have complex geometries. Because the packages include dissimilar materials, great care is required to ensure that the differences in the CTEs of the materials do not cause misalignment during temperature fluctuations. This situation often leads package designers to compromise between heat dissipation and mechanical stability requirements.

Another disadvantage of these assemblies is the fact that they require a relatively large number of steps to fabricate. Each assembly has numerous subassemblies and, in general, one step is required for fabricating each subassembly. In turn, multiple steps and large numbers of subassemblies increase the cost, complexity and size of the package.

A technique for providing passive alignment between a plurality of diode lasers and optical fibers is described in U.S. Pat. No. 5,163,108. By forming alignment pedestals on the substrate for holding the laser chip and grooves in the substrate for holding optical fibers, simple alignment is accomplished. Unfortunately, this technique is limited because it does not provide an adaptable method for including other optical components such as lenses or mirrors. Further, the technique does not provide for enhanced heat dissipation for active elements generating large amounts of heat.

U.S. Pat. No. 5,123,074 describes a substrate for mounting active and passive optical elements and optical components. The substrate is made of an insulating block with metal regions formed for electrical connections and for mounting components. A reversed structure with a metal block and insulating regions is also described. Electrical circuits are formed on the insulating regions with the metal regions serving as bonding pads for the optical hardware. In the embodiment with an underlying metal block, the metal

5,977,567

| 3 | 4 |

block acts as a ground plane, enhancing the high speed electrical characteristics of the substrate. The surfaces of the metal and insulating regions of the substrate lie in one plane, so that the substrate provides no mechanical alignment. Thus, this invention has the disadvantage of requiring the components to be actively aligned. Also, since the surface of the substrate is a single plane, different components cannot be mounted at different heights to allow for optical alignment.

U.S. Pat. No. 4,926,545 discloses a batch process for manufacturing optoelectronic assemblies. The assemblies can provide passive alignment or simplified active alignment for optoelectronic and optical components. The device includes metalization patterns for aiding alignment. The metalization patterns act as visual alignment aids for the placement of components. A problem with this device is that it uses silicon and therefore has all the disadvantages associated with silicon optoelectronic substrates. In addition, the process only provides for device positioning in which the optical axes are perpendicular to the substrate. This limits the ability of an optoelectronic circuit designer since orienting the optical axes parallel to the substrate allows one to design more complex optoelectronic circuits in a smaller space.

U.S. Pat. No. 5,119,448 discloses a method of making a substrate for mounting optical components by forming relief structures into the surface of the substrate. The relief structures provide mechanical alignment for the components. This method is primarily concerned with mounting fiber arrays and using such fiber arrays as sensors. No provisions are made for incorporating active optoelectronic components such as lasers and using the substrate as an optoelectronic circuit. Further, this method does not yield an optoelectronic package, or assembly for a package, and requires at least two patterning steps.

In the prior art, no single optoelectronic packaging technique offers the simultaneous advantages of high speed electrical operation, adaptability to produce various optoelectronic devices, adaptability to batch processing, effective heat dissipation and resistance to misalignment caused by changes in temperature. Yet a combination of these characteristics is very desirable for further progress in the field of optoelectronic packaging and circuit design.

### OBJECTS AND ADVANTAGES OF THE INVENTION

In view of the above, it is an object of the present invention to provide an optoelectronic assembly which allows one to mount active optical devices, passive optical devices, and electronic components. The optoelectronic assembly may be used in optoelectronic packages and is compatible with any combination of active and passive optical devices and electronic components.

Another object of the invention is to provide a method for making the optoelectronic assembly. The method is particularly well-suited for batch processing fabrication. Additionally, the method is compatible with pick and place manufacturing techniques to achieve simple, precise, and reproducible active alignment of the active and passive devices and elements.

A further object of the invention is to provide an optoelectronic assembly which is compatible with high-speed electrical operation and which exhibits superior heat dissipation capability and mechanical stability over a wide temperature range.

Another object of the invention is to provide CTE matching between the optoelectronic components and the assem-

bly. This increases device life and allows for a wider range of operating temperatures.

These and other objects and advantages will become apparent upon consideration of the ensuing description and the accompanying drawings.

### SUMMARY

These objects and advantages are achieved by an optoelectronic assembly having an insulating substrate with a planar surface and a metal layer bonded to the planar surface such that selected regions of the substrate are exposed and a step is produced between the substrate and a top surface of the metal layer. An active optical device such as a diode laser, optical amplifier, optical modulator, light detector or any other device is mounted on the metal layer. The active device has a first optical axis and in this arrangement this axis is parallel to the substrate. In addition, the metal layer provides an electrical path to the active device. It is essential for the optoelectronic assembly that the metal layer have a well-defined thickness. This thickness is selected such that the heat generated by the active device is dissipated, the substrate does not interfere with the propagation of light along the first optical axis, and such that the in-plane coefficient of thermal expansion (CTE) of the metal layer is constrained by the substrate.

Suitable thicknesses of the metal layer are between 50 $\mu$m and 1,000 $\mu$m. The metal layer is preferably made of a material selected from the group consisting of copper, copper-tungsten, copper alloys, copper composites, copper plated materials, copper clad materials, and copper laminates. The actual material selected will depend upon the purpose of the assembly and design specifications. The insulating substrate is thick enough to lend mechanical stability to the assembly, is a good dielectric for high speed electronics, and bonds well with metal. Alumina, BeO and AlN are good examples.

The optoelectronic assembly of the invention further admits a passive optical element with a second optical axis positioned in one of the selected regions. The positioning of this passive optical element should be such that the second optical axis is aligned with the first optical axis of the active device. Any passive elements such as optical fibers, lenses, filters, diffraction gratings, beam splitters, isolators and mirrors may be placed on the substrate.

In the preferred embodiment, the optoelectronic assembly incorporates square lenses and square isolators. An example of square lenses are graded index of refraction (GRIN) lenses, such as Gradium lenses. The metal layer is patterned as an electrical circuit and electrical components are mounted on the metal layer. This is particularly advantageous for highly integrated packages which include all three types of components, i.e. active and passive optical elements and electrical parts.

A bottom metal layer can be bonded to the insulating substrate opposite the planar surface. This second layer can also be patterned as an electrical circuit. In one embodiment the assembly with such a second layer has no cooling elements mounted on the opposite side of the substrate. These cooling elements may include Peltier coolers. Microchannel coolers using fluid coolants can also be patterned in the second layer of metal.

