$E_{XHIBIT}$ 8

1                    THE COURT:   The body is the long portion of the

2      grooving?

3                    THE WITNESS:   Yes.

4                    THE COURT:   And it has at the top of it up at the

5      left end it's got a portion that goes forward and attaches?

6                    THE WITNESS:   Yes, attaches to this front.

7                    THE COURT:   And the legs are on the side of that?

8                    THE WITNESS:   And then the sides of it, there are

9      two thin regions which are spring regions.

10                    THE COURT:   And that is the lower one that is

11      immediately attached to the groove?

12                    THE WITNESS:   Within here.

13                    THE COURT:   Okay.

14      BY MR. WALLACH:

15          Q    Let's just conclude for a moment going to figure

16      three, tell his honor what that is, please?

17          A    That was another implementation I was thinking

18      about for the magnified motion at the time.  And, again,

19      this is a different implementation for aligning of the

20      optical fibers which does not involve flexure in that the

21      block, the block and wedge combination where you push the

22      wedge because of geometry, if you push it, the motion, for

23      example, if I have a wedge here and I have a fiber here, as

24      I push on it, the fiber will go up.  So see if I can

25      demonstrate that.  If I have a wedge and I have a fiber here

1    if I push on the wedge, the fiber goes --

2              **THE COURT:**  Where are you?  On page three?

3              **MR. WALLACH:**  Yes.

4              **THE WITNESS:**  So you can see that the wedge here.

5              **THE COURT:**  Right.

6              **THE WITNESS:**  And the purpose of the wedge is so

7    when I have optical fibers sitting on the wedge, if I push

8    here, the fiber will go up.  So again it enables alignment

9    up and down.  And the reason why this is, why it is in this

10   combination is that by changing the angle of this wedge I

11   can have, you know, very fine motion.  Because I make this

12   wedge a very low angle.  A big translation of this wedge

13   only goes from a very small motion up and down.  So, again,

14   this enables fine alignment accuracies because of the

15   combination of the magnified motion.

16   BY MR. WALLACH:

17        Q    All right.  Does this -- let's go to figure two.

18   Does figure two disclose any movement of the fiber and

19   flexure?

20        A    Yes.  There is several movements that are

21   disclosed.  One, as you see in the spring regions here in

22   the cavity, if you push on the center of the flexure, the

23   legs will fold up so the entire magnetism of the fiber will

24   go up and down.

25              **THE COURT:**  As you look at it now, at the drawing,

1   the idea is the flexure is put on the devices above.

2            THE WITNESS:  Yeah.

3            THE COURT:  It mounts on top of that.

4            THE WITNESS:  Yes.

5            THE COURT:  All right.  Now, when you got it

6   mounted on top of that, what movement do you make?

7            THE WITNESS:  So when I have this in contact with

8   the floor here, it is not attached it is not fixed onto the

9   floor.  It can fly on the floor to get it into -- in plain

10  alignment with the laser.

11           THE COURT:  All right.

12           THE WITNESS:  And you push on it.

13           THE COURT:  Where do you push?

14           THE WITNESS:  The center here.

15           THE COURT:  On that small piece that goes across?

16           THE WITNESS:  Yeah, you push on the fiber.

17           THE COURT:  All right.

18           THE WITNESS:  What would happen is that these legs

19  will fold up.

20           THE COURT:  Okay.  The legs on the outside?

21           THE WITNESS:  Yes, they would fold like this.  And

22  the contact between the legs will be on the edge of the

23  floor.  They would fold up and the whole thing would go up

24  and down.  And once you have -- the reason for doing that is

25  to get rough vertical alignment.  So what you must do first

1   is get the -- lower this flexure so that it is in rough

2   vertical alignment with the laser diode.  Once that is

3   accomplished, you attach the front leg.

4            THE COURT:  When you push there, the legs go up

5   and it moves the fiber up or down?

6            THE WITNESS:  It moves the whole thing up and

7   down.

8   BY MR. WALLACH:

9        Q    So when the legs go up, what happens to the fiber?

10       A    The fiber goes down.

11       Q    What is that called in electronics?

12       A    The legs come together or spread together.  And

13   the body is below, comes below the legs.

14       Q    Do you know -- in looking at figure two, his Honor

15   made reference to accented deployed movement.  Can you show

16   us that movement?  And actually for the spring maybe it will

17   be more easy.  Your Honor.  May we also approach the screen?

18            THE COURT:  Yeah.

19            THE WITNESS:  So let me describe the process of

20   aligning the flexure because there are several movements

21   that do involve X and Y.  So again you see first is the

22   flexure suspended in -- not attached -- not above the

23   substrate.  You lower it and it comes in contact with the

24   floor.  So this -- no, it comes out vertically and hits the

25   floor.  So you can slide it on the plane of the floor to

1    allow motion in the x and another axis, the Z axis, in plane

2    with the laser.

3    BY MR. WALLACH:

4        Q    I'm sorry.  Which axis?

5        A    In the Z axis, it is not shown. but it is the

6    third axis for translation.

7        Q    The z axis?

8            THE COURT:  The Z axis means moving back and

9    forth?

10           THE WITNESS:  Yes.  Back and forth.  So the -- by

11   contacting on here, it allows you to move it on the plane,

12   on the axis of the plane, which in this diagram would be Z

13   and x.

14   BY MR. WALLACH:

15       Q    You mean to say in the direction of our court

16   reporter.

17       A    In the Z and x.

18       Q    Z and x?

19       A    Z and x.  So that's a first -- that's a first

20   part.  And when you get it aligned to the laser, roughly in

21   the horizontal plane, you push down on the center and the

22   wings fold up and that allows you the third axis, which is

23   the y axis, the up and down axis.  Once you have that

24   accomplish, so it is in rough alignment, you can now use the

25   pivoting motion that is shown in the now neck region.  And

1   the pivoting, so what I disclose so far is movement in the

2   front of the flexure.  Now, once you fix the legs when it's

3   in rough alignment, now you can move the back of the flexure

4   up and down and sideways to accomplish the pivoting motion

5   to get the final alignment.  So to summarize, first what you

6   need to do is to get this flexure into rough alignment with

7   the laser by the legs folding or it moving on in the plane

8   of the floor.  And once you have that, you fix the front

9   legs and then you align the rear.  So first it's just gross

10  translation motion, forwards and backwards, up and down, and

11  sideways.  And then you have a second set of motion on the

12  rear of the flexure lever arm.  So once you fix the front,

13  the motion up and down and sideways causes fine motions in

14  the front.

15      Q    You mentioned the neck.  Is there a neck indicated

16  in your record of invention?

17      A    Yes, there are certain narrow neck regions in the

18  flexure.

19      Q    What is the function of the neck?

20      A    The neck provides a point by which you can cause

21  the pivoting where the pivoting can happen.

22      Q    Can you cause such motion without a neck?

23      A    Yes.

24      Q    Would you in the course of your work at Radiance

25  develop an illustrations of flexures that did not have a

1    You're moving it -- what they call it?  Yawing.  You're

2    moving it in a motion where the front goes from right to

3    left.  Can you do that when you've got those affixed?

4              THE WITNESS:  Yes.  Because you can see it.  You

5    can see if I fix this --

6              THE COURT:  I see.  Okay.

7              THE WITNESS:  So residual flexibility --

8              THE COURT:  All right.

9              THE WITNESS:  -- in the front to accomplish both

10   of these.

11             THE COURT:  Okay.  Okay.

12   BY MR. WALLACH:

13        Q    All right.  I want you to do one last thing for

14   me.  While -- take the Flexure, please.  Lift it.  In what

15   position now are the legs?

16        A    As you can see, when I just lift the Flexure by

17   itself, the legs have a slight tilt downward so the body is

18   slightly elevated from the legs and the bottom of the legs.

19        Q    Does that have a name?

20        A    It's called the elevated body or the body in an

21   elevated position.

22        Q    All right.  Now, put it back, if you will, and

23   depress the Flexure.

24        A    See, as I come down on it, as I come down, the

25   legs will spread apart, and then it will go where the whole

1        Q        But specifically I want to turn to the CAD

2    drawings that relate to the rendering of an elevated Flexure

3    or the process that went into determining the feasibility of

4    an elevated Flexure.

5        A        Yes.   Let me start with a series of CAD drawings

6    drawn on May 12.   Yeah, that's it right there.   On the

7    left-hand side -- may I come down to --

8        Q        Would you, please?

9        A        This is a wide frame drawing, and it is called a

10   wide frame because it just shows the edges of mechanics, so

11   you can see that the edge of the substrate is a little hard

12   to see because it shows all the lines, even the ones that

13   you shouldn't be able to see.

14               So what I'm going to do next is to delete the

15   lines that should be hidden, so it is a little bit easier to

16   make out.   So this is the same drawing.   It's just with the

17   hidden lines removed so that it's easier to see this drawing

18   properly so you can see the substrate.

19               May I have the prototype at the same time so

20   I can illustrate the two things?

21   BY MR. WALLACH:

22       Q        Let's take a moment and identify that.   That is

23   exhibit 717.

24       A        This is exhibit 717.

25       Q        And the Bates number on it is --

1   same plane as the laser.  The leg have to naturally conform

2   to geometry of the laser and the floor.  So again in the

3   first illustration when I show the laser below the height of

4   the frame floor, the legs will be above the body.  When the

5   laser is above the substrate floor, then the legs will pull

6   down to conform with that geometry.

7        Q    Can you tell us as of March 17 with what frequency

8   laser modules would have been located above the flexure.

9   Excuse me.  Before the floor?

10       A    That was quite common for the laser to be above

11  the floor of the package, very common.

12       Q    Would it be fair to say that in order to produce a

13  commercially viable product it would be necessary to be able

14  to produce a flexure that would be responsive to lasers

15  which were located above?

16       A    Yes.

17       Q    Would you take your seat, please.  All right.  Did

18  you ever draw an elevated flexure at Radiance?

19       A    I did.

20       Q    And do you have an illustration of the elevated

21  flexure that was drawn while at Radiance?

22       A    I have a hand drawing that I did on May 15 in the

23  conference.  And I have other hand drawings that are not

24  dated but I can show you the one that is dated next.

25       Q    Would you turn, please, to Exhibit 558?

1      A     That, the previous one.   Right.

2      Q     The previous one.

3      A     No, previous one.   I'm sorry.

4      Q     That's it.

5      A     Yeah.

6      Q     All right.  First of, all what are we looking at?

7      A     These are seminar notes from a seminar I attended

8  given by Unitech.   They are laser weld manufacturer.

9      Q     Do you know the date you attended this?

10     A     I attended this on May 15, 1997.

11     Q     How do we know that?

12     A     There is a flyer that shows the date of that

13  seminar.  May I zoom into the top?

14     Q     Please.

15     A     So you can see the date of that seminar was

16  May 15, 1997 from 8:30 in the morning to 1:30 in the

17  afternoon.

18     Q     There is some handwriting on it.  Who's

19  handwriting?

20     A     That is my handwriting.

21     Q     And what does it say?

22     A     It says Quadalupe south to airport 87.  Park

23  Avenue.  Those are the directions to the seminar.

24     Q     And the word Hilton?

25     A     I think that was next to the Hilton or late in the

1    direction.

2          Q    It says Avenue park Avenue left at loop?

3          A    I'm not sure.  Some direction.

4          Q    Okay.  All right.  Did you attend?

5          A    I did.

6          Q    And what was the subject matter?

7          A    It was shown different laser welding techniques.

8    For assembling, attaching the parts together.

9          Q    Now, did you make an illustration of an elevated

10   flexure?

11         A    I did.

12         Q    And would you go to the next exhibit, please.

13   Tell us what is displayed on this exhibit?

14         A    This is exhibit 558.  It is an inside page of that

15   exhibit 558.  It is on the back of one of the pages.

16         Q    What is it, please?

17         A    Let me zoom into that picture.  May I approach the

18   screen?

19         Q    Please.  Wait just one moment.  Would you give

20   this to your Honor?  (Counsel is handing the court a

21   booklet.)

22              THE COURT:  Okay.

23              MR. WALLACH:  Thank you, your Honor.  All right.

24              THE COURT:  Let's go back to page 51 of that

25   exhibit.

1          **MR. WALLACH:**  You have it in front of you.  Is

2     that what it says?

3          **THE COURT:**  The original has pages and I've got

4     data in page 51 of the original, on the back of it has this

5     drawing.

6          **MR. WALLACH:**  Thank you.

7          **THE COURT:**  Okay.

8          **MR. WALLACH:**  All right.

9     Q     So at the top, tell us what this portrays?

10    A     May I start in the middle?

11    Q     Start wherever you like.

12    A     Um, as you can see, this is a cross section of a

13    flexure similar to the drawing that I showed you previously

14    done on May 12 and May 14.  As you will see, there is a body

15    of the flexure in the center.  There are two legs that

16    contact the floor that I shown previously.  This is the two

17    legs, the body and here is a thinned out screen region.  And

18    this is the cavity similar to the cavity that we talked

19    about.  The cavity.  What I showed here, the dimension for

20    this materials to make this out of.  This is the thickness,

21    .007.  That represents seven thousandths of one inch.  It

22    shows material 17-7.  That is representation for 17-7

23    stainless steel.  It is a material to use to make flexures.

