Exhibit 12

Certified Copy

1                   UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   DEPARTMENT ONE                  D. LOWELL JENSEN, JUDGE

4   FRANK T. SHUM,                ) C 02-03262 DLJ (EMC)

5              PLAINTIFF,         ) OAKLAND, CALIFORNIA

6   VS.                          ) **WITNESS:  JEAN-MARC VERDIELL**

7   INTEL CORPORATION, JEAN-MARC ) **DIRECT EXAMINATION CONTINUED**

8   VERDIELL AND LIGHTLOGIC, INC.,) **AFTERNOON SESSION 1/18/05**

9              DEFENDANTS.        )

10  _____ )

11  JEAN-MARC VERDIELL,           )

12         COUNTER-CLAIMANT,      )

13  VS.                          )

14  FRANK T. SHUM,                )

15         COUNTER-DEFENDANT.     )

16  _____ )

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               **TUESDAY, JANUARY 18, 2005**

19                      **VOLUME 5-B**

20  APPEARANCES:

21  FOR THE PLAINTIFF:

22  LAW OFFICES OF E. ROBERT (BOB) WALLACH, P.C.
    E. ROBERT (BOB) WALLACH, ESQUIRE
23  P.O. BOX 2670
    SAN FRANCISCO, CALIFORNIA  94126-2670
24  TEL (415) 989-6445
    FAX (415) 983-3802
25
    MORE APPEARANCES ON NEXT PAGE

1                          I N D E X

2    TUESDAY, JANUARY 18, 2005; DEPARTMENT ONE, D. LOWELL JENSEN,

3    JUDGE AFTERNOON SESSION VOLUME 5-B

4    WITNESSES              DIRECT  CROSS REDIRECT RECROSS JUDGE

5    FOR THE DEFENDANT:

6    JEAN-MARC VERDIELL   988(T) CONTINUED

7    T - TAYLOR

8                        E X H I B I T S

9                   IDENTIFICATION  EVIDENCE   VOLUME

10   FOR THE DEFENDANT

11   1044                1040                    5-B

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THE BOND BETWEEN THE COPPER AND CERAMIC.

