1 TOWNSEND AND TOWNSEND AND CREW LLP
  MARK T. JANSEN (State Bar No. 114896)
2 PAUL F. KIRSCH (State Bar No. 127446)
  ANGUS M. MacDONALD (State Bar No. 212526)
3 TALI L. ALBAN (State Bar No. 233694)
  Two Embarcadero Center, Eighth Floor
4 San Francisco, California  94111
  Telephone: (415) 576-0200
5 Facsimile: (415) 576-0300
  Email: mtjansen@townsend.com, pkirsch@townsend.com
6         ammacdonald@townsend.com, tlalban@townsend.com

7 Attorneys for Plaintiff
  FRANK T. SHUM
8

9

                    UNITED STATES DISTRICT COURT
10
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                          OAKLAND DIVISION
12

13 | FRANK T. SHUM,                    | Case No.   C02-3262 DLJ (EMC)

14 |              Plaintiff,           | **PLAINTIFF FRANK SHUM'S**
                                       | **OPPOSITION TO DEFENDANTS**
15 |     v.                            | **INTEL CORPORATION,**
                                       | **LIGHTLOGIC, INC. AND JEAN-MARC**
16 | INTEL CORPORATION, JEAN-MARC      | **VERDIELL'S MOTION FOR**
   | VERDIELL, and LIGHTLOGIC, INC.,   | **SUMMARY JUDGMENT**

17 |              Defendants.          | Date:      July 25, 2008
                                       | Time:      2:00 p.m.
18                                     | Place:     Courtroom 1, 4th Floor
                                       |            Hon. D. Lowell Jensen
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   DEFENDANTS' MOTION SHOULD BE SUMMARILY DENIED ON ALL
     CLAIMS ................................................................................................................. 1

II.  STATEMENT OF FACTS ....................................................................................... 1

III. ARGUMENT ........................................................................................................... 8

     A.   Shum's Inventorship Claim Requires A Jury Trial ...................................... 8

          1.   Joint inventorship arises from the conjoined efforts of the
               inventors. ............................................................................................ 8

          2.   Contribution to a single claim establishes joint inventorship. ........... 9

          3.   Whether conception is sufficiently corroborated is governed by
               a "rule of reason" under which all evidence must be
               considered. ........................................................................................ 10

          4.   Defendants repeatedly misstate the governing legal standards. ........ 11

               a)   Defendants overstate the corroboration requirement ............... 11

               b)   Defendants misconstrue the joint inventorship standard. ......... 13

               c)   Defendants confuse originality and priority. ........................... 14

          5.   Verdiell's admissions along with the documentary and
               circumstantial evidence establish that Shum is at least a co-
               inventor of the flexure patents. ......................................................... 15

               a)   Extensive evidence confirms Shum's inventive
                    contribution. ............................................................................ 15

               b)   Defendants offer no viable evidence rebutting Shum's
                    inventorship of the flexure patents. ......................................... 18

               c)   Verdiell's admissions that Shum drew the conception
                    documents at issue preclude summary judgment as to
                    the flexure patents. ................................................................. 19

          6.   Shum is at least a joint inventor of the step patents. ........................ 20

               a)   Verdiell's contradictory testimony regarding
                    inventorship of the abandoned Shum application
                    precludes summary judgment as to the step patents. ............... 20

               b)   Substantial additional evidence supports Shum's
                    inventorship claim. ................................................................. 22

          7.   Shum is at least a co-inventor of the dual enclosure patent ............. 22

          8.   Defendants' summary judgment as to inventorship should be

**TABLE OF CONTENTS(con't)**

Page

denied. ................................................................................................................. 23

B.  Shum's Unjust Enrichment Claim Requires a Jury Trial ................................. 25

1.  Shum's unjust enrichment claim and the POL do not embrace
the same subject matter ........................................................................... 25

2.  Shum's unjust enrichment claim is not defective as to Intel and
LightLogic. .............................................................................................. 27

3.  Defendants' "co-ownership" argument is legally erroneous ................... 30

C.  Shum's Breach of Contract Claim Requires a Jury Trial ............................... 31

D.  Shum's Fiduciary Duty Claim Requires a Jury Trial ..................................... 32

1.  Shum's standing to redress his injuries from Verdiell's breach
of fiduciary duties to Radiance is "law of the case." ............................. 32

2.  Two California Supreme Court cases, *City of Hope* and
*Stevens,* contradict Defendants' premise that Verdiell did not
owe any fiduciary duties as a matter of law. .......................................... 34

3.  There is abundant evidence of a confidential and fiduciary
relationship between Verdiell and Radiance as well as between
Verdiell and Shum. ................................................................................. 35

E.  Shum's Fraud and Fraudulent Concealment Claims Require a Jury
Trial ............................................................................................................... 37

IV.  THE AMOUNT OF DAMAGES IS NOT APPROPRIATELY BEFORE THE
COURT, AND SHUM SHOULD BE PERMITTED AN OPPORTUNITY TO
CONDUCT ADDITIONAL DISCOVERY PURSUANT TO FED. R. CIV. P.
56(f) ........................................................................................................................ 40

V.  CONCLUSION ....................................................................................................... 40

1

**TABLE OF AUTHORITIES**

2

Page

3

**Cases**

4

*Acromed Corp. v. Sofamor Danek Group,*
    253 F.3d 1371 (Fed. Cir. 2001) ................................................................ 13, 14

5

*Aro Mfg. v. Convertible Top Replacement Co.,*

6
    365 U.S. 336 (1961) ................................................................................... 13

7

*Bancroft-Whitney Co. v. Glen,*
    64 Cal. 2d 327 (1966) ................................................................................ 36

8

*Bedoni v. Navajo-Hopi Indian Relocation Comm'n.,*

9
    878 F.2d 1119 (9th Cir. 1989) ................................................................... 37

10

*Beech Aircraft Corp. v. EDO Corp.,*
    990 F.2d 1237 (Fed. Cir. 1993) ................................................................. 8

11

*Berkla v. Corel Corp.,*

12
    302 F.3d 909 (9th Cir. 2002) ..................................................................... 26, 27

13

*Blankenheim v. E.F. Hutton & Co.,*
    217 Cal. App. 3d 1463 (1990) ................................................................... 38

14

*Boyd v. Bevilacqua,*

15
    247 Cal. App. 2d 272 (1966) ..................................................................... 37

16

*Burroughs Wellcome Co. v. Barr Lab.,*
    40 F.3d 1223 (Fed. Cir. 1994) ................................................................... 8, 9, 13

17

*C.R. Bard, Inc. v. M3 Sys., Inc.,*

18
    157 F.3d 1340 (Fed. Cir. 1998) ................................................................. 8

19

*Cal. Med. Assn. v. Aetna U.S. Healthcare,*
    94 Cal. App. 4th 151 (2001) ...................................................................... 27

20

*Cardonet, Inc. v. IBM Corp.,*

21
    2007 WL 3256204 (N.D. Cal. Nov. 5, 2007) ........................................... 26

22

*Carroll v. Metropolitan Ins. & Annuity Co.,*
    166 F.3d 802 (5th Cir. 1999) ..................................................................... 39

23

*Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.,*

24
    118 F. Supp. 2d 1002 (C.D. Cal. 2000) .................................................... 39

25

*Celador Int'l Ltd. v. Walt Disney Co.,*
    347 F. Supp. 2d 846 (C.D. Cal. 2004) ...................................................... 35

26

*Checkpoint Systems, Inc. v. All-Tag Security S.A.,*

27
    412 F.3d 1331 (Fed. Cir. 2005) ................................................................. 21, 22, 24, 25

28

*Chou v. Univ. of Chicago,*
    254 F.3d 1347 (Fed. Cir. 2001) ................................................................. 28, 30, 31, 36

**TABLE OF AUTHORITIES (con't)**

Page

*City of Hope Medical Center v. Genentech, Inc.,*
43 Cal. 4th 375 (2008)..................................................................................... 32, 34, 35

*Cooper v. Goldfarb,*
154 F.3d 1321 (Fed. Cir. 1998) ....................................................................... 10, 11

*County of San Bernardino v. Walsh,*
158 Cal. App. 4th 533 (2007) .......................................................................... 29, 33

*County of Solano v. Vallejo Redevelopment Agency,*
75 Cal. App. 4th 1262 (1999) .......................................................................... 26, 28, 29

*David Welch Co. v. Erskine & Tulley,*
203 Cal. App. 3d 884 (1988) ........................................................................... 33

*Davis v. Kahn,*
7 Cal. App. 3d 868 (1970) ............................................................................... 38

*Day v. Amax, Inc.,*
701 F.2d 1258 (8th Cir. 1983) ......................................................................... 1

*Eli Lilly & Co. v. Aradigm Corp.,*
376 F.3d 1352 (Fed. Cir. 2004) ....................................................................... 9, 15

*Elsbach v. Mulligan,*
58 Cal. App. 2d 354 (1943) ............................................................................. 36

*Ethicon, Inc. v. U.S. Surgical Corp.,*
135 F.3d 1456 (Fed. Cir. 1998) ....................................................................... 8, 9, 10, 19

*Fenn v. Yale Univ.,*
283 F. Supp. 2d 615 (D. Conn. 2003) .............................................................. 33, 37

*Fina Oil & Chem. Co. v. Ewen,*
123 F.3d 1466 (Fed. Cir. 1997) ....................................................................... 8, 14

*First Nationwide Savings v. Perry,*
11 Cal. App. 4th 1657 (1992) .......................................................................... 27

*Fox v. Abrams,*
163 Cal. App. 3d 610 (1985) ........................................................................... 37

*Frank's Casing Crew v. PMR Techs., Ltd.,*
292 F.3d 1363 (Fed. Cir. 2002) ....................................................................... 9

*Garcia v. Pueblo Country Club,*
299 F.3d 1233 (10th Cir. 2005) ....................................................................... 17

*Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.,*
148 Cal. App. 4th 937 (2007) .......................................................................... 39

PLAINTIFF FRANK SHUM'S OPPOSITION TO DEFENDANTS INTEL CORPORATION, LIGHTLOGIC, INC.

AND JEAN-MARC VERDIELL'S MOTION FOR SUMMARY JUDGMENT, CASE NO. C02-3262 DLJ (EMC)          - iv -

**TABLE OF AUTHORITIES (con't)**

Page

*Gemstar-TV Guide Int'l, Inc. v. ITC,*
   383 F.3d 1352 (Fed. Cir. 2004) ................................................................. 9, 10, 11

*Gerlinger v. Amazon.com, Inc.,*
   311 F. Supp. 2d 838 (N.D. Cal. 2004)............................................................... 27

*Gipson v. Mattox,*
   2006 U.S. Dist. LEXIS 86207 (S.D. Ala. 2006) ............................................... 25

*Glaxo Inc. v. Novapharm, Ltd.,* 110 F.3d 1562, 1566 (Fed. Cir. 1997) ................ 13

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,*
   397 F.3d 1217 (9th Cir. 2005)............................................................................ 16

*Hillsman v. Sutter Community Hospitals,*
   1 53 Cal. App. 3d 743 (1984) ............................................................................ 26

*Huang v. Cal. Inst. of Tech.,*
   72 U.S.P.Q.2d (BNA) 1161 (C.D. Cal. 2004) ................................................... 14

*Hybritech Inc., v. Monoclonal Antibodies, Inc.,*
   802 F.2d 1367 (Fed. Cir. 1986) ......................................................................... 13

*Jewel v. Boxer,*
   156 Cal. App. 3d 171 (1984) ............................................................................. 37

*Kelegian v. Mgrdichian,*
   33 Cal. App. 4th 982 (1995) .............................................................................. 36

*Kennedy v. Wright,*
   676 F. Supp. 888 (C.D. Ill. 1988) ..................................................................... 36

*Kern-Tulare Water Dist. v. Bakersfield,* 634 F. Supp. 656 (E.D. Cal. 1986), *aff'd* in
   part, *rev'd* in part on other grounds, 828 F.2d 514 (9th Cir. 1987) .................... 1

*Kridl v. McCormick,*
   105 F.3d 1446 (Fed. Cir. 1997) ......................................................................... 10

*Lacotte v. Thomas,*
   758 F.2d 611 (Fed. Cir. 1985) ........................................................................... 23

*Lacy v. Rotating Prods. Sys., Inc.,*
   961 P.2d 1144 (Colo. Ct. App. 1998)................................................................ 36

*Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.,*
   44 Cal. App. 4th 194 (1996)............................................................................... 27

*Lectrodryer v. SeoulBank,*
   77 Cal. App. 4th 723 (2000) .............................................................................. 25

*Leff v. Gunter,*
   33 Cal. 3d 508 (1983)......................................................................................... 37

PLAINTIFF FRANK SHUM'S OPPOSITION TO DEFENDANTS INTEL CORPORATION, LIGHTLOGIC, INC.

AND JEAN-MARC VERDIELL'S MOTION FOR SUMMARY JUDGMENT, CASE NO. C02-3262 DLJ (EMC)          - V -

**TABLE OF AUTHORITIES (con't)**

Page

*Loral Fairchild Corp. v. Matsushita Elec. Ind. Co.,*
   266 F.3d 1358 (Fed. Cir. 2001) ................................................................................ 11, 23

*Mahurkar v. C.R. Bard,*
   79 F.3d 1572 (Fed. Cir. 1996) .......................................................................................... 12

*Manderville v. PCG&S Group, Inc.,*
   146 Cal. App. 4th 1486 (2007) ........................................................................................ 38

*Medichem, S.A. v. Rolabo, S.L.,*
   437 F.3d 1157 (Fed. Cir. 2006) ................................................................................ 11, 12

*Michelson v. Hamada,*
   29 Cal. App. 4th 1566 (1994) .......................................................................................... 35

*Monsanto v. Ralph,*
   382 F.3d 1374 (Fed. Cir. 2004) ................................................................................ 29, 30

*Nelson v. Abraham,*
   29 Cal. 2d 745 (1947) ...................................................................................................... 34

*Nibbi Bros. v. Home Fed. Sav. & Loan Ass'n,*
   205 Cal. App. 3d 1415 (1988) ........................................................................................ 38

*Opryland USA, Inc. v. Great American Music Show, Inc.,*
   970 F.2d 847 (Fed. Cir. 1992) ........................................................................................ 40

*P&G v. Teva Pharm. USA, Inc.,*
   2008 U.S. Dist. LEXIS 15127  (D. Del. 2008)................................................................ 12

*Pannu v. Iolab Corp.,*
   155 F.3d 1344 (Fed. Cir. 1998) ................................................................................... 9, 31

*Paracor Fin., Inc. v. GE Capital Corp.,*
   96 F.3d 1151 (9th Cir. 1996) ........................................................................................... 27

*Perez v. Van Groningen & Sons,*
   41 Cal. 3d 962 (1986) ...................................................................................................... 28

*Persson v. Smart Inventions, Inc.,*
   125 Cal. App. 4th 1141 (2005) .................................................................................. 32, 33

*Peyton v. Cly,*
   184 Cal. App. 2d 193 (1960) ........................................................................................... 39

*Phillips v. AWH Corp.,*
   376 F.3d 1382 (Fed. Cir. 2004) ...................................................................................... 17

*Price v. Symsek,*
   988 F.2d 1187 (Fed. Cir. 1993) ................................................................................. 10, 12

PLAINTIFF FRANK SHUM'S OPPOSITION TO DEFENDANTS INTEL CORPORATION, LIGHTLOGIC, INC.

