1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3         BEFORE THE HONORABLE D. LOWELL JENSEN

4

5  FRANK T. SHUM,                    )
                                     )
6              Plaintiff,            )
                                     )
7          vs.                       ) NO. CV 02-03262 DLJ
                                     )
8  INTEL CORPORATION, et al.         )
                                     )
9              Defendants.           )
                                     )Oakland, California
10 _____)Friday, July 25, 2008
                                     )1:58 p.m.
11

12             **TRANSCRIPT OF PROCEEDINGS**

13               **(HEARING ON MOTIONS)**

14 **APPEARANCES:**

15 **For Plaintiff:**    Townsend and Townsend and Crew, LLP
                         Two Embarcadero Center - 8th Floor
16                       San Francisco, CA 94111
                         BY:  **PAUL F. KIRSCH, ESQ.**
17                            **ROBERT A. McFARLANE, ESQ.**
                             **PAUL F. KIRSCH, ESQ.**
18

19 **For Defendant:**    Taylor & Company
                         Law Offices, LLP
20                       One Ferry Building Suite 355
                         San Francisco, CA 94111
21                       BY:  **STEPHEN E. TAYLOR, ESQ.**
                              **JAYESH HINES-SHAH, ESQ.**
22                            **STEPHEN McG. BUNDY, ESQ.**
                              **CATHERINE DUNBAR, Sr. Legal Asst.**
23

24 **Reported by::**     **MARGARET "MARGO" GURULE, CSR #12976**
                         Pro Tem Court Reporter, US District Court
25

1

PDF created with pdfFactory trial version www.pdffactory.com

1                    P R O C E E D I N G S

2            July 25, 2008; 1:59 p.m.; Courtroom 1, 4th Floor

3            THE CLERK:  Please be seated.  Calling Civil Action

4    02-32612, Frank Shum vs. Intel, Verdiell and LightLogic.

5            Counsel, please come forward and state your

6    appearances.

7            MR. KIRSCH:  Good afternoon, Your Honor.  Paul

8    Kirsch, representing Frank Shum.  With me are my colleagues,

9    Rob McFarlane and Angus MacDonald.

10           MR. TAYLOR:  Good afternoon, Your Honor.  Stephen

11   Taylor, representing the defendants.  And with me today are

12   Stephen Bundy, Jayesh Hines-Shah, and also Catherine Dunbar, a

13   senior paralegal from our office.

14           THE COURT:  Good.  All right.  Maybe we should start,

15   Mr. Kirsch, with your basic position saying that this entire

16   motion ought to be stricken.

17           MR. KIRSCH:  Thank you, Your Honor.  Despite the long

18   record in this court from the removal through prior summary

19   judgment motions and bifurcation motions, where the defendants

20   have argued that the issue of inventorship is primary and

21   should be decided before any of the state law issues, now, just

22   before trial, they changed their mind and seek in their fourth

23   summary judgment motion, especially in their reply brief, a

24   summary judgment on all the state law claims regardless of

25   whether there is summary judgment on the inventorship claims.

2

PDF created with pdfFactory trial version www.pdffactory.com

1          Essentially, they're saying that, even if defendants

2   misappropriated Shum's technology and the work that went into

3   that technology, derived fraudulent patents, filed fraudulent

4   patent assignments, and then bootstrapped that into millions of

5   dollars for themselves, Shum has no valid state law claims, and

6   that's plainly wrong.  It runs afoul of the Federal Circuit's

7   decisions, which --

8          **THE COURT:**  Okay.  I'm trying to get at not the

9   substance of the motions but rather the procedure.  In essence,

10  you're saying that I shouldn't be hearing a summary judgment

11  motion at all?

12         **MR. KIRSCH:**  Yes, Your Honor.  And my next point is

13  just that.  Their motion is also precluded by this Court's

14  prior summary judgment motion.  And hence, we filed a motion to

15  strike.  And our motion to strike is based essentially on the

16  fact that they moved for summary judgment on every single claim

17  that is involved in this summary judgment motion before, and

18  they lost.  In fact, they candidly and refreshingly referred to

19  their summary judgment motion as "a motion for reexamination."

20  But they have not met the highly unusual circumstance standard

21  for showing a motion for reexamination or reconsideration is

22  appropriate.  They have not demonstrated any new material

23  difference in fact or law.

24         The only evidence they have that there should be --

25  that they claim is new and material is from the vacated

3

1    inventorship trial, which is clearly inappropriate and would

2    violate Mr. Shum's Seventh Amendment rights if this Court were

3    to consider that evidence in the summary judgment motion.

4            **THE COURT:**  Wait, wait, wait.  Consider the evidence?

5            **MR. KIRSCH:**  Yes, Your Honor.

6            **THE COURT:**  I'm not sure what you mean.  I think

7    there's two things that it's going to get straightened out.

8    One is the idea that, for some reason, there ought to be

9    consideration by this Court of summary judgment, and the other

10   is:  What evidence is available?

11           And as I read your papers, I wasn't quite sure.

12           You were saying that, inasmuch as the Federal Circuit

13   had vacated the 256 hearing, that that could no longer be used

14   in some fashion.  I mean, even though the evidence that was

15   introduced there has its own standing, you can't use that

16   evidence anymore because it was used in that proceeding before?

17           **MR. KIRSCH:**  Correct.  That's my understanding, based

18   on the law including --

19           **THE COURT:**  I don't understand that.  I think that

20   the -- you go back to go, in the sense that the 256 order is no

21   longer in existence.  But you had people testify, you had

22   documents that were introduced, and I don't understand how

23   those documents are no longer evidence or what was said there

24   is no longer evidence.

25           **MR. KIRSCH:**  Well, the evidence -- excuse me.  The

4

PDF created with pdfFactory trial version www.pdffactory.com

1    cases we cited, the U. S. vs. Ares and others in that vein,

2    state that when a trial is vacated, that the parties go back to

3    square one.  And any new evidence must be submitted on

4    stipulation of the parties that --

5             **THE COURT:**  Well, wait.  But it doesn't disappear as

6    evidence.  It has to be reintroduced.

7             **MR. KIRSCH:**  It has to be reintroduced, correct, Your

8    Honor, and that's -- correct.  That's my point.  And I don't

9    believe that they can introduce it in summary judgment.  They

10   would have -- they have to go back in the new trial that's

11   coming up and reintroduce that testimony, fresh, again.

12            **THE COURT:**  If there is no reason to have summary

13   judgment.  If there is a summary judgment motion, then the

14   question would be:  Would it be admissible on that?  Well, for

15   example, if you want to introduce a document, a CAD drawing,

16   that was put on in the 256 trial, you can put it on now, can't

17   you, if there is a summary judgment motion?

18            **MR. KIRSCH:**  Absolutely.  Absolutely.  And they can,

19   as well, Your Honor.

20            **THE COURT:**  Right.

21            **MR. KIRSCH:**  We don't object to that at all.  What

22   we're objecting to is the testimony that was adduced in that

23   inventorship trial that violated Mr. Shum's Seventh Amendment

24   rights.

25            **THE COURT:**  But I don't know -- the testimony --

PDF created with pdfFactory trial version www.pdffactory.com

1    let's say that Mr. Verdiell, at that trial, had said something

2    that amounts to a party admission --

3              **MR. KIRSCH:**  Correct.

4              **THE COURT:**  -- and that's the only place it appears.

5    I mean, you can't use that?

6              **MR. KIRSCH:**  I don't think we could use it.  I don't

7    think they could use a party admission by our client.

8              **THE COURT:**  Well, I disagree.

9              **MR. KIRSCH:**  Okay.

10             **THE COURT:**  I think that the evidence has to be

11   reintroduced, but it's still evidence.  I mean, if you have --

12   if you go to trial, certainly you can put that evidence on.

13   So, at trial, you're going to put that on.  And if I say,

14   "We're going to hear summary judgment," I don't know why it's

15   not evidence in the summary judgment motion, either.

16             **MR. KIRSCH:**  All right.  Even if the Court considers

17   that evidence, then our point is, it is not material --

18             **THE COURT:**  Yeah.

19             **MR. KIRSCH:**  -- to their arguments that they can get

20   summary judgment on all of these state law claims.

21             **THE COURT:**  But that's on the substance of the

22   motion --

23             **MR. KIRSCH:**  Correct.

24             **THE COURT:**  -- if we're hearing it.

25             **MR. KIRSCH:**  Correct.

6

1          **THE COURT:**  But I'm not sure that I can see that what

2    was done in the Federal Circuit removes a notion of a possible

3    summary judgment motion.

4          **MR. KIRSCH:**  Well, I agree.  The argument that the

5    Federal Circuit mandates completely excludes summary judgment

6    motion here.  Perhaps we overstated it in our brief.  I

7    apologize, Your Honor.

8          But I think we have much stronger arguments that we

9    stated in our brief that I would like to focus on today, and

10   that is -- and those are that they don't submit any new facts

11   or new material facts or new law that should make this Court

12   reconsider the Court's previous rulings on each of the causes

13   of action by Mr. Shum.

14         **THE COURT:**  Okay.  I wish everybody had your narrow

15   approach to reconsideration.  I have never seen how you stop

16   anything, any consideration myself.  But nevertheless, I know

17   what you're saying is that there are rules and we have local

18   rules that say, "You have got to do this, this and this to be

19   reconsidered."

20         And that's basically the Court saying, "I won't hear

21   your argument now because of that."  But if the Court says, "I

22   want to hear your argument," you can do that, too.

23         **MR. KIRSCH:**  It certainly can.  And I think that if

24   the Court does hear the arguments, we should prevail, as well.

25         **THE COURT:**  That's another issue.  It's a totally

PDF created with pdfFactory trial version www.pdffactory.com

1   different issue.

2           **MR. KIRSCH:**  I agree with that.

3           **THE COURT:**  And we're going to have you heard.  But

4   I'm -- under the circumstances, I think that, even in the

5   course of an argument saying that we should be able to file a

6   summary judgment motion, you almost necessarily start doing the

7   substance anyway.

8           **MR. KIRSCH:**  Correct.

9           **THE COURT:**  So what we're going to do is I think -- I

10  wanted to get it clear that I am not going to exclude their

11  motion on the notion that the Federal Circuit did that or that

12  reconsideration does that or that evidence can't be introduced.

13  It comes out of that trial, as long as it's introduced and it's

14  admissible.  But that's the way we're approaching it.

15          **MR. KIRSCH:**  That's fine, Your Honor.  Would you like

16  me to argue the substance?

17          **THE COURT:**  No.  We're going to switch over and let

18  them start in on the summary judgment motion, and then you can

19  respond to it.  So you go ahead.

20          **MR. KIRSCH:**  That's fine, Your Honor.

21          **MR. TAYLOR:**  Thank you, Your Honor.  I would like to

22  start by saying that it is the defendant's position that the

23  claims in this case are susceptible to summary judgment, but,

24  more importantly, that based on new law and new facts and with

25  respect to two of the causes of action where we've never had a

PDF created with pdfFactory trial version www.pdffactory.com

1   prior opportunity to bring a motion for summary judgment, we

2   think that all of them can.  But I would like to focus my

3   argument this afternoon, if I could, on the state law claims,

4   because I do believe strongly that each of the state law claims

5   is insufficient as a matter of law.

6        **THE COURT:**  Now, we did have a summary judgment

7   motion on this.  Our history includes an order by the Court on

8   the 12(b)6 motion and then we had an order on summary judgment

9   that dealt with state law claims and basically denied summary

10  judgment.  So then we had the 256 trial and the summary motion.

11  The 256 and the summary judgment were gone.  So we're back to

12  where we were, which is after the first summary judgment

13  motion.

14       **MR. TAYLOR:**  Exactly.  So we're back to 2004.  So

15  just to tick through, then, on unjust enrichment, that's the

16  claim that was dismissed, so this would be the first time we're

17  going for a motion for summary judgment.

18       **THE COURT:**  Right.

19       **MR. TAYLOR:**  On the breach of contract claim, that

20  was brought before.  But there is new evidence that we're

21  putting before Your Honor on that claim.  And I'll just remind

22  Your Honor that this is the case where after we had filed our

23  2004 motion for summary judgment, we had discovery problems.

24  So we -- Magistrate Judge Chen ordered that the plaintiffs

25  produce a large amount, about 19 gigabytes of information.  19

PDF created with pdfFactory trial version www.pdffactory.com

1    depositions were taken after that and some 10,000 pages of

2    hard-copy documents were produced.  And they were very

3    material.  That was the first time we really learned the extent

4    to which Mr. Shum was competing on his own and doing things

5    secretly from Mr. Verdiell, a number of things.

6            This would be the first time, since we're going back

7    to 2004, we can take advantage of that evidence and put it

8    before Your Honor for summary judgment.

9            **THE COURT:**  Well, you have to tell me not just that

10   there was new evidence but what it is, why it's material, and

11   how it affects your position.

12           **MR. TAYLOR:**  Well, I will.  On fiduciary duty, as I

13   have just run through the state law claims, it's new law.  Your

14   Honor, in the summary judgment decision that was vacated on

15   fiduciary duty, you referred to the Persson case.

16           **THE COURT:**  Well, the Persson case was after the 2004

17   summary judgment motion.

18           **MR. TAYLOR:**  Yes.  And since then, there has been

19   City of Hope which we think approves the Persson.  So that part

20   of our motion has really brought on new law since the 2004

21   motion.  That was appealed.  The Federal Circuit didn't touch

22   it.  So we're bringing that back before Your Honor.  And on the

23   fraud claim, it's the most significant claim I think that we're

24   bringing before Your Honor on the new evidence that we have

25   obtained.  And it really is significant new evidence and I'm

PDF created with pdfFactory trial version www.pdffactory.com

1   prepared, briefly, but to walk Your Honor through that.

