UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**ORIGINAL**

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | **JURY TRIAL** |
| | ) | |
| PLAINTIFF, | ) | **VOLUME 15** |
| | ) | |
| VS. | ) | NO. C 02-3262 DLJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| JEAN-MARC VERDIELL AND | ) | **PAGES 3196 - 3411** |
| LIGHTLOGIC, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | WEDNESDAY, DECEMBER 10, 2008 |

<u>TRANSCRIPT OF PROCEEDINGS</u>

APPEARANCES:

FOR PLAINTIFF:          TOWNSEND AND TOWNSEND AND CREW LLP
                        TWO EMBARCADERO CENTER, EIGHTH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94111-3834
                   BY:  MARK T. JANSEN,
                        PAUL F. KIRSCH,
                        ANGUS M. MACDONALD,
                        ROBERT A. MCFARLANE, ATTORNEYS AT LAW

FOR DEFENDANTS:         TAYLOR & CO. LAW OFFICES
                        ONE FERRY BUILDING SUITE 355
                        SAN FRANCISCO, CALIFORNIA  94111
                   BY:  STEPHEN E. TAYLOR
                        JESSICA GRANT, ATTORNEYS AT LAW


                        KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                   BY:  RAGESH K. TANGRI, ATTORNEYS AT LAW



REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258

```
 1                          I N D E X

 2    DEFENDANTS' WITNESSES                        PAGE    VOL.

 3    GORMAN, JOHN C.

 4    DIRECT EXAMINATION BY MR. TANGRI             3202    15

 5    CROSS-EXAMINATION BY MR. MACDONALD           3216    15

 6    REDIRECT EXAMINATION BY MR. TANGRI           3226    15

 7

 8    SIVAKUMAR, RAMAMURTHY

 9    DIRECT EXAMINATION (RESUMED) BY MS. GRANT    3228    15

10    CROSS-EXAMINATION BY MR. MACDONALD           3263    15

11    REDIRECT EXAMINATION BY MS. GRANT            3296    15

12    RECROSS-EXAMINATION BY MR. MACDONALD         3306    15

13

14    TIMMINS, JIM

15    DIRECT EXAMINATION BY MS. GRANT              3309    15

16    VOIR DIRE EXAMINATION BY MR. JANSEN          3312    15

17    DIRECT EXAMINATION (RESUMED) BY MS. GRANT    3314    15

18    DIRECT EXAMINATION (RESUMED) BY MS. GRANT    3368    15

19    CROSS-EXAMINATION BY MR. JANSEN              3391    15

20

21    SCHAEPE, CHRISTOPHER

22    DIRECT EXAMINATION BY MS. GRANT              3329    15

23    CROSS-EXAMINATION BY MR. KIRSCH              3347    15

24    REDIRECT EXAMINATION BY MS. GRANT            3363    15

25    RECROSS-EXAMINATION BY MR. KIRSCH            3367    15
```

1

2

**E X H I B I T S**

3 | TRIAL EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
4 | 473 | | | 3344 | 15 |
5 | 735 | | | 3277 | 15 |
6 | 815 | | | 3257 | 15 |
7 | 2724 | | | 3354 | 15 |
8 | 2728 | | | 3336 | 15 |

9

10

11                    --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, DECEMBER 10, 2008                    8:59 A.M.

 2                    P R O C E E D I N G S

 3             (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

 4   PRESENCE OF THE JURY:)

 5             THE CLERK:  REMAIN SEATED.  COURT IN SESSION.  COME

 6   TO ORDER.

 7             MR. JANSEN:  GOOD MORNING, YOUR HONOR.  LAST NIGHT,

 8   WE SUBMITTED A REQUEST TO YOUR HONOR TO GET TWO ADDITIONAL

 9   HOURS OF TIME FOR THE PLAINTIFF AND THE DEFENSE EACH TO

10   COMPLETE THEIR CASE.  WE JUST NEED -- RIGHT NOW, I THINK, ON

11   THE 37 AND A HALF HOURS THAT YOU CUT US BACK TO A WEEK AGO

12   MONDAY, WE JUST HAVE -- RIGHT NOW WE HAVE 36 MINUTES LEFT, AND

13   WE JUST HONESTLY NEED MORE TIME.

14             WE'VE TRIED TO BE AS EFFICIENT AS POSSIBLE TO MEET

15   THE TIME RESTRAINTS IMPOSED SINCE LAST MONDAY, AND WE'VE --

16   WE'VE REALLY REDUCED CROSS-EXAMINATION.  WE CUT OUT SOME

17   WITNESSES WE WANTED FOR OUR CASE-IN-CHIEF, BUT I THINK IN ORDER

18   TO BE ABLE TO -- WITHOUT -- IN ORDER TO BE ABLE TO

19   CROSS-EXAMINE THE REMAINING WITNESSES, WE NEED THE ADDITIONAL

20   TWO HOURS WE'RE ASKING FOR.  AND I THINK WE SUBMITTED A

21   CALCULATION THAT, BASED ON THE AMOUNT OF TIME WE USE PER DAY OF

22   COURT TIME, ABOUT FIVE AND A HALF HOURS, YOU COULD GRANT THE

23   REQUEST FOR EACH SIDE TO GET AN ADDITIONAL TWO HOURS AND WE

24   STILL WOULD COMPLETE THE CASE BY THE CLOSE OF BUSINESS ON

25   MONDAY.
```

3200

```
 1              SO WE REQUEST THAT.

 2              THE COURT:  OKAY.  I THINK THAT AS FAR AS YOUR

 3  REQUEST TO HAVE ENOUGH TIME TO FINISH OFF CROSS-EXAMINATION, I

 4  THINK THAT'S GOT TO BE -- YOU HAVE TO HAVE THAT.  SO I DON'T

 5  HAVE ANY PROBLEMS WITH THAT.  AND I DON'T KNOW WHETHER YOU'RE

 6  THINKING ABOUT PUTTING ON ANYBODY ELSE, WE HAVE TO CONSIDER

 7  THAT.  BUT AS FAR AS HAVING ENOUGH TIME TO FINISH YOUR

 8  CROSS-EXAMINATION, I DON'T HAVE ANY PROBLEM WITH IT.

 9              MR. JANSEN:  THANK YOU.

10              MR. TAYLOR:  SO, YOUR HONOR, ADDRESSING THAT

11  CONCERN, 'CAUSE THAT'S WHAT THEY SAY IN THEIR PAPERS, IT'S A

12  CROSS-EXAMINATION CONCERN --

13              THE COURT:  RIGHT.

14              MR. TAYLOR:  -- I THINK THIS WILL WORK OUT.

15              BUT HERE'S OUR ISSUE, KNOWING THEY'VE USED QUITE A

16  LOT OF TIME, AND SOME OF OUR WITNESSES HAVE A REAL SCHEDULING

17  CONSTRAINT.  SO TODAY, WE HAVE FOUR WITNESSES THAT WE MUST HAVE

18  GET UP AND DOWN TODAY.

19              THE COURT:  WELL, LET'S GET GOING.

20              MR. TAYLOR:  AND I THINK WE'LL GET GOING QUICKLY,

21  AND I THINK OUR DIRECT WILL TAKE LESS THAN FOUR HOURS.

22              THE COURT:  WELL, YOU CAN SQUEEZE DOWN YOUR DIRECT,

23  AND I THOUGHT YOU CUT DOWN ON CROSS.  AND THAT -- WHEN I SAY

24  YOU CUT DOWN, I THINK YOU DID CUT DOWN BEFORE, BUT THAT MEANS

25  YOU CUT DOWN, BUT BEFORE, MAYBE YOU SPENT TOO MUCH TIME.
```

```
 1                     BUT THAT'S -- BUT I THINK YOU CAN DO CROSS.  SO

 2   LET'S GET GOING, AND WE HAVE AN OUT OF ORDER WITNESS RIGHT NOW.

 3              MR. TAYLOR:  OKAY.

 4              THE COURT:  YOU CAN FINISH CROSS.

 5              MR. JANSEN:  THANK YOU, YOUR HONOR.

 6                   (PAUSE IN THE PROCEEDINGS.)

 7                   (OFF-THE-RECORD DISCUSSION.)

 8              MR. KIRSCH:  WE, I THINK, TALKED ABOUT ARGUING JURY

 9   INSTRUCTIONS ON THIS FRIDAY.

10              THE COURT:  RIGHT.

11              MR. KIRSCH:  WHAT TIME WOULD THAT BE?  CAN YOU TELL?

12              THE COURT:  FRIDAY AFTERNOON.

13              MR. KIRSCH:  FRIDAY AFTERNOON AT 2:00?

14              THE COURT:  SOMETHING LIKE THAT.

15              MR. KIRSCH:  ALL RIGHT.  THANK YOU.

16                   (PAUSE IN THE PROCEEDINGS.)

17                   (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

18   PRESENCE OF THE JURY:)

19              THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

20              JURORS:  GOOD MORNING.

21              THE COURT:  COUNSEL.

22              MR. TANGRI:  YOUR HONOR, AT THIS TIME, DEFENDANTS

23   WOULD CALL A WITNESS, DUE TO SCHEDULING CONCERNS, OUT OF ORDER,

24   MR. JOHN GORMAN.

25              THE COURT:  ALL RIGHT.  WE'RE GOING TO BREAK INTO
```

1  THE TESTIMONY OF THE WITNESS WHO'S ON THE STAND AND HAVE

2  ANOTHER WITNESS, BECAUSE OF SPECIFIC CONDITIONS, PUT ON NOW,

3  AND THEN WE'LL GO BACK TO THE WITNESS THAT'S ALREADY ON THE

4  STAND.

5          PLEASE GO AHEAD.

6                    **JOHN C. GORMAN**,

7  CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

8  TESTIFIED AS FOLLOWS:

9          **THE CLERK:**  PLEASE BE SEATED, AND THEN SCOOT UP TO

10 THE MIKE, AND THEN PLEASE STATE YOUR FULL NAME AND SPELL YOUR

11 LAST NAME.

12         **THE WITNESS:**  JOHN C. GORMAN, LAST NAME IS

13 G-O-R-M-A-N.

14                  **DIRECT EXAMINATION**

15 **BY MR. TANGRI:**

16 **Q.**    GOOD MORNING, MR. GORMAN.

17 **A.**    GOOD MORNING.

18 **Q.**    WHAT IS YOUR OCCUPATION, SIR?

19 **A.**    I'M AN ATTORNEY.

20 **Q.**    AND WILL YOU PLEASE SUMMARIZE BRIEFLY YOUR EDUCATIONAL

21 BACKGROUND FOR US.

22 **A.**    SURE.  I GRADUATED WITH A DEGREE IN ECONOMICS FROM THE

23 UNIVERSITY OF ILLINOIS IN 1976.  AND I HAVE A LAW DEGREE FROM

24 STANFORD THAT I GOT IN 1979.

25 **Q.**    AND WHAT DID YOU DO AFTER GETTING YOUR LAW DEGREE FROM

GORMAN — DIRECT / TANGRI

 1    STANFORD IN '79?

 2    **A.**    I WORKED FOR A LARGE LAW FIRM IN CHICAGO.

 3    **Q.**    WHICH FIRM WAS THAT?

 4    **A.**    SONNENSCHEIN CARLTON (PHONETIC).

 5    **Q.**    AND DID THERE COME A TIME WHEN YOU RELOCATED YOUR LAW

 6    PRACTICE?

 7    **A.**    YES, I MOVED TO LOS ANGELES IN 1982.

 8    **Q.**    AND WHERE DID YOU WORK WHEN YOU WERE IN LOS ANGELES?

 9    **A.**    FIRM CHANGED NAMES SEVERAL TIMES, BUT WHEN I JOINED THEM

10    IT WAS SHAPIRO LAW FIRM --

11    **Q.**    DID THERE COME A TIME WHEN YOU RELOCATED AGAIN?

12    **A.**    YES.  IN 1988, I CAME TO SAN JOSE.

13    **Q.**    AND WHERE DID YOU WORK WHEN YOU CAME TO SAN JOSE?

14    **A.**    -- FOUNDING PARTNER OF -- I WAS A FOUNDING PARTNER OF A

15    LAW FIRM CALLED MINUTELL (PHONETIC) AND GORMAN.

16    **Q.**    AND WHAT YEAR WAS THAT?

17    **A.**    1988.

18    **Q.**    AND WHAT FIRM DO YOU WORK AT NOW?

19    **A.**    IT'S CALLED GORMAN & MILLER.  WE SET THAT UP JANUARY OF

20    1994.

21    **Q.**    AND HOW MANY LAWYERS WORK AT GORMAN & MILLER TODAY, SIR?

22    **A.**    SIX.

23    **Q.**    AND WHAT SORT OF LAW DOES GORMAN & MILLER PRACTICE?

24    **A.**    WE DO A FULL-SERVICE BUSINESS AND COMMERCIAL -- AND ALSO

25    REAL ESTATE PRACTICE, WHICH WOULD INCLUDE CORPORATE

1    TRANSACTIONS, INTELLECTUAL PROPERTY, BUSINESS LITIGATION.

2    **Q.**    AND DO YOU PERSONALLY WORK IN ALL OF THOSE AREAS?

3    **A.**    I DO.

4    **Q.**    AND WAS THE NATURE OF YOUR PRACTICE SIMILAR TO THAT IN

5    1997?

6    **A.**    YES.

7    **Q.**    AND YOU WERE AT GORMAN & MILLER IN 1997?

8    **A.**    THAT IS CORRECT.

9    **Q.**    AND HOW MANY ATTORNEYS WERE EMPLOYED AT GORMAN & MILLER

10   IN 1997?

11   **A.**    BELIEVE IT WOULD BE ABOUT FIVE, BUT I DON'T RECALL

12   EXACTLY.

13   **Q.**    HAVE YOU EVER REPRESENTED A MAN NAMED JEAN-MARC VERDIELL?

14   **A.**    YES.

15   **Q.**    DID YOU REPRESENT HIM IN 1997?

16   **A.**    YES, IT STARTED IN 1997.

17   **Q.**    HOW DID YOU COME TO REPRESENT DR. VERDIELL --

18   MR. VERDIELL?

19   **A.**    HE GAVE -- HE CALLED ME AND SAID HE WANTED TO COME IN AND

20   SPEAK WITH ME ABOUT A PENDING MATTER.

21   **Q.**    DID THAT MATTER RELATE IN ANY WAY TO A MAN NAMED FRANK

22   SHUM?

23   **A.**    CORRECT.

24   **Q.**    AND IF YOU COULD JUST DESCRIBE GENERALLY, WITHOUT

25   REFERENCE TO SPECIFIC COMMUNICATIONS, BUT GENERALLY THE SUBJECT

GORMAN – DIRECT / TANGRI

 1  MATTER OF THAT REPRESENTATION, SIR.

 2  **A.**    IT HAD TO DO WITH A COMPANY CALLED RADIANCE DESIGN AND

 3  THE FACT THAT MR. VERDIELL AND MR. SHUM WERE NOT GETTING ALONG

 4  AND WANTED TO EXPLORE -- OR MR. VERDIELL WANTED TO EXPLORE WHAT

 5  OPTIONS MIGHT BE AVAILABLE TO BE -- EITHER DISASSOCIATE OR

 6  RESOLVE THE IMPASSE.

 7  **Q.**    AND DO YOU RECALL ROUGHLY WHEN IN 1997 THIS WAS?

 8  **A.**    I BELIEVE IT WAS IN THE EARLY FALL TIME, LIKE SEPTEMBER.

 9  **Q.**    AND DID THERE COME A TIME WHEN YOU MET MR. SHUM

10  PERSONALLY?

11  **A.**    YES.

12  **Q.**    WHEN WAS THAT?  WHEN WAS THE FIRST TIME YOU MET MR. SHUM

13  IF YOU CAN RECALL?

14  **A.**    IT WOULD BE EITHER LATE SEPTEMBER OR EARLY OCTOBER OF

15  1997.

16  **Q.**    AND WHAT WAS -- WHAT CIRCUMSTANCE WAS THAT?

17  **A.**    MR. SHUM HAD RETAINED A LARGE LAW FIRM TO REPRESENT HIM,

18  AND WE HAD A MEETING AT THE OTHER LAW FIRM'S OFFICE.

19  **Q.**    AND WHAT -- DO YOU RECALL THE NAME OF THE LAW FIRM --

20  LARGE LAW FIRM, I THINK YOU SAID, THAT WAS RETAINED TO

21  REPRESENT MR. SHUM?

22  **A.**    YEAH, IT WAS CALLED COUDERT BROTHERS.

23  **Q.**    AND DID YOU HAVE AN UNDERSTANDING IN 1997 AS TO THE

24  RELEVANT SIZE OF COUDERT BROTHERS?

25  **A.**    COUDERT, AT THAT TIME, WAS, I BELIEVE, ONE OF THE LARGER

1   LAW FIRMS IN THE WORLD.  THEY WERE ONE OF THE FIRST

2   INTERNATIONAL LAW FIRMS.

3   Q.    AND WHO ATTENDED THIS FIRST MEETING THAT YOU JUST

4   MENTIONED?

5   A.    MYSELF, MR. VERDIELL, MR. SHUM, AND HE HAD TWO ATTORNEYS,

6   LUCAS CHANG AND JOE MASON.

7   Q.    AND WERE -- WERE BOTH OF MR. SHUM'S ATTORNEYS FROM

8   COUDERT BROTHERS?

9   A.    YES.

10  Q.    DID ANYONE ELSE ATTEND ON YOUR SIDE ON -- WITH

11  MR. VERDIELL AND YOURSELF?

12  A.    NO.

13  Q.    AND I BELIEVE YOU -- WHEN DID -- DO YOU RECALL WHEN THAT

14  FIRST MEETING TOOK PLACE?

15  A.    I THINK I SAID LATE SEPTEMBER OR EARLY OCTOBER.  I DON'T

16  RECALL THE EXACT DATE.

17  Q.    COULD IT HAVE BEEN AS LATE AS EARLY NOVEMBER?

18  A.    IT'S POSSIBLE.  IT'S BEEN A NUMBER OF YEARS.  SOMEWHERE

19  IN THAT TIME FRAME.

20  Q.    CAN YOU TELL THE JURY WHAT WAS SAID -- WELL, WITHDRAW

21  THAT.  WHAT WAS THE SUBJECT MATTER OF THAT FIRST MEETING

22  GENERALLY?

23  A.    AT THAT POINT, THE DISCUSSION WAS FOCUSED PRIMARILY ON

24  MR. VERDIELL WANTING TO BUY MR. SHUM'S STOCK OR BUY HIM OUT.

25  AND MR. SHUM HAD A PROPOSAL WHERE HE WANTED A CROSS-OPTION TO

1   BUY OUT MR. VERDIELL IF MR. VERDIELL DIDN'T COME UP WITH A

2   CERTAIN AMOUNT OF MONEY WITHIN CERTAIN PERIOD OF TIME.

3   **Q.**   OKAY.

4       LET ME JUST TRY TO UNPACK THAT A LITTLE BIT.  WHAT

5   WOULD -- WHAT WAS YOUR UNDERSTANDING OF WHAT WOULD HAVE BEEN

6   ACCOMPLISHED IF DR. VERDIELL HAD BOUGHT OUT MR. SHUM AT THAT

7   MEETING OR IN CONNECTION WITH THAT MEETING?

8   **A.**   AT THAT POINT, HE WOULD BECOME THE SOLE SHAREHOLDER OF

9   RADIANCE AND WOULD HAVE HAD ALL OF THE RIGHTS TO WHATEVER HAD

10  BEEN DEVELOPED AT RADIANCE.

11  **Q.**   OKAY.  AND WHAT RIGHTS WOULD MR. SHUM HAVE HAD IF THAT

12  PROPOSAL OF MR. VERDIELL BUYING OUT MR. SHUM'S RIGHTS HAD GONE

13  THROUGH?

14  **A.**   HE WOULD NO LONGER HAVE ANY RIGHTS TO ANY OWNERSHIP IN

15  RADIANCE OR ANY CLAIM TO ANY OF ITS ASSETS.  INSTEAD, HE WOULD

16  HAVE RECEIVED CASH AS A BUYOUT FOR THOSE.  BASICALLY, HE WOULD

17  HAVE SOLD HIS STOCK TO MR. VERDIELL.

18  **Q.**   AND WHAT COULD HE HAVE DONE WITH THE CASH HE RECEIVED?

19  WOULD THERE HAVE BEEN ANY RESTRICTIONS ON HIM?

20  **A.**   THAT WAS A SUBJECT OF NEGOTIATION.  WE NEVER ACTUALLY

21  CAME TO A MEETING OF THE MINDS, BUT TYPICALLY WHEN YOU BUY OUT

22  A SHAREHOLDER IN A SMALL CORPORATION, THERE'S SOME SORT OF

23  COVENANT NOT TO COMPETE.  AND WE DID DISCUSS WHAT THE TERMS OF

24  SOMETHING LIKE THAT MIGHT LOOK -- LOOK LIKE AT THAT MEETING.

25  **Q.**   AND OTHER THAN WITH REGARD TO THE CASH, THAT CASH

GORMAN - DIRECT / TANGRI

1   WOULDN'T HAVE BEEN FOR THE BUSINESS; IS THAT CORRECT?

2   **A.**    IT WOULD HAVE BEEN FOR THE SHARES.

3   **Q.**    RIGHT.  AND MR. SHUM WOULD HAVE BEEN -- WOULD HE HAVE HAD

4   ANY RESTRICTIONS ON HOW HE COULD USE THAT CASH HIMSELF?

5   **A.**    NO.  NO, HE WOULD HAVE RECEIVED A LUMP SUM OF CASH OR

6   PAYMENTS OVER TIME, DEPENDING ON HOW THAT GOT NEGOTIATED.

7   **Q.**    AND I BELIEVE YOU MENTIONED THAT THERE WAS -- MR. SHUM

8   HAD A COUNTERPROPOSAL OF SOME SORT AT THAT MEETING.  WHAT WAS

9   THAT?

10  **A.**    THERE WAS A LETTER THAT MR. SHUM'S LAWYERS HAD SENT PRIOR

11  TO THE MEETING, AS I RECALL.  AND IT WAS BASICALLY -- AND I

12  DON'T RECALL THE EXACT DETAILS, BUT IF MR. VERDIELL WASN'T ABLE

13  TO BUY OUT MR. SHUM WITHIN A CERTAIN PERIOD OF TIME, MR. SHUM

14  THEN WANTED THE RIGHT TO BUY OUT MR. VERDIELL.

15  **Q.**    WAS THERE ANY AGREEMENT REACHED ON EITHER THE ORIGINAL

16  PROPOSAL OR MR. SHUM'S COUNTERPROPOSAL AT THAT FIRST MEETING?

17  **A.**    NO.

18  **Q.**    DID THE SUBJECT OF PATENTS OR INVENTORSHIP OF PATENTS

19  COME UP AT ALL AT THAT FIRST MEETING?

20  **A.**    YES, IT DID.

21  **Q.**    AND IF YOU CAN JUST TELL US AND TELL THE JURY AS BEST AS

22  YOU CAN RECALL WHAT WAS SAID ON THAT SUBJECT AT THAT FIRST

23  MEETING.

24  **A.**    THERE WAS A DISCUSSION THAT ONE OF THE ASSETS OF RADIANCE

25  WAS THAT THERE WAS A PENDING PATENT APPLICATION TO THE U.S.

1    PATENT AND TRADEMARK OFFICE AND THAT BECAUSE OF THE WAY IT HAD

2    BEEN FILED, APPARENTLY MR. SHUM WAS LISTED AS THE INVENTOR ON

3    THAT AND THAT THAT WAS INCORRECT AND THAT THE PATENT

4    APPLICATION NEEDED TO BE WITHDRAWN AND REFILED TO SHOW THE

5    CORRECT INVENTORSHIP.

6         AND THERE WAS A DISCUSSION ABOUT WHO HAD INVENTED WHAT,

7    AND IT WAS -- MR. VERDIELL MADE A STATEMENT THAT HE HAD

8    INVENTED ABOUT 90 PERCENT OF WHAT WAS BEING CLAIMED IN THE

9    PATENT AND MR. SHUM HAD INVENTED ABOUT 10 PERCENT, WHICH

10   RELATED TO SOME SORT OF LENS CONCEPT.

11   Q.    SORRY.  DID YOU SAY SOME SORT OF WHAT CONCEPT?

12   A.    A LENS.

13   Q.    PLEASE GO AHEAD.  I'M SORRY TO INTERRUPT YOU.

14   A.    YEAH, AND THEN -- SO THAT IT SHOULD BE REFILED AS A JOINT

15   APPLICATION 'CAUSE THEY'D EACH CONTRIBUTED SOME PERCENTAGE TO

16   THE INVENTION.

17   Q.    AND WHO -- I THINK YOU SAID 90 PERCENT DR. VERDIELL,

18   10 PERCENT MR. SHUM.  WHO -- WHO FIRST RAISED THOSE NUMBERS?

19   A.    I REMEMBER MARC FIRST RAISED THE NUMBER, AND THEN THERE

20   WAS A DISCUSSION ABOUT IT AND FRANK CONCURRED THAT THOSE WERE

21   THE APPROPRIATE NUMBERS, THAT HE HAD DONE THE LENS AND MARC HAD

22   DONE -- SOMETHING ABOUT DIRECT-BONDED COPPER.

23   Q.    DID MR. SHUM DISAGREE AT ANY TIME WITH THE 90/10 FIGURE?

24   A.    NO, HE AGREED WITH THE FIGURE.

25   Q.    DID MR. SHUM AT ANY POINT IN THAT MEETING SAY THAT HE HAD

1    ALSO INVENTED OR CONTRIBUTED TO THE INVENTION OF THE

2    DIRECT-BONDED COPPER PART?

3    **A.**    ONLY IN A MINOR WAY.  HE -- HE WAS AWARE OF -- MARC WAS

4    SHOWING HIM WHAT MARC WAS DOING, BUT IT WAS REALLY MARC'S

5    INVENTION.

6    **Q.**    AND WHAT DID MR. SHUM SAY AT THAT MEETING HIS INVENTION

7    WAS THAT HAD BEEN CLAIMED IN THAT PENDING PATENT APPLICATION?

8    **A.**    ADDING SOME LENS TO THE REST OF THE INVENTION.  IT --

9    IT'S A LITTLE BIT OVER MY HEAD, THE ELECTRICAL ENGINEERING, HOW

10   ALL THAT WORKED.  BUT HIS LENS MADE THE REST OF THE INVENTION

11   WORK BETTER IN SOME WAY.

12   **Q.**    AND WERE THEY DISCUSSING AT THIS MEETING THAT THE -- THAT

13   THE -- YOU SAID IT WAS A PENDING PATENT APPLICATION, I GUESS.

14        WHAT DO YOU MEAN BY THAT?

15   **A.**    IT HAD BEEN FILED BUT NOT YET APPROVED BY THE U.S. PATENT

16   AND TRADEMARK OFFICE.

17   **Q.**    AND AT THE TIME OF THE MEETING, THE DISCUSSION WAS THAT

18   IT WAS STILL ON FILE AT THE PATENT AND TRADEMARK OFFICE; IS

19   THAT CORRECT?

20   **A.**    YES, IT WAS STILL ON FILE, BUT THEIR PLAN WAS TO WITHDRAW

21   IT AND REFILE IT.

22   **Q.**    AND WHO WAS DISCUSSING WITHDRAWING IT?

23   **A.**    BOTH MARC AND FRANK.

24   **Q.**    AND WERE MR. SHUM'S LAWYERS AT THAT MEETING?

25   **A.**    YES.

1   Q.    BOTH MR. CHANG AND MR. MASON WERE PRESENT FOR THAT?

2   A.    YES, THEY WERE.

3   Q.    AND DID ANY OF -- DID EITHER OF THE LAWYERS FOR MR. SHUM

4   AT ANY POINT SAY THAT THE APPLICATION DID NOT NEED TO BE

5   WITHDRAWN?

6   A.    NO.

7   Q.    DID MR. SHUM AT THE MEETING EVER SAY THAT THE APPLICATION

8   DID NOT NEED TO BE WITHDRAWN?

9   A.    NO.

10  Q.    NOW, DID MR. VERDIELL SAY ANYTHING AT THAT MEETING ABOUT

11  WHY HE WANTED TO BUY OUT MR. SHUM'S RIGHTS?

12  A.    YES.  MR. VERDIELL MADE A STATEMENT THAT HE PLANNED TO

13  CONTINUE WORKING ON DEVELOPMENT OF THIS CONCEPT, THAT HE WAS

14  GOING TO LOOK TO START A NEW COMPANY AND RAISE MONEY BECAUSE

15  HE -- HE BELIEVED IN THE TECHNOLOGY AND WANTED TO PURSUE IT.

16  Q.    AND DID MR. SHUM SAY ANYTHING AT THE MEETING ABOUT WHAT

17  HE PLANNED TO DO?

18  A.    YES.  FRANK SHUM INDICATED THAT HE DID NOT -- HE DIDN'T

19  HAVE A DESIRE TO BE IN A STARTUP COMPANY ANYMORE.  HE WANTED TO

20  GO OUT AND GET A JOB, A REGULAR-PAYING JOB AS AN ENGINEER

21  WORKING ON LENS TECHNOLOGIES WITH A -- YOU KNOW, A MAINSTREAM

22  COMPANY OR POSSIBLY DO SOME CONSULTING ON RESEARCH AND

23  DEVELOPMENT IN THAT AREA.

24  Q.    DID HE SAY WHY HE DIDN'T WANT TO BE PART OF A STARTUP

25  ANYMORE?

1    A.    HE SAID HE REALIZED THAT WHAT WAS MOST ATTRACTIVE TO

2    VENTURE CAPITALISTS WAS GOING TO BE MARC'S IDEA, WHEREAS THE

3    LENS TECHNOLOGY WASN'T AS EXCITING TO THEM, AND I THINK HE JUST

4    FELT HE HAD HAD ENOUGH OF THE PRESSURES AND THE HOURS AND

5    THE -- HE SAID HE WANTED TO GO BACK AND NOT -- AND DO A REGULAR

6    JOB AND GET A PAYCHECK.

7    Q.    AND I THINK YOU SAID THERE WAS NO AGREEMENT REACHED AT

8    THAT MEETING; IS THAT CORRECT?

9    A.    THAT'S CORRECT.  WE NEVER WORKED OUT ANY AGREEMENT.

10   Q.    OKAY.

11         WHAT HAPPENED -- PUTTING ASIDE ANY PRIVILEGED

12   COMMUNICATIONS YOU MIGHT HAVE HAD WITH DR. VERDIELL, WHAT

13   HAPPENED NEXT BETWEEN THE TWO MEN IN THE -- AFTER THE MEETING?

14   A.    I DON'T KNOW WHAT WAS HAPPENING DIRECTLY BETWEEN FRANK

15   AND MARC.

16   Q.    WHAT HAPPENED NEXT THAT YOU WERE INVOLVED IN?

17   A.    THERE WERE SOME FOLLOW-UP COMMUNICATIONS WITH THE COUDERT

18   BROTHER ATTORNEYS, AND WE DID SET UP A SECOND MEETING TO TAKE

19   PLACE ON THE FRIDAY AFTERNOON RIGHT BEFORE THANKSGIVING.

20   Q.    AND WHO ATTENDED THAT SECOND MEETING, THE FRIDAY BEFORE

21   THANKSGIVING?

22   A.    IT'D BE THE SAME PEOPLE, MR. SHUM, THE TWO LAWYERS FROM

23   COUDERT BROTHERS, MYSELF, AND MARC VERDIELL.

24   Q.    AND WHAT WAS THE GENERAL SUBJECT MATTER UNDER DISCUSSION

25   AT THAT MEETING?

 1    **A.**    AT THAT POINT, IT -- WE HAD DECIDED THAT THE BUYOUT

 2    CONCEPT WASN'T GOING TO WORK, BUT THE TWO SHAREHOLDERS NEEDED

 3    TO GO THEIR SEPARATE WAYS.  SO THE FOCUS OF THE MEETING WAS

 4    WHAT ARRANGEMENTS COULD WE PUT IN PLACE FOR A DISSOLUTION OF

 5    THE CORPORATION.

 6    **Q.**    OKAY.  WAS ANYTHING SAID AT THAT MEETING -- AT THAT

 7    MEETING ABOUT WHY THE BUYOUT PROPOSAL WASN'T GOING TO WORK?

 8    **A.**    THERE WAS NEVER AN AGREEMENT ON WHAT THE NONCOMPETITION

 9    AGREEMENT WOULD BE.  MR. VERDIELL WASN'T GOING TO PAY A

10    SIGNIFICANT AMOUNT OF MONEY TO MR. SHUM FOR SHARES AND THEN

11    HAVE MR. SHUM BE ABLE TO GO AND USE ALL THE TRADE SECRETS FROM

12    THE PRIOR COMPANY.  AND WITHOUT -- WITHOUT AN ACCEPTABLE

13    NONCOMPETITION AGREEMENT, THE BUYOUT DIDN'T MAKE SENSE.

14    **Q.**    AND WAS THERE A DISCUSSION AT THE MEETING AS TO WHY

15    WITHOUT A BUYOUT, YOU STILL HAD TO FIND SOME WAY TO ALLOW THE

16    COMPANY TO DISSOLVE AND THE TWO MEN TO GO THEIR SEPARATE WAYS?

17    **A.**    COULD YOU REPEAT THAT?

18    **Q.**    SURE.  WAS THERE -- WAS THERE A DISCUSSION AT THE MEETING

19    AS TO WHY THEY STILL WANTED TO GO THEIR SEPARATE WAYS?

20    **A.**    WELL, THEY BOTH ACKNOWLEDGED THEY WEREN'T GETTING ALONG.

21    THEY COULDN'T CONTINUE WORKING TOGETHER, AND THEY NEEDED TO

22    EACH DO SOMETHING PRODUCTIVE.

23    **Q.**    AND WHAT WAS THE PROPOSAL THAT WAS BEING DISCUSSED AT THE

24    SECOND MEETING?

25    **A.**    THE PROPOSAL WAS ESSENTIALLY HOW DO WE DISSOLVE THE

```
 1   COMPANY?  WHAT HAPPENS TO THE ASSETS WHICH WERE THE -- THE

 2   PENDING PATENT APPLICATION AND SOME TOOLS THAT APPARENTLY WERE

 3   USED TO WORK ON THE TECHNOLOGY.

 4   Q.    AND DID PEOPLE -- WHAT WAS DISCUSSED ABOUT THE TOOLS TO

 5   WORK ON THE TECHNOLOGY AT THAT MEETING?

 6   A.    MARC VERDIELL WANTED TO BUY THE TOOLS, AND THERE WAS A

 7   DISCUSSION ABOUT WHAT THE TOOLS WERE WORTH.  I DON'T RECALL THE

 8   FIGURES.

 9   Q.    AND WHAT WAS DISCUSSED ABOUT THE PATENT APPLICATION AT

10   THAT MEETING?

11   A.    THE PATENT APPLICATION THERE WAS -- IT WAS REITERATED

12   THAT THE PATENT APPLICATION STILL NEEDED TO BE WITHDRAWN AND

13   REFILED.  BUT AT THIS POINT, BECAUSE THEY WERE GOING TO

14   DISSOLVE, THEY WEREN'T GOING TO REFILE IT JOINTLY, AND THEY

15   WEREN'T GOING TO FILE IT IN THE NAME OF RADIANCE BECAUSE THAT

16   COMPANY WASN'T GOING TO EXIST ANYMORE.  SO THEY WERE --

17         MARC WANTED TO BE ABLE TO PATENT AND CLAIM WHAT HE HAD

18   INVENTED, AND THERE WAS -- FRANK HAD SOME PROBLEMS WITH THAT,

19   SO WE, AGAIN, DIDN'T COME TO A -- AN AGREEMENT.

20   Q.    WHAT DID -- WHAT DID -- WHAT, IF ANYTHING, DID

21   DR. VERDIELL, MARC VERDIELL, SAY AT THAT SECOND MEETING ABOUT

22   WANTING TO BE ABLE TO PATENT WHAT HE HAD INVENTED?

23   A.    THERE WAS A DISCUSSION IN WHICH FRANK SAID, MARC, I KNOW

24   YOU WANT TO KEEP WORKING ON THE TECHNOLOGY.  YOU'RE GOING TO

25   MEET WITH PEOPLE, YOU'RE GOING TO TRY TO RAISE MONEY, AND THAT
```

1    YOU NEED TO BE ABLE TO HAVE SOME INTELLECTUAL PROPERTY BEHIND

2    YOU TO RAISE MONEY FROM INVESTORS.  HE SAID, ON THE OTHER HAND,

3    I'M NOT GOING TO DO THAT.  YOU DON'T HAVE TO WORRY ABOUT ME.

4    I'M NOT GOING TO BE COMPETING WITH YOU.  I'M NOT GOING TO TAKE

5    A JOB AS A COMPETITOR, BUT I FEEL I'M A 50 PERCENT EQUAL

6    SHAREHOLDER.  I CONTRIBUTED TO THE INVENTION.  I WANT EQUAL

7    RIGHTS TO IT.

8          AND MARC SAID THAT, YOU KNOW, I -- 90 PERCENT OF IT IS

9    MINE.  I SHOULD BE ABLE TO CLAIM MORE OF IT, AND YOU SHOULD

10   CLAIM YOUR LENS.

11   **Q.**    DID MR. SHUM DISAGREE AT THAT MEETING, THE SECOND

12   MEETING, ABOUT THE 90 PERCENT OF IT IS DR. VERDIELL'S,

13   10 PERCENT -- THE LENS WAS MR. SHUM'S?  DID HE DISAGREE WITH

14   THAT ALLOCATION?

15   **A.**    NO, HE AGREED WITH THAT.

16   **Q.**    WHAT DID HE SAY ABOUT, THEN, IN RESPONSE TO WHAT YOU JUST

17   REPORTED FROM DR. VERDIELL?

18   **A.**    THAT NOTWITHSTANDING THAT MARC HAD DONE MORE OF THE

19   INVENTION AND THE MORE VALUABLE PART OF THE INVENTION, FRANK

20   WAS AN EQUAL 50 PERCENT SHAREHOLDER AND FELT THAT HE SHOULD

21   HAVE EQUAL RIGHTS TO WHATEVER HAD BEEN DEVELOPED AT RADIANCE.

22   **Q.**    DID HE SAY ANYTHING ABOUT WHAT HE PLANNED TO DO WITH THAT

23   WITH THAT -- THOSE RIGHTS IF HE GOT THEM?

24   **A.**    NO, HE REALLY DIDN'T.  IT SOUNDED LIKE MORE IT WAS MATTER

25   A PRINCIPLE TO HIM THAT HE HAVE THE RIGHTS, BUT HE KEPT

```
 1   ASSURING US THAT HE WASN'T GOING TO DO ANYTHING THAT WOULD

 2   COMPETE OR INTERFERE.  HE WAS GOING TO TAKE A JOB WITH A

 3   COMPANY.

 4   Q.   WAS ANY RESOLUTION REACHED AT THAT SECOND MEETING?

 5   A.   NO.

 6   Q.   WAS A RESOLUTION EVENTUALLY REACHED AT SOME LATER POINT

 7   IN TIME?

 8   A.   YES.

 9   Q.   AND WHAT -- WHAT WAS THAT?

10   A.   FRANK AND MARC HIRED -- WELL, THEY USED THE REGULAR

11   CORPORATE ATTORNEY OF RADIANCE DESIGN TO COME UP WITH A PLAN OF

12   DISSOLUTION AND CIRCULATED IT FOR COMMENT.  AND I DID PROVIDE

13   SOME INPUT AND SOME LANGUAGE CHANGES, AND IT WAS ULTIMATELY

14   SIGNED.

15   Q.   IT WAS ULTIMATELY SIGNED?

16   A.   YES.

17        MR. TANGRI:  THANK YOU VERY MUCH, MR. GORMAN.  I

18   HAVE NO FURTHER QUESTIONS FOR YOU.

19        THE WITNESS:  THANK YOU.

20              CROSS-EXAMINATION

21   BY MR. MacDONALD:

22   Q.   GOOD MORNING, MR. GORMAN.  MY NAME IS ANGUS MACDONALD,

23   AND I REPRESENT THE PLAINTIFF FRANK SHUM.

24        DO YOU STILL OWN INTEL STOCK?

25   A.   I DO HAVE SOME, YES.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **Q.**   DO YOU OWN INTEL STOCK CURRENTLY AS YOU TESTIFY HERE

2    TODAY; IS THAT CORRECT?

3    **A.**   YES.

4    **Q.**   YOU CONSIDER MR. VERDIELL A FRIEND, DON'T YOU?

5    **A.**   YES.

6    **Q.**   YOU AND MR. VERDIELL SOCIALIZE TOGETHER, HAVEN'T YOU?

7    **A.**   OCCASIONAL.

8    **Q.**   OKAY.  AND IN YOUR OCCASIONAL SOCIAL ACTIVITIES, YOU'VE

9    INCLUDED YOUR RESPECTIVE SPOUSES; IS THAT CORRECT?

10   **A.**   YES.

11   **Q.**   DURING THOSE SOCIAL ACTIVITIES WITH MR. VERDIELL, RIGHT?

12   **A.**   YEAH, I BELIEVE I'VE SEEN MR. VERDIELL THREE TIMES

13   SOCIALLY THIS YEAR.

14   **Q.**   OKAY.  AND -- THREE TIMES THIS YEAR?

15   **A.**   THREE TIMES THIS YEAR, YES.

16   **Q.**   OKAY.  AND YOU VISITED MR. VERDIELL AT HIS HOUSE SEVERAL

17   TIMES; IS THAT CORRECT?

18   **A.**   TRUE.

19   **Q.**   AND HE'S VISITED YOU AT YOUR HOUSE.

20   **A.**   AT LEAST ONCE, YES.

21   **Q.**   OKAY.

22        AND YOU'VE BEEN MR. VERDIELL'S ATTORNEY ON SEVERAL

23   MATTERS, IS THAT CORRECT, DURING THE COURSE OF YOUR

24   RELATIONSHIP WITH HIM?

25   **A.**   THAT WOULD BE CORRECT.  NOTHING RECENTLY, BUT, YEAH, I

1    HAVE IN THE PAST.  YES.

2    **Q.**   APPROXIMATELY HOW MANY TIMES HAVE YOU REPRESENTED

3    MR. VERDIELL?

4    **A.**   I CAN THINK OF THREE, BUT THERE COULD HAVE BEEN ANOTHER

5    ONE.

6    **Q.**   OKAY.  AND ISN'T IT TRUE THAT ONE OF THE TIMES THAT YOU

7    REPRESENTED MR. VERDIELL WAS IN CONNECTION WITH A LAWSUIT FILED

8    BY A GENTLEMAN NAMED REMY AUBERT; IS THAT CORRECT?

9    **A.**   CORRECT.

10   **Q.**   DO YOU KNOW WHO REMY AUBERT IS?

11   **A.**   YES.

12   **Q.**   WHO IS?

13   **A.**   HE WAS -- HE'S FROM FRANCE.

14          **MR. TANGRI:**  YOUR HONOR.  OBJECTION, MOVE TO STRIKE.

15   I THOUGHT WE HAD A RULING ON THIS AND --

16          **THE COURT:**  WE'RE NOT GOING TO GO INTO ANOTHER

17   LAWSUIT.

18          **MR. MacDONALD:**  OKAY.

19   **Q.**   NOW, MR. VERDIELL REFERRED YOU CLIENTS; IS THAT CORRECT?

20   **A.**   I'M NOT SURE OF THAT.  I CAN'T THINK OF ANY THAT HE

21   REFERRED TO ME.

22   **Q.**   OKAY.

23          LET ME ASK YOU THIS TO REFRESH YOUR RECOLLECTION.  DO YOU

24   KNOW WHO MAREK ALBOSZTA IS?

25   **A.**   YES.

1    Q.    OKAY.  WAS HE EVER A CLIENT OF YOURS?

2    A.    YES.

3              MR. TANGRI:  YOUR HONOR.

4              MR. MacDONALD:  THIS HAS NOTHING TO DO WITH A

5    PREVIOUS LAWSUIT.

6              THE COURT:  LET'S SEE WHAT WE'RE DOING.

7    BY MR. MacDONALD:

8    Q.    AND ISN'T IT TRUE --

9              THE COURT:  NO, NO.

10             (SIDEBAR, NOT REPORTED.)

11             (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

12   PRESENCE OF THE JURY:)

13   BY MR. MacDONALD:

14   Q.    SO IT'S TRUE, MR. GORMAN, THAT MR. VERDIELL HAS REFERRED

15   YOU CLIENTS, CORRECT?

16   A.    I DON'T KNOW.  MR. ALBOSZTA DID CONTACT ME, BUT IT WAS

17   MUCH LATER THAN WHEN MR. VERDIELL WAS COMING TO SEE ME ABOUT

18   THE RADIANCE DAYS.

19   Q.    OKAY.

20   A.    I DON'T KNOW IF HE SPECIFICALLY CALLED MARC AND SAID CAN

21   I GET A REFERRAL TO A LAWYER OR IF MR. ALBOSZTA JUST HAPPENED

22   TO KNOW MY NAME FROM PRIOR TIME PERIODS.

23   Q.    OKAY.

24         YOU RECALL THAT LAWYERS FOR MR. SHUM, BUT -- NOT ME NOR

25   MY COLLEAGUES BUT OTHER LAWYERS FOR MR. SHUM -- SUED YOU

GORMAN - CROSS / MACDONALD

1    SOMETIME AGO; IS THAT CORRECT?

2    A.    YES.

3    Q.    AND YOU WROTE TWO LETTERS TO MR. SHUM'S OTHER LAWYERS IN

4    RESPONSE TO BEING NAMED AS A DEFENDANT, CORRECT?

5    A.    CORRECT.

6    Q.    AND IN BOTH LETTERS, YOU STATED THAT IF THE LAWSUIT WAS

7    NOT IMMEDIATELY DISMISSED AGAINST YOU, YOU WOULD SUE SHUM AND

8    HIS ATTORNEYS FOR MALICIOUS PROSECUTION; ISN'T THAT TRUE?

9    A.    YES.

10   Q.    NOW, MR. GORMAN, IT'S FAIR TO SAY THAT YOU'RE BIASED IN

11   FAVOR OF MR. VERDIELL, CORRECT?

12   A.    I'M SWORN TO TELL THE TRUTH.

13   Q.    BUT YOU HAVE A BIAS IN FAVOR OF MR. VERDIELL, RIGHT?

14   A.    I WOULDN'T SAY -- I LIKE MARC.  I THINK HE'S RIGHT.  BUT

15   I'M -- I'M TELLING THE TRUTH.  I'M UNDER OATH.

16   Q.    AND ISN'T IT TRUE THAT YOU'RE BIASED AGAINST MR. SHUM,

17   ESPECIALLY IN VIEW OF A LAWSUIT THAT WAS FILED AGAINST YOU BY

18   MR. SHUM?

19   A.    NO.  IT WAS DISMISSED BY THE COURT.  I MEAN, THEY AGREED

20   THAT I WAS RIGHT AND MR. SHUM WAS WRONG, BUT I'M NOT BIASED

21   BECAUSE OF THAT.

22   Q.    DOESN'T IT -- ISN'T IT TRUE THAT YOUR PERCEPTIONS HAVE

23   BEEN AFFECTED BY SOME OF THE THINGS THAT I WAS JUST GOING OVER

24   OVER THE LAST FEW MINUTES?

25   A.    NO.

1    Q.    ISN'T THAT TRUE?

2    A.    NO.

3    Q.    NOW, YOU TESTIFIED HERE THAT THE FIRST MEETING THAT

4    INCLUDED MR. SHUM, MR. VERDIELL, MR. SHUM'S ATTORNEYS AND

5    YOURSELF OCCURRED IN SEPTEMBER OF 1997 OR POSSIBLY OCTOBER OF

6    1997, CORRECT?  THAT'S WHAT YOU JUST TESTIFIED TO, RIGHT?

7    A.    YEAH, I TESTIFIED I DON'T RECALL THE EXACT TIME FRAME,

8    BUT IT WAS SOMEWHERE IN THAT SEPTEMBER, OCTOBER, MAYBE EARLY

9    NOVEMBER TIME FRAME.

10   Q.    NOW, IN A PRIOR PROCEEDING YOU TESTIFIED WITHOUT

11   HESITATION THAT THE FIRST MEETING ACTUALLY OCCURRED IN EARLY

12   NOVEMBER 1997?

13            MR. TANGRI:  OBJECTION, MOVE TO STRIKE THE

14   COMMENTARY, YOUR HONOR.

15            THE COURT:  IT WILL BE STRICKEN.  REPHRASE YOUR

16   QUESTION.

17   BY MR. MacDONALD:

18   Q.    IN AN EARLIER PROCEEDING, YOU TESTIFIED, DID YOU NOT,

19   THAT THE FIRST MEETING OCCURRED IN EARLY NOVEMBER 1997?

20   A.    I HONESTLY DON'T -- IT'S BEEN 11 YEARS.

21   Q.    AND --

22   A.    IT WAS IN THAT FALL TIME FRAME.

23   Q.    AND ISN'T IT TRUE THAT BECAUSE OF 11 YEARS THAT HAVE

24   PASSED, YOUR MEMORY HAS BEEN IMPACTED SOMEWHAT?  ISN'T THAT

25   TRUE?

1   **A.**    I THINK ANYONE'S MEMORY AFTER 11 YEARS IS NOT AS PERFECT

2   AS IT WOULD HAVE BEEN 11 YEARS AGO.

3   **Q.**    OKAY.  NOW, THERE WERE FIVE PEOPLE IN ATTENDANCE DURING

4   THESE MEETINGS, INCLUDING -- DURING WHEN THIS ALLEGED

5   90/10 PERCENT DISCUSSION OCCURRED, RIGHT?

6   **A.**    CORRECT.

7   **Q.**    AND THESE FIVE PEOPLE WERE MR. SHUM, MR. JOE MASON,

8   MR. LUCAS CHANG, YOURSELF, AND MR. VERDIELL, RIGHT?

9   **A.**    RIGHT.

10  **Q.**    ARE YOU AWARE THAT THE FOUR OTHER INDIVIDUALS AT THE

11  MEETING BESIDES YOU ALL HAVE HAD THEIR DEPOSITIONS TAKEN IN

12  THIS CASE?

13  **A.**    NO.

14  **Q.**    OKAY.  I WILL REPRESENT TO YOU THAT ALL OF THE FOUR, EACH

15  OF THE FOUR INDIVIDUALS THAT I JUST MENTIONED HAVE BEEN

16  DEPOSED.  AND I'LL REPRESENT TO YOU THAT THEY'VE BEEN DEPOSED

17  MULTIPLE TIMES.  WERE YOU AWARE OF THAT?

18  **A.**    NO, I DON'T KNOW WHO'S BEEN DEPOSED.

19  **Q.**    WELL, I'LL ALSO REPRESENT TO YOU THAT THE FOUR OTHER

20  INDIVIDUALS THAT WERE IN THAT ROOM FOR THESE MEETINGS TESTIFIED

21  UNDER OATH ABOUT THESE TWO OTHER MEETINGS.  AND DO YOU RECALL

22  THAT NONE OF THE OTHER FOUR INDIVIDUALS, NOT EVEN MR. VERDIELL,

23  HAVE EVER TESTIFIED ABOUT THIS ALLEGED 90/10 PERCENT DISCUSSION

24  IN ANY OF THEIR MULTIPLE DEPOSITIONS?

25          **MR. TANGRI:**  OBJECTION, YOUR HONOR.

1      **THE COURT:**  OBJECTION -- OBJECTION SUSTAINED.

2      **BY MR. MacDONALD:**

3      **Q.**    NOW, MR. GORMAN, FOR THE SAKE OF ARGUMENT, LET'S SAY THAT

4      MR. VERDIELL DID MAKE THAT 90 PERCENT STATEMENT AND THAT

5      MR. SHUM CONCURRED WITH THIS CLAIM.  ISN'T IT TRUE WHAT

6      MR. SHUM WAS ACTUALLY EXPRESSING, EVEN IF HE WERE ONLY A

7      10 PERCENT INVENTOR, HE WAS STILL A 50/50 CO-OWNER OF RADIANCE

8      AND THEREFORE BY VIRTUE OF BEING A 50/50 OWNER, HE WAS A

9      CO-OWNER OF THE PATENT?  ISN'T THAT TRUE?  ISN'T THAT WHAT HE

10     STATED?

11     **A.**    I THINK THAT WOULD BE A FAIR SUMMARY, YES.

12     **Q.**    OKAY.

13            NOW, YOU'RE AWARE THAT THERE WAS ONLY ONE PATENT

14     APPLICATION EVER FILED AT RADIANCE, RIGHT?

15     **A.**    THERE'S ONLY ONE THAT I KNOW OF.

16     **Q.**    OKAY.

17            AND THIS ALLEGED 90 PERCENT/10 PERCENT DISCUSSION RELATED

18     TO ONLY THAT ONE PATENT APPLICATION FILED AT RADIANCE, RIGHT?

19     **A.**    CORRECT.

20     **Q.**    AND THAT PATENT APPLICATION WAS KNOWN AS DIRECT-BONDED

21     COPPER OR DBC, RIGHT?

22     **A.**    IT RELATED TO DIRECT-BONDED COPPER.  I DON'T KNOW IF IT

23     WAS CALLED THAT.

24     **Q.**    OKAY.

25            THERE WAS NO DISCUSSION OF FLEXURE, WAS THERE?

GORMAN - CROSS / MACDONALD

1    A.    I DON'T RECALL.

2    Q.    OKAY.

3    A.    I REMEMBER HEARING THAT WORD IN THAT TIME FRAME, BUT I

4    DON'T RECALL IF THAT WAS PART OF THE PATENT OR NOT.

5    Q.    WELL, ARE YOU AWARE THAT THIS LAWSUIT INVOLVES SIX OTHER

6    PATENTS?

7    A.    NO, I DON'T KNOW --

8    Q.    OKAY.

9    A.    -- WHAT YOU'VE ALLEGED IN THIS LAWSUIT.

10   Q.    SO THIS 90 PERCENT/10 PERCENT DISCUSSION, TO THE EXTENT

11   IT EVER OCCURRED, HAS ABSOLUTELY NO RELEVANCE ON ANY OF THESE

12   OTHER PATENTS OR PATENT APPLICATIONS, RIGHT?  IT JUST RELATES

13   TO THE DBC PATENT, CORRECT?

14   A.    I DON'T KNOW ABOUT SIX OTHER PATENTS.

15   Q.    OKAY.  BUT IT JUST -- THE 90/10 PERCENT DISCUSSION JUST

16   RELATES TO ONE PATENT, AND -- YOU KNOW.  THAT'S YOUR TESTIMONY,

17   RIGHT?

18   A.    ONE INVENTION.

19   Q.    ONE INVENTION.  OKAY.

20         BUT ONE PATENT APPLICATION, RIGHT?

21   A.    AT THAT TIME, THERE WAS ONE PATENT APPLICATION.

22   Q.    NOW, YOU TESTIFIED THAT MR. SHUM WANTED TO GO BACK TO A

23   DAY JOB; IS THAT CORRECT?

24   A.    THAT'S WHAT HE SAID.

25   Q.    BUT YOU ALSO TESTIFIED THAT MR. SHUM MADE A BUYOUT OFFER

GORMAN - CROSS / MACDONALD

 1    TO MR. VERDIELL, RIGHT?

 2    **A.**    CORRECT.

 3    **Q.**    NOW, WHY WOULD -- WHY WOULD MR. SHUM MAKE A BUYOUT OFFER

 4    IF MR. SHUM WANTED TO GO BACK TO A DAY JOB?  DOES THAT MAKE

 5    SENSE?

 6    **A.**    IT -- IT COULD.

 7    **Q.**    ARE YOU SURE ABOUT THAT, MR. GORMAN?

 8    **A.**    YEAH.  I MEAN, HE MENTIONED ONE THING HE MIGHT DO IS IF

 9    HE BOUGHT THE RIGHT, HE'D TRY TO SELL THEM.  AT THAT TIME,

10    THERE WAS STILL A LOT OF VENTURE CAPITAL ACTIVITY AND STARTUPS

11    GOING ON.  I THINK HE THOUGHT THERE WAS VALUE TO THE RIGHTS.

12    **Q.**    OKAY.  NOW, IN YOUR DEALINGS WITH MR. MASON, WHO WAS

13    MR. SHUM'S ATTORNEY, DID YOU FIND HIM TO BE A PROFESSIONAL

14    PERSON?

15    **A.**    YES.

16    **Q.**    IN YOUR DEALINGS WITH MR. MASON, DID YOU HAVE ANY REASON

17    TO QUESTION HIS INTEGRITY OR HONESTY?

18    **A.**    NO.

19    **Q.**    YOU HAVE NO REASON TO BELIEVE THAT MR. MASON IS

20    DISHONEST, CORRECT?

21    **A.**    I DON'T KNOW MR. MASON OTHER THAN THESE MEETINGS, AND I

22    HAVE NO INFORMATION TO SUGGEST HE'S DISHONEST.

23    **Q.**    OKAY.  THANK YOU.

24          NO FURTHER QUESTIONS, YOUR HONOR.

25              **MR. TANGRI:**  JUST BRIEFLY, YOUR HONOR.

1     **REDIRECT EXAMINATION**

2     **BY MR. TANGRI:**

3     Q.    MR. GORMAN, YOU MENTIONED IN RESPONSE TO A QUESTION THAT

4     MR. MACDONALD ASKED YOU THAT MR. SHUM THOUGHT THERE WERE -- WAS

5     VALUE TO THE RIGHTS OF RADIANCE.

6           AND DO YOU RECALL THE AMOUNT OF MONEY THAT WAS BEING

7     DISCUSSED IN CONNECTION WITH MR. SHUM'S COUNTERPROPOSAL TO BUY

8     OUT MR. VERDIELL'S RIGHTS?

9     A.    I'M NOT ENTIRELY POSITIVE, BUT MY MEMORY IS AROUND

10    250,000.

11    Q.    AND DO YOU RECALL WHAT AMOUNT OF MONEY MR. VERDIELL

12    WOULD -- WAS OFFERING TO PAY IF -- IF HE COULD BUY OUT

13    MR. SHUM'S RIGHTS?

14    A.    TO THE BEST OF MY RECOLLECTION, IT WAS 250,000.

15    Q.    AND DID EITHER MAN DISAGREE WITH THAT NUMBER IN EITHER

16    OF -- IN ANY -- AT ANY TIME THAT YOU WERE INVOLVED IN THIS

17    MATTER?

18    A.    NO.

19    Q.    OKAY.  AS FAR AS YOU WERE AWARE, 250,000 WAS AN

20    AGREED-UPON NUMBER BETWEEN THE TWO MEN?

21    A.    WHATEVER THE NUMBER WAS, IT WAS REFLECTED IN A LETTER.

22    Q.    OKAY.

23    A.    BUT WHATEVER THAT NUMBER WAS, THEY -- THAT'S -- THEY WERE

24    BOTH USING THAT NUMBER.

25    Q.    SO WHATEVER THAT NUMBER WAS, WE CAN LOOK AT THE LETTER

1   SOMETIME, BUT THAT WAS AN AGREED-UPON NUMBER BETWEEN THE TWO

2   MEN?

3   **A.**    IT WAS A NUMBER THAT WAS -- MR. VERDIELL WAS PREPARED TO

4   PAY IF THERE WAS AN ACCEPTABLE COVENANT NOT TO COMPETE, AND

5   MR. SHUM THEN ASKED FOR THE -- THE CROSS-OPTION THAT IF

6   MR. VERDIELL DIDN'T BUY HIM, HE WANTED TO BUY MR. VERDIELL OUT

7   AT THE SAME PRICE.

8              **MR. TANGRI:**  THANK YOU, MR. GORMAN.  NO FURTHER

9   QUESTIONS.  THANK YOU FOR COMING.

10             **MR. MacDONALD:**  NO FURTHER QUESTIONS, YOUR HONOR.

11             **THE COURT:**  MR. GORMAN, YOU CAN BE EXCUSED NOW.

12             **THE WITNESS:**  THANK YOU.

13             **MS. GRANT:**  YOUR HONOR, THE DEFENDANTS RE-CALL

14  MR. SIVAKUMAR.

15                  (PAUSE IN THE PROCEEDINGS.)

16             **MS. GRANT:**  WHO WILL BE COMING SHORTLY.

17             I THINK HE'S IN THE REST ROOM.

18                  (PAUSE IN THE PROCEEDINGS.)

19             **MS. GRANT:**  I THINK THEY FOUND HIM.

20                  (PAUSE IN THE PROCEEDINGS.)

21             **MS. GRANT:**  HE'S IN THE BUILDING.  THAT'S WHAT I'M

22  TOLD.

23             **THE COURT:**  YOU MAY HAVE NOTICED THAT TRIALS DON'T

24  RUN LIKE WELL-OILED MACHINES.

25                  (LAUGHTER.)

1        **MS. GRANT:**  GO AHEAD.

2                    **DIRECT EXAMINATION** (RESUMED)

3   **BY MS. GRANT:**

4   **Q.**    GOOD MORNING, MR. SIVAKUMAR.

5   **A.**    GOOD MORNING.

6   **Q.**    YESTERDAY, BEFORE WE TOOK THE BREAK, YOU WERE EXPLAINING

7   THE STEPS THAT INTEL WENT THROUGH TO BUY LIGHTLOGIC.  AND I

8   WANTED TO ASK YOU, WHO HANDLED THE NEGOTIATIONS ON BEHALF OF

9   LIGHTLOGIC?

10  **A.**    THE -- THE PRIMARY PERSON THAT WE DEALT WITH FROM A

11  NEGOTIATIONS STANDPOINT WAS THE C.E.O., WAS JOHN MCGRAW.

12  **Q.**    OKAY.

13  **A.**    AND, OBVIOUSLY, HE HAD HIS BANKERS HELP HIM OUT WITH

14  THAT.  AND IN A FEW INSTANCES, WE HAD CONVERSATIONS WITH

15  THEIR -- WITH THEIR C.F.O., AND A COUPLE OTHER GENTLEMEN.  BUT

16  PRIMARILY JOHN MCGRAW WOULD PROBABLY BE THE RIGHT NAME, IF

17  YOU'RE LOOKING FOR A SINGLE NAME.

18  **Q.**    WHAT WAS YOUR IMPRESSION OF LIGHTLOGIC'S MANAGEMENT TEAM

19  AT THAT TIME?

20  **A.**    THEY HAD A GOOD COMBINATION OF -- OF VERY TECHNICALLY

21  STRONG CTO, WHO WAS ALSO THE FOUNDER, DR. VERDIELL, AND WHAT WE

22  THOUGHT -- A VERY SEASONED SET OF SENIOR LEADERS FROM THE

23  INDUSTRY.  MANY OF THEM WERE FROM A COMPANY CALLED RAYTHEON,

24  AND THEY WERE A VERY MATURE MANAGEMENT TEAM.  SO THERE WAS A

25  GOOD COMBINATION OF SCIENTISTS AND INNOVATORS WHO BUILT THE

1    TECHNOLOGY AND A VERY SEASONED TEAM, WHICH IS SORT OF A

2    REFLECTION OF WHAT THEY WERE PLANNING TO DO LONG TERM, WHICH IS

3    ACTUALLY BUILD A VERY SOLID, YOU KNOW, BIG COMPANY OVER A

4    PERIOD OF TIME.

5    Q.    AND WHAT WAS YOUR IMPRESSION OF THE -- I THINK AT THAT

6    TIME PROBABLY ROUGHLY 50 -- 50-ODD ENGINEERS THAT WERE AT

7    LIGHTLOGIC.  WHAT WAS YOUR IMPRESSION OF THE TECHNICAL TEAM?

8    A.    OH, VERY, VERY SOLID.  THE TECHNICAL TEAM OVER TIME, AS

9    WE LEARNED THEIR CAPABILITIES AND WHAT THEY HAD BEEN ABLE TO

10   ACHIEVE IN A FEW YEARS, I THINK THEY'D BEEN AROUND FOR A LITTLE

11   OVER THREE YEARS OR SOMETHING LIKE THAT, A VERY GOOD

12   COMBINATION.  I -- I DON'T REMEMBER THE SIZE.  PROBABLY ABOUT

13   50 PEOPLE OR SO.  AND THAT WAS A REALLY GOOD COMBINATION OF

14   TYPES OF SKILL SETS THAT WE THOUGHT WOULD TAKE TO -- TO BUILD

15   THE TYPE OF BUSINESS THAT THEY WERE IN.

16        THEY HAD MANAGED TO HIRE SOME VERY, VERY SOLID TECHNICAL

17   TALENT, WHICH IS OFTEN THE -- SORT OF THE CORE ANCHOR FOR A --

18   COMPANY THAT HAS -- TECHNOLOGY.

19   Q.    COULD WE GO TO EXHIBIT 740.

20              (EXHIBIT PUBLISHED TO JURY.)

21         MS. GRANT:  MAY I APPROACH, YOUR HONOR?

22         THE COURT:  YOU MAY.

23   BY MS. GRANT:

24   Q.    I'M HANDING YOU A DOCUMENT THAT YOU STARTED TO TALK ABOUT

25   YESTERDAY WITH THE JURY CALLED THE APA.  AND IF YOU COULD JUST

1   REFRESH OUR RECOLLECTIONS AS TO WHAT THE APA STANDS FOR.

2   A.    YEAH, THE -- THAT STANDS FOR "ACQUISITION PROJECT

3   APPROVAL."  IT IS THE FIRST STEP OF FORMAL APPROVAL TO MOVE

4   FORWARD WITH AN ACQUISITION.

5   Q.    OKAY.

6         AND, JEFF, IF WE CAN GO TO PAGE 7.

7         AND CAN YOU JUST TELL US --

8               (EXHIBIT PUBLISHED TO JURY.)

9   BY MS. GRANT:

10  Q.    -- WHAT EXACTLY -- IT SAYS "DISRUPTION."  AND THEN

11  THERE'S A LITTLE DISRUPTION NO. 2, AND THERE'S A LITTLE ARROW

12  FOR "LICORICE."

13        CAN YOU JUST EXPLAIN TO THE JURY WHAT THAT TERMINOLOGY

14  MEANS, THE "DISRUPTION"?

15  A.    THE TECHNOLOGY INDUSTRY TENDS TO BE CHARACTERIZED BY KEY

16  CHANGES THAT ARE OFTEN DRIVEN BY TRANSITIONS THAT -- THAT

17  HAPPENED IN TECHNOLOGY.  AND WE WERE AT A POINT IN TIME AT THE

18  BEGINNING OF THIS DECADE WHEN THE WORLDWIDE INFRASTRUCTURE WAS

19  GOING TO MOVE FROM WHAT WAS CALLED 1G OR 1 GIGABYTE TECHNOLOGY

20  TO 10G OR 10 GIGABYTE TECHNOLOGY.

21        AND THOSE KINDS OF TECHNOLOGY WINDOWS HAPPEN PERHAPS

22  APPROXIMATELY ABOUT ONCE A DECADE OR SO OR SOMEWHERE ON THAT

23  AVERAGE.  AND IT IS VERY IMPORTANT FOR YOU TO TIME YOUR ENTRY

24  INTO A MARKET WITH YOUR TECHNOLOGY AND YOUR PRODUCTS AND YOUR

25  ENTIRE PORTFOLIO OF OFFERINGS AND ALL OF THAT STUFF AT EXACTLY

SIVAKUMAR – DIRECT (RESUMED)/ GRANT

1   THE RIGHT TIME.

2        AND WE HAD DISCUSSED THAT THESE DISRUPTIONS WERE GOING TO

3   HAPPEN IN A STRATEGIC REVIEW WITH OUR MANAGEMENT.  I BELIEVE,

4   WHAT, A YEAR BACK.  I DON'T EXACTLY REMEMBER WHEN -- WHAT THAT

5   12/21 REFERS TO.  I THINK IT'S A DATE.  BUT I DON'T REMEMBER

6   THE YEAR, BUT I THINK IT WAS A YEAR BEFORE THE LIGHTLOGIC

7   DISCUSSION.

8        AND THE TERMS HERE JUST REFERENCE TO OUR INTERNAL

9   STRATEGIC REVIEW MEETING WHERE WE PRESENTED OUR THOUGHTS.

10  Q.    AND SO THEN WITH THE DISRUPTION NO. 2 WITH THE "LICORICE"

11  ARROW?

12  A.    YEAH.

13  Q.    IS THAT SOMETHING -- EXPLAIN THAT.

14  A.    SO WHAT THAT MEANS IS THAT IN THAT BIG TRANSITION THAT WE

15  WERE TRYING TO DRIVE WHERE, YOU KNOW, AS AN ANALOGY, IF WE WERE

16  TRYING TO BUILD THIS NEW TYPE OF LEGO, RIGHT -- LET'S SAY A NEW

17  TYPE OF CAR.  THERE ARE LOTS OF DIFFERENT PIECES THAT YOU HAVE

18  TO ASSEMBLE FOR US TO BE ABLE TO TAKE ADVANTAGE OF THE

19  DISRUPTION IN TECHNOLOGY LIKE THAT.

20       AND LICORICE OR LIGHTLOGIC COULD POTENTIALLY CONTRIBUTE

21  TO THAT.  THAT'S -- THAT'S REALLY WHAT THAT REFERS.

22  Q.    AND JUST SO WE'RE CLEAR, 'CAUSE THERE'S LOTS OF

23  TERMINOLOGY IN THIS CASE.

24  A.    YES.

25  Q.    THE TEN GIG IS -- WE'RE TALKING ABOUT THE TRANSPONDERS?

1   A.    YEAH, THIS IS A PIECE OF TECHNOLOGY THAT WILL ALLOW US TO

2   DO TEN GIG.

3   Q.    OKAY.

4         IF WE CAN GO TO THE NEXT PAGE, JEFF.

5             (EXHIBIT PUBLISHED TO JURY.)

6   BY MS. GRANT:

7   Q.    AND THEN CAN YOU JUST TELL US -- WE SEE ANOTHER LITTLE

8   LICORICE ARROW --

9   A.    YEAH.

10  Q.    -- WHAT DOES THAT REFER TO?

11  A.    THAT REFERS TO THE FACT THAT LIGHTLOGIC OR LICORICE WOULD

12  HAVE A TEN GIGABIT ETHERNET MODULAR -- TRANSFORM THE MODULE

13  LIKE THE ONE THAT YOU HELD UP -- SHIPPING OR SAMPLING --

14  SAMPLING MEANING BEFORE WE GET INTO MANUFACTURING A PRODUCT IN

15  VERY HIGH VOLUME, WE SAMPLE THAT WITH OUR CUSTOMERS, AND THEY

16  WERE GOING TO SAMPLE THAT PRODUCT IN THE MIDDLE OF 2001.  THE

17  "'01" IS REFERENCE TO THE YEAR.

18  Q.    OKAY.

19        IF WE CAN GO TO EXHIBIT 750.

20            (EXHIBIT PUBLISHED TO JURY.)

21        MS. GRANT:  MAY I APPROACH, YOUR HONOR?

22        THE COURT:  YOU MAY.

23  BY MS. GRANT:

24  Q.    SO I'M HANDING YOU A COPY OF WHAT'S CALLED THE LICORICE

25  DAM2, WHICH WE TALKED A LITTLE BIT ABOUT YESTERDAY.

1    **A.**     YEAH.

2    **Q.**     AND CAN YOU, AGAIN, JUST REFRESH THE JURY'S RECOLLECTION

3    ABOUT WHAT IS THE PURPOSE OF A DAM?

4    **A.**     THE PURPOSE OF THE DAM IS THE FINAL MEETING DEAL

5    AUTHORIZATION OR DEAL APPROVAL MEETING, I THINK IT'S CALLED,

6    THAT WE PRESENT TO THE HIGHEST MANAGEMENT IN THE COMPANY TO OUR

7    C.E.O., C.F.O. AND THE -- AND TYPICALLY THE CHAIRMAN OF THE --

8    OF THE COMPANY GETTING FINAL APPROVAL TO GO AND CLOSE A

9    TRANSACTION.  AND AN ACQUISITION TRANSACTION.

10   **Q.**     COULD WE GO TO PAGE 12, JEFF.

11              (EXHIBIT PUBLISHED TO JURY.)

12   **BY MS. GRANT:**

13   **Q.**     AND YOU SEE ALL THESE LITTLE THINGS COMING OUT OF THE

14   TRANSPONDER.  ONE OF THE THINGS THAT WE HADN'T REALLY HEARD

15   ABOUT IS SOMETHING CALLED "COLLAPSE INTERCONNECT."

16              DO YOU KNOW WHAT THAT MEANS?  AND IF YOU DON'T --

17   **A.**     NO, I DON'T SPECIFICALLY REMEMBER WHAT THAT MEANS.

18   **Q.**     AND THE "RF DESIGN TEAM"?

19   **A.**     YES.

20   **Q.**     WHAT -- CAN YOU TELL THE JURY WHAT THAT REFERS TO?

21   **A.**     "RF" IS THE -- THESE WERE PRODUCTS THAT -- THAT TAKE

22   DIFFERENT TYPES OF INGREDIENTS THAT GO INTO BUILDING A PIECE OF

23   TECHNOLOGY.  "RF" REFERS TO WHAT IS THE -- THE RADIO FREQUENCY

24   TECHNOLOGY.  IT'S -- IT'S A COMBINATION OF COMPUTER CHIPS THAT

25   ALLOWS YOU TO DO RADIO TRANSMISSION, WHICH IS PART OF THE

1    TRANSMITTER AND RECEIVE PIECE OF -- OF A TRANSPONDER WHICH IS

2    SHOWN IN THE MIDDLE THERE.

3    **Q.**    AND WHAT'S "FORWARD ERROR CORRECTION"?  DO YOU KNOW WHAT

4    THAT IS?

5    **A.**    IT'S, AGAIN, A PIECE OF ELECTRONICS THAT MAKES YOU DO

6    SOME CORRECTIONS IN THE -- IN THE DATA THAT IS RECEIVED SO THAT

7    IF THERE IS A PROBLEM IN THE TRANSMISSION, THOSE THINGS CAN BE

8    ANTICIPATED AND CORRECTED AS YOU MOVE FORWARD.

9         THESE ARE JUST TECHNOLOGY COMPONENTS THAT GO INTO A

10   LARGER TRANSPONDER.  AND, YOU KNOW, AS YOU CAN TELL, A DEVICE

11   LIKE THE -- THE -- SORRY, THE BOX THAT'S SHOWN THERE, WHICH IS

12   WHAT YOU HELD UP, A TRANSPONDER, IS A COLLECTION OF MANY

13   DIFFERENT PIECES OF TECHNOLOGY AND A SUBSET OF THAT IS SHOWN ON

14   THIS FOIL, THINGS TO WHICH -- THINGS INTO WHICH LICORICE OR

15   LIGHTLOGIC WOULD HAVE CONTRIBUTED.  OF COURSE, THE STORY (SIC)

16   IS MUCH LARGER THAN THIS.

17   **Q.**    "OF COURSE THE" WHAT?

18   **A.**    THE PRODUCT WOULD BE MUCH LARGER THAN THIS, WHAT WE WERE

19   EVENTUALLY TRYING TO BUILD, WHICH IS A MODULE.

20   **Q.**    AND WHEN YOU SAY THE PRODUCT THAT INTEL IS TRYING TO

21   BUILD IS MUCH BIGGER THAN THE TRANSPONDER, CAN YOU EXPLAIN THAT

22   FOR THE JURY?

23   **A.**    YEAH, I'LL TRY.

24        SO THE TECHNOLOGY, WHEN IT GETS INTRODUCED IN OUR

25   BUSINESS, TENDS TO COME IN WHAT ARE CALLED VERY DISCRETE

SIVAKUMAR - DIRECT (RESUMED)/ GRANT

1    SOLUTIONS, WHICH MEANS THERE'S A LOT OF DIFFERENT PIECES OF

2    TECHNOLOGY THAT COME IN DIFFERENT SETS OF INDIVIDUAL PRODUCTS.

3    OVER A PERIOD OF TIME, THEY GET INTEGRATED, RIGHT.

4    Q.    DO YOU WANT A LASER POINTER?

5    A.    SURE.  AND THE BOX HERE, THE THING IN THE MIDDLE, WHICH

6    IS A TRANSPONDER, IS -- IN A -- IN A PERIOD OF TIME, THAT'S --

7    INTEGRATION HAPPENS.  ALL THESE -- YOU CAN --

8         FOR INSTANCE, IF YOU TAKE SOMETHING LIKE FORWARD ERROR

9    CORRECTION, THAT COULD BE A SEPARATE PRODUCT IN ITSELF.  IT

10   COULD BE A SEPARATE PIECE OF COMPUTER CHIP THAT CAN ACTUALLY DO

11   THAT.  OVER A PERIOD OF TIME, YOU IMPROVE TECHNOLOGY AND MAKE

12   IT MORE EFFICIENT AND REDUCE COST AND ALL OF THAT THROUGH A

13   PROCESS OF INTEGRATING THESE INDIVIDUAL DISCRETE PIECES OF

14   TECHNOLOGY.

15        INTEL WAS EVENTUALLY TRYING TO BUILD WHAT WE CALL A

16   SUPERMODULE.  TO GIVE YOU AN ANALOGY, THINK OF A SUPERMODULE AS

17   A RACE CAR AND A LOT OF DIFFERENT PIECES OF TECHNOLOGY THAT

18   WILL GO INTO THAT.  THERE'LL BE THE ENGINE TECHNOLOGY, THE

19   TRANSMISSION TECHNOLOGY.  THERE ARE THINGS THAT YOU HAVE TO DO

20   TO HAVE YOUR WHEELS MOVE IN A CERTAIN WAY, ON, AND ON AND ON,

21   RIGHT?

22        THAT'S EVENTUALLY WHAT OUR STRATEGY WAS.  THAT'S WHAT WE

23   HAD APPROVAL FOR IN THE PREVIOUS STRATEGIC REVIEWS WE HAD IN

24   THE COMPANY.  WHAT LIGHTLOGIC WAS GOING TO BRING IS A COMPONENT

25   THAT WOULD FIT INTO THAT OVERALL STRATEGY.  A BUNCH OF OTHER

 1   PIECES THAT WILL GO INTO THE RACE CAR WE HAD ALREADY ACQUIRED.

 2   THERE WERE STILL OTHER PIECES THAT WE WERE EITHER DEVELOPING OR

 3   ACQUIRING TO EVENTUALLY BUILD WHAT WE CALL THE SUPERMODULE,

 4   WHICH IS SORT OF A RACE CAR, IF YOU WILL.

 5        SO THAT'S KIND OF THE WAY TO THINK ABOUT THIS, RIGHT.

 6   AND ALL OF THESE PIECES -- INDIVIDUAL PIECES THAT ARE SHOWN,

 7   LIGHTLOGIC WAS BRINGING SOME PARTS OF THOSE TECHNOLOGIES THAT

 8   WE MAY OR MAY NOT USE.  IN SOME CASES, WE MIGHT JUST BORROW

 9   SOME IDEAS AFTER THE ACQUISITION IS DONE THAT GOES INTO OUR

10   PRODUCT.  IN SOME CASES, WE MIGHT ACTUALLY BORROW WHAT THEY HAD

11   BUILT.  IN SOME CASES, THE PEOPLE THAT HAVE COME HAVE BUILT

12   SOMETHING LIKE THIS PRIOR, BUT WHAT THEY HAVE BUILT MIGHT NOT

13   APPLY TO US.  BUT WE MIGHT USE THEIR KNOWLEDGE TO BUILD

14   SOMETHING ELSE THAT WE ACTUALLY NEED THAT DOES A SIMILAR THING.

15        SO THERE'S A LOT OF DIFFERENT THINGS THAT GO ON IN TERMS

16   OF AN ACQUISITION THAT YOU GET LOTS OF DIFFERENT PIECES OF

17   TECHNOLOGY AND THEN YOU INTEGRATE IT TO THE TYPE OF SOLUTION

18   THAT YOU WANT TO BUILD.

19   Q.    SO IF -- I'M JUST TRYING TO UNDERSTAND.  SO IN TERMS OF

20   WHY INTEL BOUGHT LIGHTLOGIC, WAS IT TO GET THE TRANSPONDER OR

21   WAS IT TO GET THE PEOPLE THAT KNEW HOW TO BUILD THE

22   TRANSPONDER?

23   A.    THE SECOND PART IS MUCH MORE IMPORTANT.  THE FACT THAT

24   THERE WERE PEOPLE WHO HAD GONE THROUGH THE -- IF I CAN CALL IT

25   THE END-TO-END PROCESS OF BUILDING A TRANSPONDER IS CRITICAL.

SIVAKUMAR — DIRECT (RESUMED)/ GRANT

1     NOW, THE TRANSPONDER IS NOT THE END GAME.  THE

2  TRANSPONDER IS SORT OF THE -- A MIDDLE STEP.  IT IS A POINT OF

3  INTEGRATION.  YESTERDAY I MENTIONED TO YOU THAT OPTICAL

4  TECHNOLOGY AND ELECTRONIC TECHNOLOGY WERE COMING TOGETHER

5  DURING THAT PERIOD OF TIME.

6     AND INTEL'S DESIRE WAS TO ACCELERATE THAT, AND BY THE

7  ABILITY TO MANUFACTURE, WHICH IS WE ARE.  WE ARE A

8  MANUFACTURING COMPANY.  BY OUR ABILITY TO, YOU KNOW, REALLY

9  OPTIMIZE THE MANUFACTURING AND LOWER COST AND BE ABLE TO BRING

10  THESE VERY HIGH-TECHNOLOGY PRODUCTS TO MARKET AT THE RIGHT

11  TIME, WE WERE GOING TO, YOU KNOW, TAKE ADVANTAGE OF THAT

12  CONVERGENCE OF THOSE HAPPENING.

13     LIGHTLOGIC OR LICORICE'S TECHNOLOGY ALLOWED US IN THAT

14  PROCESS TO ACCELERATE OUR ROAD MAP, OUR ROAD MAP OF TECHNOLOGY,

15  THAT WE COULD DO.  WE COULD PROBABLY HAVE DONE IT OURSELVES AND

16  INCREMENTALLY EITHER LEARNED IT OURSELVES OR BROUGHT OTHER

17  PEOPLE WHO KNEW HOW TO DO IT.  BUT THAT WOULD TAKE A PERIOD OF

18  TIME.

19     SO IN LIGHTLOGIC, YOU HAD A COMBINATION OF PEOPLE WHO

20  HAD, IN OUR BEST EVALUATION, GONE THROUGH THAT, AT LEAST IN --

21  IN A DEMONSTRABLE WAY.

22  Q.   OKAY.  AND I DON'T KNOW IF YOU -- WERE YOU AWARE THAT IN

23  THIS TRANSPONDER, IN TERMS OF THE LITTLE OPTICAL MODULES, THAT

24  LIGHTLOGIC BOUGHT THOSE OFF THE SHELF FROM ORTEL?  DID YOU KNOW

25  THAT?

1    **A.**    YEAH, AND THAT IS VERY TYPICAL, THAT INITIALLY, WHEN YOU

2    HAVE AN IDEA OF A CERTAIN SOLUTION, YOU DON'T TRY TO BUILD

3    EVERYTHING FROM SCRATCH.  BECAUSE YOU'RE GOING TO BUILD A CAR,

4    YOU DON'T GO BUY A MINE AND, YOU KNOW, MINE THE ORE TO BUILD

5    THE STEEL AND THEN -- YOU KNOW, ON AND ON AND ON AND ON.

6         YOU TAKE THINGS OFF THE SHELF SO YOU CAN PROVE THE -- THE

7    INITIAL IDEA THAT YOU HAD.  AND THEN OVER A PERIOD OF TIME, YOU

8    LOOK AT PIECES OF WHAT YOU HAVE PUT TOGETHER THAT YOU CAN

9    IMPROVE, WHERE CAN YOU ADD VALUE.  WHAT ARE THE THINGS THAT I

10   CAN THROW OUT, PERHAPS BUILD OR DESIGN MYSELF AND IMPROVE THE

11   QUALITY OF IT, IMPROVE THE -- LOWER THE COST, MAKE IT MORE

12   EFFICIENT OR RUGGED OR, YOU KNOW, WHATEVER THE DESIRE IS, LOWER

13   HOW MUCH POWER IT CONSUMES OR HOW MUCH POWER IT ACTUALLY

14   DELIVERS IN TERMS OF, YOU KNOW, SENDING INFORMATION OR DATA

15   OUT.

16        THERE'S A LOT OF DIFFERENT THINGS THAT GO ON.  INITIALLY,

17   WHAT YOU TYPICALLY DO TO -- IS TO PROVE YOUR IDEA.  YOU TRY TO

18   SHORTEN THE PATH TO PROVE YOUR IDEA BY TAKING THINGS OFF THE

19   SHELF.  AND THAT'S A PRETTY GOOD EXAMPLE OF THAT THAT -- THAT

20   OFF-THE-SHELF TECHNOLOGIES ARE USED FOR THAT.

21             **MS. GRANT:**  CAN WE GO TO PAGE 25, JEFF.

22             (EXHIBIT PUBLISHED TO JURY.)

23   **BY MS. GRANT:**

24   **Q.**    I WANTED TO SEE -- THERE'S SOMETHING ON HERE -- FIRST OF

25   ALL, WHAT'S A SITUATION ANALYSIS, IF YOU KNOW?  THIS IS FROM

1    THE DAM II, AGAIN.

2    **A.**    -- OUT OF CONTEXT.  LET ME -- JUST GIVE ME A SECOND.

3    **Q.**    SURE.

4    **A.**    WHAT PAGE?

5    **Q.**    THIS IS ON PAGE 25.

6    **A.**    OH, IT'S IN THE BACKUP.  OKAY.

7    **Q.**    SO --

8    **A.**    THIS IS -- THIS IS JUST A COLLECTION OF SORT OF THE FACTS

9    OF THE MARKET SEGMENT THAT WE ARE TRYING TO ENTER, ADDRESSES

10   PACKAGING, ADDRESSES CERTAIN ARCHITECTURE THINGS, ADDRESSES

11   SOME CUSTOMER FEEDBACK, VARIOUS THINGS LIKE THAT.

12   **Q.**    AND THERE'S SOMETHING IN QUOTES AND ITALICS.  I'VE SEEN

13   THIS IN OTHER DOCUMENTS.  I WANT TO ASK YOU ABOUT IT.

14        IT SAYS, "CISCO IS NO LONGER THE CUSTOMER FOR GIGA."

15        WHAT DOES THAT MEAN?

16   **A.**    SO LET ME TAKE YOU BACK TO AN ANSWER THAT I GAVE EARLIER,

17   WHICH IS IN THE -- THE NEW TECHNOLOGIES COME, INITIALLY, THEY

18   DON'T COME IN NICELY PACKAGED SOLUTIONS, RIGHT?  THEY COME IN

19   WHAT ARE CALLED DISCRETE PARTS.  LOTS OF DIFFERENT PIECES COME

20   TOGETHER.

21        AND COMPANIES LIKE CISCO WOULD BUY ALL OF THOSE

22   INDIVIDUAL PIECES OF TECHNOLOGY, INTEGRATE THEM, PUT THEM IN A

23   NICE LITTLE BOX AND SELL THEM.  OVER TIME, COMPANIES LIKE

24   CISCO, WHEN THEY ARE BUYING THOSE INDIVIDUAL COMPONENTS FROM

25   COMPANIES LIKE INTEL, DON'T WANT TO BE DOING THE HARD WORK OF

 1   INTEGRATING BECAUSE IT TAKES TIME AND IT TAKES INVESTMENT AND

 2   IT TAKES LOTS OF OTHER THINGS.  THEY LIKE TO GET THINGS MORE

 3   AND MORE INTEGRATED.

 4        GIGA IS A COMPANY THAT INTEL HAD ACQUIRED PRIOR TO

 5   LIGHTLOGIC, WHICH WAS A SUPPLIER OF THESE DISCRETE TECHNOLOGIES

 6   THAT CISCO WAS BUYING FROM US.  AND OVER TIME, CISCO HAD

 7   COMMUNICATED TO US THAT WE DON'T WANT TO BE BUYING INDIVIDUAL

 8   TECHNOLOGY.

 9        IF I CAN MAYBE USE THAT PIECE --

10   **Q.**   THIS ONE (INDICATING)?

11   **A.**   YEAH.

12            **MS. GRANT:**  MAY I APPROACH, YOUR HONOR?

13            **THE WITNESS:**  OR MAYBE EVEN THE BOARD, IF YOU DON'T

14   MIND.

15   **BY MS. GRANT:**

16   **Q.**   OH, SURE.

17   **A.**   I COULD JUST USE THAT AS A POINT OF REFERENCE.

18   **Q.**   I BROKE THIS, SO --

19   **A.**   OKAY.  WITHOUT ANY SPECIFIC REFERENCE TO ANY INDIVIDUAL

20   PART HERE, YOU CAN THINK OF EACH ONE OF THESE LITTLE BOXES THAT

21   YOU SEE AS DIFFERENT PIECES OF TECHNOLOGY.  WHEN NEW TECHNOLOGY

22   COMES, A COMPANY LIKE CISCO MIGHT BE OKAY BUYING THESE

23   INDIVIDUAL PARTS FROM US AND THEN DO ALL THE HARD WORK OF

24   PUTTING IT ALL TOGETHER.

25        OVER TIME, THEY DON'T WANT TO DO THAT BECAUSE IT'S

1    INVESTMENT, IT'S TIME, IT'S -- IT'S A LOT OF KNOWLEDGE THAT YOU

2    HAVE TO HAVE.  YOU HAVE TO HIRE CERTAIN TYPES OF PEOPLE WHO

3    KNOW HOW TO DO THESE THINGS, AND THEY DON'T WANT TO DO THAT.

4    THEY WANT COMPANIES LIKE INTEL TO KIND OF GIVE THEM A BLACK

5    BOX, A BOX THAT LOOKS LIKE THAT, WHERE ALL WE TELL THEM IS THIS

6    GOES IN AND THIS COMES OUT.  THAT'S ALL THEY WANT TO KNOW.

7         THEY WANT TO KNOW, YOU KNOW, WHAT DO I HAVE TO PUT IN TO

8    GET THE OUTPUT THAT I'M DESIRING.  THAT'S ALL THEY WANT TO

9    KNOW, RIGHT?

10        IT'S LIKE YOU BUY A CAR, YOU DON'T REALLY WANT TO KNOW

11   WHAT'S INSIDE.  COMPANIES LIKE CISCO LIKE THAT, BECAUSE THAT

12   GIVES THEM THE ADVANTAGE TO GO TO MARKET VERY QUICKLY.

13   **Q.**   AND WHAT'S THE ADVANTAGE -- WELL, I THINK WE CAN ALL KNOW

14   THE ADVANTAGE OF GOING TO MARKET QUICKLY.  BUT --

15        SO IF WE GO BACK TO THAT ORIGINAL PAGE, JEFF.

16        AND GIVEN YOUR EXPLANATION OF BASICALLY CISCO WANTING THE

17   BOX AND NOT TO HAVE TO MAKE ALL OF THIS (INDICATING) --

18        WE'RE GOING BACK TO, I THINK, 750, JEFF, PAGE 25.

19             (EXHIBIT PUBLISHED TO JURY.)

20   **BY MS. GRANT:**

21   **Q.**   SO WHAT THEN IS THE SIGNIFICANCE OF CISCO NO LONGER BEING

22   THE CUSTOMER FOR GIGA?

23   **A.**   WHAT THAT MEANS IS CISCO NOW DOESN'T WANT TO BUY THESE

24   INDIVIDUAL PARTS FROM US.  THEY WANT TO GET THE BLACK BOX FROM

25   US.  AND THE SIGNIFICANCE OF THAT IS IF YOU WANT TO RETAIN

1   CISCO AS A CUSTOMER, WE BETTER HAVE THE BOXES READY.  THAT'S

2   REALLY WHAT IT MEANS.

3   **Q.**    AND IS IT YOUR UNDERSTANDING THAT THAT'S ONE OF THE

4   THINGS THAT LIGHTLOGIC WAS OFFERING IS, BASICALLY THE BLACK

5   BOX?

6   **A.**    YEAH.  AND -- AND LIGHTLOGIC ALREADY HAD A -- A GOOD

7   STARTING POINT -- A GOOD RELATIONSHIP WITH CISCO, WHICH WAS

8   OBVIOUSLY, YOU KNOW, CRITICAL TO US AS WELL.

9   **Q.**    AND WHAT DOES THE LAST DIAMOND BULLET POINT, SAYS "ENTRY

10  NOW IS KEY TO EMBRACE THIS TRANSITION, RETAIN KNOWLEDGE, AND

11  ESTABLISH A NEW ARCHITECTURE."

12       WHAT IS THE SIGNIFICANCE OF THAT?

13  **A.**    WHAT THAT MEANS IS THAT -- YOU KNOW, LIKE I EXPLAINED

14  EARLIER, THAT -- THAT TRANSITION WAS HAPPENING FROM ONE GIG TO

15  TEN GIG, AND AS THOSE KINDS OF DISRUPTIVE THINGS HAPPEN IN THE

16  MARKET, PEOPLE WHO ARE ABLE TO COME OUT WITH A SOLUTION

17  EARLY -- AND, MIND YOU, THESE KINDS OF TECHNOLOGY SOLUTIONS CAN

18  BE DONE IN A HUNDRED DIFFERENT WAYS.  THERE ISN'T ONE WAY TO DO

19  THESE THINGS.  YOU GO TO A HALF A DOZEN COMPANIES OR A DOZEN

20  COMPANIES, EACH ONE WOULD HAVE THEIR OWN WAY OF -- THE

21  SOLUTIONS.

22       AND HOW DO YOU DO A SOLUTION IS THE REFERENCE TO THE

23  ARCHITECTURE, IS HOW -- YOU KNOW, HOW DO YOU ARCHITECT IT, HOW

24  DO YOU PUT THE SOLUTION TOGETHER.  AND WHOEVER GETS TO MARKET

25  FIRST AND IS ABLE TO ESTABLISH THEIR SOLUTION, SORT OF CAN

1   BUILD A FRANCHISE AROUND IT, IT'S -- THEN THAT BECOMES --

2   HAS -- DOESN'T BECOME AUTOMATICALLY BUT HAS THE OPPORTUNITY TO

3   BECOME THE STANDARD SOLUTION, RIGHT?

4        AND THAT'S WHAT IS REFERENCE TO, AS WE ARE GOING THROUGH

5   THIS TRANSITION, IF WE ARE ABLE TO GET OUR ARCHITECTURE OUT OR

6   OUR SOLUTION OUT FIRST, THEN WE HAVE THE OPPORTUNITY TO

7   REESTABLISH IT.  THAT'S REALLY WHAT I'M SAYING.

8   Q.   AND HOW DID LIGHTLOGIC FIT INTO THAT -- INTEL'S PLAN TO

9   GET ITS ARCHITECTURE OUT FIRST?

10  A.   SO LIGHTLOGIC -- THERE ARE TWO THINGS.  ONE IS THEY HAD

11  TAKEN PORTIONS OF WHAT WE NEEDED, THEY INTEGRATED THAT INTO A

12  SOLUTION, THEY HAD DEMONSTRATED THAT IT WORKED.  THEY HAD GONE

13  THROUGH, YOU KNOW, CERTIFYING THEIR SOLUTION AND VARIOUS OTHER

14  THINGS THAT ARE NEEDED IN OUR BUSINESS.

15       BECAUSE, ULTIMATELY, THESE KINDS OF THINGS ARE BOUGHT BY

16  LARGE TELECOMMUNICATION COMPANIES WHO REQUIRE YOUR PRODUCTS TO

17  BE VERY DEEPLY CERTIFIED.  YOU KNOW, WHEN YOU PUT THAT INTO

18  THEIR NETWORK, THEY DON'T -- THEY WANT TO BE COMPLETELY HUNDRED

19  PERCENT SURE THAT IT'S NOT GOING TO COLLAPSE THEIR NETWORK.  SO

20  THERE'S A LOT OF CERTIFICATION THAT PRODUCTS HAVE TO GO

21  THROUGH.

22       LIGHTLOGIC HAD GONE THROUGH MANY OF THOSE STEPS, AND

23  THEY'RE ALSO DEMONSTRATED TO CUSTOMERS IN PROVABLE MANNER THAT

24  THEY HAD GONE THROUGH THOSE STEPS WITH THE PRODUCTS THAT CAN BE

25  DEPLOYED INTO NETWORKS.  ALL OF THOSE PIECES ARE IMPORTANT TO

1    US BECAUSE WE WERE TRYING TO BUILD A LARGER SOLUTION.  RIGHT?

2    SO IT KIND OF FIT INTO THE ROAD MAP THAT WE WERE BUILDING FOR

3    OUR PRODUCTS.

4    **Q.**    OKAY.  AND DID -- DID INTEL'S BOARD OF DIRECTORS HAVE TO

5    APPROVE THE LIGHTLOGIC TRANSACTION?

6    **A.**    YEAH.  AFTER THE -- THE -- THE PRESENTATION THAT YOU'RE

7    SHOWING RIGHT NOW, THE DAM, ASSUMING THAT WE WERE SUCCESSFUL AT

8    THE DAM AND OUR MANAGEMENT GAVE US THE GO-AHEAD, WE WOULD GO TO

9    THE INTEL BOARD.

10        IN THIS PARTICULAR CASE, GIVEN THE SIZE OF THE

11   TRANSACTION, WE HAD TO GET APPROVAL FROM THE FULL BOARD TO MOVE

12   FORWARD.

13   **Q.**    WHAT DO YOU MEAN, "THE FULL BOARD"?  WHAT'S THE

14   DIFFERENCE?

15   **A.**    THERE'S A CLASSIFICATION OF TRANSACTIONS.  SMALLER

16   TRANSACTIONS CAN BE APPROVED BY A SMALL PORTION OF THE BOARD,

17   BUT --

18            **MS. GRANT:**  CAN WE HAVE EXHIBIT 772?

19            (EXHIBIT PUBLISHED TO JURY.)

20            **MS. GRANT:**  MAY I APPROACH, YOUR HONOR?

21            **THE WITNESS:**  YOU MAY.

22   **BY MS. GRANT:**

23   **Q.**    I'M HANDING YOU 772.  AND IF YOU COULD TELL US,

24   MR. SIVAKUMAR, WHAT THIS DOCUMENT IS.

25   **A.**    PRIOR TO THE -- THE MEETING WHERE TRANSACTIONS LIKE

SIVAKUMAR - DIRECT (RESUMED)/ GRANT

1    LICORICE ARE PRESENTED TO THE INTEL BOARD, WE CREATE A FAIRLY

2    DETAILED DOCUMENT CALLED THE BRIEFING BOOK.  YOU KNOW, THIS

3    PARTICULAR ONE IS NOT VERY THICK, BUT THERE ARE TRANSACTIONS

4    WHERE THE BRIEFING BOOKS CAN BE VERY BIG.

5         ESSENTIALLY, WHAT IT DOES IS BEFORE THE -- THE BOARD

6    COMES TO THE MEETING TO APPROVE A TRANSACTION, IT GIVES THEM A

7    COMPLETE VIEW OF THE -- THE STRATEGY, WHY WE WERE PROPOSING TO

8    DO THIS; YOU KNOW, WHO THE COMPANY IS; HOW THEY FIT INTO WHAT

9    INTEL'S TRYING TO DO; ON AND ON AND ON.

10        SO IT'S A BRIEFING BOOK THAT THE BOARD GETS TYPICALLY

11   ABOUT A WEEK BEFORE THEY COME TO THE MEETING.

12   Q.   AND I THINK THIS IS ABOUT 80 PAGES LONG.  WE'VE

13   DOUBLE-SIDED IT SO IT'S A LITTLE SKINNIER.  CAN YOU TELL THE

14   JURY, IS THERE ANY PARTICULAR PART OF THE BRIEFING BOOK FOR THE

15   BOARD OF DIRECTORS THAT'S OF PARTICULAR SIGNIFICANCE?

16   A.   YOU KNOW, NOT SURPRISINGLY, OUR BOARD CONSISTS OF PEOPLE

17   WHO ARE INCREDIBLY BUSY, AND, YOU KNOW, GETTING THEIR TIME

18   IS -- IS OBVIOUSLY VERY CRUCIAL TO US.  AND SO AS A RESULT, YOU

19   KNOW, JUST LIKE WHAT JOURNALISTS WOULD DO, WE CREATE AN

20   EXECUTIVE SUMMARY AT THE BEGINNING OF THE DOCUMENT, WHICH, YOU

21   KNOW, TYPICALLY RUNS THREE, FOUR, FIVE PAGES, SOMETHING LIKE

22   THAT, THAT BECOMES THE CORE PART OF THE -- WHAT THEY -- THEY

23   READ TO GET THE -- SORT OF SUMMARY PICTURE OF WHAT THEY'RE

24   GOING TO HEAR.

25        MANY OF THOSE DETAILS OF EVERYTHING THAT'S SAID IN THE

1  SUMMARY EXISTS IN THE REST OF DOCUMENT.  OFTEN, THOSE ARE

2  THINGS THAT, YOU KNOW, MIGHT CATCH THE FANCY OF SOME BOARD

3  MEMBERS, BUT THOSE ARE USED AS REFERENCE.  WHEN YOU HAVE TO

4  MAKE THE PRESENTATION OR SOMETHING, WE CAN GO -- REFER BACK TO

5  SAY, YOU KNOW, AS IT'S EXPLAINED IN THE BRIEFING BOOK AND SO

6  ON, SO FORTH.

7       SO THERE'S A LOT OF CONTENT IN THE BRIEFING BOOK, BUT

8  IT'S TYPICALLY THE EXECUTIVE SUMMARY THAT THEY ARE MOST LIKELY

9  TO, YOU KNOW, FULLY READ.

10 Q.   OKAY.  SO LET'S TAKE A LOOK JUST BRIEFLY AT THE EXECUTIVE

11 SUMMARY.  I THINK THE JURY'S SEEN PART OF THIS DOCUMENT BEFORE.

12           (EXHIBIT PUBLISHED TO JURY.)

13 **BY MS. GRANT:**

14 Q.   AND I THINK YOU'RE RIGHT, IT'S ABOUT -- ALMOST TWO PAGES.

15       SO IF WE CAN ACTUALLY BLOW UP -- LET'S START AT THE THIRD

16 PARAGRAPH.  ACTUALLY, IF WE CAN GO -- NO, BRING UP THE FIRST

17 PART OF -- SORRY, JEFF.  JUST THE WHOLE -- YEAH, THAT FIRST --

18 THREE PARAGRAPHS.

19           (EXHIBIT PUBLISHED TO JURY.)

20 **BY MS. GRANT:**

21 Q.   AND I JUST HAD TO ASK YOU SOMETHING BECAUSE IT TALKS

22 ABOUT INTEL'S VISION, AND THEN IT SAYS, THIRD PARAGRAPH, "AS

23 PART OF THE STRATEGIC DIRECTION IN VECTOR NO. 5," WHICH

24 SOUNDS -- WHAT IS VECTOR NO. 5?

25 **A.**   THAT'S JUST THE FIRST --

SIVAKUMAR - DIRECT (RESUMED)/ GRANT

1  Q.    OH, IT'S --

2  A.    ENGINEERS HAVE A LANGUAGE THAT IS ARCANE.  AND

3  "VECTOR" --

4  Q.    I'VE ALWAYS WONDERED WHAT "VECTOR NO. 5" IS, SO I JUST

5  THOUGHT I'D ASKED YOU --

6  A.    WE COULD HAVE JUST SAID "NO. 5," BUT WE LIKE TO MAKE IT

7  FANCY.

8  Q.    OKAY.  IT'S VERY FANCY.

9        "AS PART OF THE STRATEGIC DIRECTION IN VECTOR NO. 5, IT

10 IS INTEL'S PLAN TO DELIVER INTEGRATED OPTOELECTRONIC

11 COMPONENTS, IOC, ACROSS A RANGE OF APPLICATIONS IN ENTERPRISE,

12 METRO, AND LONG HAUL NETWORKS.  OUR INITIAL GOAL IS TO

13 ESTABLISH LEADERSHIP IN THE METRO MARKET SEGMENT DURING THE

14 CRITICAL CONVERGENCE AT 10 GIG SPEED OF SONET OC192 IN THE WAN

15 AND 10 GIG ETHERNET, 10GE, IN THE LAN."

16       CAN YOU JUST SUMMARIZE THAT IN -- IN JUST NORMAL

17 LANGUAGE?

18 A.    OKAY.

19       YEAH I'LL TRY.

20       SO INTEL'S HISTORY IS -- IF YOU -- IF YOU FOCUS ON THE

21 THREE WORDS THERE, "ENTERPRISE," "METRO," AND "LONG HAUL,"

22 THINK OF THOSE AS THREE DIFFERENT SEGMENTS INTO WHICH SOME

23 PRODUCT OR TECHNOLOGY MIGHT BE SOLD.

24       SIMPLE ANALOGY, AN AUTOMOBILE COULD BE SOLD TO AN

25 INDIVIDUAL, A HOME BUYER, OR IT COULD BE SOLD TO A LARGE

 1   COMPANY LIKE HERTZ, OR IT COULD BE, LET'S SAY, SOLD TO THE

 2   GOVERNMENT.  RIGHT.  THREE DIFFERENT MARKETS.

 3        SIMILARLY, TECHNOLOGIES CAN GO INTO LOTS OF DIFFERENT

 4   MARKETS.  AND "ENTERPRISE" REFERS TO LARGE COMPANIES.  "METRO"

 5   REFERS TO NETWORKS THAT MIGHT EXIST IN A CITY, LIKE OAKLAND OR

 6   SAN FRANCISCO, WHATEVER.  THAT'S WHAT "METRO" REFERS TO.  "LONG

 7   HAUL" REFERS TO NETWORKS THAT MIGHT BE BETWEEN TWO LARGE

 8   CITIES, SAN FRANCISCO TO NEW YORK.  THAT WOULD BE A LONG HAUL

 9   NETWORK.  RIGHT, SO THESE ARE THREE DIFFERENT MARKETS.

10        AND HISTORICALLY OVER THE LAST, YOU KNOW, 30, 40, 50

11   YEARS, TECHNOLOGIES FOR THESE MARKETS HAVE BEEN BUILT SPECIFIC

12   TO THOSE MARKETS.  AND OVER THE HISTORY OF -- OF TECHNOLOGY,

13   OVER THAT PERIOD OF TIME, 50 OR 60 YEARS, TYPICALLY, THINGS

14   THAT WERE LONG HAUL WERE BUILT SPECIFICALLY FOR LARGE COMPANIES

15   LIKE AT&T AND SO ON, SO FORTH.  THEY WERE INCREDIBLY EXPENSIVE

16   TECHNOLOGY THAT WAS CUSTOMIZED OR SPECIFICALLY BUILT FOR WHAT

17   THEY NEEDED TO DO?

18        INTEL, ON THE OTHER HAND, HISTORICALLY BUILT TECHNOLOGIES

19   THAT WENT INTO LARGE COMPANIES, INTO WHAT'S REFERRED TO THERE

20   AS "ENTERPRISE."  AS THESE MARKETS WERE CONVERGING, LOTS OF

21   DIFFERENT FORCES AT PLAY.

22        ONE IS THE NEED FOR NETWORKS HAVE EXPONENTIALLY GROWN

23   OVER THE LAST 20 YEARS AS THE INTERNET HAS GROWN AND ALL OF

24   THAT STUFF.  AND ALL COMPANIES, TELECOM COMPANIES, LARGE

25   COMPANIES, THEY ALL WANT, OBVIOUSLY, TO REDUCE COST.  THEY WANT

1   TO HAVE CHEAPER TECHNOLOGY THAT CAN DO BETTER THINGS.

2        AND ONE OF THE WAYS IN WHICH THAT CAN BE DONE IS TO TRY

3   AND BUILD TECHNOLOGIES THAT CAN GO INTO ALL OF THOSE SEGMENTS

4   THAT YOU DON'T CUSTOMIZE FOR INDIVIDUAL SEGMENTS, SO THE CORE

5   TECHNOLOGY THAT YOU BUILD CAN GO INTO EACH ONE OF THOSE

6   MARKETS.

7        WHAT THIS PARAGRAPH IS REALLY SAYING IS THAT WHILE

8   INTEL'S HISTORY IS REALLY ON THE ENTERPRISE STUFF, AND ON

9   THE -- YOU KNOW, SELLING TECHNOLOGY TO LARGE COMPANIES, BECAUSE

10  THIS CONVERGENCE IS HAPPENING -- AND THE TERM "OC192," ALL THAT

11  REFERS TO IS THE LONG HAUL NETWORK, TO KEEP IT VERY SIMPLE.

12  RIGHT.

13       THAT WAN, ON THE OTHER HAND, REFERS TO THE ENTERPRISE.

14  IN THIS SENTENCE, YOU'VE NOT USED THE WORD "METRO INTERNET,"

15  BUT TEN GIG ETHERNET, YOU CAN THINK OF THE TECHNOLOGY THAT

16  MIGHT GO INTO THE THIRD SEGMENT, WHICH IS THE METRO.  RIGHT?

17       WHAT THIS PARAGRAPH IS REALLY SAYING IS THAT AS WE ARE

18  TRYING TO DELIVER INTEGRATED OPTOELECTRONIC COMPONENTS THAT CAN

19  SPAN THESE NETWORKS, LICORICE OR LIGHTLOGIC GIVES US THE

20  OPPORTUNITY TO DO THAT OR ACCELERATE OUR FOCUS INTO BUILDING

21  THAT ONE SOLUTION -- OBVIOUSLY, THEY'LL TAKE US TIME TO DO IT,

22  BUT IT GIVES US THE OPPORTUNITY TO ACCELERATE THAT THAT CAN

23  SERVICE ALL OF THESE MARKETS.

24       I KNOW I GAVE A VERY LONG ANSWER, BUT --

25  Q.   NO, THAT WAS VERY HELPFUL.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          AND IF WE CAN GO DOWN ONE MORE PARAGRAPH, JEFF, I THINK

2     WE CAN GET --

3                    (EXHIBIT PUBLISHED TO JURY.)

4     **BY MS. GRANT:**

5     **Q.**    "WE BELIEVE LICORICE HAS THE PRODUCT AND PROCESS

6     CAPABILITIES NECESSARY TO CREATE THIS UNIFYING TECHNOLOGY

7     PLATFORM."

8          MR. SIVAKUMAR, WHAT ARE PROCESS CAPABILITIES?

9     **A.**    I THINK IN THIS CONTEXT, IT REFERS TO THE FACT THAT

10    LIGHTLOGIC HAD TAKEN THESE INITIAL IDEAS, TAKEN SOME

11    OFF-THE-SHELF PRODUCTS OR WHATEVER AND CREATED THEIR OWN

12    TECHNIQUES, CREATED FAIRLY COMPLEX SOFTWARE, FIGURE OUT HOW TO

13    ACTUALLY PUT SOME OF THESE PIECES TOGETHER, AND ULTIMATELY

14    DELIVER A PIECE OF TECHNOLOGY THAT WAS ALL INTEGRATED.

15         AND I THINK THAT'S WHAT THIS PARTICULAR SENTENCE REFERS

16    TO.

17    **Q.**    OKAY.

18         AND IF WE COULD GO TO THE LAST PARAGRAPH ON THIS PAGE,

19    JEFF.  STARTS WITH "THE PROPOSED."

20                    (EXHIBIT PUBLISHED TO JURY.)

21    **BY MS. GRANT:**

22    **Q.**    "THE PROPOSED LICORICE ACQUISITION WOULD ENABLE INTEL TO

23    IMMEDIATELY OFFER 10-GIG IOC'S TO THE MARKETPLACE AND BECOME A

24    LEADER IN THE TRANSITION TO 10 GIG."

25         WHAT -- WHAT IS -- WHAT DOES THAT MEAN?

1  **A.**    AGAIN, IT GOES BACK TO THE LONG ANSWER I GAVE, WHICH

2  IS -- THINK I SAID THE SENTENCE AT THE VERY END, WHICH IS IF WE

3  BOUGHT LIGHTLOGIC, THE FACT THAT THEY HAD ALREADY TAKEN SOME OF

4  THE STEPS THAT WE NEEDED TO TAKE TO GO ADDRESS THIS MARKET, IF

5  WE GOT THEM AND WE SUCCESSFULLY INTEGRATED THEM INTO WHAT IS

6  ALREADY ONGOING AT INTEL, WE HAD AN OPPORTUNITY TO BECOME A

7  LEADER IN THIS TRANSITION TO 10 GIGABIT, WHICH IS GOING FROM

8  1 GIGABIT TO 10 GIGABIT, WE HAD AN OPPORTUNITY TO BECOME A

9  LEADER.

10  **Q.**    AND 10 GIG, AGAIN, WE'RE TALKING ABOUT THESE THINGS --

11  **A.**    YEAH.  THESE PRODUCTS THAT WILL GO INTO THE BIGGER

12  SOLUTION --

13  **Q.**    OKAY.

14        CAN WE GO TO -- WELL, LET ME ASK YOU -- SO I -- I THINK

15  SINCE -- OBVIOUSLY, THE BOARD OF DIRECTORS APPROVED THE

16  LIGHTLOGIC TRANSACTION, CORRECT?

17  **A.**    YEAH.  YES.

18  **Q.**    AND CAN WE GO TO EXHIBIT 815.

19            (PAUSE IN THE PROCEEDINGS.)

20  **BY MS. GRANT:**

21  **Q.**    AND I'M HANDING YOU, MR. SIVAKUMAR, SOMETHING CALLED A

22  COMPANY DISCLOSURE SCHEDULE.

23        IF YOU CAN PUT IT UP, JEFF.

24            (EXHIBIT PUBLISHED TO JURY.)

25

1   **BY MS. GRANT:**

2   **Q.**     HAVE YOU EVER SEEN THIS DOCUMENT BEFORE, OR DO YOU KNOW

3   WHAT ITS PURPOSE IS?

4   **A.**     YEAH, I THINK THESE ARE THE DISCLOSURES THAT WE GET FROM

5   THE TARGET COMPANY, IN THIS PARTICULAR CASE, LIGHTLOGIC.

6   **Q.**     OKAY.

7        AND CAN WE TURN TO PAGE 12, JEFF.

8            (EXHIBIT PUBLISHED TO JURY.)

9   **BY MS. GRANT:**

10  **Q.**     AND YOU CAN EITHER LOOK AT IT -- WHICHEVER'S EASIER FOR

11  YOU -- ON THE SCREEN OR ON THE COPY THAT YOU HAVE.

12       CAN YOU BLOW UP SECTION 2.14A, INTELLECTUAL PROPERTY.

13       AND YOU CAN SEE HERE THAT LIGHTLOGIC IS MAKING A

14  DISCLOSURE TO INTEL THAT SAYS, JEAN-MARC VERDIELL AND FRANK

15  SHUM FOUNDED A COMPANY CALLED RADIANCE DESIGN, INC., RADIANCE.

16       PURSUANT TO A RADIANCE DESIGN, INC. PLAN OF LIQUIDATION,

17  APPROVED BY THE BOARD OF DIRECTORS OF RADIANCE IN JANUARY 1998,

18  FRANK SHUM AND JEAN-MARC VERDIELL WERE GIVEN EQUAL RIGHTS TO

19  INDEPENDENTLY EXPLOIT THE INTELLECTUAL PROPERTY DEVELOPED BY

20  RADIANCE DESIGN, INC., INCLUDING THE RIGHT TO U.S. PATENT

21  NO. 5,977,567.

22       DID THE FACT THAT MR. SHUM HAD RIGHTS TO SOME TECHNOLOGY

23  FROM RADIANCE -- WAS THAT A PROBLEM TO -- WAS THAT AT ALL A

24  PROBLEM TO INTEL?

25  **A.**     NO.  NOT REALLY.  NO.

1    Q.    WHY?

2    A.    WHAT IS MORE IMPORTANT IS THAT THERE ISN'T SOMETHING OUT

3    THERE THAT WILL BLOCK OUR ABILITY TO GO OUT AND PURSUE THIS

4    TECHNOLOGY, INTEGRATE INTO OUR PRODUCTS, AND SO ON, SO FORTH.

5         AND IT'S REALLY LEFT TO OUR LEGAL TEAM TO VERIFY THAT

6    THERE ISN'T SOMETHING THAT WILL BLOCK US FROM DOING THAT.

7    THAT'S THE ONLY THING THAT WE CARE ABOUT.  IN FACT, IN OUR

8    INDUSTRY, WE ARE -- VERY RARELY HAVE THE LUXURY OF HAVING

9    EXCLUSIVE ACCESS TO ANY SPECIFIC PIECE OF TECHNOLOGY.  LOTS OF

10   THINGS WE ACTUALLY OPEN OUT SO THAT OTHER PEOPLE CAN ACTUALLY

11   BUILD PRODUCTS AND SO ON, SO FORTH.

12        SO THIS ISN'T SOMETHING -- BEYOND THE FACT THAT IT

13   DOESN'T STOP US FROM DOING WHAT WE WANT TO DO, IT'S NOT

14   SOMETHING THAT WE WORRY ABOUT.

15   Q.    AND WHEN YOU SAY YOU VERY RARELY IN YOUR INDUSTRY HAVE

16   THE LUXURY OF HAVING EXCLUSIVE RIGHTS, WHAT -- WHY IS THAT?

17   A.    ESPECIALLY IN TECHNOLOGIES THAT -- WE OPERATE IN -- IN AN

18   INDUSTRY THAT -- THAT BELIEVES IN, YOU KNOW, OPEN ACCESS TO

19   TECHNOLOGY, SO ON, SO FORTH.

20        I CAN USE THE EXAMPLE THAT MIGHT BE A LITTLE BIT MORE

21   FAMILIAR.  LET'S -- LET'S TALK ABOUT WIRELESS TECHNOLOGY THAT

22   GOES INTO LAPTOPS, FOR INSTANCE.  NOW, THERE ARE SOME -- SO

23   WHEN YOU -- I'M SURE MOST -- MANY OF YOU USE LAPTOPS AND YOU

24   OPEN THEM, AND THEY CONNECT INTO WIRELESS NETWORKS, AND YOU'RE

25   ABLE TO GET INTO THE INTERNET AND DO EMAIL AND SO ON, SO FORTH.

1          THE -- THE WIRELESS TECHNOLOGY THAT IS IN THERE HAS SOME

2     ARCANE NAMES, AND I WON'T USE ALL OF THOSE NAMES, BUT THAT

3     TECHNOLOGY ITSELF, THERE ARE MANY PEOPLE IN THE INDUSTRY THAT

4     HAVE ACCESS TO THAT TECHNOLOGY OR SOME VARIATIONS OF IT.

5          ULTIMATELY, OUR BUSINESS IS HOW DO YOU TAKE, YOU KNOW,

6     CORE PIECE OF TECHNOLOGY LIKE THAT AND VERY QUICKLY TRANSFORM

7     THEM INTO PRODUCTS, HOPEFULLY PRODUCTS BETTER THAN ANYBODY

8     ELSE, USE OUR ABILITY TO MANUFACTURE THEM IN MILLIONS OF UNITS

9     AND THEN GET THEM TO MARKET IN A VERY TIMELY FASHION SO THAT WE

10    CAN POTENTIALLY BE A LEADER AND WE CAN -- RIGHT?

11         IN THAT PROCESS, IT IS VERY IMPORTANT FOR US TO KNOW THAT

12    WE WON'T BE HINDERED IN DOING WHAT WE NEED TO DO RATHER THAN

13    WORRYING ABOUT WHO ELSE HAS ACCESS TO IT.  THAT WOULDN'T BE --

14    I DON'T KNOW IF I'M MAKING MY POINT, BUT THAT'S KIND OF HOW WE

15    HAVE TO THINK ABOUT -- THINK ABOUT ACCESS TO TECHNOLOGY.

16    **Q.**    SO IF I UNDERSTAND YOUR TESTIMONY, IT'S THE RIGHT TO USE

17    THAT'S MOST IMPORTANT TO INTEL?

18    **A.**    THAT'S RIGHT.

19    **Q.**    AND HAVE YOU EVER HEARD OF SOMETHING AT INTEL CALLED A

20    PATENT POOL?

21    **A.**    YEAH.

22    **Q.**    CAN YOU TELL THE JURY WHAT THAT MEANS?

23    **A.**    MAYBE I'LL JUST USE THE SAME EXAMPLE THAT I JUST USED.

24    **Q.**    OKAY.

25    **A.**    THE -- IF -- LET'S -- LET'S SAY THAT TO INTRODUCE A NEW

SIVAKUMAR — DIRECT (RESUMED)/ GRANT

1    WIRELESS TECHNOLOGY —— LET'S SAY THERE ARE TEN PATENTS THAT ARE

2    REQUIRED.   RIGHT.   YOU'LL NEED MANY OTHER THINGS TO INTRODUCE A

3    PIECE OF TECHNOLOGY, BUT LET'S JUST SAY FROM A PATENT FRONT,

4    THERE ARE TEN PATENTS THAT ARE REQUIRED.   AND LET'S —— FOR,

5    SAY, SIMPLICITY OF DISCUSSION, LET'S SAY THOSE TEN PATENTS ARE

6    OWNED BY TEN DIFFERENT PEOPLE, AND LET'S SAY THEY ALL HAVE

7    UNREASONABLE EXPECTATIONS ON WHAT THE VALUE OF THOSE PATENTS

8    ARE AND SO ON, SO FORTH.

9         WHAT THAT WOULD DO IS THAT IT WILL ALMOST ENSURE THAT

10   SOLUTIONS THAT REQUIRE ALL OF THOSE PATENTS TO BE BROUGHT TO

11   MARKET ACTUALLY NEVER HAPPENS.

12        SO PATENT POOLS IS AN IDEA BY WHICH COMPANIES THAT

13   DEVELOP DIFFERENT PIECES OF TECHNOLOGY THAT ARE NEEDED THAT

14   WORK TOWARDS A SPECIFIC STANDARD AND WHEN I USE THE WORD

15   "STANDARD," WHAT THAT MEANS IS WHETHER I HAVE A LAPTOP OR ANY

16   ONE OF YOU HAVE A LAPTOP, THEY ALL KIND OF WORK THE SAME WAY

17   BECAUSE THEY ARE BUILT ON STANDARD TECHNOLOGY.

18        THEY ADOPT STANDARDS THAT ARE SET BY INDUSTRY

19   ASSOCIATIONS THAT AGREE ON, YEAH, WE WILL ALL FOLLOW THE SAME

20   SET OF RULES, TECHNICAL RULES, SO THAT THE PRODUCT BUILT BY ME

21   AND BUILT BY SOMEBODY ELSE CAN ALL WORK TOGETHER, BUT OUR

22   COMMERCIAL SUCCESS WILL DEPEND ON HOW QUICKLY WE DO IT, HOW WE

23   HIT THE MARKET AT THE RIGHT TIME, HOW GOOD OUR PRODUCT IS, AND

24   SO ON, SO FORTH.

25        SO PATENT POOL IS A MECHANISM BY WHICH COMPANIES THAT

1   DEVELOP DIVERSE SET OF TECHNOLOGIES IN A CERTAIN AREA AGREE TO

2   PUTTING ALL THE -- ALL THEIR PATENTS TOGETHER AND SAYING, HEY,

3   WE ALL HAVE ACCESS TO IT.  LET'S LICENSE IT TO EACH OTHER SO

4   THAT WE ARE NOT SLOWING DOWN THE -- THE SPEED AT WHICH

5   TECHNOLOGY CAN BE INTRODUCED TO MARKET.

6        SO, FOR INSTANCE, IF -- WHEN THE WIRELESS TECHNOLOGY,

7   LET'S SAY THAT GOES IN THE LAPTOPS, WHICH MOST PEOPLE ARE

8   FAMILIAR WITH, IF THERE WAS AN UNREASONABLE BLOCKING OF A

9   CERTAIN ACCESS TO THAT TECHNOLOGY BY SOME ENTITY, WE WOULD NOT

10  BE ABLE TO INTRODUCE OR ACCELERATE NEW TECHNOLOGY THAT COMES

11  INTO THE MARKET IN THE WAY CUSTOMERS MIGHT DESIRE OR TECHNOLOGY

12  COMPANIES MIGHT DESIRE, AND PATENT POOLS IS THE WAY TO DO THAT.

13  **Q.**   SO IT SOUNDS STRANGE THAT YOU'RE SHARING TECHNOLOGY WITH

14  COMPETITORS, SO IF YOU'RE DOING THAT THROUGH THESE PATENT

15  POOLS, HOW DO YOU -- HOW DO YOU BEAT -- HOW DOES INTEL THEN

16  BEAT THE COMPETITION IF THEY'RE SHARING THEIR TECHNOLOGY WITH A

17  COMPETITOR?

18  **A.**   YEAH, I THINK THIS SORT OF GOES BACK TO AN ANSWER THAT I

19  GAVE YESTERDAY, WHICH IS ULTIMATELY WE MAKE MONEY ON THE

20  PRODUCTS THAT WE BUILD, RIGHT?  IT IS THE COMPUTER CHIPS THAT

21  WE BUILD THAT GET INTEGRATED INTO PC'S OR INTO LAPTOPS OR INTO

22  OTHER DEVICES.  AND WE ARE A MANUFACTURING COMPANY.  WE LIKE TO

23  BUILD THINGS IN MILLIONS OF UNITS, RIGHT?

24        SO THE WAY YOU WIN IS TO TAKE THE -- THE PIECES OF

25  TECHNOLOGY THAT YOU HAVE, INTEGRATE THAT -- THEM INTO PRODUCTS,

1    AND, HOPEFULLY, WE ARE GOING TO CREATE PRODUCTS THAT PEOPLE

2    WANT TO BUY AND ARE HAPPY WITH AND WILL PAY FOR US (SIC).

3         AND WE REALLY WIN BY OUR ABILITY TO MANUFACTURE THEM

4    BETTER THAN ANYBODY ELSE OR DESIGN THOSE PRODUCTS BETTER THAN

5    ANYBODY ELSE AND INTRODUCE THEM IN A VERY TIMELY FASHION INTO

6    THE MARKETPLACE.  SO THAT IS REALLY WHERE OUR FOCUS IS.

7    Q.    OKAY.

8         **MS. GRANT:**  YOUR HONOR, THIS MIGHT BE A GOOD TIME TO

9    JUST TAKE A BREAK.

10        **THE COURT:**  ALL RIGHT.  WE'LL TAKE TEN MINUTES.

11        (RECESS TAKEN AT 10:27 A.M.)

12        (PROCEEDINGS RESUMED AT 10:40 A.M.)

13        **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

14   COME TO ORDER.

15        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

16   PRESENCE OF THE JURY:)

17        **THE COURT:**  COUNSEL, PLEASE GO AHEAD.

18        **MS. GRANT:**  THANK YOU, YOUR HONOR.

19        ACTUALLY, HOUSEKEEPING, WE'D LIKE -- THE DEFENDANTS

20   WOULD LIKE TO MOVE EXHIBIT 815, THE COMPANY DISCLOSURE SCHEDULE

21   THAT MR. SIVAKUMAR IDENTIFIED, INTO EVIDENCE.

22        **THE COURT:**  BE INTRODUCED.

23             (TRIAL EXHIBIT 815

24             RECEIVED IN EVIDENCE)

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

SIVAKUMAR – DIRECT (RESUMED)/ GRANT

1   BY MS. GRANT:

2   Q.    MR. SIVAKUMAR, YESTERDAY, WE STARTED TO TALK ABOUT YOUR

3   NEGOTIATIONS THAT YOU HAD WITH DR. VERDIELL.  AND CAN YOU TELL

4   THE JURY WHAT YOUR IMPRESSION WAS OF DR. VERDIELL WHEN YOU WERE

5   NEGOTIATING WITH HIM TO BUY LIGHTLOGIC.

6   A.    I THINK I -- I MET DR. VERDIELL THE FIRST TIME I VISITED

7   THE COMPANY.  THE FIRST CONVERSATION, LIKE I EXPLAINED, WAS ON

8   THE PHONE WITH THE -- WITH THE C.E.O., JOHN MCGRAW.  AND IT

9   TOOK, MAYBE FIVE MINUTES OF THAT INITIAL MEETING TO UNDERSTAND

10  HIS IMPORTANCE TO THE COMPANY.

11        YOU KNOW, IT WAS -- IT WAS BEYOND A DOUBT HIS PASSION,

12  AND HIS UNDERSTANDING OF -- OF WHERE THE MARKETS WERE GOING,

13  THE CRITICALITY OF THE TECHNOLOGY THAT THEY HAD BUILT.  YOU

14  KNOW, THE -- NO DISRESPECT MEANT TO YOU, HE WAS PERHAPS A

15  CLINICAL EXAMPLE OF A CRAZY SCIENTIST, AND -- YOU KNOW, THE

16  TYPE OF PEOPLE WE LOVE.  AND -- YOU KNOW, IT WAS JUST AN

17  AMAZING EXPERIENCE.  AND I --

18        IT WAS -- LIKE I SAID, IT WAS WITHIN THE PRETTY MUCH THAT

19  FIRST MEETING, AND I THINK I SPENT ABOUT TWO, TWO AND A HALF

20  HOURS IN LIGHTLOGIC GETTING A TOUR OF THE FACILITY, GETTING TO

21  MEET THE SENIOR TEAM, LOOKING AT SOME OF THE -- THE THINGS THAT

22  THEY HAD BUILT IN THE BACKGROUND AND WHAT THEIR STRATEGY WAS

23  AND SO ON, SO FORTH.

24        WHAT STOOD OUT FOR ME WAS THIS COMPLETE PASSION TO -- TO

25  BUILDING THIS TECHNOLOGY, BUILDING A BIG COMPANY OUT OF IT.  IT

1    WAS ACTUALLY VERY INTERESTING THAT THERE ARE TWO VERY

2    CONFLICTING SORT OF THINGS THAT CAME OUT OF THAT INITIAL

3    DISCUSSION WHERE HIS PASSION AND HIS HEART WAS REALLY IN TAKING

4    THAT INITIAL TECHNOLOGY THAT HE HAD CREATED AND BUILDING A BIG

5    COMPANY OUT OF IT, RIGHT, OVER MANY YEARS, AND HE WANTED TO BE

6    THE GUY DOING IT, AND HE WANTED THE WORLD TO RECOGNIZE THAT HE

7    IS THE GUY WHO BROUGHT THE SOLUTION AND SO ON, SO FORTH.

8         AT THE SAME TIME, HE WAS VERY CLEARLY A PRAGMATIST, A GUY

9    WHO UNDERSTOOD THAT FOR TECHNOLOGIES TO SUCCEED, FOR YOUR IDEA

10   TO REALLY BECOME BIG IN THE MARKET SO YOU CAN POINT TO, YOU

11   KNOW, YOUR GRANDMOTHER OR WHATEVER AND SAY THAT I BUILT IT,

12   IT'S ALL -- IT'S ALL TIMING RELATED.  YOU HAVE TO COME OUT AT

13   THE RIGHT TIME, YOU HAVE TO BUILD THE RIGHT PRODUCT, YOU HAVE

14   TO GET THE RIGHT CUSTOMERS, YOU HAVE TO HAVE THE ABILITY TO

15   BUILD IT AT A QUALITY AND VOLUME, AND VARIOUS THINGS LIKE THAT.

16        AND SORT OF THE PRAGMATIC SIDE OF HIM WAS HE RECOGNIZED

17   THAT SOMEBODY LIKE AN INTEL COULD ACTUALLY HELP HIM DO THAT.

18   SO THERE WAS THAT COMBINATION OF FEELINGS.  I MEAN, LEFT TO,

19   YOU KNOW, HIS EMOTIONAL SIDE OR THE PASSION SIDE, HE WOULD HAVE

20   WANTED TO DO IT HIMSELF.  BUT HE ALSO RECOGNIZED THAT, YOU

21   KNOW, THERE WAS A LOT OF VALUE THAT A COMPANY LIKE INTEL COULD

22   BRING.

23        SO THAT'S KIND OF MY FIRST SET OF IMPRESSIONS.

24   Q.   DID HE EVER TELL YOU ABOUT HIS FEELINGS ABOUT HOW HE FELT

25   ABOUT BEING ACQUIRED BY INTEL?

1   **A.**    YOU KNOW, YOU ALWAYS HAD A BIT OF MIXED SET OF FEELINGS

2   FROM HIM.  OBVIOUSLY, YOU KNOW, INTEL'S A BIG COMPANY.  INTEL

3   COULD BE A SCARY COMPANY FOR SOME PEOPLE WHO ARE -- ARE USED TO

4   CALLING THE SHOTS AND BEING, YOU KNOW, CONTROL OF THEIR OWN

5   DESTINIES, SO HE EXPRESSED SOME OF THOSE CONCERNS AND HOW --

6   YOU KNOW, HOW DO WE PLAN ON HANDLING THAT.  IF WE WERE TO GO

7   THROUGH AND CONSUMMATE A TRANSACTION, HOW WOULD WE INTEGRATE

8   HIM INTO THE COMPANY, WHERE HE WOULD HE FIT, HOW MUCH FREEDOM

9   WOULD HE HAVE TO CONTINUE TO DO OTHER TECHNOLOGY, OR HOW MUCH

10  FREEDOM WOULD HE HAVE TO DRIVE STRATEGY AND THOSE KINDS OF

11  THINGS, RIGHT?

12       SO NO, IT WASN'T -- IT WASN'T LIKE ON THE FIRST MEETING

13  IT WAS A SLAM DUNK TO SAY THAT, YEAH, I'M READY TO JOIN INTEL,

14  RIGHT.  IT TOOK MANY WEEKS OF WORKING WITH HIM, BUT IT WAS

15  CLEAR TO US PRETTY MUCH FROM DAY ONE THAT HE WAS AN INCREDIBLY

16  IMPORTANT, YOU KNOW, COMPONENT OF -- OF ANY TRANSACTION THAT WE

17  WOULD DO WITH LIGHTLOGIC.

18  **Q.**    DID YOU DO ANYTHING -- YOU MENTIONED YESTERDAY HE WAS

19  CRITICAL TO THE DEAL.  DID YOU DO ANYTHING TO TRY AND MAKE SURE

20  THAT HE WOULD STAY AT INTEL OR COME TO INTEL?

21  **A.**    YEAH, THERE WERE -- THERE WERE THINGS THAT WE DID TO

22  RETAIN HIM FOR AT LEAST THREE YEARS FROM THE -- FROM THE

23  STRUCTURE OF, YOU KNOW, WHAT HIS -- THE CONSIDERATION THAT

24  WOULD GO TO HIM AND -- AND THERE WERE VARIOUS OTHER MECHANISMS

25  BY WHICH WE ENSURED THAT, YOU KNOW, WE WOULD KEEP HIM FOR A

 1   PERIOD OF TIME.  ABSOLUTELY.

 2              **MS. GRANT:**  CAN WE GO TO EXHIBIT 750, PAGE 19, JEFF?

 3              (EXHIBIT PUBLISHED TO JURY.)

 4              **THE WITNESS:**  YEAH, RIGHT THERE.

 5   **BY MS. GRANT:**

 6   **Q.**    SO RIGHT THERE, IT SAYS -- THERE'S A SECOND BULLET POINT,

 7   THREE-YEAR DEFERRED PAYOUT FOR CTO AND KEY EMPLOYEES.  CTO IS

 8   DR. VERDIELL?

 9   **A.**    YES.

10   **Q.**    AND THEN IT SAYS THREE-YEAR NONCOMPETE FROM THE CTO.  WAS

11   HE -- WAS DR. VERDIELL THE ONLY PERSON THAT HAD THE THREE-YEAR

12   NONCOMPETE?

13   **A.**    YEAH, I MEAN, IT WAS -- BEYOND A DOUBT, IT WAS CLEAR TO

14   US THAT, YOU KNOW, HE WAS THE ONLY GUY WHO COULD REASSEMBLE A

15   TEAM AND REBUILD SOMETHING THAT COULD GO AND COMPETE WITH US IN

16   THE SAME SPACE.  SO AS PART OF THE REQUIREMENT OF OUR

17   TRANSACTION WAS THAT HE WOULD STAY WITH US FROM A MECHANISM

18   THAT DEFERS THE PAYOUT, WHICH MEANS HE GETS HIS

19   CONSIDERATION -- LET'S SAY HE GETS "X" AMOUNT OF MONEY, THAT IS

20   PAID TO HIM OVER A PERIOD OF TIME.  IN THIS CASE, IT WAS THREE

21   YEARS, AND IT WAS APPLIED TO HIM TO A LARGE DEGREE AND TO A

22   SMALL SET OF OTHER EMPLOYEES THAT WE HAD IDENTIFIED.

23              AND THEN WE DIDN'T WANT HIM TO JUST TURN AROUND AND SET

24   UP A COMPANY ACROSS THE STREET FROM INTEL TO COMPETE WITH WHAT

25   HE HAD JUST SOLD US.  SO THERE WAS A NONCOMPETE THAT WAS PUT IN

SIVAKUMAR - DIRECT (RESUMED)/ GRANT

1    PLACE SO THAT -- TO AVOID THAT SITUATION.

2    **Q.**    THE THREE-YEAR NONCOMPETE, WAS THERE ANY NEGOTIATION

3    BETWEEN YOU AND DR. VERDIELL ABOUT THE LENGTH OF HOW LONG HE

4    WOULD HAVE TO AGREE TO NOT COMPETE?

5    **A.**    YEAH, WE HAD SOME DISCUSSIONS, BUT I DON'T THINK THERE

6    WAS A -- THAT WAS A HUGE ISSUE.

7    **Q.**    OKAY.  AND DO YOU KNOW HOW DR. VERDIELL DID IN TERMS OF

8    HIS PERFORMANCE AFTER HE JOINED INTEL?

9    **A.**    NO, I DON'T HAVE TOO MUCH FIRST-HAND KNOWLEDGE OF THAT.

10   I -- I BELONG TO THE -- DURING THAT TIME, I BELONGED TO THE

11   CORPORATE GROUP THAT WAS DOING MERGERS AND ACQUISITIONS, AND

12   I'M SURE I WAS -- I'D ALREADY MOVED ON TO OTHER TRANSACTIONS.

13       YOU KNOW, EVERY ONCE IN A WHILE, WE HAD HALLWAY

14   CONVERSATIONS OR EXCHANGED SOME EMAIL BUT -- ANECDOTALLY,

15   WHATEVER I HEARD ABOUT HIM WAS ALWAYS VERY POSITIVE, AND, YOU

16   KNOW, I COULD CERTAINLY SENSE HIS PRESENCE BECAUSE THE OPTICAL

17   SPACE IN WHICH THIS, YOU KNOW, LIGHTLOGIC WAS WAS A VERY

18   IMPORTANT PART OF, YOU KNOW, WHAT WE WERE DOING.

19       SO I -- I CERTAINLY RAN INTO HIM, BUT NOT FROM A

20   DAY-TO-DAY STANDPOINT.

21   **Q.**    WERE YOU AWARE THAT HE HAD BECOME -- WAS SELECTED TO

22   BECOME AN INTEL FELLOW?

23   **A.**    YES, I WAS AWARE OF THAT.  YES.

24   **Q.**    AND IN YOUR -- WE TALKED -- THE JURY HAS HEARD A LITTLE

25   BIT ABOUT IT.  WHAT DOES THAT MEAN TO YOU?

1   **A.**    SO AN INTEL FELLOW, AT THAT TIME, WAS THE -- THE

2   SENIOR-MOST TECHNICAL POSITION ANYBODY COULD -- AN ENGINEER

3   COULD GET TO AT INTEL.

4        AND WE HAD EXTENSIVE CONVERSATIONS ABOUT THAT DURING THE

5   COURSE OF THE -- OF THE TRANSACTION ITSELF.  AND THEN, YOU

6   KNOW, POST-TRANSACTION, HE BECAME AN INTEL FELLOW.

7   SUBSEQUENTLY NOW WE HAVE A CONCEPT OF A SENIOR FELLOW, BUT WE

8   DIDN'T HAVE IT AT THAT TIME.  SO AT THAT TIME, IT WAS THE MOST

9   SENIOR POSITION AN ENGINEER COULD GET TO AT INTEL.  SO YES, I

10  WAS VERY AWARE OF -- OF JEAN-MARC BEING AN INTEL FELLOW.

11             **MS. GRANT:**  OKAY.  THANK YOU.  I HAVE NO FURTHER

12  QUESTIONS AT THIS TIME, YOUR HONOR.

13             (PAUSE IN THE PROCEEDINGS.)

14                     **CROSS-EXAMINATION**

15  **BY MR. MacDONALD:**

16  **Q.**    GOOD MORNING, MR. SIVAKUMAR.

17  **A.**    GOOD MORNING.

18  **Q.**    AM I PRONOUNCING YOUR NAME RIGHT, SIVAKUMAR?

19  **A.**    CLOSE ENOUGH.

20  **Q.**    OKAY.  GREAT.

21        MY NAME IS ANGUS MACDONALD, AND I REPRESENT THE

22  PLAINTIFF, FRANK SHUM.

23        MR. SIVAKUMAR, IN DOING SOME RESEARCH ON YOU, I NOTICED

24  SEVERAL ONLINE PROFILES OF YOU.  AND THEY ALL MENTION THE FACT

25  THAT YOU HAVE A U.S. PATENT IN YOUR NAME; IS THAT CORRECT?

SIVAKUMAR – CROSS / MACDONALD

```
 1    A.     YEAH.

 2    Q.     YOU ARE AN INVENTOR TO A U.S. PATENT, RIGHT?

 3    A.     YES.

 4    Q.     A COINVENTOR ALONG WITH FOUR OTHER INVENTORS, RIGHT?

 5    A.     THAT'S CORRECT.

 6    Q.     AND DO YOU RECALL WHEN THAT PATENT ISSUED, ROUGHLY?

 7    A.     IN THE MID-'90'S.  I DON'T REMEMBER EXACTLY.  PROBABLY

 8    '95, '96.

 9    Q.     AND IT'S IMPORTANT IN YOUR PROFILE TO MENTION THAT YOU

10    HOLD A U.S. PATENT, RIGHT?

11    A.     I'M SORRY?

12    Q.     IT'S IMPORTANT TO MENTION IN YOUR PROFILE THAT YOU HOLD A

13    U.S. PATENT, RIGHT?  THAT YOU OWN A PATENT?

14    A.     IN MY PROFILE AS IN...?

15    Q.     YOUR ONLINE PROFILE.  YOU WOULDN'T MENTION SOMETHING IN

16    YOUR PROFILE UNLESS IT WAS IMPORTANT TO YOU, RIGHT?

17    A.     I DON'T HAVE AN ONLINE PROFILE.  IT MUST BE WRITTEN BY

18    SOMEBODY ELSE.

19    Q.     OKAY.

20           LET'S TURN TO TX723 IN YOUR BINDER, PLEASE.

21    A.     (REVIEWING DOCUMENTS.)

22           YES.

23    Q.     THIS IS A DOCUMENT YOU TESTIFIED (SIC) YESTERDAY; IS THAT

24    CORRECT?

25    A.     YEAH.
```

1    Q.    AND IT'S A SUMMARY OF A CONVERSATION INVOLVING YOU AND

2    MR. WILLIS ON ONE HAND AND LIGHTLOGIC'S C.E.O. AND SOME BANKERS

3    FROM JP MORGAN ON THE OTHER HAND, RIGHT?

4    A.    YES.

5    Q.    LET'S GO TO THE SECOND PARAGRAPH OF THIS EMAIL.

6          DAVID, YOU WANT TO BRING IT UP, TX723, SECOND PARAGRAPH.

7               (EXHIBIT PUBLISHED TO JURY.)

8    BY MR. MacDONALD:

9    Q.    THIS IS THE PARAGRAPH THAT SAYS LIGHTLOGIC CLAIMS THEY

10   HAVE AN OFFER FROM ONE COMPANY TO PURCHASE THEM AND EXPECT A

11   SECOND OFFER THIS FRIDAY.  INTEL IS INVITED TO ALSO BID.  THEY

12   EXPECT VALUATION TO BE 500 MILLION PLUS.

13         YOU BECAME AWARE THAT BOTH ALCATEL AND CORNING HAD MADE

14   OFFERS TO PURCHASE LIGHTLOGIC AS OF THE FEBRUARY 2001 TIME

15   FRAME, RIGHT?

16   A.    NO.  THAT WAS KNOWLEDGE THAT I GOT, YOU KNOW, MUCH, MUCH

17   AFTER THE TRANSACTION WAS DONE.  I DIDN'T KNOW THE SPECIFIC

18   NAMES.  I KNEW THAT THERE WERE -- WE WERE TOLD BY THE COMPANY

19   THAT THERE WERE OTHER BIDDERS.

20   Q.    OKAY.  SO YOU BECAME AWARE THAT LIGHTLOGIC HAD OTHER

21   BIDDERS?

22   A.    THAT'S RIGHT.

23   Q.    THEY WERE --

24   A.    FROM WHAT THEY HAD TOLD US.

25   Q.    AND THEY WERE ALCATEL AND CORNING.

1    A.    THAT I DIDN'T KNOW AT THAT TIME WHEN WE WERE DOING THE

2    TRANSACTION.

3    Q.    BUT SUBSEQUENTLY, YOU BECAME AWARE OF THAT?

4    A.    AFTER -- YEAH, AFTER THE TRANSACTION WAS CLOSED.

5    Q.    AND SUBSEQUENTLY, YOU BECAME AWARE THAT THESE OFFERS WERE

6    IN THE $500 MILLION RANGE, RIGHT?

7    A.    NO, I DIDN'T.

8    Q.    YOU NEVER --

9    A.    I DIDN'T KNOW THE NUMBERS.  THESE WERE THINGS THAT THEY

10   JUST SHARED WITH US SAYING THAT -- THIS WAS SORT OF AN

11   UNSOLICITED FIRST CONVERSATION THAT THEY HAD WITH US, AND THEY

12   INDICATED THAT THERE WERE OTHER PEOPLE WHO ARE BIDDING.

13   Q.    OKAY.

14   A.    YOU KNOW, THAT'S ALL WE KNEW.

15   Q.    DO YOU HAVE ANY REASON TO DISPUTE THE $500 MILLION

16   FIGURE?

17   A.    IT'S -- NO, I -- I DON'T HAVE ANY REASON TO DISPUTE IT.

18   Q.    NOW, MR. SIVAKUMAR, YOU TESTIFIED YESTERDAY THAT INTEL

19   HAS A PATENT ACQUISITION GROUP.  IS THAT -- IS THAT CORRECT?

20   A.    I DON'T KNOW EXACTLY WHAT THEY'RE CALLED, BUT THEY GO AND

21   LOOK FOR PATENTS THAT WE MIGHT GET ACCESS TO.

22   Q.    AND THEY GO OUT AND LOOK FOR PATENTS FROM OTHER ENTITIES

23   TO PURCHASE; IS THAT CORRECT?

24   A.    THAT'S RIGHT.

25   Q.    OKAY.

1    **A.**    PURCHASE OR, YOU KNOW, GET SOME SORT OF RIGHTS TO.

2    **Q.**    BUT IT TAKES TWO TO TANGO, RIGHT, MR. SIVAKUMAR?  IT

3    TAKES ONE COMPANY OR ONE ENTITY TO OFFER TO SELL THEIR PATENTS

4    AND INTEL TO PURCHASE THAT; ISN'T THAT CORRECT?

5    **A.**    YEAH, IT'S LIKE ANY OTHER SELLING AND BUYING

6    TRANSACTIONS.

7    **Q.**    AND YOU'RE AWARE THAT LIGHTLOGIC WAS LOOKING FOR -- TO BE

8    PURCHASED ENTIRELY, NOT NECESSARILY TO HAVE SOME OF ITS ASSETS

9    SOLD TO INTEL, CORRECT?

10   **A.**    YES.

11   **Q.**    NOW, WITH OFFERS FROM ALCATEL AND CORNING TO PURCHASE THE

12   ENTIRE COMPANY, MEANING LIGHTLOGIC, LIGHTLOGIC DIDN'T HAVE ANY

13   SORT OF INCENTIVE TO JUST SELL OFF SOME OF ITS PATENTS.  IT WAS

14   LOOKING FOR AN ENTIRE ACQUISITION OF IT, RIGHT?

15            **MS. GRANT:**  OBJECTION, LACKS FOUNDATION.

16            **THE COURT:**  OVERRULED.

17   **BY MR. MacDONALD:**

18   **Q.**    YOU CAN ANSWER THE QUESTION.

19   **A.**    ASK IT AGAIN.

20   **Q.**    OKAY.  SO WITH OFFERS FROM ALCATEL AND CORNING,

21   LIGHTLOGIC HAD NO INCENTIVE TO JUST SELL TO INTEL JUST ONE OR

22   TWO OF ITS PATENTS.  IT WANTED THE ENTIRE COMPANY TO BE

23   PURCHASED, RIGHT?

24   **A.**    I WOULDN'T KNOW WHAT THEIR INCENTIVES WOULD BE.  I

25   DIDN'T -- I HAVE NO IDEA WHO THEY WERE AND WHO THEY WERE

SIVAKUMAR – CROSS / MACDONALD

1    TALKING TO AND ALL THAT.

2    **Q.**    OKAY.  NOW, ONE OF THE KEY ADVANTAGES CLAIMED BY

3    LIGHTLOGIC TO YOU WAS THEIR AUTOMATED ACTIVE FIBER ALIGNMENT

4    THAT HAD ACCURACY WITHIN ONE-TENTH OF A MICRON, CORRECT?

5    **A.**    AMONG LOTS OF OTHER THINGS, YES.  THEY HAD SOME

6    TECHNIQUES OF ALIGNING FIBER, YES.

7    **Q.**    BUT THEY CLAIM THAT ONE OF THEIR ADVANTAGES WAS THIS

8    AUTOMATED ACTIVE FIBER ALIGNMENT, CORRECT?

9    **A.**    AMONG A LONG LIST OF THINGS, ABSOLUTELY.

10    **Q.**    OKAY.

11         NOW, DURING YOUR FEBRUARY 7, 2001, TELEPHONE CONVERSATION

12    WITH LIGHTLOGIC AS MEMORIALIZED IN TX723, THE -- THE PEOPLE

13    FROM LIGHTLOGIC EXPLAINED TO YOU WHAT THE VALUE OF LIGHTLOGIC

14    WAS, CORRECT?

15    **A.**    YEAH.

16    **Q.**    OKAY.  AND THEY EXPLAINED THAT THE VALUE ADDED -- THAT

17    LIGHTLOGIC PROVIDED WAS ITS OPTICAL MODULE DESIGN AND

18    MANUFACTURING CAPABILITY, CORRECT?

19    **A.**    IN A VERY BROAD SENSE, YES.

20    **Q.**    OKAY.  NOW, ISN'T IT TRUE THAT INTEL VIEWED LIGHTLOGIC AS

21    STRICTLY A DESIGN AND OPTICAL PACKAGING COMPANY?

22    **A.**    INTEL'S VIEW OF LIGHTLOGIC WAS BASED ON A MUCH BIGGER

23    STRATEGY OF -- OF A PRODUCT THAT WE WANTED TO BUILD CALLED THE

24    SUPERMODULE, RIGHT?  AND TO BUILD THAT BIG PRODUCT, THERE WERE

25    PIECES OF TECHNOLOGY THAT WERE NEEDED.  AND WE WERE LOOKING FOR

1   OTHER THIRD-PARTY COMPANIES THAT WOULD HAVE POTENTIALLY DONE

2   SOMETHING LIKE THAT.  AND LIGHTLOGIC HAD DONE SOME PIECES OF

3   THAT.

4         SO I -- I DON'T KNOW HOW ELSE TO ANSWER WHAT YOU'RE

5   ASKING ME.

6   **Q.**   OKAY.  WELL, BUT ISN'T IT TRUE THAT INTEL VIEWED

7   LIGHTLOGIC AS STRICTLY AN OPTICAL -- STRICTLY AS A DESIGN AND

8   OPTICAL PACKAGING COMPANY?

9   **A.**   I -- I WOULDN'T KNOW HOW TO ANSWER THAT.

10  **Q.**   OKAY.

11        LET'S GO TO TX723, DAVID, TOP OF PAGE 2.

12  **A.**   TX...?

13  **Q.**   723, AND IT'S ON THE TOP OF PAGE 2 WHERE I'M TURNING YOUR

14  ATTENTION TO.

15              (EXHIBIT PUBLISHED TO JURY.)

16           **THE WITNESS:**  YEAH.

17  **BY MR. MacDONALD:**

18  **Q.**   I'LL READ ALOUD THE FIRST PARAGRAPH.  "THEIR VALUE ADDED

19  IS STRICTLY THE OPTICAL MODULE DESIGN, MANUFACTURING, AND

20  INTEGRATION OF THE COMMUNICATION INTEGRATED CIRCUITS, AND

21  INTERFACING TO THE LINE CARDS.  STRICTLY A DESIGN AND OPTICAL

22  PACKAGING COMPANY.  THEY OUTSOURCE TRANSPONDER ASSEMBLY.  I'M

23  NOT EXACTLY SURE WHAT HE WAS TRYING TO TELL ME ABOUT WHAT WAS

24  OUTSOURCED VERSUS WHAT THEY DO INTERNALLY."

25        DOES THAT REFRESH YOUR RECOLLECTION THAT INTEL VIEWED

1    LIGHTLOGIC AS STRICTLY A DESIGN AND OPTICAL PACKAGING COMPANY?

2    **A.**    THIS IS THE SAME EMAIL, RIGHT.  SO THIS WAS AN EMAIL THAT

3    TOM WILLIS WROTE, AND THIS IS HIS LANGUAGE.  SO I -- I WOULDN'T

4    BE ABLE TO INTERPRET IT BEYOND THAT.

5    **Q.**    YOU WERE PART OF THIS CONVERSATION WITH LIGHTLOGIC,

6    CORRECT?

7    **A.**    YES, I WAS.

8    **Q.**    WHEN YOU -- WHEN YOU RECEIVED THIS EMAIL, MR. WILSON'S

9    (PHONETIC) EMAIL, DID YOU SEE ANY INACCURACIES IN HIS EMAIL?

10   **A.**    NO.  IN A BROAD SENSE, THIS IS REASONABLY ACCURATE.  THIS

11   WAS A FIRST CONVERSATION.  IT'S A PHONE CONVERSATION BEFORE YOU

12   EVEN KNOW WHO THE COMPANY IS OR WHERE THEY'RE BASED.  AND THIS

13   WAS A SORT OF A SUMMARY OF WHAT WE HEARD ON THE PHONE.

14   **Q.**    ALL RIGHT.

15         NOW, AT THE TIME OF THE ACQUISITION -- ACQUISITION,

16   LIGHTLOGIC WAS MANUFACTURING A TRANSPONDER WITH OFF-THE-SHELF

17   COMPONENTS.  I THINK THAT WAS YOUR TESTIMONY EARLIER, CORRECT?

18   **A.**    YEAH, THEIR INITIAL -- INITIAL STUFF, THEY HAD DONE BASED

19   ON --

20   **Q.**    IN OTHER WORDS, LIGHTLOGIC WASN'T SELLING TRANSPONDERS

21   WITH ITS OWN OPTICAL MODULES, CORRECT?

22   **A.**    I KNOW -- I DON'T KNOW ALL OF THE DISCRETE PRODUCTS THAT

23   WENT INTO THE MODULE, INTO THE TRANSPONDER MODULE.  BUT THEY

24   HAD A BUNCH OF THINGS THAT WERE TAKEN OFF THE SHELF, YES,

25   THAT'S RIGHT.

SIVAKUMAR — CROSS / MACDONALD

1   Q.    AND YOU KNEW THAT LIGHTLOGIC WAS PLANNING ON SELLING A

2   TRANSPONDER WITH ITS OWN OPTICAL MODULES.  YOU KNEW THAT,

3   CORRECT?  OR YOU BECAME AWARE OF THAT.

4   A.    YEAH, THEY WOULD HAVE -- ONE WOULD THINK THEY WOULD HAVE

5   DONE SOMETHING LIKE THAT.

6   Q.    AND DID YOU KNOW THAT THE -- THE PRICE OF THE

7   NEXT-GENERATION TRANSPONDER OR THE -- SORRY -- THE COST OF THE

8   NEXT-GENERATION TRANSPONDER, THE ONE THAT INCLUDED THE

9   LIGHTLOGIC PARTS, WAS ACTUALLY LOWER IN COST THAN THE

10  OFF-THE-SHELF PARTS?  WERE YOU AWARE OF THAT?

11  A.    NO, I DON'T SPECIFICALLY RECALL BEING AWARE OF THAT,

12  BUT -- I --

13  Q.    DO YOU HAVE ANY REASON TO DISPUTE THAT?

14  A.    I --

15  Q.    OKAY.

16  A.    -- DON'T KNOW --

17  Q.    OKAY.  SO YESTERDAY --

18        GOING BACK TO TX723, DAVID.

19              (EXHIBIT PUBLISHED TO JURY.)

20  BY MR. MacDONALD:

21  Q.    WE WERE TALKING ABOUT PAGE 2.  AND YOU'LL SEE THAT

22  THERE'S COMPETITIVE ADVANTAGES THAT YOU WERE ASKED QUESTIONS

23  ABOUT.

24        RIGHT, MR. SIVAKUMAR?  THOSE FOUR COMPETITIVE ADVANTAGES?

25  A.    YEAH.  YEAH.

1    Q.    YOU RECALL THAT TESTIMONY FROM YESTERDAY?

2    A.    YEAH.

3    Q.    NOWHERE ON THIS LIST DOES IT STATE ANYTHING ABOUT

4    CUSTOMER TRACTION AS A COMPETITIVE ADVANTAGE, CORRECT?

5    A.    (REVIEWING DOCUMENT.)

6          NO, I -- I DON'T SEE IT, NO.

7    Q.    THERE'S NO MENTION OF CUSTOMER TRACTION AS A COMPETITIVE

8    ADVANTAGE?

9    A.    RIGHT.

10   Q.    RIGHT, MR. SIVAKUMAR?

11   A.    NOT IN THIS.

12   Q.    OKAY.  AND YOU SEE IN NO. 3, "THEIR CERAMIC PLANAR

13   SUBSTRATE ENABLES GOOD THERMAL MANAGEMENT."  YOU'RE AWARE THAT

14   THAT CERAMIC PLANAR SUBSTRATE WAS THE SUBJECT OF A PATENT

15   APPLICATION OR AT LEAST A PATENT, ACTUALLY, BY THAT --

16                (SIMULTANEOUS COLLOQUY.)

17           **MS. GRANT:**  THAT LACKS --

18           **THE WITNESS:**  NO, I WAS NOT --

19           **MS. GRANT:**  THAT LACKS FOUNDATION.

20   **BY MR. MacDONALD:**

21   Q.    YOU WEREN'T.  OKAY.

22         LET'S GO NEAR THE BOTTOM OF TX -- PAGE 2 OF TX723 WHERE

23   IT STATES, "I WOULD SUGGEST" --

24         CAN YOU BLOW IT UP, DAVID, PLEASE.

25                (EXHIBIT PUBLISHED TO JURY.)

1   BY MR. MacDONALD:

2   Q.    SEE THAT PARAGRAPH WHERE IT SAYS, "I WOULD SUGGEST THAT

3   SOMEONE FROM RAMA'S TEAM SHOULD ATTEND TO SEE IF THEY REALLY

4   HAVE ANYTHING SPECIAL IN THE ACTIVE ALIGNMENT, AUTOMATION, OR

5   THE CERAMIC SUBSTRATE."

6         DO YOU SEE THAT, MR. SIVAKUMAR?

7   A.    YES, I DO.

8   Q.    AND INTEL DID SOME ADDITIONAL DUE DILIGENCE REGARDING

9   LIGHTLOGIC'S TECHNOLOGY BEFORE IT ACQUIRED --

10  A.    PLENTY OF DUE DILIGENCE.

11  Q.    AND INTEL FOUND OUT, IN FACT, THAT LIGHTLOGIC DID HAVE

12  SOMETHING SPECIAL WITH RESPECT TO ITS ACTIVE ALIGNMENT,

13  AUTOMATION, AND CERAMIC SUBSTRATE, CORRECT?

14  A.    THEY HAD A LOT OF OTHER THINGS, RIGHT.  AND, OBVIOUSLY,

15  THESE ARE ALSO ON THAT LIST.

16  Q.    BUT THAT WAS SOMETHING THAT -- DURING THE DUE DILIGENCE,

17  THEY REALIZED THAT LIGHTLOGIC TRULY DID HAVE SOMETHING SPECIAL

18  IN ITS ALIGNMENT, AUTOMATION, AND CERAMIC SUBSTRATE?

19  A.    SURE THEY HAD, AMONG LOTS OF OTHER THINGS.

20  Q.    AND YOU'RE AWARE THAT THESE ATTRIBUTES ARE COVERED BY THE

21  LIGHTLOGIC PATENT AND PATENT APPLICATIONS AT THE TIME, CORRECT?

22              **MS. GRANT:**  LACKS FOUNDATION.

23              **THE WITNESS:**  NO, I WAS NOT.

24              **THE COURT:**  EXCUSE ME.  THAT'S OVERRULED.

25              **MR. MacDONALD:**  OKAY.

1    Q.    YOU WEREN'T AWARE?  IS THAT --

2    A.    NO, I WASN'T --

3    Q.    OKAY.

4          NOW, INTEL WAS PURCHASING LIGHTLOGIC LARGELY --

5    A.    I JUST WANT TO BE VERY CLEAR THAT THERE ISN'T ANY

6    CONFUSION HERE BECAUSE OF NAMES.  THE RAMA THERE DOESN'T REFER

7    TO ME BECAUSE IT'S ALSO PART OF MY NAME.  THAT'S A DIFFERENT

8    PERSON.

9    Q.    RIGHT.  THANK YOU FOR THAT CLARIFICATION, MR. SIVAKUMAR.

10          NOW, INTEL WAS PURCHASING LIGHTLOGIC LARGELY BECAUSE OF

11    ITS TECHNOLOGY, CORRECT?

12    A.    SAY THAT AGAIN.

13    Q.    INTEL WAS PURCHASING LIGHTLOGIC LARGELY BECAUSE OF ITS

14    TECHNOLOGY, CORRECT?

15    A.    AMONG -- AMONG MANY OTHER THINGS.  TECHNOLOGY IS

16    OBVIOUSLY KEY, BUT --

17    Q.    TECHNOLOGY WAS KEY.

18    A.    -- CUSTOMERS, THERE IS VARIOUS OTHER STEPS THAT THEY ARE

19    TAKING TO MANUFACTURE THINGS.  THERE'S LOTS OF OTHER THINGS.

20    THERE'S CERTIFICATION.  THERE ARE MANY STEPS INVOLVED --

21    Q.    RIGHT.

22    A.    -- IN A COMPLEX TECHNOLOGY LIKE THIS.  AND LIGHTLOGIC HAD

23    SPEND THE TIME WORKING ON MANY OF THOSE THINGS.  AND, REALLY,

24    IN THE LONG EXPLANATION THAT I GAVE YOU EARLIER ON WHAT IT

25    TAKES TO BUILD A COMPLEX PIECE OF TECHNOLOGY-BASED PRODUCT, ALL

SIVAKUMAR - CROSS / MACDONALD

```
1    OF THOSE STEPS BECOME VERY IMPORTANT.

2         AND WHAT LIGHTLOGIC HAD DEMONSTRATED IS THAT IT'S NOT

3    JUST AN IDEA OR IT'S NOT JUST SOMETHING THAT THEY THOUGHT

4    ABOUT, BUT THEY HAD ACTUALLY TAKEN IT FROM END TO END AND

5    ACTUALLY BUILT SOMETHING THAT WAS FUNCTIONAL THAT WOULD GO INTO

6    STANDARDS-TESTING LABORATORIES WHERE THEY LOOK AT THESE

7    PRODUCTS AND THEY SAY THAT IT DELIVERS WHAT IT ACTUALLY CLAIMS

8    TO DO, RIGHT?

9         AND THEN THEY HAD TAKEN THOSE PRODUCTS TO MANY CUSTOMERS,

10   AND THE CUSTOMERS VALIDATED THAT IT, INDEED, DOES WHAT

11   LIGHTLOGIC CLAIMED.  SO THERE'S A LOT OF DIFFERENT ASPECTS TO

12   IT.

13        SO I WOULDN'T -- I JUST WANTED TO GIVE A FULLER ANSWER.

14   Q.   BUT, MR. SIVAKUMAR, THOSE ASPECTS THAT YOU JUST

15   MENTIONED, INCLUDING CUSTOMERS, THEY WEREN'T MENTIONED AS

16   COMPETITIVE ADVANTAGES IN THAT DOCUMENT THAT WE JUST REFERRED

17   TO?

18   A.   WHICH DOCUMENT ARE YOU REFERRING TO?

19   Q.   THE TX --

20             (SIMULTANEOUS COLLOQUY.)

21   BY MR. MacDONALD:

22   Q.   DID YOU UNDERSTAND THE QUESTION?  DO YOU HAVE THE

23   QUESTION IN YOUR MIND?

24   A.   YEAH.  SO IF YOU READ THAT EMAIL, IT SAYS "THEY CLAIM THE

25   FOLLOWING COMPETITIVE ADVANTAGE," SO THIS IS WHAT LIGHTLOGIC
```

1   TOLD US ON THE PHONE.

2   **Q.**   EXACTLY.  IT'S WHAT LIGHTLOGIC TOLD YOU.

3   **A.**   SURE.

4   **Q.**   THEY DIDN'T MENTION CUSTOMERS OR THEY DIDN'T MENTION

5   CUSTOMER TRACTION AT THAT POINT, DID THEY?

6   **A.**   LIKE I SAID, THIS WAS A SUMMARY OF WHAT TOM WILLIS WROTE.

7   YOU KNOW, THE PHONE CONVERSATION WAS, YOU KNOW, EIGHT YEARS

8   BACK, SO I DON'T EXACTLY KNOW WHETHER THEY MENTIONED CUSTOMER

9   OR NOT.  BUT IT'S NOT SUMMARIZED IN THE EMAIL TO --

10  **Q.**   THANK YOU.

11      NOW, THE FACT THAT -- THAT INTEL WAS INTERESTED IN

12  LIGHTLOGIC'S TECHNOLOGY WAS REFLECTED IN THE INTEL DUE

13  DILIGENCE DOCUMENTS, CORRECT?

14  **A.**   YES.  TECHNOLOGY IS OBVIOUSLY SOMETHING THAT WE ARE

15  INTERESTED IN.

16  **Q.**   OKAY.  LET'S GO TO TX735.  IT'S IN YOUR BINDER.

17  **A.**   (REVIEWING DOCUMENTS.)

18  **Q.**   AND THIS IS THE LICORICE APA THAT YOU WERE TESTIFYING

19  ABOUT EARLIER; IS THAT CORRECT?

20  **A.**   YEAH.  UM-HMM.

21  **Q.**   AND "APA" -- I THINK YOU ALREADY MENTIONED, BUT IT STANDS

22  FOR ACQUISITION PROJECT --

23  **A.**   "AUTHORIZATION."

24  **Q.**   OR "APPROVAL"?

25  **A.**   "AUTHORIZATION."

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   Q.    OKAY.  AND YOU WERE AN AUTHOR OF THIS EXHIBIT, CORRECT?

2   A.    WHAT ARE YOU REFERRING TO?

3   Q.    TX735?

4   A.    THE FULL DOCUMENT?

5   Q.    PARTS OF THE DOCUMENT.

6   A.    THERE ARE -- THERE ARE PIECES OF IT THAT I WOULD HAVE

7   WRITTEN.

8   Q.    AND YOU'RE FAMILIAR WITH THIS DOCUMENT, CORRECT?

9   A.    I'M FAMILIAR WITH THE DOCUMENT, YES.

10          **MR. MacDONALD:**  YOUR HONOR, I OFFER TX735 INTO

11   EVIDENCE.

12          **THE COURT:**  BE ADMITTED.

13                    (TRIAL EXHIBIT 735

14                     RECEIVED IN EVIDENCE)

15   **BY MR. MacDONALD:**

16   Q.    NOW, MR. SIVAKUMAR, INTEL UNDERSTOOD LIGHTLOGIC'S CORE

17   TECHNOLOGIES, INCLUDING THE FLEXURE DESIGN, CORRECT?

18   A.    I -- FLEXURE WAS A VERY SMALL PART OF THEIR OVERALL

19   SOLUTION, BUT YEAH.

20   Q.    BUT INTEL UNDERSTOOD THE FLEXURE ASSIGNMENT BEING PART OF

21   INTEL'S (SIC) CORE TECHNOLOGY, RIGHT?

22   A.    NOT INTEL'S.

23   Q.    SORRY.  LIGHTLOGIC'S CORE TECHNOLOGY.

24          INTEL UNDERSTOOD THAT AS BEING PART OF LIGHTLOGIC'S CORE

25   TECHNOLOGY?

1    A.    IT'S A PIECE OF CAPABILITY THAT THEY HAD TO DEVELOP TO

2    ACTUALLY MAKE THE PRODUCT WORK.

3    Q.    RIGHT.

4    A.    SO IT'S AN IMPORTANT PART OF THE OVERALL SOLUTION, BUT

5    THERE'S A LOT OF OTHER THINGS THAT GO INTO BUILDING A PRODUCT

6    LIKE THAT.

7    Q.    AND INTEL UNDERSTOOD LIGHTLOGIC'S CORE TECHNOLOGIES,

8    INCLUDING THIS HIGH-FREQUENCY PLANAR CERAMIC METAL SUBSTRATE,

9    CORRECT?

10   A.    UM.

11   Q.    I'M ASKING YOU WITHOUT RESPECT TO THE DOCUMENT.

12   A.    I DON'T KNOW HOW TO ANSWER THAT.

13   Q.    OKAY.  WELL, LET'S GO TO THE DOCUMENT.  LET'S GO TO THE

14   DOCUMENTS.  PAGE 10 OF 735.

15                (EXHIBIT PUBLISHED TO JURY.)

16   BY MR. MacDONALD:

17   Q.    NOW, THIS SLIDE IS TITLED "LICORICE CORE TECHNOLOGY,"

18   WHICH IS THE LIGHTLOGIC CORE TECHNOLOGY, CORRECT,

19   MR. SIVAKUMAR?

20   A.    YES.

21   Q.    AND YOU SEE THE REFERENCE TO THE FLEXURE UP AT THE TOP

22   LEFT?

23   A.    SURE.

24   Q.    AND YOU SEE THE REFERENCE TO THE HIGH-FREQUENCY PLANAR

25   CERAMIC METAL SUBSTRATE, CORRECT?

1    A.    YEAH.

2    Q.    AND THEN ON THE RIGHT-HAND SIDE OF THE TOP, THE AUTOMATED

3    ALIGNMENT AND WELDING?

4    A.    RIGHT.

5    Q.    THIS IS ALL PART OF LIGHTLOGIC'S CORE TECHNOLOGY AS INTEL

6    UNDERSTOOD IT, CORRECT?

7    A.    IT'S ALL PART OF IT, YES.

8    Q.    OKAY.  AND AT THE BOTTOM RIGHT, IT SAYS "LICORICE HAS THE

9    NECESSARY TECHNOLOGY BUILDING BLOCKS FOR OC192/10GBE

10   OPTOELECTRONIC MODULES."

11        DO YOU SEE THAT?

12   A.    YES.

13   Q.    NOW, INTEL UNDERSTOOD THAT LIGHTLOGIC'S FLEXURE AND

14   PLANAR CERAMIC METAL SUBSTRATE WERE THE KEY BUILDING BLOCKS FOR

15   ITS TRANSPONDER, CORRECT?

16             **MS. GRANT:**  LACKS FOUNDATION.

17             **THE COURT:**  SUSTAINED.

18             YOU CAN ASK THE QUESTION.  REPHRASE IT.

19             **MR. MacDONALD:**  OKAY.

20   Q.    THESE THINGS THAT WE WERE JUST TALKING ABOUT, THE FLEXURE

21   AND THE PLANAR CERAMIC METAL SUBSTRATE, THOSE ARE THE BUILDING

22   BLOCKS FOR LIGHTLOGIC'S CORE TECHNOLOGY, CORRECT?

23   A.    A LOT OF BUILDING BLOCKS WOULD GO INTO BUILDING THESE

24   MODULES.  AND THESE WERE A FEW THAT WE CHOSE TO DISCUSS, AND

25   THESE ARE -- IF YOU JUST TOOK THOSE FEW PIECES, YOU CAN'T BUILD

SIVAKUMAR – CROSS / MACDONALD

1   A MODULE.

2   Q.   RIGHT.

3   A.   THERE'S A LOT OF OTHER THINGS THAT GO INTO A MODULE.  BUT

4   THESE ARE SOME PIECES THAT LICORICE OR LIGHTLOGIC HAD ACTUALLY

5   WORKED ON.

6   Q.   BUT THESE WERE THE NECESSARY KEY BUILDING BLOCKS TO BUILD

7   THE TRANSPONDER, CORRECT?

8   A.   THESE ARE THE WAYS IN WHICH A CERTAIN PIECE OF TECHNOLOGY

9   THAT NEEDS TO BE IMPLEMENTED INSIDE THE MODULE, HOW LIGHTLOGIC

10   CHOSE TO DO IT.  THERE ARE MANY DIFFERENT WAYS TO DO IT.

11   LIGHTLOGIC CHOSE TO DO IT IN A CERTAIN WAY.  AND WE WERE

12   REFLECTING HOW THEY ACTUALLY DID IT.  RIGHT.

13       BUT IF YOU JUST TOOK THESE PIECES OF TECHNOLOGY, YOU

14   CAN'T BUILD AN OPTICAL MODULE.  I WANT TO BE VERY CLEAR ON THAT

15   POINT.

16   Q.   RIGHT.

17   A.   LIKE WE SHOWED THE LITTLE BOARD EARLIER WHEN I BROUGHT IT

18   UP ON THE LAST PART, THERE ARE A HUNDRED DIFFERENT THINGS THAT

19   GO INTO BUILDING A MODULE.  THESE PIECES OF TECHNOLOGY REFLECT

20   HOW LIGHTLOGIC CHOSE TO DO A CERTAIN STEP INSIDE THIS MODULE BY

21   BUILDING THE -- THE PIECES OF THINGS LIKE THE FLEXURE AND

22   VARIOUS THINGS THAT THEY NEEDED TO DO.

23   Q.   NOW, YOU JUST TESTIFIED THERE WERE MANY DIFFERENT WAYS TO

24   BUILD A TRANSPONDER, CORRECT?

25   A.   YEAH.

1    Q.    BUT THESE ARE THE WAYS THAT DIFFERENTIATED LIGHTLOGIC

2    FROM OTHER COMPANIES, RIGHT?

3    A.    YEAH, WHAT THIS SHOWED US IS THAT LIGHTLOGIC HAS THE

4    CAPABILITY, THE –– BOTH THE PEOPLE AND THE THINKING CAPABILITY

5    TO DO SOME VERY IMPORTANT STEPS INSIDE A VERY COMPLEX PRODUCT

6    LIKE A TRANSPONDER, RIGHT.  AND THIS REFLECTS THE PARTICULAR

7    METHOD THAT THEY USED TO ACTUALLY DO IT.

8    Q.    OKAY.

9          LET'S GO TO TX740, DAVID, PLEASE.

10                (EXHIBIT PUBLISHED TO JURY.)

11   BY MR. MacDONALD:

12   Q.    AND THIS IS THE INTEL LICORICE APA DATED FEBRUARY 28,

13   2001, CORRECT?

14   A.    (REVIEWING DOCUMENT.)

15   Q.    THIS IS THE DOCUMENT YOU JUST TESTIFIED ABOUT TODAY,

16   RIGHT?

17   A.    YEAH, PROBABLY THE SAME DOCUMENT.

18          MR. MacDONALD:  LET'S GO TO PAGE 11, DAVID, TX740.

19          THE WITNESS:  (REVIEWING DOCUMENTS.)

20                (EXHIBIT PUBLISHED TO JURY.)

21   BY MR. MacDONALD:

22   Q.    ARE YOU WITH ME, MR. SIVAKUMAR, PAGE 11?

23   A.    YEAH, I'M GETTING THERE.

24          (REVIEWING DOCUMENTS.)

25   Q.    THIS SLIDE, AGAIN, IS TITLED THE "LICORICE CORE

SIVAKUMAR - CROSS / MACDONALD

1   TECHNOLOGY," CORRECT?

2   **A.**    YEAH.

3   **Q.**    AND IT LOOKS ALMOST IDENTICAL TO THE PREVIOUS SLIDE WE

4   LOOKED AT, RIGHT?

5   **A.**    SURE.

6   **Q.**    HOWEVER, THERE'S ONE NOTICEABLE DIFFERENCE HERE.  IN THE

7   BOTTOM RIGHT-HAND CORNER NOW TALKS ABOUT "BEST-OF-CLASS

8   PROPRIETARY PATENT-PENDING SMF ALIGNMENT AND OPTICS PACKAGING

9   TURN-KEY SOLUTION."

10          DO YOU SEE THAT?

11  **A.**    YEAH.

12  **Q.**    WHAT DOES "SMF" STAND FOR, BY THE WAY?

13  **A.**    YOU GOT ME THERE.

14  **Q.**    SINGLE-MODE FIBER?  REFRESH YOUR RECOLLECTION?

15  **A.**    YEAH, THERE YOU GO.  SINGLE-MODE FIBER.

16  **Q.**    NOW AS OF FEBRUARY 28, 2001, INTEL UNDERSTOOD THAT

17  LICORICE'S CORE TECHNOLOGY WAS BASED ON A BEST-OF-CLASS

18  PROPRIETARY PATENT-PENDING ALIGNMENT TECHNOLOGY, CORRECT?

19  **A.**    YEAH, AMONG LOTS OF OTHER THINGS THAT HAVE TO HAPPEN IN

20  THE MODULE, WHAT THIS REFLECTS IS THAT LIGHTLOGIC HAD FIGURED

21  OUT A VERY GOOD WAY TO DO FIBER ALIGNMENT WITHIN THEIR PRODUCT.

22  **Q.**    THAT WAS PATENTED, CORRECT?

23  **A.**    I -- YOU KNOW, IT SAYS "PATENT PENDING," SO I DON'T KNOW.

24  **Q.**    OKAY.  IT WAS A PATENT-PENDING TECHNOLOGY, CORRECT?

25  **A.**    IF THEY APPLIED FOR IT AND THEY GOT THE PATENT, YEAH.

1    Q.    ALL RIGHT.

2          LET'S TURN TO TX772, WHICH IS WHAT YOU TESTIFIED EARLIER

3    TODAY IS THE INTEL BOARD OF DIRECTORS BRIEFING BOOK.

4    A.    YEAH.

5    Q.    NOW, YOU'RE AWARE THAT THERE ARE NUMEROUS REFERENCES TO

6    LIGHTLOGIC'S PATENTED TECHNOLOGY THROUGHOUT THIS BOARD OF

7    BRIEFING BOOK, CORRECT?

8    A.    I DON'T KNOW HOW MANY REFERENCES THERE ARE.

9    Q.    I DIDN'T -- WELL, YOU'RE AWARE THAT THERE ARE NUMEROUS

10   REFERENCES, RIGHT?

11   A.    I -- I -- I WOULD THINK THAT THERE ARE A FEW REFERENCES

12   BUT I DON'T KNOW HOW MANY THERE ARE.

13   Q.    WELL, LET'S GO TO PAGE -- T -- TX772, PAGE 6.

14               (EXHIBIT PUBLISHED TO JURY.)

15          THE WITNESS:  PAGE 6?

16   BY MR. MacDONALD:

17   Q.    WELL, IT'S 0006 AT THE BOTTOM.

18   A.    YEAH.  SURE.

19   Q.    YOU SEE THE COMPANY OVERVIEW, MR. SIVAKUMAR?

20   A.    YEAH.

21   Q.    AND YOU -- THIS IS PART OF THE EXECUTIVE SUMMARY THAT YOU

22   WERE JUST TESTIFYING TO, CORRECT?

23   A.    UM-HMM.

24   Q.    OKAY.  NOW, LET'S LOOK AT THE THIRD SENTENCE.

25          CAN YOU BLOW IT UP, DAVID, THE PARAGRAPH.

SIVAKUMAR – CROSS / MACDONALD

```
 1              (EXHIBIT PUBLISHED TO JURY.)

 2   BY MR. MacDONALD:

 3   Q.   IT SAYS, "LICORICE PROVIDES A BEST-OF-CLASS PROPRIETARY

 4   PATENT-PENDING FIBER ALIGNMENT AND OPTICS PACKAGING SOLUTION

 5   WHICH WE BELIEVE WOULD BE AN IMPORTANT DIFFERENTIATION AT LEAST

 6   IN THE NEAR TERM."

 7        DO YOU SEE THAT, MR. SIVAKUMAR?

 8   A.   YEAH.

 9   Q.   SO THE PATENT-PENDING ALIGNMENT TECHNOLOGY WAS GOING

10   TO -- IS WHAT DIFFERENTIATED LIGHTLOGIC FROM OTHER COMPANIES,

11   CORRECT?

12   A.   WHAT LIGHTLOGIC HAD DONE WAS TO TAKE THAT ONE STEP THAT

13   IS REQUIRED IN A SOLUTION LIKE THAT AND DEMONSTRATED THAT IT

14   WORKS.  RIGHT?  AND -- AND, OBVIOUSLY, I'VE MENTIONED IT A FEW

15   TIMES, THAT THEY WENT TO A CERTIFICATION PROCESS --

16   CERTIFICATION PROCESS, THEY HAD GOT CUSTOMERS, ALL OF THAT

17   STUFF.

18        AND TO THAT EXTENT, IT WAS IMPORTANT TO REFLECT THAT THEY

19   HAVE ACTUALLY BEEN ABLE TO SOLVE A -- A PARTICULAR STEP IN A --

20   IN A -- IN AN INTERESTING WAY.

21   Q.   AND --

22   A.   AND THAT'S WHAT IT REFLECTS?

23   Q.   AND THAT STEP WAS AN IMPORTANT DIFFERENTIATION?

24   A.   YEAH.

25   Q.   CORRECT?
```

SIVAKUMAR - CROSS / MACDONALD

1    **A.**    AS THE LANGUAGE IS WRITTEN, IT'S -- AGAIN, IT'S ONE STEP

2    IN A LOT OF DIFFERENT THINGS THAT HAVE TO HAPPEN IN THE MODULE.

3    AND I WANT TO -- AND IT'S ONE WAY TO DO IT.  THERE ARE MANY

4    DIFFERENT WAYS TO DO IT, RIGHT?  SO -- I -- YOU KNOW, THAT'S --

5    THAT'S -- THAT'S WHAT I CAN SAY ABOUT THAT.

6    **Q.**    THERE ARE MANY WAYS TO DO IT, BUT THIS IS THE IMPORTANT

7    DIFFERENTIATION BETWEEN LIGHTLOGIC AND OTHER COMPANIES, RIGHT?

8    **A.**    THIS IS A DIFFERENCE.  BUT I THINK THE -- THE THING THAT

9    WE OUGHT TO NOT FORGET IS THE MOST IMPORTANT THING FOR US WAS

10   THAT THEY JUST DIDN'T HAVE AN IDEA, THAT THEY HAD ACTUALLY

11   IMPLEMENTED IT AND MANUFACTURED IT, TAKEN THOSE THINGS AND

12   SAMPLED OUT WITH CUSTOMERS, CUSTOMERS HAD GIVEN GOOD FEEDBACK,

13   ALL OF THOSE BECOME -- IT'S IN A MUCH BIGGER CONTEXT.

14       THIS IS ONE SENTENCE THAT REFLECTS A CERTAIN DIFFERENCE

15   THAT THEY HAVE WITH A LOT OF OTHER COMPANIES THAT WERE WORKING

16   ON THE SAME SOLUTION, BUT WHAT REALLY MAKES IT IMPORTANT IS

17   THAT WITHIN THE CONTEXT THAT THEY HAD TAKEN ALL OF THOSE PIECES

18   OF TECHNOLOGY, CREATED A WORKING MODULE THAT CUSTOMERS WOULD

19   ACTUALLY PAY FOR AND TAKE IT FROM THEM, AND THEN -- THEN

20   ACTUALLY COME BACK WITH GOOD FEEDBACK THAT IT WORKS, ALL OF

21   THOSE THINGS BECOME VERY IMPORTANT FOR US.  ABSOLUTELY.

22   **Q.**    AND INTEL UNDERSTOOD THAT LIGHTLOGIC HAD A STRONG BASE OF

23   IP AT THIS TIME -- INTELLECTUAL PROPERTY AT THIS TIME, RIGHT?

24   **A.**    THEY HAD A COLLECTION OF INTELLECTUAL PROPERTY.  YES.

25   **Q.**    AND IT WAS -- IT WAS VIEWED AS A STRONG BASE OF

1  INTELLECTUAL PROPERTY, CORRECT?

2  **A.**   I -- I DON'T KNOW HOW TO CHARACTERIZE THE "STRONG"

3  LANGUAGE.

4  **Q.**   OKAY.

5      WHY DON'T WE GO TO THE THIRD PARAGRAPH, DAVID, OF THIS

6  PAGE, "OUR PRELIMINARY DUE DILIGENCE."  FOURTH PARAGRAPH.

7          (EXHIBIT PUBLISHED TO JURY.)

8  **BY MR. MacDONALD:**

9  **Q.**   FIRST SENTENCE, "OUR PRELIMINARY DUE DILIGENCE FINDINGS

10  INDICATE THE COMPANY HAS DEVELOPED A STRONG BASE OF IP."

11      YOU SEE THAT?

12  **A.**   YEAH.

13  **Q.**   DOES THAT REFRESH YOUR RECOLLECTION THAT INTEL VIEWED

14  LIGHTLOGIC AS HAVING A STRONG BASE OF IP?

15  **A.**   FOR THE STUFF THAT THEY NEEDED IT FOR, YES.

16  **Q.**   OKAY.  LET'S GO TO PAGE 21, 772.0021.

17  **A.**   (REVIEWING DOCUMENTS.)

18          (EXHIBIT PUBLISHED TO JURY.)

19  **BY MR. MacDONALD:**

20  **Q.**   YOU WITH ME?

21  **A.**   YEAH.

22          **MR. MacDONALD:**  IF WE COULD BLOW UP, DAVID, THE --

23  THE INSERT IS, WORLD CLASS -- HVM POTENTIAL.  FIGURE, FIGURE

24  11.

25          (EXHIBIT PUBLISHED TO JURY.)

1    BY MR. MacDONALD:

2    Q.    YOU SEE IN THE BOTTOM RIGHT-HAND, YOU SEE THIS SAME

3    LANGUAGE, MR. SIVAKUMAR, ABOUT "BEST-OF-CLASS PROPRIETARY

4    PATENT-PENDING, FIBER ALIGNMENT, AND OPTIC PACKAGING SOLUTION."

5          YOU SEE THAT?

6    A.    YEAH.

7    Q.    CORRECT?

8          OKAY.  AND THAT WAS GOING TO ENABLE LIGHTLOGIC --

9    SORRY -- INTEL TO HAVE HIGH-VOLUME MANUFACTURING OF ITS -- OF

10   TRANSPONDERS, CORRECT?

11   A.    YEAH, SO THE -- SO LIGHTLOGIC HAD CREATED SOME PIECES OF

12   TECHNOLOGY THAT WOULD FILL -- LIKE I SAID, THE -- THE GAPS THAT

13   WE HAD IN THE BIG PRODUCT THAT WE WERE TRYING TO BUILD.  AND

14   ULTIMATELY, WE HAD THE POTENTIAL -- THAT'S WHY IT SAYS I

15   WILL -- "HVM" STANDS FOR -- I THINK IT'S HARD TO READ, BUT IT

16   STANDS FOR "HIGH-VOLUME MANUFACTURING."  AND THAT WE HAD THE

17   POTENTIAL TO TAKE IT INTO HIGH-VOLUME MANUFACTURING.

18   Q.    AND THAT WAS BASED ON THE PATENT-PENDING PROPRIETARY

19   FIBER ALIGNMENT?

20   A.    NO, THAT'S ONE PIECE OF IT.

21   Q.    AN IMPORTANT PIECE, CORRECT?

22   A.    AMONG MANY, MANY OTHER THINGS, YES.

23   Q.    BUT IT WAS A SIGNIFICANT ENOUGH PIECE TO HIGHLIGHT IT

24   THROUGHOUT THIS BOARD OF BRIEFING -- BOARD OF DIRECTORS

25   BRIEFING BOOK, CORRECT?

 1  A.    THE -- THE -- YOU TYPICALLY GET A SHORT AMOUNT OF THE

 2  ATTENTION SPAN FROM THE BOARD OF DIRECTORS, YOU DO HAVE TO TELL

 3  THEM A FEW THINGS THAT COMPLETE THE FULL PICTURE FOR US, RIGHT,

 4  I MEAN, THEY'RE AWARE OF ALL OF THE OTHER THINGS THAT WE ARE

 5  DOING, AND WE HAD TO HIGHLIGHT WHAT SOME OF THESE THINGS.

 6  MIGHT HELP IN TERMS OF ACCELERATING OUR PRODUCTS TO MARKET,

 7  YES.

 8  Q.    OKAY.  WELL, LET'S SEE -- LET'S SEE IT AGAIN HIGHLIGHTED

 9  ON PAGE 25.  TX772.0025.  THIS IS THE --

10                  (EXHIBIT PUBLISHED TO JURY.)

11  BY MR. MacDONALD:

12  Q.    -- COMPANY OVERVIEW SECTION, CORRECT, MR. SIVAKUMAR?

13  A.    (REVIEWING DOCUMENTS.)

14        YEAH.

15  Q.    OKAY.  AND YOU SEE IN THAT FIRST PARAGRAPH --

16        DAVID, COULD YOU BLOW UP THE FIRST PARAGRAPH --

17                  (EXHIBIT PUBLISHED TO JURY.)

18  BY MR. MacDONALD:

19  Q.    WE SEE THAT SAME LANGUAGE, AGAIN, IN THE THIRD SENTENCE,

20  "LIGHTLOGIC PROVIDES A BEST-OF-CLASS PROPRIETARY PATENT-PENDING

21  FIBER ALIGNMENT AND OPTICS PACKAGING SOLUTION WHICH INTEL

22  BELIEVES WOULD BE AN IMPORTANT DIFFERENTIATION, AT LEAST IN THE

23  NEAR TERM."

24        IT'S EXACTLY -- ALMOST THE EXACTLY THE SAME --

25  A.    IT'S A LANGUAGE -- THIS DESCRIPTION IS REALLY A

1    DESCRIPTION OF WHAT IS IN THE FOILS, SO OBVIOUSLY YOU FIND THE

2    SAME --

3    **Q.**   AND WHAT WAS IN THE FOILS WAS AN IMPORTANT PART OF HOW

4    INTEL GOT APPROVAL OR HOW YOU GOT APPROVAL THROUGH INTEL'S

5    BOARDING TO ACQUIRE LIGHTLOGIC, CORRECT?

6    **A.**   LIKE I SAID, IN THE CONTEXT OF MANY, MANY OTHER THINGS.

7    **Q.**   OKAY.

8         BUT THIS IS -- THIS IN THE FIRST PARAGRAPH OF THE COMPANY

9    OVERVIEWS?

10   **A.**   YEAH, BECAUSE, YOU KNOW, RECOGNIZE THAT WE ARE A

11   TECHNOLOGY COMPANY, AND IT IS IMPORTANT FOR US TO HIGHLIGHT

12   SOME OF THE TECHNOLOGY PIECES BEFORE WE GET INTO A LOT OF THE

13   OTHER DETAILS.

14        SO YOU'RE LOOKING AT A DOCUMENT THAT I DON'T KNOW HOW

15   LONG IT IS, PROBABLY 80 PAGES OR WHATEVER, THERE ARE MANY OTHER

16   SECTIONS WHERE IT TALKS ABOUT CUSTOMERS, IT TALKS ABOUT THE --

17   THE SOFTWARE THAT THEY'VE DEVELOPED, THE TYPE OF PEOPLE THEY

18   HAVE, ON AND ON AND ON.

19        SO THIS IS WITHIN THE CONTEXT OF THAT LARGER ANSWER.

20   **Q.**   OKAY.

21   **A.**   I WOULDN'T SAY THAT IT IS NOT IMPORTANT, BUT IT IS IN A

22   MUCH BIGGER CONTEXT.

23   **Q.**   OKAY.  BUT IN THIS FIRST PARAGRAPH OF THE COMPANY

24   OVERVIEW, YOU DON'T SEE ANY MENTION OF CUSTOMERS, DO YOU?

25   **A.**   LIKE I SAID, WE TEND TO -- EXCUSE ME.  WE ARE -- WE ARE A

1    TECHNOLOGY COMPANY, AND IT IS -- IT IS OFTEN, YOU KNOW, OUR

2    BIAS TO TALK ABOUT TECHNOLOGY FIRST.

3    **Q.**    OKAY.  NOW, INTEL UNDERSTOOD THAT THE FOUNDATION FOR THE

4    LIGHTLOGIC OPTOELECTRONIC PLATFORM WAS ITS PATENTED TECHNOLOGY,

5    CORRECT?

6    **A.**    I'M SORRY?

7    **Q.**    INTEL UNDERSTOOD THAT THE FOUNDATION OF THE LIGHTLOGIC

8    OPTOELECTRONIC PLATFORM WAS ITS PATENTED TECHNOLOGY, CORRECT?

9    **A.**    I DON'T BELIEVE SO.  I THINK THE -- I -- I ACTUALLY DON'T

10   EXACTLY REMEMBER WHAT THE PATENT REFERRED TO.  BUT IT IS A

11   COMBINATION OF MANY DIFFERENT THINGS THAT THEY DID TO BUILD THE

12   INITIAL MODULE THAT THEY HAD DONE.  RIGHT?  THE MODULE THAT HAS

13   BEEN SHOWN MANY TIMES.  AND -- AND SO I -- I DON'T THINK THAT

14   HAS BEEN CHARACTERIZED CORRECTLY.

15   **Q.**    OKAY.

16        LET'S GO TO TX772.0027, DAVID, PLEASE.

17             (EXHIBIT PUBLISHED TO JURY.)

18         **MR. MacDONALD:**  THE SECOND PARAGRAPH UNDER

19   "MICRO-OPTIC DESIGNS," THE SECOND PARAGRAPH --

20             BLOW -- YEAH.

21             (EXHIBIT PUBLISHED TO JURY.)

22   **BY MR. MacDONALD:**

23   **Q.**    DO YOU SEE WHERE IT SAYS "THE FOUNDATION FOR THE LICORICE

24   OPTOELECTRONIC PLATFORM IS A PATENTABLE METALLIZED,

25   MULTI-LAYER, CO-FIRED CERAMIC SUBSTRATE WITH INTEGRATED

1   CAPABILITIES."  AND IT LISTS THREE CAPABILITIES.

2         DO YOU SEE THAT?

3   A.    YEAH.

4   Q.    OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER

5   THE FOUNDATION FOR THE LIGHTLOGIC OPTOELECTRONIC PLATFORM --

6   A.    YEAH.

7   Q.    -- WAS ITS --

8   A.    I -- I WOULDN'T CLAIM INTIMATE FAMILIARITY WITH ALL THE

9   TECHNOLOGY.  I WAS INVOLVED IN DOING THE TRANSACTION, NOT IN

10  UNDERSTANDING ALL OF THE TECHNOLOGY.

11        WHAT I'M READING THERE IS IT SAYS IT IS PATENTABLE, YOU

12  KNOW, AND I'LL LEAVE IT TO THE JUDGMENT OF PEOPLE WHO

13  UNDERSTAND THE TECHNOLOGY.

14  Q.    OKAY.  MOVING ON TO ANOTHER SUBJECT, YOU RECALL WORKING

15  WITH DREW SMITH AT INTEL CAPITAL, CORRECT?

16  A.    I KNEW DREW, YES.

17  Q.    HOW LONG HAVE YOU KNOWN DREW FOR?

18  A.    I -- NOT -- NOT VERY LONG.  I PROBABLY -- HE'S NOT WITH

19  INTEL ANYMORE.  I USED TO KNOW HIM FOR A PERIOD OF TIME.

20  Q.    OKAY.  AND YOU KNEW THAT DREW SMITH WAS WORKING ON THE

21  LIGHTLOGIC/INTEL DEAL, CORRECT?

22  A.     NO, DREW DIDN'T HAVE A VERY DIRECT INVOLVEMENT WITH IT.

23  HE HAD REMOTE INVOLVEMENT, CALL IT PERIPHERAL INVOLVEMENT.  HE

24  WAS -- HE WAS PART OF THE INTEL CAPITAL OPTICAL SECTOR, BUT ON

25  THE PARTICULAR TRANSACTION, HE DOESN'T HAVE A VERY DIRECT

1   INVOLVEMENT.

2   Q.   OKAY.  YOU'RE AWARE THAT DREW SMITH LOOKED AT A COMPANY

3   CALLED NETWORKS ELEMENTS?

4   A.   SURE.

5   Q.   AND THAT WAS A POTENTIAL COMPANY THAT INTEL WAS THINKING

6   ABOUT ACQUIRING IN LIEU OF LIGHTLOGIC, CORRECT?

7   A.   WE HAD A LONG LIST.  NETWORK ELEMENTS WAS ON THAT LIST.

8   Q.   YOU'RE AWARE THAT NETWORK ELEMENT ACTUALLY HAD MORE

9   PEOPLE, MORE SALES, AND MORE ADVANCED PRODUCT THAN LIGHTLOGIC

10  HAD AT THE TIME?

11  A.   I WOULDN'T CLAIM TO RECALL ALL THAT, NO.  I DON'T KNOW.

12  Q.   OKAY.

13       LET'S -- LET'S QUICKLY TURN TO TX750, PLEASE.  IT'S IN

14  YOUR BINDER.  IT'S ALREADY IN EVIDENCE.

15       DAVID, WE CAN PUT IT UP?

16  A.   IT'S THE SAME DOCUMENT WE'RE ON, NO. 750?

17  Q.   750.

18  A.   YEAH.

19            (EXHIBIT PUBLISHED TO JURY.)

20  BY MR. MacDONALD:

21  Q.   LET'S TURN TO PAGE 16 OF TX750.

22       BY THE WAY, JUST FOR THE RECORD, THIS IS THE LICORICE DAM

23  II DOCUMENT THAT -- THAT -- DATED MARCH 8, 2001.

24       YOU'RE FAMILIAR WITH THIS DOCUMENT, MR. SIVAKUMAR?

25  A.   YEAH.

1    Q.    OKAY.  SO PAGE 16.

2                  (EXHIBIT PUBLISHED TO JURY.)

3          **THE WITNESS:**  YEAH.

4    **BY MR. MacDONALD:**

5    Q.    THIS SLIDE IS TITLED "LICORICE SOURCES OF VALUE"?

6    A.    YES.

7    Q.    LET'S TURN -- LET'S TURN TO THE CHART, THE LICORICE

8    FORECAST REVENUE CHART.

9          CAN YOU BLOW IT UP, DAVID, PLEASE.  GOOD.

10                 (EXHIBIT PUBLISHED TO JURY.)

11               **MR. MacDONALD:**  THAT CHART THERE.

12   Q.    NOW, THIS CHART REPRESENTS PROJECTIONS FROM 2001 TO 2004,

13   CORRECT?

14   A.    YEAH.

15   Q.    AND IT'S -- ITS PROJECTIONS FOR LIGHTLOGIC'S REVENUE,

16   TOTAL UNITS SOLD AND METRO MSS PERCENTAGES.  CORRECT?

17         WHAT DOES "METRO MSS" STAND FOR?

18   A.    LIKE I EXPLAINED EARLIER, THERE ARE THREE DIFFERENT

19   MARKETS.  THE ENTERPRISE MARKET, THE METRO MARKET, AND THE LONG

20   HAUL MARKET.  THE "METRO MSS" STANDS FOR WITHIN THE METRO

21   MARKET SEGMENT WHAT SHARE WE CAN HOPE TO OBTAIN IF WE DID A LOT

22   OF THINGS RIGHT.

23         AND I WANT VERY CLEAR, EVEN THOUGH IT SAYS "LICORICE

24   FORECAST," WHAT THIS REALLY MEANS IS IF WE TAKE THE LIGHTLOGIC

25   TECHNOLOGY AND WE ARE ABLE TO INTEGRATE AND GET THE RIGHT

SIVAKUMAR - CROSS / MACDONALD

1    PRODUCT IN INTO THE MARKET AT THE RIGHT TIME, YOU GET ALL THE

2    RIGHT CUSTOMERS, MANY, MANY, MANY OF THOSE THINGS HAPPENED, WE

3    COULD POTENTIALLY BUILD A BUSINESS THAT LOOKS LIKE THIS.  SO

4    THIS IS NOT LIGHTLOGIC'S BUSINESS.

5    **Q.**    RIGHT.

6    **A.**    THIS IS INTEL'S BUSINESS USING LIGHTLOGIC'S TECHNOLOGY

7    INTO --

8    **Q.**    SO --

9    **A.**    -- INTO THE PRODUCT THEY'RE BUILDING.

10   **Q.**    SO, FOR EXAMPLE, THE 3 PERCENT IN 2001, THAT DOESN'T

11   REPRESENT LIGHTLOGIC'S MARKET SEGMENT SHARE PERCENTAGE,

12   CORRECT?

13   **A.**    NO.

14   **Q.**    THAT'S WHAT INTEL WAS HOPING TO ACHIEVE BY THE END OF

15   2001?

16   **A.**    WHAT INTEL WOULD BE ABLE TO DO WITH THE PRODUCTS THAT IT

17   WOULD BUILD, YES.

18   **Q.**    AND INTEL WAS -- WAS HOPING TO ACHIEVE A 4 PERCENT MARKET

19   SEGMENT SHARE IN 2002, CORRECT?

20   **A.**    YEAH.

21   **Q.**    AND THEN FOR 2003, IT LOOKS LIKE 6 PERCENT, RIGHT?

22   **A.**    YEAH.

23   **Q.**    AND YOU TESTIFIED EARLIER TO, IN YOUR DEPOSITION, THAT

24   YOU KNEW LIGHTLOGIC WAS SHIPPING SAMPLES AT THE TIME.

25   **A.**    YES.

1    **Q.**    CORRECT?

2          BUT YOU DIDN'T THINK THEY WERE SHIPPING ANY PRODUCTS AS

3    OF THE TIME OF THE DEAL, CORRECT?

4    **A.**    YEAH.  AS FAR AS I KNEW, THEY WERE SHIPPING SAMPLES.

5    **Q.**    NOW, IT'S FAIR TO SAY THAT AS OF THE TIME OF THIS DEAL,

6    LIGHTLOGIC HAD NOT ACHIEVED ANY CUSTOMER TRACTION YET, CORRECT?

7    **A.**    YOU KNOW, THE PROCESS OF WHAT WE CALL DESIGNMENTS, WHERE

8    YOU ACTUALLY WIN A SPECIFIC DESIGN WITHIN A CUSTOMER BASE, THAT

9    A CUSTOMER TAKES YOUR PRODUCTS AND INTEGRATES IT INTO SOMETHING

10   THAT THEY ARE BUILDING, IS -- IS A LONG GESTATION PERIOD.  IT

11   TAKES SIX, NINE, TWELVE MONTHS TO WIN THOSE KINDS OF DESIGNS.

12          AND DURING THE COURSE OF THAT TIME, IN SOME CASES, THE

13   SAMPLES YOU GIVE THEM OR THE INITIAL PRODUCTS YOU GIVE THEM,

14   SOME OF IT IS GIVEN FOR FREE, SOME OF IT YOU CHARGE.  THERE ARE

15   VARIOUS COMPLEX THINGS THAT HAPPEN.  AND IT TAKES TIME TO GET

16   THAT CUSTOMER TRACTION.

17          AND FROM OUR DILIGENCE, LIGHTLOGIC HAD AT THAT TIME, IF I

18   REMEMBER RIGHT, CLOSE TO ABOUT 20 CUSTOMERS AND THEY WERE ALL

19   AT VARIOUS LEVELS OF TRACTION.

20   **Q.**    AND AS OF THE TIME RIGHT -- AT THE TIME OF THE

21   ACQUISITION IN THE SPRING OF 2001, IT'S FAIR TO SAY THAT

22   LIGHTLOGIC DID NOT HAVE A SIGNIFICANT MARKET SHARE IN THE

23   TRANSPONDER MARKET, CORRECT?

24   **A.**    THE MARKET WAS JUST STARTING.  NOBODY HAD SHARE IN THE

25   TRANSPONDER MARKET AT THAT TIME.

1   Q.   AND NOBODY HAD A SIGNIFICANT MARKET SHARE AT THE TIME,

2   CORRECT?

3   A.   ANY MARKET, HOWEVER SMALL, IS HUNDRED PERCENT OF MARKET,

4   SO SOMEBODY COULD HAVE, YOU KNOW, 80 PERCENT OF A

5   HUNDRED-DOLLAR MARKET, BUT IT'S A SMALL MARKET.

6   Q.   RIGHT.  BUT AT THE TIME, LIGHTLOGIC DIDN'T HAVE A

7   SIGNIFICANT MARKET SHARE IN THE TRANSPONDER MARKET?

8   A.   IT WAS -- IT WAS A MARKET IN ABSOLUTE INFANCY, SO I DON'T

9   KNOW WHAT -- HOW TO CHARACTERIZE THAT.

10  Q.   OKAY.

11       OKAY.  I HAVE NO FURTHER QUESTIONS.

12                   **REDIRECT EXAMINATION**

13  **BY MS. GRANT:**

14  Q.   MR. SIVAKUMAR, I HAVE ONLY SEVERAL QUESTIONS TO ASK YOU.

15       JEFF, COULD WE HAVE EXHIBIT 2150, PHOTO 185 UP, PLEASE.

16             (EXHIBIT PUBLISHED TO JURY.)

17  **BY MS. GRANT:**

18  Q.   AND I'LL JUST LET YOU KNOW THAT THAT'S ACTUALLY THE

19  INSIDE OF ONE OF THESE TRANSPONDERS.

20       YOU TESTIFIED THAT THE TRANSPONDER CONTAINED

21  OFF-THE-SHELF OPTICAL MODULES.  AND CAN YOU -- DO YOU SEE

22  THERE, IT SAYS, "ORTEL"?

23  A.   YEAH.

24  Q.   OKAY.  AND IS THAT CONSISTENT WITH YOUR TESTIMONY?

25  A.   YEAH.  I -- I DIDN'T REMEMBER THAT IT WAS ORTEL, BUT

SIVAKUMAR - REDIRECT / GRANT

1    YEAH.

2    **Q.**    SO THESE ARE NOT LIGHTLOGIC OPTICAL MODULES?

3    **A.**    NO.

4    **Q.**    OKAY.  SO ARE YOU AWARE THAT THE FLEXURE THAT LIGHTLOGIC

5    HAD DESIGNED AND DEVELOPED IS NOT IN THE TRANSPONDER?

6    **A.**    YOU KNOW, I THINK I WAS AWARE OF THAT.  AND THOSE -- I

7    THINK I MENTIONED THIS EARLIER, THAT IT IS NOT SO IMPORTANT FOR

8    US WHETHER THAT PARTICULAR PIECE OF TECHNOLOGY WAS INSIDE THE

9    ONE BOX THAT WE WERE LOOKING AT OR --

10        WHAT IS IMPORTANT FOR US IS THAT THE TEAM THAT WAS THERE

11   AT -- AT LIGHTLOGIC UNDERSTOOD WHAT NEEDED TO BE DONE.  AND

12   THEY HAD FIGURED OUT A WAY TO DO IT IN A DEMONSTRABLE MANNER,

13   RIGHT?  SO WHETHER OR NOT IT WAS ON A PARTICULAR PRODUCT THAT

14   THEY HAD BUILT WAS OF LESS RELEVANCE.

15        SO I THINK I WAS AWARE THAT IT WASN'T PART OF THE ONE

16   THAT THEY WERE SAMPLING WITH CUSTOMERS.  BUT IT -- IT IS NOT

17   SOMETHING THAT WE -- WE VIEW AS, YOU KNOW, VERY RELEVANT.

18   **Q.**    AND WHEN YOU SAY THEY HAD FIGURED OUT A WAY TO DO IT, WHY

19   WAS THAT SO IMPORTANT TO INTEL, THAT THEY HAD FIGURED OUT A WAY

20   THAT YOU SAID TO GO FROM END TO END?

21   **A.**    WHAT IT TELLS YOU IS THE QUALITY AND THE SKILL SETS OF

22   INDIVIDUALS.  IT'S -- IT'S ACTUALLY -- AND THE KNOWLEDGE THAT

23   THEY HAVE AND THE ABILITY TO THINK THROUGH HIGHLY COMPLEX

24   PROBLEMS.  THESE ARE -- THESE ARE, AT SOME LEVEL, TRULY SCIENCE

25   FICTION TO BE ABLE TO CONVERT THOSE KINDS OF IDEAS INTO A --

1    WORKING SOLUTION AND SHOW IT, THAT -- YOU KNOW, THE IDEA THAT

2    THEY HAVE OF HOW TO ACTUALLY DO IT, AND THEY'RE ABLE TO THEN GO

3    INTO A SMALL FACTORY AND DEMONSTRATE THAT AND BUILD THE

4    EQUIPMENT TO ACTUALLY DO IT --

5         YOU KNOW, CONTROLLING THIS ALL THIS -- IN THE FACTORY

6    TAKES A LOT OF SOFTWARE, SO YOU HAVE TO SHOW THE ABILITY THAT

7    YOU HAVE THE SKILL SETS TO KNOW HOW TO WRITE THE SOFTWARE AND

8    CONTROL THOSE MACHINES AND THEN, EVENTUALLY, YOU KNOW, IN THIS

9    PARTICULAR CASE, MAYBE ALIGN A PIECE OF FIBER OR WHATEVER.  IT

10   TELLS A LOT ABOUT THE CAPABILITY OF THE TEAM, OF WHAT THEY HAVE

11   ASSEMBLED, RIGHT?  AND THEIR -- THEIR ANALYTICAL PROCESS AND SO

12   ON AND SO FORTH.  SO --

13        I -- I THINK THAT WAS WHAT WAS IMPORTANT TO US BECAUSE

14   WE -- WE WERE NOT GETTING INTO THIS BUSINESS TO SELL A PRODUCT

15   THAT SOMEHOW YOU KNOW LIGHTLOGIC HAD COBBLED TOGETHER.  WHAT WE

16   WERE DOING WAS TAKING A SET OF CAPABILITIES AND A SET OF HIGHLY

17   SKILLED PEOPLE THAT THEY HAD ASSEMBLED THAT COULD BE INTEGRATED

18   INTO INTEL, RIGHT?  WE HAD A LARGE TEAM ALREADY IN PLACE.  AND

19   THEN BE ABLE TO VERY POSITIVELY CONTRIBUTE TO THE PRODUCT LINE

20   OR TO THE SET OF PRODUCTS THAT INTEL WAS GOING TO BUILD, RIGHT?

21        SO THOSE ARE ALL INCREDIBLY IMPORTANT FOR US.

22   Q.   WERE YOU AWARE THAT THE DBC THAT COUNSEL REFERENCED NOT

23   IN THOSE OPTICAL MODULES --

24   A.   THE WHAT?

25   Q.   THE DBC, DID YOU EVEN KNOW WHAT THAT WAS?

1   A.    I HAVE FORGOTTEN WHAT THAT IS.

2   Q.    SO YOU PROBABLY DON'T KNOW IF IT'S IN THERE.  BUT IT'S AN

3   ORTEL MODULE.  DOES THAT TELL YOU THAT NOTHING FROM LIGHTLOGIC

4   WOULD BE IN THOSE TWO OPTICAL MODULES?

5   A.    YEAH.

6         MS. GRANT:  COULD WE HAVE EXHIBIT 815 ON THE SCREEN,

7   JEFF?

8              (EXHIBIT PUBLISHED TO JURY.)

9   BY MS. GRANT:

10  Q.    WHICH IS -- THIS IS A COMPANY DISCLOSURE SCHEDULE.

11        IF WE GO TO PAGE 12?

12        MR. MacDONALD:  YOUR HONOR, I'M GOING TO OBJECT.

13  THIS IS OUTSIDE THE SCOPE OF MY CROSS-EXAMINATION.

14        THE COURT:  THIS IS -- THIS QUESTIONS HAVE ALREADY

15  BEEN ASKED.

16        MS. GRANT:  I WAS GOING TO ASK --

17        THE COURT:  SO LET'S ASK ANOTHER QUESTION.

18        MS. GRANT:  SURE.

19  Q.    WITH REGARD TO THE FLEXURE TECHNOLOGY, COUNSEL SHOWED YOU

20  ALL THOSE DIFFERENT SLIDES.  YOU RECALL THAT PART OF YOUR

21  TESTIMONY?

22  A.    YEAH.  YEAH.

23  Q.    OKAY.  WAS IT YOUR UNDERSTANDING THAT LIGHTLOGIC HAD THE

24  RIGHT TO USE ANY FLEXURE IDEA THAT HAD EMANATED FROM RADIANCE?

25        MR. MacDONALD:  OBJECTION, YOUR HONOR, LEADING.

1    **THE COURT:**  ASK WHETHER OR NOT IT'S WITHIN HIS

2    KNOWLEDGE OR WHAT HIS --

3    **BY MS. GRANT:**

4    **Q.**    IS IT WITHIN YOUR KNOWLEDGE THAT LIGHTLOGIC HAD THE RIGHT

5    TO USE ANYTHING THAT HAD EMANATED -- ANY IDEA THAT HAD EMANATED

6    FROM RADIANCE?

7    **A.**    YEAH, BECAUSE THAT'S WHAT WE DEPENDED ON, OUR LEGAL TEAM

8    TO TELL US THAT THERE ISN'T ANYTHING THAT THEY'RE DOING THAT IS

9    A POTENTIAL PROBLEM, YES.  TO THAT EXTENT, WE KNEW WE WERE FREE

10   AND CLEAR TO USE IT.

11   **Q.**    OKAY.  NOW, COUNSEL ASKED YOU SOME QUESTIONS ABOUT A

12   SENTENCE IN ONE OF THE DOCUMENTS THAT SAID THE LIGHTLOGIC HAD A

13   STRONG BASE OF IP.

14       DO YOU RECALL THAT?

15   **A.**    YES.

16   **Q.**    AND WHAT DOES -- TO YOUR KNOWLEDGE, WHAT DOES "IP" OR

17   "INTELLECTUAL PROPERTY" ENCOMPASS?

18   **A.**    SO MAYBE I'LL REPEAT A FEW THINGS THAT I SAID YESTERDAY

19   WERE IP.  YOU KNOW, IP IS A VERY BROAD TOPIC THAT INCLUDES A

20   LOT OF THINGS LIKE KNOW-HOW AND TRADE SECRETS AND WHAT'S MORE

21   COLLOQUIALLY CALLED SECRET SAUCE, YOU KNOW, VARIOUS THINGS LIKE

22   THAT.  THAT -- THAT GOES INTO BUILDING HIGHLY COMPLEX PRODUCTS.

23   RIGHT?

24       SOME PIECE OF THAT, COMPANIES WILL CHOOSE TO GO THROUGH A

25   VERY FORMAL PROCESS OF APPLYING FOR AND GETTING PATENTS AND SO

1    ON AND SO FORTH.  AND GETTING A PATENT IS A VERY EXPENSIVE

2    PROCESS.  IT'S NOT SOMETHING THAT YOU VERY FRIVOLOUSLY DECIDE

3    TO DO.  IT'S NOT CHEAP TO GO APPLY FOR A PATENT AND GO THROUGH

4    A FIVE-YEAR, PERHAPS, PROCESS OF ACTUALLY, YOU KNOW, GETTING

5    SOMETHING ISSUED.

6         AND MANY TIMES IN THE TECHNOLOGY INDUSTRY, PATENTS ARE --

7    OR YOUR KNOW-HOW OR YOUR WHATEVER BECOMES SOMETHING THAT YOU

8    DON'T WANT IT TO BE VERY BROADLY KNOWN.  SO A LOT OF TIMES,

9    THINGS ARE MAINTAINED AS TRADE SECRETS, THINGS THAT, YOU KNOW,

10   YOU DON'T NECESSARILY SHARE, RIGHT?

11        LIGHTLOGIC, WITHIN THAT PIECE OF THE SET OF SOLUTIONS

12   THAT THEY WERE GOING TO BRING FOR US, CERTAINLY HAD KNOWLEDGE.

13   SO WITHIN THAT CONTEXT, YEAH, WE WOULD PROBABLY HAVE CALLED IT

14   STRONG, BUT IT IS, AGAIN, WITHIN THE CONTEXT OF THE SET OF

15   THINGS THAT LIGHTLOGIC WAS ACTUALLY DOING.  I THINK -- I JUST

16   WANTED TO EMPHASIZE THAT.

17   Q.   WHEN YOU TALK ABOUT YOUR UNDERSTANDING OF THE STRONG BASE

18   OF IP INCLUDING TRADE SECRETS AND KNOW-HOW, WHAT DO YOU MEAN BY

19   "KNOW-HOW"?

20   A.   WHEN YOU WORK IN A CERTAIN AREA, DOESN'T MATTER WHETHER

21   IT IS TECHNOLOGY OR NOT, THERE ARE THINGS THAT YOU DEVELOP AND

22   RETAIN IN YOUR HEAD BECAUSE YOU'VE DONE THOSE THINGS BEFORE OR

23   YOU HEARD SOMEBODY ELSE HAS DONE IT AND YOU LEARNED SOMETHING

24   AS YOU GO ALONG, VARIOUS THINGS LIKE THAT.

25        ALL OF THAT CONSTITUTES, IN MY OPINION, KNOW-HOW.  SOME

```
 1    OF THAT YOU MIGHT TRANSLATE INTO SPECIFIC IMPLEMENTATIONS OF AN

 2    IDEA THAT -- THAT GOES INTO PERHAPS PRODUCT OR A -- OR A

 3    TEMPTATION THAT YOU MIGHT BUILD, OR WHATEVER.

 4         THOSE THINGS MIGHT BE CALLED TRADE SECRETS IF THEY

 5    ACTUALLY BECOME PRODUCTS.  I DON'T KNOW HOW TO DRAW THE LINE.

 6    I'M USING IT MUCH MORE COLLOQUIALLY THAN ANY LEGAL LANGUAGE.

 7    I'M SURE THERE'S SOME LEGAL DEFINITION FOR ALL THIS, BUT I'M

 8    NOT AWARE OF ALL THE --

 9    Q.   AND THEN, FINALLY, COUNSEL ASKED YOU SOME QUESTIONS ABOUT

10    EXHIBIT 772, WHICH IS THE BOARD OF DIRECTORS BRIEFING BOOK.

11         IF WE CAN JUST BRING THAT UP ON THE SCREEN, JEFF.

12         AND COUNSEL ASKED YOU SOME QUESTIONS ABOUT OVER IN THE

13    COMPANY OVERVIEW DESCRIPTION, SO LET'S START THERE FIRST, AND

14    THEN WE'LL GO BACK TO THE EXECUTIVE SUMMARY.  AND IN THE

15    COMPANY OVERVIEW SECTION --

16         JEFF, IF WE CAN GO -- THAT'S PAGE 6.

17              (EXHIBIT PUBLISHED TO JURY.)

18           MS. GRANT:  AND CAN WE GO TO THE FOURTH PARAGRAPH

19    DOWN, JUST BLOW THAT UP.

20              (EXHIBIT PUBLISHED TO JURY.)

21    BY MS. GRANT:

22    Q.   AND YOU CAN SEE WHERE IT SAYS, "LICORICE HAD REVENUE OF

23    2 MILLION FOR THE QUARTER ENDING DECEMBER 31ST, 2000 AND IS

24    EXPECTED TO HAVE A REVENUE OF 5 MILLION IN THE QUARTER ENDING

25    MARCH 31ST, '01, AND 35 MILLION IN TOTAL FOR THE FISCAL YEAR
```

1   ENDING SEPTEMBER 30TH, 2001.  ALMOST ALL ITS SALES ARE TO

2   PUBLIC COMPANIES.  THEIR PRIMARY CUSTOMERS ARE OEM BOX

3   BUILDERS."

4        IS THAT REVENUE -- IN TERMS OF STARTUPS THAT YOU'RE

5   FAMILIAR THAT INTEL'S BOUGHT, HOW DOES THAT REVENUE COMPARE FOR

6   LIGHTLOGIC AS A STARTUP?

7   **A.**   YOU KNOW, AT THAT TIME IN THE TECHNOLOGY INDUSTRY,

8   ANYBODY COULD -- WHO COULD ACTUALLY SHOW SOME ABILITY TO GET

9   REVENUE, IT WAS ACTUALLY A PRETTY GOOD THING, BECAUSE A LOT

10  OF -- THAT WAS THE FRENZY OF TIME WHEN EVERYBODY WAS BUILDING

11  TECHNOLOGY AND BUILDING PRODUCTS WITH A VIEW TO, YOU KNOW,

12  GETTING REVENUE IN THE FUTURE, RIGHT.

13       TO THE EXTENT THAT THEY HAD ACTUALLY MANAGED TO GET SOME

14  REVENUE FOR THE SAMPLES THAT THEY HAD SHIPPED AND, OF COURSE,

15  THE BIG NUMBER THERE IS BECAUSE THEY WERE GOING TO INTRODUCE

16  THAT MODULE SOMETIME IN THE MIDDLE OF '01.  AND I THINK THAT'S

17  WHY YOU SEE THAT JUMP IN -- IN -- IN THE FISCAL YEAR ENDING

18  SEPTEMBER '01, BECAUSE THEY WOULD ACTUALLY BE SELLING PRODUCTS

19  AT THAT TIME.

20       SO THAT WAS KIND OF I THINK WHAT THIS THING REFLECTS.  SO

21  IT'S PRETTY GOOD IF YOU HAVE SOME REVENUE COMING IN.

22  **Q.**   AND THEN FINALLY, IF WE CAN GO BACK TO THE EXECUTIVE

23  SUMMARY UNDER "OPPORTUNITY," WHICH IS ON PAGE 5, AND IF WE CAN

24  GO TO THE --

25       JUST PULL UP THE FIRST THREE PARAGRAPHS, JEFF.

1          (EXHIBIT PUBLISHED TO JURY.)

2     **BY MS. GRANT:**

3     **Q.**    AND, ACTUALLY, PULL UP THE WHOLE THING BECAUSE IN TALKING

4     ABOUT THE OPPORTUNITY, DO YOU SEE ANYTHING IN THIS SECTION --

5     FEEL FREE TO LOOK AT -- AT THE PAGE 5 -- THAT EVEN MENTIONS

6     ANYTHING ABOUT THE FLEXURE OR FIBER ALIGNMENT?

7     **A.**    THIS IS THE -- WHAT PAGE WAS THIS?

8     **Q.**    PAGE 5.

9     **A.**    (REVIEWING DOCUMENTS.)

10    **Q.**    IT'S ACTUALLY PAGE 2 OF THE LITTLE -- ACTUAL DOCUMENT,

11    BUT IT'S PAGE 5 OF THE TRIAL EXHIBIT.  IT'S CONFUSING.

12    **A.**    (REVIEWING DOCUMENTS.)

13    **Q.**    LET ME ASK IT THIS WAY.

14    **A.**    YEAH.

15            **MS. GRANT:**  IF YOU PULL UP THE THIRD PARAGRAPH,

16    JEFF.

17    **Q.**    "OPTOELECTRONIC COMPONENTS CAN BE DIFFERENTIATED BY THEIR

18    DEGREE OF INTEGRATION.  THE LOWEST LEVEL OF INTEGRATION IS A

19    TRANSMITTER AND/OR RECEIVER OR TRANSCEIVER MODULE THAT PERFORMS

20    THE MOST BASIC CONVERSION BETWEEN OPTICAL AND ELECTRICAL

21    SIGNALS."

22            DO YOU HAVE AN UNDERSTANDING THAT THAT'S ONE OF THOSE

23    OPTICAL MODULES?

24    **A.**    YEAH.  YEAH, UH-HUH.

25    **Q.**    IT'S AN OPTICAL MODULE?

1    A.    (NODS HEAD.)

2    Q.    OKAY.  AT THE NEXT HIGHER LEVEL?

3    A.    IT'S A -- LET ME BE VERY PRECISE.

4    Q.    SURE.

5    A.    THAT'S AN OPTICAL COMPONENT.  SIMPLEST WAY TO THINK ABOUT

6    THIS IS, LIKE I SAID INITIALLY, THESE TECHNOLOGIES COME IN

7    DISCRETE LITTLE COMPONENTS.  THEN YOU GO THROUGH VARIOUS LEVELS

8    OF INTEGRATION.  LIGHTLOGIC WAS SOMEWHERE ON THAT PATH.  THEY

9    HAD TAKEN SOME OF THESE DISCRETE COMPONENTS AND LIKE YOU SAW ON

10   THAT BOARD, THEY HAD INTEGRATED INTO A TRANSCEIVER -- A

11   TRANSPONDER MODULE.

12         INTEL -- WHAT THIS PARAGRAPH REALLY REFLECTS IS INTEL'S

13   STRATEGY, RIGHT, OF BUILDING THAT SUPERMODULE, WHICH HAD A MUCH

14   HIGHER DEGREE OF INTEGRATION THAT THE -- THAT THE BIG COMPANIES

15   ARE LOOKING FOR -- FOR A, YOU KNOW, CISCO, AGILENT OR PEOPLE

16   WHO WERE OUR CUSTOMERS WERE LOOKING FOR A MUCH HIGHER LEVEL OF

17   INTEGRATION OF THAT MODULE, WHICH WE INTERNALLY CALLED A

18   SUPERMODULE, WHICH IS SORT OF THE -- THE BLACK BOX THAT THEY

19   WANTED TO BUY FROM US.

20   Q.    AND THE LAST SENTENCE THERE, "WITH THE ACQUISITION

21   LICORICE, INTEL'S STRATEGY WOULD BE TO ENTER THE METRO SEGMENT

22   OF OC192 TRANSPONDER PRODUCTS AND THEN RAPIDLY DEVELOP 10GE

23   PRODUCTS AND/OR SUPER MODULES."  THAT WAS INTEL'S REASON FOR

24   BUYING LIGHTLOGIC -- ONE OF THE PRIMARY REASONS, CORRECT?

25   A.    ONE OF THE REASONS, BECAUSE IT HELPED US FILL SOME OF THE

 1   GAPS THAT WE HAD IN BUILDING THAT SUPERMODULE, WHICH WAS OUR

 2   ULTIMATE STRATEGY IN TERMS OF ADDRESSING THESE MARKETS THAT

 3   I --

 4         **MS. GRANT:**  THANK YOU, MR. SIVAKUMAR.  I HAVE NO

 5   FURTHER QUESTIONS.

 6                       <u>**RECROSS-EXAMINATION**</u>

 7   **BY MR. MacDONALD:**

 8   **Q.**   JUST A FEW QUESTIONS, MR. SIVAKUMAR.

 9   **A.**   OKAY.

10   **Q.**   YOU TESTIFIED INTEL WANTED THE LIGHTLOGIC TEAM, CORRECT?

11   **A.**   YES.

12   **Q.**   THAT WAS AN IMPORTANT SOURCE OF VALUE?

13   **A.**   THE TEAM WAS -- YES.

14   **Q.**   TEAM WAS IMPORTANT.

15         IS IT YOUR TESTIMONY THAT INTEL PAID $409 MILLION JUST

16   FOR THE LIGHTLOGIC TEAM?

17   **A.**   IT'S -- IT'S A COMBINATION OF A LOT OF THINGS, AND TEAM

18   WAS IMPORTANT.  TEAM IS -- AND WITHIN THE TEAM, THERE WERE A

19   SET OF PEOPLE IDENTIFIED AS KEY PEOPLE THAT WE NEEDED TO

20   RETAIN, AND THE MOST IMPORTANT ONE BEING DR. VERDIELL.

21         AND THEN I DON'T REMEMBER THE EXACT NUMBER, BUT WE

22   PROBABLY HAD ABOUT A HALF A DOZEN OTHER KEY EMPLOYEES THAT

23   NEEDED TO BE RETAINED, AND THAT'S -- THAT'S, YOU KNOW, PART OF

24   ANY TRANSACTION.

25   **Q.**   DID YOU EVER PUT A VALUE AS TO HOW MUCH MONEY -- OR DID

1   YOU EVER ASSESS A VALUE AS TO THE TEAM, THE KEY LIGHTLOGIC

2   TEAM?

3   **A.**   NO, WE -- WE DON'T DO THAT KIND OF --

4   **Q.**   ARE YOU AWARE THAT INTEL HIRED AN -- SORRY -- AN

5   ACCOUNTING FIRM, DELOITTE & TOUCHE, TO ASSESS THE VALUE OF

6   LIGHTLOGIC'S ASSETS AFTER THE DEAL?  ARE YOU AWARE OF THAT?

7   **A.**   I WASN'T SPECIFICALLY AWARE OF THAT.

8   **Q.**   ARE YOU AWARE THAT DELOITTE ACTUALLY PUT A VALUE OF

9   2.34 MILLION?

10           **MS. GRANT:**  THAT MISSTATES THE DOCUMENTS AND LACKS

11   FOUNDATION.

12           **THE COURT:**  SUSTAINED.

13           **MR. MacDONALD:**  I'M JUST ASKING HIS AWARENESS, YOUR

14   HONOR.

15           **THE COURT:**  I KNOW.  HE JUST SAID HE DIDN'T KNOW.

16           **MR. MacDONALD:**  OKAY.

17           NOW, LET'S GO BACK TO TX772 ON THE SIXTH PAGE,

18   DAVID.

19           (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. MacDONALD:**

21   **Q.**   AND IT'S -- LET'S HIGHLIGHT THE PARAGRAPH WITH THE

22   REVENUES, "OUR PRELIMINARY DUE DILIGENCE FINDINGS."

23           NOW, YOU TESTIFIED THAT STARTING IN THE MIDDLE OF 2001,

24   THE REVENUES WERE GOING TO -- IT WAS EXPECTED THAT THE REVENUES

25   OF LIGHTLOGIC WOULD INCREASE SIGNIFICANTLY, CORRECT?

SIVAKUMAR – RECROSS / MACDONALD

1   **A.**   YEAH.  BECAUSE AS AN INDEPENDENT COMPANY, THEY WERE GOING

2   TO START SELLING THE MODULE, THAT TRANSPONDER MODULE.

3   **Q.**   AND YOU'RE AWARE THAT THEY WERE GOING TO ACTUALLY START

4   SELLING TRANSPONDER MODULES WITH THEIR OWN LIGHTLOGIC

5   TECHNOLOGY; IS THAT CORRECT?

6   **A.**   I WOULDN'T SPECIFICALLY REMEMBER THAT.  I DON'T REMEMBER

7   THAT.

8                **MR. MacDONALD:**  OKAY.  THAT'S IT, YOUR HONOR.

9                **THE COURT:**  MR. SIVAKUMAR, YOU CAN BE EXCUSED NOW.

10               **THE WITNESS:**  THANK YOU.

11                    (PAUSE IN THE PROCEEDINGS.)

12               **MS. GRANT:**  AND, YOUR HONOR, BEFORE THE DEFENSE

13   CALLS THE NEXT WITNESS, I BELIEVE PLAINTIFF -- THAT WE'D ASK

14   PLAINTIFF TO REST THEIR CASE.  I BELIEVE THAT WAS THEIR PLAN

15   AFTER THIS WITNESS WAS CALLED.

16               **MR. KIRSCH:**  YOUR HONOR, WE JUST HAVE THIS ONE

17   OUTSTANDING ISSUE WITH MR. WILLHOIT, BUT OTHERWISE PLAINTIFF

18   WOULD REST.

19               **THE COURT:**  GO AHEAD.

20               **MS. GRANT:**  YOUR HONOR, THE PLAINTIFFS (SIC) CALL AS

21   THE NEXT WITNESS JIM TIMMINS.

22                    (PAUSE IN THE PROCEEDINGS.)

23                    **JIM TIMMINS,**

24   CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

25   TESTIFIED AS FOLLOWS:

1     **THE CLERK:**  PLEASE BE SEATED.  AND IF YOU'LL SCOOT

2     YOUR CHAIR UP AND PULL THE MICROPHONE UP TO YOU, AND THEN

3     PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

4     **THE WITNESS:**  JIM TIMMINS, T-I-M-M-I-N-S.

5     <u>**DIRECT EXAMINATION**</u>

6     **BY MS. GRANT:**

7     **Q.**    GOOD MORNING, MR. TIMMINS.

8     **A.**    GOOD MORNING.

9     **Q.**    WHAT DO YOU DO FOR A LIVING?

10    **A.**    I HAVE AT VARIOUS TIMES IN MY CAREER BEEN BOTH AN

11    INVESTMENT BANKER AND A VENTURE CAPITALIST.

12    **Q.**    AND IF YOU COULD JUST -- JUST PULL IT UP OR JUST TALK

13    MORE INTO THE MICROPHONE, THAT WOULD BE GREAT?

14    **A.**    I'M TOO TALL FOR IT.

15    **Q.**    I KNOW HOW THAT FEELS.

16          SO YOU HAVE WORKED AS AN INVESTMENT BANKER AND A VENTURE

17    CAPITAL --

18    **A.**    THAT'S CORRECT.

19    **Q.**    OKAY.  AND WHAT IS YOUR EDUCATIONAL BACKGROUND?

20    **A.**    I HAVE AN UNDERGRADUATE DEGREE FROM A UNIVERSITY IN

21    CANADA WHERE I GREW UP AND THEN A MASTER'S IN BUSINESS

22    ADMINISTRATION FROM STANFORD UNIVERSITY.

23    **Q.**    OKAY.  AND BRIEFLY FOR THE JURY, CAN YOU DESCRIBE YOUR

24    WORK EXPERIENCE?

25    **A.**    YES.  AFTER GRADUATING WITH THE M.B.A. IN 1981, I ENTERED

1    INVESTMENT BANKING WITH A LARGE WALL STREET FIRM, SALOMON

2    BROTHERS, AND WORKED THERE FOR A NUMBER OF YEARS.  I THEN

3    DISCOVERED MY LOVE FOR TECHNOLOGY COMPANIES AND MOVED TO A

4    SAN FRANCISCO—BASED FIRM CALLED HAMBRECHT & QUIST, WHICH WAS

5    THE ORIGINAL SPONSOR OF A GOOD MANY TECHNOLOGY COMPANIES SUCH

6    AS APPLE AND GENENTECH AND ADOBE.

7         I WAS THERE FOR MANY YEARS, WORKED WITH A LOT OF VERY

8    EXCITING TECHNOLOGY COMPANIES, AND MADE A TRANSITION TO VENTURE

9    CAPITAL INVESTING IN THE LATE 1980'S, EARLY 1990'S, AND SPENT

10   THE BULK OF THE 1990'S AND INTO THIS PAST FEW YEARS IN VENTURE

11   CAPITAL INVESTING WITH A COUPLE OF FIRMS ON WHAT'S CALLED SAND

12   HILL ROW, THE STREET IN MENLO PARK WHERE SO MANY VENTURE

13   CAPITAL FIRMS ARE LOCATED.

14   Q.    AND WHERE —— WHAT IS YOUR PRESENT OCCUPATION?

15   A.    I'M WITH AN INVESTMENT BANKING FIRM THAT WORKS

16   EXCLUSIVELY WITH TECHNOLOGY COMPANIES IN SILICON VALLEY.

17   Q.    OKAY.  AND WHAT IS YOUR POSITION THERE?

18   A.    MANAGING DIRECTOR.

19   Q.    AND DO YOU HAVE ANY SPECIAL EXPERTISE OR AREA OF FOCUS IN

20   VENTURE CAPITAL FUNDING?

21   A.    THE BULK OF MY CAREER HAS BEEN SPENT WORKING WITH WHAT WE

22   CALL HARDWARE COMPANIES.  THESE ARE COMPANIES THAT ARE INVOLVED

23   IN THE MAKING OF SEMICONDUCTOR OR OPTICAL COMPONENTS.  THE

24   COMMUNICATIONS SYSTEMS INTO WHICH THOSE COMPONENTS ARE

25   INSTALLED, AND THEN OCCASIONALLY THE BITS OF SOFTWARE AND OTHER

TIMMINS – DIRECT / GRANT

 1   THINGS AROUND THEM THAT ARE NECESSARY TO RUN THOSE SYSTEMS.

 2   **Q.**     AND ALL TOLD, HOW MANY YEARS HAVE YOU SPENT IN VENTURE

 3   CAPITAL FINANCE AND INVESTMENT BANKING?

 4   **A.**     I GUESS IT'S 27 YEARS NOW.

 5   **Q.**     OKAY.  AND HAVE YOU PERSONALLY EVALUATED COMPANIES FOR

 6   VENTURE CAPITAL FUNDING?

 7   **A.**     YES.  SEVERAL HUNDRED.

 8   **Q.**     OKAY.

 9          HAVE YOU EVER EVALUATED ANY COMPANIES FOR ACQUISITION?

10   **A.**     YES.  QUITE A FEW AS WELL.

11   **Q.**     OKAY.  HAVE YOU COMPLETED ANY COURSES IN BUSINESS

12   VALUATION?

13   **A.**     YES.  THE AMERICAN SOCIETY OF APPRAISERS, WHICH IS THE

14   PRIMARY AUTHORIZATION BODY FOR VALUATION, OFFERS FOUR BUSINESS

15   VALUATION COURSES, AND I COMPLETED ALL FOUR AND WROTE THE EXAMS

16   AND PASSED THEM SUCCESSFULLY.

17   **Q.**     AND HAVE YOU EVER SERVED ON ANY COMPANY'S BOARD OF

18   DIRECTORS?

19   **A.**     YES.  AT MORE THAN 15 OR SO BOARDS OF DIRECTORS.

20   **Q.**     DO YOU SIT PRESENTLY ON ANY BOARD OF DIRECTORS FOR ANY

21   COMPANIES?

22   **A.**     I'M ON TWO BOARDS OF DIRECTORS, AN OPTICAL COMPONENTS

23   COMPANY IN SILICON VALLEY AND A COMMUNICATIONS SYSTEMS COMPANY

24   HERE IN OAKLAND.

25   **Q.**     DO YOU HAVE ANY TEACHING EXPERIENCE?

1   **A.**    I'VE BEEN ASKED TO LECTURE AND HAVE LECTURED AT BOTH THE

2   STANFORD GRADUATE SCHOOL OF BUSINESS AND SANTA CLARA UNIVERSITY

3   SCHOOL OF LAW.  I DO SOME TEACHING FOR LAWYERS IN THEIR

4   CONTINUING EDUCATION, AND I'VE SPOKEN AT A LARGE NUMBER OF

5   CONFERENCES IN INDUSTRY EVENTS AS WELL.

6   **Q.**    AND ARE YOU THE AUTHOR OF ANY PUBLICATIONS IN THE VENTURE

7   CAPITAL FIELD?

8   **A.**    NOT STRICTLY SPEAKING IN THE VENTURE CAPITAL FIELD.  I

9   DO -- I HAVE IN THE PAST CONTRIBUTED -- I CONTRIBUTED FOR ABOUT

10  EIGHT YEARS TO A LINE OF PUBLICATIONS THAT WAS USED BY LAW

11  FIRMS AND LAWYERS WHO WERE ENGAGED IN VENTURE CAPITAL

12  FINANCING.

13  **Q.**    HAVE YOU EVER TESTIFIED AS AN EXPERT WITNESS BEFORE?

14  **A.**    YES.

15  **Q.**    AND HOW MANY TIMES?

16  **A.**    ONCE IN DEPOSITION, ONCE IN TRIAL.

17          **MS. GRANT:**  OKAY.  YOUR HONOR, DEFENDANTS WOULD

18  OFFER MR. TIMMINS AS AN EXPERT IN VENTURE CAPITAL FINANCE AND

19  PRACTICES.

20          **THE COURT:**  ANY QUESTIONS?

21          **MR. JANSEN:**  YEAH, I HAVE, YOUR HONOR.  COUPLE OF --

22  COUPLE OF VOIR DIRE QUESTIONS.

23          **THE COURT:**  GO AHEAD.

24

25

|     |                                                                         |
|-----|-------------------------------------------------------------------------|
| 1   | **VOIR DIRE EXAMINATION**                                               |
| 2   | **BY MR. JANSEN:**                                                      |
| 3   | **Q.**   MR. TIMMINS, YOU DON'T HAVE AN ENGINEERING DEGREE, DO          |
| 4   | YOU?                                                                     |
| 5   | **A.**   THAT IS CORRECT.  I DO NOT.                                    |
| 6   | **Q.**   AND YOU DON'T HAVE AN ACCOUNTING DEGREE, DO YOU?               |
| 7   | **A.**   I DO NOT.                                                       |
| 8   | **Q.**   AND YOU'RE NOT -- YOU'RE NOT A CERTIFIED PUBLIC                |
| 9   | ACCOUNTANT?                                                              |
| 10  | **A.**   I AM NOT.                                                       |
| 11  | **Q.**   YOU'VE NEVER BEEN A CERTIFIED PUBLIC ACCOUNTANT?               |
| 12  | **A.**   NO, I HAVE NOT.                                                 |
| 13  | **Q.**   YOU'VE NEVER WORKED IN ACCOUNTING ORGANIZATIONS LIKE           |
| 14  | THE -- AMERICAN INSTITUTION OF C.P.A.'S, ARE YOU?                       |
| 15  | **A.**   I AM NOT.                                                       |
| 16  | **Q.**   YOU WEREN'T ASKED TO REACH OPINIONS REGARDING THE AMOUNT       |
| 17  | OF DAMAGES MR. SHUM HAS SUFFERED IN THIS CASE, HAVE YOU?                |
| 18  | **A.**   I WAS ASKED TO REVIEW THE METHODOLOGY THAT WAS USED TO         |
| 19  | CALCULATE DAMAGES BUT NOT TO ACTUALLY CALCULATE A SUM OF                |
| 20  | DAMAGES.                                                                 |
| 21  | **Q.**   AND YOU HAVEN'T MADE ANY EFFORT TO DETERMINE OR CALCULATE      |
| 22  | THE VALUE OF ANY OF THE PATENTS AT ISSUE IN THIS CASE, RIGHT?           |
| 23  | **A.**   NOT DIRECTLY, NO.                                               |
| 24  | **Q.**   AND YOU DIDN'T ATTEMPT IN THIS CASE TO DETERMINE THE           |
| 25  | VALUE OF ANY OF THE INTELLECTUAL PROPERTY AT RADIANCE, DID YOU?         |

1    **A.**    I DID NOT, NO.

2            **MR. JANSEN:**  YOUR HONOR, WE DON'T OBJECT TO

3    MR. TIMMINS BEING PUT UP AS AN EXPERT ON VENTURE CAPITAL

4    PRACTICES BUT WE DON'T THINK HE'S APPROPRIATELY QUALIFIED TO

5    TESTIFY REGARDING DAMAGE ISSUES OR ACCOUNTING ISSUES.

6            **THE COURT:**  HE'S BEING PROFFERED AS AN EXPERT IN

7    VENTURE CAPITAL PRACTICES, AND THE COURT WILL ACCEPT HIM AS A

8    EXPERT ON THAT AREA.

9            **MS. GRANT:**  THANK YOU, YOUR HONOR.

10                    **DIRECT EXAMINATION** (RESUMED)

11   BY MS. GRANT:

12   **Q.**    WERE YOU INVOLVED IN THE TRANSACTIONS IN THIS CASE, THE

13   VENTURE CAPITAL FUNDING OF LIGHTLOGIC?

14   **A.**    IN THE 1990'S?

15   **Q.**    YES.

16   **A.**    AND EARLY IN THIS DECADE?

17        NO, I WAS NOT.

18   **Q.**    OKAY.  HOW MUCH TIME HAVE YOU SPENT WORKING ON THIS CASE

19   AS AN EXPERT?

20   **A.**    SOMETHING OVER A HUNDRED HOURS.

21   **Q.**    OKAY.  AND HAVE YOU BEEN COMPENSATED OR -- FOR YOUR TIME?

22   ARE YOU BEING COMPENSATED?

23   **A.**    I WILL BE COMPENSATED, YES.

24   **Q.**    OKAY.  CAN YOU TELL THE JURY WHAT YOU WERE ASKED TO DO IN

25   THIS CASE?

1    **A.**    I WAS ASKED TO EXAMINE THE -- THE VENTURE CAPITAL

2    INVESTMENTS WHICH WERE MADE IN LIGHTLOGIC AND THE ACQUISITION

3    OF LIGHTLOGIC BY INTEL.  I WAS ASKED TO EXAMINE THE BUSINESS

4    PLAN THAT WAS PREPARED BY MR. SHUM FOR HIS ENTITY LUMINANCE,

5    AND I WAS ASKED TO REVIEW SOME CALCULATIONS THAT WERE MADE BY

6    AN EXPERT ON THE OTHER SIDE, MR. LASINSKI, IN CONNECTION WITH

7    ASSESSMENT OF THOSE DAMAGES.

8    **Q.**    AND SINCE COUNSEL ASKED YOU, YOU'RE NOT OBVIOUSLY AN

9    ACCOUNTANT, YOU'RE TESTIFYING IN THE FIELD OF VENTURE CAPITAL

10   FUNDING.  DOES MR. LASINSKI OR MR. REGAN HAVE ANY EXPERIENCE,

11   TO YOUR KNOWLEDGE, IN VENTURE CAPITAL FUNDING?

12   **A.**    I --

13              **MR. JANSEN:**  OBJECTION, FOUNDATION.

14              **THE COURT:**  OBJECTION'S SUSTAINED.

15   **BY MS. GRANT:**

16   **Q.**    ARE YOU AWARE OF MR. REGAN'S BACKGROUND?

17   **A.**    I READ HIS EXPERT REPORT AND TRANSCRIPTS, YES.

18   **Q.**    AND WHAT IS YOUR UNDERSTANDING OF WHAT -- WHAT HIS

19   PROFESSIONAL AREA OF EXPERIENCE AND EXPERTISE IS?

20   **A.**    IT'S OUTSIDE VENTURE CAPITAL.  HE'S NOT BEEN A PRACTICING

21   VENTURE CAPITALIST.

22   **Q.**    AND WHAT ABOUT MR. LASINSKI, TO YOUR KNOWLEDGE, DOES HE

23   HAVE ANY -- ANY EXPERIENCE IN VENTURE CAPITAL FUNDING?

24              **MR. JANSEN:**  OBJECTION, FOUNDATION.

25              **THE COURT:**  SUSTAINED.

1    **BY MS. GRANT:**

2    Q.    WHAT IS YOUR UNDERSTANDING OF MR. LASINSKI'S BACKGROUND,

3    IF ANY, IN VENTURE CAPITAL FUNDING?

4             **MR. JANSEN:**  SAME OBJECTION.

5             **THE COURT:**  SUSTAINED.

6    **BY MS. GRANT:**

7    Q.    CAN YOU TELL THE JURY WHAT YOUR UNDERSTANDING IS OF

8    MR. LASINSKI'S BACKGROUND?

9             **MR. JANSEN:**  SAME OBJECTION, YOUR HONOR.

10            **THE COURT:**  SUSTAINED.  HE'S ALREADY TESTIFIED AND

11   THERE'S A BACKGROUND THAT'S BEEN INTRODUCED AND OFFERED TO THE

12   JURY.

13   **BY MS. GRANT:**

14   Q.    SO IF YOU CAN TELL THE JURY, WHAT METHODOLOGY YOU

15   EMPLOYED TO REACH YOUR EXPERT OPINIONS IN THIS CASE.

16   A.    I REVIEWED THE MATERIALS THAT THE VARIOUS VENTURE CAPITAL

17   FIRMS HAD GATHERED OR PREPARED FOR THEIR INTERNAL REVIEW, THEIR

18   INTERNAL DECISION MAKING, AND I DID THE SAME IN CONNECTION WITH

19   INTEL'S ULTIMATE ACQUISITION.

20        AND I REVIEWED THE TRANSCRIPTS OF VARIOUS PEOPLE WHO

21   HAVE, AT ONE TIME OR ANOTHER, SPOKEN ABOUT THE CASE, THAT THE

22   DEFENDANTS' LEGAL TEAM THOUGHT WERE APPROPRIATE.  I HAVE

23   REVIEWED A NUMBER OF OUTSIDE SOURCES, AND I RELIED FAIRLY

24   HEAVILY ON MY OWN MORE THAN 25 YEARS DIRECT EXPERIENCE OF

25   INVESTING AND WORKING WITH SILICON VALLEY COMPANIES.

1    Q.    WHEN YOU SAY YOU "RELIED ON OUTSIDE SOURCES," WHAT DO YOU

2    MEAN BY THAT?

3    A.    THERE ARE A NUMBER OF FAIRLY WELL-ESTABLISHED HANDBOOKS

4    WHICH ARE USED BY MEMBERS OF THE COMMUNITY, LAWYERS,

5    ACCOUNTANTS, VENTURE CAPITALISTS THAT I LOOKED THROUGH AGAIN --

6    I MEAN, I READ MANY OF THEM BEFORE IN MY PROFESSIONAL PRACTICE.

7    BUT I LOOKED THROUGH THEM AGAIN TO SEE WHAT THEY SAID DIRECTLY

8    ON THESE SUBJECTS.

9    Q.    AND DID YOU -- IN REACHING YOUR OPINIONS IN THIS CASE,

10   DID YOU TALK TO ANYONE, ANY WITNESS OR ANYTHING LIKE THAT?

11   A.    YES.  THE -- THE DEFENDANTS' LEGAL TEAM SET UP INTERVIEWS

12   WITH THE LEAD VENTURE CAPITALIST AT EACH OF THE THREE FIRMS

13   WHICH LED EACH OF THE THREE ROUNDS OF VENTURE CAPITAL

14   INVESTMENT IN LIGHTLOGIC.

15   Q.    AND IN FORMING YOUR OPINIONS IN THIS CASE, DID YOU RELY

16   ON WHAT THOSE VENTURE -- LEAD VENTURE CAPITALISTS TOLD YOU?

17   A.    I DID, YES.

18   Q.    NOW, DID YOU FORM ANY CONCLUSIONS AS A RESULT OF WORK

19   THAT YOU DID IN THIS CASE?

20   A.    YES.  TO -- TO REITERATE THE WORK THAT I DID A MOMENT

21   AGO, I DID REVIEW THE DILIGENCE, THE INTERNAL REVIEW PROCESSES

22   THAT WERE FOLLOWED BY THE VARIOUS VENTURE CAPITAL ORGANIZATIONS

23   IN THEIR VARIOUS INVESTMENTS, DIFFERENT STAGES.  AND I FOUND

24   THAT THE WORK WAS IN KEEPING WITH THE SORT OF ORDINARY

25   PRACTICES THAT ARE THE NORM ON SAND HILL ROAD IN THE VENTURE

1    CAPITAL COMMUNITY.

2    Q.    OKAY.  AND DID YOU REACH ANY OPINIONS IN THIS CASE?

3    A.    I DID.  YES.  THAT -- THAT THEIR WORK WAS IN -- WITHIN

4    THE NORM, THAT IT WAS ALL THE STANDARD SORTS OF THINGS THAT

5    THEY HAD LOOKED AT THE ORDINARY SORTS OF ISSUES AND THAT THEY

6    HAD NOT NEGLECTED TO LOOK AT ANY SORTS OF ISSUES THAT WOULD BE

7    CONSIDERED IMPORTANT IN AN ORDINARY DEAL.

8    Q.    AND YOU ALSO TESTIFIED JUST A MINUTE AGO THAT YOU LOOKED

9    AT THE BUSINESS PLANS THAT MR. SHUM HAD DONE FOR HIS COMPANY.

10        DID YOU REACH ANY OPINIONS ABOUT MR. SHUM'S COMPANY

11   LUMINANCE?

12   A.    I DID.  I DETERMINED THAT IT WAS NOT A CANDIDATE FOR

13   INSTITUTIONAL VENTURE CAPITAL AT THAT POINT IN TIME.

14   Q.    AND DID YOU REACH ANY OPINIONS ABOUT -- MENTIONED THAT

15   YOU HAD -- YOU TOOK A LOOK AT SOME OF THE METHODOLOGY

16   MR. LASINSKI DID.  DID YOU REACH ANY OPINIONS ABOUT HIS

17   METHODOLOGY?

18            MR. JANSEN:  YOUR HONOR, I BELIEVE THAT THIS WOULD

19   BE OUTSIDE THE SCOPE OF THE EXPERTISE OF THIS --

20            THE COURT:  NO, HE CAN TESTIFY AS TO PRACTICES, AND

21   IF THERE'S THE SAME SUBJECT MATTER, HE CAN TESTIFY TO THAT.

22            BUT HE CAN'T OFFER AN OPINION ABOUT SOMEBODY ELSE'S

23   TESTIMONY.

24            MS. GRANT:  RIGHT.  I THINK THIS IS SQUARELY WITHIN

25   ITS OWN VENTURE CAPITAL PRACTICES.

1              **THE COURT:**  THEN ASK IT, THEN.

2     **BY MS. GRANT:**

3     **Q.**    DID YOU -- DID MR. LASINSKI OFFER ANY OPINIONS REGARDING

4     VENTURE CAPITAL FUNDING?

5     **A.**    HE DID, YES.

6     **Q.**    AND DID YOU ANALYZE THOSE OPINIONS?

7     **A.**    I DID, YES.

8     **Q.**    AND DO YOU HAVE AN OPINION ABOUT THE METHODOLOGY

9     MR. LASINSKI USED?

10    **A.**    I DID, YES.  HE USED --

11             **MR. JANSEN:**  OBJECTION, YOUR HONOR, FOUNDATION.

12             **THE WITNESS:**   -- EXACTLY WHAT IT IS.

13             **THE COURT:**  YOU SHOULD ASK THE SUBJECT MATTER SO

14    THAT WE UNDERSTAND THAT WE'RE TALKING ABOUT THE SAME SUBJECT

15    MATTER, IN ADDITION TO THE FACT THAT HE RECOGNIZES THAT ANOTHER

16    EXPERT HAD SAID SOMETHING ABOUT THAT.

17             BUT ASK YOUR QUESTION ABOUT THE SUBJECT MATTER.

18    **BY MS. GRANT:**

19    **Q.**    DID MR. LASINSKI OFFER ANY OPINIONS REGARDING THE AVERAGE

20    RATE OF RETURNS FOR VENTURE CAPITAL FUNDING?

21    **A.**    HE DID, YES.  HE USED THE AVERAGE RATES OF RETURNS TO

22    ATTEMPT TO CALCULATE SOME NUMBERS IN CONNECTION WITH --

23    **Q.**    AND BASED ON YOUR EXPERIENCE IN VENTURE CAPITAL FUNDING,

24    DO YOU HAVE AN OPINION ABOUT THAT?

25    **A.**    I DO, YES.  I BELIEVE THAT THOSE AVERAGE RATES OF RETURN

1   WERE INAPPROPRIATELY USED IN THIS INSTANCE, THAT AVERAGE RATES

2   OF RETURN DO NOT ADEQUATELY ACCOUNT FOR ALL THE LOSSES.

3          IN A TYPICAL VENTURE CAPITAL PORTFOLIO, ONLY ABOUT ONE IN

4   FIVE COMPANIES, 20 PERCENT OF ALL COMPANIES ARE SUCCESSFUL.

5   THE OTHER FOUR, THE OTHER 80 PERCENT ARE UNSUCCESSFUL.  SO THE

6   SHORTHAND IN THE VENTURE CAPITAL COMMUNITY IS THAT THE WINNERS

7   MUST PAY FOR THE LOSERS.

8          TO USE AN AVERAGE RATE OF RETURN, THAT IS, A RATE OF

9   RETURN THAT'S CALCULATED ACROSS ALL THE VARIOUS COMPANIES IN A

10  PORTFOLIO IS TO MISSTATE THE ACTUAL RATE OF RETURN THAT IS

11  ENJOYED IN A SUCCESSFUL COMPANY.  AND, CLEARLY, LIGHTLOGIC WAS

12  A SUCCESSFUL INVESTMENT.  SO USING AN AVERAGE RATE OF RETURN IS

13  USING A RATE OF RETURN THAT'S ARTIFICIALLY LOW AND IS BEING

14  USED TO SUPPRESS VALUE.

15  **Q.**    OKAY.  AND WE'LL GO BACK TO THAT, BUT I WANT TO GO INTO

16  IS YOUR FIRST OPINION, WHICH WAS -- WELL, ACTUALLY, BEFORE WE

17  DIVE INTO THAT, CAN YOU JUST GIVE THE JURY A BRIEF

18  UNDERSTANDING ABOUT HOW VENTURE CAPITAL FUNDING WORKS VIS-A-VIS

19  OTHER TYPES OF INVESTMENT THAT THE JURY MIGHT BE MORE FAMILIAR

20  WITH?

21  **A.**    CERTAINLY.  THE VENTURE CAPITAL INVESTMENT PROCESS IS A

22  LITTLE DIFFERENT FROM OTHER SORTS OF FINANCIAL INVESTMENT

23  PROCESSES BECAUSE IT'S NOT AS DRIVEN BY THE SORTS OF THINGS

24  THAT ARE COMMONLY TALKED ABOUT IN CONNECTION WITH OTHER

25  FINANCIAL INVESTMENTS.

1    OTHER FINANCIAL INVESTMENTS -- INVESTMENTS IN THE STOCK

2   MARKET, INVESTMENTS IN PUBLICLY TRADED BONDS AND SO ON

3   BASICALLY LOOK AT THE NUMBERS.  IF REVENUE AND EARNINGS HISTORY

4   OF THE COMPANY THAT'S BEING CONSIDERED IS KNOWN AND THERE'S AN

5   ANALYSIS MADE OF THAT HISTORY, THERE'S AN ASSESSMENT ABOUT

6   WHAT'S POSSIBLE IN THE FUTURE.

7    BUT IT'S A VERY NUMBERS-DRIVEN PROCESS.

8    THE VENTURE CAPITAL PROCESS IS DIFFERENT BECAUSE, AS YOU

9   PROBABLY HEARD IN OTHER PIECES OF TESTIMONY IN THIS TRIAL,

10  THERE AREN'T A LOT OF NUMBERS WITH EARLY-STAGE COMPANIES.  IN

11  FACT, WHEN A COMPANY IS JUST BEING STARTED, WHAT WE REFER TO IN

12  THE INDUSTRY AS THREE GUYS AND A DOG IN A GARAGE, THERE ARE NO

13  NUMBERS AT ALL.  THERE'S NO REVENUE.  THERE ARE NO OTHER

14  NUMBERS TO ASSESS.  SO THE THINGS AT WHICH A VENTURE CAPITALIST

15  MUST LOOK ARE DIFFERENT.

16   THE VENTURE CAPITALIST WILL CONSIDER THE SIZE OF THE

17  MARKET, THE CAPABILITY OF THE TECHNOLOGY, AND THINGS OF THAT

18  SORT.  BUT THE PREDOMINANT FACTOR THAT A VENTURE CAPITALIST

19  ASSESSES IS THE QUALITY OF THE MANAGEMENT TEAM.  BECAUSE,

20  FRANKLY, IT'S THE MANAGEMENT TEAM WHICH HAS RECOGNIZED THAT

21  MARKET IN THE FIRST PLACE.  IT'S THE MANAGEMENT TEAM THAT'S

22  COME UP WITH THE TECHNOLOGY SOLUTION THAT'S GOING TO CREATE A

23  PRODUCT TO ADDRESS THAT MARKET.  AND IT'S THE MANAGEMENT TEAM

24  THAT WILL DEAL WITH ALL THE INEVITABLE SORTS OF PROBLEMS THAT

25  WILL CROP UP ALONG THE WAY, AND THAT WILL HAVE TO BE OVERCOME

1    IF THE COMPANY GOES ON TO BE SUCCESSFUL.

2         MY MENTOR, BILL HAMBRECHT, WHO'S A VERY FAMOUS VENTURE

3    CAPITALIST, AS I MENTIONED EARLIER, HE SUCCESSFULLY BACKED

4    APPLE AND GENENTECH AND ADOBE AND A HOST OF OTHER COMPANIES HAD

5    A SAYING.

6         HE SAID, "EVERY SUCCESSFUL COMPANY DIES SEVERAL TIMES ON

7    ITS PATH TO SUCCESS."  AND IT'S THE MANAGEMENT TEAM WHO ARE

8    RESPONSIBLE FOR BRINGING IT BACK TO LIFE, OVERCOMING WHATEVER

9    THE LATEST PROBLEM IS ALONG THE WAY.  SO IT'S THE MANAGEMENT

10   TEAM ULTIMATELY THAT THE VENTURE CAPITALISTS LOOK TO IN MAKING

11   THEIR ASSESSMENT AND THEN CONCLUDING ON A -- ON A VALUATION AND

12   FINALLY PULLING THE TRIGGER AND MAKING AN INVESTMENT DECISION.

13   **Q.**    YOU MENTIONED SOMETHING ABOUT THREE GUYS AND A DOG IN A

14   GARAGE.  WELL, WHAT IF IT'S JUST ONE PERSON IN A BEDROOM WITH

15   NO DOG AND NO OTHER PEOPLE, THEN WHAT DO THE VENTURE

16   CAPITALISTS DO?

17   **A.**    IT'S THE SAME SORT OF ANALYSIS.  IT'S LOOKING AT THE

18   TECHNOLOGY.  IT'S LOOKING AT THE POTENTIAL MARKET.  AND, AGAIN,

19   I SOUND LIKE A BROKEN RECORD, BUT IT REALLY IS TRUE.  ASSESSING

20   THE VALUE OF THAT VENTURE CAPITAL -- SORRY -- THAT -- OF THAT

21   ENTREPRENEUR, THAT POTENTIAL MANAGER.

22        THERE'S AN OLD SAYING ABOUT REAL ESTATE INVESTMENT, THAT

23   THERE ARE ONLY THREE THINGS THAT MATTER, LOCATION, LOCATION,

24   LOCATION.  WELL, THERE'S SOMETHING SIMILAR IN THE VENTURE

25   CAPITAL INDUSTRY.  WE SAY ABOUT A STARTUP COMPANY THAT THERE

1  ARE ONLY THREE THINGS THAT MATTER, MANAGEMENT, MANAGEMENT,

2  MANAGEMENT.

3  **Q.**    OKAY.

4        AND IS THAT JUST -- THAT'S NOT JUST YOUR VIEW.  IS THAT

5  THE VIEW IN THE INDUSTRY?

6  **A.**    THAT IS A VERY WIDELY HELD VIEW, AND IT RUNS ALL THE WAY

7  TO THE SENIOR LIONS OF THE INDUSTRY, THE PEOPLE WHO'VE BEEN IN

8  IT SINCE THE 1950'S AND '60'S AND '70'S.

9  **Q.**    AND YOU MENTIONED ALSO THAT THE VENTURE CAPITALISTS ARE

10  REALLY LOOKING AT THE MARKET OPPORTUNITY.  CAN YOU JUST TELL

11  THE JURY A LITTLE BIT MORE ABOUT WHAT YOU MEAN BY THAT.

12  **A.**    THERE WILL BE A NUMBER OF ATTEMPTS BY VARIOUS MEMBERS OF

13  THE INVESTMENT TEAM TO QUANTIFY THE SIZE OF THE POTENTIAL

14  MARKET.  SO THEY MAY GO AND LOOK AT OUTSIDE RESEARCH.  THEY MAY

15  HAVE INTERNAL EXPERTS WHOM THEY'LL PULL.  BUT AT THE END OF THE

16  DAY, SOME OF IT IS A SEAT-OF-THE-PANTS ASSESSMENT.

17        THEY -- THEY'VE SEEN OTHER TECHNOLOGY MARKETS EMERGE FROM

18  ZERO TO GROW TO HUNDREDS OF MILLIONS OR BILLIONS OF DOLLARS IN

19  THE PAST.  AND THEY'LL HAVE A SENSE OF WHETHER THIS PARTICULAR

20  PRODUCT HAS THE SAME POTENTIAL TO DRIVE A MARKET THAT COULD BE

21  AS LARGE AS HUNDREDS OF MILLIONS OR BILLIONS OF DOLLARS, WHICH

22  IS THE SORT OF TARGET MARKET THAT A VENTURE

23  CAPITAL-INVESTED-BACKED COMPANY TYPICALLY WANTS.

24  **Q.**    I JUST WANT TO GO BACK TO SOMETHING.

25        IN YOUR EXPERIENCE INVESTING IN EARLY-STAGE STARTUPS,

1   WHEN YOU'RE EVALUATING THE PEOPLE OR THE PERSON, HOW DO YOU DO

2   THAT?

3   **A.**   IT'S DIFFICULT.  THERE ARE A LOT OF DIFFERENT PRACTICES

4   WITHIN DIFFERENT FIRMS, BUT THEY ALL BOIL DOWN TO THE SAME

5   THING, THE SAME TWO THINGS, BASICALLY.  ONE IS WHAT COULD BE

6   LOOSELY CALLED REFERENCE CHECKING, BUT IT'S NOT JUST THE

7   STANDARD SORT OF REFERENCE CHECKING.

8        YOU CAN'T JUST TAKE THE TWO OR THREE NAMES THAT AN

9   INDIVIDUAL GIVES YOU AND MAKE CALLS TO THEM AND BE SATISFIED

10  WITH THAT.  SO WE'LL TYPICALLY MAKE CALLS TO ALL OF THE LISTED

11  REFERENCES.  WE'LL ASK EACH OF THE PEOPLE WHOM WE CONTACT IN

12  THOSE REFERENCE CALLS WHO ELSE MIGHT KNOW THE INDIVIDUAL ABOUT

13  WHOM WE'RE ASKING QUESTIONS, AND THEN CALL ALL OF THEM AND ASK

14  THEM THE SAME QUESTION AND CALL ALL OF THEM, THREE OR FOUR

15  DEGREES OF SEPARATION.

16       WE'LL USE OUR OWN NETWORKS, TOO.  AS YOU'VE HEARD

17  ALREADY, I'VE BEEN IN SILICON VALLEY MORE THAN 25 YEARS.  I

18  KNOW A LOT OF PEOPLE IN THE TECHNOLOGY AND LEGAL AND VENTURE

19  CAPITAL AND EDUCATIONAL COMMUNITIES.  AND I WILL CALL THEM.  I

20  WILL ASK IF ANY OF THEM HAVE HEARD OF THIS INDIVIDUAL OR KNOW

21  OF SOMEONE WHO MIGHT HAVE WORKED WITH HIM OR HER AT A PRIOR

22  COMPANY AND THEN CALL THOSE PEOPLE.

23       I SAID THERE WERE TWO THINGS.  THE OTHER IS MY OWN ALMOST

24  INTUITION.  I DON'T WANT TO SAY IT'S PURELY INTUITION THAT

25  MAKES IT SOUND TOO AIRY, TOO INSUBSTANTIAL.  BUT I DO TRY TO

1    SPEND A LOT OF TIME -- AND I KNOW OTHER VENTURE CAPITALISTS TRY

2    TO SPEND A LOT OF TIME WITH POTENTIAL INVESTMENT CANDIDATES.

3         SO WE'LL ASK THEM TO PRESENT.  WE'LL ASK THEM TO COME IN

4    AND SPEAK TO A MEETING.  WE'LL SUBJECT THEM TO GRILLINGS.

5    WE'LL TAKE THEM OUT FOR DINNER.  IN SOME CASES, WE'LL ASK THEM

6    TO GO OUT FOR DINNER WITH THEIR SPOUSE SO WE SEE HOW THEY

7    INTERACT WITH OTHER PEOPLE IN THEIR LIVES, AND JUST TRY TO

8    DEVELOP A SENSE OF THE -- OF THE PERSON, WHETHER HE OR SHE IS

9    SOMEONE WHO IS GOING TO BE AS GOOD IN THE BAD TIMES AS HE OR

10   SHE IS DURING THE PLEASANT INTERLUDE OF RAISING MONEY.

11              **THE COURT:**  ALL RIGHT.  WE'LL TAKE THE RECESS NOW.

12   PLEASE BE BACK AT 1:00 O'CLOCK.

13              (RECESS TAKEN AT 12:02 P.M.)

14

15

16

17              (CONTINUED NEXT PAGE; NOTHING OMITTED.)

18

19

20              --OOO--

21

22

23

24

25

1    WEDNESDAY, DECEMBER 10, 2008                        1:00 P.M.

2

3            (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            **MR. TAYLOR:**  YOUR HONOR, BEFORE WE BRING THE JURY

5    IN, WE HAD ONE SCHEDULING ISSUE, A STREAMLINING SCHEDULING

6    ISSUE TO RAISE WITH THE COURT.

7            WE HAVE DECIDED TWO THINGS OVER THE NOON BREAK.  ONE

8    IS THAT OUR LAST WITNESS FOR TODAY WHO WAS TO BE MAREK

9    ALBOSZTA, BASED ON THE TESTIMONY THAT HAS COME IN, WE ARE NOT

10   GOING TO CALL HIM TODAY.  IT GIVES US MORE TIME WITH THE TWO

11   WITNESSES WE HAVE.  I WAS TELLING COUNSEL WE NEEDED TO MOVE AS

12   QUICKLY AS POSSIBLE.

13           THE OTHER NEWS, AND PERHAPS THE BETTER NEWS IS WE

14   ARE GOING TO CALL TWO WITNESSES TOMORROW, DR. VERDIELL AND THEN

15   OUR DAMAGE EXPERT, AND WE ARE GOING TO REST.  WE DO NOT THINK

16   THAT WE WILL TAKE THAT LONG WITH EITHER ONE OF THOSE WITNESSES,

17   SO THERE WILL BE ADEQUATE TIME TO CROSS-EXAMINE.

18           **THE COURT:**  OKAY.

19           **MR. TAYLOR:**  THE ONLY THING WE WOULD LIKE TO SUGGEST

20   IS I HAVE NOT DONE WHAT I AM OBLIGATED TO DO FOR DR. VERDIELL,

21   WHICH IS TO GIVE THEM A LIST OF ALL THE DIRECT EXAMINATION

22   EXHIBITS THAT I WAS TO GIVE THEM.

23           AND ONE POSSIBILITY WOULD BE, THIS IS UP TO YOUR

24   HONOR, IF WE COULD -- IF WE DON'T USE THE WHOLE DAY TODAY, IF

25   WE COULD BREAK EARLY, START FIRST THING TOMORROW MORNING, I CAN

1    GIVE THEM THE LIST, AND THEN WE CAN COVER DR. VERDIELL AND THE

2    EXPERT, AND YOU CAN CHARGE THE TIME AGAINST US TO THE EXTENT

3    THAT'S NECESSARY.  BUT IT WOULD BE EASIER TO PROCEED THAT WAY

4    AND WE WILL BE ABLE TO REST TOMORROW.  MORE EFFICIENT FOR US AS

5    WELL.

6            THE COURT:  EITHER WAY THAT SOUNDS FINE.  WE WILL

7    PROCEED ON THAT BASIS.

8            WE ARE GOING TO CALL A WITNESS OUT OF ORDER RIGHT

9    NOW; IS THAT RIGHT?

10           MR. TANGRI:  THAT IS CORRECT, YOUR HONOR.

11           THE COURT:  OKAY.  GOOD.

12           MR. KIRSCH:  YOUR HONOR, I WILL TALK WITH MR. TAYLOR

13   AT THE BREAK ABOUT THE DETAILS OF THE DISCLOSURE OF THE

14   EXHIBITS.  I AM NOT SURE I UNDERSTOOD EXACTLY WHAT HE WAS

15   SAYING.  I CAN TALK WITH HIM ABOUT THAT.

16           THE COURT:  ALL RIGHT.

17           MR. KIRSCH:  AND THEN WITH REGARD TO US PUTTING ON A

18   REBUTTAL CASE, WE HAD PLANNED TO PUT ON A SHORT REBUTTAL CASE

19   ON MONDAY.  PERHAPS I WILL TRY TO GET --

20           THE COURT:  WE CAN ACCOMMODATE THAT UNDER ANY

21   CIRCUMSTANCES.  WE CAN, ONCE WE GET THROUGH THE NEXT TWO DAYS,

22   WE WILL HAVE A PRETTY GOOD HANDLE ON WHAT THE TIMING IS GOING

23   TO BE.

24           ALL I WANT TO DO IS MAKE SURE THAT BEFORE WE SEND

25   THE JURY HOME TOMORROW EVENING, WE WILL HAVE A SESSION SO THAT

1    WE CAN NOW INCLUDE WITHIN THEM ANY NOTICE I NEED TO GIVE TO THE

2    JURY IN TERMS OF TIMING.  SO, I WOULD LIKE TO GET THAT RESOLVED

3    BEFORE WE SEND THEM HOME TOMORROW AFTERNOON.

4            **MR. KIRSCH:**  THAT'S FINE.

5            **MR. TAYLOR:**  ONE OF THE THINGS WE WERE THINKING

6    ABOUT, YOUR HONOR, SINCE WE ARE TRYING TO MOVE AS QUICKLY AS WE

7    CAN, IS WHETHER, AND PARTICULARLY GIVEN THE TIME LIMITS WE HAVE

8    ALL BEEN LIVING WITH, IF WE CAN FREE UP MONDAY, WHETHER THAT

9    WOULD TAKE SOME PRESSURE OFF ALL OF US TO WORK ON JURY

10   INSTRUCTIONS --

11           **THE COURT:**  THAT'S WHY I AM SAYING IS THAT IT MAY

12   VERY WELL BE THAT IF WE CAN GET THIS DONE, THE JURY DOESN'T

13   HAVE TO COME IN ON MONDAY, COME IN ON TUESDAY, AND WE HAVE USED

14   THE TIME ON MONDAY TO GET READY TO DO THAT.

15           **MR. TAYLOR:**  THAT'S WHAT WE THOUGHT.

16           **THE COURT:**  I WAS HOPING WE MIGHT ARRIVE AT THAT

17   SITUATION, BUT IT SOUNDS LIKE WE ARE STARTING TO GET THERE.

18           **MR. TAYLOR:**  WE ARE GOING TO BE THERE.

19           **THE COURT:**  OKAY.

20           **MR. TAYLOR:**  GOOD.

21           **MR. KIRSCH:**  THAT'S FINE.

22           (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

23           **THE COURT:**  WE HAVE ANOTHER SITUATION WHERE WE ARE

24   GOING TO BREAK IN OUT OF ORDER.  WE ARE GOING TO BRING IN

25   ANOTHER WITNESS NOW IN THE MIDDLE OF THE TESTIMONY OF THE

1    WITNESS ON THE STAND.  WE WILL RESUME THAT OTHER TESTIMONY AS

2    SOON AS WE GET THROUGH WITH THIS WITNESS.  OKAY?

3              PLEASE GO AHEAD.

4              **MS. GRANT:**  THE DEFENDANTS CALL CHRISTOPHER SCHAEPE.

5                   **CHRISTOPHER SCHAEPE,**

6    CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

7    TESTIFIED AS FOLLOWS:

8              **THE WITNESS:**  I DO.

9              **THE CLERK:**  PLEASE BE SEATED.  AND THEN PULL YOUR

10   CHAIR UP TO THE STAND, PULL THE MICROPHONE UP, AND THEN PLEASE

11   STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

12             **THE WITNESS:**  CHRISTOPHER JAMES SCHAEPE, SPELLED

13   S-C-H-A-E-P- P LIKE PETER- E.

14                   **DIRECT EXAMINATION**

15   **BY MS. GRANT:**

16   **Q.**   GOOD AFTERNOON, MR. SCHAEPE.

17             PLEASE TELL THE JURY WHAT YOU DO FOR A LIVING?

18   **A.**   I WORK IN THE VENTURE CAPITAL INDUSTRY.

19   **Q.**   WHERE DO YOU PRESENTLY WORK?

20   **A.**   LIGHTSPEED VENTURE PARTNERS.

21   **Q.**   WHAT IS YOUR JOB TITLE?

22   **A.**   MANAGING DIRECTOR.

23   **Q.**   AND WHAT IS A MANAGING DIRECTOR?  WHAT DO YOU DO?

24   **A.**   WE ARE RESPONSIBLE FOR MAKING INVESTMENTS IN PRIVATE

25   COMPANIES, SERVING ON BOARDS OF DIRECTORS OF THOSE COMPANIES,

SCHAEPE – DIRECT / MS. GRANT

1    HELPING COMPANIES TO ACHIEVE LIQUIDITY, AND THAT'S OUR

2    INVESTMENT CYCLE.

3            WE ALSO ARE RESPONSIBLE FOR RAISING MONEY FROM OUR

4    INVESTORS, UPDATING THEM ON THE INVESTMENT PROGRESS OF THEIR

5    INVESTMENTS, AND GENERATING RETURNS FOR THEM.

6    **Q.**   AND HOW LONG HAVE YOU WORKED AS A VENTURE CAPITALIST?

7    **A.**   APPROXIMATELY 17 YEARS.

8    **Q.**   CAN YOU JUST TELL THE JURY WHAT YOUR EDUCATIONAL

9    BACKGROUND IS?

10   **A.**   BACHELOR'S AND MASTER'S DEGREES IN COMPUTER SCIENCE,

11   ELECTRICAL ENGINEERING FROM MIT AND MBA FROM STANFORD

12   UNIVERSITY.

13   **Q.**   AND DO YOU FOCUS ON ANY PARTICULAR INDUSTRY OR FIELD IN

14   YOUR VENTURE CAPITAL INVESTING, DO YOU PERSONALLY?

15   **A.**   YES, INFORMATION TECHNOLOGY.

16   **Q.**   AND JUST BALLPARK, HOW MANY COMPANIES DO YOU THINK YOU'VE

17   INVESTED IN DURING YOUR APPROXIMATELY 17 YEARS?

18   **A.**   ON THE ORDER OF 30.

19   **Q.**   OKAY.

20           AND CAN YOU EXPLAIN TO THE JURY, JUST GENERALLY,

21   WHAT ARE THE IMPORTANT FACTORS WHEN YOU ARE TRYING TO MAKE A

22   DECISION ABOUT WHETHER OR NOT TO INVEST IN A COMPANY?

23   **A.**   YEAH.  IT'S A COMBINATION OF SEVERAL ITEMS.  THE QUALITY

24   OF THE TEAM IS PROBABLY THE MOST IMPORTANT.  THE SIZE OF THE

25   MARKET OPPORTUNITY IS ALSO IMPORTANT, AND WHETHER THEY HAVE ANY

SCHAEPE – DIRECT / MS. GRANT

1    ELEMENTS TO THEIR BUSINESS PLAN THAT WILL GIVE THEM COMPETITIVE

2    ADVANTAGE OR DEFENSIBILITY IN THEIR BUSINESS OVER TIME.

3    **Q.**   IS IT IMPORTANT TO YOU WHEN YOU ARE DECIDING WHETHER OR

4    NOT TO INVEST IN A COMPANY WHETHER A STARTUP HAS PATENTS?

5    **A.**   IT IS NOT A PRIMARY FOCUS IN TERMS OF MY OWN

6    RECOMMENDATION OR NOT TO INVEST IN A COMPANY.

7    **Q.**   WHY IS THAT?

8    **A.**   THE ISSUE IS THAT TO DEFEND -- FOR A COMPANY TO DEFEND

9    ITSELF AGAINST A COMPETITOR THAT IS POTENTIALLY VIOLATING THEIR

10   PATENTS, REQUIRES A LEGAL PROCESS, AND THAT IS AN EXTREMELY

11   EXPENSIVE PROPOSITION.  SO STARTUPS TYPICALLY DON'T HAVE ENOUGH

12   MONEY IN THE BANK TO GO ENTER INTO A LEGAL PROCESS TO FEND OFF

13   THE COMPETITION THAT MAY BE VIOLATING ONE OF THEIR PATENTS.

14   **Q.**   DOES IT MATTER TO YOU WHETHER A STARTUP HAS EXCLUSIVE

15   RIGHTS TO ITS TECHNOLOGY?

16   **A.**   MY MAIN CONCERN IS THAT A STARTUP HAS RIGHTS TO USE ITS

17   TECHNOLOGY AND IT'S NOT IN VIOLATION OF SOMEONE ELSE'S RIGHTS.

18   **Q.**   WHAT DO YOU MEAN "IN VIOLATION OF SOMEONE ELSE'S RIGHTS"?

19   WHAT DO YOU MEAN BY THAT?

20   **A.**   THEY HAVE A LEGALLY FREE AND CLEAR WAY TO USE THE

21   TECHNOLOGY.  THEY ARE ENTITLED TO USE THE TECHNOLOGY THAT THEY

22   ARE USING IN THEIR PRODUCTS.

23   **Q.**   LET'S TURN TO LIGHTLOGIC.

24          WHEN DID YOU FIRST BECOME ACQUAINTED WITH

25   LIGHTLOGIC?

SCHAEPE – DIRECT / MS. GRANT

1    A.   THIS WAS PRIOR TO THE COMPANY'S FIRST ROUND OF FINANCING I

2    MET MR. VERDIELL.  AND THIS WAS BEFORE HE HAD RAISED ANY MONEY

3    FOR THE COMPANY.  PRETTY MUCH A ONE-MAN SHOW AT THAT TIME.  AND

4    THAT WAS REALLY THE CONTEXT I MET HIM.

5           HE EXPLAINED TO ME SOME IDEAS HE HAD FOR CREATING A

6    COMPANY.  HE WAS LOOKING TO RAISE MONEY.  I MADE A

7    DETERMINATION THAT THE PROJECT WAS TOO EARLY AND RAW AT THAT

8    TIME.  THERE REALLY WASN'T ENOUGH THERE FOR ME TO BE INTERESTED

9    IN INVESTING IN HIM.  HE HAD SOME IDEAS, BUT THERE REALLY WAS

10   NO TEAM AROUND HIM.  THE PRODUCT STRATEGY AND PRODUCT ROAD MAP

11   WAS NOT FLESHED OUT AND NOT CLEAR IN MY MIND AT THAT TIME.  AND

12   I THOUGHT IT WAS POTENTIALLY INTERESTING, BUT I WANTED TO SEE

13   THOSE THINGS DEVELOP FURTHER, THE TEAM, THE PRODUCT ROAD MAP,

14   AND THEN BUSINESS LEADERSHIP OF THE COMPANY.

15          AND SO I REFERRED THE DEAL TO ONE OF MY COLLEAGUES

16   IN THE INDUSTRY, A GUY BY THE NAME OF BRUCE GRAHAM WHO WAS AT

17   BESSEMER VENTURE PARTNERS TO SEE IF HE HAD INTEREST.  I THINK

18   HE ULTIMATELY ENDED UP FUNDING THE COMPANY.  I DON'T KNOW HOW

19   LONG AFTER I REFERRED HIM.

20   Q.   WHEN YOU FIRST MET WITH DR. VERDIELL, WHERE DID THAT

21   MEETING TAKE PLACE?

22   A.   THE FIRST MEETING WAS AT DR. VERDIELL'S APARTMENT IN PALO

23   ALTO.

24   Q.   AND WHAT, IF ANYTHING, DID HE SHOW YOU?  DID HE DO A

25   PRESENTATION?  WHAT HAPPENED?

SCHAEPE – DIRECT / MS. GRANT

1  **A.**  YEAH.  I DON'T RECALL WHETHER THERE WAS A PAPER

2  PRESENTATION OR NOT, BUT HE SHOWED ME A SMALL DEMONSTRATION

3  THAT HE HAD SET UP ON HIS DESK IN HIS BEDROOM AT THE TIME.

4          IT WAS VERY PRIMITIVE AND THERE WASN'T MUCH THERE.

5  **Q.**  AND WHAT WAS YOUR IMPRESSION OF DR. VERDIELL FROM THIS

6  MEETING?

7  **A.**  I THOUGHT HE WAS PROBABLY A GOOD SCIENTIST.  SOME GOOD

8  IDEAS, BUT MY IMPRESSION THAT HE WAS NOT A MANAGEMENT TYPE

9  PERSON, AND THAT WOULD NEED SUPPLEMENTING WITH OTHER MANAGEMENT

10  TYPES TO REALLY MAKE THE COMPANY SUCCESSFUL.

11  **Q.**  AND WHY DID YOU INTRODUCE HIM TO BRUCE GRAHAM?  WHY DID

12  YOU THINK MR. GRAHAM MIGHT BE ABLE TO HELP?

13  **A.**  I HAD KNOWN BRUCE FOR MANY YEARS.  HE WAS A BUSINESS

14  SCHOOL COLLEAGUE.  AND I THOUGHT HE WAS -- HIS AREA OF INTEREST

15  WAS IN THE COMPONENT AREA AND SUBSYSTEM AREA, AND I THOUGHT

16  THIS MIGHT FALL INTO HIS DOMAIN OF INTEREST.

17  **Q.**  AND DID YOUR FIRM EVENTUALLY INVEST IN LIGHTLOGIC?

18  **A.**  NOT MY CURRENT FIRM.  THE FIRM I WAS WORKING AT AT THE

19  TIME DID.

20  **Q.**  WHAT WAS THE NAME OF THAT FIRM?

21  **A.**  WEISS PECK & GREER VENTURE PARTNERS.

22  **Q.**  OKAY.

23          AND DO YOU KNOW APPROXIMATELY WHAT ROUND YOUR FIRM,

24  WEISS PECK & GREER, INVESTED IN?

25  **A.**  WE LED THE SERIES C ROUND.

SCHAEPE - DIRECT / MS. GRANT

1    Q.   WHAT CHANGED FROM THE TIME WHEN YOU MET WITH DR. VERDIELL

2    IN HIS BEDROOM THAT LED YOU TO INVEST IN A SERIES C ROUND?

3    A.   YEAH.  IT WAS REALLY THE TEAM AND THE PRODUCT ROAD MAP HAD

4    BECOME MUCH MORE TANGIBLE.  IN PARTICULAR, THEY HAD HIRED A

5    VERY GOOD CEO, SOMEONE WITH A GOOD GENERAL MANAGEMENT

6    BACKGROUND OUT OF RAYCHEM, A SENIOR EXECUTIVE AT THAT COMPANY,

7    SALES AND MARKETING ORIENTED GENERAL MANAGER WHO HAD BEEN

8    EXPERIENCED IN COMPONENTS AND SUBSYSTEMS BUSINESSES AT RAYCHEM.

9         AND THEN THE TEAM HE HAD, AS I RECALL, HAD PUT

10   TOGETHER A FAIRLY GOOD SIZED ENGINEERING TEAM BY THAT TIME THAT

11   HAD A MIX OF BOTH HIGH-SPEED ELECTRONICS AND OPTICS TEAM

12   MEMBERS.  SO TWO GOOD DISCIPLINES REPRESENTED A SOLID

13   DEVELOPMENT TEAM, SOLID LEADERSHIP AT THE TOP, AND THE PRODUCT

14   ROAD MAP WAS MUCH MORE WELL-DEFINED AT THAT POINT.

15        THEY HAD A PROTOTYPE THAT, AS I RECALL, THE NEXT

16   QUARTER WAS GOING TO BE INTRODUCED FOR TESTING AT CUSTOMERS.

17   YOU COULD TOUCH AND FEEL THE PRODUCT.

18   Q.   WHAT WAS THAT PRODUCT CALLED, DO YOU REMEMBER?

19   A.   I BELIEVE IT WAS A 10 GIGABIT PER SECOND OPTICAL

20   TRANSCEIVER.

21   Q.   AND WHY -- WHEN YOU TALK ABOUT THE PRODUCT ROAD MAP BEING

22   MORE DEFINED, WHY WAS THAT IMPORTANT TO YOU?

23   A.   WHEN I FIRST MET DR. VERDIELL, HE HAD SOME IDEAS ABOUT HOW

24   HE COULD APPLY HIS OPTICAL KNOW-HOW TO SOLVE SOME PROBLEMS AND

25   MAKE PRODUCTS THAT WERE BETTER, FASTER, CHEAPER FOR THE TELECOM

1    MARKET, BUT THERE WASN'T A CLEAR ASSOCIATION IN MY MIND HOW

2    THOSE TECHNICAL IDEAS TRANSLATED INTO A PRODUCT.

3            WHAT WAS THE PRODUCT GOING TO LOOK LIKE?  HOW WOULD

4    IT BE PRICED?  WHAT SYSTEMS PRODUCTS WOULD THIS SUBSYSTEM FIT

5    INTO?  ALL THAT, IN MY MIND, WAS NOT VERY WELL DEFINED.

6    Q.   AND THE -- WHAT WAS YOUR -- DID YOU HAVE AN UNDERSTANDING

7    OF THE PRODUCT THAT YOU MENTIONED AT LIGHTLOGIC YOU COULD TOUCH

8    AND FEEL, WAS THAT GOING TO BE PUT ON THE MARKET?

9    A.   YES.  I INVESTED, AS I MENTIONED, IN 2000, YEAR 2000, AND

10   SHORTLY AFTER WE MADE OUR INVESTMENT, THE COMPANY INTRODUCED

11   PRODUCTS FOR TESTING AT CUSTOMERS.

12   Q.   AND YOU MENTIONED THE CEO WAS PARTICULARLY IMPORTANT TO

13   YOU.  WHY WAS THAT OF PARTICULAR IMPORTANCE TO YOU?

14   A.   NOTHING UNIQUE TO THIS SITUATION.  IT'S JUST WHEN YOU HAVE

15   A PRODUCT THAT NEEDS TO GO TO MARKET, YOU NEED TO HAVE

16   LEADERSHIP AT THE TOP WHO HAS EXPERIENCE IN SALES AND MARKETING

17   AND DEALING WITH SOPHISTICATED END CUSTOMERS LIKE THE TYPE THAT

18   LIGHTLOGIC WAS GOING TO BE SELLING TO.  AND MR. MCGRAW BROUGHT

19   THAT SKILL SET TO THE TABLE.

20           YOU KNOW, WITHOUT THAT, I HAVE SEEN MANY STARTUPS

21   FLOUNDER, THEY HAVE THE WRONG DISTRIBUTION STRATEGY, THEY DON'T

22   KNOW HOW TO CALIBRATE THE CUSTOMER INPUT IN TERMS OF THE

23   REQUIRED FEATURES, THEY DON'T KNOW HOW TO HIRE THE SALES TEAM

24   AND MANAGE THE SALES TEAM PROPERLY AND INCENTIVIZE THEM.

25           SO IT'S IMPORTANT TO HAVE SOMEONE AT THE TOP WITH

1    SALES AND MARKETING EXPERIENCE.

2    **Q.**    OKAY.

3          **MS. GRANT:**  I AM GOING TO SHOW YOU -- CAN WE HAVE

4    EXHIBIT 2728?

5          MAY I APPROACH, YOUR HONOR.

6          **THE COURT:**  YOU MAY.

7    **BY MS. GRANT:**

8    **Q.**  I AM GOING TO HAND YOU MR. SCHAEPE 2728.  IF YOU WOULD

9    JUST TELL US WHAT THIS DOCUMENT IS?

10   **A.**    THIS IS AN INVESTMENT MEMO THAT WE USED AT WEISS PECK &

11   GREER VENTURE PARTNERS AT THE TIME WE RECOMMENDED THAT THE

12   PARTNERSHIP CONSIDER FINAL APPROVAL IN AN INVESTMENT.

13   **Q.**    DID YOU WRITE THIS DOCUMENT?

14   **A.**    YES, I DID.

15         **MS. GRANT:**  YOUR HONOR, THE DEFENDANTS WOULD MOVE

16   EXHIBIT 2728 INTO EVIDENCE.

17         **THE COURT:**  IT'S ADMITTED.

18              (TRIAL EXHIBIT 2728 RECEIVED IN EVIDENCE)

19         (EXHIBIT DISPLAYED ON SCREEN.)

20         **MS. GRANT:**  SO, IF WE CAN JUST BLOW IT UP AT THE

21   BEGINNING.  THANKS.

22   **BY MS. GRANT:**

23   **Q.**    AND THIS IS FROM YOU DATED APRIL 7, 2000.  WHO ARE THE

24   "TO"?  YOU DON'T HAVE TO GO THROUGH EVERY PERSON; ARE THESE

25   PEOPLE AT YOUR FIRM?

SCHAEPE – DIRECT / MS. GRANT

1    **A.**    THOSE WERE PEOPLE EMPLOYED BY WEISS PECK & GREER VENTURE

2    PARTNERS AT THAT TIME.

3    **Q.**    OKAY.

4    **A.**    MOST OF WHICH WERE GENERAL PARTNERS OF THE FIRM WHO WOULD

5    VOTE TO APPROVE A DEAL.

6           **MS. GRANT:**  IF WE CAN GO TO THE NEXT PAGE, JEFF.

7           (PAGE DISPLAYED ON SCREEN.)

8    **BY MS. GRANT:**

9    **Q.**    AND WHAT IS THE PURPOSE OF WRITING ONE OF THESE -- WHY DO

10   YOU WRITE ONE OF THESE INVESTMENT MEMOS?

11   **A.**    THE PURPOSE OF THE MEMO IS TO GIVE THE PARTNERS AT THE

12   FIRM WHO VOTE ON DEALS BACKGROUND ON THE COMPANY THAT THE

13   INVESTMENT IS BEING PROPOSED IN AND SOME RELEVANT PARAMETERS

14   AROUND THE SIZE OF THE FINANCING AT HAND, HOW MUCH IS BEING

15   RECOMMENDED FOR INVESTMENT BY WEISS PECK & GREER VENTURE

16   PARTNERS, WHAT ARE THE UPSIDES IN THE DEAL, THE POSITIVES, IF

17   YOU WILL, WHAT ARE THE RISKS IN THE DEAL.

18   **Q.**    AND IS THERE ANYTHING IN THE INVESTMENT MEMO THAT

19   INDICATES WHY YOU WERE RECOMMENDING TO YOUR PARTNERS THAT WEISS

20   PECK & GREER INVEST IN LIGHTLOGIC?

21   **A.**    WELL, THE WAY THESE MEMOS WERE STRUCTURED, YOU HAVE SOME

22   GENERAL SECTIONS THAT WERE FAIRLY STANDARD TALK ABOUT THE

23   BUSINESS OVERVIEW, FINANCING OVERVIEW, MARKET TRENDS,

24   INFORMATION ABOUT THE PRODUCT AND THE TEAM AND THE COMPETITION,

25   SOME REFERENCES ON THE CEO, PERSONAL REFERENCES, AND THEN A

1    FINANCIAL SUMMARY WHICH SHOWED, YOU KNOW, IF THINGS WENT

2    REASONABLY WELL, WHAT COULD THIS BUSINESS LOOK LIKE GOING

3    FORWARD AND WHAT COULD AN INVESTMENT RETURN IF THINGS WENT

4    WELL.

5             AND USUALLY THERE IS SOME SUMMARY IN THESE MEMOS

6    THAT TALK ABOUT THE KEY POSITIVES AND NEGATIVES.

7    **Q.**  IS THAT -- ARE THERE THE KEY POSITIVES AND NEGATIVES IN

8    THIS MEMO?

9    **A.**  YES.  IF YOU LOOK AT THE LAST PAGE, THERE IS A SUMMARY OF

10   THAT ON THE FINANCIAL INVESTMENT SUMMARY.

11            **MS. GRANT:**  IF WE CAN GO TO, IT'S BATES NUMBER 82,

12   JEFF.

13            THERE YOU GO.  THANKS.  BLOW THAT UP?

14            (PAGE DISPLAYED ON SCREEN.)

15   **BY MS. GRANT:**

16   **Q.**  MR. SCHAEPE, CAN YOU TELL US, FIRST OF ALL, WHAT WE ARE

17   LOOKING AT HERE?

18   **A.**  THIS IS THE EXCEL SPREADSHEET THAT WE ATTACHED AT THE TIME

19   TO EACH OF OUR INVESTMENT RECOMMENDATIONS THAT LAID OUT SOME OF

20   THE KEY FINANCIAL PARAMETERS OF THE DEAL, HOW MUCH WE WERE

21   INVESTING, WHAT THE REVENUE PLAN COULD LOOK LIKE IF THINGS WENT

22   WELL, HOW MUCH TIME IT WOULD TAKE TO ACHIEVE AN EXIT, WHAT THE

23   VALUE OF THE COMPANY MIGHT LOOK LIKE AT THE TIME OF EXIT, AND

24   THEN SOME OTHER INFORMATION ABOUT WHAT OUR OWNERSHIP POSITION

25   WOULD BE, AND OTHER INVESTORS AS WELL, SOME RATINGS ON THE

1    MANAGEMENT TEAM MEMBERS, AND THEN A SUMMARY OF THE POSITIVES

2    AND NEGATIVES OF THE DEAL AT THE BOTTOM.

3    **Q.**    WHAT WAS THE AMOUNT THAT WEISS PECK & GREER WAS

4    CONTEMPLATING IT WOULD INVEST?

5    **A.**    IN THE UPPER RIGHT OF THIS IT SHOWED A $10 MILLION.

6    **Q.**    OKAY.  AND I SEE THERE IN THE UPPER RIGHT-HAND CORNER.

7            JEFF, IF WE CAN HAVE THE SCREEN SCROLL DOWN A LITTLE

8    BIT.

9    **BY MS. GRANT:**

10   **Q.**    THEN THERE IS A -- YOU MENTIONED THERE'S A LITTLE BOX,

11   SECOND BOX AT THE BOTTOM, I GUESS, SAYS "MANAGEMENT POSITION

12   RATING."

13           WHAT ARE YOU RATING?  WHAT IS THAT?

14   **A.**    JUST A GENERATING OF EACH OF THE KEY MANAGEMENT TEAM

15   MEMBERS RATED IN THEIR ABILITY TO PERFORM IN THEIR RESPECTED

16   ROLES.  YOU KNOW, IT'S A SCALE OF ONE TO TEN, WITH TEN BEING

17   THE BEST.

18   **Q.**    AND YOU'VE GOT JOHN MCGRAW AS A NINE AND DR. VERDIELL AT A

19   NINE.

20           WHAT ABOUT DR. VERDIELL RATED HIM A NINE OUT OF TEN?

21   **A.**    WELL, HIS BACKGROUND AND ACHIEVEMENTS TO DATE, THE LEVEL

22   OF TECHNICAL EXPERTISE HE HAD IN THE OPTICAL AREA, THE FACT

23   THAT HE WAS ABLE TO PUT TOGETHER THE TEAM THAT HE DID.

24           I SAW HIM WHEN IT WAS BASICALLY ONE GUY INITIALLY

25   AND HE PUT TOGETHER A GOOD TECHNICAL TEAM AROUND HIM IN SEVERAL

SCHAEPE – DIRECT / MS. GRANT

1    DIFFERENT DISCIPLINES.

2            SO I THOUGHT AS A CTO, YOU KNOW, A TECHNICAL

3    VISIONARY, I THOUGHT HIS ABILITY TO PERFORM THAT ROLE WAS VERY

4    STRONG.

5    Q.   AND THEN WE SEE THE POSITIVES ON THE LEFT-HAND SIDE.

6            PERHAPS JUST BRIEFLY YOU CAN WALK THE JURY THROUGH

7    WHY YOU CONSIDERED EACH ONE OF THOSE FACTORS TO BE A POSITIVE

8    AND WHAT EACH ONE OF THOSE FACTORS IS.

9            THANKS.

10   A.   OKAY.  ON THE POSITIVES, "MARKETING-ORIENTED CEO WITH

11   SENIOR GENERAL MANAGER EXPERIENCE," THAT IS SELF-EXPLANATORY.

12   SOMEONE WHO HAS MANAGED SIGNIFICANT NUMBERS OF PEOPLE, SOMEONE

13   WHO HAS MANAGED GROWTH, SOMEONE WHO UNDERSTANDS THE MARKET

14   DYNAMICS AND CUSTOMERS, SOMEONE WHO HAS AN ABILITY TO GROW A

15   TEAM AND PROPERLY INCENTIVIZE AND LEAD A TEAM.

16           BASICALLY THE SKILLS NEEDED TO LEAD A GROWING

17   COMPANY.

18   Q.   OKAY.  THE NEXT ONE SAYS "UNIQUE IP ENABLING SIGNIFICANT

19   PRODUCT DIFFERENTIATION."

20   A.   YEAH.  THE COMPANY HAD, AS I MENTIONED, HIGH-SPEED

21   ELECTRONICS AS WELL AS OPTICS EXPERTISE ON ITS TECHNICAL TEAM,

22   AND TOGETHER THEY WERE OR HAD PRODUCED AT THE TIME A PROTOTYPE

23   THAT LOOKED LIKE IT WAS SMALLER, CHEAPER, BETTER THAN EXISTING

24   GENERATION OF TECHNOLOGY IN THESE HIGH-SPEED TRANSCEIVERS.  AND

25   A LOT OF PROCESS KNOW-HOW AND EXECUTING ON THAT INITIAL

SCHAEPE – DIRECT / MS. GRANT

1   PRODUCT.

2   **Q.**   IS THIS WHAT YOU ARE TALKING ABOUT THAT THEY HAD THIS

3   TRANSPONDER (INDICATING)?

4   **A.**   I COULDN'T TELL YOU WHETHER THAT IS THE SAME ONE I LOOKED

5   AT AT THE TIME, BUT IT LOOKS, IT'S SIMILAR AND THAT COULD HAVE

6   BEEN THE UNIT.  I JUST DON'T REMEMBER.

7   **Q.**   FAIR ENOUGH.

8           BUT IT WAS A TRANSPONDER THAT WAS HEADING TO MARKET

9   THAT YOU WERE --

10  **A.**   THAT'S CORRECT.

11  **Q.**   OKAY.  IT MIGHT NOT BE THIS EXACT ONE.  I GET WHAT YOU ARE

12  SAYING.

13          THE NEXT ONE SAYS "STRATEGIC HIGH-GROWTH MARKET IN

14  OPTICAL COMPONENTS."

15          WHY WAS THAT A POSITIVE?

16  **A.**   WELL, AT THE TIME THE INTERNET WAS GROWING RAPIDLY.

17  TELECOM SERVICE PROVIDERS NEEDED A LOT OF CAPACITY IN THEIR

18  NETWORKS FOR ALL THIS GROWTH IN THE INTERNET TRAFFIC.  OPTICAL

19  TECHNOLOGIES WERE PROVIDING THAT BANDWIDTH.  AND THE INTERNET

20  GROWTH WAS DRIVING HIGH GROWTH IN ALL THE TELECOM MARKET

21  CREATING A LARGE POTENTIAL MARKET FOR LIGHTLOGIC TO SELL INTO

22  AND GROW THEIR REVENUES.

23  **Q.**   "POTENTIAL FOR SUSTAINABLE HIGH MARGINS DUE TO HIGH

24  BARRIERS TO ENTRY."

25          WHY WAS THAT A POSITIVE AND WHAT DOES THAT MEAN?

SCHAEPE – DIRECT / MS. GRANT

1    **A.**   OPTICAL COMPONENT EXPERTISE, IN PARTICULAR THE JUNCTION OF

2    THAT WITH HIGH-SPEED ELECTRONICS WAS AN AREA WHERE THERE WAS

3    NOT A LOT OF WHAT I WOULD CALL STATE-OF-THE-ART KNOW-HOW.  AND

4    IT WAS NOT EASY TO PUT TOGETHER A TEAM WITH THE DEPTH OF

5    EXPERIENCE THAT THIS TEAM HAD AT THE TIME.

6            SO, YOU KNOW, IF A COMPETITOR WANTED TO DUPLICATE

7    THIS, IT WOULD REQUIRE SOME NUMBER OF YEARS TO PUT TOGETHER A

8    TEAM LIKE THIS TYPE OF CORE CONFIDENCE.

9    **Q.**   FINALLY IT SAYS "LOW FINANCIAL RISK."

10           WHAT DOES THAT MEAN?

11   **A.**   THE FACT THAT THE PRODUCT EXISTED AND IT LOOKED LIKE THE

12   COMPANY HAD READY BUYERS FOR THE PRODUCT, AND THIS TYPE OF

13   PRODUCT GENERALLY WAS IN SHORT SUPPLY IN THE INDUSTRY, IN MY

14   MIND, I FELT LIKE EVEN THOUGH THE COMPANY WAS NOT PROFITABLE AT

15   THE TIME, THERE WOULD BE A LOT OF DEMAND FOR THE PRODUCT FROM

16   THE CUSTOMERS AND WOULD HELP THE COMPANY RAMP ITS REVENUE AND

17   GET TO PROFITABILITY OVER NOT A LONG PERIOD OF TIME.

18           **MS. GRANT:**  IF WE CAN GO, JEFF, TO BATES NUMBER 78,

19   OR PAGE 3 OF THE ACTUAL DOCUMENT, AND BLOW UP "COMPETITION".

20           (PAGE DISPLAYED ON SCREEN.)

21   **BY MS. GRANT:**

22   **Q.**   I WOULD LIKE YOU TO FOCUS IN ON THE SECOND BULLET POINT

23   THAT STARTS:

24           "LIGHTLOGIC'S COMPETITIVE ADVANTAGES STEM FROM

25           ITS STRONG ENGINEERING TEAM COMPRISED OF EXPERTS

1               IN BOTH OPTICS AND HIGH-SPEED ELECTRONICS AS

2               WELL AS ITS PACKAGING AND MANUFACTURING PROCESS

3               INNOVATIONS."

4          WHAT DO YOU MEAN BY "MANUFACTURING PROCESS

5     INNOVATIONS"?

6     **A.**   AS I RECALL, AT THE TIME THEY HAD WHAT THEY CALL A PLANAR

7     INTEGRATION PLATFORM WHERE THE PHYSICAL PACKAGING OF THE, OF

8     THIS PRODUCT WOULD BE SMALLER THAN OTHER EXISTING PRODUCTS IN

9     THE MARKET, AND IT WOULD ALLOW THEM TO INTEGRATE OTHER FEATURES

10    AND FUNCTIONS IN A RELATIVELY SMALL SIZED PRODUCT, AND A

11    PRODUCT THAT COULD BE MANUFACTURED AT LOWER COST AND HIGH

12    VOLUME WITH LESS LABOR CONTENT THAN OTHER EXISTING PRODUCTS.

13    **Q.**   DID LIGHTLOGIC AT THIS TIME HAVE AN ACTUAL MANUFACTURING

14    FACILITY?

15    **A.**   I THINK THEY HAD AN IN-HOUSE ABILITY TO MANUFACTURE A LOW

16    QUANTITY OF PRODUCT, BUT IN TERMS OF A VOLUME RAMP-UP, MY

17    RECOLLECTION IS THAT THEY WOULD NEED TO OUTSOURCE THAT TO THIRD

18    PARTY MANUFACTURING WHEN THEY GOT BEYOND A CERTAIN LEVEL OF

19    VOLUME.

20               **MS. GRANT:**  AND IF WE GO TO PAGE, JEFF, 80 OF THE

21    BATES NUMBERS, PAGE 5 OF THE ACTUAL DOCUMENT.

22    **BY MS. GRANT:**

23    **Q.**   THERE IS SOMETHING THAT SAYS "REFERENCES, CEO, JOHN

24    MCGRAW.  CAN YOU EXPLAIN TO THE JURY WHAT THAT MEANS?

25    **A.**   AT THE TIME, OUR STANDARD PRACTICE WAS TO HAVE TWO OR

1   THREE OR MORE REFERENCES, PERSONAL REFERENCES ON THE CEO WHERE

2   WE WOULD CALL PEOPLE THAT KNEW THEM FROM THE PAST OR WORKED

3   WITH THEM IN THE PAST, OR MAYBE PEOPLE THEY REPORTED TO, TO

4   FIND OUT WHAT —— HOW DID THEY PERFORM IN THEIR PRIOR ROLES AND

5   WHAT THEIR STRENGTHS AND WEAKNESSES MIGHT BE.

6              **MS. GRANT:**  CAN WE HAVE EXHIBIT 473, KAREN?

7              MAY I APPROACH, YOUR HONOR?

8              **THE COURT:**  YES.

9   **BY MS. GRANT:**

10  **Q.**   I AM HANDING YOU WHAT HAS BEEN MARKED AS EXHIBIT 473.

11             CAN YOU TELL US, MR. SCHAEPE, IF YOU RECOGNIZE THIS

12  DOCUMENT?

13  **A.**   YEAH.  THESE LOOK LIKE THE SERIES C FINANCING DOCUMENTS.

14  **Q.**   AND WHAT ARE THE PURPOSE OF THE SERIES C FINANCING

15  DOCUMENTS?

16  **A.**   THESE DOCUMENTS CODIFY IN A LEGAL SENSE THE TERMS OF THE

17  SERIES C DEAL.

18             **MS. GRANT:**  YOUR HONOR, DEFENDANTS WOULD MOVE

19  EXHIBIT 473 INTO EVIDENCE.

20             **THE COURT:**  IT'S ADMITTED.

21                  (TRIAL EXHIBIT 473 RECEIVED IN EVIDENCE)

22             (EXHIBIT DISPLAYED ON SCREEN.)

23  **BY MS. GRANT:**

24  **Q.**   WHO PREPARES THESE CLOSING FINANCE DOCUMENTS?

25  **A.**   USUALLY COMPANY COUNSEL PREPARES THE DOCUMENTS AND THEN

1    THEY ARE REVIEWED BY BOTH COMPANY COUNSEL AND INVESTOR COUNSEL.

2              **MS. GRANT:**  CAN WE GO TO PAGE 50 OF THE TRIAL

3    EXHIBIT.

4              YOU CAN BLOW IT UP, JEFF.

5              (PAGE DISPLAYED ON SCREEN.)

6    **BY MS. GRANT:**

7    **Q.**    AND IF YOU CAN'T SEE, FEEL FREE TO TURN TO IT.

8    **A.**    WHAT PAGE IS THAT?

9    **Q.**    SEE IT ON THE BOTTOM IT SAYS "TX" AND THERE IS A "50".

10   **A.**    OKAY.

11   **Q.**    THERE'S MORE THAN ONE PAGE.

12   **A.**    OKAY.

13   **Q.**    LET ME KNOW WHEN YOU ARE THERE.

14   **A.**    YES.

15   **Q.**    SO WE ARE LOOKING AT EXHIBIT F, SCHEDULE OF EXCEPTIONS.

16            CAN YOU TELL THE JURY -- ARE YOU FAMILIAR WITH WHAT

17   THE SCHEDULE OF EXCEPTIONS ARE?

18   **A.**    YES.

19   **Q.**    WHAT ARE THEY?

20   **A.**    SCHEDULE OF EXCEPTIONS ARE NOTABLE ITEMS THAT CALL OUT ANY

21   IMPORTANT FIGURES OR EXCEPTIONAL ITEMS THAT THE LAWYERS THINK

22   IT'S IMPORTANT TO BRING TO THE ATTENTION OF INVESTORS BEFORE

23   THE ROUND CLOSES.

24            **MS. GRANT:**  CAN WE GO TO PAGE 51, JEFF?  AND BRING

25   UP SECTION 2.11.

SCHAEPE – DIRECT / MS. GRANT

1           AND HIGHLIGHT THE FIRST PARAGRAPH OF THE FIRST

2    SENTENCE THERE.

3           (PAGE DISPLAYED ON SCREEN.)

4    **BY MS. GRANT:**

5    **Q.**   IT SAYS:

6           "PURSUANT TO THE RADIANCE DESIGN, INC. PLAN OF

7            LIQUIDATION, FRANK SHUM AND JEAN-MARC VERDIELL

8            HAVE EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT THE

9            INTELLECTUAL PROPERTY DEVELOPED BY RADIANCE

10           DESIGN, INC."

11          DID THE FACT THAT MR. SHUM HAD RIGHTS TO TECHNOLOGY,

12   WAS THAT A PROBLEM FOR YOU IN TERMS OF MAKING A DECISION TO

13   INVEST?

14   **A.**   NO.

15   **Q.**   CAN YOU TELL THE JURY WHY?

16   **A.**   AS LONG AS JEAN-MARC VERDIELL AND HIS COMPANY HAD THE

17   RIGHTS TO USE THE TECHNOLOGY, IT'S NOT VERY RELEVANT IF SOMEONE

18   ELSE HAVE THOSE RIGHTS UNLESS I DEEM THAT OTHER PARTY TO BE A

19   VERY FORMIDABLE COMPETITOR WITH A LOT OF RESOURCES, WHICH DID

20   NOT APPEAR TO BE THE CASE HERE.

21   **Q.**   THE LAST SENTENCE:

22           "TO THE COMPANY'S KNOWLEDGE, MR. SHUM IS NOT

23            PRESENTLY ENGAGED IN ANY BUSINESS DIRECTLY

24            COMPETITIVE WITH THE COMPANY."

25           THAT'S WHAT YOU WERE JUST SAYING?

1    A.    CORRECT.

2              AND EVEN IF HE WAS, I WOULDN'T HAVE CARED BECAUSE

3    IT'S NOT –– YOU KNOW, IF THIS WERE CISCO, OR SOME BIG COMPANY

4    WITH A LOT OF RESOURCES TO COMPETE, MAYBE I WOULD HAVE CARED,

5    MAYBE I WOULDN'T HAVE CARED, IT WOULD HAVE BEEN MORE ON MY

6    RADAR SCREEN.

7              THE FACT THAT AN INDIVIDUAL HAD THOSE RIGHTS, IT

8    WOULDN'T BE VERY SIGNIFICANT.

9    Q.    DID YOU EXPLORE OR INVESTIGATE LIGHTLOGIC'S PATENTS WHEN

10   YOU WERE INVESTING?

11   A.    I DON'T THINK SO.

12   Q.    WOULD YOU –– DO YOU KNOW IF LIGHTLOGIC HAD ANY PATENTS

13   WHEN YOU INVESTED?

14   A.    I DON'T RECALL.

15   Q.    IS IT IMPORTANT TO YOU THAT A COMPANY –– LET ME ASK YOU

16   THIS:  IF LIGHTLOGIC HAD HAD NO PATENTS, WOULD YOU STILL HAVE

17   DONE THE DEAL?

18   A.    YES.

19              MS. GRANT:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

20              THANK YOU VERY MUCH.

21                        CROSS–EXAMINATION

22   BY MR. KIRSCH:

23   Q.    GOOD AFTERNOON, MR. SCHAEPE.

24   A.    GOOD AFTERNOON.

25   Q.    YOU JUST TESTIFIED THAT YOU DON'T RECALL WHETHER OR NOT

SCHAEPE – CROSS / MR. KIRSCH

1  LIGHTLOGIC HAD ANY PATENTS; IS THAT CORRECT?

2  **A.**   YEAH.  OFF THE TOP OF MY HEAD, I DON'T REMEMBER.

3  **Q.**   LET'S TAKE A LOOK AT 2728 AGAIN, TRIAL EXHIBIT 2728 WHICH

4  YOU JUST DISCUSSED WITH YOUR COUNSEL.

5           (EXHIBIT DISPLAYED ON SCREEN.)

6           THIS IS THE INVESTMENT MEMO THAT I BELIEVE YOU SAID

7  YOU WROTE; IS THAT CORRECT?

8  **A.**   YES.

9  **Q.**   AND IF WE COULD TAKE A LOOK AT THE PAGE 82, THE BOX THAT

10  YOU WERE JUST TALKING ABOUT, THE POSITIVES OF LIGHTLOGIC --

11  **A.**   YES.

12  **Q.**   -- IN THE LOWER LEFT-HAND COLUMN?

13  **A.**   YES.

14           **MR. KIRSCH:**  LOWER LEFT-HAND COLUMN, DAVID.

15           (PAGE DISPLAYED ON SCREEN.)

16  **BY MR. KIRSCH:**

17  **Q.**   SEE THAT IT SAYS "UNIQUE IP ENABLING SIGNIFICANT PRODUCT

18  DIFFERENTIATION"?

19  **A.**   YES.

20  **Q.**   YOU TESTIFIED WHAT YOU THOUGHT THAT MEANT, WHAT YOUR

21  UNDERSTANDING OF WHAT THAT SENTENCE MEANT, CORRECT?

22  **A.**   YES.  IT'S THE KNOW-HOW AND THE OPTICS AND THE ELECTRONICS

23  AND EXPERTISE OF THE TEAM.

24  **Q.**   YOU DIDN'T MENTION ANYTHING ABOUT PATENTS, CORRECT?

25  **A.**   NO.

1        **MR. KIRSCH:**  IF WE CAN TURN BACK TO PAGE 3 OF THIS

2   MEMO, PLEASE, DAVID.

3               (PAGE DISPLAYED ON SCREEN.)

4   **BY MR. KIRSCH:**

5   **Q.**  BY THE WAY, "IP" REFERS TO INTELLECTUAL PROPERTY, CORRECT?

6   **A.**  CORRECT.

7        **MR. KIRSCH:**  SO IF YOU COULD BLOW UP THE MARKET

8   TRENDS AND THE FIRST FOUR BULLET POINTS.

9               SORRY, AT PAGE -- UNDER PAGE 3, NEXT PAGE OF THE

10  DOCUMENT, UNDER "PRODUCTS," THE FIRST FOUR BULLET POINTS.  I

11  APOLOGIZE.

12              (PAGE DISPLAYED ON SCREEN.)

13  **BY MR. KIRSCH:**

14  **Q.**  IT SAYS:

15              "LIGHTLOGIC HAS FILED PATENTS ON INTELLECTUAL

16              PROPERTY RELATING TO ITS CERAMIC-METAL

17              OPTOELECTRONIC SUBSTRATE, SUBSTRATE FABRICATION

18              METHOD, PLANAR INTEGRATION PLATFORM, AUTOMATED

19              ASSEMBLY AND FIBER ALIGNMENT METHOD, AND MICRO

20              FLEXURE DESIGN, AND HERMETIC ENCLOSURE DESIGN."

21              DO YOU SEE THAT?

22  **A.**  YES.

23  **Q.**  DOES THAT REFRESH YOUR RECOLLECTION THAT LIGHTLOGIC HAD

24  PATENTS WITH REGARD TO -- AND THAT WAS THE INTELLECTUAL

25  PROPERTY THAT YOU ARE REFERRING IN THE OTHER PAGE?

SCHAEPE – CROSS / MR. KIRSCH

1   **A.**   YES.  SO YOU HAD A COUPLE OF QUESTIONS MIXED TOGETHER

2   THERE, BUT THE FIRST ONE, DOES IT REFRESH MY MEMORY, NO, IT

3   DOES NOT BECAUSE IT CLAIMS THAT THE COMPANY HAD FILED PATENTS,

4   IT DOESN'T SAY ANYTHING ABOUT WHETHER THEY HAD BEEN ISSUED.

5   **Q.**   CORRECT.

6           AND IS IT YOUR UNDERSTANDING THAT THERE IS A

7   SIGNIFICANT DIFFERENCE BETWEEN -- FROM AN INVESTMENT

8   STANDPOINT, BETWEEN PATENTS THAT HAVE BEEN FILED AND PATENTS

9   THAT HAVE BEEN ISSUED?

10  **A.**   AS AN INVESTOR, I PLACE VERY LITTLE WEIGHT ON PATENTS

11  WHATSOEVER.  AND SO, YOU KNOW, IN TERMS OF MY ANALYSIS OF A

12  DEAL, IT'S NOT VERY RELEVANT WHETHER THEY HAVE PATENTS, WHETHER

13  THEY HAVE NO PATENTS, WHETHER THEY HAVE PATENT FILINGS.  IT'S A

14  VERY MARGINAL ISSUE BECAUSE STARTUPS, AS I MENTIONED BEFORE,

15  THEY WIN BY EXECUTING THE COMPETITION, NOT BY OUT-PATENTING THE

16  COMPETITION.

17  **Q.**   IT WAS IMPORTANT ENOUGH FOR YOU TO PUT IN THIS MEMO?

18  **A.**   AS A FACTUAL MATTER, YES.

19  **Q.**   YOU ALSO MENTION IN THE PREVIOUS BULLET POINT:

20          "SMALL PRODUCT SIDES AND LOWER MANUFACTURING

21          COSTS ARE ENABLED BY LIGHTLOGIC'S PATENTED

22          PLANAR SURFACE-MOUNT PACKAGING PLATFORM WHICH

23          LENDS ITSELF TO PRODUCTION AUTOMATION."

24          DO YOU SEE THAT?

25  **A.**   YES.

1    Q.    THAT PATENTED PLANAR SURFACE-MOUNT PACKAGING PLATFORM

2    WHICH LENDS ITSELF TO PRODUCT AUTOMATION WAS IMPORTANT ENOUGH

3    FOR YOU TO PUT IN THIS MEMO, CORRECT?

4    A.    YES.  IT'S A FACTUAL ITEM AS PART OF THE MEMO.

5              I WOULD SAY THAT THAT WAS NOT, THOUGH, PATENT OR NO

6    PATENT WAS NOT RELEVANT TO MY CORE RECOMMENDATION OF THE

7    INVESTMENT.

8              MR. KIRSCH:  IF WE GO BACK TO THE FIRST BULLET POINT

9    IN THIS MEMO, PAGE 1, UNDER "BUSINESS", DAVID?

10             (PAGE DISPLAYED ON SCREEN.)

11   BY MR. KIRSCH:

12   Q.    FIRST BULLET POINT SAYS:

13             "FOUNDED IN 1998," DESCRIBES LIGHTLOGIC WHAT IT

14   DOES.  THE NEXT SENTENCE SAYS:

15             "THE COMPANY'S PRODUCTS ARE BASED ON A UNIQUE

16             PLANAR PACKAGING PLATFORM WHICH ENABLES

17             LOW-COST, SMALL FORM FACTOR COMPONENTS THAT,

18             UNLIKE CURRENT GENERATION COMPONENTS, CAN BE

19             PRODUCED WITH SCALABLE AUTOMATED MANUFACTURING

20             PROCESSES."

21             DO YOU SEE THAT?

22   A.    YES.

23   Q.    AND ISN'T IT YOUR UNDERSTANDING THAT THAT UNIQUE PLANAR

24   PACKAGING PLATFORM IS COVERED BY THE PATENTS THAT YOU JUST

25   DESCRIBED?

SCHAEPE – CROSS / MR. KIRSCH

1    **A.**   I DON'T KNOW.  HARD TO KNOW WHETHER ALL OF IT OR SOME OF

2    IT IS COVERED BY THOSE PATENTS.

3    **Q.**   AND WOULDN'T IT BE A COMPETITIVE ADVANTAGE TO HAVE THE

4    EXCLUSIVE RIGHTS, PATENT RIGHTS IN A FEATURE THAT PROVIDED

5    SIGNIFICANT SCALABLE AUTOMATED MANUFACTURING PROCESSES?

6    **A.**   IT'S POSSIBLE, BUT NOT NECESSARILY THE CASE.  DEPENDS ON

7    THE CIRCUMSTANCES.

8    **Q.**   AND IF -- WAS IT YOUR UNDERSTANDING THAT LIGHTLOGIC,

9    LIGHTLOGIC'S OPTICAL INTEGRATION PLATFORM WAS COVERED BY

10   CERTAIN PATENTS?

11            DID YOU UNDERSTAND THAT?

12   **A.**   YOU KNOW, ALL I CAN TELL YOU IS WHAT YOU SEE IN FRONT OF

13   YOU IN THE MEMO IS, AT THE TIME, HOW I INTERPRETED THE

14   SITUATION AND DOCUMENTED IT.  I DON'T KNOW IF I CAN ADD

15   ANYTHING FURTHER TO THAT.

16   **Q.**   DID YOU HAVE AN UNDERSTANDING THAT LIGHTLOGIC ADVERTISED

17   INVESTORS THAT ITS OPTICAL INTEGRATION PLATFORM, WHICH WAS

18   COVERED BY CERTAIN PATENTED FEATURES, ENABLED LIGHTLOGIC'S

19   FAMILY OF TRANSPONDERS?

20   **A.**   COULD YOU REPEAT THE QUESTION?

21   **Q.**   UH-HUH.

22            DID YOU HAVE AN UNDERSTANDING THAT LIGHTLOGIC, AT

23   THE TIME YOU WERE INVESTING IN 2000 --

24   **A.**   YEAH.

25   **Q.**   -- HAD A UNIQUE OPTICAL INTEGRATION PLATFORM WITH CERTAIN

SCHAEPE – CROSS / MR. KIRSCH

1    PATENTED FEATURES, WHICH ENABLED LIGHTLOGIC'S FAMILY OF

2    TRANSPONDERS?

3    **A.**   MY UNDERSTANDING AT THE TIME WAS THAT THE FAMILY OF

4    TRANSPONDERS INCLUDED A LOW-COST PLANAR PACKAGING ELEMENT TO

5    THOSE PRODUCTS.

6            THE EXTENT TO WHICH THOSE WERE COVERED BY PATENTS

7    THAT HAD ACTUALLY BEEN ISSUED, I DON'T THINK I HAD A CLEAR

8    UNDERSTANDING OF THAT.

9    **Q.**   AND DID YOU HAVE AN UNDERSTANDING THAT THESE PATENTED

10   FEATURES THAT LIGHTLOGIC WAS ADVERTISING TO INVESTORS WOULD

11   SIGNIFICANTLY LOWER THE COST OF TRANSPONDERS?

12   **A.**   I THINK MY UNDERSTANDING WAS THAT THE PLANAR PLATFORM THAT

13   THE COMPANY HAD USED OR WAS USING COULD BE LOWER COST AND

14   SMALLER FORM FACTOR THAN THE COMPETITION, BUT THE ASPECT

15   RELATING TO THE PATENTS OR NOT, I, YOU KNOW, I DON'T THINK I

16   HAD A VERY DETAILED UNDERSTANDING OF THAT, AND I TYPICALLY DO

17   VERY LITTLE WORK IN MY DUE DILIGENCE ON PATENTS BECAUSE I

18   DON'T, AS I SAID BEFORE, I PLACE VERY LITTLE VALUE IN THEM IN

19   THE CONTEXT OF A STARTUP.

20   **Q.**   IF WE CAN LOOK AT 2724.

21           I DON'T BELIEVE THAT IS IN EVIDENCE YET, SO I NEED

22   TO ASK YOU A FEW QUESTIONS, MR. SCHAEPE.

23           I BELIEVE YOU HAVE 2724 IN THE BINDER IN FRONT OF

24   YOU.

25   **A.**   WHAT PAGE IS THAT?

SCHAEPE – CROSS / MR. KIRSCH

1    **Q.**   IT IS TABBED AT 2724.

2    **A.**   SORRY, I DON'T SEE THAT.

3    **Q.**   YOU DON'T HAVE 2724?  I APOLOGIZE.

4            (EXHIBIT HANDED TO WITNESS.)

5            THIS DOCUMENT IS DATED MARCH 29, 2000, AND I BELIEVE

6    HAS YOUR INITIALS ON IT AND IT'S ENTITLED "INVESTMENT IN

7    LIGHTLOGIC."

8            DO YOU SEE THIS?

9    **A.**   YES.

10   **Q.**   CAN YOU EXPLAIN WHAT THIS IS?

11   **A.**   IT LOOKS LIKE SOME SORT OF DRAFT OF THE OTHER INVESTMENT

12   MEMO THAT WAS DISPLAYED.  FROM THE DATE IT'S ROUGHLY A WEEK

13   EARLIER.

14   **Q.**   AND YOU DRAFTED THIS; IS THAT CORRECT?

15   **A.**   YES.  IT'S GOT MY NAME ON IT.

16           **MR. KIRSCH:**  PLAINTIFF MOVES 2724 INTO EVIDENCE.

17           **THE COURT:**  IT IS ADMITTED.

18               (TRIAL EXHIBIT 2724 RECEIVED IN EVIDENCE)

19           **MR. KIRSCH:**  IF WE CAN BRING THAT UP, DAVID.

20           (EXHIBIT DISPLAYED ON SCREEN.)

21   **BY MR. KIRSCH:**

22   **Q.**   AND THE SECOND BULLET POINT UNDER THE COMPANY'S BUSINESS

23   TALKS ABOUT IN THE SECOND SENTENCE:

24           "THE COMPANY'S TECHNOLOGY GIVES IT A UNIQUE

25            ADVANTAGE RELATIVE TO ITS COMPETITION AND

1              ENABLES A NEW CLASS OF OPTOELECTRONIC

2              COMPONENTS."

3              MR. SCHAEPE, IS IT YOUR UNDERSTANDING THAT THE

4    COMPANY'S TECHNOLOGY THAT YOU ARE REFERRING TO THERE IS THE

5    PATENTED TECHNOLOGY?

6    **A.**    NO, NOT NECESSARILY THE CASE.  TECHNOLOGY MEANS THE

7    PEOPLE, THE PROCESSES, THE HARDWARE, THE SOFTWARE IN THE

8    PRODUCT.

9    **Q.**    THE TECHNOLOGY MEANS THE PEOPLE AND THE PRODUCT?

10   **A.**    THE TECHNOLOGY, THE WAY I THINK ABOUT IT'S THE HARDWARE,

11   SOFTWARE, IT'S THE KNOW-HOW THAT GOES INTO MANUFACTURING THE

12   PRODUCT, THE PROCESS DEVELOPMENT AROUND THAT, IT'S A WHOLE

13   DIVERSE SET OF ITEMS THAT REALLY CREATE WHAT WOULD BE REFERRED

14   TO AS TECHNOLOGY.

15   **Q.**    DOES THAT INCLUDE THE PATENTED TECHNOLOGY?

16   **A.**    IT COULD.

17   **Q.**    AND DID IT IN THIS CASE?

18   **A.**    I DON'T KNOW.

19   **Q.**    IF WE GO TO THE SECOND PARAGRAPH, AND THE THIRD.  I

20   APOLOGIZE, THE BULLET:

21              "THE COMPANY'S PRODUCTS PROVIDE TELECOMMUNICATION

22   EQUIPMENT MANUFACTURERS WITH THE FOLLOWING COMPETITIVE

23   ADVANTAGES:"  AND THEN IT LISTS THEM.

24              "HIGH PERFORMANCE BELLCORE QUALIFIED LASER

25   PACKAGING, SCALABLE, AUTOMATED MANUFACTURING READY FOR HIGH

1    VOLUMES, COST EFFECTIVE SOLUTIONS FOR OC 192 DWDM INTERFACES,"

2    AND A COUPLE MORE.

3            IS IT YOUR UNDERSTANDING THAT THESE COMPETITIVE

4    ADVANTAGES WERE PROVIDED BY THE PATENTED TECHNOLOGY?

5    **A.**   AGAIN, I DON'T KNOW WHAT THE SPECIFIC RELATIONSHIP IS WITH

6    WHATEVER THEY HAD PATENTED AND THE THINGS THAT I REALLY CARED

7    ABOUT, WHICH WERE THE PRODUCT ATTRIBUTES.

8    **Q.**   MR. SCHAEPE, WERE YOU INVOLVED IN -- WELL, LET ME BACK UP

9    FOR A SECOND.

10           YOU INVESTED IN ABOUT MAY OF 2000, CORRECT?

11   **A.**   IT LOOKED LIKE, ACCORDING TO THIS SET OF DOCUMENTS HERE,

12   IT LOOKED LIKE IT WAS APRIL OR MAY OF 2000.

13           **MR. KIRSCH:**  AND IF WE COULD BRING UP TRIAL EXHIBIT

14   476, PLEASE, DAVID.

15           (EXHIBIT DISPLAYED ON SCREEN.)

16   **BY MR. KIRSCH:**

17   **Q.**   THIS IS A PRESS RELEASE THAT IS ALREADY IN EVIDENCE.  IT'S

18   DATED MAY 18TH, 2000, AND TALKING ABOUT LIGHTLOGIC RAISING

19   57.5 MILLION OF DEBT AND EQUITY FINANCING.

20           DO YOU SEE THAT?

21   **A.**   YES.

22   **Q.**   AND THEN YOU HAVE A QUOTE IN THE SECOND TO LAST PARAGRAPH

23   ON THIS PAGE.  SAYS, MENTION YOU, AND THEN IT SAYS QUOTE:

24           "WE ARE ENTHUSIASTIC ABOUT WORKING WITH

25           LIGHTLOGIC TO BRING THEIR TRULY UNIQUE OPTICAL

1                PACKAGING TECHNOLOGY AND STATE-OF-THE-ART

2                OPTOELECTRONIC INTEGRATION CAPABILITIES TO

3                MARKET."

4    A.   UH-HUH.

5    Q.   IS IT YOUR TESTIMONY THAT YOU DON'T REMEMBER WHETHER THAT

6    TRULY UNIQUE OPTICAL PACKAGING TECHNOLOGY WAS COVERED BY

7    PATENTS OR PATENT APPLICATIONS?

8    A.   YES.  I DO NOT RECALL WHETHER THAT WAS THE CASE OR NOT.

9    Q.   YOU DON'T RECALL ANY DISCUSSIONS WITH ANYBODY AT

10   LIGHTLOGIC ABOUT THAT, CORRECT?

11   A.   NO I DON'T.

12   Q.   YOU DON'T RECALL READING ANY DOCUMENTS, BUSINESS PLANS, OR

13   OTHERWISE FROM LIGHTLOGIC REGARDING WHETHER OR NOT LIGHTLOGIC'S

14   TRULY UNIQUE OPTICAL PACKAGING TECHNOLOGY WAS COVERED BY

15   PATENTS OR PATENT APPLICATIONS?

16   A.   BASED ON MY MEMO, THERE MUST HAVE BEEN SOME DOCUMENTATION

17   ABOUT PATENTS THAT HAD BEEN APPLIED FOR, BUT I DON'T

18   SPECIFICALLY RECALL WHETHER THEY WERE DOCUMENTS THAT DESCRIBED

19   WHICH PATENTS HAD BEEN ISSUED OR NOT.

20   Q.   YOU WERE ON THE BOARD OF DIRECTORS OF LIGHTLOGIC; IS THAT

21   TRUE?

22   A.   YES.

23   Q.   AND WERE YOU INVOLVED IN THE NEGOTIATIONS WITH INTEL

24   REGARDING THEIR ACQUISITION?

25   A.   NOT DIRECTLY, NO.

SCHAEPE – CROSS / MR. KIRSCH

1  Q.   YOU DON'T KNOW THE REASONS WHY INTEL PURCHASED LIGHTLOGIC,

2  CORRECT?

3  A.   NO.  AT THIS TIME I CAN'T SAY THAT I DO.

4  Q.   WERE YOU INVOLVED IN WORKING WITH JP MORGAN, AN INVESTMENT

5  BANKER, IN TRYING TO PROMOTE LIGHTLOGIC TO INTEL?

6  A.   I BELIEVE THE COMPANY HAD RETAINED JP MORGAN TO ASSIST IN

7  STRATEGIC ALTERNATIVES ONE OF WHICH COULD BE SALE OF THE

8  COMPANY.

9  Q.   AND DID YOU INTERFACE WITH PEOPLE AT JP MORGAN?

10  A.   I DON'T RECALL WHETHER I INTERFACED DIRECTLY WITH THEM OR

11  WHETHER THE BOARD HAD UPDATES FROM JP MORGAN BY WAY OF JOHN

12  MCGRAW WHO WAS THE CEO WHO WAS PROBABLY THE POINT PERSON

13  WORKING WITH JP MORGAN ON THIS.

14  Q.   DID YOU, AS A LIGHTLOGIC BOARD MEMBER REVIEW THE MATERIALS

15  THAT JP MORGAN PREPARED TO PROMOTE LIGHTLOGIC TO POTENTIAL

16  INVESTORS OR ACQUIRERS?

17  A.   I DON'T RECALL.

18  Q.   COULD TAKE A LOOK AT TRIAL EXHIBIT 719, PLEASE?

19        THIS IS A DOCUMENT ENTITLED "LIGHTLOGIC, INC.

20  INVESTMENT SUMMARY," AND IT HAS JP MORGAN STAMPED ON THE BOTTOM

21  AND A LIGHTLOGIC INSIGNIA ON THE LEFT-HAND COLUMN.

22        DO YOU SEE THIS?

23  A.   NO, I DON'T KNOW WHAT EXHIBIT YOU ARE REFERRING TO.

24  Q.   EXHIBIT 719.  I APOLOGIZE.

25        **THE WITNESS:**  IS IT IN THE BOOK HERE?

1          **MR. KIRSCH:**  IT SHOULD BE IN THE BOOK.

2          MAY WE APPROACH THE WITNESS, YOUR HONOR?  I

3   APOLOGIZE.  HERE IS ANOTHER COPY.

4          **THE WITNESS:**  THANKS.

5   BY MR. KIRSCH:

6   **Q.**   DO YOU RECOGNIZE THIS DOCUMENT, MR. SCHAEPE?

7   **A.**   I DON'T REMEMBER SEEING THIS, NO.

8   **Q.**   DO YOU RECALL THAT JP MORGAN PUT TOGETHER LIGHTLOGIC

9   INVESTMENT SUMMARY FOR LIGHTLOGIC?

10  **A.**   I DON'T REMEMBER WHETHER THEY DID OR NOT.

11  **Q.**   DO YOU RECALL THAT JP MORGAN PROMOTED LIGHTLOGIC AS A

12  COMPANY THAT HAD DEVELOPED KEY PROPRIETARY AND PATENT PENDING

13  DESIGN AUTOMATED MANUFACTURING AND PACKAGING TECHNOLOGIES TO

14  FUNDAMENTALLY REDUCE COST IN THE COMPONENT SUPPLY CHAIN?

15  **A.**   I DON'T REMEMBER UNFORTUNATELY.

16  **Q.**   MR. SCHAEPE, IF YOU COULD TURN TO TRIAL EXHIBIT 473, WHICH

17  WE –– YOU SPOKE ABOUT BRIEFLY WITH YOUR COUNSEL, WHICH IS THE

18  SERIES C FINANCING PACKET?

19  **A.**   YES.

20  **Q.**   PAGE 51.

21          YOU DISCUSSED ––

22          **MR. KIRSCH:**  IF YOU CAN BRING THAT UP, DAVID,

23  PLEASE.

24          (EXHIBIT DISPLAYED ON SCREEN.)

25  ///

1   **BY MR. KIRSCH:**

2   **Q.**   YOU DISCUSSED PARAGRAPH 2.11?

3   **A.**   YES.

4   **Q.**   DO YOU RECALL THAT?

5           AND THAT PARAGRAPH READS THAT:

6           "PURSUANT TO THE PLAN OF LIQUIDATION, FRANK SHUM

7           AND JEAN-MARC VERDIELL HAVE EQUAL RIGHTS TO

8           INDEPENDENTLY EXPLOIT THE INTELLECTUAL PROPERTY

9           DEVELOPED BY RADIANCE DESIGN, INC.  SUCH

10          INTELLECTUAL PROPERTY IS SET FORTH IN THE PATENT

11          APPLICATION IDENTIFIED AS VER-101."

12          DO YOU SEE THAT?

13  **A.**   I SEE THAT, YES.

14  **Q.**   YOU DON'T HAVE AN UNDERSTANDING OF WHAT VER-101 IS,

15  CORRECT?

16  **A.**   NO, I DON'T KNOW.

17  **Q.**   YOUR UNDERSTANDING OF THIS PARAGRAPH IS THAT THE

18  INTELLECTUAL PROPERTY THAT MR. SHUM HAS EQUAL RIGHTS TO

19  INDEPENDENTLY EXPLOIT IS SET FORTH IN THAT PATENT APPLICATION,

20  CORRECT?

21          **MS. GRANT:**  LACKS FOUNDATION.

22          **THE COURT:**  OVERRULED.

23          **THE WITNESS:**  CAN YOU REPEAT THE QUESTION?

24  **BY MR. KIRSCH:**

25  **Q.**   YOUR UNDERSTANDING IS THAT THE INTELLECTUAL PROPERTY THAT

1    MR. SHUM HAS EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT IS SET FORTH

2    IN PATENT APPLICATION IDENTIFIED AS VER-101, CORRECT?

3    **A.**    ALL I CAN SAY, I AM READING THE SAME SENTENCE YOU ARE, SO

4    I WOULD HAVE THE SAME INTERPRETATION I GUESS THAT ANYONE ELSE

5    WOULD READING THIS THING.

6    **Q.**    AND WAS IT YOUR UNDERSTANDING THAT THERE WERE -- STRIKE

7    THAT.

8             LET ME ASK IT THIS WAY:  DID YOU EVER SEE ANY

9    DOCUMENTS THAT INDICATED THAT MR. SHUM HAD RIGHTS IN THE

10   FLEXURE TECHNOLOGY?

11   **A.**    I DON'T RECALL.

12   **Q.**    YOUR COMPANY, WEISS PECK INVESTED APPROXIMATELY HOW MUCH

13   IN LIGHTLOGIC?

14   **A.**    ABOUT $10 MILLION.

15   **Q.**    HOW MUCH DID IT MAKE?

16   **A.**    I THINK WE INVESTED SOMETHING LIKE 150 MILLION VALUATION.

17   I BELIEVE THE COMPANY WAS, I DON'T KNOW.  I DON'T KNOW IF IT IS

18   PUBLIC INFORMATION WHAT THE COMPANY WAS SOLD FOR, BUT --

19   **Q.**    THE COMPANY LIGHTLOGIC?

20   **A.**    YEAH.

21   **Q.**    YES, IT IS.

22            THE COMPANY WAS SOLD, I CAN REPRESENT, WAS SOLD FOR

23   $409 MILLION.

24   **A.**    YEAH.  SO IF YOU LOOK AT OUR INVESTMENT MEMO HERE, WHICH

25   OUTLINES THE PRICE, IT LOOKED LIKE IT WAS POST MONEY VALUATION

SCHAEPE − CROSS / MR. KIRSCH

1    OF 190 MILLION.  PROBABLY WOULD HAVE MADE TWO TO THREE TIMES

2    OUR MONEY.

3    Q.    AND YOU ARE A PARTNER OF WEISS PECK AT THE TIME; IS THAT

4    RIGHT?

5    A.    WEISS PECK & GREER VENTURE PARTNERS, YES.

6    Q.    YOU SHARED IN THE PROFITS FROM THAT, CORRECT?

7    A.    DID I SHARE IN THE PROFITS OF THAT?

8          THIS FUND, I THINK WAS OUR '99 FUND?  I DON'T KNOW

9    EXACTLY HOW TO ANSWER THAT BECAUSE THAT FUND IS IN

10   OVERDISTRIBUTION SITUATION, SO ANY PROFITS WE WOULD EVER SEE WE

11   HAVEN'T PAID BACK.

12   Q.    HAVE YOU CO-INVESTED WITH INTEL CAPITAL BEFORE, YOU OR

13   YOUR COMPANY?

14   A.    HAVE I INVESTED WITH INTEL CAPITAL WHEN?

15   Q.    AT ANY POINT IN TIME.

16   A.    YES.

17   Q.    SEPARATE AND APART FROM -- WELL, CAN YOU DESCRIBE WHAT

18   CIRCUMSTANCES THOSE WERE?

19   A.    WEISS PECK AND GREER VENTURE PARTNERS HAD BEEN INVESTING

20   IN STARTUPS FOR 20 PLUS YEARS, AND I HAD JOINED THEM IN 1991,

21   AND SINCE THEN, I'M AT ANOTHER VENTURE CAPITAL FIRM, LIGHTSPEED

22   VENTURE PARTNERS, AND WE HAD PROBABLY INVESTED, SINCE I HAVE

23   BEEN AT THOSE TWO FIRMS, ON THE ORDER OF A HUNDRED PLUS

24   COMPANIES.

25          AND I KNOW THAT SOME OF THE COMPANIES THAT I AM

SCHAEPE – CROSS / MR. KIRSCH

1   CURRENTLY INVOLVED IN, TWO OF THEM TO BE SPECIFIC, COUPLE OF

2   THEM HAVE INTEL CAPITAL AS A CO-INVESTOR.

3            I DON'T REMEMBER WHETHER ANY PORTFOLIO COMPANIES I

4   WAS ON THE BOARD OF WERE INVESTED IN WEISS PECK & GREER VENTURE

5   PARTNERS HAD INTEL CAPITAL AS AN INVESTOR.

6   **Q.**   IT'S YOUR PLAN TO CONTINUE TO INVEST WITH INTEL CAPITAL,

7   CORRECT?

8   **A.**   I DON'T HAVE ANY SPECIFIC PLANS THAT I MUST DO IT, BUT I

9   DON'T HAVE ANY SPECIFIC PLAN THAT I MUST INVEST IN ANY FIRM IN

10  PARTICULAR, BUT THEY ARE A GOOD INVESTOR ALONG WITH MANY

11  OTHERS.

12  **Q.**   YOU ARE CURRENTLY AN INVESTOR IN JEAN-MARC'S NEW COMPANY

13  APRIUS, CORRECT?

14  **A.**   THAT'S CORRECT.

15  **Q.**   AND YOU'RE CURRENTLY A DIRECTOR OF JEAN-MARC'S NEW

16  COMPANY, APRIUS, CORRECT?

17  **A.**   THAT'S RIGHT.  I'M ON THE BOARD.

18           **MR. KIRSCH:**  I HAVE NO FURTHER QUESTIONS, YOUR

19  HONOR.

20                  <u>**REDIRECT EXAMINATION**</u>

21  **BY MS. GRANT:**

22  **Q.**   WHY DID YOU INVEST IN DR. VERDIELL'S NEW COMPANY, APRIUS?

23  **A.**   I HAD GAINED RESPECT FOR HIS TECHNICAL ABILITY AND HIS

24  TECHNICAL VISION, VISIBILITY TO ASSEMBLE GOOD TECHNICAL TEAMS

25  THAT CAN PRODUCE PRODUCT AND INNOVATE.  AND HE HAD SOME IDEAS

1    ABOUT APPLYING SOME OF HIS KNOWLEDGE IN THE OPTICAL DOMAIN TO A

2    DIFFERENT AREA OF ENTERPRISE COMPUTING.

3    **Q.**   AND MR. SHUM'S COUNSEL KEPT REFERRING TO ME AS YOUR

4    COUNSEL.  I DON'T REPRESENT YOU OR MY FIRM AND MR. TANGRI'S

5    FIRM DON'T REPRESENT YOU IN THIS CASE, CORRECT?

6    **A.**   THAT'S CORRECT.

7    **Q.**   YOU ARE NOT A PART OF THIS CASE, YOU'RE NOT A DEFENDANT OR

8    ANYTHING LIKE THAT, CORRECT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   YOU ARE HERE JUST AS A WITNESS, CORRECT?

11   **A.**   THAT'S CORRECT.

12   **Q.**   DO YOU BELIEVE THAT -- COUNSEL ASKED YOU SOME QUESTIONS

13   ABOUT THE PROFITS YOUR FIRM MADE.

14           DO YOU BELIEVE THAT MONEY SHOULD GO TO MR. SHUM?

15   **A.**   ABSOLUTELY NOT.

16   **Q.**   WHY IS THAT?

17   **A.**   MR. SHUM HAD NOTHING TO DO WITH THE SUCCESS OF LIGHTLOGIC.

18   HE WAS NOT AN INVESTOR IN LIGHTLOGIC.

19           **MS. GRANT:**  CAN WE GO TO TRIAL EXHIBIT 476?

20           AND THE SECOND TO THE LAST PARAGRAPH, IF WE CAN BLOW

21   THAT UP.

22           (EXHIBIT DISPLAYED ON SCREEN.)

23   **BY MS. GRANT:**

24   **Q.**   AND I THINK COUNSEL ASKED YOU SOME QUESTIONS ABOUT THAT.

25   AND HE ASKED YOU SOME QUESTIONS, IT SAYS:

1              "WE ARE ENTHUSIASTIC ABOUT WORKING WITH LIGHTLOGIC

2    TO BRING THEIR TRULY UNIQUE OPTICAL PACKAGING TECHNOLOGY," ET

3    CETERA.

4              WHEN YOU USE THE WORDS "TRULY UNIQUE," DID YOU MEAN

5    PATENTED?

6    **A.**   NO.  THAT SENTENCE DOES NOT MEAN PATENTED.  IT SAYS WHAT

7    IT SAYS, UNIQUE.  IT IS DIFFERENT THAN THE COMPETITION.

8    **Q.**   DID YOU CARE ONE WAY OR THE OTHER WHETHER THE UNIQUE

9    TECHNOLOGY THAT LIGHTLOGIC HAD WAS PATENTED OR NOT?

10   **A.**   NO.

11   **Q.**   HOW DO STARTUPS TYPICALLY PROTECT THEIR TECHNOLOGY?

12   **A.**   STARTUPS TYPICALLY ARE NOT IN A POSITION TO PROTECT THEIR

13   TECHNOLOGY BECAUSE THEY DON'T HAVE THE FINANCIAL RESOURCES TO

14   FIGHT LONG AND EXPENSIVE COURT BATTLES WITH COMPETITORS THAT

15   MAY BE VIOLATING THEIR TECHNOLOGY.

16             STARTUPS PROTECT THEMSELVES BY BEING FIRST TO

17   MARKET, MOVING FASTER, COMING UP WITH MORE COST EFFECTIVE AND

18   BETTER PRODUCTS AND HAVING A MARKET LEAD ON THE COMPETITION.

19   **Q.**   AND ONE FINAL QUESTION.  I THINK YOU TESTIFIED THAT YOU

20   PLACE LITTLE VALUE ON PATENTS BECAUSE STARTUPS WIN BY

21   OUT-EXECUTING THE COMPETITION, NOT BY OUT-PATENTING THE

22   COMPETITION.

23             WHAT DID YOU MEAN BY THAT?

24   **A.**   STARTUPS SUCCEED BY GENERATING REVENUE AND CASH FLOW SO

25   THAT THEY CAN GO FROM A LOSS POSITION TO PROFITABILITY, HIRE

1    MORE ENGINEERS AND SUSTAIN THEMSELVES.

2            HAVING PATENTS DOES NOT ALLOW A COMPANY TO DO THAT.

3    YOU KNOW, COMPANIES WITH PATENTS AND SMART ENGINEERS WITH

4    PATENTS ARE PLENTIFUL.  SUCCESSFUL STARTUPS ARE NOT THAT

5    PLENTIFUL.

6            WHAT MAKES A SUCCESSFUL STARTUP SUCCESSFUL IS THE

7    FACT THAT THEY PUT TOGETHER A PRODUCT THAT'S RELIABLE, OFFERS A

8    VALUE PROPOSITION TO CUSTOMERS, IT'S BETTER THAN THE

9    COMPETITION, IS ABLE TO EFFECTIVELY DISTRIBUTE THAT PRODUCT IN

10   THE MARKET, AND EFFECTIVELY RAISE MONEY TO CONTINUE TO FINANCE

11   THE R AND D AND EXPANSION WHILE THE COMPANY IS IN A LOSS

12   POSITION.

13           THOSE ARE THE THINGS THAT REALLY MAKE A STARTUP

14   SUCCESSFUL.  PATENTS ON THE MARGIN CAN BE USEFUL LATER ON

15   ESPECIALLY IF THE COMPANY IS ACQUIRED BY A BIG COMPANY THAT

16   DOES HAVE A LOT OF DEEP POCKETS AND FINANCIAL RESOURCES TO USE

17   THOSE PATENTS AS A COMPETITIVE WEAPON AND BE WILLING TO SPEND

18   MONEY IN COURT TO PROTECT THE TECHNOLOGY BASED ON PATENTS, BUT

19   IT TAKES MANY YEARS USUALLY TO GET PATENTS ISSUED, AND THERE IS

20   MANY WAYS FOR COMPETITORS TO WORK AROUND PATENTS.  THEY ARE BY

21   NO MEANS AIRTIGHT IN MOST CASES.

22           AND IN MY EXPERIENCE OVER 17 YEARS, I HAVE JUST

23   FOUND PATENTS TO BE OF LITTLE PRACTICAL VALUE IN THE SUCCESS OF

24   THE STARTUPS.

25           **MS. GRANT:**  THANK YOU, MR. SCHAEPE.

1          I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

2          **MR. KIRSCH:**  JUST A COUPLE OF QUESTIONS, YOUR HONOR.

3                        **RECROSS–EXAMINATION**

4  **BY MR. KIRSCH:**

5  Q.   MR. SCHAEPE, YOU WERE TALKING ABOUT THE IMPORTANCE TO

6  PATENTS –– THE IMPORTANCE OF PATENTS TO STARTUPS JUST A SECOND

7  AGO.

8          WERE YOU AWARE THAT MR. VERDIELL WROTE A LETTER TO

9  HIS PATENT AGENT JUST AFTER THE SERIES A FINANCING IN THIS CASE

10  THAT SAID "THE PATENT APPLICATIONS GOT US FUNDED"?

11          **MS. GRANT:**  ACTUALLY MISSTATES THE DOCUMENT, YOUR

12  HONOR.  LACKS FOUNDATION.

13          **THE COURT:**  REPHRASE THE QUESTION.

14  **BY MR. KIRSCH:**

15  Q.   ARE YOU AWARE, MR. SCHAEPE, THAT MARC VERDIELL

16  CORRESPONDED WITH HIS PATENT AGENT AFTER SERIES A FINANCING

17  INDICATING THAT CERTAIN PATENT APPLICATIONS, DRAFT PATENT

18  APPLICATIONS GOT LIGHTLOGIC FUNDED?

19          **MS. GRANT:**  STILL MISSTATES THE DOCUMENT AND LACKS

20  FOUNDATION.

21          **THE COURT:**  OVERRULED.

22          **THE WITNESS:**  YEAH, I DID NOT INVEST IN THE SERIES

23  A, SO, NO, I WAS NOT AWARE.  I TURNED DOWN THE DEAL AT THAT

24  TIME.

25  ///

1    BY MR. KIRSCH:

2    Q.   YOU DON'T KNOW WHETHER MR. SHUM IS AN INVENTOR OR

3    CO-INVENTOR IN LIGHTLOGIC PATENTED TECHNOLOGY, CORRECT?

4    A.   REPEAT THE QUESTION?

5    Q.   YOU DON'T KNOW IF MR. SHUM IS AN INVENTOR OR CO-INVENTOR

6    IN LIGHTLOGIC'S PATENTED TECHNOLOGY, CORRECT?

7    A.   I AM JUST TRYING TO UNDERSTAND THE QUESTION.

8            YOU ARE SAYING -- SAY IT AGAIN?

9    Q.   YOU DON'T KNOW PERSONALLY IF MR. SHUM IS AN INVENTOR OR

10   CO-INVENTOR IN LIGHTLOGIC'S PATENTED TECHNOLOGY.

11   A.   I CAN'T SAY THAT I KNOW THAT.

12           MR. KIRSCH:  NO FURTHER QUESTIONS, YOUR HONOR.

13           THE COURT:  MR. SCHAEPE, YOU CAN BE EXCUSED NOW.

14           THE WITNESS:  OKAY.

15           MS. GRANT:  YOUR HONOR, THE DEFENSE RECALLS MR. JIM

16   TIMMINS.

17                   DIRECT EXAMINATION RESUMED

18   BY MS. GRANT:

19   Q.   GOOD AFTERNOON, MR. TIMMINS.

20   A.   GOOD AFTERNOON.

21   Q.   I THINK WE LEFT OFF YOU WERE TALKING ABOUT CRITERIA THAT

22   ARE IMPORTANT TO A VENTURE CAPITALIST WHEN THEY ARE MAKING

23   THEIR INVESTMENTS, AND YOU TALKED ABOUT THE MARKET.

24           DO VENTURE CAPITALISTS LOOK AT WHAT COMPETITORS ARE

25   DOING?

TIMMINS - DIRECT / MS. GRANT

1    **A.**   YES.  THERE'S TYPICALLY AN ANALYSIS CALLED A COMPETITIVE

2    ANALYSIS WHICH EXAMINES THE COMPANIES THAT HAVE PRODUCTS THAT

3    DO THE SAME SORT OF THING IN THE MARKET ALREADY, AND CONSIDERS

4    WHETHER THERE ARE OTHER COMPANIES OR THOSE SAME COMPANIES THAT

5    COULD INTRODUCE NEW PRODUCTS WHICH ARE POTENTIALLY THREATENING

6    TO THE PLANNED PRODUCT OF THE STARTUP WE'RE EVALUATING.

7    **Q.**   WE JUST HEARD TESTIMONY FROM MR. SCHAEPE, BUT I AM GOING

8    TO ASK YOU, ARE PATENTS IMPORTANT TO VENTURE CAPITALISTS'

9    DECISIONS TO INVEST IN A PARTICULAR COMPANY?

10   **A.**   AMONG OTHER THINGS, A VENTURE CAPITALIST WILL LOOK AT

11   PATENTS, BUT IT IS AMONG A HOST OF OTHER THINGS.  IT IS

12   CERTAINLY NOT IN THE TOP TEN LIST.

13          IT WOULD BE VERY UNUSUAL FOR A PATENT TO BE EVEN

14   DISCUSSED AT A PARTNER MEETING WHERE AN INVESTMENT DECISION WAS

15   BEING MADE.  THERE ARE MANY, MANY OTHER ISSUES WHICH ARE THE

16   SUBJECT OF VERY HEATED DISCUSSION BEFORE THAT LARGE INVESTMENT

17   DECISION IS TAKEN.

18   **Q.**   DO STARTUPS THAT YOU HAVE INVESTED IN, DO THEY EVEN

19   TYPICALLY HAVE PATENTS?

20   **A.**   I WOULD HAVE TO SEARCH MY MEMORY TO RECALL A COMPANY WHICH

21   DID HAVE A PATENT.  MOST DO NOT HAVE PATENTS.

22   **Q.**   THEN HOW DO THEY PROTECT THEIR TECHNOLOGY?

23   **A.**   A VARIETY OF DIFFERENT WAYS.  ONE IS TO MAINTAIN TRADE

24   SECRETS, TO REQUIRE ALL EMPLOYEES AND NEW HIRES TO SIGN

25   AGREEMENTS TO KEEP INFORMATION IN THE COMPANY CONFIDENTIAL, TO

TIMMINS – DIRECT / MS. GRANT

1   REQUIRE CUSTOMERS WHO MAY EVEN BE EVALUATING EARLY STAGE

2   PRODUCTS TO SIGN CONFIDENTIALITY AGREEMENTS THAT THEY WON'T

3   DISCLOSE, AND TO RUN FASTER THAN THE COMPETITION.

4           SO, TO CONTINUOUSLY INNOVATE, TO HIRE THE VERY BEST

5   ENGINEERS, TO INCENT THEM TO PRODUCE SUPERIOR WORK AND TO GET

6   THERE FASTEST WITH THE NEW PRODUCTS.

7   Q.   YOU JUST SAID TO "INCENT THEM," INCENT THE ENGINEERS TO

8   PRODUCE THEIR VERY BEST WORK.

9           WHAT DO YOU MEAN BY THAT?

10  A.   TO GIVE THEM REASONS TO WANT TO PRODUCE THE BEST PRODUCTS

11  AS QUICKLY AS POSSIBLE.  THOSE CAN BE FINANCIAL IN THE FORM OF

12  SALARY, BUT QUITE IMPORTANTLY IN THE FORM OF STOCK OPTIONS,

13  OPTIONS ON THE COMPANY STOCK.

14          BUT THERE ARE OTHER LESS TANGIBLE INCENTIVES AS

15  WELL.  MANY OF THE ENGINEERS WHO WORK IN SILICON VALLEY DO SO

16  BECAUSE THEY ENJOY THE CHALLENGE.  THEY WANT TO BE ASSOCIATED

17  WITH A COMPANY THAT LAUNCHES A PRODUCT BEFORE ANY OTHER

18  COMPETITORS IN THE MARKET.  THAT IS A BADGE OF HONOR TO MANY OF

19  THOSE ENGINEERS.  AND IN SOME CASES THEY WOULD WORK EQUALLY

20  HARD AT IT EVEN IF THERE WAS NO FINANCIAL INCENTIVE.

21          IF YOU THINK ABOUT IT, GIVEN HOW MANY STARTUPS DO

22  NOT SUCCEED, 80 PERCENT OF COMPANIES BACKED BY VENTURE CAPITAL

23  OFTEN DO NOT SUCCEED.  THOSE ENGINEERS WORKED VERY, VERY HARD.

24  THEY PUT THEIR ALL INTO IT, AND THEY WERE DOING IT WITHOUT A

25  FINANCIAL RETURN.

1  Q.  DOES IT MATTER TO VENTURE CAPITALISTS WHETHER OR NOT A

2  COMPANY HAS THE EXCLUSIVE RIGHTS TO ITS TECHNOLOGY?

3  A.  NO, TYPICALLY IT DOES NOT.  THERE ARE MANY COMPANIES, I

4  WOULD NOT HESITATE TO SAY MOST COMPANIES WHICH HAVE ENGAGED IN

5  SOME SORT OF A TRANSACTION THAT RESULTS IN HAVING LESS THAN THE

6  WHOLE LOAF OF TECHNOLOGY RIGHTS.

7          FOR INSTANCE, A COMPANY COULD LICENSE A TECHNOLOGY

8  WHICH IT DEVELOPED TO A MANUFACTURING PARTNER.  THIS IS VERY

9  COMMONPLACE.  A SEMICONDUCTOR COMPONENT COMPANY MIGHT LICENSE

10  THE RIGHT TO MANUFACTURE A DEVICE TO AN ASIAN WAFER

11  MANUFACTURING PARTNER.

12          MANY COMPANIES ARE REQUIRED BY THEIR CUSTOMERS TO

13  LICENSE TECHNOLOGY TO CREATE A SO-CALLED SECOND SOURCE.  A

14  CUSTOMER, SUCH AS CISCO, DOES NOT WANT TO BE OVERLY RELIANT

15  UPON A SINGLE SOURCE SUPPLIER.  AND A CUSTOMER LIKE CISCO COULD

16  DEMAND, AS A CONDITION FOR A LONG-TERM PURCHASE CONTRACT, THE

17  LICENSING OF THAT TECHNOLOGY TO A SECOND MANUFACTURER UNDER

18  CONTROLLED CIRCUMSTANCES, OF COURSE, SO THAT SHOULD THAT FIRST

19  COMPANY GO OUT OF BUSINESS OR SHOULD IT START TO ACT IN A

20  MONOPOLISTIC WAY AND RAISE PRICES OUTRAGEOUSLY, THE CUSTOMER,

21  IN THIS CASE CISCO, WOULD HAVE ALTERNATIVES.

22          TECHNOLOGY IS OFTEN DEVELOPED OUTSIDE A CORPORATION.

23  THE UNIVERSITIES IN THIS AREA ARE FAMOUS FOR DEVELOPING LEADING

24  TECHNOLOGIES, AND THERE ARE OTHER NONUNIVERSITY RESEARCH

25  CENTERS AROUND, AND THEIR TECHNOLOGY IS LICENSED.

1              STANFORD HAS AN OFFICE OF TECHNOLOGY LICENSING WHICH

2    SITS IN A SEPARATE BUILDING OFF THE CAMPUS AND IS VERY BUSY.

3    SOME OF THE MOST FAMOUS PATENTS DEVELOPED BY SCIENTISTS AT

4    STANFORD, LAWYERS PATENTS HAVE BEEN LICENSED MORE THAN 400

5    TIMES.  COMPANIES SAW VALUE IN THOSE PATENTS AND LICENSED THEM

6    EVEN THOUGH THEY HAD ALREADY BEEN LICENSED HUNDREDS OF TIMES

7    BEFORE TO OTHER COMPANIES.

8    **Q.**   SO WHAT DOES THAT MEAN TO PEOPLE THAT DON'T NECESSARILY

9    KNOW EXACTLY THE LICENSING TERMINOLOGY, IF IT HAS BEEN LICENSED

10   400 TIMES, WHAT DOES THAT MEAN?

11   **A.**   THAT MEANS THAT THERE ARE THAT MANY COMPANIES OUT THERE

12   WHO HAVE OBTAINED FROM STANFORD THE NONEXCLUSIVE RIGHT TO USE

13   THAT UNDERLYING TECHNOLOGY IN PRODUCTS.

14   **Q.**   SO 400 COMPANIES, IN ESSENCE, HAVE THE RIGHT TO USE THAT

15   TECHNOLOGY?

16   **A.**   I DON'T KNOW THAT IT'S 400 COMPANIES.  I KNOW THAT THE --

17   THAT THOSE PATENTS, SET OF PATENTS HAVE BEEN LICENSED MORE THAN

18   400 TIMES.

19   **Q.**   SO IF EXCLUSIVE RIGHTS AREN'T IMPORTANT TO PEOPLE IN YOUR

20   BUSINESS, WHAT TYPE OF RIGHTS ARE?

21   **A.**   WELL, NOT BEING PRECLUDED FROM --

22   **Q.**   THE AIR CONDITIONING JUST WENT ON?  NOT BEING, I'M SORRY.

23   **A.**   NOT BEING PRECLUDED FROM USING THE TECHNOLOGY.  SO NOT

24   FACING A COMPETITOR WHICH DOES HAVE EXCLUSIVE RIGHTS.

25   **Q.**   OKAY.  AND WHY IS THAT IMPORTANT?

TIMMINS – DIRECT / MS. GRANT

1    **A.**    POTENTIALLY THAT COMPETITOR COULD CREATE A ROAD BLOCK,

2    SOME SORT OF A BARRIER TO DEVELOPMENT OF THE PRODUCT WHICH THE

3    INVESTED COMPANY IS CONSIDERING.

4    **Q.**    DOES FILING A PATENT GET YOU EXCLUSIVE RIGHTS OR MUST A

5    COMPANY DO SOMETHING ELSE?

6    **A.**    WELL, I DON'T KNOW THAT FILING A PATENT GETS YOU ANYTHING

7    OTHER THAN A RECORD THAT THE PATENT HAS BEEN FILED.

8            **MR. JANSEN:**  OBJECTION, YOUR HONOR, THIS CALLS FOR

9    LEGAL CONCLUSIONS.

10           **THE COURT:**  REPHRASE.

11   **BY MS. GRANT:**

12   **Q.**    IN YOUR EXPERIENCE, HOW DOES A COMPANY, IF ONE WANTED

13   EXCLUSIVE RIGHTS, HOW DOES ONE ACHIEVE THAT GOAL?

14           **MR. JANSEN:**  OBJECTION, YOUR HONOR, THIS IS ALSO

15   OUTSIDE THE SCOPE.

16           **THE COURT:**  OBJECTION IS OVERRULED.

17           **THE WITNESS:**  DOES THIS PERTAIN TO A TECHNOLOGY THAT

18   COULD BE PATENTED OR NOT?

19   **BY MS. GRANT:**

20   **Q.**    YES.

21   **A.**    YES.  THEN, AS I UNDERSTAND IT, AND THIS IS FROM

22   DISCUSSIONS WITH INTELLECTUAL PROPERTY WITH PATENT ATTORNEYS AT

23   BOARD MEETINGS AND IN OTHER VENUES --

24           **MR. JANSEN:**  OBJECTION, YOUR HONOR, COUNSEL IS

25   RESTATING LEGAL OPINIONS.

1              **THE COURT:**  NO, HE'S STATING PRACTICES THAT COME OUT

2    OF THESE DISCUSSIONS.  HE CAN STATE THAT.  IT DOESN'T -- HE IS

3    NOT A LAWYER AND HE IS NOT GIVING YOU INSTRUCTIONS ON THE LAW,

4    HE IS JUST TELLING YOU THE BASIS FOR HIS OPINIONS ABOUT THE

5    PRACTICES OF VENTURE CAPITALISTS.

6              SO, GO AHEAD.

7              **THE WITNESS:**  THANK YOU.

8              THE DISCUSSIONS THAT HAVE TAKEN PLACE IN BOARD

9    MEETINGS, WHICH I HAVE ATTENDED INCLUDE THE DECISION, AS A

10   STRATEGIC DECISION, TO PURSUE PATENTING CERTAIN TECHNOLOGY THAT

11   HAS BEEN DEVELOPED BY THE COMPANY, BUT THAT'S TYPICALLY A PART

12   OF A LARGER SET OF INITIATIVES WHICH INCLUDE THE CONTINUED

13   EFFORTS TO DEVELOP ADDITIONAL TECHNOLOGY.  IN OTHER WORDS, TO

14   GET THERE FASTER WITH SOMETHING BETTER, TO MAINTAIN TRADE

15   SECRETS, TO KEEP A BODY OF KNOWLEDGE WITHIN THE EMPLOYEES OF

16   THE COMPANY.  AND SO IT IS USUALLY PART OF A LARGER PROGRAM.

17   **BY MS. GRANT:**

18   **Q.**  IN ALL OF THE, I THINK YOU SAID 27 YEARS OF VENTURE

19   CAPITAL FUNDING THAT YOU'VE BEEN A PART OF, HAVE YOU EVER SEEN

20   A DEAL NOT GO FORWARD BECAUSE OF A LACK OF EXCLUSIVE RIGHTS?

21   **A.**  NO.  WE HAVE CERTAINLY EVALUATED A GOOD NUMBER OF DEALS

22   WHERE THE COMPANY WHICH WE WERE CONSIDERING FUNDING DID NOT

23   HAVE EXCLUSIVE RIGHTS AND THAT WAS PART OF THE OVERALL

24   EVALUATION.  BUT WE NEVER DECIDED NOT TO PROCEED WITH AN

25   INVESTMENT BECAUSE THAT COMPANY DID -- LACKED EXCLUSIVE RIGHTS.

TIMMINS - DIRECT / MS. GRANT

1    Q.   DO YOU UNDERSTAND THAT ONE OF THE CLAIMS IN THIS CASE IS

2    THAT INVESTORS WOULD NOT HAVE INVESTED IN LIGHTLOGIC UNLESS IT

3    HAD EXCLUSIVE RIGHTS?

4    A.   YES.  I HAVE SEEN THAT REPRESENTATION.

5    Q.   DO YOU AGREE?

6    A.   I DISAGREE QUITE STRONGLY.

7    Q.   CAN YOU TELL THE JURY WHY?

8    A.   AS I WAS SAYING EARLIER, IT'S A VERY COMMON BUSINESS

9    PRACTICE, NOT JUST AMONG STARTUP COMPANIES IN SILICON VALLEY,

10   BUT AMONG COMPANIES IN GENERAL, TO DEAL WITH TECHNOLOGY WHICH

11   THEY DO NOT OWN EXCLUSIVELY.  EITHER THE COMPANY CONCERNED

12   DEVELOPED THE TECHNOLOGY AND THEN LICENSED OR OTHERWISE DEALT

13   AWAY SOME RIGHTS TO IT, OR IT DID NOT DEVELOP THE TECHNOLOGY IN

14   THE FIRST PLACE, THE TECHNOLOGY WAS DEVELOPED AT A UNIVERSITY

15   OR AT ANOTHER CORPORATION, AND THE SUBJECT IN THE PORTFOLIO

16   COMPANY THEN OBTAINED THE RIGHTS BY LICENSE OR SOME OTHER

17   MEANS.

18            SO THERE'S A LOT OF HORSE TRADING OF RIGHTS THAT

19   TAKES PLACE EVERY DAY IN THE COMMERCIAL MARKETPLACE, AND IT'S

20   OUR JOB, AS POTENTIAL A INVENTOR, TO EVALUATE WHETHER THERE ARE

21   ENOUGH RIGHTS OBTAINED OR ENOUGH RIGHTS RETAINED TO PROCEED

22   WITH THE BUSINESS PLAN, BUT WE DON'T NEED A PERFECT SET OF

23   RIGHTS.  WE DON'T NEED ABSOLUTELY EVERY RIGHT IN THE UNIVERSE

24   TO PROCEED.

25   Q.   IF YOU CAME ACROSS -- ARE YOU AWARE OF THE PLAN OF

TIMMINS – DIRECT / MS. GRANT

1    LIQUIDATION IN THIS CASE?

2    **A.**   YES.  I HAVE REVIEWED THAT DOCUMENT.

3    **Q.**   IN YOUR INVESTMENT, IF YOU CAME ACROSS A COMPANY THAT HAD

4    A SIMILAR AGREEMENT, WHERE ONE COMPANY HAD THE RIGHT TO USE AND

5    ANOTHER COMPANY HAD THE RIGHT TO USE, WHAT WOULD THAT MEAN TO

6    YOU?

7    **A.**   TO THE COMPANY IN WHICH I WAS CONSIDERING AN INVESTMENT?

8    **Q.**   YES.

9    **A.**   WELL, I THINK YOU'VE STATED THE POINT ALREADY, THAT THAT

10   COMPANY HAD THE RIGHT TO USE.  I WOULD THEN MAKE A BUSINESS

11   DECISION AS DISTINCT FROM A LEGAL DECISION ABOUT WHETHER THAT

12   RIGHT WAS ADEQUATE, AND I WOULD EXAMINE THE OTHER HOLDER OF THE

13   OTHER RIGHT AS A POTENTIAL COMPETITOR.

14   **Q.**   WELL, LET'S TURN TO MR. SHUM'S ATTEMPT TO OBTAIN VENTURE

15   FUNDING FOR HIS NEW COMPANY AFTER RADIANCE DISSOLVED.

16           DO YOU KNOW THE NAME OF MR. SHUM'S COMPANY THAT HE

17   FORMED?

18   **A.**   WAS IT A COMPANY?

19           IT WAS AN ENTITY OF SOME SORT, YES.

20   **Q.**   OKAY.

21   **A.**   LUMINANCE.  YES.

22   **Q.**   DID YOU REVIEW THE BUSINESS PLAN FOR THAT BUSINESS ENTITY,

23   LUMINANCE?

24   **A.**   I WAS PROVIDED WITH AT LEAST ONE WORD DOCUMENT AND

25   POSSIBLY A COUPLE OF SLIDE PRESENTATIONS.

TIMMINS – DIRECT / MS. GRANT

1          AND I WOULD TAKE THOSE TOGETHER TO BE THE BUSINESS

2     PLAN, YES.

3     Q.   WHY DON'T WE TAKE A LOOK AT EXHIBIT 313.

4          **MS. GRANT:**  MAY I APPROACH, YOUR HONOR?

5          **THE COURT:**  YOU MAY.

6     **BY MS. GRANT:**

7     Q.   I AM HANDING YOU WHAT HAS BEEN MARKED 313, WHICH IS REALLY

8     HARD TO SEE THE DATE.  IT IS FEBRUARY 15, 1998.

9     A.   THANK YOU.

10    Q.   AND IS THIS ONE OF THE BUSINESS PLANS THAT YOU REVIEWED IN

11    CONNECTION WITH YOUR WORK IN THIS CASE?

12    A.   IT LOOKS FAMILIAR, YES.

13         **MS. GRANT:**  GO AHEAD AND PUT IT ON THE SCREEN, JEFF.

14         (EXHIBIT DISPLAYED ON SCREEN.)

15    **BY MS. GRANT:**

16    Q.   AND BASED --

17         **MR. JANSEN:**  YOUR HONOR, THIS ISN'T IN EVIDENCE, I

18    DON'T BELIEVE.  THIS IS NOT IN EVIDENCE.

19         **THE COURT:**  IS IT?

20         **THE CLERK:**  NO.

21    **BY MS. GRANT:**

22    Q.   LET ME ASK YOU THIS WAY.  YOU REVIEWED MR. SHUM'S BUSINESS

23    PLAN FOR LUMINANCE?

24    A.   YES, I DID.

25    Q.   BASED ON YOUR EXPERIENCE IN VENTURE CAPITAL FUNDING, WAS

1    MR. SHUM'S COMPANY A GOOD CANDIDATE FOR VENTURE CAPITAL

2    FINANCE?

3    **A.**    BASED ON MY EXPERIENCE, NO, IT WAS NOT.

4    **Q.**    CAN YOU TELL THE JURY WHY NOT?

5    **A.**    IN THE COURSE OF A YEAR, A VENTURE CAPITALIST MIGHT SEE 20

6    TO 50, PERHAPS IN SOME CASES AS MANY AS A HUNDRED BUSINESS

7    PLANS.  AND AS A VENTURE CAPITALIST, I DEVELOPED A SENSE OF

8    WHAT WAS LIKELY TO PROVE TO BE INTERESTING ON A FURTHER

9    EXAMINATION AND WHAT DIDN'T MERIT ANYTHING BEYOND A QUICK FIRST

10   READING.

11           THIS BUSINESS PLAN, THIS SET OF SLIDES THAT WERE

12   DOCUMENT -- WITH WHICH I WAS PROVIDED, FALL INTO THAT LATTER

13   CATEGORY AS BEING WORTH A LOOK BECAUSE IT WAS A HOT MARKET AT

14   THE TIME, BUT THEN ON FURTHER -- A FAIRLY SUMMARY FURTHER

15   EXAMINATION NOT BEING WORTH ANY ADDITIONAL TIME.

16   **Q.**    WHY DO YOU SAY THAT?

17   **A.**    WELL, THERE WERE SEVERAL THINGS ABOUT THE DOCUMENT THAT

18   STRUCK ME, JUST ON MY FIRST READING OF IT, THAT WOULD HAVE IN

19   ALL LIKELIHOOD STRUCK ME IF I WERE REVIEWING IT AT THAT TIME.

20           ONE WAS THE SINGLE FOUNDER AND THE LACK OF A

21   MANAGEMENT TEAM.  THE FOUNDER HAD A PURE ENGINEERING

22   BACKGROUND, NO BUSINESS EXPERIENCE WHATSOEVER.  THAT'S NOT AN

23   ABSOLUTE STRIKE AGAINST SOMEONE, BUT IT'S CERTAINLY SOMETHING

24   THAT IS CAUTIONARY.

25           BEYOND THAT, THE TECHNOLOGY WHICH WAS BEING PROMOTED

1    AND THE IMPROVEMENTS IN MANUFACTURING EFFICIENCY AND IN COST

2    THAT WERE BEING PROMISED WEREN'T OF THE SUFFICIENT SCALE TO BE

3    INTERESTING.  THIS IS A LITTLE BIT HARD TO EXPLAIN, SO PLEASE

4    BEAR WITH ME ON THIS.

5            MANY PEOPLE WILL HAVE HEARD OF MOORE'S LAW, WHICH

6    WAS DEVELOPED BY ONE OF THE FOUNDERS OF INTEL, WHICH STATES

7    THAT EVERY COUPLE OF YEARS THE NUMBER OF SEMICONDUCTOR

8    MICROPROCESSORS OR OTHER DEVICES THAT CAN BE PUT ON AN

9    INTEGRATED CIRCUIT DOUBLES.

10           SO WE ARE TALKING ABOUT VERY SUBSTANTIAL

11   IMPROVEMENTS IN TECHNOLOGY IN VERY SHORT AMOUNTS OF TIME.  THE

12   OPTICAL COMPONENT BUSINESS HAD NOT ARRIVED AT THE SAME LEVEL OF

13   INTEGRATION AS THE SEMICONDUCTOR COMPONENTS BUSINESS DURING

14   THIS PERIOD OF TIME, IN THE LATE 1990'S OR AROUND 2000, BUT IT

15   WAS EXPECTED TO MOVE IN THAT DIRECTION.

16           SO THE IMPROVEMENT THAT WOULD BE EXPECTED FROM

17   ADOPTING A NEW TECHNOLOGY WOULD HAVE TO BE SUBSTANTIALLY

18   GREATER THAN WAS BEING PROMISED BY MR. SHUM IN THIS, IN THIS

19   BUSINESS PLAN.  IN OTHER WORDS, A CUSTOMER, A CISCO-TYPE

20   CUSTOMER, TO GO THROUGH ALL THE PAIN AND AGGRAVATION OF

21   EXAMINING AND QUALIFYING A DEVICE WOULD WANT THERE TO BE ENOUGH

22   POTENTIAL GAIN FOR IT ON THE OTHER SIDE OF THAT PROCESS TO MAKE

23   THAT PROCESS WORTHWHILE.  AND THE INCREMENTAL PROGRESS THAT WAS

24   BEING PROMISED BY MR. SHUM IN THIS PRESENTATION WAS NOT ON THAT

25   ORDER OF MAGNITUDE.

TIMMINS – DIRECT / MS. GRANT

1        THAT'S ESPECIALLY INTERESTING BECAUSE MOST

2   ENTREPRENEURS, WHEN THEY ARE PROVIDING A BUSINESS PLAN TO

3   VENTURE CAPITALISTS FOR A STARTUP COMPANY, IN ESSENCE, OVER

4   PROMISE.  THEY PROMISE MORE THAN THEY CAN HUMANLY DELIVER.  AND

5   SO WE LOOK AT THOSE PROMISES AND TAKE THEM WITH A GRAIN OF

6   SALT.  WE KNOCK THEM DOWN A BIT KNOWING THAT HUMANS AREN'T

7   CAPABLE OF THE SORT OF SUPER HUMAN TASKS THAT ARE BEING

8   CONTEMPLATED IN A BUSINESS PLAN.

9        THIS BUSINESS PLAN DIDN'T EVEN PROMISE ANYTHING THAT

10  MARVELOUS.  AND EVEN SO, I WOULD STILL HAVE TO KNOCK IT DOWN

11  SOME BECAUSE PEOPLE DON'T USUALLY ATTAIN EVERYTHING THAT THEY

12  THINK THAT THEY CAN.

13  Q.   DID YOU CONSIDER ANY OF WHAT MR. SHUM DID TO MEET WITH

14  INVESTORS AS PART OF YOUR OPINION IN THIS CASE?

15  A.   I DID.  I READ HIS DEPOSITION TRANSCRIPTS ABOUT HIS

16  EFFORTS WITH INVESTORS.

17  Q.   DID YOU DRAW ANY OPINIONS OR CONCLUSIONS AS A RESULT OF

18  WHAT MR. SHUM TESTIFIED HE DID WITH REGARD TO MEETING WITH

19  INVESTORS?

20  A.   YES.  THE DEPOSITION TRANSCRIPTS SUGGESTED THAT HE MET

21  ONLY WITH TWO VENTURE CAPITALISTS, AND I THINK BOTH OF THEM

22  WERE FROM TAIWAN, NOT EVEN FROM THE UNITED STATES, WHICH STRUCK

23  ME AS NOT VERY MUCH EFFORT.

24        A TYPICAL STARTUP ENTREPRENEUR CAN EXPECT TO MEET

25  WITH 20 OR 30 OR EVEN 50 VENTURE CAPITALISTS IN THE COURSE OF

TIMMINS – DIRECT / MS. GRANT

1   ATTEMPTING TO RAISE MONEY.  AND IT'S A HARD EFFORT.  IT'S A

2   FULL-TIME JOB FOR SOMEONE TO GO OUT AND ATTEMPT TO RAISE MONEY

3   FOR THE FIRST TIME.

4            TO ONLY MEET WITH TWO IS A PRETTY HALF-HEARTED

5   EFFORT, IN MY ESTIMATION.

6   **Q.**   SO ARE PERSISTENCE AND INITIATIVE IMPORTANT THEN?  ARE

7   VENTURE CAPITALISTS LOOKING FOR THAT?

8   **A.**   THOSE ARE SOME OF THE QUALITIES THAT WE ARE LOOKING FOR IN

9   A POTENTIAL ENTREPRENEUR, POTENTIAL MANAGER OF A COMPANY, YES.

10  **Q.**   WHY ARE YOU LOOKING FOR THOSE QUALITIES?

11  **A.**   BECAUSE, AS I SAID EARLIER TODAY, STARTUPS ARE HARD.  MANY

12  OF THEM NEARLY DIE SOMETIMES SEVERAL TIMES ON THEIR WAY TO

13  SUCCESS.  AND WE ARE LOOKING FOR PEOPLE WHO HAVE THIS SORT OF

14  DRIVE AND INITIATIVE AND UNWILLINGNESS TO ADMIT FAILURE WHO CAN

15  OVERCOME THAT SORT OF ADVERSITY.

16  **Q.**   ARE THERE EVENTS THAT ENTREPRENEURS CAN GO TO WHERE THEY

17  CAN MEET VENTURE CAPITALISTS?

18  **A.**   YES.  THERE ARE SOME EVENTS EXPLICITLY DESIGNED TO MEET

19  VENTURE CAPITALISTS.  AND THERE ARE ALSO INDUSTRY EVENTS, WHILE

20  NOT DESIGNED TO MEET VENTURE CAPITALISTS, PROVIDE A GOOD FORUM

21  FOR MEETING VENTURE CAPITALISTS.

22            ONE SUCH EVENT FOR THIS MARKET, THE OPTICAL

23  COMPONENTS MARKET, IS AN ANNUAL CONFERENCE CALLED OFC.  BY THIS

24  TIME, THE LATE 1990'S, 2000 IT HAD BECOME A VERY LARGE EVENT.

25  ALMOST EVERY VENTURE CAPITALIST WHO WAS INTERESTED IN THIS

1    MARKET AT THE TIME WOULD BE IN THE HABIT OF ATTENDING THIS

2    CONFERENCE.  I KNOW I WAS.  I ATTENDED IT QUITE CONSISTENTLY

3    FOR A NUMBER OF YEARS.  AND I WAS FREQUENTLY PURSUED IN THE

4    HALLWAYS OF THE CONFERENCE, WHICH I TOOK AS A SIGN OF THE SORT

5    OF INITIATIVE FOR WHICH I AM LOOKING FOR IN ENTREPRENEURS.  I

6    WAS FREQUENTLY STOPPED.

7         WE WEAR VERY VISIBLE BADGES, JUST LIKE THE JURORS

8    HERE ARE WEARING VERY VISIBLE BADGES.  THEY ARE EVEN

9    COLOR-CODED TO INDICATE THAT WE ARE INVESTORS.  SO IT'S PRETTY

10   EASY FOR ENTREPRENEURS AND WOULD-BE ENTREPRENEURS TO FIND US

11   AND STOP US IN THE HALLWAY.

12   Q.  SINCE YOU REVIEWED MR. SHUM'S TESTIMONY, DID HE TESTIFY

13   ABOUT MAKING ANY SUCH EFFORTS TO PURSUE INVESTORS AT THESE

14   CONFERENCES?

15   A.  I KNOW THAT IN ONE CASE RIGHT AROUND THE TIME THAT HE WAS

16   CREATING THESE POWER POINT PRESENTATIONS AND THIS BUSINESS

17   PLAN, HE HAD ATTENDED OFC, BUT THERE WAS NOTHING IN EITHER HIS

18   E-MAIL COMMUNICATION AT THE TIME OR HIS DEPOSITION TRANSCRIPT

19   THAT INDICATED THAT HE HAD APPROACHED VC'S THERE.

20   Q.  YOU MENTIONED E-MAIL.

21        MS. GRANT:  CAN WE HAVE 2516 ON THE SCREEN?  IT'S IN

22   EVIDENCE.

23        (EXHIBIT DISPLAYED ON SCREEN.)

24   BY MS. GRANT:

25   Q.  THIS IS AN E-MAIL THAT MR. SHUM WROTE TO HIS SISTER IN

TIMMINS – DIRECT / MS. GRANT

1   MARCH 8, 1998.  THE JURY HAS SEEN THIS BEFORE, MR. TIMMINS.

2            DID YOU CONSIDER THIS E-MAIL IN REACHING YOUR

3   OPINIONS IN THIS CASE?

4   **A.**   THAT WAS AN E-MAIL WHICH I REVIEWED, YES.

5   **Q.**   WAS THERE ANYTHING THAT YOU FOUND THAT WAS SIGNIFICANT

6   ABOUT THIS E-MAIL TO YOUR OPINIONS?

7   **A.**   YES.

8            IN THE SECOND TO LAST SENTENCE ABOVE THE BULLET

9   POINTS, SO THE SECOND TO LAST SENTENCE IN THE FIRST PARAGRAPH.

10            **MS. GRANT:**  WHY DON'T WE BLOW UP THE FIRST

11   PARAGRAPH, JEFF, SO YOU DON'T STRAIN YOUR EYES.  THAT'S STILL

12   LOOKING PRETTY SMALL.

13            DO WE HAVE EXHIBIT 2516?  HERE YOU GO.

14            MAY I APPROACH, YOUR HONOR?

15            **THE COURT:**  YOU MAY.

16            **THE WITNESS:**  YES.  IN THIS E-MAIL, IN THAT FIRST

17   PARAGRAPH, MR. SHUM MENTIONED THAT HE DID NOT BELIEVE THAT HE

18   HAD A UNIQUE ENOUGH PRODUCT OR TECHNOLOGICAL ADVANTAGE TO

19   JUSTIFY TAKING THE RISK.  HE DIDN'T HAVE CONTROL OF THE RAW

20   CHIP SUPPLY.

21            AND ONE OF THE LEADING SUPPLIERS AT THE TIME AT

22   UNIPHASE, WHICH LATER BECAME PART OF JDSU, WAS RELUCTANT TO

23   SELL RAW CHIPS TO OUTSIDERS AND, IN EFFECT, CREATE COMPETITORS.

24            SO, I THINK THIS WAS, AT THAT TIME, ESSENTIALLY HIS

25   SURRENDER IN THE MARKETPLACE.

1    **BY MS. GRANT:**

2    **Q.**    NOW, I WANT TO GO TO YOUR FINAL OPINION IN THIS CASE.

3    YOU –– DID YOU CONSIDER THE TESTIMONY OF MR. LASINSKI WHO USED

4    AN AVERAGE RATE OF RETURN TO CALCULATE DAMAGES IN THIS CASE?

5    **A.**    I DID, YES.

6    **Q.**    CAN YOU JUST EXPLAIN, SO THE JURY UNDERSTANDS, WHAT THIS

7    CONCEPT AVERAGE RATE OF RETURN IS?

8    **A.**    YES.

9              WE DISCUSSED THIS A LITTLE EARLIER TODAY.  A TYPICAL

10   VENTURE CAPITAL FIRM WILL MAKE A SERIES OF INVESTMENTS OVER

11   TIME.  AT THE END OF IT, THIS IS KNOWN AS A PORTFOLIO OF

12   INVESTMENTS.

13             AND THE THEORY BEHIND THIS IS THAT BY HAVING A

14   SIGNIFICANT NUMBER OF INVESTMENTS, RATHER THAN JUST ONE OR TWO

15   OR A FEW INVESTMENTS, ONE GAINS THE ADVANTAGE OF THE PORTFOLIO,

16   AND THAT IS, THAT THERE BE SOME WINNERS IN THE PORTFOLIO WHICH

17   WILL HELP PAY FOR THE LOSERS.

18             THERE HAS ACTUALLY BEEN VERY EXTENSIVE RESEARCH

19   AROUND THIS AND THERE'S A WHOLE BODY OF KNOWLEDGE CALLED

20   PORTFOLIO THEORY AROUND IT.

21             IN ANY EVENT, IN A TYPICAL VENTURE CAPITAL PORTFOLIO

22   LONG–TERM RESEARCH HAS SHOWN THAT ABOUT ONE IN FIVE COMPANIES

23   GOES ON TO SOME FORM OF SUCCESS.  SUCCESS IS RATHER LOOSELY

24   DEFINED.  IT MAY MEAN AS LITTLE AS A COUPLE OF TIMES RETURN ON

25   ORIGINAL INVESTMENT.  AND THE OTHER FOUR AND FIVE, SO

TIMMINS - DIRECT / MS. GRANT

1    80 PERCENT, GO ON TO FAILURE.  AND, AGAIN, FAILURE IS A BIT

2    LOOSELY DEFINED.  IT DOESN'T NECESSARILY MEAN LOSS OF ALL OF

3    THE MONEY.  IT MAY MEAN A RETURN OF ONLY PART OF THE MONEY, BUT

4    THAT IS AKIN TO FAILURE IN THE VENTURE CAPITAL WORLD BECAUSE

5    VERY HIGH RATES OF RETURN ARE EXPECTED BY THE INVESTORS IN

6    VENTURE CAPITAL FUNDS.

7            SO, TO OBTAIN A RATE OF RETURN ACROSS THE PORTFOLIO

8    THAT AVERAGES SOME VERY SIGNIFICANT NUMBER, 20 OR 30 PERCENT,

9    THERE WOULD HAVE TO BE SOME VERY SPECTACULAR WINS IN THE

10   PORTFOLIO, COMPANIES WHICH GENERATE RETURNS OF SEVERAL HUNDRED

11   PERCENT TO MAKE UP FOR THE OTHER COMPANIES IN THE PORTFOLIO

12   THAT HAVE NOT GENERATED ANY RETURNS OR GENERATED VERY, VERY LOW

13   RETURNS.

14           YOU CAN DO THE NUMBERS IN YOUR HEAD AND QUICKLY COME

15   TO THE CONCLUSION THAT, YES, IF YOU'VE GOT A BUNCH OF ZEROS OR

16   FIVES, YOU NEED SOME HUNDREDS AND TWO HUNDREDS AND THREE

17   HUNDREDS TO GET TO AN OVERALL AVERAGE OF 20 OR 30 PERCENT.

18           NOW, THE WORK BY MR. --

19       **MR. JANSEN:**  YOUR HONOR, I THINK THE WITNESS HAS

20   ANSWERED THE QUESTION.

21       **MS. GRANT:**  I CAN ASK AN ANOTHER.

22       **MR. JANSEN:**  I THINK HE HAS GONE PAST --

23       **MS. GRANT:**  I WILL ASK ANOTHER QUESTION.

24   **BY MS. GRANT:**

25   **Q.**   YOU TALKED ABOUT THE AVERAGE RATE OF RETURN, AND YOU'VE

TIMMINS – DIRECT / MS. GRANT

1    EXPLAINED WHAT IT IS FOR THE JURY.

2              AND CAN YOU TELL US, DID YOU FORM AN OPINION ABOUT

3    MR. LASINSKI USING AVERAGE RATE OF RETURN IN THIS CASE?

4              **MR. JANSEN:**  YOUR HONOR, THAT GETS INTO ACCOUNTING

5    METHODOLOGY.

6              **THE COURT:**  HE CAN GIVE AN OPINION AS TO HOW HE

7    WOULD MAKE SUCH A CALCULATION.  AND THEN YOU CAN MAKE

8    COMPARISONS, BUT ASK HIM ABOUT HIS CALCULATION, NOT ABOUT

9    SOMEBODY ELSE.

10             **MS. GRANT:**  THANK YOU, YOUR HONOR.

11   **BY MS. GRANT:**

12   Q.   WHAT CALCULATION WOULD YOU HAVE USED IN THIS CASE?

13             **MR. JANSEN:**  YOUR HONOR, THE WITNESS WASN'T RETAINED

14   TO WORK ON DAMAGES.  HE'S NOT AN ACCOUNTANT OR CPA.

15             **THE COURT:**  IT'S A QUESTION IN TERMS OF HOW, IF AT

16   ALL, THIS FITS IN WITH VENTURE CAPITALIST FUNDING PRACTICE.  IF

17   IT IS PART OF HIS PRACTICE THAT USES THIS KIND OF INFORMATION

18   OR ANALYSIS, LET'S FIND OUT ABOUT IT.  THEN YOU CAN ASK.

19   **BY MS. GRANT:**

20   Q.   IN YOUR VENTURE CAPITAL PRACTICE, WOULD YOU USE AVERAGE

21   RATE OF RETURN OR A DIFFERENT METHODOLOGY?

22             **MR. JANSEN:**  YOUR HONOR, INCOMPLETE QUESTION.  I AM

23   NOT SURE WHAT THE QUESTION IS GOING TO.

24             **THE COURT:**  THE QUESTION IS ALL RIGHT.  YOU CAN GO

25   AHEAD.

TIMMINS – DIRECT / MS. GRANT

1          **THE WITNESS:** EVERY COMPANY, WHICH A VENTURE CAPITAL

2     FIRM DECIDES TO FUND, IS PROSPECTIVELY A BIG WINNER.  A VENTURE

3     CAPITAL FIRM WOULD NEVER START OUT THE PROCESS OF INVESTMENT

4     THINKING THAT THE COMPANY IS GOING TO BE A LOSER OR JUST A

5     MEDIOCRE PERFORMER.

6          SO WE HOPE ALL OF THE COMPANIES WILL BE A WINNER,

7     WILL BE WINNERS, EVEN THOUGH WE KNOW THAT A GOOD PORTION OF

8     THEM, AND AS MUCH AS 80 PERCENT, WILL NOT BE.

9          WITH THAT IN MIND, WE HAVE A VERY HIGH TARGET RATE

10    OF RETURN FOR EACH INVESTMENT.  WE LOOK AT EACH INVESTMENT AND

11    ATTEMPT TO FORECAST WHAT THE OUTCOME WILL BE, WHETHER THIS IS A

12    CANDIDATE FOR AN INITIAL PUBLIC OFFERING, AN IPO, OR AN

13    EVENTUAL SALE.  AND IF SO, HOW LONG WILL THAT TAKE, AND WHAT

14    THE FINANCIAL PRICE MIGHT BE.

15         TO THAT END, WE OFTEN HAVE SO-CALLED TARGET RATE OF

16    RETURN IN MAKING AN INVESTMENT.  AND A TARGET RATE OF RETURN

17    WILL BE MUCH, MUCH HIGHER THAN AN AVERAGE RATE OF RETURN FOR A

18    PORTFOLIO BECAUSE, AGAIN, THE LOSERS WILL PULL DOWN THE

19    ULTIMATE RATE OF RETURN.

20         SO TO ACHIEVE AN AVERAGE RATE OF RETURN OF 20 TO

21    30 PERCENT, WE WILL HAVE TARGET RATES OF RETURN OF AT LEAST

22    50 PERCENT, OFTEN SEVERAL HUNDRED PERCENT.  AND IT IS IN THAT

23    CONTEXT THAT ONE SHOULD USE THE MUCH HIGHER RATES OF RETURN IN

24    ANALYZING THE OUTCOME AT LIGHTLOGIC.

25

1    **BY MS. GRANT:**

2    **Q.**   WOULD IT BE POSSIBLE -- ASK IT THIS WAY.

3              IS THERE AN ACTUAL RATE OF RETURN THAT IS ASSOCIATED

4    WITH WHAT THE INVESTORS GOT AT LIGHTLOGIC?

5    **A.**   YES.

6              **MR. JANSEN:**  OBJECTION, YOUR HONOR.

7              **THE WITNESS:**  ACTUAL RATES OF RETURN FOR --

8              **MR. JANSEN:**  -- THIS IS OUTSIDE THE SCOPE OF HIS --

9              **THE COURT:**  IT IS OVERRULED.

10             GO AHEAD.

11             **MS. GRANT:**  GO AHEAD.

12             **THE WITNESS:**  I AM SORRY?

13   **BY MS. GRANT:**

14   **Q.**   GO AHEAD.

15   **A.**   CAN YOU ASK THE QUESTION AGAIN?

16   **Q.**   SURE.

17             WE TALKED ABOUT NOW AVERAGE RATES OF RETURN.  YOU

18   MENTIONED TARGET RATES OF RETURN.  MY QUESTION WAS, ARE THERE

19   ACTUAL RATES OF RETURN THAT THE INVESTORS GOT?

20   **A.**   YES.  THOSE ARE VERY EASY TO CALCULATE.  WE KNOW THE DATES

21   ON WHICH EVERY SERIES OF STOCK, EVERY STOCK INVESTMENT WERE

22   FUNDED.  WE KNOW THE DATES ON WHICH THE RETURNS WERE RECEIVED,

23   THE PAYOUT FROM INTEL, AND WE KNOW THE AMOUNTS PAID AT THE

24   BEGINNING AND THE AMOUNTS RECEIVED AT THE END.

25             THOSE ARE VERY SIMPLE MATHEMATICAL CALCULATIONS TO

1   DERIVE THE INTERNAL RATES OF RETURN FOR THOSE INVESTMENTS.

2   **BY MS. GRANT:**

3   **Q.**   DID MR. LASINSKI USE THE ACTUAL RATES OF RETURNS THE

4   INVESTORS GOT?

5   **A.**   HE DID NOT, NO.

6   **Q.**   AND YOU DID FORM AN OPINION ABOUT THAT IN YOUR EXPERT

7   REPORT, CORRECT?

8   **A.**   I DID, YES.

9           **MR. JANSEN:**  YOUR HONOR --

10          **THE COURT:**  REPHRASE YOUR QUESTION.

11          **MS. GRANT:**  SURE.

12  **BY MS. GRANT:**

13  **Q.**   IF YOU HAD USED THE ACTUAL RATE OF RETURN, WOULD THAT

14  DIFFER FROM THE AVERAGE RATE OF RETURN?

15  **A.**   YES.

16          **MR. JANSEN:**  YOUR HONOR, NOW WE ARE GETTING INTO THE

17  ACCOUNTING METHODOLOGY USED BY MR. LASINSKI.  I THINK IT'S

18  NOT --

19          **MS. GRANT:**  IT'S NOT ACCOUNTING.

20          **THE COURT:**  IT IS A QUESTION ABOUT HOW, IF AT ALL,

21  THIS IS USED IN YOUR PRACTICE IN MAKING FUNDING DECISIONS.  SO

22  THAT YOU CAN RELATE IT TO THAT AND IF THERE'S A PRACTICE AND

23  EXPERIENCE, TELL US ABOUT IT.

24          **THE WITNESS:**  YES.  WE WOULD NEVER MAKE AN

25  INVESTMENT DECISION USING AVERAGE RATES OF RETURN FOR THE

TIMMINS – DIRECT / MS. GRANT

1    INDUSTRY.  WE ALWAYS USE THE MUCH HIGHER TARGET RATES OF RETURN

2    THAT ARE NECESSARY BECAUSE A GOOD NUMBER OF COMPANIES WILL FALL

3    OUT ALONG THE WAY AND THE WINNERS HAVE TO PAY FOR THE LOSERS.

4    **BY MS. GRANT:**

5    **Q.**    WHY WOULD YOU USE THE ACTUAL RATE OF RETURN?

6    **A.**    IN EXAMINING THIS CASE?

7    **Q.**    YES.

8    **A.**    IT'S VERY SIMPLE --

9              **MR. JANSEN:**  YOUR HONOR --

10             **THE WITNESS:**  -- BECAUSE THE NUMBERS ARE AVAILABLE.

11             **MR. JANSEN:**  THIS MISSTATES THE EVIDENCE.

12             **THE COURT:**  OVERRULED.  HE CAN ANSWER THAT QUESTION.

13   **BY MS. GRANT:**

14   **Q.**    YOU SAID YOU WOULD ABSOLUTELY USE THE ACTUAL RATES OF

15   RETURN AS OPPOSED TO THE AVERAGE INDUSTRY AVERAGE RATES OF

16   RETURN WHY?

17   **A.**    BECAUSE THE NUMBERS ARE AVAILABLE.  WHY USE A THEORETICAL

18   MODEL WHEN THE ACTUAL RESULTS ARE THERE IN BLACK AND WHITE FOR

19   SOMEONE TO EXAMINE THEM.

20             **MS. GRANT:**  I HAVE NO FURTHER QUESTIONS.

21             THANK YOU VERY MUCH.

22             **MR. JANSEN:**  DID YOU WANT TO BREAK BEFORE?

23             **THE COURT:**  YES, LET'S DO THAT.  10 MINUTES PLEASE.

24                  (RECESS TAKEN AT 2:30 P.M.)

25                (PROCEEDINGS RESUMED AT 2:45 P.M.)

1          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

2          **THE COURT:**  COUNSEL, PLEASE GO AHEAD.

3          **MR. JANSEN:**  THANK YOU, YOUR HONOR.

4                          **CROSS-EXAMINATION**

5    **BY MR. JANSEN:**

6    **Q.**   GOOD AFTERNOON, MR. TIMMINS.

7    **A.**   MR. JANSEN.

8    **Q.**   LET'S SEE.  I BELIEVE YOU INDICATED YOU HAVE BEEN RETAINED

9    AS AN EXPERT BY COUNSEL FOR INTEL, CORRECT?

10   **A.**   THAT IS CORRECT.

11   **Q.**   AND HOW MUCH IS IT YOU ARE CHARGING PER HOUR?

12   **A.**   $600.

13   **Q.**   $600 FOR YOUR TIME.  HOW MANY HOURS HAVE YOU SPENT TO

14   DATE?

15   **A.**   100 TO 120.

16   **Q.**   NOW, MR. TIMMINS, YOU DIDN'T HAVE ANY ROLE IN EVALUATING

17   LIGHTLOGIC FOR INVESTMENTS BY ANY OF THE VC'S IN THE ACTUAL

18   TIME PERIODS WHEN THOSE INVESTMENTS WERE MADE, DID YOU?

19   **A.**   I DID NOT.

20   **Q.**   SO YOU DIDN'T LOOK AT LIGHTLOGIC AND EVALUATE IT AS A

21   POTENTIAL INVESTMENT VEHICLE IN 1988 (SIC) 1999 -- I'M SORRY,

22   1998, 1999, 2000 OR 2001?

23   **A.**   I HAD HEARD OF THE COMPANY AT THAT TIME, BUT I DID NOT

24   EVALUATE IT.

25   **Q.**   AND YOU DIDN'T HAVE ANY ROLE, DID YOU, IN EVALUATING

1   LIGHTLOGIC ON BEHALF OF INTEL FOR ACQUISITION IN 2001, DID YOU?

2   **A.**   I DID NOT.

3   **Q.**   YOU DIDN'T HAVE ANY ROLE OR INVOLVEMENT IN INTEL'S

4   DECISION TO ACQUIRE LIGHTLOGIC, DID YOU?

5   **A.**   I DID NOT.

6   **Q.**   AND YOU WERE NEVER ON THE BOARD OF DIRECTORS OF

7   LIGHTLOGIC, RIGHT?

8   **A.**   I WAS NOT.

9   **Q.**   YOU WERE NEVER PRIVY TO LIGHTLOGIC'S DECISIONS TO APPLY

10  FOR OR OBTAIN PATENTS, WERE YOU?

11  **A.**   I HAD NO PART IN IT.

12  **Q.**   AND YOU DIDN'T HAVE ANY ROLE IN LIGHTLOGIC'S DECISION TO

13  OBTAIN ASSIGNMENTS TO ITS PATENT APPLICATIONS FROM JEAN-MARC

14  VERDIELL, DID YOU?

15  **A.**   AGAIN, I HAD NO PART IN IT.

16  **Q.**   AND YOU ARE NOT AN ATTORNEY, RIGHT?

17  **A.**   I AM NOT.

18  **Q.**   NOR ARE YOU AN INTELLECTUAL PROPERTY SPECIALIST PER SE?

19  **A.**   NO, I AM NOT.

20  **Q.**   SO YOU CAN'T OPINE ABOUT THE NATURE OR SCOPE OF WHAT

21  INTEL'S ATTORNEYS WHO WERE LOOKING AT ACQUIRING THE COMPANY AS

22  PART OF AN INTELLECTUAL PROPERTY DUE DILIGENCE LOOKED AT WHEN

23  THEY DID THEIR DUE DILIGENCE, CAN YOU?

24  **A.**   THAT'S NOT WHAT I WAS ASKED TO DO.

25  **Q.**   AND YOU ALSO WEREN'T ASKED TO OPINE AS TO WHAT THE VENTURE

1  CAPITALISTS' IP ATTORNEYS LOOKED AT IN THEIR DUE DILIGENCE

2  BEFORE THEY INVESTED?

3  **A.**   I WAS NOT ASKED TO DO THAT.

4  **Q.**   BECAUSE IN YOUR TESTIMONY I THINK BEFORE LUNCH, YOU

5  INDICATED YOU REVIEWED A BUNCH OF DOCUMENTS THAT WERE RELIED ON

6  BY THE VC'S?

7  **A.**   I DID, YES.

8  **Q.**   BUT YOU DIDN'T LOOK AT THE DOCUMENTS THAT WERE PREPARED BY

9  THE VC'S ATTORNEYS AS PART OF THEIR IP DUE DILIGENCE, DID YOU?

10 **A.**   I DON'T RECALL LOOKING AT ANYTHING LIKE THAT, NO.

11 **Q.**   NOW, ARE YOU AWARE THAT LIGHTLOGIC HAD OBTAINED FROM

12 JEAN-MARC VERDIELL AND FILED IN THE PATENT OFFICE PRIOR TO THE

13 ACQUISITION OF LIGHTLOGIC BY INTEL, ASSIGNMENTS THAT

14 TRANSFERRED ALL RIGHT, TITLE AND INTEREST IN THE INVENTIONS

15 CLAIMED IN AT LEAST SIX OF THE PATENTS IN THIS LAWSUIT?

16 **A.**   I DON'T RECALL THE NUMBER, BUT I DO RECALL THAT THERE WERE

17 ASSIGNMENTS, YES.

18 **Q.**   AND DO YOU RECALL WHEN THE FIRST OF THOSE ASSIGNMENTS WAS

19 EXECUTED?

20 **A.**   I DO NOT.

21 **Q.**   NOW, ARE YOU FAMILIAR -- YOU HAVE DONE A HUNDRED VENTURE

22 CAPITAL DEALS; IS THAT RIGHT?

23 **A.**   I EVALUATED MORE THAN A HUNDRED.  I THINK I PROBABLY MADE

24 ACTUAL INVESTMENTS IN 40 OR 50.

25 **Q.**   AND AS PART OF THOSE, THERE'S A FUNDING DOCUMENT, A

1  FUNDING AGREEMENT, CORRECT?

2  **A.**   THERE USUALLY ARE A SERIES OF AGREEMENTS THAT GO INTO THE

3  FUNDING, YES.

4  **Q.**   OKAY.  AND THOSE AGREEMENTS HAVE REPRESENTATIONS AND

5  WARRANTIES THAT ARE MADE BY THE COMPANY SEEKING FUNDING,

6  CORRECT?

7  **A.**   THERE ARE REPRESENTATIONS AND WARRANTIES MADE BY A VARIETY

8  OF PARTIES, INCLUDING THE COMPANY THAT IS SEEKING FUNDING, YES.

9  **Q.**   AND THOSE OFTEN INCLUDE, IN FACT, IN ADDITION

10  REPRESENTATIONS REGARDING THE NATURE OF THE INTELLECTUAL

11  PROPERTY THAT'S OWNED BY THE COMPANY SEEKING INVESTMENTS,

12  CORRECT?

13  **A.**   THAT IS A FAIRLY STANDARD WARRANTY.

14  **Q.**   AS A VC INVESTOR -- STRIKE THAT.

15        AS AN INVESTOR, YOU WOULD EXPECT THAT ALL THE

16  REPRESENTATIONS AND WARRANTIES WOULD BE ACCURATELY STATED

17  SUBJECT TO THE SCHEDULE OF EXCEPTIONS; ISN'T THAT RIGHT?

18  **A.**   THAT IS CORRECT.

19  **Q.**   AND SIMILARLY, WITH RESPECT TO IP REPRESENTATIONS, THAT IS

20  REPRESENTATIONS MADE IN THE DEAL AGREEMENT BY THE COMPANY

21  SEEKING INVESTMENT WITH RESPECT TO THEIR INTELLECTUAL PROPERTY

22  RIGHTS, YOU WOULD EXPECT THOSE TO BE ACCURATELY STATED AS WELL

23  EXCEPT TO THE EXTENT IT IS QUALIFIED IN A SCHEDULE OF

24  EXCEPTIONS, CORRECT?

25  **A.**   AGAIN, YES.

1    Q.   HAVE YOU EVER BEEN IN A SITUATION WHERE YOU LEARNED THAT A

2    TARGET COMPANY, TARGET COMPANY BEING ONE THAT IS SUBJECT TO

3    BEING INVESTED IN BY VENTURE CAPITALISTS, A SITUATION WHERE YOU

4    LEARNED THAT A TARGET COMPANY HAD INTENTIONALLY MISSTATED FACTS

5    SET FORTH IN THE REPRESENTATION AND WARRANTIES?

6    A.   WOULD YOU NARROW THE QUESTION?  ARE YOU REFERRING TO ME

7    PERSONALLY, THE FUNDS WITH WHICH I HAVE BEEN WORKING, OTHER

8    VC'S WHOM I KNOW?  I DIDN'T FOLLOW THE FIRST PART.

9    Q.   YOU PERSONALLY HAVE NEVER BEEN INVOLVED IN A SITUATION

10   WHERE YOU LEARNED THAT A TARGET COMPANY HAD INTENTIONALLY

11   MISSTATED FACTS IN THE REPRESENTATIONS AND WARRANTIES?

12   A.   THAT IS CORRECT.

13   Q.   I THINK YOU TESTIFIED THAT EXCLUSIVITY WASN'T IMPORTANT IN

14   PATENTS -- LET ME STRIKE THAT.  THAT WAS A VERY BAD QUESTION.

15            I THINK YOU TESTIFIED YOUR OPINION WAS THAT HAVING

16   EXCLUSIVE RIGHTS TO INTELLECTUAL PROPERTY WAS NOT IMPORTANT TO

17   INVESTORS?

18   A.   I TESTIFIED THAT AS A GENERAL COMMERCIAL PRACTICE,

19   EXCLUSIVITY IS NOT MANDATORY TO GETTING DEALS DONE, AND THAT

20   WOULD INCLUDE VENTURE CAPITAL INVESTMENTS.

21   Q.   BUT THERE ARE SITUATIONS, AREN'T THERE, WHERE NOT HAVING

22   EXCLUSIVE RIGHTS TO TECHNOLOGY DOES TURN INVESTORS OFF?

23   A.   I CAN THINK OF ONLY A FEW LIMITED EXCEPTIONS.  FOR

24   INSTANCE, A FIRM THAT WAS A NONPRACTICING FIRM, SO-CALLED

25   PATENT-TROL, JUST LOOKING TO BUY PATENTS TO PROSECUTE THEM

1    AGAINST OTHER COMPANIES, WOULD ONLY BE INTERESTED IN

2    EXCLUSIVITY.

3             BUT IN THE GENERAL COMMERCE, COMPANIES DOING

4    BUSINESS WITH OTHER COMPANIES, NONEXCLUSIVITY IS NOT A BARRIER.

5    **Q.**   WELL, I WANT TO SHOW YOU MR. VERDIELL'S TESTIMONY IN HIS

6    DEPOSITION IN THIS CASE.

7             **MR. JANSEN:**  DAVE, CAN YOU PULL UP HIS TESTIMONY AT

8    PAGE 209, LINES 14 THROUGH 22?  AND MR. VERDIELL WAS ASKED THIS

9    QUESTION IN HIS DEPOSITION IN THIS CASE.

10            (PAGE DISPLAYED ON SCREEN.)

11

12   **BY MR. JANSEN:**

13   **Q.**   (READING)

14            "WAS THE LAST WORD YOU USED TOTAL SUCCESSOR TO

15   RADIANCE DESIGN?"

16            AND THE PREVIOUS TESTIMONY REFERRED TO LIGHTLOGIC.

17            THE ANSWER THAT I WANT TO FOCUS ON, MR. VERDIELL'S

18   ANSWER:

19            "THAT'S A VERY GOOD WAY OF SAYING IT.  SO, ONE,

20            LET ME CORRECT THAT BECAUSE IT'S NOT A GOOD

21            CHOICE OF WORDS.  THAT I WAS GOING TO CONTINUE

22            THE SAME BUSINESS AND TECHNOLOGY WHICH I HAVE

23            TRIED TO DO WITH RADIANCE DESIGN, AND I WAS

24            ALLOWED TO DO THAT WITH THE AGREEMENT."

25            HE IS REFERRING TO THE PLAN OF LIQUIDATION.

1              AND THEN HE CONTINUES:  "OF COURSE, BEING, THE

2              OTHER PERSON BEING ABLE DO THAT WHICH TURNED

3              INVESTORS COMPLETELY OFF."

4              SO MR. VERDIELL, AT LEAST APPEARS TO BELIEVE THAT

5    HAVING EXCLUSIVE RIGHTS WAS IMPORTANT TO GETTING FUNDING.  YOU

6    DISAGREED WITH HIS OPINION I GATHER?

7    **A.**   MR. VERDIELL WAS A FIRST-TIME ENTREPRENEUR WITHOUT A LARGE

8    AMOUNT OF BUSINESS EXPERIENCE.  HE WAS NOT A VENTURE

9    CAPITALIST.

10   **Q.**   SO HE WAS JUST WRONG IN HIS BELIEF; IS THAT RIGHT?

11   **A.**   HE MAY HAVE BEEN TOLD THAT BY SOME VENTURE CAPITALIST WITH

12   WHOM HE MET, BUT VENTURE CAPITALISTS HAVE A LOT OF DIFFERENT

13   WAYS OF SAYING, NO, YOUR BABY IS UGLY, I DON'T WANT TO DO

14   BUSINESS WITH YOU.  USUALLY WE TRY TO LET THE ENTREPRENEUR DOWN

15   GENTLY.

16   **Q.**   BUT YOU ARE AWARE, THOUGH, AREN'T YOU, THAT AT LEAST ONE

17   VENTURE CAPITALIST, A COMPANY CALLED BATTERY VENTURES, TURNED

18   DOWN AN INVESTMENT POTENTIALLY IN MR. VERDIELL'S COMPANY

19   BECAUSE HE HAD NOT RESOLVED AND OBTAINED RIGHTS FROM MR. SHUM,

20   RIGHT?

21   **A.**   I DON'T RECALL THAT EXACT FACT SET.

22   **Q.**   I ALSO LIKE YOU TO LOOK AT ANOTHER EXHIBIT, TRIAL EXHIBIT

23   367.

24              **MR. JANSEN:**  IF WE CAN BRING THAT UP, DAVID.

25              (EXHIBIT DISPLAYED ON SCREEN.)

1    BY MR. JANSEN:

2    Q.   THIS IS MR. VERDIELL'S LETTER THAT HE WROTE TO HIS PATENT

3    AGENT, MAREK ALBOSZTA, RIGHT AFTER HE GOT HIS FIRST ROUND OF

4    FUNDING.

5              AND HE STATES IN THAT LETTER, SEPTEMBER 4TH, 1998:

6              "DEAR MAREK, THE FIRST DRAFT OF THE PATENT DID

7              ITS JOB:  IT GOT US FUNDED."

8              ISN'T THAT INCONSISTENT WITH YOUR TESTIMONY THAT

9    PATENTS AREN'T CRITICAL TO GETTING FUNDING?

10   A.   AGAIN, DR. VERDIELL WAS A FIRST-TIME ENTREPRENEUR.  HE MAY

11   HAVE HAD A SET OF BELIEFS ABOUT WHAT DROVE THE VENTURE CAPITAL

12   INVESTMENT PROCESS, BUT IT IS NOT THE SAME AS MY OWN EXPERIENCE

13   WORKING IN THE INDUSTRY.

14   Q.   BUT, AGAIN, YOU WEREN'T IN THE ROOM WITH MR. VERDIELL AND

15   THE VC'S THAT DECIDED TO FUND LIGHTLOGIC AND THE SERIES A

16   ROUND, WERE YOU?

17   A.   NO, BUT I HAVE INTERVIEWED THEM, SEEN THEIR DEPOSITION AND

18   TRIAL TRANSCRIPTS, AND I'VE SEEN THE CONTEMPORANEOUS E-MAIL AND

19   MEMOS.

20   Q.   I THINK YOU ALSO TESTIFIED IT WAS YOUR OPINION THAT

21   GETTING PATENTS IS NOT THAT IMPORTANT TO STARTUPS, RIGHT?

22   A.   IT'S TYPICALLY NOT THAT IMPORTANT, YES.

23   Q.   CAN YOU EXPLAIN WHY, AS INDICATED IN THE LAST SENTENCE OF

24   THAT LETTER, WHY WOULD THE FILING THE PATENT BE A TOP GOAL THAT

25   THE VC SET FOR US THIS MONTH?

1    **A.**   I BELIEVE YOU ARE GOING TO HAVE A CHANCE TO ASK THAT

2    QUESTION OF DR. VERDIELL.  I DON'T KNOW WHY HE WOULD HAVE SAID

3    THAT IN THIS COMMUNICATION.

4    **Q.**   MAYBE THE VC'S ASKED HIM TO DO THAT, RIGHT?

5    **A.**   I DON'T KNOW.

6    **Q.**   POSSIBLY?

7    **A.**   I AM NOT GOING TO SPECULATE.

8    **Q.**   OKAY.

9             **MR. JANSEN:**  NOW YOU CAN TAKE THAT DOWN, DAVID.

10   **BY MR. JANSEN:**

11   **Q.**   YOU AGREED THAT LIGHTLOGIC WOULD BE WHAT YOU CALL AN EARLY

12   STAGE COMPANY?

13   **A.**   AT WHAT POINT IN ITS LIFE?

14   **Q.**   WELL ESPECIALLY BEFORE THE SERIES A AND B FINANCING.

15   **A.**   YES.

16   **Q.**   AND I THINK COUNSEL REFERRED TO IT AS ONE GUY IN HIS

17   BEDROOM.  SO -- AND YOU REFER TO HIM AS THREE GUYS, A DOG AND A

18   GARAGE.  IS THERE A DIFFERENCE?

19   **A.**   NO.  IT'S AN INDIVIDUAL OR A SMALL GROUP OF INDIVIDUALS

20   WHO HAVE AN IDEA AND ARE PURSUING IT, BUT THEY DON'T HAVE A LOT

21   OF RESOURCES YET.

22   **Q.**   AND DO YOU AGREE THAT OFTEN MUCH OF AN EARLY STAGE

23   COMPANY'S VALUE IS EMBODIED IN THE INTELLECTUAL PROPERTY

24   DEVELOPED BY THE FOUNDERS?

25   **A.**   NO, I DISAGREE WITH THAT.  A LOT OF IT HAS TO DO WITH THE

1    ENERGY OF THE TEAM, THE SIZE OF THE MARKET WHICH THEY ARE

2    PURSUING, THE ADVANCES WHICH THEY HAVE BEEN ABLE TO MAKE IN THE

3    TECHNOLOGY, THOSE ADVANCES MAY OR MAY NOT BE CAPTURED IN SOME

4    FORM OF INTELLECTUAL PROPERTY RECORD DOWN THE ROAD.

5    Q.   DON'T YOU AGREE THAT -- ISN'T IT TRUE PATENT PRODUCTION IS

6    OFTEN A SOURCE OF --

7              **THE REPORTER:**  PLEASE REPEAT YOUR QUESTION.

8    **BY MR. JANSEN:**

9    Q.   I WILL REASK THE QUESTION.

10             DON'T YOU AGREE THAT PATENT PROTECTION IS OFTEN A

11   SOURCE OF SIGNIFICANT ADVANTAGE FOR EARLY STAGE COMPANIES?

12   **A.**   IT'S RARELY A SOURCE OF ADVANTAGE FOR EARLY STAGE

13   COMPANIES BECAUSE THE PATENT PROCESS -- THE PROCESS OF

14   OBTAINING A PATENT TAKES SO LONG AND THE PROCESS OF PROSECUTING

15   A PATENT AGAINST ANOTHER COMPANY TAKES EVEN LONGER.

16             AN EARLY STAGE COMPANY DOESN'T HAVE THE TIME,

17   DOESN'T HAVE THE CASH TO PURSUE THOSE SORTS OF THINGS.  THERE

18   ARE OTHER THINGS WHICH WILL DETERMINE THE SUCCESS OR FAILURE OF

19   THAT EARLY STAGE COMPANY.

20   Q.   NOW YOU TESTIFIED EARLIER THIS MORNING BEFORE LUNCH THAT

21   YOU REVIEWED AND RELIED ON A NUMBER OF SOURCES, INCLUDING, I

22   THINK YOU SAID OUTSIDE SOURCES, WHICH INCLUDED A NUMBER OF

23   BOOKS?

24   **A.**   I DID, YES.

25   Q.   AND WAS ONE OF THOSE BOOKS BY SOMEBODY NAMED JUSTIN CAMP?

1   **A.**   YES.

2   **Q.**   WHO IS MR. CAMP?

3   **A.**   I DON'T RECALL NOW.  I WOULD HAVE TO LOOK AT THE FLY LEAF

4   OF THE BOOK TO RECALL.

5   **Q.**   HE'S A VC, RIGHT?  HE HAS A VC ENTITY IN THE BAY AREA AND

6   HE'S ALSO A GRADUATE OF WHARTON SCHOOL OF BUSINESS?

7   **A.**   AS I SAY, I DON'T RECALL.  I WOULD HAVE TO LOOK AT THE FLY

8   LEAF.

9   **Q.**   YOU ACTUALLY CITED AND RELIED ON HIS BOOK WHEN YOU WROTE

10  YOUR REPORT IN THIS CASE, DIDN'T YOU?

11  **A.**   I DID SEVERAL MONTHS AGO.

12  **Q.**   I WOULD LIKE YOU TO TAKE A LOOK AT THAT BOOK.

13          **MR. JANSEN:**  MAY I APPROACH THE WITNESS, YOUR HONOR.

14          **THE COURT:**  YOU MAY.

15  **BY MR. JANSEN:**

16  **Q.**   THIS IS A BOOK TITLED "VENTURE CAPITAL DUE DILIGENCE A

17  GUIDE TO MAKING SMART INVESTMENT CHOICES AND INCREASING YOUR

18  PORTFOLIO RETURNS" BY JUSTIN J. CAMP.

19          THERE YOU GO.  THAT IS ONE OF THE BOOKS YOU RELIED

20  ON IN FORMING YOUR OPINIONS IN THIS CASE, WASN'T IT?

21  **A.**   IT IS, YES.

22  **Q.**   I WOULD LIKE YOU TO TAKE A LOOK AT PAGE 111 OF THAT BOOK.

23  AND THERE IS A CHAPTER CALLED "INTELLECTUAL PROPERTY

24  PROTECTION" THAT STARTS ON THE BOTTOM OF PAGE 111.

25          YOU SEE THAT?

1   **A.**   THERE'S A SECTION CALLED "INTELLECTUAL PROPERTY

2   PROTECTION" AS PART OF A LARGER CHAPTER CALLED "LEGAL DUE

3   DILIGENCE."

4   **Q.**   RIGHT.  I JUST WANT TO DRAW YOUR ATTENTION TO WHAT

5   MR. JUSTIN CAMP HAS TO SAY ABOUT THIS SUBJECT.

6               "INTELLECTUAL PROPERTY PROTECTION, GENERAL.

7               WHAT ARE THE COMPANY'S INTELLECTUAL PROPERTY

8               ASSETS AND HOW IMPORTANT ARE SUCH ASSETS TO THE

9               SUCCESS OF THE COMPANY?"

10              HE WRITES:  "INTELLECTUAL PROPERTY IS GENERALLY

11              DEFINED AS A COMMERCIALLY VALUABLE PRODUCT OF

12              HUMAN INTELLECT THAT CAN BE PROTECTED BY SUCH

13              LEGAL MECHANISMS AS PATENTS, COPYRIGHTS,

14              TRADEMARKS, AND TRADE SECRET RIGHTS.  VENTURE

15              CAPITALISTS TEND TO PAY PARTICULAR ATTENTION TO

16              INTELLECTUAL PROPERTY HELD BY THE COMPANIES THEY

17              CONSIDER FOR INVESTMENT."

18              IT GOES ON TO SAY THAT "VENTURE CAPITALISTS

19              ATTEMPT TO ANALYZE THE POTENTIAL VALUE OF A

20              STARTUP COMPANY.  AN INTELLECTUAL PROPERTY DUE

21              DILIGENCE INVESTIGATION SHOULD PLAY A CRITICAL

22              ROLE IN THE ANALYSIS."

23              AND MR. CAMP, WHOSE BOOK YOU RELIED ON, CONTINUES:

24              "IT SHOULD PLAY A CRITICAL ROLE BECAUSE OFTEN

25              MUCH OF AN EARLY STAGE COMPANY'S VALUE" -- HE

1          GOES ON TO SAY THAT "THE IP DUE DILIGENCE SHOULD

2          PLAY A CRITICAL ROLE BECAUSE OFTEN MUCH OF AN

3          EARLY STAGE COMPANY'S VALUE IS EMBODIED IN THE

4          INTELLECTUAL PROPERTY DEVELOPED BY ITS FOUNDERS.

5          THIS IS ESPECIALLY TRUE OF TECHNOLOGY

6          COMPANIES."

7          DO YOU AGREE WITH THAT?

8    **A.**   I DON'T COMPLETELY AGREE WITH IT.  I DON'T AGREE WITH

9    EVERYTHING THAT MR. CAMP WROTE IN HIS BOOK.

10          I WILL NOTE THAT THIS SECTION ON LEGAL DUE DILIGENCE

11   WHICH INCLUDES THE VERY SMALL PIECE ON INTELLECTUAL PROPERTY

12   DUE DILIGENCE, WHICH YOU JUST MENTIONED, COMES BEHIND MUCH

13   LARGER SECTIONS THAT DEAL WITH MANAGEMENT DUE DILIGENCE AND

14   BUSINESS OPPORTUNITY DUE DILIGENCE.

15          AND THOSE TWO ARE CONSISTENT WITH WHAT I AND THE

16   VENTURE CAPITALISTS HAVE BEEN SAYING ARE THE PREDOMINANT

17   FACTORS IN MAKING AN INVESTMENT DECISION.

18          THE LEGAL DUE DILIGENCE TYPICALLY TAKES PLACE AT THE

19   VERY END OF THE INVESTMENT PROCESS AFTER THE INVESTMENT FIRMS

20   HAVE MADE A DECISION TO PROCEED, AND THE INTELLECTUAL PROPERTY

21   DUE DILIGENCE IS A VERY SMALL SLIVER OF THAT LEGAL DUE

22   DILIGENCE PIECE AT THE END.  SO I WANT IT TO BE TAKEN IN

23   CONTEXT.

24   **Q.**   THANK YOU FOR THAT.

25          LET'S LOOK AT WHAT MR. CAMP HAD TO SAY ABOUT PATENTS

1    IN PARTICULAR IN THE SAME CHAPTER ON THE IP DUE DILIGENCE

2    SECTION OF THIS BOOK.

3              BY THE WAY, YOU CITED TO THIS SECTION OF THIS BOOK

4    IN YOUR REPORT, DIDN'T YOU?

5    **A.**   I DON'T RECALL WHETHER I CITE IT EXACTLY THIS SECTION, BUT

6    I CERTAINLY CITED THIS BOOK.

7    **Q.**   AND YOU CITED PORTIONS OF THIS CHAPTER OF THIS BOOK,

8    DIDN'T YOU?

9    **A.**   AGAIN I DON'T RECALL.  I WOULD HAVE TO LOOK AT MY REPORT.

10   **Q.**   WE MAY DO THAT IN A MINUTE.

11             UNDER PATENTS, THE QUESTION IS:  "ARE ANY OF THE

12             COMPANY'S INTELLECTUAL PROPERTY ASSETS PROTECTED

13             BY U.S. PATENTS?"

14             "PATENT PROTECTION" –– MR. CAMP WRITES:

15             "PATENT PROTECTION IS OFTEN A SOURCE OF

16             SIGNIFICANT COMPETITIVE ADVANTAGE FOR EARLY

17             STAGE COMPANIES, AND IS THEREFORE AN EXTREMELY

18             IMPORTANT TOPIC FOR THE VENTURE CAPITALISTS

19             CONSIDERING INVESTMENTS IN THEM."

20             SO AT LEAST THERE IS ONE VENTURE CAPITALIST WHO

21   DISAGREES WITH YOUR OPINIONS, RIGHT?

22   **A.**   YOU WOULD HAVE TO ASK ––

23   **Q.**   AND THAT IS MR. CAMP?

24   **A.**   YOU HAVE TO ASK HIM.

25   **Q.**   I THINK WE HAVE HIS ANSWER HERE.

1          AGAIN, YOU RELIED ON HIS BOOK WHEN YOU WROTE YOUR

2     REPORT.

3          LET'S SEE WHAT ELSE HE HAD TO SAY.

4     **A.**   I WOULD NOTE FROM THE FLY LEAF THAT MR. CAMP IS AN

5     ATTORNEY BY TRAINING AND PRACTICE, NOT A VENTURE CAPITALIST.

6     HE HAS FORMED A COMPANY WHICH HAS THE WORDS -- THE WORD

7     "VENTURE" IN IT, BUT I DON'T BELIEVE HE IS A PRACTICING VENTURE

8     CAPITALIST.

9     **Q.**   BUT NONETHELESS, YOU RELIED ON HIS BOOK IN FORMING YOUR

10    OPINIONS IN THIS CASE?

11    **A.**   I DID, AND I CITED THE IMPORTANCE OF THE OVERALL PROCESS

12    OF LEGAL DUE DILIGENCE AS PART OF THE VENTURE CAPITAL

13    INVESTMENT PROCESS.  BUT IT WOULD BE PUTTING THE CART AHEAD OF

14    THE HORSE TO DRIVE THE WHOLE PROCESS OF INTELLECTUAL PROPERTY

15    DUE DILIGENCE OR EVEN LEGAL DUE DILIGENCE.

16          THE MOST IMPORTANT PARTS OF DUE DILIGENCE ARE

17    MANAGEMENT, THE BUSINESS OPPORTUNITY, THE UNDERLYING

18    TECHNOLOGY.  ALL THESE OTHER THINGS ARE DONE AGAINST A

19    CHECKLIST AT THE VERY END OF THE PROCESS.

20    **Q.**   AND THE UNDERLYING TECHNOLOGY IS OFTEN PROTECTED BY U.S.

21    PATENTS, ISN'T IT, SIR?

22    **A.**   IN EARLY STAGE COMPANIES THE UNDERLYING TECHNOLOGY IS

23    RARELY PROTECTED BY PATENTS BECAUSE THE COMPANY HAS NOT BEEN

24    AROUND LONG ENOUGH TO HAVE FILED AND BEEN GRANTED PATENTS.

25    **Q.**   THAT'S NOT THE CASE IN THE SITUATION WITH LIGHTLOGIC, IS

TIMMINS - CROSS / MR. JANSEN

1   IT?  THEY HAD APPLIED FOR PATENTS?

2   **A.**   I SAID FILED AND BEEN GRANTED.

3   **Q.**   THEY HAD FILED PATENTS, CORRECT?

4   **A.**   YES, BUT I SAID FILED AND BEEN GRANTED.  A PATENT IS NOT A

5   PATENT UNTIL IT HAS BEEN GRANTED.

6   **Q.**   ARE YOU AWARE THAT ASSIGNMENTS ARE LOOKED AS PART OF THE

7   IP DUE DILIGENCE?

8   **A.**   YES, ABSOLUTELY.

9   **Q.**   AS PART OF THE IP DUE DILIGENCE, WHETHER AN INVESTMENT OR

10  AN ACQUISITION BY INTEL, THE ASSIGNMENTS OF PATENT RIGHTS WOULD

11  BE LOOKED AT AS PART OF THAT DUE DILIGENCE, CORRECT?

12  **A.**   THAT WOULD BE PART OF THE ORDINARY COURSE OF DUE

13  DILIGENCE, YES.

14  **Q.**   AND DO YOU AGREE THAT LIGHTLOGIC, AT THE TIME OF ITS FIRST

15  FUNDING, WAS MR. VERDIELL AND A SMALL NUMBER OF PEOPLE THAT

16  WERE LINED UP TO POSSIBLY JOIN THE COMPANY ONCE FUNDING WAS

17  RECEIVED AND SOME INTELLECTUAL PROPERTY THAT HE HAD ASSIGNED TO

18  LIGHTLOGIC?

19  **A.**   I AM SORRY, WOULD YOU RESTATE THAT QUESTION?  I COULDN'T

20  FOLLOW IT.

21  **Q.**   AT THE TIME THAT LIGHTLOGIC WAS FUNDED IN THE SERIES A

22  ROUND, LIGHTLOGIC CONSISTED OF MR. VERDIELL, A SMALL NUMBER OF

23  PEOPLE THAT WERE LINED UP READY TO JOIN THE COMPANY ONCE IT WAS

24  FUNDED, AND SOME IP THAT HAD BEEN ASSIGNED TO LIGHTLOGIC BY

25  VERDIELL?

1   **A.**   I THINK THAT IF YOU WERE TO SPEAK TO THE VENTURE

2   CAPITALISTS WHO MADE THE INVESTMENT AT THAT TIME, OR EVEN WITH

3   DR. VERDIELL, THEY WOULD NOT AGREE WITH THAT ASSESSMENT.

4          THEY WOULD SAY THAT BEYOND THE INTELLECTUAL

5   PROPERTY, LAY THE TECHNOLOGY.  WHETHER YOU CALL THAT AN IDEA OR

6   SOMETHING ELSE, IT'S ALMOST IRRELEVANT.  THE INTELLECTUAL

7   PROPERTY IS A PIECE OF IT, BUT THERE'S A WHOLE LOT MORE TO IT

8   THAN JUST THE IDEA ABOUT THE TECHNOLOGY.

9          THERE'S HOW TO APPLY THAT TECHNOLOGY AND TURN IT

10  INTO A PRODUCT.  THERE IS HOW TO SELL THAT PRODUCT TO CUSTOMERS

11  IN A MARKET.  IT IS HOW TO GET CUSTOMERS TO ADOPT THAT

12  TECHNOLOGY, THAT PRODUCT, AND DRIVE THE SIZE OF THE MARKET

13  LARGER.

14         SO IT'S A WHOLE HOST OF THINGS.  LOTS OF PEOPLE HAVE

15  INVENTED LOTS OF GREAT THINGS DOWN IN SILICON VALLEY.  VERY FEW

16  OF THEM MAKE IT OUT INTO THE MARKETPLACE.  AND EVEN FEWER GO ON

17  TO BECOME SUCCESSFUL.

18         SO IT'S NOT ABOUT INTELLECTUAL PROPERTY.  IT'S ABOUT

19  DRIVING A PRODUCT ALL THE WAY THROUGH THE MARKET PROCESS,

20  GETTING TRACTION WITH CUSTOMERS AND GOING ON TO COMMERCIAL

21  SUCCESS.

22  **Q.**   I WANT TO FOCUS –– I UNDERSTAND THAT'S THE BIG PICTURE,

23  BUT I WASN'T TO FOCUS IN ON YOUR UNDERSTANDING OF WHAT

24  LIGHTLOGIC CONSISTED OF, WHAT WERE ITS ASSETS AT THE TIME IT

25  GOT ITS SERIES A FUNDING.

1            DO YOU HAVE AN OPINION ON THAT?  OR DO YOU HAVE ANY

2    KNOWLEDGE WHATSOEVER?

3    **A.**   WHAT I AM SAYING IS CONSISTENT WITH AN ANSWER TO YOUR

4    QUESTION.  I DON'T THINK YOU WANT TO HEAR IT.

5            THERE WAS MORE TO LIGHTLOGIC THAN JUST A LITTLE

6    PACKET OF TECHNOLOGY.  THERE WAS A VISION FOR HOW TO TAKE THAT

7    PRODUCT INTO THE MARKETPLACE AT LARGE AND MAKE IT A COMMERCIAL

8    SUCCESS.

9    **Q.**   OKAY.

10           IN FACT, YOU DON'T HAVE ANY UNDERSTANDING AS TO WHAT

11   LIGHTLOGIC HAD ACCOMPLISHED BETWEEN THE DATE THE PLAN OF

12   LIQUIDATION WAS SIGNED AND RADIANCE WAS DISSOLVED AND THE

13   SERIES A FUNDING?

14   **A.**   WELL, I DO HAVE SOME UNDERSTANDING OF WHAT HAD BEEN

15   ACCOMPLISHED.  ONE OF THE MOST NOTABLE THINGS THAT HAD BEEN

16   ACCOMPLISHED WAS THAT DR. VERDIELL HAD CONVINCED A NUMBER OF

17   INVESTORS TO PROVIDE FUNDING.  THAT IS VERY SIGNIFICANT BECAUSE

18   A HOST OF COMPANIES GO WITHOUT EVER OBTAINING FUNDING.

19   **Q.**   AND THE FUNDING IS WHAT ALLOWED LIGHTLOGIC TO DRAW THE

20   BUSINESS THAT INTEL WAS INTERESTED IN ACQUIRING THREE YEARS

21   LATER, CORRECT?

22   **A.**   IT WAS A PIECE OF IT.  THE HUMAN EFFORT BEHIND IT WAS A

23   VERY SIGNIFICANT PIECE OF IT.  YOU COULD HAVE A LARGE AMOUNT OF

24   MONEY IN A COMPANY, BUT WITHOUT THE RIGHT PEOPLE TO EXECUTE ON

25   THE IDEAS, IT WILL NEVER TURN INTO ANYTHING SIGNIFICANT.

1    **Q.**   AND IT WAS THE MONEY, THE INVESTMENT MONEY THAT ALLOWED

2    DR. VERDIELL TO HIRE ENGINEERS TO DEVELOP THE IP THAT HE

3    BROUGHT FROM RADIANCE, TO GET MORE INVESTORS AND DEVELOP A

4    PRODUCT LINE, GET A CHIEF FINANCIAL OFFICER, GET A CHIEF

5    EXECUTIVE OFFICER AND GROW THE BUSINESS; IT WAS THAT VC MONEY

6    THAT ALLOWED HIM TO DO THAT, CORRECT?

7    **A.**   THE VENTURE CAPITAL MONEY DID ALLOW THE COMPANY TO

8    ACCOMPLISH A LOT OF THINGS.  I DON'T KNOW THAT ALL OF THE

9    TECHNOLOGY THAT WAS ENCOMPASSED BY LIGHTLOGIC AT THE TIME OF

10   THE INTEL ACQUISITION GREW OUT OF RADIANCE.

11              IN POINT OF FACT, I THINK IT HAS BEEN OBSERVED

12   ELSEWHERE IN THIS PROCESS THAT A LOT OF ELEMENTS OF THE

13   TECHNOLOGY THAT WERE EMBEDDED IN THE PRODUCTS AND THAT WERE

14   ATTRACTIVE TO INTEL DID NOT GROW OUT OF RADIANCE.

15   **Q.**   I JUST WANT -- IF WE CAN LOOK AT YOUR DEPOSITION.  I TOOK

16   YOUR DEPOSITION, YOU RECALL, ABOUT A MONTH AND A HALF AGO?

17   **A.**   YES.

18              **MR. JANSEN:**  IF WE CAN PUT UP PAGE 208, DAVID,

19   LINES 7 THROUGH 14.

20              (DEPOSITION DISPLAYED ON SCREEN.)

21   **BY MR. JANSEN:**

22   **Q.**   I ASKED YOU THE FOLLOWING QUESTION, MR. TIMMINS.

23              **MR. JANSEN:**  CAN YOU PUT THAT UP, DAVID?

24   **BY MR. JANSEN:**

25   **Q.**   MY QUESTION TO YOU WAS AT LINE 7:

1              "WHAT DO YOU UNDERSTAND LIGHTLOGIC HAD

2              ACCOMPLISHED BETWEEN THE TIME OF DISSOLUTION OF

3              RADIANCE AND THE TIME THAT MR. VERDIELL OBTAINED

4              FUNDING, SERIES A FUNDING FOR LIGHTLOGIC IN JUNE

5              OR JULY OF 1998?"

6          YOUR ANSWER:  "MIGHT HAVE BEEN AS LATE AS

7              AUGUST.  I DON'T KNOW SPECIFICALLY WHAT WAS

8              ACCOMPLISHED DURING THAT TIME."

9          **MR. JANSEN:**  THANKS VERY MUCH.  I DON'T HAVE ANY

10   FURTHER QUESTIONS RIGHT NOW, YOUR HONOR.

11          **MS. GRANT:**  NO QUESTIONS, YOUR HONOR.

12          **THE COURT:**  MR. TIMMINS YOU CAN BE EXCUSED NOW.

13          **THE WITNESS:**  THANK YOU.

14          **MR. TAYLOR:**  YOUR HONOR, AS WE INDICATED, THAT

15   CONCLUDES OUR WITNESSES FOR TODAY AND WE HAVE ONLY TWO MORE

16   WITNESSES TO CALL, WHICH WE WILL CALL TOMORROW AND WE WILL BE

17   DONE.

18          **THE COURT:**  ALL RIGHT.  SO WE'RE GOING TO GET

19   THROUGH A LITTLE EARLY THEN.

20          ARE WE THROUGH FOR TODAY?  ALL RIGHT.  GET ON THE

21   ROAD.

22          ALL RIGHT.  PLEASE DON'T TALK ABOUT THE CASE AT ALL

23   AMONG YOURSELVES OR WITH ANYBODY ELSE, KEEP AWAY FROM ANY

24   OUTSIDE INFORMATION, KEEP AN OPEN MIND UNTIL IT HAS BEEN

25   SUBMITTED TO YOU FOR YOUR DELIBERATIONS.

1              TOMORROW MORNING AT 9:00 O'CLOCK.   THANK YOU.

2

3              (PROCEEDINGS ADJOURNED AT 3:10 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL.,, WERE REPORTED BY US, THURSDAY, DECEMBER 11, 2008 CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

_____/S/_____

DIANE E. SKILLMAN, CSR, RPR, FCRR