ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

FRANK T. SHUM,                    )    **JURY TRIAL**
                                  )
          PLAINTIFF,              )    **VOLUME 16**
                                  )
  VS.                             )    NO. C 02-3262 DLJ
                                  )
INTEL CORPORATION,                )
JEAN-MARC VERDIELL AND            )    **PAGES 3412 - 3581**
LIGHTLOGIC, INC.,                 )
                                  )
          DEFENDANTS.             )    OAKLAND, CALIFORNIA
_____)        THURSDAY, DECEMBER 11, 2008


### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          TOWNSEND AND TOWNSEND AND CREW LLP
                        TWO EMBARCADERO CENTER, EIGHTH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94111-3834
                   BY:  MARK T. JANSEN,
                        PAUL F. KIRSCH,
                        ANGUS M. MACDONALD,
                        ROBERT A. MCFARLANE, ATTORNEYS AT LAW


FOR DEFENDANTS:         TAYLOR & CO. LAW OFFICES
                        ONE FERRY BUILDING SUITE 355
                        SAN FRANCISCO, CALIFORNIA  94111
                   BY:  STEPHEN E. TAYLOR,
                        JESSICA GRANT, ATTORNEYS AT LAW



                        KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                   BY:  RAGESH K. TANGRI, ATTORNEYS AT LAW



REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

I N D E X

**DEFENDANTS' WITNESSES**                        **PAGE**   **VOL.**

NAPPER, BRIAN W.

DIRECT EXAMINATION BY MS. GRANT          3428   16

CROSS-EXAMINATION BY MR. JANSEN          3483   16

REDIRECT EXAMINATION BY MS.  GRANT       3559   16


E X H I B I T S

| **TRIAL EXHIBITS** | **W/DRAWN** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 834 | | | 3539 | 16 |
| 3783 | | | 3579 | 16 |

--OOo--

```
 1   THURSDAY, DECEMBER 11, 2008                        8:59 A.M.

 2                   P R O C E E D I N G S

 3           (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

 4   PRESENCE OF THE JURY:)

 5           THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

 6   COME TO ORDER.

 7           MR. KIRSCH:  MORNING, YOUR HONOR.

 8           THE COURT:  MORNING.

 9           MR. KIRSCH:  BEFORE WE BEGIN TODAY, WE HAVE ONE

10   EVIDENTIARY ISSUE THAT WE NEED TO BRING UP.  THE DEFENDANTS,

11   THIS MORNING, TOLD US THAT THEY WERE GOING TO HAVE TWO -- LAST

12   NIGHT TWO WITNESSES, MR. VERDIELL AND MR. NAPPER.  THIS MORNING

13   AT ABOUT 7:00 THEY DROPPED MR. VERDIELL.  AND SO IT LOOKS LIKE

14   MR. NAPPER WILL THEIR LAST WITNESS.  AND THEY ASKED US WHAT

15   REBUTTAL CASE WE WERE GOING TO PUT ON.

16           AND OUR ONLY THOUGHT AT THIS TIME, DEPENDING ON WHAT

17   MR. NAPPER SAYS, IS TO MAKE SURE THAT THE DELOITTE & TOUCHE

18   REPORT COMES INTO EVIDENCE.  AND WE DISCUSSED THIS WITH THE

19   COURT EARLIER.  OUR ONLY PLAY WOULD BE TO PLAY THE

20   DUSTIN SWITZER VIDEO FOR SIX MINUTES AND LAY THE EVIDENTIARY

21   FOUNDATION FOR THE DELOITTE & TOUCHE REPORT TO COME IN UNLESS

22   THEY -- THEY WOULD AGREE TO STIPULATE.  THEN WE WOULDN'T NEED

23   TO DO THAT.

24           MR. TAYLOR:  YOUR HONOR, MR. TANGRI WILL ADDRESS THE

25   REPORT.  WE ARE ONLY GOING TO CALL ONE WITNESS, MR. NAPPER, WHO
```

```
 1    IS OUR, YOU KNOW, ECONOMIC DAMAGES EXPERT, AND THEN WE WILL BE

 2    RESTING SUBJECT TO THIS ISSUE.

 3              AND THEN MR. TANGRI'S REALLY LOOKED AT THE REPORT

 4    ISSUE MORE CLOSELY.

 5              MR. TANGRI:   AND AS MS. GRANT SAYS, WE MAY BOTH

 6    ADDRESS THIS, BUT ON THE DELOITTE REPORT, THEIR EXPERT -- THE

 7    ONLY REFERENCE TO THE DELOITTE REPORT SO FAR HAS BEEN THEIR

 8    EXPERT, MR. REGAN, TESTIFYING THAT HE VIEWED IT AS HELPING

 9    CONFIRM HIS CONCLUSIONS, AND THERE WAS CROSS-EXAMINATION ON

10    THAT.  THE DOCUMENT DID NOT COME INTO EVIDENCE DURING HIS

11    EXAMINATION AND IS NOT OTHERWISE IN EVIDENCE.

12              WE DON'T THINK THAT THE WITNESS SWITZER LAYS A

13    PROPER FOUNDATION FOR THE DOCUMENT, BUT MORE FUNDAMENTALLY, THE

14    PROBLEM IS THIS DOCUMENT IS -- I MEAN, IT'S PREPARED BY

15    DELOITTE & TOUCHE.  IT'S PREPARED FOR A SPECIFIC PURPOSE WHICH

16    IS SEC ACCOUNTING, AND IT'S NOT THE PURPOSE THAT THEY'RE GOING

17    TO TRY TO USE IT FOR HERE, WHICH IS CALCULATION OF DAMAGES.

18    THERE'S AN EXPRESS STATEMENT ON THE FACE OF THE DOCUMENT BY

19    DELOITTE & TOUCHE THAT IT'S NOT SUPPOSED TO BE USED FOR ANY

20    OTHER PURPOSE.

21              SWITZER WASN'T INVOLVED IN ITS PREPARATION OR

22    INVOLVED, I DON'T BELIEVE, IN ITS USE AT INTEL FOR WHATEVER USE

23    INTEL MADE OF IT.  AND SO WE THINK TO HAVE THIS RATHER THICK --

24    I MEAN, IT'S ABOUT A HUNDRED -- IT'S ABOUT AN 82-PAGE CONDENSED

25    ACCOUNTING TREATISE ABOUT GAAP ACCOUNTING FOR PURCHASE
```

3417

```
1    ALLOCATION -- BE HANDED TO THE JURY TO LET THEM CHEW ON IT
2    WITHOUT ANY PROPER SPONSORING TESTIMONY ABOUT IT STRIKES US AS
3    BEING PREJUDICIAL AND CAN -- SOMETHING THAT CAN LEAD ONLY TO
4    CONFUSION.
5               WE HAD OFFERED EARLIER TO MAKE AVAILABLE THE AUTHOR
6    OF THE REPORT FROM DELOITTE & TOUCHE.  THEY'VE CHOSEN NOT TO
7    CALL HIM.  HE'S AVAILABLE.  HE'S BEEN AVAILABLE.  WE'VE OFFERED
8    HIM.  THEY'VE NOT CALLED HIM.
9               SO TO HAVE THIS DOCUMENT COME FLYING INTO THE JURY
10   AT THE END OF THE CASE WITHOUT A PROPER SPONSORING WITNESS,
11   WHEN IT'S PREPARED FOR A DIFFERENT PURPOSE, TO BE USED FOR A
12   DIFFERENT PURPOSE, AND SENT BACK TO THE JURY ROOM FOR THEM TO
13   WORK THROUGH AND MAKE WHATEVER THEY WILL OF IT STRIKES US AS
14   PREJUDICIAL AND CONFUSING.
15             MR. MacDONALD:  YOUR HONOR, WE DO HAVE A SPONSORING
16   WITNESS AND THAT WITNESS IS MR. SWITZER'S DEPOSITION TESTIMONY.
17   HE WAS INTEL'S 30(B)(6) PERTAINING TO THE DELOITTE & TOUCHE
18   REPORT.
19             MOREOVER, YOUR HONOR, AS YOU STATED IN YOUR
20   DECEMBER 1ST -- ON DECEMBER 1, THIS DOCUMENT IS JUST A BUSINESS
21   RECORD OF INTEL'S PRODUCED BY INTEL'S FILES.  MR. SWITZER, IN
22   HIS SIX-MINUTE TRANSCRIPT -- DESIGNATED TRANSCRIPT, WOULD
23   TESTIFY THAT HE PRODUCED THE DELOITTE REPORT AS PART OF HIS
24   DOCUMENT COLLECTION.  HE IS FAMILIAR WITH THE REPORT.  HE'S
25   SEEN OTHER REPORTS JUST LIKE THIS, AND HE TESTIFIED AT HIS
```

```
 1    DEPOSITION ABOUT THE REPORT.

 2            MR. TANGRI:  YOUR HONOR, HE ACTUALLY -- JUST TO BE

 3    CLEAR, HE WASN'T A 30(B)(6) WITNESS ON THIS REPORT.  HE WAS A

 4    30(B)(6) WITNESS ON THE -- ON THE ACQUISITION OR TOPICS RELATED

 5    TO THE ACQUISITION.  HE WASN'T INVOLVED IN IT.  HE WAS THE MOST

 6    AVAILABLE -- THE MOST -- YOU KNOW, THE BEST WITNESS AVAILABLE

 7    AT THE TIME OF THIS -- THIS ISSUE CAME UP IN 2008.  THE

 8    ACQUISITION WAS SEVEN YEARS PRIOR.  THE FOLKS WHO HAD BEEN

 9    INVOLVED IN THAT ASPECT OF IT WERE NOT AROUND AT THAT POINT.

10            SO TO SAY THAT HE WAS THE BEST WITNESS INTEL HAD ON

11    THE DOCUMENT DOESN'T MEAN HE'S A PROPER TRIAL WITNESS FOR THE

12    DOCUMENT.  THE PROPER TRIAL WITNESS FOR THE DOCUMENT WOULD

13    PRESUMABLY BE THE AUTHOR.

14            THE COURT:  WELL.  ALL RIGHT.  IT SEEMS TO ME THAT

15    THE -- THE QUESTION ABOUT PROPER TRIAL WITNESS IS REALLY NOT

16    PARTICULARLY SIGNIFICANT IN THAT THAT'S REALLY -- YOU'RE

17    TALKING ABOUT WHETHER OR NOT THERE'S A FOUNDATION FOR THE

18    DOCUMENT AS A BUSINESS RECORD.  IT SEEMS TO ME THAT THAT'S NOT

19    AN ISSUE.  ALL RIGHT.  I WOULD THINK THAT THE -- THE OTHER PART

20    IS MORE PROBLEMATIC IN TERMS OF DO WE PUT THE WHOLE THING IN TO

21    THE JURY OR NOT.

22            I DON'T KNOW WHY -- THERE'S BEEN SOME REFERENCES TO

23    PORTIONS OF THE REPORT IN THE TESTIMONY ALREADY.  I DON'T KNOW

24    WHY YOU DON'T PUT IN THE PIECES OF THE REPORT THAT ARE RELEVANT

25    TO THE TESTIMONY THAT'S ALREADY IN AND LET IT GO AT THAT.
```

3419

```
 1          I CAN UNDERSTAND WHERE YOU HAVE A BIG DOCUMENT THAT

 2   HASN'T BEEN TALKED ABOUT AND YOU CAN MARCH THROUGH THAT.

 3   NOBODY WANTS TO DO THAT.  BUT THAT'S NOT THE ONLY DOCUMENT IN

 4   THE CASE THAT HAS THAT AS A CRITERIA.

 5          MR. TANGRI:  BUT --

 6          THE COURT:  SO I WOULD THINK THAT IT IS A BUSINESS

 7   RECORD, IT COULD COME IN, THERE'S BEEN TESTIMONY ABOUT IT.  AND

 8   I DON'T SEE ANY REASON WHY YOU CAN'T TAKE OUT THE PIECES OF THE

 9   REPORT THAT WERE REFERRED TO.

10          MR. TANGRI:  YOUR --

11          THE COURT:  NOW, ALSO I WOULD PUT IN THE PART WHERE

12   IT SAYS, "THIS IS NOT TO BE USED FOR ANY OTHER PURPOSE."  I

13   DON'T KNOW.  THAT OUGHT TO BE THERE SO THAT IF ANYBODY'S

14   LOOKING AT IT, YOU CAN POINT OUT THAT THIS IS NOT FOR THAT

15   PURPOSE AND THE REPORT SAYS THAT.  BUT THAT OUGHT TO COME IN AS

16   A PIECE OF THE REPORT.

17          SO I THINK YOU OUGHT TO PULL OUT THE PIECES THAT

18   HAVE BEEN REFERRED TO IN THE TESTIMONY AND MAKE THAT AS A

19   PARTIAL EXHIBIT AND THEN WE PUT IT IN.

20          MR. TANGRI:  YOUR HONOR, LET ME JUST ADDRESS THAT.

21   THE PROBLEM -- AND THE PROBLEM ISN'T FOUNDATION.  I MEAN,

22   THERE'S NO --

23          THE COURT:  THAT'S IT.

24          (SIMULTANEOUS COLLOQUY.)

25          MR. TANGRI:  -- REPORT.
```

1          WHEN I SAY A PROPER TRIAL WITNESS, I MEAN A PROPER

2    TRIAL WITNESS TO EXPLAIN THE DOCUMENT AND GIVE IT A PROPER

3    CONTEXT SO THE JURY CAN UNDERSTAND IT.

4          **THE COURT:**  THAT'S WHY I SAID IT'S BEEN REFERRED

5    TO -- AND -- WELL, ONLY COLLATERALLY, BUT IT'S BEEN REFERRED

6    TO, SOME PIECES OF IT.

7          **MR. TANGRI:**  AND THE CONCERN, YOUR HONOR, AND I'LL

8    BE UP FRONT WITH THE COURT ABOUT THIS, IS THE DISPUTE BETWEEN

9    THE PARTIES ON THIS DOCUMENT IS PLAINTIFF WOULD LIKE TO SAY

10   THAT SOME PIECE OF THE VALUATION DONE IN THIS DOCUMENT CAPTURES

11   THE VALUE OF THE LIGHTLOGIC INTELLECTUAL PROPERTY.

12         **THE COURT:**  WELL --

13         **MR. TANGRI:**  AND THERE'S -- NO.  I MEAN, THAT'S THE

14   PURPOSE FOR WHICH THEY'RE OFFERING IT.  THEY'RE SAYING THIS

15   REPORT BREAKS LIGHTLOGIC'S VALUE INTO VARIOUS BUCKETS, AND IN

16   ONE OF THOSE BUCKETS IS THE IP AND SO THAT TELLS US SOMETHING

17   ABOUT THE VALUE OF THE IP.

18         AND THERE IS A DISPUTE ABOUT WHICH BUCKET THE THING

19   GOES INTO.  AND SO IF WE'RE GOING TO PUT THE THING IN, I THINK

20   WE HAVE TO PUT THE WHOLE THING IN --

21         **THE COURT:**  OKAY.

22         **MR. TANGRI:**  -- BECAUSE THE FIGHT IS OVER WHICH

23   BUCKET.

24         **THE COURT:**  I THINK THAT'S RIGHT.  IT OUGHT TO BE

25   THAT ANYTHING THAT GOES IN HAS ITS FULL CONTEXT.  AND IF -- THE

1    EASIEST WAY IS JUST TO PUT THE WHOLE THING IN.  AND IF YOU PUT

2    THE WHOLE THING IN, THEN THEY CAN SAY WHAT THEY WANT AND YOU

3    CAN SAY WHAT YOU WANT ABOUT IT.  THERE ARE GOOD STATEMENTS THAT

4    CAN BE MADE EITHER WAY.

5            MY ANSWER TO IT WOULD BE IT'S PROBABLY JUST AS EASY,

6    SO THAT IT DOESN'T RAISE SOME ISSUES THAT ARE, YOU KNOW, HARD

7    FOR A JURY TO FIGURE OUT WHY IS THIS BEING DONE, WHY IT'S NOT

8    BEING DONE, WE JUST PUT THE WHOLE THING IN.  THEN YOU CAN BOTH

9    MAKE REFERENCE TO IT AS YOU WISH.

10           **MR. TANGRI:**  AND JUST SO OUR POSITION IS AS CLEAR AS

11   IT CAN BE, YOUR HONOR, OUR POSITION IS THAT THERE IS -- THERE

12   IS NO PROPER TESTIMONY TO SUPPORT ARGUMENT FROM THE LAWYERS ON

13   WHICH --

14           **THE COURT:**  THAT'S -- YOU CAN SAY THAT ALREADY.

15   SEE, THAT ALREADY EXISTS.  AND THE -- THE ARGUMENT IS HERE'S

16   THIS PIECE OF PAPER WITH THESE NUMBERS ON IT.  THEY SAY THAT IT

17   MEANS THIS.  YOU SAY THAT IT MEANS THAT.  AND THEN THAT'S JUST

18   A QUESTION OF ARGUMENT IN TERMS OF FACT FINDERS DECIDING WHAT

19   IT IS.  I THINK THAT -- THAT DOESN'T MEAN IT CAN'T COME IN.

20           AND IT REALLY ISN'T A QUESTION ABOUT THE TOTAL

21   DOCUMENT AS BEING A BUSINESS RECORD AND BEING IDENTIFIABLE AS

22   THE DOCUMENT ITSELF.  SO I THINK THAT THE BEST THING TO DO IS

23   JUST BY STIPULATION TO PUT IT IN.

24           **MR. MacDONALD:**  YOUR HONOR, WE HAD -- SORRY.

25           **MR. TANGRI:**  YOUR HONOR, WE -- JUST TO BE -- WE

1   STIPULATE TO FOUNDATION FOR THE DOCUMENT, BUT WE DO NOT

2   STIPULATE TO ITS ADMISSION.  WE DO OBJECT TO ITS ADMISSION.

3            **MR. TAYLOR:**  HERE'S THE DILEMMA, I THINK, FOR THE

4   DEFENSE.  IF IT'S COMING IN, THEN IT MAY NOT BE OUR LAST

5   WITNESS.  WE MAY NEED TO GO HAVE THE DELOITTE PERSON COME IN

6   AND TESTIFY ABOUT IT.  WE HAD ASSUMED IT WAS NOT COMING IN.  WE

7   WEREN'T GOING TO INTRODUCE IT.  SO THIS EVENT CHANGES THE PLAN

8   PERHAPS.

9            **THE COURT:**  YOU CAN DO THAT, IF YOU CAN GET SOMEBODY

10  IN THIS AFTERNOON.  IS THAT POSSIBLE?

11           **MR. TAYLOR:**  I HAVE NO IDEA.  WE'LL CALL AND FIND

12  OUT.

13           **THE COURT:**  WHY DON'T YOU CALL AND FIND OUT.

14           **MR. TAYLOR:**  OKAY.

15           **THE COURT:**  IT MAY BE THAT --

16           **MR. TANGRI:**  BUT --

17           **THE COURT:**  -- IT HAS TO BE DONE.  BECAUSE I WOULD

18  THINK THAT THERE'S SOME AREA ABOUT EXPLANATION, THERE'S BEEN

19  SOME TESTIMONY ABOUT IT, BUT OBVIOUSLY OTHER TESTIMONY COULD

20  COME IN THAT'S MORE EXPLANATORY.

21           **MR. TANGRI:**  AND THE DOCUMENT HAD NOT BEEN ADMITTED

22  UNTIL NOW --

23           **THE COURT:**  RIGHT.

24           **MR. TANGRI:**  -- AND THEY HAD NOT RAISED THIS UNTIL

25  THIS MORNING.  AND IT'S NOT SOMETHING THAT --

```
 1              THE COURT:  YEAH.  BUT IT WAS -- IT WAS OUT THERE,

 2    EVERYBODY KNEW ABOUT IT.  IT HAD BEEN TALKED ABOUT QUITE A BIT.

 3              MR. TANGRI:  THEY -- THEY HAD RESTED SUBJECT ONLY TO

 4    THIS ONE FELLOW WILLHOIT, AND HE'S NOT PART OF THIS.  SO WE

 5    WERE UNDER THE IMPRESSION THAT THIS WAS OVER AND DONE WITH.

 6              THE COURT:  ALL RIGHT.

 7              MR. TANGRI:  AND IT'S NOT SOMETHING THAT WE'VE

 8    RAISED IN OUR CASE SO THEY'RE SUBJECT TO PROVIDE IT.

 9              MR. MacDONALD:  YOUR HONOR, THEY HAVE RAISED IT IN

10    THEIR CASE THAT THE PEOPLE, FOR INSTANCE, WERE THE DRIVING

11    FACTOR FOR THE INTEL PURCHASE AND IT WASN'T THE -- INTELLECTUAL

12    PROPERTY WASN'T THE OTHER ISSUES THAT THE DELOITTE --

13              THE COURT:  DELOITTE & TOUCHE ISN'T GOING TO SOLVE

14    THAT.

15                   (SIMULTANEOUS COLLOQUY.)

16              THE COURT:  IF YOU'RE GOING TO MAKE ARGUMENTS ABOUT

17    THAT PEOPLE HAD DELOITTE & TOUCHE AS A PIECE OF THE WHOLE PIE,

18    BUT THAT IT -- YOU KNOW, I -- YOU COULD MAKE YOUR ARGUMENTS

19    BUT, YOU KNOW, I DON'T KNOW THAT I WOULD SEE THAT AS A DOCUMENT

20    THAT NOW ADDRESSES THAT ISSUE.

21                   (SIMULTANEOUS COLLOQUY.)

22              THE COURT:  IT'S -- YOU KNOW, IT'S WORKED AT BY BOTH

23    PARTIES.  IT'S -- IT'S -- THIS IS KIND OF LIKE THE NOSE OF WAX.

24    WE HAVE A NOSE OF WAX IN EVERY PATENT TRIAL.  SO THIS IS A NOSE

25    OF WAX.  OKAY.  BUT YOU PEOPLE CAN WORK ON IT.
```

```
 1              BUT I THINK THAT YOU CAN -- YOU CAN CALL SOMEBODY

 2    ELSE IF YOU'D LIKE TO.

 3              MR. TANGRI:  IF -- LET US SEE WHETHER THE SOMEBODY

 4    ELSE IS EVEN AVAILABLE, YOUR HONOR.

 5              THE COURT:  RIGHT.

 6              MR. TANGRI:  BECAUSE AS I SAID, THIS -- THEY DID

 7    USE -- THEY'LL TRY TO USE THIS DOCUMENT WITH THEIR EXPERT FOR

 8    PRECISELY THE POINT THAT COUNSEL WAS MAKING NOW.  IT DIDN'T

 9    COME IN.  WE WOULD HAVE CALLED THIS GENTLEMAN HAD THAT DOCUMENT

10    BEEN IN SOONER AND TO HAVE IT --

11              THE COURT:  RIGHT.

12              MR. TANGRI:  -- SO IT'S NOT REBUTTAL.  AND TO HAVE

13    IT COME IN NOW, IF WE CAN'T GET THIS PERSON, WOULD BE

14    PREJUDICIAL.

15              THE COURT:  WELL, I DON'T KNOW WHY -- THEY --

16    THEY'RE SAYING THAT THEY COULD PUT IT IN WITH A WITNESS.  AND

17    THAT IS PART OF THEIR REBUTTAL.  SO I MEAN, THAT -- THAT'S

18    ANOTHER WAY IN WHICH WE'RE LOOKING AT THIS.

19              MR. TANGRI:  WELL, YOUR HONOR, I -- I DON'T SEE HOW

20    IT'S PART OF THEIR REBUTTAL WHEN IT'S A DOCUMENT THEY TRIED TO

21    ADMIT THROUGH THEIR EXPERT THE FIRST TIME, AND IT DIDN'T COME

22    IN.  THAT'S --

23              THE COURT:  WELL, BUT I DON'T KNOW WHY IT DOESN'T

24    COME IN, FRANKLY.

25              MR. MacDONALD:  AND MOREOVER, YOUR HONOR,
```

```
 1   DEFENDANTS' NEXT WITNESS AND FINAL WITNESS IS LIKELY GOING TO

 2   BE --

 3             THE COURT:  IF HE TALKS ABOUT IT.

 4             MR. MacDONALD:  -- OPINING AS TO ISSUES RELATING TO

 5   THE DELOITTE REPORT.

 6             MR. TAYLOR:  WE CAN REVISIT IT.

 7             THE COURT:  WELL, HE COULD TALK ABOUT IT, AND THEN

 8   YOU CAN TALK ABOUT IT, TOO, AND IT MAY BE THAT THAT WITNESS

 9   TAKES CARE OF EVERYTHING.  IT MAY BE THAT THE -- THE ARGUMENTS

10   YOU WANT TO MAKE ARE GOING TO BE DEVELOPED THROUGH THAT WITNESS

11   AND MAYBE YOUR ARGUMENTS ARE DEVELOPED ALSO.  BUT I DON'T KNOW.

12             MR. TAYLOR:  HEARING THIS WITNESS AND THE WAY THE

13   TESTIMONY GOES WILL BE HELPFUL TO RESOLVING THIS ISSUE.

14             THE COURT:  ALL RIGHT.  ALL RIGHT.

15             MR. KIRSCH:  SO WE'LL REVISIT.

16             THE COURT:  THE NEXT WITNESS WE CALL, THEN I GUESS

17   WE KEEP ON GOING IN TERMS OF WHERE WE ARE, AND YOU CALL

18   MR. NAPPER.

19             MR. TAYLOR:  YES, YOUR HONOR.

20             MR. TANGRI:  YES, YOUR HONOR, DEFINITELY CALL

21   MR. NAPPER.

22             THE COURT:  BUT I THINK THAT IT CAN COME IN.  I

23   DON'T SEE WHY IT CAN'T COME IN.  AND IF IT COMES IN, IT COMES

24   IN AS A WHOLE BECAUSE I THINK YOU'RE CORRECT, IT'S MUCH EASIER

25   TO DO IT THAT WAY, AND THEN YOU HAVE AN OPPORTUNITY FOR BOTH
```

```
1   SIDES TO GIVE IT A FULL CONTEXT.

2            MR. KIRSCH:  SO DOES THAT OBVIATE THE NEED FOR THE

3   SIX-MINUTE VIDEO, YOUR HONOR?  OR --

4            THE COURT:  I THINK SO.

5            MR. TANGRI:  THE SIX-MINUTE VIDEO IS NOT THE ISSUE,

6   AND WE DON'T REQUIRE THE SIX-MINUTE VIDEO.  WE -- WE DON'T

7   THINK THE SIX-MINUTE VIDEO ADDRESSES THE OBJECTION.  IF YOUR

8   HONOR IS INCLINED TO ADMIT THE DOCUMENT, THEN WHEN IT COMES IN,

9   WE'LL SEE IF WE CAN GET THE AUTHOR OVER.  IF WE CAN'T, WE

10  CAN'T.  BUT --

11           MR. MacDONALD:  YOUR HONOR, MAY WE FORMALLY MOVE 834

12  INTO EVIDENCE THEN?

13           MR. TANGRI:  WE DO OBJECT TO THAT.  WE THOUGHT WE

14  WERE GOING TO HEAR WHAT THIS WITNESS HAD TO SAY ABOUT IT.

15           THE COURT:  I'M GOING TO LISTEN.

16           MR. MacDONALD:  OKAY.

17           THE COURT:  YOU'VE MOVED IT.

18           MR. MacDONALD:  THANK YOU.

19               (OFF-THE-RECORD DISCUSSION.)

20           THE COURT:  SPEAKING OF DOCUMENTS WITH ALL KINDS OF

21  MATERIALS IN THEM THAT THE JURY CAN MUSH OVER --

22               (SIMULTANEOUS COLLOQUY.)

23           MR. JANSEN:  THIS HAS BEEN MARKED.  I FORGOT TO GIVE

24  THIS -- THIS JUSTIN CAMP BOOK PORTION THAT WE USED DURING THE

25  CROSS-EXAMINATION.
```

1          **THE COURT:**  WELL, GIVE IT A NUMBER.

2          **MR. JANSEN:**  EXHIBIT 1208 FOR IDENTIFICATION, AND WE

3     MOVE THAT INTO EVIDENCE.

4          **THE CLERK:**  OKAY.

5          **MR. TANGRI:**  YOUR HONOR, THIS WAS A BOOK AND THE

6     WITNESS TESTIFIED ABOUT --

7          **THE COURT:**  THIS ONE IS MANIFESTLY ONE WHERE THE

8     ONLY PIECES THAT GO IN ARE THE ONES THAT THE TESTIMONY WAS

9     ABOUT.  WE'RE NOT GOING TO PUT IN BOOKS THAT --

10          **MR. JANSEN:**  OKAY.

11          **THE COURT:**  -- NOBODY'S TALKED ABOUT.

12          **MR. JANSEN:**  I MOVE IN THE PAGES THAT THE WITNESS

13     TALKED ABOUT.

14          **THE COURT:**  WELL, YOU CAN PICK OUT THE PAGES THAT

15     THE WITNESS TALKED --

16                    (SIMULTANEOUS COLLOQUY.)

17          **MR. TANGRI:**  YOUR HONOR, THE WITNESS TALKED ABOUT

18     MORE THAN JUST THE EXCERPTS THAT COUNSEL HAS, I'M FAIRLY

19     CONFIDENT, BECAUSE THE WITNESS HAD THE ENTIRE BOOK IN FRONT OF

20     HIM AND MADE REFERENCE TO PORTIONS OF THE BOOK OTHER THAN WHAT

21     WAS IN THE EXCERPT.

22          **THE COURT:**  ALL OF THE -- ALL OF THE REFERENCES

23     SHOULD BE PUT IN.  AND THAT'S ALL.

24          **MR. JANSEN:**  OKAY.  WE'LL WORK THAT OUT AT A BREAK,

25     YOUR HONOR.

```
1           THE COURT:  ALL RIGHT.  DO WE GIVE IT A NUMBER?

2           MR. JANSEN:  IT'S 1208 FOR IDENTIFICATION.

3           THE COURT:  ALL RIGHT.

4           MR. TANGRI:  AND WE HAVE TWO THINGS.  ONE, WE HAVE A

5   COUPLE OF HOUSEKEEPING MATTERS OF OUR OWN, BUT I THINK WE CAN

6   DO THOSE AFTER THESE WITNESSES.

7           THE COURT:  ALL RIGHT.

8           MR. TANGRI:  AND SECONDLY, I'M BEING INFORMED THAT

9   PERHAPS WE DO WANT THIS -- IF THIS DOCUMENT IS GOING TO COME

10  IN, WE NEED TO REVISIT THE ISSUE OF THE WITNESS' VIDEO, AND WE

11  CAN DO THAT AS WELL AFTER THIS WITNESS TESTIFIES.

12          THE COURT:  ALL RIGHT.

13              (OFF-THE-RECORD DISCUSSION.)

14          THE COURT:  ARE WE READY?

15          MS. GRANT:  YEAH, YOUR HONOR.

16              (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

17  PRESENCE OF THE JURY:)

18          THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

19          JURORS:  MORNING, YOUR HONOR.

20          THE COURT:  COUNSEL, PLEASE GO AHEAD.

21          MS. GRANT:  THANK YOU, YOUR HONOR.

22          THE DEFENSE CALLS BRIAN NAPPER.

23                      BRIAN W. NAPPER,

24  CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

25  TESTIFIED AS FOLLOWS:
```

1          **THE CLERK:**  PLEASE BE SEATED.  AND IF YOU'LL SCOOT

2     THE CHAIR UP TO THE MIKE AND SCOOT THE MICROPHONE UP, AND THEN

3     PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

4          **THE WITNESS:**  BRIAN WILLIAM NAPPER, N-A-P-P-E-R.

5                        **DIRECT EXAMINATION**

6     **BY MS. GRANT:**

7     **Q.**    GOOD MORNING, MR. NAPPER.

8     **A.**    GOOD MORNING, MS. GRANT.

9     **Q.**    YOU'VE BEEN RETAINED AS AN EXPERT WITNESS IN THIS CASE,

10    CORRECT?

11    **A.**    I HAVE.

12    **Q.**    AND WE'VE PREPARED SOME SLIDES TO HELP THE JURY FOLLOW

13    YOUR TESTIMONY TODAY.

14    **A.**    YES.

15    **Q.**    OKAY.

16          **MS. GRANT:**  IF WE CAN HAVE THE FIRST SLIDE, JEFF.

17              (EXHIBIT PUBLISHED TO JURY.)

18    **BY MS. GRANT:**

19    **Q.**    CAN YOU JUST TELL THE JURY A LITTLE BIT ABOUT YOUR

20    PROFESSIONAL EXPERIENCE.

21    **A.**    OH, THAT'S A LOT OF WORDS ON THAT SLIDE, ISN'T IT?  I

22    WON'T GO THROUGH EVERY ONE OF THESE.

23          I'M CURRENTLY A SENIOR MANAGING DIRECTOR, WHICH IS THE

24    HIGHEST POSITION IN THE FIRM, AT FTI CONSULTING.  I'M BASED IN

25    SAN FRANCISCO.  AND FTI CONSULTING IS A PUBLICLY HELD COMPANY

1   ABOUT 3- OR 4,000 EMPLOYEES, AND I HEAD UP THEIR INTELLECTUAL

2   PROPERTY GROUP.  AND WE HAVE ABOUT 60 FULL-TIME PROFESSIONALS

3   DOING INTELLECTUAL PROPERTY CONSULTING FOR A WIDE VARIETY OF

4   CLIENTS.

5       AND I ALSO HOLD A COUPLE OF OTHER TITLES AS EXECUTIVE

6   COMMITTEE MEMBER AT FTI.  I'VE BEEN THERE FOR ABOUT ALMOST FOUR

7   YEARS NOW.  I FORMERLY WAS, FOR ABOUT SIX YEARS, A PRINCIPAL OR

8   PARTNER AT DELOITTE & TOUCHE, WHICH IS A LARGE PUBLIC

9   ACCOUNTING FIRM IN SAN FRANCISCO.  I HEADED UP THEIR

10  INTELLECTUAL PROPERTY PRACTICE.

11      AND I'VE ALSO HAD EXPERIENCE IN KIND OF STARTUPS, IF YOU

12  WILL.  I'VE BEEN INVOLVED IN TWO STARTUP CONSULTING FIRMS,

13  BARRINGTON WHICH WAS PRIOR TO MY DELOITTE & TOUCHE PARTNERSHIP,

14  AND THEN STONETURN, WHICH WAS MORE RECENT AFTER

15  DELOITTE & TOUCHE AND BEFORE FTI CONSULTING.  SO I'VE BEEN --

16  WORKED FOR VERY LARGE COMPANIES, I'VE WORKED FOR VERY SMALL

17  COMPANIES AS WELL.

18  Q.   AND CAN YOU JUST TELL THE JURY YOUR EDUCATIONAL

19  BACKGROUND.

20  A.   YES.  I GRADUATED FROM THE UNIVERSITY OF CALIFORNIA

21  BERKELEY, UP THE ROAD HERE, IN GETTING A BS DEGREE IN BUSINESS

22  ADMINISTRATION WITH AN ACCOUNTING AND FINANCE DEGREE.  I

23  SUBSEQUENTLY ATTENDED A -- WHAT THEY CALL A STUDY PROGRAM ALSO

24  AT U.C. BERKELEY, WHICH FOCUSES ON TECHNOLOGY TRANSFERS.  AND

25  THAT HELPS TO KIND OF EDUCATE YOU ON INTELLECTUAL PROPERTY,

```
 1    HOW, FOR EXAMPLE, PROPERTY GETS FROM THE R & D LABS OF BERKELEY

 2    INTO THE PUBLIC DOMAIN.  AND I'VE ACTUALLY TAUGHT,

 3    SUBSEQUENTLY, THAT COURSE AS IT RELATES TO INTELLECTUAL

 4    PROPERTY VALUATION.

 5              MS. GRANT:  AND CAN WE HAVE THE NEXT SLIDE.

 6              (EXHIBIT PUBLISHED TO JURY.)

 7    BY MS. GRANT:

 8    Q.    IF YOU CAN JUST TELL THE JURY A LITTLE BIT ABOUT YOUR

 9    INTELLECTUAL PROPERTY VALUATION EXPERIENCE.

10    A.    SO IT BREAKS DOWN INTO THREE DIFFERENT AREAS.  THE FIRST

11    AREA THAT -- OF INTELLECTUAL PROPERTY, WHICH IS ALL I DO

12    ESSENTIALLY IS FOCUS ON THE VALUE OF INTELLECTUAL PROPERTY AND

13    THE ECONOMICS, IS WHAT WE CALL INTELLECTUAL ASSET MANAGEMENT.

14    AND THIS IS ESSENTIALLY CONSULTING WITH COMPANIES, TRYING TO

15    HELP THEM IDENTIFY INTELLECTUAL PROPERTY THEY MIGHT BE

16    UNDERUTILIZING, THEY MIGHT WANT TO LICENSE IT INTO THE

17    MARKETPLACE.  MY EXAMPLE OF THE LAWRENCE BERKELEY LAB, TRYING

18    TO GET THEIR TECHNOLOGY INTO THE PUBLIC DOMAIN AND CREATE

19    ROYALTY STREAMS BACK TO THE UNIVERSITY, A VERY WORTHWHILE

20    ENDEAVOR, AND ALL THE WAY DOWN TO SMALLER COMPANIES, WORKING

21    FOR SMALLER COMPANIES AND HELPING THEM FIND HOMES FOR THEIR

22    TECHNOLOGIES THAT THEY'VE DEVELOPED.

23              INTELLECTUAL PROPERTY VALUATION, A NUMBER OF DIFFERENT

24    REASONS WHY COMPANIES OR INDIVIDUALS MIGHT WANT TO VALUE THEIR

25    INTELLECTUAL PROPERTY, THEY MIGHT WANT TO ALLOCATE RESOURCES
```

1    APPROPRIATELY, THERE'S LIMITED BUDGETS FOR R & D, FOR EXAMPLE,

2    SO THEY WANT TO GO TO THE MOST VALUABLE OR MOST TIME SENSITIVE.

3    OTHERS MIGHT BE JUST TO PRESENT TO THE BOARD OF DIRECTORS THAT

4    THE PROPERTIES -- THE INTELLECTUAL PROPERTY IS BEING MANAGED

5    APPROPRIATELY BY THE VARIOUS PEOPLE IN THE COMPANY THAT ARE

6    TASKED WITH DOING THAT.

7         AND THEN ANOTHER -- I THINK ANOTHER SLIDE TALKS ABOUT THE

8    THIRD LEG, IF YOU WILL, WHICH IS INTELLECTUAL PROPERTY DISPUTES

9    AND EXPERT TESTIMONY, SUCH AS SOME OF THE WORK I'VE DONE IN

10   THIS CASE.

11        AND I'VE TESTIFIED IN A NUMBER OF FORUMS, FEDERAL COURT

12   LIKE I AM HERE TODAY, BUT ALSO IN THE INTERNATIONAL CHAMBER OF

13   COMMERCE AND WHAT'S CALLED THE ICT, OR INTERNATIONAL TRADE

14   COMMISSION, ALL ON INTELLECTUAL PROPERTY ISSUES.

15   Q.   DO YOU HAVE AN ESTIMATE OF HOW MANY TIMES YOU'VE

16   TESTIFIED AS AN EXPERT?

17   A.   IN TRIAL, PROBABLY OVER THE LAST TEN YEARS, ABOUT 20

18   TIMES OR SO.

19   Q.   OKAY.

20        MS. GRANT:  AND CAN WE GO AHEAD TO THE NEXT SLIDE,

21   JEFF.

22             (EXHIBIT PUBLISHED TO JURY.)

23   BY MS. GRANT:

24   Q.   AND YOU'VE PREPARED THIS.  WHAT DOES THIS SHOW US?

25   A.   THIS JUST GIVES A LITTLE BIT OF FLAVOR OF SOME OF THE

1    TYPES OF COMPANIES THAT I'VE HAD THE HONOR AND PLEASURE OF

2    WORKING WITH.  SO TECHNOLOGY COMPANIES IN GENERAL.  SOME OF

3    THESE ARE MULTIPLE PROJECTS THAT I WORK ON WITH THEM, ALL

4    DEALING WITH INTELLECTUAL PROPERTY.

5         AND THEN A LITTLE MORE FOCUS ON TELECOM, WORKING WITH

6    CISCO AND 3COM, FINISTAR, VITESSE.  THOSE ARE SOME OF THE MORE

7    CORE TELECOM COMPANIES THAT AGAIN I'VE DONE INTELLECTUAL

8    PROPERTY CONSULTING, EITHER IN DISPUTE SETTING OR HELPING THEM

9    TO LICENSE THEIR TECHNOLOGY.

10        ONES THAT ARE LISTED ARE SOME OF MY FAVORITE CLIENTS

11   WHICH ARE THE -- ONE OF MY FAVORITE TYPES OF CLIENTS IS THE

12   SMALL ENTREPRENEURIAL CLIENT THAT HAS TECHNOLOGY.  I'M WORKING

13   WITH A COUPLE RIGHT NOW, TWO DIFFERENT COMPANIES, WHERE THEY'RE

14   TRYING TO FIND A HOME FOR THEIR TECHNOLOGY.  THEY DON'T HAVE

15   THE INFRASTRUCTURE TO ACTUALLY TAKE A PRODUCT TO MARKET, BUT

16   THEY HAVE WHAT'S -- WHAT I CONSIDER TO BE KIND OF NEAT

17   TECHNOLOGY IN PATENTS, AND THEY'RE TRYING TO FIND A HOME.

18        SO I WORK WITH THEM AND TRY TO INTRODUCE THEM TO,

19   OFTENTIMES COMPANIES LIKE -- LIKE THE ONES SHOWN HERE ON THE

20   SLIDE IN ORDER TO CREATE A REVENUE STREAM FOR THE ENTREPRENEUR

21   OR THE INVENTOR.

22   Q.   AND WE HAVE ANOTHER SLIDE ABOUT YOUR EXPERIENCE.  AND IF

23   YOU COULD JUST MAYBE HIGHLIGHT A COUPLE THINGS THAT YOU THINK

24   ARE MOST RELEVANT TO THIS -- YOUR WORK IN THIS CASE.

25   A.   SURE.  I WOULD FOCUS MORE ON THE FACT THAT I'VE -- ABOUT

1   THE THIRD BULLET DOWN, THAT I PARTICIPATED AND ACTUALLY

2   PREPARED THE VIDEO COURSE FOR INTELLECTUAL PROPERTY VALUATION

3   OR APPRAISALS, WHY COMPANIES GET INTELLECTUAL PROPERTY

4   APPRAISALS.  AND THAT WAS PREPARED AND IS SPREAD OUT AND

5   DISTRIBUTED TO THE MEMBERS OF THE AMERICAN INSTITUTE OF

6   CERTIFIED PUBLIC ACCOUNTANTS, AND SO THEY USE THAT FOR THEIR

7   TRAINING MATERIALS.

8          AND THEN I'VE LECTURED EXTENSIVELY ON -- AND I TALKED

9   ABOUT MY TEACHING AT THE TECHNOLOGY TRANSFER STUDY PROGRAM.

10  AND LES IS A MEMBER OF EXECUTIVE SOCIETY -- LICENSING EXECUTIVE

11  SOCIETY THAT ESSENTIALLY, AGAIN, HELPS TO CREATE REVENUE

12  STREAMS OR VALUE FROM THEIR INTELLECTUAL PROPERTY.

13  Q.    AND JUST ALL TOLD, HOW MUCH -- HOW MANY YEARS HAVE YOU

14  BEEN WORKING IN INTELLECTUAL PROPERTY VALUATION?

15  A.    EVER SINCE I HAD HAIR, MS. GRANT.  IT'S BEEN A LONG TIME.

16  IT'S ABOUT ALMOST 20 YEARS NOW, BUT I FOCUS ALMOST FULL-TIME ON

17  INTELLECTUAL PROPERTY.

18          MS. GRANT:  YOUR HONOR, THE DEFENDANTS WOULD OFFER

19  MR. NAPPER AS AN EXPERT IN THE FIELD OF INTELLECTUAL PROPERTY

20  VALUATION.

21          THE COURT:  ANY QUESTIONS?

22          MR. JANSEN:  NOT AT THIS TIME, YOUR HONOR.  RESERVE.

23          THE COURT:  THE COURT WILL ACCEPT MR. NAPPER AS AN

24  EXPERT ON THE AREA OF INTELLECTUAL PROPERTY VALUATION.

25          MS. GRANT:  THANK YOU, YOUR HONOR.

1        COULD WE HAVE THE NEXT SLIDE?

2   **BY MS. GRANT:**

3   **Q.**   CAN YOU PLEASE TELL THE JURY WHAT WAS YOUR ASSIGNMENT IN

4   THIS CASE?

5              (EXHIBIT PUBLISHED TO JURY.)

6        **THE WITNESS:**  I WAS ASKED TO DO THREE -- LOOK AT

7   THREE THINGS.

8              THE FIRST IS TO DETERMINE THE VALUE OF BEING NAMED

9   AS AN INVENTOR OR COINVENTOR OF WHAT I TERM THE DBC AND FLEXURE

10  PATENTS.  THERE'S BEEN QUITE A BIT OF DISCUSSION IN TRIAL

11  RELATED TO THOSE.

12             THE SECOND WOULD BE TO DETERMINE THE VALUE OF

13  MR. SHUM'S RIGHTS IN THE RADIANCE INTELLECTUAL PROPERTY AS IT

14  RELATES TO THE PLAN OF LIQUIDATION.

15             AND THEN LAST, I WAS ASKED TO LOOK AT AND COMMENT

16  AND ANALYZE THE WORK OF MR. SHUM'S EXPERTS, MR. LASINSKI AND

17  MR. REGAN, IN THEIR ATTEMPTS TO ESSENTIALLY VALUE MR. SHUM'S

18  RIGHTS AS I UNDERSTAND THEIR ANALYSIS.

19  **BY MS. GRANT:**

20  **Q.**   OKAY.  AND WHAT INFORMATION DID YOU CONSIDER IN REACHING

21  YOUR CONCLUSIONS IN THIS CASE?

22  **A.**   WELL, AS YOU CAN WELL IMAGINE, THERE WAS QUITE A BIT OF

23  THE INFORMATION THAT WAS PRODUCED BETWEEN THE PARTIES.  SO IT

24  RANGES FROM FINANCIAL INFORMATION, FOR EXAMPLE, THE PROFIT AND

25  LOSS STATEMENTS OF LIGHTLOGIC, SOME INFORMATION AND EMAILS

1    RELATING TO OFFERS BACK AND FORTH BETWEEN MR. SHUM AND

2    DR. VERDIELL THAT I'LL TOUCH ON IN A LITTLE BIT, VARIOUS OTHER

3    DOCUMENTS, MARKETING DOCUMENTS, BUSINESS PLANS.

4         I REVIEWED QUITE A BIT OF DEPOSITION TESTIMONY, MANY OF

5    THE FACT WITNESSES, AS WELL AS I'VE BEEN REVIEWING THE TRIAL

6    TESTIMONY THAT HAS BEEN GOING ON HERE FOR SOUNDS LIKE QUITE A

7    FEW -- QUITE A FEW DAYS.

8    **Q.**    HOW MANY HOURS APPROXIMATELY, JUST BALLPARKING IT FOR US,

9    HAVE YOU WORKED ON REVIEWING THE INFORMATION IN THIS CASE AND

10   FORMULATING YOUR CONCLUSIONS?

11   **A.**    I WOULD ESTIMATE IT AT ABOUT -- ABOUT 150 HOURS OF MY

12   PERSONAL TIME THAT I'VE INVESTED IN LOOKING OVER THIS

13   INFORMATION IN WRITING MY REPORT.

14   **Q.**    AND HOW MUCH HAVE YOU BEEN COMPENSATED TO DATE OR BILLED

15   TO DATE?

16   **A.**    MY FIRM, I THINK, HAS BILLED A LITTLE -- A LITTLE OVER

17   $300,000, I THINK.

18   **Q.**    AND DID YOU REVIEW -- I THINK IT'S ON -- YOU REVIEWED THE

19   PLAN OF LIQUIDATION; IS THAT CORRECT?

20   **A.**    I DID.

21   **Q.**    AND WAS THE PLAN OF LIQUIDATION IMPORTANT TO THE

22   CONCLUSIONS THAT YOU'VE REACHED IN THIS CASE?

23   **A.**    WELL, YES.  IT'S CERTAINLY A PRIMARY DOCUMENT.  IT -- IT

24   ESSENTIALLY, AS I UNDERSTAND IT, SPELLED OUT THE -- MR. SHUM

25   AND DR. VERDIELL AND SUMMARIZED THEIR -- THEIR AGREEMENT TO GO

1   FORTH AFTER THE RADIANCE DESIGN, INC., ERA, IF YOU WILL.  AND

2   SO I DID FOCUS ON THAT.

3   Q.    AND DID YOU MAKE ANY ASSUMPTIONS THAT ARE RELEVANT TO

4   YOUR OPINIONS IN THIS CASE?

5   A.    I DID.  AND THEY PRIMARILY STEM, AT LEAST SOME OF THEM

6   AND PERHAPS MANY OF THEM, FROM THE PLAN OF LIQUIDATION.

7   Q.    WELL, WHY DON'T YOU GO AND EXPLAIN TO THE JURY -- WE'RE

8   GOING TO GO THROUGH AND JUST EXPLAIN SOME OF THE ASSUMPTIONS.

9   A.    SURE.  WHAT I'VE DONE IS HIGHLIGHTED A CERTAIN SECTION OF

10  THE PLAN OF LIQUIDATION THAT WAS SIGNED IN JANUARY 5TH, 1998.

11  AND THE FIRST SECTION I FOCUSED ON IS THAT VERDIELL AND SHUM

12  SHALL HAVE EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT THE

13  INTELLECTUAL PROPERTY DEVELOPED BY THE CORPORATION.

14        SO MY ASSUMPTION THAT I WAS ASKED TO MAKE OR MY TAKEAWAY,

15  IF YOU WILL, IS THAT MR. SHUM AND DR. VERDIELL EACH HAD FULL

16  INDEPENDENT RIGHTS TO COMPETE USING ANY IDEAS DEVELOPED AT

17  RADIANCE, INCLUDING WHAT I UNDERSTAND TO BE THE DBC AND FLEXURE

18  INVENTIONS.

19  Q.    OKAY.  AND HAVE YOU MADE ANY OTHER ASSUMPTIONS?

20  A.    I HAVE.  I THINK THERE'S A COUPLE OF OTHERS THAT STEM

21  FROM THE PLAN OF LIQUIDATION.

22        ANOTHER ONE -- ANOTHER SECTION OF THE PLAN OF LIQUIDATION

23  WOULD -- STATES THAT THEY HAD THE RIGHT TO PURSUE ANY AND ALL

24  SUCH OTHER BUSINESS ACTIVITIES AS THEY SHALL DESIRE, EVEN IF

25  SUCH ACTIVITIES ARE IN COMPETITION WITH THE BUSINESS OF THE

1   CORPORATION.

2   **Q.**    WHY --

3   **A.**    SO --

4   **Q.**    I'M SORRY.

5   **A.**    I'M SORRY.

6   **Q.**    I WAS GOING TO SAY WHY WAS THAT IMPORTANT TO YOUR

7   OPINIONS IN THIS CASE?

8   **A.**    SO MY TAKEAWAY ON THAT IN TERMS OF AN ASSUMPTION IS THAT

9   MR. SHUM, AS WELL AS DR. VERDIELL, CAN MAKE, USE OR SELL ANY

10  IDEAS, INVENTIONS OR TECHNOLOGIES OWNED BY RADIANCE, AND CAN --

11  MR. SHUM CAN TRANSFER HIS RIGHTS TO OTHERS JUST AS DR. VERDIELL

12  ENDED UP TRANSFERRING HIS RIGHTS TO LIGHTLOGIC AND THEN

13  ULTIMATELY TO INTEL.

14       THESE RIGHTS REALLY -- THESE PARTICULAR RIGHTS, THE

15  RIGHTS TO GO OUT, MAKE, USE, HAVE THE INVENTIONS, USE THE

16  INVENTIONS, THEY DON'T VARY WITH RESPECT TO WHO IS NAMED AS THE

17  INVENTOR ON THE PATENTS.  IN OTHER WORDS, THE ECONOMIC RIGHTS

18  OF THOSE TWO INVENTORS -- AND I'LL EXPLAIN THAT A LITTLE BIT

19  MORE IN A MINUTE -- DON'T REALLY CHANGE DEPENDING UPON WHO'S

20  NAMED AS THE INVENTOR.

21  **Q.**    DID YOU MAKE ANY OTHER ASSUMPTIONS BASED ON THE PLAN OF

22  LIQUIDATION?

23  **A.**    ONE OTHER PART OF THE PLAN OF LIQUIDATION WAS THE PART

24  THAT DEALT WITH THE COMMUNICATION OR DUTY BETWEEN DR. VERDIELL

25  AND MR. SHUM, AND THAT'S STRAIGHT FROM THE -- THE PLAN OF

```
 1   LIQUIDATION WOULD BE WITHOUT ANY LIABILITY OR DUTY TO ACCOUNT

 2   TO THE CORPORATION OR TO THE OTHER TO PURSUE ANY AND ALL SUCH

 3   OTHER BUSINESS ACTIVITIES AS THEY SHALL DESIRE.

 4   Q.    WHY WAS THAT SIGNIFICANT TO YOUR WORK IN THIS CASE?

 5   A.    SO THE ASSUMPTION HERE AND -- AND WHAT'S INCORPORATED

 6   INTO MY WORK IS THAT DR. VERDIELL AND MR. SHUM, AS SHOWN HERE

 7   ON THE SLIDE, IDENTIFIED (SIC) -- CAN PURSUE ANY AND ALL

 8   BUSINESS OPPORTUNITIES WITHOUT A DUTY TO ACCOUNT TO EACH OTHER.

 9   THERE'S NO RIGHT TO SHARE IN THE PROFITS OF THOSE ACTIVITIES.

10   Q.    LET'S TALK ABOUT YOUR FIRST OPINION IN THIS CASE.  HAVE

11   YOU REACHED AN OPINION REGARDING THE VALUE OF BEING NAMED AS AN

12   INVENTOR OR A COINVENTOR ON THE PATENTS IN THIS CASE?

13   A.    I HAVE.

14   Q.    OKAY.

15           MS. GRANT:  GO TO THE NEXT SLIDE, JEFF.

16           (EXHIBIT PUBLISHED TO JURY.)

17   BY MS. GRANT:

18   Q.    AND IF YOU COULD JUST BRIEFLY TELL THE JURY A LITTLE BIT

19   ABOUT YOUR OPINION, AND THEN WE'LL DELVE MORE DEEPLY INTO IT.

20   A.    SURE.  JUST FROM A HIGH LEVEL, BASED UPON A COUPLE OF

21   DIFFERENT APPROACHES, AND I TRIED TO IDENTIFY IT ON A

22   PER-PATENT BASIS, IS MY OPINION THAT THE VALUE BEING NAMED AS

23   AN INVENTOR OR COINVENTOR ON THE DBC AND/OR FLEXURE PATENTS

24   RANGES FROM $25,000 ON THE LOW END TO $37,500 ON THE HIGH END.

25           SO IF ONE WERE TO TAKE ALL SIX PATENTS THAT I UNDERSTAND
```

1    CONSTITUTE DBC AND FLEXURE PATENTS, THAT THAT WOULD RANGE FROM

2    $150,000 TO $225,000.

3    Q.    AND DID YOU MAKE ANY ASSUMPTIONS RELATED TO THIS OPINION?

4    A.    I DID.

5          **MS. GRANT:**  AND JEFF.

6    **BY MS. GRANT:**

7    Q.    MAYBE YOU CAN EXPLAIN THAT FOR THE JURY.

8    A.    SURE.  I'VE JUST BRIEFLY TALKED ABOUT WHAT I CALLED

9    ASSUMPTION NO. 2 FROM THE PLAN OF LIQUIDATION, THAT THE RIGHTS

10   OF THE PLAN OF LIQUIDATION, THEY DIDN'T VARY DEPENDING ON WHO

11   WAS NAMED AS THE INVENTOR.

12         WHAT I WAS ASKED TO LOOK AT IS WHAT IS THE VALUE IF

13   MR. FRANK SHUM APPEARS ON THE INVENTOR LINE WITH JEAN-MARC

14   VERDIELL, AND JUST THE VALUE OF APPEARING ON THAT PATENT,

15   BECAUSE MY ASSUMPTION IS MR. SHUM HAD RIGHTS TO USE THE

16   TECHNOLOGY THAT'S COVERED BY THE PATENT, GO AND PURSUE HIS

17   SPECIFIC ACTIVITIES, FROM THE PLAN OF LIQUIDATION.

18   Q.    WELL, LET ME JUST ASK YOU.  MR. REGAN TESTIFIED THAT WHEN

19   DR. VERDIELL FILED A PATENT, IT ABOLISHED MR. SHUM'S RIGHTS.

20   DO YOU AGREE WITH THAT?

21   A.    NO.

22   Q.    AND WHY NOT?

23   A.    IT'S MY ASSUMPTION THAT MR. SHUM STILL HAS THE RIGHTS,

24   EVEN IF A PATENT HAS BEEN FILED BY DR. VERDIELL, TO USE, MAKE,

25   HE COULD TAKE THAT TECHNOLOGY AND HAVE SOMEBODY ELSE MAKE AND

```
1    USE THE TECHNOLOGY, HE CAN EVEN ASSIGN HIS RIGHTS TO ANOTHER

2    COMPANY.  AND SO IT DOESN'T ABOLISH HIS RIGHTS.

3    Q.    DOES HE HAVE THOSE RIGHTS EVEN SITTING HERE RIGHT NOW

4    TODAY?

5    A.    HE DOES.  THAT'S MY ASSUMPTION THAT HE DOES.

6    Q.    OKAY.

7            MS. GRANT:  CAN WE GO TO THE NEXT SLIDE, JEFF.

8    BY MS. GRANT:

9    Q.    AND GET INTO YOUR --

10            (EXHIBIT PUBLISHED TO JURY.)

11   BY MS. GRANT:

12   Q.    -- AND YOU SAID THAT THERE WERE A COUPLE DIFFERENT

13   APPROACHES FOR THE WAY THAT YOU CAME UP WITH YOUR -- YOUR

14   CONCLUSION.  IF YOU CAN JUST EXPLAIN -- I THINK THIS IS THE

15   FIRST APPROACH?

16   A.    SURE.  YEAH.  THERE'S THREE DIFFERENT APPROACHES I LOOKED

17   AT.  I LOOKED AT WHAT'S CALLED THE INCOME APPROACH, THE COST

18   APPROACH, AND THE MARKET APPROACH.  THESE ARE, AS YOU CAN WELL

19   IMAGINE, NOT DISSIMILAR SOMEWHAT TO VALUING REAL ESTATE OR SOME

20   OTHER TANGIBLE ASSET.

21       YOU LOOK AT THE INCOME THAT CAN BE DRIVEN OFF OF THE

22   ASSET.  YOU LOOK AT COMPARABLES, THE HOUSE DOWN THE STREET SOLD

23   FOR "X," MAYBE A LITTLE LOWER, UNFORTUNATELY, IN THIS ECONOMY,

24   AND THEN THE COST TO KIND OF BUILD THE HOUSE.

25       SO JUST WITH THAT AS A FRAMEWORK, I LOOKED AT THE INCOME
```

1    APPROACH, AND I IDENTIFIED THAT SOME COMPANIES -- AND I'M

2    FAMILIAR WITH THIS PRACTICE -- SORRY -- THAT SOME COMPANIES

3    ACTUALLY GIVE AWARDS, BONUS AWARDS OR MERIT AWARDS OR

4    COMPENSATION, TO THEIR RESEARCH AND DEVELOPERS IF THEY'RE NAMED

5    ON PATENTS.

6        FIRST OF ALL, IF A PATENT APPLICATION IS FILED, AND THEN

7    ULTIMATELY IF A PATENT ACTUALLY DOES GET ISSUED, THEN COMPANIES

8    WILL PAY A BONUS, IF YOU WILL, TO THOSE INVENTORS.

9        AND REMEMBER, THOSE INVENTORS TYPICALLY -- THOSE -- THE

10   RIGHTS TYPICALLY OF THOSE INVENTORS ON THE PATENTS GO TO THE

11   COMPANY, SO THIS IS RECOGNITION OF HAVING YOUR NAME ON THE

12   PATENT.  SO I THOUGHT THAT MIGHT BE A GOOD PROXY TO LOOK AT TO

13   TRY TO VALUE BEING NAMED AS AN INVENTOR ON A PATENT.

14   Q.   WHEN YOU SAY THAT -- THAT THE RIGHTS GO TO THE -- THE

15   INVENTOR'S RIGHTS GO TO THE COMPANY, WHAT DO YOU MEAN BY THAT?

16   A.   WELL, ESSENTIALLY IN COMPANIES LIKE CISCO AND MOTOROLA

17   THAT I'VE NAMED HERE AND OTHER COMPANIES, IT'S MORE TYPICAL

18   THAT THE RESEARCH AND DEVELOPERS WORK -- THEY'RE EMPLOYEES, AND

19   ANY OF THE PATENT RIGHTS THAT ISSUE THAT THEY'RE AN INVENTOR

20   ON, THEY GO TO THE -- THEY GO TO THE COMPANY BECAUSE THE

21   COMPANY IS PAYING THEIR SALARY, AND SO ESSENTIALLY THAT'S WHAT

22   THEY'RE PAYING THEM TO DO.

23       THIS IS AN EXTRA AMOUNT OF COMPENSATION TO RECOGNIZE THAT

24   THEY'RE DRIVING PATENT APPLICATIONS OF PATENTS THAT MIGHT HAVE

25   SOME VALUE TO THE COMPANY OVERALL.

1   Q.     SO CAN YOU TELL THE JURY HOW YOU CALCULATED THIS UNDER

2   THE INCOME APPROACH?

3   A.     YES.  SO UNDER THIS INCOME APPROACH, I LOOKED AT A

4   COMPANY LIKE CISCO, WHICH I THOUGHT WAS SOMEWHAT RELEVANT GIVEN

5   THAT THEY'RE IN THE TELECOM SPACE IN A PRETTY LARGE WAY, AND

6   THEY -- THEY PAY $5,000 IF A PATENT ISSUES.  AND THIS IS

7   PUBLICLY AVAILABLE INFORMATION THAT SOME COMPANIES LIKE TO TOUT

8   AND TRY TO ATTRACT INVENTORS AND RESEARCH AND DEVELOPERS TO --

9   TO BE EMPLOYED.

10      MOTOROLA RANGES FROM 10,000 TO 25,000.  AND THEN I LOOKED

11  AT A SURVEY OF VARIOUS COMPANIES AND IT RANGED AS LOW AS $200,

12  I THINK I ACTUALLY HAD ONE COMPANY THAT SAID THEY PAID A DOLLAR

13  TO AN INVENTOR IF THEY'RE NAMED ON A PATENT, TO AS HIGH AS

14  37,500.

15      SO WHAT I ESSENTIALLY DID IS I TOOK THE HIGH END OF THAT

16  RANGE, RECOGNIZING I COULD HAVE CHOSEN OTHER DATA POINTS OR

17  INDICATORS OR PAYMENTS, BUT I CHOSE THE HIGH END OF 37,500,

18  MULTIPLIED THAT BY THE NUMBER OF POTENTIAL PATENTS AT ISSUE,

19  WHICH WOULD BE SIX, AND CAME OUT WITH $225,000 UNDER THE INCOME

20  APPROACH.

21  Q.     AND SO USING THE INCOME APPROACH, SO WHAT -- CAN YOU JUST

22  SAY IN TERMS OF MR. SHUM'S RIGHTS IN THIS CASE OF BEING, JUST

23  HAVING HIS NAME, BEING NAMED AS AN INVENTOR, WHAT WOULD THAT

24  MEAN IN TERMS OF YOUR OPINION?

25  A.     SO THAT WOULD INDICATE THAT IF MR. SHUM WERE TO BE NAMED

1   AS THE INVENTOR ON ALL SIX PATENTS, THEN THIS WOULD BE THE

2   VALUE BASED UPON THE INCOME APPROACH OF $225,000.

3   **Q.**    AND YOU MENTIONED THERE WAS A SECOND APPROACH?

4   **A.**    YES.  I ALSO LOOKED AT IT FROM A COST APPROACH.  AND IN A

5   COST APPROACH, THIS IS SOMEWHAT THE SAME, YOU KNOW, ROAD, IF

6   YOU WILL, TO GET THERE, WHICH IS WHAT IS THE COST FOR

7   SOMEBODY -- INCLUDING SOMEBODY LIKE MR. SHUM -- WHAT IS THE

8   COST TO ACTUALLY FILE A PATENT APPLICATION, WORK POTENTIALLY

9   WITH OUTSIDE PATENT ATTORNEYS AND TO ACTUALLY GET A PATENT TO

10  ISSUE.

11       AND I'M ALSO FAMILIAR WITH THIS PRACTICE.  I'VE WORKED A

12  LOT WITH PATENT ATTORNEYS, AS YOU CAN WELL IMAGINE, AND SO I

13  HAVE ESTIMATES OF WHAT THEY GIVE TO THEIR CLIENTS.  BUT THERE'S

14  ALSO PUBLICLY AVAILABLE INFORMATION.  I THINK IT'S FROM,

15  ACTUALLY, GOVERNMENT SOURCES AS WELL.  AND THAT RANGED ANYWHERE

16  FROM $5,000 ON A PER-PATENT BASIS UP TO $25,000 FOR A FAIRLY

17  COMPLEX PATENT APPLICATION.  PATENT -- THOSE TYPICALLY ON THE

18  HIGH END ARE TYPICALLY MORE IN THE LIFE SCIENCES AND BIOTECH

19  ARENA.  AS YOU CAN WELL IMAGINE, IT'S PRETTY COMPLEX STUFF.

20  **Q.**    OKAY.  AND SO CAN YOU JUST TELL THE JURY -- I THINK IT'S

21  PRETTY OBVIOUS -- BUT FOR THE RECORD, HOW YOU CALCULATED

22  MR. SHUM, JUST BEING NAMED AS AN INVENTOR, WHAT THAT WOULD BE

23  WORTH?

24  **A.**    SURE.  SO IF SOMEBODY LOOKED AT THE COST -- WHAT DOES IT

25  COST TO ACTUALLY FILE THE PATENT AND BEING NAMED AS THE

NAPPER - DIRECT / GRANT

1    INVENTOR, OBVIOUSLY, AS A RESULT OF THAT, IT WOULD BE SIX

2    PATENTS AT ISSUE, AS I UNDERSTAND IT, TIMES THE HIGH END OF

3    $25,000 OR A TOTAL OF $150,000 USING THE COST APPROACH IN

4    VALUING MR. SHUM BEING NAMED AS AN INVENTOR OR COINVENTOR.

5    **Q.**    NOW, YOU ALSO MENTIONED THAT THERE'S ANOTHER APPROACH

6    CALLED THE MARKET APPROACH.  CAN YOU TELL THE JURY A LITTLE BIT

7    ABOUT THAT?

8    **A.**    YEAH, THE MARKET APPROACH LOOKS AT, YOU KNOW, COMPARABLES

9    IN TERMS OF AGREEMENTS.  FOR EXAMPLE, HAS THERE BEEN AN

10   AGREEMENT THAT HAS GIVEN THAT TYPE OF RIGHTS, IF YOU WILL, AND

11   GOTTEN SOME CONSIDERATION?  HAVE THERE BEEN OFFERS FOR THAT OR

12   DISCUSSIONS BACK AND FORTH?

13         I JUST COULDN'T FIND ANYTHING.  I'M NOT FAMILIAR WITH

14   REALLY ANY AGREEMENTS THAT WOULD EXCHANGE CONSIDERATION FOR THE

15   RIGHT OF BEING NAMED AS AN INVENTOR OR COINVENTOR ON PATENTS.

16   SO THE MARKET APPROACH IS NOT APPLICABLE HERE.

17   **Q.**    IF I UNDERSTAND YOUR TESTIMONY THAT WHEN YOU'RE LOOKING

18   AT THE MARKET APPROACH, ARE YOU LOOKING AT WHAT THE MARKETPLACE

19   VALUES -- HOW THE MARKET VALUES THESE RIGHTS?

20   **A.**    ESSENTIALLY THAT'S RIGHT.  AND WHAT I'M LOOKING FOR IN

21   TERMS OF HOW THE MARKET MIGHT VALUE IT IS LOOKING FOR HAVE

22   THERE BEEN ANY -- ANY AGREEMENTS, ARE THERE ANY DATA POINTS I

23   CAN GATHER THAT WOULD SUGGEST THAT THIS RIGHT OF VALUE BEING

24   NAMED AS AN INVENTOR WAS EXCHANGED FOR SOME CONSIDERATION.

25         AND, YOU KNOW, I RACKED MY BRAIN, QUITE HONESTLY, A

NAPPER - DIRECT / GRANT

1    LITTLE WHILE.  I'M JUST NOT FAMILIAR WITH THAT.  AFTER 20 YEARS

2    OF WORKING IN THIS FIELD, I'VE REALLY NEVER SEEN ANYTHING LIKE

3    THAT.

4    Q.    OKAY.  HAVE WE COVERED YOUR FIRST OPINION?

5    A.    WE HAVE.

6    Q.    LET'S GO ON TO YOUR SECOND OPINION.  IF YOU COULD JUST,

7    AT A HIGH LEVEL, TELL THE JURY WHAT THAT IS.

8    A.    SURE.  I WAS ASKED TO LOOK AT AND VALUE MR. SHUM'S RIGHTS

9    IN THE RADIANCE -- IN THE RADIANCE DBC AND/OR FLEXURE

10   INVENTIONS UNDER THE PLAN OF LIQUIDATION.  AND IT'S MY OPINION

11   THAT THOSE -- THE VALUE OF THOSE RIGHTS RANGE FROM $250,000 TO

12   $500,000.  SO THIS IS SEPARATE AND DISTINCT FROM BEING NAMED AS

13   AN INVENTOR, BUT WHETHER MR. SHUM'S RIGHTS AND THE VALUE OF

14   THOSE RIGHTS.

15   Q.    AND WE'VE HEARD IN THIS CASE SOMETHING CALLED EXCLUSIVE

16   RIGHTS.  IS THIS MEANT TO COVER THAT?

17   A.    IT IS.  IT ALSO COVERS THE EXCLUSIVE RIGHTS UNDER THE --

18   UNDER THE PLAN OF LIQUIDATION.

19   Q.    AND DID YOU USE THE -- THE MARKET APPROACH FOR THIS OR

20   SOME OTHER APPROACH?

21   A.    IN THE APPROACH, I DID USE THE MARKET APPROACH BECAUSE

22   THERE WERE A COUPLE PIECES OF INFORMATION I FOUND PARTICULARLY

23   HELPFUL TO ME IN TRYING TO IDENTIFY THE VALUE OF MR. SHUM'S

24   RIGHTS.

25   Q.    IS THIS -- IS THE OPINION YOU REACHED ABOUT THE VALUE OF

1   MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION OR THE

2   EXCLUSIVE RIGHTS BASED ON ANY ASSUMPTIONS?

3   **A.**    YES.

4            **MR. JANSEN:**  OBJECTION, YOUR HONOR, IT'S A COMPOUND

5   QUESTION.  I DON'T KNOW WHETHER SHE'S ASKING ABOUT EXCLUSIVE

6   RIGHTS OR RIGHTS OF MR. SHUM UNDER THE PLAN OF LIQUIDATION.

7            **MS. GRANT:**  WELL, I CAN ASK A DIFFERENT QUESTION TO

8   CLARIFY IT.

9   **BY MS. GRANT:**

10  **Q.**    THIS OPINION WHERE IT SAYS THE VALUE OF MR. SHUM'S RIGHTS

11  IN THE RADIANCE DBC OR FLEXURE INVENTION, IS THAT THE SAME AS

12  EXCLUSIVE RIGHTS?

13  **A.**    IT IS.  THAT WOULD BE THE SAME AS EXCLUSIVE RIGHTS,

14  THAT'S CORRECT.

15  **Q.**    AND IS THAT OPINION BASED ON ANY ASSUMPTIONS?

16  **A.**    YES.

17            **MS. GRANT:**  CAN WE GO TO THE NEXT SLIDE, JEFF.

18            (EXHIBIT PUBLISHED TO JURY.)

19  **BY MS. GRANT:**

20  **Q.**    AND SO CAN YOU PLEASE EXPLAIN TO THE JURY THE ASSUMPTION

21  THAT YOU BASED YOUR OPINION ON?

22  **A.**    SO BACK TO THE PLAN OF LIQUIDATION AND ASSUMPTION NO. 3

23  WHERE DR. VERDIELL AND MR. SHUM CAN PURSUE ANY AND ALL BUSINESS

24  OPPORTUNITIES WITHOUT ANY LIABILITY OR DUTY TO ACCOUNT TO EACH

25  OTHER.  SO THEY CAN PURSUE AND USE THESE RIGHTS UNDER THIS PLAN

1   OF LIQUIDATION.  THEY CAN EXPLOIT THOSE RIGHTS.  THEY CAN DO

2   WHAT THEY WILL.  THEY CAN ASSIGN THEM TO ANOTHER COMPANY.

3   THOSE ARE MY ASSUMPTIONS.

4   **Q.**    AND WHY WAS THE FACT THAT THEY HAVE NO RIGHT TO SHARE IN

5   THE PROFITS IMPORTANT TO YOUR OPINION?

6   **A.**    WELL, IT'S ESSENTIALLY BECAUSE THEY -- THE PLAN OF

7   LIQUIDATION, IN MY ASSUMPTION, IS BOTH PARTIES CAN GO AND

8   PURSUE INDEPENDENTLY AND KIND OF -- IT'S ALMOST LIKE A HORSE

9   RACE.  IT'S LIKE WHO'S GOING TO DEVELOP AND FURTHER THE

10  TECHNOLOGY THAT WAS ULTIMATELY AT RADIANCE.

11  **Q.**    AND CAN YOU DESCRIBE THE FIRST TRANSACTION THAT YOU

12  CONSIDERED.

13  **A.**    YES.  I FIRST LOOKED AT A SERIES OF BACK AND FORTH, I

14  THINK, EMAILS AND CORRESPONDENCE BETWEEN DR. VERDIELL AND

15  MR. SHUM IN LATE 1997.  AND IN PARTICULAR I IDENTIFIED THIS --

16  THIS DOCUMENT -- THERE WERE MANY -- THAT TALKED ABOUT BUYOUT

17  OFFERS BACK AND FORTH.  NOW, THIS IS BUYOUT OFFERS FOR THE

18  WHOLE COMPANY OR THEIR OWN -- THEIR PORTION OF THE COMPANY,

19  "THEY" BEING DR. VERDIELL AND MR. SHUM.

20      AND SO ESSENTIALLY WHILE THERE WAS A NUMBER OF BACK AND

21  FORTHS, I LOOKED AT THIS NUMBER OF $250,000 AS A DATA POINT

22  BECAUSE THAT'S ESSENTIALLY WHAT MR. SHUM, AT THAT POINT IN

23  TIME, WAS POTENTIALLY WILLING TO HAVE DR. VERDIELL BUY OUT HIS

24  PORTION OF THE COMPANY.  AND CONVERSELY, IF DR. VERDIELL DIDN'T

25  EXERCISE THAT, THEN MR. SHUM COULD HAVE BOUGHT OUT

NAPPER – DIRECT / GRANT

1   DR. VERDIELL'S PORTION OF THE COMPANY.  THIS IS ALSO

2   PARTICULARLY RELEVANT BECAUSE IT'S RIGHT AROUND THE TIME OF THE

3   END OF -- OF THE COMPANY WHEN DR. VERDIELL AND MR. SHUM WERE

4   WORKING TOGETHER.

5        SO THAT'S KIND OF A GOOD PICTURE OF WHERE THE TECHNOLOGY

6   STOOD, WHERE THE RIGHTS AND THE VALUE OF RIGHTS STOOD AT THAT

7   POINT IN TIME.

8   Q.   WHEN YOU SAY "THE VALUE OF RIGHTS," HERE WE'RE LOOKING AT

9   THE VALUE OF EXCLUSIVE RIGHTS.  IS THAT THE FIGURE YOU WERE

10  TALKING ABOUT OR --

11  A.   YES.  SO THIS WOULD -- AND THIS IS WHY I GO BACK BECAUSE

12  THIS COULD BE USED AS THE EXCLUSIVE RIGHTS AS WELL BECAUSE THIS

13  ESSENTIALLY GIVES TO THE OTHER INDIVIDUAL ALL RIGHTS,

14  ESSENTIALLY, TO THE TECHNOLOGY.  SO -- AND THEN THE PERSON

15  DOESN'T RETAIN ANY RIGHTS.  SO THIS IS A COMPLETE BUYOUT AND

16  SEPARATION.

17  Q.   DID THE BUYOUT OFFER OF 250,000 INCLUDE ALL THE RIGHTS OR

18  JUST THE RIGHTS TO THE RADIANCE IP?

19  A.   IT INCLUDED ALL THE RIGHTS TO THE COMPANY, ALL THE

20  EQUIPMENT, IF THERE -- THERE WAS SOME EQUIPMENT AT THE COMPANY.

21  IT ALSO INCLUDED -- I THINK THERE'S SOME GOVERNMENT CONTRACTS

22  THAT RADIANCE HAD AT THE TIME THAT THE BUYOUT PERSON COULD

23  ESSENTIALLY GO AND TRY TO PERFORM UNDER THOSE GOVERNMENT

24  CONTRACTS BECAUSE THERE WAS SOME REVENUE POTENTIALLY TO BE HAD

25  THERE, PARTICULARLY IMPORTANT FOR A STARTUP COMPANY.

NAPPER - DIRECT / GRANT

1    AND IT ALSO INCLUDED A LIMITED -- WHAT I CALLED A LIMITED

2  SIX MONTHS NONCOMPETE IN THE BACK AND FORTH, WHICH WOULD MEAN

3  THAT THE INDIVIDUAL WHO WAS -- WHO RECEIVED THE MONEY AND GAVE

4  THEIR PORTION OF THE COMPANY TO THE BUYER WOULD ESSENTIALLY NOT

5  BE ALLOWED TO GO WORK FOR A SMALL STARTUP TELECOM COMPANY.

6  THEY COULD WORK FOR A LARGER TELECOM COMPANY, BUT THEY COULDN'T

7  DO ANOTHER STARTUP FOR SIX MONTHS.  SO THAT WAS TALKED ABOUT AS

8  WELL.

9  **Q.**   SO IF I UNDERSTAND YOUR TESTIMONY, THE VALUE OF

10  NONCOMPETE AND THE TOOLS AND EVERYTHING ELSE YOU MENTIONED ARE

11  IN THE 250,000; IS THAT CORRECT?

12  **A.**   THAT'S CORRECT.  IT'S ALL WITHIN THAT.

13  **Q.**   SO WHAT WOULD BE THE VALUE OF JUST THE VALUE OF HAVING

14  THE EXCLUSIVE RIGHTS TO THE RADIANCE IP?

15  **A.**   WELL, I DIDN'T -- I DIDN'T GO DOWN TO THAT PARTICULAR

16  LEVEL.  I DIDN'T PARSE DOWN TO THAT ONE.  I WAS SATISFIED THAT

17  BASED UPON OTHER WORK AS WELL, 250,000 WAS THE RIGHT TAKEAWAY.

18  WELL, IT WOULD BE LOWER.  OBVIOUSLY THOSE WOULD BE DEDUCTS

19  BECAUSE THAT'S OTHER CONSIDERATION, BUT IT WOULD GO TO THOSE

20  OTHER ITEMS THAT WENT ALONG WOULD GO TO REDUCE THE $250,000,

21  BUT I JUST STATED $250,000.

22  **Q.**   AND I GUESS I SHOULD ASK YOU A QUESTION.  YOUR OPINIONS

23  IN THIS CASE ABOUT -- WE SAW THAT THE VALUE OF BEING NAMED AS

24  AN INVENTOR, ARE YOU MAKING AN ASSUMPTION ABOUT WHETHER OR NOT

25  MR. SHUM PROVES LIABILITY AND CAUSATION IN THIS CASE?

1   A.    YES.  IT'S -- MAYBE IT'S NOT OBVIOUS.  BUT IT -- I ASSUME

2   LIABILITY AND I ASSUME CAUSATION.  SO IN OTHER WORDS, IF

3   THERE'S NO LIABILITY, THEN -- THEN DAMAGES DON'T COME INTO

4   PLAY.

5   Q.    OKAY.  AND THAT WOULD BE TRUE FOR YOUR SECOND OPINION,

6   ARE YOU ASSUMING THAT MR. SHUM IS PROVING LIABILITY AND

7   CAUSATION IN THIS CASE?

8   A.    I AM.

9   Q.    OKAY.  JUST WANTED TO CLARIFY THAT.

10          MS. GRANT:  IF WE CAN GO TO THE NEXT SLIDE, JEFF.

11          (EXHIBIT PUBLISHED TO JURY.)

12  BY MS. GRANT:

13  Q.    AND SO I THINK YOU MENTIONED YOU CONSIDERED ANOTHER

14  TRANSACTION.

15  A.    YES.  SO IT'S MY OPINION THAT MR. SHUM -- PARDON ME -- IN

16  2001 STARTED DISCUSSING WITH JENKIN RICHARD THE POSSIBILITY --

17  I THINK JENKIN RICHARD WORKED FOR A COMPANY CALLED GIGA, I

18  BELIEVE, AND GIGABIT OPTICS, AND ESSENTIALLY MR. SHUM AND

19  MR. RICHARD DISCUSSED THE POSSIBILITY OF GIGABIT OPTICS

20  PURCHASING MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION.

21  THIS WAS DONE IN 2001.

22          AND I JUST -- I HAD READ MR. RICHARD'S DEPOSITION

23  TESTIMONY, AND I UNDERSTAND HE TESTIFIED HERE IN TRIAL AS WELL,

24  THAT HE HAD A DISCUSSION WITH MR. SHUM THAT THEY TALKED

25  ABOUT -- THEY BANDIED ABOUT A PARTICULAR NUMBER, AND IT WAS

NAPPER – DIRECT / GRANT

1    SOMEWHERE BETWEEN 250,000 AND $500,000.

2    Q.    WAS THERE ANYTHING IMPORTANT ABOUT THE TIMING OF THIS

3    OFFER WITH REGARD TO YOUR OPINIONS IN THIS CASE?

4    A.    WELL, CERTAINLY AS SOMETHING TO CONSIDER IS THAT THIS IS

5    SIGNIFICANTLY FAR DOWN THE ROAD IN TERMS OF 2001 VERSUS BACK IN

6    THE -- OFFERS WE SAW, THE BUYOUT OFFERS WE SAW BEFORE WERE BACK

7    IN 1997.

8         BY 2001, A LOT HAD HAPPENED.  THERE WAS MORE GROWTH IN

9    THE OPTICS, FIBEROPTICS AND TELECOM SPACE, AND IT ALSO FAIRLY

10   FALLS CLOSELY WITH THE INTEL ACQUISITION OF LIGHTLOGIC.  SO IT

11   WAS DURING THAT KIND OF GENERAL TIME FRAME THAT THIS KIND OF

12   DISCUSSION WAS TAKING PLACE.

13   Q.    OKAY.  AND DID YOU DO ANYTHING -- YOU'VE TALKED ABOUT THE

14   BUYOUT OFFER AND NOW YOU CONSIDERED ANOTHER OFFER THAT MR. SHUM

15   MADE TO SELL HIS RIGHTS IN 2001.  DID YOU DO ANYTHING TO

16   CROSS-CHECK THE REASONABLENESS OF THOSE TRANSACTIONS?

17   A.    I DID.  I PERFORMED A REASONABLENESS CHECK BECAUSE I

18   WANTED TO -- I HAD THESE OFFERS, I WANTED TO KIND OF SAY,

19   "WELL, WHAT MAKES SENSE IN TERMS OF OTHER POTENTIAL

20   TRANSACTIONS THAT OCCURRED?"  AND I FOCUSED ON THE SERIES A,

21   WHICH WAS THE FIRST FUNDING OF INVESTORS FOR LIGHTLOGIC, AND

22   LOOKED AT THAT PARTICULAR TRANSACTION.  I THOUGHT THAT WAS MOST

23   RELEVANT.

24   Q.    AND CAN YOU JUST TELL THE JURY WHAT WE'RE LOOKING AT ON

25   THE SCREEN HERE.

1    **A.**    SURE.  IN AUGUST 1998, SO THIS IS ABOUT SEVEN OR EIGHT

2    MONTHS AFTER THE PLAN OF LIQUIDATION WAS SIGNED, LIGHTLOGIC

3    WENT THROUGH A SERIES A FINANCING.  THEY FIRST HAD SOME ANGEL

4    INVESTORS, I THINK FOR A FEW HUNDRED THOUSAND DOLLARS, BUT THIS

5    WAS THEIR FIRST SERIOUS, IF YOU WILL, SERIES A FINANCING.

6         AND AT THAT POINT IN TIME, INVESTORS PUT IN ABOUT

7    $2.1 MILLION.  AND DR. VERDIELL'S SHARES, BASED UPON THE VALUE

8    OF WHAT THE INVESTORS PUT IN AT THAT POINT, WHICH WAS ABOUT A

9    $1.20 PER SHARE, DR. VERDIELL'S SHARES WERE THEN VALUED -- HIS

10   OWNERSHIP IN THE COMPANY, LIGHTLOGIC, AT 2.4 MILLION.  SO THE

11   TOTAL VALUE OF THE COMPANY LIGHTLOGIC IN AUGUST OF 1998 OF

12   4.5 MILLION.

13   **Q.**    AND CAN YOU -- I THINK WE HAVE A SLIDE -- BUT CAN YOU

14   EXPLAIN TO THE JURY WHY YOU FELT THE SERIES A TRANSACTION WAS

15   AN APPROPRIATE CROSS-CHECK?

16   **A.**    RIGHT.  I TOUCHED ON THIS A LITTLE BIT SO -- BUT

17   ESSENTIALLY IN AUGUST 1998, THAT'S THE FIRST TIME A KIND OF AN

18   INDEPENDENT PARTY OR A COMPANY HAS INVESTED, LOOKED AT THE

19   COMPANY, LIGHTLOGIC, AND LOOKED AT WHAT THEY WERE DOING, WHAT

20   TECHNOLOGY THEY HAD DEVELOPED, THE PEOPLE THAT -- AND

21   DR. VERDIELL'S BACKGROUND, IF YOU WILL.  SO IT WAS KIND OF A

22   SEPARATE VALIDATION OF THE VALUE, IF YOU WILL, OF THE

23   INTELLECTUAL PROPERTY AS WELL AS OTHER ASSETS THAT WERE

24   INVESTED IN.

25         SO THAT'S WHY I TOUCH ON -- IT WAS AN ARM'S-LENGTH

1  TRANSACTION, BUT IT WAS ALSO KNOWLEDGEABLE INVESTORS.  THEY

2  KIND OF KNEW WHAT THEY WERE DOING.  THEY TENDED -- I THINK

3  DR. HUBER HAD EXTENSIVE EXPERIENCE IN THE TELECOM SPACE.  HE

4  WAS INTERESTED IN THIS AND INTERESTED ENOUGH TO INVEST.  THAT

5  THE RADIANCE INTELLECTUAL PROPERTY WAS CERTAINLY OF SOME

6  INTEREST TO THE INVESTORS.  THERE'S NO DOUBT THAT THEY WERE

7  INTERESTED, THAT THEY HAD SOME IDEAS GOING ON THAT SEEMED OF

8  INTEREST AND VALUE.  AND THAT I -- I CERTAINLY BELIEVE THE 1998

9  IS A BETTER VALUATION POINT THAN 2001.

10  Q.    AND WHY DO YOU SAY -- WHY DO YOU CALL THAT OUT?

11  A.    THERE'S A NUMBER OF REASONS, BUT ESSENTIALLY IN AUGUST

12  1998, THAT'S THE CLOSEST IN TIME TO WHERE THE PLAN OF

13  LIQUIDATION UNDER MY ASSUMPTIONS SPLIT AND HAD DR. VERDIELL GO

14  ONE WAY AND MR. SHUM GO THE OTHER TO GO AND PURSUE WHAT THEY

15  WANTED TO PURSUE.  AND SO THAT TECHNOLOGY IN, FOR LACK OF A

16  BETTER DATE, EARLY JANUARY 1998 IS CLOSEST IN TIME TO ITS

17  STATE, TO ITS DEVELOPMENT STATE IN AUGUST 1998, RATHER THAN

18  DOWN THE ROAD IN 2001.

19        2001, A LOT HAS HAPPENED BETWEEN 1998 AND 2001.  SO WHEN

20  YOU ATTEMPT TO IDENTIFY THE VALUE OF MR. SHUM'S RIGHTS IN 2001,

21  IT'S -- IT'S MUCH MORE OF AN EXERCISE IN A LOT OF ASSUMPTIONS

22  AND A LOT OF THINGS YOU HAVE TO DIG THROUGH BECAUSE SO MUCH HAS

23  HAPPENED.

24  Q.    DID MR. LASINSKI AND MR. REGAN VALUE -- ATTEMPT TO VALUE

25  MR. SHUM'S RIGHTS IN 2001 OR SOME OTHER TIME?

NAPPER — DIRECT / GRANT

1   **A.**    IT'S MY UNDERSTANDING MR. LASINSKI AND MR. REGAN

2   RESTRICTED THEMSELVES TO ONLY ONE POINT IN TIME, AND THAT WAS

3   AT THE TIME OF THE INTEL ACQUISITION.  THEY DIDN'T LOOK PAST

4   THE INTEL ACQUISITION, WHAT HAPPENED AFTER THAT, AND THEY

5   DIDN'T LOOK BEFORE.

6   **Q.**    OKAY.  WE'LL GET INTO THAT LATER.

7        HAVE YOU COVERED THE REASONS WHY YOU THINK THAT THE

8   SERIES A FINANCING TRANSACTION IN AUGUST 1998 WAS AN

9   APPROPRIATE CROSS-CHECK?

10  **A.**    I THINK SO.  I GUESS ONE OTHER POINT IS THAT AT THIS TIME

11  IN JANUARY 1998, THEY HAVE THESE RIGHTS, MR. SHUM AND

12  DR. VERDIELL, TO GO AND EXPLOIT -- INDEPENDENTLY EXPLOIT.  AND

13  ESSENTIALLY IF YOU -- IN THIS PARTICULAR MARKETPLACE, TIMING

14  IS -- IS FAIRLY IMPORTANT.  IT'S KIND OF A RACE, IF YOU WILL,

15  TO GET PRODUCTS IN THE MARKETPLACE AND COMPETITION BECAUSE

16  THERE'S A LOT OF INFRASTRUCTURE BEING BUILT UP.  IF YOU RECALL,

17  IT'S BACK IN THE INTERNET BOOM.

18       AND SO ESSENTIALLY, IF YOU DON'T TAKE ADVANTAGE OF

19  TECHNOLOGY, IT DOESN'T HAVE A VERY GOOD SHELF LIFE.  IT DOESN'T

20  REALLY -- IT -- IT TENDS TO, LIKE FRUIT, MAYBE IT GETS -- IT

21  DOESN'T GET BETTER WITH AGE LIKE WINE.  IT MAY GET WORSE WITH

22  AGE LIKE FRUIT.

23  **Q.**    AND CAN YOU EXPLAIN FOR THE JURY HOW YOU ANALYZED THE

24  SERIES A FINANCING TRANSACTION FOR YOUR CONCLUSIONS IN THIS

25  CASE?

1    A.    YEAH.  SO I SPLIT THE -- ESSENTIALLY THE VALUE OF THE

2    COMPANY AT THAT POINT, THE 4.5 MILLION, INTO WHAT THE INVESTORS

3    PUT IN AND THE SHARES THEY OWN.  SO ON THE LEFT SIDE OF THIS

4    BUY GRAPH, THAT'S THE INVESTORS AT $2.1 MILLION.  AND THEN I

5    LOOKED AT WHAT DR. VERDIELL -- HE HAD THEN HIS OWNERSHIP VALUED

6    AT $2.4 MILLION AT AUGUST 1998 AFTER THE MONEY WAS PUT IN.

7         NOW, AS PART OF THAT ARRANGEMENT, DR. VERDIELL'S SHARES,

8    HIS SHARES IN LIGHTLOGIC, ESSENTIALLY WERE ONLY PARTIALLY

9    VESTED.  THAT'S JUST A, YOU KNOW, FANCY FINANCIAL TERM, I

10   SUPPOSE, TO JUST SAY HE ONLY COULD DO SO MUCH WITH A CERTAIN

11   NUMBER OF SHARES.  HE CAN ONLY -- HE ONLY HAD 714,000 SHARES OF

12   LIGHTLOGIC IN AUGUST 1998 THAT HE ACTUALLY OWNS.

13        HE THEN GETS THE REST OF THE SHARES THAT GET HIM UP TO

14   THE -- TO THE $2.4 MILLION.  HE GETS THE REST OF THE SHARES IF

15   HE STAYS EMPLOYED.  SO THEY CALL THAT A VESTING SCHEDULE.  AND

16   HE GETS TWO PERCENT OF THE REST OF THE SHARES EACH MONTH FOR AN

17   EXTENDED PERIOD OF TIME.

18   Q.    LET ME JUST STOP YOU.  WHERE ARE YOU GETTING THIS

19   INFORMATION WITH REGARD TO THE VESTING SCHEDULE?

20   A.    THAT'S IN THE SERIES A FINANCING DOCUMENTS THAT I

21   REVIEWED.

22   Q.    AND DID YOU RELY UPON THOSE DOCUMENTS?

23   A.    I DID.

24   Q.    DO YOU KNOW IF MR. REGAN RELIED ON THOSE DOCUMENTS?

25   A.    MR. REGAN DIDN'T LOOK AT ANY OF THE INVESTORS PRIOR TO

1    THE INTEL ACQUISITION.

2    **Q.**    SO I APOLOGIZE FOR INTERRUPTING YOU.

3         WERE YOU TALKING ABOUT THE 1,543,000 -- AND I PROBABLY

4    DIDN'T SAY THAT RIGHT -- $1.5 MILLION FOR THE FUTURE

5    EMPLOYMENT?  MATH IS -- I'LL HAVE YOU DO THE MATH.

6    **A.**    FAIR ENOUGH.

7    **Q.**    OKAY.

8    **A.**    AND I'LL HAVE YOU DO THE LEGAL STUFF.

9    **Q.**    OKAY.

10   **A.**    SO THE 1.543 MILLION IS ESSENTIALLY WHAT I TALKED ABOUT,

11   THAT HE HAS TO STAY, DR. VERDIELL HAS TO STAY EMPLOYED.  AND IF

12   HE WERE TO LEAVE, LET'S SAY HE LEFT THE NEXT DAY AFTER THIS

13   MONEY CAME IN, HE WOULD GET NONE OF THOSE SHARES AND THEREFORE

14   NONE OF THIS VALUE.

15        SO THAT VALUE REALLY IS NOT A VALUE OF ANY INTELLECTUAL

16   PROPERTY.  IT'S REALLY THE VALUE OF DR. VERDIELL STAYING,

17   MANAGING, MANAGING NOW EMPLOYEES THAT HE CAN HIRE BECAUSE HE

18   HAS MONEY TO DEVELOP THE TECHNOLOGY.

19        SO I DIDN'T CONSIDER THAT TO BE FAIRLY RELEVANT TO THE

20   INTELLECTUAL PROPERTY.  THE LEFTOVER, THE STUFF UP TO THAT

21   POINT IN TIME THAT HE FULLY HAS OWNERSHIP OF, WAS VALUED AT

22   $857,000.

23   **Q.**    AND AGAIN, WHERE DID YOU GET -- HOW DID YOU GET THE

24   $857,000?

25   **A.**    THAT'S HOW MANY SHARES HE OWNED AT THAT POINT IN TIME

1    THAT HE COULD ACTUALLY DO SOMETHING WITH.  HE ACTUALLY OWNED

2    THOSE SHARES.  AND I THINK IT'S 714,000 SHARES TIMES $1.20.

3         AND THAT AMOUNT OF MONEY IS MORE PARTICULARLY RELEVANT

4    BECAUSE THAT'S WHAT HE'S DONE KIND OF IN THE PAST.  IT ACCOUNTS

5    FOR WHAT HE'S BEEN DOING BOTH WHILE -- PERHAPS WHILE HE WAS

6    WORKING AT RADIANCE PRIOR TO THE PLAN OF LIQUIDATION UP TILL

7    JANUARY 1998, AS WELL AS FROM JANUARY 1998 TO AUGUST 1998.

8         SO THAT FIGURE 857,000 MIGHT BE A LITTLE HIGH BECAUSE IT

9    INCLUDES -- I UNDERSTAND DR. VERDIELL WAS WORKING FROM

10   JANUARY 1998 TO AUGUST 1998 FURTHER TRYING TO REFINE THE

11   TECHNOLOGY, ET CETERA.  AND IT ALSO INCLUDES USE RIGHTS UNDER

12   THE PLAN OF LIQUIDATION.  IN OTHER WORDS, CALLED IT -- IT'S MY

13   ASSUMPTION THAT DR. VERDIELL HAS USE RIGHTS AND MR. SHUM HAD

14   USE RIGHTS TO INDEPENDENTLY EXPLOIT THE TECHNOLOGY.

15        SO THAT'S NOT WHAT I'M TRYING TO VALUE.  I'M TRYING TO

16   FOCUS ON THE EXCLUSIVE RIGHTS IN THIS EXERCISE.  AND SO THOSE

17   TWO -- THOSE TWO -- FIRST TWO BULLETS UNDER THE $857,000 WOULD

18   BE REDUCTIONS TO THAT AMOUNT TO TRY TO DRILL DOWN TO THE RIGHTS

19   OF MR. SHUM AND THE EXCLUSIVE RIGHTS UNDER THE PLAN OF

20   LIQUIDATION.

21   Q.   SO IF I UNDERSTAND WHAT YOUR TESTIMONY IS THAT PAST WORK

22   AT LIGHTLOGIC AND THE USE RIGHTS WOULD BE DEDUCTED FROM THE

23   857,000; IS THAT RIGHT?

24   A.   THAT'S CORRECT.  AND THEN SO ULTIMATELY IT'S SOMETHING

25   SOUTH OF $857,000.  I DID NOT TRY TO GO AND IDENTIFY EVEN

1  FURTHER WHAT IT WOULD BE.  IT IS SOMETHING SOUTH OF 857,000.

2  AND I'VE ALREADY GOT TWO OTHER DATA POINTS, 250,000 AND

3  500,000.  THAT'S WHY I CALL THIS KIND OF A REASONABLENESS

4  CHECK.  IT'S ANOTHER WAY TO SAY, "WELL, GEE, THAT NUMBER IS --

5  THAT RANGE OF NUMBERS SEEMS TO BE -- SEEMS TO BE APPROPRIATE."

6  KIND OF A SMELL TEST, IF YOU WILL.

7  Q.    AND SO IF YOU COULD JUST, YOU KNOW, SUMMARIZE THE BASIS

8  OF YOUR -- YOUR SECOND OPINION IN TERMS OF YOU TALKED ABOUT

9  THREE DIFFERENT TRANSACTIONS NOW.  CAN YOU JUST TELL THE

10  JURY -- SUMMARIZE YOUR OPINION.

11  A.    YES.  IT'S MY OPINION THAT THE VALUE OF MR. SHUM'S RIGHTS

12  UNDER THE PLAN OF LIQUIDATION WOULD BE, INCLUDING EXCLUSIVITY

13  RIGHTS, WOULD BE 250,000 TO $500,000.  SOMEWHERE IN BETWEEN

14  THERE.

15  Q.    NOW, DID MR. REGAN OR MR. LASINSKI CALCULATE THE VALUE OF

16  THE -- HAVING THE EXCLUSIVE RIGHTS TO THE RADIANCE TECHNOLOGY?

17  A.    NO, THEY DID NOT.

18  Q.    DID YOU REVIEW THE ANALYSES OF MR. REGAN AND

19  MR. LASINSKI?

20  A.    I DID.

21  Q.    AND DID YOU FORM ANY OPINIONS ABOUT THEIR WORK IN THIS

22  CASE?

23  A.    I DID.  I HAVE A NUMBER OF COMMENTS ABOUT THEIR OPINION

24  AND HOW THAT MAY OR MAY NOT BE RELEVANT TO THE EXERCISE OF WHAT

25  WE'RE ASKED TO DO.

1    Q.    WELL, LET'S START WITH MR. REGAN.

2          IF WE CAN HAVE A SLIDE.

3              (EXHIBIT PUBLISHED TO JURY.)

4    BY MS. GRANT:

5    Q.    AND JUST TELL THE JURY WHAT WE'RE LOOKING AT HERE.

6    A.    SURE.  AS I UNDERSTAND MR. REGAN'S ANALYSIS, AGAIN, HE

7    FOCUSED ON ONE TRANSACTION AND ONE TRANSACTION ONLY, WHICH WAS

8    THE VALUATION OF LIGHTLOGIC IN 2001 BASED UPON THE INTEL

9    ACQUISITION OF LIGHTLOGIC.

10         AND WHAT HE DID IS HE IDENTIFIED -- OR IT WAS IDENTIFIED

11   FOR HIM THAT THERE WERE TANGIBLE ASSETS VALUED AT $59 MILLION.

12   Q.    AND WHAT ARE TANGIBLE ASSETS?

13   A.    THOSE ARE LIKE THE PROPERTY, PLANT, AND EQUIPMENT, THE

14   FACILITIES, I BELIEVE WERE HERE IN NORTHERN CALIFORNIA, NEWARK,

15   IF I WANT -- IF I RECALL CORRECTLY.  SO I THINK IT WAS

16   30,000 FEET OF WORK SPACE AND TOOLS AND EQUIPMENT.

17         OBVIOUSLY THEY HAD STARTED MANUFACTURING AT LEAST

18   SAMPLES, IF NOT TRANSPONDERS, AT THAT POINT IN TIME.  "THEY"

19   BEING LIGHTLOGIC.  SO IT'S ALL THE KIND OF THE HARD ASSETS, THE

20   STUFF YOU CAN TOUCH.  THAT WAS VALUED AT $59 MILLION.

21             MS. GRANT:  AND IF WE CAN GO TO THE NEXT SLIDE,

22   JEFF.

23             (EXHIBIT PUBLISHED TO JURY.)

24   BY MS. GRANT:

25   Q.    ONE QUESTION I WANTED TO ASK YOU IS DID MR. REGAN VALUE

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    LIGHTLOGIC'S INTELLECTUAL PROPERTY OR THE EXCLUSIVE RIGHTS TO

2    THE RADIANCE INTELLECTUAL PROPERTY?

3    **A.**    IT WAS THE FORMER.  HE -- HE BASICALLY VALUED

4    LIGHTLOGIC'S INTELLECTUAL PROPERTY.  WELL, VALUED.  HE

5    BASICALLY IDENTIFIED SOME VALUE OF OTHER THINGS, BACKED THAT

6    OUT OF THE ACQUISITION PRICE, AND THEN HAS THIS BIG, YOU KNOW,

7    BUCKET, IF YOU WILL.  THIS ALMOST LOOKS LIKE PACMAN, DOESN'T

8    IT?  BIG BUCKET OF VALUE OF LIGHTLOGIC'S INTELLECTUAL PROPERTY,

9    KIND OF THE LEFTOVER, IS WHAT HE THEN SAID IS THE VALUE OF

10   LIGHTLOGIC'S INTELLECTUAL PROPERTY, NOT THE EXCLUSIVE RIGHTS.

11   **Q.**    DO YOU -- WAS THAT -- IN YOUR OPINION, WAS THE APPROACH

12   THAT MR. REGAN TOOK APPROPRIATE IN THIS CASE?

13   **A.**    NO, IT'S NOT.  HE -- HE ESSENTIALLY, AS I UNDERSTAND IT,

14   FOR A NUMBER OF REASONS, BUT CERTAINLY THE PLAN OF LIQUIDATION

15   AND THE ASSUMPTION THAT EACH DR. VERDIELL AND MR. SHUM HAVE

16   EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT THE TECHNOLOGY IS NOT

17   ENCOMPASSED AND NOT VALUED OR IDENTIFIED BY MR. REGAN'S

18   ANALYSIS.

19            **MS. GRANT:**  GO TO THE NEXT SLIDE, JEFF.

20            (EXHIBIT PUBLISHED TO JURY.)

21            **MS. GRANT:**  I'M ACTUALLY GOING -- MAY I APPROACH THE

22   WHITE BOARD, YOUR HONOR?

23            **THE COURT:**  SURE.

24            **MS. GRANT:**  JUST GOING TO TURN THIS.

25            (OFF-THE-RECORD DISCUSSION.)

1    BY MS. GRANT

2    Q.    OKAY.  SO TELL US WHAT THE -- WHAT WE'RE LOOKING AT WITH

3    REGARD TO THIS SLIDE.

4    A.    SO WHAT THIS SLIDE DOES IS, AGAIN, IDENTIFIES THE

5    TANGIBLE ASSETS, 59 MILLION, THE WORK FORCE OF 2 MILLION, THE

6    TRANSPONDER, WHICH WAS THE ONLY PRODUCT SELLING AT THE TIME

7    LIGHTLOGIC WAS PURCHASED BY INTEL, WHICH MR. REGAN ASSIGNED A

8    $1 MILLION VALUE TO.  AND THE REST OF IT, THE REST OF THE PIE,

9    IF YOU WILL, IS WHAT HE SAYS IS LIGHTLOGIC'S INTELLECTUAL

10   PROPERTY.

11   Q.    WELL, LET'S GO THROUGH -- LET ME FIRST TALK ABOUT THE

12   $2 MILLION.  AND I THINK MR. REGAN SAID HE RELIED ON A REPORT

13   FROM DELOITTE & TOUCHE FOR THAT FIGURE.  AND I RECALL HIS

14   TESTIMONY AND HE SAID THAT DELOITTE & TOUCHE VALUED THE WORK

15   FORCE, THE LIGHTLOGIC WORK FORCE, AT 2.4 MILLION.

16        DO YOU AGREE WITH THAT?

17   A.    DO I AGREE THAT THAT'S WHAT HE VALUED IT AT?  THAT'S

18   ACTUALLY WHAT HE TOOK OUT OF THE DELOITTE & TOUCHE REPORT.  I

19   DON'T AGREE THAT THAT'S THE VALUE OF THE WORK FORCE.

20   Q.    AND THIS DELOITTE & TOUCHE REPORT, HAVE YOU REVIEWED IT?

21   A.    I HAVE.

22   Q.    AND I THINK YOU TESTIFIED YOU USED TO WORK AT

23   DELOITTE & TOUCHE?

24   A.    I DID.

25   Q.    AND THIS IS CALLED A PURCHASE PRICE ALLOCATION, CORRECT?

1    A.    THAT'S EXACTLY WHAT IT IS.  IT'S A PURCHASE PRICE

2    ALLOCATION WHICH IS ESSENTIALLY A -- A VEHICLE BY WHICH

3    COMPANIES TRY TO TAKE THE PURCHASE PRICE OF ANY TRANSACTION AND

4    TRY TO ALLOCATE IT TO ASSETS.  AND TO SOME EXTENT, YOU KNOW FOR

5    TAX PURPOSES, IT DEPENDS ON WHETHER IT ENDS UP ON THE BALANCE

6    SHEET OR PROFIT AND LOSS, WHETHER THEY WRITE IT OFF, NOT TO GET

7    TOO MUCH INTO ACCOUNTING JARGON.  BUT THERE'S AN OBJECTIVE TO

8    HAVING THAT IN CASE THE, IN ONE CASE THE IRS COMES BACK AND

9    SAYS, "WELL, WAIT A MINUTE, YOU'VE WRITTEN OFF TOO MANY ASSETS.

10   YOU'RE TRYING TO PROTECT PROFITS."  IT'S REALLY A TAX VEHICLE

11   MORE THAN ANYTHING ELSE.

12   Q.    WERE YOU AWARE THAT THIS REPORT SAYS THAT THIS VALUATION

13   SHOULD NOT BE USED FOR ANY OTHER PURPOSE OR DISTRIBUTED TO

14   THIRD PARTIES WITHOUT THE EXPRESS KNOWLEDGE AND WRITTEN CONSENT

15   OF DELOITTE & TOUCHE?

16   A.    WELL, THAT'S RIGHT.  IT ESSENTIALLY IS VERY LIMITED IN

17   SCOPE, LIKE I SAID.  IT'S LIMITED TO HELPING THE COMPANY, YOU

18   KNOW, "WHERE ARE WE GOING TO PUT THESE VARIOUS ASSETS?"  IT'S

19   NOT TO BE USED FOR ANYTHING ELSE.  THIS IS, YOU KNOW -- I

20   ACTUALLY KNOW THE CREATOR OF THIS DOCUMENT.  HE WAS A PARTNER

21   OF MINE AT DELOITTE & TOUCHE.

22   Q.    DO YOU RECALL WHETHER MR. REGAN HAS EVER EVEN PREPARED

23   ONE OF THESE REPORTS?

24   A.    HE HAS NOT.

25   Q.    OKAY.

NAPPER – DIRECT / GRANT

1    BUT, OKAY, SO HE RELIED ON IT.  AND HE SAID THAT DELOITTE

2 & TOUCHE VALUED THE ENTIRE VALUE, ANYTHING ASSOCIATED WITH THE

3 LIGHTLOGIC WORK FORCE, AT 2.4 MILLION.

4    DO YOU AGREE THAT THAT'S WHAT DELOITTE & TOUCHE DID?

5 **A.**   NO, THAT'S NOT WHAT DELOITTE & TOUCHE DID.

6 **Q.**   THERE IS A $2.4 MILLION NUMBER IN HERE FOR THE WORK

7 FORCE.  CAN YOU EXPLAIN TO THE JURY YOUR UNDERSTANDING OF WHAT

8 THAT IS?

9 **A.**   YES.  DELOITTE & TOUCHE WAS DIRECTED TO ESSENTIALLY

10 IDENTIFY THE COST TO REPLACE THE ASSEMBLED WORK FORCE.  SO WHAT

11 DOES THAT MEAN?  WELL, WHAT THAT MEANS IS IT'S ESSENTIALLY THE

12 HEAD HUNTER FEES, THE RECRUITING, THE TIME, THE ACTIVITY THAT

13 WOULD BE HAD TO HAVE TO PAY OUT TO GO AND ASSEMBLE THAT WORK

14 FORCE BACK TOGETHER, THAT 50-PLUS ENGINEERS AND 70-PLUS

15 EMPLOYEES.  SO IT'S JUST THE OUT-OF-POCKET COSTS THAT WOULD

16 HAVE TO BE INCURRED, HEAD HUNTER FEES, ET CETERA.

17    THE REST OF THE VALUE OF THE WORK FORCE IS IN THE

18 GOODWILL PORTION OF THE ALLOCATION, PURCHASE PRICE ALLOCATION.

19 THAT'S THE INTELLECTUAL CAPITAL, THE FACT THAT THIS WORK FORCE

20 HAS WORKED TOGETHER FOR YEARS AND YEARS AND YEARS AND KNOWS

21 WHAT -- HOW TO INTERACT WITH PEOPLE, THE TRIAL AND ERROR, ALL

22 THOSE THINGS, AS THE VALUE OF THE WORK FORCE, AND THAT'S NOT IN

23 THAT $2.4 MILLION NUMBER AT ALL.

24 **Q.**   AND JUST, WE'RE NOT GOING TO GET TOO DEEP INTO THIS, BUT

25 WHAT IS, SINCE YOU MENTIONED IT, WHAT IS GOODWILL?

1    **A.**    SO GOODWILL IS KIND OF THE, FOR LACK OF A BETTER TERM,

2    THE LEFTOVER.  SO ONCE YOU'VE IDENTIFIED CERTAIN ASSETS, THE

3    LEFTOVER IS JUST KIND OF LUMPED ALL INTO GOODWILL.  IT'S

4    BASICALLY YOU CAN'T -- THEY WENT THROUGH AN EXERCISE THEY FOUND

5    SOME VALUE FOR SOME THINGS, BUT THEY -- THE REST OF IT GOES

6    INTO GOODWILL, INCLUDING THIS INTELLECTUAL CAPITAL OF THE WORK

7    FORCE.

8    **Q.**    ARE THERE ANY, I THINK THEY'RE CALLED FAS ACCOUNTING

9    STANDARDS THAT GOVERN HOW YOU VALUE THE WORK FORCE, LIKE THE

10   KNOW-HOW AND ALL THE SYNERGIES, EVERYTHING YOU JUST MENTIONED?

11   **A.**    YES.  THERE'S FAS 141 AND NOW 142 ACTUALLY GOES INTO THE

12   VALUATION OF THE WORK FORCE, AND THAT'S QUITE A BIT OF WORK.

13   IT KEEPS SOME OF THE ACCOUNTING FIRMS BUSY TO ACTUALLY PERFORM

14   THAT ACTIVITY.

15   **Q.**    AND SO WHEN MR. REGAN TOLD THE JURY THAT THE VALUE OF

16   LIGHTLOGIC'S WORK FORCE WAS $2.4 MILLION, WAS THAT OPINION

17   CONSISTENT WITH FAS141 AND 142?

18   **A.**    IN MY OPINION, NO.

19   **Q.**    AND WHY IS THAT?

20   **A.**    BECAUSE ESSENTIALLY FOR THE REASONS I'VE ALREADY

21   EXPLAINED, WHICH IS THE 2.4 WAS DIRECTED TO BE A COST TO

22   REPLACE, NOT THE VALUE OF THE ASSEMBLED WORK FORCE.

23   **Q.**    AND SO WE JUST HAD A HARD BOARD THERE IN TERMS OF ALL OF

24   THE VALUE THAT ALL OF THESE 75 PEOPLE WORKING TOGETHER CREATING

25   THIS NEW TECHNOLOGY, WHERE WOULD THAT BE?  IS THAT IN THE

1   2.4 MILLION, OR IS THAT IN GOODWILL?

2   **A.**    NO, THAT'S IN THE GOODWILL NUMBER IN DELOITTE & TOUCHE --

3   DELOITTE & TOUCHE'S REPORT.

4        **MS. GRANT:**  AND COULD WE HAVE THE SLIDE BACK UP.

5   **BY MS. GRANT:**

6   **Q.**    AND THEN YOU ALSO MENTIONED THAT MR. REGAN VALUED THE

7   TRANSPONDER AT 1 MILLION, AND I THINK YOU SAID THAT THAT'S WHAT

8   DELOITTE & TOUCHE DID.

9        DO YOU AGREE WITH THAT?

10  **A.**    THAT'S -- HE GOT THAT NUMBER -- IN FACT, HE GOT THOSE

11  THREE NUMBERS FROM A PIE FROM THE DELOITTE & TOUCHE REPORT.

12  **Q.**    THE WHICH THREE NUMBERS?

13  **A.**    I'M SORRY.  THE TRANSPONDER 1 MILLION, I BELIEVE HE GOT

14  THE TANGIBLE 59 MILLION, AND THE WORK FORCE NUMBER ALL FROM --

15  2 MILLION.  HE DIDN'T DO AN ANALYSIS.  HE ACTUALLY JUST TOOK IT

16  FROM DELOITTE & TOUCHE'S PURCHASE PRICE ALLOCATION.

17  **Q.**    OKAY.  AND WHEN HE TOLD THE JURY THAT THE TRANSPONDER WAS

18  ONLY WORTH $1 MILLION, BECAUSE THAT'S WHAT DELOITTE & TOUCHE

19  SAYS, DO YOU AGREE WITH THAT?

20  **A.**    WELL, I AGREE THAT THE DELOITTE & TOUCHE REPORT SAYS

21  $1 MILLION, BUT I DON'T AGREE THAT'S THE VALUE OF THE

22  TRANSPONDER.  THE TRANSPONDER WAS THE ONLY PRODUCT THAT WAS

23  SELLING AT THE TIME, AND THERE'S A NUMBER OF PROJECTIONS OF

24  FORECASTS FOR THE VALUE -- FOR THE PRODUCT SALES THAT WERE

25  GOING TO GO ON, INCLUDING THAT PARTICULAR TRANSPONDER.

NAPPER - DIRECT / GRANT

1    Q.    SO IS DELOITTE -- WHY WOULD, THEN, IF WE HAVE A

2    TRANSPONDER THAT IT WAS ON THE MARKET -- EXPLAIN TO ME WHY THAT

3    WOULD BE 1 MILLION BUT THEN YOU SAY THERE'S OTHER VALUE FOR IT

4    LATER ON?

5    A.    WELL, ESSENTIALLY THE -- THE TRANSPONDER AT A MILLION

6    DOLLARS WAS JUST FOR THE SALES THAT HAD BEEN -- IT HAD ACHIEVED

7    AT THAT POINT IN TIME.  IT REALLY DIDN'T TAKE INTO ACCOUNT THE

8    FUTURE AND THE NEXT GENERATION OF PRODUCTS THAT WOULD BUILD ON

9    THAT.  SO IT CERTAINLY UNDERVALUED THE TRANSPONDER.

10   Q.    AND WHEN -- WHEN PEOPLE ARE DOING THESE PURCHASE PRICE

11   ALLOCATIONS, HOW DO THEY -- ARE THEY LOOKING AT PRODUCTS?  ARE

12   THEY LOOKING AT REVENUE?  HOW DO THEY -- WHAT'S DONE?  HOW IS

13   IT DONE?

14   A.    WELL, THEY DO -- THEY DO A LOT OF DIFFERENT THINGS.  THEY

15   LOOK AT A NUMBER OF DIFFERENT ASPECTS.  THEY INTERVIEW

16   MANAGEMENT, FIRST AND FOREMOST, TO GET THEIR INPUT.  AND THEN

17   THEY'RE -- AGAIN, THEIR EXERCISE IS TRYING TO SIMPLY IDENTIFY,

18   WITHOUT GOING INTO TOO MUCH DETAIL, SIMPLY IDENTIFY WHERE

19   SHOULD WE PUT THIS -- THIS $400 MILLION.  WHAT SHOULD WE

20   ALLOCATE IT TO?  AND SO THEY'RE JUST LOOKING TO DO THAT AND DO

21   IT WITH AN IDEA TOWARDS HAVING A DOCUMENT IF THE IRS WERE TO

22   QUESTION SOME OF THE ALLOCATION METHODOLOGIES.  SO THAT'S WHAT

23   THEY REALLY DO.

24         FOR EXAMPLE, DELOITTE & TOUCHE WOULD HAVE GONE THROUGH AN

25   EXERCISE -- OR DID GO THROUGH AN EXERCISE, I'M SURE, TO TRY TO

```
1    IDENTIFY A SEPARATE VALUE FOR THE PATENTS, FOR THE PATENTS OF

2    LIGHTLOGIC.  I THINK THREE HAD ISSUED AT THAT POINT IN TIME, AS

3    OF THE TIME OF THE INTEL ACQUISITION.

4         WHAT THEY COULDN'T FIND IS THEY COULDN'T FIND A SEPARABLE

5    VALUE FOR THE PATENTS.  AND THAT'S ONE OF THE EXERCISES THEY GO

6    THROUGH.  SO SOMETIMES YOU FIND THESE PURCHASE PRICE

7    ALLOCATIONS, THEY ALLOCATE A LOT OF MONEY OF THE PURCHASE PRICE

8    TO THE PATENTS.

9         IN THIS CASE, THEY COULDN'T SEPARATE IT OUT AND THEY JUST

10   KIND OF, AGAIN, THE EXERCISE OF DUMPING IN GOODWILL.  IF IT'S

11   NOT -- IF YOU CAN'T SEPARATE IT OUT, THEN IT GOES INTO

12   GOODWILL.

13   Q.   SO IF I UNDERSTAND YOUR TESTIMONY, WHAT YOU'RE SAYING IS

14   THAT DELOITTE & TOUCHE DID NOT PLACE ANY VALUE OR ALLOCATE ANY

15   VALUE TO THE PATENTS?

16   A.   THEY ESSENTIALLY USED THE TERMINOLOGY "NO SEPARABLE

17   VALUE," IN OTHER WORDS THEY DON'T STAND ALONE AS A VALUE

18   MECHANISM.  WHICH COULD INDICATE A NUMBER OF THINGS, BUT

19   CERTAINLY ONE MIGHT BE THAT THERE'S NOT ENOUGH VALUE THERE TO

20   WARRANT THE EXERCISE.

21   Q.   AND IN READING THIS PURCHASE PRICE ALLOCATION, DID YOU

22   SEE -- DID DELOITTE ALLOCATE ANYTHING TO LIKE THE FLEXURE OR

23   THE DBC?  DID THEY GO DOWN TO THE COMPONENTS?

24   A.   NO, THEY DIDN'T.  THEY DIDN'T GET DOWN TO THAT

25   NITTY-GRITTY.  THEY DO HAVE A CATEGORY IN THERE CALLED CORE
```

1   TECHNOLOGY THAT THEY VALUED.  IT'S UNCLEAR EXACTLY WHAT'S IN

2   THERE.  AND THAT WAS VALUED AT $8 MILLION.

3   **Q.**   IF YOU REALLY WANT TO KNOW WHAT'S IN HERE, WOULD WE HAVE

4   TO TALK TO THE GUY WHO WROTE?

5   **A.**   I THINK IT'S ABOUT AN 80-PAGE REPORT, SO I WOULD SAY IF

6   YOU WANTED TO UNDERSTAND ALL THE METHODOLOGIES THAT WENT INTO

7   THAT, THAT WOULD BE THE BEST SOURCE.

8   **Q.**   OKAY.  OKAY.

9   **A.**   OR SOMEBODY ON HIS TEAM.

10   **Q.**   OKAY.  THANK YOU.

11       SO GOING BACK TO -- SORRY, TOOK A LITTLE BIT OF A DETOUR

12   THERE, BUT I THOUGHT IT WAS IMPORTANT SINCE MR. REGAN HAD

13   REFERENCED THAT, THAT YOU EXPLAIN SOME OF HIS APPROACHES THERE.

14       SO WE TALKED ABOUT PART OF WHY YOU DISAGREE WITH WHAT HE

15   DID WITH REGARD TO THE D&T REPORT.  DO YOU HAVE ANY OTHER

16   OPINIONS ABOUT WHY HIS APPROACH WITH REGARD TO THE LIGHTLOGIC

17   INTELLECTUAL PROPERTY IS NOT RIGHT?

18   **A.**   I HAVE A NUMBER OF BULLETS, AS YOU CAN SEE ON THE SLIDE,

19   THAT ESSENTIALLY SAYS THERE'S A LOT IN THIS -- THIS BIG YELLOW

20   PIE, IF YOU WILL, THAT'S LEFT OVER.  AND THE FIRST, AS I'VE

21   ALREADY MENTIONED, IT INCLUDES DR. VERDIELL'S USE RIGHTS.

22   RECALL THAT I -- IT'S MY ASSUMPTION UNDER THE PLAN OF

23   LIQUIDATION THAT DR. VERDIELL HAS LEGITIMATE USE RIGHTS TO

24   EXPLOIT THE TECHNOLOGY.  SO THAT'S DEFINITELY INCLUDED IN THAT

25   PARTICULAR $347 MILLION NUMBER.

1          IT ALSO INCLUDES MANY OF THE IMPROVEMENTS.  AND IF WE GO

2     BACK TO THE LIGHTLOGIC TIME LINE OVER HERE, ALL THE ACTIVITY

3     THAT WENT ON FROM 1998 TO 2001, THAT WAS LEGITIMATE TECHNOLOGY,

4     DEVELOPMENT, GETTING MORE MONEY TO -- IN ORDER TO BUILD

5     FACILITIES, CUSTOMER RELATIONSHIPS, TEAMS, AND -- AND

6     ENGINEERS, ALL THAT VALUE, ALL OF THAT IS IN THE $347 MILLION

7     NUMBER.

8     Q.    WHEN YOU SAY IT IGNORES MR. SHUM'S LACK OF CONTRIBUTION

9     FROM JANUARY 1998 FORWARD, WHY IS THAT SIGNIFICANT?

10    A.    WELL, THAT'S -- I DIDN'T MEAN TO BE DEROGATIVE AT ALL TO

11    MR. SHUM, BUT I'M JUST -- MAYBE THAT'S BAD WORDING, BUT

12    MR. SHUM WASN'T INVOLVED IN THIS ACTIVITY, OBVIOUSLY FROM 1998

13    TO 2001.  SO HE -- HE'S NOT CONTRIBUTING TO THIS FURTHER

14    DEVELOPMENT IN TERMS OF THE 347 MILLION.

15          AND IT ALSO DOES NOT VALUE THE EXCLUSIVITY -- WE'VE

16    ALREADY TALKED ABOUT THAT -- WITH RESPECT TO THE RADIANCE DBC

17    FLEXURE INVENTIONS, WHICH IS WHAT I UNDERSTAND, AT LEAST I WAS

18    ASKED TO VALUE.

19    Q.    AND -- AND THEN YOU POINT UP AT THE TOP, IS THAT

20    MR. REGAN'S ANALYSIS VALUES IT IN 2001.

21    A.    CORRECT.  AS OF ONE POINT IN TIME.  HE DOESN'T LOOK PAST

22    THAT POINT, HE DOESN'T LOOK PRIOR TO THAT POINT.  HE JUST DOES

23    IT AT THAT POINT, 2001.

24    Q.    AND I JUST WANT TO CLARIFY BECAUSE I THINK IT'S

25    IMPORTANT.  MR. REGAN VALUED LIGHTLOGIC'S INTELLECTUAL

1   PROPERTY, NOT THE RADIANCE INTELLECTUAL PROPERTY, CORRECT?

2   **A.**    THAT IS TRUE.

3   **Q.**    AND THEN HE -- HE DIDN'T VALUE WHAT WOULD BE THE VALUE OF

4   HAVING THE EXCLUSIVE RIGHTS TO THE RADIANCE INTELLECTUAL

5   PROPERTY.

6           **MR. JANSEN:**  YOUR HONOR, I'M OBJECTING TO LEADING ON

7   THIS QUESTION.

8           **MS. GRANT:**  I CAN REPHRASE.

9   **BY MS. GRANT**

10  **Q.**    DID HE VALUE -- SO FIRST YOU WOULD START WITH THE

11  RADIANCE INTELLECTUAL PROPERTY, CORRECT?

12  **A.**    RIGHT.  SO YOU HAVE -- IT'S KIND OF TIERED, BUT AS YOU'RE

13  INDICATING WITH YOUR ARMS, LIGHTLOGIC'S INTELLECTUAL PROPERTY

14  IS WHAT IS LEFT OVER AFTER HE TAKES OUT SOME THINGS.  SO THAT

15  SAYS THE VALUE OF LIGHTLOGIC'S INTELLECTUAL PROPERTY.  HE

16  DIDN'T VALUE THE RADIANCE INTELLECTUAL PROPERTY, THE DBC AND/OR

17  FLEXURE INVENTIONS, AND FURTHER, HE DIDN'T VALUE THE

18  EXCLUSIVITY RELATED TO THOSE RIGHTS BECAUSE, AGAIN, MY

19  ASSUMPTION MR. SHUM AND DR. VERDIELL HAVE RIGHTS TO

20  INDEPENDENTLY EXPLOIT THAT TECHNOLOGY.

21  **Q.**    NOW, DID YOU EXAMINE MR. LASINSKI'S ANALYSIS IN THIS

22  CASE?

23  **A.**    I DID.

24  **Q.**    AND HOW DID MR. LASINSKI'S APPROACH DIFFER FROM

25  MR. REGAN'S OR --

1   **A.**    MR. LASINSKI TOOK A SLIGHTLY DIFFERENT SLANT AT IT, BUT

2   THE CORE IS THE SAME, WHICH IS HE STARTS AND ENDS IN 2001, THE

3   INTEL ACQUISITION OF LIGHTLOGIC.  AND HE LOOKS AT THAT ENTIRE

4   BUCKET.  AND HE'S -- ESSENTIALLY IDENTIFIES HOW MUCH IN THE

5   PINK SLICE THERE, IF YOU WILL, HOW MUCH VENTURE CAPITAL MONEY

6   HAD GONE INTO THE COMPANY, 49.8 MILLION.

7        THEN HE TAKES FROM AN ARTICLE KIND OF AN AVERAGE RATE OF

8   RETURN OR A REASONABLE RETURN THAT INVESTORS WOULD -- WOULD

9   GET.  AND HE SAYS THAT'S 40 MILLION.  SO 49.8 MILLION OF ACTUAL

10  MONEY IN THE COMPANY.  AND THEN HE IDENTIFIES A $40 MILLION

11  REASONABLE RETURN.  AND THEN THAT'S REALLY THE EXTENT OF HIS

12  ANALYSIS BESIDES DIVVYING IT UP BETWEEN INVENTIONS, BECAUSE HE

13  ENDS UP WITH ANOTHER BIG PIE OF $319.2 MILLION.  AND THAT'S THE

14  LEFTOVER FROM AFTER SLICING OFF THESE TWO ITEMS.

15  **Q.**    SO IF I UNDERSTAND YOUR TESTIMONY, HE TOOK THE AMOUNT OF

16  MONEY THAT THE VENTURE CAPITALISTS INVESTED AND THEN THE AMOUNT

17  OF AN AVERAGE OR REASONABLE RATE OF RETURN, AND HE THEN BACKED

18  THAT OUT AND SAID EVERYTHING ELSE IS THE RADIANCE INTELLECTUAL

19  PROPERTY?

20  **A.**    THAT'S CORRECT.

21  **Q.**    AND I KNOW HE SAID THAT THIS 319 MILLION WAS THE RADIANCE

22  INTELLECTUAL PROPERTY.  DO YOU AGREE IN THAT THAT'S THE

23  RADIANCE INTELLECTUAL PROPERTY VALUE?

24  **A.**    WELL, I WOULD FIND IT HARD TO BELIEVE BECAUSE ESSENTIALLY

25  WHAT I UNDERSTAND MR. LASINSKI HAS DONE IS HE'S ASSUMED IN THAT

1   VENTURE CAPITAL INVESTMENT AND THE, QUOTE UNQUOTE, REASONABLE

2   RETURN, HE'S ASSUMING THAT THAT INCLUDES ALL THIS OTHER STUFF,

3   ALL THE OTHER ACTIVITIES THAT WERE GOING ON.  I THINK IT'S

4   ANOTHER SLIDE DOWN THE ROAD.

5            **MS. GRANT:**  YEAH, WE CAN GO TO THE NEXT SLIDE, AND

6   WE'LL GO BACKWARDS.

7                  (PUBLISHED TO THE JURY.)

8            **THE WITNESS:**  YEAH.  SO ESSENTIALLY NOW COMBINING

9   THOSE TWO PIECES THAT YOU SAW BEFORE, IT WOULD BE 89.8 MILLION,

10  HE SAYS THAT INCLUDES THE LIGHTLOGIC KNOW-HOW, THE TRADE

11  SECRETS, THE TECHNICAL TEAM, ITS MANAGEMENT TEAM.  ALL IS

12  ENCOMPASSED IN THE MONEY THAT WENT IN FROM THE INVESTORS PLUS

13  A, QUOTE, UNQUOTE, REASONABLE RETURN TO THOSE INVESTORS, ALL

14  GOES INTO THAT PART OF IT, AND THEN THEREFORE HE THEN SAYS,

15  WELL, THE VALUE OF THE RADIANCE INTELLECTUAL PROPERTY IS -- HAS

16  TO BE THE LEFTOVER.

17  **Q.**   WELL, I KNOW HE SAYS IT'S RADIANCE, BUT HASN'T HE JUST

18  VALUED THE LIGHTLOGIC INTELLECTUAL PROPERTY IN 2001?

19  **A.**   ESSENTIALLY THAT'S WHAT HE'S DONE.

20  **Q.**   OKAY.  NOW LET'S GO BACK TO THE PREVIOUS SLIDES BECAUSE I

21  WANTED TO ASK YOU.  HE USED THE AVERAGE RATE OF RETURN.  ARE

22  YOU AWARE OF AN ACTUAL RATE OF RETURN THAT EXISTS -- THAT THE

23  INVESTORS ACTUALLY GOT?

24  **A.**   WELL, OF COURSE.  THERE IS AN ACTUAL RATE OF RETURN TO

25  THE INVESTORS THAT PUT MONEY INTO LIGHTLOGIC.  THAT ACTUAL

NAPPER - DIRECT / GRANT

```
 1   RETURN TO THEM WAS ABOUT 237.4 MILLION, NOT A -- ESTIMATED RATE
 2   OF RETURN THAT MR. LASINSKI CALCULATES.
 3   Q.    AND HOW DID YOU CALCULATE THE ACTUAL MONEY -- THAT'S WHAT
 4   "RETURN" MEANS, RIGHT?
 5   A.    CORRECT.
 6   Q.    HOW DID YOU CALCULATE THE ACTUAL MONEY THAT THE INVESTORS
 7   AND LIGHTLOGIC RECEIVED?
 8   A.    IT'S FROM THE DOCUMENTS THAT WERE PRODUCED RELATED TO THE
 9   INTEL ACQUISITION OF LIGHTLOGIC THAT IDENTIFIES HOW MUCH OF
10   THE -- THE PURCHASE WENT DIRECTLY TO THE INVESTORS.  SO I WAS
11   ABLE TO IDENTIFY THAT OF $237.4 MILLION.  AND WHEN YOU COMPARE
12   THAT TO MR. LASINSKI'S AVERAGE RATE OF RETURN, BASED UPON SOME
13   ARTICLE OR STUDY BACK IN THE LATE 80'S HE COMES OUT TO A
14   89.8 MILLION.  SO THERE'S QUITE A BIT OF DISCONNECT BETWEEN THE
15   ACTUAL AND THIS KIND OF AVERAGE THAT HE USED.
16   Q.    WHAT WOULD THE IMPACT IF MR. LASINSKI OR ANYONE WAS TO
17   USE THE ACTUAL MONEY THAT WENT TO INVESTORS AS OPPOSED TO AN
18   AVERAGE FROM AN ARTICLE IN 1980?
19   A.    WELL, IF YOU JUST LOOK AT THE DIFFERENTIAL, IT'S ABOUT
20   $150 MILLION.  SO RIGHT OFF THE -- IF YOU GO TO THE NEXT SLIDE,
21   IF YOU WOULDN'T MIND, PLEASE.
22              (EXHIBIT PUBLISHED TO JURY.)
23         THE WITNESS:  SO RIGHT OFF THAT 319.2 MILLION WOULD
24   COME $150 MILLION.
25   Q.    AND DID THE EMPLOYEES OF LIGHTLOGIC RECEIVE MONEY OR
```

1    STOCK AS A RESULT OF THE ACQUISITION?

2    **A.**    THEY DID.  HE ALSO DOES NOT TAKE INTO ACCOUNT THAT

3    THAT -- THAT THE EMPLOYEES OF LIGHTLOGIC RECEIVED STOCK THAT

4    WENT DIRECTLY TO THEM, AND HE DOESN'T INCLUDE THAT AT ALL.  HE

5    JUST IGNORES THAT.

6    **Q.**    OKAY.

7    **A.**    AND THAT'S PROBABLY TENS OF MILLIONS OF DOLLARS AS WELL.

8    **Q.**    SO IF YOU WERE TO ADD UP ALL THE MONEY THAT ALL THE

9    LIGHTLOGIC EMPLOYEES GOT -- YOU SAY HE DIDN'T COUNT THAT

10   EITHER?

11   **A.**    HE DID NOT.  HE, FOR SOME REASON, DIDN'T INCLUDE THAT.

12   **Q.**    SO YOU'D TAKE OUT ALL THE MONEY THAT THE INVESTORS GOT

13   AND YOU'D TAKE OUT ALL THE MONEY THAT THE EMPLOYEES GOT AND HOW

14   WOULD THAT IMPACT HIS OPINION?

15   **A.**    WELL, JUST AS A STARTING POINT, IT WOULD TAKE THAT

16   $319.2 MILLION DOWN AT LEAST A 150 MILLION PLUS TENS OF

17   MILLIONS, SO YOU'RE PROBABLY LOOKING AT MAYBE A HUNDRED MILLION

18   LEFT, BEST ESTIMATE IN THAT PIE.

19        THAT'S JUST AN EXAMPLE OF, YOU KNOW, PERHAPS MAYBE THAT'S

20   NOT THE RIGHT METHODOLOGY TO USE.

21   **Q.**    OKAY.  AND WHEN YOU SAY IT DOES NOT ACCOUNT FOR

22   LIGHTLOGIC'S RIGHTS TO USE RADIANCE TECHNOLOGY, WHAT DO YOU

23   MEAN BY THAT?

24   **A.**    WELL, ESSENTIALLY, AS WE KNOW, DR. VERDIELL AS BEING AT

25   LIGHTLOGIC ASSIGNED HIS RIGHTS UNDER THE PLAN OF LIQUIDATION TO

1    LIGHTLOGIC, AND THAT'S -- IN MY ASSUMPTION, THAT'S A LEGITIMATE

2    RIGHT.   THAT'S A -- AN OKAY RIGHT.   SO THAT'S INCLUDED IN THAT

3    GREEN BUCKET, IF YOU WILL, AND STILL HAS NOT BEEN IDENTIFIED.

4    THAT'S WHAT MY ANALYSIS ATTEMPTS TO DO.

5        AND IT ALSO DOESN'T ATTEMPT TO VALUE, AS A RESULT OF

6    THAT, EXCLUSIVITY WHICH IS ANOTHER EXERCISE THAT WE'VE BEEN

7    ASKED TO DO, OR I'VE BEEN ASKED TO DO.   SO IT LEAVES A LOT ON

8    THE TABLE, FOR LACK OF A BETTER TERM.

9    Q.   OKAY.

10       DID YOU ANALYZE THE OPINIONS OF MR. LASINSKI AND

11   MR. REGAN WITH REGARD TO DR. VERDIELL?

12   A.   YES.   I LOOKED AT THEIR ANALYSIS OR REVIEW OF

13   DR. VERDIELL'S UNJUST ENRICHMENT.   I BELIEVE THEY IDENTIFY

14   58.4 MILLION IS WHAT DR. VERDIELL RECEIVED, GIVEN HIS STAKE IN

15   LIGHTLOGIC.   I THINK THAT NUMBER IS ACTUALLY LOWER THAN THAT.

16   I THINK IT'S -- I THINK DR. VERDIELL TESTIFIED, BECAUSE HE GOT

17   STOCK AND STOCK GOES DOWN, SOMETIMES IT GOES UP, LET'S HOPE IT

18   GOES UP, BUT NOW IT'S GOING DOWN, AND I THINK HIS TOTAL TAKE

19   RIGHT NOW IS ABOUT 50 MILLION.

20   Q.   OKAY.   AND SO JUST SO WE'RE CLEAR, THE SLIDE HERE, YOU

21   ARE TAKING THE NUMBER THAT MR. REGAN AND MR. LASINSKI USED?

22   A.   CORRECT.   THIS IS -- THIS IS THEIR -- THEIR STARTING

23   POINT FOR DR. VERDIELL'S ENRICHMENT CALCULATION.

24   Q.   AND YOU TESTIFIED THAT YOU BELIEVE DR. VERDIELL TESTIFIED

25   IN THIS CASE THAT THE VALUE WAS 50 MILLION, AND IT -- PROBABLY

1    GOING DOWN, BUT --

2    A.    RIGHT.

3    Q.    OKAY.

4    A.    RIGHT.  CORRECT.  AND SO THEIR STARTING POINT IS A LITTLE

5    HIGH BY A FEW MILLION.  AND THEN AGAIN, BACK TO THIS -- THIS

6    FIGURE INCLUDES THE VALUE OF ALL LIGHTLOGIC ASSETS THAT

7    MR. SHUM DID NOT MAKE A CONTRIBUTION TOWARDS.  AGAIN BACK TO

8    1998 TO 2001, IT INCLUDES THE LEGITIMATE VALUE OF

9    DR. VERDIELL'S USE RIGHTS UNDER THE PLAN OF LIQUIDATION.  AND

10   IT ALSO INCLUDES COMPENSATION.  DR. VERDIELL HAS TO -- HE HAD A

11   THREE-YEAR NONCOMPETE.  SO IT MEANS HE CAN'T COMPETE WITH

12   INTEL'S OPERATIONS THAT OCCUR IN THE TELECOM SPACE AND INCLUDES

13   COMPETITION FOR THREE AND A HALF YEARS OF WORK BY DR. VERDIELL

14   AT LIGHTLOGIC.  ALL THAT --

15   Q.    LET ME JUST STOP YOU WITH THE THREE-YEAR NONCOMPETE,

16   BECAUSE WE'VE HEARD SOME TESTIMONY, YOU EVEN REFERENCED IT

17   YOURSELF.  IF YOU AGREE TO A NONCOMPETE, ARE YOU PAID FOR THAT?

18   A.    YOU ARE PAID FOR THAT, CONSIDERATION FOR THAT, EXACTLY.

19   YOU KNOW, LAWS WOULD SUGGEST THAT IF YOU'RE NOT PAID FOR THAT,

20   THEN IT'S NOT ENFORCEABLE.  SO YOU'D ALMOST HAVE TO BE -- PARSE

21   OUT SOME OF THE COMPENSATION, SOME OF THE TAKEAWAY HAS TO BE

22   ATTRIBUTABLE TO A NONCOMPETE.

23   Q.    AND DO YOU HAVE AN UNDERSTANDING OF HOW THE DEAL WAS

24   STRUCTURED IN TERMS OF WHEN MR. VERDIELL -- OR DR. VERDIELL

25   WOULD GET HIS STOCK?

NAPPER - DIRECT / GRANT

1   **A.**    YEAH, I -- IT WAS SIMILAR IN TERMS OF THIS VESTING OVER

2   TIME, THAT HE WOULD BE ABLE TO THEN GET THE STOCK OF INTEL AND

3   TO SELL IT.  SO IT'S A PERIOD OF TIME THAT IT FLOWS, NOT --

4   **Q.**    SO IN ADDITION TO HAVING TO WORK AT INTEL AND HAVE THE

5   STOCK VEST, YOU HAVE SOMETHING ELSE THERE THAT SAYS

6   "PERFORMANCE TRIGGERED COMPENSATION AT INTEL."  WHAT DOES THAT

7   MEAN?

8   **A.**    WELL, ESSENTIALLY, AS I UNDERSTAND THE DOCUMENTS,

9   DR. VERDIELL HAD TO MEET CERTAIN PERFORMANCE METRICS IN ORDER

10  TO RECEIVE THAT -- THAT STOCK OF INTEL FROM THE ACQUISITION OF

11  LIGHTLOGIC.  AND WHAT THAT MEANS, THAT KIND OF TIED INTO THE

12  FUTURE.  SO PART OF THAT MONEY, IF YOU WILL, THAT DR. VERDIELL

13  RECEIVED IS TIED INTO FUTURE PERFORMANCE.  HE HAS TO MEET

14  CERTAIN THRESHOLDS IN ORDER TO GET IT.  AND CERTAINLY THAT

15  REALLY DOESN'T HAVE MUCH TO DO WITH THE RADIANCE INTELLECTUAL

16  PROPERTY.

17  **Q.**    AND THEN YOUR LAST BULLET POINT INCLUDES COMPENSATION FOR

18  THREE AND A HALF YEARS OF WORK BY DR. VERDIELL AT LIGHTLOGIC.

19  WHAT DO YOU MEAN BY THAT?

20  **A.**    WELL, ESSENTIALLY, THAT'S BACK TO THERE'S A LOT OF PERIOD

21  OF TIME THAT HE WAS WORKING AND HE WAS DEVELOPING AND DOING

22  ACTIVITIES.

23  **Q.**    AND CAN YOU -- DID YOU REACH AN OPINION -- NOW, AGAIN,

24  ASSUMING THAT MR. SHUM WAS ABLE TO PROVE HIS CASE, LIABILITY

25  AND CAUSATION, DID YOU -- DID YOU MAKE ANY ANALYSIS ABOUT

NAPPER – DIRECT / GRANT

1  LIGHTLOGIC, UNJUST ENRICHMENT?

2  **A.**    YES.  I LOOKED AT THE LIGHTLOGIC CLAIM FOR UNJUST

3  ENRICHMENT, HOW WAS LIGHTLOGIC UNJUSTLY ENRICHED.  AND FIRST,

4  FOR THE PERIOD OF TIME FROM 1998 TO 2001, LIGHTLOGIC DID NOT

5  MAKE A PROFIT.  THEY ACTUALLY LOST MONEY, ABOUT $9 MILLION OR

6  SO.

7  **Q.**    AND WHY IS THAT SIGNIFICANT?

8  **A.**    WELL, IT'S MY UNDERSTANDING UNJUST ENRICHMENT HAS TO BE

9  THE RECEIVED BENEFITS FROM SOME CLAIM OF WRONGFUL DOING, IF YOU

10  WILL, FOR UNJUST ENRICHMENT.  AND IF THERE'S NO BENEFIT -- IF

11  THE BENEFITS AREN'T RECEIVED, THE PROFITS AREN'T RECEIVED.  IF

12  THERE'S NO PROFITS, THERE'S NO UNJUST ENRICHMENT.

13  **Q.**    OKAY.  AND WAS THERE ANYTHING ELSE?

14                 **MS. GRANT:**  I THINK WE HAVE A SLIDE, JEFF.

15                 (EXHIBIT PUBLISHED TO JURY.)

16                 **THE WITNESS:**  SO THEN YOU TURN SO THE -- LIGHTLOGIC

17  HAD LOST MONEY UP TO 2001.  AND THEN YOU TURN TO THE

18  TRANSACTION, AND WHAT HAPPENED DURING THE TRANSACTION IS INTEL

19  ESSENTIALLY TRANSFERRED STOCK TO -- AND COMPENSATION DIRECTLY

20  TO THE LIGHTLOGIC SHAREHOLDERS, NOT LIGHTLOGIC, THE COMPANY,

21  BUT LIGHTLOGIC SHAREHOLDERS.  THE INVESTORS, THE EMPLOYEES,

22  DR. VERDIELL, ALL RECEIVED IT DIRECTLY.  AND LIGHTLOGIC, THE

23  COMPANY, DID NOT RECEIVE ANY OF THE INTEL STOCK.

24  **Q.**    AND WHY IS THAT SIGNIFICANT TO YOUR OPINIONS IN THIS

25  CASE?

1    A.    WELL, AGAIN, BACK TO UNJUST ENRICHMENT, IF IT'S BENEFITS

2    RECEIVED, LIGHTLOGIC DIDN'T RECEIVE ANY BENEFITS.  LIGHTLOGIC

3    AS AN ENTITY.  SO THERE IS NO UNJUST ENRICHMENT TO LIGHTLOGIC.

4    Q.    AND FINALLY, MR. NAPPER, CAN YOU SUMMARIZE THE OPINIONS

5    YOU'VE REACHED IN THIS CASE.

6              (OFF-THE-RECORD DISCUSSION.)

7              **MS. GRANT:**  AND WE ACTUALLY HAVE A SLIDE, I THINK,

8    TO HELP THE JURY FOLLOW ALONG.

9              **THE WITNESS:**  YES.

10   **BY MS. GRANT**

11   Q.    AND AGAIN, I JUST WANT TO POINT OUT THIS IS IF MR. SHUM

12   PROVES LIABILITY AND IF HE PROVES CAUSATION, THEN YOU'VE COME

13   UP WITH THESE DAMAGE FIGURES; IS THAT CORRECT?

14   A.    THAT'S CORRECT.  I ASSUME LIABILITY AND CAUSATION.

15         AND SO AS BEST I COULD IDENTIFY THE CLAIMS OF

16   MR. SHUM'S -- OR HIS LEGAL CLAIMS, THERE'S A BREACH OF CONTRACT

17   CLAIM THAT HE WAS NOT NAMED AS AN INVENTOR ON ONE OR MORE OF

18   THE DBC AND/OR FLEXURE PATENTS.  AND WE TALKED ABOUT MY

19   CALCULATION AND DETERMINATION THAT THAT VALUE RANGES FROM

20   $150,000 TO $225,000.

21   Q.    AND THAT WOULD BE IF HE WAS -- SHOULD HAVE BEEN --

22   ASSUMING HE PROVED THAT HE SHOULD HAVE BEEN NAMED AS A

23   COINVENTOR OR SOLE INVENTOR ON ALL THE PATENTS, THAT'S THE

24   VALUE FOR ALL THE PATENTS?

25   A.    CORRECT.  IF YOU FIND THAT THERE'S -- IT'S ON A

NAPPER – DIRECT / GRANT

```
 1   PER-PATENT BASIS, IT'S LESS THAN THE SIX PATENTS, THEN YOU HAVE

 2   THAT DATA TO MAKE THAT CALCULATION.

 3   Q.    AND WHAT WAS THE PER-PATENT -- LET ME JUST -- SO IT'S --

 4   I JUST WANT TO GO BACK.

 5         THE PER-PATENT -- JUST SO WE HAVE IT HERE.  I APOLOGIZE

 6   THAT I DON'T HAVE IT HANDY.

 7         BUT I JUST -- YOU SAID THAT IT WAS 25,000 TO 37,500 PER

 8   PATENT WAS THE RANGE YOU USED?

 9   A.    CORRECT.

10   Q.    OKAY.

11   A.    THAT'S RIGHT.

12   Q.    AND THEN THERE'S A SECOND BULLET POINT UNDER BREACH OF

13   CONTRACT, AND CAN YOU EXPLAIN THAT?

14   A.    YES.  THE SECOND BULLET POINT IS THE VALUE OF MR. SHUM'S

15   RIGHTS UNDER THE PLAN OF LIQUIDATION, ASSUMING A BREACH OF

16   CONTRACT OF THE PLAN OF LIQUIDATION, OF 250,000 TO $500,000.

17   AND THAT'S BASED UPON THE OFFERS THAT WE TALKED ABOUT AS WELL

18   AS MY REASONABLENESS CHECK.

19   Q.    OKAY.  SO THAT'S BASED ON THE BUYOUT OFFER, THE GIGABIT

20   OFFER, AND THE SERIES A CROSS-CHECK YOU DID?

21   A.    CORRECT.

22   Q.    AND IT'S NOT ON THE SLIDE, BUT IT SAYS "VALUE OF

23   MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION."

24         WOULD THAT ALSO EQUATE TO EXCLUSIVE RIGHTS?

25   A.    RIGHT.  AND THAT'S DOWN AT THE BOTTOM.  YOU SEE
```

 1   EXCLUSIVITY.  IT'S THE SAME CALCULATION WE DID THERE.

 2   Q.    AND THEN WE HAVE "FRAUD."  CAN YOU EXPLAIN THAT BULLET

 3   POINT?

 4   A.    YES.  I UNDERSTAND THERE MAY BE SOME CLAIMS OF FRAUD.

 5   AND IT'S MY UNDERSTANDING -- I GET DIRECTION FROM A LEGAL

 6   STANDPOINT FROM COUNSEL ON THIS -- THAT THAT WOULD CONSTITUTE

 7   MR. SHUM'S OUT-OF-POCKET LOSS AS A RESULT OF THE FRAUD.  I JUST

 8   HAVEN'T SEEN ANY INFORMATION THAT WOULD SUGGEST THAT MR. SHUM

 9   HAS -- HAS SUFFERED AN OUT-OF-POCKET LOSS, AND I CERTAINLY

10   HAVEN'T SEEN A QUANTIFICATION OF THAT IF HE HAS.

11   Q.    AND JUST BECAUSE THAT TERM IS A LEGAL TERM SO -- BUT WHAT

12   IS YOUR UNDERSTANDING JUST SO THE JURY -- WHAT IS OUT-OF-POCKET

13   LOSS?

14   A.    ESSENTIALLY IT'S COSTS THAT MR. SHUM, FOR EXAMPLE,

15   WOULD -- WOULD INCUR AS A DIRECT RESULT OF A FRAUD CLAIM.  AND

16   SO IT WOULD BE HE HAD TO REACH INTO HIS POCKET, HE HAD TO SPEND

17   SOME MONEY, OR TO DO SOMETHING IN ORDER TO ADDRESS THE FRAUD,

18   FOR LACK OF A BETTER TERM.

19   Q.    SO CAN YOU GET -- WOULD IT BE LIKE STARTING LUMINANCE?

20   OR GIVE US AN EXAMPLE OF LIKE -- I KNOW THERE HASN'T BEEN ANY

21   EVIDENCE, BUT WHAT WOULD BE OUT-OF-POCKET LOSS?

22   A.    WELL, I HAVE TO SAY, MS. GRANT, IT AT LEAST DEPENDS ON

23   WHAT THE FRAUD THAT'S BEING CLAIMED.  I THINK IT WOULD DIFFER.

24   SO I CAN'T REALLY THINK OF AN EXAMPLE UNLESS I KNOW

25   SPECIFICALLY WHAT THE FRAUD IS THAT'S BEING CLAIMED.

NAPPER - DIRECT / GRANT

1   Q.    OKAY.  FAIR ENOUGH.

2         AND YOU HAVE IT AT ZERO.  WHY IS THAT?

3   A.    WELL, AGAIN, I -- I'M NOT QUITE CLEAR ON THE FRAUD CLAIMS

4   PER SE.  I HAVEN'T SEEN A CLAIM BY MR. SHUM'S EXPERTS AS TO TRY

5   TO QUANTIFY THE OUT-OF-POCKET LOSS.  AND I HAVEN'T REALLY SEEN

6   ANY EVIDENCE OF AN OUT-OF-POCKET LOSS.  AND MR. SHUM DID, YOU

7   KNOW, START TO TRY TO -- TO TAKE THE TECHNOLOGY, AS I

8   UNDERSTAND IT, FORM A COMPANY, BUT I'M NOT SURE THAT

9   CONSTITUTES AN OUT-OF-POCKET LOSS.  THAT'S HIS ATTEMPTS TO EARN

10  A LIVING AND EXPLOIT HIS RIGHTS UNDER THE PLAN OF LIQUIDATION.

11  Q.    OKAY.  AND FINALLY, YOU HAVE UNJUST ENRICHMENT.  AND CAN

12  YOU JUST EXPLAIN THE FIRST BULLET POINT TO THE JURY?

13  A.    YES.  THE -- THE -- AGAIN, UNDER UNJUST ENRICHMENT, IF

14  DR. VERDIELL OR DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED BECAUSE

15  MR. SHUM WAS NOT NAMED AS INVENTOR ON ONE OR MORE OF THE

16  PATENTS, THEN AGAIN THAT ROAD LEADS DOWN TO THE CALCULATION

17  I'VE ALREADY MADE OF 150,000 TO $225,000.

18  Q.    AND AGAIN, THAT'S ALL SIX PATENTS AND --

19  A.    CORRECT.  AND THE SAME PER PATENT, I THINK IT'S 25,000 TO

20  37,500.

21  Q.    AND FINALLY, THE -- THE LAST BULLET POINT?

22  A.    THE LAST IS AGAIN UNDER AN UNJUST ENRICHMENT CLAIM, IT'S

23  THE VALUE OF MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION

24  AND THE EXCLUSIVITY OF THOSE RIGHTS.  AND I'VE CALCULATED THAT

25  TO BE 250,000 TO $500,000.

1    Q.    AND, AGAIN, WHY -- YOU KNOW, WE'VE HEARD A LOT ABOUT

2    EXCLUSIVITY.  WHY DID YOU FOCUS IN ON THE EXCLUSIVITY?

3    A.    WELL, I FOCUSED ON THE EXCLUSIVITY BECAUSE, AGAIN, UNDER

4    MY ASSUMPTION, THE PLAN OF LIQUIDATION ALLOWS DR. VERDIELL AND

5    MR. SHUM TO EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT THE

6    TECHNOLOGY.  SO WHAT WE'RE REALLY ASKED TO LOOK AT IS WHAT IS

7    THE POTENTIAL VALUE OF EXCLUSIVITY.

8    Q.    OKAY.  HAVE WE COVERED YOUR OPINIONS IN THIS CASE?

9    A.    I THINK SO.

10            MS. GRANT:  THANK YOU.  I HAVE NO FURTHER QUESTIONS

11   AT THIS TIME, YOUR HONOR.

12            THE COURT:  WE'LL TAKE THE RECESS NOW, ABOUT TEN

13   MINUTES.

14            (RECESS TAKEN AT 10:26 A.M.)

15            THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

16   COME TO ORDER.

17            (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

18   PRESENCE OF THE JURY:)

19            THE COURT:  PLEASE GO AHEAD, COUNSEL.

20            MR. JANSEN:  THANK YOU, YOUR HONOR.

21                    CROSS-EXAMINATION

22   BY MR. JANSEN:

23   Q.    GOOD MORNING, MR. NAPPER.

24   A.    GOOD MORNING, MR. JANSEN.

25   Q.    THE COURT REPORTER WARNED US DURING THE BREAK THAT WE

1    SHOULD TRY TO TALK NOT TOO QUICKLY, SO I'LL TRY FOR AS LONG AS

2    I CAN.

3         LET'S START -- I'D LIKE TO START MY QUESTIONING TO YOU AT

4    THE END OF WHERE YOU LEFT OFF, AND YOU TESTIFIED YOU FELT

5    LIGHTLOGIC HAD RECEIVED NO UNJUST ENRICHMENT, ZERO; IS THAT

6    RIGHT?

7    A.    THAT'S CORRECT.  AS AN ENTITY, THAT'S CORRECT.

8    Q.    AND -- BUT I THINK YOU SAID THAT UNJUST ENRICHMENT IS

9    MEASURED -- YOU HAVE TO RECEIVE A BENEFIT -- BENEFIT THAT HAS

10   TO BE RECEIVED FOR THERE TO BE UNJUST ENRICHMENT, CORRECT?

11   A.    THAT IS MY UNDERSTANDING.

12   Q.    AND WHEN WAS THE BENEFIT OBTAINED IN THIS CASE?

13   A.    THE BENEFIT FOR THE LIGHTLOGIC SHAREHOLDERS, AS

14   CALCULATED BY MR. REGAN AND MR. LASINSKI?

15   Q.    WHEN WAS THAT BENEFIT OBTAINED?

16   A.    THE BENEFIT OF THE LIGHTLOGIC SHAREHOLDERS, AS THE CLAIM

17   THAT MR. LASINSKI AND MR. REGAN -- REGAN, WAS IN 2001.

18   Q.    RIGHT.  AND THAT CAME THROUGH THE SALE OF LIGHTLOGIC TO

19   INTEL FOR $409 MILLION IN INTEL STOCK, CORRECT?

20   A.    THAT'S -- THAT'S HOW THEY CALCULATED WHEN THE UNJUST

21   ENRICHMENT OCCURRED.  BUT, AGAIN, TO --

22   Q.    THAT WAS -- THAT WAS THE ONLY TIME THAT ANY BENEFIT WAS

23   OBTAINED, RIGHT?

24   A.    BY LIGHTLOGIC, THE ENTITY?

25   Q.    BY LIGHTLOGIC, THE ENTITY.  YOU SAID THAT THEY LOST MONEY

1    FOR THREE YEARS, AND THEN -- AND THEN THEY SOLD THEMSELVES TO

2    INTEL.  THAT WAS THE ONLY TIME ANY BENEFIT WAS OBTAINED AT THE

3    SALE OF 2001, CORRECT?

4    **A.**   WELL, I DID IDENTIFY THEY LOST MONEY FROM '98 TO 2001,

5    AND THEN LIGHTLOGIC WAS SOLD OR ACQUIRED BY INTEL WITH THE

6    BENEFITS FLOWING TO THE LIGHTLOGIC STAKEHOLDERS DIRECTLY.

7    **Q.**   AND YOU DIDN'T -- YOU DID NOT ATTEMPT TO MEASURE THE

8    VALUE OF THE INTELLECTUAL PROPERTY OF LIGHTLOGIC AS PART OF

9    THE -- AS PART OF THE PURCHASE PRICE, THE $409 MILLION PURCHASE

10   PRICE, DID YOU?

11   **A.**   I -- I WOULD SAY I MEASURED A PORTION OF THE INTELLECTUAL

12   PROPERTY OF LIGHTLOGIC AT THAT TIME AND THAT PORTION WOULD BE

13   THE -- MY CALCULATION OF MR. SHUM'S RIGHTS UNDER THE PLAN OF

14   LIQUIDATION, 250- TO $500,000.

15   **Q.**   THE VALUE OF WHAT?

16   **A.**   OF THE -- THE -- FOR LACK OF A BETTER TERM, THE

17   TECHNOLOGY AT ISSUE, DBC AND FLEXURE PATENTS AND THE RIGHTS

18   UNDER THE PLAN OF LIQUIDATION.  IN OTHER WORDS, THAT'S --

19   THAT'S PART OF THIS LARGE BUCKET THAT MR. LASINSKI AND

20   MR. REGAN IDENTIFIED AS LIGHTLOGIC'S INTELLECTUAL PROPERTY.

21   **Q.**   OKAY.  YOU DID NOT TRY TO VALUE THE COMPLETE RIGHT,

22   TITLE, AND INTEREST IN THE PATENTS THAT WERE SOLD TO INTEL IN

23   2001 AS PART OF THAT $409 MILLION ACQUISITION, THOUGH, DID YOU?

24   **A.**   WELL, AGAIN, WHAT I VALUED IS A PORTION OF THAT WHICH IS

25   THE RIGHTS UNDER THE PLAN OF LIQUIDATION, THE RIGHTS TO

1    INDEPENDENTLY EXPLOIT AND USE, HAVE MADE, OR SELL THE RIGHTS

2    UNDER THOSE INVENTIONS.

3    Q.    WHAT'S THE DIFFERENCE --

4    A.    AND I ASSUME WE'RE TALKING ABOUT JUST THE DBC AND FLEXURE

5    PATENTS.

6    Q.    LET ME JUST BACK UP A SECOND AGAIN.  WITH -- YOU

7    UNDERSTAND THAT A CORPORATION ACTS ON BEHALF OF ITS

8    SHAREHOLDERS?

9    A.    YES, I WOULD SAY THAT'S TRUE.  I HOPE SO.

10   Q.    AND THE PROFITS OF THE CORPORATION ALWAYS GO TO THE

11   SHAREHOLDERS, DON'T THEY?

12   A.    NO.

13   Q.    THEY'RE DISTRIBUTED AS DIVIDENDS?

14   A.    NO.

15   Q.    WHO DO THE -- WHERE DO THE PROFITS OF THE CORPORATION GO?

16   A.    WELL, THE PROFITS DON'T GO ANYWHERE.  THEY CAN BE

17   RETAINED.  THEY CAN BE USED FOR INVESTMENTS.  I'M A SHAREHOLDER

18   IN FTI CONSULTING, BUT THE PROFITS OF FTI CONSULTING CERTAINLY

19   DON'T GO TO ME.

20   Q.    ON BEHALF OF THE SHAREHOLDERS?

21   A.    ON BEHALF OF THE --

22   Q.    THE CORPORATION IS RUN ON BEHALF OF THE SHAREHOLDERS?

23   A.    I WOULD AGREE WITH THAT, THAT THE CORPORATION IS RUN ON

24   BEHALF OF THE SHAREHOLDERS.  FROM THE NON-LEGAL STANDPOINT,

25   SURE, THE CORPORATION HAS OBLIGATIONS TO RUN A COMPANY WELL AND

1   HELP TO -- ITS SHAREHOLDERS.

2   **Q.**    AND DON'T YOU AGREE THAT LIGHTLOGIC SOLD ITSELF TO INTEL

3   FOR THE BENEFIT OF ITS SHAREHOLDERS?

4   **A.**    WELL, I -- LIGHTLOGIC SOLD ITSELF TO INTEL.  I DON'T --

5   CAN'T READ THE MIND OF WHY LIGHTLOGIC DID THAT.  ONE CAN ONLY

6   PRESUME THAT THEY DID THAT ON BEHALF OF THE SHAREHOLDERS, SURE.

7   **Q.**    AND THE SHAREHOLDERS MUST HAVE UNDERSTOOD WHEN THEY

8   APPROVED THE SALE THAT THEY WERE GOING TO BE GETTING THE STOCK,

9   RIGHT?

10  **A.**    I DON'T KNOW WHAT THE SHAREHOLDERS KNEW WHAT THEY WERE

11  GOING TO BE GETTING AS A RESULT OF THE SALE.

12  **Q.**    AS A RESULT OF THE SALE, THE DEAL WAS STRUCTURED SO THAT

13  THE SHAREHOLDERS GOT THE STOCK IN INTEL CORPORATION.

14  **A.**    THAT'S MY UNDERSTANDING OF HOW THE DEAL WAS STRUCTURED,

15  THAT'S CORRECT.

16  **Q.**    AND LIGHTLOGIC, WHEN IT SOLD ITSELF TO INTEL FOR

17  $409 MILLION, IT TRANSFERRED EXCLUSIVE RIGHTS IN THE PATENTS AT

18  ISSUE IN THIS CASE, DIDN'T THEY?

19          **MS. GRANT:**  LACKS FOUNDATION AS TO TIMING, YOUR

20  HONOR.

21          **THE COURT:**  REPHRASE THE QUESTION.

22  **BY MR. JANSEN:**

23  **Q.**    WELL, DO YOU UNDERSTAND, SIR, THAT WHEN LIGHTLOGIC SOLD

24  ITSELF TO INTEL, IT -- IT SOLD EXCLUSIVE -- WITH IT -- WITH

25  THAT SALE, IT INCLUDED EXCLUSIVE RIGHTS TO USE THE INVENTIONS

1    COVERED BY THE PATENTS AT ISSUE IN THIS CASE?

2              **MS. GRANT:**  STILL LACKS FOUNDATION AS TO TIMING.

3              **THE COURT:**  NO, THAT -- THAT OBJECTION'S OVERRULED.

4              **THE WITNESS:**  SO IT'S MY UNDERSTANDING THAT

5    LIGHTLOGIC -- THAT INTEL ACQUIRED WHATEVER LIGHTLOGIC RIGHTS

6    THEY HAD AT THAT POINT IN TIME.

7    **BY MR. JANSEN:**

8    **Q.**    OKAY.  AND THOSE WERE EXCLUSIVE RIGHTS TO THE ENTIRE

9    RIGHT, TITLE, AND INTEREST IN THE INVENTIONS COVERED BY THE

10   PATENTS IN SUIT; ISN'T THAT TRUE?

11   **A.**    IT'S MY ASSUMPTION THAT DR. VERDIELL HAD RIGHTS, AND SO

12   HE ASSIGNED WHATEVER RIGHTS HE HAD TO LIGHTLOGIC, AND THEN

13   WHATEVER RIGHTS LIGHTLOGIC HAD, THEY ASSIGNED TO INTEL AS PART

14   OF THE ACQUISITION.

15   **Q.**    AND HE ASSIGNED THE ENTIRE RIGHT, TITLE, AND INTEREST IN

16   THOSE INVENTIONS TO LIGHTLOGIC, CORRECT?

17   **A.**    IT SOUNDS LIKE A LEGAL CONCLUSION.  I DON'T -- I DON'T GO

18   THROUGH THE DOCUMENTS AND SAY WHAT SPECIFIC TITLE HE

19   TRANSFERRED.  I DO ASSUME THAT DR. VERDIELL TRANSFERRED RIGHTS

20   TO LIGHTLOGIC, AND THAT THEN LIGHTLOGIC TRANSFERRED WHATEVER

21   THE RIGHTS THOSE WERE TO INTEL.

22   **Q.**    AND IN FACT, YOU DIDN'T EVEN LOOK AT THE ASSIGNMENTS THAT

23   DR. VERDIELL HAD EXECUTED TO LIGHTLOGIC IN PREPARATION OF YOUR

24   REPORT IN THIS CASE, DID YOU?

25   **A.**    THAT DR. VERDIELL HAD TRANSFERRED TO LIGHTLOGIC?  I DON'T

1   RECALL WHETHER I LOOKED AT THOSE ASSIGNMENT DOCUMENTS.

2   **Q.**   YOU HADN'T EVEN CONSIDERED THEM IN CONNECTION WITH YOUR

3   OPINION WORK IN THIS CASE?

4   **A.**   WELL, I -- I WAS ASKED TO ASSUME THAT DR. VERDIELL --

5   DR. VERDIELL HAD RIGHTS UNDER THE PLAN OF LIQUIDATION.  I

6   ASSUMED THOSE WERE THE ONES THAT WERE ESSENTIALLY ASSIGNED TO

7   LIGHTLOGIC, WHATEVER RIGHTS THOSE WERE.

8   **Q.**   OKAY.  AND WHAT WERE THOSE RIGHTS?

9   **A.**   THEY WERE THE RIGHTS TO -- AS I EXPLAINED ON MY

10  ASSUMPTION, THEIR RIGHT TO INDEPENDENTLY EXPLOIT, HAVE MADE,

11  MAKE, ASSIGN RIGHTS TO THE, QUOTE, UNQUOTE, "RADIANCE

12  INTELLECTUAL PROPERTY."

13  **Q.**   AND YOU ASSUMED THAT MR. SHUM HAD THE SAME RIGHTS?

14  **A.**   CORRECT.

15  **Q.**   SO THEY WEREN'T EXCLUSIVE RIGHTS.  THEY WERE -- THEY EACH

16  HAD RIGHTS SEPARATELY, CORRECT?

17  **A.**   WELL, THEY EACH HAD EQUAL RIGHTS TO INDEPENDENTLY

18  EXPLOIT, SO TO DO SOMETHING WITH THE TECHNOLOGY, AND THEY ALSO

19  COULDN'T ENFORCE ANYTHING THEY DID AGAINST EACH OTHER.  THEY

20  COULDN'T STOP THE OTHER PERSON FROM USING THAT TECHNOLOGY.

21  **Q.**   WELL, YOU -- EARLIER, YOU EQUATED THAT RIGHT, WHAT YOU

22  CALL THE RIGHT TO USE, THAT THEY EACH HAD EQUALLY AS BEING

23  EXCLUSIVE RIGHTS.

24  **A.**   YES.

25  **Q.**   I'M CONFUSED BECAUSE I THOUGHT A PATENT -- A PATENT GIVES

1   SOMEBODY EXCLUSIVE RIGHT TO USE THE TECHNOLOGY, CORRECT?

2   **A.**    IN A TYPICAL FASHION, A PATENT GIVES SOMEBODY THE RIGHT

3   TO EXCLUDE OTHERS TO USE THE TECHNOLOGY.  IT DOESN'T MEAN THEY

4   USE IT.

5   **Q.**    AND IF YOU HAVE TWO -- TWO INVENTORS ON A PATENT, THEY

6   EACH HAVE SEPARATE NON-EXCLUSIVE RIGHTS, DON'T THEY?

7   **A.**    NO.  I THINK IT -- I DON'T KNOW.  IT DEPENDS ON THE

8   SITUATION.  IN THIS SITUATION, UNDER THE PLAN OF LIQUIDATION,

9   THEY EACH HAVE INDEPENDENT RIGHTS TO EXPLOIT.

10  **Q.**    SO THEY BOTH HAD EQUAL RIGHTS.

11  **A.**    THEY HAVE EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT.

12  **Q.**    SEPARATE BUT EQUAL RIGHTS, CORRECT?

13  **A.**    I WOULD SAY SEPARATE BUT EQUAL RIGHTS TO INDEPENDENTLY

14  EXPLOIT, NOT NECESSARILY EQUAL RIGHTS MEANING LIKE 50 PERCENT,

15  BUT EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT.

16  **Q.**    SO MR. VERDIELL DID NOT HAVE EXCLUSIVE RIGHTS, THEN.

17  **A.**    HE HAD RIGHTS TO ESSENTIALLY USE AND MAKE AND ASSIGN HIS

18  RIGHTS UNDER THE PLAN OF LIQUIDATION.  AND THAT WAS ASSIGNED TO

19  LIGHTLOGIC, AND THEN ULTIMATELY I ASSUME THAT'S WHAT WAS

20  ACQUIRED BY INTEL.  AND MR. SHUM HAD THOSE SAME RIGHTS.  AND

21  THEY COULDN'T -- THEY COULDN'T -- WHAT THEY COULDN'T DO IS

22  ESSENTIALLY HALT THE OTHER FROM USING THE TECHNOLOGY.

23  **Q.**    OKAY.  WELL, NOW YOU'RE TELLING US WHAT -- WHAT

24  MR. VERDIELL ASSIGNED TO LIGHTLOGIC, BUT YOU JUST TESTIFIED YOU

25  HADN'T EVEN LOOKED AT THE ASSIGNMENTS THAT WERE EXECUTED BY

1    MR. VERDIELL IN THIS CASE WHEN YOU PREPARED YOUR OPINION.

2    **A.**    WHEN I PREPARED MY OPINION, I THINK YOU AND I WENT

3    THROUGH SOME ASSIGNMENT DOCUMENTS IN MY DEPOSITION, BUT AT THE

4    END OF THE DAY, IT'S AN ASSUMPTION OF MINE AS TO WHAT

5    DR. VERDIELL ASSIGNS, AND IT'S MY ASSUMPTION –– AND I'VE

6    ALREADY EXPLAINED MY ASSUMPTION –– AS TO WHAT HE DID ASSIGN.

7    **Q.**    AND THE FIRST TIME YOU LOOKED AT THOSE ASSIGNMENTS WAS AT

8    YOUR DEPOSITION, RIGHT?

9    **A.**    THAT IS CORRECT.

10   **Q.**    AND YOU HADN'T LOOKED AT THEM OR CONSIDERED THEM IN

11   PREPARING YOUR OPINION IN THIS CASE BEFORE THAT.

12   **A.**    YEAH.  BUT I'M NOT AN ATTORNEY SO I CAN'T TELL YOU

13   EXACTLY WHAT THE ASSIGNMENT DOCUMENTS, IN TERMS OF TITLE,

14   ET CETERA, WHAT WAS TRANSFERRED.  THAT'S NOT MY ROLE.  MY ROLE

15   IS, ASSUMING THAT THE INDEPENDENT –– EQUAL RIGHTS TO

16   INDEPENDENTLY EXPLOIT WERE ASSIGNED, THAT'S WHAT I ASSUME WAS

17   DONE.

18   **Q.**    OKAY.  AND YOUR ASSUMPTIONS ARE ESSENTIALLY THE

19   FOUNDATION OF YOUR OPINIONS, AREN'T THEY?

20   **A.**    I WOULD SAY THAT MY ASSUMPTIONS ARE NOT FOUNDATION, BUT

21   THEY'RE IMPORTANT TO MY OPINION, SURE.

22   **Q.**    OKAY.  AND IF THOSE ASSUMPTIONS AREN'T TRUE, YOUR OPINION

23   JUST CRUMBLES WITH THE FOUNDATION, DOESN'T IT?

24   **A.**    "CRUMBLE" IS A HARSH WORD.  I WOULD SAY THAT IF ONE OR

25   MORE OF THE ASSUMPTIONS ARE FOUND TO BE COMPLETELY UNTRUE, THEN

1    AN ADJUSTMENT WOULD BE APPROPRIATE, SURE.

2    Q.    OKAY.  WELL, LET'S LOOK AT THE ASSIGNMENT.  LET'S LOOK AT

3    ONE OF THE ASSIGNMENTS.  LET'S LOOK AT EXHIBIT 17.

4              MR. JANSEN:  IF WE COULD PULL THAT UP, DAVID.

5                   (EXHIBIT PUBLISHED TO JURY.)

6              MR. JANSEN:  AND LET'S GO TO THE SECOND PAGE.

7              THE WITNESS:  I DON'T WANT TO BREAK THIS.  DOES THIS

8    TILT?

9              MR. JANSEN:  LET'S GO TO THE SECOND PAGE.  LET'S GO

10   TO THE THIRD PAGE.  CAN YOU BLOW THAT UP, PLEASE?

11   BY MR. JANSEN:

12   Q.    I'M SORRY.  YOU HAVEN'T GOT THE DOCUMENT IN FRONT OF YOU.

13        THIS IS AN ASSIGNMENT OF THE FLEXURE PATENT APPLICATION

14   THAT WAS FILED ON JANUARY 11TH, 1999.

15             MS. GRANT:  EXCUSE ME, I APOLOGIZE, YOUR HONOR.  I

16   DON'T THINK THE WITNESS SHOULD HAVE TO LOOK AT THE SCREEN.  CAN

17   YOU ACTUALLY GIVE HIM THE DOCUMENT?

18             THE COURT:  IF YOU'RE GOING TO ASK THE WITNESS TO --

19   TO READ THAT --

20             CAN YOU READ THAT, SIR?

21             THE WITNESS:  I CAN READ IT ON HERE.  THANKS.

22             MR. JANSEN:  NO, NO.  WE CAN --

23             THE WITNESS:  I CAN'T READ THAT.

24             THE COURT:  CAN YOU?

25             MR. JANSEN:  WE CAN -- WE CAN.

1              JEFF --

2              JEFF'S GETTING THE BINDER.

3              WHY DON'T YOU BRING THE WHOLE BINDER, JEFF.  JUST

4    BRING THE WHOLE BINDER.

5                   (PAUSE IN THE PROCEEDINGS.)

6    BY MR. JANSEN:

7    Q.   THE JURY'S SEEN THIS ASSIGNMENT BEFORE, MR. NAPPER, AND

8    IT'S -- IT'S THE ASSIGNMENT OF DR. VERDIELL'S ASSIGNMENT OF

9    INVENTIONS UNDER THE FLEXURE PATENT, THE '950 FLEXURE PATENT

10   THAT WAS FILED -- THE APPLICATION FOR PATENT WAS FILED ON

11   JANUARY 11TH, 1999.  AND THIS ASSIGNMENT IS DATED 4/10/1999.

12   IT WAS SIGNED BY DR. VERDIELL ON THE LAST PAGE.

13             MR. JANSEN:  DO YOU WANT TO GO TO THE SIGNATURE PAGE

14   RIGHT NOW, DAVID.  PAGE 4.  PAGE 4.

15                   (EXHIBIT PUBLISHED TO JURY.)

16   BY MR. JANSEN:

17   Q.   PAGE 4, YOU SEE DR. VERDIELL SIGNED THAT ON APRIL 10TH,

18   1999, UP THERE ON THE TOP?

19   A.   IS THIS PAGE 455 OR 453?

20   Q.   IT'S TRIAL EXHIBIT 17, PAGE 04.

21   A.   ZERO FOUR.  THANK YOU.  I SEE THAT YOU'RE SEQUENCING NOW.

22   YES, I SEE THAT.

23             MR. JANSEN:  OKAY.  AND IF WE GO TO THE NEXT --

24   PREVIOUS PAGE.  JUST BLOW THAT PART OF IT UP, DAVID.

25                   (EXHIBIT PUBLISHED TO JURY.)

1    BY MR. JANSEN:

2    Q.    JUST STATES THAT JEAN-MARC VERDIELL HEREBY SELLS,

3    ASSIGNS, AND TRANSFERS TO LIGHTLOGIC AND TO ITS SUCCESSORS,

4    ASSIGNS, OR REPRESENTATIVES, ET CETERA, THE ENTIRE RIGHT,

5    TITLE, AND INTEREST FOR THE UNITED STATES AND ALL FOREIGN

6    COUNTRIES, AND IT'S TO ANY AND ALL IMPROVEMENTS THAT ARE

7    DISCLOSED IN THE PATENT APPLICATION.  THAT'S THE '950 PATENT

8    APPLICATION.

9              MR. JANSEN:  IF WE GO TO THE NEXT PAGE OF THE NEXT

10   PARAGRAPH.

11              (EXHIBIT PUBLISHED TO JURY.)

12   BY MR. JANSEN:

13   Q.    AND THE RIGHTS TRANSFERRED ARE TO THE APPLICATION AS TO

14   ALL DIVISIONAL APPLICATIONS, CONTINUATION APPLICATIONS,

15   ET CETERA, ASSIGNED TO THE INVENTION.

16              MR. JANSEN:  AND I'D LIKE TO FOCUS ON THE LAST

17   PARAGRAPH DOWN AT THE BOTTOM, DAVID.

18              (EXHIBIT PUBLISHED TO JURY.)

19   BY MR. JANSEN:

20   Q.    AND THERE'S A COVENANT THAT JEAN-MARC VERDIELL -- A

21   COVENANT THAT -- A PROMISE, A COVENANT WITH THE ASSIGNEE

22   LIGHTLOGIC THAT NO OTHER ASSIGNMENT, GRANT, MORTGAGE, LICENSE

23   OR ANY OTHER AGREEMENT AFFECTING THE RIGHTS AND PROPERTY HEREIN

24   CONVEYED HAS BEEN MADE TO OTHERS BY THE UNDERSIGNED.

25              NOW, YOU INDICATED YOU FELT THAT WAS AN ASSIGNMENT OF

1   JUST MR. SHUM -- MR. VERDIELL'S RIGHT TO USE.  I DON'T SEE THAT

2   LANGUAGE IN THE ASSIGNMENT.  I WONDER WHERE YOU GOT THAT

3   ASSUMPTION.

4   **A.**   WELL, I GOT THE ASSUMPTION THAT I WAS ASKED TO MAKE IN

5   TERMS OF QUANTIFYING DAMAGES FROM THE PLAN OF LIQUIDATION,

6   WHICH IS AN ASSUMPTION THAT EACH PARTY, DR. VERDIELL AND

7   MR. SHUM, HAVE INDEPENDENT RIGHTS TO FULLY EXPLOIT THE RADIANCE

8   TECHNOLOGY.  SO I'M ASSUMING THAT THROUGH THAT, DR. VERDIELL

9   TRANSFERRED THOSE RIGHTS TO -- OR ASSIGNED THOSE RIGHTS TO

10  LIGHTLOGIC.  IT'S MY ASSUMPTION HE'S ABLE TO DO THAT AND IT

11  FLOWS THROUGH TO ULTIMATELY THE INTEL ACQUISITION.

12  **Q.**   OKAY.  BUT HE ASSIGNED THE ENTIRE RIGHT, TITLE, AND

13  INTEREST IN THE INVENTION.  HE DIDN'T TRANSFER A HALF INTEREST

14  OR HIS RIGHT TO USE IT.  HE TRANSFERRED THE ENTIRE RIGHT,

15  TITLE, AND INTEREST IN THE INVENTION.

16  **A.**   THIS DOCUMENT SAYS THAT THAT'S WHAT HE ASSIGNED.  AGAIN,

17  I'M GOING UNDER THE ASSUMPTION THAT WHAT HE ASSIGNED IS HIS

18  RIGHTS UNDER THE PLAN OF LIQUIDATION.

19  **Q.**   OKAY.  YOU LOOKED AT THE OTHER ASSIGNMENTS SINCE YOUR

20  DEPOSITION, I ASSUME, HAVEN'T YOU?

21  **A.**   I DON'T THINK SO.

22  **Q.**   YOU HAVEN'T LOOKED AT THEM?

23  **A.**   NO.

24  **Q.**   IF I REPRESENTED TO YOU THEY ALL SAID EXACTLY THE SAME

25  THING, THAT DR. VERDIELL TRANSFERRED THE ENTIRE RIGHT, TITLE,

1    AND INTEREST IN HIS ASSIGNMENT IN HIS INVENTIONS THAT ARE THE

2    SUBJECT OF THOSE APPLICATIONS, YOU -- YOU'D AGREE WITH THAT AS

3    A FACT?

4    **A.**   WOULD I AGREE WITH IT?  NO.  BUT I CAN ASSUME IT AS A

5    FACT, IF YOU'D LIKE, BUT I CAN'T --

6    **Q.**   OKAY, GOOD.

7                   (SIMULTANEOUS COLLOQUY.)

8             **THE WITNESS:**  -- HAVE A BASIS TO AGREE.

9    **BY MR. JANSEN:**

10   **Q.**   NOW, THOSE PATENTS WERE THEN TRANSFERRED BY LIGHTLOGIC TO

11   INTEL, CORRECT?

12   **A.**   SO THE --

13   **Q.**   IS THAT YOUR ASSUMPTION?

14   **A.**   THE RIGHTS UNDER THE PLAN OF LIQUIDATION BY DR. VERDIELL

15   WERE TRANSFERRED FROM LIGHTLOGIC TO INTEL, THAT'S CORRECT.  I

16   THINK THERE WERE THREE PATENTS AT ISSUE.

17   **Q.**   IT'S YOUR UNDERSTANDING, ISN'T IT, THAT LIGHTLOGIC

18   TRANSFERRED THE PATENTS TO INTEL WHEN IT SOLD -- WHEN INTEL

19   PURCHASED LIGHTLOGIC, IT OBTAINED THE ASSIGNED RIGHTS FROM

20   DR. VERDIELL.  THOSE ASSIGNMENTS CAME WITH THAT, RIGHT?

21   **A.**   I HAVEN'T -- I HAVEN'T SEEN THOSE, BUT I'M PRESUMING FOR

22   PURPOSES OF MY CALCULATION THAT THE RIGHTS UNDER THE PLAN OF

23   LIQUIDATION THAT DR. VERDIELL HAD WERE TRANSFERRED AND ASSIGNED

24   TO LIGHTLOGIC, AND THEN, I'VE REPEATED PROBABLY TOO MANY TIMES,

25   TO -- ULTIMATELY TO INTEL.

1   Q.    OKAY.  AND WE'LL TALK ABOUT A COUPLE OF YOUR OTHER

2   ASSUMPTIONS IN A FEW MINUTES.

3         I WANT TO GO BACK TO YOUR -- YOUR BACKGROUND A LITTLE

4   BIT.

5         YOU INDICATED YOU HAVE A BACHELOR OF SCIENCE DEGREE FROM

6   UNIVERSITY OF CALIFORNIA?

7   A.    YES.

8   Q.    IN ACCOUNTING AND FINANCE?

9   A.    YES.

10  Q.    AND YOU INDICATED YOU'VE TAKEN SOME FOLLOW-UP COURSES

11  THERE.  THOSE WEREN'T PART OF A GRADUATE PROGRAM, WERE THEY?

12  A.    NO.

13  Q.    AND YOU'RE NOT A CERTIFIED PUBLIC ACCOUNTANT, ARE YOU?

14  A.    I AM NOT.

15  Q.    AND SO YOU'RE NOT A MEMBER OF ANY C.P.A. ASSOCIATION, ARE

16  YOU?

17  A.    I AM NOT.

18  Q.    SO YOU'RE, FOR EXAMPLE, YOU'RE NOT A MEMBER OF THE

19  AMERICAN INSTITUTION -- AMERICAN INSTITUTE OF CERTIFIED

20  PROFESSIONAL ACCOUNTANTS, ARE YOU?

21  A.    NO, I'M A LECTURER TO THEM BUT NOT A MEMBER OF THEM.

22  Q.    OKAY.  AND THAT'S BECAUSE YOU'RE NOT A C.P.A.?  YOU'RE

23  NOT, YOURSELF, A CERTIFIED PUBLIC ACCOUNTANT?

24  A.    THAT'S CORRECT.

25  Q.    NOW, A COUPLE -- I'D LIKE TO TALK ABOUT SOME OF THE OTHER

1    ASSUMPTIONS THAT ARE PART OF YOUR OPINION, AND ONE OF THEM --

2    ONE OF THEM WAS THAT YOU ASSUMED THAT ALL THE PATENTS AT ISSUE

3    ARE IN FACT RADIANCE INVENTIONS, THAT IS, INVENTIONS THAT WERE

4    MADE AT RADIANCE PRIOR TO THE PLAN OF LIQUIDATION, CORRECT?

5              **MS. GRANT:**  THAT LACKS FOUNDATION, YOUR HONOR.

6              **THE COURT:**  LAY YOUR FOUNDATION.

7    **BY MR. JANSEN:**

8    **Q.**    IS THAT AN ASSUMPTION THAT WAS IN YOUR REPORT?

9    **A.**    I DON'T KNOW IF IT'S PHRASED EXACTLY LIKE THAT, BUT FOR

10   THE PURPOSES OF QUANTIFYING THE DAMAGES IN MY ANALYSIS DAMAGES,

11   I'M ASSUMING THAT ONE OR MORE OF THE -- WHAT ARE CALLED THE DBC

12   AND FLEXURE PATENTS, I'M ASSUMING, BECAUSE MR. SHUM HAS CLAIMED

13   THAT THAT INCLUDES TECHNOLOGY, AT LEAST IN PART, THAT WAS

14   FORMULATED AT RADIANCE DESIGN.

15   **Q.**    AND ANOTHER ONE OF YOUR ASSUMPTIONS, ISN'T IT TRUE THAT

16   YOU ALSO ASSUMED, WAS THAT DR. VERDIELL WAS THE SOLE INVENTOR

17   OF ALL THE INVENTIONS CLAIMED IN THE -- IN THE PATENTS IN

18   ISSUE?

19   **A.**    NOT FOR THE PURPOSES OF MY DAMAGES.  I UNDERSTAND THAT

20   THAT'S DR. VERDIELL'S BELIEF AND OPINION THAT HE WAS THE SOLE

21   INVENTOR OF ALL THE PATENTS.  BUT THAT'S NOT HOW I CALCULATED

22   MY DAMAGES.  THAT'S JUST A STATEMENT OF WHAT DR. VERDIELL

23   BELIEVES.

24   **Q.**    WELL, I GUESS I SHOULD ASK YOU TO LOOK AT THE REPORT YOU

25   PREPARED IN THIS CASE BECAUSE YOU SAID SOMETHING DIFFERENT THAN

1    THAT IN YOUR REPORT.

2          DO YOU HAVE THAT IN FRONT OF YOU?

3    **A.**    IS IT IN THE BINDER YOU HANDED ME?

4    **Q.**    I -- IT MAY BE.

5               (BINDER PROVIDED TO WITNESS.)

6          **THE WITNESS:**  THANK YOU, SIR.

7               (REVIEWING DOCUMENTS.)

8          **THE WITNESS:**  CAN YOU DIRECT ME TO A CERTAIN PAGE?

9    **BY MR. JANSEN:**

10   **Q.**    OH YEAH.  I CAN DIRECT YOU TO PAGE 3 TO START WITH.

11   **A.**    THANK YOU.

12   **Q.**    VERY BEGINNING OF YOUR REPORT.

13   **A.**    (REVIEWING DOCUMENT.)

14   **Q.**    AND THERE AT THE TOP OF THE FIRST PAGE, YOU REFER TO THE

15   FIRST PATENT APPLICATION THAT RESULTED IN WHAT YOU CALL THE DBC

16   PATENT.  AND YOU STATE THERE IN YOUR REPORT, "THE PATENT

17   CONTAINED THE DBC INVENTION," PAREN, "OF WHICH MY ASSUMPTION IS

18   THAT DR. VERDIELL WAS THE SOLE INVENTOR."

19          DO YOU SEE THAT?

20   **A.**    I DO SEE THAT.

21   **Q.**    OKAY.  AND THEN GO TO THE NEXT PAGE, TOP OF PAGE 4, AND

22   YOU STATE THERE, QUOTE, DON'T YOU, "I HAVE BEEN ASKED TO ASSUME

23   THAT WHILE EMPLOYED AT RADIANCE, DR. VERDIELL CONCEIVED OF

24   USING, ONE, A MULTI-LEGGED FLEXURE TO ACHIEVE ALIGNMENT BY

25   APPLYING DOWNWARD PRESSURE ON THE FLEXURE, AND, TWO, A DUAL

1    ENCLOSURE METHOD TO DISSIPATE THE HEAT BUILDUP IN AN

2    OPTOELECTRONIC PACKAGE"?

3    **A.**    YES, I SEE THAT.

4    **Q.**    AND YOU ALSO ASSUMED, DIDN'T YOU, THAT UNDER THE PLAN OF

5    LIQUIDATION, THAT MR. VERDIELL AND MR. SHUM HAVE THE RIGHT TO

6    FILE, QUOTE, "LAWFUL PATENTS"?

7    **A.**    YES, THAT IS ONE OF MY ASSUMPTIONS.

8    **Q.**    AND YOU ASSUMED, DIDN'T YOU, THAT -- ASSUMED THAT

9    DR. VERDIELL'S PATENT APPLICATIONS FILED BY HIM WERE IN FACT

10   LAWFUL BECAUSE HE WAS THE SOLE INVENTOR?

11   **A.**    I DON'T KNOW IF I GOT THAT SPECIFIC, BUT I ASSUME THAT

12   THEY WERE LAWFUL AND I ASSUME DR. VERDIELL -- IN FACT I KNOW

13   THAT DR. VERDIELL APPLIED FOR PATENTS.

14   **Q.**    AND SO JUST LIKE THE OTHER ASSUMPTIONS WE TALKED ABOUT,

15   IF THAT ASSUMPTION IS WRONG, IF THE JURY DISAGREES WITH YOU AND

16   BELIEVES THAT MR. VERDIELL DIDN'T FILE A LAWFUL PATENT, THEN

17   YOUR OPINIONS CRUMBLE?

18   **A.**    WELL, I WOULD SUGGEST THAT IT DEPENDS UPON THE LEVEL OF,

19   FOR LACK OF A BETTER TERM, THE UNLAWFULNESS.  IF IT'S SIMPLY

20   PUTTING AND REFLECTING MR. SHUM AS A COINVENTOR, THEN THAT --

21   THAT PARTICULAR PART OF MY ANALYSIS DOESN'T CRUMBLE, IN YOUR

22   WORDS.  I THINK IT STILL HOLDS.

23   **Q.**    AND LEAVING ASIDE THAT ASSUMPTION, THE ASSUMPTION THAT

24   MR. VERDIELL WAS THE SOLE INVENTOR, WHICH THEN MADE THE

25   PATENTS -- THE PATENT APPLICATIONS LAWFUL, YOU ALSO FURTHER

1   ASSUMED, DIDN'T YOU, THAT THE SOLE RESTRICTION POSED BY THE

2   PLAN OF LIQUIDATION WAS THAT NEITHER MR. SHUM OR MR. VERDIELL

3   COULD INTERFERE WITH THE OTHER'S INDEPENDENT RIGHT TO EXPLOIT

4   THE RADIANCE TECHNOLOGY?

5   **A.**   I ASSUMED THAT THEY BOTH HAD EQUAL RIGHTS TO

6   INDEPENDENTLY EXPLOIT THE TECHNOLOGY, THAT'S CORRECT.

7   **Q.**   AND SO THEREFORE YOU -- YOU THEN PRESUMED IT WAS

8   PERMISSIBLE FOR VERDIELL, MR. VERDIELL TO ASSIGN TO LIGHTLOGIC

9   ALL THE RIGHT, TITLE, AND INTEREST IN THE INVENTIONS?

10  **A.**   I PRESUMED FOR THE PURPOSE OF MY CALCULATION THAT

11  DR. VERDIELL HAD THE RIGHTS UNDER THE PLAN OF LIQUIDATION TO

12  ASSIGN WHATEVER RIGHTS HE HAD UNDER THE PLAN OF LIQUIDATION TO

13  LIGHTLOGIC JUST LIKE MR. SHUM HAS THOSE RIGHTS.

14  **Q.**   SO YOU --

15  **A.**   NOT TO ASSIGN TO LIGHTLOGIC, BUT TO ASSIGN IT TO ANYBODY.

16  **Q.**   OKAY.  SO ASSUMING THAT HE ACTUALLY ASSIGNED MORE THAN HE

17  WAS ENTITLED TO ASSIGN, THAT HE ASSIGNED ALL RIGHT, TITLE, AND

18  INTEREST IN THE INVENTION WHEN HE ONLY REALLY HAD THIS RIGHT TO

19  ASSIGN A MUCH MORE LIMITED RIGHT TO USE, YOU DIDN'T -- YOU

20  DIDN'T -- YOU DIDN'T EVEN CONSIDER THAT ASSUMPTION, DID YOU?

21  **A.**   YEAH, I CONSIDERED THAT ASSUMPTION.  AGAIN, IT'S MY

22  UNDERSTANDING IN THESE ASSIGNMENT DOCUMENTS THAT THERE WERE

23  OTHER TESTIMONY AND INFORMATION AS TO THE LIGHTLOGIC INVESTORS

24  AS TO WHETHER THEY, YOU KNOW, KNEW ABOUT THE PLAN OF

25  LIQUIDATION AND TOOK THAT INTO CONSIDERATION WHEN THEY WERE

1    FUNDING AND PUTTING FUNDS INTO LIGHTLOGIC.  SO THEY WERE AWARE

2    OF THOSE -- THOSE RIGHTS, IS MY ASSUMPTION.

3    Q.    SO IT'S YOUR ASSUMPTION -- ONE OF THE ASSUMPTIONS

4    UNDERLYING YOUR OPINIONS HERE IS THAT ALL THE INVESTORS WERE

5    AWARE OF MR. SHUM'S RIGHT TO ALL THE INVENTIONS THAT ARE

6    CLAIMED IN THE PATENTS?

7    A.    IT'S MY UNDERSTANDING THAT THERE'S TESTIMONY AND

8    DECLARATIONS THAT SUPPORT THE -- THE PREMISE THAT THE

9    LIGHTLOGIC INVESTORS KNEW OF THE PLAN OF LIQUIDATION AND

10   MR. SHUM'S RIGHTS UNDER THAT PLAN OF LIQUIDATION.

11   Q.    AND IS IT ALSO YOUR ASSUMPTION THAT THOSE INVESTORS WERE

12   SPECIFICALLY AWARE -- MADE SPECIFICALLY AWARE THAT MR. SHUM HAD

13   RIGHTS IN THE FLEXURE TECHNOLOGY?

14   A.    I DON'T KNOW IF IT GOT DOWN TO THAT SPECIFICS, NOR DO I

15   BELIEVE THAT THAT'S PARTICULARLY NECESSARY FOR THE WAY I

16   QUANTIFY DAMAGES, BECAUSE I COME AT IT FROM A NUMBER OF

17   DIFFERENT POINTS, BUT -- SO I WOULD SAY I DON'T KNOW WHETHER IT

18   DRILLS DOWN SPECIFICALLY THE FLEXURE.  BUT WHAT I DO HAVE AN

19   UNDERSTANDING IS THEY KNEW ABOUT THE PLAN OF LIQUIDATION.

20   Q.    SO YOU'RE SAYING IT DOESN'T MATTER FOR PURPOSES OF YOUR

21   OPINION WHETHER OR NOT THE INVESTORS WERE MADE AWARE THAT SHUM

22   HAD RIGHTS IN THE FLEXURE TECHNOLOGY?

23   A.    I WOULD SAY I DON'T THINK THAT WOULD HAVE MUCH OF AN

24   IMPACT, DEPENDING ON WHICH CALCULATION THE COURT WOULD LIKE TO

25   LOOK AT IN TERMS OF VALUE OF THE RIGHTS.  AND I CAN EXPLAIN

1    THAT, BUT --

2    Q.    BUT THE TIME OF UNJUST ENRICHMENT WAS THE SALE OF

3    LIGHTLOGIC TO INTEL IN APRIL 2001, CORRECT?

4    A.    WELL, THAT'S -- SOUNDS LIKE A LEGAL PREMISE.  THAT'S THE

5    WAY MR. REGAN AND MR. LASINSKI HAVE CALCULATED, THAT THAT

6    TRANSACTION IS THE ONE AND ONLY TIME THAT UNJUST ENRICHMENT

7    SHOULD BE REVIEWED AND LOOKED AT.  AND THEY'VE IGNORED ANYTHING

8    THAT HAPPENED PRIOR OR SUBSEQUENT.

9    Q.    AND WHAT IS THE -- EXACTLY IS THE BASIS OF YOUR

10   ASSUMPTION THAT MR. VERDIELL COULD EXECUTE ASSIGNMENT DOCUMENTS

11   LIKE THE ONE WE LOOKED AT IN WHICH HE ASSIGNED ALL RIGHT,

12   TITLE, AND INTEREST IN THE INVENTIONS COVERED BY THOSE PATENTS

13   WHEN MR. SHUM HAD EQUAL RIGHTS TO USE?

14   A.    NOT SURE I UNDERSTAND THAT QUESTION, MR. JANSEN, BUT LET

15   ME TAKE A WHACK AT IT.

16   Q.    LET ME REPHRASE IT.

17   A.    OKAY.  THANK YOU.

18   Q.    WHERE DID YOU -- WHAT'S THE BASIS, WHERE DID YOU GET THE

19   ASSUMPTION THAT MR. VERDIELL COULD TRANSFER AND ASSIGN TO

20   LIGHTLOGIC ALL RIGHT, TITLE, AND INTEREST IN, FOR EXAMPLE, THE

21   FLEXURE INVENTIONS WITHOUT ACKNOWLEDGING MR. SHUM'S RIGHTS

22   TO -- TO USE THAT -- USE THAT TECHNOLOGY?

23   A.    AGAIN, I GET THE ASSUMPTION FROM THE PLAN OF LIQUIDATION

24   THAT IDENTIFIES THE RIGHTS THAT MR. SHUM AND DR. VERDIELL HAVE.

25   AND I'VE ASSUMED FOR THE PURPOSES OF MY CALCULATION THAT THOSE

1    ARE THE RIGHTS THAT ULTIMATELY END UP AND ARE ASSIGNED TO

2    LIGHTLOGIC AND, SUBSEQUENT, TO INTEL.

3    **Q.**    SO THEN YOU ASSUME THAT MR. SHUM HAD THE SAME RIGHT TO

4    ASSIGN ALL RIGHT, TITLE, AND INTEREST IN THE INVENTIONS TO SOME

5    OTHER ENTITY?  MR. SHUM HAD THAT RIGHT?

6    **A.**    I -- I -- THAT'S MY ASSUMPTION, THAT MR. SHUM HAD THAT

7    RIGHT --

8    **Q.**    OKAY.

9    **A.**    -- THAT HE ASSIGNED -- IN FACT HE WAS TRYING TO -- HE WAS

10   TRYING TO SELL THOSE RIGHTS TO GIGABIT IN 2001.

11   **Q.**    MR. SHUM WAS TRYING TO ASSIGN ALL RIGHT, TITLE, AND

12   INTEREST IN THE INVENTIONS TO GIGABIT IN 2001?

13   **A.**    HE APPROACHED GIGABIT AND MR. RICHARD, AND THEY DISCUSSED

14   SELLING MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION.

15   THAT'S MY UNDERSTANDING OF WHAT THE -- THE SUBJECT --

16                  (SIMULTANEOUS COLLOQUY.)

17   **BY MR. JANSEN:**

18   **Q.**    MR. SHUM DIDN'T HAVE EXCLUSIVE RIGHT, TITLE, AND INTEREST

19   TO THE INVENTIONS IN 2001, DID HE?

20   **A.**    HE HAD THE RIGHTS UNDER THE PLAN OF LIQUIDATION.

21   **Q.**    BUT AT THAT POINT IN TIME, IN 2001 -- I MEAN, THAT'S

22   INTERESTING BECAUSE YOU DID TALK ABOUT THAT AS A DATA POINT,

23   THIS PURPORTED OFFER.  IT WASN'T EVEN REALLY AN OFFER, WAS IT?

24   IT HAPPENED IN 2001.  THERE'S A DISCUSSION ABOUT WHETHER

25   MR. SHUM MIGHT BE INTERESTED IN ACCEPTING SOME MONEY FOR

1   WHATEVER RIGHTS HE HAD AT THAT TIME, CORRECT?

2   **A.**    THAT -- THAT WAS THE DISCUSSION, YES.  I THINK MR. SHUM

3   HAD A RELATIONSHIP WITH MR. RICHARD PREVIOUSLY, AND SO HE WAS

4   DISCUSSING WITH MR. RICHARD SELLING HIS RIGHTS UNDER THE PLAN

5   OF LIQUIDATION TO GIGABIT OPTICS.

6           **MR. JANSEN:**  DO WE HAVE A CHART OF THE PATENTS,

7   PATENT ASSIGNMENTS?  CAN YOU PUT THAT UP, DAVID?

8           (EXHIBIT PUBLISHED TO JURY.)

9   **BY MR. JANSEN:**

10  **Q.**    SO, MR. NAPPER, THIS IS A CHART THAT -- JUST -- IT LISTS

11  THE PATENTS AT ISSUE.  I'M SURE YOU'VE SEEN THIS BRIEFLY

12  PREVIOUSLY AT VARIOUS TIMES.  BUT IT LISTS THE PATENTS AT ISSUE

13  IN CHRONOLOGICAL ORDER FROM THEIR FILING DATE, AND IT ALSO

14  SHOWS WHEN THEY ISSUED, THE ISSUE DATE OF THE PATENTS, AND THE

15  ASSIGNMENT DATES.

16          AND WITH RESPECT TO THAT 2001 EVENT THAT YOU USE AS A

17  DATA POINT, THIS DISCUSSION WITH OPTIC -- ISN'T IT TRUE THAT AT

18  THAT POINT IN TIME, INTEL HAD ALREADY ACQUIRED LIGHTLOGIC

19  THAT WAS PUBLIC KNOWLEDGE?

20  **A.**    I THINK THAT'S RIGHT.  I THINK IT WAS IN OR AROUND THAT

21  TIME.

22  **Q.**    IT WAS AFTER THE ACQUISITION, CORRECT?

23  **A.**    I THINK THAT'S RIGHT.

24  **Q.**    OKAY.  AND AT THAT POINT, A NUMBER OF THESE PATENTS HAD

25  ACTUALLY -- HAD ALREADY ISSUED WITH JEAN-MARC VERDIELL'S NAME

1    ON THEM AS THE SOLE INVENTOR, AND ASSIGNMENTS FILED IN THE

2    PATENT OFFICE SHOWING THAT HE HAD ASSIGNED THE EXCLUSIVE RIGHT,

3    TITLE, AND INTEREST TO LIGHTLOGIC, CORRECT?

4    **A.**    I CAN'T VERIFY THAT, BUT I CAN PRESUME THAT, SURE.

5    **Q.**    AND ANYBODY -- ANYBODY WHO WAS IN DISCUSSIONS WITH

6    MR. SHUM WOULD BE VERY MUCH AWARE THAT INTEL --

7            **MS. GRANT:**  THAT LACKS FOUNDATION, YOUR HONOR, ALSO

8    CALLS FOR SPECULATION.

9            **THE COURT:**  REPHRASE THE QUESTION.

10   **BY MR. JANSEN:**

11   **Q.**    ISN'T IT TRUE -- ISN'T IT FAIR TO SAY THAT IN A

12   HYPOTHETICAL SITUATION WHERE ANYBODY'S DISCUSSING WITH MR. SHUM

13   WHETHER -- AND WHAT THE VALUE OF HIS RIGHTS -- HIS SO-CALLED

14   RIGHTS AT THAT POINT WERE UNDER THE PLAN OF LIQUIDATION, THAT

15   IF THEY WERE IN THE BUSINESS, THEY WOULD BE VERY MUCH AWARE OF

16   THE FACT THAT THESE PATENTS HAD ISSUED, THAT MR. VERDIELL

17   WAS -- HAD ASSIGNED ALL EXCLUSIVE RIGHT, TITLE, AND INTEREST TO

18   LIGHTLOGIC AND THAT INTEL NOW OWNED THOSE PATENTS?

19           **MS. GRANT:**  THAT --

20           **THE COURT:**  HE CAN MAKE THAT AS AN ASSUMPTION.

21           **MS. GRANT:**  OKAY.  WANTED TO DO A HYPOTHETICAL, I

22   GUESS.

23           **THE COURT:**  ALL RIGHT.  GO AHEAD.

24           **THE WITNESS:**  I MEAN, IF YOU'RE ASKING ME THAT'S HOW

25   ANY BUSINESS OPERATION WOULD WORK, I HAVE NO IDEA WHAT THE

1    EXTENT OF KNOWLEDGE WAS THAT GIGABIT OPTICS WAS OPERATING WITH

2    MR. RICHARD IN THEIR DISCUSSIONS WITH MR. SHUM.

3    **BY MR. JANSEN:**

4    Q.    BUT DON'T YOU THINK MR. SHUM'S RIGHTS WOULD BE SOMEWHAT

5    DIMINISHED BY THE FACT THAT NOBODY WOULD WANT TO BUY RIGHTS

6    FROM MR. SHUM WHEN THEY COULD LOOK AT THE PATENT OFFICE AND SEE

7    THAT INTEL CORPORATION WAS LISTED AS THE SOLE AND EXCLUSIVE

8    OWNER OF THOSE PATENTS?

9    **A.**    I MEAN -- I DON'T KNOW IF THEY'D BE DIMINISHED.  IF THEY

10   WENT FURTHER AND DISCOVERED THAT, THEN THERE MIGHT BE SOME

11   DISCUSSION AS TO A POSSIBLE REDUCTION.  BUT THERE'S A

12   PRESUMPTION IN YOUR QUESTION THAT THEY KNEW THAT AT THE TIME

13   THAT THE FIGURE OF 250,000 TO 500,000 WAS BEING DISCUSSED, THAT

14   THAT WAS THE SITUATION.  I HAVEN'T SEEN THAT INFORMATION.  I

15   HAVE SEEN NOTHING TO VERIFY THAT.

16   Q.    BUT -- SO IT'S YOUR POSITION, THOUGH, THAT THE PLAN OF

17   LIQUIDATION SOMEHOW ALLOWS MR. VERDIELL TO CLAIM THE ENTIRE

18   RIGHT, TITLE, AND INTEREST IN THE INVENTIONS THAT ARE -- THAT

19   CAME FROM RADIANCE?

20   **A.**    IT WAS MY PRESUMPTION THAT DR. VERDIELL HAS THE RIGHTS

21   UNDER THE PLAN OF LIQUIDATION TO INDEPENDENTLY EXPLOIT THE

22   RADIANCE TECHNOLOGY, JUST LIKE MR. SHUM.

23   Q.    OKAY.  AND TO ANSWER -- IF YOU COULD ANSWER MY QUESTION,

24   WHICH IS A LITTLE BIT DIFFERENT, IS IT YOUR OPINION THAT THE

25   PLAN OF LIQUIDATION ALLOWS DR. VERDIELL TO CLAIM THAT HE HAS

1  THE ENTIRE RIGHT, TITLE, AND INTEREST IN THOSE INVENTIONS?

2  **A.**    WELL, THAT SOUNDS LIKE A LEGAL OPINION.  I'M NOT AN

3  EXPERT IN ASSIGNMENT DOCUMENTS, AS I SAID BEFORE, SO THAT

4  SOUNDS LIKE A LEGAL INTERPRETATION OF WHETHER HE HAS THAT RIGHT

5  OR NOT.

6  **Q.**    WELL, I MEAN, THE REASON I'M ASKING IS BECAUSE YOU WERE

7  MAKING INTERPRETATIONS ABOUT THE PLAN OF LIQUIDATION, AND I'M

8  ASKING YOU WHAT YOUR INTERPRETATION OF THE PLAN OF LIQUIDATION

9  IS.

10        DOES IT INCLUDE THE RIGHT FOR MR. VERDIELL TO CLAIM -- IN

11  YOUR OPINION, DOES IT INCLUDE THE RIGHT FOR HIM TO CLAIM THE

12  ENTIRE RIGHT, TITLE, AND INTEREST IN THE INVENTIONS THAT ARE --

13  THAT ARE PART OF THE RADIANCE TECHNOLOGY?

14        **MS. GRANT:**  JUST OBJECT -- THE ENTIRE RIGHT, TITLE,

15  AND INTERESTS TO THE PATENTS, NOT THE INVENTIONS.  IT'S A

16  MISLEADING STATEMENT.

17        **MR. JANSEN:**  OH, IS THAT RIGHT?  LET'S LOOK AT

18  EXHIBIT 15.  COULD WE PULL UP TRIAL EXHIBIT 15.

19  **BY MR. JANSEN:**

20  **Q.**    NOW, COUNSEL MADE AN INTERESTING POINT, THAT THE

21  ASSIGNMENTS DON'T COVER, SHE SAYS, THE INVENTIONS, THEY COVER

22  THE PATENTS.

23        **MR. JANSEN:**  LET'S LOOK AT EXHIBIT 15, DAVID.  IF

24  WE --

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

NAPPER – CROSS / JANSEN

1    **BY MR. JANSEN:**

2    Q.    THIS IS THE ASSIGNMENT OF THE '567 PATENT.

3          **MR. JANSEN:**  IF YOU CAN PULL THAT UP, DAVID.  PAGE 2

4    I THINK.  LET'S LOOK AT THE ASSIGNMENT, PAGE 3.

5          (EXHIBIT PUBLISHED TO JURY.)

6    **BY MR. JANSEN:**

7    Q.    LET'S READ THAT.  I THINK WE SHOULD SEE WHAT IT SAYS.

8    IT'S AN ASSIGNMENT BY JEAN-MARC VERDIELL.  IT STATES, "WHEREAS

9    ASSIGNOR," THAT'S JEAN-MARC VERDIELL, "HAS INVENTED CERTAIN NEW

10   AND USEFUL IMPROVEMENTS IN," AND IT NAMES THE PATENT

11   APPLICATION, "WHEREAS" -- IT CONTINUES, "WHEREAS LIGHTLOGIC IS

12   DESIROUS OF OBTAINING THE ENTIRE RIGHT, TITLE, AND INTEREST IN

13   AND TO SAID INVENTIONS AND SAID APPLICATION FOR LETTERS PATENT.

14   NOW, THEREFORE," IT CONTINUES.

15         **MR. JANSEN:**  AND LET'S GO DOWN TO THE NEXT LINE.

16         (EXHIBIT PUBLISHED TO JURY.)

17   **BY MR. JANSEN:**

18   Q.    "NOW, THEREFORE -- NOW, THEREFORE, THE ASSIGNOR," THAT'S

19   VERDIELL, "HAS SOLD, ASSIGNED, TRANSFERRED, AND SET OVER AND

20   DOES HEREBY SELL, ASSIGN, TRANSFER, AND SET OVER UNTO SAID

21   ASSIGNEE THE ENTIRE RIGHT, TITLE, AND INTEREST IN, TO, AND

22   UNDER SAID INVENTIONS."

23         NOW -- NOW THAT WE'VE CLARIFIED THAT, I'D LIKE TO GET

24   BACK TO MY ORIGINAL QUESTION WHICH WAS, WAS IT YOUR

25   UNDERSTANDING, SIR, THAT THE PLAN OF LIQUIDATION ALLOWS

1    MR. VERDIELL TO CLAIM THE ENTIRE RIGHT, TITLE, AND INTEREST TO

2    THE INVENTIONS OF RADIANCE DESIGN?

3    **A.**    IT IS MY UNDERSTANDING AND MY ASSUMPTION THAT

4    DR. VERDIELL HAS RIGHTS TO INDEPENDENTLY EXPLOIT THE RIGHTS OF

5    RADIANCE TECHNOLOGY, AS DOES MR. SHUM, AND HAS THE RIGHTS TO

6    ASSIGN THOSE RIGHTS UNDER THE PLAN OF LIQUIDATION TO ANY

7    COMPANY.  THAT'S MY WORKING ASSUMPTION FOR MY DAMAGES

8    QUANTIFICATION.

9    **Q.**    SO YOUR OPINION IS THAT HE CAN, UNDER THE PLAN OF

10   LIQUIDATION, AS YOU UNDERSTAND IT, ASSIGN THE ENTIRE RIGHT,

11   TITLE, AND INTEREST IN THE INVENTIONS?

12   **A.**    WELL, IT'S --

13   **Q.**    OR WHAT IS YOUR UNDERSTANDING?  I'M STILL NOT CLEAR ABOUT

14   THAT.

15   **A.**    I'M TRYING TO BE AS CLEAR AS I CAN, BUT MY UNDERSTANDING

16   IS THAT HE HAS RIGHTS UNDER THE PLAN OF LIQUIDATION, AND THAT'S

17   MY ASSUMPTION FOR QUANTIFYING DAMAGES.  SO I WOULD ASSUME THAT

18   HE HAS THE RIGHT TO TRANSFER HIS RIGHTS UNDER THE PLAN OF

19   LIQUIDATION TO, IN THIS CASE, LIGHTLOGIC.

20   **Q.**    LET'S -- LET'S TAKE ANOTHER LOOK AT ANOTHER ASSUMPTION

21   THAT YOU -- UNDERLIES YOUR -- YOUR ANALYSIS.

22        YOU'RE ESSENTIALLY HERE TRYING TO MEASURE WHAT SHUM --

23   MR. SHUM HAS LOST, NOT HOW THE DEFENDANTS WERE ENRICHED BY

24   THEIR ASSUMED WRONGFUL CONDUCT OF TRANSFERRING THE ENTIRE

25   RIGHT, TITLE, AND INTEREST IN THE PATENTS; ISN'T THAT TRUE?

1    A.    NO, I WOULDN'T SAY THAT'S TRUE.  I WOULD SAY IN THE CASE

2    OF THE -- MY -- MY FIRST OPINION, CALCULATION, THE VALUE OF

3    BEING NAMED AS AN INVENTOR IS -- COULD BE MORE TERMED THE VALUE

4    TO MR. SHUM FOR BEING NAMED AS AN INVENTOR.

5    Q.    WELL, YOU'RE ASSUMING THAT THE MEASURE OF UNJUST

6    ENRICHMENT DAMAGES IS THE VALUE OF MR. SHUM'S RIGHT TO USE

7    UNDER THE PLAN OF LIQUIDATION, RIGHT?

8    A.    THE VALUE OF MR. SHUM'S RIGHTS TO USE, YES.

9    Q.    OKAY.

10   A.    ALL RIGHTS HE HAS UNDER THE PLAN OF LIQUIDATION.

11   Q.    BUT IF YOU -- WHAT HAPPENED HERE, THOUGH, WAS THAT

12   DR. VERDIELL AND LIGHTLOGIC ASSIGNED AND SOLD TO INTEL

13   CORPORATION THE COMPLETE RIGHT, TITLE, AND INTEREST TO THE

14   PATENTED INVENTIONS; ISN'T THAT CORRECT?

15   A.    YOU'RE ASKING ME TO ASSUME THAT?  I CAN ASSUME THAT.

16   Q.    HAVE YOU ASSUMED THAT AS PART OF YOUR -- HAVE YOU ASSUMED

17   THAT AS PART OF THE -- YOUR OPINIONS THAT YOU TOLD THE JURY

18   ABOUT THIS MORNING?

19   A.    IN TERMS OF ONE OR MORE OF THE QUANTIFICATIONS, THE VALUE

20   OF MR. SHUM'S RIGHTS?  YES.

21   Q.    YOU'VE ASSUMED THAT -- YOU'VE ASSUMED AS PART OF YOUR

22   WORK THAT LIGHTLOGIC DID TRANSFER TO INTEL THE ENTIRE RIGHT,

23   TITLE, AND INTEREST IN THESE PATENTS, EVEN THOUGH THEY DIDN'T

24   HAVE THAT RIGHT UNDER THE PLAN OF LIQUIDATION?

25   A.    I'VE ASSUMED WHAT I CALL -- WHAT I CALL -- WHAT I

1    UNDERSTAND TO BE A CLAIM OF SO-CALLED FALSE EXCLUSIVITY, WHICH

2    I'M ASSUMING IS EMBODIED IN YOUR DISCUSSION OF THE ASSIGNMENT

3    DOCUMENTS, AND WITHIN THAT, MY CALCULATION OF MR. SHUM'S

4    RIGHTS, I BELIEVE, WOULD ENCOMPASS THAT.

5    **Q.**    BUT ALL YOU DID WAS TO TRY TO VALUE THE RIGHT TO USE

6    THOSE INNOVATIONS.

7    **A.**    I VALUED THE RIGHTS -- MR. SHUM'S RIGHTS UNDER THE PLAN

8    OF LIQUIDATION THAT WOULD ALSO INCLUDE EXCLUSIVITY -- CLAIMED

9    EXCLUSIVITY.

10   **Q.**    YOU DIDN'T MEASURE -- YOU DIDN'T MEASURE THE VALUE OF THE

11   INTELLECTUAL PROPERTY THAT -- AS PART OF THE PURCHASE PRICE TO

12   INTEL.

13   **A.**    NO, I -- I WOULD -- I WOULD SUGGEST THAT THE -- MY

14   APPROACHES WOULD LOOK AT THE -- IF YOU'RE TALKING ABOUT THE

15   VALUE OF THE RADIANCE DBC AND FLEXURE INVENTIONS, THAT THE WAY

16   I CALCULATED IT COULD BE IDENTIFIED AS THE BUCKET OF ASSET

17   (SIC) THAT INTEL PURCHASED FROM LIGHTLOGIC.

18        IN OTHER WORDS, IF YOU RECALL MY LARGE LEFTOVER BUCKET OF

19   MR. REGAN AND MR. LASINSKI, MY CALCULATION WOULD BE PART OF

20   THAT.  IT RELATES TO THE -- MR. SHUM'S RIGHTS UNDER THE PLAN OF

21   LIQUIDATION IN THE RADIANCE INVENTIONS.

22   **Q.**    WELL, MAYBE WE SHOULD LOOK AT YOUR DEPOSITION TESTIMONY

23   FROM WHEN I TOOK YOUR DEPOSITION A COUPLE MONTHS AGO,

24   BECAUSE --

25            **MR. JANSEN:**  AND IF WE COULD LOOK AT PAGE 104.

1    **BY MR. JANSEN:**

2    **Q.**    I ASKED YOU A QUESTION ON THIS TOPIC.  I THINK YOU GAVE A

3    SLIGHTLY DIFFERENT ANSWER.

4              **MR. JANSEN:**  PAGE 104, LINES 20 THROUGH 105, 9.

5              (EXHIBIT PUBLISHED TO JURY.)

6    **BY MR. JANSEN:**

7    **Q.**    DO YOU HAVE THAT?

8    **A.**    YEAH, I HAVE THAT.

9    **Q.**    OKAY.  AND I ASKED YOU THE QUESTION, "I'M NOT ASKING YOU

10   ABOUT SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION.  I'M ASKING

11   YOU SPECIFICALLY FOR THE VALUE FOR THE PATENTS ACQUIRED BY

12   INTEL HAD AS PART OF THE $409 MILLION.  DID YOU MAKE ANY EFFORT

13   TO DETERMINE WHAT THE VALUE OF THOSE PATENTS WAS AS PART OF THE

14   ACQUISITION PRICE PAID BY INTEL IN MAY 2001?"

15             AND YOU ANSWERED BY SAYING, "LET ME ASK YOU SOME

16   QUESTIONS, MR. JANSEN, FOR CLARIFICATION.  DID I DO A PURCHASE

17   PRICE ALLOCATION AS OF 2001 TO DETERMINE WHAT PART OF THAT

18   PURCHASE PRICE WAS ALLOCATED TO THE PATENTS IN SUIT?  I DIDN'T

19   DO THAT."

20             YOU DIDN'T DO THAT, CORRECT?

21   **A.**    I DIDN'T DO A PURCHASE PRICE ALLOCATION.

22   DELOITTE & TOUCHE DID THAT, RIGHT.

23   **Q.**    YOU SAID DELOITTE & TOUCHE DID IT?

24   **A.**    THAT'S WHAT THEY DID.  THEY DID A PURCHASE PRICE

25   ALLOCATION OF THE 409 MILLION.

1    Q.    YOU DID NOT DO THAT?

2    A.    I DID NOT PERFORM THAT CALCULATION, RIGHT.

3    Q.    OKAY.  YOU DID NOT VALUE -- YOU DID NOT ATTEMPT TO VALUE

4    THE PATENTS THAT WERE TRANSFERRED TO INTEL AS -- AT 2001 AS

5    PART OF THE 409 PURCHASE PRICE, DID YOU?

6    A.    AS I INDICATED, I THINK MY ANALYSIS COULD SUGGEST WHAT

7    THE VALUE OF THE RADIANCE CLAIMED TECHNOLOGY WOULD BE AS OF

8    2001.  I THINK I EVEN SAY THAT.

9    Q.    YOUR ANALYSIS SUGGESTS WHAT IT MIGHT BE.

10         OKAY.

11              MR. JANSEN:  WE CAN TURN THIS OFF RIGHT NOW.

12   BY MR. JANSEN:

13   Q.    I WANT TO TALK ABOUT ONE ASPECT OF YOUR -- YOUR ANALYSIS

14   YOU TALKED ABOUT WAS THAT YOU FELT THE DAMAGE THAT WAS CAUSED

15   BY MR. SHUM BEING LEFT OFF THE PATENTS WAS APPROXIMATELY

16   $35,000 PER PATENT?

17   A.    $37,500 PER PATENT.

18   Q.    37,000?

19   A.    YES.

20   Q.    OKAY.  YOU'RE GOING TO --

21   A.    THAT'S THE HIGH END OF MY RANGE, RIGHT.

22   Q.    OKAY.  THANKS FOR ADDING THE EXTRA 2,500 BUCKS THERE.

23   A.    MY PLEASURE.

24   Q.    YEAH, THANK YOU.

25         AND THE BASIS OF THAT IS THAT BECAUSE HE WAS AN -- IF HE

1  HAD BEEN AN EMPLOYEE AT A COMPANY LIKE CISCO, LUCENT, IBM, AND

2  HE WAS AN INVENTOR AND WAS NAMED ON A PATENT, THEY MIGHT HAVE

3  GIVEN HIM A BONUS IN ABOUT THAT AMOUNT.  THAT'S HOW YOU VALUED

4  THAT?

5  **A.**   RIGHT, BECAUSE I WAS TRYING TO ESSENTIALLY RECALL THAT

6  UNDER MY ASSUMPTION, MR. SHUM HAS RIGHTS TO INDEPENDENTLY

7  EXPLOIT ALL THAT TECHNOLOGY, SO I'M JUST LOOKING AT THE

8  INCREMENTAL BENEFIT OF BEING NAMED AS AN INVENTOR.

9  **Q.**   BUT YOU DIDN'T LOOK AT THE LOSS OF VALUE THAT RESULTS

10  FROM NOT BEING ABLE TO ASSIGN ALL YOUR RIGHTS UNDER THE PATENTS

11  TO ANYBODY YOU WANT TO.  THOSE EMPLOYEES AT CISCO, LUCENT, AND

12  IBM, THEY WORK FOR THE COMPANY.  THEY'RE REQUIRED TO ASSIGN

13  THOSE PATENTS TO THE COMPANY, RIGHT?

14  **A.**   THAT'S CORRECT.  I TAKE THAT --

15  **Q.**   OKAY.

16  **A.**   -- OUT OF THE EQUATION BECAUSE I'M JUST LOOKING -- I

17  DIDN'T INCLUDE THEIR SALARY, FOR EXAMPLE, BECAUSE THEY'RE --

18  ESSENTIALLY THEIR SALARY IN PART IS FOR THEM TO INVENT AND

19  CREATE, AND SO THEY DON'T -- SINCE THEY ASSIGN ANY RIGHTS UNDER

20  ANY PATENT APPLICATION OR PATENTS TO THE COMPANY, THEN I'M JUST

21  LOOKING AT THE INCREMENTAL BONUS OR MERIT FOR BEING NAMED AS AN

22  INVENTOR.

23  **Q.**   MR. VERDIELL, ON THE OTHER HAND, FILED A PATENT

24  APPLICATION AND THEN HE ASSIGNED IT, HE WAS ABLE TO ASSIGN THAT

25  TO AN ENTITY OF HIS CHOICE, LIGHTLOGIC, AND USE THOSE PATENT

1    ASSIGNMENTS TO GET INVESTORS AND EVENTUALLY SELL THE COMPANY TO

2    INTEL FOR $400 MILLION.

3    **A.**    IS THAT A STATEMENT OR A QUESTION?

4    **Q.**    IT'S A QUESTION.

5    **A.**    NO, THAT'S NOT MY UNDERSTANDING.  I'VE ALREADY TALKED

6    ABOUT THE FACT THAT THE LATTER PART OF YOUR STATEMENT WAS

7    ESSENTIALLY THAT THE INVESTORS INVESTED IN LIGHTLOGIC AS A

8    RESULT OF THESE ASSIGNMENT DOCUMENTS THAT YOU'VE SHOWN ME.

9    THAT WOULD BE INCONSISTENT WITH WHAT I UNDERSTAND THE TESTIMONY

10   TO BE OF THE ACTUAL INVESTORS IN LIGHTLOGIC.

11   **Q.**    YOU UNDERSTAND -- YOU UNDERSTAND, THOUGH, THAT THE

12   ABILITY TO USE -- TO BE A NAMED INVENTOR ON A PATENT

13   APPLICATION AND THEN EXECUTE ASSIGNMENTS OF THOSE PATENTS TO

14   ANYBODY YOU CHOOSE PROVIDES VALUE IN THE FORM OF YOU CAN GET

15   LOANS, YOU CAN GET INVESTORS --

16   **A.**    WELL, AGAIN --

17   **Q.**    -- YOU CAN SELL YOUR RIGHTS.

18   **A.**    SORRY?

19   **Q.**    IS THAT TRUE?

20   **A.**    I APOLOGIZE FOR STEPPING OVER YOUR QUESTION.

21   **Q.**    YEAH.

22   **A.**    I WOULD SAY IN THIS SITUATION, NOT THAT I'VE SEEN.  COULD

23   THAT BE A -- THE CASE?  POSSIBLY.  BUT IN THIS SITUATION, BASED

24   UPON WHAT THE INVESTORS IN LIGHTLOGIC HAVE TESTIFIED TO AND

25   DECLARED, THEY WERE AWARE THE PLAN OF LIQUIDATION, THEY WERE

1   AWARE OF MR. SHUM'S RIGHTS UNDER THE PLAN OF LIQUIDATION, SO

2   THEY WERE AWARE OF THIS -- THIS KIND OF SITUATION.

3        SO WHAT I'M TRYING TO VALUE WHEN I'M VALUING BEING NAMED

4   AS A COINVENTOR IS WHAT'S THE INCREMENTAL VALUE OF THAT

5   PARTICULAR ACTIVITY, FOR LACK OF A BETTER TERM.

6   Q.   OKAY.  AND YOU'RE ASSUMING THAT THE INVESTORS KNEW ALL OF

7   MR. SHUM'S RIGHTS, INCLUDING HIS RIGHTS TO THE FLEXURE

8   INVENTION; IS THAT RIGHT?

9   A.   I'M ASSUMING THAT THE INVESTORS KNEW OF THE PLAN OF

10  LIQUIDATION AND KNEW OF MR. SHUM'S RIGHTS WHEN THEY INVESTED IN

11  LIGHTLOGIC, AS DID INTEL, I WOULD ASSUME.

12  Q.   OKAY.  NOW, WHAT DID YOU DO SPECIFICALLY TO VALUE THESE

13  PATENTS?

14  A.   WELL, THERE'S -- THERE'S -- AS FAR AS SPECIFICALLY

15  VALUING THE PATENTS, I DON'T KNOW IF I CREATED A VALUE

16  SPECIFICALLY FOR THE PATENTS.  HOWEVER, THE DATA POINTS THAT I

17  USED, THE $250,000 BACK AND FORTH BETWEEN DR. VERDIELL AND

18  MR. SHUM, IS ONE INDICATOR OF VALUE.  ANOTHER IS THE GIGABIT

19  OFFER.  AND A THIRD IS THE SERIES A FINANCING ANALYSIS THAT I

20  DID TO THE TUNE OF ABOUT 857,000.  BUT DID I DRILL DOWN TO THE

21  SPECIFIC PATENTS AND VALUE THOSE?  I DID NOT DO THAT.

22  Q.   SO YOU BASICALLY JUST LOOKED AT TWO EVENTS -- THREE

23  EVENTS.  YOU LOOKED AT WHAT YOU CLAIM WAS AN OFFER BY MR. SHUM

24  TO MR. VERDIELL TO SELL HIS RIGHTS FOR 250,000?

25  A.   BACK AND FORTH, RIGHT.

1    Q.    OKAY.

2    A.    MORE THAN JUST THE RIGHTS OF -- OF TECHNOLOGY, OBVIOUSLY,

3    BUT YES.

4    Q.    AND YOU LOOKED AT THIS DISCUSSION THAT HAPPENED IN 2001

5    AFTER INTEL HAD ALREADY ACQUIRED LIGHTLOGIC AND IT WAS PUBLIC

6    KNOWLEDGE THAT INTEL OWNED THOSE PATENTS, RIGHT?

7    A.    I -- AGAIN, THAT'S A PRESUMPTION THAT IT WAS PUBLIC

8    KNOWLEDGE THAT INTEL OWNED THOSE PATENTS.

9    Q.    OKAY.  WE'VE ALREADY TALKED ABOUT.

10   A.    WE HAVE.

11   Q.    OKAY.  NOW, THERE WAS ANOTHER OFFER, WASN'T THERE?  THERE

12   WAS A BATTERY VENTURES OFFER WHICH VALUED THE COMPANY AT

13   $7 MILLION AT ABOUT THE SAME TIME THAT MR. VERDIELL AND

14   MR. SHUM ARE DISCUSSING POSSIBLY DISSOLVING THE COMPANY.

15         ARE YOU AWARE OF THAT?

16   A.    I'M -- I DON'T KNOW IF I'D CHARACTERIZE IT QUITE THAT

17   STRONGLY, BUT I UNDERSTAND THERE WAS INTEREST BY BATTERY

18   VENTURES INVESTING IN THE COMPANY, YES, IN -- I THINK IT'S IN

19   LATE 1997.  THERE WAS ANOTHER OFFER FOR THE COMPANY INVESTING

20   EARLY IN THE CREATION OF RADIANCE DESIGN THAT PUT THE NUMBER AT

21   3 MILLION.  SO THOSE ARE ALL KIND OF DATA POINTS THAT WOULD

22   INCLUDE OWNERSHIP OF THE COMPANY.

23   Q.    OKAY.  AND THE BATTERY VENTURES OFFER WAS A VALUATION AT

24   $7 MILLION FOR THE COMPANY, WASN'T IT?

25   A.    I DON'T RECALL WHAT THE POST MONEY VALUATION WOULD BE,

1    BUT THAT WOULD BE FOR THE WHOLE COMPANY, OBVIOUSLY.

2    Q.    RIGHT.

3    A.    NOT JUST THE TECHNOLOGY.

4    Q.    AND ARE YOU AWARE THAT MR. VERDIELL -- THIS IS ABOUT THE

5    SAME TIME THAT MR. SHUM AND MR. VERDIELL WERE EXCHANGING

6    COUNTEROFFERS ON POSSIBLE OPTIONS TO BUY EACH OTHER OUT, AND

7    THAT THE BATTERY VENTURES OFFER CAME IN ABOUT THE SAME TIME?

8    A.    I JUST DON'T RECALL THE TIMING.  YOU COULD BE RIGHT.  I

9    JUST DON'T RECALL THE TIMING.

10   Q.    AND DO YOU ALSO UNDERSTAND THAT MR. SHUM WAS NEVER

11   INFORMED ABOUT THAT OFFER FROM BATTERY VENTURES?

12   A.    I DON'T RECALL HIS TESTIMONY ON THAT.

13   Q.    AND, IN FACT, THIS OPTION AGREEMENT THAT WAS BEING

14   PROPOSED WAS A LITTLE BIT MORE COMPLICATED THAN SOMETHING --

15   MR. SHUM SAYING HE WOULD -- HE WOULD BE WILLING TO BE BOUGHT

16   OUT FOR $250,000, WASN'T IT?

17   A.    THAT'S KIND OF A VAGUE QUESTION.  BUT "COMPLICATED" IN

18   WHAT SENSE?  IT INCLUDED A LOT MORE ASSETS.  IT INCLUDED HALF

19   THE COMPANY, OBVIOUSLY.  AND IT INCLUDED THIS KIND OF

20   NONCOMPETE THAT I TALKED ABOUT.

21   Q.    MR. VERDIELL HAD PREVIOUSLY OFFERED TO PAY MR. SHUM A

22   SMALL AMOUNT OF MONEY FOR AN OPTION TO BUY HIM OUT FOR

23   $250,000.  DO YOU RECALL THAT?

24   A.    I DON'T RECALL THAT.  THERE -- I RECALL THE NUMBER

25   $250,000 BEING KIND OF STABLE THROUGH THAT WHOLE DISCUSSION.

1    BUT I DON'T RECALL THAT SPECIFICALLY.

2    **Q.**    AND AN OPTION AGREEMENT IS NOT A PROMISE TO PAY SOMEBODY

3    SOME MONEY.  IT'S A PROMISE TO GIVE THEM A SMALL AMOUNT OF

4    MONEY FOR THE RIGHT TO BUY THEM OUT LATER IF YOU WANT TO BUY

5    THEM OUT.

6    **A.**    THAT'S NOT HOW I UNDERSTOOD THE DOCUMENTS.  IT WAS

7    $250,000 BEING –– THERE WAS A PERIOD OF TIME THAT DR. VERDIELL

8    COULD EXERCISE AND PAY $250,000 AND GET MR. SHUM'S PART OF THE

9    COMPANY.  AND THEN IF DR. VERDIELL DIDN'T EXECUTE ON THAT,

10   MR. SHUM HAD THAT SAME RIGHT, 250,000 TO BUY DR. VERDIELL'S

11   PORTION OF THE COMPANY OUT.

12   **Q.**    AND SO IF MR. –– IF MR. VERDIELL HAD AGREED TO THAT

13   OPTION, IF HE'D AGREED TO THAT AND HADN'T BEEN ABLE TO RAISE

14   THE $250,000 WITHIN A MONTH, THEN MR. SHUM WOULD HAVE BEEN ABLE

15   TO BUY HIM OUT?

16   **A.**    THAT'S CORRECT.  THAT'S MY UNDERSTANDING.

17   **Q.**    OKAY, RIGHT.

18   **A.**    FOR WHATEVER REASON, HE COULDN'T RAISE THE $250,000, THEN

19   THE OPTION WOULD FALL TO MR. SHUM.

20   **Q.**    THAT PUT MR. VERDIELL AT RISK IF HE COULDN'T RAISE

21   $250,000, THEN HE WAS AT RISK OF BEING BOUGHT OUT AT THAT

22   AMOUNT AS WELL, RIGHT?

23   **A.**    SURE.

24   **Q.**    AND YOU DON'T KNOW WHY MR. VERDIELL DECIDED NOT TO ACCEPT

25   THAT OFFER?

1    A.    I DON'T KNOW WHO ULTIMATELY DECIDED.  THERE WAS CERTAINLY

2    SOME BACK AND FORTH.  I DON'T KNOW WHO ULTIMATELY SAID THIS IS

3    NOT GOING TO HAPPEN.

4    Q.    NOW THE SERIES A ROUND WAS IN 1998, RIGHT, AUGUST 1998?

5    A.    AUGUST 1998, THAT'S CORRECT.

6    Q.    WHILE YOU'RE HAVING WATER, I'LL HAVE SOME WATER.

7          AND AT THAT POINT IN TIME, LIGHTLOGIC WAS PRIMARILY JUST

8    THE INTELLECTUAL PROPERTY ASSETS; ISN'T THAT RIGHT?

9    A.    I WOULD SAY CERTAINLY THAT MADE UP MORE OF THE COMPANY

10   THAN LATER ON.  THERE HAD BEEN SOME ACTIVITY FROM JANUARY 1998

11   TO AUGUST 1998 BY DR. VERDIELL.

12   Q.    IT WAS PRIMARILY JUST INTELLECTUAL PROPERTY ASSETS.

13   A.    AGAIN, I WOULD SAY THAT REPRESENTED MORE OF THE COMPANY

14   THAN LATER ON.

15   Q.    OKAY.  AND THE -- THE INVESTORS THAT INVESTED IN THAT

16   COMPANY WERE INVESTING BECAUSE THEY SAW THE OPPORTUNITY TO TAKE

17   THAT INTELLECTUAL PROPERTY AND BUILD A COMPANY ON IT, TO GROW

18   THE -- TO GROW THE BUSINESS; ISN'T THAT RIGHT?

19   A.    WELL, IF YOU'RE ASKING ME TO BE IN THE MIND OF THE

20   INVESTORS, I THINK THEY ACTUALLY TESTIFIED AS TO WHY THEY

21   INVESTED IN LIGHTLOGIC, AND IT'S MY UNDERSTANDING THERE WERE A

22   NUMBER OF REASONS WHY.

23   Q.    IS THAT A FAIR CHARACTERIZATION OF WHAT THEIR REASONS

24   WERE?

25   A.    WELL, I -- I ALSO UNDERSTOOD THAT THEY THOUGHT FAIRLY

1    HIGHLY OF DR. VERDIELL'S SKILLS AND ABILITIES TO EXECUTE.

2    Q.    AND YOU UNDERSTAND THE -- THE VC'S, THE VENTURE

3    CAPITALISTS, THAT INVESTED AT THAT TIME INVESTED BECAUSE THEY

4    SAW THAT THE INVENTIONS PROVIDED A -- A POTENTIAL COMPETITIVE

5    ADVANTAGE IN A, WHAT THEY SAW AS A VERY LUCRATIVE MARKET.

6              MS. GRANT:  LACKS FOUNDATION.

7    BY MR. JANSEN

8    Q.    IS THAT RIGHT?

9              MS. GRANT:  IT'S ALSO COMPOUND AS TO THE INVENTIONS.

10             THE COURT:  YEAH, I THINK YOU'RE ASKING HIM TO MAKE

11   THESE ASSUMPTIONS.  I THINK HE CAN DO THAT.

12             THE WITNESS:  I CAN ASSUME.  I DON'T KNOW WHAT THEY

13   ULTIMATELY TESTIFIED TO.  I KNOW WHAT THEIR DECLARATIONS SAID

14   AS TO WHY THE INVESTORS WERE INTERESTED.

15   BY MR. JANSEN:

16   Q.    HAVE YOU EVER VALUED -- BY THE WAY, BACK UP.

17         HAVE YOU EVER VALUED INTELLECTUAL PROPERTY FOR VENTURE

18   CAPITALISTS BEFORE?

19   A.    A COUPLE OF TIMES.

20   Q.    AND -- AND SO FROM YOUR OWN EXPERIENCE, THEN, VENTURE

21   CAPITALISTS ARE -- THEY INVESTIGATE INTELLECTUAL PROPERTY WITH

22   THE HOPES OF INVESTING IN THE COMPANY, DEVELOPING THE

23   INTELLECTUAL PROPERTY TO THE POINT WHERE THEY CAN MAKE PRODUCT

24   AND SELL PRODUCT AND GROW THE BUSINESS, RIGHT?

25   A.    I WOULD NOT -- AS I SAID, I'VE DONE THIS A COUPLE OF

1  TIMES OVER MY 20-YEAR CAREER.  I WOULD NOT CONSIDER MYSELF TO

2  BE AN EXPERT IN A BROAD STATEMENT AS TO WHY VC'S INVEST IN

3  COMPANIES.  I MEAN THERE'S A WIDE VARIETY OF REASONS WHY THEY

4  WOULD, IT WOULD SEEM TO ME.

5  **Q.**   SO THEY DON'T -- VC'S, IN YOUR OPINION, DON'T INVEST

6  IN -- LET'S JUST MOVE ON.

7       NOW, THE POINT IS VERDIELL AND LIGHTLOGIC CONTINUED,

8  DIDN'T THEY, TO FILE PATENT APPLICATIONS AFTER THAT SERIES A

9  FINANCING?

10 **A.**   I THINK THEY FILED PATENT APPLICATIONS AFTER THAT

11 SERIES A, YES.

12         **MR. JANSEN:**  MAYBE WE COULD PULL THAT CHART UP

13 AGAIN.

14 **BY MR. JANSEN**

15 **Q.**   MR. VERDIELL HAD ONLY FILED ONE PATENT APPLICATION --

16         (EXHIBIT PUBLISHED TO JURY.)

17 **BY MR. JANSEN:**

18 **Q.**   -- PRIOR TO THE SERIES A FINANCING, CORRECT?

19 **A.**   RIGHT, JUST A PATENT APPLICATION, NOT A PATENT, RIGHT.

20 **Q.**   HE FILED ONE PATENT APPLICATION AND HE EXECUTED THAT

21 FIRST ASSIGNMENT THAT WE JUST LOOKED AT, TRIAL EXHIBIT 15,

22 BEFORE THE SERIES A FINANCING, RIGHT?

23 **A.**   THAT'S WHAT IT LOOKS LIKE BASED UPON YOUR CHART.

24 **Q.**   OKAY.  BUT HE CONTINUED THEREAFTER -- DR. VERDIELL AND

25 LIGHTLOGIC CONTINUED THEREAFTER TO FILE MORE PATENT

1   APPLICATIONS.  HE FILED THE FLEXURE -- TWO FLEXURE PATENT

2   APPLICATIONS ON JANUARY 11TH, 1999.  DO YOU SEE THAT?

3   **A.**     I SEE THAT.

4   **Q.**     OKAY.  AND THEN HE ASSIGNED THE ENTIRE RIGHT, TITLE, AND

5   INTEREST IN THOSE PATENTS IN EXHIBITS 16 AND 17 ON

6   FEBRUARY 18TH, 1999, AND APRIL 10TH, 1999.  DO YOU SEE THAT,

7   THE SECOND AND THIRD LINES OF THE CHART?

8   **A.**     I DO.

9   **Q.**     AND IS IT YOUR UNDERSTANDING BASED ON YOUR REVIEW OF THE

10  RECORD THAT LIGHTLOGIC PROMOTED THOSE NEWLY FILED PATENTS AND

11  PATENT APPLICATIONS TO THE INVESTORS FOR THE B ROUND AS PARTS

12  OF THEIR EFFORTS TO RAISE FINANCING FOR THE B ROUND?

13  **A.**     IT'S MY RECOLLECTION IN REVIEWING THE INFORMATION WITH

14  SERIES B THAT A NUMBER OF DIFFERENT THINGS WERE TALKED ABOUT

15  BETWEEN LIGHTLOGIC AND THE POTENTIAL INVESTORS.

16  **Q.**     OKAY.  AND YOU'VE SEEN THE BUSINESS PLANS, HAVEN'T YOU,

17  FOR LIGHTLOGIC AFTER THESE TWO STEP PATENT APPLICATIONS WERE

18  FILED IN JANUARY 1999, THE BUSINESS PLANS THAT PROMOTE THE

19  PATENTED TECHNOLOGY, INCLUDING THESE -- INCLUDING THESE NEW

20  FLEXURE PATENTS?

21  **A.**     THEY DID -- I THINK THOSE BUSINESS PLANS PROMOTE A LOT OF

22  DIFFERENT THINGS, INCLUDING, AS I UNDERSTAND IT, THE FLEXURE

23  PATENTS.  BUT THERE'S A LOT OF INFORMATION IN THOSE BUSINESS

24  PLANS.

25  **Q.**     AND THOSE LATER-FILED PATENTS AND PATENT APPLICATIONS

1    WERE ALSO PROMOTED TO THE ROUND C INVESTORS, WEREN'T THEY?

2    **A.**    AMONG VARIOUS OTHER ATTRIBUTES OF THE COMPANY AND THE

3    SKILLS AND ABILITIES OF THE MANAGEMENT TEAM, THE TRADE SECRETS

4    THAT THE COMPANY HAD, AND THE PROPRIETARY PROCESSES, THE

5    MANUFACTURING, ALL OF THOSE WERE CONSISTENTLY PUT INTO THE

6    BUSINESS PLAN.

7    **Q.**    AND IT'S ALSO YOUR UNDERSTANDING, ISN'T IT, SIR, THAT THE

8    TECHNOLOGY AND THE FACT THERE WERE PATENTS, PATENT APPLICATIONS

9    COVERING THAT TECHNOLOGY WAS ALSO PROMOTED TO INTEL AT -- AS

10   PART OF THE DRIVER OF VALUE FOR THE INTEL ACQUISITION DECISION?

11   **A.**    WELL, MY UNDERSTANDING OF THE INTEL INTERNAL INFORMATION

12   IS THAT THEY CHARACTERIZE THE STRATEGIC VALUE DRIVER, USING

13   YOUR DRIVER WORD, AS THE WORK FORCE, AS THE TEAM AND THE

14   ENGINEERS.

15   **Q.**    UM-HMM.

16   **A.**    THAT'S THE ONE TIME THEY USED STRATEGIC VALUE DRIVER AS A

17   TERMINOLOGY.

18   **Q.**    AND YET JUST A FEW MONTHS AFTER THAT ACQUISITION, INTEL

19   CORPORATION AND LIGHTLOGIC CORPORATION MANAGEMENT WORKING WITH

20   DELOITTE & TOUCHE SET A VALUE FOR THAT WORK FORCE OF

21   $2.4 MILLION.

22   **A.**    NO.  THEY SET A COST TO REPLACE, A HEAD HUNTER FEE OF

23   $2.4 MILLION.  THE REST OF IT OR THE VALUE OF THAT AS TESTIFIED

24   TO BY INTEL AND AS DISCLOSED IN THE DOCUMENT IS IN GOODWILL.

25   **Q.**    BUT -- BUT LET'S -- LET'S TALK ABOUT THOSE SLIDES.  SLIDE

1  25, I THINK OF YOUR -- OF YOUR PRESENTATION, YOU CLAIM YOU

2  DIDN'T DO A PURCHASE PRICE ALLOCATION BECAUSE YOU DIDN'T NEED

3  TO DO IT BECAUSE DELOITTE & TOUCHE HAD DONE SO.

4  **A.**   WELL, I DIDN'T -- I DIDN'T -- I DIDN'T NEED TO DO IT FOR

5  A NUMBER OF DIFFERENT REASONS AS WELL AS BECAUSE

6  DELOITTE & TOUCHE HAD DONE SO.  A PURCHASE PRICE ALLOCATION, AS

7  I'VE TALKED ABOUT, IS A -- IS AN INSTRUMENT IS ALLOCATE A

8  PURCHASE PRICE TO VARIOUS ASSETS, TO THE EXTENT THEY CAN.

9  **Q.**   OKAY.  MR. REGAN, YOU'VE CRITICIZED HIS METHODOLOGY.  HE

10  DID ATTEMPT TO DETERMINE THE VALUE OF THE INTELLECTUAL PROPERTY

11  IN 2001 AS PART OF THE -- AS PART OF THE ACQUISITION PRICE OF

12  $409 MILLION, DIDN'T HE?

13  **A.**   YEAH.  I HATE TO QUIBBLE WITH THAT STATEMENT.  I DON'T

14  THINK THAT'S WHAT MR. REGAN DID.  ALL MR. REGAN DID WAS TAKE

15  THE PURCHASE PRICE AND DEDUCT THREE COMPONENTS FROM THE

16  DELOITTE & TOUCHE REPORT, AND HE ULTIMATELY ENDS UP WITH A --

17  WHATEVER'S LEFT OVER.  I DON'T CONSIDER THAT TO BE A VALUATION

18  OF THE LIGHTLOGIC INTELLECTUAL PROPERTY.

19  **Q.**   OKAY.

20      BUT YOU, YOURSELF, DIDN'T ATTEMPT TO VALUE OR BREAK OUT

21  ANY OF THE ASSETS IN LIGHTLOGIC AS PART OF THAT SALE.

22  **A.**   ONLY TO THE EXTENT THAT MY ANALYSIS COULD BE USED TO

23  IDENTIFY THE VALUE OF THE RADIANCE DBC FLEXURE TECHNOLOGY.

24  **Q.**   OKAY.  WHICH IS BASED ON THE ASSUMPTIONS WE'VE ALREADY

25  TALKED ABOUT?

1  A.    BASED UPON -- WELL, NOT THE ASSUMPTIONS AS WELL AS THE

2  DATA POINTS, THE ACTUAL OFFERS BACK AND FORTH AND MY ANALYSIS

3  OF SERIES A.

4  Q.    LET'S TALK ABOUT THE -- THE ALLOCATION.  MAYBE WE CAN PUT

5  UP YOUR SLIDE 25.

6            MR. JANSEN:  CAN YOU PUT THAT SLIDE UP, SLIDE 25?

7            JEFF, CAN YOU PUT UP SLIDE 25?

8            THANKS.

9                (EXHIBIT PUBLISHED TO JURY.)

10           MR. JANSEN:  LET'S GO BACK ONE SLIDE, PLEASE, TO 24,

11 PLEASE, JEFF.

12               (EXHIBIT PUBLISHED TO JURY.)

13 BY MR. JANSEN:

14 Q.    THIS WAS THE -- THIS WAS THE BREAKOUT THAT RESULTS FROM

15 MR. REGAN'S ANALYSIS FOR USING THE DELOITTE & TOUCHE REPORT AND

16 OTHER -- OTHER ACCOUNTING DOCUMENTS OF THE COMPANY, CORRECT?

17 OF INTEL.

18 A.    NO.  I THINK THIS -- I THINK, IF I RECALL CORRECTLY, ALL

19 THREE OF THOSE SMALLER SLICES OF THE PIE, THE TRANSPONDER,

20 TANGIBLE, AND THE WORK FORCE, HE DERIVED FROM DELOITTE &

21 TOUCHE'S REPORT.  WHAT HE THEN IGNORES IN DELOITTE & TOUCHE'S

22 REPORT -- DELOITTE & TOUCHE DID A LOT MORE WORK ABOUT THE

23 TECHNOLOGY, THE CORE TECHNOLOGY, ET CETERA -- HE DOESN'T DO ANY

24 OF THAT.  HE JUST LUMPS THE REST OF IT INTO THAT YELLOW PIECE

25 OF PIE.

1    Q.    OKAY.  BUT HE DEDUCTED FROM THE PURCHASE PRICE THE

2    TANGIBLE ASSETS WHICH INCLUDE CASH LEFT OVER THAT HADN'T BEEN

3    USED FROM THE PRIOR INVESTMENT ROUND, WHICH INCLUDED INVENTORY,

4    OTHER THINGS LIKE THAT?

5    A.    YES.

6    Q.    AND YOU DON'T DISPUTE THAT NUMBER, DO YOU?

7    A.    I HAVE NO BASIS TO DISPUTE IT OR TO CHECK IT FOR

8    ACCURACY.

9    Q.    DO YOU UNDERSTAND THAT NUMBER CAME FROM THE 10K REPORT

10   THAT INTEL FILED WITH THE SECURITIES AND EXCHANGE COMMISSION?

11   A.    I DON'T RECALL.  I RECALL SEEING SOME NUMBER IN THE D&T

12   REPORT ON TANGIBLE ASSETS LEFT OVER.  BUT THAT COULD BE RIGHT.

13   Q.    AND MR. REGAN ALSO DEDUCTED THE WORK FORCE AMOUNT OF

14   $2.4 MILLION THAT DELOITTE HAD DETERMINED AS PART OF ITS

15   ALLOCATION, CORRECT?

16   A.    AGAIN, JUST TO BE CLEAR, HE REDUCED IT BY THE COST TO

17   REPLACE OF THE WORK FORCE.  THE REST OF THE VALUE OF THE WORK

18   FORCE IS IN THAT YELLOW PIECE OF THE PIE.

19   Q.    OKAY.  AND HE DID THAT IN CONNECTION WITH -- IN

20   CONJUNCTION WITH INTEL MANAGEMENT.  HE CAME UP WITH --

21   DELOITTE & TOUCHE CAME UP WITH THAT NUMBER, NOT MR. REGAN, BUT

22   DELOITTE & TOUCHE CAME UP WITH THAT NUMBER FOR THE VALUE OF THE

23   WORK FORCE IN CONJUNCTION WITH INTEL MANAGEMENT, CORRECT?

24   A.    NO, THAT IS NOT THE VALUE OF THE WORK FORCE.  WHAT THAT

25   IS, IS THE COST TO REPLACE THE HEAD HUNTER FEES, THE RECRUITING

NAPPER – CROSS / JANSEN

1   TIME, IN-HOUSE RECRUITERS TO GO OUT AND FIND THOSE ENGINEERS,

2   TO ASSEMBLE THEM.  UNDER -- UNDER FAS 141, THE REST OF THAT

3   VALUE OF -- THE REST OF THAT VALUE OF THE WORK FORCE, WHICH

4   COULD BE QUITE SUBSTANTIAL, WOULD BE IN THAT YELLOW PIE.

5   **Q.**    YOU TALKED --

6   **A.**    AND THEY TALKED TO -- AND I'M SORRY, MR. JANSEN.  THEY

7   DID TALK TO INTEL INDIVIDUALS AS TO, WELL, WHAT KIND OF HEAD

8   HUNTER FEES WOULD YOU HAVE TO PAY, YOU KNOW, WHAT KIND OF

9   RECRUITING TIME WOULD HAVE TO BE INCURRED TO ASSEMBLE THIS WORK

10  FORCE.

11  **Q.**    OKAY.  WELL YOU'VE REVIEWED THE DELOITTE & TOUCHE

12  ANALYSIS, RIGHT?

13  **A.**    I HAVE.

14  **Q.**    OKAY.  AND IT'S BEEN ADMITTED INTO EVIDENCE.  I WANT TO

15  LOOK AT PAGE --

16          **MS. GRANT:**  YOUR HONOR, I DO NOT BELIEVE THE REPORTS

17  HAVE BEEN ADMITTED INTO EVIDENCE.

18          **MR. JANSEN:**  PLAINTIFF MOVES THE REPORT INTO

19  EVIDENCE, YOUR HONOR.

20          **THE COURT:**  HE CAN REFER TO IT.

21          **MR. JANSEN:**  AND I'D LIKE TO TAKE A LOOK AT PAGE 40

22  OF THAT, PLEASE, DAVID.

23          CAN I APPROACH THE WITNESS, YOUR HONOR?

24          **THE COURT:**  YOU MAY.

25          **THE WITNESS:**  THANK YOU.

```
 1              (EXHIBIT PUBLISHED TO JURY.)

 2          MR. JANSEN:  LET'S LOOK AT -- LET'S BLOW UP

 3   SECTION 7.4.1 UNDER "ASSEMBLED WORK FORCE."  THAT'S GOOD.

 4   YEAH, PULL THAT UP SO WE CAN SEE IT.

 5              (EXHIBIT PUBLISHED TO JURY.)

 6          THE WITNESS:  I'M SORRY, MR. JANSEN, ARE YOU ON

 7   PAGE 40 OF THE DOCUMENT?  OR 40 --

 8   BY MR. JANSEN

 9   Q.    I'M SORRY.  DO YOU SEE TX8340040?  THAT'S HOW WE'RE --

10   A.    SO IT'S PAGE --

11   Q.    IT'S PAGE 33 OF YOUR -- OF THE ACTUAL REPORT.

12   A.    THANK YOU, SIR.  SORRY.

13   Q.    AND DO YOU SEE IT SAYS THERE WAS ANALYSIS DONE, AND

14   DELOITTE & TOUCHE HAD RECOGNIZED THAT AS OF THE VALUATION

15   DATE -- AND THE VALUATION DATE WAS WHAT?  THE ACQUISITION DATE?

16   A.    YES.

17   Q.    OKAY.

18   A.    MAY 23RD.

19   Q.    THAT, "LIGHTLOGIC POSSESSED A SKILLED ASSEMBLED WORK

20   FORCE OF 82 EMPLOYEES, A LARGE NUMBER OF WHICH WERE INVOLVED IN

21   RESEARCH AND DEVELOPMENT ACTIVITIES.  INTEL CONSIDERS THIS

22   SKILLED WORK FORCE A VALUABLE ASSET ACQUIRED IN THE

23   TRANSACTION.  BASED UPON OUR DISCUSSIONS WITH MANAGEMENT

24   CONCERNING THE COMPOSITION OF THE ASSEMBLED WORK FORCE, IT WAS

25   DETERMINED THAT ITS VALUE WOULD LIKELY BE MATERIAL ENOUGH TO
```

1    WARRANT ITS VALUATION FOR ALLOCATION PURPOSES."

2         AND IT GOES ON TO SAY, "WE VALUED THE TRAINED AND

3    ASSEMBLED LIGHTLOGIC WORK FORCE USING THE REPLACEMENT COST

4    APPROACH."

5         OKAY.  AND IT GOES ON, BUT IT STATES THAT, "IT'S OUR

6    OPINION THE FAIR VALUE OF THE ASSEMBLED WORK FORCE AS OF THE

7    VALUATION DATE IS REASONABLY ESTIMATED AT APPROXIMATELY

8    $2.3 MILLION."

9         DO YOU SEE THAT?

10   **A.**   I DO.  THIS IS EXACTLY WHAT I'VE BEEN TALKING ABOUT.

11   **Q.**   AND THIS IS -- EVEN THOUGH CERTAIN EMPLOYEES WERE DEEMED

12   CRITICAL TO THE ENTERPRISE, RIGHT?

13   **A.**   THIS CONFIRMS WHAT I'VE BEEN SAYING, WHICH IS IT'S A

14   REPLACEMENT COST APPROACH.

15   **Q.**   OKAY.  AND THAT WAS A CHOICE THAT -- THAT WAS A CHOICE

16   THAT WAS -- THAT MADE -- TO VALUE IT ON THAT BASIS?

17   **A.**   I BELIEVE INTEL MADE THAT CHOICE TO VALUE IT ON THAT

18   BASIS, IF I RECALL MR. SWITZER'S TESTIMONY CORRECTLY.

19   **Q.**   OKAY.  AND, IN FACT, IF YOU LOOK AT -- AT PAGE 31 OF THE

20   SAME EXHIBIT -- AND THIS IS PAGE 24 OF THE REPORT, MR. NAPPER.

21   **A.**   OH.  THANK YOU.

22   **Q.**   BUT IT'S PAGE 31 OF THE EXHIBIT.

23              (EXHIBIT PUBLISHED TO JURY.)

24   **BY MR. JANSEN:**

25   **Q.**   AND THERE'S A SECTION THERE CALLED "INTANGIBLE ASSET

NAPPER - CROSS / JANSEN

```
1    VALUATION," AND IT SORT OF TALKS ABOUT HOW THEY'RE GOING TO

2    APPROACH VALUING THE INTANGIBLES.  AND IT VERY CLEARLY SAYS

3    THERE AT THE VERY BOTTOM SENTENCE, THAT SENTENCE THAT THEY,

4    DELOITTE & TOUCHE, MADE THE ASSET VALUATION AS A RESULT OF

5    RESEARCH AND DISCUSSIONS WITH INTEL AND LIGHTLOGIC MANAGEMENT.

6         DO YOU SEE THAT?

7    A.   YES, I SEE THAT.

8    Q.   OKAY.  AND YOU MENTIONED THE FAS 141 AND 142 ACCOUNTING

9    RULES?

10   A.   YES.

11   Q.   THOSE CHANGED SUBSEQUENT TO THIS ACQUISITION, DIDN'T

12   THEY?  THEY CHANGED IT IN 2002?

13   A.   RIGHT.  AS A RESULT OF SOME ISSUES RELATED TO PURCHASE

14   PRICE ALLOCATIONS THAT WERE BEING DONE BEFORE.

15   Q.   OKAY.

16   A.   NOT NECESSARILY THIS PARTICULAR ONE.  BUT I'M JUST SAYING

17   THAT THERE WAS AN EVOLUTION BECAUSE THERE WASN'T ENOUGH

18   RIGOR --

19   Q.   OKAY.

20   A.   -- BEING CONDUCTED IN THESE ANALYSES.

21   Q.   SO WHEN DELOITTE PREPARED THIS -- THIS EVALUATION OF THE

22   WORK FORCE, AT THAT POINT IT WASN'T CONSTRAINED BY THE

23   ACCOUNTING RULES YOU REFERENCED THAT WERE AMENDED AND ADOPTED

24   AFTER THE FACT, RIGHT?

25   A.   THAT'S -- THAT'S EXACTLY MY POINT.  HAD THEY DONE IT
```

1    UNDER FAS 141, 142, WE'D BE SEEING A MUCH DIFFERENT REPORT

2    WHERE THERE WOULD BE MORE IDENTIFICATION FOR THE VALUE OF THE

3    WORK FORCE.

4    **Q.**    OKAY.  BUT THEY HAD -- THEY HAD A CHOICE, THERE WAS A

5    CHOICE THAT INTEL MANAGEMENT AND DELOITTE HAD AS TO HOW TO

6    VALUE THE WORK FORCE.  THEY WEREN'T CONSTRAINED BY THE

7    ACCOUNTING RULES YOU REFERRED TO EARLIER.

8    **A.**    THEY WEREN'T CONSTRAINED BY THAT ACCOUNTING RULE.  I

9    WOULD AGREE THAT THEY CHOSE TO USE A COST TO REPLACE, WHICH IS,

10   YOU KNOW, A BARE MINIMUM, IF YOU WILL.

11   **Q.**    OKAY.

12   **A.**    IT'S LIKE USING THE COST APPROACH TO VALUING ANYTHING.

13   IT'S THE COST TO CONSTRUCT A HOUSE.

14   **Q.**    OKAY.  WELL, INTEL CHOSE THAT, DELOITTE & TOUCHE CHOSE

15   THAT.  LIGHTLOGIC MANAGEMENT WAS CONSULTED.  AND THAT'S THE

16   NUMBER THEY CAME UP WITH, RIGHT?

17   **A.**    THAT'S INCORRECT ON TWO OF THE THREE.  INTEL DIRECTED

18   DELOITTE & TOUCHE TO USE A COST-TO-REPLACE APPROACH.  AND THEN

19   THEY CONSULTED -- INTEL MANAGEMENT AND LIGHTLOGIC WERE

20   CONSULTED ON, WELL, HOW DO WE GO ABOUT DOING THAT?  HEAD HUNTER

21   FEES, WHAT WOULD THEY BE APPROXIMATELY?  ET CETERA.

22   **Q.**    NOW, THERE WAS ALSO ANOTHER DEDUCTION WE TALKED ABOUT,

23   THAT WAS THE VALUE OF THE -- THE TRANSPONDER BUSINESS.

24   **A.**    YES.

25   **Q.**    AND THAT WAS, I THINK --

1          **MR. JANSEN:**  IF WE CAN GO BACK TO SLIDE 24, JEFF,

2     PLEASE.

3                    (EXHIBIT PUBLISHED TO JURY.)

4     **BY MR. JANSEN:**

5     **Q.**   NOW, YOU SAY IN YOUR SLIDE HERE THAT MR. REGAN ASSIGNED

6     $1 MILLION TO THE TRANSPONDER TECHNOLOGY, BUT, IN FACT, THAT

7     WAS A DELOITTE & TOUCHE ANALYSIS OF THE EXISTING TRANSPONDER

8     BUSINESS, THE VALUE OF THE EXISTING TRANSPONDER BUSINESS AT

9     LIGHTLOGIC AT THE TIME OF THE ACQUISITION; ISN'T THAT RIGHT?

10    **A.**   STATED MORE CORRECTLY, IT'S TO ALLOCATE THE PURCHASE

11    PRICE PAID TO THE TRANSPONDER, NOT TO THE VALUE OF THE

12    TRANSPONDER.

13    **Q.**   OKAY.  AND LET'S JUST LOOK AT THE REPORT AGAIN.  LET'S

14    LOOK AT THE DELOITTE REPORT THAT WAS DONE FOR INTEL AFTER THE

15    ACQUISITION.

16          **MR. JANSEN:**  PAGE 41 TO 42, OF EXHIBIT 834, PLEASE,

17    DAVID.

18                    (EXHIBIT PUBLISHED TO JURY.)

19          **MR. JANSEN:**  830 -- I'M SORRY.  PAGE 41.

20          **THE WITNESS:**  OF THE DOCUMENT OR -- OR THE BATES?

21    **BY MR. JANSEN:**

22    **Q.**   PAGE 41 OF THE EXHIBIT, MR. NAPPER.  I'M SORRY.

23    **A.**   THANK YOU.  SO YOU'RE ALWAYS GOING TO GIVE EXHIBIT

24    NUMBERS, SO I DON'T HAVE TO BOTHER YOU ANYMORE.

25    **Q.**   IT'S THE ONLY WAY THAT DAVID CAN UNDERSTAND WHICH ONE TO

1    GO FOR.

2    **A.**    OKAY.  THANK YOU.  I HAVE IT.

3                    (EXHIBIT PUBLISHED TO JURY.)

4              **MR. JANSEN:**  THANK YOU.

5    BY MR. JANSEN:

6    **Q.**    AND THERE'S A SECTION AT THE BOTTOM, 7.5.1 CALLED

7    "DEVELOPED TECHNOLOGY."  AND THIS IS THE SECTION OF THE REPORT

8    THAT DISCUSSES THE DEVELOPED TECHNOLOGY AND HOW IT SHOULD BE

9    VALUED, CORRECT, FOR ACQUISITION ALLOCATION PURPOSES?

10   **A.**    CORRECT.

11   **Q.**    AND THEY LIMITED THIS -- THEY LIMITED THIS -- THIS NUMBER

12   TO THE ACTUAL DEVELOPED PRODUCTS THAT HAD ACHIEVED

13   TECHNOLOGICAL FEASIBILITY; IS THAT RIGHT?

14   **A.**    RIGHT.  THEY'RE KIND OF INSTRUCTED TO DO THAT, YES.

15   **Q.**    OKAY.  AND THOSE WERE THE PRODUCTS THAT WERE ACTUALLY

16   EITHER ON THE MARKET OR GOING INTO THE MARKET WITHIN THE NEXT

17   YEAR, RIGHT?

18   **A.**    I DON'T KNOW IF IT'S THE NEXT YEAR BUT VERY SOON.  SO I

19   WOULD AGREE WITH THE OVERALL PREMISE IT'S EITHER IN THE MARKET

20   OR VERY, VERY SOON.

21   **Q.**    OKAY.  AND WHAT -- WHAT IS THE -- WHAT WAS THE -- HOW FAR

22   IN THE FUTURE ARE THEY LOOKING?

23   **A.**    THAT'S WHAT I'M TRYING TO FIND.

24   **Q.**    DO YOU HAVE AN UNDERSTANDING OF THAT?

25   **A.**    NOT OFF THE TOP OF MY HEAD.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1        **MR. JANSEN:**  CAN WE GO TO THE NEXT PAGE, DAVID.

2              (EXHIBIT PUBLISHED TO JURY.)

3    **BY MR. JANSEN:**

4    Q.   BUT WE SEE AT THE TOP OF THAT PAGE, IT SAYS

5    ESSENTIALLY --

6              **MR. JANSEN:**  LET'S GO -- LET'S GO BACK TO PAGE 41,

7    DAVID.

8              (EXHIBIT PUBLISHED TO JURY.)

9    **BY MR. JANSEN:**

10   Q.   AND THERE'S A REFERENCE TO TWO PRODUCTS.  IT SAYS BOTH

11   PRODUCTS UTILIZE LIGHTLOGIC'S DEVELOPED MODULE DESIGN AND

12   CONTAIN OPTICAL TRANSMITTERS, RECEIVERS, AND CHIP SETS

13   MANUFACTURED BY THIRD PARTIES.

14        AND IT CONTINUES, "THESE TWO PRODUCTS ARE EXPECTED TO

15   GENERATE REVENUES THROUGH THE END OF FISCAL YEAR 2001 AND WILL

16   THEN BE REPLACED BY THE 2 KILOMETER B AND 40 KILOMETER B

17   PRODUCTS.  ESSENTIALLY THE B VERSION OF PRODUCTS ARE THE SAME

18   AS THE A VERSIONS EXCEPT THAT THE THIRD PARTY OPTICAL MODULES

19   WILL BE REPLACED WITH THE BTX AND BRX COMPONENTS PRODUCED BY

20   LIGHTLOGIC."

21        SO IS THIS -- THIS IS IN -- IT COMPORTS WITH YOUR OWN

22   ANALYSIS OF THE RECORDS IN THIS CASE WHICH WAS THAT THE

23   TRANSPONDERS THAT WERE BEING SHIPPED BY LIGHTLOGIC AT THE TIME

24   OF THE ACQUISITION USED -- USED COMPONENTS FROM THIRD PARTIES,

25   BUT THERE WAS A B VERSION THAT WAS GOING TO BE INTRODUCED --

1    THAT WAS THE PLAN.  INTEL WAS GOING TO INTRODUCE -- INTRODUCE A

2    B PRODUCT THAT WOULD INCLUDE THE LIGHTLOGIC COMPONENTS, RIGHT?

3    **A.**    IT'S MY UNDERSTANDING THAT -- THAT GENERALLY COMPORTS

4    WITH MY UNDERSTANDING THAT A WAS OUTSOURCED AND USED

5    THIRD-PARTY COMPONENT PARTS AND THE B WAS HOPEFULLY GOING TO

6    USE AT LEAST SOME OF THE LIGHTLOGIC COMPONENT PARTS.

7    **Q.**    OKAY.

8         AND IF WE GO DOWN TO THE BOTTOM OF THAT PARAGRAPH,

9    JUST --

10             (EXHIBIT PUBLISHED TO JURY.)

11   **BY MR. JANSEN:**

12   **Q.**    THERE'S A -- THE STATEMENT AT THE END STATES, "BASED UPON

13   THE DATA PROVIDED AND OUR INDEPENDENT ANALYSIS, IT'S OUR

14   OPINION," DELOITTE'S OPINION, "THAT THE FAIR VALUE OF THE

15   DEVELOPED TECHNOLOGY ASSETS AS OF THE VALUATION DATE IS

16   REASONABLY ESTIMATED AT $1.2 MILLION."

17        AND THAT INCLUDES THE TRANSPONDER PRODUCTS, RIGHT?

18   **A.**    THAT'S -- INCLUDES THOSE TWO TRANSPONDER PRODUCTS, THAT'S

19   MY UNDERSTANDING.

20   **Q.**    OKAY.  EVEN THE ONE THAT HADN'T YET BEEN RELEASED?

21   **A.**    THAT'S CORRECT.

22   **Q.**    OKAY.  THANKS.

23             **THE COURT:**  COUNSEL, COULD YOU GIVE ME AN ESTIMATE?

24   SHOULD WE TAKE RECESS NOW OR MAYBE FINISH THIS UP?  I DON'T

25   KNOW.

 1          **MR. JANSEN:**  LET ME JUST CONSULT WITH MR. KIRSCH.

 2               (PAUSE IN THE PROCEEDINGS.)

 3          **MR. JANSEN:**  YOUR HONOR, I THINK WE NEED A RECESS.

 4    WE SHOULD PROBABLY TAKE THE RECESS NOW.

 5          **THE COURT:**  ALL RIGHT.  TAKE THE RECESS UNTIL

 6    1:00 O'CLOCK, PLEASE.  THANK YOU.

 7               (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

 8    PRESENCE OF THE JURY:)

 9          **THE COURT:**  MR. NAPPER, DO YOU WANT TO STEP OUT.  WE

10    MIGHT TALK ABOUT YOUR TESTIMONY.

11          **MR. JANSEN:**  YOUR HONOR, I THINK I HAVE ABOUT 30, 40

12    MINUTES.

13          **MR. TAYLOR:**  YOUR HONOR, THERE'S 39 HOURS AND FIVE

14    MINUTES.  THAT'S WHAT THEY ASKED FOR, AND THIS IS GOING ON AND

15    ON AND ON.  HE'S NOW CROSSED HIM LONGER THAN WE DID ON DIRECT,

16    AND ENOUGH.

17          **THE COURT:**  WELL, WE'RE ALMOST THROUGH.

18          **MR. TAYLOR:**  I KNOW.  IT'S JUST --

19          **THE COURT:**  ACTUALLY, WELL, I THINK WE BASE -- YOU

20    HAVE TO -- AS FAR AS 8134 (SIC) IS CONCERNED, THE

21    DELOITTE & TOUCHE REPORT, I DON'T SEE THERE'S ANY QUESTION

22    ABOUT ITS AUTHENTICITY.  THE QUESTION ABOUT WHETHER IT OUGHT TO

23    BE PUT IN AND WHETHER THERE'S GOING TO BE ANY MORE ABOUT IT IS

24    SORT OF UP TO YOU, BUT IT SEEMS TO ME THAT THE WITNESS NOW HAS

25    TESTIFIED TO EVERYTHING ABOUT THE DELOITTE & TOUCHE REPORT THAT

1    YOU'RE GOING TO GET OUT OF ANY OTHER WITNESS AND THAT WE

2    BASICALLY ARE READY TO PUT IT IN.

3            I DON'T SEE WHY IT DOESN'T GO IN.  SEE, I THINK

4    THERE IS NO QUESTION ABOUT ITS FOUNDATION.  AND THEN THE

5    ARGUMENT ABOUT WHAT IT MEANS HAS ALREADY BEEN DISCUSSED, AND I

6    THINK THE WITNESS HAS EXPLAINED THE POSITION THAT WOULD BE

7    TAKEN BY THE DEFENDANT.

8            **MR. TAYLOR:**  WE UNDERSTAND THE COURT'S POSITION.

9            OUR QUESTION, AND WE'LL TALK ABOUT IT OVER LUNCH, IS

10   WHETHER SINCE THIS IS COMING IN AFTER THEY'VE CLOSED, WHETHER

11   WE NEED TO DO SOMETHING WITH A DIFFERENT WITNESS TO DEAL WITH

12   THE EXHIBIT.

13           **THE COURT:**  YOU COULD DO THAT.  BUT I SHOULD LET YOU

14   KNOW THAT I'M GOING TO LET IT IN, AND THEN YOU FIGURE OUT AS TO

15   WHETHER OR NOT YOU THINK THAT NAPPER TESTIMONY IS ALL THAT'S

16   NECESSARY FOR YOUR POSITION TO BE SUFFICIENTLY DEVELOPED, SO

17   YOU CAN TALK ABOUT IT.

18                        (TRIAL EXHIBIT 834

19                        RECEIVED IN EVIDENCE)

20           **MR. TAYLOR:**  COULD WE ASK FOR A HARD STOP FOR THIS

21   EXAMINATION --

22                   (OFF-THE-RECORD DISCUSSION.)

23           **THE COURT:**  "HARD STOP."

24           **MR. TAYLOR:**  WE'VE USED 30 HOURS.  THEY'RE NOW

25   ALMOST AT 40.  THERE'S GOT TO BE SOME FAIRNESS HERE.

```
1          THE COURT:  WELL, THEY'RE ALMOST THROUGH.  THAT'S

2  WHY I WAS ASKING BECAUSE I DON'T SEE HOW YOU COULD GO MORE THAN

3  15 MINUTES WITH THAT.

4          MR. JANSEN:  OKAY.  WE'LL SHORTEN IT DOWN TO THAT.

5          THE COURT:  PARDON?

6          MR. JANSEN:  WE'LL SHORTEN IT DOWN TO LESS THAN HALF

7  AN HOUR.

8          THE COURT:  ALL RIGHT.

9          NEXT THING, SO WE DON'T TO HAVE TALK ABOUT THIS

10 AGAIN.  MY -- MY ANTICIPATION IS THAT IS WHAT HAPPENS AND

11 YOU'RE THROUGH AND THEN YOU REST.  YOU CAN CONSIDER WHAT YOU'RE

12 GOING TO DO, BUT OBVIOUSLY IF YOU'RE GOING TO DO IT THIS

13 AFTERNOON, YOU HAVE TO FIGURE THAT OUT BETWEEN NOW AND WHEN YOU

14 GET BACK.

15          BUT WHAT I'D LIKE TO BE ABLE TO DO IS JUST TO LOOK

16 AT THIS AS THOUGH WE'RE ALL THROUGH, AND THEN WHAT ARE WE GOING

17 TO DO AFTER THAT.

18          AND I WOULD BE THINKING THAT WE WOULD SEND THE JURY

19 HOME AND WE WOULD TELL THEM THAT WE'RE GOING TO HAVE TO DO SOME

20 CONSIDERATION OF THE CASE OUTSIDE OF THEIR PRESENCE AND THAT WE

21 THINK THAT WE WOULD -- WE'LL DO THAT AND THAT THEY SHOULD COME

22 BACK ON TUESDAY AND THE CASE WOULD BE PRESENTED TO THEM ON

23 TUESDAY.

24          MR. TAYLOR:  WE WOULD AGREE WHOLEHEARTEDLY, YES,

25 YOUR HONOR.
```

```
 1           MR. KIRSCH:  US TOO, YOUR HONOR.  WE AGREE.

 2           THE COURT:  ALL RIGHT.  OKAY.

 3           MR. JANSEN:  THANK YOU.

 4                (RECESS TAKEN AT 12:03 P.M.)

 5           (PROCEEDINGS RESUMED AT 1:01 P.M.)

 6           THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

 7  COME TO ORDER.

 8                (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

 9  PRESENCE OF THE JURY:)

10           THE COURT:  COUNSEL, PLEASE GO AHEAD.

11           MR. JANSEN:  THANK YOU, YOUR HONOR.

12                CROSS-EXAMINATION (CONTINUED)

13  BY MR. JANSEN:

14  Q.   MR. NAPPER, BEFORE WE BROKE FOR LUNCH, WE WERE DISCUSSING

15  YOUR CRITIQUE OF MR. REGAN'S ANALYSIS DAMAGES.  DO YOU RECALL

16  THAT?

17  A.   YES.

18  Q.   I WANT TO GET BACK TO THAT IN JUST A MINUTE, BUT FIRST I

19  WANT TO GO BACK TO THE LIGHTLOGIC/INTEL TRANSACTION IN 2001,

20  AND THIS IS ALL PART OF THAT, OF COURSE, BUT ISN'T -- ISN'T IT

21  YOUR UNDERSTANDING THAT LIGHTLOGIC THE CORPORATION, CONTROLLED

22  THE STRUCTURE OF THE LIGHTLOGIC/INTEL MERGER?

23  A.   I DON'T KNOW WHO CONTROLLED THE STRUCTURE -- I DON'T KNOW

24  WHO -- WHETHER IT WAS INTEL OR LIGHTLOGIC THAT DICTATED THE

25  STRUCTURE OF THE DEAL.
```

1    **Q.**    IT WOULD HAVE BEEN ONE -- IT WOULD HAVE BEEN INTEL OR

2    LIGHTLOGIC, CORRECT?

3    **A.**    I WOULD PRESUME SO.

4    **Q.**    OKAY.  AND IT WAS A BARGAIN -- IT WAS A BARGAINED

5    TRANSACTION, CORRECT?  BARGAINED-FOR TRANSACTION?

6    **A.**    BARGAINED IN TERMS OF THE STRUCTURE THAT WENT ON?  I'M

7    NOT AWARE OF THAT.

8    **Q.**    THE MERGER AGREEMENT WAS A NEGOTIATED TRANSACTION,

9    CORRECT?

10   **A.**    WERE THERE ELEMENTS OF THE MERGER THAT WERE DISCUSSED?  I

11   WOULD IMAGINE THAT'S THE CASE.  I'M NOT FAMILIAR WITH WHETHER

12   THE TYPE OF STRUCTURE THAT OCCURRED WAS DISCUSSED.

13   **Q.**    OKAY.  SO IT WAS EITHER LIGHTLOGIC OR INTEL THAT

14   CONTROLLED THAT STRUCTURE AND YOU'RE NOT AWARE OF WHICH IT WAS?

15   **A.**    I DON'T -- I DON'T.  WELL, I WOULD SAY I DON'T KNOW ONE

16   WAY OR THE OTHER --

17   **Q.**    OKAY.

18   **A.**    -- ANYTHING AS TO WHO -- WHO WOULD CONTROL THAT

19   STRUCTURE.

20   **Q.**    AND ISN'T IT TRUE THAT LIGHTLOGIC CONTROLLED THE

21   DISPOSITION OF THE -- THE COMPENSATION, THE INTEL FUNDS TO

22   LIGHTLOGIC SHAREHOLDERS PURSUANT TO THE STRUCTURE OF THAT

23   AGREEMENT?

24              **MS. GRANT:**  THAT LACKS FOUNDATION, YOUR HONOR.

25              **THE COURT:**  OVERRULED.

1              **THE WITNESS:**  I DON'T KNOW.

2    **BY MR. JANSEN:**

3    **Q.**    YOU HAVE NO KNOWLEDGE OF THAT AREA?

4    **A.**    IN THE AREA OF THE DISPOSITION OF THE INTEL STOCK TO THE

5    SHAREHOLDERS?

6    **Q.**    RIGHT.

7    **A.**    I KNOW THAT IT WENT TO THE SHAREHOLDERS.

8    **Q.**    AND YOU CAN'T ANSWER --

9              (PAUSE IN THE PROCEEDINGS.)

10             **MR. JANSEN:**  MINE DOES THAT ALL THE TIME.  JUDGE

11   JENSEN HAS YELLED AT ME A COUPLE OF TIMES.

12   **BY MR. JANSEN:**

13   **Q.**    YOU DON'T KNOW -- YOU CAN'T SAY WHO CONTROLLED THAT?

14   **A.**    I CAN'T SAY ONE WAY OR THE OTHER.

15   **Q.**    OKAY.

16             NOW, GOING BACK TO -- I THINK IT WAS SLIDE 25.

17             **MR. JANSEN:**  JEFF, COULD YOU PLEASE PULL THAT UP FOR

18   ME.

19             (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. JANSEN:**

21   **Q.**    WE'VE TALKED ABOUT THE DEDUCTIONS FROM 409 MILLION --

22   BEFORE LUNCH -- THE TRANSPONDER, 1 MILLION, THE TANGIBLE ASSETS

23   OF 59, THE WORK FORCE OF 2.4 MILLION, I THINK IT WAS, THAT

24   WAS -- AS ANALYZED BY AND DETERMINED BY DELOITTE & TOUCHE.

25             I WANT TO TALK ABOUT THIS 347 MILLION.  AND YOU HAVE A

1    BUNCH OF ITEMS UNDER THAT THAT YOU SAY THAT INCLUDES.  DO YOU

2    SEE THAT?  YOU TALKED ABOUT THAT THIS MORNING.

3    **A.**    I DID.

4    **Q.**    OKAY.  AND YOU POINT OUT THAT THIS 347 MILLION INCLUDES

5    DR. VERDIELL'S USE -- RIGHT TO USE THE RADIANCE INVENTION.

6    THAT -- THAT IS THE -- THAT'S PART OF THE INTELLECTUAL PROPERTY

7    THAT WE'RE -- WE'RE TALKING ABOUT HERE, THE -- THE PATENTS IN

8    SUIT?

9    **A.**    WELL, WHO'S TALKING ABOUT -- ARE WE TALKING ABOUT MR. --

10   WHAT MR. REGAN'S TALKING ABOUT?  WHO -- WHO ARE WE TALKING

11   ABOUT?  THIS IS MR. REGAN'S ANALYSIS, SO-CALLED ANALYSIS, THE

12   VALUE OF LIGHTLOGIC'S INTELLECTUAL PROPERTY.

13   **Q.**    UM-HMM.

14   **A.**    SO MY POINT IN THE FIRST POINT YOU JUST BROUGHT UP IS,

15   INCLUDED IN THAT IS DR. VERDIELL'S USE RIGHTS TO THE RADIANCE

16   INVENTIONS, WHICH YOU'RE RIGHT, THAT'S WHAT I HAVE PLACED A

17   VALUE ON, MR. SHUM AND DR. VERDIELL'S USE RIGHTS UNDER THE PLAN

18   OF LIQUIDATION.

19   **Q.**    OKAY.  SO THE PATENTS IN SUIT ARE PART OF THAT

20   347 MILLION?

21   **A.**    THE PATENT -- DR. VERDIELL'S USE RIGHTS TO THE RADIANCE

22   TECHNOLOGY AS MANIFESTED IN SOME PATENTS THAT HAVE ISSUED AT

23   THAT POINT IN TIME ARE IN THAT 347 MILLION.

24   **Q.**    AGAIN, I'M ASKING A DIFFERENT QUESTION.  AREN'T THE

25   PATENTS INCLUDED IN THAT 347 MILLION?

 1    A.    AGAIN, I -- THE PATENTS THAT ISSUE -- THAT HAD ISSUED AT

 2    THAT POINT IN TIME, I THINK THERE'S THREE -- I THINK THERE'S

 3    OTHER PATENTS THAT ISSUED, TOO, THAT AREN'T AT ISSUE IN THIS

 4    PARTICULAR DISPUTE, BUT THE THREE AT -- AT ISSUE, IF YOU WILL,

 5    ARE RADIANCE, DBC, AND/OR FLEXURE PATENTS.  THREE HAD ISSUED AT

 6    THIS TIME, AND DR. VERDIELL'S USE RIGHTS FOR THAT TECHNOLOGY

 7    ARE INCLUDED IN THE 347 MILLION.

 8    Q.    OH, I SEE.  BECAUSE YOU'RE SAYING THAT -- THAT INTEL

 9    DIDN'T ACTUALLY HAVE A PATENT, THEY JUST ACQUIRED A -- MR. --

10    MR. VERDIELL'S USE RIGHTS.

11    A.    I'VE ASSUMED THAT DR. VERDIELL ACQUIRED -- OR

12    DR. VERDIELL SIGNED TO INTEL -- OR LIGHTLOGIC, I GUESS,

13    TECHNICALLY ASSIGNED TO INTEL, DR. VERDIELL'S USE RIGHTS UNDER

14    THE PLAN OF LIQUIDATION.  YES.

15    Q.    OKAY.

16          AND YOU'RE SAYING THAT THE 347 MILLION ALSO INCLUDES

17    LAWFUL IMPROVEMENTS TO RADIANCE.  WHAT DO YOU MEAN BY "LAWFUL

18    IMPROVEMENTS"?

19    A.    WELL, IT'S MY UNDERSTANDING AND/OR ASSUMPTION THAT

20    IMPROVEMENTS HAS -- HAVE BEEN MADE THAT WOULD NOT CONSTITUTE

21    WORK BY MR. SHUM AND HIS CONTRIBUTIONS.  IN OTHER WORDS, UNDER

22    MY ASSUMPTION FROM THE PLAN OF LIQUIDATION, DR. VERDIELL HAS

23    USE RIGHTS TO THE ORIGINAL RADIANCE IP AND CAN MAKE

24    IMPROVEMENTS ON THAT WITHOUT THE DUTY TO DISCLOSE AND HAS,

25    UNDER THE PLAN OF LIQUIDATION, THE RIGHT TO DO SO.

1    Q.    ISN'T IT TRUE, THOUGH, WITHOUT THE UNDERLYING RADIANCE

2    TECHNOLOGY, THE FUNDAMENTAL FLEXURE AND STEP INVENTIONS IN

3    PARTICULAR, THESE IMPROVEMENTS ON THE RADIANCE TECHNOLOGY WOULD

4    NOT HAVE HAD VALUE -- WOULD HAVE HAD LITTLE VALUE?

5    A.    WELL, I THINK -- I THINK AS A GENERAL RULE THE STEP

6    FUNCTION AND THE FLEXURE TECHNOLOGY, BY MY CALCULATIONS, IN

7    TERMS OF THE USE RIGHTS UNDER THE PLAN OF LIQUIDATION DON'T

8    HAVE AN INCREDIBLE AMOUNT OF VALUE.  SO, I MEAN, IF YOU START

9    WITH THAT PREMISE, EVEN THE IMPROVEMENTS TO THEM, AGAIN, UNDER

10   THE PLAN OF LIQUIDATION, DR. VERDIELL'S ALLOWED TO DO THAT

11   UNDER MY ASSUMPTION.

12   Q.    SO --

13   A.    AS IS MR. SHUM.

14   Q.    OKAY.  SO YOU -- HAVE YOU READ THE INTEL INTERNAL BOARD

15   DOCUMENTS EXPLAINING WHY THEY WANTED TO BUY LIGHTLOGIC AND THE

16   RELIANCE -- THEIR EXPECTED RELIANCE UPON THE FLEXURE TECHNOLOGY

17   AND THE FIBER ALIGNMENT TECHNIQUES THAT THAT ALLOWED TO DEVELOP

18   SUPER MODULES THAT WOULD ALLOW EFFICIENT OPTICAL COUPLING AND

19   LONG-RANGE TRANSMISSION BECAUSE OF INCREASED POWER OUTPUT

20   THROUGH THE TRANSPONDERS?

21   A.    I'VE READ QUITE A BIT OF INTEL --

22   Q.    OKAY.

23   A.    -- DOCUMENTATION AND THE SO-CALLED LICORICE BOOK THAT

24   TALKS ABOUT A NUMBER OF DIFFERENT REASONS WHY INTEL'S

25   INTERESTED IN ACQUIRING LIGHTLOGIC, INCLUDING THE STRATEGIC

1   VALUE DRIVER OF BEING THE EMPLOYEES, THE ASSEMBLED WORK FORCE.

2   **Q.**    OH, THE ASSEMBLED WORK FORCE THAT'S BEEN VALUED AT

3   2.4 MILLION, RIGHT?

4   **A.**    NO, IT HAS NOT, MR. JANSEN.  WE JUST DISAGREE ON THAT

5   POINT.

6   **Q.**    WE DO.

7   **A.**    IT ABSOLUTELY HAS NOT BEEN VALUED AT $2.4 MILLION.

8   **Q.**    NOW --

9          **MR. JANSEN:**  IF WE COULD -- JEFF --

10          (OFF-THE-RECORD DISCUSSION.)

11          **MR. JANSEN:**  THANKS VERY MUCH.

12          (EXHIBIT PUBLISHED TO JURY.)

13   **BY MR. JANSEN:**

14   **Q.**    THE -- WHATEVER IMPROVEMENTS WERE MADE TO RADIANCE IP AND

15   LAWFUL -- WHATEVER, THAT'S KIND OF AN ADJECTIVE I'LL LIVE

16   WITH -- THOSE IMPROVEMENTS WERE -- WERE FUNDED AND PAID FOR BY

17   THE INVESTMENT MONEY THAT CAME IN TO LIGHTLOGIC STARTING IN

18   JULY 1998 AND THEREAFTER IN THE SUBSEQUENT ROUNDS OF B AND C

19   ROUNDS OF FINANCING, CORRECT?

20   **A.**    GENERALLY, THAT'S TRUE.

21   **Q.**    AND GOING TO THE NEXT POINT, YOUR STATEMENT THAT THE

22   347 -- YOUR OPINION THAT THE $347 MILLION THAT'S LEFT OVER

23   INCLUDES A TECHNICAL TEAM AND ITS INTELLECTUAL CAPITAL.  AND

24   YOU JUST DISAGREE THAT -- WITH THE DELOITTE & TOUCHE STATEMENT

25   THAT THE COST OF REPLACING THE WORK FORCE IS 2.4.  YOU THINK

1   THAT THAT -- THERE'S SOME -- SOME ELEMENT OF WORK FORCE THAT'S

2   INCLUDED IN THIS GOODWILL NUMBER, THIS -- THIS $347 MILLION

3   REMAINDER; IS THAT RIGHT?

4   **A.**   I -- THAT IS ACTUALLY A FACT THAT THE -- THE ASSEMBLED

5   WORK FORCE VALUE IS INCLUDED IN THE GOODWILL PORTION OF THE D&T

6   REPORT.

7   **Q.**   NOW, ISN'T IT TRUE THAT THIS TECHNICAL TEAM AND ITS --

8   AND ITS, QUOTE, "INTELLECTUAL CAPITAL," THAT'S KNOWLEDGE THAT

9   THE PEOPLE HAVE IN THEIR HEADS, RIGHT?

10  **A.**   THAT THEY HAVE GAINED THROUGH EXPERIENCE ELSEWHERE AS

11  WELL AS WORKING AT LIGHTLOGIC, THAT'S CORRECT.

12  **Q.**   OKAY.  AND THE DELOITTE & TOUCHE REPORT CALCULATED THE

13  COST OF REPLACING THOSE PEOPLE, EVEN CRITICAL EMPLOYEES --

14  SO-CALLED CRITICAL EMPLOYEES AT LIGHTLOGIC, CORRECT?

15  **A.**   IT -- DELOITTE & TOUCHE DID NOT VALUE THAT INTELLECTUAL

16  CAPITAL.  WHAT THEY VALUED IS THE COST TO REPLACE THE EFFORTS,

17  THE HEADHUNTER FEES, THE -- THE TIME THAT IT WOULD TAKE TO

18  REPLACE THAT TYPE OF ASSEMBLED WORK FORCE.  IT DOES NOT

19  CALCULATE AND IDENTIFY VALUE FOR THE WORK FORCE'S INTELLECTUAL

20  CAPITAL.

21  **Q.**   BUT THAT INCLUDED THE COST OF REPLACING EVEN EMPLOYEES?

22  **A.**   YEAH, THE 2 MILLION DOES, YES.

23  **Q.**   OKAY.

24  **A.**   THE COST TO REPLACE, NOT THEIR INTELLECTUAL CAPITAL.

25  **Q.**   NOW, THERE WAS ALSO A REFERENCE MANAGEMENT TEAM.  AND

1   THAT'S -- THE MANAGEMENT TEAM ALSO WAS INCLUDED IN THE

2   PERSONNEL THAT -- AS TO WHOM DELOITTE & TOUCHE DETERMINED THE

3   COST TO REPLACE; ISN'T THAT RIGHT?

4   **A.**    I THINK THAT'S RIGHT.  I DON'T RECALL SPECIFICALLY, BUT

5   I -- I ASSUME IT WOULD BE --

6   **Q.**    OKAY.

7   **A.**    -- IN THE COST TO REPLACE.

8   **Q.**    SO THE DELOITTE & TOUCHE VALUE FOR THE ASSEMBLED WORK

9   FORCE OF $2.4 MILLION INCLUDED THE COST OF REPLACING MANAGEMENT

10  PEOPLE AND OTHER CRITICAL EMPLOYEES.

11  **A.**    IT INCLUDED THE COST TO REPLACE, NOT THEIR INTELLECTUAL

12  CAPITAL, NOT THE VALUE -- TRUE VALUE THAT THEY BRING TO A

13  COMPANY LIKE -- LIKE LIGHTLOGIC.  SORRY.

14  **Q.**    NOW, YOU ALSO SAY THAT MR. SHUM'S LACK OF CONTRIBUTION IS

15  IGNORED HERE.  I'LL PASS OVER THAT ONE.  I DIDN'T UNDERSTAND

16  THAT, BUT IT DOES NOT -- YOU'RE SAYING IT DOES NOT VALUE

17  EXCLUSIVITY WITH RESPECT TO THE RADIANCE, DBC, FLEXURE

18  INVENTIONS.

19       AND I GUESS MY QUESTION HERE IS REALLY THE $347 MILLION

20  THAT'S LEFT OVER THERE, WHATEVER IS IN THAT PART OF THE PIE

21  OTHER THAN THE ACTUAL, YOU KNOW, THE RADIANCE TECHNOLOGY, THE

22  RADIANCE INVENTIONS THAT ARE THE SUBJECT OF THIS LAWSUIT, THAT

23  WAS GROWTH -- BUSINESS GROWTH THAT CAME FROM -- THE RESULT OF

24  BUSINESS GROWTH THAT CAME FROM INVESTMENT MONEY THAT CAME INTO

25  THE COMPANY, RIGHT?

1    **A.**    OH, IT CAME FROM A NUMBER OF DIFFERENT ITEMS.  I MEAN,

2    INVESTMENT MONEY HELPED TO FUND -- I WOULD AGREE WITH

3    ACTIVITIES LIKE ON THIS TIME LINE, BUT THERE HAS BEEN A

4    SUBSTANTIAL AMOUNT OF EFFORT AND TIME AND TRIAL AND ERROR THAT

5    HAS GONE ON BETWEEN 1998 AND 2001, WHICH IS WHY I BELIEVE 1998

6    IS A BETTER WAY TO LOOK AND MORE APPROPRIATE WAY TO LOOK AT THE

7    TECHNOLOGY AT ISSUE.

8    **Q.**    THE -- THE ENGINEERS THAT WERE HIRED AT LIGHTLOGIC WERE

9    HIRED WITH THE INVESTMENT MONEY THAT CAME INTO LIGHTLOGIC,

10   CORRECT?

11   **A.**    THEY WERE HIRED, I ASSUME, BY DR. VERDIELL AND HIS TEAM

12   AND INTERVIEWED AND LOOKED AT POTENTIALLY THEIR BACKGROUND AS

13   TO A FIT WITHIN THE OVERALL ORGANIZATION.  IN TERMS OF HOW THEY

14   WERE PAID, THEY WERE PAID BY THE COMPANY.  AND IF YOUR QUESTION

15   IS HOW WAS THE COMPANY FUNDED, THERE WERE INVESTORS ALONG THE

16   WAY THAT PUT MONEY INTO THE COMPANY.

17   **Q.**    OKAY.  AND TECHNICAL IMPROVEMENT, TO THE EXTENT THERE

18   WERE ANY, DEVELOPMENTAL PROCESSES WERE PAID FOR BY INVESTMENT

19   CAPITAL, CORRECT?

20   **A.**    SINCE THE COMPANY DIDN'T HAVE ANY OTHER SOURCE OF FUNDS,

21   THERE'S NOT A DIRECT LINK THERE, BUT THE INVESTORS INVESTED IN

22   THE COMPANY AND THEN THE COMPANY OBVIOUSLY PAID A FEE, THE

23   PAYROLL, AND SO THOSE IMPROVEMENTS CAME AS A RESULT OF

24   ACTIVITIES OF THOSE INDIVIDUALS.

25   **Q.**    OKAY.  AND THE INVESTMENT MONEY THAT CAME INTO THE

1    COMPANY AND BASICALLY FUNDED THE -- ALL OF THEIR ASPECTS OF

2    DEVELOPMENTS OF LIGHTLOGIC TO THE POINT WHERE IT WAS -- COULD

3    BE PURCHASED BY INTEL FOR $409 MILLION, CORRECT?

4    **A.**    WELL, I WOULDN'T SAY THAT'S EXACTLY THE CASE.  I COULD

5    THINK OF EXAMPLES WHERE THE INVESTMENT MONEY DIDN'T FUND.  FOR

6    EXAMPLE, I KNOW A COUPLE OF PEOPLE WHO WORKED ON HALF SALARY OR

7    NO SALARY DURING THE TIME PERIOD.  SO THAT MONEY DIDN'T COME

8    FROM INVESTORS.  THEY ACTUALLY -- I CALL IT SWEAT EQUITY.  THEY

9    PUT SOME SWEAT EQUITY INTO THE COMPANY AS WELL.

10   **Q.**    NOW, YOU SAID THAT -- I THINK YOU TESTIFIED THAT -- THAT

11   THE INTELLECTUAL CAPITAL OF THE EMPLOYEES, THAT SOME ASPECT OF

12   EMPLOYEES, THE WORK FORCE, IS NOT INCLUDED IN THE 2.4 NUMBER

13   BUT IS INSTEAD IN GOODWILL.

14   **A.**    THAT -- THAT IS CORRECT, THAT IT IS IN GOODWILL.

15   **Q.**    OKAY.  AND WHERE -- WHERE SPECIFICALLY --

16   **A.**    NOT SOME ASPECTS, LITERALLY ALL OF THE INTELLECTUAL

17   CAPITAL IS IN THE GOODWILL.

18   **Q.**    I THINK YOU HAVE THE DELOITTE & TOUCHE REPORT IN FRONT OF

19   YOU.  COULD YOU POINT TO ME WHERE IN THAT REPORT IT STATES THAT

20   INTELLECTUAL CAPITAL, THAT IS, THE WORK FORCE, IS SOMEHOW

21   INCLUDED IN GOODWILL AS OPPOSED TO WHAT WAS VALUED BY

22   DELOITTE & TOUCHE AS $2.4 MILLION?

23   **A.**    SO YOU WANT ME TO GO THROUGH THIS 80-PAGE REPORT,

24   MR. JANSEN, AND SEE IF I CAN IDENTIFY THAT?

25   **Q.**    YOU'VE REVIEWED THIS BEFORE.  YOU SEEM LIKE YOU'RE VERY

1  FAMILIAR WITH IT.

2  **A.**   WELL, I'M NOT THAT FAMILIAR.  BUT, I MEAN, I CAN TAKE

3  YOUR TIME, IF YOU'D LIKE.

4                    (SIMULTANEOUS COLLOQUY.)

5            **THE WITNESS:**  I THINK MY RESPONSE –– I'M SORRY.

6  **BY MR. JANSEN:**

7  **Q.**   GO AHEAD.

8  **A.**   MY RESPONSE WOULD BE IF BY, IF YOU WILL, SUBTRACTION,

9  BECAUSE DELOITTE & TOUCHE CLEARLY STATES THAT THE $2.4 MILLION

10  COMES AS A RESULT OF THE COST TO REPLACE THAT WORK FORCE.

11        I DON'T KNOW HOW ELSE WE CAN GET OFF THIS POINT BECAUSE

12  IT CLEARLY STATES THAT, AND THAT THE –– THE $2.4 MILLION ONLY

13  REPRESENTS THE TIME, THE RECRUITING TO GO OUT AND FIND PEOPLE

14  TO PUT 50 ENGINEERS TOGETHER, AND OTHER INDIVIDUALS.

15        WHAT IT DOESN'T CAPTURE IS THE FACT THAT THESE

16  INDIVIDUALS IN THE WORK FORCE HAVE BEEN WORKING TOGETHER FOR

17  THREE-PLUS YEARS IN TRIAL AND ERROR WORKING WITH PRODUCTS, NOT

18  WORKING WITH PRODUCTS, PRODUCTS THAT SUCCEED, PRODUCTS THAT MAY

19  FAIL, PUTTING TOGETHER EQUIPMENT, ORDERING SPECIALIZED

20  EQUIPMENT.  THERE'S JUST A LOT OF INFORMATION AND A LOT OF

21  ACTIVITIES THAT THIS WORK FORCE PERFORMED OVER THOSE YEARS.

22  **Q.**   OKAY.  SO IT'S NOT EXPRESSLY STATED ANYWHERE IN THE

23  DELOITTE & TOUCHE REPORT.  IT'S BY SUBTRACTION YOU GET THAT?

24  **A.**   WELL, IT MAY BE.  I MEAN, I COULD LOOK FOR IT IF YOU'D

25  LIKE, BUT CERTAINLY AS JUST AN OVERALL PREMISE, THAT IS –– THAT

 1    IS THE CASE.

 2    Q.    OKAY.  YOU CAN SET THAT ASIDE.

 3         NOW, I WANT TO MOVE NOW TO YOUR CRITICISM OF

 4    MR. LASINSKI'S APPROACH.  MR. LASINSKI -- MR. LASINSKI

 5    OPERATED, DIDN'T HE, ON THE ASSUMPTION THAT THE PRIMARY ASSET

 6    OF LIGHTLOGIC, WHEN IT FIRST RECEIVED INVESTMENT FUNDING, WAS

 7    THE RADIANCE INTELLECTUAL PROPERTY, THE INTELLECTUAL PROPERTY

 8    FROM BEFORE THE -- THE PLAN OF LIQUIDATION?

 9    A.    I RECALL MR. LASINSKI SUGGESTING THAT THE FUNDING OF

10    INVESTORS CAME AS A RESULT -- I -- I DON'T RECALL, QUITE

11    HONESTLY.  I HAVE TO REFRESH MY MEMORY AS TO HIS OVERALL

12    PREMISE.

13    Q.    OKAY.  AND FURTHER, THAT THE GROWTH OF LIGHTLOGIC AS A

14    BUSINESS AND THE DEVELOPMENT OF THAT INTELLECTUAL PROPERTY WAS

15    PAID FOR BY THE INVESTMENT MONEY.  THAT WAS PART OF HIS -- THAT

16    WAS ONE OF HIS ASSUMPTIONS AS WELL, CORRECT?

17    A.    I DON'T RECALL.  BUT, AGAIN, WE TALKED ABOUT THE FACT

18    THAT INVESTORS PUT MONEY INTO THE COMPANY.  THERE'S ALSO SWEAT

19    EQUITY, BUT THAT'S --

20    Q.    AND YOU AGREE THAT THE PREDOMINANT AMOUNT OF THE GROWTH

21    OF THE COMPANY WAS FROM THE INVESTMENT CAPITAL THAT ALLOWED THE

22    HIRING OF EMPLOYEES AND THE DEVELOPMENT OF PRODUCT, THE

23    IMPROVEMENT OF THE TECHNOLOGY TO THE POINT WHERE THE COMPANY

24    COULD GROW TO WHAT IT BECAME IN 2001?

25              MS. GRANT:  ASKED AND ANSWERED, YOUR HONOR.  WE'VE

1   COVERED THIS.

2   **BY MR. JANSEN:**

3   **Q.**    IS THAT TRUE?

4           **THE COURT:**  ASK ANOTHER QUESTION.

5   **BY MR. JANSEN:**

6   **Q.**    LET ME JUST ASK.  LASINSKI -- MR. LASINSKI DID APPLY AN

7   AVERAGE RATE OF RETURN, CORRECT?  HE SUBTRACTED AN AVERAGE RATE

8   OF RETURN THAT HE FELT INVESTORS SHOULD GET -- LET'S JUST BACK

9   UP JUST A SECOND.

10          THERE WAS A TOTAL $409 MILLION PURCHASE, CORRECT?

11  **A.**    YES.

12  **Q.**    AND MR. LASINSKI RECOGNIZED THAT THIS WAS PAID FOR BY --

13  THE GROWTH -- THE GROWTH OF THAT COMPANY WAS PAID FOR BY

14  INVESTMENT MONEY PUT IN BY INVESTORS, AND HE SUBTRACTED OUT ALL

15  OF THE MONEY PUT IN BY THE INVESTORS THAT PAID FOR THE

16  DEVELOPMENT OF RADIANCE.  HE SUBTRACTED ALL THAT MONEY,

17  CORRECT?

18  **A.**    SO I HAVE TROUBLE WITH YOUR QUESTION, MR. JANSEN, NOT TO

19  QUIBBLE.  YOU MAKE STATEMENTS.  THEN YOU ASK A QUESTION.  SO IF

20  YOUR QUESTION IS DID MR. LASINSKI SUBTRACT OUT THE MONEY THAT

21  INVESTORS PUT INTO LIGHTLOGIC, I WOULD AGREE WITH THAT

22  STATEMENT.

23  **Q.**    OKAY.

24  **A.**    HE DID SUBTRACT THAT OUT.

25  **Q.**    AND THAT WAS MONEY THAT WAS USED TO BUILD LIGHTLOGIC INTO

1    THE $409 MILLION ENTITY IT WAS FROM THE STARTUP THAT EXISTED

2    WHEN MR. VERDIELL FIRST GOT FINANCING IN AUGUST 1998?

3              **MS. GRANT:**  YOUR HONOR, I REALLY MUST OBJECT.  THIS

4    HAS BEEN ASKED AND ANSWERED SEVERAL TIMES NOW.

5              **THE COURT:**  ASK ANOTHER QUESTION.

6    **BY MR. JANSEN:**

7    **Q.**   DO YOU AGREE MR. LASINSKI DID APPLY AVERAGE RATES OF

8    RETURN -- HE DEDUCTED AVERAGE RATES OF RETURN THAT WERE

9    APPROPRIATE -- THAT WERE -- HE CORRECTLY APPLIED AVERAGE RATES

10   OF RETURN AND SUBTRACTED THOSE IN ADDITION FROM THE

11   $409 MILLION, AND -- AND HE USED NUMBERS THAT WERE FROM A

12   PUBLISHED STUDY THAT HAS BEEN ACCEPTED BY THE AMERICAN

13   INSTITUTE OF C.P.A.'S?

14   **A.**   WOW, THAT WAS A LONG QUESTION.

15        I DON'T AGREE WITH SOME OF YOUR QUESTION.  I WILL STATE

16   WHAT I UNDERSTAND MR. LASINSKI DID, IS HE USED AN ARTICLE THAT

17   TRIED TO CALCULATE THE AVERAGE RATE OF RETURN FOR VC'S.  I

18   THINK IT DATED BACK IN THE 1980'S.  AND HE APPLIED THAT

19   SO-CALLED AVERAGE RATE OF RETURN TO THE MONEY THAT LIGHTLOGIC

20   INVESTORS HAD PUT INTO THE COMPANY OVER TIME.  I THINK THAT'S

21   WHAT HE -- THAT'S MY UNDERSTANDING OF WHAT HE DID.

22   **Q.**   AND DO YOU UNDERSTAND THAT THE RATES HE USED WERE IN FACT

23   RATES THAT ARE TYPICAL AVERAGE RATES OF RETURN THAT WERE IN

24   FACT EXPERIENCED IN THE LATE 1990'S BY VENTURE CAPITALISTS THAT

25   INVESTED IN THE COMPANY?

1    A.    I DON'T HAVE THAT UNDERSTANDING, NO.

2    Q.    LET ME SHOW YOU --

3          MR. JANSEN:  IF I COULD TURN THE OVERHEAD ON,

4    PLEASE.

5    BY MR. JANSEN:

6    Q.    MR. LASINSKI, I'M GOING TO PUT UP VERY QUICKLY -- I MEAN,

7    MR. NAPPER, I'M SORRY.  I'M GOING TO PUT UP VERY QUICKLY --

8    A.    NO OFFENSE TAKEN.

9    Q.    I'M GOING TO PUT UP VERY QUICKLY A STUDY -- SUMMARY OF

10   WHAT -- A SUMMARY OF WHAT MR. LASINSKI PRESENTED WHEN HE

11   TESTIFIED.

12              (EXHIBIT PUBLISHED TO JURY.)

13   BY MR. JANSEN:

14   Q.    AND HE BASICALLY SAID IT WOULD BE APPROPRIATE -- HIS --

15   HIS TESTIMONY WAS HE FELT IN HIS OPINION IT WOULD BE

16   APPROPRIATE TO DEDUCT NOT ONLY -- FROM THE $409 MILLION, NOT

17   ONLY THE AMOUNT OF MONEY THAT WAS INVESTED BY THE VENTURE

18   CAPITALISTS, BUT ALSO AN AVERAGE OR REASONABLE RATE OF RETURN

19   THAT WAS APPROPRIATE FOR EACH LEVEL OF THE INVESTORS, DEPENDING

20   ON THE RISK OF WHETHER THEY WERE A SERIES A, EARLY SEED

21   INVESTORS, OR LATER INVESTORS.

22         THIS IS THE STUDY HE -- HE -- HE USED.  AND I'M GOING TO

23   SHOW YOU THE NEXT PAGE WHICH IS HIS CALCULATION OF -- OF THE

24   ACTUAL RATES OF RETURN THAT HE APPLIED --

25              MS. GRANT:  I'M GOING TO OBJECT THAT'S NOT THE

1    ACTUAL RATES OF RETURN, SO MISLEADING.

2    **BY MR. JANSEN:**

3    **Q.**    THIS SHOWS THE ACTUAL -- THE RATE OF RETURN THAT HE

4    APPLIED AS A REASONABLE RATE OF RETURN BASED ON THE INFORMATION

5    HE BELIEVED WAS APPROPRIATE TO DETERMINE THE RATE OF RETURN.

6    AND YOU SEE HE APPLIED A 50-PERCENT ANNUAL RATE OF RETURN ON

7    INVESTMENTS AT THE C LEVEL, PEOPLE THAT INVESTED IN MAY 2001.

8    DO YOU SEE THAT?

9    **A.**    I SEE THAT.

10   **Q.**    AND FOR PEOPLE THAT INVESTED -- THE INVESTORS THAT

11   INVESTED IN THE B ROUND, HE APPLIED A 60-PERCENT RATE OF

12   RETURN.  DO YOU SEE THAT?

13   **A.**    THAT'S RIGHT.

14   **Q.**    OKAY.

15   **A.**    HE DOESN'T ACTUALLY LABEL IT, BUT I KNOW THE GENERAL

16   AMOUNT OF --

17   **Q.**    OKAY.  HE USED THE HIGHER -- EVEN HIGHER RATES OF RETURN

18   FOR THE INVESTOR THAT INVESTED IN THE B -- THE A ROUND IN

19   AUGUST OF 1998, AND THE -- THE ANGEL INVESTOR WHO INVESTED IN

20   MAY OF -- IN MARCH OF 1998.

21        DO YOU SEE THAT HE WENT TO 70-PERCENT AND 80-PERCENT

22   ANNUAL RATE OF RETURN THAT HE -- HE CALCULATED?

23   **A.**    DO I SEE THAT MATH?  YES.

24   **Q.**    OKAY.  DID HE -- WAS -- DID HE DO ANYTHING WRONG IN THAT

25   MATH?

1    A.    I DON'T KNOW IF I CHECKED THE MATH SO --

2    Q.    YOU DIDN'T CHECK THE MATH.  OKAY.

3          NOW, YOU BELIEVE THAT'S -- THOSE NUMBERS ARE NOT -- YOU

4    BELIEVE THOSE NUMBERS DO NOT REFLECT THE AVERAGE RATES OF

5    RETURN THAT WERE BEING EXPERIENCED BY VENTURE CAPITALISTS IN

6    THAT PERIOD OF TIME?

7    A.    I HAVE -- I DON'T BELIEVE THAT AN ARTICLE OR EVEN A STUDY

8    WOULD SUGGEST THAT YOU COULD SUPERIMPOSE THAT ON THE RATE OF

9    RETURN BY VENTURE CAPITALISTS IN ANY KIND OF VENTURE IN ANY

10   KIND OF INDUSTRY IMAGINABLE.  I JUST DON'T THINK THAT'S

11   FEASIBLE.

12         AND BESIDES WHICH HE HAS ACTUAL RATE OF RETURN, SO I

13   DON'T KNOW WHY HE DOESN'T USE THAT.

14   Q.    WELL, IF YOU USE THE ACTUAL -- THE ACTUAL RATE OF RETURN

15   TO THE INVESTORS, ALL THE INVESTORS, WAS $409 MILLION, RIGHT?

16   A.    NO.  THE ONES WE'RE TALKING ABOUT FOR THE LIGHTLOGIC

17   INVESTORS, I THINK IT WOULD BE SOMEWHERE IN THE NEIGHBORHOOD OF

18   200, 240 MILLION, SOMETHING LIKE THAT.

19   Q.    ALL THE SHAREHOLDERS IN THE COMPANY ALL TOGETHER GOT

20   $409 MILLION DISTRIBUTED?

21   A.    THAT'S TRUE, YES.

22   Q.    I WANT TO SHOW YOU THE TESTIMONY THAT WAS GIVEN BY

23   MR. BRUCE GRAHAM, TUESDAY, REGARDING THE -- THE AVERAGE RATE OF

24   RETURN HE RECEIVED AS AN INVESTOR RUNNING VC FUNDS.  HE

25   TESTIFIED IN RESPONSE TO A QUESTION FROM MR. TANGRI CONCERNING

1    HIS EXPERIENCE.

2              "A.  YOU MAKE MORE MONEY THAN YOU PUT

3              IN.  I'VE GENERATED ABOUT 60-PERCENT RATE

4              OF RETURN OVER MY CAREER AND RETURNED ABOUT

5              THREE AND A HALF TIMES CAPITAL THAT I

6              INVEST IN.  THAT'S A PRETTY GOOD RESULT."

7         DO YOU UNDERSTAND THAT MR. GRAHAM WAS A SERIES B

8    INVESTOR?

9    **A.**   I HAVE THAT UNDERSTANDING, YES.

10   **Q.**   SO THIS NUMBER, 60 PERCENT, IS PRETTY MUCH IN LINE WITH

11   THE AVERAGE RATE OF RETURN FIGURE THAT MR. LASINSKI APPLIED,

12   ISN'T IT?

13   **A.**   WELL, I DON'T KNOW.  IF YOU COMPARE APPLES AND ORANGES,

14   MR. GRAHAM HAS HIS OWN PORTFOLIO OF WHAT HE'S INVESTING IN.

15   THAT'S HIS OWN PERSONAL RETURN ON INVESTMENT.

16              **MR. JANSEN:**  THANKS VERY MUCH, MR. NAPPER.  I HAVE

17   NO FURTHER QUESTIONS RIGHT NOW.

18              **THE WITNESS:**  THANK YOU, MR. JANSEN.  GOOD TO SEE

19   YOU AGAIN.

20              (OFF-THE-RECORD DISCUSSION.)

21              <u>REDIRECT EXAMINATION</u>

22   **BY MS. GRANT:**

23   **Q.**   GOOD AFTERNOON, MR. NAPPER.

24   **A.**   HI, MS. GRANT.

25              **MS. GRANT:**  CAN WE HAVE SLIDE 27, JEFF?

```
 1              (EXHIBIT PUBLISHED TO JURY.)

 2    BY MS. GRANT:

 3    Q.    DID MR. LASINSKI USE THE RATE OF RETURN THAT THE

 4    LIGHTLOGIC INVESTORS ACTUALLY GOT OUT OF THE DEAL?

 5    A.    HE DID NOT.  AS I JUST EXPLAINED, HE USED THIS KIND OF

 6    AVERAGE TYPE OF RATE OF RETURN AS OPPOSED TO THE ACTUAL RATE OF

 7    RETURN WHICH IS SHOWN ON THIS CHART.

 8    Q.    DO YOU HAVE AN UNDERSTANDING HE WOULDN'T -- WHY HE WOULD

 9    IGNORE WHAT THE INVESTORS ACTUALLY GOT?

10    A.    NOT REALLY, NO.

11    Q.    WAS THAT INFORMATION AVAILABLE TO HIM?  COULD HE HAVE

12    CALCULATED THE ACTUAL RATE OF RETURN?

13    A.    I -- I WOULD THINK HE WOULD BE ABLE TO DO THAT, YES.

14    Q.    AND WHERE WOULD THAT INFORMATION -- WHERE IS THAT

15    LOCATED?

16    A.    IT'S IN THE DOCUMENTS PRODUCED RELATED TO THE INTEL

17    ACQUISITION OF LIGHTLOGIC.

18    Q.    OKAY.

19          NOW, COUNSEL, AT THE BEGINNING OF YOUR EXAMINATION, HE

20    ASKED YOU SOME QUESTIONS ABOUT AN ASSIGNMENT DOCUMENT, I GUESS

21    MANY QUESTIONS ABOUT IT, AND IT WAS DATED APRIL 10TH, 1999,

22    WHERE DR. VERDIELL TRANSFERRED HIS RIGHTS TO HIS COMPANY.

23          HAVE YOU SEEN ANY EVIDENCE IN THE RECORD THAT MR. SHUM

24    TRIED TO EXPLOIT HIS RIGHTS TO THE RADIANCE IP AFTER

25    APRIL 1999?
```

NAPPER - REDIRECT / GRANT

1    A.    YES.

2    Q.    AND WHAT EVIDENCE HAVE YOU SEEN THAT AFTER ASSIGNMENT

3    DOCUMENTS WERE DONE THAT MR. SHUM TRIED TO EXPLOIT HIS RIGHTS

4    IN THE RADIANCE INTELLECTUAL PROPERTY?

5    A.    I DESCRIBED ONE SUCH INSTANCE WHICH IS THE GIGABIT OPTICS

6    AND MR. SHUM'S INTERACTION WITH MR. JENKIN -- I'M SORRY,

7    MR. RICHARD IN TERMS OF POTENTIALLY SELLING HIS RIGHTS UNDER

8    THE PLAN OF LIQUIDATION IN 2001 TO GIGABIT OPTICS.

9    Q.    AND DO YOU HAVE AN UNDERSTANDING AS TO WHETHER THAT OFFER

10   THAT MR. SHUM MADE TO SELL HIS RIGHTS TO GIGABYTE -- GIGABIT IN

11   OCTOBER OF 2001, DID THAT ALSO INCLUDE THAT HE WOULD TRANSFER

12   HIS RIGHTS TO THE RADIANCE IP TO GIGABIT?

13   A.    I'M ASSUMING THAT'S HOW THE TRANSACTION WOULD HAVE TAKEN

14   PLACE, HE WOULD ASSIGN HIS RIGHTS.

15   Q.    SO MR. SHUM OBVIOUSLY THOUGHT HE STILL HAD RIGHTS TO SELL

16   IN AUGUST OF 2001 DESPITE THE ASSIGNMENT DOCUMENTS, RIGHT?

17           MR. JANSEN:  OBJECTION.  LEADING.

18           MS. GRANT:  I'LL REPHRASE.

19   BY MS. GRANT:

20   Q.    IS IT YOUR UNDERSTANDING THAT DESPITE ALL THESE

21   ASSIGNMENT DOCUMENTS, MR. SHUM STILL THOUGHT HE HAD RIGHTS TO

22   SELL?

23           MR. JANSEN:  THAT'S STILL LEADING.

24           THE COURT:  YOU CAN ASK LEADING QUESTIONS IF THAT'S

25   WHAT WE NEED AS A PREMISE.  SO YOU CAN ASK THAT QUESTION.

```
 1              GO AHEAD AND ANSWER IT.

 2              THE WITNESS:  WELL, IT ACTUALLY WOULD DICTATE THAT

 3   HE BELIEVED HE STILL HAD RIGHTS UNDER THE PLAN OF LIQUIDATION.

 4   I'M NOT A MIND-READER.  I DON'T KNOW WHAT MR. SHUM WAS

 5   THINKING, BUT HIS ACTION WOULD INDICATE THAT HE HAD RIGHTS

 6   UNDER THE PLAN OF LIQUIDATION.

 7   BY MS. GRANT:

 8   Q.   DO YOU KNOW -- YOU MENTIONED ABOUT -- DO YOU KNOW WHEN

 9   SOMEONE SIGNS AN ASSIGNMENT DOCUMENT, ARE THEY ASSIGNING THEIR

10   RIGHTS OR ANYONE ELSE'S RIGHTS?

11   A.   I'M ASSUMING FROM A GENERAL --

12              MR. JANSEN:  OBJECTION, YOUR HONOR.  CALLS FOR A

13   LEGAL CONCLUSION.

14              MS. GRANT:  I'M SORRY, YOUR HONOR.  HE ASKED HIM

15   MANY QUESTIONS ABOUT THE ASSIGNMENTS.

16              THE COURT:  OVERRULED.

17   BY MS. GRANT:

18   Q.   GO AHEAD.

19   A.   FROM A GENERAL PREMISE, NON-LEGAL PREMISE, IF YOU WILL, I

20   WOULD PRESUME THAT SOMEBODY IS ASSIGNING THEIR RIGHTS, IF THEY

21   HAVE RIGHTS, THEY'RE ASSIGNING THOSE RIGHTS OVER TO THE

22   COMPANY.

23   Q.   NOW, COUNSEL ASKED YOU SOME -- AGAIN, MANY QUESTIONS

24   ABOUT THE DELOITTE & TOUCHE REPORT.  YOU WERE A PARTNER AT

25   DELOITTE & TOUCHE?
```

1  A.    I WAS.  THEY CALL US A PRINCIPAL.

2  Q.    PRINCIPAL?

3  A.    BECAUSE I WAS A NON-C.P.A., BUT, YES, I WAS A PARTNER.

4  Q.    OKAY.  AND HAVE YOU ACTUALLY SPOKEN TO THE AUTHOR OF THIS

5  REPORT, I THINK HIS NAME IS MARK MAXSON?

6  A.    I -- I'VE KNOWN MARK MAXSON FOR YEARS.  HE WAS A PARTNER

7  OF MINE OVER THERE, AND WE WERE IN THE SAME GROUP, FINANCIAL

8  ADVISOR SERVICES.

9  Q.    HAVE YOU SPOKEN TO MR. MAXSON ABOUT THIS

10 DELOITTE & TOUCHE REPORT THAT WAS DONE FOR THE INTEL

11 ACQUISITION?

12 A.    I HAVE.

13 Q.    NOW, DOES THIS REPORT -- AND I APOLOGIZE, I DON'T KNOW --

14      **MS. GRANT:**  WHAT WAS THE EXHIBIT NUMBER?

15          (OFF-THE-RECORD DISCUSSION.)

16 **BY MS. GRANT:**

17 Q.    834.  SO DOES THIS DELOITTE & TOUCHE REPORT ENABLE YOU TO

18 CALCULATE THE VALUE OF THE EXCLUSIVE RIGHTS TO THE RADIANCE IP?

19 A.    NO.  THIS -- THIS REPORT IS A PURCHASE PRICE ALLOCATION

20 REPORT.  IT IS NOT HELPFUL IN VALUING WHAT I WAS ASKED TO

21 VALUE, WHICH IS THE EXCLUSIVE RIGHTS TO THE RADIANCE IP.  IT

22 JUST DOESN'T -- IT'S NOT -- SHOULD NOT BE USED FOR THAT

23 PURPOSE.  AND IT DOESN'T EVEN HAVE THE INFORMATION TO DO IT.

24 Q.    OKAY.  DID MR. REGAN SAY ANYTHING, EITHER IN HIS

25 TESTIMONY OR HIS REPORT, ABOUT HIS FEELINGS ABOUT THIS REPORT?

NAPPER - REDIRECT / GRANT

1    A.    HE DID.  YES.

2    Q.    WHAT DID HE SAY?

3    A.    MR. REGAN AGREES WITH ME THAT THIS REPORT, THIS TYPE OF

4    REPORT, SHOULD NOT BE -- IS NOT RELIABLE FOR THE PURPOSES OF

5    WHAT WE'RE ASKED TO DO HERE.

6    Q.    AND WHERE DID HE SAY THAT?

7    A.    HE SAID THAT IN HIS REPORT.  HE SAID YOU SHOULDN'T USE

8    THIS.

9    Q.    AND YET HE USES IT FOR SOME PARTS.  WHAT IS YOUR OPINION

10   OF THAT?

11   A.    YEAH, HE -- MY IMPRESSION IS HE GOES IN AND USES IT FOR

12   SOME PIECES OF INFORMATION BUT DISCARDS OTHER PIECES OF

13   INFORMATION SO -- AND OVERALL HE DOESN'T THINK IT'S RELIABLE

14   FOR THAT PURPOSE.

15   Q.    DID DELOITTE & TOUCHE -- AND YOU'VE READ THIS REPORT,

16   YOU'VE SPOKEN TO THE AUTHOR.  TO YOUR KNOWLEDGE, DID MR. REGAN

17   SPEAK WITH MR. MAXSON?

18   A.    HE DID NOT.

19   Q.    SO YOU'VE SPOKEN TO THE AUTHOR OF THIS REPORT, YOU'VE

20   REVIEWED THE REPORT, YOU'RE A FORMER PRINCIPAL AT DELOITTE &

21   TOUCHE.  DOES THIS REPORT VALUE THE LIGHTLOGIC TRANSPONDER AT

22   $1 MILLION?

23   A.    NO.  I MEAN, IT -- IT'S NOT A VALUE OF THE TRANSPONDER.

24   IT'S -- IT'S -- IT SHOULDN'T BE USED FOR THAT PURPOSE.  IT IS,

25   AGAIN, AN ALLOCATION OF A PURCHASE PRICE PAID AND AN EXERCISE

1    BASED UPON STANDARDS AND REGULATIONS AND TYPICAL ASSIGNMENTS.

2    **Q.**     WHY DO COMPANIES EVEN DO THESE THINGS?

3    **A.**     THEY DO THIS FOR REGULATORY PURPOSES AND FOR, AS I

4    INDICATED BEFORE, FOR TAX PURPOSES, IN ORDER TO KIND OF "WHERE

5    AM I GOING TO" -- THIS IS THE COMPANY TALKING, "WHERE AM I

6    GOING TO PUT THESE?  SHOULD I PUT THEM ON THE BALANCE SHEET AND

7    AMORTIZE THESE ASSETS ACQUIRED?  SHOULD I IMMEDIATELY DEDUCT

8    THEM OFF OF OUR PROFIT AND LOSS STATEMENT?"  BECAUSE THERE'S

9    ASSETS ACQUIRED THAT DON'T HAVE MUCH VALUE ON A GO-FORWARD

10   BASIS, IT'S REALLY DONE FOR ACCOUNTING PURPOSES STRICTLY, NOT

11   FOR VALUATION.

12   **Q.**     DID -- AND -- SO WHAT'S THE DIFFERENCE BETWEEN VALUATION

13   AND ACCOUNTING REPORTING PURPOSES?

14   **A.**     WELL, VALUATION, SUCH AS WHAT WE'RE DOING HERE, IS

15   VALUING THE ECONOMIC RIGHTS UNDER ASSUMPTIONS FOR CERTAIN

16   TECHNOLOGIES.  SO YOU LOOK AT A NUMBER OF DIFFERENT THINGS.

17   YOU LOOK AT SOME OF THE THINGS I'VE ALREADY DESCRIBED.  IN

18   TERMS OF WHAT THIS IS -- IS DOING, IS -- IS GOING -- THIS

19   REPORT OF DELOITTE & TOUCHE IS GOING THROUGH AND JUST FROM AN

20   ACCOUNTING STANDPOINT, WHERE SHOULD THE COMPANY BOOK THEIR

21   PARTICULAR ASSETS AND WHERE SHOULD THEY RESIDE.  SO IT'S NOT

22   REALLY FROM THE STANDPOINT OF A PURE MARKET VALUATION.

23   **Q.**     DID THE D&T REPORT TAKE INTO ACCOUNT ANY USE RIGHTS OR

24   RIGHTS TO EXPLOIT UNDER THE PLAN OF LIQUIDATION?

25   **A.**     NO.

1  Q.    DO THESE REPORTS EVEN LOOK AT STUFF LIKE THAT?

2  A.    NO, THEY DON'T DRILL DOWN TO THAT LEVEL AT ALL.

3  Q.    DID THIS DELOITTE & TOUCHE REPORT VALUE ANY SINGLE

4  COMPONENT IN THE TRANSPONDER?

5  A.    NO.

6  Q.    DID -- DID -- DID DELOITTE & TOUCHE ALLOCATE ANY VALUE TO

7  ANY OF LIGHTLOGIC'S PATENTS?

8  A.    NO.  AS I INDICATED, I THINK, BEFORE, BUT THE -- THE

9  ANALYSIS OF DELOITTE & TOUCHE OR THE EXERCISE THEY WENT

10 THROUGH, THEY COULDN'T SEPARATE A SEPARATE VALUE FOR ANY OF THE

11 PATENTS AT LIGHTLOGIC OR ANY OF THE TECHNOLOGY.  THEY COULDN'T

12 SEPARATE IT OUT AND HAVE IT BE A STAND-ALONE.  I HAVE SEEN

13 REPORTS THAT WERE ABLE TO DO THAT.  THIS REPORT DID NOT DO

14 THAT.

15 Q.    SO THERE WAS NO VALUE ALLOCATED TO THE PATENTS?

16 A.    THAT'S EXACTLY RIGHT.  NO SEPARABLE VALUE ALLOCATED TO

17 THE PATENTS, PERIOD.

18 Q.    AND COUNSEL ASKED YOU SOME QUESTIONS ABOUT THIS

19 $2.4 MILLION NUMBER, AND I ONLY HAVE A FEW QUESTIONS ABOUT IT.

20     FIRST OF ALL, YOU MENTIONED INTELLECTUAL CAPITAL AND THAT

21 THE $2.4 MILLION ALLOCATION TO LIGHTLOGIC'S WORK FORCE DOESN'T

22 INCLUDE INTELLECTUAL CAPITAL.  ARE THERE ANY GAAP OR FAS

23 ACCOUNTING STANDARDS THAT TELL DELOITTE & TOUCHE HOW TO HANDLE

24 INTELLECTUAL CAPITAL OF EMPLOYEES?

25 A.    YES.  THERE'S THE -- I HAD MENTIONED BEFORE FAS 141 AND

1    142 STARTS TO LOOK AT THAT PARTICULAR ASPECT TO HAVE THE

2    INTELLECTUAL CAPITAL THAT'S EXPERIENCED, AND WHERE THAT IS

3    ALLOCATED TO IS TO -- TO GOODWILL.

4    Q.    AND "FAS," WHAT DOES THAT STAND FOR?

5    A.    "FAS" IS "FINANCIAL ACCOUNTING STANDARDS."

6    Q.    OKAY.  AND YOU ALSO TESTIFIED IN RESPONSE TO COUNSEL'S

7    QUESTION THAT YOU RELIED AND CONSIDERED THE TESTIMONY OF

8    SOMEONE NAMED JUSTIN SWITZER.

9    A.    YES.  FROM INTEL.

10   Q.    AND WHY DID YOU RELY ON HIS OPINION -- OR, EXCUSE ME --

11   HIS TESTIMONY?

12   A.    HE HAD SOME INFORMATION AS TO THE METHODS BY WHICH

13   DELOITTE & TOUCHE WAS GOING THROUGH TO IDENTIFY THE COST TO

14   REPLACE THE WORK FORCE OF LIGHTLOGIC.

15   Q.    AND DO YOU KNOW WHAT -- WHAT AREA OF EXPERIENCE OR WHAT

16   MR. SWITZER DOES AT INTEL?

17   A.    I THINK HE'S IN THE ACCOUNTING DEPARTMENT AT INTEL.

18        MS. GRANT:  JEFF, CAN WE HAVE HIS -- PAGE 50, LET'S

19   START WITH PAGE 1 OF HIS DEPOSITION.  SO HE WAS DEPOSED ON

20   AUGUST 26TH, 2008.  WE CAN GO TO PAGE 50.

21        MR. JANSEN:  YOUR HONOR, THIS IS HEARSAY.  I --

22   THINK -- PARTY -- PARTY STATEMENT.

23        MS. GRANT:  HE RELIED UPON IT.

24        THE COURT:  IF THIS IS A PART OF WHAT HE RELIED

25   UPON, HE CAN RELY UPON IT.  THAT DOESN'T AUTHENTICATE OR PROVE

1    ITS TRUTH.  IT SIMPLY GOES FOR HIS ASSUMPTIONS THAT HE RELIED

2    UPON.

3              **MS. GRANT:**  JEFF, ACTUALLY, IF WE CAN START AT

4    PAGE 2 WHERE MR. SWITZER STARTS EXPLAINING HOW

5    DELOITTE & TOUCHE CAME TO THE $2.4 MILLION, SO WE START ON

6    PAGE 2 OF LINE --

7              (EXHIBIT PUBLISHED TO JURY.)

8              **MS. GRANT:**  -- ACTUALLY, LINE 4 OF PAGE 50.

9              I MESSED YOU UP, JEFF, MY FAULT.

10             SO PAGE 50, LINE 4.

11             (EXHIBIT PUBLISHED TO JURY.)

12   **BY MS. GRANT:**

13   Q.    OKAY.

14        "AND I ALSO STATED THAT THE VALUATION WHICH I CAN GO

15   THROUGH" --

16             (OFF-THE-RECORD DISCUSSION.)

17   **BY MS. GRANT:**

18   Q.    "AND I ALSO STATED THAT THE VALUATION WHICH I CAN GO

19   THROUGH FURTHER IN THE EXHIBIT 9 YOU JUST HANDED ME SURROUNDING

20   THE WORK FORCE IN PLACE, THE VALUATION METHODOLOGY FOR THAT,

21   BECAUSE WE DID HAVE D&T COME UP WITH A COST-TO-REPLACE VALUE,

22   COST TO REPLACE IS SIMPLY -- AND I -- THE NUMBER'S PROBABLY

23   AROUND 2 MILLION BUCKS, IF I REMEMBER RIGHT.  I COULD TELL YOU

24   THAT REAL QUICKLY BY LOOKING AT NO. 9.  2.34 MILLION IS THE

25   COST TO REPLACE VALUATION OF THE ASSEMBLED WORK FORCE IN THE

```
 1    LIGHTLOGIC ACQUISITION.

 2                    "Q.  RIGHT?

 3                    "A.  'COST TO REPLACE' MEANS IF YOU

 4              HAVE THE WHATEVER, 80 ROUGHLY, EMPLOYEES, I

 5              DON'T REMEMBER THE EXACT NUMBER, AND YOU

 6              HAD TO GO OUT AND HIRE SIMILAR PEOPLE,

 7              THOSE 80 PEOPLE, THIS IS WHAT IT WOULD COST

 8              YOU TO GO THROUGH THOSE HIRING EFFORTS,

 9              FINDERS' FEES, RECRUITING FEES --"

10              JEFF?

11                    (EXHIBIT PUBLISHED TO JURY.)

12    BY MS. GRANT:

13    Q.    -- "AND THEN THERE'S ALSO IN THAT IS A COST TO GET SPUN

14    UP.  'SPUN UP,' MEANING UP TO SPEED AS FAR AS IN THE COMPANY.

15    COST TO REPLACE, THAT'S ALL THIS NUMBER IN THE D&T REPORT

16    REPRESENTS.  AND AS THE D&T REPORT ALSO DISCUSSES, IS INTEL

17    PLACED A LOT OF VALUE IN THIS ASSEMBLED WORK FORCE, IN THE WORK

18    FORCE THAT CAME OVER IN THE ACQUISITION.

19                    "Q.  HOW DO YOU KNOW?

20                    "A.  THE D&T REPORT SAYS SO.

21                    "Q.  WHERE DOES IT SAY THAT?

22                    "A.  I WOULD HAVE TO LOOK THROUGH IT

23              REALLY QUICKLY.  AND WHILE I'M LOOKING --

24              BEAR WITH ME HERE.

25                    "Q.  AND JUST FOR THE RECORD, YOU'RE
```

1            LOOKING AT EXHIBIT 9 WHICH IS THE

2            DELOITTE & TOUCHE REPORT, CORRECT?

3                "A.  THE DELOITTE & TOUCHE REPORT,

4            YEAH, BEAR WITH ME.  THESE THINGS ARE NOT

5            THIN."

6            **MS. GRANT:**  SCROLLING DOWN JUST A LITTLE BIT.  WE'RE

7    ALMOST DONE, JEFF.

8                "Q.  AND JUST FOR THE RECORD, THE

9            DELOITTE & TOUCHE --"

10           TALKS ABOUT THE -- WHAT THE BATES NUMBERS ARE.

11           PICKING UP ON LINE 23, IF YOU HIGHLIGHT.

12               "SO INTEL IN THIS ACQUISITION HAS ALSO

13           SHOWN IN THE D&T REPORT, INTEL PLACED A LOT

14           OF VALUE IN THE PEOPLE HIRED.  THEY WERE

15           HIGHLY SKILLED, HIGHLY TRAINED, UNIQUE, AND

16           SO ON AND SO FORTH.  THE VALUATION

17           METHODOLOGY SURROUNDING THIS UNDER, AGAIN, A

18           COST-TO-REPLACE METHODOLOGY, COST TO REPLACE

19           IS UNIQUE IN THE SENSE THAT IT DOESN'T

20           REPRESENT THE TOTAL IMPLIED OR PERCEIVED

21           VALUE TO A COMPANY WHEN DOING ACQUISITION.

22           THAT ADDITIONAL VALUE THAT WE, INTEL,

23           PERCEIVED IN THIS HIGHLY SKILLED WORK FORCE

24           WOULD ALSO BE A COMPONENT OF GOODWILL, WHICH

25           I DEFINED EARLIER, IS THE PURE DEFINITION IS

1          AN EXCESS OF PURCHASE PRICE OVER IDENTIFIED

2          ASSETS ACQUIRED.  SO GOODWILL IS A

3          COMBINATION OF MANY, MANY THINGS, WORK FORCE

4          OBVIOUSLY BEING ONE OF THOSE MANY THINGS OF

5          VALUE."

6  **BY MS. GRANT:**

7  **Q.**    IS THIS PART OF WHAT YOU RELIED UPON?

8  **A.**    YES, I DID REVIEW THIS TESTIMONY AND IT WAS CONSISTENT

9  WITH MY UNDERSTANDING AS TO MY READING OF THE D&T REPORT.

10  **Q.**    NOW, IS THE VALUE OF LIGHTLOGIC'S INTELLECTUAL PROPERTY

11  AT ISSUE IN THIS CASE?

12  **A.**    NOT TO MY UNDERSTANDING.

13  **Q.**    WHAT ISSUES DO YOUR CALCULATIONS ADDRESS?

14  **A.**    I WAS ASKED TO ADDRESS THE VALUE OF THE RIGHTS TO THE

15  RADIANCE TECHNOLOGY UNDER THE PLAN OF LIQUIDATION AND THE

16  EXCLUSIVITY OF THOSE RIGHTS.

17  **Q.**    OKAY.  NOW, YOU HAVE TALKED AND GIVEN THE JURY SOME

18  CALCULATIONS FOR DAMAGES, AND YOU WERE ASKED TO ASSUME THAT

19  MR. SHUM PREVAILED IN ONE OR MORE OF HIS CLAIMS; IS THAT RIGHT?

20  **A.**    THAT'S CORRECT.

21  **Q.**    SO THOSE NUMBERS ARE BASED ON THE ASSUMPTION THAT

22  MR. SHUM CONVINCES THE JURY THAT HIS CLAIMS HAVE MERIT,

23  CORRECT?

24  **A.**    IT ASSUMES LIABILITY.  SO IT ASSUMES THAT THE COURT WERE

25  TO FIND THAT SOME OR ALL OF MR. SHUM'S CLAIMS ARE VALID AND

1    THAT CAUSATION HAD BEEN PROVEN AS WELL.

2    **Q.**    AND IF MR. SHUM PREVAILS, THEN YOU HAVE GIVEN WHAT YOU

3    FEEL ARE THE APPROPRIATE DAMAGE NUMBERS?

4    **A.**    THAT'S CORRECT.

5    **Q.**    NOW, IF YOU WERE TO ASSUME THAT THE DEFENDANTS WERE TO

6    PREVAIL, WHAT WOULD BE YOUR DAMAGE CALCULATIONS?

7    **A.**    WELL, I'D BE IRRELEVANT BECAUSE THERE WOULD BE NO

8    DAMAGES.

9    **Q.**    PARDON ME?

10   **A.**    THERE WOULD BE NO DAMAGES.  I'D BE IRRELEVANT.  MY

11   TESTIMONY IS NOT RELEVANT BECAUSE THERE WOULD BE NO DAMAGES.

12            **MS. GRANT:**  THANK YOU.  I HAVE NO FURTHER QUESTIONS,

13   MR. NAPPER.

14            **MR. JANSEN:**  NO QUESTIONS, YOUR HONOR.

15            **THE COURT:**  MR. NAPPER, YOU CAN BE EXCUSED NOW.

16            **THE WITNESS:**  THANK YOU, YOUR HONOR.

17            **MS. GRANT:**  AND, YOUR HONOR, THAT WAS OUR FINAL

18   WITNESS.

19            **THE COURT:**  SO YOU REST YOUR CASE?

20            **MS. GRANT:**  WELL, I THINK WE HAVE SOME HOUSEKEEPING

21   ISSUES, BUT WE WILL NOT BE CALLING ANY MORE WITNESSES.

22            **THE COURT:**  ALL RIGHT.  THANK YOU.

23            **MR. KIRSCH:**  PLAINTIFF RESTS AS WELL, YOUR HONOR.

24   PLAINTIFF RESTS AS WELL.

25            **THE COURT:**  THANK YOU.

1    ALL RIGHT.  HERE'S OUR TIMING NOW.  THIS MEANS THAT

2    THE EVIDENCE HAS BEEN CONCLUDED.  AND THE NEXT THING YOU'RE

3    GOING TO HAVE PRESENTED TO YOU WILL BE THE ARGUMENTS OF THE

4    COUNSEL AND MY INSTRUCTIONS.

5    NOW, THAT WILL ALL HAPPEN -- WE HAVE TO HAVE -- THAT

6    WILL HAPPEN ON ONE DAY BECAUSE WE DON'T WANT TO SPREAD IT OUT

7    SO ONE QUESTION IS HEARD AND THE ANSWERS ARE NOT HEARD UNTIL

8    THE NEXT DAY, THAT SORT OF THING.  THAT WILL ALL BE ON ONE DAY.

9    WE HAVE SOME TIME WE NEED TO SPEND TO GET PREPARED

10   TO DO THAT, AND WE HAVE TO DO IT OUTSIDE OF YOUR PRESENCE.  SO

11   I'VE BEEN THINKING ABOUT HOW THE BEST WAY OF DOING THIS IS, AND

12   HERE'S MY CONCLUSION.  WE WILL RECESS NOW, AND THEN I'D ASK YOU

13   TO BE BACK HERE ON TUESDAY MORNING.  WE'LL NOT DO ANYTHING.

14   MONDAY WE'LL TAKE THE TIME TO GET EVERYTHING READY FOR YOU, BUT

15   I DON'T WANT YOU HERE JUST WAITING FOR THAT.  YOU CAN COME IN

16   AND ON TUESDAY MORNING, WHAT WILL HAPPEN IS WE'LL BE READY TO

17   PRESENT EVERYTHING TO YOU, THE ARGUMENTS AND THE INSTRUCTIONS,

18   AND THE CASE WILL BE PRESENTED TO YOU NEXT TUESDAY.  OKAY?

19   NOW, THE SAME INSTRUCTIONS, YOU HEAR ME SAY THIS ALL

20   THE TIME.  DON'T TALK ABOUT THIS AMONG YOURSELVES OR WITH OTHER

21   PERSONS.  DON'T GET ANY INFORMATION FROM OUTSIDE THE COURTROOM.

22   KEEP AN OPEN MIND.

23   AND THOSE STILL APPLY, AND THAT'S BECAUSE THE TIME

24   WHEN YOU SHOULD BE TALKING ABOUT THIS CASE IS WHEN YOU GO INTO

25   THE JURY ROOM TO DELIBERATE AFTER YOU'VE HEARD COUNSEL'S

1    ARGUMENTS AND MY INSTRUCTIONS AND YOU KNOW WHERE WE ARE IN

2    TERMS OF THE CONTEXT OF THIS WHOLE THING, ALL OF THE -- THE

3    LEGAL CONTEXT WILL BE THEN CLEAR TO YOU AND YOU'LL HAVE YOUR

4    INSTRUCTIONS TO USE.

5              SO UNTIL THEN, I DON'T WANT YOU MAKING UP YOUR MIND

6    ABOUT ANYTHING.  KEEP AN OPEN MIND TILL YOU'VE HEARD ALL THAT.

7    EVEN THOUGH THERE'S NOT GOING TO BE ANY MORE EVIDENCE, THERE

8    ARE GOING TO BE OTHER THINGS THAT HAPPEN, AND I WANT YOU TO ALL

9    WAIT BEFORE YOU START DISCUSSING IT TOGETHER.

10             SO THAT'S THE INSTRUCTIONS FOR YOU, PLEASE.  AND I

11   HOPE EVERYBODY HAS A GOOD WEEKEND, AND WE WOULD ASK YOU TO BE

12   BACK HERE AT 9:00 O'CLOCK NEXT TUESDAY.  THE CASE WILL BE

13   PRESENTED TO YOU ON THAT DAY.

14             ALL RIGHT?  THANK YOU.

15             (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

16   PRESENCE OF THE JURY.)

17             **THE COURT:**  OKAY.  WE WILL GET YOU A -- A DRAFT OF

18   PROPOSED INSTRUCTIONS.  I LIKE TO DO IT WHERE YOU HAVE A DRAFT

19   TO WORK OFF, AND THEN I'LL GET YOU A DRAFT AND YOU CAN GET THAT

20   FROM US TOMORROW.  OKAY.  AND YOU'LL HAVE THE WEEKEND TO GO

21   OVER IT.

22             AND THEN MONDAY I THINK WE'VE GOT TO GET BACK HERE

23   ABOUT 10:00 O'CLOCK ON MONDAY, AND SO WE'LL GO THROUGH

24   EVERYTHING WE NEED TO DO AT THAT POINT IN TERMS OF

25   INSTRUCTIONS, VERDICTS, WHATEVER ELSE WE HAVE TO TAKE CARE OF.

```
 1          BUT I'LL GET YOU A DRAFT, AND THE DRAFT IS JUST

 2   THAT, IT IS SOMETHING THAT IS AVAILABLE TO YOU TO COMMENT ON

 3   AND YOU CAN SUGGEST WHAT YOU LIKE.  IF THERE'S SOMETHING THAT

 4   ISN'T THERE, TELL ME WHAT YOU THINK SHOULD BE THERE.  IF

 5   THERE'S SOMETHING THAT IS THERE THAT YOU DON'T WANT IN THERE,

 6   YOU CAN TELL ME THAT, TOO.

 7          AND THE WHOLE IDEA IS THAT ON MONDAY, YOU WILL FIND

 8   OUT FROM ME WHAT I'M GOING TO DEAL WITH SO THEN YOU'LL KNOW

 9   WHAT YOU'RE READY TO DO ON TUESDAY, OKAY?  BUT THE IDEA IS THAT

10   YOU CAN TAKE A LOOK AT THAT AND THEN WE'LL BE READY TO PROCEED.

11          MR. KIRSCH:  YOUR HONOR, COULD I ASK A QUESTION

12   ABOUT TUESDAY?  IS IT TWO HOURS OF CLOSING ARGUMENT?

13          THE COURT:  WELL, I THINK SO.  I THINK IT SHOULDN'T

14   BE MORE THAN TWO HOURS.  AND BOTH SIDES TAKE TWO HOURS -- IT

15   TAKES ABOUT AN HOUR FOR INSTRUCTIONS.  I WOULD THINK THESE

16   INSTRUCTIONS TAKE A LITTLE BIT OF TIME, BUT THAT WILL GIVE US A

17   FIVE-DAY -- OR A FIVE-HOUR DAY AND THAT'S OKAY.  SO NO MORE

18   THAN TWO HOURS.

19          MR. KIRSCH:  AND DO WE GET A SHORT TIME FOR REBUTTAL

20   OUT OF THAT TWO-HOUR TIME FRAME?

21          THE COURT:  YOU'RE THE PLAINTIFF.

22          MR. KIRSCH:  OKAY.

23          THE COURT:  YOU GET TWO HOURS, AND YOU GET TO

24   PRESENT YOUR OPENING, AND THEN THEY'LL DO THEIRS, AND THEN YOU

25   CAN OFFER REBUTTAL, BUT THAT'S TWO HOURS.
```

1          **MR. KIRSCH:** I UNDERSTAND.

2          **THE COURT:** BOTH OF YOU, WHEN YOU ADD UP THE TIME

3     YOU DID AT THE BEGINNING AND TIME YOU DO AT THE END, IT'S NO

4     MORE THAN TWO HOURS.  AND THEY GET TWO HOURS.

5          **MR. KIRSCH:** RIGHT.

6          **THE COURT:** OKAY.  ALL RIGHT.  SOMETIMES PEOPLE SAY

7     "WELL, IS IT OKAY IF YOU HAVE MORE THAN ONE PERSON PARTICIPATE

8     IN THE ARGUMENT?"  THAT'S OKAY BY ME.  I DON'T MIND.  THAT IS,

9     I DON'T TREAT THAT THE SAME WAY AS I WOULD A WITNESS.  YOU

10    CAN -- YOU CAN DIVVY THINGS UP, BUT LET'S NOT MAKE IT A TAG

11    TEAM.  LET'S JUST HAVE A PRESENTATION THAT SEEMS TO MAKE SENSE.

12    BUT IF YOU CAN -- YOU DON'T HAVE TO HAVE ONE PERSON DO IT IF

13    YOU WANT TO SPLIT IT UP IN SOME FASHION.  ALL RIGHT.

14         **MR. TANGRI:** IS YOUR PREFERENCE OR YOUR PLAN TO

15    INSTRUCT FIRST AND THEN ARGUE OR --

16         **THE COURT:** I LIKE TO INSTRUCT LAST.

17         **MR. TANGRI:** OKAY.  VERY GOOD.  I JUST WANTED TO

18    KNOW.

19         **THE COURT:** LAST WORDS.

20         **MR. TANGRI:** AND THEN ONE OF THE HOUSEKEEPING

21    MATTERS WHICH I THINK IT IS AGREED UPON, WE HAVE A REQUEST FOR

22    JUDICIAL NOTICE COVERING SOME PATENTS WHICH WERE ADDRESSED BY

23    WITNESSES HEYLER AND KOCH AND WHICH WE JUST DIDN'T MOVE IN.

24         **THE COURT:** WELL, THAT'S -- SEE, ALL -- I THINK THAT

25    THERE'S CLEANUP THAT YOU WANT TO MAKE SURE, AND I THINK THAT WE

1    SHOULD HAVE THAT AS A PART OF OUR TASK ON MONDAY, TOO.  MAKE

2    SURE THAT THE RECORD'S COMPLETE AS FAR AS YOU'RE CONCERNED.

3              **MR. TANGRI:**  BUT THAT'S --

4              **THE COURT:**  AND SO YOU UNDERSTAND, BECAUSE I WANT TO

5    HAVE THAT DONE ALSO ON MONDAY SO THAT WHEN THEY ASK FOR THE

6    MATERIALS TO GO IN TO THEM, WE SEND THEM WHAT HAS BEEN PUT IN

7    EVIDENCE AND NOTHING ELSE.

8              **MR. TANGRI:**  AND SO THOSE ARE --

9              **THE COURT:**  THOSE ARE THINGS YOU --

10                  (SIMULTANEOUS COLLOQUY.)

11             **MR. TANGRI:**  I BELIEVE THERE'S NO OBJECTION.

12             **MR. KIRSCH:**  WE HAVE NO OBJECTION.

13             **THE COURT:**  ALL RIGHT.  THEN WE COULD PUT THOSE IN

14   RIGHT NOW.  I WANT TO MAKE SURE THE RECORD SHOWS THAT THEY'RE A

15   PART OF THE EVIDENCE.

16             **MR. TANGRI:**  THE OTHER EXHIBIT, YOUR HONOR, THAT WE

17   WERE PREPARED TO TALK TO YOUR HONOR ABOUT TODAY IS THE TRIAL

18   EXHIBIT 3783 WHICH WAS THAT REDLINED PATENT APPLICATION THAT'S

19   SIMPLY A MECHANICAL COMPARISON OF THESE TWO EARLIER, FOR THE

20   CONVENIENCE OF THE JURY BECAUSE IT'S VERY DIFFICULT TO COMPARE

21   THESE TWO TO SEE WHAT WAS REMOVED OR NOT.  AND WE WOULD OFFER

22   EXHIBIT 3783 INTO EVIDENCE AS WELL.

23             **MR. KIRSCH:**  WE, I THINK, I BELIEVE, I HAVEN'T SEEN

24   THIS ONE FOR A COUPLE OF WEEKS, AGREED THAT IT WAS A

25   DEMONSTRATIVE AND SHOULD COME IN AS A DEMONSTRATIVE, BUT I'M

```
1    NOT SURE IT COMES IN AS A --

2              MR. TAYLOR:  AND WE'RE MOVING IT INTO EVIDENCE UNDER

3    RULE 1006 AS THE SUMMARY EXHIBIT THAT WOULD BE INDEED

4    HELPFUL --

5              THE COURT:  IT'S NOT REALLY A SUMMARY EXHIBIT, IT'S

6    A -- IT'S AN EXHIBIT OF WHAT WAS DONE.

7              NOW, SEE, YOU CAN ARGUE THIS AND YOU CAN -- IT'S

8    ALWAYS INTERESTING IS THAT WHENEVER A JUDGE TOLD ME I COULDN'T

9    INTRODUCE THAT IN EVIDENCE, I JUST DID IT IN ARGUMENT.

10             MR. TAYLOR:  THAT'S FINE.  I JUST -- TO THE EXTENT

11   THERE'S A QUESTION THAT HAS BEEN RAISED WHETHER THINGS WERE

12   REALLY REMOVED OR NOT, IT'S A DIFFICULT THING FOR THE JURORS TO

13   DO IN COMPARING THESE OTHER TWO EXHIBITS.  THOSE WORDS WITH ALL

14   THE LENSING MATERIAL REMOVED OR NOT, INCLUDING THE FIGURES,

15   WE'VE GOT 44 PAGES HERE, WE'VE GOT 57 PAGES HERE, AND I THOUGHT

16   THAT UNDER RULE 106 OR 611, THIS WOULD BE USEFUL TO THE JURY

17   AND WE ACTUALLY WANTED THEM TO HAVE IT, NOT JUST AS A --

18             THE COURT:  I THINK THERE'S BEEN TESTIMONY THAT THIS

19   PROCESS WAS UNDERTAKEN.

20             MR. TAYLOR:  YES.

21             THE COURT:  AND IT IS SOMETHING THAT CAN BE MADE

22   AVAILABLE FOR THEIR -- I THINK THAT THIS WOULD BE INTRODUCED IN

23   EVIDENCE.  I'LL ALLOW IT IN EVIDENCE.

24             MR. TAYLOR:  THANK YOU, YOUR HONOR.

25
```

```
 1                      (TRIAL EXHIBIT 3783

 2                    RECEIVED IN EVIDENCE)

 3          THE COURT:  OKAY.

 4          MR. TAYLOR:  THE OTHER THING I WANTED TO LET THE

 5  COURT DO IS WE INTEND TO FILE A MOTION TO STRIKE WHICH WE'LL

 6  FILE I THINK EITHER LATER TODAY OR TOMORROW MORNING.  IT'S

 7  DIRECTED TO THE EXPERT TESTIMONY OF THE PLAINTIFF'S DAMAGES

 8  EXPERTS.  AND WE'LL ALSO BE FILING A RULE 50 MOTION.

 9          THE COURT:  WELL, AS I SAID, WE'LL HEAR ANY MOTIONS

10  THAT WE NEED TO.  I -- IN TERMS OF MOTION TO STRIKE, I WILL

11  BE -- YOU CAN FILE ANYTHING, BUT YOU MIGHT HAVE IN MIND THAT I

12  WILL BE RELUCTANT TO DO THAT.

13          I MEAN, I CAN BE CONVINCED, BUT IT'S GOING TO TAKE A

14  LOT OF CONVINCING FOR ME TO DO THAT.  NOW WE'VE ALREADY PUT IT

15  IN AND WE'VE HEARD EVERYTHING AND YOU'VE HAD AN OPPORTUNITY TO

16  CROSS-EXAMINE AND THE WHOLE BIT, AND IT'S AVAILABLE FOR -- AS

17  YOU WISH.  I DON'T LIKE TO -- TO GO BACK AND TAKE OUT PIECES OF

18  TESTIMONY BECAUSE THERE'S OBVIOUSLY PIECES THAT ARE GOING TO

19  HAVE TO STAY IN.  THEY CAN'T BE -- I'M NOT GOING TO STRIKE IT

20  AS SUCH.  THAT -- IF YOU WANT A RULING ON THAT, I'M NOT GOING

21  TO STRIKE -- I THINK IT WAS NO CASE COULD BE SAID THAT THEY

22  WERE IMPROPERLY PRESENTED AS WITNESSES AND THAT THEIR TESTIMONY

23  OUGHT TO BE STRUCK IN ITS ENTIRETY.

24          SO THE ONLY WAY I WOULD THINK ABOUT IT IS IF THERE'S

25  SOMETHING THAT'S NOT THERE, AND THAT SEEMS TO ME TO BE JUST A
```

1   QUESTION THAT IS AVAILABLE FOR ARGUMENT.  BUT YOU CAN PUT WHAT

2   YOU WANT IN, BUT IT'S GOING TO BE -- TAKE AN AWFUL LOT TO GET

3   TO THE POINT WHERE I'M GOING TO STRIKE THEM.

4           **MR. TAYLOR:**  YOUR HONOR, FOR PURPOSES OF CLOSING,

5   THE INSTRUCTIONS WILL BE SETTLED IN ADVANCE OF CLOSING SO WE

6   CAN REFER TO THEM EVEN THOUGH YOU HAVE THE LAST WORD?

7           **THE COURT:**  YES, YOU CAN.  YOU CAN REFER TO THEM.

8   MY LAWYERS IN THE DA'S OFFICE WOULD SAY, "AND THE JUDGE WILL

9   INSTRUCT YOU," AND THE JUDGE LOOKS DOWN AND SAYS, "NO, THE

10  JUDGE WILL NOT."

11              (LAUGHTER.)

12          **THE COURT:**  SO I DON'T LIKE TO GET TO THERE.  SO YOU

13  CAN USE -- THAT'S THE WHOLE POINT IS THAT WE'LL GET THEM ALL

14  RESOLVED AND YOU'LL KNOW WHAT I'M GOING TO SAY, WHETHER OR NOT

15  YOU AGREE WITH IT, BUT THAT'S WHAT I'M GOING TO SAY, AND YOU

16  CAN USE IT IN YOUR ARGUMENT.

17          **MR. KIRSCH:**  THANK YOU, YOUR HONOR.

18          **THE COURT:**  OKAY?  ALL RIGHT.  WELL, THEN WE'LL SEE

19  YOU ON MONDAY, BUT THEN YOU CAN GET A COPY OF OUR DRAFT

20  TOMORROW.  OKAY.

21          **MR. TAYLOR:**  THANK YOU.

22          **MR. TANGRI:**  THANK YOU.

23          (PROCEEDINGS WERE CONCLUDED AT 1:54 P.M.)

24              --O0O--

25

<u>**CERTIFICATE OF REPORTER**</u>

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, DECEMBER 12, 2008