The method of making the optoelectronic assembly includes the steps of selecting the metal layer and substrate and bonding the metal layer to the substrate. In the patterning step, the metal layer is formed by photolithography, etching, stamping, electrodeposition or electro-discharge

**5**

machining before bonding it to the substrate. Alternatively, photolithography or diamond sawing is used to pattern the metal layer after the bonding step. The desired thickness is achieved by plating the metal layer on a thin metal film on the insulating substrate, or by a polish-back step. The active device may then be mounted on the metal layer.

During placing, the passive optical element is actively displaced in the selected region or is allowed to come to rest at the intended location under the force of gravity. In either case, the passive element moves along the step which serves as a mechanical fiduciary.

The method of the invention is particularly well-suited for batch processing. The assemblies are formed by patterning the metal layer on one large, flat insulating substrate which is then divided into at least two parts. Preferably, many assemblies are simultaneously produced. Bonding of the active devices on the metal layers can be performed before or after the dividing step. Likewise, the placement of passive elements can be performed before or after the dividing step, depending on the production process.

In still another embodiment, the active optical device is mounted on a submount and the step serves as a mechanical fiduciary to align the active optical device on this submount with any second active device or passive elements. The thickness of the submount is selected such that the optical axis of the components are aligned and the heat generated by the first active device is dissipated through the submount. A corresponding method is also a part of the invention.

The details of the invention will be better appreciated upon reading the detailed description below and referring to the drawing figures.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is an isometric view of an optoelectronic assembly according to the invention.

FIG. 2 is an isometric view of active and passive optical elements in the optoelectronic assembly of FIG. 1.

FIG. 3 is an isometric view of feed through lines of one embodiment.

FIG. 4 is a cross sectional view along a first optical axis of the view in FIG. 2.

FIG. 5 is a three dimensional view showing the placement of passive elements according to the invention.

FIG. 6 is a cross-sectional view of an assembly with a substrate made of a metal base layer and a thin dielectric layer on top of the base layer. The patterned metal layer is bonded on top of the dielectric layer.

FIG. 7 illustrates a batch manufacturing method according to the invention.

FIGS. 8A–B are cross sectional views showing the fabrication steps for producing patterned metal layers.

FIG. 9 is a top plan view showing a metal layer patterned as a circuit.

FIG. 10A is a cross sectional view of an embodiment with cooling elements.

FIG. 10B is a cross sectional view of an embodiment with channels for cooling fluid.

FIG. 11 is an isometric view of a portion of an assembly in which the active device is a submount.

FIG. 12 is an isometric view illustrating the positioning of the active device of FIG. 11.

FIG. 13 is an isometric view illustrating the positioning of a free-standing active device in an assembly portion similar to that of FIG. 11.

**6**

FIG. 14 is a side view of an embodiment wherein the active optical element (laser) is edge mounted. This embodiment can be used as a subassembly.

## DETAILED DESCRIPTION

A preferred embodiment of an optoelectronic assembly 10 is illustrated in FIG. 1. Assembly 10 is built on an insulating substrate 12 which provides mechanical stability to entire assembly 10. The particular assembly 10 shown is a laser-fiber coupler as is commonly used to send optical signals. Suitable materials for substrate 12 are ceramics such as alumina, BeO and AIN. The overall stability and size restrictions on assembly 10 will dictate the thickness and material of choice of substrate 12 in specific instances.

A metal layer 14 is bonded on a planar face 11 of substrate 12. Suitable metals include copper, copper-tungsten, various copper alloys, copper composites, copper plated materials, copper clad materials, and copper laminates. Copper composites may be copper-molybdenum laminates or copper materials made from mixed copper powders. Metal layer 14 is preferably made of copper because of this metal's high electrical and thermal conductivity, low cost, and because it is easily direct bonded to alumina. The thickness T of layer 14 (see FIG. 3) ranges from 50 $\mu$m to 1,000 $\mu$m and most preferably is equal to about 250 $\mu$m. The actual thickness is determined according to rules described below.

Metal layer 14 is patterned to accommodate an active optical device 16 in the middle of assembly 10. In this case, optical device 16 is an edge-emitting diode laser with one terminal. In general, however, device 16 can be any optically active device such as an optical amplifier, an optical modulator or a light detector. Further, optical device 16 may have two, three or more input terminals. Passive optical elements 22, 24 are positioned in region 28 where substrate 12 is exposed. In this case, optical element 22 is a square isolator and optical element 24 is a spherical lens or square lens, such as a Gradium lens.

FIG. 2 affords a more detailed look at the positioning of these elements. Laser 16 is mounted on portion 30 such that an active edge 32 of laser 16 is at the height of a top surface 34 of metal layer portion 30. Thus, first optical axis 36 along which light propagates from laser 16 is elevated above planar face 11 by a distance equal to the thickness of the metal layer portion 30 plus the depth of the laser portion in the laser die. In this way, the height of first optical axis 36 is selected by the thickness of metal layer portion 30. In many applications this is convenient because it is relatively easy to determine the precise thickness of metal layer portion 30. Furthermore, optical axis 36 is parallel to planar face 11. The laser cavity need not be at the surface of the die, however.

A metal layer portion 54 bears an integrated circuit 56 for controlling laser 16. Signals are sent to laser 16 via a lead 58. Specifically, lead 58 is connected to the first terminal of laser 16. Another lead 60 is connected to metal layer portion 30. Because portion 30 is made of a conductive metal, it provides an electrical path to laser 16 and in particular to the second terminal of laser 16. Thus, the two electrical connections required to control laser 16 are easily achieved. Since a person of average skill in the art will know how to properly connect the terminals of laser 16, they are not shown in the drawings.

Referring again to FIG. 1, an optical output fiber 72 has an optical axis aligned with optical axis 36. Fiber 72 can be single-mode or multi-mode depending upon the application. It is commonly known that more precise alignment toler-

5,977,567

7

ances (approximately 1 μm) are required for single-mode fibers than for multi-mode fibers (up to 10 μm). Fiber 72 is mounted on metal layer 14 by any suitable means. In the preferred embodiment, fiber 72 is placed in a groove and bonded to the groove. This is a standard technique well-known in the art.

A set of leads 80, 82 and 84 provides electrical connections to integrated circuit 56. To ensure operation at very high speeds, portions 90, 92 and 94 are preferably electrical transmission lines. Such transmission lines are necessary when laser diode 16 requires modulation or control signals in the GHz range. Furthermore, portions 90, 92 and 94 terminate at the right edge of substrate 12 in pads 100, 102 and 104 to which are soldered contact straps or pins 110, 112, and 114, respectively. Similarly, lead 60 is connected via metal layer portion 96, which is preferably also a transmission line, to pad 106 and pin 116. Two additional pins 117 and 118 are provided on pads 107 and 108 of metal layer portions 97 and 98.