24    Q     It is what kind of a material?

25    A     It is a spring stainless steal used for making

1      springs and flexures.  The same material I used at SDL to

2      make a tunable flexure, tunable laser flexure.  You can see

3      what it says here called the cavity of this material here,

4      SST symbolizing stainless steel.  I also show the cavity

5      width of .2 inches and I show an arrow pushing down on the

6      center indicating there will be pressure on this.

7                      As you can see in the top drawing, it bends

8      up similar to the illustration I showed on the CAD drawing

9      on the day before, on the May 14 CAD drawing.  And see there

10     are spots here indicating one that is pushed down and I have

11     it in alignment, I was going to attach the flexure at the

12     edges.

13                     So again, this is in the position where the

14     flexure, the floor of the flexure is above the laser so I

15     push down.  I can push down to get the alignment, the body

16     and the fiber to the laser.

17                     And the last drawing, this is the body of the

18     version of the flexure where the body is elevated above the

19     floor.  So rather than the legs coming together now the

20     flexure legs are prebent.  You will see again there are

21     spring regions which are sketched in here.  This is the

22     body.  These are the spring regions and these are the legs

23     of the flexure.

24          Q     And there is an arrow?

25          A     And there is an arrow again indicating pressure.

1   you have conversations with Mr. Dumen about the subject of

2   how to fold the flexure?

3       A    I did.

4       Q    Did you have conversations with Mr. Verdiell about

5   the subject of how to fold the flexure after the Les Dumen

6   meeting?

7       A    I showed him, picked out my CAD drawings.  I don't

8   remember us having a conversation.  I showed him what I was

9   doing.

10      Q    All right.  Did he have contributions to make?

11      A    No.

12      Q    Did he have commentaries to make?

13      A    Not that I remember, no.

14      Q    Was it apparent from your drawings that you were

15  talking about an elevated flexure?

16      A    Yes.

17      Q    Do you have a CAD drawing that illustrates an

18  elevated flexure that comes at least after the date of

19  May 26?

20      A    I have a drawing on May 24 showing the first

21  elevated flexure in my CAD drawings.  May I show that,

22  please?

23      Q    Please.  First make it clear to us this is an

24  elevated flexure.  Step down if it helps you.

25           **THE COURT:**  What is this one?

1              MR. WALLACH:  Well, your Honor, it says 717.

2              MR. CAVALLO:  That is right.  That is right.

3              THE COURT:  What is the number on 717.

4              MR. CAVALLO:  FS73.

5              THE COURT:  Seventy-three.  Okay.

6              THE WITNESS:  Again, let me show.  This is the

7    laser diode again with an optical axis.  You can see that

8    form there is a floor here.  That is the below the height of

9    the laser.  And you know that because this is the front of

10   the body of the flexure.  And you can see there are legs

11   here that are bent in a downward direction and are folded

12   upwards that make contact the substrate.  So if I could

13   illustrate that and highlight that shape.  You can see the

14   body of the flexure is elevated above the floor by folding

15   the legs in a position that -- so that the bottom leg

16   contact the floor but raises the body up to the height of

17   the laser.

18   BY MR. WALLACH:

19        Q    The date of this is?

20        A    May 24.

21        Q    Do we know whether this came before or after the

22   Les Dumen meeting?

23        A    I do not know.

24        Q    You indicate you wrote your e-mail thanking

25   Mr. Sun on what date?

1    Q    Who witnessed it?

2    A    I'm sorry.  John -- I signed as writer understood.

3    Q    Who signed it?

4    A    Marc signed it.

5    Q    And you read it and understood it?

6    A    Yes.

7    Q    What is the normal procedure for reading and

8    understanding versus initially signing a document?

9         Let me reask the question.  A person reads as

10   understanding.  Is that the person who did the drawing?

11   A    Not necessarily, no.  No.

12   Q    On 4A, who signed it?

13   A    Marc Verdiell signed it.

14   Q    And who read it as understanding?

15   A    I did.

16   Q    Do you have any explanation for why you signed

17   this as understanding it and Mr. Verdiell signed it as the

18   person who may have authored it?

19   A    Marc signed it and he asked me to sign it so I

20   did.

21   Q    Why don't you take your seat, please.

22        All right.  I want to go to your 1997

23   prototype, please, which is Exhibit 656.  Okay.  And can you

24   also please bring up Exhibit 705?

25   A    Um.  Go to presentation.

1      Q    All right.  Stop right there, please.

2                You're actually aware of the longitude.  705.

3      Stop right there, please.

4                On the left, what is depicted?

5      A    That is the Radiance prototype I designed and

6      built.

7      Q    And his honor has here in the courtroom?

8      A    There is a version of this in the -- .

9      Q    That is Exhibit 656.  What is exhibit 705?

10               **MR. TANGRI:**  It is Exhibit 29.

11               **MR. CAVALLO:**  The patent is 29.

12     BY MR. WALLACH:

13     Q    What is portrayed on the right?

14     A    The right hand side is the LightLogic patent

15     '6585427.

16     Q    When did you first see it?

17     A    I saw it in the course of this litigation.

18     Q    All right.  Does an embodiment or rendering below

19     on that page.  Would you bring it, up please?

20               Can you do a side by side comparison of the

21     features of these two?

22     A    I can.

23     Q    Would you step down, please?

24     A    Let me first go to the left hand side.  Again,

25     there is a laser on this raised platform.  And on the right

1   BY MR. WALLACH:

2       Q    Please.

3       A    The bottom part is the part fabricated at Radiance

4   Design.  And this is the photograph of it.  And the

5   fabrication of this dates to October 1997.  I have those

6   parts but this picture was taken recently to show this

7   flexure.

8               MR. TANGRI:  Your Honor, that is labeled Exhibit

9   '719.  Okay.  There is multi-pages of 719.  It's part of it.

10              THE COURT:  Well, let's get the picture of the

11  part so we're going to take a look at it.

12              MR. TANGRI:  There are a number of pictures in

13  terms of '719 and this looks like one of the pictures.

14              THE COURT:  Let me see.

15              MR. TANGRI:  A part.  That's fine.

16              THE COURT:  Okay.  719 that I have has a series of

17  photographs and it looks like on the second page of those

18  series of photographs we've got this particular photograph,

19  719.  It doesn't have any other identification that I can

20  see.

21              MR. TANGRI:  That's right.

22  BY MR. WALLACH:

23      Q    Okay.

24      A    Let me compare -- again, this is from Radiance.

25      Q    Let's try and solve that incontinuity.  What is it

1    that we're looking at in 719?

2         A    719 is a flexure that I designed and then built,

3    that had fabricated that result in this part which we

4    photographed that part.

5         Q    Say that again please.  What is this?

6         A    This is a Radiance flexure.

7         Q    As of what date?

8         A    As of October 1997.

9         Q    What is above us?

10        A    Above us, that is figure 26 from the LightLogic

11   '427 patent.

12        Q    Can you make a comparison between these two?

13        A    I can.

14        Q    Would you please?

15        A    As you can see, there are four legs in both of

16   these, figure and photograph.  You will see that there is a

17   long body that connects these two pairs of legs.  This long

18   structure here.  You will see that both sets of legs are

19   bent downwards so that the body is elevated above the floor.

20   You will see there is a neck region here, both of these,

21   that accomplishes the -- that result in explicit pivot.

22        Q    Now, if you will allow me to present some what?

23        A    An explicit pivot region.

24        Q    What is an explicit pivot region?

25        A    There a narrow neck area so when you go up and

1

## COURT REPORTER'S CERTIFICATE

3          I, STARR A. WILSON, CSR NO. 2462, United States

4     District Court, Northern District of California, do hereby

5     certify that the foregoing is a correct transcript from the

6     record of proceedings in the above-entitled matter.

7          I certify that the transcript fees and format

8     comply with those prescribed by the Court and Judicial

9     Conference of the United States.

10

11     _____

12          STARR A. WILSON, CSR NO. 2462

13

14

15

16

17

18

19

20

21

22

23

24

25

1    thing is parallel.  If I keep pressing on it, the legs will

2    come together.  So it goes from the legs spreading apart to

3    the legs coming together.

4        Q    Thank you.

5             I want you to walk to your record invention,

6    please, chart.  Can you go back here?

7             All right.  On March the 17th, you and

8    Mr. Verdiell looked at this record invention, and you signed

9    it and he witnessed it?

10       A    Yes.

11       Q    Looking at this record of invention, in what

12   position is the Flexure shown?

13       A    This is showing the planar position.

14       Q    The planar is defined as --

15       A    The Flexure is -- the legs and the body are in the

16   same plane.

17       Q    Can we look at this record of invention with

18   knowledgable eyes in the optical electronic field and

19   determine whether or not movement is intended for the

20   Flexure?

21       A    Yes.

22       Q    Explain to His Honor, please, what the person

23   would see who has the experience and level of competence in

24   this field that both you and Mr. Verdiell have?

25       A    First, you will see that there are -- that the two

1                    UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    DEPARTMENT ONE                D. LOWELL JENSEN, JUDGE

4    FRANK T. SHUM,               ) C 02-03262 DLJ (EMC)

5                  Plaintiff,     )

6    vs.                          )

7    INTEL CORPORATION, JEAN-MARC )

8    VERDIELL AND LIGHTLOGIC, INC.,)

9                  Defendants.    )

10   _____)

11   JEAN-MARC VERDIELL,          )

12         Counter-Claimant,      )

13   vs.                          )

14   FRANK T. SHUM,               )

15         Counter-Defendant.     )

16   _____)

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                  MONDAY, JANUARY 10, 2005

19                        VOLUME I

20   APPEARANCES:

21   FOR THE PLAINTIFF:

22   LAW OFFICES OF E. ROBERT (BOB) WALLACH, P.C.
     E. ROBERT (BOB) WALLACH, ESQUIRE
23   P.O. BOX 2670
     SAN FRANCISCO, CALIFORNIA  94126-2670
24   TEL (415) 989-6445
     FAX (415) 983-3802
25
     MORE APPEARANCES ON NEXT PAGE

3

1                               I N D E X

2    MONDAY, JANUARY 10, 2005; DEPARTMENT ONE, D. LOWELL JENSEN,

3    JUDGE

4    OPENING STATEMENT - WALLACH                        9

5    OPENING STATEMENT - TAYLOR                        10

6    WITNESSES              DIRECT  CROSS REDIRECT RECROSS JUDGE

7    FOR THE PLAINTIFF:

8    FRANK T. SHUM        41(W)

9                           E X H I B I T S

10                            IDENTIFICATION        EVIDENCE

11   FOR THE PLAINTIFF:

12   1 - Time line                     42

13   2 - Diagrams                      43

14   3 -                               52

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | **BENCH TRIAL** |
| | ) | |
| PLAINTIFF, | ) | **VOLUME 2A - A.M. SESSION** |
| | ) | |
| VS. | ) | NO. C 02-3262 DLJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| JEAN-MARC VERDIELL AND | ) | **PAGES 218 - 317** |
| LIGHTLOGIC, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| | ) | TUESDAY, JANUARY 11, 2005 |
| AND RELATED CROSS-ACTION. | ) | |
| | ) | **Certified Copy** |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF AND                 LAW OFFICES OF E. ROBERT (BOB) WALLACH,
COUNTER-DEFENDANT:                    P.C.
                                  P.O. BOX 2670
                                  SAN FRANCISCO, CALIFORNIA  94126-2670
                          BY:     E. ROBERT WALLACH, ATTORNEY AT LAW

                                  SHOPOFF & CAVALLO LLP
                                  353 SACRAMENTO STREET, SUITE 1040
                                  SAN FRANCISCO, CALIFORNIA  94111
                          BY:     GREGORY S CAVALLO, ATTORNEY AT LAW

                                  BELL, BOYD & LLOYD
                                  70 WEST MADISON STREET, SUITE 3300
                                  CHICAGO, ILLINOIS 60602-4207
                          BY:     ALAN L. BARRY, ATTORNEY AT LAW

                                  LAW OFFICES OF HARRIS ZIMMERMAN
                                  1330 BROADWAY, SUITE 710
                                  OAKLAND, CALIFORNIA   94612
                          BY:     HARRIS ZIMMERMAN, ATTORNEY AT LAW

(APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:              RAYNEE H. MERCADO, CSR NO. 8258

# I N D E X

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| SHUM, FRANK T. | | |
| DIRECT EXAMINATION (RESUMED) BY MR. WALLACH | 221 | 2 |
| DIRECT EXAMINATION BY MR. BARRY | 281 | 2 |

--oOo--

1  Q.  FIRST OF ALL, IT'S THE FIRST TIME WE'VE SEEN THAT, SO LET'S

2  LOOK AT IT.  IT'S IDENTIFIED AS EXHIBIT 719.  WHAT IS THAT,

3  PLEASE?

4  A.  EXHIBIT 719 IS A RADIANCE FLEXURE PART THAT WAS FABRICATED

5  AROUND OCTOBER OF 1997 BY DESIGN -- SHOWN -- A DESIGN OF IT IS

6  SHOWN IN MY CAD DRAWING AROUND JUNE OF 1997.

7  Q.  TELL ME AGAIN.  I'M SORRY.  I WAS NOT FOCUSED.  MY

8  APOLOGIES.

9         WHEN WAS THAT DESIGNED?

10  A.  AROUND JUNE OF 1997.

11  Q.  SO ALL THREE OF THESE DEMONSTRATE A NECK?

12  A.  YES.

13  Q.  AND THE NECK TELLS YOU WHAT ABOUT THE CAPACITY OF THE THREE

14  OBJECTS TO PIVOT?

15  A.  AGAIN, IT DEFINES A SPECIFIC LOCATION THAT ENABLES THIS

16  MOTION TO HAPPEN (INDICATING).

17  Q.  ALL RIGHT.  I'D LIKE TO GO TO THE MODEL THAT WE HAVE THAT IS

18  1031, I BELIEVE?