2       Q    DID YOU TAKE ANY NOTES DURING THIS CONVERSATION?

3       A    AH, YES, I DID.

4       Q    AND WHERE DID YOU TAKE THE NOTES?

5       A    I CARRY THEM EVEN TODAY IN MY GREEN AGENDA BOOK

6 AND IT HAS PAGES ONLY FOR AGENDA AND FOR NOTES AND I DO MY

7 DAILY NOTES ON THAT ONE.

8       Q    EXHIBIT 51, PLEASE.

9       A    CALENDAR AGENDA WITH ME.

10      Q    DO YOU RECOGNIZE THIS DOCUMENT, MR. VERDIELL?

11      A    THAT'S THE PAGE OF NOTES I TOOK ON THAT DATE.

12      Q    AND IF WE BLOW UP THE BOTTOM HALF OF THAT

13 DOCUMENT, PLEASE. DO YOU RECOGNIZE WHAT WE ARE LOOKING,

14 WHAT WE ARE SEEING THERE?

15      A    THAT'S THE ENTRIES I MADE WHILE I WAS AT THE

16 LITTLE BOOTH OR TABLE.

17      Q    AT THE BRUSH WELLMAN BOOTH?

18      A    THAT'S CORRECT. THAT IS WRITTEN, FIRST OF ALL,

19 RIGHT THERE.

20      Q    OKAY. SO TELL US WHAT, YOU WERE STARTING TO

21 DISCUSS THE CONVERSATION WITH THEM ABOUT HOW IT WAS MADE AND

22 SOMETHING ABOUT CTE.

23      A    RIGHT. SO I TRIED TO PROBE THEM ON, WITHOUT

24 TELLING THEM TOO MUCH OF WHAT I WAS GOING TO DO, WHETHER

25 THIS PART COULD, COULD WORK FOR THIS, THIS SUBMOUNT,

1   SUBSTRATE MATERIAL SIMULATION.  AND THE FIRST THING I

2   CONFIRMED IS THAT IT IS ACTUALLY COPPER.  IT IS ACTUALLY

3   BULK.  AND IT'S SOMEWHERE, THEY TOLD ME, IT IS 250 MICRONS.

4   THE NEXT THING I INQUIRE, HOW THE HELL DO YOU HAVE SUCH A

5   THICK LAYER OF COPPER STICK ON WHAT TURNED OUT TO BE ALUMINA

6   CERAMIC.  AND THE ANSWER COMPLETELY SURPRISED ME.  I DIDN'T

7   EXPECT THAT AT ALL BECAUSE THE USUAL WAY YOU WOULD DO IT IS

8   THAT YOU WOULD DO SOMETHING NEW TO OPERATE SOME NEW LAYER

9   THAT STICKS ON CERAMIC OR MULTILAYER.  USUALLY IT IS

10  TITANIUM OR CHROMIUM OR SOMETHING.  THEN YOU WOULD SOLDER A

11  SUBMOUNT ON TOP OF IT OR I EXPECTED THAT IT WOULD HAVE

12  SOLDERED THE LAYER OF COPPER ON TOP OF IT.  AND THAT'S NOT

13  AT ALL WHAT IT IS.

14          SO WHAT THEY DID, WHAT THEY EXPLAIN TO ME THAT IT

15  WAS A SOLDER BETWEEN THE TWO, THAT THOSE TWO MATERIALS WERE

16  DIRECT BONDED.  AND YOU WILL UNDERSTAND LATER ON THAT, THAT

17  WAS NOT THE ANSWER THAT I EXPECTED.  BUT THAT WAS A REAGENT

18  BECAUSE THAT WAS THE RIGHT ANSWER.  SO THEN I WENT INTO

19  DETAIL HOW IS THAT DONE?  AND IT'S QUITE SIMPLE.

20          THEY TAKE -- THEY TAKE A SHEET OF COPPER.

21  THEY START TO SEPARATE IT AND THEY OXIDIZE THE BOTTOM.  THEN

22  THEY PUT BETWEEN CONTACT IN WAFER FORM AT VERY ELEVATED

23  TEMPERATURE, 1100 DEGREES CELSIUS OR SOMETHING LIKE THAT.

24  AND AT THAT TEMPERATURE THE OXIDE OF THE COPPER FORMS A

25  EUTECTIC -- SO EUTECTIC, E-U-T-E-C-T-I-C -- WITH THE -- WITH

1   THE MATERIAL -- WITH THE CERAMIC MATERIAL, WHICH ALSO HAS

2   OXYGEN IN IT.  AND SO THEY BECOME INTIMATELY BONDED WITH

3   THAT ATOMIC LINK, MEANING IT IS A VERY, VERY STRONG BOND,

4   MUCH HIGHER STRENGTH THAN YOU WOULD GET BY SOLDER OR

5   ANYTHING ELSE.

6        Q    WHAT DO YOU MEAN BY ATOMIC BOND?

7        A    THEY ARE JUST, THE ATOMS OF THE COPPER ARE BONDED

8   TO THE ATOMS OF THE CERAMIC.  IT'S WITHIN THE MATERIAL.

9   THERE IS NO EXTRA MATERIAL.

10       Q    SO WHAT HAPPENED NEXT, WELL, AT THIS --

11       A    THERE IS A MEANING TO THAT.  SO THE REASON I WAS

12  ASKING THAT AND THE REASON THAT ANSWER WAS SO MEANINGFUL IS

13  THAT IF THE BOND WAS ATOMIC, IT WAS GOING TO BE VERY STRONG.

14  AND IF IT HAD BEEN DONE AT 1100 DEGREES CS, WHICH IS, YOU

15  KNOW, ENOUGH TEMPERATURE, THAT IS VERY, VERY HOT, RIGHT.

16  AND THE PART I SAW HAD COOLED DOWN TO AMBIENT TEMPERATURE

17  AND THE TWO HAD NOT DELAMINATED, THEN THE ONLY THING THAT

18  COULD HAVE HAPPENED IS THAT ONE MATERIAL WOULD HAVE YIELDED

19  IT TO THE OTHER MEANING THAT SINCE THEY HAVE SUCH DIFFERENT

20  COEFFICIENT OF EXPANSION WITH THE COPPER EXPANDS MUCH, MUCH

21  MUCH FASTER THAN CERAMIC, THE ONLY WAY THEY COULD HAVE

22  STAYED STUCK TO EACH OTHER ONCE THE BOND WAS SO STRONG THAT

23  THE COPPER WAS CONSTRAINED TO THE CERAMIC.  IT HAD TO FOLD

24  THE EXPANSION OF THE CERAMIC.

25       Q    DID YOU TALK ABOUT THAT WITH THE BRUSH WELLMAN

1   REPRESENTATIVES?

2        A    I -- I -- I ASKED THEM AND THEY WERE LIKE A WEIRD

3   QUESTION, WE NEVER ASKED ABOUT THAT, BUT OBVIOUSLY THEY

4   REMAIN STUCK TOGETHER SO THAT MUST NOT BE HAPPENING.  THEY

5   ALSO CONFIRMED THAT THE COPPER WAS, SINCE IT HAD BEEN HEATED

6   TO 1100 DEGREES C WAS, YOU KNOW, IN A VERY RELAXED STATE SO

7   IT WAS VERY MALLEABLE, SO VERY AMENABLE TO FOLLOW THE STRONG

8   CERAMIC IN ITS MOVEMENT.  THAT'S WHY IT DOES THIS BIG

9   CRYSTALS, CRYSTALLIZES WHEN IT DOES THAT.

10               BUT THE SIGNIFICANCE OF THAT FOR

11   OPTOELECTRONICS IS VERY FUNDAMENTAL BECAUSE FOR THE TOTAL

12   PACKAGES, THE ONLY MATERIAL THAT CAN USE THIS FOR SUBMOUNTS

13   MUST BE CTE MATCHED TO THE DIODE.  AND COPPER IS NOT.

14        Q    WHAT KIND OF PRODUCTS ARE CTE MATCHED WITH THE

15   DIODE?

16        A    WELL, YOU'RE BASICALLY -- EITHER YOU CHOOSE

17   SUBMOUNTS THAT ARE CERAMIC.  AND THE BEST YOU CAN DO THIS IS

18   KNOWN AS BEO OR BERYLLIUM OXIDE IS ONE OF THE HIGHEST, WELL,

19   THE HIGHEST CONDUCTIVE CERAMIC, WHICH HAS THE RIGHT FUNCTION

20   OF EXPANSION.  OR IF YOU CHOOSE THE SUBMOUNTS AMONG THE

21   METAL CATEGORY, THE BEST ONE YOU'RE STUCK WITH IS COPPER

22   TUNGSTEN.  IT'S IN THE LAW OF COPPER THAT HAS AN INSANE

23   AMOUNT OF TUNGSTEN IN IT.  IT IS 80 PERCENT TUNGSTEN SO IT

24   IS ALMOST ALL TUNGSTEN, WHICH HAS THE RIGHT RIDGE OF

25   EXPANSION.  THAT IS WHY YOU PUT SO MUCH TUNGSTEN.  BUT IT IS

1  THAT ONE.  YOU KNOW, I'M BUYING SUBSTRATES AND SUBMOUNTS

2  THAT COST ME HUNDREDS OF DOLLARS.  AND HERE THIS GUY IS

3  COMPLAINING THAT THE PART COST BY 50 CENTS.

4           SO NOT ONLY HAD ALL THOSE NICE MECHANICAL

5  PROPERTIES AND ALL THOSE NICE HIGH PROPERTIES BUT IT WAS

6  INCREDIBLY CHEAP.  CHEAPER THAN PROCESSED SILICON.

7      Q    NOW, CAN YOU RECALL ANYTHING ELSE IN THAT INITIAL

8  DISCUSSION WITH THE BRUSH WELLMAN PEOPLE AT THEIR BOOTH?

9      A    WELL, IF I READ MY NOTES.

10     Q    ACTUALLY, WITH HIS HONOR'S PERMISSION WOULD YOU

11 STEP TO THE SCREEN SO WE CAN DISCUSS THOSE NOTES FOR JUST A

12 MINUTE, MR. VERDIELL?

13     A    I LOST MY STICK.  IT'S HERE.  SO IT SAYS,

14 "EXHIBITION PACKAGING, BRUSH WELLMAN, MAKE PARTS IN THE" --

15 WHO KNOWS WHAT THAT IS.  MADE BY THE PERSON AT THE BOOTH.

16 AUTOMOTIVE BACKGROUND.  THIS TECHNOLOGY WAS DEVELOPED FOR --

17 BY THE AUTO INDUSTRY.  THEY'RE USED IN AUTO IGNITION

18 MODULES.  THAT IS THE PART THAT I HAVE THERE IS FROM THE

19 IGNITION.

20     Q    AUTO IGNITION MODULES?

21     A    YES, RUGGED CONDITIONS.  MORE RUGGED PENDANT

22 CIRCUIT BOARD MATERIAL.

23     Q    WHAT DOES THE NEXT LINE REFER TO?

24     A    THICK COPPER, GRADE ALUMINA SO I JUST CONFIRMED

25 THAT IT'S REAL COPPER ON CERAMIC.  AND THEN I LEARNED THAT

1  IT'S DIRECT BOND COPPER.  THIS SAYS DIRECT BOND COPPER

2  PRODUCTS.  AND I MUST HAVE ASKED TO, HOW -- CAN YOU PUT THE

3  RING FRAME ON IT BECAUSE OBVIOUSLY THOSE DEVICES DON'T HAVE

4  THE RING FRAME AND THEY SAID ADDING THE SIDE WALL COST TEN

5  TO $15.

6      Q    LET ME STOP YOU THERE.  WHICH ENTRY ARE YOU

7  REFERRING TO NOW?

8      A    IT SAYS "ADDING SIDE WALL".  SO THAT IS -- THAT IS

9  IF I WANTED TO MAKE A HERMETIC OPTICAL PACKAGE ABOUT IT, I

10  WOULD HAVE TO PUT A CAP ON IT.

11      Q    SO A SIDE WALL WOULD RELATE TO WHAT PART OF THE

12  PACKAGE?

13      A    IT WOULD BE A RING FRAME THAT YOU PUT ON IT SO YOU