AND JEAN-MARC VERDIELL'S MOTION FOR SUMMARY JUDGMENT, CASE NO. C02-3262 DLJ (EMC)     - vi -

**TABLE OF AUTHORITIES (con't)**

Page

*Ray v. Alad Corp.*,
19 Cal.3d 22 (1977) ................................................................................................. 29

*Richelle v. Roman Catholic Archbishop*,
106 Cal. App. 4th 257 (2003) ................................................................................. 34

*Sabasta v. Buckaroos, Inc.*,
507 F. Supp. 2d 986 (S.D. Iowa 2007) ................................................................... 11

*Sandt Tech. v. Resco Metal & Plastics*,
264 F.3d 1344 (Fed. Cir. 2001) ............................................................................. 11

*Sewall v. Walters*,
21 F.3d 411 (Fed. Cir. 1994) ........................................................................... 15, 39

*Shum v. Intel*,
499 F.3d 1272 (Fed. Cir. 2007) ......................................................................... 1, 25

*Sime v. Malouf*,
95 Cal. App. 2d 82 (1950) ...................................................................................... 37

*Singh v. Brake*,
222 F.3d 1362 (Fed. Cir. 2000) ....................................................................... 12, 13

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2002) ............................................................................. 10

*Small v. Fritz Companies, Inc.*,
30 Cal. 4th 167 (2003) ........................................................................................... 39

Stark v. Advanced Magnetics,
119 F.3d 1551 (Fed. Cir. 1997) ............................................................................. 31

*Stevens v. Marco*,
147 Cal. App. 2d 357 (1956) .................................................................................. 34

*Stonecraft, LLC v. Slagter*,
322 B.R. 623 (S.D. Miss. 2005) ............................................................................ 36

*Sutter v. General Petroleum Corp.*,
28 Cal. 2d 525 (1946) ............................................................................................ 33

*T.A. Pesue Co. v. Grand Enterprises, Inc.*,
782 F. Supp. 1476 (D. Colo. 1991) ........................................................................ 37

*Trovan, Ltd. v. Sokymat SA*,
299 F.3d 1292 (Fed. Cir. 2002) ............................................................................. 10

*U.S. v. Thrasher*,
483 F.3d 977 (9th Cir. 2007) ................................................................................. 33

1

**TABLE OF AUTHORITIES (con't)**

2

Page

3

*United States v. Ayres,*
76 U.S. 608 (1869) ........................................................................................ 1

4

*United States v. Montgomery,*
462 F.3d 1067 (9th Cir. 2006) ........................................................................ 1

5

6

*Universal Sales Corp. v. Cal. Press Mfg. Co.,*
20 Cal. 2d 751 (1942) .................................................................................. 34

7

*ViChip Corp. v. Lee,*
438 F. Supp. 2d 1087 (N.D. Cal. 2006) ................................................... 36, 37

8

9

*Wal-Noon Corp. v. Hill,*
45 Cal. App. 3d 605 (1975) ...................................................................... 26, 27

10

*Weiner v. Fleischman,*
54 Cal. 3d 476 (1991) .................................................................................. 34

11

12

*Winston v. NBC, Inc.,*
231 Cal. App. 3d 540 (1991) ........................................................................ 38

13

**Statutes**

14

35 U.S.C. § 100(d) ............................................................................................ 30

15

35 U.S.C. § 102(f) .............................................................................................. 8

16

35 U.S.C. § 112 ................................................................................................ 13

17

35 U.S.C. § 116 ....................................................................................... 8, 9, 35

18

35 U.S.C. § 154(a)(1) ....................................................................................... 30

19

35 U.S.C. § 156 .................................................................................................. 5

20

35 U.S.C. § 256 ................................................................................................ 31

21

35 U.S.C. § 271 ................................................................................................ 30

22

35 U.S.C. § 281 ................................................................................................ 30

23

37 C.F.R. § 1.56(a) (2007) .......................................................................... 35, 38

24

California Civil Code § 1668 ............................................................................ 38

25

California Civil Code § 1710(3) ....................................................................... 38

26

California Corporations Code § 1107(a) ........................................................... 29

27

28

1

**TABLE OF AUTHORITIES (con't)**

2

Page

3

**Other Authorities**

4

1 Witkin, *Summary of Cal. Law, Contracts*, § 97, pp. 126-27 ............................................ 28

5

Chodos, *Coownership of Copyright and Fiduciary Duty: The Poverty of Preemption*,
  The Law of Fiduciary Duties (2000) .................................................... 35

6

Fletcher Cyc. of the Law of Private Corp., § 893 (2007) .................................... 36

7

Manual of Patent Examining Procedure § 2001.04 .......................................... 35

8

RESTATEMENT OF RESTITUTION § 168(1) ...................................................... 29

9

**Rules**

10

Federal Rule of Civil Procedure 30(e) ........................................................ 16

11

Federal Rule of Civil Procedure 56(f) ........................................................ 40

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   DEFENDANTS' MOTION SHOULD BE SUMMARILY DENIED ON ALL CLAIMS

The Federal Circuit in its reversal of this Court's bifurcation order, this Court in its previous order denying summary judgment, and Defendants in their removal papers have all recognized the factual issue of inventorship – "when and where the claimed inventions were conceived, and by whom" – is interwoven in Shum's inventorship and state law claims and requires a jury trial.  *See, e.g.*, *Shum v. Intel*, 499 F.3d 1272, 1277-78 (Fed. Cir. 2007); *see also United States v. Montgomery*, 462 F.3d 1067, 1072 (9th Cir. 2006) (on remand, district court has a duty follow the "letter and the spirit" of the appellate court's mandate).  Yet Defendants once again invite error by improperly seeking reinstatement of this Court's vacated inventorship and second summary judgment orders.  Defendants' motion moreover rests on inadmissible testimony and claim construction rulings from the vacated inventorship trial.  *United States v. Ayres*, 76 U.S. 608, 610 (1869); *Day v. Amax, Inc.*, 701 F.2d 1258, 1263 (8th Cir. 1983) ("Following the grant of a new trial, the second trial, absent any stipulations by the parties to the contrary, proceeds de novo.").  Defendants' motion also presents the ***exact same*** arguments they made – and lost – in their first summary judgment motion without ***any*** showing of new law or new facts.  *See* April 27, 2004 Summary Judgment Order.  This flawed motion is nothing more than a motion for reconsideration and should be summarily denied.  *See, e.g., Kern-Tulare Water Dist. v. Bakersfield*, 634 F. Supp. 656, 665-666 (E.D. Cal. 1986), *aff'd* in part, *rev'd* in part on other grounds, 828 F.2d 514 (9th Cir. 1987) (court properly refused to consider second motion for summary judgment).

Shum requests that the Court summarily strike Defendants' motion (*see* Shum's Motion to Strike and Objections to Evidence, filed concurrently herewith).  Shum also responds to the substance of the motion by resubmitting the abundant evidence which supports his inventorship and state law claims and by addressing, once again, Defendants' stale, incorrect and previously rejected legal arguments.

## II.   STATEMENT OF FACTS

This Court is well acquainted with the factual background and legal claims in this action. Therefore, the following is a summary of certain important facts pertinent to this motion.[1]

---

[1]  For a more facts pertinent to the background and technical issues in this case, please refer to the accompanying Declarations of Frank T. Shum and Dr. Wayne Knox, as well as the evidentiary testimony and exhibits contained in the accompanying Declaration of Angus M. MacDonald ("MacDonald Decl.").

1    Frank Shum, a highly skilled and creative optomechanical designer and engineer, worked for

2    many years in the 1990's to develop innovative optoelectric packaging technology for use in the

3    burgeoning telecom industry.  *See* Shum Decl., ¶¶4-6; MacDonald Decl., Ex. A at 38:14-47:22, Ex. B at

4    337:10-341:1, Ex. C at 610:1-11, Ex. F at 18:2-14 and 13:17-14:11.  Shum started Radiance in mid-

5    1996 as a sole proprietorship devoted to such technology.  *See* Shum Decl., ¶7.  Over the next couple of

6    years, Shum spent all his time at Radiance working on his innovative step, flexure and dual enclosure

7    optoelectronic packaging technology.  *See* Shum Decl., ¶7; MacDonald Decl., Ex. C at 394:20-399:9,

8    Ex. E at 1053:3-1054:16, Ex. I-J.  He contemporaneously recorded these new concepts in a multitude of

9    Records of Invention, government proposals, business proposals, CAD drawings, a laboratory notebook,

10   and draft patent claims; filed a patent application on his inventions; and reduced his new technology to

11   prototype.  MacDonald Decl., Ex. ZZ and Ex. C at 469:15-470:11 and 583:15-584:15.  In 1996 and

12   early 1997, Shum consulted with Jean-Marc Verdiell, his acquaintance from Shum's previous employer,

13   SDL, about the progress of his new company and its step, flexure and dual enclosure technology.[2]

14         According to Verdiell, he and Shum worked together in 1996 and early 1997 on developing

15   Radiance's innovative technology.  MacDonald Decl., Ex. F at 22:24-23:23, 40:3-8 and 77:1-19, Ex. C

16   at 513:17-515:3; Shum Decl., Ex. L.  Shum had already shared with Verdiell the concept of the "step"

17   invention, in April 1996, <u>before</u> Verdiell attended an industry conference where he met a salesman who

18   told him about the potential applications of a widely sold substrate comprised of "direct bonded copper."

19   MacDonald Decl., Ex. D at 664:22-667:2.  Later, in August 1996, Verdiell suggested that Shum should

20   file for a patent as the sole inventor of the step technology, and he referred Shum to Marek Alboszta,

21   Verdiell's friend and patent agent, to commence the patent filing process.  *Id.*, Ex. F at 110:17-112:5,

22   Ex. H at 17:4-8.  Over the next several months, Shum worked with Alboszta on preparing the step patent

23   application with Shum listed as the sole inventor.  *Id.*, Ex. H at 17:4-8.  Throughout 1996, Shum and

24   Verdiell jointly wrote proposals to potential customers reflecting Radiance's new optoelectronic

25   packaging design.  *Id.*, Ex. F at 35:6-16.  During the fall of 1996, Verdiell referred to this step invention

26

27   [2]  Verdiell testified that he was confident his work with Shum did not violate any agreement he had with
     SDL.  *See* MacDonald Decl., Ex. F at 80:22-25.

28

1   as a joint project of Shum and himself, using "our" and "we." *Id.*, Exs. K and L.  Although he *expressly*

2   recognized Shum's inventorship (*id.*, Ex. F at 91:13-19; Shum Decl., Ex. M), Verdiell worked

3   confidentially with Alboszta regarding the potential patentability of this invention.  MacDonald Decl.,

4   Exs. K and L.

5       As discussed in detail in Section III.A.5 *infra*, Verdiell has also credited Shum with at least joint

6   inventorship of the "flexure" and "dual enclosure" technologies, even though Verdiell now claims sole

7   inventorship rights.  In fact, Verdiell acknowledged that he and Shum "worked together" (*id.*, Ex. F at

8   22:24-23:23, 40:3-8, 77:1-19) and described his relationship with Shum as a collaboration in which they

9   worked together to develop technology – "our first baby steps towards developing [packaging]

10  technology."  MacDonald Decl., Ex. F at 138:25-139:6 and 89:19-22.  From the volume of work papers

11  concerning this technology – Shum's binders full versus Verdiell's four pages – it is evident, however,

12  who did the majority of work.  *Compare* Shum Decl., Exs. G, K, L, H, M-V, *with* MacDonald Decl.,

13  Exs. M, N and O; Taylor Decl., Ex. 22.

14      Shum asked Verdiell to join him at Radiance because of Verdiell's business acumen.  Shum

15  Decl. ¶10.  On April 22, 1997, Shum and Verdiell incorporated Radiance Design, Inc. as co-officers, co-

16  directors, and co-owners.[3]  Shum agreed that Verdiell would become the President of Radiance, and

17  would be solely responsible for managing Radiance's business and financial future, including locating

18  funding to promote Radiance's innovative technology.  Shum gave Verdiell control over Radiance's

19  accounting and legal matters as well as discussions with potential investors and customers.  *See*

20  MacDonald Decl., Exs. P and Q.  Shum, the Vice President, was Radiance's chief engineer.  *Id.*, Ex. E at

21  1018:7-12, Ex. D at 691:23-692:5.

22      The day Radiance incorporated, with Verdiell's approval, Shum filed a patent application for the

23  step technology, listing himself as a "sole" inventor.  Shum Decl., Ex. P.  Shum, as is typically required

24  of any officer of any corporation, assigned his invention and patent application rights to Radiance.

25  MacDonald Decl., Ex. R.  A short time later in May 1997, both Shum and Verdiell signed (and

26

27  ───────────────
    [3]  In its short nine months of existence, Radiance, however, never had any Board of Directors meetings.
    Shum Decl., ¶16.

28

countersigned on behalf of Radiance) a "Confidentiality and Property Rights Agreement" through which they both agreed that their previous and ongoing efforts to develop innovative optoelectronic packaging were the "exclusive property of [Radiance], its successors and assigns," and that each had a duty to "***disclose in confidence***" all "***ideas or inventions***" to Radiance whether developed "***solely or jointly***." Shum Decl., Exs. I and J at ¶2 (emphasis added).  The Confidentiality Agreement also stated that Verdiell and Shum agreed to "assist [Radiance] in every proper way, including the signing of any and all papers, authorizations, applications, and assignments, … to obtain and to maintain for the use and benefit of the Company or its nominees, patents, … for any and all Work Product." *Id.* at ¶4.  This obligation specifically "extended beyond any termination" of Verdiell's and Shum's employment at Radiance.  *Id.*

Shum and Verdiell worked to develop and promote Radiance technology over the next few months.  *See* MacDonald Decl., Ex. F at 95:23-96:10.  By early Fall, 1997, a personal rift had developed between Verdiell and Shum.  *Id.*, Ex. G at 226:8-227:21 and 242:22-243:12.  They did not agree on business issues related to Radiance technology.  At one point, Shum asked Verdiell to step down as president so that he, Shum, could invest more capital, become a majority owner and have some control over Radiance technology.  *Id.*, Ex. A at 92:17-97:14.  Verdiell refused.  *Id.* at 99:9-101:13.  About the same time, Verdiell implemented a scheme to steal the Radiance technology for himself, which (according to Verdiell) was at least jointly invented by him and Shum, and without question, was jointly owned by Verdiell and Shum through Radiance.  *Id.*, Ex. F at 89:19-22, Ex. G at 198:13-21, 203:13-205:11, 206:16-207:1, 208:6-209:22, and 257:9-18.

Despite his obligations as an officer of Radiance, including his express duties under the Confidentiality Agreement to promote Radiance technology as the "exclusive property" of the company and, despite his obligations to Shum as a joint inventor and fellow officer and shareholder of Radiance, Verdiell secretly shopped Radiance technology to investors for his own benefit – even denying Shum had any interest in the company.  *Id.*, Ex. S (listing Remy Aubert as one of two "Founders" of Radiance, but not Shum).  Verdiell also refused to provide Shum any information about meetings with investors or written communications that confirmed the investors' substantial interest in Radiance and its technology.

1   Verdiell misled Shum about the value of his shares in the company.[4]  Verdiell hid from Shum a letter of

2   intent from Siemens, a customer and potential investor, which demonstrated its interest in procuring

3   over $12 million of Radiance technology.  *Id.*, Ex. T.  Verdiell also used his unlimited control as the

4   president of Radiance to secretly clear the company's bank account.  He placed all company funds under

5   his sole control and unilaterally pushed Shum from his chief engineer role at Radiance by removing

6   Shum as the "principal investigator" on important government contracts.  *Id.*, Ex. U.

7         Verdiell then made a power play for Radiance's most prominent intellectual property to date:

8   Shum's patent application.  Verdiell informed Radiance's patent agent (Alboszta) – but not Shum – that

9   he, Verdiell, considered himself a "joint inventor" with Shum of the pending step application.  *Id.*, Ex. F

10  at 89:19-22.  Consequently, Alboszta incorrectly told Shum that Shum's patent application would need

11  to be abandoned as invalid because Verdiell's name was not on the patent as a co-inventor.  Then

12  Verdiell offered a deal to Shum:  re-file Shum's pending patent application in both their names as

13  inventors, but only if Shum sold Verdiell his interest in Radiance at a low-ball price.  *Id.*, Ex.V.  Shum

14  declined.  Soon, Verdiell secretly organized a new company, LightLogic, to be his depository for

15  Radiance's technology, and Verdiell instructed Alboszta to formally file an unnecessary abandonment of

16  Shum's application in the PTO.[5]  *Id.*, Ex. F at 123:6-13, 171:3-9, Ex. H at 61:13-20.  Verdiell then began

17  drafting a virtual copy of Shum's step patent applications but with Verdiell listed as the "sole inventor."[6]

18        While Verdiell was withholding critical information about the value of Radiance's technology

19  and secretly drafting his plagiarized patent application for LightLogic's benefit, Verdiell and his lawyers

20  negotiated a dissolution of Radiance.  Verdiell apparently considered doing the right thing – telling

21  Shum about his plans for LightLogic (Radiance's "total successor" in Verdiell's words) and offering

22  Shum an ownership interest in the new company.  MacDonald Decl., Ex F at 144:15-20, Ex. G at 202:1-

23  _____

24  [4]  For example, Verdiell secretly arranged to sell ten percent of Radiance for $250,000, then offered to buy
     Shum's 50% share of Radiance for the same amount of money.  *Id.*, Exs. V, W.