2           **THE COURT:**  Go ahead.

3           **MR. TAYLOR:**  So on the state law claims, that's where

4   we are.  If I can -- we stated all of our positions in our

5   papers.  I did bring a very small booklet of exhibits, Your

6   Honor, if I may hand it to you and walk through the state law

7   claims.

8           Thanks a lot, Frances.

9           So with Your Honor's permission, I just would like to

10  start with unjust enrichment, since we've never had an

11  opportunity to bring a motion for summary judgment with respect

12  to unjust enrichment.  Our motion, as Your Honor knows from our

13  papers on unjust enrichment, is that California law is clear,

14  abundantly clear, that if you have a contract that covers

15  subject matter of the conduct that's being complained of for

16  unjust enrichment, then you can bring a breach of contract

17  action, but you cannot bring an unjust enrichment action.  And

18  we cite the Wal-Noon case and Parafor case and Berkeley case

19  and so on and so forth.

20          So, here, if we look at the unjust enrichment claim,

21  the unjust enrichment claim has to do with the allegation that

22  Mr. Verdiell obtained patents without naming Mr. Shum as a

23  coinventor.  I -- to remind the Court of what we're dealing

24  with in this case, although I know the Court is abundantly

25  familiar with it, tab 1 is the plan of liquidation which the

                                                            11

1    Court has construed on a number of occasions, and I highlighted

2    on page 3 of the plan of liquidation the two key provisions,

3    and the Court has construed both of these.

4              But at the bottom of page 3, we have the very

5    important provision that both Shum and Verdiell shall be

6    entitled, without any liability or duty to account to the

7    corporation or the other, to pursue any and all such other

8    business activities as they shall desire, even if such

9    activities are in competition with the business of the

10   corporation and even if they take, or attempt to take, a

11   business opportunity that the corporation could itself have

12   pursued.

13             So with respect to patenting activity, Your Honor, in

14   the summary judgment order that we're going back to, April 27,

15   2004, looked at both of those provisions and construed those

16   provisions.  And you said about the provision that I just read

17   that the filing of patent applications to protect Radiance

18   Technology is a business opportunity within the meaning of that

19   provision.

20             Then you further held, with respect to the provision

21   just above that, which is key, the provision about each party

22   having equal rights to independently exploit.  Your Honor

23   stated that the plain import of that statement is that Verdiell

24   and Shum were entitled to patent any intellectual property

25   which had previously been the property of Radiance.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  It doesn't say that they could unlawfully

2     patent.

3          **MR. TAYLOR:**  It doesn't say that they could get it

4     wrong and that it's still okay under the plan of liquidation.

5          **THE COURT:**  Right.

6          **MR. TAYLOR:**  What we're suggesting to Your Honor is

7     that it is almost without controversy that what we're talking

8     about here is a contract claim that is brought for the very

9     same conduct as the unjust enrichment claim.  So if you look at

10    tab 2, I have copied and presented to the Court just the breach

11    of contract claim which is currently before the Court.

12         And you can see that the breach of contract claim

13    relates to the alleged patenting of Shum's inventions without

14    naming Shum as an inventor or owner.  In tab 3, I have included

15    the unjust enrichment claim.  Now, this is the claim that was

16    dismissed some, I guess, five years ago.  But here's the claim

17    again, and I've highlighted -- here we see this claim, too,

18    relates to the alleged inventorship on these patent

19    applications having been omitted by Verdiell.

20         It's clear two things:  One, that those causes of

21    action overlap.  But it is clear that this plan of liquidation

22    covers the patenting activity of either person, in other words,

23    the business.

24         **THE COURT:**  When you say "the patenting activity,"

25    that means lawful patenting activity?

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. TAYLOR:**  Well, Your Honor, I think whether it's

2   lawful -- I think the plan of liquidation would govern whether

3   the patenting activity was lawful or not.  For example, the

4   corporation could have applied for a patent.

5          **THE COURT:**  Well, in terms of who's the applicant.

6   But the question is, in terms of whether you applied and named

7   the inventors.

8          **MR. TAYLOR:**  Right.  And if the Court --

9          **THE COURT:**  If you did so unlawfully, if you didn't

10  name the inventors as required by patent law --

11         **MR. TAYLOR:**  That would be a breach, I believe, of

12  the plan of liquidation.

13         **THE COURT:**  Okay.

14         **MR. TAYLOR:**  And that's what, I think, the plan of

15  liquidation is about.  Because if you did that and if you did

16  it wrong and it was proven that that actually prevented someone

17  from equally exploiting the technology, it would be a breach of

18  the plan of liquidation.

19         But the key between these two gentlemen, I think, is

20  that the plan of liquidation is the document and the agreement

21  which govern what they could do and what they could not do with

22  intellectual property, and their remedy is there.

23         If someone does something that's unlawful or is a

24  breach or interferes, prevents them from equally exploiting the

25  technology, it's a breach.  It's not unjust enrichment.

14

1           And I think the cases we cite make it clear that if

2    the same conduct is being covered by both causes of action,

3    which it is here, and if its subject is within the scope of

4    what the contract governs, attempts to undertake activities

5    that the corporation could have taken.

6           **THE COURT:**  Well, let's do this again.

7           **MR. TAYLOR:**  Yes.

8           **THE COURT:**  If the patent application --

9           **MR. TAYLOR:**  Yes.

10          **THE COURT:**  -- violates patent law because it doesn't

11   name the event, then it may be that a patent application can be

12   made.  But could that patent application be made?

13          **MR. TAYLOR:**  If the patent application was made and

14   it was wrongful, it violated the rules of the Patent Office --

15          **THE COURT:**  Uh-huh.

16          **MR. TAYLOR:**  -- that would be an attempt to exploit,

17   that would be in violation of this plan of liquidation.

18          **THE COURT:**  Okay.

19          **MR. TAYLOR:**  If it impacted the other person's right

20   to independently exploit.  If some -- if there had been a minor

21   mistake in the patent application, if it had had an error that

22   was in Shum's favor or in Verdiell's favor or something else

23   that might have been unlawful, then it wouldn't be -- it may be

24   a breach because it wasn't done properly.  But it wouldn't have

25   any impact -- excuse me.  It may be a wrongful act, but it

PDF created with pdfFactory trial version www.pdffactory.com

1   wouldn't be a breach at the time.

2           **THE COURT:**  Not in and of itself.

3           **MR. TAYLOR:**  Right.

4           **THE COURT:**  But thereafter, if it sold with only one

5   name on it --

6           **MR. TAYLOR:**  Correct.

7           **THE COURT:**  -- that changes, I think.

8           **MR. TAYLOR:**  Right.  So we think, looking at the

9   Wal-Noon case, looking at things, we think this is quite clear,

10  Your Honor, if we may, that the plan of liquidation covers

11  patenting, it covers patenting of any kind, and it covers what

12  kind of activity is actionable between the two.  And that's an

13  activity that impairs or prevents them from their equal rights

14  to exploit.

15          That's the basis of our motion on unjust enrichment.

16  It's a ground that we have not previously advanced before the

17  Court because we have not been before the Court on a motion for

18  summary judgment.  This is the claim that was dismissed by the

19  Federal Circuit saying that without further elaboration, it was

20  not able to sustain the Court's decision.  And I think this

21  provides exactly the further elaboration under California law

22  that the Court would be looking for.

23          **THE COURT:**  Okay.

24          **MR. TAYLOR:**  On breach of contract, if I may,

25  briefly, the breach of contract claim -- or excuse me, our

PDF created with pdfFactory trial version www.pdffactory.com

1   motion for the breach of contract claim is based on new

2   evidence since the last motion was brought that confirms that

3   Mr. Shum actually made no effort to exploit the Radiance

4   Technology, at least after an initial effort in 1998.

5          If you look at the plan of liquidation, just as we

6   did, the plan of liquidation speaks not in terms of who owns

7   anything or who has possessory interest in anything.

8          The plan of liquidation speaks to one thing.  It

9   allows you to do anything you want that the corporation could

10  have done with the IP.  But what you cannot do, because it

11  grants people equal rights -- or Shum and Verdiell equal rights

12  to independently exploit -- you may not undertake an activity

13  that prevents either party from independently exploiting.

14         The fact here is Mr. Shum decided not to exploit.  So

15  nothing --

16         **THE COURT:**  How would that affect the existence of or

17  nonexistence of a breach of contract?  If Mr. Verdiell does

18  something that breaches that contract, is it saved by the fact

19  that there was no attempt by Mr. Shum?

20         **MR. TAYLOR:**  Correct.

21         **THE COURT:**  Or does that --

22         **MR. TAYLOR:**  There has to be a fact of injury.

23  Mr. Verdiell could have done a variety of things.

24         **THE COURT:**  Then your argument is:  There was a

25  breach of contract, but there is no damage?  Is it that?

                                                          17

1          **MR. TAYLOR:**  Yes.  It would be that there has to be a

2    vindication.  It's like you can't trip a person who is not

3    walking.  And Mr. Shum decided not to walk.  There was no

4    impact on him from anything that Mr. Verdiell did; therefore,

5    his rights to equally exploit the intellectual property were

6    not impacted.  It didn't impact him.  It didn't touch him.

7          Now, there is this one instance he raises in the last

8    two sentences of his declaration where he tries to refer to a

9    conversation that he had with Robertson Stephens -- and we can

10   talk about that separately.  I think that's clearly hearsay and

11   inadmissible.

12         But other than that, Your Honor, there is not a

13   single piece of evidence that Mr. Shum even attempted to

14   exploit the intellectual property, much less that he was

15   prevented from or impaired from trying to exploit it by

16   anything Mr. Verdiell did.

17         **THE COURT:**  But are you saying that if he says, I

18   went to Robertson Stephens and I did this and they did that,

19   that he can't use that to show he was attempting to exploit?

20         **MR. TAYLOR:**  If Robertson Stephens did.  He cannot

21   come before this Court and offer --

22         **THE COURT:**  No, but he can tell you what he did.  I

23   mean, you say he did not take any action to exploit.  He says,

24   I went to Robertson Stephens, and see if I can get into this.

25         **MR. TAYLOR:**  He can say he went to Robertson

PDF created with pdfFactory trial version www.pdffactory.com

1    Stephens.

2           **THE COURT:**  He can say what he said.

3           **MR. TAYLOR:**  He can say what he said.  But that

4    doesn't show that there is anything about Mr. Verdiell's

5    patenting activities that in any way impacted what Robertson

6    Stephens said or what they will really do.  That part --

7           **THE COURT:**  He may.  But the question is:  Did he

8    attempt to exploit the patent?

9           **MR. TAYLOR:**  But the question is:  Was he prevented?

10   No.  I'm saying it's an easy question from 1998 to 2001 because

11   he didn't even try.

12          After 2001, we have one instance to deal with --

13   that's Robertson Stephens -- where he makes a statement, yes,

14   that he did go to them to ask them for help in marketing the

15   patent.  From an evidentiary standpoint, that's where it stops,

16   that he went to them and asked them for help.

17          There is no evidence that the allegedly wrongful

18   invention -- excuse me -- wrongful patent, not including

19   Mr. Shum on a patent, had any impact on Mr. Shum's --

20          **THE COURT:**  On that transaction.

21          **MR. TAYLOR:**  Exactly.  And there is nothing there.

22   So that motion -- this part of the motion is fraught -- you

23   cannot have a breach of contract claim if you didn't try to do

24   the things that the contract protects the others -- protects

25   the others from.

PDF created with pdfFactory trial version www.pdffactory.com

1           **THE COURT:**  Well, again, that's -- analytically,

2    you're talking about, there is no damage.

3           **MR. TAYLOR:**  That's correct.

4           **THE COURT:**  Before you even start talking about

5    damages, you've got to find whether there is a breach.  The

6    breach doesn't disappear because there is no damage.  There is

7    still a breach.

8           **MR. TAYLOR:**  Analytically, I think it's challenging.

9    The way I look at it personally is I don't think there is a

10   fact of injury.  I think Your Honor is right.  There may be a

11   breach, but it's not an actionable breach unless you can

12   actually demonstrate that it deprived Mr. Shum of his rights to

13   equally exploit, because that's what the contract governs.  You

14   can do anything else.  But what you can't do under the contract

15   is deprive the other party of that right to exploit.

16           Any activity the corporation could engage in,

17   anything, and that's -- and that was the arrangement between

18   the two gentlemen.  They wanted to go off and do whatever it

19   was they were going to do and compete against each other.  What

20   they couldn't do -- the one thing they carved out is:  Do

21   not -- we cannot interfere with the judge's right to exploit.

22   No liability to each other, no duty to account, no nothing.

23   But don't do that.  And that's the way the plan of liquidation

24   reads and I believe should be construed.

25           On fiduciary duty and fraudulent concealment, this is

PDF created with pdfFactory trial version www.pdffactory.com

1    the cause of action Your Honor has already addressed and looked

2    at under the Persson case.  And we're required, since the

3    Federal Circuit vacated that decision, to bring this back

4    before Your Honor.

5            And we think -- at least we state them in this

6    motion.  We think the Persson case is directly on point here;

7    that 50/50 shareholders do not owe each other a fiduciary duty.

8    Without a fiduciary duty, there can be no fraudulent

9    concealment claim on these fact.

10           Persson was recently cited with approval in City of

11   Hope, which is the most recent case, cited twice by the City of

12   Hope with approval.  And actually, City of Hope disapproved the

13   Stevens vs. Marco case, which is the case that Mr. Shum relies

14   on.

15           THE COURT:  Well, the argument is that this should go

16   to the fact finder.

17           MR. TAYLOR:  Say again.

18           THE COURT:  This should go to the fact finder.  It

19   shouldn't be resolved on summary judgment.

20           MR. TAYLOR:  Well, the issue is that there can be no

21   fiduciary duty, as a matter of law on these facts, on this

22   factual record.