In another embodiment, as shown in FIG. 3, feedthrough leads 81, 83 and 85 are used instead of leads 80, 82 and 84. Feedthrough leads 81, 83 and 85 connect integrated circuit 56 to an electrical transmission substrate 87 located beneath integrated circuit 56, eliminating the need for electrical transmission lines 90, 92 and 94; pads 100, 102 and 104; and straps or pins 110, 112 and 114. Likewise, feedthrough lead 61 replaces lead 60 and eliminates the need for electrical transmission line 96, pad 106 and pin 116.

Referring again to FIG. 1, non-resident or external circuitry (not shown) communicates with integrated circuit 56 of assembly 10 via pins 110, 112 and 114. Direct communication with laser 16 is obtained via pin 116. In the present case pins 117 and 118 are not required for operating assembly 10.

It is essential for proper operation of assembly 10 that metal layer 14 and especially metal layer portion 30, have a certain thickness T in the range from 50 to 1,000 μm. In particular, thickness T is set to optimize three different parameters. The cross sectional view of FIG. 4 best explains the rationale in selecting thickness T in a specific case.

First, the heat generated by active device 16 must be dissipated by conducting it through metal layer portion 30 to substrate 12. In general, the effectiveness of metal layer portion 30 in its function as a heat sink will improve with increasing thickness T. A list of thermal conductivity and thermal expansion values for materials used as metal layer 14 (specifically, portion 30), active device 16, and substrate 12 is provided in Table 1.

### TABLE 1

| Material | Coefficient of Thermal Expansion, CTE, x 10^{-6}/°C. | Thermal Conductivity W/m·°C. |
|---|---|---|
| Alumina | 7.0 | 18.0 |
| BeO | 6.4 | 280 |
| Copper | 17.5 | 392 |
| Copper/Tungsten | 7.0 | 248 |
| GaAs | 6.5 | 53 |
| Silicon | 4.2 | 130 |

Second, thickness T of metal layer 14 has to be large enough such that substrate 12 does not interfere with the propagation of light along first optical axis 36. Thus, when a light beam 120 is emitted by laser 16 along first optical axis 36 at a divergence angle α the light should not scatter off substrate 12 before reaching isolator 22. This restriction is

8

purely geometrical and dictates a minimum thickness T dependent upon angle α and the distance from the emitting edge of laser 16 to isolator 22. Preferably, the thickness T of the metal layer 14 (portion 30) is such that the laser 16, isolator 22 and lens 24 share a common optic axis.

Third, thickness T should be sufficiently thin for substrate 12 to constrain the thermal expansion of metal layer portion 30 during changes in temperature. In particular, the in-plane coefficient of thermal expansion (CTE) of portion 30 should be constrained to the CTE of substrate 12. Generally, the metal layer 14 will have a CTE greater than the CTE of the substrate.

The above three conditions are satisfied, for example, when metal layer 14 is made of copper, thickness T of metal layer portion 30 is about 250 μm, the distance to isolator 22 is 300 μm, and substrate 12 is made of alumina. From Table 1 it can be seen that the CTE of alumina is much less than the CTE of copper. Since thickness T of metal layer portion 30 is considerably smaller than the thickness of substrate 12, and the insulating substrate 12 is stiffer than the metal layer 14, metal layer portion 30 will be prevented from expanding in-plane, i.e. parallel to substrate 12, at its natural rate during temperature cycling. In other words, the copper making up metal layer portion 30 will inherit the in-plane CTE of the underlying alumina making up substrate 12. Thus, by selecting a particular material for substrate 12, metal layer 14 (portion 30) can be forced to have a desired in-plane CTE.

The advantage of constraining the in-plane CTE of metal layer 14 is that misalignments between optical components during operation are prevented. In particular, laser 16 will not undergo any relative position changes with respect to lens 22 positioned on substrate 12. Analogously, the alignment of laser 16 with isolator 22, lens 24 and fiber 72 (see FIG. 1) will be preserved. Another advantage is that the GaAs chip is not stressed, improving reliability. The mechanical stability of optoelectronic assembly 10 is also improved.

Most optoelectronic components, such as laser 16, are stress sensitive and are made from compound semiconductors that have CTEs that are close to the CTE of alumina. The CTE for GaAs, for example, is given in Table 1. Since metal layer 14 inherits the in-plane CTE of alumina, optoelectronic components made from compound semiconductors can be safely mounted on layer 14. Thus, in general, the in-plane CTE matching technique allows for the relatively stress free bonding of large area electronic and optoelectronic components to metal layer 14. In fact, referring back to FIG. 2, integrated circuits 56 made from silicon or GaAs are safely mounted on metal layer portion 54 and experience reduced thermal expansion-induced mechanical stress.

Integrated circuit 56 residing on metal layer portion 54 is driven by external circuitry (not shown) which sends appropriate control signals through pins 110, 112, 114, electrical microwave waveguides 90, 92, 94 and leads 80, 82 and 84. An electrical path is also provided via pin 116, transmission line 96, lead 60 and metal layer portion 30 to the second terminal of laser 16. Thanks to this construction electrical control signals in the GHz frequency range can be delivered to control the gain and other working parameters of laser 16.

During operation laser 16, generates heat which is dissipated through metal layer portion 30, as shown in FIG. 4. The light beam 120 propagates along first optical axis 36 at divergence angle α and is focused by isolator 22 and lens 24 into fiber 72. Due to CTE matching between metal layer 14 (specifically metal layer portion 30) and substrate 12, the in-plane thermal expansion of portion 30 is constrained by

5,977,567

<table>
<tr><td>9</td><td>10</td></tr>
</table>

substrate 12. Thus, misalignment is prevented between laser 16, isolator 22 and lens 24 as well as fiber 72.

In sum, optoelectronic assembly 10 is compatible with high-speed electrical operation and exhibits superior heat dissipation capability together with mechanical stability over a wide temperature range. Furthermore, assembly 10 is simple in construction.

The following embodiments serve to better illustrate in a general manner several important aspects of the invention. It will be appreciated by those skilled in the art that these aspects can be applied in any particular optoelectronic assembly.

An arrangement for aligning multiple laser beams 320 with multiple lenses is shown in FIG. 5. A single-piece lens 318 with multiple lens facets 316 is used. The lens 318 can slide on the surface 304 of the insulating substrate until it abuts against the step 310 formed by the patterned metal layer 314. The patterned metal layer 314 has a cut-in section to accommodate the lens 318.

This method of placing, guiding, and aligning passive optical elements is convenient and compatible with pick and place techniques. A pick and place machine operates by manipulating a tip that can grasp the optoelectronic and optical components. The tip moves rapidly to place the components in their proper locations on the optoelectronic assemblies. The pick and place machine slides the components until they abut against the side walls of the metal layer. In this way, at least coarse alignment is provided. Coarse alignment reduces the time and expense of active alignment.