19         MR. TANGRI:  YES.

20  BY MR. WALLACH:

21  Q.  FIRST OF ALL, WHAT IS THIS DESIGNED TO REPRESENT, IS YOUR

22  UNDERSTANDING?

23  A.  IT'S A OPTICAL FIBER.

24  Q.  IS THERE A NECK DEPICTED ON THIS PARTICULAR MODEL?

25  A.  AS YOU CAN SEE IN THIS MODEL, THERE IS NO EXPLICIT NECK

1   1999.

2   BY MR. WALLACH:

3   Q.  ALL RIGHT.  YOU'VE READ THE CLAIM THAT WE PLACED IN CONTEST

4   HERE IN THIS LITIGATION?

5   A.  I HAVE.

6   Q.  YOU'VE READ THIS PATENT?

7   A.  I HAVE.

8   Q.  DOES THIS PATENT REPRESENT THE RADIANCE TECHNOLOGY THAT YOU

9   INVENTED AT RADIANCE DESIGN?

10  A.  IT DOES.

11  Q.  WOULD YOU TAKE YOUR SEAT, PLEASE.

12          AND, YOUR HONOR, IF I COULD HAVE ONE MOMENT, PLEASE.

13              (PAUSE IN THE PROCEEDINGS.)

14          MR. WALLACH:  YOUR HONOR, MAYBE THAT'S THE ANSWER.

15  COULD WE TAKE A BREAK AT THIS POINT?

16          THE COURT:  SURE.

17          MR. WALLACH:  THANK YOU.

18              (RECESS TAKEN AT 10:26 A.M.)

19          (PROCEEDINGS RESUMED AT 10:39 A.M.)

20          MR. WALLACH:  MY APOLOGIES, YOUR HONOR.

21  Q.  ALL RIGHT, MR. SHUM.  DID YOU HAVE OTHER EVIDENCE OF YOUR

22  WORK EFFORT DEVELOPING THE CONCEPT WHICH BECAME EMBODIED IN THE

23  LIGHTLOGIC PATENT?

24  A.  FOR DUAL SEAL, YES.

25  Q.  ALL RIGHT.  AND HOPE THIS IS RIGHT.  COULD YOU TURN TO

1    EXHIBIT 562.

2                    (EXHIBIT PUBLISHED.)

3    BY MR. WALLACH:

4    **Q.**   DO YOU RECOGNIZE THAT DOCUMENT?

5    **A.**   I DO.

6    **Q.**   WHAT IS IT, PLEASE?

7    **A.**   THIS DOCUMENT IS PART OF A DRAFT PROPOSAL.  THE HANDWRITING

8    ON IT IS DURING A CONVERSATION I HAD WITH DAN AT LUMEN

9    INTELLECTUAL PROPERTIES IN AUGUST OF 1996.  IT WAS MY DISCUSSION

10   TO EXPLAIN TO HIM THE TECHNOLOGY FOR THE STEP -- TECHNOLOGY

11   ALONG WITH ENCLOSURES.

12   **Q.**   LET'S STOP FOR A MOMENT.  YOU SAY THIS IS A DRAFT PROPOSAL

13   FOR WHAT?

14   **A.**   FOR NASA.

15   **Q.**   PARDON?

16   **A.**   DRAFT OF THE NASA PROPOSAL.

17   **Q.**   DID IT ULTIMATELY BECOME PART OF THE NASA PROPOSAL?

18   **A.**   THE DRAFTING, YES, BUT NOT THE HAND SKETCHES.

19   **Q.**   ALL RIGHT.  NOW, THE HAND SKETCHES ARE DONE BY WHOM?

20   **A.**   MYSELF AND DAN.

21   **Q.**   CAN I ASK YOU TO STEP DOWN, IF YOU WOULD, PLEASE.

22            DO YOU KNOW WHEN THIS SKETCHING WAS DONE?

23   **A.**   IT WAS IN AUGUST OF 1996.

24   **Q.**   WHAT DID YOU INTEND TO COMMUNICATE BY THE SKETCHES?

25   **A.**   I WAS EXPLAINING TO DAN THE SINGLE AND DUAL ENCLOSURE

SHUM - DIRECT / BARRY

### CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_Raynee H. Mercado_

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

WEDNESDAY, JANUARY 12, 2005

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   DEPARTMENT ONE          D. LOWELL JENSEN, JUDGE

4   FRANK T. SHUM,              ) C 02-03262 DLJ (EMC)

5          PLAINTIFF,           )

6   VS.                         )

7   INTEL CORPORATION, JEAN-MARC )    **Certified Copy**

8   VERDIELL AND LIGHTLOGIC, INC.,)

9          DEFENDANTS.          )

10  _____)

11  JEAN-MARC VERDIELL,         )

12          COUNTER-CLAIMANT,   )

13  VS.                         )

14  FRANK T. SHUM,              )

15          COUNTER-DEFENDANT.  )

16  _____)

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18          **TUESDAY, JANUARY 11, 2005**