14  CAN SOLDER PACKAGE.  SO I DON'T THINK ANY OTHER SAMPLE HAD

15  THAT.  SO IT'S POSSIBLE THAT IT COULD BE COSTED.

16      Q    WHAT ABOUT THE NEXT ONE?

17      A    SO BRAZED WITH COPPER SILVER, THAT IS THE BRAZE

18  THEY USE TO PUT THE LEADS.

19      Q    THAT IS IN ONE OF THE SAMPLES?

20      A    YEAH.  AND THIS ONE, "DO LASER CUTTING OF

21  CERAMICS", I AM INQUIRING WHETHER YOU CAN PRECUT THOSE,

22  WHICH WOULD BE INTERESTING IF YOU WERE TO MAKE A LOT OF

23  PACKAGES AT THE SAME TIME AND THEN WANTED TO SINGULARIZE

24  THEM INTO INDIVIDUAL PIECES.  AND IF YOU DO, AND I HAVE ONE

25  ON PART THAT IS PRECUT.  AND THEY TELL ME, YES, WE DO.  WE

1    DO PRESCRIBE STRIPS.

2         Q    AND THEN THE PRESCRIBED STRIPS REFERS TO WHAT?

3         A    THEY DO A LASER OR A DIAMOND SAW PRECUT THAT

4    DOESN'T GO THROUGH THE WHOLE THICKNESS OF THE MATERIALS SO

5    IT'S FULL -- IT WILL STAND TOGETHER UNTIL YOU SNAP THEM

6    APART PHYSICALLY.

7         Q    HOW ABOUT THE NEXT LINE?

8         A    SO THIS I DON'T KNOW IF I -- I MIGHT HAVE DONE

9    THAT AFTER I TALKED TO THEM.  THOSE ARE DETAILS OF THE

10   PROCESS.  IT SAYS, "HEAT COPPER OXIDIZED CHEMICALLY".  THAT

11   IS THE COPPER OXIDE ON THE BOTTOM.  THEY SAID "HEAT UP IN

12   CONTACT WITH ALUMINA".  THAT IS THE PROCESS I WAS DESCRIBING

13   BEFORE.  "OR OTHER O".  O STANDS FOR OXYGEN-BEARING CERAMIC

14   AT 1068 DEGREES".  I WASN'T THAT FAR ENOUGH.  1100 DEGREES C

15   I WAS REFERRING TO.  THIS IS MY SHORTHAND FOR DEGREES.

16        NEXT LINE SAYS, "CUO FORM DETECTED".  THAT MEANS

17   COPPER OXIDE ARE OUR CHEMICAL SYMBOLS FOR COPPER OXIDE FORMS

18   EUTECTIC.  THAT IS THE NAME -- THE NAME SPELLED OUT BEFORE.

19        THAT WAS IMPORTANT.  "THEN ETCH".  SO THAT WAS

20   ANOTHER NICE FEATURE IS THAT TO MAKE THOSE COPPER, TO REMOVE

21   THE COPPER IN THE AREA WHERE YOU COULD SEE THE CERAMIC, THAT

22   WAS JUST DONE BY ETCHING MEANING YOU TAKE A WHOLE WAFER AT A

23   TIME AND YOU USE A CHEMICAL METHOD TO REMOVE IT SO IT IS

24   ALSO VERY LOW COST WAY OF DOING THINGS.

25        Q    CAN WE HAVE EXHIBIT D TO SEE THE PHOTOGRAPHS OF

1   THE SAMPLES?

2        A     THIS IS ALL THE WHITE REGIONS HERE.

3        Q     YES.

4        A     THAT USED TO BE ALL METAL.  AND IT HAVE BEEN

5   REMOVED BY ETCHING.

6        Q     AND WHAT'S THE SIGNIFICANCE -- WHAT WAS THE

7   SIGNIFICANCE OF THAT TO YOU?

8        A     THE SIGNIFICANCE OF THAT IS YOU CAN DO ALL KIND OF

9   CIRCUITS ALL AT ONCE IN THE WHOLE WAFER SO IT CAN BE VERY

10  CHEAP.  SO IT IS THE PARTING FROM THE OLD WAY OF DOING

11  THINGS WHERE YOU PUT YOUR LITTLE PIECES ONTO OTHER PIECES

12  ONE AT A TIME, YOU COULD DO IT ALL IN ONE STEP.  AND, YOU

13  KNOW, OBVIOUSLY VERY CHEAPLY.

14       Q     LET'S GO BACK TO THE CALENDAR NOTES, IF YOU WILL.

15       A     TAKE THE BOTTOM LINE.

16       Q     WHAT DO WE SEE BELOW THE REFERENCE TO ETCH?  WHAT

17  COMES NEXT?

18       A     WELL, THAT IS MY WORKING IDEA ABOUT "DO THERMAL

19  VIAS THROUGH CERAMIC"".  AND THEN THE ANSWER IS "CU", THAT

20  MEANS COPPER, "AT LIKE PISTON.  DON'T PUT UNDER DIE".  THIS

21  IS THEIR POLITE WAY TO TELL ME THAT THAT IS -- THAT'S REALLY

22  NOT A GOOD IDEA.

23            THEN THE NEXT ENTRY, "OR USE BARIUM OXIDE" INSTEAD

24  OF TRYING TO LOAD YOUR ALUMINA WITH COPPER, JUST USE A

25  BETTER CERAMIC.  AND THAT'S WHERE THEY TELL ME THAT THE

1   PRICE IS -- JUMPS FROM THIS INCREDIBLE $1.5 TO $2.

2        Q    WHAT IS YOUR UNDERSTANDING ABOUT IF YOU USED BEO

3   WHETHER YOU WOULD HAVE THIS PROBLEM OF PISTONING?

4        A    YOU WOULD NOT.  BECAUSE BEO IS JUST A STANDARD

5   CERAMIC AND IT HAS THE RIGHT COEFFICIENT OF EXPANSION SO

6   THIS WOULD REPLACE THE ALUMINA.  YOU WOULDN'T BE ABLE TO

7   TELL BY LOOKING AT THE PART.  BEO LOOKS EXACTLY LIKE

8   ALUMINA.  AND THE ONLY DIFFERENCE, THE ONE IMPORTANT

9   DIFFERENCE, IT IS A MUCH BETTER SEMICONDUCTOR.

10       Q    AND THEN WHAT IS THE LAST ONE?

11       A    IT'S THE, OH, AL203.  THAT'S ALUMINA, ALUMINUM

12  OXIDE.  SO ALTHOUGH IT'S SAYS ALUMINUM IN IT, IT IS ACTUALLY

13  CERAMIC, THIS WHITE MATERIAL THAT WE RECOGNIZE AS A CERAMIC.

14  IT DOESN'T LOOK AT ALL NOR ACT AT ALL LIKE METAL.  SO IT

15  SAYS SHORTHAND FOR ALUMINUM OXIDE IS "$1.5 PER SQUARE INCH

16  ETCHED".  ETCHED MEANS IT IS $1.5 PER SQUARE INCH.  ONCE YOU

17  HAVE GONE THROUGH TROUBLE OF DEFINING ALL THOSE REGION THAT

18  CAN BE, IT HAS BEEN INDICATED AS YOU WISH.

19       Q    I BELIEVE YOU SAID THAT YOU'RE NOT SURE WHETHER

20  YOU PREPARED THESE DURING THE CONVERSATION OR AFTER; IS THAT

21  CORRECT?

22       A    YES.  BECAUSE I AM READING THIS AND I SEE IF I AM

23  ASKING THOSE QUESTIONS OVER HERE.  PROBABLY I WENT THROUGH

24  THAT ALREADY.

25       Q    IF THEY WERE PREPARED AFTER, DO YOU RECALL HOW

1    LONG AFTER THAT WAS?

2        A    OH, RIGHT ON THE SPOT.   RIGHT THERE.   I STOPPED

3    AND --

4        Q    WHAT WAS YOUR REACTION, MR. VERDIELL, TO HEARING

5    THE INFORMATION THAT WAS -- YOU JUST RELATED TO US?

6        A    I WAS -- I WAS VERY EXCITED.   I'M STILL EXCITED TO

7    THIS DAY ACTUALLY.   THIS IS UNUSUALLY, YOU COME UP WITH

8    BRIGHT IDEA AND ASK QUESTIONS AND YOU HIT THE WALL WITHIN

9    FIVE SECONDS.   AND THIS ONE, IT WENT ALL THE WAY THROUGH.

10   SO I STARTED TO THINK IN MY HEAD ABOUT THE PACKAGE USING

11   THAT MATERIAL.   AND IMPLEMENTATION OF AN OPTICAL PACKAGE.

12       Q    OKAY.   SO WHAT DID YOU -- WHAT DID YOU DO NEXT

13   THEN WITH RESPECT TO THIS BRUSH WELLMAN MATERIAL?

14       A    I TOOK AS MUCH, A PIECE, PARTS AS I COULD FROM THE

15   EXHIBITS.

16       Q    SAMPLES?

17       A    THEY WERE VERY NICE TO LET ME TAKE SOME.

18   THERE'S -- SO I TOOK THEM THAT WERE PRESCRIBED.   I TOOK ONE

19   THAT ACTUALLY WAS PLATED.   I DON'T KNOW IF YOU CAN -- IF YOU

20   CAN SEE IT BECAUSE I COULD SEE RIGHT AWAY THAT I COULD

21   TRANSFER THAT INTO AN OPTICAL PACKAGE WHICH I DID LATER ON.

22       Q    CAN WE GO BACK TO THE PHOTOGRAPH 1008-D?   WHICH

23   ONE ARE YOU REFERRING TO?

24       A    I'M REFERRING TO THIS ONE.   SO THIS ONE IS VERY --

25       Q    SO THE ONE?

1    A    OF COURSE.

2    Q    DID HE SHARE THOSE CONCERNS?

3    A    OF COURSE WE WERE BOTH VERY WORRIED.  SDL HAD HAD

4  A HISTORY OF BEING VERY AGGRESSIVE WITH -- WITH EMPLOYEES

5  THAT HAD LEFT AND CONTINUED IN THE SAME FIELD AND STARTED

6  COMPANIES.

7    Q    NOW, LATER, AFTER THE APPLICATION WAS WITHDRAWN,

8  YOU FILED AN APPLICATION FOR THE PATENTS WE JUST SAW FOR

9  LIGHTLOGIC; CORRECT?

10   A    YES, THAT'S CORRECT.  IT'S AN APPLICATION WHERE I

11 HAD -- IT'S A SUBSET OF THE FIRST APPLICATION THAT CONTAINS

12 ONLY MY -- MY CLAIMS AND INVENTION.

13   Q    OKAY.  AND HAVE YOU HAD OCCASION TO COMPARE THE

14 PATENT APPLICATION THAT WAS FILED ON BEHALF OF RADIANCE IN

15 MR. SHUM'S NAME, THE ONE YOU FILED FOR LIGHTLOGIC?

16   A    YES.

17   Q    LET ME SHOW YOU AN EXHIBIT THAT WE'VE ONLY USED AS

18 A DEMONSTRATIVE UP TO NOW.  LET ME HAVE IT MARKED.  WHAT'S

19 NEXT IN ORDER?

20        (EXHIBIT 1044 MARKED FOR IDENTIFICATION.)

21        MR. VERDIELL, DO YOU RECOGNIZE WHAT WE MARKED AS

22 EXHIBIT 1044?

23   A  · YES.

24   Q    AND WHAT IS THAT?

25   A    IT'S A RED LINE VERSION OF THE PREPARED -- THE

1   ORIGINAL APPLICATION AND THE REFI APPLICATION.

2        Q    HAVE YOU REVIEWED -- HAVE YOU REVIEWED THOSE TWO

3   DOCUMENTS AND ALL OF THE RED LINING THAT YOU SEE IN EXHIBIT

4   1044?