25  [5]  This patent application could have been easily amended to add joint inventors, if legally required.  *See* 35
     U.S.C. § 156.

26  [6]  *See* Knox Decl., Ex. G (listing the similarities between the claims at issue in Shum's application and
     corresponding claims in the final step patent that was issued).  Many claims and drawings are exactly the
27  same in both, and Verdiell admitted just a few months after he filed his application that he had not made
     "significant changes" to Shum's application.  MacDonald Decl., Ex. EE.
28

11, 209:3-209:13 and Ex. BB.  In fact, Verdiell's notes suggested he considered offering Shum a "20%" interest.  *Id.*, at Ex. AA at MV0011580.  But Verdiell kept quiet.  Instead, without any knowledge of the value of the technology or Verdiell's ongoing plans to misappropriate it, Shum agreed to a "Plan of Liquidation" (or "POL") of Radiance – drafted in pertinent part by Verdiell's attorneys – that stated:

> assets shall be divided between Shum and Verdiell such that each party receives items of approximately the same total value.  Verdiell and Shum shall have **equal rights** to independently exploit the intellectual property developed by the Corporation.

*Id.*, Ex. CC (POL), § 2(d)(iii) (emphasis added).  The POL also contains the language Defendants have relied upon as a "release" clause, which purportedly allowed Verdiell to compete on Radiance "business opportunities" without accounting to Shum.  *Id.*, § 3.  However, the POL also recognized that the "good faith" obligations of Shum and Verdiell to "wind down" Radiance extended beyond the date the POL was executed.  *Id.*, § 4.

On January 6, 1998, the **very next day** after the POL was signed and unknown to Shum, Verdiell filed his "sole inventorship" step patent application, which Verdiell immediately assigned to LightLogic, a company which he solely owned at the time.  Verdiell remained as an owner, officer and key executive of LightLogic throughout LightLogic's existence over the next three years.  *Id.*, Exs. FF, GG.

Over the next few months following the fraudulent dissolution of Radiance, Verdiell communicated with Shum, but continued to hide that he already filed a patent naming himself as "sole inventor" on the step technology.  *Id.*, Ex. Z.  Verdiell moreover acknowledged Shum's continuing intellectual property rights in Radiance technology as he persisted seeking to buyout Shum's interest. *Id.*, Exs. HH and II.  While Verdiell would soon seek and obtain millions from LightLogic investors because of Radiance's marvelous new technology (*id.*, Exs. FF and GG), he offered Shum only a few thousand dollars for his rights.  *Id.*, Ex. II.  Shum again declined.  *Id.*, Ex. FFF.

Over the next several months, Verdiell recognized he needed "exclusivity" of the Radiance IP to impress investors.  *Id.*, Exs. G at 277:21-278:3, V and EE at MV0024430.  He therefore continued surreptitiously filing a series of additional patent applications on Radiance technology for LightLogic, again falsely naming himself as the sole inventor on the step, flexure and dual enclosure technologies.

1    *Id.*, Ex. JJ.  LightLogic executives all knew the important flexure technology was first designed at

2    Radiance.  *Id.*, Ex. KK at MV0025557, Ex. YY at 67:4-70:3.  Yet nobody from LightLogic, including

3    Verdiell, ever notified Shum of any of these patent applications based on Shum's work at Radiance.  *Id.*,

4    Ex. C at 419:14-425:9.[7]  Nor did Verdiell (or anybody else from LightLogic or Intel) ever notify Shum

5    when these patents were issued.  Shum Decl., ¶18.  Then, when Verdiell assigned his purloined patent

6    rights to LightLogic (and later Intel), Defendants denied that Shum had any ownership interest

7    whatsoever in the Radiance technology.  For example, when he assigned the first step patent to

8    LightLogic, Verdiell filed an assignment in the PTO stating:

9            2.  Said Assignor [Verdiell] hereby warrants and represents that, at the time of
execution and delivery of these presents, said Assignor is the ***sole and lawful owner***

10           ***of the entire*** *right, title and interest in and to said inventions* and said application
for Letters Patent, and that the same has not entered into any assignment, contract

11           or understanding in conflict herewith.

12    *Id.*, Ex. LL (emphasis added).[8]

13         Verdiell and LightLogic used Radiance's technology – the falsely obtained patents – as the

14    fulcrum of their business plan efforts to obtain investments, obtaining tens of millions of dollars in

15    venture capital funding based on these presentations.  *Id.*, Exs. FF and GG.[9]  Shum too had approached

16    venture capitalists following Radiance's dissolution.  *Id.*, Ex. C at 529:19-531:12.  Shum, unlike

17    Verdiell, did not file any deceptive patent applications, and he did not falsely claim exclusivity or full

18    ownership of the patents.  Instead, Shum fully disclosed the ambiguous "equal rights" provision of the

19    POL, and, as Verdiell had been initially, Shum was rebuffed by investors who were concerned over the

20    uncertainty and lack of exclusive rights.  *Id.*

21         When Intel and other companies pursued LightLogic in 2001, Verdiell on behalf of LightLogic

22    told those companies about Shum's involvement in the development of the Radiance technology at

23    issue.  *Id.*, Ex. EE at MV00244430.  Indeed, Intel's "due diligence" gave it access to Shum's

24

25    [7]  Defendants admitted years later in an interrogatory response (provided just before the inventorship trial)
that virtually all of the patents-at-issue were conceived at Radiance, not LightLogic.  *Id.*, Ex. WW.

26    [8]  *See also* MacDonald Decl., Exs. LL-TT.

27    [9]  Compare Radiance's Business Plans focusing on Radiance's technology (*id.*, Ex. UU) with LightLogic's
Business Plans and Presentations to Investors (*id.*, Ex. VV) which focused on Radiance technology – both

28    showing the exact same technology.

1   Confidentiality Agreement, abandoned patent application and the POL.  *Id.*, Exs. CC and XX; Shum

2   Decl., Exs. I and J.  But no one from Intel (or LightLogic) ever called Shum to inquire about his

3   inventorship and ownership interest in the technology or to inform him of the imminent sale of his

4   inventorship and ownership rights in Radiance technology.  MacDonald Decl., Ex. C at 419:14-425:9.

5   When Shum learned of Intel's $409 million acquisition of LightLogic in 2001, he contacted Intel to

6   discuss the value of his rights in Radiance technology.  Following Intel's advice, Shum approached a

7   venture capitalist firm, Robertson Stevens, who told Shum he had nothing unless Intel would provide

8   written confirmation of his rights.  *See* Shum Decl., ¶18.  Intel refused.  *Id.*

9   **III.   ARGUMENT**

10         There are seven patents at issue.  Four of the patents are referred to as the "Flexure patents," two

11  as the "Step patent" (or DBC patents by Defendants), and one as the "Dual Enclosure patent."  A brief

12  description of the patents is included in paragraphs 6 through 15 of the Knox Declaration.

13         **A.      Shum's Inventorship Claim Requires A Jury Trial**

14               **1.      Joint inventorship arises from the conjoined efforts of the inventors.**

15         "Inventorship is a question of who actually invented the subject matter claimed in a patent,"

16  *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993), and the "inventor" is the

17  "person or persons who conceived the patented invention."  *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d

18  1340, 1352 (Fed. Cir. 1998).  Conception is "the formation in the mind of the inventor, of a definite and

19  permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."

20  *Burroughs Wellcome Co. v. Barr Lab.,* 40 F.3d 1223, 1228 (Fed. Cir. 1994).

21         Joint inventorship is the "product of a collaboration between two or more persons working

22  together to solve the problem addressed."  *Burroughs,* 40 F.3d at 1227 (citation omitted).  Naturally, in

23  the case of a joint invention, each inventor "needs to perform only a part of the task which produces the

24  invention."  *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed. Cir. 1998); *Fina Oil &*

25  *Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("One need not alone conceive of the entire

26  invention, for this would obviate the concept of joint inventorship.").

27         When two or more persons jointly conceive of an invention, they **must** jointly apply for a patent.

28  *See* 35 U.S.C. §§ 102(f), 116.  Section 116 sets no explicit lower limit on the quality or quantity of

1   inventive contribution required for a person to qualify as a joint inventor.  *See Burroughs,* 40 F.3d at

2   1227.  The joint inventor need only "(1) contribute in some significant manner to the conception or

3   reduction to practice of the invention, (2) make a contribution to the claimed invention that is not

4   insignificant in quality, when that contribution is measured against the dimension of the full invention,

5   and (3) do more than merely explain to the real inventors well-known concepts and/or the current state

6   of the art." *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1351 (Fed. Cir. 1998) (citations omitted).

7          Joint inventorship may be established even if the inventors "did not physically work together or

8   at the same time, . . .did not make the same type or amount of contribution, or . . . each did not make a

9   contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116; *Gemstar-TV Guide*

10  *Int'l, Inc. v. ITC,* 383 F.3d 1352, 1381 (Fed. Cir. 2004).  Thus, an omitted inventor need only

11  "demonstrate that his labors were conjoined with the efforts of the named inventors." *Eli Lilly & Co. v.*

12  *Aradigm Corp.,* 376 F.3d 1352, 1359 (Fed. Cir. 2004).  There need only be "some open line of

13  communication during or in temporal proximity to their inventive efforts," or "some element of joint

14  behavior, such as collaboration or working under common direction, one inventor seeing a relevant

15  report and building upon it or hearing another's suggestion at a meeting." *Id.* (citation omitted).

16              **2.     Contribution to a <u>single</u> claim establishes joint inventorship.**

17         Because co-inventors need not contribute to the subject matter of every claim of the patent,

18  inventorship is determined on a claim-by-claim basis.  *See Gemstar,* 383 F.3d 1381.  Contribution to a

19  *single* claim makes one a joint inventor of the *entire* patent.  *Ethicon,* 135 F.3d at 1460.  "[T]he critical

20  question for joint conception is who conceived . . . the subject matter of the claims at issue." *Id.*  To

21  determine inventorship of any claim, the Court must determine: (1) what the omitted inventor's

22  contribution was, and (2) whether that contribution's role appears in the *claimed* invention.  *See Frank's*

23  *Casing Crew v. PMR Techs., Ltd.,* 292 F.3d 1363, 1373 (Fed. Cir. 2002) (citation omitted).  "If [a

24  person] contributed to the invention defined by [a claim in the patent], he is a joint inventor of that

25  claim." *Ethicon,* 135 F.3d at 1461.  Thus, Shum may establish his co-inventorship by showing that a

26  claimed invention was conceived while he and Verdiell were "engaged in a collaborative enterprise" and

27  that Shum conceived of "significant aspects of the invention." *Pannu,* 155 F.3d at 1351.

28

**3.    Whether conception is sufficiently corroborated is governed by a "rule of reason" under which <u>all</u> evidence must be considered.**

A party seeking to be added as an inventor must produce evidence corroborating his contribution (*see, e.g., Cooper v. Goldfarb*, 154 F.3d 1321, 1331 (Fed. Cir. 1998)), but "[t]here is no particular formula that an inventor must follow in providing corroboration." *Singh v. Brake,* 317 F.3d 1334, 1341 (Fed. Cir. 2002) (citation omitted). "Rather, whether a putative inventor's testimony has been sufficiently corroborated is determined by a 'rule of reason' analysis" (*see id.*), under which, "*all* of the evidence put forth by the [putative inventor] including any of his *corroborated* testimony, must be considered as a whole, not individually," in order to reach "a sound determination of the credibility of the inventor's story." *Price v. Symsek*, 988 F.2d 1187, 1195, 1196 (Fed. Cir. 1993) (emphasis in original). Inventorship may be proven by clear and convincing evidence even where no one piece of evidence in and of itself establishes the omitted inventor's conception; it is sufficient if the picture painted by all of the evidence taken collectively gives an abiding conviction that the omitted inventor's assertion of conception is highly probable. *See id.* at 1196.

To meet the burden of clear and convincing evidence, "[t]here need <u>not</u> be corroboration for every factual issue contested by the parties." *Ethicon*, 135 F.3d at 1464 (emphasis added). "[T]he law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason." *Cooper*, 154 F.3d at 1331. Simply put, it is "not necessary to produce an actual over-the-shoulder observer" of the inventive process to establish inventorship. *Id.* at 1330. The rule merely provides that "evidence of the inventive facts must not rest <u>alone</u> on the testimony of the inventor himself." *Singh*, 317 F.3d at 1341 (emphasis added); *see also Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997) (same). In the final analysis, "each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Cooper*, 154 F.3d at 1331.

"Corroborating evidence may take many forms." *Gemstar,* 383 F.3d at 1382; *Trovan, Ltd. v. Sokymat SA,* 299 F.3d 1292, 1302-03 (Fed. Cir. 2002). "Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's

1   testimony has been corroborated." *Sandt Tech. v. Resco Metal & Plastics,* 264 F.3d 1344, 1350-51

2   (Fed. Cir. 2001).  But "[c]ircumstantial evidence about the inventive process, *alone*, may also

3   corroborate." *Sandt Tech.*, 264 F.3d at 1351 (emphasis added).  Also, oral testimony from someone

4   other than the alleged inventor may corroborate.  *See, e.g., Gemstar*, 383 F.3d at 1382.  Finally, the

5   "determination about '[w]hether or not corroboration exists is a question of fact,' and the determination

6   is fundamentally one about 'credibility.'"  *Sabasta v. Buckaroos, Inc.*, 507 F. Supp. 2d 986, 998 (S.D.

7   Iowa 2007) (quoting *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006)).

8                    **4.        Defendants repeatedly misstate the governing legal standards.**

9         Faced with Verdiell's own admissions establishing Shum's inventive contributions and

10   mountains of contemporaneous, corroborated and documentary evidence further supporting Shum's

11   contributions as summarized below, Defendants have resorted to misstating several of the standards

12   governing Shum's claim of inventorship in their effort to win summary judgment.  Each of Defendants'

13   misstatements of law should be rejected and their motion denied.

14                    **a)        Defendants overstate the corroboration requirement.**

15        Defendants inflate the standard for corroborating documentary evidence needed to support

16   Shum's inventorship claim.  *See* Memo. at 20, 29.  Contrary to Defendants' assertion, the law imposes

17   no hard and fast requirement for documentary evidence to corroborate an inventorship claim.  In

18   reversing summary judgment against a putative inventor, the Federal Circuit specifically held that the

19   district court's "insistence upon 'documentary evidence' to corroborate test results of [the putative

20   inventor's] claimed reduction to practice was erroneous as a matter of law."  *Loral Fairchild Corp. v.*

21   *Matsushita Elec. Ind. Co.,* 266 F.3d 1358, 1364 (Fed. Cir. 2001).  The Court explained:

22               Under the 'rule of reason,' the inventor's testimony must be sufficiently
                 corroborated by independent evidence, *but not necessarily documentary*
23               *evidence.*  Rather, the rule requires an evaluation of all pertinent evidence when
                 determining the credibility of an inventor's testimony.
24

25   *Id.* (citation and quotation omitted); *see also Cooper* 154 F.3d at 1330 (noting that circumstantial

     evidence <u>alone</u> may corroborate a claim inventorship).[10]
26

27   ───────────────────────
     [10]  In any event, Defendants' motion would still have to be denied even if the law did strictly require
     documentary evidence to corroborate inventorship.  Shum has submitted copious documentary evidence in
28   opposition to Defendants' motion in addition to his own testimony, the admissions of Verdiell, and the
     Continued on the next page

Additionally, while admitting that the most reliable proof of corroboration is contemporaneous documentary or other physical evidence, Defendants try to discount the value of Shum's detailed records whenever they are not contemporaneously witnessed.  However, controlling precedent confirms the value of such evidence, whether or not witnessed by others.