23           THE COURT:  This gets into -- there is a bit about

24   who decides the facts?

25           MR. TAYLOR:  Well, I think the undisputed facts and

PDF created with pdfFactory trial version www.pdffactory.com

1    our subset of 50/50 shareholders -- put it this way:  There is

2    no evidence that has been put before Your Honor that would get

3    them outside the scope of Persson.  And the one exception to

4    that is -- and Your Honor has seen this in the papers between

5    the parties -- is if they could demonstrate there was one of

6    those relationships of vulnerability.

7           The City of Hope addresses it.  Persson does a little

8    bit.  And City of Hope does a good job of explaining what kind

9    of vulnerability that is and how it has to be a really

10   significant and substantial disparity.

11          THE COURT:  Is it a question of fact?

12          MR. TAYLOR:  No, not -- well, I don't think it is,

13   and the Court there decides -- it's interesting.  The City of

14   Hope decides that it's a matter of law.

15          THE COURT:  Well, they throw out the fiduciary duty

16   claims.

17          MR. TAYLOR:  But they don't say it has to go back to

18   the tribe.  They decide that as a matter of law.  So I think

19   there is nothing in this factual record.

20          I included one exhibit, Your Honor, just to give you

21   an example.  And it's behind tab 5.  It's an e-mail message

22   from Mr. Shum to Monica Florio, just demonstrating, during this

23   process with her 50/50 shareholders separating from each other,

24   demonstrating a couple of things:

25          First of all, just as in Persson, they're both

PDF created with pdfFactory trial version www.pdffactory.com

1    consulting lawyers and represented by counsel.  And the second

2    thing is that it is from this being an unequal, vulnerable

3    situation.

4           Mr. Shum is telling his friend that this is all about

5    strategy.  Business is like a big game, except it's real money,

6    which is fine.

7           But he's certainly not in a position of

8    vulnerability.  He's a 50/50 shareholder, who is doing his best

9    to negotiate whatever deal he can.

10          So under the undisputed facts of this case, there

11   just is no evidence that would create a fiduciary relationship.

12   There is some reference to confidential relationships in the

13   plaintiff's papers, but this is not a confidential

14   relationship.

15          The only confidential agreement -- confidentiality

16   agreement they had was a proprietary right, like every employee

17   signs, with every company, and that's not enough to create a

18   fiduciary duty relationship, frankly.  So Persson is just

19   directly on point, as it was before, stronger with City of

20   Hope.

21          **THE COURT:**  What about the fiduciary duty that

22   Verdiell owes Radiant or LightLogic -- owes to Radiant and

23   LightLogic?  Even if he doesn't owe a fiduciary duty to Shum,

24   he may owe it to the corporation.

25          **MR. TAYLOR:**  Right.

                                                                    23

1          **THE COURT:**  What's the effect of that?

2          **MR. TAYLOR:**  Well, he may.  And if this were a

3     derivative lawsuit, we'd be dealing with that, but it's not.

4          Mr. Shum has not been --

5          **THE COURT:**  Well, we did talk about that a little bit

6     in terms of that first 12(b)(6) motion --

7          **MR. TAYLOR:**  Uh-huh, uh-huh.

8          **THE COURT:**  -- in terms of whether he had standing to

9     raise it himself on Verdiell's breach, alleged breach.

10         **MR. TAYLOR:**  And my understanding of that ruling and

11    the position that the Court took was that he has demonstrated a

12    sufficient personal injury to himself that he has standing to

13    actually bring a claim if he wishes in his own name for his own

14    injuries.

15         But he is not here in front of this Court on behalf

16    of the corporation.

17         **THE COURT:**  If he would be able to do that, he hasn't

18    done that, but he could?

19         **MR. TAYLOR:**  He could try.  He could try.  But he is

20    not here on behalf of the corporation.

21         **THE COURT:**  Okay.

22         **MR. TAYLOR:**  So the last state law claim that I would

23    like to address is fraud.  And I think in some ways it is the

24    most important one because it involves the greatest number of

25    additional facts.

                                                                    24

PDF created with pdfFactory trial version www.pdffactory.com

1          In all candor, Your Honor, this Court looks at every

2    issue and argument as diligently as is humanly possible.  And I

3    just would ask the Court to do the same with this issue,

4    because it is a particularly -- it is a particularly

5    challenging issue, and I think it's an issue that summary

6    judgment should be granted and this issue should not be going

7    to the jury for trial and here's why.

8          And I would first remind Your Honor that you did look

9    at this before.  You looked at this in 2004.  You looked at it

10   with respect to Mr. Alboszta and Mr. Verdiell, and then, based

11   on those facts, which are different than these facts, then you

12   decided -- and you said in your decision, "It's a close call."

13   And you said that you're -- with respect to Intel and

14   Mr. Verdiell, you were denying the motion at this stage in the

15   proceedings.

16         And even though when Mr. Alboszta, who is now

17   dismissed and no longer in the case, you denied the motion as

18   to him and without prejudice.  So even then, it was a close

19   call.

20         And what I would like to suggest to Your Honor is

21   that the new evidence that we've put before the Court makes it

22   clear that it is no longer a close call and that this motion

23   should be granted.

24         Now, just to put this in context, the nature of the

25   alleged misrepresentation is such that it almost invites

PDF created with pdfFactory trial version www.pdffactory.com

1   careful inquiry because Mr. Verdiell is being charged with

2   fraud for really two statements that were made not by him but

3   made by Mr. Alboszta.

4           One statement was, as Mr. Alboszta said to Mr. Shum,

5   "I have been told on this patent application that we filed that

6   Mr. Verdiell is an inventor.  And the patent application only

7   names you, but he tells me he's an inventor."  That was

8   statement number 1.

9           Statement number 2 was, based on that, my

10  recommendation, Alboszta says, as your patent agent, is that

11  we withdraw that patent application.  And the alleged fraud is

12  that the statement that the patent application should have been

13  withdrawn is a false and fraudulent statement intended to

14  deceive Mr. Shum.

15          A couple of things preliminarily.  There is no direct

16  evidence in the record that Mr. Verdiell told Mr. Alboszta to

17  say that, but maybe more importantly, there is no evidence in

18  the record to suggest that Mr. Verdiell, on the issue of

19  withdrawal or not withdrawing or correcting or whatever you

20  could do, has any way -- any understanding at all whether that

21  advice was correct or incorrect.  There is just nothing in this

22  record to suggest that he knew that.

23          The further reason that it is important to look at

24  the claim is because Mr. Shum has testified on numerous

25  occasions that he was the sole inventor of that patent

26

PDF created with pdfFactory trial version www.pdffactory.com

1    application, the sole inventor.  So when Mr. Alboszta comes to

2    him and says, "Mr. Shum" --

3          **THE COURT:**  This is the first patent application?

4          **MR. TAYLOR:**  This is the first patent application

5    that contained ideas of both.  And then it was withdrawn and

6    then a patent application was refiled by Mr. Verdiell that had

7    some of the same, his ideas, and then he added some new ones of

8    his.  And he tried, he testified, to take out Mr Shum's ideas.

9          So this was the application, the very first one that

10   was ever filed that never was granted that contained -- in our

11   position, it contained both Verdiell ideas because it had the

12   CTE direct --

13         **THE COURT:**  Maybe this would be the time to ask about

14   this.

15         **MR. TAYLOR:**  Sure.

16         **THE COURT:**  I think they pointed out, if you go in

17   and you look at claim 18 of the patent that was actually

18   admitted, and you look at claim 18 and then you look at claim

19   59 of the patent that was withdrawn or the patent application

20   that had been withdrawn, they're the same.  And they seem to

21   have the so-called inventive idea in it; that is, the taking on

22   the coefficient of 1 with the constraints, the constraint

23   notion.  It's in both of those.

24         **MR. TAYLOR:**  Right, right.

25         **THE COURT:**  All right.  Now, when it was put in by

PDF created with pdfFactory trial version www.pdffactory.com

1   Radiance first, that's Shum's invention, right?

2           **MR. TAYLOR:**  Right.

3           **THE COURT:**  All right.  And so Shum's invention,

4   then, in claim 59 of the submitted application is now in 18

5   that was admitted that was Alboszta -- I mean -- excuse me --

6   that Mr. Verdiell put in as his invention.  So it changes from

7   Shum's invention to Verdiell's invention.  Is that what

8   happened?

9           **MR. TAYLOR:**  No, I don't think that's what happened,

10  but -- and I can address that now, Your Honor, or I can address

11  it --

12          **THE COURT:**  Either way.  I mean, since you started

13  with this about the comparison between the two of them, that

14  seems to be a salient point, and I just wanted to ask you about

15  it.

16          **MR. TAYLOR:**  Let me -- if I may -- and it's up to

17  Your Honor.  But maybe, if I could save that until we talk

18  about the DVC, I would be happy to address it then --

19          **THE COURT:**  Yeah, okay.

20          **MR. TAYLOR:**  -- if I can just address fraud and talk

21  about that.

22          **THE COURT:**  Okay.  Yeah.

23          **MR. TAYLOR:**  So this patent application, in any

24  event, is the one that was in Mr. Shum's name alone, but which

25  Mr. Verdiell contends had his ideas in it, as well.  So, for

PDF created with pdfFactory trial version www.pdffactory.com

1    fraud, the key fact is that it really doesn't matter whose

2    ideas were actually in it because Mr. Alboszta is coming to

3    Mr. Shum and he's saying, "I understand this patent application

4    has got Verdiell ideas in it."

5            Now, Mr. Shum believes that to be a lie or to be

6    false or to be untrue.  Because Mr. Shum believes, as he is

7    hearing that, he is the sole inventor.  He believed that until

8    he came to trial.

9            And so Mr. Shum, just to start with -- and we're

10   trying to think about reliance here -- is hearing someone give

11   him a piece of advice that's based on one statement that

12   Mr. Shum knows is false, or believes is 100 percent false.

13           He also knows at this time that he and Verdiell are

14   not speaking with each other.  He knows, Mr. Shum does, that

15   he, Mr. Shum, is secretly trying to start a business, when you

16   put this evidence before the Court, to compete with

17   Mr. Verdiell; assumes Mr. Verdiell, I'm sure, is doing the same

18   thing.

19           He knows also that Mr. Alboszta is Mr. Verdiell's

20   friend, that Mr. Alboszta -- and he puts that in his

21   declaration -- and that Mr. Alboszta was introduced to Radiance

22   and Mr. Shum by Mr. Verdiell, and in effect, Mr. Verdiell is --

23   excuse me -- Mr. Alboszta is friends and sort of a patent agent

24   of choice, for lack of a better term.

25           They know that -- he knows what took place, and he

PDF created with pdfFactory trial version www.pdffactory.com

1   knows that he's just heard a statement that is absolutely

2   false.  And then he knows that, based on that false statement,

3   someone is telling them that he should do something about

4   withdrawal.

5           What is interesting in the evidence, in the new

6   evidence that we have been able to obtain, is that that very

7   issue of whether it should be withdrawn as opposed to whether

8   something else should happen to it is an issue that Mr. Shum

9   directly addressed with his own separate counsel.  And he did

10  this before the patent application was actually withdrawn.  And

11  we've put other evidence in the record where Mr. Shum says he

12  agreed to have it withdrawn.

13          But Your Honor, I have put three tabs here, if I may,

14  the tab 6 -- we already saw, by the way in tab 5 that Mr. Shum

15  had -- was consulting with counsel, lawyers, at least as early

16  as October 5.  And to give Your Honor some frame of reference,

17  the patent application was withdrawn on November 17th of 1997.

18          So I just put three things in here to try to help

19  make the point.  These are all before Your Honor in the record.

20          But first is a retention letter, because Mr. Shum

21  retained Coudert Brothers formally on October 20, 1997.  And on

22  the first page I just highlighted that, among other things,

23  they were retained on intellectual property matters.

24          Now, tab 7 is a draft agreement -- we have seen this

25  before -- is a draft agreement that Shum and Verdiell were

PDF created with pdfFactory trial version www.pdffactory.com

1    trying to negotiate with each other.  And this is a version

2    that was generated by Mr. Shum's lawyers.  You can see this

3    comes from Coudert Brothers, and it goes to Mr. Verdiell's

4    lawyers.

5            So this is a document that's being offered by, for a

6    draft that's being sent back by Mr. Shum, and Mr. Shum in

7    consultation with his lawyers.  And if you look at what I have

8    highlighted on page 4 of the letter, but it's numbered

9    paragraph 6, there is a section there about -- and this is

10   before the patent is withdrawn about how they should handle it.

11           And it says there, Each of us acknowledges that he

12   will promptly cooperate with the other, to the extent proper

13   and reasonably necessary, for the purposes of withdrawing the

14   current U.S. Patent application and resubmitting the new

15   application and the same invention and so on and so forth.

16           It's this withdrawal concept, as opposed to just

17   leaving it on file, that Mr. Shum says is fraudulent by

18   Mr. Alboszta and that he was relying on Mr. Alboszta when he

19   withdrew.

20           The new document that we hadn't seen until we got the

21   production -- this is after the motion in 2004 was brought --

22   is behind tab 8.  Here we have a document that comes out of the

23   Coudert Brothers' files.  This is an internal document from the

24   Coudert Brothers.

25           And it is -- it shows us the origin of that word of

PDF created with pdfFactory trial version www.pdffactory.com

1  withdrawal.  How did the word "withdrawal" come up?  And it

2  shows it in two places.  If you look right at the top on the

3  first page of the letter, there is some bold comments.  One of

4  them is underlined and is also stricken, "Withdrawal of patent

5  immediately."

6          **THE COURT:**  It says "Withdraw."

7          **MR. TAYLOR:**  See that, "Withdrawal of patent

8  immediately"?