The components can be attached to the assembly with a thin layer of hard solder. Preferably, the components are soldered individually using localized heating techniques. Focused laser beams, for example, may be used to heat small regions of the assembly to solder the components individually. Also, resistive heating elements may be used. Resistive heating elements are thin film resistors that heat up when a current is passed through them. If the heating elements are placed in locations on the assembly where components are to be soldered, then they can be independently controlled to solder individual components. Both laser heating and resistive element heating are well known in the art. Alternatively, the components can be attached with a glass solder or a glue such as epoxy. Such attaching techniques are well known in the art.

According to a preferred method of the invention, optoelectronic assemblies are produced in a batch process. This method is similar in many respects to that used in the manufacture of integrated circuits, where a large wafer containing many complete circuits is fabricated and then cut into individual chips. In batch production according to the invention, an insulating substrate 450, as shown in FIG. 7, is selected from the group of suitable materials listed above. Metal layers 452 are then bonded to substrate 450. The thicknesses of metal layers 452 ranges between 50 and 1,000 μm. Precise thickness values are fixed according to the criteria required for heat dissipation, non-interference with light propagation and in- plane CTE constraint by substrate 450.

In fact, metal layers 452 include at least a first metal layer 452A and a second metal layer 452B. For practical applications, first and second metal layers 452A and 452B are identical, since the batch process is designed to fabricate a large number of identical optoelectronic circuits. Metal layers 452A and 452B will generally consist of numerous metal layer portions to accommodate the desired active optical devices, passive optical elements and electronic components.

Metal layers 452 can be produced and patterned by well-known techniques such as: photolithography, etching, stamping, and electro-discharge machining (EDM). Any of these processing techniques can be used to pattern metal layers 452 prior to bonding to substrate 450. Alternatively, metal layers 452 can be produced and patterned by photolithography or diamond sawing after bonding to substrate 450. The individual pre-cut parts can also be plated and brazed.

To produce individual optoelectronic assemblies 454, insulating substrate 450 is divided. The dividing step is performed with any suitable dicing apparatus. In FIG. 7 a cutting beam 456 delivered from a high power laser (not shown) is used to divide substrate 450 along a line 458. Cut assemblies 454A and 454B correspond to portions of substrate 450 bearing metal layers 452A and 452B.

Of course, metal layers 452 expose selected regions where substrate 450 is free for placing passive optical elements and other locations for mounting active optical devices and electrical components on the metal. According to the invention, metal layers 452A and 452B of assemblies 454A and 454B are fitted with the required active optical devices, passive optical elements and electrical components either before or after the dividing step. For example, active optical devices and electrical components can be mounted on the metal layers before dicing, and passive optical elements can be placed on cut assemblies 454A and 454B. The choice of when the individual devices and elements are mounted is up to the designer and can be optimized to ensure efficient batch processing.

A simple way of preparing a substrate 508 is illustrated in FIGS. 8A and 8B. First, substrate 506 is provided with a top metal layer 530 and a bottom metal layer 540, as shown in FIG. 8A. In a processing step, e.g., etching, top layer 530 is patterned to yield metal layer portions 510A and 512A, and bottom layer 540 is patterned to leave block 520A. This method is advantageous because the patterning of portions 510A and 512A can be carried out independently and simultaneously with the making of block 520A. In another embodiment of the invention intended for high-frequency operation, bottom metal layer 540 can be left intact or merely etched to a desired thickness to provide a ground plane. The actual pattern of the ground plane will be selected based on application.

The substrate used in this invention may not be entirely insulating. FIG. 6 shows a cross sectional side view of an assembly with a substrate composed of a thin layer of dielectric material 710 bonded to an underlying thicker base layer of metal 712. The metal base layer 712 provides the necessary mechanical rigidity. The patterned metal layer 714 is bonded to the dielectric layer. Such substrates are commercially available from The Bergquist Company in Minneapolis, Minn. The metal base layer 712 can be copper, aluminum, invar, or other metals and the dielectric layer 710 is preferably ceramic. In this embodiment, the dielectric layer 710 is substantially thinner than the metal base layer 712. The standard metal base layer thickness for these composites is 1–3 mm. The patterned metal layer 714 is the same thickness as in the other embodiments, 50–1000 μm.

In one advantageous embodiment illustrated in the plan view of FIG. 9, a bottom metal layer 556 is patterned as an electrical circuit 554 on a bottom surface 552 of an insulating substrate 550. Electrical components required for the operation of the corresponding optoelectronic assembly can thus be mounted on bottom surface 552. Clearly, it is also possible to pattern bottom surface 552 for mounting additional optoelectronic devices.

FIG. 10A illustrates how an optoelectronic assembly 600 according to the invention is cooled. Cooling elements 601 are mounted between a bottom metal layer 602 on the underside of a substrate 608 and a metal layer 604 on a separate base 606. For example, cooling elements 601 can be Peltier elements or any other electronic devices capable of dissipating heat from substrate 608. Contacts 610, 612 are provided for applying suitable voltages to elements 601 and result in the cooling of assembly 600 during operation. The details of mounting and driving cooling elements are well-known in the art.

FIG. 10B illustrates how the optoelectronic assembly 600 can also be cooled by liquid coolants flowing through channels 605 etched in the bottom metal layer 602. Of course, a cover 610 for the channels 605 is required in this embodiment. One advantage of optoelectronic assembly 600 is that it has a high hermiticity.

As shown in FIGS. 11 and 12, the present invention is also well-suited for positioning an active optical device 622 on an optoelectronic assembly 618 (only portion shown). In this embodiment, active optical device 622 is delivered on a submount 620. This adaptation is very useful, since most equipment manufacturers ship active devices, e.g., diode lasers, optical amplifiers, optical modulators and light detectors, which are premounted on submounts.

Assembly 618 has a metal layer 624 bonded on a planar surface 626 of an insulating substrate 628. A step 630 is formed between substrate 628 and the top surface of layer 624. A fiber 632 is mounted in a notch 634 machined in metal layer 624. In fact, fiber 632 sits at a slight off-set from the edge of layer 624 for better in-coupling of light from device 622.

During placement of optical device 622 in assembly 618, a second optical axis 636 of fiber 632 is aligned with a first optical axis 638 of device 622. Device 622 is oriented such that axis 638 is parallel to surface 626 of substrate 628. For this purpose step 630 is used as a fiduciary to slide submount 620 into the aligned position illustrated in FIG. 11. The arrows in FIG. 11 show how submount 620 is displaced on surface 626 using step 630. Of course, in this embodiment submount 620 is used as part of the electrical path to device 622. Additional passive elements having their own optical axes—i.e., a third optical axis—can be positioned and aligned on substrate 628 with optical axis 638 of device 622.