19          VOLUME 2-B (AFTERNOON SESSION)

20  APPEARANCES:

21  FOR THE PLAINTIFF:

22  LAW OFFICES OF E. ROBERT (BOB) WALLACH, P.C.
    E. ROBERT (BOB) WALLACH, ESQUIRE
23  P.O. BOX 2670
    SAN FRANCISCO, CALIFORNIA  94126-2670
24  TEL (415) 989-6445
    FAX (415) 983-3802
25
    MORE APPEARANCES ON NEXT PAGE

```
1                         I N D E X

2   TUESDAY, JANUARY 11, 2005; DEPARTMENT ONE, D. LOWELL JENSEN,

3   JUDGE

4

5   WITNESSES              DIRECT  CROSS REDIRECT RECROSS JUDGE

6   FOR THE PLAINTIFF:

7   FRANK T. SHUM         320(B)   (CONTINUED)

8                                   330(T)

9                          E X H I B I T S

10                             IDENTIFICATION      EVIDENCE

11  FOR THE PLAINTIFF:

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1    PROCESS CAN CREATE A STRUCTURE THAT IS COMPATIBLE WITH THE

2    SAME ONE.

3        Q     PRIOR TO YESTERDAY, YOU HAD ALWAYS REFERRED TO

4    THIS AS THE DBC PATENT, RIGHT?

5        A     YES.

6        Q     THE TIME LINE SAYS DBC ON IT?

7        A     YES.

8        Q     DID YOU HELP PREPARE THAT?

9        A     YES.

10       Q     AND CLAIM ONE, MR. SHUM, CALLS FOR A VARIETY OF

11   ELEMENTS YOU SEE THAT ACTIVE OPTICAL DEVICE IS THE FIRST

12   ELEMENT LISTED?

13       A     YES.

14       Q     INSULATING SUBSTRATE WITH A PLANAR SURFACE IS THE

15   SECOND ELEMENT LISTED?

16       A     YES.

17       Q     AND THEN WE GET TO A METAL LAYER.  AND HOW DOES

18   THE METAL LAYER, THAT RELATE TO THE PLANAR SURFACE?

19       A     BONDED.

20       Q     IT IS BONDED, OKAY.  SUCH THAT A STEP IS PRODUCED

21   BETWEEN THE SUBSTRATE AND THE TOP SURFACE OF THE METAL

22   LAYER; RIGHT?

23       A     YES.

24       Q     UM, AND THEN IT GOES ON TO DESCRIBE IN LITTLE ONE,

25   LITTLE TWO AND LITTLE THREE, THREE PARTICULAR PROPERTIES.

1    A    NO.

2    Q    WHAT DIDN'T IT DISCLOSE?

3    A    IT DIDN'T DISCLOSE TWO THINGS:  ONE IS THE

4  INSULATING SUBSTRATE AND ONE IS THE C POT 3, THE COEFFICIENT

5  OF EXPANSION IS CONSTRAINED.

6    Q    NOW, YOU TESTIFIED YESTERDAY, MR. SHUM, THAT THE

7  PURPOSE OF A RECORD OF INVENTION IS TO EXPRESS WHAT THE

8  INVENTION IS; RIGHT?

9    A    YES.

10    Q    WHEN YOU WROTE THAT RECORD OF INVENTION AT SDL,

11  YOU WANTED TO DESCRIBE THE BACKGROUND OF THE AREA?

12    A    I DON'T KNOW IF I DESCRIBED THE BACKGROUND BUT I

13  GENERALLY DESCRIBE WHAT MY INVENTION WAS INTENDED TO DO.

14    Q    WHEN YOU WROTE RECORDS OF INVENTION AT SDL, IT WAS

15  YOUR PRACTICE TO TRY TO DESCRIBE THE BACKGROUND OF THE ART

16  THAT YOU WERE WRITING ABOUT?

17    A    I TYPICALLY DID THAT.  I DON'T REMEMBER IF I DID

18  IT IN THE CASE TYPE DEAL.

19    Q    THAT WAS YOUR PRACTICE AT SDL?

20    A    YES.

21    Q    AND THEN YOU WOULD TRY TO SHOW THE IMPLEMENTATION

22  OF YOUR INVENTION?

23    A    YES.

24    Q    OR WHAT YOU BELIEVED YOUR INVENTION WAS?

25    A    YES.

1      Q    AND WAS IT YOURS?

2      A    YES.

3      Q    SO THE MICRO-PIVOT TECHNOLOGY THAT YOU'RE

4  DESCRIBING HERE IS YOUR TECHNOLOGY?

5      A    PIVOTS IN GENERAL HAVE EXISTED.  IN THIS

6  IMPLEMENTATION I WAS NOT AWARE THAT IT HAD BEEN DONE BEFORE

7  IN THE IMPLEMENTATION.

8      Q    WHEN YOU JUST SAID THIS IMPLEMENTATION, THE

9  IMPLEMENTATION DESCRIBED IN THE PROPOSAL, YOU'RE SAYING, IS

10  YOUR DEVELOPMENT?

11      A    YES.

12      Q    LET'S GO DOWN TO THE NEXT PARAGRAPH.

13      THIS PARAGRAPH, MR. SHUM, TALKS ABOUT LENSES;

14  RIGHT?

15      A    YES.

16      Q    AND TOWARDS THE END IT MENTIONS THE PIVOT

17  TECHNOLOGY.

18      A    YES.

19      Q    DOES IT TALK ABOUT HEAT BEING DISSIPATED FROM A

20  DIODE?

21      A    NO.

22      Q    DOES IT TALK ABOUT PRECISION STEPS OR SPACERS,

23  PRECISION STEPS TO HOLD THE DIODE UP TO A CERTAIN HEIGHT?

24      A    NOT IN THIS PARAGRAPH.

25      Q    DOES IT TALK ABOUT THE BONDING OF ANY SORT OF

1   METAL TO ANY SORT OF SUBSTRATE?

2        A     NO:

3        Q     NEXT PARAGRAPH, PLEASE.

4              SO THAT'S THE END OF THE SUMMARY.  CAN WE GO ON TO

5   THE NEXT PAGE, JEFF PLEASE?

6              TECHNICAL APPROACH.   LET'S HAVE TECHNICAL

7   APPROACH.   AND THE FIRST PARAGRAPH SAYS YOU'RE GOING TO DO A

8   NOVEL OPTOELECTRONIC PACKAGE.   AND THEN THE SECOND PARAGRAPH

9   WE HAVE UP THERE SAYS "THE FIRST KEY TECHNOLOGY IS OUR NOVEL

10  APPROACH TO MANUFACTURING LOW COST HIGH PRECISION

11  CYLINDRICAL ASPERS; DO YOU SEE THAT?

12       A     I DO.

13       Q     THOSE ARE LENSES, RIGHT --

14       A     YEAH.

15       Q     -- THAT YOU'RE TALKING ABOUT THERE?  AND YOU GO ON

16  TO TALK ABOUT THIS DRAWN FIBER TECHNOLOGY, RIGHT?

17       A     YES.

18       Q     AND YOU SAY THAT IT IS WAS DEVELOPED COMMERCIALLY

19  FROM BLUE SKY RESEARCH LAB.

20             **THE COURT REPORTER:**  WHOA.  SLOW DOWN.  SLOW DOWN.

21             **MR. TANGRI:**  I'M SORRY.  SORRY.

22       Q     YOU SAY THAT IT'S COMMERCIALLY AVAILABLE FROM THIS

23  COMPANY, BLUE SKY RESEARCH?

24       A     YES.

25       Q     CAN WE HAVE THE NEXT, JEFF.

1          THIS IS THE NEXT PAGE OF -- STILL ON EXHIBIT ONE

2    OR 133.  SORRY -- ONE OR 133.  THIS DIAGRAM DESCRIBES THIS

3    DRAWN FIBER LENS MANUFACTURING PROCESS?

4          A    YES.

5          Q    OKAY.  AND THEN IT SAYS UP HERE ON THE SECOND

6    PARAGRAPH THAT THE SECOND KEY TO THE PACKAGE IS EASE OF

7    ASSEMBLY AND ALIGNMENT USING PASSIVE REGISTRATION AND THE

8    MICRO-PIVOT TECHNOLOGY, RIGHT?

9          A    YES.

10         Q    AND THEY TALK ABOUT THE MICRO LENSES HAVING A

11   CERTAIN CONSTRUCTION AND THEY TALK ABOUT HAVING THE SAME LIP

12   IDEA THAT YOU HAD AT SDL; RIGHT?

13         A    LET ME TRY TO FINISH READING THIS.

14         Q    SURE.

15         A    CAN YOU REASK THE QUESTION, PLEASE?

16         Q    IT DESCRIBES IN THE MIDDLE OF THE THIRD PARAGRAPH

17   ON THIS PAGE PUTTING A LIP ON THE TOP OF THE LENS AND USING

18   THAT FOR ALIGNMENT BY ABUTTING THAT TO THE DIODE; RIGHT?

19         A    YES.

20         Q    AND THAT'S THE SAME THING WE SAW EARLIER IN

21   EXHIBIT 57?

22         A    YES.

23         Q    YOUR SDL RECORD OF INVENTION?

24         A    YES.

25         Q    AND NOTHING ON THIS PAGE TALKS ABOUT DISSIPATING

1      THE HEAT FROM THE DIODE?

2          A     NO.

3          Q     NOTHING ON THIS PAGE TALKS ABOUT BONDING ANY METAL

4      TO ANY SUBSTRATE?

5          A     NO.

6          Q     ALL RIGHT.   IF WE CAN HAVE THE NEXT PAGE, PLEASE?

7      AND LET'S BLOW UP THE FIGURE.

8                THIS IS THE FIGURE YOU TALKED ABOUT WITH

9      MR. WALLACH YESTERDAY.   IT SHOWS A PRECISION STEP, RIGHT?

10         A     YES.

11         Q     IT DOESN'T SAY WHAT IT'S MADE UP, RIGHT?

12         A     NO.

13         Q     IT DOESN'T SAY WHETHER IT'S METAL OR ANYTHING

14     ELSE?

15         A     IT DOES NOT IN THIS INSTANCE.   AGAIN, MY RECORD

16     OF INVENTION SHOWED ONE POSSIBILITY WAS COPPER TUNGSTEN FOR

17     THAT STEP.

18         Q     ONE POSSIBILITY WAS COPPER TUNGSTEN.   ANYTHING

19     ELSE FROM THE WORLD IS A POSSIBILITY FROM ALL WE CAN SEE IN

20     THIS DIAGRAM, RIGHT?

21         A     AS LONG AS IT IS SUITABLE FOR MOUNTING A LASER

22     DIODE.

23         Q     AND IT SHOWS YOUR LENS IDEA FROM SDL WITH THE LIP

24     ON THE TOP BUTTING UP AGAINST THE LASER DIODE?

25         A     IT SHOWS A LIP.   IT ALSO SHOWS THAT THE STEP

1    MATERIAL IS AT THE CENTER OF THAT LENS SO THAT IT IS IN THE

2    SAME OPTICAL AXIS WHICH SHOWS THAT THE PRECISION STEP HAS TO

3    HAVE A DIMENSION THAT IS COMPATIBLE WITH LENSES.  AND I

4    BELIEVE IN THIS PROPOSAL I ALSO TALK ABOUT THE SIZE OF THESE

5    LENSES ON THE ORDER OF BEING MAYBE HALF A MILLIMETER SO IF

6    YOU READ THAT INTO THIS DRAWING, YOU WILL ALSO SEE A

7    PRECISION STEP COULD BE ON THE ORDER OF A HALF MILLIMETER, A

8    QUARTER OF A MILLIMETER.

9        Q    IT COULD BE ON THE ORDER OF A QUARTER MILLIMETER

10   WITH THOSE LENSES?

11       A    YES. 250 MICRON.

12       Q    OR DIFFERENT HEIGHTS WITH DIFFERENT LENSES?

13       A    YES, BUT AGAIN I GIVE AN EXAMPLE.

14       Q    AND IT COULD BE MADE OUT OF ANYTHING?

15       A    ANYTHING THAT IS SUITABLE FOR MOUNTING THE LASER

16   DIODE.  NOT ANYTHING IN THE WORLD.

17       Q    AND THE THING IT IS ALL RESTING ON, WHICH ISN'T

18   LABELED?

19       A    THE STEP.  THE STEP IS --

20       Q    THE STEP IS RESTING ON.

21       A    THAT IS A PLANAR SURFACE.

22       Q    IT IS A PLANAR SURFACE TO BE SURE BECAUSE IT IS

23   FLAT?

24       A    YES.

25       Q    IT IS NOT LABELED AS ANYTHING?

1  A  THAT IS CORRECT.

2  Q  WE DON'T KNOW WHAT IT'S MADE UP FROM LOOKING AT

3 THIS PICTURE?

4  A  NO.

5  Q  NOW, LET'S HAVE THE PARAGRAPH BELOW THIS.  THIS

6 THEN MOVES ON TO SAY THE FINAL ALIGNMENT OF THE FIBER WILL

7 USE YET ANOTHER INNOVATION AND IT GOES ON TO DESCRIBE THIS

8 MICRO-PIVOT TECHNOLOGY; RIGHT?

9  A  YES.

10  Q  NOTHING IN HERE ABOUT BONDING METAL TO ANYTHING?

11  A  MAY I HAVE A CHANCE TO READ THE PARAGRAPH?

12  Q  SURE.

13  A  MAY I HAVE THE QUESTION AGAIN?

14  Q  THERE IS NOTHING IN HERE ABOUT BONDING METAL TO

15 ANYTHING?

16  A  CORRECT.

17  Q  THERE IS NOTHING IN HERE ABOUT DISSIPATING THE

18 HEAT FROM THE DIODE?

19  A  NOT IN THE WRITING, NO.

20  Q  THERE IS NOTHING IN HERE -- I'M TALKING ABOUT THIS

21 PARAGRAPH NOW.

22  A  YES.

23  Q  THERE IS NOTHING IN HERE ABOUT CONSTRAINING OF THE

24 COEFFICIENT OF THERMAL EXPANSION OF ONE THING OR ANOTHER?

25  A  CORRECT.

1      Q      ALL RIGHT.   WILL YOU GO TO THE NEXT PAGE, PLEASE.

2             AND THE FIGURE DESCRIBES THE MICRO PIVOT?

3      A      YES.

4      Q      OKAY.   AND THEN IF WE GO DOWN TO THE TEXT.

5   NOTHING IN THIS TEXT ABOUT BONDING OF METAL TO ANYTHING,