5        A    YES.  EVERY SINGLE PAGE OF IT.

6        Q    IS IT ACCURATE?

7        A    IT IS ACCURATE.

8        Q    AND DOES IT SHOW -- WHAT DOES IT SHOW?

9        A    IT SHOWS ONE OF THE WHAT HAS BEEN REMOVED AND WHAT

10  HAS BEEN ADDED BETWEEN THE TWO VERSIONS.

11       Q    AND IN YOUR EFFORT TO MODIFY THE LIGHTLOGIC

12  PATENT, WHAT WERE YOU TRYING TO DO?

13       A    I WAS TRYING TO RENEW THE AGREEMENT IN THE

14  RADIANCE, IN THE RADIANCE PACKAGE, WHEN I WAS TRYING TO

15  REMOVE ALL OF FRANK'S, ALL OF MR. SHUM'S CONTRIBUTION TO THE

16  PACKAGE.  THE PATENT.

17       Q    AND YOU BELIEVE YOU DID THAT?

18       A    YES.

19       Q    NOW, YOU FILED THIS APPLICATION ON WHAT DATE?

20       A    JANUARY 6 OR 7, 1998.

21       Q    AND WHEN WAS THE AGREEMENT, THE PLAN OF

22  LIQUIDATION THAT YOU AND MR. SHUM SIGNED WITH RESPECT TO

23  YOUR RIGHTS?

24       A    IT WAS SIGNED THE DAY BEFORE.  I WAS ACTUALLY

25  WAITING FOR THE OFFICIAL AUTHORIZATION TO DO THAT.

1     A     OF COURSE HE WAS MY COMPETITOR AT THE TIME.  MY

2    PRIMARY COMPETITOR.

3     Q     LET'S TURN TO THE FLEXURE PATENTS AND THE CLAIMS

4    IN THE FLEXURE PATENTS.  UM, LET ME GO BACK, IF I CAN, TO

5    TAKE YOU TO 1997.  AND LATE MARCH OF 1997 WHEN YOU LEAVE SDL

6    AND YOU'RE NOW WORKING AT RADIANCE WITH MR. SHUM, WHAT IS

7    YOUR OWN VIEW OF WHAT IT IS THAT YOU'RE LOOKING FOR TO TRY

8    AND DEAL WITH THE LINE AND ATTACH CHALLENGE AS WE SEEN IT

9    REFERRED TO?

10     A     AS I SAY BEFORE, UM, THE VISION FOR RADIANCE IS,

11    AMONG OTHER THINGS, TO FIND AN AUTOMATABLE QUASIPLANAR

12    IMPLEMENTATION OF AN OPTICAL PACKAGE.  AND THE SUBSTRATE BY

13    THAT TIME WE -- I THINK I HAVE A GOOD SOLUTION FOR IT.  AND

14    THE ATTACHMENT, AND LINE-UP METHOD, AT LEAST I DON'T HAVE A

15    GOOD SOLUTION AT THAT TIME.

16     Q     AND STARTING FROM THAT TIME PERIOD, WHAT -- WHAT

17    EFFORTS DID YOU MAKE TO TRY TO COME UP WITH THE SOLUTION?

18     A     OH, I TRIED AND DREW THE TON OF CONCEPTS.  MOST OF

19    THEM WOULD HAVE THE FATAL PROBLEM WITH THEM, WITH THE REPORT

20    FOR ONE REASON OR ANOTHER.  I KEPT DOING SEVERAL A DAY

21    ACTUALLY.

22     Q     UM, LET ME, CAN WE HAVE EXHIBIT 236, PLEASE?  DO

23    YOU RECOGNIZE THIS DOCUMENT, MR. VERDIELL?

24     A     I DO.

25     Q     AND IT LOOKS LIKE -- CAN YOU GIVE ME THE DATE ON

1    THE TOP RIGHT CORNER?

2        A    IT IS APRIL 1, '97.

3        Q    ARE THESE YOUR DRAWINGS?

4        A    YES, THEY ARE.

5        Q    AND WHAT ARE THEY?

6        A    THEY ARE TRIALS FOR SOLUTION FOR THE FIBER

7    ALIGNMENT AND ATTACHMENT PROBLEM.  IN THE QUASIPLANAR

8    FORMAT.

9        Q    ALL RIGHT.  AND DO ANY OF THESE DESIGNS INVOLVE

10   FLEXURES?

11       A    THE TWO TOP ONES ARE FLEXURE LIMITATIONS.

12       Q    AND DO ANY OF THESE DESIGNS INVOLVE LASER WELDING?

13       A    THE TWO TOP ONES FOR SURE.  THE THIRD ONE, THE

14   THIRD ONE I ANTICIPATED LATER LASER WELDING, TO USE OTHER

15   MECHANICS.  THE THIRD ONE BEING THE BOTTOM, VERY BOTTOM ONE.

16       Q    AND DID YOU PURSUE ANY OF THESE IDEAS?

17       A    NO.  THEY ALL HAD SOME -- SOME ISSUES WITH THEM

18   THAT MADE THEM UNATTRACTIVE.

19       Q    ARE THESE IDEAS YOU CONCEIVED OF ON YOUR OWN OR

20   DID YOU CONCEIVE OF THESE TOGETHER WITH MR. SHUM?

21       A    THIS IS ON MY OWN.

22       Q    NOW, BY THIS TIME HAD YOU ALREADY SEEN HIS RECORD

23   OF INVENTION OF THE PIVOT OR THE FLEXURE IMPLEMENTATION OF A

24   LEVER ARM PIVOT?

25       A    BY APRIL 1, YES.

1       Q   AND WHY WERE YOU PURSUING OTHER DESIGNS OF THIS

2   KIND?

3       A   A -- THE -- THE -- MR. SHUM'S INVENTION DIDN'T

4   ADDRESS THE ATTACHMENT AND THE THREE DIMENSIONAL QUASIPLANAR

5   ALIGNMENT PROBLEM.  SO IT WAS -- SO I THINK WE WENT OVER

6   THAT SO MANY TIMES.  THERE IS NO -- IT'S NOT, SAY, HOW IT IS

7   GOING TO BE ATTACHED AND THAT'S ACTUALLY VERY CRITICAL.

8           ON TOP OF THAT, UM, I WAS LOOKING FOR

9   SOMETHING THAT COULD BE AUTOMATED, NOT ANY AUTOMATION

10  TECHNIQUE WOULD WORK.  I PUSHED VERY HARD TO HAVE AN

11  ATTACHMENT THAT COULD BE SUITABLE FOR AUTOMATION AND BE ALSO

12  HAS SOME VERTICALITY TO IT, HAVING, I MEAN SUFFERED MY

13  PREVIOUS STRESS ALIGNMENT PROBLEMS.

14      Q   WHY DID YOU CONSIDER VERTICALITY TO BE IMPORTANT?

15      A   SO THAT I LEARNED THAT THE HARD WAY BY TRYING TO

16  DO PASSIVE ALIGNMENT METHODS THAT THE -- THERE IS JUST NO

17  WAY YOU CAN HAVE A PRECISION THAT IS NEEDED TO MAKE -- YOU

18  CAN MAKE SOME PRODUCTS BUT YOU COULDN'T MAKE A COMPETITIVE

19  PRODUCT WITHOUT RESORTING TO ACTUAL ALIGNMENT AND

20  THREE-DIMENSIONAL ALIGNMENT.

21      Q   AND YOU REFERRED TO AUTOMATION.  WHAT WAS YOUR

22  VIEW OF MR. SHUM'S LEVER ARM PIVOT IN TERMS OF AUTOMATION?

23      A   IT'S COMPLETELY INDEPENDENT.  IT'S THE

24  IMPLEMENTATION OF A PIVOT SO IT DOESN'T ASSUME AUTOMATION OR

25  ATTACHMENT.  IT'S NOTHING.  IT'S IRRELEVANT.

1   Q   IN THE SENSE IT IS NOT ADDRESSED?

2   A   IT IS NOT ADDRESSED, YES.  IT IS NOT THE POINT OF

3   THE INVENTION.

4   Q   SO WHAT DO THESE THEN REFLECT, THESE KINDS OF

5   WARRANTS IN APRIL 1 FOLLOWING?

6   A   DO YOU WANT ME TO GIVE YOU DETAILED INFORMATION OR

7   JUST --

8   Q   IN GENERAL?

9   A   IN GENERAL.  THEY ARE WAYS, UM, TO ALIGN THE

10  FIBER.  AND, ONCE AGAIN, BOTH OF THE TOP ONES IS HOW, WITH

11  LARGE MOVEMENT OF SOMETHING, YOU CAN AFFECT A SMALL MOVEMENT

12  OF THE TIP OF THE FIBER.  HOWEVER, THOSE -- THOSE TWO

13  INPLANE ATTACHMENT MECHANISM WITH THE SUN DIAL AND THE

14  PARALLELOGRAM FLEXURE IS THE FIRST ONE, FOR EXAMPLE.

15  Q   WHY DON'T YOU STEP TO THE SCREEN FIRST AND SHOW US

16  WHERE THE ATTACHMENT WOULD BE IF YOU WOULD ON THE TOP TWO?

17  A   THE SECRET TO DO THE OPTICAL ATTACHMENT IS THAT

18  YOUR GAPS ARE VERY SMALL.  YOU HAVE NO GAPS OF ANY KIND

19  BETWEEN THE PARTS THAT YOU ARE GOING TO ATTACH.  SO THIS TO

20  SEE TO SOLVE THAT YOU WOULD, OF COURSE, THIS IS THE PIECE

21  THAT WAS MEANT TO BE DBC AT THE TIME SO THESE ARE METAL

22  AFFIXED IN THE FRONT AND SOMEHOW IT HAS BEEN ETCHED OR

23  RELIEVED SO THE RIGHT PART OF IT IS FREE FLOATING.  IT

24  FLOATS SO THAT YOU CAN MOVE IT SO THE FRONT PART JUST STAY

25  ATTACHED.  SO I THINK THIS IS THE, WHEN YOU PUSH THAT LEVER

1  HERE, WITH THE LEVER OF SOME KIND OR A PUSHER OF SOME KIND,

2  IT'S COMPLETELY FIXED IN THE FRONT, THE WHOLE THING IS BEING

3  BENT.  IT'S GOING TO GLOBALLY DEFORM.  IT IS GOING TO BEND,

4  RIGHT.  AND THE FIBER IS TOWARDS THE FIXED PART SO IT WILL

5  MOVE ONLY A PORTION, OF COURSE, OF WHAT YOU MOVE THE OUTER

6  PART.

7          AND ONCE YOU HAVE OBTAINED ALIGNMENT, FOR EXAMPLE,

8  I REMOVED THE LEVER UP TO HERE.  THEN YOU WELD JOINT BETWEEN

9  THE TIP OF THE LEVER AND THIS REMAINING METAL PART.  THE

10  TRICK HERE IS THAT WITH THIS CURVE IS SUCH THAT THE TIP OF

11  THE LEVER AND THE METAL EDGE WHICH WERE, I THINK, WELDED

12  THERE WAS VERY CLOSE.  A PERFECT CURVE.  SO THAT THE WELD

13  SHIFT WILL BE VERY SMALL.

14      Q    AND THAT'S WHY IT SHOULD BE CLOSED FOR A SMALL

15  WELD SHAPE?

16      A    YEAH.  YOU HAVE TO BE CLOSE FIRST SO YOU CAN WELD

17  IT.

18      Q    AND WHERE IS THE ATTACHED POINT ON THE SECOND

19  DRAWING THERE?  THE SECOND FLEXURE ALIGNMENT MECHANISM?

20      A    IT'S A SIMILAR CONCEPT.  YOU SEE, IT IS A FULL TIP

21  HERE THAT IS CLOSE THAT IS JOINT HERE.  THAT'S WHERE WE WELD

22  IT TO THIS BIG PART HERE.  THAT PART IS METAL.  SO YOU WANT

23  ME TO EXPLAIN THIS ONE BUT IT'S A SIMILAR WAY OF ACTION TO

24  THE PREVIOUS ONE.  IT IS PARALLELOGRAM FLEXURE.  YOU PUSH ON

25  THIS ONE.  SO IT'S ATTACHED HERE.  IT IS FLOATING OVER HERE.

1  YOU PUSH THAT ONE.  THE PARALLELOGRAM FORMS.  THE FIBER

2  IS -- PUSH TOWARDS THE -- TOWARD THE PART THAT IT IS FIXED

3  SO I CAN ONLY MOVE A SMALL PORTION OF THE MOVEMENT OVER

4  HERE.  AND THIS LITTLE TAB, AT ALL TIMES, IS VERY CLOSE TO

5  THE WALL, IS WELDED AT THE WALL, AND IT WILL NOT SHIFT.

6      Q    NOW, DO EITHER OF THESE, ARE EITHER OF THESE HAVE

7  A SPRINGINESS TO THEM?

8      A    THIS ONE WOULD BE SPRINGY.  THIS ONE COULD OR

9  COULD NOT BE SPRINGY.  IT DOESN'T NEED TO BE SPRINGY.  I

10  THINK EITHER ONE DOESN'T NEED TO BE SPRINGY EITHER.

11      Q    OKAY.

12      A    YOU COULD PUSH IT BACK THE OTHER WAY.

13      Q    OKAY.  LET'S LOOK AT -- YOU CAN TAKE YOUR SEAT FOR

14  JUST A MOMENT.  LET'S LOOK AT THE FIRST OF THE FLEXURE

15  PATENTS OR AT LEAST FIRST OF THE TWO FLEXURE PATENTS, THE

16  '950 PATENT.  AND IF I CAN ASK YOU TO TURN, IF YOU WOULD,

17  MR. VERDIELL, TO CLAIM ONE OF THAT PATENT.  ARE YOU FAMILIAR

18  WITH THAT CLAIM?

19      A    OF COURSE.  YES.

20      Q    ARE YOU THE INVENTOR?

21      A    YES.

22      Q    WHEN DID YOU CONCEIVE OF THIS INVENTION?

23      A    THAT WAS ON APRIL 17, 1997, I BELIEVE.

24      Q    OKAY.  AND DID YOU HAVE A DOCUMENTARY EVIDENCE OF

25  THAT CONCEPTION?

1    Q    THANK YOU.

2    A    -- KIND OF MATERIAL.

3    Q    THANK YOU.  UM, TELL US WHAT ELSE WE SEW IN THE

4    DRAWING?

5    A    SO YOU HAVE THE LASER DIODE MOUNTED ON THIS WHOLE

6    STACK.  THE PHOTO DIODE IN THE BACK, WHICH IS THE ONE THAT I

7    HAVE DRAWN OVER HERE.

8    Q    YES.

9    A    A LENS, A CYLINDRICAL LENS, WHICH IS VERY SIMILAR

10   TO THE PROTOTYPE NUMBER ONE THAT YOU SHOWED BEFORE THAT'S

11   PLACED ON THE BOTTOM OF THE SUBSTRATE.  THE BIPOD FLEXURE

12   BECAME KNOWN LATER WAS THE METAL ISLANDS WHERE YOU WOULD

13   WELD THE FEET.  A CAP FOR HERMETISM.  THE FIBER WENT THROUGH

14   THE CAP, DETAILED HOW IT'S DONE, AND BEING ATTACHED TO THE

15   BOTTOM OF THE FLEXURE.  AND WHAT I CAN -- QUITE NOVEL

16   THING -- THE UNIQUE RECALL AS MOST PACKAGES AT THAT TIME ARE

17   BUTTERFLIED SO WE HAVE THE LEADS THAT COME THROUGH THE

18   WALLS.  AND HERE I TAKE ADVANTAGE OF THE FACT THAT MY

19   SUBSTRATE IS ALSO AT THE BOTTOM OF THE PACKAGE AND IT'S

20   CERAMIC AND ISOLATING.  SO I PUT THE LEADS ERST AND THEN YOU

21   DON'T SEE IT VERY WELL ON THIS COPY.  THIS IS THIS CATCH VIA

22   THAT WILL TAKE THIS LEAD HERMETICALLY AND ELECTRICALLY

23   CONTACT IT TO THE OTHER SIDE OF THE SUBSTRATE AND GO UP TO

24   THE DIODE.

25   Q    SO THE DIODE, I SEE TWO LITTLE VERTICAL LINES, ONE

1   TALLER THAN THE OTHER, UNDERNEATH WHAT YOU DESCRIBED AS A

2   CYLINDRICAL LENS AND WHAT DO THOSE REPRESENT?

3        A    SO THAT THE VERY SKETCHY REPRESENTATION OF THE

4   VIAS THAT WOULD BE A CONNECTION FROM THE LEG UNDERNEATH TO

5   THE INSIDE OF THE PACKAGE.

6        Q    OKAY.  OKAY.

7        A    WHAT ELSE?  THEN YOU SEE SOME -- I'M TRYING TO PUT

8   MY ISOLATOR BACK IN SO YOU SEE SOMETHING THAT LOOK LIKE

9   ISOLATORS.  SOME, ANOTHER LENS.  THIS BEING CONSIDERED FOR

10  ATTACHMENT.

11       Q    OVER ON THE SIDE, THERE'S SOME WRITING.  IT LOOKS

12  LIKE IT SAYS "DEMONSTRATED"; IS THAT CORRECT?

13       A    THAT'S CORRECT.

14       Q    WHAT ARE THE REFERENCES UNDER THAT AND WHAT DO

15  THEY MEAN?

16       A    WELL, IT'S -- ALL THE THINGS I AM PROUD OF WHICH I

17  THINK I HAVE SOLVED AND ALL THE THINGS WHICH I AM WORRIED

18  ABOUT WHICH I THINK NEED MORE WORK.

19       Q    OKAY.

20       A    SO --

21       Q    WHAT IS THE FIRST ONE UNDER "DEMONSTRATED"?

22       A    WELL, THAT'S THE BONDING OF THE ATTACHMENT OF

23  THE -- OF THE FIBER, RIGHT, WHICH I HAD STRUGGLED WITH FOR A

24  LONG TIME.  THAT WE CAN PUT THE LENS ON THE PACKAGE.  THAT

25  WE CAN DO THE FIBER ALIGNMENT.  THAT IT'S SMALL.  THAT IT'S

1

2   COURT REPORTER'S CERTIFICATE

3   I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

4   DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

5   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7   I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

8   COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

9   CONFERENCE OF THE UNITED STATES.

10

11   _____

12   STARR A. WILSON, CSR NO. 2462

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 13

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

COPY

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | BENCH TRIAL |
| PLAINTIFF, | ) | NO. C 02-3262 DLJ |
| VS. | ) | |
| INTEL CORPORATION, JEAN-MARC VERDIELL AND LIGHTLOGIC, INC., | ) | VOLUME 6A - A.M. SESSION PAGES 1072 - 1169 |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA WEDNESDAY, JANUARY 19, 2005 |
| AND RELATED CROSS-ACTION. | ) | |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF AND
COUNTER-DEFENDANT:

LAW OFFICES OF E. ROBERT (BOB) WALLACH,
P.C.
P.O. BOX 2670
SAN FRANCISCO, CALIFORNIA  94126-2670
BY:  E. ROBERT WALLACH, ATTORNEY AT LAW

SHOPOFF & CAVALLO LLP
353 SACRAMENTO STREET, SUITE 1040
SAN FRANCISCO, CALIFORNIA  94111
BY:  GREGORY S. CAVALLO, ATTORNEY AT LAW

BELL, BOYD & LLOYD
70 WEST MADISON STREET, SUITE 3300
CHICAGO, ILLINOIS 60602-4207
BY:  ALAN L. BARRY, ATTORNEY AT LAW

LAW OFFICES OF HARRIS ZIMMERMAN
1330 BROADWAY, SUITE 710
OAKLAND, CALIFORNIA   94612
BY:  HARRIS ZIMMERMAN, ATTORNEY AT LAW

(APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          CAROLYN M. MANN, CSR NO. 10066

# I N D E X

**DEFENDANTS' WITNESSES**                          **PAGE**    **VOL.**

**JEAN-MARC VERDIELL**
DIRECT EXAMINATION BY MR. TAYLOR
    (RESUMED)                                   1075       6-A
CROSS-EXAMINATION BY MR. WALLACH                1128       6-A

# E X H I B I T S

**DEFENDANTS' EXHIBITS**           **IDENTIFIED**              **VOL.**
VERDIELL 3                          1125                     6-A