Although unwitnessed laboratory notebooks cannot *on their own* establish inventorship, even unwitnessed notebooks are *admissible* without independent corroboration.  *See P&G v. Teva Pharm. USA, Inc.,* 2008 U.S. Dist. LEXIS 15127 at *36 (D. Del. 2008) (citing *Medichem, S.A. v. Rolabo S.L.,* 437 F.3d 1157, 1169 (Fed. Cir. 2006) ("Lab notebooks, like any other documentary or physical evidence, are admissible without independent corroboration.").  Such evidence is to be weighed along with the other evidence under the rule of reason analysis.  *See Price,* 988 F.2d at 1196.  Moreover, the *contents* of Shum's notebooks and records, even if unwitnessed, do not require further, independent corroboration.  "Unlike a situation where an inventor is proffering oral testimony attempting to remember specifically what was conceived and when it was conceived, a situation where, over time, honest witnesses can convince themselves that they conceived the invention of a valuable patent, corroboration is not necessary to establish what a physical exhibit [offered into evidence] includes.  *Only the inventor's testimony requires corroboration before it can be considered.*" *Price,* 988 F.2d at 1195 (emphasis added, citations and quotation omitted); *see also Mahurkar v. C.R. Bard,* 79 F.3d 1572, 1577-78 (Fed. Cir. 1996) ("This court does not require corroboration where a party seeks to prove conception through the use of physical exhibits.  The trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art." (citation omitted)).

Finally, unwitnessed inventor records may be afforded more corroborative weight in cases dealing with conception, such as the present one, than in cases dealing with an invention's reduction to practice, since "the standard of proof required to corroborate a reduction to practice [is] a more stringent than required to corroborate conception."  *Singh v. Brake,* 222 F.3d 1362, 1370 (Fed. Cir. 2000).  Indeed, "in some cases, conception may be proved *solely* on the basis of laboratory notebooks witnessed

_____

Continued from the previous page

substantial circumstantial evidence demonstrating and corroborating his inventive contributions.

1   subsequent to their entry."  *Id.* at 1362 (citing *Hybritech Inc., v. Monoclonal Antibodies, Inc.,* 802 F.2d

2   1367, 1378 (Fed. Cir. 1986)).  Moreover, the Federal Circuit has specifically held that the rule that an

3   inventor "must provide independent corroborating evidence in addition to his own statements and

4   documents" did ***not*** nullify the corroborative value of the putative inventor's laboratory notebook entries

5   in a case dealing with conception, because the case enunciating that rule dealt with the higher standard

6   of proof required to establish reduction to practice.  *Singh*, 222 F.3d at 1370.

7          Finally, Defendants improperly seek to increase the burden on Shum to overcome summary

8   judgment by claiming that Shum's corroborating evidence *must* be enabling.  *See* Memo. at 22.

9   However, the very case Defendants rely on states that "[o]bviously, enablement and conception are

10  ***distinct*** issues, and one need ***not*** necessarily meet the enablement standard of 35 U.S.C. § 112 to prove

11  conception." *Burroughs*, 40 F.3d at 1231 (emphasis added).

12         In any event, as outlined below, Shum has provided extensive and contemporaneous

13  documentary evidence, circumstantial evidence, and numerous admissions of Verdiell that corroborate

14  his inventorship and that provide disclosures establishing Shum's contribution to each patent at issue.

              **b)          Defendants misconstrue the joint inventorship standard.**

16         Defendants claim that putative inventors have a "particularly high" corroboration requirement

17  and that "joint inventorship is proven <u>only</u> where the evidence establishes that the challenger conceived

18  of <u>the</u> aspect of the final invention that made it patentable."  Memo. at 24, 25.  Defendants incorrectly

19  seek to limit the inventorship analysis to a single "key" aspect of the claimed invention.  Indeed,

20  Defendants' attempt in this case to formulate the inventorship analysis under the rubric of a "key

21  inventive element" violates basic principles of patent law.

22         "It is elementary patent law that <u>all</u> limitations are material," *see, e.g., Glaxo Inc. v. Novapharm,*

23  *Ltd.,* 110 F.3d 1562, 1566 (Fed. Cir. 1997), and that "there is no legally recognizable or protected

24  'essential' element, or 'gist' or 'heart' of the invention in a combination patent."  *Aro Mfg. v. Convertible*

25  *Top Replacement Co.,* 365 U.S. 336, 345 (1961).  In *Acromed*, the case cited by Defendants, the Federal

26  Circuit confirmed that "[v]irtually all inventions are combinations and virtually all are combinations of

27  old elements."  *Acromed Corp. v. Sofamor Danek Group,* 253 F.3d 1371, 1381 (Fed. Cir. 2001).  Indeed,

28  *Acromed* concluded (1) that the claim at issue was patentable because it "combined [] various old

1   features to produce a new and nonobvious invention," and (2) that the "entire combination not the

2   [single feature allegedly provided by the putative inventor] alone, renders [the claim] patentable." *Id.*[11]

3   *Acromed* simply does not place any heightened burden on the putative inventor of a combination patent,

4   nor does it require a putative inventor to contribute any "key inventive element" to a combination patent.

5        Defendants' over-simplified "key inventive element" approach has never been adopted by the

6   Federal Circuit, would violate the well-settled precedent under *Aro Manufacturing*, and would establish

7   a formulaic approach to inventorship that would violate the Federal Circuit's admonition that "[t]he

8   determination of whether a person is a joint inventor is fact specific and *no bright-line standard will*

9   *suffice in every case.*"  *Fina Oil,* 123 F.3d at 1473.[12]  In any event, the extensive evidence shown below

10  establishes that Shum contributed to the conception of each claim at issue and to the novel combinations

11  of those elements.  Thus, Shum is, at the very least, a co-inventor under either the correct standard or

12  Defendants' incorrect "key inventive element" approach.

13                    **c)      Defendants confuse originality and priority.**

14        Defendants erroneously argue that Shum cannot be a joint inventor of the Flexure, Step or

15  Dual Enclosure patents if they can point to a Verdiell note that they assert shows some inventive

16  contribution of Verdiell pre-dating the earliest corresponding document offered by Shum.  *See* Memo. at

---

[11]  Ironically, Defendants' reliance on *Acromed* undermines their position.  The putative inventor in *Acromed* claimed to have contributed the idea of using arcuate recesses to the design of a spine plate intended to block sliding.  However, the Court found that the arcuate recesses existed in the prior art, and rejected the argument that their inclusion, rather than conception of the non-obvious combination as a whole, was an inventive contribution. *Id.* at 1380-81.  Here, for example, Defendants claim that the "essential new element" rendering the combination in the Step Patents patentable was Verdiell's contribution of direct bonded copper ("DBC") material.  *See* Memo. at 25:13-17.  However, the DBC material was not novel, as it was a prior art material that Verdiell claims to have found on sale from Brush-Wellman.  Thus, based on Defendants' position, Verdiell simply provided a known element to an overall novel combination. Consequently, under *Acromed,* Verdiell is not even an inventor of the Step Patents.

[12]  Defendants also cite, to no avail, *Huang v. Cal. Inst. of Tech.*, 72 U.S.P.Q.2d (BNA) 1161 (C.D. Cal. 2004).  The putative inventor in *Huang* structured his inventorship claims around four "core concepts" that he claimed to have contributed, rather than explain his asserted contributions on a claim-by-claim basis. *Id.* at 1165.  The proffered evidence consisted "almost exclusively" of the putative inventor's unwitnessed lab notebooks and his own testimony, *id.*, and the Court found that he failed to establish that he made substantial contribution to the claimed inventions, prove that he had a sufficiently firm and definite idea of the claimed invention as a whole to have acted jointly as an inventor, and could not even articulate how his alleged contribution would be implemented in the final embodiments in the patent.  *Id.* at 1178.  *Huang*, decided upon an inventor's complete failure of proof, does not merit the significant expansion of the *Acromed* case that Defendants propose.

25:10-11.  Defendants' argument is flawed because it confuses the question of originality with priority. In an originality case, the inventorship issue to be decided is "merely who conceived the invention for which patent protection is sought, and not who first conceived that invention."  *Sewall v. Walters,* 21 F.3d 411, 415 (Fed. Cir. 1994).  Here, as summarized below, Verdiell's own testimony establishes in all cases at issue that, at a minimum, Shum at least <u>collaborated</u> with Verdiell.  Thus, Verdiell testified that Shum made drawings "in the afternoon" that reflected ideas he and Shum had "in the morning" (MacDonald Decl., Ex. F at 95:23-96:10), and that the earliest documentary evidence showing the Dual Enclosure and Flexure patents represented Shum and Verdiell's joint work.  *See* Shum Decl., Ex. V. Additionally, Verdiell's earliest purported conception document regarding the Step patents (1) post-dates many of Shum's documents showing his own conception of the claimed subject matter and (2) does not negate Verdiell's contemporaneous <u>admissions</u> that the invention was Shum's.  Even if Verdiell was able to produce some evidence pre-dating Shum's proffered evidence that Verdiell asserted demonstrates conception of some *but not all* aspects of the claimed invention, it does not follow that Shum is not a co-inventor, since it is readily possible for the jury to conclude from Shum's voluminous work product that Shum conceived of other inventive subject matter during their collaboration.

As set forth above, joint inventorship results from the conjoined efforts of two inventors who have some open line of communication or some element of collaboration.  *See Eli Lilly,* 376 F.3d at 1359.  Given Verdiell's testimony that he collaborated with Shum on the subject matter of the inventions, it is only natural that both Shum and Verdiell would have documentary evidence at various times during the inventive process that show their purported contributions.  The existence of a document Verdiell maintains pre-dates documents produced by Shum that discloses some, *but not all*, of any of the claimed subject matter simply does not negate the collaborative process that even Verdiell admits resulted in the patents at issue.

### 5.   Verdiell's admissions along with the documentary and circumstantial evidence establish that Shum is <u>at</u> <u>least</u> a co-inventor of the flexure patents.

### a)   Extensive evidence confirms Shum's inventive contribution.

Shum proffers extensive evidence from which a jury could readily find that he is *at least* a co-inventor of each of the Flexure patents.  Shum Decl., ¶14.  For example, Shum's March 17, 1997 Record

1 of Invention (ROI) that Verdiell contemporaneously witnessed is the earliest conception evidence

2 offered by either party as to the Flexure patent inventions.  MacDonald Decl., Ex. F at 43:17-44:2;

3 Shum Decl., Ex. V.  Verdiell also <u>admitted</u> that Shum was the sole inventor of the novel flexure

4 implementation shown in Figure 2 of this ROI.  MacDonald Decl., Ex. F at 50:5-9.  Shum's expert,

5 Dr. Knox, opines that this ROI discloses significant subject matter claimed in the Flexure patents,

6 including claim 1 of the '950 Patent, which Professor Knox believes claims "exactly what is shown" in

7 this ROI, as well as numerous claimed features of Flexure patent claims particularly those in the '427

8 and 6,726 Patents.[13]  Knox Decl., ¶1, Ex. A at 52; 53-56; 72-81; 82-97; ¶16, Ex. E.[14]

9         The next piece of documentary evidence relating to conception of the Flexure patents is one of

10 the two ROI's dated April 17, 1997 (the "Joint April 17 ROI").  Again, Verdiell himself testified that the

11 Joint April 17 ROI includes flexures and reflects the ***joint*** ideas of Shum and Verdiell.

12        Q.  Is 4B also illustrative, indicative of your claim of inventorship?

13        A.  It has all kinds of, **it has some flexures**, it has the package with the neck.  It has the
            steel ring, **it has the dual enclosure package**, it has all kinds of dimensions on it.

14        Q.  Is this page in your handwriting?

15        A.  I believe so.

16        Q.  Would you look at it carefully so you can tell me if you are sure or not sure?

16        A.  It's signed by me and it's witnessed by Frank.  **So I suppose they are joint ideas.**

17 MacDonald Decl., Ex. F at 133:11-22 (emphasis added) and Ex. N.  Incredibly, after his deposition,

18 Verdiell changed the critical word "joint" to "my" when making errata to his deposition transcript.  This,

19 of course, only raises an additional question of fact under the Ninth Circuit's precedent governing post-

20 deposition "corrections" to testimony.  *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397

21 F.3d 1217, 1226 (9th Cir. 2005) ("We agree with our sister circuits' interpretation of F.R.C.P. 30(e) on

---

[13]  While Defendants dispute whether this implementation shows the claimed flexure, this merely raises a triable issue of fact.

[14]  Not only do Defendants improperly rely on vacated trial testimony to address this issue, *see* Shum's accompanying Motion to Strike, they mischaracterize the cited testimony.  Whereas Defendants claim that the cited testimony states that <u>none</u> of the listed elements are "explicitly discussed or disclosed," *see* Memo. at 32:15-20, the testimony actually states that the "spring regions" are shown in the diagram; that the "body" is the same feature as the "lever arm" shown in the drawing; and that the "legs," and the ability of the device to be in an elevated position are implicit in the application.  *See* Taylor Decl., ¶ 12, Exh. 10 at pp. 446:13-448:25, 452:17-453.8.

1   this point, and hold that Rule 30(e) is to be used for corrective, and not contradictory, changes.");

2   *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2005) ("The Rule cannot be

3   interpreted to allow one to alter what was said under oath … A deposition is not a take home

4   examination.")  At best, all that can be said of this document – the <u>only</u> viable piece of documentary

5   evidence that Verdiell can even credibly claim supports his position – raises more questions than it

6   answers.  Indeed, Verdiell even admitted that portions of the Joint April 17 ROI may be in Shum's

7   handwriting.  MacDonald Decl., Ex. F at 158:7-12.  Verdiell's authorship of the Joint April 17 POI is

8   further undermined by his lack of understanding of its technical content such as the meaning of the

9   notations on the page, and his testimony "I don't remember what this is exactly," when asked about the

10  sketches he claims show the flexure.  *Id.*, Ex. F at 137:10-138:17.  Shum, for his part, testified that the

11  drawings in the April 17 Joint ROI represented Shum's concepts that Verdiell was writing down for the

12  purpose of making sure that Verdiell understood Shum's concepts because he needed to make

13  presentations to investors and other people outside the company.  *Id.*, Ex. C at 467:10- 469:20.

14        Next, Shum drew a sketch on May 15, 1997, while attending a conference entitled "Precision

15  Metals Joining Seminar for Medical Device Manufacturers," showing a flexure embodiment in which

16  (1) the body was clearly elevated above the legs of the flexure, (2) pressure could be applied to the body

17  portion to achieve alignment, and (3) the legs were pre-bent and would spread apart in response to the

18  application of such downward pressure.[15]  Shum Decl., ¶13 and Exs. F and K (following page 51).

19        Next, Shum created extensive CAD drawings that included detailed embodiments of flexure

20  designs that would ultimately be claimed in the Flexure patents.  *Id.*, ¶14, Ex. W.  Verdiell testified that

21  *all* of the CAD drawings he produced at Bates Nos. MV0003917-3976 and which bear dates of June 1,

22  1997 through August 22, 1997 were created by Shum.  MacDonald Decl., Ex. EEE at 319:20-320:12;

23  Ex. AAA.  Verdiell has specifically admitted that at least one of these drawings discloses a design that is

24  ────────────────────

25  [15]  While Shum disagrees that the "leg" as used in these patents must extend downward from the "body," his work papers in fact show that embodiment.  In any event, the requirement that the "body" be perched above

26  the "legs" and the legs spread apart is related to Defendants' proffered construction of the term "leg," which was adopted by the Court in its vacated decision.  As will be addressed in Plaintiff's forthcoming Claim

27  Construction Brief, the previous construction, which was issued prior to the Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed. Cir. 2004), is incorrect under more recent Federal Circuit authority.

28

1   protected in the patents-in-suit.  *Id.*, Ex. EEE at 409:19-410:8; Ex. AAA at MV00003970.  And, Shum's

2   expert opined that the CAD drawings, including those that Verdiell admits were drawn by Shum, clearly

3   and specifically disclose the subject matter claimed in all of the Flexure patents.  Knox Decl., Ex. A at

4   52-97, ¶16, Ex. E.  Moreover, Shum dates additional "wire frame" CAD drawings, including those

5   showing the claimed flexure as having been created during the same period.  Shum Decl., ¶14.