9          **THE COURT:**  It says "withdraw."  It doesn't say

10  withdrawal.

11          **MR. TAYLOR:**  You're right.  You're right.  You're

12  right.  Thank you, Your Honor.  "Withdraw of patent

13  immediately."

14          **THE COURT:**  Whatever that is.

15          **MR. TAYLOR:**  And the record would show that comment

16  as being made by Mr. Shum.  And he makes other references in

17  these bold things and he refers to me and what about myself and

18  these interlinked comments.  The interesting part, particularly

19  for whether there is any basis upon which Mr. Shum can continue

20  to claim he was relying on Alboszta with respect to whether the

21  patent should be withdrawn is on page 4 where we see that same

22  paragraph, and now we see where the word "withdraw" comes from

23  or at least where it was added.

24          In this internal Coudert Brothers document that

25  appears to be a discussion or dialogue between Shum and his

PDF created with pdfFactory trial version www.pdffactory.com

1   lawyers, they add the word.  If I read that right, that say

2   "withdrawing."

3           **THE COURT:**  Let me see.  This is on page tab 8.

4           **MR. TAYLOR:**  Okay.  This is on page 4, numbered

5   paragraph 5.  It's the last tab in the book.  I tried to

6   highlight it.

7           **THE COURT:**  Okay.

8           **MR. TAYLOR:**  Over in the right-hand margin.

9           **THE COURT:**  Right.

10          **MR. TAYLOR:**  And that actually is where that word

11  "withdrawing" got inserted, more or less.  And it suggests that

12  before this application was withdrawn, rather than relying on

13  anything that Mr. Alboszta was saying -- Mr. Shum was getting

14  his own advice as to how to handle that.

15          And Your Honor has had enough history with this

16  case --

17          **THE COURT:**  The point is you're saying that the

18  evidence leads to only one conclusion, and that is that he did

19  not rely upon the statement by Alboszta --

20          **MR. TAYLOR:**  Right.

21          **THE COURT:**  -- because he had the same talk about

22  withdrawal of some of his own ideas.

23          **MR. TAYLOR:**  And if he did rely or contends he

24  relied, there is no basis upon which it could be considered

25  justified.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Justified in terms of the statement by

2     Alboszta.

3          **MR. TAYLOR:**  Right.  And Your Honor, you've had

4     enough experience and history with the case, for better or

5     worse, if you go back to that first page, there is another

6     concern that's interesting and I think related to his

7     discussion with his lawyers about the withdrawal aspect.

8          On those same bulleted points where we had "withdraw

9     of patent immediately," the last one of those items, "Can I be

10    sued by SDL because of potential liability with Marc's not

11    leaving SDL?"

12         And there is evidence elsewhere in the record that

13    SDL was a concern, and a concern for both gentlemen and a

14    concern with respect to this patent.  And an inference, I

15    think, can be drawn that there was discussion about withdrawal

16    and there was discussion about SDL and that those two matters

17    were not unrelated.

18         So our argument on fraud, the last of the state law

19    claims, is that based on this new evidence, this claim, too,

20    should be subject to summary judgment, and Mr. Shum should not

21    be permitted to take this claim to a jury trial on the basis of

22    --

23         **THE COURT:**  This is not a question of law; this is a

24    question of fact.

25         **MR. TAYLOR:**  It is, Your Honor.  It is.  But there is

PDF created with pdfFactory trial version www.pdffactory.com

1    just not -- there is not sufficient evidence to demonstrate he

2    relied on what Mr. Alboszta said, particularly when it's a

3    fraud claim that is being brought against Mr. Verdiell without

4    any evidence that Mr. Verdiell has the specialized knowledge

5    even to know what this is all about, and also in the context,

6    if I may, of just exactly how -- what the relationship was

7    between Mr. Shum and Mr. Verdiell at the time and also Mr. Shum

8    and Mr. Alboszta.

9          These two gentlemen -- we now have evidence that at

10   the same time that these letters are being written, Mr. Shum's

11   got business plans -- he conceded through Mr. Verdiell where

12   he's getting ready to compete.  They're not speaking, and

13   they're competing like crazy as they get into the plan of

14   liquidation.

15         So it's just not -- it's not supportable that he was

16   relying on Alboszta on behalf of Verdiell, particularly when

17   the first statement he hears he knows to be false.  It just

18   doesn't work.

19         Now, I'm happy to talk about inventorship or take a

20   break here.  What would Your Honor prefer?

21         **THE COURT:**  Why don't you talk about the other one we

22   didn't do before.

23         **MR. TAYLOR:**  Okay.  So I know Your Honor knows DVC.

24   Hang on just a minute.

25         So on the direct bonded copper, here's our argument,

PDF created with pdfFactory trial version www.pdffactory.com

1   our position and the basis for saying that that patent is

2   subject to summary judgment.  We have never had a chance to do

3   this before.

4        And Your Honor, to be candid with you, until we got

5   admissions from Mr. Shum in this new production of documents, I

6   don't think we were in a position to do it.

7        On the direct bonded copper, this issue that Your

8   Honor raises about having this reference to the CTE or the

9   coefficient thermal expansion reference, I think the evidence

10  is now, after we have gotten the recent documents and also had

11  the benefit of the trial clear, that the only invented element

12  in the DVC patents or step patents, whatever -- they were the

13  DCV patents right at the beginning of trial and then they got

14  changed, the only inventive element is the constraint of the

15  metal layer, of the CTE of the metal layer by the substrate,

16  and then inheriting the CTE of this bond, this eutonic bond --

17  or atechnic bond -- excuse me.

18       And we know it's the only invented element for two

19  reasons.  One for the patent execution history.  And we see in

20  the patent prosecution history that claim one was rejected by

21  the PTO as being based on prior art.  And it wasn't until

22  Mr. Verdiell amended claim 1 to add the specific reference to

23  the metal layer inheriting the end plain CTE of the insulated

24  substrate and calling to the examiner's attention -- "Look, you

25  may think everything else is prior art, but that's not.  Where

36

 1   have you seen that before?" -- that the examiner approved the

 2   claim.

 3          So the patent prosecution disagreement -- Your Honor

 4   is familiar with this -- makes it pretty clear that the

 5   entire --

 6          THE COURT:  Well, this language is in claim 1 of the

 7   issue patent.

 8          MR. TAYLOR:  Yes.

 9          THE COURT:  It's also in claim 18 --

10          MR. TAYLOR:  Yes.

11          THE COURT:  -- of the issue patent --

12          MR. TAYLOR:  Yes.

13          THE COURT:  -- the same language --

14          MR. TAYLOR:  Right.

15          THE COURT:  -- that you're talking about, this

16   constraint language.  There is an argument they make about what

17   is invention and what is not invention.  But you argue that

18   there is an inventive key or disk of the patent, and that's

19   this constraint.  And you say now that Verdiell goes back and

20   he tells the Patent Office, "I'll add this to one."  And was it

21   already in 18?

22          MR. TAYLOR:  Well, what was in 18 was everything

23   that you -- 18, I think, was the same.  I should check that,

24   Your Honor, about 18.  I believe 18 was the same as we see in

25   the issue patent.

                                                                37

1          THE COURT:  And it was the same --

2          MR. TAYLOR:  Yeah.

3          THE COURT:  -- both 18 and 1?

4          MR. TAYLOR:  Right.  So the question --

5          THE COURT:  Then it's the same as old 59?

6          MR. TAYLOR:  Right.  So the question is:  What is the

7   independent conception evidence of Mr. Shum that this is his

8   invention?

9          THE COURT:  Right.  Okay.  Well, the first step is --

10  let us say that I agree with your argument that there is such a

11  thing as it's not an invention unless you have this language.

12  And so this language is what makes it an invention.  And this

13  language, then -- you have to go back now and find out, Whose

14  language is it?  And it was in the original application.

15         MR. TAYLOR:  Now I understand Your Honor's question

16  better.  Our position is that the language that you see without

17  the amendment is also a description of the invention; that the

18  added language, the inherits of the CTE -- and the patent

19  prosecution history which I have here, I can show Your Honor --

20  was added.  And they even say to the examiner, "We're trying to

21  make this even clearer."

22         But the invented element of this patent is what you

23  see in number 3.  We'll add something to it to make it clear,

24  but the notion that the in plain coefficient of thermal

25  expansion of the metal layer can be constrained by the ceramic,

1    just alone, this is the inventive aspects, whether or not it

2    has the amendment piece to it.

3            **THE COURT:**  I'm not sure what you mean by

4    amendment --

5            **MR. TAYLOR:**  The added language.

6            **THE COURT:**  -- if the language is the invented

7    element.

8            **MR. TAYLOR:**  Well, so our position would be that

9    subpart 3, as it's written in claim 18 but also as it's written

10   with additional words in claim 1 --

11           **THE COURT:**  What are the additional words?

12           **MR. TAYLOR:**  The additional words in -- I can hand

13   this to Your Honor, if you would like.

14           Let me read the whole thing, and then I'll tell you

15   what the additional words are.

16           **THE COURT:**  Okay.

17           **MR. TAYLOR:**  It's short.  The words that are in both

18   claims read as follows.  "The in plain coefficient of thermal

19   expansion for then CTC of said metal layer is constrained by

20   said insulating substrate."  That's in both.

21           The language that's added right after that is and

22   said metal layer inherits the in plain CTE of said insulating

23   substrate.  So what the record shows is that the idea that the

24   CTE of the metal layer could be constrained could be so

25   strongly bonded to the ceramic that it wouldn't move even if --

PDF created with pdfFactory trial version www.pdffactory.com

1    it wouldn't expand even if heated, that it would be so

2    constrained, it would have the same CTE, that comes from

3    Mr. Verdiell's trip to that ECT.

4         THE COURT:  But what's the difference?  Are you

5    saying that this language that says "inherits" is the reason

6    there is an invention?

7         MR. TAYLOR:  Okay.  So if I may -- I made only one

8    copy of this, Mr. Kirsch.  This is from the summary judgment

9    from the patent prosecution.

10        So, Your Honor, I'm going to hand you two documents,

11   one at a time.  The first one is the amendment that was made to

12   the claim.  And this is actually how it was given to the Patent

13   and Trademark Office.

14        And the second is the letter that -- or submission to

15   the PTO by the applicant that was made in conjunction with that

16   just a few days later where Mr. Verdiell is explaining that he

17   doesn't think the examiner has focused on the language that we

18   just looked at in subpart 3.  But to make it more explicit,

19   he's adding the language on the amendment.

20        But the claim by the applicant is that the examiner

21   didn't focus adequately the first time on the language that was

22   there, but to make it clear that they would add the list.

23        THE COURT:  Well, let's go back to the sequence,

24   though.

25        MR. TAYLOR:  Yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1              THE COURT:   The inventive element is the constraint?

2              MR. TAYLOR:   Correct.

3              THE COURT:   And the constraint was in the original

4      patent application submitted by Radiance, having Shum as the

5      inventor?

6              MR. TAYLOR:   Correct.

7              THE COURT:   And we contrast that with the end now or

8      the inventive element is now adopted by Verdiell?

9              MR. TAYLOR:   Correct.

10             THE COURT:   And he says, "I'm the inventor," whereas

11     Radiance said before that Shum is the inventor.

12             MR. TAYLOR:   And Mr. Shum -- and we have this in the

13     evidence -- essentially admits that Mr. Verdiell is the

14     inventor, in our opinion, when he says --

15             THE COURT:   When he's saying -- when they put it in

16     first place -- when they originally put it in -- they put in

17     that Shum did this invention and they knew that that was

18     wrong -- I mean, if Verdiell did it and they put it in Shum's

19     name alone, they are telling the Patent Office that Shum

20     invented this thing, and that includes that language.

21             MR. TAYLOR:   Exactly.

22             THE COURT:   Is that a misrepresentation to the Patent

23     office.

24             MR. TAYLOR:   I think it was a misrepresentation by

25     Mr. Shum because I think Mr. Shum later --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Well, it's by Radiance.  It's by Shum

2   because he's the inventor, but it includes the whole thing.

3   It's done on behalf of Radiance.

4          MR. TAYLOR:  No, no -- yes.  But to say that Mr. Shum

5   was the inventor of that aspect was not correct.  But that's --

6          THE COURT:  Then does everybody know that?  I mean,

7   does Verdiell know that?  Radiance knows that, obviously.

8   Verdiell knows that also.

9          MR. TAYLOR:  Well, that's what Mr. Alboszta is

10  raising and saying, "What do you want to do about that?"  He's

11  asking to withdraw.  That's what caused -- on the fraud claim,

12  that's what caused --

13         THE COURT:  Well, I never heard anybody explain what

14  language was that Alboszta was supposed to be saying, "This is

15  why I'm an inventor."

16         MR. TAYLOR:  Well, I think Mr. Alboszta said -- All

17  we know, is Mr. Alboszta said to Mr. Shum, "Mr. Verdiell says

18  he's an inventor on this patent."

19         THE COURT:  Well, "I'm an inventor" is different than

20  saying, "I am the inventor," which is what you're saying now --

21         MR. TAYLOR:  So --

22         THE COURT:  Which is that Shum was not the inventor.

23  Therefore, what we put in is a patent that had the wrong

24  inventor.

25         MR. TAYLOR:  So our position on that application

PDF created with pdfFactory trial version www.pdffactory.com

1    which Your Honor is focused on is that, yes, it does contain

2    the same language.  That application, in and of itself, is not

3    corroborating evidence of conception by Mr. Shum.

4           **THE COURT:**  Fine.

5           **MR. TAYLOR:**  It is not the kind of contemporary

6    conception evidence that is required to prove inventorship.

7           **THE COURT:**  Fine.  But if we go back --

8           **MR. TAYLOR:**  Yes.