FIG. 13 illustrates how an active optical device 642 having a first optical axis 646 and no submount can be positioned on a metalized planar surface 640 of an optoelectronic assembly 650. The metalization of surface 640 provides the necessary electrical path to device 642. Otherwise, assembly 650 is identical to assembly 618 and the positioning steps are analogous to those illustrated in FIGS. 11 and 12.

FIG. 14 illustrates a particularly useful assembly wherein an optoelectronic component such as a laser diode 801 is edge-mounted on the assembly. The edge 810 of the laser 801, edge 816 of the metal layer 806, and edge 820 of the insulating substrate are all flush. This arrangement can function as a sub-assembly and be incorporated into a larger optoelectronic package. Preferably, this embodiment incorporates the advantageous features described above. Specifically, the metal layer 806 provides heat dissipation and has a constrained CTE. Also, the metal layer 806 is patterned to provide electrical contacts 808 for the laser 801. A wire 818 provides an electrical connection for the laser 801. Direct bond copper-on-ceramic is a preferred material for this application. Of course, these assemblies can be manufactured using batch processing techniques.

It will be clear to one skilled in the art that the above embodiments may be altered in many ways to produce an optoelectronic assembly performing any desired function by selecting the appropriate components. This will be done without departing from the scope of the invention. Additional modifications, such as providing multiple metal layers formed by bonding additional metal layers on top of existing metal layers, or patterning the additional metal layers before or after bonding, are also envisioned by the invention. Accordingly, the scope of the invention should be determined not by the examples given but by the following claims and their legal equivalents.

What is claimed is:

1. An optoelectronic assembly comprising:

a) an active optical device having a first optical axis;

b) an insulating substrate with a planar surface;

c) a metal layer bonded to said planar surface such that selected regions of said insulating substrate are exposed and a step is produced between said insulating substrate and a top surface of said metal layer, said active optical device being mounted on said metal layer such that said first optical axis is parallel to said insulating substrate, said metal layer further providing an electrical path to said active optical device and having a predetermined thickness such that:

i) heat generated by said active optical device is dissipated;

ii) said insulating substrate does not interfere with the propagation of light along said first optical axis; and

iii) the in-plane coefficient of thermal expansion (CTE) of said metal layer is constrained by said insulating substrate such that said metal layer inherits the in-plane CTE of said insulating substrate.

2. The optoelectronic assembly of claim 1 wherein said active optical device is selected from the group consisting of diode lasers, optical amplifiers, optical modulators, optical switches, optical fibers, and light detectors.

3. The optoelectronic assembly of claim 1 further comprising a first passive optical element having a second optical axis and being positioned in one of said selected regions such that said second optical axis is aligned with said first optical axis.

4. The optoelectronic assembly of claim 3 wherein said passive optical element is selected from the group consisting of optical fibers, lenses, filters, diffraction gratings, beam splitters, isolators, and mirrors.

5. The optoelectronic assembly of claim 3 wherein said passive optical element is positioned on said insulating substrate.

6. The optoelectronic assembly of claim 5 wherein said passive optical element has a flat bottom.

7. The optoelectronic assembly of claim 3 wherein said metal layer is patterned such that said step is a fiduciary for aligning said passive optical element.

8. The optoelectronic assembly of claim 7 wherein said passive optical element has a flat side wall fitting against said fiduciary.

9. The optoelectronic assembly of claim 1 wherein said metal layer is patterned as an electrical circuit.

10. The optoelectronic assembly of claim 9 further comprising electrical components mounted on said metal layer.

11. The optoelectronic assembly of claim 1 wherein said predetermined thickness ranges between 50 μm and 1,000 μm.

12. The optoelectronic assembly of claim 1 wherein said metal layer is made of a material selected from the group consisting of copper, copper-tungsten, copper alloys, copper

5,977,567

13

composites, copper plated materials, copper clad materials and copper laminates.

13. The optoelectronic assembly of claim 1 wherein said insulating substrate is a ceramic chosen from the group consisting of alumina, BeO and AlN.

14. The optoelectronic assembly of claim 1 further comprising a bottom metal layer bonded to said insulating substrate opposite said planar surface.

15. The optoelectronic assembly of claim 14 wherein said bottom metal layer is patterned as an electrical circuit.

16. The optoelectronic assembly of claim 14 further comprising a cooling means.

17. The optoelectronic assembly of claim 16 wherein said bottom metal layer is patterned and covered with a cover to provide channels for a liquid coolant.

18. An optoelectronic assembly comprising:

a) an active optical device with an edge;

b) an insulating substrate with a planar surface and with an edge;

c) a metal layer with an edge:

wherein said metal layer is bonded to said planar surface such that said metal layer edge is flush with said insulating substrate edge, and said active optical device edge is flush with said metal layer edge, said metal layer further providing an electrical path to said active optical device and having a predetermined thickness such that:

14

1) heat generated by said active optical device is dissipated;

2) said insulating substrate does not interfere with the propagation of light along said first optical axis; and

3) the in-plane coefficient of thermal expansion (CTE) of said metal layer is constrained by said insulating substrate.

19. The optoelectronic assembly of claim 18 wherein said active optical device is selected from the group consisting of diode lasers, optical amplifiers, optical modulators, optical switches, optical fibers, and light detectors.

20. The optoelectronic assembly of claim 18 wherein said predetermined thickness ranges between 50 $\mu$m and 1,000 $\mu$m.

21. The optoelectronic assembly of claim 18 wherein said metal layer is made of a material selected from the group consisting of copper, copper-tungsten, copper alloys, copper composites, copper plated materials, copper clad materials and copper laminates.

22. The optoelectronic assembly of claim 18 wherein said insulating substrate is selected from ceramics from the group consisting of alumina, BeO and AlN.

23. The optoelectronic assembly of claim 18 further comprising a bottom metal layer bonded to said insulating substrate opposite said planar surface.

*  *  *  *  *

EXHIBIT 7

US006376268B1

(12) **United States Patent**
Verdiell

(10) Patent No.: **US 6,376,268 B1**
(45) Date of Patent: *Apr. 23, 2002

(54) **OPTOELECTRONIC ASSEMBLY AND METHOD OF MAKING THE SAME**

(75) Inventor: **Jean-Marc Verdiell**, Palo Alto, CA (US)

(73) Assignee: **Intel Corporation**, Santa Clara, CA (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/334,146

(22) Filed: **Jun. 15, 1999**

**Related U.S. Application Data**

(62) Division of application No. 09/003,114, filed on Jan. 6, 1998, now Pat. No. 5,977,567.