6   CONSTRAINING THERMAL EXPANSION, OR DISSIPATING THE HEAT FROM

7   A DIODE; RIGHT?

8      A      CAN YOU REPEAT THE QUESTION?

9      Q      THERE IS NOTHING IN THERE ABOUT BONDING METAL TO

10  ANYTHING; CORRECT?

11     A      YES.

12     Q      NOTHING IN THERE ABOUT DISSIPATING THE HEAT FROM

13  THE DIODE?

14     A      YES.

15     Q      NOTHING IN THERE ABOUT CONSTRAINING THE

16  COEFFICIENT OF THERMAL EXPANSION OF ANYTHING?

17     A      YES.

18     Q      LET'S JUST HAVE THE NEXT PAGE.

19            THIS IS THE FIRST PARAGRAPH.   IT SAYS, "IN

20  CONCLUSION, HIGH SPEED HIGH PERFORMANCE FIBER OPTICS, ETC."

21  THAT IS THE END OF THE DESCRIPTION OF THE TECHNOLOGY, RIGHT?

22     A      YES, THE END OF THE SECTION.   I DON'T KNOW IF IT

23  IS THE END OF THE TECHNOLOGY IN THE WHOLE SECTION.   I NEED

24  TO HAVE THE PROPOSAL.

25     Q      JEFF, IF YOU COULD TAKE DOWN THE PROJECTION DOWN,

1    PLEASE.  THE NEXT PART TALKS ABOUT THE BUSINESS PLAN.  DO

2    YOU WANT TO READ IT OR DO YOU BELIEVE THERE'S ANYTHING IN

3    THERE ABOUT DISSIPATING THE HEAT FROM A DIODE IN THE

4    BUSINESS PLAN?

5         A    NO, I DO NOT BELIEVE THERE IS ANYTHING

6    SPECIFICALLY MENTIONED THAT.  AND THE REASON FOR THAT IS

7    AGAIN, WHEN YOU MOUNT LASER SOMETHING, YOU WANT TO DISSIPATE

8    THE HEAT.  AGAIN TO YOUR QUESTION, NO.

9         Q    AND NONE OF THE OTHER PROPERTIES WE'VE BEEN

10   TALKING ABOUT ARE GOING TO BE LISTED IN THE BUSINESS PLAN,

11   ARE THEY?

12        A    METAL OR BONDING, NO.

13        Q    AND THEN LET'S HAVE THE NEXT PAGE.

14             COMPARISON WITH RELATED RESEARCH, DO YOU WANT TO

15   LOOK AT THAT AND SEE IF THERE IS ANY DISCUSSION IN THERE

16   OF --

17        A    WE COULD.  THERE'S MENTION OF PRODUCTS IN THERE

18   THAT DO INVOLVE BONDING OF COPPER TO CERAMIC.  FOR EXAMPLE,

19   THE FIBER COPPER MOPA PRODUCT HAS A PATENT RELATED TO THE

20   BONDING OF COPPER TO CERAMIC SO YOU CAN OVERCOME THE FILM

21   EXPANSION ISSUE SO IT IS NOT SPECIFICALLY STATED IN THERE.

22   BUT IF YOU LOOK AT THOSE PATENTS, YOU WILL SEE THAT.

23        Q    IF YOU LOOK AT WHICH PATENTS?

24        A    I MEAN THE REFERENCE.

25        Q    IS THERE A PATENT --

1      A      THE FIBER MOPA IN THAT PACKAGE THERE IS METAL

2  BONDED TO CERAMIC, NOT FOR STEP SUBSTRATE, BUT FOR OTHER

3  APPLICATION.

4      Q      FOR ANOTHER APPLICATION?

5      A      YES.

6      Q      IN A DIFFERENT PATENT?

7      A      AT A DIFFERENT PACKAGE.

8      Q      IN UNRELATED, A DIFFERENT PACKAGE.  YOU MEAN NOT A

9  PATENT ON THIS STUFF?

10     A      THAT'S CORRECT.

11     Q      RIGHT.  AND THE PATENT ISN'T MENTIONED?

12     A      NO.  AND I'M TRYING TO UNDERSTAND.  YOU LOOK AT

13  THE PARAGRAPH, IT DOES NOT STATE THOSE WORDS THAT YOU OPEN

14  THOSE PACKAGES, IT WOULD HAVE MUCH OF WHAT YOU TALKED ABOUT

15  IN DIFFERENT RESPECTS.

16     Q      NOT IN THE SAME COMBINATION THAT YOU SEE IN CLAIM

17  ONE OF THE DBC PACKAGE?

18     A      NO.

19     Q      ALL RIGHT.  LET'S JUST GO BACK FOR A MOMENT, JEFF,

20  TO PAGE FIVE, I BELIEVE.  AND AGAIN THAT DIAGRAM RELATES TO

21  THIS DRAWN FIBER FABRICATION PROCESS?

22     A      YES.

23     Q      AND THAT WAS, MR. VERDIELL, WHEN HE CAUSED THE

24  PATENT APPLICATION FROM RADIANCE TO BE REFILED BY

25  LIGHTLOGIC, HE TOOK OUT A CLAIM DIRECTED TO THE DRAWN FIBER

1   PROCESS; ISN'T THAT RIGHT?

2       A    I BELIEVE SO.  YES.

3       Q    THAT WAS ONE OF THE CLAIMS THAT HE TOOK OUT?

4       A    I DON'T REMEMBER SPECIFICALLY THE CLAIMS THAT HE

5   TOOK OUT.  I DO REMEMBER HE HAD TAKEN OUT CLAIMS RELATED TO

6   HOW ABOUT FEET SPECIFICATION AND FEATURES RELATED TO THIS.

7       Q    LET'S JUST PUT THIS UP, JEFF.  LOWER CLAIM SEVEN.

8   THIS IS FROM THE RED LINE SHOWING WHAT WAS DELETED.  THIS IS

9   THE DELETION OF CLAIM SEVEN REFRESH YOUR MEMORY, MR. SHUM,

10  THAT HE, IN FACT, DID TAKE OUT A CLAIM DIRECTED TO A DRAWN

11  FIBER PROCESS?

12      A    HE DID.  BUT MAY I ADD SOMETHING HERE?

13      Q    THAT'S OKAY.

14      A    ACTUALLY --

15      Q    YOU CAN ADD THINGS WHEN MR. WALLACH COMES BACK.

16          MR. WALLACH:  EXCUSE ME.

17          THE COURT:  SEE, THE WAY IT WORKS IS IF YOU'VE

18  GIVEN AN ANSWER AND YOU HAVE AN EXPLANATION OF THAT ANSWER,

19  YOU CAN ADD THAT.  BUT IF IT IS ADDING SOMETHING OF ANOTHER

20  SUBJECT MATTER, THAT IS ANOTHER QUESTION, SO YOU CAN'T BE

21  ADDING TO THAT.

22          MR. TANGRI:  AND IF WE CAN GO TO THE NEXT PAGE OF

23  EXHIBIT ONE, JEFF?

24          MR. WALLACH:  MAY I AT LEAST INQUIRE AS TO THE

25  WITNESS?

1          **THE COURT:**  I TOOK IT THAT IF WHAT YOU WERE GOING

2    TO ADD WAS SOMETHING THAT WAS GOING TO EXPLAIN THE ANSWER

3    THAT YOU'VE ALREADY GIVEN, YOU CAN DO THAT.  IF YOU'RE GOING

4    TO ADD SOMETHING THAT IS NOT AN EXPLANATION OF YOUR PREVIOUS

5    ANSWER, THEN THAT WILL HAVE TO COME OUT FROM ANOTHER

6    QUESTION.

7          **MR. WALLACH:**  DO YOU WISH TO GO FURTHER ON YOUR

8    DIALOGUE?

9          **THE WITNESS:**  MAY I ADD A CLARIFICATION TO THE

10   LAST ANSWER?

11         **MR. WALLACH:**  YOU MAY.

12         **THE WITNESS:**  THE JOINT FIBER PROCESS THAT YOU SAW

13   IN THAT PICTURE.  MAY I HAVE THAT PICTURE BACK UP AGAIN,

14   SHOWS A DRAWN FIBER LENS, NOT ONLY THE PROCESS OF DRAWING

15   THE FIBER BUT IS ALSO SHOWING DRAWING A SPECIFIC TYPE OF

16   LENS.  IF YOU LOOK AT THAT LENS, IT DOES HAVE THE FIDUCIARY

17   FEATURE.  AND IT ALSO HAS A LENS WITH A FLAT BOTTOM.  SO IT

18   SHOWS A DRAWING OF A LENS WITH A FLAT BOTTOM.  IF WE LOOK TO

19   THE CLAIMS OF THE PATENT APPLICATION AS WE FILED BY MARC

20   VERDIELL, ONE OF THE CLAIMS SPECIFICALLY STATES THAT THE

21   MICRO LENS SHOULD HAVE A FLAT BOTTOM.  HE DID NOT REDACT

22   COMPLETELY WHAT IS SHOWN IN THAT FIGURE.

23   BY MR. TANGRI:

24        Q    RIGHT.  HE DID NOT REDACT FLAT BOTTOM LENSES;

25   RIGHT?

1          A       THAT IS CORRECT.

2          Q       AND FLAT BOTTOM LENSES WERE KNOWN BEFORE THIS

3     PROPOSAL, RIGHT?

4          A       IT WAS KNOWN, YES.  BUT ALSO THIS PROCESS WAS

5     KNOWN BEFORE THIS PROPOSAL.

6          Q       AND FLAT BOTTOM LENSES WERE COMMERCIALLY

7     AVAILABLE?

8          A       YES.  ALONG WITH THIS WHOLE PROCESS OF DRAWING WAS

9     COMMERCIALLY AVAILABLE.

10         Q       AND MR. VERDIELL TOOK OUT FROM THE PATENT CLAIMS

11    AS WELL A CLAIM DIRECTED TO THAT LITTLE LIP ON THE TOP OF

12    THE LENS THAT BUTTS UP AGAINST THE DIODE FOR ALIGNMENT

13    PURPOSES; RIGHT?

14         A       YES.  THAT LIP WAS ALSO COMMERCIALLY AVAILABLE.

15         Q       BUT YOU BELIEVED AT LEAST IN 1994 THAT YOU HAD

16    INVENTED THAT LIP, RIGHT?

17         A       I HAD INVENTED IT BUT IT BECAME PUBLIC DOMAIN SO

18    IT WAS COMMERCIALLY VALUABLE TECHNOLOGY.

19         Q       I UNDERSTAND.  BUT YOU BELIEVED IN 1994 YOU

20    INVENTED IT?

21         A       YES.

22         Q       AND YOU STILL THOUGHT OF IT IN 1996 AS SOMETHING

23    THAT YOU HAD DEVELOPED BECAUSE YOU HAD DEVELOPED IT?

24         A       YES.

25         Q       AND YOU HAD COMMUNICATED THAT TO MR. VERDIELL?

1    A    YES.

2    Q    AND HE TOOK OUT OF THE PATENT CLAIMS SPECIFICALLY

3    DIRECTED TO THE LIP?

4    A    YES.

5    Q    JEFF, LET'S HAVE 50-0, IF YOU MAY.   AND ACTUALLY

6    CAN WE GET THE BOARD?

7         MR. SHUM, THIS IS 50-0, WHICH IS THE -- A LETTER

8    SENT TO YOU BY -- THE FIRST PAGE OF THIS IS A LETTER SENT TO

9    YOU BY THE DEPARTMENT OF THE ARMY OR SENT TO MR. PELHAM BY

10   THE DEPARTMENT OF THE ARMY.   THIS IS THE LETTER REJECTING

11   THE ARMY PROPOSAL, RIGHT?

12   A    YES.

13   Q    I BELIEVE THIS MORNING YOU SAID THAT CAME AROUND

14   SEPTEMBER.   DOES THIS REFRESH YOUR RECOLLECTION THAT IT WAS

15   NOVEMBER?

16   A    NOVEMBER.

17   Q    ALL RIGHT.   LET'S GO TO THE NEXT PAGE, JEFF.

18        MR. WALLACH:   YOU CAN TAKE THAT DOWN.

19   BY MR. TANGRI:

20   Q    AND THIS, I BELIEVE YOU TESTIFIED AGAIN THIS

21   MORNING WITH MR. BARRY OR THIS AFTERNOON WITH MR. BARRY IS

22   THE FIRST PAGE OF THE ARMY PROPOSAL?

23   A    YES.

24   Q    AND THAT WAS SIGNED AND PRESUMABLY SUBMITTED ON

25   JULY 2, 1996; RIGHT?

1          COURT REPORTER'S CERTIFICATE

2          I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

3  DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

4  CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

5  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6          I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

7  COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

8  CONFERENCE OF THE UNITED STATES.

9

10

11          STARR A. WILSON, CSR NO. 2462

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | **BENCH TRIAL** |
| | ) | |
| PLAINTIFF, | ) | **VOLUME 3A – A.M. SESSION** |
| | ) | |
| VS. | ) | NO. C 02-3262 DLJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| JEAN-MARC VERDIELL AND | ) | **PAGES 438 – 557** |
| LIGHTLOGIC, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| | ) | WEDNESDAY, JANUARY 12, 2005 |
| AND RELATED CROSS-ACTION. | ) | Certified Copy |
| | ) | |

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF AND        LAW OFFICES OF E. ROBERT (BOB) WALLACH,
COUNTER-DEFENDANT:           P.C.
                         P.O. BOX 2670
                         SAN FRANCISCO, CALIFORNIA  94126-2670
                  BY:    E. ROBERT WALLACH, ATTORNEY AT LAW

                         SHOPOFF & CAVALLO LLP
                         353 SACRAMENTO STREET, SUITE 1040
                         SAN FRANCISCO, CALIFORNIA  94111
                  BY:    GREGORY S CAVALLO, ATTORNEY AT LAW

                         BELL, BOYD & LLOYD
                         70 WEST MADISON STREET, SUITE 3300
                         CHICAGO, ILLINOIS 60602-4207