--oOo--

1    Q.   AND DO YOU HAVE AN INDEPENDENT RECOLLECTION OF THAT NOW?

2    A.   YES, THEN IT ALL CAME BACK TO ME.

3    Q.   OKAY.  AND YOU'RE SURE, AS YOU SIT HERE TODAY, THAT SUCH A

4    DRAWING ON A NAPKIN WAS PREPARED?

5    A.   YES.

6    Q.   LET'S TAKE A LOOK IF WE CAN AT THE APRIL 17 DRAWING, THE

7    RECORD OF INVENTION.  AND WHAT I'D LIKE TO DO BEFORE WE LEAVE

8    THE '950 PATENT, MR. VERDIELL, IS JUST CONFIRM THAT ALL OF THE

9    ELEMENTS OF CLAIM 1, DETERMINE WHETHER THEY CAN BE FOUND IN

10   THIS DRAWING.

11             COULD YOU STEP TO THE SCREEN, PLEASE.  READING FROM

12   THE ELEMENTS OF CLAIM 1, DO YOU SEE AN OPTOELECTRONICS PACKAGE

13   IN THIS DRAWING?

14   A.   THAT'S THE MAIN DRAWING OVER HERE.

15   Q.   HOW ABOUT A SUBSTRATE HAVING A FLOOR?

16   A.   THIS LARGE RECTANGLE IS THE SUBSTRATE WITH THE FLOOR, AND

17   THIS, AND THIS IS A LENS MOUNTED ON THE FLOOR, FOR EXAMPLE.

18   Q.   BOTH AND YOU I ARE GOING TO HAVE TO KEEP OUR VOICES UP,

19   AND PARTICULARLY WHEN YOU'RE STANDING OVER AT THE SCREEN, AWAY

20   FROM THE MICROPHONE.

21   A.   I WILL TRY.

22   Q.   SO REFERRING TO THE SUBSTRATE, AT THE TIME YOU MADE THIS

23   DRAWING, WHAT MATERIAL WERE YOU CONSIDERING OR WERE YOU TO MAKE

24   THE SUBSTRATE OUT OF?

25   A.   THAT, THAT WOULD BE THE BEO, BERYLLIUM OXIDE, I HAD TALKED

1    ABOUT EARLIER.   THAT WOULD BE THE DBC, DIRECT-BONDED COPPER,

2    WITH THE BERYLLIUM OXIDE CERAMIC.

3    Q.   WITH THE BEO CERAMIC.

4              THE CLAIMS REFER TO A FIRST OPTICAL ELEMENT COUPLED

5    TO THE SUBSTRATE.   DO YOU SEE THAT?

6    A.   THIS WOULD BE THE LASER DIODE.   IT'S OVER HERE SITTING ON,

7    ON THE LITTLE RAISED PLATFORM.   IT'S DETAILED OVER THERE ON THE

8    TOP OF THE DRAWING ALSO.

9    Q.   AND HOW ABOUT A SECOND OPTICAL ELEMENT?

10   A.   WE HAVE PLENTY OF THOSE.   THERE'S THE LENS I JUST ALLUDED

11   TO; IT'S SHOWN OVER HERE, AND THERE'S A THIRD ONE HERE.   THOSE

12   OVER HERE ARE FIBER LENSES.

13   Q.   DO YOU SEE A FLEXURE COUPLED TO THE SECOND OPTICAL ELEMENT

14   AND THE SUBSTRATE --

15   A.   SO --

16   Q.   -- TO MAINTAIN THE SECOND ELEMENT AND OPTICAL ALIGNMENT

17   WITH THE FIRST OPTICAL ELEMENT?

18   A.   WELL, THAT SECOND OPTICAL ELEMENT IS A FIBER.   THAT WOULD

19   BE HERE, THE MIDDLE DRAWING, THE TOP DRAWING.   AND WHAT DID YOU

20   SAY?  WAS COUPLED TO THE . . . SECOND OPTICAL?

21   Q.   THE FLEXURE IS COUPLED TO THE SECOND OPTICAL ELEMENT.

22   A.   THIS IS THE FLEXURE ON TOP OF THE FIBER.

23   Q.   AND IT'S ALSO COUPLED TO THE SUBSTRATE?

24   A.   AND IT'S COUPLED TO THE, TO THE SUBSTRATE OVER HERE.

25   Q.   TO MAINTAIN THE SECOND OPTICAL ELEMENT IN OPTICAL

1   ALIGNMENT WITH THE FIRST OPTICAL ELEMENT.

2   A.   RIGHT.  SO IN THIS CASE, THAT WOULD BE MEAN THAT THIS,

3   THAT THE DIODE LASER IS ALIGNED WITH THE FIBER VIA THE LENS, OF

4   COURSE, BUT THE ALIGNMENT IS ACCOMPLISHED BY THIS FLEXURE.

5   Q.   DOES THE DRAWING SHOW THE FLEXURE HAVING AT LEAST TWO

6   LEGS?

7   A.   IT HAS EXACTLY TWO LEGS.

8   Q.   DOES THE DRAWING SHOW A BRIDGE ON THE FLEXURE?

9   A.   RIGHT.  SEE, THE FIRST LEG IS OVER HERE.  THEN IT ELEVATES

10  INTO A BRIDGE.

11  Q.   AND DOES THE DRAWING SHOW A PAIR OF SPRING REGIONS THAT

12  COUPLE THE BRIDGE TO AT LEAST TWO LEGS?

13  A.   THOSE WOULD BE THOSE TWO DOWNWARD SLOPING REGIONS ON

14  EITHER SIDE OF THE BRIDGE, BETWEEN THE BRIDGE AND THE LEG.

15  Q.   THANK YOU, MR. VERDIELL.  IF YOU COULD HAVE A SEAT FOR A

16  MOMENT.

17          DOES THE TWO-LEGGED FLEXURE, AS YOU CONCEIVED IT,

18  INCLUDE ANY KIND OF A PIVOT MECHANISM?

19  A.   NO.

20  Q.   AND DOES IT CONTAIN A PIVOT MECHANISM EITHER BEFORE OR

21  AFTER IT'S ATTACHED?

22  A.   NO.

23  Q.   WHAT ABOUT THE FOUR-LEGGED FLEXURE THAT YOU CONCEIVED OF,

24  DOES THAT CONTAIN ANY KIND OF A PIVOT MECHANISM?

25  A.   NO.

1  Q.   DOES IT CONTAIN ANY KIND OF A PIVOT MECHANISM AFTER THE

2  FRONT END IS ATTACHED AND ONE IS, IS ALIGNING AND ATTACHING THE

3  BACK END?

4  A.   NO.   IN THIS CASE, IT WOULD KIND OF BEND GLOBALLY.   IT'S

5  NOT, IT'S NOT THOUGHT TO BE A PIVOT.

6  Q.   WOULD BENDING GLOBALLY BE A PIVOT MECHANISM?

7  A.   NO, IT WOULD NOT HAVE A PIVOT POINT AND IT'S NOT A

8  PIVOTING LEVER MECHANISM.   IT'S JUST, THE WHOLE PARTS BECOMES

9  TWISTED, AS WE HAVE SEEN IN THE EARLIER TESTIMONIES AND THE

10  CALCULATIONS.

11  Q.   LET'S PROCEED, IF WE CAN, TO THE '724 PATENT, WHICH IS THE

12  METHOD OR PROCESS PATENT FOR THE FLEXURE.   AND LET'S GO AS

13  QUICKLY AS WE CAN, MR. VERDIELL, THROUGH THESE CLAIMS, STARTING

14  WITH CLAIM 1.   COULD YOU REVIEW CLAIM 1, PLEASE.   ARE YOU THE

15  INVENTOR OF WHAT'S CLAIMED IN CLAIM 1 OF THIS PATENT,

16  MR. VERDIELL?

17  A.   YES.

18  Q.   WHEN DID YOU CONCEIVE OF THIS INVENTION?

19  A.   4-17-1997.

20  Q.   SO THE NOTION OF PROVIDING PRESSURE TO A FLEXURE, CAUSING

21  THE LEGS ON THE FLEXURE TO SPREAD FURTHER APART, WAS THAT

22  SOMETHING YOU CONCEIVED OF ON APRIL 17?

23  A.   YES, THAT'S THE WAY THE FLEXURE WOULD BE ATTACHED ON THIS

24  DRAWING OF 4-17.

25  Q.   AND -- OKAY, I WITHDRAW THAT.

1         AND IS THERE ANY, IS THERE ANY OTHER ASPECT OF THE,

2   WHAT WE SEE IN CLAIM 1 THAT'S ALSO REFERENCED IN THE APRIL 17

3   DRAWING?

4   A.   AS WE HAVE SEEN, THE SUBSTRATE, THE FIRST OPTICAL ELEMENT,

5   THE LEGS ON FLEXURE, THE ALIGNMENT OF OPTICAL AXIS, AND THE

6   ATTACHMENT POINT AS THEY ARE SHOWN IN THE DRAWING, THE

7   ATTACHMENT FROM THE LEGS TO THE, FROM THE LEG ON THE FLEXURE TO

8   THE SUBSTRATE ARE DRAWN OUT IN THE 4-17 DRAWING.

9   Q.   DID YOU CONCEIVE OF WHAT YOU JUST REFERRED TO ON, ON

10  APRIL 17 OR BY APRIL 17?

11  A.   ON APRIL 17.

12  Q.   AND IT'S ALL IN THE DRAWING.

13  A.   RIGHT.

14  Q.   LET'S MOVE TO CLAIM 5.  IF YOU COULD TAKE A LOOK AT CLAIM

15  5, WHICH INCLUDES A SECOND PAIR OF LEGS.  ARE YOU INVENTOR OF

16  CLAIM 5, MR. VERDIELL?

17  A.   YES.

18  Q.   AND WHAT IS THE INVENTION THAT'S REFERRED TO IN CLAIM 5?

19  A.   SAME AS WE HAVE SEEN BEFORE, WITH THE ADDITION OF A PAIR

20  OF BACK LEGS WITH WHICH YOU DO A SECOND ALIGNMENT AND FIXING.

21  Q.   AND WHEN DID YOU CONCEIVE OF THIS?

22  A.   THAT WAS AT THE LES DUMAN MEETING IN MAY, AROUND MAY 1997.

23  Q.   IN YOUR EXPERIENCE WITH OPTOELECTRONICS DEVICES AND

24  PARTICULARLY ALIGNMENT AND ATTACH DEVICES, HAD YOU HAD PRIOR

25  EXPERIENCE WITH ANY DEVICE THAT WAS ATTACHED AT THE FRONT AND

1   A.   YES.

2   Q.   AND WHEN DID YOU CONCEIVE OF THIS?

3   A.   4-17.

4   Q.   DID YOU HAVE ANY PRIOR EXPERIENCE BEFORE APRIL 17 WITH

5   ETCHING OR STAMPING?

6   A.   YES.

7   Q.   AND WHERE WAS THAT?

8   A.   ETCHING GOES ALL THE WAY BACK TO THOMSON.  FLAT METAL

9   PIECES, I HAD USED THEM IN ONE PACKAGE IMPLEMENTATION AT SDL IN

10  '95 TIME FRAME.

11  Q.   AND HOW ABOUT STAMPING AND FORMING?

12  A.   OH.  WHERE WOULD . . . I MEAN, I COULD GO -- I DON'T KNOW

13  WHEN MY -- THOSE ARE SO COMMON, PROCESSES ARE SO COMMON, I USED

14  THEM AT SDL, BUT I MIGHT HAVE KNOWN THEM FROM BEFORE.  I MUST

15  HAVE KNOWN THAT FROM BEFORE.

16  Q.   SO WHAT WE SEE IN CLAIM 14 ARE NOT THINGS YOU WERE

17  INFORMED OF BY MR. SHUM; IS THAT CORRECT?

18  A.   NO.

19  Q.   LET'S LOOK NEXT AT WHAT WE REFER TO AS THE '6,726 PATENT,

20  WHICH IS EXHIBIT 52 IN THIS CASE.  AND LET'S START WITH

21  CLAIM 1, WHICH IS THE FIRST CLAIM IN THIS PATENT WHICH IS AT

22  ISSUE IN THIS CASE.  ARE YOU FAMILIAR WITH CLAIM 1,

23  MR. VERDIELL?

24  A.   YES.

25  Q.   AND CLAIM 1 REFERS TO A FIRST AND SECOND ELECTRICALLY

1    CONDUCTED PATTERN THAT'S COUPLED TOGETHER BY ONE OR MORE

2    HERMETIC VIAS.   YOU SEE THAT AT THE END OF SUBPART A, EXCUSE

3    ME, OF THE FIRST PARAGRAPH?

4    A.    I DO.

5    Q.    WHAT DOES THAT REFER TO?

6    A.    THAT ALSO REFERS TO THE 4-17 DRAWING WHERE THE LEADS ARE

7    PLACED ON THE BOTTOM OF THE SUBSTRATE AND THE VIAS RUN IN THE

8    SUBSTRATE TO, TO CONTACT THE ELEMENTS INSIDE THE PACKAGE.

9    Q.    AND LOOKING AT CLAIM 1 OF THE '6,726 PATENT -- FIRST OF

10   ALL, ARE YOU THE INVENTOR?

11   A.    YES.

12   Q.    WHEN DID YOU CONCEIVE OF THIS?

13   A.    AT LEAST BY 4-17.

14   Q.    AND IS IT REFERRED TO, THE CONCEPT THAT WE SEE IN CLAIM 1,

15   IN THE DRAWING, THE RECORD OF INVENTION ON APRIL 17?

16   A.    YES.

17            MR. TAYLOR:   COULD WE HAVE THAT DRAWING BACK,

18   PLEASE.

19   Q.    MR. VERDIELL, COULD YOU SHOW US AGAIN WHERE WE SEE THE

20   INVENTION THAT'S DESCRIBED IN CLAIM 1 ON THIS DRAWING, WHICH IS

21   EXHIBIT 4-A?

22   A.    YES.   (INDICATES.)   SO THOSE ARE THE LEADS.

23   Q.    YOU'RE GOING TO HAVE TO KEEP YOUR VOICE UP.

24   A.    SORRY.   THOSE ARE THE LEADS ON THE BOTTOM OF THE

25   SUBSTRATE.   AND THERE IS A LITTLE VIA.   IT'S REALLY NOT MY BEST

1  DRAWING EVER.  IT HARDLY SHOWS UP HERE.  THIS WOULD BE SKETCHED

2  BY THIS, THIS LITTLE TUNNEL.  I DON'T KNOW HOW TO -- IT'S A

3  LITTLE PILLAR THAT'S EMBEDDED IN THE SUBSTRATE.

4  Q.    SO IS THERE A FIRST SIDE AND A SECOND ELECTRICALLY

5  CONDUCTED PATTERN ON A SECOND SIDE?

6  A.    THE, THE FIRST SIDE WOULD BE, OR COULD BE THE

7  UNDERNEATH --

8  Q.    YES.

9  A.    -- OF THE PACKAGE, AND THEN YOU OBVIOUSLY NEED TO

10  CONTACT -- IT'S COMMON ART -- THE LASER DIODE INSIDE THE

11  PACKAGE.  SO THERE WOULD BE A, SOME KIND OF METAL CONDUCTIVE

12  PATTERN ON TOP.

13  Q.    AND WHAT COUPLES THEM TOGETHER CONDUCTIVELY?

14  A.    THAT WOULD BE THE VIA MAKES THE ELECTRICAL CONDUCTION

15  BETWEEN THE TOP AND THE BOTTOM.

16  Q.    CLAIM 1 CALLS FOR A HERMETIC VIA.  DOES THIS DRAWING SHOW

17  A HERMETIC VIA?

18  A.    WELL, IT'S HARD TO SAY.  IT'S MEANT TO BE A HERMETIC VIA

19  BECAUSE IT'S A HERMETIC PACKAGE.  I MEAN, I WOULDN'T KNOW HOW

20  TO DRAW A HERMETIC VIA AND A NONHERMETIC VIA.

21  Q.    SO WHERE ARE THE VIAS LOCATED?  INSIDE THE PACKAGE?

22  A.    IT WOULD BE INSIDE THE PACKAGE.  IT WOULD BE HERE

23  (INDICATES).

24  Q.    IS THE WHOLE PACKAGE INTENDED TO BE HERMETIC?

25  A.    YES.

1   Q.   THANK YOU, MR. VERDIELL.   YOU CAN TAKE A SEAT AGAIN, IF

2   YOU WOULD.

3            LET'S LOOK AT CLAIM 2 OF THE '6,726 PATENT.

4   CLAIM 2 REFERS TO CLAIM 1, IT'S A DEPENDENT CLAIM AND REFERS TO

5   THE FACT THAT THE, THAT ONE OR MORE CONTACTS ARE COUPLED TO THE

6   VIAS.

7   A.   YES.

8   Q.   AND ARE YOU THE INVENTOR OF THAT?

9   A.   YES.

10  Q.   IS THAT A -- WAS THAT COMMONLY KNOWN IN THE INDUSTRY AT

11  THAT TIME?

12  A.   WELL, OBVIOUSLY, YOUR VIA IS MEANT TO CREATE AN ELECTRICAL

13  PATH BETWEEN TWO CONTACTS.

14  Q.   IS THERE ANYTHING IN EITHER CLAIM 1 OR CLAIM 2 THAT YOU

15  WERE INFORMED OF BY MR. SHUM?

16  A.   NO.

17  Q.   LET'S LOOK AT CLAIM 5, PLEASE.   CLAIM 5, AGAIN, IS A

18  DEPENDENT CLAIM INCORPORATING CLAIM 1 BUT REFERENCES LEGS OF

19  THE FLEXURE BEING ATTACHED TO THE FRAME.   FIRST OF ALL, HAVE

20  YOU -- LET ME ASK, WHAT IS A FRAME WITHIN AN OPTOELECTRONIC

21  PACKAGE?

22  A.   A FRAME IS, IS USUALLY A METALLIC WALL THAT YOU PUT AROUND

23  THE EDGE OF THE PACKAGES SO YOU CAN SOLDER A CAP ON TOP OF IT.

24  Q.   AND HAD YOU HAD PRIOR EXPERIENCE WITH FRAMES BY APRIL OF

25  1997?