6        It is not surprising that Verdiell would testify the critical design drawings for the Flexure patents

7   were created by Shum.  Verdiell testified that he and Shum did not have specific procedures to

8   document which of them conceived of specific ideas and that Shum would quickly record both of their

9   ideas.  Indeed, when answering a line of questions pertaining to the inventorship of specific aspects of

10  the Step patents, Verdiell testified that that it would be difficult to attribute inventorship since "[e]ven

11  though **we** think of it in the morning, Frank would draw it in the afternoon."  MacDonald Decl., Ex. F at

12  95:23-96:10 (emphasis added).  Thus, Shum's position in this lawsuit, namely that the CAD drawings he

13  created reflect many of his own ideas, is completely consistent with Verdiell's explanation of the

14  inventive processes at Radiance and the creation of Shum's drawings.  *Id.*

15       Additionally, on April 10, 1997, Shum specifically calculated the effects of coupling light into a

16  lensed optical fiber as a function of the offsets caused by precisely the motions described in claim of the

17  '427 Patent.  Knox Decl., ¶1, Ex. A at 72 (citing FS0152); Shum Decl., Ex. Q.

18       The final pieces of physical evidence corroborating Shum's testimony that he is, at least, a co-

19  inventor of the Flexure patents consist of:  (1) a December 1997 CAD drawing of a completed package

20  showing the claimed flexure, and (2) a prototype of Shum's invention that was completed in December

21  1997.  Shum Decl., Exs. T and Y; Knox Decl., Ex. A at 52-97.

22            **b)   Defendants offer no viable evidence rebutting Shum's inventorship of**
               **the flexure patents.**
23

24       Defendants have but one piece of documentary evidence, the second of the two April 17, 1997

25  ROI ("Verdiell's April 17 ROI"), to support their claim that Verdiell is the sole inventor of the Flexure

26  patents.  However, unlike the Joint April 17 ROI, Verdiell's April 17 ROI <u>does not even disclose</u> the

27  claimed flexure.  Although Verdiell did testify, and Defendants assert, the ROI shows a flexure coupled

28  to the optical fiber, *see* Memo. at 30, the structure described is actually a different device – a device

1   specifically defined as a "spring leaf" in the Flexure patent specifications, and this document does not

2   even show the claimed "flexure."  Knox Decl.,¶¶17-26.  The claimed flexure is more than the "generic

3   bent device" shown in Verdiell's April 17 ROI (*cf.* Memo. at 32:5-6), and this sketch does not support

4   Verdiell's purported invention of the claimed flexure.

5          Additionally, the notes on Verdiell's April 17 ROI indicate that the optical fiber is a "multimode

6   fiber" and that one of the problems with this design is that it had "no single mode."  This statement

7   further supports interpreting this drawing as failing to disclose the claimed flexure, because multimode

8   fibers are an order of magnitude larger than the single mode fibers needing the precise alignment

9   discussed in the Flexure patents.  *See* Knox Decl. at ¶21.

10         Finally, Defendants' claim that Verdiell conceived of the multi-leg flexure wherein the legs

11   could slide or spread open during a May 1997 meeting contradicts their claim that the April 17 Joint

12   ROI, flexures similar to the design ultimately patented.  Thus, the April 17 Joint ROI undermines his

13   tale of conception and further supports Shum's contention that the design already existed when Verdiell

14   claims to have conceived of it.

**c)      Verdiell's admissions that Shum drew the conception documents at issue preclude summary judgment as to the flexure patents.**

17         Verdiell's admissions that Shum created many of the drawings establishing Shum's inventorship

18   of the Flexure patents (*see, e.g.,* MacDonald Decl., Ex. F at 156:6-14) creates a question of fact under

19   the landmark *Ethicon* decision and precludes summary judgment.  In reasoning directly on point to the

20   facts of this case, the court squarely ruled that a similar issue must be weighed by the trier of fact:

> In a coinventorship case like this one, where it is undisputed that the person
> claiming to be a coinventor prepared sketches resembling figures of the patent
> and the named inventor says that the other simply drew what he was told to
> draw, the trier of fact should be able to assess the sketches in light of all the
> evidence to determine whose conceptions they reflect. If the trier is convinced
> that the sketches reflect an inventive contribution by the person who prepared
> them, and rejects as unworthy of belief the named inventor's assertion that the
> other merely drew what he was told to draw, the trier should be able to consider
> the documents as corroborating evidence. Otherwise, the named inventor could
> prevail simply by asserting that the other drew what he was told to draw,
> regardless of how incredible that assertion might be.

27   *Ethicon, Inc. v. U.S. Surgical Corp.,* 937 F. Supp. 1015, 1034-35 (D. Conn. 1996), *aff'd* 135 F.3d 1456

28   (Fed. Cir. 1998) (emphasis added).  Here, as in *Ethicon*, Verdiell's acknowledgement that Shum made

the drawings contained in Shum's asserted conception documents must be submitted to the jury, so the trier of fact may assess whether they reflect the inventive contribution of Frank Shum, the person who admittedly created them.

### 6.    Shum is at least a joint inventor of the step patents.

#### a)    Verdiell's contradictory testimony regarding inventorship of the abandoned Shum application precludes summary judgment as to the step patents.

Verdiell's contemporaneous statements and actions fully support Shum's inventorship claim as to the Step patents, which includes numerous claims that are virtually identical to or, in some cases, copied *verbatim* from the abandoned Shum application.  Knox Decl., ¶27, Ex. G.  It is undisputed that Verdiell initially concurred that the application should have named Shum as the sole inventor.  MacDonald Decl., Ex. F at 103:24-104:11.  Moreover, Verdiell sent Shum an e-mail unequivocally stating the technology in the patent application was Shum's (Shum Decl., Ex. M), and Verdiell routinely referred to the subject matter as "our" invention, rather than his own.  MacDonald Decl., ¶¶11-12, Exs. K and L. All of this evidence unambiguously supports Shum's claim of inventorship as to the Step patents.[16]

Verdiell may not avoid a jury trial by now claiming as he did at the vacated trial and his deposition, that his previous statements crediting Shum were purposefully deceptive and were part of a

---

[16]  Verdiell's claim that he "redacted" out what he unilaterally considered to be Shum's contribution does nothing to eliminate the remaining questions of material fact.  Verdiell never got Shum's authorization to file the "redacted" application in his own name and never consulted with Shum to ascertain whether Shum concurred with his determinations or believed them to be accurate.  MacDonald Decl., Ex. F at 92:20-93:2. Even more fundamentally, Verdiell's redactions did not remove from the LightLogic patent application subject matter that Verdiell had previously concurred was Shum's.  Indeed, his application contains claims that are copied *verbatim* from Shum's application.  Knox Decl. ¶27, Ex. G.  Moreover, there is no merit to Defendants position that the addition of the phrase "such that said metal layer inherits the in-plane CTE of said insulating substrate," to claim 1 of the two Step Patents somehow removes Shum's contribution from the claimed subject matter.  First, this claim was not added to issued claim 18 of the '567 Patent, which is substantively identical to claim 59 of the Abandoned Shum Application.  Second, this limitation is taken from the draft application originally filed in Shum's name.  *See* Shum Decl., Ex. P at 19:8-12, 19:26-27. Second, in order to further the patent application, the applicant specifically argued that this additional phrase was "fully described in the specification," and further, that "the limitation cited in original claim 1 stating that the in-plane coefficient of thermal expansion (CTE) of the metal layer is constrained by said insulating substrate," and that that added language did nothing more that making that claim limitation "more explicit in amended claim 1."  MacDonald Decl., Ex. DDD at 3:20-26.  Thus, the patentee argued that this was not *new* subject matter, but merely a more explicit description of what was already described in claim 1 – the same claim that was copied directly from the Abandoned Shum Application.  Finally, claim 18 of the '567 Patent does not even have the phrase Defendants claim is critical to Verdiell's inventive contribution – the claim is *identical* to claim 59 in the Abandoned Shum Application.  *See* Knox Decl., ¶27, Ex. G.

---

1   scheme intended to prevent his employer SDL from making any claim to the patented invention.

2   MacDonald Decl., Ex. F at 77:17-78:24, 81:10-18, 194:8-15.[17]  Indeed, these contradictions on their

3   own create a question of material fact regarding the inventorship of the Step patents under *Checkpoint*

4   *Systems, Inc. v. All-Tag Security S.A.,* 412 F.3d 1331 (Fed. Cir. 2005), a case decided on facts strikingly

5   similar to this case is directly on point.  The patent at issue in *Checkpoint* listed a single inventor named

6   Jorgenson.  *Id.* at 1333.  After the patent issued and was asserted in litigation, Jorgenson, and two other

7   men named Pichl and Geiges, each attempted to contradict their statements during patent prosecution

8   that the Jorgenson was the sole inventor.  The three asserted in court declarations that the subject matter

9   of the patent was actually based on concepts jointly developed by Pichl and Jorgenson, and that Pichl

10  was *intentionally* omitted as a co-inventor "to avoid any later argument by Checkpoint" that the

11  invention belonged to it.  *Id.* at 1335.  Based on these declarations, the district court granted summary

12  judgment that Pichl should, in fact, have been named a joint inventor.  *Id.* at 1333.  The Federal Circuit

13  reversed, holding it was error to grant summary judgment based on the contradictory declarations:

14          [T]o do so would be to accept as true testimony proffered by the movant for
        summary judgment, when it is elementary that on summary judgment all evidence
15          and infrances are to be drawn in the non-movant's favor.  (citation)  In their
        [current] declarations, Jorgenson, Geiges and Pichl claimed they lied to the PTO
16          because they were concerned that Checkpoint would claim ownership of the
        [patent] . . . .  However, [this] explanation . . . does not negate the contradictory
17          evidence in the [prior] declarations that Jorgenson was the sole inventor. . . . In
        short, it is clear that there is a genuine issue of material fact as to whether
18          Jorgenson was the sole inventor….

19  *Id.* at 1338.  The court concluded that "[t]he unresolved question is whether Jorgenson, Pichl, and

20  Geiges lied to the PTO in 1988 or whether they are lying to the courts now," and ruled that the "district

21  ─────────────────────────

22  [17]  Verdiell's explanation for the application being filed solely in Shum's name is also suspect.  As explained
    above, Verdiell testified that he suggested that earlier proposals be submitted in Shum's name to protect his
23  employment with SDL.  However, Verdiell also testified that SDL did ***not*** similarly go after former
    employees.

24          "Q: You were aware of the fact they [SDL] could pursue even after you left SDL if
        they determined the ideas contained in radiance proposals had been developed as they
25          used it while you were at SDL?

        A. They don't do it like that… [A]fter I left it was very cordial and they knew what
26          we did.  They never complained about it."  [MacDonald Decl., Ex. F at 81:19-82:7]

27  Given that Verdiell resigned from SDL in March 1997 *before* the Abandoned Shum Application was filed in
    April, Verdiell's explanation for filing the application in Shum's name is simply not credible.  *Id.*, Ex. G at
28  179:9-24; 187:3-25.

1  court's grant of summary judgment was improper and must be reversed." *Id.* at 1339, 1338.

2       Similarly, here, one of the many jury questions will be whether Verdiell intended to deceive

3  when he concurred that the abandoned Shum application was to be filed in Shum's name only, or if he is

4  engaged in false testimony now in claiming that *he*, and not Shum, was the sole inventor of this subject

5  matter.  Drawing all inferences in Shum's favor as the non-moving party, a grant of summary judgment

6  would clearly be an error under *Checkpoint*.

7                 **b)**      **Substantial additional evidence supports Shum's inventorship claim.**

8       Although no more is needed to avoid summary judgment as to the Step patents, Shum proffers

9  substantial evidence in addition to the Abandoned Shum Application and Verdiell's contemporaneous

10  statements that support his inventorship claim on the Step patents.  First, Shum began creating basic

11  structures underlying the Step patents as early as October 1994.  Shum Decl., Ex. G.  Shum continued

12  working on these concepts, and provided them in the April 15, 1996 proposal to ARPA which, despite

13  Defendants' allegations to the contrary, disclose much of subject matter specifically claimed in the Step

14  patents.  *Id.*, Ex. L; s*ee* Knox Decl., ¶1, Ex. A at 19-51; ¶16, Exs. C and D.  Shum's concepts were

15  thereafter included in even greater detail in the July 2, 1996 Army Proposal.  Shum Decl., Ex. H.

16       It was not until <u>after</u> Shum had substantially conceived of the claimed subject matter, shared it

17  with Verdiell, and included it in the April 15, 1996 Proposal, that Verdiell claims to have conceived of it

18  at the ECTC Conference in May 1996.  There he came across the Dual Bonded Copper material made

19  by Brush-Wellman, which it is critical to note, is <u>not</u> even specifically claimed in the Step patent.

20  Simply put, Verdiell's claim that he attended a conference and learned that the DBC material was for

21  sale does not negate Shum's extensive contributions to the claimed subject matter of the patents,

22  particularly in light of Verdiell's contemporaneous statements attributing the invention to Shum and

23  Shum's extensive conception evidence.  Jury questions clearly exist.

24               **7.**      **Shum is at least a co-inventor of the dual enclosure patent.**

25       Summary judgment is also improper as to the Dual Enclosure patents.  The earliest documentary

26  evidence of the conception of the Dual Enclosure recognized by Verdiell is the April 17 Joint ROI.

27  MacDonald Decl., Ex. F at 133:11-22.  Significantly, Verdiell himself corroborated that Shum is at least

28  a joint inventor when he originally testified the April 17 Joint ROI "has the dual enclosure package" and

1  reflected "joint ideas" of himself and Shum.  *Id.*  Verdiell's testimony that the earliest offered evidence

2  regarding the conception of this invention was a "joint" idea must alone preclude summary judgment.

3        Subsequently, as the development of this invention continued, Shum performed a cost analysis

4  of the parts that would be used in the Dual Enclosure Package on September 29, 1997,[18] created a

5  detailed CAD drawing of the design on December 19, 1997, completed a complete prototype that

6  included the claimed Dual Enclosure, and drafted a business plan that included a detailed drawing and

7  description of the device on December 27, 1997.  Shum Decl., Ex. U.  All such evidence is admissible,

8  and supports Shum's inventorship under the "rule of reason."  *See* Knox Decl., Ex. A at 98-103.

9        Even though Verdiell testified that the "joint" idea of the Dual Enclosure was shown in the

10  April 17 Joint ROI, Defendants claim in their motion that Verdiell conceived of the concept some four

11  months later in August 1997, and, even later, "memorialized" that alleged conception in a document that

12  vaguely refers to "making a butterfly around it" on September 20, 1997, and in a document that refers to

13  a "double enclosure" on October 1, 1997.  Memo. at 28:1-4.  It would, of course, be improper to weigh

14  the evidence on summary judgment by discounting Verdiell's original testimony that the Dual Enclosure

15  was first shown in April 1997 as a joint invention and accept his contrary testimony that he conceived

16  the invention four months later on his own.  Consequently, summary judgment should be denied as to

17  the Dual Enclosure patent.

18          **8.**    **Defendants' summary judgment as to inventorship should be denied.**

19        Defendants' motion ignores Verdiell's admissions supporting the joint nature of the inventive

20  process and the abundant and contemporaneous documentary and circumstantial evidence supporting

21  Shum's claim that he is at least a joint inventor of each of the patents at issue.  Granting summary

22  judgment would require the Court to accept as true numerous of Defendants' factual contentions,

23

---

24  [18]  Defendants' claim that this cost analysis or "parts list" cannot serve to corroborate Shum's inventorship is
incorrect, particularly when the cost analysis is viewed in conjunction with Shum's other evidence.  To the

25  contrary, evidence pertaining to the parts necessary to practice an invention can serve to corroborate
inventive facts.  *See, e.g., Lacotte v. Thomas,* 758 F.2d 611, 613 (Fed. Cir. 1985) ("The testimony of [the

26  inventor], and the written evidence of his reduction to practice in his notebook, *are corroborated by
independent circumstantial evidence of his withdrawal of supplies to practice the invention,* as well as
independent corroborating testimony of his associate. . ."); *see also Loral,* 266 F.3d at 1364 (delivery of

27  materials necessary to practice the invention *even in the absence of independent documentary corroboration*
can further an omitted inventor's corroboration of his reduction to practice of a claimed invention).