9           **THE COURT:**  -- and we leave that out for the moment,

10   in terms of what's going on with it, if I say, Okay, that this

11   was really invented by Verdiell in a sense that he's the one

12   that conceived of the constraint notion --

13          **MR. TAYLOR:**  Right.

14          **THE COURT:**  -- fine.  But he also knows that they put

15   in a phony application, then, in saying that Shum was the one

16   who conceived it.  Is that correct?

17          **MR. TAYLOR:**  Well, he knows that the application

18   contains his inventions.  His testimony has been that he did

19   not know at the time that all inventors needed to be on the

20   application; that he learned that later.  But he did know that

21   that was his invention, not Shum's.  Yes, Your Honor.

22          **THE COURT:**  All right.  So -- and then when he learns

23   that, with Alboszta, he and Alboszta are talking about the fact

24   that Shum didn't invent this, I did, and we've got to now

25   change this whole thing?  That doesn't seem to me the way the

43

PDF created with pdfFactory trial version www.pdffactory.com

1    interaction went, the way it's set up.  You've got to add

2    Verdiell to the patent now rather than replace Verdiell.

3           **MR. TAYLOR:**  Well, I don't think there was

4    discussion.  As you can see in the draft letters, there is not

5    discussion about replacing.  There was discussion in that

6    application which the evidence would show contains ideas from

7    both.  They should both -- they should be withdrawal and they

8    should both be on the application.  The later application,

9    which plaintiff always refers to as "identical," the one that

10   was actually identical, that's not identical.  That's the

11   problem.

12          **THE COURT:**  Okay.  What -- can you tell me what was

13   in the original application that you say is a product of Shum's

14   conception that was taken out of the next one.

15          **MR. TAYLOR:**  Sure.  We -- and there is an exhibit in

16   the trial record which we can show Your Honor.  There is a

17   red-line copy of the patent application which shows the lensing

18   technology in the application that was filed and later

19   withdrawn, the one we're talking about now, that is Shum's

20   information.  When Mr. Verdiell went to refile for LightLogic,

21   the reason for the red line, is he took that out and he

22   replaced it with his own lensing ideas.

23          But it kept the -- it maintained the concept of the

24   CTE constraint.  So he tried to file a patent and I think did

25   file a patent that contained only his own ideas after this one

1    was withdrawn and he was on his own.

2            **THE COURT:**  Okay.

3            **MR. TAYLOR:**  So I don't know.  I hope that answers

4    Your Honor's questions.  But our position on the direct line

5    copper is simply that.

6            I guess -- on inventorship, very quickly, you know,

7    Your Honor, our position on inventorship is pretty simple in

8    the sense that the standard is high, and it's very different in

9    the sense that Mr. Shum really does have to persuade a jury

10   under the Northern District model rules that it's highly

11   probable that he's an actual inventor of these patents.

12           And then, as Your Honor knows as well or better than

13   any of us, there are laws very specific about what kind of

14   evidence he can submit to demonstrate or prove that he actually

15   is an inventor.  And that's the corroborating evidence

16   requirement that we talked about.

17           And just to break it down so Your Honor can

18   understand our position and what we see, we believe that the

19   law that we have cited in our brief requires that Mr. Shum

20   really demonstrate, with independent evidence -- not with his

21   testimony, but with independent evidence -- three separate

22   things:  One, that he personally conceived of the idea that's

23   disclosed in the patent and that he can't use his own testimony

24   to buck this thing, nor can he use his own witness doctor.

25           Second, he's got to show that the idea disclosed is

1    actually inventive -- it was not -- it's the idea that would

2    enable or partly enable the patent to become patentable, or the

3    invention to be patentable.

4           And third, that the disclosure was -- that whatever

5    document we're talking about or whatever disclosure we're

6    talking about was contemporaneous, that it wasn't made at some

7    significantly later date.

8           On this evidentiary record, Mr. Shum is not relying

9    on summary judgment --

10          **THE COURT:**  So that I get the way it's presented in

11   your papers is you have discussed this; you, in effect, list

12   the things, that is assessment of what they're relying on as an

13   evidentiary basis of their inventorship position?

14          **MR. TAYLOR:**  Right.

15          **THE COURT:**  And so we start with the notion that what

16   you have said is an accurate description of their position --

17          **MR. TAYLOR:**  Right.

18          **THE COURT:**  -- that is that what you have outlined as

19   being the underlying evidence is, in fact, what they're relying

20   on.  And then you analyze that in terms of the corroboration

21   issues and the conception issues?

22          **MR. TAYLOR:**  And the problem is how really weak,

23   noncorroborating, the evidence is.  When you really strip it

24   all away, we have the flexure -- that drawing on the back of

25   the catalog book, which is undated, it's unwitnessed, it's

                                                              46

1   unsigned.  We don't know anything about it.  It's not even

2   clear what it relates to.

3          We have CAD drawings, and we have the testimony that

4   he did all the CAD drawings.  And they postdate Verdiell's

5   record.  And so you have -- the issue of the CAD drawing

6   without his testimony doesn't meet his burden.  He needs his

7   testimony to do it.

8          And then the only other real piece of evidence on

9   that, with one exception, is this calculation, mathematical

10  calculations in his lab notebook that even with his testimony

11  don't make any sense and don't tie to this invention in any

12  way.  We've tried to make this clear.

13         But there is no new tie to those to conception of

14  anything having to do with the flexure invention, and that's

15  the flexure of it.

16         Now he has -- I should be clear, Your Honor.  He has

17  his own record of invention documents, a printed record of

18  invention of the plainer implementation of a pivot flexure.

19         And in order for Your Honor to decide this motion in

20  our favor, Your Honor would have to construe the term late.

21  And I think it can be construed.  It can be construed now as

22  evidence before the Court.  Actually, the Court now has --

23         **THE COURT:**  This is interesting as to whether or not

24  what we did in the original trial, the 256 trial, counts

25  anymore --

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. TAYLOR:**  Right, right.

2          **THE COURT:**  -- I mean, when it doesn't have anything

3    to do with any jury decision.  I mean, the jury doesn't get to

4    do claim construction anymore.  It used to, but they can't do

5    it anymore.

6          **MR. TAYLOR:**  Right.

7          **THE COURT:**  So I don't know why the Federal Circuit's

8    ruling would have any effect upon what the Court has done by

9    way of claim construction.  That's part of your argument.

10   You're going to have to convince me somehow.

11         **MR. TAYLOR:**  Other than vacating it so Your Honor has

12   to do it again, that's all.  I mean, that evidence is all the

13   same.

14         You know, it's interesting, on dual enclosure, we

15   have the same situation.  I mean, the evidence just doesn't

16   come close to rising to the level of being corroborated.  We

17   have a parts list, which Your Honor is familiar with, and

18   that's all it is, is a parts list.

19         And then we have a drawing of something that's got

20   two enclosures that comes -- I don't know -- maybe three months

21   after what Mr. Verdiell's record of invention is.  But more

22   importantly, this drawing doesn't show any of the elements of

23   the -- at least the key elements in the one claim that's at

24   issue.

25         It doesn't show the heat pipe.  It doesn't show how

PDF created with pdfFactory trial version www.pdffactory.com

1    that heat is being dissipated away.  It doesn't show that the

2    second enclosure is, you know, coupled to the other one in the

3    way it's described in the claim.

4             And all it shows is that there is essentially a

5    container into which you're going to put another object.  And

6    there is nothing that ties that, nothing that ties that to the

7    claims in the patent.  It doesn't suggest or rise to the level

8    of corroborating evidence of conception of this claim at all.

9             And then we come down to DVC, and I won't -- I just

10   will remind Your Honor of one thing on DVC because it really is

11   important.

12            We not only know that the key inventive element is

13   made clear in the prosecution history, but we know from

14   Mr. Knox's testimony -- and this is also before Your Honor and

15   in the record.  We know from Mr. Knox's testimony that, with

16   respect to claim 1, not only had he seen, he had worked with

17   every element in claim 1 prior to the time the application was

18   filed, except the last one, except the CTE constraint.  That's

19   the only one he hadn't seen before.  But he personally worked

20   with them all.  So that is the only inventive element.

21            Then we have Verdiell's essentially like engineering

22   notes -- and those come out of his calendar -- where he makes

23   all of his notes in his drawing when he goes to that conference

24   at ECTC, and he identifies this product.

25            And then what we got in the new discovery was

49

1    Mr. Shum's very important admission when he is drafting the

2    Army report or the proposal for a grant.  And he has an italics

3    in that proposal.

4              "Mark, how about adding your BEO substrate idea" --

5    or "BEO substrate?"  And in response to that, we get another

6    version of the report, and it's full of references to exactly

7    what Mr. Verdiell saw at ECTC, the CTE constraint, the copper

8    bond and all of it.

9         **THE COURT:**  And when you say that he said, "adding

10   your," that means it's an admission that it's done by Verdiell?

11        **MR. TAYLOR:**  And even more is what happens

12   afterwards, what happens in the next draft.  And the next draft

13   is -- it just unloads almost verbatim what we see as being

14   listed in Mr. Verdiell's notes.

15             So, you know, for example, Your Honor, Mr. Verdiell's

16   notes talk about direct copper bond.  He identifies brush

17   wellman.  He talks about how this is used in the automotive

18   industry.  He talks about the fact that you can use BEO.  He

19   talks about the ceramic substrate and so on and so forth.

20             When you then read the next report after Mr. Shum

21   asks if he could add a substrate, you see the same thing.  You

22   see a ceramic substrate, you see BEO, you see reference to in

23   the automotive industry, you see identification of the same

24   vendor.  And this is -- there is not any evidence to the

25   contrary.

PDF created with pdfFactory trial version www.pdffactory.com

1          This is where the CTE concept comes from and gets

2    into that patent.  And Mr. Shum has no evidence of conception,

3    of contemporaneous evidence of conception of that invention.

4          They do focus, Your Honor -- you may have noticed

5    this -- on what they claim is an admission by Mr. Verdiell in

6    an e-mail message where he's dealing with what should he

7    disclose to SDL, his employer, about whether or not -- should

8    he disclose to them anything about any inventions or

9    proprietary information that belongs to others.

10          And he writes an e-mail to Mr. Shum and he says,

11   "Clearly, the packaging patent is proprietary information that

12   belongs to you, so it should not be disclosed to SDL."

13          And the plaintiff argues that's an admission of

14   Mr. Shum as an inventor, and we disagree.  We say, at most,

15   that's a reference to who the patent might belong to.  And even

16   that's ambiguous because there wasn't a patent and not even a

17   patent application at this point.  But our argument, Your

18   Honor, is that --

19          **THE COURT:**  This is a factual argument?

20          **MR. TAYLOR:**  Huh?

21          **THE COURT:**  It's a factual argument?

22          **MR. TAYLOR:**  It is a factual argument, except to the

23   extent that when you get to conception and who conceded and

24   what Mr. Shum's burden is, that he has to demonstrate it's

25   highly probable that he conceded he must do that with

PDF created with pdfFactory trial version www.pdffactory.com

1   independent conception.

2        **THE COURT:**  Well, it's factual -- the issue that has

3   to be resolved by the person who has the burden of clearing the

4   S & M?

5        **MR. TAYLOR:**  If the Court considers that to be an

6   admission that relates to conception.  We don't think it is.

7   We think that ownership of a patent is different than

8   conception of an invention, and that's our argument on that.

9        **THE COURT:**  But would you say that it's factual?  The

10  argument -- you're saying you have the better side of facts.

11  You're just saying they don't meet their burden?  That's what

12  your argument is?

13       **MR. TAYLOR:**  Maybe.  I've stated our position.  But I

14  wanted to bring that to Your Honor's attention.

15       **THE COURT:**  Okay.

16       **MR. TAYLOR:**  Because when I say he has no evidence, I

17  think that's the only piece of evidence that he has that would

18  relate to it.

19       **THE COURT:**  All right.

20       **MR. TAYLOR:**  Okay.  Thank you, Your Honor.

21       **THE COURT:**  Okay.

22       **MR. KIRSCH:**  Your Honor, I think I'll take in order

23  Mr. Taylor's argument on each of the state law causes of action

24  first, and then go to the inventorship claim.

25       With regard to the unjust enrichment claim, it's

PDF created with pdfFactory trial version www.pdffactory.com

1   critical for this Court to understand that the contract at

2   issue, the plan of liquidation, is only between Mr. Verdiell

3   and Mr. Shum regarding the dissolution of Radiance.  It is not

4   between LightLogic and Intel and Mr. Shum.

5           LightLogic and Intel are not parties to the

6   agreement.  And therefore, the contract as a matter of law,

7   cannot preclude an unjust enrichment claim against LightLogic

8   and Intel.

9           The Court recognized, when Mr. Taylor was arguing

10  that the POL and the Court's interpretation of the POL does not

11  permit unlawful patenting.  That's the essence of our unjust

12  enrichment claim, that they fraudulently cut patents,

13  fraudulently assigned and then obtained millions of dollars.

14          There is nothing in the POL that covers how Mr. Shum

15  is going to be compensated if Verdiell, LightLogic and Intel

16  fraudulently patent.  And therefore, under the law, the cases

17  they cite, California Medical and Wal-Noon, the POL and our

18  unjust enrichment claim don't cover the same subject matter.

19          In fact, the case that's closest on point here is the

20  Chow case, a Federal Circuit case, which held that a university

21  professor could be liable to the students he was working with

22  as a potential joint inventor for unjust enrichment when he

23  went out and filed a sole inventorship patent on their work

24  product.

25          We incorrectly in our briefs said that the university

PDF created with pdfFactory trial version www.pdffactory.com

1   could be liable, but it's actually the university professor who

2   stands in the same position as Mr. Verdiell here.

3           So their cases stand for the proposition, including

4   California Medical, which they put most of their weight on,

5   that if there is remuneration spelled out in a contract for

6   what will happen in case of X, then the parties are limited to

7   those express terms.  And that's correct and that makes sense.