(51) Int. Cl.[7] .................. H01L 21/00; H01L 33/00; H01L 31/0203

(52) U.S. Cl. .................. 438/26; 438/27; 257/99; 257/433

(58) Field of Search .................. 438/26, 27; 257/99, 257/433

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,908,184 A | 9/1975 | Asazawa |
| 4,114,177 A | 9/1978 | King |
| 4,119,363 A | 10/1978 | Camlibel et al. |
| 4,233,619 A | 11/1980 | Webb et al. |
| 4,357,072 A | 11/1982 | Goodfellow et al. |
| 4,893,901 A | 1/1990 | Taumberger |
| 4,926,545 A | 5/1990 | Pimpinella et al. |
| 5,026,134 A | * 6/1991 | Sugawara et al. ....... 350/96.11 |
| 5,119,448 A | 6/1992 | Schaefer et al. |
| 5,123,074 A | 6/1992 | Yakota et al. |
| 5,163,108 A | 11/1992 | Armiento et al. |
| 5,475,775 A | * 12/1995 | Kragl ..................... 385/14 |
| 5,610,395 A | 3/1997 | Nishiyama |
| 5,641,984 A | 6/1997 | Aiberga |
| 5,833,202 A | 11/1998 | Wolfgang |
| 5,915,163 A | * 6/1999 | Noordermeer ............. 438/33 |

* cited by examiner

Primary Examiner—Charles Bowers
Assistant Examiner—Nema Berezny
(74) Attorney, Agent, or Firm—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

An optoelectronic assembly having an insulating substrate with a planar surface and a metal layer bonded to the planar surface such that selected regions of the substrate are exposed and a step is produced between the substrate and top surface of the metal layer. An active optical device is mounted on the metal layer and a passive optical device is aligned with the active device using the step as a fiduciary for positioning the former. The metal layer provides an electrical path to the active device. The thickness of the metal layer is selected such that the heat generated by the active device is dissipated, the substrate does not interfere with the propagation of light along the first optical axis, and such that the in-plane coefficient of thermal expansion (CTE) of the metal layer is constrained by the substrate. The optoelectronic assembly is also suitable for mounting active devices provided with submounts or without.

33 Claims, 7 Drawing Sheets





EXHIBIT

*19*

PLAINTIFF'S EXHIBIT *19*
VERDIELL
*10-16-03*

Case4:02-cv-03262-DLJ   Document535-1   Filed04/04/08   Page68 of 77



**FIG. 1**



**FIG. 2**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002

Case4:02-cv-03262-DLJ   Document535-1   Filed04/04/08   Page69 of 77



**FIG. 3**



**FIG. 4**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002

**U.S. Patent**     Apr. 23, 2002     Sheet 3 of 7     US 6,376,268 B1



**FIG. 5**



**FIG. 6**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002



**FIG. 7**



**FIG. 8A**



**FIG. 8B**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002

U.S. Patent      Apr. 23, 2002      Sheet 5 of 7      US 6,376,268 B1



**FIG. 9**



**FIG. 10A**



**FIG. 10B**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002



**FIG. 11**



**FIG. 12**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002



**FIG. 13**



**FIG. 14**

Copy provided by USPTO from the PIRS Image Database on 10-03-2002



US 6,376,268 B1

1

## OPTOELECTRONIC ASSEMBLY AND METHOD OF MAKING THE SAME

This Appln is a Div of Ser. No. 09/003,114 filed Jan. 6, 1998, U.S. Pat. No. 5,997,567.

### FIELD OF THE INVASION

This invention relates to an optoelectronic assembly and, more specifically, to a method and assembly for mounting active and passive optical devices and elements.

### BACKGROUND OF THE INVENTION

Optoelectronic components or active optical devices such as diode lasers, light-emitting diodes (LEDs) and photodiode detectors are used for printing, data storage, optical data transmission and reception, as well as pumping of high power lasers and a multitude of other applications. Optoelectronic packages are intended to provide a way for mounting passive and active optical elements and devices, as well as electrical components, in a robust structure which preserves proper alignment. Typically, an optoelectronic package includes an assembly upon which the optoelectronic components are mounted. The requirements of a package depend upon the application. In most cases, a package should provide precision alignment for the internal components, enable high speed electrical operation, provide for heat dissipation, match the coefficient of thermal expansion (CTE) between the mount and the device, and provide for simple external electrical connections and hermetic sealing. In addition, the package should be mechanically robust and be highly reliable. Clearly, satisfying all of these requirements calls for a judicious choice of materials and mounting techniques. In cases where numerous optical parts including other active devices and passive optical elements, e.g. lenses, gratings, filters, mirrors and the like are intended to cooperate with each other, alignment of these parts with respect to each other is crucial.

These requirements have resulted in packages that are an order of magnitude larger, costlier, and more difficult to manufacture than purely electronic packages. In fact, the cost of most optoelectronic devices is dominated by the package rather than the optical devices themselves. New optoelectronic technologies will not succeed in the marketplace if the cost of packaging remains as high as it is now.

In a laser-fiber coupler, for example, the relative positions of fibers, lenses, mirrors and lasers must be precisely adjusted and permanently fixed to maintain beam coupling efficiency. Single-mode optical fibers, for example, require optical alignment tolerances of less than 1 µm while multi-mode optical fibers require optical alignment tolerances of less than 10 µm. To achieve precision alignment, the optoelectronic device is operated and monitored while the optical components are moved. The components are typically secured in place once a coarse alignment is achieved and then fine-tuned for optimal performance.

Precision alignment is complicated by the expansion and contraction of package materials during temperature fluctuations brought about primarily by the heat required to attach (solder) the individual active optical devices and variations in ambient temperature. Many prior art techniques use materials with varied coefficients of thermal expansion (CTEs). During thermal cycling the components of an optoelectronic device can drift out of alignment causing poor performance or even complete malfunction. Also, the mechanical stress produced can damage the components.

Existing packaging techniques often require that packages be manufactured individually. For example, individual con-

2

stituent mechanical components of a package may be assembled into a finished device one at a time in an assembly line process. Batch processing techniques have been developed which can fabricate large numbers of optoelectronic assemblies. These techniques, however, are usually limited in their ability to manufacture a wide variety of optoelectronic devices and result in performance sacrifices. This is chiefly due to a high number of parts and a reliance on 3-D alignment. For example, conventional TO cans and high performance butterfly packages are not planar and thus their production cannot be easily automated.