                  BY:    ALAN L. BARRY, ATTORNEY AT LAW

                         LAW OFFICES OF HARRIS ZIMMERMAN
                         1330 BROADWAY, SUITE 710
                         OAKLAND, CALIFORNIA   94612
                  BY:    HARRIS ZIMMERMAN, ATTORNEY AT LAW

(APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

# I N D E X

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| SHUM, FRANK T. | | |
| CROSS-EXAMINATION (RESUMED) BY MR. TANGRI | 441 | 3 |
| REDIRECT EXAMINATION BY MR. WALLACH | 499 | 3 |
| RECROSS-EXAMINATION BY MR. TANGRI | 508 | 3 |
| | | |
| KNOX, WAYNE HARVEY | | |
| DIRECT EXAMINATION BY MR. BARRY | 511 | 3 |

--oOo--

SHUM - CROSS (RESUMED) / TANGRI

1   Q.   YOU JUST SAID AS IT SAYS UP THERE USING A PLANAR FLEXURE.

2   "PLANAR" MEANS FLAT, RIGHT?

3   A.   YES.

4   Q.   SO IT'S A FLAT FLEXURE THAT IMPLEMENTS THE PRIOR ART PIVOT

5   CONCEPT?

6   A.   YES.

7   Q.   AND THE USE -- AS WE JUST TALKED ABOUT, THE USE OF THE PIVOT

8   ITSELF WAS ALREADY WELL KNOWN.

9   A.   YES.

10  Q.   AND WHAT IS NOVEL ABOUT THIS IS THAT IT IS A PLANAR FLEXURE

11  IMPLEMENTATION OF THAT PRIOR WELL-KNOWN CONCEPT.

12  A.   YES.

13  Q.   NOW, WHERE IN THE TEXT OF THIS RECORD OF INVENTION DO YOU

14  TALK ABOUT LEGS?

15  A.   I DON'T -- THERE IS NO EXPLICIT WORD ABOUT LEGS --

16  Q.   OKAY.

17  A.   -- IN THIS, BUT THERE'S ALSO -- THERE'S -- MANY THINGS ARE

18  IMPLICIT TO THE APPLICATION.

19  Q.   WHERE IN THE TEXT OF THIS RECORD OF INVENTION DO YOU TALK

20  ABOUT SPRING REGIONS?

21  A.   EXPLICIT DOESN'T SAY SPRING REGIONS, BUT IT SHOWS THIS IN

22  THE DIAGRAM.  AND BY THE USE OF THE WORD "FLEXURE" IMPLIES

23  THERE'S SPRING -- SOME SPRING GOING ON.

24  Q.   WHERE IN THE TEXT OF THIS RECORD OF INVENTION DO YOU TALK

25  ABOUT A BODY ON THE FLEXURE?

1  A.  THE LEVER ARM IS THE BODY.  WHETHER YOU LABEL IT AS A LEVER

2  ARM OR A BODY, IT'S MORE SEMANTICS.  WHETHER YOU USE THE WORD

3  "LEVER ARM" OR "BODY" TO LABEL THAT FEATURE, THAT LONG FEATURE,

4  IT'S THE SAME FEATURE.

5  Q.  I BELIEVE YOU ALSO SAID THAT YOU DIDN'T USE THE WORD "BODY."

6  A.  YES.

7  Q.  AND WHERE IN THE FLEXURE -- I'M SORRY.  WHERE IN THIS RECORD

8  OF INVENTION DOES IT TALK ABOUT THE FLEXURE BEING IN AN ELEVATED

9  POSITION?

10  A.  IT DOESN'T SAY THAT IN THE TEXT, BUT THAT'S IMPLICIT IN THE

11  APPLICATION.

12  Q.  WHERE IN THE RECORD OF INVENTION DOES IT TALK ABOUT REAR

13  LEGS?

14  A.  AGAIN, DOESN'T SAY THAT IMPLICIT IN THE APPLICATION.

15  Q.  AND I BELIEVE THAT YOU -- I BELIEVE IT -- YOUR CONTENTION IS

16  THAT IT'S IMPLICIT BECAUSE BY VIRTUE OF THOSE LITTLE X, Y ARROWS

17  THAT YOU SEE AT THE BACK OF THE LEVER ARM; IS THAT RIGHT?

18  A.  THAT -- NO, THAT'S -- XYZ CONTEMPLATES MOVEMENT IN THE BACK,

19  AND THAT IT'S IMPLICIT THAT THERE WILL BE ATTACHMENT IN THE BACK

20  OF WHICH LEGS COULD BE ONE VERSION OF ATTACHMENT.

21  Q.  SO IT'S IMPLICIT THAT THERE WOULD HAVE TO BE AN ATTACHMENT

22  AT THE BACK?

23  A.  YES.

24  Q.  AND LEGS COULD BE AN ATTACHMENT AT THE BACK?

25  A.  YES.

SHUM - CROSS (RESUMED) / TANGRI

1  Q.  OTHER ATTACHMENTS AT THE BACK COULD BE A BLOB OF GLUE?

2  A.  YES.

3  Q.  COULD BE SOLDER?

4  A.  YES.

5  Q.  COULD BE A HARD STOP LIKE A BLOCK OR A WEDGE THAT IT SITS

6  ON?

7  A.  YES.  I WAS TRYING TO SHOW THAT WAS A FLEXURE WITH AT LEAST

8  TWO LEGS.

9  Q.  AND JUST TO BE CLEAR, IT DOESN'T -- THE TEXT DOESN'T TALK

10  ABOUT LEGS.  WE'VE ESTABLISHED THAT?

11  A.  YES.

12  Q.  WHERE IN THIS RECORD OF INVENTION DOES IT TALK ABOUT LASER

13  WELDING?

14  A.  IT DOES NOT SPECIFICALLY MENTION THAT.

15  Q.  THE ONLY MEANS OF ATTACHMENT DISCUSSED IN HERE ARE GLUE AND

16  SOLDER, RIGHT?

17  A.  IN THE PREAMBLE, NOT IN THIS -- IT DOESN'T TALK ABOUT THE

18  EXACT ATTACHMENT METHOD IN THE DISCLOSURE PORTION, I DON'T

19  BELIEVE.

20  Q.  I UNDERSTAND THAT, BUT IN THE DOCUMENT AS A WHOLE, THE ONLY

21  ATTACHMENT METHODS DISCUSSED ARE GLUE AND SOLDER?  IS THAT

22  RIGHT?

23  A.  YES.

24  Q.  LASER WELDING IS NOT DISCUSSED ANYWHERE.

25  A.  I DON'T BELIEVE SO, NO.

1   THAT.

2   Q.   YEAH, MY -- I'LL BE ABLE TO TELL YOU IN JUST A MOMENT.

3            LET'S HAVE UP, JEFF, EXHIBIT 51, PLEASE.

4                    (EXHIBIT PUBLISHED.)

5            MR. TANGRI:   AND LET'S GO TO CLAIM 1 OF THAT EXHIBIT.

6                    (EXHIBIT PUBLISHED.)

7            MR. TANGRI:   WHICH IS COLUMN 9.   THERE WE GO.

8                    (EXHIBIT PUBLISHED.)

9            THE WITNESS:   OH, OKAY.

10  BY MR. TANGRI:

11  Q.   SEE THERE, CLAIM 1, APPLYING PRESSURE TO TAKE FLEXURE

12  'CAUSING THE LEGS ON THE FLEXURE TO SPREAD FURTHER APART?

13  A.   YES, I SEE THAT.

14  Q.   OKAY.   SO -- THE '724 PATENT IN THE CLAIMS REFERS TO

15  APPLYING PRESSURE TO CAUSE THE LEGS TO SPREAD FURTHER APART?

16  A.   YES, I SEE THAT.

17  Q.   OKAY.   AND IN YOUR RECORD OF INVENTION, EXHIBIT 2, LOOKING

18  AT THAT, THERE'S NO DISCUSSION IN THERE OF APPLYING PRESSURE TO

19  SPREAD THE LEGS FURTHER APART, IS THERE?

20  A.   IN THIS IMPLEMENTATION, AS I SHOWED YESTERDAY OR DAY BEFORE,

21  THAT IMPLY PRESSURE, THE LEGS WOULD COME TOGETHER AND YOU LIFT

22  IT UP IN THE MODEL THAT YOU USE TO REPRESENT MY RECORD INVENTION

23  AND YOU PUT DOWN, THE LEGS WOULD SPREAD APART NATURALLY.   IT'S A

24  NATURAL MODEL, YOU KNOW, REPRESENTATION OF MY RECORD INVENTION.

25  THE LEGS WILL SPREAD APART.

1  Q.  IF YOU APPLY PRESSURE, THE LEGS WILL COME CLOSER TOGETHER,

2  CORRECT?

3  A.  IN WHAT'S SHOWN HERE, YES.

4  Q.  AND IF YOU WERE TO APPLY PRESSURE -- WITHDRAW THAT.

5       IF YOU WERE TO WANT TO CAUSE THE LEGS TO SPREAD

6  APART, ASSUMING YOU WANTED TO AT ALL, YOU WOULD NOT APPLY

7  PRESSURE TO DO THAT IN THIS, CORRECT?

8  A.  YES.

9       MR. TANGRI:  NOW, LET'S HAVE BRIEFLY, JEFF, IF WE

10 CAN, EXHIBIT 727A.

11                  (EXHIBIT PUBLISHED.)

12 BY MR. TANGRI:

13 Q.  YOU RECALL DISCUSSING THIS WITH MR. WALLACH?

14 A.  YES.

15 Q.  AND I BELIEVE THAT YOU TESTIFIED THAT THIS WAS AN

16 IMPLEMENTATION OF A FLEXURE THAT YOU WERE WORKING ON.

17 A.  YES.

18 Q.  AND JUST SO THAT WE'RE ORIENTED, I TAKE IT ON THE RIGHT-HAND

19 SIDE, THE -- LET'S TAKE THE RIGHT-HAND PICTURE.  OKAY.

20 A.  OKAY.

21 Q.  -- OF THE TWO PICTURES.  THE END OF THE DEVICE THAT WE SEE

22 POINTING AT THE LOWER RIGHT-HAND CORNER OF THAT BOX IS THE

23 FRONT.  DO I HAVE THAT RIGHT?

24 A.  THAT'S THE BACK OF THE --

25 Q.  THAT'S THE BACK.

1  Q.  AND I BELIEVE YOU TESTIFIED THAT THIS DOCUMENT IS DATED BY

2  YOU FROM THE ELECTRONIC FILES AS BEING CREATED AS DECEMBER 27TH,

3  1997?

4  A.  YES.

5  Q.  ALL RIGHT.

6        LET'S HAVE IF WE COULD, EXHIBIT 562, PLEASE.

7                    (EXHIBIT PUBLISHED.)

8  BY MR. TANGRI:

9  Q.  THIS IS ANOTHER DOCUMENT YOU TESTIFIED AS EVIDENCING YOUR

10  CONCEPTION OF THE DOUBLE SEAL INVENTION CLAIMED IN CLAIM 58 OF

11  THE DUAL ENCLOSURE PATENT?

12  A.  YES.

13  Q.  ALL RIGHT.

14        IF WE CAN GO TO PAGE LU45, PLEASE, JEFF.

15                    (EXHIBIT PUBLISHED.)

16  BY MR. TANGRI:

17  Q.  AND IN PARTICULAR, IF I'M CORRECT, YOU CITED THE SKETCHES IN

18  THE BOTTOM HALF OF THAT PAGE AS EVIDENCE, CORRECT?

19  A.  YES.

20  Q.  AND YOU TESTIFIED THAT THE THREE BOTTOM SKETCHES WERE DRAWN

21  BY YOU?

22  A.  YES.

23  Q.  THE UPPER CENTRAL SKETCH WITH THE FOUR CIRCLES IN IT WHAT --

24  YOU SAID WAS DRAWN BY WHO?

25  A.  DAN AT LUMEN INTELLECTUAL PROPERTIES.

1  Q.   DAN?   DO WE HAVE A LAST NAME?   I --

2  A.   I BELIEVE HIS -- IT'S FROM THE RECORDS.   MY BEST

3  RECOLLECTION, LAST NAME IS STEINBERG.

4  Q.   AND WHOSE HANDWRITING IS THAT WHERE IT SAYS -- THE

5  HANDWRITING OFF TO THE RIGHT OF THE THING IN THE CENTER?

6  A.   THAT'S HIS HANDWRITING.

7  Q.   OKAY.

8          AND HE DREW THE UPPER SKETCH?

9  A.   YES.

10  Q.   HOW DO YOU KNOW?

11  A.   THAT'S HIS -- THAT'S HIS -- THAT'S NOT MY DRAWING.

12  Q.   OKAY.   DID HE DRAW IT WITH -- WERE YOU DRAWING ONE THING AND

13  HE WAS DRAWING ANOTHER THING?

14  A.   YES.

15  Q.   I MEAN, YOU WERE BOTH THERE DRAWING?

16  A.   YES.

17  Q.   AND THEN YOU SAID, I BELIEVE, THAT THE FIGURE OFF ON THE

18  BOTTOM RIGHT-HAND CORNER DISPLAYS THE DUAL ENCLOSURE.

19  A.   YES.

20  Q.   AND IT SHOWS AN OPTOELECTRONIC PACKAGE, RIGHT?

21  A.   YES.

22  Q.   THERE'S NO LID ON THE OPTOELECTRONIC PACKAGE, IS THERE,

23  MR. SHUM?

24  A.   IT'S THE TOP -- THE TOP RECTANGLE REPRESENTS THE LID.

25  Q.   THE TOP RECTANGLE -- LET ME JUST MAKE SURE I UNDERSTAND YOU.

SHUM - CROSS (RESUMED) / TANGRI

1   OR THE FIRST SERIES OF MEETINGS?

2   A.   IT WAS IN THE FIRST SERIES OF MEETINGS WITH THEM.   MAYBE THE

3   SECOND MEETING.   FIRST MEETING WAS INTRODUCTORY.   I THINK IT WAS

4   SECOND MEETING.   MAYBE SECOND OR THIRD MEETING.

5   Q.   MR. VERDIELL WAS AT THE FIRST MEETING, RIGHT?

6   A.   HE WAS.

7   Q.   AND HE WAS NOT AT THE LATER MEETINGS?

8   A.   NO.

9   Q.   THAT YOU WERE AT ANYWAY?

10   A.   YES.

11   Q.   AND TO YOUR BEST RECOLLECTION, WHEN DID YOU MAKE THIS

12   DRAWING?

13   A.   IN AUGUST OF 1996.

14   Q.   WITH MR. STEINBERG PRESENT?

15   A.   YES.

16   Q.   AND WITH HIM DRAWING THE OTHER DRAWINGS?

17   A.   YES.

18   Q.   AND IS IT CORRECT, MR. SHUM, THAT THIS DRAWING AND THE PARTS

19   LIST YOU REFERRED TO YESTERDAY --

20           WELL, FIRST OFF, IS IT CORRECT THAT THE DRAWING IS

21   THE ONLY CONCEPTION EVIDENCE YOU HAVE CITED IN YOUR TESTIMONY --

22   A.   YES.

23   Q.   -- AS EVIDENCE OF YOUR -- I'M SORRY.   LET ME START OVER.

24           IS IT CORRECT THAT THIS DRAWING IS THE ONLY EVIDENCE

25   OF YOUR CONCEPTION OF CLAIM 58 OF THE DUAL ENCLOSURE PATENT THAT

KNOX – DIRECT / BARRY

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, JANUARY 13, 2005

EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