1  A.  THAT'S THE STANDARD METHOD TO, TO, TO SOLDER A CAP ON TOP

2  OF A CERAMIC SUBSTRATE.  YOU HAVE TO PUT A FRAME AROUND IT OR

3  YOU HAVE NO WAY TO SOLDER IT.

4  Q.  IS THERE EVIDENCE IN YOUR APRIL 17 DRAWING OF WHAT WE SEE

5  IN CLAIM 5?

6  A.  YOU CAN SEE -- YES.

7        MR. TAYLOR:  COULD WE HAVE THE APRIL 17 DRAWING

8  AGAIN, PLEASE.

9  Q.  AND SHOW US WHERE THE -- FIRST OF ALL, IS THERE A FRAME

10  DRAWN IN THIS DRAWING?

11  A.  THE FRAME IS NOT CALLED OUT.  IT'S OMITTED.

12  Q.  SHOW US HOW THIS DRAWING WOULD DEMONSTRATE THAT THE LEGS

13  OF THE FLEXURE COULD BE ATTACHED TO THE FRAME.

14  A.  WELL, THE FRAME IS NOT NOVEL, SO THIS IS NOT SOMETHING

15  THAT I INCLUDED IN THIS DRAWING, BUT IT COULD BE OBVIOUSLY

16  WHERE THE CAP, IN BETWEEN THE CAP AND THE SUBSTRATE.  AND THIS

17  PART HERE (INDICATES) SHOWS THE, THE METAL SIDE OF THE FRAME

18  WHERE THE LEGS ARE ATTACHED.

19  Q.  WHEN YOU CONCEIVED OF THIS, WHAT DID YOU THINK THE FRAME

20  WOULD BE MADE OUT OF?

21  A.  THAT WAS SUPPOSED TO BE DIRECT-BONDED COPPER.

22  Q.  IN YOUR DISCUSSIONS WITH THE BRUSH WELLMAN PEOPLE, DID YOU

23  RAISE ANY QUESTION WITH THEM ABOUT MAKING A FRAME OUT OF

24  DIRECT-BONDED COPPER?

25  A.  I THINK THAT'S ONE OF THE FIRST QUESTIONS I DOCUMENT ON MY

1    A.    AT THE LES DUMAN MEETING.

2    Q.    DID MR. SHUM CONTRIBUTE ANY INFORMATION TO THIS INVENTION?

3    A.    NO.

4    Q.    AND LASTLY, NOT LASTLY -- ACTUALLY, LET'S SEE IF WE CAN

5    TAKE THESE TOGETHER.   LET'S LOOK AT BOTH CLAIMS 9 AND 10 OF

6    THE '6,726 PATENT.   CLAIM 9 IS DEPENDENT ON CLAIM 1, AND THEN

7    CLAIM 10 IS DEPENDENT ON CLAIM 9.   CLAIM 9 REFERS TO A CAP

8    THAT'S COUPLED TO THE SUBSTRATE CAUSING A SEAL, AND CLAIM 10

9    SAYS THAT SEAL CAN BE HERMETIC.   CORRECT?

10   A.    YES.

11   Q.    ARE YOU THE INVENTOR OF THAT, SIR?

12   A.    YES.

13   Q.    AND WHEN DID YOU CONCEIVE OF IT?

14   A.    IT'S IN THE DRAWING OF 4-17.

15   Q.    IS IT SHOWN IN THE DRAWING?

16   A.    YES.

17            MR. TAYLOR:   OKAY.   ONCE AGAIN, CAN WE HAVE THE

18   DRAWING.

19   Q.    AND MR. VERDIELL, COULD YOU STEP TO THE SCREEN AND JUST

20   POINT THAT OUT TO US?

21   A.    (INDICATES.) IT'S CALLED OUT "CAP" HERE.

22   Q.    IS THAT THE WORD CAP?

23   A.    CAP.

24   Q.    C-A-P?

25   A.    OVER HERE, AND IT'S, THIS CAP.

1    Q.    IS IT THE COVER?

2    A.    IT'S, IT'S A COVER.  PEOPLE -- WE CALL IT A CAP.  AND YOU

3    KNOW, IT'S EVEN WRITTEN HERE THAT IT DEMONSTRATES SEALING.  THE

4    PURPOSE OF THAT IS OBVIOUS, RIGHT.  IT'S TO -- ALL PACKAGES FOR

5    TELECOM ARE HERMETICALLY SEALED AND YOU NEED A CAP TO DO THAT.

6    Q.    SO AS OF APRIL 1997, WAS IT STATE OF THE ART?

7    A.    ABSOLUTELY.

8    Q.    THANK YOU.

9              NEXT, LET'S TAKE THE '427 PATENT, THE LAST OF THE

10   FLEXURE PATENTS.  YOU'RE FAMILIAR WITH THIS PATENT,

11   MR. VERDIELL?

12   A.    YES, I AM.

13   Q.    OKAY.  AND ARE YOU A CO-INVENTOR ON THIS PATENT?

14   A.    YES, I AM.

15   Q.    AND THIS PATENT WAS, WAS THIS PATENT FILED IN JUNE OF

16   2001?