28

1   including:  (1) that Verdiell was not truthful when he concurred in the Abandoned Shum Application

2   being filed in Shum's name alone, but that he is truthful now when he claims the same subject matter is

3   his own; (2) that Verdiell instructed Shum what to put in Shum's CAD drawings showing conception of

4   the subject matter in the Flexure patents, and that such drawings do not reflect Shum's own work; (3)

5   that Verdiell conceived of the claimed Flexure patent subject matter in May 1997, even though he

6   admitted that the prior Joint April 17 ROI reflected ideas *jointly* developed with Shum and showed the

7   same subject matter; (4) that the Verdiell April 17 ROI, which clearly shows a generic spring leaf,

8   actually shows the claimed flexure; and (5) that Verdiell first conceived of the subject matter claimed in

9   the Dual Enclosure patent in September 1997, even though Verdiell testified that the Joint April 17 ROI

10  reflected the Dual Enclosure some five months before his purported conception.  It would be improper,

11  of course, for this Court to make such factual determinations on summary judgment.  *See Checkpoint,*

12  412 F.3d at 1338 (to accept defendant's explanation of the facts "would be to accept as true testimony

13  proffered by the movant for summary judgment, when it is elementary that on summary judgment all

14  evidence and inferences are to be drawn in the non-movant's favor.").

15        Defendants' motion also ignores the overwhelming circumstantial evidence of Shum's

16  inventorship, including: (1) Defendants' admission that, even though Verdiell applied for the patents

17  while at LightLogic, all of the claimed subject matter (except for one claim of one patent) was

18  conceived at Radiance; (2) the paucity of Verdiell's documentation (four pages) reflecting some (but

19  certainly not all) of the claimed subject matter, contrasted with Shum's substantial documentation and

20  physical work product including the final prototype demonstrating his inventions, (3) Verdiell's

21  common sense acknowledgement that it was obvious who any "joint inventors" had to be at Radiance –

22  since there were "only two of us" in the company (MacDonald Decl., Ex. F at 116:3-5); (4) LightLogic's

23  contemporaneous documents which revealed that it understood the first generation of the flexure was

24  designed at Radiance; (5) Verdiell's acknowledgement of Shum's extensive knowledge, expertise and

25  motivation in the field of optoelectronic packaging; and (6) Verdiell's contemporaneous admissions of

26  Shum's inventorship, ownership, and indeed "equal rights" in Radiance technology coupled with

27  Verdiell's repeated attempts to purchase these rights.

28        Verdiell, of course, will try to explain away these circumstantial facts.  He will argue that

1  Verdiell "ghost wrote" all of Shum's work because Verdiell was concerned about SDL asserting

2  ownership rights in these valuable new inventions – even though there is no evidence, including

3  documents or testimony from SDL, supporting Verdiell's tale.  Verdiell will claim that he was offering

4  to buyout Shum's ownership – not inventorship rights – even though he now contends that he did not

5  need to buyout those rights.  However, Verdiell's "explanations" will merely underscore the important

6  fact questions which require a jury's determination.

7        Summary judgment motions against a putative inventor have been denied based on far less

8  evidence than Shum offers here.  *See, e.g., Gipson v. Mattox,* 2006 U.S. Dist. LEXIS 86207, at *21

9  (S.D. Ala. 2006) (denying summary judgment even though "[u]nquestionably, plaintiffs' primary source

10  of evidence presented on summary judgment is [his own testimony]," and putative inventor only offered

11  oral testimony of third party as corroboration); *see also Checkpoint,* 412 F.3d at 1331.  Defendants'

12  motion should be denied.

13        **B.        Shum's Unjust Enrichment Claim Requires a Jury Trial**

14           **1.        Shum's unjust enrichment claim and the POL do not embrace the same
                          subject matter.**

15

16        Shum's unjust enrichment claim is based on Defendants' successful scheme to improperly obtain

17  extensive patents rights on Shum's substantial inventive contributions to the Radiance technology, and

18  to improperly assert complete ownership over that technology, and to then sell those valuable rights for

19  substantial consideration without informing or compensating Shum.  *See Lectrodryer v. SeoulBank*, 77

20  Cal. App. 4th 723, 726 (2000) (elements of an unjust enrichment cause of action are "receipt of a

21  benefit" and "unjust retention of the benefit at the expense of another.")  The Federal Circuit clearly held

22  that Shum is entitled to pursue a cause of action for unjust enrichment.  *Shum*, 499 F.3d at 1279-80.

23  Despite this mandate, Defendants now argue that Shum is not entitled to assert his unjust enrichment

24  claim by virtue of the POL.  This is a pure legal argument that Defendants could have made in its

25  Motion to Dismiss in 2003 or in its appellate brief in 2006.  They did not.  As discussed in the

26  accompanying Motion to Strike, Defendants' latest (and third) attempt to dispose of Shum's unjust

27  enrichment claim is untimely and has been waived.

28        Moreover, contrary to Defendants' characterization, the allegations of Shum's unjust enrichment

claim and the Radiance POL do **not** cover the "same subject matter, existing at the same time." *See Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (1975). The POL provides, in pertinent part, that "Verdiell and Shum shall have equal rights to independently exploit intellectual property developed by Radiance." MacDonald Decl., Ex. CC, § 2(d)(iii). While this provision allows "Verdiell and Shum to patent any intellectual property which had been the property of Radiance" (*see* April 27, 2004 Summary Judgment Order, at 22), it does **not** permit Verdiell or Shum to obtain patents unlawfully by omitting the true inventor of the patented inventions in contravention of federal patent laws or selling those rights – the basis of Shum's unjust enrichment claim. Thus, there is no conflict between Shum's unjust enrichment theory and the express terms of the POL. *See, e.g., Hillsman v. Sutter Community Hospitals*, 153 Cal. App. 3d 743, 755 (1984) (allowing plaintiff's implied contract theory to proceed despite existence of letter agreement because "there is no readily ascertainable conflict between plaintiff's implied contract theory and the express terms of the letter of understanding").[19]

Moreover, Verdiell did not somehow "bargain for" the express benefit of omitting Shum as an inventor in the patent applications and patents when the POL was entered into. As Defendants observe, "where the parties have freely, fairly, and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability and to withdraw from one party benefits for which he has bargained and to which he is entitled." Memo. at 4:13-16 (quoting *Wal-Noon*, 45 Cal. 3d at 613). Accepting Defendants' argument that the POL covers the same subject matter as Shum's unjust enrichment claim, would mean that Verdiell must have "bargained for" the express right to unlawfully apply for and obtain patents over technology that Shum invented. *See id.* Clearly, nothing in the POL provides any such right, as even Verdiell had to acknowledge. MacDonald Decl., Ex. F at 68:6-17; *see also Hillsman*, 153 Cal. App. 3d at 755 ("unlike the situation in

---

[19]  As Shum does here, a plaintiff may successfully pursue both a breach of contract claim and a quasi-contract claim arising out of a common nucleus of fact. *See, e.g., County of Solano v. Vallejo Redevelopment Agency*, 75 Cal. App. 4th 1262, 1275-79 (1999) (substantial evidence supported trial court's determination of breach of contract and unjust enrichment arising out of a common facts); *see also Berkla v. Corel Corp.*, 302 F.3d 909, 918 n.9 (9th Cir. 2002) (a party can assert breach of an express NDA and breach of confidence claim "arising out of a common nucleus of fact"); *Cardonet, Inc. v. IBM Corp.*, 2007 WL 3256204, *4 (N.D. Cal. Nov. 5, 2007) (concluding that plaintiff's "quasi contract claims are not barred by the existence of a valid, enforceable agreement" under similar New York law).

1   *Wal-Noon,* the agreement does not expressly preclude plaintiff's pleaded [implied contract] assertion

2   that termination was to be in accordance with the hospital's bylaws").[20]

3          The cases cited by Defendants are readily distinguishable as they involved plaintiffs who sought

4   to recover under a quasi-contract theory when the parties had actual, express contract terms determining

5   the appropriate and specific compensation.  *See, e.g., Cal. Med. Assn. v. Aetna U.S. Healthcare,* 94 Cal.

6   App. 4th 151, 172-73 (2001) (because contracts already spelled out the agreed-upon compensation for

7   medical services rendered by the physicians, it was not proper to resort quasi-contract theories of

8   recovery).[21]  Here, on the other hand, Shum seeks to recover the amounts by which Defendants were

9   unjustly enriched through their improper patenting and selling of those rights.  The POL simply does not

10  set forth the scope or measure of relief in the event of such unlawful patenting.

## 2.   Shum's unjust enrichment claim is not defective as to Intel and LightLogic.

12         Defendants' argument that Shum's unjust enrichment claim is defective as to Intel and

13  LightLogic hinges entirely on Defendants' prevailing on their initial, flawed argument that Shum has no

14  unjust enrichment claim against Verdiell.  As discussed above, they are wrong.  Furthermore,

---

16  [20]  Two other considerations are relevant here.  First, the unjust enrichment claim and POL do ***not*** cover the same subject matter "existing at the same time," as required under the rule on which Defendants rely.  *See Wal-Noon,* 45 Cal. App. 3d at 613.  The unjust enrichment occurred when Intel purchased LightLogic for $409 million in March 2001.  *See First Nationwide Savings v. Perry,* 11 Cal. App. 4th 1657, 1670 (1992).  The POL, including its breach, concerns only an earlier timeframe when Defendants improperly acquired exclusivity over the Radiance technology.  Second, Defendants cannot establish, as a matter of law, that "the parties have freely, ***fairly*** and voluntarily bargained for" the right to unlawfully pursue patents on inventions that Shum developed.  Memo. at 4:13-16.  As alleged in the fraud cause of action and discussed further below, the POL was *not* "fairly" entered into because of misrepresentations and purposeful omissions by Verdiell that fraudulently induced Shum to agree to the POL.  *See* Section III.D-E *infra*; *see also* Fourth Am. Compl., ¶ 32.

21  [21]  Similarly, in *Wal-Noon*, plaintiffs/lessees sought recovery of the cost of installing a new roof on their leased premises even though the lease required the lessees to provide notice to the landlord of the need to repair the roof.  *Wal-Noon,* 45 Cal. App. 3d at 612-13.  Plaintiffs' request for a refund on the money spent replacing the roof was denied because they failed to provide notice to the landlord as expressly required under the lease agreement, thereby depriving the landlord of his bargained-for benefit of the lease, i.e., the right to repair.  *Id.* at 613-14; *see also Berkla v. Corel Corp.,* 302 F.3d 909, 918 (9th Cir. 2002) (holding that breach of NDA and breach of confidence, which is a quasi-contractual claim, are "coterminous"); *Paracor Fin., Inc. v. GE Capital Corp.,* 96 F.3d 1151, 1167 (9th Cir. 1996) (holding that the contractual provisions, which "squarely set out" the obligations of the parties, "expressly precludes" the type of quasi-contract relief sought by plaintiffs); *Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.,* 44 Cal. App. 4th 194, 198, 203 (1996) (worker's compensation policy covers same subject matter as quasi-contract theory for recovery of wrongful appropriations); *Gerlinger v. Amazon.com, Inc.,* 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) (plaintiff's quasi-contract claim for recovery for overpayments on book purchases was covered by an express contract).

LightLogic and Intel were not "third parties who *incidentally* receive[d] benefits as a consequence of" the illegal conduct giving rise to Shum's unjust enrichment claim.  Memo. at 6:11-12 (emphasis in original).  Instead, LightLogic, the company founded by Verdiell to be his depository for the Radiance technology, was the *direct* and the intended beneficiary of the false exclusivity it enjoyed over the patents.  MacDonald Decl., Exs. LL-TT.  Verdiell was acting on LightLogic's behalf, and LightLogic is responsible for his conduct as Verdiell was acting in the course and scope of his duties for LightLogic. *See Perez v. Van Groningen & Sons*, 41 Cal. 3d 962, 967 (1986) ("Under the doctrine of respondeat superior, an employer is vicariously liable for his employee's torts committed within the scope of the employment"); *see also Chou v. Univ. of Chicago*, 254 F.3d 1347, 1361 (Fed. Cir. 2001) ("Chou adequately stated a claim that the University is liable under the doctrine of respondeat superior for [University professor's] alleged concealment of his misappropriation of Chou's inventions.").  Indeed, Verdiell considered LightLogic as the "successor" to Radiance and acted as if it had the full inventorship and ownership rights to the Radiance intellectual property.  MacDonald Decl., Ex. G at 209:3-13, Ex. BB.  Even the LightLogic business plans, emphasizing Radiance technology, were identical to earlier Radiance business plans.  *Compare id.*, Ex. UU, *with* Ex. VV.  Thus, it was LightLogic that was intended to and did directly (and unjustly) benefit from the ownership of the patents, as these patents increased the value of LightLogic in its $409 million sale to Intel.[22]  And though LightLogic was technically not a party to the POL, it cannot claim ignorance of the sordid circumstances surrounding its own enrichment, especially considering Verdiell's role in both Radiance and then LightLogic.[23]  *See County of Solano v. Vallejo Redevel. Agency*, 75 Cal. App. 4th 1262, 1279-

---

[22]  The amount by which LightLogic and the other Defendants were unjustly enriched is the subject of unfinished fact expert discovery and will be presented at trial.  *See* Section IV *infra*.

[23]  Defendants' substantial reliance on the *California Medical* case is entirely misplaced.  The pertinent rule, as stated in *California Medical* is:  "A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution."  94 Cal. App. 4th at 174.  The focus, however, is on ***plaintiff's*** "acts in performance of his own duty or in protection or improvement of his own property."  *Id.* (citing 1 Witkin, *Summary of Cal. Law, Contracts*, § 97, pp. 126-27).  However, nowhere do Defendants argue that (or demonstrate how) Shum – "in performance of his duty or in protection or improvement of his property" – incidentally conferred a benefit to LightLogic and Intel.  *Id.*  Moreover, unlike the healthcare service plans in *California Medical*, both LightLogic and Intel directly benefited from the improper omission of Shum as an inventor by enjoying exclusive ownership to the patents.  These benefits were not incidental to Shum's "performance of his own duty or to the protection or improvement of his own things."  *Id.* at 174.

1   80 (1999) ("While Vallejo was not a party to the agreement between the Agency and Solano County, …

2   it "does not, and cannot, claim that it was ignorant of [unauthorized] payments, because the same

3   individuals were on the governing boards of both the Agency and the Vallejo City Council").

4   Accordingly, disgorgement of *all* ill-gotten gains received by LightLogic (as well as Verdiell) is proper.

5   *See County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542-43 (2007) (applying unjust

6   enrichment to disgorge all ill-gotten gains received by Defendants even if the plaintiff did not suffer a

7   corresponding loss or even any loss).

8       Likewise, Intel is liable for unjust enrichment (as well as any other liabilities of LightLogic) as

9   the successor-in-interest to LightLogic.[24]

10      Further, Intel was the ***direct*** beneficiary of the exclusive ownership rights to the patents.  Intel,

11  like LightLogic, benefited from the false, improperly obtained exclusivity it enjoyed over the patents

12  when ownership of the patents was transferred to Intel.  *See* MacDonald Decl., Exs. NN, PP, SS and TT;

13  *see also Monsanto v. Ralph,* 382 F.3d 1374, 1383 (Fed. Cir. 2004) ("One of the most fundamental tenets

14  of patent law is that a patent gives its owner the right to exclude others from making, using, selling,

15  offering to sell, or importing the patented subject matter").  And Intel, as well as the executives at

16  LightLogic, had known about Shum's inventorship rights at the time of its merger with LightLogic, but

17  it failed to make any inquiries with Shum regarding his inventorship rights.  *See* Shum Decl., ¶18.[25]

18  Therefore, Intel cannot claim it was ignorant of Shum's rights in the patented inventions; as such, Intel

19  was not a bona fide purchaser without notice of Shum's ownership rights over the patents.  *See County*

20  *of Solano*, 75 Cal. App. 4th at 1279 (1999) ("a transferee with knowledge of the circumstances

21  surrounding the unjust enrichment may be obligated to make restitution").[26]

22

23  [24]  *See* MacDonald Decl., Ex. BBB.  The Merger Agreement expressly provides that "all debts, liabilities and duties of [LightLogic] … shall become the debts, liabilities and duties of Surviving Corporation [i.e., Intel]." *Id.*, at § 1.4, at 2.  Even in the absence of this contractual provision, Intel would be liable for LightLogic's

24  torts based on successor liability as the result of its merger with LightLogic.  *See* Cal. Corp. Code § 1107(a); *see also Ray v. Alad Corp.*, 19 Cal.3d 22, 34 (1977) (successor corporation is liable for former company's

25  torts when there is a consolidation or merger of two corporations).