8           **THE COURT:**  Okay.  Well, also Chow talks about the

9   idea that you're supposed to look and see what was an

10  enrichment and what wasn't an enrichment, or what was a benefit

11  and what wasn't a benefit.

12          **MR. KIRSCH:**  Correct.

13          **THE COURT:**  And if you don't add both inventors, it

14  doesn't make any difference to the party who obtains rights to

15  the patent.  They got the rights to the patent, and it doesn't

16  matter whether the patent says one inventor or two inventors.

17          The argument being that if you're looking at unjust

18  enrichment to Intel in terms of their own conduct, that they're

19  not enriched by the fact that there wasn't a naming of

20  Mr. Shum.  It doesn't make any difference to them.  So there is

21  no change in their enrichment by the economy.

22          **MR. KIRSCH:**  Well, they're certainly liable for

23  LightLogic's --

24          **THE COURT:**  No, that's different.

25          **MR. KIRSCH:**  Correct.

54

1    **THE COURT:**  I mean, it's one thing to say that

2  Verdiell did something that unjustly enriches himself in

3  that -- that's unjust enrichment.  It's another thing to say

4  that whatever Verdiell did, Intel is responsible for it because

5  they buy his shoes.  But it's another thing to say that Intel

6  did something that is an act of unjust enrichment.

7    What I'm saying is that Chow seems to be supporting

8  the notion that if the only thing that happened is that Intel

9  got a patent that didn't name all the inventors, that it

10  doesn't make any difference to their enrichment.  So there is

11  no unjust enrichment to them.

12    **MR. KIRSCH:**  But that's not the only thing that

13  happened in this case.  In this case, Intel knew, according to

14  Verdiell, because he told them everything, that there were

15  issues about Shum's inventorship and rights.  And so they went

16  ahead and purchased these patents, which have, by the way,

17  substantial value, more than Intel paid for them.  And they

18  obtained the right to exclude under the patent laws,

19  partially --

20    **THE COURT:**  But they would get that because of

21  Inventor Verdiell.  I mean, if Verdiell is an inventor, they

22  get -- all these are steps along the way.

23    **MR. KIRSCH:**  Right.

24    **THE COURT:**  If you look at it as it exists now, they

25  have a patent that was invented, as far as the PTO is

PDF created with pdfFactory trial version www.pdffactory.com

1    concerned, by Verdiell, and they can exclude anybody they want

2    now because that's their patent.

3         **MR. KIRSCH:**  If we can prove sole inventorship, that

4    would be true.

5         **THE COURT:**  No, but then that's like taking away the

6    patent.  You have to now eliminate the patent because you're

7    saying that if the patent doesn't exist because it was obtained

8    inequitably, unlawfully, or whatever you want to call it, then

9    at that point, Intel, they lose everything.  So they're not

10   going to get enriched there, either.  So if you had all this

11   stuff, then they don't get enriched because there is no patent.

12        And if the patent still remains because Verdiell is

13   an inventor, then you're not enriched by the addition of his

14   name, either.  So where does Intel do anything that makes them

15   unjust?

16        **MR. KIRSCH:**  Well, I think -- I think it's -- one

17   issue of law that they don't respond to is that, through

18   respondeat superior, even after --

19        **THE COURT:**  It's the same.  That's something else.

20   That's something else.

21        **MR. KIRSCH:**  Okay.

22        **THE COURT:**  If they are liable for what the other

23   actor did -- okay, leave out the other actor -- the question

24   is:  Did they do something that makes them in a position where

25   they should unjustly -- or they have a benefit that they're

PDF created with pdfFactory trial version www.pdffactory.com

1    unjustly detained.

2          MR. KIRSCH:  Well, for instance, I think it's Exhibit

3    N to the MacDonald Declaration -- I'm not sure.  But in 2003,

4    Intel filed, through Jean-Marc Verdiell, an assignment where

5    they fraudulently, according to us, said that they had the

6    entire right, title and interest to one of the flexure patents.

7          THE COURT:  Well, all that means is they have what

8    the Patent Office thinks, is that they've got the right, title

9    and interest to this patent that the Patent Office issued to

10   Verdiell.  So as far as that's concerned, if you look at just

11   what it looks like, that's perfectly right.  What they say is

12   correct.

13         If you now go in and you say, "No, that patent is no

14   good because of what Verdiell did," that's something else.  But

15   they don't know that.

16         MR. KIRSCH:  Sure.  Well, they do know it because

17   through the doctrine of respondeat superior, they're

18   responsible for Verdiell, for Verdiell's actions and

19   Verdiell's --

20         THE COURT:  Well, they're not responsible for his

21   thought pattern.  They're responsible for what he did before

22   they even talked to him?

23         I mean, you're saying they're responsible for what

24   Verdiell did when he goes to the Patent Office?  I mean, in

25   terms of his thought pattern?

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. KIRSCH:**  They're not responsible for his thought

2    pattern; I agree with that.

3          **THE COURT:**  So I don't know how -- they may be

4    responsible under respondeat superior, whatever.  But that

5    means they're responsible for something that Verdiell did

6    that's wrong.

7          Okay.  Now, the question is:  What did they do that's

8    wrong, leaving out Verdiell?

9          **MR. KIRSCH:**  And I understand Your Honor's argument.

10   I understand that.

11         So the point, though -- the important point for the

12   unjust enrichment claim is that LightLogic -- if they enter it,

13   though, it's unlawfully patented and it's not covered by the

14   plan of liquidation.  And we claim -- their argument that it's

15   clear-cut, that these contracts should preclude this unjust

16   enrichment claim, has no basis in law even according to their

17   own authority.

18         **THE COURT:**  Well, you've got to distinguish between

19   the argument that goes to whether Verdiell has done something

20   wrong, as opposed to whether Intel has done something wrong.

21   That's what I'm saying.  And I'm trying to figure out where it

22   is that Intel did anything wrong that gets them into a position

23   where they independently have an unjust enrichment liability.

24         **MR. KIRSCH:**  Well, my -- the essence of the argument

25   is what they did after 2001 when they acquired LightLogic and

PDF created with pdfFactory trial version www.pdffactory.com

1    Verdiell and the other employees of LightLogic continued the
2    fraud, if you will.  But -- and I held them responsible through
3    respondeat superior.  But I understand -- not other than that.
4              **THE COURT:**  Okay.  All right.
5              **MR. KIRSCH:**  All right.  Another point on the unjust
6    enrichment claim very quickly:  They don't even mention,
7    defendants don't even mention that this plan of liquidation was
8    fraudulently induced.  At least there is a factual issue about
9    that.
10             We allege and they haven't even addressed the factual
11   issues about Mr. Verdiell hiding the investor and customer
12   interest in this IP.  And that's why Mr. Shum entered into this
13   plan of liquidation.  So we don't think the contract should
14   preclude it.
15             **THE COURT:**  Okay.  So we'll get to the next -- that
16   also runs through the track of fiduciary duty.
17             **MR. KIRSCH:**  True.  On the breach of contract claim,
18   I think the Court recognized that what defendants were arguing
19   that fraudulently patenting, fraudulently giving defendants,
20   was still a breach of the provisions of the POL.
21             And for instance, in 2001, after Mr. Shum went to
22   Robertson Stephens and came back to Intel and asked for an
23   understanding of what his rights were -- we have this in his
24   declaration -- Intel wouldn't provide him any acknowledgment of
25   his rights.  So we think that's another breach --

                                                              59

1          THE COURT:  Of what?

2          MR. KIRSCH:  -- of -- of -- well, excuse me.  It's

3  not a breach of the POL.  But it's another circumstance where

4  Mr. Shum was precluded from obtaining his equal rights under

5  the plan of liquidation.

6          THE COURT:  He has a right to have Intel tell him

7  what he wants them to tell him?

8          MR. KIRSCH:  No, he doesn't have that.  But he has a

9  right to have Verdiell, who is now at Intel, not do anything to

10  prohibit him from obtaining his equal rights, inventorship or

11  ownership rights, in those patents.

12          THE COURT:  Well, that's something Verdiell did or

13  failed to do?

14          MR. KIRSCH:  Correct.

15          THE COURT:  That's not Intel.

16          MR. KIRSCH:  Okay.  I agree that the breach of

17  contract claim is just between Verdiell and Shum.  It's not

18  Intel.

19          THE COURT:  All right.

20          MR. KIRSCH:  On the breach of fiduciary duty and

21  fraudulent concealment claim, I think this is where I would

22  like to spend some time, because the Persson case is legally

23  and factually distinguishable from this case.  It's legally

24  distinguishable from this case because, in Persson, the

25  plaintiff did not allege, as we have here -- at least not in

                                                              60

```
 1    the Court of Appeals decision -- that he has standing to assert
 2    a fiduciary duty that the officer had to the corporation.
 3             THE COURT:  But that doesn't create a personal
 4    fiduciary duty on his part.  That creates something with
 5    reference to standing.
 6             MR. KIRSCH:  Correct.
 7             THE COURT:  I mean, if we're running through the
 8    standing, we're talking about he has standing that is based
 9    upon Verdiell's existing fiduciary duty to the corporation.
10             MR. KIRSCH:  Correct.
11             THE COURT:  But that doesn't create a personal duty
12    on his part.
13             MR. KIRSCH:  Correct.  It creates a duty from
14    Verdiell to the corporation.  And this Court has held and it's
15    law in the case that Shum can recover for his injury caused by
16    that breach.
17             THE COURT:  But he's got to do it on the basis that
18    the corporation can recover.  He can't recover anything the
19    corporation has.
20             MR. KIRSCH:  Correct.
21             THE COURT:  So you have to show me that the
22    corporation has suffered something by a breach of fiduciary
23    duty by Verdiell.
24             MR. KIRSCH:  And I think we have.  I mean,
25    essentially --
```

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Well, they're saying -- you haven't even

2     raised that.  This is not a suit where the corporation is suing

3     Verdiell for his breach.

4          **MR. KIRSCH:**  Well, I wasn't aware that we had to

5     formally amend the complaint to add Radiance.

6          **THE COURT:**  Okay.

7          **MR. KIRSCH:**  If we have to, we can.  But essentially,

8     Radiance was fraudulently developed by Mr. Verdiell.  That's

9     our argument, and Mr. Shum was damaged thereby in the

10    subsequent fraudulent patent.

11         And I think, based on the Court's previous ruling

12    that Mr. Shum has standing to sue for Radiance's injury, we can

13    easily amend the complaint to add Radiance as a plaintiff.

14         **THE COURT:**  Well, at this stage, really, it's a

15    question of you state -- you don't have to add it.  You at

16    least have to add it in terms of what factual basis there is.

17         **MR. KIRSCH:**  Well, and the factual basis is that all

18    of this intellectual property was Radiance's.  And Mr. Shum and

19    Mr. Verdiell had ownership interest in Radiance.  And then

20    Verdiell, through his fraud, transfers it all to his company,

21    LightLogic, according to him, the total successor to Radiance,

22    taking it away from Radiance and taking it away from

23    Mr. Shum's interest.  And so that's the damage to Radiance.

24         **THE COURT:**  Well, he can only patent this.

25         **MR. KIRSCH:**  Excuse me?

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  He can patent all this if he does it

2    lawfully.

3          **MR. KIRSCH:**  Right.  But if it's unlawful --

4          **THE COURT:**  Wait, wait, wait.  In that sense, he can

5    take -- there is nothing that says he can't patent what Shum

6    had invented as a matter of fact.  He can patent that, as long

7    as he does it lawfully.

8          **MR. KIRSCH:**  Correct.  And that's our allegation,

9    that he didn't do it lawfully.

10         **THE COURT:**  All right.  But that means that the

11   breach now is with the PTO.  It's not with what he did

12   vis-a-vis Shum, see?

13         **MR. KIRSCH:**  Well, I'm not sure I understand.

14         **THE COURT:**  Okay.  Well, I'm not saying it right.

15   I'm saying that, then it means that what he does that is a

16   breach of fiduciary duty is what he does with the Patent

17   Office.  And you say that has to relate back because that is

18   breaching his duty to Radiance?

19         **MR. KIRSCH:**  Correct.  And the way it relates back --

20   I'll try to be clearer -- is Radiance was fraudulently

21   dissolved, according to us, and as part of that fraudulent

22   dissolution in the POL, the confidentiality agreement between

23   Verdiell and Shum was dissolved.

24         If that was not dissolved -- if that provision is

25   stricken, then all of the -- all of the IP that is filed and

1    assigned in the next several years should be and inure to the

2    benefit of Radiance, not LightLogic.  That's the express terms

3    of the confidentiality agreement that was fraudulently

4    dissolved through Mr. Verdiell's conduct.

5            And that's why he damaged Radiance and also damaged

6    the 50 percent owner of Radiance, Mr. Shum, who is also the 50

7    percent -- or potentially joint inventor in this intellectual

8    property.

9            THE COURT:  All right.  Well, let's go back to

10   Persson.  You saying that Persson supports your case?

11           MR. KIRSCH:  I said it's legally and factually

12   distinguishable, legally distinguishable because it did not

13   include the issue of a fiduciary duty to the corporation.

14           THE COURT:  Well, let me ask you, if Persson doesn't

15   apply to this circumstance, then what does?

16           MR. KIRSCH:  Well, City of Hope does.  City of Hope

17   says it's a question of fact.  It's a Supreme Court case.

18           THE COURT:  Well, City of Hope says it's a question

19   of fact.  But it also said, You know what?  On the facts that

20   happened here, it's no good.

21           MR. KIRSCH:  And the reason they said that is because

22   the plaintiff in the case below only argued that there was a

23   breach of fiduciary duty as a matter of law, and that's not

24   what we're arguing.  We're arguing that either as a matter of

25   law or as a question of fact.