The cost of present devices is further increased by the fact that optoelectronic assemblies frequently reside on substrates which need to be mounted on other substrates to produce the final package. For example, optoelectronic components mounted on silicon, a frequently-used material, must be remounted when placed in an optoelectronic package. Silicon is problematic for high-speed optoelectronic packages because it is a rather lossy dielectric. Progress in the fields of optics and electronics yields ever faster optoelectronic devices and therefore, this characteristic of silicon is limiting. Also, silicon is a brittle material susceptible to cracking and chipping, a liability in mechanically demanding applications. Further, its thermal conductivity is far lower than that of conventional heatsinks such as copper.

The teachings of U.S. Pat. No. 4,357,072, 4,119,363, and 4,233,619 hinge on proper placement and alignment of the optical and electronic components in three dimensions. Under these circumstances, the alignment of a fiber to a laser or the alignment of a lens to a detector is very difficult. Each component must be actively positioned, incurring all the expense associated with active alignment. Due to their design, these packages preclude the use of batch process manufacturing techniques. Also, high speed operation is problematic since these packages use numerous electrical connections and have complex geometries. Because the packages include dissimilar materials, great care is required to ensure that the differences in the CTEs of the materials do not cause misalignment during temperature fluctuations. This situation often leads package designers to compromise between heat dissipation and mechanical stability requirements.

Another disadvantage of these assemblies is the fact that they require a relatively large number of steps to fabricate. Each assembly has numerous subassemblies and, in general, one step is required for fabricating each subassembly. In turn, multiple steps and large numbers of subassemblies increase the cost, complexity and size of the package.

A technique for providing passive alignment between a plurality of diode lasers and optical fibers is described in U.S. Pat. No. 5,163,108. By forming alignment pedestals on the substrate for holding the laser chip and grooves in the substrate for holding optical fibers, simple alignment is accomplished. Unfortunately, this technique is limited because it does not provide an adaptable method for including other optical components such as lenses or mirrors. Further, the technique does not provide for enhanced heat dissipation for active elements generating large amounts of heat.

U.S. Pat. No. 5,123,074 describes a substrate for mounting active and passive optical elements and optical components. The substrate is made of an insulating block with metal regions formed for electrical connections and for mounting components. A reversed structure with a metal block and insulating regions is also described. Electrical circuits are formed on the insulating regions with the metal

Copy provided by USPTO from the PIRS Image Database on 10-03-2002

US 6,376,268 B1

3

regions serving as bonding pads for the optical hardware. In the embodiment with an underlying metal block, the metal block acts as a ground plane, enhancing the high speed electrical characteristics of the substrate. The surfaces of the metal and insulating regions of the substrate lie in one plane, so that the substrate provides no mechanical alignment. Thus, this invention has the disadvantage of requiring the components to be actively aligned. Also, since the surface of the substrate is a single plane, different components cannot be mounted at different heights to allow for optical alignment.

U.S. Pat. No. 4,926,545 discloses a batch process for manufacturing optoelectronic assemblies. The assemblies can provide passive alignment or simplified active alignment for optoelectronic and optical components. The device includes metalization patterns for aiding alignment. The metalization patterns act as visual alignment aids for the placement of components. A problem with this device is that it uses silicon and therefore has all the disadvantages associated with silicon optoelectronic substrates. In addition, the process only provides for device positioning in which the optical axes are perpendicular to the substrate. This limits the ability of an optoelectronic circuit designer since orienting the optical axes parallel to the substrate allows one to design more complex optoelectronic circuits in a smaller space.

U.S. Pat. No. 5,119,448 discloses a method of making a substrate for mounting optical components by forming relief structures into the surface of the substrate. The relief structures provide mechanical alignment for the components. This method is primarily concerned with mounting fiber arrays and using such fiber arrays as sensors. No provisions are made for incorporating active optoelectronic components such as lasers and using the substrate as an optoelectronic assembly. Further, this method does not yield an optoelectronic package, or assembly for a package, and requires at least two patterning steps.

In the prior art, no single optoelectronic packaging technique offers the simultaneous advantages of high speed electrical operation, adaptability to produce various optoelectronic devices, adaptability to batch processing, effective heat dissipation and resistance to misalignment caused by changes in temperature. Yet a combination of these characteristics is very desirable for further progress in the field of optoelectronic packaging and circuit design.

## OBJECTS AND ADVANTAGES OF THE INVENTION

In view of the above, it is an object of the present invention to provide an optoelectronic assembly which allows one to mount active optical devices, passive optical devices, and electronic components. The optoelectronic assembly may be used in optoelectronic packages and is compatible with any combination of active and passive optical devices and electronic components.

Another object of the invention is to provide a method for making the optoelectronic assembly. The method is particularly well-suited for batch processing fabrication. Additionally, the method is compatible with pick and place manufacturing techniques to achieve simple, precise, and reproducible active alignment of the active and passive devices and elements.

A further object of the invention is to provide an optoelectronic assembly which is compatible with high-speed electrical operation and which exhibits superior heat dissipation capability and mechanical stability over a wide temperature range.

4

Another object of the invention is to provide CTE matching between the optoelectronic components and the assembly. This increases device life and allows for a wider range of operating temperatures.

These and other objects and advantages will become apparent upon consideration of the ensuing description and the accompanying drawings.

## SUMMARY

These objects and advantages are achieved by an optoelectronic assembly having an insulating substrate with a planar surface and a metal layer bonded to the planar surface such that selected regions of the substrate are exposed and a step is produced between the substrate and a top surface of the metal layer. An active optical device such as a diode laser, optical amplifier, optical modulator, light detector or any other device is mounted on the metal layer. The active device has a first optical axis and in this arrangement this axis is parallel to the substrate. In addition, the metal layer provides an electrical path to the active device. It is essential for the optoelectronic assembly that the metal layer have a well-defined thickness. This thickness is selected such that the heat generated by the active device is dissipated, the substrate does not interfere with the propagation of light along the first optical axis, and such that the in-plane coefficient of thermal expansion (CTE) of the metal layer is constrained by the substrate.

Suitable thicknesses of the metal layer are between 50 μm and 1,000 μm. The metal layer is preferably made of a material selected from the group consisting of copper, copper-tungsten, copper alloys, copper composites, copper plated materials, copper clad materials, and copper laminates. The actual material selected will depend upon the purpose of the assembly and design specifications. The insulating substrate is thick enough to lend mechanical stability to the assembly, is a good dielectric for high speed electronics, and bonds well with metal. Alumina, BeO and AlN are good examples.

The optoelectronic assembly of the invention further admits a passive optical element with a second optical axis positioned in one of the selected regions. The positioning of this passive optical element should be such that the second optical axis is aligned with the first optical axis of the active device. Any passive elements such as optical fibers, lenses, filters, diffraction gratings, beam splitters, isolators and mirrors may be placed on the substrate.