FRANK T. SHUM,                    )
                                  )      **BENCH TRIAL**
            PLAINTIFF,            )
                                  )      **VOLUME 4A – A.M. SESSION**
   VS.                            )
                                  )      NO. C 02-3262 DLJ
                                  )
INTEL CORPORATION,                )
JEAN-MARC VERDIELL AND            )      **PAGES 632 – 739**
LIGHTLOGIC, INC.,                 )
                                  )
            DEFENDANTS.           )      OAKLAND, CALIFORNIA
_____   )      THURSDAY, JANUARY 13, 2005
AND RELATED CROSS-ACTION.         )
                                  )      Certified Copy
_____   )

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF AND          LAW OFFICES OF E. ROBERT (BOB) WALLACH,
COUNTER-DEFENDANT:             P.C.
                           P.O. BOX 2670
                           SAN FRANCISCO, CALIFORNIA  94126-2670
                    BY:    E. ROBERT WALLACH, ATTORNEY AT LAW

                           SHOPOFF & CAVALLO LLP
                           353 SACRAMENTO STREET, SUITE 1040
                           SAN FRANCISCO, CALIFORNIA  94111
                    BY:    GREGORY S CAVALLO, ATTORNEY AT LAW

                           BELL, BOYD & LLOYD
                           70 WEST MADISON STREET, SUITE 3300
                           CHICAGO, ILLINOIS 60602-4207
                    BY:    ALAN L. BARRY, ATTORNEY AT LAW

                           LAW OFFICES OF HARRIS ZIMMERMAN
                           1330 BROADWAY, SUITE 710
                           OAKLAND, CALIFORNIA  94612
                    BY:    HARRIS ZIMMERMAN, ATTORNEY AT LAW

            (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:           RAYNEE H. MERCADO, CSR NO. 8258

_____

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404**

# I N D E X

### PLAINTIFF'S WITNESSES

| | PAGE | VOL. |
|---|---|---|
| DUMAN, LESLIE | | |
| DIRECT EXAMINATION BY MR. WALLACH | 636 | 4 |
| CROSS-EXAMINATION BY MR. TAYLOR | 664 | 4 |
| REDIRECT EXAMINATION BY MR. WALLACH | 686 | 4 |
| | | |
| KNOX, WAYNE HARVEY | | |
| DIRECT EXAMINATION (RESUMED) BY MR. BARRY | 702 | 4 |

## E X H I B I T S

| DEFENDANT'S   EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1039 | | 682 | | 4 |
| 902A | | 685 | | 4 |

--oOo--

DUMAN - DIRECT / WALLACH

1  A.  NO.

2  Q.  OKAY.  TELL US WHAT THESE TOOLS ARE DESIGNED TO DO THAT YOU

3  BROUGHT TO THAT MEETING?

4  A.  OKAY.  LET ME -- LET ME BE CLEAR.  I DID NOT BRING -- I DID

5  NOT BRING HAND TOOLS TO THE MEETING.  WHAT I BROUGHT TO THE

6  MEETING WERE SMALL METAL PARTS WHICH ARE USED AS CONVERSATIONAL

7  TOOLS.  SO THESE SMALL METAL PARTS ARE INSTANCES -- THEY'RE

8  SAMPLES FROM PARTS THAT HAD BEEN MADE PREVIOUSLY FOR MANY OTHER

9  CUSTOMERS OVER A PERIOD OF YEARS.

10          THEY'RE USUALLY JUST -- THEY'RE PIECES OF METAL THAT

11  ARE BENT, PUNCHED, STAMPED, TURNED INTO SOMETHING USEFUL WITHIN

12  OTHER PEOPLE'S MECHANICAL -- ELECTROMECHANICAL PRODUCTS.  AND SO

13  BY HAVING THESE OTHER PARTS WITH ME, WHEN I'M MEETING WITH

14  SOMEONE ON A DESIGNING PROJECT, THEY CAN USE AS A REFERENCE.  OR

15  I CAN USE THEM AS A REFERENCE.

16          RATHER THAN TRYING TO CREATE A MENTAL PICTURE, I CAN

17  PICK UP A SAMPLE PART AND SAY, "WE'RE TALKING ABOUT SOMETHING

18  LIKE THIS?  WE'RE TALKING ABOUT SOMETHING LIKE THIS?  OR WE'RE

19  TALKING ABOUT SOMETHING LIKE THIS?"  THEY'RE USED AS EXAMPLES.

20  Q.  ALL RIGHT.  AMONG THOSE PARTS THAT YOU BROUGHT, WAS THERE

21  ONE THAT HAD THE KIND OF DESCRIPTIVE NAME CALLED SPIDER?

22  A.  YES, THERE WAS.

23  Q.  ACTUALLY, TELL US THE ORIGIN OF THAT NAME.

24  A.  OKAY.  THE SPIDER WAS THE NAME THAT AT THE TIME I WORKED

25  FOR -- AT THE TIME THAT THE SPIDER WAS PRODUCED, I WORKED FOR A

DUMAN - DIRECT / WALLACH

1    COMPANY CALLED SCANDIG (SIC) WHICH PRODUCED THE SPIDER FOR DATA

2    PRODUCTS, AND WHAT IT WAS, IT WAS -- PRINT HEAD FOR -- RETURN

3    SPRING FOR THE PRINT WIRES.  AND THAT PART, IT'S KIND OF SHAPED

4    LIKE A -- IT'S KIND OF FLOWER-LIKE IN SHAPE.

5             IT'S A DISC.  IT'S PRODUCED FROM A DISC OF -- IT'S

6    PRODUCED FROM A PIECE OF METAL STRIP, AND THEN STAMPED INTO A

7    DISC WITH A NUMBER OF FINGERS RADIATING OUT FROM THE CENTER,

8    EACH OF THOSE FINGERS FUNCTIONING AS AN INDEPENDENT SPRING TO

9    RETURN A PRINT WIRE.

10   Q.   AND WHAT SIZE IS IT?

11   A.   APPROXIMATELY THREE INCHES IN DIAMETER.

12   Q.   ALL RIGHT.  IS THIS A PART THAT WAS ONCE ON AN IBM SELECTRIC

13   TYPEWRITER?

14   A.   NO.

15   Q.   EVER ON A TYPEWRITER?

16   A.   NO.  IT WAS ON A PRINTER, BUT IT -- SOMEONE COULD BE

17   MISTAKEN AND THINK THAT, 'CAUSE IT HAS THAT SAME SIZE AND KIND

18   OF SHAPE AND CONFIGURATION AS A DAISY WHEEL.

19   Q.   AS A -- DID YOU SAY "DAISY WHEEL"?

20   A.   DAISY WHEEL BEING A TYPE OF PRINTER WHEEL.

21   Q.   ALL RIGHT.  DO YOU -- DO YOU RECALL ANY DISCUSSION THAT

22   FOCUSED UPON THE SPIDER?

23   A.   YES.

24   Q.   AND WHAT DISCUSSION DO YOU RECALL?

25   A.   IN THE BEGINNING OF THIS MEETING, AS IN THE BEGINNING OF A

1    THE TERM IS YIELDING.  IN OTHER WORDS, IT RETAINED ITS ORIGINAL

2    HEIGHT AFTER IT WAS RELEASED.

3              AND THERE'S ALSO CONVERSATION ABOUT HOW THE LEGS --

4    HOW THE LEGS OF THE SPIDER MIGHT PERFORM IF THEY WERE PUT IN

5    OTHER JUXTAPOSITIONS, RELATIONSHIPS, WHAT THE MATERIAL TYPE WAS,

6    HOW IT WORKED, SOME GENERAL QUESTIONS AROUND SPRING PROPERTIES.

7    Q.  NOW, THE SUBJECTS THAT YOU'VE JUST DESCRIBED, LEGS AND THE

8    SPRING PROPERTIES, DID THAT INVOLVE ALL THREE OF YOU?

9    A.  AT -- TO SOME POINT, YES.  AT SOME POINT, THERE WAS A

10   CONVERSION, AND, AGAIN, WHEN I -- WHEN I COME TO THESE KIND OF

11   MEETINGS, I TRY TO AS QUICKLY AS POSSIBLE MAKE ASSESSMENTS OF

12   WHO I'M DEALING WITH.

13             AND FRANK, I KEYED HIM AS BEING A PERSON WHO WAS MORE

14   ENGINEERING FOCUSED, AND A LOT OF THE -- SOME OF -- A LOT OF THE

15   QUESTIONS AROUND SPECIFIC ENGINEERING ATTRIBUTES AS FAR AS

16   MATERIAL TYPES AND THAT SORT OF THING CAME FROM FRANK.  A LOT

17   OF -- THERE WAS INPUT FROM BOTH.

18             MARC WAS VERY INTERESTED IN WHAT SOME OF THE

19   FUNCTIONS WOULD BE OF -- I'LL BRING IN A NEW TERM NOW, THE

20   SLIDER ASPECT.  WHEN YOU PUSH DOWN OUR -- WHEN YOU PUSH DOWN ON

21   A PART LIKE THE SPIDER, THERE'S DOWNWARD PRESSURE WHICH CAUSES

22   THE LEGS TO GO OUT.  WHEN IT'S RELEASED, THE LEGS COME BACK IN.

23   COULD THAT BE DONE IF THE LEGS WERE FIXED?  WHILE YOU'RE PUSHING

24   DOWN THE BACK, WOULD THAT CAUSE THE MATERIAL TO DISTORT?

25             THERE WAS CONVERSATION AROUND ALIGNMENT.  SOMEONE

1   A.   YES.

2   Q.   WHAT WAS THAT?

3   A.   OKAY.  I DO NOT REMEMBER THE DETAILS OF IT, BUT BASICALLY IT

4   ADDRESSED THE FUNCTIONALITY SHOWN IN THE LEG OF THE SPIDER.  AND

5   IF THAT FUNCTIONALITY OF THE LEG OF THE SPIDER COULD BE

6   INCORPORATED INTO A DESIGN WHEREIN THEY COULD ADJUST THE HEIGHT

7   OF A STIFF BACK-BONED PART WITH FLEXIBLE LEGS AND BE ABLE TO SET

8   IT INTO POSITION AND FIX IT THERE VIA WELDING.  AND, AGAIN,

9   THAT -- I DON'T REMEMBER THE SPECIFICS OF THAT, AND I COULD BE

10  COMMINGLING A NUMBER OF CONVERSATIONS.

11  Q.   COMMINGLING A NUMBER OF CONVERSATIONS?

12  A.   WHAT I'M SAYING IS OVER THIS SPAN OF TIME SINCE THE EVENT

13  OCCURRED, I DO NOT HAVE SPECIFIC MEMORY OF WHO SAID WHAT ON EVEN

14  WHAT DAY.  BUT I DO KNOW IN THAT FIRST MEETING, THERE WAS

15  CONVERSATION BETWEEN THE TWO ABOUT THE POTENTIAL POSITIVE VALUE

16  OF INCORPORATING THE FUNCTION OF THE SLIDER -- THE SPIDER LEGS

17  INTO AN ALIGNMENT DEVICE THAT WOULD HOLD AN OPTIC FIBER.

18  Q.   I WANT TO SPEND JUST A MOMENT WITH YOU BECAUSE HUMAN MEMORY

19  IS THE SUBJECT MATTER THAT IS OFTEN COVERED IN TESTIMONY.  I

20  NEED TO TRY AND EVALUATE IT.

21       FIRST OF ALL, DID I UNDERSTAND CORRECTLY THAT THE

22  ONLY DISCUSSION THAT YOU HAD INVOLVING MR. VERDIELL WAS AT THIS

23  MEETING THAT LASTED SOMETHING LESS THAN AN HOUR?

24  A.   IN -- IN THAT INITIAL SET OF EVENTS, YES.  I HAD HAD OTHER

25  CONVERSATIONS WITH MR. VERDIELL AFTER RADIANCE HAD CEASED TO

DUMAN - CROSS / TAYLOR

1   Q.   DID HE PICK IT UP?

2   A.   HE EITHER PICKED IT UP OR HE SAID "THAT'S INTERESTING" OR I

3   HANDED IT TO HIM IT WAS POINTED OUT.

4   Q.   DO YOU REMEMBER WHAT HE DID WITH IT?

5   A.   ONE OF THE THINGS HE -- ONE OF THE THINGS HE DID WITH IT --

6   Q.   OKAY.   SO YOU'RE GOING TO DEMONSTRATE THIS?

7   A.   SURE.   IT'S A WHOLE LOT EASIER.

8   Q.   THAT'S FINE.   PLEASE DO.

9   A.   HE DEFLECTED IT.

10   Q.   WHAT DOES DEFLECTING IT MEAN?

11   A.   DEFLECT WOULD BE TAKE IT FROM A STATIC POSITION TO AN

12   ACTUATED POSITION.' HE PRESSED -- HE PRESSED DOWN ON THE UPPER

13   SERVICE (SIC) -- SURFACE CAUSING THE LEGS TO SPLAY.

14   Q.   CAUSING THE LEGS TO SPREAD OUT?

15   A.   YES.

16   Q.   DID HE DO ANYTHING ELSE WITH IT?

17   A.   AND, AGAIN, I WISH I HAD PERFECT RECALL, BUT I DON'T, SO THE

18   ORDER OF QUESTIONS AND THE COMMENTS, I DO NOT RECALL PRECISELY.

19   BUT HE DID FLEX THE LEGS (INDICATING), AND AT -- AT SOME POINT,

20   THERE WERE EITHER QUESTIONS OR ACTIONS REGARDING COULD THE LEGS

21   BE HELD IN PLACE AND THE BODY OF THE PART BE DEFLECTED WITHOUT

22   THERE BEING PERMANENT DISTORTION OR YIELD.

23   Q.   AND YOUR RECOLLECTION IS THAT'S MR. VERDIELL'S QUESTION,

24   CORRECT?

25   A.   YES.

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_Raynee H. Mercado_

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, JANUARY 14, 2005

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    DEPARTMENT ONE              D. LOWELL JENSEN, JUDGE

4    FRANK T. SHUM,             ) C 02-03262 DLJ (EMC)

5              PLAINTIFF,       )  PAGES   740 - 868