17   A.    YES, IT'S A LATER LIGHTLOGIC PATENT.

18   Q.    AND WHO ARE YOUR CO-INVENTORS ON THIS PATENT?

19   A.    IT'S THE TEAM OF PEOPLE THAT WORKED ON MAKING THE FLEXURE

20   ACTUALLY WORK AT LIGHTLOGIC.

21   Q.    WERE THEY ALL LIGHTLOGIC EMPLOYEES?

22   A.    THEY WERE.

23   Q.    OKAY.  AND WHEN DID THIS WORK BEGIN AT LIGHTLOGIC WITH

24   THESE EMPLOYEES?

25   A.    WELL, WHEN THEY WERE, WHEN THEY WERE HIRED, WAS THE FIRST

VERDIELL - DIRECT / TAYLOR                                    1116

1    A.    NO, NO, THAT'S NOT IT.

2    Q.    THERE'S A NEXT STEP?

3    A.    YES.

4    Q.    AND WHAT IS THAT?

5    A.    WELL, THE NEXT STEP GOES THROUGH TALKING TO A CUSTOMER

6    ABOUT THIS IN EARLY AUGUST, I THINK.  WE HAD A CUSTOMER AT

7    CIENA.  AND IT WAS A CUSTOMER THAT HAD VERY STRINGENT

8    REQUIREMENT OF TEMPERATURE STABILITY OF THE DEVICE BECAUSE THEY

9    WERE DOING DOUBLE U, D, M, WHICH WE TALKED ABOUT EARLIER.  AND

10   HIS WORRY WAS THAT IT'S ALL FINE AND DANDY, BUT IF I HAVE SOME

11   HOT AIR GOING OVER HERE, IT MIGHT INFLUENCE THE TEMPERATURE OF

12   THE UPPER ASSEMBLY, JUST THROUGH CONVECTION INSIDE THE PACKAGE,

13   DESPITE THE FACT THAT YOU HAVE THE PELTIER COOLER UNDERNEATH.

14   AND THE REASON HE TOLD ME THAT IS THAT HE ACTUALLY WAS BATTLING

15   WITH THIS PROBLEM.  YOU HAVE THE SAME PROBLEM HERE (INDICATES).

16   RIGHT, IF YOU HAVE AIR OVER HERE, YOU KNOW, YOU MIGHT HEAT UP

17   THROUGH, THROUGH CONVECTION THE LASER DIODE OVER HERE.

18   Q.    SO WAS CLAIM 58 YOUR SOLUTION TO THAT?

19   A.    THAT WAS MY ANSWER TO IT.

20             MR. TAYLOR:  CAN WE SEE FIGURE 3.

21   Q.    IS THIS WHAT IS DESCRIBED IN CLAIM 58?

22   A.    YEAH.  SO THE SOLUTION TO THAT -- ONCE YOU KNOW, IT'S VERY

23   SIMPLE -- IS THAT YOU MAKE THE PELTIER BOX BIGGER.  AND NOW NOT

24   ONLY IS IT CHEAPER THAN THIS, BUT IT'S ALSO BETTER.  BECAUSE

25   NOW YOU HAVE TWO -- THIS, THIS WHOLE ENCLOSURE IS PROTECTED

VERDIELL - DIRECT / TAYLOR

1117

1   FROM DRAFTS OR, OR AIR, OF TEMPERATURE THAT'S CHANGING.  THE

2   IDEA IS TO INCLUDE ONE ENCLOSURE INTO THE OTHER ONE, AND THIS

3   NOW BECOMES WELL ISOLATED FROM THE, FROM THE EXTERIOR.

4   Q.   NOW, THE NOTION OF DUAL ENCLOSURES, DESCRIBE FOR US -- ARE

5   THERE TWO ENCLOSURES IN THAT DRAWING?

6   A.   RIGHT.  SO NOW, MY FIRST ENCLOSURE IS MY HIGHLY HERMETIC,

7   ORGANIC FREE, SUPER DUPER RELIABLE OPTICAL ASSEMBLY.

8   Q.   SO THE TRAPEZOIDAL SHAPE, WHAT DOES THAT REPRESENT?

9   A.   IT'S A SUBSTRATE, SO IT'S MEANT TO REPRESENT A PACKAGE

10  LIKE IN THE 4-17 DRAWING.

11  Q.   IS THAT AN ENCLOSURE?

12  A.   THERE'S A CAP ON TOP OF IT.  MY INTERPRETATION OF THE

13  SUBSTRATE, THE DIODE, THE LENS, AND THE FIBER.

14  Q.   IS THAT AN ENCLOSURE, WHAT YOU JUST DESCRIBED?

15  A.   YES, IT'S AN ENCLOSURE.  AND WHAT I DESCRIBED INSIDE IS

16  THE OPTICAL ASSEMBLY.

17  Q.   WHERE IS THIS SECOND ENCLOSURE?

18  A.   THE SECOND ENCLOSURE IS UNDERNEATH THE PELTIER COOLER AND

19  ENCIRCLES THE FIRST ENCLOSURE COMPLETELY.

20  Q.   AN ENCLOSURE INSIDE AN ENCLOSURE?

21  A.   IT'S AN ENCLOSURE INSIDE AN ENCLOSURE.

22  Q.   NOW, DO YOU HAVE DRAWINGS THAT WERE DONE AT THE VERY

23  MOMENT YOU CONCEIVED OF THIS?

24  A.   ACTUALLY, NO.  THE WHOLE SERIES, I NEVER HAD.

25  Q.   LET'S LOOK AT A COUPLE OF DRAWINGS AND SEE WHAT THEY DO

1   A.   NO.

2   Q.   HAVE A SEAT IF YOU WOULD, MR. VERDIELL.

3           MR. SHUM RELIES IN THIS CASE ON ANOTHER DOCUMENT AS

4   CONCEPTION EVIDENCE, FS562.

5           CAN WE HAVE THE FIRST PAGE OF THAT.

6           ARE YOU FAMILIAR WITH THIS DOCUMENT, MR. VERDIELL?

7   A.   YES.

8   Q.   IF WE COULD TURN TO PAGE, I BELIEVE IT'S PAGE 045, FS045.

9   AND MR. SHUM TESTIFIED THAT -- DO YOU REMEMBER MR. SHUM

10  TESTIFYING THAT THIS IS HIS DRAWING OF A DUAL ENCLOSURE

11  PACKAGE?

12  A.   YES.

13  Q.   ARE YOU FAMILIAR WITH THAT DRAWING, MR. VERDIELL?

14  A.   YES, I AM.

15  Q.   WHO DREW IT?

16  A.   I DREW IT.   YOU MEAN THE DRAWING AT THE BOTTOM?

17  Q.   YES.

18  A.   I DREW THAT ONE.

19  Q.   ARE YOU SURE THAT THAT'S YOUR DRAWING AND NOT MR. SHUM'S

20  DRAWING?

21  A.   SURE, YES.

22  Q.   IS IT A DRAWING OF A DUAL ENCLOSURE PACKAGE?

23  A.   NO.   IT'S MEANT TO REPRESENT, TO EXPLAIN WHAT AN

24  INTEGRATED PELTIER PACKAGE WOULD BE.

25  Q.   CAN YOU TELL US HOW IT IS THAT YOU HAPPEN TO BE MAKING

1  THAT DRAWING ON THIS DOCUMENT?

2  A.    THAT'S DURING A MEETING WITH MR. ALBOSZTA.

3  Q.    WHEN?

4  A.    END OF NOVEMBER, EARLY DECEMBER, 1997.

5  Q.    WHAT WAS THE PURPOSE OF THE MEETING?

6  A.    THAT'S WHEN I WAS HELPING MR. ALBOSZTA REWRITE THE DBC

7  PATENT APPLICATION.

8  Q.    AND WHAT WAS THE PURPOSE OF THIS DRAWING?

9  A.    ACTUALLY, TURNED OUT THAT MR. ALBOSZTA HAD, DIDN'T

10 UNDERSTAND THE, STILL AT THAT TIME DIDN'T UNDERSTAND THE

11 INVENTION VERY WELL.  SO I WENT OVER IT, AND THAT'S ONE OF THE

12 IDEAS THAT'S IN THE PATENT AND ALSO IN THE DRAWING OF -- I WAS

13 EXPLAINING A CONCEPT IN THIS PROPOSAL TO HIM.  THAT'S ON THE

14 PREVIOUS PAGE.

15 Q.    SO WERE YOU MAKING THE DRAWING TO HELP EXPLAIN SOMETHING?

16 A.    RIGHT.

17 Q.    WERE YOU EXPLAINING DUAL ENCLOSURE?

18 A.    NO.  NO.  WASN'T INVENTED AT THAT TIME.

19 Q.    WHAT WERE YOU EXPLAINING?  WHAT WERE YOU EXPLAINING?

20 A.    I WAS EXPLAINING A PACKAGE WITH AN INTEGRATED PELTIER

21 COOLER.

22        MR. TAYLOR:  COULD WE HAVE THE PRIOR PAGE, THE TEXT

23 ON PAGE FS 044.

24 Q.    ACTUALLY, WE PUT THE TEXT NEXT TO THE DRAWING, AND THIS IS

25 THE TEXT FROM THE PRIOR PAGE.  DO YOU RECOGNIZE THAT,

1  MR. VERDIELL?

2  A.   YES, THAT'S WHAT I'M TRYING TO EXPLAIN.

3  Q.   COULD YOU STEP TO THE SCREEN AND THEN CONNECT FOR US, SHOW

4  US, YOU KNOW, WHAT THE DRAWING SHOWS THAT HELPS EXPLAIN THAT

5  TEXT.

6  A.   BY THE WAY, THIS IS JUST FROM THE PAGE BEFORE WHERE THE

7  DRAWING IS.  IT'S AT THE BOTTOM.

8  Q.   OKAY.

9  A.   SO IT SAYS, "MOST TELECOM GRADE DEVICES NEED A PELTIER

10  COOLER FOR TEMPERATURE STABILIZATION."  THAT'S THIS FELLOW OVER

11  HERE.  THAT'S THE ONE OVER HERE.  "FIGURE 9 SHOWS AN

12  ULTRACOMPACT IMPLEMENTATION OF A THERMOELECTRIC COOLER WHERE

13  THE TOP SUBSTRATE NOW FORMS THE TOP OF THE COOLER."  SO THE

14  IDEA -- YOU WANT ME TO EXPLAIN THIS?

15  Q.   PLEASE.

16  A.   SO IF YOU DO A TRADITIONAL ENCLOSURE, YOU'LL HAVE A

17  SUBSTRATE HERE WITH AN OPTOELECTRONIC ASSEMBLY, AND YOU PUT IT

18  ON TOP OF THE COOLER.  IT TURNS OUT THAT SINCE THIS WAS BY

19  DBC --

20  Q.   WHICH IS DBC?

21  A.   DIRECT-BONDED COPPER, THIS ONE.  (INDICATES.)

22  Q.   OKAY.

23  A.   THIS IS A CERAMIC BOTTOM.  AND GUESS WHAT, THE TOP OF THE

24  PELTIER COOLER IS MADE OF, IT'S A CERAMIC PLATE.  SO YOU END UP

25  WITH THIS CONFIGURATION WHERE YOU GO CERAMIC PLATE ON TOP OF

1    CERAMIC PLATE.  AND THE IDEA IS REALLY VERY SIMPLE, IS TO

2    ELIMINATE ONE OF THE CERAMIC PLATES AND MAKE A PLATE THAT'S

3    BOTH.  USE THE TOP TO MAKE YOUR OPTICAL ASSEMBLY AND USE THE

4    BOTTOM TO CONNECT TO YOUR PELTIER ELEMENTS.  AND THAT'S WHAT IT

5    DOES.  AND ACTUALLY, I DREW X THIS PART, TAKE IT OUT.  SO

6    THAT'S WHAT IT SAYS.  THE THERMAL -- THE TOP SUBSTRATE, THIS

7    ONE, NOW FORMS THE TOP OF THE COOLER AS WELL AS A PLATFORM FOR

8    THE OPTICS AND ELECTRONICS.  SO EITHER THIS ONE OR THIS ONE IS

9    GOING TO DISAPPEAR.  AND THEY ARE GOING TO BE CONNECTED.  THEY

10   ARE DRAWN HERE UPSIDE DOWN, ACTUALLY.

11              CAN YOU TURN THIS ONE UPSIDE DOWN?

12              THEN YOU END UP WITH THE TOP OF YOUR PELTIER --

13   THERE IS ONE SUBSTRATE, IT'S BOTH THE TOP OF YOUR PELTIER AND

14   THE BOTTOM OF YOUR OPTICAL ASSEMBLY.

15   Q.   HOW MANY ENCLOSURES?

16   A.   ONE.  TURN IT AROUND.  IT EXPLAINS WHY YOU WOULD WANT TO

17   DO THAT.  "THE BRAZING OF A COOLER IN A HIGH SPEED PACKAGE IS A

18   VERY COSTLY OPERATION, WHICH WE PROPOSE TO COMPLETELY ELIMINATE

19   IN THE FOLLOWING IMPLEMENTATION."  OH, I DO THE BOTTOM TOO.

20   "WHERE THE BOTTOM SUBSTRATE OF THE T.E. COOLER NOW SERVES AS

21   PART OF THE ENCLOSURE WHERE THE LID IS BRAZED."

22              SO YOU DO THE, YOU CAN DO THE SAME TRICK WITH THE

23   BOTTOM, RIGHT.  THIS IS CERAMIC PARTS.  AND THE BOTTOM OF YOUR

24   ENCLOSURE IS CERAMIC.  SO THE IDEA IS PRETTY STRAIGHTFORWARD.

25   YOU X THIS ONE, TAKE IT OUT, AND THOSE TWO MERGE, RIGHT -- AND

1   THEN IF YOU TURN IT  AROUND AND GO BACK TO THAT PICTURE -- CAN

2   YOU TURN THIS ONE AROUND?   THERE YOU GO.

3               NOW THERE IS, THERE WERE TWO PLATES OVER HERE; NOW

4   IT'S MERGED INTO ONE.   SO THIS IS BOTH THE BOTTOM OF MY

5   PACKAGING ENCLOSURE AND ALSO THE BOTTOM OF MY PELTIER ELEMENTS.

6   IT'S ATTACHED.

7   Q.   SO IS -- THE DRAWING AT THE FAR RIGHT, NOW THAT WE HAVE IT

8   UPSIDE DOWN, REFLECTS WHAT?

9   A.   IT REFLECTS THE INVENTION, WHAT HAS BEEN PRACTICED.   IT'S

10  BETTER DRAWN IN FIGURE 9.   BUT ONCE YOU'VE DONE THIS AND X'D,

11  TAKEN OUT THE PART I MARKED AS AN X, YOU END UP WITH THAT.   SO

12  IT'S THE FINAL PACKAGE.

13              MR. TAYLOR:   CAN WE GO BACK TO SEE ALL OF PAGE

14  FS045?

15  Q.   FIGURE 9 ON THIS PAGE, MR. VERDIELL, DO YOU RECOGNIZE

16  THAT?

17  A.   YES.

18  Q.   WHAT WAS THAT?

19  A.   WELL, THAT'S A BETTER DRAWING OF THIS (INDICATES).   WELL,

20  BETTER; DOESN'T SHOW UP.   BUT IT HAS THE BOTTOM PART OF THE

21  ENCLOSURE IS ALSO THE BOTTOM OF THE PELTIER COOLER.   YOU HAVE

22  THE PELTIER ELEMENT.   IT'S VERY HARD TO SEE ON HERE.

23  Q.   LET'S JUST LOOK ONE TIME AT PAGES 44 AND 45 TOGETHER.

24  A.   BETTER.   YOU WANT ME TO -- THIS IS A BETTER VERSION OF IT.

25  Q.   LET'S JUST DO THIS.   LET ME ASK YOU ONE QUESTION, SEE IF

1    WE CAN PUT THIS IN CONTEXT BEFORE WE DO THAT.

2            SO THE TEXT WE LOOKED AT IS ON THE BOTTOM OF PAGE

3    LU44.  I'VE BEEN CALLING THIS "FS," WHICH IS A MISTAKE.  I

4    FORGOT THIS IS AN LU DOCUMENT.  BUT THAT'S THE TEXT.  DOES THAT

5    TEXT GO WITH THE FIGURE ON THE TOP OF THE NEXT PAGE?

6    A.   YES, IT'S THE TEXT THAT GOES WITH THIS FIGURE HERE.

7    Q.   AND THEN WHAT IS YOUR DRAWING?

8    A.   AND MY DRAWING IS AN EXPLANATION OF THAT FIGURE.

9            MR. TAYLOR:  OKAY, OKAY.  I THINK THAT'S ENOUGH.

10           YOUR HONOR, WOULD THIS BE AN APPROPRIATE TIME?

11           THE COURT:  YES, IT IS.  WE'LL TAKE ABOUT TEN

12   MINUTES.

13           (WHEREUPON, A RECESS WAS TAKEN)

14           THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

15   COME TO ORDER.

16           THE COURT:  PLEASE GO AHEAD, COUNSEL.

17                 **DIRECT EXAMINATION (RESUMED)**

18   BY MR. TAYLOR:

19   Q.   JUST A COUPLE OF MORE QUESTIONS, MR. VERDIELL.

20           FIRST OF ALL, WHEN WE WERE REFERRING TO EXHIBIT 562

21   AND WE WERE TALKING ABOUT THE DRAWINGS ON THE BOTTOM OF 562, I

22   BELIEVE YOU TESTIFIED THAT SOMETHING OCCURRED BEFORE DUAL

23   ENCLOSURE WAS EVEN INVENTED.  AND I JUST WANTED TO CLARIFY,

24   WHAT WAS PREPARED BEFORE DUAL ENCLOSURE WAS EVEN INVENTED?

25   A.   IT WAS FIGURE 9 IN THIS WHOLE PROPOSAL.

1  Q.   THE UNDERLYING DOCUMENT?

2  A.   THE UNDERLYING DOCUMENT.

3  Q.   AND WHEN WERE THE DRAWINGS -- WERE THE DRAWINGS PREPARED

4  BEFORE OR AFTER DUAL ENCLOSURE?

5  A.   OH, THE DRAWING AT THE BOTTOM?

6  Q.   YEAH.

7  A.   THEY WERE AFTER.

8  Q.   AND DOES THE DRAWING HAVE ANYTHING TO DO WITH DUAL

9  ENCLOSURE?

10 A.   NO.

11 Q.   SECONDLY, I'M ADVISED BY MY GROUP THAT I PUT TO YOU A NICE

12 DOUBLE NEGATIVE QUESTION AND THEN MADE THE ANSWER

13 UNINTELLIGIBLE WHEN WE WERE TALKING ABOUT CLAIM 14 OF THE '724

14 PATENT.  AND THE QUESTION I'D LIKE TO RE-ASK, MR. VERDIELL, IS

15 WHETHER MR. SHUM INFORMED YOU OF ANYTHING RELATING TO YOUR

16 CONCEPTION OF THAT CLAIM.

17 A.   HE DID NOT.

18      MR. TAYLOR:  YOUR HONOR, LASTLY, I'D LIKE TO LABEL

19 THE THIRD DRAWING THAT MR. VERDICT DID AS VERDIELL 3.

20      THANK YOU, MR. VERDIELL.

21      THE WITNESS:  (INDICATES.)

22      THE COURT:  GO AHEAD.  IT'S SO MARKED.

23      (WHEREUPON, DEFENDANTS' EXHIBIT VERDIELL

24      3 WAS MARKED FOR IDENTIFICATION.)

25      MR. TAYLOR:  AND WITH THAT, I HAVE NO FURTHER

CERTIFICATE OF REPORTER

I, CAROLYN M. MANN, A CERTIFIED SHORTHAND REPORTER, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-02-3262 DLJ, FRANK T. SHUM VS. INTEL CORPORATION, ET AL., AND RELATED CROSS-ACTION, PAGES NUMBERED 1072 THROUGH 984, WERE REPORTED BY ME AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE, AND TRUE RECORD OF SAID PROCEEDINGS AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.