26  [25]  For example, the Company Disclosure Schedule, which was attached as an exhibit to the Merger Agreement between Intel and LightLogic, disclosed to Intel that "Frank Shum and Jean-Marc Verdiell were

27  given equal rights to independently exploit the intellectual property developed by Radiance Design, Inc., including the rights under U.S. Patent No. 5,977,567."  MacDonald Decl., Ex. QQQ, §§ 2.14(a), 2.14(c)(iv).

28  [26]  *See also* RESTATEMENT OF RESTITUTION § 168(1) ("Where a person holding property in which another has
    Continued on the next page

### 3.   Defendants' "co-ownership" argument is legally erroneous.

Finally, Defendants concoct a bizarre argument in claiming that, *as a matter of law*, Defendants were not unjustly enriched because, "[a]s co-owners [of Radiance technology under the POL], Shum and Verdiell have all economically valuable property rights that accrue to a patentee."  Memo. at 7:16-17.  This argument, however, lacks basis in law or fact.[27]  It is well-established that one of the most "fundamental" property rights associated with obtaining a patent is "the right to exclude others from making, using, offering for sale, or selling the invention through the United States or importing the inventions into the United States."  *See* 35 U.S.C. § 154(a)(1); *Monsanto,* 382 F.3d at 1383; *see also* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent.").  Contrary to Defendants' argument, Shum never has had "all economically valuable rights that accrue to a patentee" since he was improperly precluded from the "fundamental" right to exclude others (35 U.S.C. § 154(a)(1)), nor can he sue for patent infringement (35 U.S.C. §§ 271, 281).[28]  Indeed, it was this exclusivity that Verdiell knew he needed to attract investors or purchasers at LightLogic.  And, as Shum also learned when he was rebuffed by investors, the POL, which provides ambiguous "equal rights to independently exploit [Radiance's] intellectual property," simply does not confer all of the same rights that a patent inventor and owner obtains from the Untied States government.

Defendants now disingenuously claim that Shum is a "co-owner" of the inventions that were ultimately patented.  Verdiell and LightLogic claimed the exact opposite in the real world.  For example, in the assignments of the patent applications from Verdiell to LightLogic, Verdiell affirmatively

---

Continued from the previous page

a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, unless he is a bona fide purchaser").

[27]  Defendants cite *no* cases for the proposition that a co-owner of intellectual property has "all economically valuable property rights that accrue to a patentee."  Memo. at 7:16-17.  They only cite an entirely irrelevant section of the Patent Code that merely defines patentee as the person "to whom the patent was issued but also successors in title to the patentee."  *See* 35 U.S.C. § 100(d).

[28]  Defendants' reliance on *Chou v. Univ. of Chicago,* 254 F.3d 1347 (Fed. Cir. 2001) on this issue is wholly misplaced.  The contract in *Chou* was a patent assignment agreement in the University of Chicago's administrative policies, which *required* University personnel to assign their patent rights to the University.  *Chou,* 254 F.3d at 1363-64.  Moreover, Defendants fail to point out the Federal Circuit in *Chou* actually reinstated the unjust enrichment cause of action against the university because a professor (Roizman) who, like Verdiell, claimed to be the sole inventor of the patents-at-issue and omitted a joint inventor.  *Id.*

1   represented that he "is the **_sole and lawful owner of the entire right, title and interest in and to said_**

2   **_inventions_** and said application for Letters Patent, and that [he] has not entered into any assignment,

3   contract or understanding in conflict herewith."  MacDonald Decl., Ex. LL (emphasis added); *see also*

4   *id.*, Exs. MM, OO, QQ and RR.[29]  Intel, for its part, refused to acknowledge the rights it now argues

5   Shum always had.  Shum Decl., ¶18.

6       Thus, what Defendants argue now in this litigation directly contradicts what they said and did in

7   the marketplace.  Summary judgment should be denied on the unjust enrichment claim.

8       **C.    Shum's Breach of Contract Claim Requires a Jury Trial**

9       Defendants again move for summary judgment on the breach of contract claim, arguing Shum

10  "could not have been damaged by Verdiell's patenting of Radiance IP" since "Shum was a co-owner of

11  the patented IP and has the same rights he would have had if was the patentee."  Memo. at 9:16-19.  As

12  discussed in the unjust enrichment section above, this argument is clearly erroneous.  *See* Section III.B

13  *supra*.  Defendants are also wrong in asserting that if Shum prevails in this litigation, "the patents would

14  be invalid and unenforceable," and Shum could not gain anything through this litigation.  *See* Memo. at

15  9:23-26.  Failing to name all actual inventors does not automatically invalidate a patent.  *See* 35 U.S.C.

16  § 256 ("The error of omitting inventors or naming persons who are not inventors shall not invalidate the

17  patent in which such error occurred if it can be corrected as provided in this section."); *Pannu*, 155 F.3d

18  at 1350 (district court can correct inventorship under 35 U.S.C. § 256, "thus saving it from being

19  rendered invalid").  Moreover, Shum can recover his tort and contract damages from Defendants

20  regardless of whether the patent is invalidated or unenforceable under 35 U.S.C. § 256.  *See, e.g., Stark*

21  *v. Advanced Magnetics*, 119 F.3d 1551, 1556 (Fed. Cir. 1997) ("Stark might retain a state law action

22  against AMI" even if "the patent would not be enforceable by any party"); *Chou*, 254 F.3d at 1361-65.

23      Defendants also assert that "Shum was never prevented from exploiting all of his Radiance IP

24  rights under the POL, notwithstanding any alleged unlawful patenting."  Memo. at 9:27-10:1.  But

25  Verdiell's unlawful patenting of Radiance technology as the "sole" inventor, and his recordation of his

26  ──────────────

27  [29]  Similarly, in the Merger Agreement between LightLogic and Intel, LightLogic affirmatively represented that it owned all rights to the patented inventions "free and clear of any and all Liens, covenants, conditions

28  and restrictions…."  MacDonald Decl., Ex. BBB at § 2.14 (c)(iv), at 22.

1   (and LightLogic's) purported "sole" ownership of that technology in his assignments, gave him and

2   LightLogic "exclusivity" in fact over all the Radiance technology.  This prevented Shum from pursuing

3   his "equal rights" and inventorship rights in that technology.  And, contrary to Defendants' assertions,

4   Shum did attempt to file his own patent applications on his inventions, but Verdiell ordered the

5   application withdrawn.  MacDonald Decl., Ex. H at 61:7-20.  Therefore, because of Defendants' breach

6   of the POL, Shum suffered actual and proximate damages since he could not fully exploit his inventions

7   or even have the opportunity to enjoy all his valuable intellectual property rights.

8        **D.   Shum's Fiduciary Duty Claim Requires a Jury Trial**

9             **1.   Shum's standing to redress his injuries from Verdiell's breach of fiduciary duties to Radiance is "law of the case."**

10      Defendants cite *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141 (2005) to support

11  their argument that, as a matter of law, Verdiell did not owe a fiduciary duty to Shum.  But that

12  argument was recently rejected by the California Supreme Court in *City of Hope Medical Center v.*

13  *Genentech, Inc.,* 43 Cal. 4th 375, 387-392 (2008)  (question of fact whether fiduciary duty arose in

14  agreement to commercialize intellectual property).  *See* Section III.D.2 *infra*.  Furthermore, *Persson*

15  does not stand for the proposition that joint inventors who have expressed "confidentiality" duties can

16  never have "fiduciary duties" to one another if they also happen to be 50-50 owners in a corporation.

17  *Persson*, did not involve any allegations of joint inventorship of intellectual property and is therefore

18  inapposite.  Instead, *Persson* merely determined that the equal shareholders did not voluntarily assume

19  fiduciary duties "in the course of buyout negotiations. …" *Id.* at 1162.  *Persson* specifically found that

20  under the circumstances of that case, the required vulnerability of trust implicit in every confidential

21  relationship was missing.  *Id.*  But here, there is an <u>express</u> "confidential relationship" – in the

22  Confidentiality Agreement – concerning Radiance technology with covenants of "trust" that continued

23  through Radiance's existence and after Verdiell let Radiance.[30]

24   

---

25  [30]  Also, in *Persson*, the buyout negotiations lasted over a year, and it was well into the buyout negotiations
26  where the defendant, a corporate officer, on his own began his investigation of the "tap light" which became
    extraordinarily successful.  125 Cal. App. 4th at 1148-49.  *Persson* held that that officer did not owe the
27  other shareholder a fiduciary duty to disclose his individual work with regard to this product.  *Id.* at 1160-62.
    In contrast, Verdiell has testified the step, flexure and dual enclosure inventions were all "joint ideas" of
    Shum and him.

28   

1    Perhaps most significantly, the plaintiff in *Persson,* unlike Shum, did ***not*** argue on appeal that he

2 had standing to sue for his former co-officer's breach of fiduciary duties to the corporation.  *Id.* at 1156-

3 1162.  In contrast, this Court already has determined that Shum <u>does</u> have standing to sue for Verdiell's

4 breach of is fiduciary duty to Radiance.  *See* Mar. 25, 2003 Order denying Defendants' Motion to

5 Dismiss at 25 (citing *Sutter v. General Petroleum Corp.*, 28 Cal. 2d 525, 530 (1946)).  This is "law of

6 the case."  *U.S. v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007); *see also* Shum's Motion to Strike.

7    Defendants of course must argue strenuously to prevent the recognition that Verdiell owed had

8 fiduciary duties because the evidence that Verdiell breached those duties is undeniable.[31]  *See, e.g.,*

9 *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 632 (D. Conn. 2003) (professor owed university a fiduciary

10 duty to make full disclosure and undivided loyalty):

> 11    Dr. Fenn breached that [fiduciary] duty when he failed to promptly
> disclose the '538 invention to Yale, actively discouraged Yale from
> 12    preparing and filing a patent application by the statutory deadline while at
> the same time he was preparing a patent application in his own name, filed
> 13    a patent application in his own name without notifying Yale, and licensed
> the '538 invention to Analytica without notifying Yale.  Accordingly, Yale
> 14    also succeeds on its breach of fiduciary duty claim.

15 What Verdiell did to Shum is no different than what Dr. Fenn did to Yale University.  The extent of

16 Shum's damages is the subject of uncompleted fact and expert discovery.  *See* Section IV *infra*.  But, by

17 breaching his fiduciary duties to Shum, Verdiell – and LightLogic, the entity on whose behalf he

18 improperly acted – have forfeited their rights to profits from Radiance technology.  *County of San*

19 *Bernardino,* 158 Cal. App. 4th at 543 ("Where a person profits from transactions conducted by him as a

20 fiduciary, the proper measure of damages is full disgorgement of any secret profit made by the

21 fiduciary"); *David Welch Co. v. Erskine & Tulley,* 203 Cal. App. 3d 884, 894 (1988) (same).

22

23

---

24 [31]  For example, Verdiell (1) never informed Shum before the fraudulent dissolution of Radiance of investor

25 and customer valuations of Radiance technology, (2) misled Shum by drafting and entering into the POL which stated that Verdiell and Shum would have "equal rights" to all Radiance technology, (3) ordered the

26 abandonment of Shum's step patent application then filed an eerily similar patent applications in his own name on the day after the fraudulently induced POL was signed; (4) recorded assignments which falsely

27 requested that Verdiell was the sole inventor and sole owner of Radiance technology; (5) obtained patents on Radiance technology without informing Shum; and (6) sold all rights to these patents without informing

28 Shum.

1          **2.     Two California Supreme Court cases, *City of Hope* and *Stevens,* contradict
                 Defendants' premise that Verdiell did not owe any fiduciary duties as a
2                matter of law.**

3          In its opinion last month in *City of Hope*, the California Supreme Court considered whether

4  fiduciary duties arose from a business relationship concerning the development of intellectual property,

5  just as in this case.  *City of Hope* clarified that an agreement to patent and commercialize technology in

6  exchange for royalties does not necessarily impose a fiduciary relationship *as a matter of law*.  43 Cal.

7  4th at 391.  Instead, it presents a <u>question of fact</u> for the jury.  *Id.*  Moreover, *City of Hope* approved a

8  seminal case, *Stevens v. Marco*, 147 Cal. App. 2d 357 (1956), which held that a fiduciary duty arose on

9  facts similar to those here involving the joint development of intellectual property.  *Id.*

10         In *Stevens*, the court found that Marco owed Stevens, an inventor, a fiduciary duty because

11  Stevens had entrusted his invention to Marco to develop, manufacture and patent.  147 Cal. App. 2d at

12  372-376.  Like here, in *Stevens* the defendant obtained a purported "release" from the plaintiff after

13  misrepresenting the viability of a patent.  *Id.* at 371.  The court held that substantial evidence existed

14  allowing a jury to find that the parties engaged in an undertaking akin to a joint venture that imposed

15  fiduciary obligations.  *Id.* at 375-76.  After reviewing *Stevens*, the court in *City of Hope* held that the key

16  question in its case – whether the secret information which City of Hope provided to Genentech was

17  sufficient to impose fiduciary duties on Genentech – was a question of fact.  But because City of Hope

18  had proceeded at trial only under one theory – that *Stevens v. Marco* required a finding of fiduciary duty

19  as a matter of law – the judgment in its favor on the fiduciary duty claim could not stand.[32]  *Id.* at 392.

20  Therefore, *City of Hope* clarified that, although fiduciary duty may exist as a matter of law in certain

21  relationships (e.g., agency, attorney-client), determining whether fiduciary obligations arise from the

22  unique business relationships consequent to the joint development of intellectual property presents a

23  <u>question of fact</u>.  *Id.*  at 32-33.[33]

---

[32]  *City of Hope* also favorably cited other instances where a joint venture giving rise to fiduciary duties
24  flowed from the conduct of parties, or where the existence of a fiduciary duty was deemed a question of
25  fact, including *Nelson v. Abraham*, 29 Cal. 2d 745, 750 (1947) (the existence of joint venture presents question of
    fact) and *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal. 2d 751, 765 (1942) (joint venture may be
26  implied from conduct of contracting parties).

27  [33]  *See also Weiner v. Fleischman*, 54 Cal. 3d 476, 482, (1991) (jury must determine the existence of a joint
    venture giving rise to fiduciary duties by the preponderance of the evidence standard); *Richelle v. Roman
28  Catholic Archbishop*, 106 Cal. App. 4th 257, 272 (2003) (the existence of a confidential relationship giving
    Continued on the next page

### 3.   There is abundant evidence of a confidential and fiduciary relationship between Verdiell and Radiance as well as between Verdiell and Shum.

Shum asserts a confidential, and fiduciary, relationship arose between Verdiell and Radiance (for which Shum has standing to sue), as well as between Verdiell and Shum directly.  As shown above in Section III, Verdiell and Shum were at least "joint inventors" in Radiance technology and, as such, they owed each other fiduciary duties with respect to that technology.  For example, each had an affirmative duty when using the confidential information they developed to name all joint inventors when submitting a patent application in the PTO.  *See* 35 U.S.C. § 116.[34]  Indeed, months before Radiance was incorporated, Verdiell was treating his work with Shum as confidential, including researching whether to file patents for the inventions that, according to Verdiell, "we" [Verdiell and Shum] had been developing.  *See* MacDonald Decl., Exs. K and L.  At minimum, whether a joint venture or confidential relationship existed between Shum and Verdiell with regard to their "joint inventions" before Radiance was incorporated is a question of fact for the jury.  *See Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 854 (C.D. Cal. 2004) (whether parties' relationship created a joint venture was a jury question).  The confidential relationship arising from Shum and Verdiell's pre-incorporation "joint inventorship" were memorialized in, and continued by operation of, the Confidentiality Agreement.  In that Agreement, Verdiell and Shum specifically obligated each other to keep the step, flexure and dual enclosure inventions "confidential" for Radiance's exclusive benefit.  *City of Hope Med. Center v. Genentech, Inc.,* No. S129463, 2008 Cal. LEXIS 4435, at *32-33 (Cal. Apr. 24, 2008) (confidential relationship results in fiduciary duty).

---

Continued from the previous page

rise to fiduciary duties is a question of fact); *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1582 (1994) (affirming trial court's submission to the jury the question of the existence of a fiduciary duty based on an agency relationship flowing from written agreements between the parties).