64

1          **THE COURT:**  But if it's a question of fact, then it's

2   a question of fact in terms of Rule 56, which means if you

3   have -- if the facts are this, and they're undisputed, if

4   that's not enough to get to a fiduciary duty in California law,

5   it's out.

6          **MR. KIRSCH:**  Right.  And I think the facts are very

7   strong that there is a fiduciary duty.

8          **THE COURT:**  What is the fact that makes it a

9   fiduciary duty under California law?

10          **MR. KIRSCH:**  The strongest fact is that these --

11   Mr. Shum and Mr. Verdiell were joint inventors, working

12   together, on a -- under an express confidentiality agreement,

13   and that is the key.

14          **THE COURT:**  Well, how does that create fiduciary

15   duty?

16          **MR. KIRSCH:**  Because the key to a fiduciary duty is a

17   confidential relationship, per City of Hope.

18          **THE COURT:**  Well, no, no.  They talk about

19   vulnerability.

20          **MR. KIRSCH:**  Right.

21          **THE COURT:**  Do they have to be vulnerable over and

22   above being confidential?

23          **MR. KIRSCH:**  Well, I think they are vulnerable in a

24   confidential relationship.

25          **THE COURT:**  Is that the argument, that Shum is

PDF created with pdfFactory trial version www.pdffactory.com

1   vulnerable to Verdiell?

2           **MR. KIRSCH:**  That's not the argument, but it's one of

3   the arguments that, in a confidential relationship, where they

4   are working together to create IP, Mr. Shum is vulnerable --

5   and -- excuse me -- Mr. Shum is vulnerable to Mr. Verdiell's

6   whim of exploiting that confidentiality, of taking the secrecy

7   of the IP and turning around and selling it to somebody else,

8   which he did.

9           **THE COURT:**  Well, it's not secret.

10          **MR. KIRSCH:**  Well, it is secret.

11          **THE COURT:**  But under the POL, he can do that.  I

12  mean, his problem is that -- not that he couldn't do it, but he

13  didn't do right.  Because he didn't say to the PTO, you know,

14  I'm an inventor and so is this other guy.  If he had done that,

15  there is nothing wrong, right?

16          **MR. KIRSCH:**  But the POL would never have been

17  entered into, we don't believe, if Mr. Verdiell had said,

18  "Mr. Shum, I've got evaluations from these customers that say

19  the inventions that we're working on that we put into

20  Radiance" --

21          **THE COURT:**  Then there is a question in terms of

22  whether there is a duty.

23          **MR. KIRSCH:**  Well, I think there is a duty, as an

24  officer of the corporation, number one.

25          **THE COURT:**  No, that's not -- that's definitely not

                                                                    66

1  what <u>Persson</u> said.  I mean, the fact that you're co-officers

2  don't mean you've got a fiduciary duty to one another.

3       **MR. KIRSCH:**  Well, I think co-officers working under

4  a confidentiality agreement do have fiduciary duty.

5       **THE COURT:**  I don't know anything -- any case that

6  says that.  That's your argument.  But I don't know any case

7  that you can show me that says that.

8       **MR. KIRSCH:**  Well, I think <u>City of Hope</u> essentially

9  says that's a question of fact and it's a fact-intensive issue

10  based on how the parties -- what the parties were working on,

11  what agreements they were working under, whether or not there

12  was secrecy and whether or not there was confidentiality.

13       **THE COURT:**  Okay.

14       **MR. KIRSCH:**  On the fraud claim, I think the Court

15  recognized that the issue of justifiable reliance is a question

16  of fact.

17       **THE COURT:**  But is that -- I mean, has that been

18  cited?  I mean, the argument that's made to get to that point

19  whether there is a question of fact, you agree with that?

20  That's your theory in terms of now there is a fraud?

21       **MR. KIRSCH:**  No.  In fact, we don't rely on the

22  statement of Alboszta.  We rely on the statement of Verdiell

23  through Mr. Alboszta.  We don't have to allege --

24       **THE COURT:**  I don't understand that.  I mean, you

25  don't rely on what Alboszta said?

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. KIRSCH:**  Well, we do, but we're not blaming

2     Alboszta.  We -- you know, he -- I think the Court has already

3     decided that he's out of the case.  We couldn't rely on him.

4          But we have allegations -- and I think it's -- in our

5     brief that Mr. Verdiell was acting through Alboszta for his

6     benefit.  And it's a question of fact he was acting -- telling

7     Mr. Alboszta to tell Mr. Shum to --

8          **THE COURT:**  Okay.  That's simply a question about

9     whether or not the representation that you say is the basis of

10    the fraud is attributable back to Verdiell?

11         **MR. KIRSCH:**  Correct.

12         **THE COURT:**  Even assuming it is, their argument is:

13    There is no reliance on that.  That's the reliance, not that

14    Verdiell is responsible for it or not.  It's a question of

15    there is no reliance.

16         **MR. KIRSCH:**  And I think there is a question of

17    reliance based on the facts of this case because these parties

18    are joint inventors.  They're involved under a confidentiality

19    agreement and that --

20         **THE COURT:**  But how does that affect this reliance or

21    non-reliance?  And I'm sorry, I must have missed it.

22         **MR. KIRSCH:**  Because parties -- I think parties are

23    owed -- well, it goes back to the fiduciary duty question, I

24    guess.

25         **THE COURT:**  Okay.  Well, then that's -- you can't say

PDF created with pdfFactory trial version www.pdffactory.com

1   that the reason there is a fiduciary duty is because there is a

2   question about a fiduciary duty.

3           **MR. KIRSCH:**  No, I understand.  I understand.  If

4   there isn't a fiduciary duty, I think it's -- I think it's the

5   fact that Mr. Shum and Mr. Verdiell were engaged in an

6   enterprise before the Patent Office, and they were joint

7   inventors of -- or alleged joint inventors of a patent.  And

8   therefore, there were -- there's duties that each -- that they

9   owe to each other.

10          **THE COURT:**  Is this one of these deals were they

11  both -- where there were reciprocal fiduciary duties?

12          **MR. KIRSCH:**  Well, I don't think -- I think they owe

13  each other duties as joint inventors.  For instance --

14          **THE COURT:**  Well, does that mean that if Verdiell

15  owes Shum a fiduciary duty, that Shum owes Verdiell a fiduciary

16  duty?

17          **MR. KIRSCH:**  Yes.  In the Patent Office, for

18  instance, if Mr. Verdiell files a patent that he knows Mr. Shum

19  to be a joint inventor of, he must name Mr. Shum, and vice

20  versa.

21          **THE COURT:**  But that's a duty to the Patent Office.

22  Okay.

23          **MR. KIRSCH:**  I actually think it's a duty --

24          **THE COURT:**  Okay.  All right.

25          **MR. KIRSCH:**  Okay.

69

1           **THE COURT:**  Okay.  Go ahead.

2           **MR. KIRSCH:**  All right.  On the inventorship

3    issues --

4           **THE COURT:**  Well, let me ask you this:  Is there some

5    evidence that you have, you think that would show that Mr. Shum

6    invented the concept of constraint?

7           **MR. KIRSCH:**  Okay.  Yes, the application.  And they

8    say the patent application is not a sufficient contemporaneous

9    document.  But the patent application under the law is a

10   sufficient contemporaneous document.

11          And that patent application, as the Court pointed

12   out, contained that constraint limitation.  Now, I would

13   implore that the Court not assume that there is a key inventive

14   element.

15          **THE COURT:**  We went through this before.  I mean, I'm

16   not supposed to think like that.  But I'm certainly going to

17   allow that there is some thinking that -- I tend to agree with

18   that.  Because you don't get an invention when you combine all

19   these things that are non-inventive unless you've got something

20   in there that convinces them that there has been an invention.

21   Something has to be there.

22          **MR. KIRSCH:**  And you know what.  I think there is

23   something there, and it's the combination of elements that are

24   well-known in the art.

25          **THE COURT:**  Not just that.  There has to be some sort

PDF created with pdfFactory trial version www.pdffactory.com

1   of intentioned element that makes it into an invention, not

2   just a bunch of things that are known to the arts that are

3   recited.

4           MR. KIRSCH:  But it's the special combination.  And

5   if I could, I'd point the Court to Mr. Verdiell's September 15,

6   1996 letter.  Contemporaneous evidence.  It's MacDonald

7   Declaration Exhibit 11 -- L -- excuse me.  And he's talking to

8   his patent agent, and he is describing how the first patent

9   application that they will soon file in Shum's name alone,

10  should be a good application, should be patented.  Because even

11  though it contains a quote, well-known substrate, which is

12  direct bonded copper, what Mr. Verdiell has found at the

13  Florida conference, it is placed into an unusual optical

14  packaging scheme.  And that is what the step patent is about,

15  an unusual optical packaging scheme, based on the --

16          THE COURT:  That is the bonding of the substrates and

17  what?

18          MR. KIRSCH:  -- based on elements that are already in

19  the prior art.  And that, in fact, Your Honor, is what the law

20  says.

21          THE COURT:  So there shouldn't be a patent at all

22  because it's obvious, huh?

23          MR. KIRSCH:  No, I think, now, the law on obviousness

24  has changed, I understand.  But obviousness does not

25  immediately say combination patents of elements that are in the

71

1    prior art are not patentable.

2           **THE COURT:**  Well, is this Shum's idea or is it

3    Verdiell's idea?  Is it your position that it's Shum's idea

4    because they put in the patent application listing Shum?

5           **MR. KIRSCH:**  Well, I think there is a question of

6    fact about it, and I think there is substantial evidence that

7    there is a question of fact about that issue.

8           **THE COURT:**  But I'm asking you what the evidence

9    says.  You say the evidence so far is that they put in a patent

10   application?

11          **MR. KIRSCH:**  Right.  And the evidence on the step

12   patent that Mr. Shum is at least a joint inventor goes back to

13   the 1994 ROI that shows he was aware of the issue, the 1996,

14   April 15th, our proposal, where Mr. Verdiell and Mr. Shum were

15   working on elements of that patent, and Mr. Verdiell referred

16   to it as his team, the team of Mr. Verdiell and Shum working on

17   that patent issue.

18          **THE COURT:**  That's at -- that's an opinion that this

19   was conceived of by Shum?

20          **MR. KIRSCH:**  No.  It's an opinion that they were

21   working together on the issue.

22          **THE COURT:**  Well, how does that prove that there was

23   conception by one or the other?

24          **MR. KIRSCH:**  It doesn't -- it proves that there is an

25   issue of fact, that Mr. Shum was involved.

                                                              72

1          **THE COURT:**  He's involved in something that doesn't

2     have any proof at all about who conceived what.

3          **MR. KIRSCH:**  But Your Honor, this is the mistake that

4     I think the defendants have tried to place upon this Court.

5     The Court does not have to look at evidence broken down into

6     bits and pieces.  It needs to look at all of the evidence,

7     taken collectively.

8          **THE COURT:**  Ultimately, I have to come down and say,

9     "It was conceived of by the mind of Shum."

10         **MR. KIRSCH:**  No, that's not correct, because it

11    also -- if he's a sole inventor, yes.  But if he's a joint

12    inventor, there is no ah-ha moment between joint inventors.

13    It's -- that argument falls by the wayside.

14         **THE COURT:**  But that's a -- somehow or other that the

15    mixture includes conceptions by both in order to be

16    co-inventors.  So you've got to have somebody conceived

17    something along there?

18         **MR. KIRSCH:**  Correct.

19         **THE COURT:**  And you've got to have something that

20    shows me that Shum conceived something.

21         **MR. KIRSCH:**  Correct.  And under the law, under 35

22    U.S.C. 102, the inventorship process includes conception and

23    reduction to practice.  And reduction to practice ends

24    constructively at the time of the patent application.  So

25    Mr. Shum's draft patent application and his patent application

1    are contemporaneous documents which evidence --

2          **THE COURT:**  But you still have to go back and find

3    something that is conceived of by Shum.

4          **MR. KIRSCH:**  And it's contained in the first patent

5    application.

6          **THE COURT:**  What is?

7          **MR. KIRSCH:**  It's the entire step patent and all the

8    claims of the step patent, and that's what the Court has to

9    address.

10          **THE COURT:**  But one of the claims of the step patent

11    is the constraint.

12          **MR. KIRSCH:**  Correct, one.

13          **THE COURT:**  But that's not done by Shum.  At least

14    that's --

15          **MR. KIRSCH:**  That's the issue.

16          **THE COURT:**  They're saying that he did.

17          **MR. KIRSCH:**  That's the issue.  There is a -- they

18    claim that they went to the ECTC conference and found this

19    substrate.

20          **THE COURT:**  Right, right.

21          **MR. KIRSCH:**  Well, Mr. Verdiell testified -- it's in

22    our record -- that before he went, before Mr. Verdiell went,

23    Mr. Shum was talking to Mr. Verdiell about what Mr. Shum was

24    building.  Mr. Shum was building the step patent, the step

25    invention, step technology, back in April, May of 1996, and

74

1   that's his testimony, which, under the summary judgment --

2           **THE COURT:**  Well, how does that show that he

3   conceived of anything?

4           **MR. KIRSCH:**  Because taken as a whole, as the Court

5   must, and all inferences in Mr. Shum's favor, it led to the

6   patent application that Mr. Shum filed a few months later.

7           **THE COURT:**  It doesn't matter whether it leads to it.

8   It still has to be a Shum conception along there that someplace

9   in this whole game, you've got to have that.

10           **MR. KIRSCH:**  But the patent application, in and of

11   itself, can be the evidence of conception, Your Honor.  And I

12   think that's something that the Court from the previous trial

13   didn't understand.  The defendants argued this, and I think it

14   is critically important for the purposes of summary judgment.