In the preferred embodiment, the optoelectronic assembly incorporates square lenses and square isolators. An example of square lenses are graded index of refraction (GRIN) lenses, such as Gradium lenses. The metal layer is patterned as an electrical circuit and electrical components are mounted on the metal layer. This is particularly advantageous for highly integrated packages which include all three types of components, i.e. active and passive optical elements and electrical parts.

A bottom metal layer can be bonded to the insulating substrate opposite the planar surface. This second layer can also be patterned as an electrical circuit. In one embodiment the assembly with such a second layer has cooling elements mounted on the opposite side of the substrate. These cooling elements may include Peltier coolers. Micro-channel coolers using fluid coolants can also be patterned in the second layer of metal.

The method of making the optoelectronic assembly includes the steps of selecting the metal layer and substrate and bonding the metal layer to the substrate. In the pattern-

Copy provided by USPTO from the PIRS Image Database on 10-03-2002

5

ing step, the metal layer is formed by photolithography, etching, stamping, electrodeposition or electro-discharge machining before bonding it to the substrate. Alternatively, photolithography or diamond is sawing is used to pattern the metal layer after the bonding step. The desired thickness is achieved by plating the metal layer on a thin metal film on the insulating substrate, or by a polish-back stop. The active device may then be mounted on the metal layer.

During placing, the passive optical element is actively displaced in the selected region or is allowed to come to rest at the intended location under the force of gravity. In either case, the passive element moves along the step which serves as a mechanical fiduciary.

The method of the invention is particularly well-suited for batch processing. The assemblies are formed by patterning the metal layer on one large, flat insulating substrate which is then divided into at least two parts. Preferably, many assemblies are simultaneously produced. Bonding of the active devices on the metal layers can be performed before or after the dividing step. Likewise, the placement of passive elements can be performed before or after the dividing step, depending on the production process.

In still another embodiment, the active optical device is mounted on a submount and the step serves as a mechanical fiduciary to align the active optical device on this submount with any second active device or passive elements. The thickness of the submount is selected such that the optical axes of the components are aligned and the heat generated by the first active device is dissipated through the submount. A corresponding method is also a part of the invention.

The details of the invention will be better appreciated upon reading the detailed description below and referring to the drawing figures.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is an isometric view of an optoelectronic assembly according to the invention.

FIG. 2 is an isometric view of active and passive optical elements in the optoelectronic assembly of FIG. 1.

FIG. 3 is an isometric view of feed through lines of one embodiment.

FIG. 4 is a cross sectional view along a first optical axis of the view in FIG. 2.

FIG. 5 is a three dimensional view showing the placement of passive elements according to the invention.

FIG. 6 is a cross-sectional view of an assembly with a substrate made of a metal base layer and a thin dielectric layer on top of the base layer. The patterned metal layer is bonded on top of the dielectric layer.

FIG. 7 illustrates a batch manufacturing method according to the invention.

FIGS. 8A-B are cross sectional views showing the fabrication steps for producing patterned metal layers.

FIG. 9 is a top plan view showing a metal layer patterned as a circuit.

FIG. 10A is a cross sectional view of an embodiment with cooling elements.

FIG. 10B is a cross sectional view of an embodiment with channels for cooling fluid.

FIG. 11 is an isometric view of a portion of an assembly in which the active device is a submount.

FIG. 12 is an isometric view illustrating the positioning of the active device of FIG. 11.

FIG. 13 is an isometric view illustrating the positioning of a free-standing active device in an assembly portion similar to that of FIG. 11.

6

FIG. 14 is a side view of an embodiment wherein the active optical element (laser) is edge mounted. This embodiment can be used as a subassembly.

## DETAILED DESCRIPTION

A preferred embodiment of an optoelectronic assembly 10 is illustrated in FIG. 1. Assembly 10 is built on an insulating substrate 12 which provides mechanical stability to entire assembly 10. The particular assembly 10 shown is a laser-fiber coupler as is commonly used to send optical signals. Suitable materials for substrate 12 are ceramics such as alumina, BeO and AlN. The overall stability and size restrictions on assembly 10 will dictate the thickness and material of choice of substrate 12 in specific instances.

A metal layer 14 is bonded on a planar face 11 of substrate 12. Suitable metals include copper, copper-tungsten, various copper alloys, copper composites, copper plated materials, copper clad materials, and copper laminates. Copper composites may be copper-molybdenum laminates or copper materials made from mixed copper powders. Metal layer 14 is preferably made of copper because of this metal's high electrical and thermal conductivity, low cost, and because it is easily direct bonded to alumina. The thickness T of layer 14 (see FIG. 3) ranges from 50 $\mu$m to 1,000 $\mu$m and most preferably is equal to about 250 $\mu$m. The actual thickness is determined according to rules described below.

Metal layer 14 is patterned to accommodate an active optical device 16 in the middle of assembly 10. In this case, optical device 16 is an edge-emitting diode laser with one terminal. In general, however, device 16 can be any optically active device such as an optical amplifier, an optical modulator or a light detector. Further, optical device 16 may have two, three or more input terminals. Passive optical elements 22, 24 are positioned in region 28 where substrate 12 is exposed. In this case, optical element 22 is a square isolator and optical element 24 is a spherical lens or square lens, such as a Gradium lens.

FIG. 2 affords a more detailed look at the positioning of these elements. Laser 16 is mounted on portion 30 such that an active edge 32 of laser 16 is at the height of a top surface 34 of metal layer portion 30. Thus, first optical axis 36 along which 30 light propagates from laser 16 is elevated above planar face 11 by a distance equal to the thickness of the metal layer portion 30 plus the depth of the laser portion in the laser die. In this way, the height of first optical axis 36 is selected by the thickness of metal layer portion 30. In many applications this is convenient because it is relatively easy to determine the precise thickness of metal layer portion 30. Furthermore, optical axis 36 is parallel to planar face 11. The laser cavity need not be at the surface of the die, however.

A metal layer portion 54 bears an integrated circuit 56 for controlling the laser. Signals are sent to the laser 16 via a lead 58. Specifically, lead 58 is connected to the first terminal of laser 16. Another lead 60 is connected to metal layer portion 30. Because portion 30 is made of a conductive metal, it provides an electrical path to laser 16 and in particular to the second terminal of laser 16. Thus, the two electrical connections required to control laser 16 are easily achieved. Since a person of average skill in the art will know how to properly connect the terminals of laser 16, they are not shown in the drawings.

Referring again to FIG. 1, an optical output fiber 72 has an optical axes aligned with optical axis 36. Fiber 72 can be single-mode or multi-mode depending upon the application. It is commonly known that more precise alignment toler-

Copy provided by USPTO from the PIRS Image Database on 10-03-2002