6    VS.                        )  **WITNESS WAYNE KNOX**

7    INTEL CORPORATION, JEAN-MARC )      **CHENG LEE**

8    VERDIELL AND LIGHTLOGIC, INC.,)

9              DEFENDANTS.       )

10   _____)

11   JEAN-MARC VERDIELL,         )

12             COUNTER-CLAIMANT, )

13   VS.                         )

14   FRANK T. SHUM,              )

15             COUNTER-DEFENDANT. )

16   _____)

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18             **THURSDAY, JANUARY 13, 2005**

19             **VOLUME 4-B (AFTERNOON SESSION)**

20   APPEARANCES:

21   FOR THE PLAINTIFF:

22   LAW OFFICES OF E. ROBERT (BOB) WALLACH, P.C.
     E. ROBERT (BOB) WALLACH, ESQUIRE
23   P.O. BOX 2670
     SAN FRANCISCO, CALIFORNIA  94126-2670
24   TEL (415) 989-6445
     FAX (415) 983-3802
25
     MORE APPEARANCES ON NEXT PAGE

1    ASSEMBLY SINCE 1996.

2         Q    OR BEFORE?

3         A    IN THE PREVIOUS WORK, I HAD DESIGNED A NUMBER OF

4    OPTOELECTRONIC DEVICES AND SUBSYSTEMS AND SYSTEMS.

5         Q    HAD YOU DESIGNED AN OPTOELECTRONIC ASSEMBLY PRIOR

6    TO 1996?

7         A    YES.

8         Q    BUT NOT SINCE?

9         A    NOT SINCE 1996, NO.

10        Q    UM, HAD YOU WORKED, I ASSUME YOU HAD, WITH ACTIVE

11   OPTICAL DEVICES IN -- BY 1996?

12        A    YES.  WE USED THOSE ALL THE TIME IN THE LAB, YES.

13        Q    THE OPTICAL ELECTRONIC ASSEMBLY THAT YOU DEVELOPED

14   PRIOR TO 1996 HAD AN ACTIVE OPTICAL DEVICE IN IT?

15        A    YES.  GENERALLY, THE ACTIVE OPTICAL DEVICES, I

16   SAID, IS A WIDE RANGE OF CATEGORIES SUCH AS LASER DIODES.

17   AN ACTIVE OPTICAL DEVICE COULD BE MODERATOR.  I DID A LOT OF

18   WORK WITH ELECTROABSORPTION MODULATORS -- DID THAT SAY THAT

19   TOO QUICKLY?  ELECTROABSORPTION MODULATORS.  AND I HAD

20   DESIGNED SOME VERY HIGH SPEED CIRCUITS FOR MAKING HIGH SPEED

21   OPTOELECTRONIC MEASUREMENTS.  AND THAT DOES FIGURE A GENERAL

22   DEFINITION OF OPTOELECTRONIC ASSEMBLY.

23        Q    UM, HAD YOU WORKED PRIOR TO 1996 WITH

24   OPTOELECTRONIC ASSEMBLIES HAVING INSULATING SUBSTRATES?

25        A    YES.

1     Q    AND DID THOSE INSULATING SUBSTRATES HAVE PLANAR

2  SURFACES?

3     A    YES.

4     Q    DID ANY OF THE OPTO -- DID YOU -- WITHDRAW IT.

5  PRIOR TO 1996, DID YOU DESIGN ONE OR MORE THAN ONE

6  OPTOELECTRONIC ASSEMBLIES?

7     A    IT WAS SEVERAL OVER THE YEARS.

8     Q    DID ANY OF THEM HAVE INSULATING SUBSTRATES?

9     A    YES.

10     Q    DID ANY OF THEM HAVE METAL LAYERS?

11     A    YES.

12     Q    DID ANY OF THEM HAVE METAL LAYERS BONDED TO THE

13  PLANAR SUB -- THE PLANAR INSULATING SUBSTRATE?

14     A    YES.

15     Q    UM, DID ANY OF THEM HAVE METAL LAYERS BONDED TO

16  THE PLANAR INSULATING SUBSTRATE SO THAT SELECTED REGIONS OF

17  THAT SUBSTRATE WERE EXPOSED?

18     A    YES.

19     Q    AND SO THAT A STEP WAS PRODUCED BETWEEN THE

20  SUBSTRATE AND THE TOP SURFACE OF THE METAL LAYER?

21     A    YES.

22     Q    DID ANY OF THEM HAVE THOSE CRITERIA AND IN

23  ADDITION HAVE AN ACTIVE OPTICAL DEVICE MOUNTED ON TOP OF THE

24  METAL LAYER?

25     A    IN CASE I'M THINKING ABOUT THE ACTIVE OPTICAL

1   DEVICE WAS -- WAS INCORPORATED INTO PART OF THE -- THE

2   SUBSTRATE THAT HAD THE METAL LAYERS CONNECTED TO IT.  AND IN

3   FACT SO IT DIDN'T HAVE A SEPARATE ACTIVE OPTICAL DEVICE

4   MOUNTED ON TOP.

5        Q    IT DIDN'T HAVE A SEPARATE ACTIVE OPTICAL DEVICE

6   MOUNTED ON TOP?

7        A    THAT'S CORRECT.  THE ONE I WAS THINKING ABOUT,

8   YES.

9        Q    WELL, DID YOU WORK ON OTHERS THAT HAD OPTICAL

10  DEVICES MOUNTED ON TOP OF SUCH METAL LENS?

11       A    I'D WORK WITH ACTIVE OPTICAL DEVICES MOUNTED ON

12  SUBSTRATES.  AND IT WASN'T MOUNTED ON A METAL LAYER THEN.

13  SO IT WAS JUST A LARGE NUMBER OF DIFFERENT CONFIGURATIONS.

14  TO TRY TO GET THEM ALL EXACTLY THE SAME, I CAN'T TELL YOU

15  EXACTLY THE SAME COMBINATION.

16       Q    BUT YOU HAD WORKED WITH OPTICAL DEVICES MOUNTED ON

17  METAL LAYERS AND MOUNTED AND OTHERS MOUNTED ON SUBSTRATES?

18       A    MOUNTED ON DIFFERENT EITHER MAYBE OR INSULATING,

19  THAT'S RIGHT, A LARGE NUMBER OF THINGS.  I'M ALSO GOING ALL

20  THE WAY BACK TO 1979 WHEN I'M ANSWERING THESE QUESTIONS,

21  YES.

22       Q    I APPRECIATE THAT.  AND I'M JUST TRYING TO GET THE

23  SUM TOTAL OF YOUR EXPERIENCE --

24       A    YES.

25       Q    -- WHEN YOU STARTED THROUGH 1996?

1     A    YES, I UNDERSTAND.

2     Q    SO YOU HAD WORKED WITH OPTOELECTRONIC ASSEMBLIES,

3  ETC., UM.  IN THOSE ASSEMBLIES HAD THE METAL LAYERS PROVIDED

4  ELECTRICAL PADS TO THE OPTICAL DEVICES IN SOME INSTANCES?

5     A    YES, IN SOME INSTANCES, YES, THAT IS CORRECT.

6     Q    DID ANY OF THEM HAVE A THICKNESS SUCH THAT THE

7  HEAT GENERATED BY THE ACTIVE OPTICAL SUBSTRATE WAS

8  DISSIPATED BY THE METAL LAYER IT WAS SITTING ON?

9     A    THE HEAT GENERATED IN THE OPTICAL ELECTRONIC

10  PROCESS THAT I'M REFERRING TO WAS CERTAINLY DISSIPATED

11  PARTIALLY THROUGH THE METAL LAYERS.  THAT'S CORRECT.  YES,

12  THEY WERE.

13     Q    UM, IF THEY SAT, IF THE ACTIVE OPTICAL DEVICE SAT

14  ON A METAL LAYER, DID IT SIT HIGH ENOUGH UP TO WHERE TO THE

15  HEIGHT PROROGATED UP FROM IT DIDN'T GET INTERFERED WITH BY

16  THE SUBSTRATE?

17     A    THE DEVICE I'M THINKING OF I'M THINKING OF TWO

18  DIFFERENT KINDS OF DEVICES.  ONE WAS AN OPTICAL ELECTRONIC

19  MODULATOR DEVICE.  AND THAT, THIS ISSUE OF THE LIGHT WAS

20  CERTAINLY NOT INTERFERED WITH BY THE SUBSTRATE OR THE METAL

21  LAYERS.  IN THE CASE OF THE OTHER DEVICE THAT I'M THINKING

22  OF, IT WAS A MICROMECHANICAL MEMBRANE FLEXURE DEVICE.  AND

23  THAT FIBER COUPLE DEVICE.  SO THE -- SO THE LIGHT WAS -- WAS

24  CARRIED OUT OF AN OPTICAL FIBER FOCUSED ONTO THE FLEXURE

25  MEMBRANE DEVICE AND IT CARRIED OUT EITHER THE SAME FIBER OR

1   A DIFFERENT OPTICAL FIBER.  SO -- SO, IN EITHER CASE I'M

2   THINKING OF, THERE WAS NO PARTICULAR ISSUE WITH THE LIGHT

3   BEING INTERFERED WITH BY THE SUBSTRATE.  THOSE, UM,

4   REFERRING TO RIGHT NOW ARE BOTH REFERRED TO AS SURFACE

5   NORMAL DEVICES.  THIS DEVICE IS AN EDGE EMITTING DEVICE.

6        Q    BUT THE DEVICES YOU HAD WORKED WITH JUST SO I SORT

7   OF HAVE IT, YOU HAD ACTIVE OPTICAL DEVICES SITTING UP ON

8   METAL AND YOU HAD IT, NOT GETTING, THE LIGHT NOT GETTING

9   CLIPPED BY THE SUBSTRATE?

10       A    IN ONE CASE IT WAS A TRANSMISSION MODE DEVICE.

11  THAT WAS THE ELECTRICAL ABSORPTION MODULATOR.  THE SECOND

12  DEVICE I WAS THINKING OF, WHICH WAS THE MICROMECHANICAL

13  MEMBRANE FLEXURE MODULATOR, THAT WAS SITTING UP ABOVE THE

14  SUBSTRATE.  BUT AS I SAID, THE LIGHT WAS DELIVERED AND

15  CAPTURED BY A SEPARATE OPTICAL FIBER.

16       Q    BUT IT WAS NOT INTERFERED WITH BY THE SUBSTRATE?

17       A    THAT'S CORRECT.  IN BOTH CASES IT WASN'T.

18  CORRECT.

19       Q    AND HAD YOU WORKED WITH ANY DEVICES IN WHICH THE

20  IN PLANE COEFFICIENT OF THERMAL EXPANSION OF THE METAL LAYER

21  IN THE DEVICE WAS CONSTRAINED BY THE INSULATING SUBSTRATE?

22       A    NO, I HAD NOT WORKED WITH DEVICES THAT MET THAT,

23  NO.

24       Q    WERE YOU AWARE OF ANY SUCH DEVICES AS OF 1996?

25       A    NO, I WASN'T.

1      Q      WHEN DID YOU FIRST BECOME AWARE OF SUCH DEVICES?

2      A      IN REVIEWING THE MATERIALS FOR THIS CASE.

3      Q      BUT IS THERE A SUMMARY THAT FOR CLAIM ONE UP UNTIL

4  WE GET TO ELEMENT 1-C3 YOU HAD WORKED PRIOR TO 1996 WITH

5  DEVICES INCORPORATED EVERY ELEMENT OF THAT CLAIM?

6      A      IN VARIOUS COMBINATIONS, YES, EVERY ELEMENT OF

7  THAT CLAIM, YES.

8      Q      ARE YOU A CO-INVENTOR OF CLAIM ONE?

9      A      NO.

10     Q      OKAY.  WE CAN HAVE THAT DOWN, JEFF, THANKS.

11         I'D LIKE TO FOCUS YOUR ATTENTION, PROFESSOR KNOX,

12 ON THE TESTIMONY YOU GAVE YESTERDAY ABOUT THE --

13     A      I'M SORRY FOR INTERRUPTING.  CAN I CLARIFY

14 SOMETHING FOR THE RECORD?  COULD YOU PLEASE REPEAT THAT

15 QUESTION YOU JUST ASKED ME?

16     Q      I ASKED YOU WHETHER YOU WERE A CO-INVENTOR OF

17 CLAIM ONE OF THE '567 PATENT.

18     A      I'M SORRY.  I'M SORRY.  CAN YOU PLEASE SHOW IT

19 AGAIN?

20     Q      SURE.  JEFF.

21         THE QUESTION I HAD ASKED YOU IS WHETHER YOU WERE A

22 CO-INVENTOR OF CLAIM ONE OF THE '567 AND YOU SAID NO, BUT

23 PLEASE CLARIFY.

24     A      NO.  NO, I'M NOT.  NO, I JUST WANTED TO MAKE SURE

25 I UNDERSTOOD WHAT YOU ASKED AND WHAT I REMEMBER, I'M NOT THE

1   CO-INVENTOR ON CLAIM ONE, NO.

2        Q     YOU'RE THE CO-INVENTOR ON ANY OTHER CLAIMS ON THE

3   '567?

4        A     NO.

5        Q     THANKS, JEFF.

6              FOCUSING YOUR ATTENTION ON THE DBC PATENTS, THE

7   PATENT '567 AND PATENT '268 ABOUT WHICH YOU TESTIFIED

8   YESTERDAY, YOU IDENTIFIED, AS I UNDERSTAND IT IN YOUR

9   TESTIMONY, SIX THINGS AS SUPPORTING MR. SHUM'S CLAIM FOR THE

10  INVENTORSHIP.  AND I'M JUST GOING TO TICK THEM OFF AND ASK

11  YOU TO KEEP THEM IN MIND AND ASK IF I LEFT ANY OF THEM OUT.

12  YOU IDENTIFIED THE WITHDRAWN RADIANCE APPLICATION --

13       A     YES.

14       Q     -- WHICH IS EXHIBIT 600.  YOU IDENTIFIED THE DRAFT

15  PATENT CLAIMS, WHICH IS EXHIBIT 50-A?

16       A     YES.

17       Q     YOU IDENTIFIED THE ARMY PROPOSAL, WHICH IS EXHIBIT

18  551 IN YOUR PRESENTATION AND ALSO EXHIBIT 50-O IN OTHER

19  DOCUMENTS WE USED?

20       A     YES.

21       Q     YOU IDENTIFIED EXHIBIT 561, WHICH IS A HANDWRITTEN

22  PAGE OF NOTES WHICH MR. SHUM SAYS ARE HIS NOTES?

23       A     YES.

24       Q     YOU IDENTIFIED EXHIBIT 566, WHICH IS THE SECOND

25  PAGE FROM A LETTER TO BRUSHWELLMAN SHOWING A DIAGRAM OF THE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COURT REPORTER'S CERTIFICATE

I, STARR A. WILSON, CSR NO. 2462, UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

_____

STARR A. WILSON, CSR NO. 2462