CAROLYN M. MANN,   CSR 10066

Certified Copy

1170

1   UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   DEPARTMENT ONE                    D. LOWELL JENSEN, JUDGE

4                                     **BENCH TRIAL**

5                                     **WEDNESDAY 1/19/05 P.M. SESSION**

6                                     **PP. 1170 - 1277   VOL 6-B**

7   FRANK T. SHUM,              ) C 02-03262 DLJ (EMC)

8              PLAINTIFF,       ) OAKLAND, CALIFORNIA

9   VS.                         ) **WITNESSES**

10  INTEL CORPORATION, JEAN-MARC ) **JEAN-MARC VERDIELL CROSS**

11  VERDIELL AND LIGHTLOGIC, INC.,) **MAREK ALBOSZTA DIRECT/CROSS**

12             DEFENDANTS.      ) REPORTER'S TRANSCRIPT

13  _____) OF PROCEEDINGS

14  JEAN-MARC VERDIELL,         )

15          COUNTER-CLAIMANT,   )

16  VS.                         )

17  FRANK T. SHUM,              )

18          COUNTER-DEFENDANT.  )

19  _____)

20  **APPEARANCES:**

21  FOR THE PLAINTIFF:

22  LAW OFFICES OF E. ROBERT (BOB) WALLACH, P.C.
    E. ROBERT (BOB) WALLACH, ESQUIRE
23  P.O. BOX 2670
    SAN FRANCISCO, CALIFORNIA  94126-2670
24  TEL (415) 989-6445
    FAX (415) 983-3802
25
    MORE APPEARANCES ON NEXT PAGE

1172

1                        I N D E X

2    WEDNESDAY, JANUARY 19, 2005; DEPARTMENT ONE, D. LOWELL

3    JENSEN, JUDGE AFTERNOON SESSION, VOLUME 6-B

4    WITNESSES                DIRECT   CROSS REDIRECT RECROSS JUDGE

5    FOR THE DEFENDANT:

6    JEAN-MARC VERDIELL            1174 (W) CONTINUED

7    MAREK ALBOSZTA      1219(RT) 1250(C) 1274(RT) 1276 (C)

8    W - WALLACH

9    RT - TANGRI

10   C - CAVALLO

11   T - TAYLOR

12                  E X H I B I T S

13             IDENTIFICATION   EVIDENCE   VOLUME

14   FOR THE DEFENDANT

15

16

17   ITEMS REQUESTED                               PAGE

18   GREEN NOTEBOOK MISSING PAGES                  1189

19

20

21

22

23

24

25

1       A   I GOT, THAT WAS MADE AT ONE OF THE FIRST MEETINGS

2   OR MAYBE EVEN THE FIRST MEETING WHEN I USUALLY MAKE NOTES TO

3   MYSELF DURING THE MEETING TO FOLLOW UP WITH THE CLIENT.  UM,

4   THIS WAS A NOTE THAT I MADE TO MYSELF TO GET ADDITIONAL

5   DISCLOSURE INFORMATION AND SINCE I WAS WORKING WITH FRANK AT

6   THE TIME I JUST -- I JUST WROTE TO GET ADDITIONAL

7   INFORMATION ABOUT THE ARRAY.  ACTUALLY, THE ARRAY PACKAGING

8   BECAUSE THAT'S WHAT I'M REFERRING TO HERE.  I DIDN'T HAVE

9   ENOUGH INFORMATION TO GO ON SO I JUST WANTED TO GET MORE

10  INFORMATION.  SO THIS IS A NOTE TO MYSELF.

11      Q   OKAY.  THERE ARE ALSO THREE DRAWINGS AT THE BOTTOM

12  OF THE PAGE.  DO YOU SEE THOSE?

13      A   YES, I DO.

14      Q   DO YOU KNOW WHO DREW THOSE?

15      A   THOSE WERE DRAWN BY JEAN-MARC.

16      Q   AND WHEN WERE THEY DRAWN BY MR. VERDIELL?

17      A   THEY WERE DRAWN BY MR. VERDIELL AT A SUBSEQUENT

18  MEETING THAT I HAD WITH HIM.

19      Q   IS THIS THE MEETING IN LATE NOVEMBER OR EARLY

20  DECEMBER THAT WE HAD BEEN TALKING ABOUT?

21      A   YES.

22      Q   OF 1997?

23      A   RIGHT.

24      Q   AND DO YOU KNOW WHAT THOSE DEPICT?

25      A   THESE BASICALLY SHOW THE OPERATION OF THE COOLING

1  MECHANISM.

2       Q    CAN WE PULL BACK, JEFF.

3            DID THEY RELATE TO ANYTHING ELSE -- ACTUALLY, CAN

4  WE HAVE PAGE, THE PRIOR PAGE AND THAT PAGE SIDE BY SIDE?

5  EXCEPT WE'RE IN THE WRONG ORDER.  CAN YOU LIFT THEM, JEFF,

6  FLIP THEM, JEFF?  I APOLOGIZE.

7            NOW, LOOKING AT THIS, MR. ALBOSZTA, DO YOU HAVE AN

8  UNDERSTANDING OF WHAT THE BOTTOM THREE FIGURES ON PAGE

9  LUO045 REFER TO?  THE BOTTOM THREE DRAWINGS?

10      A    YEAH, THEY'RE BASICALLY AN EXPLANATION OF HOW

11 WITHIN THIS ENCLOSURE YOU HAVE MOUNTED, MOUNTED SOMETHING ON

12 THE COOLER LIKE A VARIOUS KINDS OF COOLERS EITHER WITH FLUID

13 OR PELTIER-TYPE COOLER.

14      Q    DO YOU RECALL THIS BEING INTRODUCED IN ANY WAY BY

15 MR. VERDIELL AS A DUAL ENCLOSURE?

16      A    NO, I DON'T.

17      Q    NOW, DID YOU, JUST TO GO BACK TO THE DRAWING THAT

18 YOU SAID THAT YOU DID OF THE ARRAY PACKAGE AND THE

19 HANDWRITING OF YOURS, I BELIEVE THAT YOU SAID THAT YOU MADE

20 THAT AT A DIFFERENT MEETING THAN THE ONE WITH MR. VERDIELL

21 IN DECEMBER OF '97?

22      A    YES.

23      Q    AND WHY DO YOU SAY THAT?

24      A    UM, BASICALLY I HAVE COPIES.  THERE ARE OTHER

25 COPIES.  I MEAN I FREQUENTLY REUSE THE SAME DOCUMENTS AND

1   THE SAME DOCUMENTS GET HANDED TO -- TO THE -- I MEAN I USE

2   THE SAME DOCUMENTS SO ADDITIONAL NOTES WOULD BE TAKEN ON THE

3   SAME DOCUMENT BUT AT A LATER TIME.  THAT'S WHY.

4         Q     AND CAN WE SEE EXHIBIT 1028, JEFF?

5               DO YOU RECOGNIZE THIS DOCUMENT, MR. ALBOSZTA?

6         A     YES, I DO.  THAT'S THE SAME DOCUMENT.

7         Q     OKAY.  AND CAN WE JUMP AHEAD, JEFF, TO PAGE BATES

8   NUMBER FS0872?  DO YOU RECOGNIZE THIS?

9         A     YES, OF COURSE.  THAT'S -- THAT'S ACTUALLY WHAT I

10  MEANT BEFORE.  SEE, I TOOK THAT NOTE TO MYSELF DURING THE

11  FIRST MEETING AND THAT'S WHY THAT'S THE ONLY NOTATION THAT

12  IS ON THE PAGE.

13        Q     THANK YOU.  I THINK YOU CAN SIT BACK DOWN NOW.  I

14  THINK WE'RE DONE WITH SHOW AND TELL FOR A MOMENT.

15              DID MR. SHUM, MR. ALBOSZTA, MAKE ANY OF THE

16  DRAWINGS THAT WE WERE JUST LOOKING AT?

17        A     NO.  I'M SORRY.  YOU MEAN THE HAND DRAWINGS?

18        Q     THE HAND DRAWINGS?

19        A     NO.

20        Q     NOW, DID THIS NEW PATENT APPLICATION THAT YOU WERE

21  MEETING WITH MR. VERDIELL ABOUT IN LATE NOVEMBER, EARLY

22  DECEMBER OF '97, DID THAT EVENTUALLY GET FILED?

23        A     YES, IT DID.

24        Q     AND DO YOU RECALL WHEN THAT GOT FILED?

25        A     IN VERY EARLY '97 LIKE JANUARY FIFTH OR SIXTH.

1    Q    YOU SAID EARLY '97.  DID YOU MISSPEAK?

2    A    YES.  '98.

3    Q    WAS IT, UM, IDENTICAL TO THE OLD APPLICATION?

4    A    IT WAS NOT IDENTICAL.  IT COVERED A LOT OF THE

5    SAME SUBJECT MATTER BUT IT ALSO DIDN'T COVER SOME OTHER

6    SUBJECT MATTER.

7    Q    AND WHY DID IT NOT COVER THAT OTHER SUBJECT

8    MATTER?

9    A    UM, BECAUSE I HAD INDICATED TO MARC, ESPECIALLY

10   BECAUSE OF THIS INVENTORSHIP ISSUE THAT HAD ARISEN IN THIS

11   CASE, THAT I WANTED TO BE REALLY CLEAR THAT ANYTHING THAT

12   WAS BEING FILED IN THE CLAIMS SHOULD ABSOLUTELY POSITIVELY

13   ONLY BE THE INVENTOR SUBJECT MATTER BY MR. VERDIELL.  AND I

14   HAD ASKED HIM IF THERE IS ANYTHING THAT EVEN POSES A DOUBT

15   IN HIS MIND AS FAR AS IT NOT BEING HIS INVENTION, THEN WE

16   SHOULD TAKE IT OUT AT THIS POINT BECAUSE I DIDN'T WANT TO

17   HAVE ANOTHER PATENT APPLICATION FILED WITH THE WRONG

18   INVENTORSHIP.

19   Q    AND DID HE COMMUNICATE TO YOU IN ANY WAY THAT

20   CERTAIN THINGS IN THE PRIOR APPLICATION SHOULD BE TAKEN OUT?

21   A    YES, HE DID.

22   Q    AND HOW DID HE DO THAT?

23   A    IN THE WRITING HE -- I ACTUALLY ASKED HIM, UM,

24   SORRY.  ONE STEP BACK.  I SENT HIM A COPY OF THE SAME

25   APPLICATION THAT WAS FILED.

1   Q   THE RADIANCE APPLICATION?

2   A   YES.

3   Q   AS IT HAD BEEN FILED?

4   A   RIGHT.  AND I ASKED HIM, WORKING BACK FROM THAT

5   APPLICATION, TAKE OUT EVERYTHING THAT YOU BELIEVE MIGHT EVEN

6   POSE ANY REMOTE CHANCE THAT IT'S NOT INVENTED BY YOU.

7   Q   AND DID HE DO THAT?

8   A   YES, HE DID.

9   Q   CAN WE SEE EXHIBIT 810, PLEASE, JEFF?  AND LET'S

10  SCROLL FORWARD BY A COUPLE OF PAGES UNTIL WE HIT ONE.

11      DO YOU RECOGNIZE THIS, MR. ALBOSZTA?

12  A   THAT'S THE PATENT APPLICATION.

13  Q   IF WE CAN JUMP TO THE PAGE, JEFF, THAT'S BATES

14  NUMBER INT0625.  DO YOU RECOGNIZE THIS?

15  A   YES.  THAT'S -- THOSE ARE THE MARKINGS THAT --

16  MADE BY MR. VERDIELL.

17  Q   IF WE CAN JUST BLOW UP THE TOP.  CAN YOU READ THE

18  WHAT'S WRITTEN IN BETWEEN THE TWO PARAGRAPHS THERE,

19  MR. ALBOSZTA?

20  A   "FRANK'S CONTRIBUTION, TAKE OUT."

21  Q   AND WERE THOSE WRITINGS CONTAINED ON THE VERSION

22  THAT MR. VERDIELL GAVE BACK TO YOU?

23  A   YES, THEY WERE.

24  Q   SO -- AND DID YOU UNDERSTAND THAT AS AN

25  INSTRUCTION FROM HIM?

1       A     YES, I DID.

2       Q     IF WE CAN ALSO SEE JEFF, PAGE INT 639.  DO YOU

3    RECALL THIS ALSO AS BEING IN THE APPLICATION THAT HE

4    RETURNED TO YOU?

5       A     YES, I DO.

6       Q     AND CAN YOU REACH -- LET'S BLOW UP AGAIN RIGHT IN

7    THERE.   PERFECT.

8             CAN YOU READ THE NOTE BETWEEN THE TWO PARAGRAPHS?

9       A     "FRANK'S CONTRIBUTION DROP."

10      Q     AND DID YOU, IN PREPARING THIS NEW APPLICATION,

11   FOLLOW MR. VERDIELL'S INSTRUCTIONS AS TO WHAT TO TAKE IN AND

12   WHAT TO TAKE OUT?

13      A     YES, I DID.

14      Q     DID HE MAKE ANY OTHER CHANGES?

15      A     I RECALL THERE WERE A FEW CHANGES TO THE CLAIMS

16   AND SOME CHANGES TO THE DRAWINGS.

17      Q     NOW, GOING BACK FOR A MOMENT IN TIME,

18   MR. ALBOSZTA, TO RADIANCE, YOU SAID THAT THE FIRST MEETING

19   YOU RECEIVED MATERIAL FOR ONE PATENT APPLICATION?

20      A     CORRECT.

21      Q     BUT THAT YOU FORMED THE UNDERSTANDING THAT OTHERS

22   MIGHT BE FORTHCOMING?

23      A     THAT'S RIGHT.

24      Q     DID YOU EVER RECEIVE ANY OTHER MATERIALS FROM

25   RADIANCE WHICH WERE INDICATED TO YOU AS REFLECTING

1          **THE COURT:**  MR. ALBOSZTA, YOU CAN BE EXCUSED.

2          **THE WITNESS:**  THANK YOU.

3          **THE COURT:**  ALL RIGHT.  WE'LL RECESS NOW UNTIL

4   TOMORROW MORNING AT 9;00 AND IF YOU WOULD PLEASE HELP ME OUT

5   AND SEE IF YOU CAN CLEAN UP THE COURTROOM.  OKAY.  THANK

6   YOU.

7   (WHEREUPON, AT 4:05 P.M. THE PROCEEDINGS WERE CONTINUED TO

8   THURSDAY, JANUARY 20, 2005 AT 9:00 A.M. FOR FURTHER

9   PROCEEDINGS.)

10             COURT REPORTER'S CERTIFICATE

11        I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

12  DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

13  CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

14  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15        I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

16  COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

17  CONFERENCE OF THE UNITED STATES.

18

19                    _____

20                 STARR A. WILSON, CSR NO. 2462

21

22

23

24

25