[34]  "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO, which includes a duty to disclose all information known to that individual to be material to patentability. . ."  37 C.F.R. § 1.56(a) (2007).  "Materiality" includes the duty to name all inventors or to disclose inventorship issues.  MPEP § 2001.04; Chodos, *Coownership of Copyright and Fiduciary Duty: The Poverty of Preemption*, The Law of Fiduciary Duties (2000) p. 1555 ("When A and B agree to co-author a book and then promote it and share the profits, they have certainly formed a joint venture.  Their relationship is similar to that which arises between any people who collaborate, invest time and energy together, share risks together, and nurture hopes and ambitions together.  They are joint venturers, and as joint venturers they owe each other fiduciary duty with respect to the book project . . . .") (emphasis added).

1    Moreover, it is undisputed that Verdiell, as a corporate officer and director of Radiance and party

2    to Radiance's Confidentiality Agreement, owed a fiduciary duty *to Radiance* with respect to Radiance

3    technology.  *See* Memo. at 12.  Verdiell was subject to the rule in *Bancroft-Whitney Co. v. Glen,* 64 Cal.

4    2d 327, 346 (1966) that "corporate officers and directors are not permitted to use their position of trust

5    and confidence to further their private interests … they stand in a fiduciary relation to the corporation

6    and its stockholders."[35]  He could not develop, file and then take corporation opportunities for his own

7    (and LightLogic's) benefit.[36]  Indeed, this Court has already ruled that Shum has standing in this lawsuit

8    to sue for his injuries caused by Verdiell's breach of his duty to Radiance.  (Motion to Dismiss, p. 35.)

9    Verdiell's fiduciary duties to Radiance, and his joint inventor, Shum, extended throughout

10   Verdiell's messy departure from Radiance and into his post Radiance life.  For example, the POL

11   specifically recognizes the Confidentiality Agreement extended at least until the date of the dissolution.

12   POL ¶1(e); *see also ViChip Corp. v. Lee,* 438 F. Supp. 2d 1087 (N.D. Cal. 2006) (ex-employer granted

13   summary judgment against a former CEO for post employment breach of contract and breach of

14   fiduciary duties in connection with patent assignment and confidentiality provisions in former

15   employment agreement).  Although Verdiell and Shum were having disagreements in late 1997 about

16   Radiance business direction, Verdiell breached his fiduciary duty to Radiance and Shum by abandoning

17   Shum's step patent application, working on his own version surreptitiously, and then re-filing his own

---

18

19   [35]  *See also Kennedy v. Wright*, 676 F. Supp. 888, 892 (C.D. Ill. 1988) (finding that patents belonged to

20   company, not individual officer, where officer used company resources to bring about the invention); *Lacy v. Rotating Prods. Sys., Inc.*, 961 P.2d 1144, 1145 (Colo. Ct. App. 1998) ("an officer or director's fiduciary duty does include the obligation to assign patents to the corporation if the officer invented the subject matter

21   of the patent while employed by the corporation and the invention relates to the business of the corporation."); *Stonecraft, LLC v. Slagter*, 322 B.R. 623, 632 (S.D. Miss. 2005) (same); 3 Fletcher Cyc. of

22   the Law of Private Corp., § 893 (2007) (same).

23   [36]  Therefore, Verdiell also cannot argue that Radiance's ostensible corporate form protects him from his fiduciary duties.  Furthermore, Radiance was only in existence as a corporate entity for a few months, with

24   its main purpose to develop and promote their technology (MacDonald Decl., Ex. Q), and it did not abide by corporate formalities.  For example, despite Radiance's Articles of Incorporation calling for the issuance of

25   stock, none were issued, and despite Shum's request to hold board meetings (Shum Decl., ¶16), none were held.  Radiance was a corporation formed as a "mere instrumentality" through which Shum and Verdiell could conduct their business and promote the technology.  *Elsbach v. Mulligan,* 58 Cal. App. 2d 354, 369

26   (1943).  Moreover, during Radiance's short life, Shum gave Verdiell sole control and power over Radiance technology – he alone controlled Radiance's legal counsel, including important patent prosecution issues, he

27   alone managed Radiance's finances, and he alone dealt with key investors and customers.  *Kelegian v. Mgrdichian*, 33 Cal. App. 4th 982, 988-89 (1995); *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1362 (Fed. Cir. 2001) (fiduciary duty arises where "a dominant party" is entrusted with the affairs of a "servient party").

28

1    one day after Radiance's dissolution.  *Id.*, *Sime v. Malouf*, 95 Cal. App. 2d 82, 97 (1950) ("The fact that

2    persons engaged in a joint venture may . . . be involved in litigation with one another, does not as a

3    matter of law, relieve them of their fiduciary duties.").[37]  Thus, Verdiell's unlawful patenting, sale and

4    assignment of Radiance technology violated his continuing duty of "good faith" in winding down

5    Radiance's assets and his obligations under the Confidentiality Agreement to assist Radiance (or its

6    "nominee" – i.e., Shum) in maintaining the proprietary rights to Radiance's inventions in "every proper

7    way, including the signing of any and all papers, authorizations, assignments and application" – a

8    covenant which expressly extended "beyond [Verdiell's] termination of employment with Radiance."

9    Shum Decl, Exs. I, J.[38]

10                   **E.        Shum's Fraud and Fraudulent Concealment Claims Require a Jury Trial**

11                   The entire premise of Verdiell's attack on Shum's fraud claim is that Verdiell did not make any

12   false statements to or conceal any material facts from Shum.  But there is plenty of evidence Verdiell

13   did both.  As discussed above (Section III.D.1), Verdiell had a fiduciary duty to Radiance and Shum

14   which required him to disclose everything he knew about Radiance technology.  *Boyd v. Bevilacqua*,

15   247 Cal. App. 2d 272, 290 -291 (1966) ("any transaction by which one of the co-adventurers secures an

16   advantage over the other or others is **presumptively fraudulent**") (emphasis added); *see also Fenn*, 283

17   F. Supp. 2d at 632-33.

18                   Moreover, Verdiell's misleading half truths during negotiations regarding dissolution of

19

---

20   [37]  *See also Leff v. Gunter*, 33 Cal. 3d 508, 514 (1983) (regarding abandoned joint venture on construction
     project, while Defendants' misconduct in bid rigging allegations "did not occur until after their withdrawal
21   [from a joint venture], their conduct was not thereby immunized.  Defendants' attempt to rely upon the
     technicality of that withdrawal prior to submission of their formal bid strikes us as being 'sadly lacking in
22   equity'"); *Jewel v. Boxer*, 156 Cal. App. 3d 171, 179 (1984) ("each former partner has a duty to wind up and
     complete the unfinished business of the dissolved partnership and . . . no former partner may take any action
23   with respect to unfinished business which leads to purely personal gain"); *T.A. Pesue Co. v. Grand
     Enterprises, Inc.*, 782 F. Supp. 1476, 1485 (D. Colo. 1991) ("[a] former director breaches his or her fiduciary
24   duty if he or she engages in transactions that had their inception before the termination of the fiduciary
     relationship or that were based on information obtained during that relationship"); *Fox v. Abrams*, 163 Cal.
25   App. 3d 610 (1985) (post-dissolution fiduciary obligations apply to law corporation as well as partnership).

26   [38]  Indeed, confidential relationships impose duties on the fiduciaries to affirmatively assist beneficiaries in
     promoting the beneficiaries' interests.  *See, e.g., Bedoni v. Navajo-Hopi Indian Relocation Comm'n.*, 878
27   F.2d 1119, 1125 (9th Cir. 1989) ("On these facts we find that the [Defendants] breached the affirmative duty
     – arising from its fiduciary obligation – to assist the [plaintiffs] to receive the maximum benefits allowed
28   them.").

1   Radiance in the POL – including suggestions that Shum would have "equal rights" to the Radiance

2   technology required him to be completely truthful with Shum about issues surrounding Radiance

3   technology.[39] *See Nibbi Bros. v. Home Fed. Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415 (1988) ("where

4   one who is under no duty to speak nevertheless does so [he] is bound to speak honestly, and not to

5   suppress facts, that materially qualify those stated"); Cal. Civ. Code § 1710(3) (defining deceit as "the

6   suppression of a fact by one who is bound to disclose it").[40]

7        Also, the fraudulently induced POL can not absolve Verdiell of all the breaches of his fiduciary

8   duties. The POL was entered into by Shum as a result of Verdiell's misrepresentations and

9   concealments about the Radiance technology. Therefore, any provisions of the POL which Verdiell

10   considers a "release" of future misconduct, or of his obligations under the Confidentiality Agreement,

11   are not enforceable. *Manderville v. PCG&S Gp.*, 146 Cal. App. 4th 1486, 1500 (2007); *Davis v. Kahn*,

12   7 Cal. App. 3d 868, 879 (1970) (fraudulently obtained contractual releases avoidable; rescission of the

13   contract is unnecessary).[41] Radiance's abrupt dissolution was not independent of Verdiell's fraud and

14   breach of his fiduciary duties, but part and parcel of his clandestine plan to steal Shum's IP rights. At

15   minimum, it too presents a question of fact for the jury. *Kelegian,* 33 Cal. App. 4th at 988-89 (whether

16   corporate officer usurped corporate opportunity for his own benefit is question of fact).

17        Similarly, Verdiell twists the language of the POL around his fraud when he argues that Shum is

18   merely complaining about Verdiell "exercis[ing] his rights under the POL." Memo. at 16. Instead,

19   Shum alleges that Verdiell fraudulently obtained those purported rights, and that his <u>breach</u> of those

20

---

21  [39] Verdiell, as the treasurer and accountant of Radiance, also made other affirmative statements regarding
22 the general assets of Radiance during the dissolution negotiations (MacDonald Decl., Ex. CCC at 1857), but never informed Shum of his supposed "sole inventorship" and "sole ownership" of the Radiance technology.

23 [40] *See also Winston v. NBC, Inc.,* 231 Cal. App. 3d 540, 543-44 (1991) (fraud claim was based on "representations in the contract [that were] false"). Defendants' argument that they had "no duty" to disclose
24 or record ownership in the PTO joint owners and accounting completely misses the mark. *See* Memo. at 15, fn 6. There <u>is</u> a duty in any filing with the Patent and Trademark Office, regarding inventorship or
25 ownership, to be candid, honest, and truthful. *See* 37 C.F.R. § 1.56(a) (2007). Verdiell may not have had an obligation to file any patents or assignments, but once he assumed that obligation, he had a duty under patent
26 and fiduciary duty law to accurately include Shum as, at least, a joint inventor on the patents at issue and a joint owner in the assignments of the patent at issue. *See* Section III.D *supra*.

27 [41] Moreover, as Shum explained to the Federal Circuit on appeal, any interpretation of the POL as providing a release of possible claims for future misconduct is against California public policy. Cal. Civ. Code § 1668;
28 *Blankenheim v. E.F. Hutton & Co.,* 217 Cal. App. 3d 1463, 1471 (1990).

---

1  purported rights under the POL that has injured Shum.  Shum, therefore, does not need to demonstrate

2  that he "justifiably relied" on the misrepresentations of Verdiell to the PTO, LightLogic investors or

3  other third parties.  Verdiell's fraud and fraudulent concealment was directed *at Shum* and the

4  communications by Verdiell to other parties, including the PTO and investors, was information which

5  Verdiell was required to disclose *to Shum*.  It is that concealment which prevented Shum from knowing

6  about the value and the extent of his rights which constitutes fraud.  *Small v. Fritz Companies, Inc*., 30

7  Cal. 4th 167, 174 (2003) ("California law has long recognized the principle that induced forbearance can

8  be the basis for tort liability.")

9      Verdiell also made false statements to Shum including through his agent, Alboszta, intending

10  that Shum rely to his detriment (which Shum did).  In order to avoid a damaging inference from his

11  overtly selfish withdrawal of Shum's patent application followed by his replica application, Verdiell

12  asserts that he can not possibly be responsible for Alboszta's statement to Shum on this issue.  *See*

13  Memo. at 14.  But it was Verdiell, not Alboszta, who ordered the withdrawal of the patent application.

14  MacDonald Decl, Ex. H at 61:7-20.  And it seems apparent that Alboszta's admitted duty as an agent to

15  protect his "client's rights to patent" was intended to benefit Verdiell, as he was the only one of the three

16  (Verdiell, Shum and Radiance) who stood to gain – and did – from the withdrawal of the Radiance

17  application.  *Id*. at 62:12-25.  The existence of an agency relationship between Verdiell and Alboszta, is

18  one more question of fact for the jury.  *Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148

19  Cal. App. 4th 937, 965 (2007); *Peyton v. Cly*, 184 Cal. App. 2d 193, 197 (1960).  Shum's "reliance" on

20  the misrepresentations and concealments of Verdiell (and his agents) also is for the jury to decide.

21  *Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.*, 118 F. Supp. 2d 1002, 1012 (C.D. Cal. 2000)

22  (justifiable reliance is a question of fact).[42]

23

24  [42]  Shum's testimony regarding his layman's belief that he was the "sole inventor" of Radiance technology
cannot be used to support Defendants' argument that Shum could not "justifiably rely" on Verdiell's

25  misrepresentations.  Shum's statements lacked foundation as they were legal conclusions of an unqualified
witness which, at most, go to the weight of his testimony (if they are admissible at all) and are not a

26  determination of reliance.  *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994) (joint inventorship a legal
conclusion); *see also Carroll v. Metropolitan Ins. & Annuity Co.*, 166 F.3d 802, 808 (5th Cir. 1999) (legal

27  conclusion of unqualified witness presented factual contradictions for jury's determination).  Moreover,
Shum's layman's understanding that he was the "sole" inventor of the Radiance patents is understandable

28  since he performed an enormous amount of inventive work – producing volumes of engineering and
technical work on the step, flexure and dual enclosure – compared against the very tiny amount of work, just
Continued on the next page

1    Defendants' argument that Shum cannot show any damage from his reliance on Verdiell's

2    misrepresentations and fraudulent concealments rests on their bold mischaracterization of this Court's

3    first summary judgment order.  There, the Court held simply that the POL does not prevent either party

4    from obtaining " lawful patent which relates to the intellectual property of Radiance."  Apr. 27, 2004

5    Order at 23.  The Court did not interpret the POL to allow lawful or unlawful patenting by Verdiell.

6    Memo. at 17.  Verdiell specifically damaged Shum by obtaining and selling inventorship and ownership

7    rights in Radiance's technology without informing Shum of his valuable rights and providing Shum the

8    opportunity to market his inventorship and ownership interest or allow Shum to share in the proceeds

9    from the sale of LightLogic – Radiance's "total successor."

10    Finally, LightLogic and Intel are not innocent bystanders.  Both companies knew what Verdiell

11    was doing and are liable to Shum directly, as well as under the doctrine of respondeat superior for

12    Verdiell's continuing fraud.  *See* Section III.B.2 *supra*.

13    **IV.    THE AMOUNT OF DAMAGES IS NOT APPROPRIATELY BEFORE THE COURT,
            AND SHUM SHOULD BE PERMITTED AN OPPORTUNITY TO CONDUCT
14          ADDITIONAL DISCOVERY PURSUANT TO FED. R. CIV. P. 56(F)**

15    Finally, pursuant to Rule 56(f), Shum requests the denial of summary judgment to allow for

16    additional discovery, including expert damages discovery.  *See* Fed. R. Civ. P. 56(f); *Opryland USA,*

17    *Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir. 1992).  Unjust enrichment fact

18    discovery is ongoing in this case, and damages will be the subject of expert testimony.  *See* MacDonald

19    Decl., ¶ 64.  Shum's damages expert(s) have not submitted their Rule 26(a)(2) reports.  Those are not

20    due until August 1, 2008.  *Id.*  Until such further discovery is completed, it is premature to establish on

21    summary judgment that Shum cannot prove damages, as Defendants claim repeatedly throughout their

22    motion for summary judgment.  *See* Memo. at 8-10, 17; *see also* MacDonald Decl., ¶¶ 61-63. Thus,

23    Defendants' motion should be denied under Rule 56(f), as discussed in the MacDonald Declaration.

24    **V.    CONCLUSION**

25    For all the foregoing reasons, Defendants' motion for summary judgment should be denied.

26    _____

27    Continued from the previous page
      four pieces of paper – that Verdiell has generated.

28

1  DATED:  May 23, 2008              Respectfully submitted,

2                                    TOWNSEND AND TOWNSEND AND CREW LLP

3

4                                    By:   /s/ Paul F. Kirsch
                                          PAUL F. KIRSCH
5                                         Attorneys for Plaintiff
                                          FRANK T. SHUM
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28