15           **THE COURT:**  But you're not telling me that I can get

16   to a co-inventorship or a sole inventorship without any

17   conception by the inventor?

18           **MR. KIRSCH:**  No, not at all.

19           **THE COURT:**  Okay.  So that would be a conceding

20   moment of some sort?

21           **MR. KIRSCH:**  No, not a conceding moment.

22           **THE COURT:**  Okay, whatever.  If it's conceding, it's

23   got to be banged into our head or it's written down or

24   whatever.  But there has to be something conceived of that is

25   in that patent?

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. KIRSCH:**  Right.

2          **THE COURT:**  And all I'm saying -- and so far, all you

3  have told me is that the patent application shows that Shum had

4  something to do with everything in there.  And that -- so that

5  makes him a -- that he concedes all this sort of thing.

6          **MR. KIRSCH:**  That's correct.

7          **THE COURT:**  Well, that's your argument.  I'm not sure

8  I agree with that.

9          **MR. KIRSCH:**  Okay.  I think the law is pretty clear

10  under the Federal Court -- Federal Circuit's standards --

11          **THE COURT:**  Right.

12          **MR. KIRSCH:**  -- that a patent application should be

13  considered evidence of conception.  I think we cite the law in

14  our briefs.  And I think that it's a question of fact from

15  there on who conceived of this invention.

16          I mean, we have a plethora of other evidence,

17  including Mr. Verdiell's admission --

18          **THE COURT:**  Okay.  What that means is -- your

19  argument is that because the patent application was put in and

20  it has a constraint language, that when the constraint language

21  gets into the patent that's issued, is that the fact that that

22  was in the application patent means that Shum who is listed as

23  the inventor invented it when it got put in the Verdiell

24  application?

25          **MR. KIRSCH:**  Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  But that's -- and the only thing that

2    sustains that is that it was a part of the original patent

3    application?

4          **MR. KIRSCH:**  Well, I disagree.  I think it's not the

5    only thing that sustains that.  That's the documentary

6    contemporaneous evidence that sustains that.  But the Court

7    should consider all the other evidence.

8          **THE COURT:**  Well, what is the other evidence?

9          **MR. KIRSCH:**  The other evidence is Mr. Shum's

10   testimony that he was working on the step patent in the months

11   before that.  And that is to be considered.

12          It's also Mr. Verdiell's testimony and the documents

13   that indicate they were working as a team on this -- on this

14   issue.  There is also -- the Court should consider the

15   subsequent admissions by Mr. Verdiell at the time that Mr. Shum

16   was the sole owner or it was proprietary information of

17   Mr. Shum.

18          And then the information over the next few months and

19   years even should be considered when Mr. Verdiell tries to buy

20   out Shum's interest.

21          And I would also like to point the Court to a very

22   important document that wasn't emphasized at the last

23   inventorship trial.  It's July 15, 1998, Exhibit EE to

24   MacDonald Declaration, at page MV 24430.  And in that document,

25   Mr. Verdiell admits that the patent application that he filed

PDF created with pdfFactory trial version www.pdffactory.com

1    one day after the dissolution of Radiance was not significantly

2    changed from the Shum application.

3              **THE COURT:**  Is that what he said?

4         **MR. KIRSCH:**  That's what he said.

5              **THE COURT:**  What's -- it's in a letter or something?

6         **MR. KIRSCH:**  It's in a letter to Ridge Partners

7    Venture Capitalists who he was discussing funding with.

8              **THE COURT:**  Okay.  EE, MW 243334.

9         **MR. KIRSCH:**  MV 24430.

10           **THE COURT:**  MV?

11        **MR. KIRSCH:**  Yes.  It's a Marc Verdiell document.

12           **THE COURT:**  24430.  Okay.

13        **MR. KIRSCH:**  So that evidence, circumstantial

14   evidence, but very powerful, that Mr. Shum admits he didn't

15   make significant changes from the Shum application.  And all of

16   that goes into the pot and should be considered for determining

17   whether or not Mr. Shum or Mr. Verdiell were telling the truth,

18   essentially a question of credibility which precludes summary

19   judgment.

20           **THE COURT:**  Well, I couldn't say, you know, Verdiell

21   is not credible.  That proves that Shum invented something.

22   That doesn't prove he invented anything.  It just means that

23   he's not credible.  So you've got to go back and do something

24   that says that Shum invented something.  And so far, we've got

25   the application, and he worked on a step patent, something that

1   he.

2           **MR. KIRSCH:**  And that Mr. Verdiell admitted that he

3   didn't make significant changes in it.

4           **THE COURT:**  Well, see, I don't know that Verdiell's

5   admission, in and of itself, can be sufficient evidence that

6   there was a conception.

7           **MR. KIRSCH:**  I agree with you.  Mr. Verdiell's

8   admission, in and of itself, is not enough.  But taken

9   together, with everything else, I think it is.

10          **THE COURT:**  Okay.

11          **MR. KIRSCH:**  One final point:  I think the Court

12  raised this about claim construction.

13          You didn't understand why we should go back and

14  revisit the leg issue?  And I understand why -- it's not that

15  appealing to me, frankly, either, but I think it's necessary.

16  It's necessary to determine --

17          **THE COURT:**  Well, do it, if you want to.  I'm just

18  saying that I don't know that -- if the Court issues a claim

19  construction that -- nobody so far has changed Marco.  And it

20  means that that's good and everybody else has got to go along

21  with it, except the Federal Circuit -- they don't go along with

22  anything.  Okay.  But everybody else has got to go along with

23  it while it's still there.

24          And it's not a jury issue.  And so them telling me I

25  should have a jury trial doesn't tell me that I should now have

PDF created with pdfFactory trial version www.pdffactory.com

1   the jury do claim construction.

2          **MR. KIRSCH:**  Oh, I don't think you should have the

3   jury do claim construction.  What we're arguing is exactly what

4   the defendants argued in their -- to get reconsideration, which

5   is there has been a significant change of law.  And the

6   Phillips case from the Federal Circuit, which was issued two

7   weeks after your previous decision --

8          **THE COURT:**  Right.

9          **MR. KIRSCH:**  -- significantly changed the law and

10  said you don't look at dictionary definitions first.  You look

11  to the intrinsic evidence.

12         **THE COURT:**  I wholly agree with that.  I think that

13  the pre-Phillips law was crazy.  But that doesn't mean that I

14  did it.  Okay.

15         So you're saying that because you changed the way in

16  which courts can look at claim construction, that means I

17  should change the claim construction I already did?

18         **MR. KIRSCH:**  Well, not automatically.  But I think if

19  you look at the arguments we made in the claim construction

20  brief, it's very persuasive that the intrinsic evidence in this

21  case means that a leg doesn't have to necessarily extend

22  downward.

23         And for purposes of summary judgment, I'll also say

24  we have evidence in the record that Mr. Shum was involved in

25  the flexure patents and the downward extending legs along with

PDF created with pdfFactory trial version www.pdffactory.com

1    or before Mr. Verdiell.  So that precludes summary judgment.

2    So it's not dispositive of summary judgment.

3              **THE COURT:**  Okay.  Well, we have, I guess, the issue

4    about when we can get to the leg.

5              Do I understand that everybody has agreed that's the

6    only one that I should be looking at?

7              **MR. KIRSCH:**  That's correct, Your Honor.

8              **MR. TAYLOR:**  Yes, Your Honor, that's true.  That's

9    correct.

10             **THE COURT:**  Do you think we should have a hearing on

11   that?  I mean, I don't have the papers yet.  But if you gave me

12   all the papers, can I read all the papers and do that?

13             **MR. TAYLOR:**  The briefing is complete and we do not

14   think a hearing is necessary.

15             **MR. KIRSCH:**  The briefing is complete and we would --

16   we would prefer a short time, maybe a half hour, to discuss

17   with the judge the issues that are raised in the briefing.  I

18   think --

19             **THE COURT:**  You like to argue.

20             **MR. KIRSCH:**  Actually, I don't think it will be me

21   that time.

22             **THE COURT:**  No, that's fine.  I don't care.  We'll do

23   that.

24             All right.  Let's see where we are now.

25             Do you want to say anything, briefly, now?  Just

PDF created with pdfFactory trial version www.pdffactory.com

1   briefly say something.

2          **MR. TAYLOR:**  I would like just to make one comment,

3   Your Honor, about unjust enrichment.  Your Honor asked a good

4   and important question because Your Honor asked whether

5   unlawful patenting is covered by the plan of liquidation.  If

6   it is covered by the plan of liquidation, then I think there

7   can be no unjust enrichment claim under our cases.  And if it's

8   not, it's a question.  So I just wanted to refer Your Honor to

9   two places that make it quite clear that unlawful patenting,

10  while not permitted by the plan of liquidation, is covered by

11  the plan of liquidation.

12         One -- and this is referenced, Your Honor, in our

13  reply brief on pages 5 and 6, is that's exactly the position

14  that Mr. Shum took; that the fraudulent -- I'm quoting -- the

15  fraudulent and inaccurate patent applications -- and then he

16  ends up saying constitute breaches of the plan of liquidation.

17  And that's what his breach of contract clause of action says.

18         But perhaps more importantly, Your Honor, in the 2004

19  summary judgment order, acknowledged that Mr. Shum was making

20  the argument to the Court that, for Mr. Verdiell to file patent

21  applications that didn't recognize Mr. Shum as an inventor

22  would have been in violation of this requirement that the

23  parties have equal rights to independently exploit the

24  technology developed by the corporation.

25         Because we were arguing federal preemption and

                                                              82

1    Mr. Shum responded, "No, it's a breach of the plan of

2    liquidation if they're unlawfully filed."

3            And Your Honor -- and this is on pages 24 and 25 and

4    that summary judgment order -- Your Honor said, accordingly,

5    the Court finds that Shum's interpretation of that provision is

6    not preempted by federal patent law.

7            So based on accepting his argument that an unlawful

8    patent would be a breach of the plan of liquidation, the Court

9    projected our preemption argument.  So he's argued every way

10   you can that that's covered.  And we think it is covered.

11   Therefore, there's certainly not unjust enrichment against

12   Verdiell, and there can be no unjust enrichment against third

13   parties.  So I just wanted to make that clear.

14           **THE COURT:**  It's a subject matter of the POI.

15           **MR. TAYLOR:**  Right.  With respect to Mr. -- just the

16   one comment about the Verdiell admission.  I'm looking at the

17   exhibit.  I just don't see it.  I'm sure it's in there, but I

18   don't see an admission at all.

19           I do see a reference in that exhibit to Mr. Verdiell

20   saying that significant changes would have had to have been

21   made in that original application if it was to be refiled.

22           **THE COURT:**  Well, this isn't the sort of thing that

23   happens all the time, is that, one, we identify a specific

24   document, and we have some language in the document, and then

25   counsel writes in the brief that this language means so and so.

PDF created with pdfFactory trial version www.pdffactory.com

1   Then I've got to go back and read it and see whether I agree

2   with you.

3           So what you're saying is, if he says that if I read

4   that language, it will be an admission by Verdiell that they

5   are significantly the same, and you're saying that it doesn't

6   do that.

7           **MR. TAYLOR:**  I just don't see the language that he

8   indicates.  That's just a minor point.

9           **THE COURT:**  So it just comes down to the way I read

10  it and then I agree with one or the another.

11          **MR. TAYLOR:**  Right.  And then, with respect to --

12  well, Your Honor, I have nothing to add.  I was going to say

13  something about the fiduciary duty, but I think it's clear to

14  Your Honor.

15          **THE COURT:**  Then just briefly.

16          **MR. KIRSCH:**  The only thing I would like to say is

17  about this document that Mr. Taylor just referenced.  It says,

18  and I quote, the step patent that Mr. Verdiell filed the day

19  after the POL dissolution would have been of value only if we

20  managed to buy back Frank's rights or if it had been issued

21  after significant changes from the original application.  Since

22  none of these conditions are likely at this point, our legal

23  counsel tells us to abandon it.  And they didn't make any

24  significant changes, and they didn't abandon it, and they got

25  the same -- they got the patent based on the Shum application.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Well, okay.  It comes down to what I'm

2     supposed to read because then its significance is disputed.

3          **MR. KIRSCH:**  Correct.

4          **THE COURT:**  So it's up to me to now -- to try to

5     interpret the language in some fashion and somehow come up with

6     what I think it meant?

7          **MR. KIRSCH:**  Yes, Your Honor.

8          **THE COURT:**  Okay.  All right.  All right.  We have

9     half an hour set aside for legs.  When is that?  In two weeks

10    or something like that?

11         **MR. TAYLOR:**  August 15th, I believe, Your Honor.

12         **THE COURT:**  Okay.  Well, then we will see you there,

13    and I'll be contemplating this thing in the meantime.  So this

14    is submitted, and we will see you on the 15th.

15         **MR. KIRSCH:**  Thank you, Your Honor.

16         **MR. TAYLOR:**  Thank you, Your Honor.

17              *(Hearing concluded at 3:48 p.m.)*

18

19

20

21

22

23

24

25

85

PDF created with pdfFactory trial version www.pdffactory.com

1               CERTIFICATE OF REPORTER

2       I, MARGARET "MARGO" GURULE, Pro Tem Court Reporter for the

3  United States Court, Northern District of California, hereby

4  certify that the foregoing proceedings in Case No. 02-03262

5  DLJ, Shum v. Intel, were reported by me, a Certified Shorthand

6  Reporter, and were thereafter transcribed under my direction

7  into typewriting; that the foregoing is a true record of said

8  proceedings as bound by me at the time of filing.

9       The validity of the reporter's certification of said

10  transcript may be void upon disassembly and/or removal from the

11  court file.

12

13

14

15

16

17                              _____
                                MARGARET "MARGO" GURULE
                                CSR No. 12976
18                              August 6, 2008

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com