UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | **JURY TRIAL** |
| | ) | |
| PLAINTIFF, | ) | **VOLUME 19** |
| | ) | |
| VS. | ) | NO. C 02-3262 DLJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| JEAN-MARC VERDIELL AND | ) | **PAGES 3842 - 4042** |
| LIGHTLOGIC, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | WEDNESDAY, DECEMBER 17, 2008 |

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:           TOWNSEND AND TOWNSEND AND CREW LLP
                         TWO EMBARCADERO CENTER, EIGHTH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94111-3834
                   BY:   MARK T. JANSEN,
                         PAUL F. KIRSCH,
                         ANGUS M. MACDONALD,
                         ROBERT A. MCFARLANE, ATTORNEYS AT LAW


FOR DEFENDANTS:          TAYLOR & CO. LAW OFFICES
                         ONE FERRY BUILDING SUITE 355
                         SAN FRANCISCO, CALIFORNIA  94111
                   BY:   STEPHEN E. TAYLOR
                         JESSICA GRANT, ATTORNEYS AT LAW



                         KEKER & VAN NEST
                         710 SANSOME STREET
                         SAN FRANCISCO, CALIFORNIA  94111-1704
                   BY:   RAGESH K. TANGRI, ATTORNEYS AT LAW



REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

3843

**I N D E X**

| | PAGE | VOL. |
|---|---|---|
| CLOSING ARGUMENT BY MR. KIRSCH | 3844 | 19 |
| CLOSING ARGUMENT BY MR. MACDONALD | 3873 | 19 |
| CLOSING ARGUMENT BY MR. TAYLOR | 3921 | 19 |
| REBUTTAL CLOSING ARGUMENT BY MR. KIRSCH | 4006 | 19 |

--oOo--

3844

```
 1   WEDNESDAY, DECEMBER 17, 2008                    9:08 A.M.

 2                    P R O C E E D I N G S

 3            THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

 4   COME TO ORDER.

 5            THE COURT:  OKAY.

 6            (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

 7   PRESENCE OF THE JURY:)

 8            THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

 9            JURORS:  MORNING.

10            THE COURT:  COUNSEL, PLEASE GO AHEAD.

11            MR. KIRSCH:  THANK YOU, YOUR HONOR.

12                      CLOSING ARGUMENT

13            MR. KIRSCH:  GOOD MORNING, LADIES AND GENTLEMEN.

14            BEFORE WE BEGIN THE CLOSING ARGUMENTS TODAY, I WANT

15   TO THANK YOU PERSONALLY ON BEHALF OF MR. SHUM FOR THE

16   REMARKABLE ATTENTION AND DEDICATION THAT EACH ONE OF YOU HAVE

17   GIVEN TO THIS MATTER OVER THE LAST MONTH.

18            WE UNDERSTAND IT'S BEEN A TREMENDOUS IMPOSITION ON

19   YOUR PERSONAL LIVES, AND WE GENUINELY APPRECIATE THE TIME AND

20   THE EFFORT THAT YOU HAVE PUT INTO THIS CASE.

21            I, ALONG WITH ALL MEMBERS OF THE TEAM THAT ARE

22   WORKING ON BEHALF OF MR. SHUM, PASS ON OUR THANKS.

23            THIS MORNING I WILL DISCUSS THE MAIN CLAIMS THAT

24   MR. SHUM HAS IN THIS MATTER, AND MY COLLEAGUE, MR. MACDONALD,

25   WILL DISCUSS OUR REQUEST FOR DAMAGES AND THE EVIDENCE
```

 1   SUPPORTING THAT REQUEST.

 2            OVER THE LAST SEVERAL WEEKS, WE HAVE SEEN HUNDREDS

 3   OF EXHIBITS AND HEARD FROM MORE THAN 25 WITNESSES.  WE'VE

 4   LEARNED A LOT ABOUT OPTOELECTRONIC PACKAGES AND TRANSPONDERS

 5   AND LASERS AND FLEXURES AND A LOT OF QUITE COMPLICATED

 6   TECHNICAL ISSUES THAT I NEVER THOUGHT I'D EVEN ATTEMPT TO TRY

 7   TO UNDERSTAND.

 8            BUT IN LOOKING BACK AT THE EVIDENCE, WHAT I REMEMBER

 9   IS WHAT'S REALLY IMPORTANT IS NOT THE TECHNICAL DETAILS HERE.

10   WHAT'S REALLY IMPORTANT AT THE MOST IMPORTANT LEVEL IS WHAT

11   HAPPENED BETWEEN MR. VERDIELL AND MR. SHUM, TWO FORMER FRIENDS

12   AND BUSINESS PARTNERS.  AND WHAT HAPPENED BETWEEN THEM IS

13   REALLY UNDISPUTED.

14            THERE ARE THREE MAIN ISSUES THAT I WANT TO ADDRESS

15   INITIALLY THIS MORNING.

16            THE FIRST IS THERE'S NO DOUBT THAT FRANK SHUM WAS A

17   WORLD-CLASS ENGINEER, OPTOELECTRONIC PACKAGING ENGINEER.

18   MR. VERDIELL SAID SO HIMSELF.  AND THAT WHILE THEY WERE AT

19   RADIANCE, MR. VERDIELL AND MR. SHUM WORKED TOGETHER, WORKED

20   TOGETHER IN DEVELOPING AND INVENTING CERTAIN TECHNOLOGY THAT

21   THEY OWNED 50/50 THROUGH RADIANCE, THEIR COMPANY.

22            SECOND, AFTER THEY SPLIT UP -- AFTER A VERY

23   CONTENTIOUS TIME PERIOD, THEY ENTERED INTO A PLAN OF

24   LIQUIDATION WHICH GAVE BOTH OF THEM THE EQUAL RIGHTS TO

25   INDEPENDENTLY EXPLOIT THE TECHNOLOGY.  THAT'S UNDISPUTED.

1           AND THIRD, AND PERHAPS MOST IMPORTANTLY, JUST AFTER

2    THE POL WAS ENTERED INTO, BOTH MR. VERDIELL AND MR. SHUM

3    UNDERSTOOD THAT THEY WEREN'T GOING -- THEY WEREN'T GOING TO BE

4    ABLE TO GET FUNDING AND DEVELOP A COMPANY WITH THE EQUAL RIGHTS

5    THAT WERE GIVEN TO EACH OF THEM IN THE RADIANCE POL.  AND THE

6    TESTIMONY ON THIS FROM MR. VERDIELL HIMSELF WAS GIVEN SEVERAL

7    WEEKS AGO, SO I WANT TO BRING UP SOME OF THE TESTIMONY.

8           IF YOU COULD, DAVID, FROM THE FIRST OR SECOND WEEK

9    OF TRIAL, I BELIEVE.

10              (EXHIBIT PUBLISHED TO JURY.)

11          **MR. KIRSCH:**  THIS IS MR. VERDIELL SPEAKING THAT,

12   "THAT WAS THE PROBLEM WITH THE PLAN OF LIQUIDATION.  IT APPLIED

13   EQUALLY TO MR. SHUM AND MYSELF.  VERY HARD TO FIND FUNDING."

14          AND THEN I ASKED, "IT WAS VERY HARD TO FIND FUNDING

15   AFTER THE PLAN OF LIQUIDATION?

16          "CORRECT."

17          AND AGAIN, AT THE NEXT TRANSCRIPT EXCERPT, I ASKED,

18   "YOU ACKNOWLEDGE THAT FRANK HAS RIGHTS IN THE PATENT

19   APPLICATION, CORRECT?"

20          AND THAT WAS TALKING ABOUT THE FIRST PATENT

21   APPLICATION THAT WAS FILED THE NEXT DAY AFTER THE PLAN OF

22   LIQUIDATION.

23          AND MR. VERDIELL RESPONDED, "YES.  THAT'S WHAT MAKES

24   THE EARLY PATENTS NOT VERY VALUABLE.  SOMEBODY ELSE HAS RIGHTS

25   TO IT."

1          IT'S A SHORT STATEMENT, BUT IT'S VERY IMPORTANT.

2          "THAT'S WHAT MAKES THE EARLY PATENTS NOT VERY

3    VALUABLE, SOMEBODY ELSE HAS RIGHTS TO IT."

4          WELL, THROUGHOUT THIS LITIGATION, MR. VERDIELL HAS

5    SAID THROUGHOUT THE TRIAL THAT MR. SHUM HAS RIGHTS TO USE MANY

6    OF THE PATENTS AT ISSUE, THE FLEXURE PATENTS AT ISSUE, THREE OF

7    THE FOUR PATENTS AT ISSUE.  AND HE'S CLAIMED THAT HE DISCLOSED

8    THOSE RIGHTS TO CERTAIN INVESTORS.  BUT THE EVIDENCE WILL

9    SHOW -- THE EVIDENCE HAS SHOWN THAT HE DIDN'T DISCLOSE THAT,

10   THAT HE NEVER DISCLOSED MR. SHUM'S RIGHTS IN THE FLEXURE TO

11   ANYONE IN ANY DOCUMENT.

12         IN FACT, IN THE U.S. PATENT AND TRADEMARK OFFICE, HE

13   FILED DOCUMENTS UNDER OATH SAYING THAT HE HAD THE ENTIRE RIGHT,

14   TITLE, AND INTEREST IN ALL THOSE FLEXURE PATENTS.  AND THE

15   REASON HE DID IT IS BECAUSE OF THIS.  HE WANTED TO MAKE SURE

16   THAT NOBODY ELSE HAD RIGHTS IN THOSE PATENTS AND THAT'S THE

17   ONLY WAY HE COULD DO IT.

18         IN FACT, IF YOU THINK BACK TO SOME OF THE EARLY

19   DOCUMENTS IN THIS CASE, THE NEGOTIATIONS OVER THE POL,

20   MR. VERDIELL COLORFULLY SAID THAT, "IF WE ARE GOING TO SHARE

21   IP, SHARE THE PATENT RIGHTS, THAT'S LIKE AN AX OVER MY HEAD."

22         HE KNEW THAT HE COULDN'T GET FUNDING.  IN FACT,

23   EARLIER, THERE WAS A DOCUMENT WHERE MR. VERDIELL TOLD MR. SHUM,

24   "IF THE IP IS SPLIT, I WON'T GET FUNDING."

25         SO IT'S UNDISPUTED THAT EARLY ON, MR. VERDIELL KNEW

1   HE NEEDED TO HAVE THE ENTIRE RIGHTS, THE EXCLUSIVE RIGHTS IN

2   ORDER TO GET FUNDING.

3         IT WAS ALSO CONFIRMED BY THAT BATTERY VENTURES

4   ATTEMPT TO GET FUNDED.  BEFORE THE POL WAS ENTERED INTO,

5   BATTERY VENTURES TOLD MR. VERDIELL THAT IT WAS A CONDITION OF

6   CLOSING THAT THE OWNERSHIP ISSUES BE CLEARED UP, AND THEY

7   WEREN'T IN THE POL AND HE DIDN'T GET FUNDING AND MR. VERDIELL

8   KNEW IT.  AND THEN HE CAME UP WITH A PLAN.

9         NOW, MR. SHUM HAS TESTIFIED SIMILARLY THAT RIGHT

10  AFTER THE POL WAS ENTERED, HE WENT TO TALK TO A COUPLE OF

11  INVESTORS, VENTURE CAPITAL INVESTORS, AND THEY CONFIRMED WHAT

12  MR. VERDIELL HAD TOLD MR. SHUM EARLIER, THAT YOU CAN'T GET

13  FUNDING FROM VENTURE CAPITALISTS IF THE IP IS SPLIT.

14        SO WHAT HAPPENED -- WHAT HAPPENED AT THIS POINT IN

15  TIME, EARLY '97 -- LATE '97, EARLY '98, WHEN IT'S CLEAR THAT

16  THESE GENTLEMEN HAD WORKED TOGETHER DEVELOPING VALUABLE

17  TECHNOLOGY -- THEY DIDN'T UNDERSTAND HOW VALUABLE, NEITHER OF

18  THEM DID AT THE TIME -- BOTH OF THEM REALIZED THAT THEY CAN'T

19  GET FUNDED IF THE IP IS SPLIT.

20        MR. SHUM, AFTER TALKING TO SOME OF THE VENTURE

21  CAPITALISTS AND LOOKING AT HIS BANK ACCOUNT, AFTER SPENDING THE

22  LAST ALMOST TWO YEARS AT RADIANCE WITHOUT A REGULAR PAYCHECK,

23  DECIDES IT'S TOO BAD, BUT HE'S GOING TO GO GET A REGULAR,

24  PAYING JOB AND TRY TO PAY THE BILLS.  HE WORKED FOR THREE AND A

25  HALF YEARS AS AN ENGINEER.

 1            MR. VERDIELL TOOK ANOTHER ROUTE.  IN FACT, HE TOOK A

 2    ROUTE THAT HE PLANNED JUST BEFORE THE POL WAS ENTERED INTO.

 3    JUST BEFORE THE POL WAS ENTERED INTO, MR. VERDIELL DRAFTED WITH

 4    HIS PATENT AGENT A SOLE AND EXCLUSIVE OWNERSHIP PATENT

 5    APPLICATION, AND HE FILED IT THE DAY AFTER THE PLAN OF

 6    LIQUIDATION WAS ENTERED INTO, GIVING HIM THAT -- THOSE

 7    EXCLUSIVE RIGHTS HE KNOW -- THAT HE KNEW HE NEEDED.

 8            A FEW WEEKS LATER -- A FEW MONTHS LATER, HE FILED AN

 9    ASSIGNMENT GIVING HIS NEW -- HIS COMPANY LIGHTLOGIC, THE

10    COMPANY THAT WAS SOLELY OWNED BY HIM, THE EXCLUSIVE RIGHTS IN

11    THAT FIRST PATENT APPLICATION.

12            AND HE GOT FUNDING.

13            IN FACT, YOU REMEMBER THAT A FEW MONTHS LATER, IN

14    THE SUMMER OF 1998, MR. VERDIELL WRITES TO HIS PATENT AGENT

15    SAYING, "THE PATENTS GOT US FUNDED."  THE FIRST GOAL OF A

16    VENTURE CAPITALIST WAS TO FILE PATENT APPLICATIONS.

17            SO MR. VERDIELL CONTINUED WITH THIS PLAN, AND OVER

18    THE NEXT SEVERAL YEARS, THREE YEARS, HE FILED PATENTS AND

19    PATENT ASSIGNMENTS IN WHICH HE CLAIMED THE SOLE AND EXCLUSIVE

20    RIGHTS, OWNERSHIP RIGHTS AND INVENTORSHIP RIGHTS, OVER THE WORK

21    THAT HE AND MR. VERDIELL HAD DONE -- HE AND MR. SHUM HAD DONE

22    AT RADIANCE.

23            AND HE KNEW THAT HE WASN'T THE SOLE INVENTOR.  WE'LL

24    TALK ABOUT THE INVENTORSHIP CLAIMS A LITTLE BIT LATER, BUT THE

25    MOUNTAIN OF WORK THAT MR. VERDIELL -- MR. SHUM DID ON

1   CONCEIVING AND DEVELOPING THAT INVENTION COMPARED TO THE TO THE

2   TWO PIECES OF PAPER, ONE FOR THE FLEXURE, THE APRIL 17TH NOTES,

3   AND ONE FOR THE STEP, THE ECTC NOTES THAT MR. VERDIELL HAS,

4   IT'S OVERWHELMING.

5           MR. VERDIELL KNEW THAT HE WASN'T THE SOLE OWNER.  HE

6   TOLD PEOPLE LIKE MR. STOCKHOLM.  WE'LL LOOK AT WHAT

7   MR. STOCKHOLM SAID.  AND YET HE WENT OUT AND TOOK THOSE

8   EXCLUSIVE RIGHTS BECAUSE HE KNEW THAT'S WHAT HE NEEDED.

9           NOW, HE WAS RIGHT.  OVER THE NEXT TWO AND A HALF

10  YEARS, HE OBTAINED MORE THAN $50 MILLION IN VENTURE CAPITAL

11  FINANCING.  PATENTS GOT HIM FUNDING IN 1998.  IN 1999, THEY

12  BILLED IN THEIR BUSINESS PLAN, LIGHTLOGIC DID, MR. VERDIELL

13  DID, THAT THE THREE PATENTS THAT WERE FILED, THE FIRST STEP OR

14  DBC PATENT AND THE FIRST TWO FLEXURE PATENTS WERE THE KEY

15  TECHNO -- TECHNOLOGY ADVANCES.

16          AND WE'VE TALKED ABOUT THIS DOCUMENT MANY TIMES.

17              (EXHIBIT PUBLISHED TO JURY.)

18          **MR. KIRSCH:**  BUT EACH COMPONENT OF THE TECHNOLOGY

19  GIVES US AN EDGE ON PERFORMANCE, COST, MANUFACTURABILITY OR

20  RELIABILITY, AND ALL OF THESE COMPONENTS, ALL THESE EDGES ARE

21  COVERED BY THEIR FIRST THREE PATENTS.  THAT'S WHAT THEY SENT TO

22  THE INVESTORS.  THAT'S WHAT THEY WERE TELLING THE INVESTORS TO

23  INVEST IN.

24          AND IN FACT, THE ISSUE, THE MAIN ISSUE IN THIS CASE

25  THAT THOSE SECOND AND THIRD PATENTS, THE FLEXURES, WHICH GAVE

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    THE MANUFACTURABILITY AND THE -- THAT DROVE THE LOWER COST OF

2    MAKING THE MODULE AND MAKING THE TRANSPONDER WHICH CONTAINED

3    THE MODULE WAS WHAT INTEL WANTED.  THE DOCUMENTARY PROOF IS

4    OVERWHELMING.  MR. MACDONALD WILL TALK ABOUT THAT IN A FEW

5    MOMENTS.

6              SO WITHIN TWO AND A HALF YEARS, MR. VERDIELL, BY

7    MAKING THESE STATEMENTS, RELYING ON THESE PATENTS, OBTAINED

8    MORE THAN $50 MILLION IN VENTURE CAPITAL FINANCING.  AND THEN

9    IN THREE YEARS HE OBTAINED, THROUGH HIS COMPANY LIGHTLOGIC,

10   OVER $400 MILLION.

11             NOW, IT IS VERY CLEAR FROM MR. VERDIELL'S OWN WORDS

12   THAT IF MR. VERDIELL HAD FOLLOWED THE EQUAL RIGHTS PROVISION OF

13   THE POL, ABIDED BY IT LIKE MR. SHUM DID, LIGHTLOGIC NEVER WOULD

14   HAVE BEEN BUILT.  YOU NEEDED THE EXCLUSIVE RIGHTS TO GET THEM.

15             MR. VERDIELL WAS A SAVVY BUSINESSMAN.  HE WAS A

16   GOVERNMENT CONTRACT PERSON.  HE KNEW HOW TO FIND MONEY AND HE

17   DID.  MR. SHUM WAS AN ENGINEER, A VERY GOOD ONE, BUT AN

18   ENGINEER.  HE ABIDED BY THE PLAN OF LIQUIDATION.

19             NOW, TO COUNTER THIS VERY SIMPLE STORY ABOUT WHAT

20   HAPPENED, THE DEFENDANTS HAVE, IN THIS TRIAL, THROWN UP A LOT

21   OF ARGUMENTS, NOT REALLY ANY FACTS.  IF YOU LOOK AT THE FACTS,

22   IF YOU LOOK AT THE DOCUMENTS AT THE TIME AND WHAT PEOPLE SAID

23   AT THE TIME, WHAT I JUST TOLD YOU ABOUT BOTH MR. VERDIELL AND

24   MR. SHUM NEEDING EXCLUSIVE RIGHTS AND KNOWING IT AND

25   MR. VERDIELL GOING OUT AND GETTING IT EVEN THOUGH HE DIDN'T

1    HAVE IT, THEY -- THE -- THAT IS -- THAT'S BEYOND DISPUTE.

2    THAT'S WHAT HAPPENED IN THIS CASE.  SO IN ORDER TO DEAL WITH

3    THIS, THE DEFENDANTS ARGUE THAT THE PATENTS AREN'T REALLY

4    IMPORTANT.  BUT --

5              DAVID, IF WE COULD TAKE A LOOK AT TX1091, AND THAT'S

6    AT PAGE 18.

7              (EXHIBIT PUBLISHED TO JURY.)

8              **MR. KIRSCH:**  WE'RE NOT GOING TO GO OVER ALL THE

9    DOCUMENTS, BUT THIS IS ONE EXAMPLE OF THE -- OF A CORPORATE

10   OVERVIEW STATEMENT FROM LATE 2000 WHERE LIGHTLOGIC IS TALKING

11   ABOUT THE MICRO FLEXURE ENABLING THE OPTICAL ALIGNMENT AND

12   THAT'S THE KEY MICRO MECHANICAL INNOVATION AND ASSEMBLY

13   PROCESS, THE INNOVATION THAT'S COVERED BY THE PATENTS.

14   THROUGHOUT THIS BUSINESS PLAN AND OTHER BUSINESS PLANS, THEY'RE

15   TALKING ABOUT THE PATENTED INVENTIONS.

16             AND IF YOU COULD, DAVID, TURN TO 424.

17             (EXHIBIT PUBLISHED TO JURY.)

18             **MR. KIRSCH:**  MR. VERDIELL, IN HIS CONVERSATIONS THE

19   YEAR BEFORE WITH HIS DUE DILIGENCE ATTORNEY AND OTHER VENTURE

20   CAPITALISTS, SOME OF WHICH -- WHOM WE'VE HEARD FROM TODAY -- IN

21   THE TRIAL, BRUCE GRAHAM AND JOHN STOCKHOLM, HE EMPHASIZES TO

22   THESE INVESTORS THAT THE KEY PATENTS ARE THE PACKAGE DESIGN AND

23   THE PACKAGE ASSEMBLY.  POO1 AND POO2, THE FLEXURE, THOSE WERE

24   THE FLEXURE PATENTS THAT MR. VERDIELL IS TELLING THE INVESTORS

25   IN DUE DILIGENCE THESE ARE CRITICALLY IMPORTANT, THESE ARE THE

1    KEY, THIS IS WHAT THEY'RE GOING TO GAIN THEIR COMPETITIVE

2    ADVANTAGE ON.

3            AND IT'S NOT SURPRISING THAT MR. VERDIELL SHOULD SAY

4    THAT.  ALL BUSINESSES, EVEN THOUGH THEY TRY TO DENY IT,

5    EMPHASIZE THE PATENTS.  INTEL, I DON'T KNOW IF YOU REMEMBER,

6    BUT IN THEIR -- THEIR CODE OF CONDUCT THAT I ASKED THE INTEL

7    ATTORNEY ABOUT, MS. SILVA, IT SAYS PLAIN AND CLEAR, INTEL

8    RECOGNIZES THAT INTELLECTUAL PROPERTY PATENTS ARE CRUCIAL TO

9    PROTECTING THE INVESTMENT THAT COMPANIES AND INDIVIDUALS MAKE

10   IN DEVELOPING NEW PRODUCTS AND IDEAS.

11           THERE'S NO DOUBT ABOUT THAT.

12           NOW, THEY ALSO, IN ANOTHER ARGUMENT THE DEFENDANTS

13   USE IN ORDER TO TRY TO AVOID THE IMPORTANCE OF MR. VERDIELL'S

14   ATTEMPTS, SUCCESSFUL ATTEMPTS, TO GAIN FALSE EXCLUSIVITY OVER

15   THE RADIANCE INTELLECTUAL PROPERTY AND PATENTS, IS THAT THE

16   ASSIGNMENTS AREN'T IMPORTANT.

17           ESSENTIALLY, MR. VERDIELL SAID, "I JUST ASSIGNED --

18   I JUST ASSIGNED THESE PATENTS TO MY COMPANY.  THAT'S WHAT I'VE

19   DONE ALL THE TIME WITH ALL MY OTHER EMPLOYERS.  I'VE BEEN --

20   I'VE WORKED AT OTHER EMPLOYERS AND EVERY TIME YOU HAVE A

21   PATENT, YOU ASSIGN IT TO YOUR COMPANY."

22           AND SOME OF YOU WHO WORK FOR COMPANIES THAT HAVE

23   CONTRACTS OR AGREEMENTS THAT REQUIRE YOU TO DO THAT MAY KNOW

24   THAT IS WHAT IS REQUIRED SOMETIMES OF EMPLOYEES.

25           BUT IN THIS CIRCUMSTANCE, MR. VERDIELL WAS CUTTING

1   OFF -- WHEN HE SIGNED THESE ASSIGNMENTS, HE WAS CUTTING OFF HIS

2   FORMER BUSINESS PARTNER'S RIGHTS.  NONE OF THOSE ASSIGNMENTS

3   SAID THAT MR. VERDIELL -- MR. SHUM HAD THE RIGHT TO USE THEM.

4           HE BASICALLY -- HE SAID PLAIN AND CLEAR, "I HAVE THE

5   ENTIRE RIGHT, TITLE, AND INTEREST, THE SOLE AND EXCLUSIVE

6   RIGHTS TO ALL OF THIS -- THESE INVENTIONS COVERED BY THESE

7   PATENTS."

8           WHEN MR. VERDIELL, AT A PREVIOUS EMPLOYER, OR ANY OF

9   US AT AN EMPLOYER, SIGN AN ASSIGNMENT TO -- OF A PATENT OR A

10  NEW IDEA OR A NEW TECHNOLOGY TO THE EMPLOYER, YOU'RE NOT

11  CUTTING OFF ANYBODY'S RIGHTS.  THE EMPLOYER, PER YOUR CONTRACT,

12  HAS THOSE RIGHTS IN THE INVENTION.  BUT MR. VERDIELL KNEW THAT

13  THESE -- THE -- THE INVENTIONS AT RADIANCE WERE INVENTED BY HIM

14  AND MR. SHUM AND HE CUT OFF MR. SHUM'S RIGHTS BY SIGNING THOSE

15  SOLE AND EXCLUSIVE PATENTS.

16          NOW, ORIGINALLY, MR. -- YOU MAY REMEMBER THAT

17  MR. VERDIELL ON THE STAND SAID, "I DIDN'T DEAL WITH THE DUE

18  DILIGENCE AND THE DETAILS OF THE ASSIGNMENTS.  I ONLY DEALT

19  WITH THE BROAD LANDSCAPE OF DUE DILIGENCE WHICH CONCERNS

20  BROADER ISSUES, BROADER ISSUES OF THE VALUE OF THE PATENTS."

21  BUT THEN I ASKED HIM WHO SARAH BROTHERS WAS.  AND SARAH

22  BROTHERS WAS HIS TECHNICAL ASSISTANT.

23          AND IF YOU COULD BRING UP 419.

24          (EXHIBIT PUBLISHED TO JURY.)

25          **MR. KIRSCH:**  I ACTUALLY FORGOT TO SHOW YOU THIS

 1   SEVERAL WEEKS AGO.  WE TALKED ABOUT IT IN COURT AND THIS

 2   DOCUMENT CAME INTO EVIDENCE, BUT I FORGOT TO BRING THIS UP ON

 3   THE SCREEN, AND I APOLOGIZE.

 4        MR. VERDIELL STATED THAT HE ASKED SARAH BROTHERS,

 5   HIS ASSISTANT, TO TRANSMIT DOCUMENTS.  AND THIS IS SARAH

 6   BROTHERS TRANSMITTING TO HIS DUE DILIGENCE ATTORNEY A FAX.  THE

 7   FAX SAYS UP IN THE RIGHT-HAND COLUMN "DILIGENCE SERIES B."

 8   IT'S DUE DILIGENCE WITH REGARD TO THE SERIES B FINANCING THAT

 9   THE INVESTORS WERE PERFORMING, DECIDING WHETHER OR NOT TO

10   INVEST IN LIGHTLOGIC.

11        LET'S SEE THE NEXT PAGE.

12        (EXHIBIT PUBLISHED TO JURY.)

13   **MR. KIRSCH:**  THE NEXT PAGE IS THE RECORDATION COVER

14   SHEET FOR THE ASSIGNMENT OF THE PATENT.  MR. VERDIELL DIRECTING

15   HIS ASSISTANT TO TELL HIS ATTORNEY AND THE INVESTORS THAT HE

16   HAD SOLE AND EXCLUSIVE RIGHTS.

17        AND THIS ONE HAPPENS TO BE --

18        IF YOU COULD BRING UP THE FULL DOCUMENT, DAVID, FOR

19   THE FIRST PATENT APPLICATION, VER101, THE FIRST STEP PATENT

20   APPLICATION.  IF YOU COULD BRING UP THE FULL DOCUMENT.

21        (EXHIBIT PUBLISHED TO JURY.)

22   **MR. KIRSCH:**  THANK YOU.

23        THE POINT IS MR. VERDIELL KNEW HOW IMPORTANT THESE

24   DOCUMENTS WERE.  THEY WERE CRITICAL TO DUE DILIGENCE.  IT WAS

25   CRITICAL TO DUE DILIGENCE THAT HE DEMONSTRATED THAT HE HAD THE

1  EXCLUSIVE RIGHTS TO THE INVESTORS.

2          THE NEXT DOCUMENT -- SORRY, THE NEXT PAGE --

3              (EXHIBIT PUBLISHED TO JURY.)

4      **MR. KIRSCH:**  -- SIMILARLY IS A PROPRIETARY RIGHTS

5  AGREEMENT, PROPRIETARY RIGHTS AGREEMENT OF LIGHTLOGIC WHICH

6  DEMONSTRATES THAT LIGHTLOGIC HAS OWNERSHIP OF THE INTELLECTUAL

7  PROPERTY AND THE PATENTS AT ISSUE.

8          SAME THING.  MR. VERDIELL KNEW HOW IMPORTANT THE

9  OWNERSHIP AND EXCLUSIVE RIGHTS WERE, AND HE DIDN'T DO IT

10 HIMSELF, BUT HE ASKED HIS ASSISTANT TO SEND THESE DOCUMENTS TO

11 THE PEOPLE THAT MATTERED, HIS ATTORNEY AND THE INVESTORS WHO

12 WERE GOING TO INVEST IN THE PROJECT.

13         NOW, THEY HAVE ARGUED THAT, "ALL WE NEEDED WAS THE

14 RIGHT TO USE.  WE DIDN'T CARE ABOUT THE OWNERSHIP.  WE

15 HAVEN'T -- WE HAVEN'T -- WE DIDN'T CARE ABOUT FULL AND

16 EXCLUSIVE RIGHTS."

17         AND I WOULD ASK YOU TO LOOK AT ALL OF THE DOCUMENTS

18 THAT -- ALL OF THESE DOCUMENTS THAT ARE IN -- ADMITTED INTO

19 EVIDENCE, ALL OF THE EXHIBITS, THE CORRESPONDENCE, THE

20 AGREEMENTS BETWEEN THE INVESTORS, THE MERGER AGREEMENT WITH

21 INTEL, ALL OF THE DOCUMENTS IN WHICH LIGHTLOGIC IS REPRESENTING

22 WHAT THEY OWN AND WHAT THEY HAVE.  NEVER, EVER, DO THEY SAY

23 THEY HAVE A RIGHT TO USE.  IN THE ASSIGNMENTS IN THE PATENTS,

24 THEY'RE SAYING THEY HAVE THE SOLE AND EXCLUSIVE OWNERSHIP AND

25 THEY'RE TELLING THE INVESTORS.

1          THEIR ARGUMENT IN THIS TRIAL THAT ALL THEY NEEDED

2     WAS THE RIGHT TO USE IS PURE SPECULATION.  YOU'LL NEVER KNOW

3     THAT.  AFTER THE FACT, THEY'RE LOOKING BACK AND SAYING, "ALL WE

4     NEEDED WAS THE RIGHT TO USE," BUT THAT'S NOT WHAT THEY HAD AT

5     THE TIME, AND THAT'S NOT WHAT MR. VERDIELL WANTED AT THE TIME,

6     AND THAT'S NOT WHAT HE GOT AND THAT'S NOT WHAT HE TRANSFERRED.

7          NOW, ANOTHER ARGUMENT THAT THE DEFENDANTS HAVE USED

8     IN THIS CASE, AND MR. MACDONALD WILL DISCUSS IT IN MORE DETAIL,

9     BUT I THINK YOU MAY REMEMBER IN THE OPENING ARGUMENT,

10    DEFENDANTS' COUNSEL EXPRESSED THE -- THE OPINION THAT ALL THE

11    WORK THAT WAS DONE AT RADIANCE WITH REGARD TO THE FLEXURE, THE

12    STEP OR THE DBC REALLY DIDN'T MATTER BECAUSE LIGHTLOGIC TOOK A

13    90-DEGREE TURN RIGHT BEFORE THE INTEL MERGER AND WENT IN A

14    COMPLETELY DIFFERENT DIRECTION AND STARTED MAKING THESE

15    TRANSPONDERS AND TRANSPONDERS HAD NO RADIANCE TECHNOLOGY IN

16    THEM, HAD NOTHING TO DO WITH MR. SHUM.  THAT'S NOT TRUE.

17         THE EVIDENCE IS OVERWHELMING, OVERWHELMING THAT THE

18    KEY ENABLING ELEMENT OF THE TRANSPONDER AND THE WHOLE

19    TRANSPONDER FAMILY WAS THE PATENTED FLEXURE.

20         THE CORPORATE DOCUMENTS THAT LIGHTLOGIC PRODUCED ALL

21    DEMONSTRATE THAT THEY HAD THIS PATENT -- OPTOELECTRONIC

22    INTEGRATION PLATFORM THEY CALLED IT IN THEIR BUSINESS PLANS,

23    AND WE'LL BRING IT UP IN A COUPLE MINUTES AND SHOW YOU AGAIN

24    WHAT WE LOOKED AT A COUPLE WEEKS AGO.  AND THAT PLATFORM

25    CONTAINED THE PATENTED METAL CERAMIC SUBSTRATE, THE STEP OR THE

1    DBC, AND THE PATENTED FLEXURE.  AND THAT WAS THE KEY THAT

2    ENABLED THE TRANSPONDER FAMILY.

3            NOW, THEY INDICATED THAT LIGHTLOGIC NEVER SOLD ANY

4    PRODUCTS THAT HAD THE LIGHTLOGIC FLEXURE IN IT.  WELL, THAT WAS

5    TRUE BECAUSE THEY COULDN'T PASS THE TESTING IN TIME.  THEY

6    DIDN'T PASS THE BELLCORE TESTING.  BUT THEY SOLD THEIR FLEXURE

7    AS THE KEY ENABLING ELEMENT, AS THIS LOW-COST MANUFACTURING,

8    EXTREMELY VALUABLE PATENT TO INTEL, AND THEY BOUGHT IT.

9            AND RIGHT AFTER THE INTEL PURCHASE, THEY STARTED

10   MANUFACTURING THOSE MODULES WITH THE LIGHTLOGIC FLEXURES IN

11   THEM.  AND THAT WAS THE KEY TO THE PURCHASE.  THAT'S WHAT

12   MR. MADER, AS YOU MIGHT REMEMBER, THE TRANSPONDER PERSON WHO

13   HAD A VERY INTERESTING VIDEO ABOUT WHAT TRANSPONDERS ARE, HE --

14   HE WROTE, ALONG WITH SEVERAL OTHER LIGHTLOGIC AND INTEL PEOPLE,

15   INCLUDING MR. VERDIELL, A DOCUMENT THAT SAYS --

16            (EXHIBIT PUBLISHED TO JURY.)

17        **MR. KIRSCH:**  -- THAT THE DESIGN AND AUTOMATED

18   MANUFACTURING MODULES CONTAINING THE FLEXURE ENABLE THE

19   IMPLEMENTATION OF THE NEW MINIATURE LOW-COST TRANSPONDERS.

20            AND, DAVID, IF WE COULD LOOK AT THE FIRST PAGE IN

21   TOTAL OF THIS DOCUMENT.

22            (EXHIBIT PUBLISHED TO JURY.)

23        **MR. KIRSCH:**  THAT'S THE CERAMIC METAL SUBSTRATE, THE

24   COMPONENT PICK AND PLACE AND THE AUTOMATED ALIGNMENT THAT WE'VE

25   SEEN DESCRIBED AS PATENTED IN MANY OF THE CORPORATE DOCUMENTS

1    OF LIGHTLOGIC.

2            AND THERE'S NO DOUBT MR. MADER DID A LOT OF GOOD

3    WORK ON THE TRANSPONDER.  THE EVIDENCE IS OVERWHELMING, THE

4    TRANSPONDER WAS A COMMODITY THAT EVERYONE WAS DOING.  JDS

5    UNIPHASE WAS FLOODING THE MARKET.  AND THE THING THAT

6    DISTINGUISHED LIGHTLOGIC FROM ALL THE OTHERS, INCLUDING NETWORK

7    ELEMENTS, YOU MIGHT REMEMBER THAT NECTARINE DOCUMENT, WAS THAT

8    THEY HAD THE PATENTED FLEXURE THAT WAS GOING TO BRING THE

9    LOW-COST MANUFACTURING.

10           SO THE ARGUMENT ISN'T SO SIMPLE THAT THE TRANSPONDER

11   HAD NOTHING TO DO WITH THE RADIANCE TECHNOLOGY.  IN FACT, IT'S

12   WRONG.  THE TRANSPONDER THAT LIGHTLOGIC PRODUCED, THE

13   TRANSPONDER THAT LIGHTLOGIC WAS SELLING TO INTEL DEPENDED ON,

14   WAS ENABLED BY -- THE TRANSPONDER FAMILY WAS "ENABLED BY,"

15   THOSE ARE THE WORDS IN THEIR CORPORATE OVERVIEW STATEMENTS, THE

16   PATENTED FLEXURE AND THE PATENTED METAL CERAMIC SUBSTRATE.

17           NOW, THE DEFENDANTS HAVE ALSO SAID THAT MR. SHUM

18   COULD HAVE DONE MORE FOR HIMSELF.  HE COULD HAVE PATENTED THESE

19   CLAIMS HIMSELF.  HE COULD HAVE GONE ON THE MARKET AND TRIED TO

20   USE HIS RIGHTS UNDER THE POL.  BUT THINK FOR A MOMENT HOW

21   SUCCESSFUL MR. SHUM WAS AND -- WHEN HE TRIED AND WOULD HAVE

22   BEEN IF HE TRIED EVEN MORE WHEN THERE ARE ASSIGNMENTS AND

23   PATENTS ON FILE IN THE USPTO THAT GIVE LIGHTLOGIC AND THEN

24   INTEL THE EXCLUSIVE RIGHTS, SOLE AND ENTIRE RIGHTS.  AND IN

25   FACT, THEY ARE STILL THERE TODAY.  TO THIS DAY, LIGHTLOGIC'S

1    SUCCESSOR, INTEL, CLAIMS THAT THEY HAVE THE SOLE AND EXCLUSIVE,

2    ENTIRE RIGHT, TITLE, AND INTEREST IN THE PATENTS AT ISSUE.

3              HOW WOULD ANY BUSINESS AGREE -- WHY WOULD ANY

4    BUSINESS AGREE TO WORK WITH MR. SHUM WHO CLAIMS HE HAS THE

5    RIGHTS TO USE?

6              THERE'S NO EXPLANATION FOR WHY THEY, LIGHTLOGIC, AND

7    LATER INTEL HAVEN'T CHANGED THOSE ASSIGNMENTS IF THEY BELIEVE

8    FRANK SHUM HAD RIGHTS UNDER THOSE PATENTS.

9              SO I DON'T HAVE TIME TO GO INTO ALL THE DETAILS, BUT

10   ESSENTIALLY WHAT DEFENDANTS' MAIN ARGUMENT BOILS DOWN TO IS

11   "IGNORE THE DOCUMENTS, IGNORE WHAT HAPPENED AT THE TIME, IGNORE

12   WHAT WE SAID AT THE TIME.  WE CAN -- WE CAN COME IN AND LOOK

13   BACK AND SPECULATE ABOUT WHAT WAS IMPORTANT, AND THAT'S --

14   THAT'S APPROPRIATE FOR US."

15             THERE ARE NUMEROUS INCONSISTENCIES BETWEEN WHAT THE

16   DOCUMENTS SAID AT THE TIME AND WHAT THEY SAID IN COURT, AND

17   MR. MACDONALD WILL TALK ABOUT A LOT OF THOSE.

18             ONE ISSUE THAT -- A COUPLE OF ISSUES THAT I WANT TO

19   BRING UP, AND IT RELATES TO INVENTORSHIP THAT I'M GOING TO BE

20   SPEAKING ABOUT IN A MOMENT, IS THAT MR. VERDIELL --

21   MR. VERDIELL CAME INTO THIS COURT AND SAID THAT HE FIGURED OUT

22   THE CONSTRAINING ELEMENT OF THE STEP.  HE TOLD THE VENDOR ABOUT

23   THE CONSTRAINING ELEMENT OF THE STEP AT THE ECTC CONFERENCE IN

24   MAY OF 1996.

25             AND THEN I SHOWED HIM TWO DOCUMENTS, A MAY 1997, AN

1    OCTOBER 1997 NASA REPORT IN WHICH IT EXPRESSLY SAID -- HE SAID

2    HE WROTE THOSE DOCUMENTS IN WHICH IT EXPRESSLY SAID THE VENDOR

3    TOLD HIM ABOUT THE CONSTRAINING ELEMENT.  HE HAD NO -- HE HAD

4    NO RESPONSE.

5              ALSO THE PRE-ACADIAN PROPOSAL, THE FIRST DOCUMENT IN

6    APRIL OF '96 THAT TALKS ABOUT THE STEP AND THE DBC,

7    MR. VERDIELL SAID THE FIRST DAY ON DIRECT BY HIS ATTORNEY, HE

8    WROTE THE WHOLE DOCUMENT.  WROTE THE WHOLE DOCUMENT.

9              THEN I SHOWED HIM A LETTER IN WHICH HE SAID,

10   "FRANK'S A VERY SMART GUY.  WE DID A GOOD PROPOSAL TOGETHER."

11   ORIGINALLY DIDN'T REMEMBER THAT DOCUMENT AND WASN'T CLEAR

12   WHETHER OR NOT HE WROTE IT.  AND THEN HE SAID, "OH, OH, YEAH,

13   FRANK MAY HAVE WRITTEN THE LENS PART."

14             AND THAT'S IMPORTANT BECAUSE THE LENS PART IS WHAT

15   HE KEPT IN, THE FLAT-BOTTOM LENS, FRANK'S CONTRIBUTION, IS ONE

16   OF THINGS AT LEAST CLEARLY THAT HE KEPT IN THE STEP AND DBC

17   PATENT APPLICATION WHICH GIVES FRANK, AMONG OTHER THINGS,

18   INVENTORSHIP AND OWNERSHIP RIGHTS IN THE STEP AND DBC PATENTS.

19             SO THEY CLAIM FRANK HAS THE RIGHT TO USE PRIVATELY

20   IN THE TRIAL, BUT IN PUBLIC IN THE U.S. PATENT AND TRADEMARK

21   OFFICE, THEY OWN EVERYTHING.

22             FRANK DIDN'T WANT TO FILE A LAWSUIT.  HE'S BEEN

23   FIGHTING THEM FOR LONGER THAN -- TWICE AS LONG AS LIGHTLOGIC

24   EXISTED, ALMOST SEVEN YEARS.  LIGHTLOGIC EXISTED FOR THREE

25   YEARS.

1          WITHOUT THE HELP OF HIS FAMILY AND FRIENDS,

2     FINANCIAL AND EMOTIONAL, HE NEVER WOULD HAVE MADE IT THIS FAR.

3          I JUST WANT TO BRIEFLY DISCUSS WHAT THE CLAIMS ARE.

4     HE HAS A CLAIM FOR FRAUD.  THAT CLAIM FOR FRAUD IS BASED ON THE

5     FACT THAT MR. VERDIELL MISREPRESENTED TO MR. SHUM DIRECTLY AND

6     THROUGH HIS PATENT AGENT, MR. ALBOSZTA, THAT THE FIRST STEP OR

7     DBC PATENT APPLICATION HAD TO BE WITHDRAWN BECAUSE MR. VERDIELL

8     HAD INTENTIONALLY LEFT HIMSELF OFF.

9          BUT THAT COMPLETELY CONTRADICTS WHAT MR. VERDIELL

10    SAID ABOUT HE -- HE ADMITTED THAT IN SEPTEMBER AND OCTOBER OF

11    '97, HE TOLD MR. ALBOSZTA, THE PATENT AGENT, THAT HE DIDN'T

12    KNOW BACK IN APRIL OF '97 THAT ALL INVENTORS HAD TO BE NAMED ON

13    THE PATENT APPLICATION.  AND IF THAT WAS TRUE, IT DIDN'T HAVE

14    TO BE WITHDRAWN.  IT COULD HAVE BEEN AMENDED.  THERE WAS NO

15    PROBLEM WITH THAT.

16         THAT WITHDRAWAL OF THE PATENT APPLICATION LED TO THE

17    DRAFTING OF THE OTHER ONE AND LED TO THE PLAN OF LIQUIDATION,

18    THROUGH WHICH MR. VERDIELL -- THROUGH WHICH MR. SHUM GAVE UP

19    HIS 50 PERCENT INTEREST IN RADIANCE.

20         AND BY THE WAY, MR. VERDIELL, IF YOU RECALL, DID SAY

21    THAT LIGHTLOGIC WAS THE SUCCESSOR TO RADIANCE.  SO UNDER

22    NOTIONS OF FAIRNESS, MR. SHUM SHOULD REALLY HAVE A 50 PERCENT

23    OWNERSHIP IN LIGHTLOGIC.

24         BEFORE WE GO ON TO THE OTHER CLAIMS, I JUST WANT TO

25    BRIEFLY TALK ABOUT THE BACKDROP TO WHAT WAS HAPPENING WITH

1    REGARD TO THE WITHDRAWAL OF THIS PATENT APPLICATION AND

2    NEGOTIATIONS OF THE POL.

3              IF YOU REMEMBER, IT WAS RATHER MESSY AND THERE WAS

4    DISAGREEMENTS BETWEEN MR. SHUM AND MR. VERDIELL, BUT

5    MR. VERDIELL MAY HAVE BEEN UPSET THAT MR. SHUM WAS THINKING

6    ABOUT A NEW CEO, THEY COULDN'T GET FINANCING.  BUT AT ONE POINT

7    MR. VERDIELL HIRED A LAWYER AND ACCUSED MR. SHUM OF STEALING

8    COMPANY FUNDS.  HE WROTE IN A LETTER, HIRED A LAWYER, WROTE IN

9    A LETTER, AND HE KNEW IT WASN'T TRUE.

10             WE SHOWED YOU THE DOCUMENTS WHERE MR. SHUM HAD --

11   THE TWO TIMES THE GOVERNMENT AND NASA HAD GIVEN HIM 30,000,

12   60,000, I FORGET EXACTLY WHAT IT WAS IN PAYMENTS, HE

13   TRANSMITTED IT RIGHT TO THE RADIANCE BANK ACCOUNTS.  AND

14   MR. VERDIELL, THE TREASURER OF THE COMPANY, KNEW IT.  AND HE

15   DIDN'T CARE AND HE NEVER DISAGREED.  HE NEVER EXPLAINED THIS IN

16   COURT.  HE GOT A LAWYER AND ACCUSED MR. SHUM OF STEALING

17   COMPANY FUNDS WHEN THOSE FUNDS WERE IN RADIANCE'S BANK

18   ACCOUNTS.

19             HE ALSO ACCUSED MR. SHUM OF GOING TO TAIWAN WITHOUT

20   HIS KNOWLEDGE, WHEN MR. SHUM AND JENKIN RICHARD CAME ON THE

21   STAND AND TESTIFIED THAT MR. VERDIELL KNEW ABOUT THAT.  AND IN

22   FACT, IN THAT THE TAIWAN TRIP, MR. VERDIELL -- EXCUSE ME --

23   MR. SHUM, PER MR. JENKIN'S (SIC) TESTIMONY, REPRESENTED

24   RADIANCE, REPRESENTED THE COMPANY, REPRESENTED THE UNIFIED

25   COMPANY, AND DID NOT SPEAK POORLY OF MR. VERDIELL.  CONTRAST

1    THAT WITH MR. VERDIELL GOING OUT WITH REMY AUBERT BEFORE

2    RADIANCE DISSOLVED AND TRYING TO ESTABLISH A NEW COMPANY

3    CUTTING OUT MR. SHUM.

4            NOW, THE BREACH OF CONTRACT CLAIM IS SIMPLE.  IT

5    BASICALLY RELATES TO THE EQUAL RIGHTS PROVISION OF THE POL.

6    AND UNDER THAT EQUAL RIGHTS PROVISION, IT DID NOT ALLOW

7    MR. VERDIELL OR MR. SHUM TO GAIN -- TO FILE OR OBTAIN UNLAWFUL

8    PATENTS OR UNLAWFUL ASSIGNMENTS.  IF THEY WEREN'T -- IF EITHER

9    OF THEM WEREN'T THE SOLE INVENTOR, THEY COULDN'T FILE SOLE

10   INVENTOR PATENT APPLICATIONS AND SOLE INVENTOR ASSIGNMENTS THAT

11   TRANSFERRED THOSE RIGHTS.

12           THE UNJUST ENRICHMENT CLAIM IS DIFFERENT THAN THE

13   OTHER TWO CLAIMS, THE BREACH OF CONTRACT CLAIM AND THE -- AND

14   THE FRAUD CLAIM.  IT LOOKS AT THINGS NOT FROM THE PERSPECTIVE

15   OF HOW MR. SHUM WAS DAMAGED BUT HOW THE DEFENDANTS,

16   MR. VERDIELL AND LIGHTLOGIC, WERE UNJUSTLY, INAPPROPRIATELY

17   BENEFITED BY THE SUBSTANTIAL WORK OF MR. SHUM.  YOU DON'T LOOK

18   AT THE SAME FACTORS THAT YOU DO WITH REGARD TO THE BREACH OF

19   CONTRACT AND THE FRAUD CLAIM IN FIGURING OUT THE UNJUST

20   ENRICHMENT CLAIM.

21           AND THE -- THE CORE ARGUMENT ON THE UNJUST

22   ENRICHMENT CLAIM IS THAT, AS I SAID BEFORE, LIGHTLOGIC WAS

23   BUILT ON THESE PATENTS -- ON THESE PATENT ASSIGNMENTS.  WITHOUT

24   THEM, THEY NEVER WOULD HAVE CASHED IN ON THE $409 MILLION THAT

25   INTEL PAID THEM.

```
 1            NOW, THE LAST CLAIM THAT I WANT TO TALK ABOUT, THIS

 2   HAPPENS TO BE THE FIRST CLAIM THAT YOU'RE GOING TO DECIDE IN

 3   THE JURY VERDICT.  IT'S PERHAPS THE MOST IMPORTANT HERE, AND IT

 4   RELATES TO THE TO THE WORK THAT MR. VERDIELL AND MR. SHUM DID

 5   TOGETHER AT RADIANCE, AND THAT'S THE INVENTORSHIP CLAIM.

 6            BY WAY OF AN OVERVIEW, THERE'S NO DOUBT THAT

 7   MR. SHUM WAS THE CHIEF ENGINEER OF RADIANCE.  MR. VERDIELL SAID

 8   SO IN THE DOCUMENTS, CONTEMPORANEOUS DOCUMENTS.  AND

 9   MR. VERDIELL WAS THE PRESIDENT AND TREASURER IN CHARGE OF

10   GETTING FUNDING.  THOSE WERE -- THOSE WERE HOW THEY HAD DIVIDED

11   THE DUTIES.

12            MR. VERDIELL WAS A SMART TECHNICAL MAN.  HE KNEW

13   ABOUT PACKAGING, CERTAINLY DID, BUT IT WAS MR. SHUM WHO WAS THE

14   WORLD-CLASS PACKAGING GUY, WHO HAD PATENTS IN PACKAGING BEFORE

15   RADIANCE, WHO HAD DEVELOPED PACKAGING PRODUCTS THAT WERE ON THE

16   COVER OF THE *SDL* MAGAZINE THAT JENKIN RICHARDS TOLD US

17   MR. VERDIELL WAS BRAGGING ABOUT.  SO MR. SHUM HAD MUCH MORE

18   EXPERIENCE IN PACKAGING BEFORE RADIANCE THAN MR. VERDIELL.

19            IT DOESN'T MAKE -- WELL, I ALSO WANT TO TAKE YOU

20   BACK TO SOME OF THE TESTIMONY OF THEIR WITNESSES, MR. WEBJORN

21   AND MR. VERDIELL.  BOTH OF THEM TESTIFIED THAT WITH REGARD TO

22   THE '427 PATENT, THE FLEXURE PATENT, IT TOOK -- THE -- THE

23   CONCEPTION AND INVENTION OF THAT FLEXURE TOOK OVER THREE YEARS

24   OF PROGRESS.  MR. VERDIELL TESTIFIED THAT THE ONE PATENT, THE

25   DUAL ENCLOSURE PATENT WE HAVEN'T TALKED ABOUT, TOOK OVER SIX
```

1    YEARS OF WORK.

2              BUT IN ORDER TO CUT OFF MR. SHUM'S RIGHTS IN THE

3    FLEXURE AND THE STEP PATENTS, HE -- HE IS IGNORING -- THEIR

4    THEORY, THE DEFENSE THEORY, IS TO IGNORE ALL THE WORK -- ALL

5    THE CONCEPTION WORK AND ALL THE WORK THAT MR. SHUM DID IN

6    CONTRIBUTING TO THE ELEMENTS OF THE CLAIMS AND FOCUS ON TWO

7    PIECES OF PAPER, THE ECTC NOTES FOR THE STEP AND THE 4/17 --

8    APRIL 17TH DRAWING FOR THE FLEXURE.

9              BUT THE PROBLEM IS THOSE TWO DOCUMENTS DON'T CONTAIN

10   ALL THE ELEMENTS OF THE INVENTIONS.  AND IF THEY DON'T CONTAIN

11   ALL THE ELEMENTS OF INVENTIONS, THEN WHO DID THEM?  THERE WERE

12   ONLY TWO PEOPLE AT RADIANCE.

13             IF WE COULD BRING UP THE FLEXURE EVIDENCE SLIDE,

14   DAVID, THAT WOULD BE GREAT.

15                  (EXHIBIT PUBLISHED TO JURY.)

16        **MR. KIRSCH:**  THE EVIDENCE IS A FLEXURE THAT FRANK

17   CONTRIBUTED TO THE CONCEPTION OF THE FLEXURE, AND IT IS

18   OVERWHELMING.  HE HAS A MARCH 17TH, 1997 ROI WHICH CONTAINS

19   MANY OF THE ELEMENTS OF THE FLEXURE.  IT DOES NOT LOOK LIKE THE

20   FLEXURE.  IT'S GOT PLANAR LEGS, IT DOESN'T HAVE LEGS THAT

21   DESCEND DOWNWARD, BUT IT HAS THE BRIDGE AND IT HAS THE BASIC

22   CONCEPT.

23             AND THEN WE GO TO THE APRIL 10TH DRAWING THAT TALK

24   ABOUT THE CALCULATIONS WITH REGARD TO HOW THE FLEXURE WORKED, A

25   MAY 15TH HAND DRAWING WHICH DESCRIBES THE FLEXURE WITH THE LEGS

1    GOING DOWN.  AND THEN A LONG SERIES OF CAD DRAWINGS FROM MAY TO

2    SEPTEMBER, THE WIRE FRAME -- EXCUSE ME -- WIRE FRAME CAD

3    DRAWINGS THAT ARE IN TRIAL EXHIBIT 163, THE FORMAL CAD

4    DRAWINGS, AND THEN THESE OTHER WIRE CAD DRAWINGS.

5            AND WE TALKED WITH MR. SHUM ABOUT HOW HE -- OVER THE

6    PERIOD OF WEEKS FROM MARCH THROUGH MAY, HE EVOLVED THE FLEXURE

7    FROM A PLANAR FLEXURE TO A BELOW PLANAR FLEXURE TO ABOVE PLANAR

8    FLEXURE, AND THAT'S REFLECTED IN THOSE DRAWINGS.

9            MR. VERDIELL'S -- AND THEN FINALLY, EXCUSE ME -- THE

10   PROTOTYPE, 1997.  IT'S -- DECEMBER 1997.  IT'S UNDISPUTED THAT

11   MR. SHUM DID THAT BY HIMSELF.  MR. VERDIELL WASN'T INVOLVED IN

12   THAT.

13            AND IF YOU COULD SHOW THE NEXT SLIDE, DAVID.

14            (EXHIBIT PUBLISHED TO JURY.)

15        **MR. KIRSCH:**  THAT'S MR. VERDIELL'S EVIDENCE.  THAT

16   ONE PIECE OF PAPER.

17            THAT ONE PIECE OF PAPER DOESN'T SHOW FOUR LEGS,

18   DOESN'T SHOW SPRING REGIONS, DOESN'T SHOW THE TOOLS THAT'S

19   NECESSARY IN THE '724.  IT DOESN'T SHOW MANY OF THE ELEMENTS OF

20   THE FLEXURE PATENTS.

21            SO HOW DO THE DEFENDANTS ARGUE THAT MR. VERDIELL IS

22   THE SOLE INVENTOR OF THE FLEXURES?  THEY PUT ON EXPERTS, AND

23   THEY CONTROL WHAT THE EXPERTS LOOK AT.

24            MR. HEYLER LOOKED AT TWO SPECIFIC DRAWINGS, THE

25   APRIL 17TH DRAWING AND A MAY 23RD DRAWING.  WHY HE DIDN'T LOOK

1    AT ALL THE OTHER EVIDENCE, I DON'T KNOW.  AND HE JUSTIFIED HIS

2    ARGUMENT THAT MR. SHUM DIDN'T CONTRIBUTE TO THE ELEMENTS OF THE

3    FLEXURE PATENTS WITHOUT LOOKING AT THE OTHER EVIDENCE BY

4    MR. SHUM.

5          MR. LEE DID THIS VERY INTERESTING FINITE ELEMENT

6    ANALYSIS, COMPUTER-GENERATED ANALYSIS, BUT HE WAS TOLD WHICH

7    FLEXURES TO PICK FROM.  HE DIDN'T PICK SHUM'S JUNE 1ST CAD

8    DRAWING WHICH HE ADMITTED ON THE STAND ACTED IN THE SAME WAY,

9    THAT SAME DEFORMATION, COMPLEX DEFORMATION, THAT HE TESTIFIED

10   THE LATER LIGHTLOGIC FLEXURES OPERATED UNDER.

11         MR. KOCH, VERY SMART MAN, LOOKED AT MORE EVIDENCE,

12   BUT HE DECIDED FOR HIMSELF WHAT HE THOUGHT WAS NEW.  HE DIDN'T

13   LOOK AT ALL OF THE CLAIMS, ALL THE COMBINATIONS IN THE PATENTS

14   AND -- AND APPLY AND LOOK AT HOW MR. SHUM'S EVIDENCE READ ON TO

15   THOSE CLAIMS.

16         MR. KNOX DID.  MR. KNOX IS THE ONLY EXPERT IN THIS

17   CASE THAT FOLLOWED THE LAW AND LOOKED AT ALL OF THE EVIDENCE

18   AND EXPLAINED HOW MR. SHUM'S EVIDENCE IS -- WAS FOUND IN THE

19   CLAIMS.

20         BESIDE THIS TECHNICAL EVIDENCE OF THE FLEXURE, THERE

21   IS CIRCUMSTANTIAL EVIDENCE, A LOT OF IT, THAT MR. SHUM IS AN

22   INVENTOR.

23         (EXHIBIT PUBLISHED TO JURY.)

24         **MR. KIRSCH:**  THERE'S THE 1999.  RIGHT AFTER

25   MR. VERDIELL GOES TO LIGHTLOGIC IN HIS BEDROOM, I GUESS, HE AND

1    MR. WEBJORN LOOK AT THE CAD DRAWINGS AND THE PROTOTYPES OF WHO?

2    MR. SHUM.

3              LIGHTLOGIC ADMITTED THAT THE FIRST GENERATION OF

4    FLEXURE WAS CREATED AT RADIANCE.  IN FACT, JONAS WEBJORN SAID

5    "IT WAS NOTHING -- MARC WAS HIDING -- IT WAS NOT" -- EXCUSE ME.

6    I APOLOGIZE.

7              "MARC WAS NOT HIDING THAT THE FLEXURES CAME FROM THE

8    EFFORTS THAT HE AND FRANK DID TOGETHER."  THAT'S WHAT HE

9    TESTIFIED ABOUT.

10             AND INTERESTINGLY ENOUGH, VERDIELL NEVER TOLD

11   MR. WEBJORN THAT HE INVENTED THE FLEXURE.  JENKIN RICHARDS

12   TESTIFIED THAT MR. VERDIELL ATTRIBUTED THE FLEXURE, THE FLEXURE

13   DESIGN TO WHAT FRANK WAS WORKING ON.

14             SO THERE IS OVERWHELMING EVIDENCE, CIRCUMSTANTIAL

15   AND TECHNICAL, NOT JUST MR. SHUM'S TESTIMONY BUT DOCUMENTS,

16   OTHER PEOPLE'S TESTIMONY THAT CORROBORATES THAT MR. SHUM IS AT

17   LEAST A COINVENTOR.

18             ON THE STEP PATENTS --

19             IF WE COULD SEE THE SLIDE, DAVID.

20                  (EXHIBIT PUBLISHED TO JURY.)

21        **MR. KIRSCH:**  -- WE START WITH MR. SHUM'S OCTOBER

22   '94 ROI WHICH DISCUSSED SOME OF THE EARLY IDEAS IN THE ACADIAN

23   PROPOSAL.  AND AS I JUST DISCUSSED A MINUTE AGO, ALTHOUGH

24   MR. VERDIELL TRIED TO DENY ORIGINALLY THAT MR. SHUM PLAYED ANY

25   ROLE IN THE ACADIAN PROPOSAL IN WRITING IT, HE DID ADMIT THAT

1    MR. SHUM WROTE THE PART ABOUT THE LENS AND THE DRAWINGS.

2              MR. SHUM -- MR. VERDIELL DID GO TO A CONFERENCE, AN

3    ECTC CONFERENCE IN LATE MAY 1996 -- AND BY THE WAY, THIS

4    CONFERENCE WAS AN OPTOELECTRONIC PACKAGING CONFERENCE, AND THE

5    BRUSH WELLMAN SALESMAN WAS THERE PROMOTING DIRECT-BONDED

6    COPPER.  SO MR. VERDIELL'S ARGUMENT THAT DIRECT-BONDED COPPER

7    WAS NEW IN THE CONTEXT OF OPTOELECTRONIC PACKAGING DOESN'T MAKE

8    SENSE.

9              THERE'S NO RECOGNITION OF THE CONSTRAINING CONCEPT

10   IN THOSE NOTES.  THERE'S NO RECOGNITION OF MANY OF THE ISSUES

11   THAT ARE IN THE STEP PATENTS.

12             THE JULY 2ND PROPOSAL WAS SUBMITTED IN SHUM'S NAME.

13   AFTER THAT, THEY WENT TO A PATENT AGENT.  THEY WENT TO MAREK

14   ALBOSZTA.  AND MR. SHUM TESTIFIED, AND MR. VERDIELL DID NOT

15   DISAGREE, THAT AT THAT MEETING, MR. VERDIELL PROMOTED -- TOLD

16   THE PATENT AGENT THAT MR. SHUM WAS THE INVENTOR.  IT'S

17   UNDISPUTED.

18             OCTOBER 13, 1996 EMAIL, VERDIELL ADMITS THAT THE

19   PACKAGING PATENT IS SHUM'S.  AND THEN WE HAVE DRAFT PATENT

20   CLAIMS IN JANUARY AND THEN AGAIN IN FEBRUARY.  THAT ONE'S NOT

21   LISTED THERE, BUT MR. SHUM, WHERE HE'S DRAFTING THE CLAIMS THAT

22   END UP IN -- IN THE FINAL AND IN THE DRAFT PATENT APPLICATION

23   IN APRIL OF '97, WHICH IS THE LAST ONE -- AS WELL AS THE CLAIMS

24   THAT ARE IN THE FINAL APPLICATION IN JANUARY OF '98, MR. SHUM'S

25   SOLE INVENTION.

1    JUST TO BACK UP FOR ONE SECOND.  ABOUT A MONTH,

2    ALMOST A MONTH EXACTLY BEFORE THEY FILED THAT APRIL 22ND, 1997

3    PATENT APPLICATION, MR. SHUM DECLARED IN AN UNRELATED PATENT

4    APPLICATION THAT HE KNEW IT WAS FALSE TO NOT NAME ALL THE

5    INVENTORS.  HE KNEW THAT HE HAD TO NAME ALL THE INVENTORS.

6    A MONTH LATER, HE LET MR. SHUM FILE THE SOLE

7    INVENTORSHIP PATENT APPLICATION.

8    GO TO THE NEXT SLIDE, DAVID.

9    (EXHIBIT PUBLISHED TO JURY.)

10    **MR. KIRSCH:**  AND THE NASA REPORTS WE SPOKE OF A FEW

11    MINUTES AGO, MAY AND OCTOBER OF '97, MR. VERDIELL ATTRIBUTED

12    THE CLAIMS, THE CONSTRAINING CLAIMS THAT MR. KOCH, THEIR

13    EXPERT, CLAIMS WERE KEY FOR THE VENDOR, NOT HIM.  THAT'S WHY I

14    ASKED HIM IF THE VENDOR WAS THE INVENTOR.

15    AND THEN IN THE DRAFT PATENT APPLICATION, NOVEMBER

16    OF 1999, MR. VERDIELL WANTS TO TAKE OUT SHUM'S CONTRIBUTION OF

17    THE FLAT-BOTTOM LENS, BUT IT'S NOT INCLUDED.  IT'S INCLUDED IN

18    THE FINAL ISSUED PATENT.

19    AND IF YOU LOOK AT THE '268 PATENT, WHICH IS THE

20    PROCESS OR METHOD PATENT ON THE STEP, IT DOESN'T MENTION DBC OR

21    CONSTRAINING AT ALL, WHICH IS THEIR MAIN ARGUMENT FOR WHAT

22    MR. VERDIELL CONTRIBUTED.

23    NOW, ON THE STEP PATENTS, WE ALSO HAVE

24    CIRCUMSTANTIAL EVIDENCE.

25    IF YOU COULD BRING UP THE NEXT SLIDE, DAVID.

1        (EXHIBIT PUBLISHED TO JURY.)

2            **MR. KIRSCH:**  JUST AFTER THE STEP DBC PATENT, SOLE

3    INVENTORSHIP PATENT APPLICATION WAS FILED IN JANUARY '98 BY

4    MR. VERDIELL, HE OFFERS TO BUY OUT SHUM'S RIGHTS IN THE PENDING

5    PATENT APPLICATION.  A FEW DAYS LATER, A MONTH LATER, HE ADMITS

6    IN A LETTER TO RICH VENTURES, ONE OF THE INVESTORS, THAT HE DID

7    NOT SIGNIFICANTLY CHANGE SHUM'S EARLIER PATENT APPLICATION AND

8    THAT IT WOULDN'T HAVE ANY VALUE BECAUSE HE DIDN'T BUY OUT

9    SHUM'S RIGHTS.

10            JOHN STOCKHOLM, A VENTURE CAPITALIST, TESTIFIED LAST

11    WEEK, AND PERHAPS TWO WEEKS AGO NOW, WHO INVESTED IN THE SUMMER

12    OF 1998 JUST AFTER THIS PATENT APPLICATION WAS FILED, WHEN

13    ASKED, "DID YOU AND MR. VERDIELL HAVE ANY DISCUSSIONS

14    REGARDING -- LEADING UP TO YOUR INVESTMENT REGARDING MR. SHUM'S

15    ROLE IN INVENTING THE INVENTIONS THAT WERE CLAIMED IN THE

16    APPLICATION THAT MR. VERDIELL ASSIGNED TO LIGHTLOGIC?"

17            AND AT THAT TIME THERE WAS ONLY ONE, AND THAT WAS

18    THAT FIRST STEP APPLICATION.

19            AND HE SAID, "I KNEW.  I KNEW IT WAS DONE AT

20    RADIANCE AND I KNEW THERE WERE ONLY TWO PEOPLE THERE AND I KNEW

21    THEY WORKED TOGETHER, AND I KNEW THEY WERE BOTH TECHNOLOGY

22    PEOPLE, SO I ASSUMED THEY SHARED WORKING ON IT.  YES, THEY BOTH

23    WORKED ON IT.

24            "WHAT DID MR. VERDIELL TELL YOU ON THAT SUBJECT?

25            "HE TOLD ME JUST WHAT I TOLD YOU."

1    SO SHUM KNEW -- EXCUSE ME -- MR. VERDIELL KNEW THAT

2    MR. SHUM WAS A CO-INVENTOR OF THE PATENTS AT ISSUE, AND YET HE

3    FILED THESE PATENTS AND ASSIGNMENTS TO GET EXCLUSIVE RIGHTS,

4    AND IT WORKED.

5        IF YOU COULD BRING UP THE JANUARY 22ND, 1999 EMAIL.

6            (EXHIBIT PUBLISHED TO JURY.)

7        **MR. KIRSCH:**  NOT ONLY DID HE OBTAIN THOSE EXCLUSIVE

8    RIGHTS KNOWING HE DIDN'T HAVE THEM.  HE AFFIRMATIVELY TRIED TO

9    BLOCK MR. SHUM.  I DON'T KNOW IF YOU RECALL THIS ONE FROM EARLY

10   ON IN THE TRIAL, BUT THIS IS THE STRATEGY THAT WAS PROPOSED BY

11   LAWYERS TO PREVENT ANY ATTEMPT BY FRANK TO PATENT STUFF BEHIND

12   THEIR BACK.  HE'S BLOCKING MR. SHUM FROM FILING HIS OWN STEP

13   PATENT APPLICATION.  AND WHY?

14       THE REASON IS HE KNEW HE NEEDED EXCLUSIVE RIGHTS.

15   IF HE DIDN'T HAVE EXCLUSIVE RIGHTS AND IF THERE WAS A FIGHT

16   ABOUT EXCLUSIVE RIGHTS, THEN THE INVESTORS AND THE VENTURE

17   CAPITALISTS WOULDN'T BE INTERESTED.  HE DID EVERYTHING HE COULD

18   TO BLOCK MR. FRANK -- MR. -- MR. SHUM, AND HE SUCCEEDED.  AND

19   HE'S CONTINUED TO BLOCK HIM UNTIL THIS DAY.

20       MR. MACDONALD WILL NOW DISCUSS THE ISSUES REGARDING

21   DAMAGES IN THIS CASE.

22            **CLOSING ARGUMENT**

23       **MR. MacDONALD:**  GOOD MORNING, LADIES AND GENTLEMEN.

24       I WANT TO REITERATE WHAT MY COLLEAGUE, MR. KIRSCH,

25   HAS SAID, WHICH IS WE THANK YOU VERY MUCH FOR YOUR TIME, YOUR

 1   PATIENCE AND YOUR INCREDIBLE ATTENTION TO THIS MATTER.  I KNOW

 2   IT'S BEEN QUITE A SACRIFICE.

 3         I WANT TO ESPECIALLY CONVEY MR. SHUM'S SINCEREST

 4   GRATITUDE FOR YOUR ATTENTION IN THIS MATTER AS WELL.  HE'S

 5   WAITED ALMOST SEVEN YEARS IN THE TIME THIS LITIGATION WAS

 6   COMMENCED TO NOW FINALLY HAVE HIS DAY IN COURT IN FRONT OF A

 7   JURY OF HIS PEERS, AND HE SINCERELY THANKS YOU FOR THIS

 8   OPPORTUNITY.

 9         AS MR. KIRSCH INDICATED, I WILL DISCUSS THE DAMAGES

10   THAT WE CLAIM ARE OWED TO MR. SHUM.  AS YOU HAVE JUST HEARD,

11   THERE ARE FOUR CLAIMS OR CAUSES OF ACTION THAT YOU WILL BE

12   ASKED TO DELIBERATE ABOUT.  THEY ARE INVENTORSHIP, FRAUD,

13   BREACH OF CONTRACT, AND UNJUST ENRICHMENT.

14         DAVID, IF YOU WANT TO SHOW THE SLIDE.

15         (EXHIBIT PUBLISHED TO JURY.)

16         **MR. MacDONALD:**  HERE'S A SUMMARY SLIDE.  AT A HIGH

17   LEVEL, I WILL PROVIDE JUST A BRIEF OVERVIEW OF THE DAMAGES THAT

18   WE SEEK FOR EACH OF THESE CLAIMS, AND I'LL SPEND THE BULK OF MY

19   TIME GOING OVER THE KEY ISSUES WITH RESPECT TO DAMAGES WITH

20   PARTICULAR EMPHASIS ON THE IMPORTANCE OF PATENTS AND THE

21   ASSIGNMENTS DURING THE RELEVANT TIME PERIOD AND JUST GENERALLY

22   THE IMPORTANCE OF THE DOCUMENTS AS -- AND THE DOCUMENTS WILL

23   AMPLY DEMONSTRATE HOW IMPORTANT THE PATENTS WERE.

24         NOW, REGARDING THE INVENTORSHIP CLAIM, YOU'LL NOTICE

25   THAT THERE'S NO DAMAGES CLAIM THERE.  THAT'S BECAUSE THERE'S NO

1    DAMAGES ALLOWED FOR INVENTORSHIP.  SO YOU WILL NOT BE ASKED TO

2    DETERMINE ANY DAMAGES.  HOWEVER, IT WAS IMPORTANT TO MR. SHUM

3    THAT HIS INVENTIVE CONTRIBUTION BE RECOGNIZED, AND THAT'S WHY

4    WE'RE PURSUING THIS CLAIM.

5                AS TO THE OTHER THREE CLAIMS, YOU'LL BE ASKED TO

6    DETERMINE THE AMOUNT OF DAMAGES, AND I'VE SUMMARIZED IT RIGHT

7    HERE.

8                FOR THE INTENTIONAL MISREPRESENTATION CLAIM,

9    ASSUMING WE PROVE THAT MR. VERDIELL OR LIGHTLOGIC IS LIABLE FOR

10   INTENTIONAL MISREPRESENTATION, YOU'LL BE ASKED TO DECIDE HOW

11   MUCH MONEY WILL REASONABLY COMPENSATE MR. SHUM FOR THE HARM,

12   EVEN IF THE HARM COULD NOT HAVE BEEN ANTICIPATED.

13               AS MR. KIRSCH WAS SAYING, THE CRUX OF OUR

14   INTENTIONAL MISREPRESENTATION CLAIM IS THAT SHUM RELIED UPON

15   MR. VERDIELL'S AFFIRMATIVE REPRESENTATIONS ABOUT HAVING TO

16   ABANDON SHUM'S PATENT APPLICATION AT RADIANCE AND THAT CAUSED

17   SHUM TO AGREE TO DISSOLVE RADIANCE AND FORGO HIS VALUABLE

18   RIGHTS.

19               FOR HIS INTENTIONAL MISREPRESENTATION CLAIM, SHUM

20   SEEKS AN AWARD OF EITHER $58 MILLION OR $29 MILLION, WHICH

21   RESPECTIVELY REPRESENTS THE FULL VALUE OF WHAT MR. VERDIELL GOT

22   FROM THE LIGHTLOGIC/INTEL MERGER OR ONE-HALF OF THAT VALUE.

23               AND THAT WAS ANALYZED BY MR. SHUM'S DAMAGES EXPERT,

24   PAUL REGAN, AS YOU MAY RECALL.

25               WE CONTEND THAT THESE FIGURES REPRESENT A REASONABLE

 1   COMPENSATION TO SHUM FOR THE HARM CAUSED BY MR. VERDIELL AND

 2   LIGHTLOGIC.

 3              DAVID, DO YOU WANT TO GO TO THE NEXT SLIDE.

 4                 (EXHIBIT PUBLISHED TO JURY.)

 5          **MR. MacDONALD:**  BREACH OF CONTRACT.  MR. VERDIELL,

 6   AS MR. KIRSCH HAS EXPLAINED, BREACHED THE PLAN OF LIQUIDATION,

 7   AND SPECIFICALLY THE EQUAL RIGHTS PROVISION OF THAT CONTRACT

 8   EVERY TIME HE FILED A PATENT APPLICATION AND/OR ASSIGNMENT THAT

 9   CLAIMED SOLE INVENTORSHIP AND/OR EXCLUSIVE OWNERSHIP OF THE

10   PATENTS IN SUIT STARTING ON JANUARY 6TH, 1998.

11              IF YOU FIND IN FAVOR OF MR. SHUM ON THIS CLAIM,

12   YOU'LL BE ASKED TO DECIDE HOW MUCH MONEY WILL REASONABLY

13   COMPENSATE FRANK SHUM FOR THE HARM CAUSED BY THE BREACH.

14   MR. SHUM, FOR THIS PARTICULAR CLAIM, THE BREACH OF CONTRACT

15   CLAIM, SEEKS AN AWARD OF $29 MILLION, WHICH REPRESENTS THE

16   BUYOUT OF FRANK SHUM'S RIGHTS TO RADIANCE, WHICH WE CONTEND

17   WOULD BE 50 PERCENT OF THE VALUE OF MR. VERDIELL'S SHARES IN

18   LIGHTLOGIC.

19              THIS NEED TO BUY OUT MR. SHUM'S RIGHTS WAS EVIDENCED

20   BY MR. VERDIELL'S APRIL 25TH, 1998 EMAIL ALMOST FOUR MONTHS

21   AFTER RADIANCE DISSOLVED.

22              AND, DAVID, IF WE CAN GO TO TX330.

23                 (EXHIBIT PUBLISHED TO JURY.)

24          **MR. MacDONALD:**  THIS IS AN EMAIL FROM MR. VERDIELL

25   TO MR. SHUM WITH RESPECT TO BUYING OUT MR. SHUM'S RIGHTS IN THE

1    PATENT APPLICATION.  AND MR. -- MR. VERDIELL RESPONDS, "I MIGHT

2    HAVE SOME INTEREST.  NOTE, I -- THAT I NOW SEE ONLY LIMITED

3    VALUE IN THE ORIGINAL DBC PATENT APPLICATION.  AND BESIDES, YOU

4    ARE NOT THE INVENTOR OF THE CLAIMS I'D BE INTERESTED IN.

5    HOWEVER, I MAY BE INTERESTED IN BUYING ALL YOUR RIGHTS FROM

6    RADIANCE AND A FULL RELEASE FOR THE SAKE OF CLEANLINESS."

7              IT'S CLEAR HERE THAT MR. VERDIELL UNDERSTOOD THAT TO

8    CONTINUE WITH HIS DESIRE TO FILE PATENT APPLICATIONS, HE NEEDED

9    TO BUY OUT ALL OF SHUM'S RIGHTS AND OBTAIN THE FULL RELEASE.

10             THIS EMAIL'S ALSO SIGNIFICANT BECAUSE IT DOESN'T --

11   DOESN'T MENTION THAT MR. VERDIELL HAD ALREADY FILED A PATENT

12   APPLICATION FOUR MONTHS EARLIER, JANUARY 6, 1998, THE DBC

13   PATENT APPLICATION.

14             UNDER THE CIRCUMSTANCES AND GIVEN THE EQUAL RIGHTS

15   PROVISION OF THE POL, IT WOULD HAVE BEEN REASONABLE TO FORESEE

16   THAT THE BUYOUT PRICE FOR MR. SHUM'S CO-INVENTORSHIP AND

17   CO-OWNER RIGHTS FOR THE RADIANCE INVENTION BE ONE-HALF OF

18   MR. VERDIELL'S SHARES IN LIGHTLOGIC, AND THAT VALUE, AS I

19   MENTIONED, EQUALED $29 MILLION.

20             AND THEN LASTLY, WE HAVE THE UNJUST ENRICHMENT

21   CLAIM, WHICH IS RIGHT HERE.

22             (EXHIBIT PUBLISHED TO JURY.)

23        MR. MacDONALD:  UNJUST ENRICHMENT, IN MANY WAYS, IS

24   THE MOST IMPORTANT CLAIM IN THIS CASE.  FOR UNJUST ENRICHMENT,

25   AS MR. KIRSCH WAS EXPLAINING, THE FOCUS IS NOT ON MR. SHUM OR

 1    ANY LOSS THAT HE MAY HAVE SUFFERED, BUT RATHER THE FOCUS IS ON

 2    WHETHER LIGHTLOGIC AND/OR VERDIELL UNJUSTLY RECEIVED A BENEFIT,

 3    EVEN IF MR. SHUM DID NOT SUFFER A CORRESPONDING LOSS OR ANY

 4    LOSS AT ALL.  AGAIN, THE FOCUS IS ON WHAT LIGHTLOGIC OR

 5    MR. VERDIELL -- WHAT AMOUNT THEY WERE UNJUSTLY ENRICHED.

 6             AND HERE, THE RECEIPT OF THE BENEFIT OCCURRED

 7    MAY 2001 AT THE TIME OF THE LIGHTLOGIC/INTEL MERGER.  FROM THAT

 8    DEAL, MR. VERDIELL OBTAINED $58 MILLION WORTH OF INTEL SHARES.

 9    AND WE CONTEND THAT WE'RE ENTITLED TO -- THAT THE UNJUST

10    ENRICHMENT WAS ALL OR HALF OF WHAT MR. VERDIELL OBTAINED FROM

11    THAT DEAL DUE TO THE CONDUCT DESCRIBED BY MR. KIRSCH.

12             NOW, AS TO LIGHTLOGIC, WHICH IS ABOVE THE

13    VERDIELL -- MR. VERDIELL'S UNJUST ENRICHMENT, WE CONTEND THAT

14    THE UNJUST ENRICHMENT IS APPROXIMATELY $175 MILLION.  AND I SAY

15    APPROXIMATELY BECAUSE WE REACHED THAT CALCULATION THROUGH TWO

16    DIFFERENT ANALYSES.

17             THE FIRST ANALYSIS IS THE CALCULATION THAT

18    MR. REGAN, MR. SHUM'S DAMAGES EXPERT, TESTIFIED TO A COUPLE

19    WEEKS AGO.  AND AS YOU RECALL, WHAT HE DID WAS HE STARTED OFF

20    WITH THE $409 MILLION PURCHASE PRICE, THEN BACKED OUT VARIOUS

21    ASSETS INCLUDING THE TANGIBLE ASSETS THAT WERE REPORTED BY

22    INTEL FROM THE DEAL WHICH WAS APPROXIMATELY $59 MILLION, AND

23    THE $2 MILLION OF THE ASSEMBLED WORK FORCE, AS SET FORTH IN THE

24    DELOITTE & TOUCHE REPORT THAT I'LL TOUCH UPON A LITTLE LATER.

25    AND HE ALSO BACKED OUT OTHER THINGS, INCLUDING THE $1 MILLION

1    TRANSPONDER VALUE THAT WAS DISCLOSED ALSO IN THE DELOITTE

2    REPORT.  AND THAT GOT HIM DOWN TO 347 MILLION.

3              AND IN RECOGNITION OF MR. SHUM'S CO-INVENTORSHIP

4    RIGHTS AND CO-OWNERSHIP RIGHTS AS WELL AS EQUAL RIGHTS UNDER

5    THE POL, WE -- WE DIVIDED THAT BY ONE-HALF AND CAME UP TO

6    $173.5 MILLION FIGURE THAT MR. REGAN TESTIFIED TO A FEW WEEKS

7    AGO.

8              NOW, AN ALTERNATIVE WAY TO CALCULATE THE UNJUST

9    ENRICHMENT IS STARTING OFF AGAIN WITH THE $409 MILLION AND

10   TAKING OUT MR. VERDIELL'S UNJUST ENRICHMENT WHICH GETS YOU DOWN

11   TO $351 MILLION, AND DOING THE SAME DIVISION BY TWO THAT I WAS

12   JUST MENTIONING, AND THAT GETS YOU DOWN TO $175.5 MILLION.

13             AND THAT'S THE UNJUST ENRICHMENT IN A NUTSHELL.

14   I'LL TURN TO IT A LITTLE BIT LATER.

15             BUT NOW I WANT TO GO -- TAKE A STEP BACK AND DISCUSS

16   SOME OF THE KEY ISSUES SURROUNDING DAMAGES.

17             THE CENTRAL DISPUTE ON DAMAGES IS DETERMINING

18   WHETHER THE PATENTS AT ISSUE IN THIS CASE PLAYED A SUBSTANTIAL

19   FACTOR IN THE LIGHTLOGIC/INTEL DEAL AS OF MAY 2001.

20             AS YOU PROBABLY NOTICE, THERE IS A WIDE DIFFERENCE

21   THAT SEPARATES THE PARTIES REGARDING HOW IMPORTANT THE PATENTS

22   PLAYED OR WHAT ROLE THE PATENTS PLAYED IN THE DEAL WHERE INTEL

23   PURCHASED LIGHTLOGIC.

24             AND LIGHTLOGIC, AT THE TIME CONSIDERED -- SORRY --

25   INTEL CONSIDERED LIGHTLOGIC AT THE TIME JUST A STARTUP COMPANY.

1          NOW, WHEN YOU LISTEN TO DEFENDANTS' CLOSING

2     ARGUMENTS AND WHEN YOU START DELIBERATING, I ASK THAT YOU MAKE

3     THE DISTINCTION BETWEEN WHAT THE DOCUMENTS ACTUALLY SAY VERSUS

4     WHAT THE DEFENDANTS' WITNESSES NOW CLAIM SEVEN TO TEN YEARS

5     AFTER THE FACT.  THESE AFTER-THE-FACT EXPLANATIONS BY

6     DEFENDANTS AND THEIR WITNESSES -- AND THEIR WITNESSES

7     MINIMIZING ANY IMPORTANCE OF THE PATENTS SIMPLY CANNOT BE

8     RECONCILED WITH THE DOCUMENTS EXISTING AT THE TIME

9     CONTEMPORANEOUS TO THE DEAL.

10          BUT AS POINTED OUT REPEATEDLY -- REPEATEDLY BY

11    MR. GREG BALDRIDGE, YOU MAY RECALL HIM, HE WAS THE LIGHTLOGIC

12    CHIEF FINANCIAL OFFICER.  WHAT HAPPENED IN HIS VIEW OF THE REAL

13    WORLD OFTEN DIFFERENT -- DIFFERS FROM WHAT HAPPENED OR IS

14    DISCLOSED IN THE DOCUMENTS.  AND I WANTED TO TALK ABOUT

15    GREG BALDRIDGE FOR A BIT.

16          AS YOU MAY RECALL, MR. BALDRIDGE JOINED THE COMPANY

17    IN LATE 1999.  LESS THAN A YEAR AND A HALF LATER WHEN

18    LIGHTLOGIC WAS SOLD TO INTEL, HE MADE $15 MILLION FROM THE DEAL

19    AND HAS BEEN RETIRED SINCE.  NOT BAD FOR HIM.

20          NOW, MR. BALDRIDGE CLAIMED THAT LIGHTLOGIC'S

21    INTELLECTUAL PROPERTY AND SPECIFICALLY ITS PATENTS CREATED NO

22    VALUE FOR LIGHTLOGIC.  AND LET ME EMPHASIZE THAT.  HE TESTIFIED

23    UNDER OATH THAT LIGHTLOGIC'S PATENTS DID NOT CREATE ANY VALUE

24    FOR LIGHTLOGIC.

25          IN FACT, LET'S SEE EXACTLY WHAT HE SAID IN HIS

1    TESTIMONY.

2              I ASKED HIM:  "DID INTELLECTUAL PROPERTY NOT CREATE

3    VALUE, MR. BALDRIDGE?

4              "ANSWER:  INTELLECTUAL PROPERTY DID NOT CREATE

5    VALUE.  PRODUCTS CREATE VALUE.

6              "SO PATENTS DIDN'T CREATE VALUE IN YOUR -- IS THAT

7    YOUR TESTIMONY?

8              "THAT IS MY TESTIMONY, PRODUCTS CREATE VALUE.

9    THERE'S A BIG DIFFERENCE."

10             NOW, THIS TESTIMONY COMES FROM THE CHIEF FINANCIAL

11   OFFICER OF THE STARTUP COMPANY WHICH PRIOR TO 2000 HAD NO

12   PRODUCTS, NO CUSTOMERS, NO MARKET SHARE, NO REVENUES, NO

13   ANYTHING, REALLY.  LIGHTLOGIC -- AND -- AND DESPITE THAT,

14   LIGHTLOGIC WAS STILL ABLE TO SECURE OVER $50 MILLION IN THREE

15   SEPARATE ROUNDS OF INVESTMENT FINANCING AND ANOTHER

16   $17.5 MILLION IN LOANS.

17             AND WHAT -- WHAT ASSETS DID LIGHTLOGIC'S HAVE --

18   WHAT ASSETS DID LIGHTLOGIC HAVE AT THE TIME?  WELL, IT HAD

19   PATENTS, PATENT APPLICATIONS SPECIFICALLY, WHICH IT TOUTED

20   REPEATEDLY IN ITS CORPORATE OVERVIEW AND BUSINESS PLAN

21   DOCUMENTS.

22             AND PERHAPS IT HAD ITS WORK FORCE, AND WE'LL TALK

23   ABOUT THE VALUE OF LIGHTLOGIC'S WORK FORCE A LITTLE LATER.  BUT

24   LET'S TALK ABOUT ITS PATENTS AND ITS VALUE TO LIGHTLOGIC.

25             NOW, EVEN THOUGH MR. BALDRIDGE CLAIMED THAT THE

 1   PATENTS HAD NO VALUE TO LIGHTLOGIC, HE WAS REGULARLY INVOLVED

 2   IN DISCUSSIONS REGARDING STRATEGIES FOR PROTECTING LIGHTLOGIC'S

 3   INTELLECTUAL PROPERTY.  HE, HOWEVER, ON THE STAND, DENIED EVER

 4   HAVING THOSE DISCUSSIONS.

 5              IF YOU WANT TO JUST QUICKLY GO TO THE Q AND A.

 6              (EXHIBIT PUBLISHED TO JURY.)

 7         **MR. MacDONALD:**  "DID YOU HAVE DISCUSSIONS WITH

 8   STRATEGIES FOR PROTECTION OF INTELLECTUAL PROPERTY" --

 9              "ANSWER:  THAT'S NOT CORRECT."

10              BUT THEN I THEN SHOWED HIM THE BOARD OF DIRECTOR

11   MEETING MINUTES FOR DECEMBER 5, 2000 WHICH CONTRADICTED HIS

12   TESTIMONY.  UNDER THE --

13              DAVID, IF WE CAN PULL THAT UP.

14              (EXHIBIT PUBLISHED TO JURY.)

15         **MR. MacDONALD:**  UNDER THE -- THIS IS FROM THE

16   DECEMBER 5, 2000 MEETING MINUTES.  UNDER "INTELLECTUAL PROPERTY

17   UPDATE," IT CLEARLY SAYS THAT HE UPDATED THE BOARD ON THE

18   COMPANY'S PATENT PROSECUTION EFFORTS AND STRATEGIES FOR

19   PROTECTION OF INTELLECTUAL PROPERTY.

20              NOW, WHEN CONFRONTED WITH THAT DOCUMENT, WHICH

21   CONTRADICTED HIS TESTIMONY, WHAT DID MR. BALDRIDGE SAY?

22              IN WHAT WILL BECOME A THEME WITH DEFENDANTS' OTHER

23   WITNESSES, MR. BALDRIDGE RETREATED FROM THE DOCUMENT AND

24   CONTENDED THAT THE MEETING MINUTES WERE PURPOSELY VAGUE.  YOU

25   MAY RECALL THE TESTIMONY.

1          (EXHIBIT PUBLISHED TO JURY.)

2          **MR. MacDONALD:** I'M NOT GOING TO READ THE ENTIRE

3    THING. BUT THE LAST Q AND A IS: "ARE YOU SUGGESTING,

4    MR. BALDRIDGE, THE AUTHOR OF THE MEETING MINUTES WAS PURPOSELY

5    VAGUE WHEN HE WROTE THAT YOU UPDATED THE BOARD REGARDING

6    GENERAL STRATEGIES FOR THE PROTECTION OF INTELLECTUAL

7    PROPERTY?"

8          AND HE ANSWERED: "THE CONCEPT, GENERAL -- GENERAL

9    STRATEGY (SIC) IS VERY VAGUE, YES."

10          AND WHY WOULD IT BE NECESSARY TO KEEP BOARD OF

11   DIRECTOR MEETING MINUTES PURPOSELY VAGUE UNLESS YOU'RE TRYING

12   TO HIDE SOMETHING? BUT MORE IMPORTANTLY, IF PATENTS REPRESENT

13   NO VALUE, AS MR. BALDRIDGE TESTIFIED, WHY WAS THERE A

14   DISCUSSION ABOUT OBTAINING PATENT PROTECTION DURING THE

15   LIGHTLOGIC BOARD OF DIRECTORS MEETINGS? AND WHY SPEND THE

16   MONEY AND THE TIME AND THE EFFORT TO FILE THESE PATENT

17   APPLICATIONS WHICH MAY TAKE TWO TO FIVE YEARS TO ISSUE INTO A

18   PATENT, SOMETIMES LONGER, IF THEY TRULY HAVE NO VALUE?

19          AND LET'S TALK ABOUT ANOTHER DOCUMENT THAT

20   MR. BALDRIDGE TESTIFIED ABOUT THAT COMPLETELY UNDERMINES HIS

21   TESTIMONY ABOUT LIGHTLOGIC'S PATENTS NOT BEING VALUABLE.

22          IT'S THE INTELLECTUAL PROPERTY SECURITY AGREEMENT,

23   WHICH IS TX18.

24          (EXHIBIT PUBLISHED TO JURY.)

25          **MR. MacDONALD:** NOW, YOU MAY RECALL THAT I ASKED

1   SOME QUESTIONS ABOUT THIS.  THIS WAS THE AGREEMENT THAT ALLOWED

2   LIGHTLOGIC TO OBTAIN $15 MILLION IN -- IN A SECURITY AGREEMENT,

3   A LOAN, DATED MARCH 31, 2000.  AND RECALL, THIS IS BEFORE ANY

4   PRODUCTS, ANY CUSTOMERS, ANY REVENUES IN MARCH 2000.  IT WAS

5   SIGNED BY MR. BALDRIDGE.

6            AND I ASKED WHETHER THE PATENT AND PATENT

7   APPLICATIONS OWNED BY LIGHTLOGIC WERE THE ONLY INTELLECTUAL

8   PROPERTY THAT LIGHTLOGIC HAD AN INTEREST IN, IN THIS TIME

9   FRAME.  AND HE FLATLY DENIED IT.

10            (EXHIBIT PUBLISHED TO JURY.)

11       **MR. MacDONALD:**  IF YOU LOOK AT THE LAST Q AND A.

12            "IN FACT, THE ONLY INTELLECTUAL PROPERTY IN WHICH

13   LIGHTLOGIC HAD AN INTEREST IN WAS THE PATENT AND PATENT

14   APPLICATION; IS THAT CORRECT?

15            "ABSOLUTELY NOT."

16            BUT THEN I SHOWED MR. BALDRIDGE A SECOND -- THE

17   SECTION IN THE INTELLECTUAL PROPERTY SECURITY AGREEMENT --

18            IF WE CAN GO BACK TO THAT, DAVID.

19            (EXHIBIT PUBLISHED TO JURY.)

20       **MR. MacDONALD:**  -- WHERE HE AFFIRMATIVELY

21   REPRESENTED, THIS IS THE GRANTOR, WHICH IS LIGHTLOGIC,

22   REPRESENTS AND WARRANTS THAT EXHIBITS A, B, AND C ARE ATTACHED

23   HERETO AS -- ATTACHED HERETO SET FORTH ANY AND ALL INTELLECTUAL

24   PROPERTY IN WHICH THE GRANTOR HAS AN INTEREST.

25            AND WHAT WAS THE INTELLECTUAL PROPERTY THAT WAS

1    DISCLOSED IN THE EXHIBITS A, B, AND C.  YOU SEE THERE'S NOTHING

2    IN EXHIBIT A.  SIX PATENT APPLICATIONS IN EXHIBIT B INCLUDING

3    ONE THAT WAS ISSUED.  AND EXHIBIT C, WELL, EXHIBIT C IS THE

4    TRADEMARKS.  AND I'LL REPRESENT TO YOU THAT THERE --

5              RIGHT THERE.

6          (EXHIBIT PUBLISHED TO JURY.)

7          **MR. MacDONALD:**  -- THERE WAS NOTHING THERE, JUST

8    PATENT APPLICATIONS SECURING A $15 MILLION LOAN, THE ONLY

9    INTELLECTUAL PROPERTY THAT LIGHTLOGIC HAD ANY INTEREST IN PER

10   THIS SECURITY AGREEMENT.

11             AND KEEP IN MIND THAT THIS MARCH 2000 SECURITY

12   AGREEMENT GAVE LIGHTLOGIC THAT EXTRA $15 MILLION RIGHT

13   BEFORE -- AT A TIME WHEN IT NEEDED TO STAY AFLOAT.  THIS WAS

14   BEFORE IT RECEIVED -- SEVERAL MONTHS BEFORE IT RECEIVED THE

15   FRESH INFUSION OF MONEY FROM THE SERIES C FINANCING, WHICH

16   OCCURRED IN THE SUMMER OF 2000.

17             SO LIGHTLOGIC'S PATENT APPLICATIONS BASICALLY HAD

18   ENOUGH VALUE THAT A THIRD PARTY WOULD -- WOULD PROVIDE A

19   $15 MILLION LOAN.  AND WHEN I ASKED MR. BALDRIDGE QUESTIONS

20   ABOUT THIS, HE AGAIN RETREATED AND HE CLAIMED THAT THE

21   DISTINCTION BETWEEN WHAT THIS -- WHAT HE CALLED "LITTLE

22   DOCUMENT" MEANT AND HOW THE REAL WORLD WORKS.  YOU MAY RECALL

23   HIS DICHOTOMY BETWEEN REAL WORLD AND THE DOCUMENTS.

24             AND LET'S JUST QUICKLY GO TO SEE HIS TESTIMONY.

25         (EXHIBIT PUBLISHED TO JURY.)

1          **MR. MacDONALD:**  I ASKED HIM IF HE CARED A LOT ABOUT

2    THIS AGREEMENT.

3               "NO, NOT THAT AGREEMENT.

4               "YOU DIDN'T CARE ABOUT THIS AGREEMENT?

5               "NO.

6               "EVEN THOUGH IT REPRESENTED $15 MILLION TO

7    LIGHTLOGIC?

8               "RIGHT.  RIGHT.  BECAUSE IT'S JUST A LITTLE

9    DOCUMENT.  I KNOW HOW THE WORLD WORKS, RIGHT?  SO WHEN THE TIME

10   COMES AND I SELL THIS COMPANY, I KNOW HOW SAUL WOULD BEHAVE,

11   AND HE'LL -- HE'LL GIVE UP ALL HIS RIGHTS.  OKAY.  BECAUSE HE'S

12   GOT WARRANTS AND HE'S GOING TO GET RICH."

13              FOR MR. BALDRIDGE, AS LONG AS HE AND HIS PALS GOT

14   RICH, THEY DIDN'T CARE WHAT THE DOCUMENTS SAY.  I THINK THAT

15   CAME OUT PRETTY CLEARLY IN TESTIMONY.

16              AS HE, AGAIN, NONCHALANTLY TESTIFIED TO, THE

17   DOCUMENTS MEAN NOTHING TO HIM AS LONG AS HE GOT HIS MONEY, AND

18   IN THIS INSTANCE, $15 MILLION.

19              THERE'S SOME MORE TESTIMONY, I THINK, AS WE GO.

20              (EXHIBIT PUBLISHED TO JURY.)

21          **MR. MacDONALD:**  AGAIN, WE'RE TALKING ABOUT THE

22   $15 MILLION SECURITY AGREEMENT.

23              AND THEN I ASKED HIM DOES IT REALLY MEAN NOTHING.

24              AND THEN REALLY HONESTLY, IS WHAT HE RESPONDED, "I

25   KNOW THAT SOUNDS WEIRD, BUT THAT'S THE WAY THE FINANCE WORLD

1   WORKS.

2              "AND YOU SIGNED THIS DOCUMENT?

3              "ANSWER:  YEAH, BECAUSE I GOT THE $15 MILLION."

4              AND THEN HIS LAST ANSWER, "IN THIS CASE, FOR THIS

5   DOCUMENT WHICH YOU'RE ASKING ME VERY SPECIFIC QUESTIONS ABOUT,

6   I DON'T CARE ABOUT THAT AT ALL."

7              BUT JUST BECAUSE THIS PARTICULAR DOCUMENT DIDN'T

8   MEAN ANYTHING TO MR. BALDRIDGE FOR HIS GROUP, ALL OF WHOM, IN

9   MR. BALDRIDGE'S WORDS, GOT FILTHY RICH, DID NOT MEAN THAT IT

10  DID NOT HAVE SIGNIFICANCE.  THE SIX PATENT APPLICATIONS GOT

11  LIGHTLOGIC THE $15 MILLION THEY NEEDED.  THESE PATENTS AND

12  PATENT APPLICATIONS HAD VALUE.

13             NOW, THE INTELLECTUAL PROPERTY SECURITY AGREEMENT IS

14  AN IMPORTANT DOCUMENT IN THAT IT GOT FILED AND RECORDED IN THE

15  UNITED STATES PATENT OFFICE.

16             YOU WANT TO GO TO THE TO THE FIRST PAGE OF TX18.

17             (EXHIBIT PUBLISHED TO JURY.)

18             **MR. MacDONALD:**  THIS SECURITY AGREEMENT WAS

19  RECORDED, YOU CAN SEE IN THE HIGHLIGHT, UNITED STATES PATENT

20  AND TRADEMARK OFFICE.

21             AND THERE'S A DUTY FOR ANYBODY FILING DOCUMENTS WITH

22  THE UNITED STATES PATENT OFFICE TO ENSURE THAT THE STATEMENTS

23  AND COMMUNICATIONS MADE TO THAT OFFICE ARE TRUE.

24             AND ONE OF THE REASONS FOR THIS DUTY IS THAT FILINGS

25  WITH THE PATENT OFFICE GIVE THE PUBLIC NOTICE OF THE TRUE

1   RIGHTS OF THE PERSONS AND COMPANIES WHO HAVE MADE A CLAIM TO

2   THESE PATENTS -- WHO HAVE A CLAIM TO THESE PATENTS.

3            YET WE SEE OTHER EXAMPLES OF DOCUMENTS FILED WITH

4   THE UNITED STATES PATENT OFFICE WHERE THE DEFENDANTS SAID ONE

5   THING IN THE DOCUMENTS BUT THEN TESTIFIED ABOUT SOMETHING ELSE

6   IN THE REAL -- IN, I GUESS, BALDRIDGE'S REAL WORLD.  AND THE

7   PATENT ASSIGNMENTS ARE EXAMPLES OF THESE DOCUMENTS.  AND SO

8   LET'S -- LET'S DISCUSS THE PATENT ASSIGNMENTS FOR A LITTLE BIT.

9            AS YOU MAY RECALL, MR. VERDIELL AND LIGHTLOGIC AND

10  THEN SUBSEQUENTLY INTEL FILED VARIOUS PATENT ASSIGNMENTS IN THE

11  U.S. PATENT OFFICE.  THESE ASSIGNMENTS ARE IMPORTANT PIECES OF

12  EVIDENCE WITH RESPECT TO MR. SHUM'S UNJUST ENRICHMENT CLAIM

13  BECAUSE THEY SHOW EXACTLY HOW DEFENDANTS WERE UNJUSTLY

14  ENRICHED.  FROM 1998 ONWARD, MR. -- SORRY -- MR. KIRSCH WAS

15  TALKING ABOUT THE DEFENDANTS FILED FALSE CLAIMS OF EXCLUSIVITY

16  OVER THE PATENTS AND PATENTED INVENTIONS, EVEN THOUGH THEY NOW

17  CLAIM AT TRIAL THEY ONLY HAD A RIGHT TO USE.

18           THROUGH THESE ASSIGNMENTS, THE DEFENDANTS HAVE

19  FALSELY ASSERTED COMPLETE OWNERSHIP RIGHTS TO THE RADIANCE

20  TECHNOLOGY, DESPITE MR. RIGHT'S OWNERSHIP -- MR. SHUM'S

21  OWNERSHIP RIGHTS TO THE THE PATENTED INVENTIONS.

22           NOW, DEFENDANTS AND ALL OF THEIR WITNESSES,

23  INCLUDING THE VENTURE CAPITALISTS, ALL CLAIM THAT THEY WERE

24  MADE AWARE OF THIS RIGHT TO USE AND THAT THEY ALL KNEW THAT

25  VERDIELL ONLY HAD A RIGHT -- MR. VERDIELL ONLY HAD A RIGHT TO

1    USE.

2          FOR EXAMPLE, DEFENDANTS' DAMAGES EXPERT, BRIAN

3    NAPPER, IS THE -- THE LAST WITNESS WHO TESTIFIED, ASSUMED IN

4    HIS DAMAGES ANALYSIS THAT MR. VERDIELL AND LIGHTLOGIC ONLY HAD

5    AN -- AND ONLY ASSERTED A RIGHT TO USE THE RADIANCE INVENTIONS.

6    AND HE ALSO ASSUMED THAT THIS LIMITED RIGHT TO USE WAS -- WAS

7    DISCLOSED TO EVERYBODY, INCLUDING THE VENTURE CAPITALISTS,

8    INCLUDING TO INTEL AND THE OUTSIDE WORLD IN GENERAL.

9          BUT MR. NAPPER ACKNOWLEDGED THAT HIS DAMAGES

10   OPINIONS CRUMBLE IF HIS ASSUMPTIONS ABOUT A MERE RIGHT TO USE

11   THE RADIANCE TECHNOLOGY WAS WRONG.  SO LET'S LOOK AT WHAT THE

12   DOCUMENTS SAY AND SPECIFICALLY WHAT THE PATENT ASSIGNMENTS SAY.

13         IF WE CAN GO TO TX15.

14            (EXHIBIT PUBLISHED TO JURY.)

15      **MR. MacDONALD:**  THIS IS THE FIRST PATENT ASSIGNMENT

16   FILED BY MR. VERDIELL ON BEHALF OF LIGHTLOGIC.

17         IF WE CAN GO TO THE TO THE THIRD PAGE, DAVID.

18            (EXHIBIT PUBLISHED TO JURY.)

19      **MR. MacDONALD:**  NOW, THE ASSIGNMENT -- THIS

20   ASSIGNMENT WAS FOR THE COPYCAT PATENT APPLICATION THAT

21   MR. VERDIELL FILED THE DAY AFTER RADIANCE WAS DISSOLVED, WHICH

22   IS THE '567 PATENT, OTHERWISE KNOWN AS THE STEP OR DBC PATENT.

23         HERE MR. VERDIELL TRANSFERRED, AND YOU'VE SEEN THIS

24   BEFORE, THE ENTIRE RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER

25   SAID INVENTIONS.  AND HE CLAIMED LATER ON, LATER ON IN THE

 1   DOCUMENT, THAT HE WAS THE SOLE AND LAWFUL OWNER OF THE --

 2   AGAIN, OF THE ENTIRE RIGHT, TITLE, AND INTEREST AND TO SAID

 3   INVENTIONS.

 4          WE KNOW, HOWEVER, THAT THIS REPRESENTATION IS FALSE.

 5   UNDER THE PLAN OF LIQUIDATION, MR. VERDIELL AND MR. SHUM HAD

 6   EQUAL RIGHTS.  AND IT'S NOT THAT MR. VERDIELL HAD SOLE AND

 7   EXCLUSIVE RIGHTS TO THE RADIANCE INVENTIONS.  AND THEN THE

 8   SENTENCE CONTINUES, THE NON-UNDERLINED PART SAYS, AND THAT'S

 9   THE SAME, MEANING THE ASSIGNOR, MR. VERDIELL, HAS NOT ENTERED

10   INTO ANY ASSIGNMENT, CONTRACT OR UNDERSTANDING IN CONFLICT

11   HEREWITH.

12          WELL, WE KNOW AGAIN THAT THAT REPRESENTATION IS

13   FALSE BECAUSE THE PLAN OF LIQUIDATION WAS A CONTRACT THAT

14   ASSIGNED RIGHTS IN CONFLICT WITH WHAT'S REPRESENTED HERE.

15          THE SAME OR SIMILAR REPRESENTATIONS WERE MADE BY

16   MR. VERDIELL IN THE OTHER ASSIGNMENTS FOR THE OTHER PATENT

17   APPLICATIONS WHICH EVENTUALLY MATURED INTO THE PATENTS THAT ARE

18   AT ISSUE HERE.

19          WE'LL TAKE A LOOK AT JUST ONE MORE VERY BRIEFLY.

20          DAVID, IF WE CAN GO TO TX16.

21          (EXHIBIT PUBLISHED TO JURY.)

22          **MR. MacDONALD:**  THIS IS THE ASSIGNMENT FOR THE

23   PATENT APPLICATION THAT EVENTUALLY MATURED INTO THE '724

24   PROCESS PATENT.  AND AGAIN, WE SEE THE SAME LANGUAGE, THE

25   ENTIRE RIGHT, TITLE, AND INTEREST TO THE INVENTIONS -- IN THE

 1   INVENTIONS TO LIGHTLOGIC.  AND IT'S NOT MERELY SOME SORT OF

 2   MYTHICAL OR FICTITIOUS RIGHT TO USE.  WE DON'T SEE THAT IN ANY

 3   OF THE DOCUMENTS.

 4           NOW ON A RELATED NOTE, I SORT OF WANTED TO CHANGE

 5   SUBJECTS HERE AND TALK ABOUT THE VENTURE CAPITAL FUNDING.  THE

 6   LIGHTLOGIC INVESTORS AND OTHER INTEL WITNESSES CLAIM THAT

 7   LIGHTLOGIC'S PATENT APPLICATIONS AND ITS ISSUED PATENTS HAD

 8   NOTHING TO DO WITH ITS DECISION TO INVEST, OR AT LEAST VERY

 9   LITTLE TO DO WITH IT.  DEFENDANTS' COUNSEL WILL CERTAINLY

10   REMIND YOU OF THE TESTIMONY BY THE VENTURE CAPITALISTS.

11           BUT, AGAIN, LET'S SEE WHAT THE DOCUMENTS SAY.

12           (EXHIBIT PUBLISHED TO JURY.)

13       **MR. MacDONALD:**  FOR EXAMPLE, LET'S GO TO THE LETTER

14   THAT YOU JUST LOOKED AT WITH MR. KIRSCH.  THIS IS THE LETTER

15   FROM VERDIELL TO HIS PATENT AGENT MAREK ALBOSZTA.  AND LET'S

16   SEE WHAT MR. VERDIELL SAYS IN HIS OWN WORDS ABOUT WHAT GOT

17   LIGHTLOGIC FUNDED.

18           IT'S THE FIRST DRAFT OF THE PATENT.  IT DID ITS JOB.

19   IT GOT US FUNDED.  THE PATENT GOT US FUNDED.  ALL RIGHT.  AT

20   THIS POINT, IT WAS THE PATENT APPLICATION.

21           AND THESE ARE MR. VERDIELL'S OWN WORDS AT THE

22   TIME -- AT THE TIME OF THE RELEVANT -- RELEVANT EVENTS.  NOT

23   WHAT HAPPENED -- OR NOT -- NOT AT TRIAL TEN YEARS LATER.  AND

24   IT -- AND IT FUNDAMENTALLY CONTRADICTS THE CENTRAL PREMISE OF

25   THE DEFENDANTS' CLAIM THAT PATENT APPLICATIONS OR PATENTS DON'T

1   GET YOU FUNDED.

2           AND IF YOU LOOK AT THE LAST SENTENCE, AND YOU'VE

3   SEEN THIS BEFORE, "FILING THE PATENT IS A TOP GOAL THAT THE

4   VC'S," VENTURE CAPITALISTS, "SET FOR THIS MONTH."

5           WHY WOULD THE VC'S MAKE FILING FOR A PATENT

6   APPLICATION A TOP GOAL FOR THAT MONTH UNLESS PATENTS WERE

7   IMPORTANT?  THEY WERE SIGNIFICANT.  THE FACT IS THAT PATENTS

8   MAKE A COMPANY, ESPECIALLY AN EARLY-STAGE COMPANY LIKE

9   LIGHTLOGIC, MORE VALUABLE AND OFFER -- OFFERS THEM SIGNIFICANT

10  COMPETITIVE ADVANTAGES.

11          JIM TIMMINS, WHO WAS DEFENDANTS' EXPERT ON VENTURE

12  CAPITAL PRACTICES, TESTIFIED THAT IN FORMING HIS EXPERT OPINION

13  IN THIS CASE, HE RELIED UPON A TREATISE KNOWN AS THE VENTURE

14  CAPITAL DUE DILIGENCE BY JUSTIN CAMP, AND THAT WAS TX1208.  HE

15  RELIED UPON THIS FOR PART OF HIS ANALYSIS.

16          NOW AS YOU MAY RECALL, MR. TIMMINS GENERALLY

17  TESTIFIED, IN HIS OPINION, THAT PATENTS ARE NOT IMPORTANT FOR

18  EARLY STAGE COMPANIES LIKE LIGHTLOGIC.  BUT LET'S SEE WHAT THE

19  TREATISE BY MR. CAMP, RELIED UPON BY MR. TIMMINS, ACTUALLY

20  SAYS.

21          AND THIS IS PAGE 115 OF THE TEXTBOOK.

22          "PATENT PROTECTION IS OFTEN A SOURCE OF SIGNIFICANT

23  COMPETITIVE ADVANTAGE FOR EARLY-STAGE COMPANIES AND IS

24  THEREFORE AN EXTREMELY IMPORTANT TOPIC FOR THE VENTURE

25  CAPITALISTS CONSIDERING INVESTMENTS IN THEM."  AND IT TALKS

 1    ABOUT SPECIFICALLY WHAT A PATENT GIVES YOU, THE RIGHT TO

 2    EXCLUDE.

 3              LET'S GO TO THE TO THE NEXT.

 4              (EXHIBIT PUBLISHED TO JURY.)

 5         **MR. MacDONALD:**  A LITTLE BIT MORE DOWN.  SAME PAGE.

 6              "BECAUSE PATENTS ARE GENERALLY CONSIDERED THE

 7    STRONGEST FORM OF INTELLECTUAL PROPERTY PROTECTION AVAILABLE,

 8    THEY CAN BE VALUABLE AND POTENT WEAPONS IN THE MARKETPLACE."

 9              AGAIN, THIS WAS A TEXTBOOK RELIED UPON BY

10    DEFENDANTS' VENTURE CAPITAL EXPERT.

11              NEXT PAGE.

12              (EXHIBIT PUBLISHED TO JURY.)

13         **MR. MacDONALD:**  "STRONG PATENT PORTFOLIOS CAN ALSO

14    MAKE COMPANIES ATTRACTIVE ACQUISITION CANDIDATES," LIKE

15    LIGHTLOGIC HERE, "REGARDLESS OF THE VIABILITY OF THEIR BUSINESS

16    PLANS AND THEIR POTENTIAL FOR PROFITABILITY."

17              NOW, MR. TIMMINS ALSO TESTIFIED ABOUT MR. SHUM'S

18    EFFORTS, AFTER RADIANCE, TO GET FUNDING FOR HIS OWN STARTUP

19    COMPANY.  AND MR. SHUM ULTIMATELY GAVE UP AFTER A FEW ATTEMPTS,

20    AS MR. TIMMINS TESTIFIED.  AND HE TESTIFIED MOREOVER THAT

21    MR. SHUM GAVE UP WAY TOO EASILY.

22              BUT MR. SHUM ENCOUNTERED THE SAME PROBLEMS THAT

23    MR. VERDIELL DID EARLY ON, RIGHT AFTER RADIANCE, WHICH WAS

24    WITHOUT EXCLUSIVITY, VENTURE CAPITAL FUNDING IS NOT GOING TO BE

25    FORTHCOMING.

1            NOW, VERDIELL REMEDIED HIS -- THIS PARTICULAR

2    PREDICAMENT BY CLAIMING TO BE THE SOLE AND EXCLUSIVE OWNER OF

3    THE INTELLECTUAL PROPERTY, AS WE'VE SEEN BY THE ASSIGNMENTS,

4    AND THIS IS DESPITE SHUM'S RIGHTS.

5            NOW, THERE ARE NUMEROUS OTHER EXAMPLES REVEALING HOW

6    THE LIGHTLOGIC PATENT PORTFOLIO WAS A SUBSTANTIAL FACTOR IN THE

7    DETERMINATION BY THE VC'S TO INVEST, WHETHER OR NOT TO INVEST

8    IN LIGHTLOGIC.  AND I'LL JUST BRIEFLY REVIEW JUST A FEW OF

9    THEM.

10            IF WE CAN GO TO TX410.

11            (EXHIBIT PUBLISHED TO JURY.)

12            **MR. MacDONALD:**  THIS IS AN EMAIL BETWEEN

13    MR. VERDIELL AND ANDREW FINE.  YOU MAY RECALL ANDREW FINE

14    WORKED WITH BRUCE GRAHAM, WHO WAS THE LEAD INVESTOR FOR THE

15    SERIES B ROUND OF FINANCING.  THEY WORKED AT BESSEMER VENTURE

16    PARTNERS.

17            AND YOU SEE THE ADVANTAGES OF THE TECHNOLOGY COME

18    FROM, ONE, THE CERAMIC METAL SUBSTRATE WHICH IS COVERED BY OUR

19    FIRST PATENT, THE FLEXURE TECHNOLOGY COVERED BY OUR SECOND

20    PATENT, LASER MICROWELDING COVERED BY OUR THIRD PATENT, AND

21    HIGH-PRECISION MACHINE-VISION DRIVEN PICK AND PLACE ALSO

22    COVERED BY OUR THIRD PATENT.  THE PATENTS ARE IMPORTANT.

23            LET'S LOOK AT THE NEXT DOCUMENT, TX424.

24            (EXHIBIT PUBLISHED TO JURY.)

25            **MR. MacDONALD:**  WELL, ACTUALLY, YOU LOOKED AT THIS

 1    WITH MR. KIRSCH.  SO WHY DON'T WE SKIP THAT DOCUMENT.  BUT

 2    LET'S GO ACTUALLY TO THE TO THE TOP -- JUST TO THE TO THE TOP

 3    OF THE FIRST THING, DAVID, THE FIRST SENTENCE.

 4               HERE ARE ANSWERS TO THE TO THE IP QUESTIONS.  IT'S

 5    QUESTIONS ASKED BY THE VENTURE CAPITALISTS THAT VERDIELL --

 6    MR. VERDIELL IS RESPONDING TO ABOUT IP.  WHAT -- WHY ARE THEY

 7    ASKING QUESTIONS ABOUT THE IP UNLESS -- UNLESS IT'S IMPORTANT?

 8               LET'S GO TO TX2728, DAVID, PLEASE.

 9               (EXHIBIT PUBLISHED TO JURY.)

10        **MR. MacDONALD:**  THIS IS AN EMAIL FORWARDING AN

11    INVESTMENT MEMO BY CHRIS SCHAEPE.  IT'S HIS INVESTMENT SUMMARY

12    BASICALLY.  AS YOU MAY RECALL, MR. SCHAEPE WAS AT LIGHTSPEED AT

13    THE TIME, FORMERLY KNOWN AS WEISS, PECK~& GREER.  AND HE LED

14    THE SERIES C -- OR THEY LEAD THE SERIES C FINANCING.  AND THIS

15    IS THE PAGE 1 OF MR. SCHAEPE'S INVESTMENT COMPANY.

16               "THE COMPANY'S PRODUCTS ARE BASED ON A UNIQUE PLANAR

17    PACKAGING PLATFORM WHICH ENABLES LOW-COST, SMALL FORM FACTOR

18    COMPONENTS THAT, UNLIKE CURRENT GENERATION COMPONENTS, CAN BE

19    PRODUCED AT (SIC) SCALABLE, AUTOMATED MANUFACTURING PROCESSES."

20               AND YOU'LL SEE THIS LANGUAGE LATER ON -- IT'S VERY

21    SIMILAR LANGUAGE -- IN THE INTEL DOCUMENT.  THAT'S WHAT INTEL

22    WAS INTERESTED IN, LOW COST MANUFACTURING THAT CAN BE PRODUCED

23    WITH SCALABLE AUTOMATED PROCESSES.

24               LET'S GO TO PAGE 3 OF THIS INVESTMENT SUMMARY,

25    DAVID, PLEASE.

1          (EXHIBIT PUBLISHED TO JURY.)

2          **MR. MacDONALD:**  OR, DAVID, IF YOU WANT, WE CAN GO TO

3    THE TO THE SECOND-TO-LAST PAGE.

4          (EXHIBIT PUBLISHED TO JURY.)

5          **MR. MacDONALD:**  WELL, IF WE'RE HAVING TECHNICAL

6    PROBLEMS, I CAN ASSURE YOU THAT THERE ARE OTHER --WELL, HERE'S

7    THE SECOND-TO-LAST PAGE, THE CHART TALKING ABOUT THE POSITIVES,

8    AND ON THE OTHER SIDE IS THE NEGATIVES, OF INVESTING IN

9    LIGHTLOGIC.

10          AND ONE OF THE POSITIVES, "UNIQUE IP ENABLING

11   SIGNIFICANT PRODUCT DIFFERENTIATION."  THE IP, AND SPECIFICALLY

12   THE PATENTS, WERE IMPORTANT.

13          NOW, I WANT TO TURN TO INTEL.  INTEL'S WITNESSES,

14   AND IN PARTICULAR MICHAEL RICCI, WHO, AS YOU MAY RECALL, HE

15   SPONSORED THE DEAL AT INTEL, THE ACQUISITION OF LIGHTLOGIC,

16   THEY ALL CLAIM THAT THE PATENTS AND THE PATENTED TECHNOLOGY

17   WERE NOT IMPORTANT TO INTEL.  BUT THE DOCUMENTS ARE REPLETE

18   WITH REFERENCES THAT ARE -- THAT ARE TO THE TO THE CONTRARY.

19   THE SIMPLE FACT IS THAT THE PATENTS AND THE PATENTED -- AND THE

20   TECHNOLOGY COVERED BY THESE PATENTS WERE SUBSTANTIAL FACTORS IN

21   INTEL'S DECISION TO ACQUIRE LIGHTLOGIC.

22          YOU'VE SEEN THE DOCUMENTS.  I'VE -- I'VE GONE

23   THROUGH THEM.  MY COLLEAGUE MR. JANSEN'S GONE THROUGH THEM.  I

24   DON'T HAVE ENOUGH TIME UNFORTUNATELY TO GO THROUGH ALL OF THE

25   DOCUMENTS IN THIS CLOSING ARGUMENT.  SO I'LL JUST QUICKLY GO

1   THROUGH A SUBSET.

2          IF WE CAN GO TO 723, DAVID.

3              (EXHIBIT PUBLISHED TO JURY.)

4          **MR. MacDONALD:**  YOU SEE THIS IS AN EMAIL THAT I

5   DISCUSSED WITH MR. SIVAKUMAR.

6              AND IF WE GO TO THE TO THE SECOND PAGE OF THE

7   DOCUMENT, DAVID.

8              (EXHIBIT PUBLISHED TO JURY.)

9          **MR. MacDONALD:**  UP ON THE TOP, THIS IS THE TOP OF

10  THE SECOND PAGE, THEY'RE TALKING ABOUT THE FOUR COMPETITIVE

11  ADVANTAGES.

12             WELL, FIRST, THEY SAY THAT LIGHTLOGIC IS STRICTLY A

13  DESIGN AND OPTICAL PACKAGING COMPANY.  AND THEN THEY -- THEN

14  THEY TALK ABOUT THE COMPETITIVE ADVANTAGES.  IT'S ALL ABOUT THE

15  TECHNOLOGY.  IT'S NOT ABOUT, AS MR. RICCI TESTIFIED, IT'S NOT

16  ABOUT THE PEOPLE.  IT'S NOT ABOUT CUSTOMER TRACTION.  IT'S

17  ABOUT TECHNOLOGY.  THAT'S THE COMPETITIVE ADVANTAGE THAT

18  LIGHTLOGIC IS GOING TO BRING.

19             THE NEXT DOCUMENT, DAVID, IF YOU WANT TO GO TO 734.

20             NOW THIS IS AN EMAIL FROM DREW SMITH, FEBRUARY 20TH,

21  2001.  DREW SMITH IS DOING SOME EARLY DUE DILIGENCE ON BEHALF

22  OF INTEL CAPITAL ABOUT LIGHTLOGIC, CODE NAME LICORICE, AND

23  NECTARINE.  YOU'VE HEARD TESTIMONY ABOUT NECTARINE.  THAT WAS

24  THE OTHER COMPANY THAT INTEL WAS INTERESTED IN, NETWORK

25  ELEMENTS.

1              AND YOU SEE THAT THESE WERE THE KEY FINDINGS.  WE

2     DON'T HAVE IT BLOWN UP.  BUT THESE WERE THE KEY FINDINGS BY

3     MR. SMITH.  AND HIS FINDINGS IS THAT NETWORK ELEMENTS IS

4     SHIPPING A MORE ADVANCED PRODUCT THAN LIGHTLOGIC.  NETWORK

5     ELEMENTS HAS A LARGER OPTICAL MODULE TEAM.

6              AND THEN IF WE SKIP DOWN TO THE TO THE LAST ONE

7     THERE.

8              NETWORK ELEMENTS APPEARS TO HAVE MUCH MORE

9     EXPERIENCE PRODUCING MODULES OF THEIR OWN DESIGN.  NETWORK

10    ELEMENTS APPARENTLY HAS FAR MORE ADVANTAGES THAN LIGHTLOGIC.

11    BUT LIGHTLOGIC HAS ONE ADVANTAGE THAT TRUMPED ALL THE OTHER

12    ONES AND THAT ULTIMATELY ALLOWED FOR THE DEAL TO OCCUR BETWEEN

13    LIGHTLOGIC AND INTEL, WHICH WAS LIGHTLOGIC'S CLEVER OR --

14    UNUSUAL OR CLEVER FIBER ALIGNMENT PROCESS.  AND THAT WAS THE

15    PROCESS THAT WAS COVERED BY MULTIPLE PATENTS, THE SAME PATENTS

16    THAT ARE AT SUIT HERE.

17             WE GO TO THE TO THE NEXT DOCUMENT, REAL BRIEFLY,

18    DAVID, TX735.

19             THIS IS THE LICORICE A.P.A.

20             (EXHIBIT PUBLISHED TO JURY.)

21        **MR. MacDONALD:**  YOU RECALL THAT I WALKED

22    MR. SIVAKUMAR THROUGH THIS DOCUMENT.  AGAIN, THEY'RE TALKING

23    ABOUT THE CORE TECHNOLOGY.  IT'S THE FLEXURE, THE HIGH

24    FREQUENCY PLANAR METALLIC -- PLANAR CERAMIC METAL SUBSTRATE.

25             AND IF YOU SEE IN THE LOWER RIGHT-HAND CORNER, THIS

 1    IS THE TECHNOLOGY, THE NECESSARY TECHNOLOGY, THE BUILDING

 2    BLOCKS FOR THE OPTOELECTRONIC MODULES, BOTH THE TRANSPONDERS,

 3    WHICH IS WHAT THEY HAD AT THE TIME.  THEY WERE JUST STARTING TO

 4    BUILD THE TRANSPONDERS.  AND ALSO FOR THE SUPER MODULES.  THESE

 5    WERE THE BUILDING BLOCKS, THE LIGHTLOGIC TECHNOLOGIES BASED ON

 6    THE RADIANCE INVENTIONS, BUILDING BLOCKS FOR WHAT THEY

 7    WANTED -- INTEL WANTED TO ULTIMATELY GET INTO, WHICH WAS THE

 8    SUPERMODULE.  AND WE'LL SEE EXAMPLES OF IT VERY BRIEFLY.

 9              DAVID, WE CAN GO TO ANOTHER DOCUMENT.  HOW ABOUT

10    TX740.

11              IT'S ANOTHER A.P.A. ONE WEEK LATER.  WE'LL SEE A

12    VERY SIMILAR PAGE.  THE ONLY DIFFERENCE HERE IS THIS BEST OF

13    CLASS PROPRIETARY PATENT PENDING SMF, WHICH STANDS FOR SINGLE

14    MODE FIBER, ALIGNMENT AND OPTICS PACKAGING TURNKEY SOLUTION.

15    THIS IS THE CORE TECHNOLOGY, AND IT'S PROTECTED BY A PATENT OR

16    PATENTS.

17              LET'S GO TO TX750, DAVID, PLEASE.

18              (EXHIBIT PUBLISHED TO JURY.)

19         **MR. MacDONALD:**  NOW, THIS IS ANOTHER DOCUMENT ABOUT

20    TEN DAYS LATER, LICORICE DAM.  AND IF WE CAN GO TO PAGE 16.

21              (EXHIBIT PUBLISHED TO JURY.)

22         **MR. MacDONALD:**  NOW, THIS DOCUMENT ACTUALLY DOESN'T

23    TALK ABOUT TECHNOLOGY, BUT THE SIGNIFICANCE OF THIS DOCUMENT IS

24    THAT IT SHOWS THE METRO MSS, WHICH IS, MSS STANDS FOR THE

25    MARKET SEGMENT SHARE.  MR. SIVAKUMAR TESTIFIED ABOUT THIS.

 1                    AND THIS IS WHAT INTEL THOUGHT THAT THE MARKET SHARE

 2     THAT THEY WOULD GET AT THE END OF 2001, WHICH IS THREE PERCENT.

 3     AND THEY THOUGHT BY -- BY -- AND THIS IS FOR THE TRANSPONDER.

 4     AND THEY THOUGHT BY 2002, THEY'D GET FOUR PERCENT, AND THEN

 5     SIX PERCENT THE SUBSEQUENT YEAR, TEN PERCENT MARKET SEGMENT

 6     SHARE.

 7                    NOW, THE REASON WHY THIS DOCUMENT -- THIS PAGE IS

 8     SIGNIFICANT IS THAT THERE'S NO CUSTOMER TRACTION HERE.  THIS IS

 9     THREE PERCENT OF THE MARKET.  THAT'S NOT CUSTOMER TRACTION.

10     BUT THAT IS WHAT -- THAT'S THE MAIN THING THAT MR. RICCI

11     TESTIFIED TO AS BEING SIGNIFICANT IN THE LIGHTLOGIC DEAL IS

12     THEIR CUSTOMER TRACTION.  BUT THERE'S NO EVIDENCE IN THE

13     DOCUMENTS THAT THEY HAD THE CUSTOMER TRACTION.

14                    AND THEN IF WE GO TO ANOTHER DOCUMENT, DAVID, 754,

15     PLEASE.  AND THIS -- LET'S GO TO THE TO PAGE 005.

16                         (EXHIBIT PUBLISHED TO JURY.)

17          **MR. MacDONALD:**  THIS WAS A -- THIS WAS A DRAFT OF

18     SOMETHING THAT GOT INTO THE BOARD OF DIRECTORS BRIEFING BOOK.

19     WE'LL TALK ABOUT IT SHORTLY.

20                    LICORICE HAS ALREADY DEMONSTRATED 70 PERCENT

21     COUPLING EFFICIENCY WITH THEIR INTELLECTUAL PROPERTY BASED 3D

22     ALIGNMENT TECHNIQUES, A VERY SIGNIFICANT IMPROVEMENT,

23     ESPECIALLY WITH AUTOMATION POTENTIAL CONSIDERED OVER THE REST

24     OF THE INDUSTRY.  IT'S THEIR IP-BASED 3D ALIGNMENT TECHNIQUES

25     THAT REPRESENTED A SIGNIFICANT IMPROVEMENT OVER THE REST OF THE

1    INDUSTRY.

2              AND LET'S GO -- LET'S GO VERY QUICKLY THROUGH THE

3    NEXT DOCUMENT WHICH IS THE BOARD OF BRIEFING BOOK, WHICH AGAIN

4    IS LITTERED WITH ALL KINDS OF REFERENCES TO THE PATENTS, THE

5    PATENTED TECHNOLOGY, THE PROPRIETARY PATENT PENDING FLEXURE.

6    SO LET'S GO TO -- LET'S START OFF WITH PAGE 4, WHICH IS

7    EXECUTIVE SUMMARY.

8                    (EXHIBIT PUBLISHED TO JURY.)

9              **MR. MacDONALD:**  AND A COUPLE PAGES INTO THE

10   EXECUTIVE SUMMARY ON PAGE 6, FIRST PARAGRAPH, FIRST PARAGRAPH

11   OF THE COMPANY OVERVIEW, THIRD SENTENCE.

12             "LIGHTLOGIC PROVIDES A BEST OF CLASS PROPRIETARY

13   PATENT PENDING FIBER ALIGNMENT AND OPTICS PACKAGING SOLUTION,

14   WHICH WE BELIEVE WOULD BE AN IMPORTANT DIFFERENTIATION AT LEAST

15   IN THE NEAR TERM."

16             AND THEN WE'LL SEE MORE -- WE'LL SEE VERY SIMILAR

17   REPRESENTATIONS.  BUT LET'S GO TO PAGE 16 VERY BRIEFLY.

18             NOW THIS IS THE SUPERMODULE OPPORTUNITY.

19                  (EXHIBIT PUBLISHED TO JURY.)

20             **MR. MacDONALD:**  THIS IS WHERE INTEL THOUGHT IT WAS

21   GOING TO GO.  THIS IS THE SIGNIFICANT REASON WHY LIGHTLOGIC WAS

22   PURCHASED BY INTEL.  BECAUSE LICORICE, LIGHTLOGIC, HAD

23   DEVELOPED BREAKTHROUGH PACKAGING AND FIBER ALIGNMENT TECHNOLOGY

24   THAT ENABLED AN EXTREMELY HIGH LEVEL OF INTEGRATION AND THERMAL

25   EFFICIENCY, POTENTIALLY MAKING THIS ARCHITECTURAL SOLUTION --

```
 1   AND WHEN THEY SAY ARCHITECTURAL SOLUTION, IT'S TALKING ABOUT

 2   THE SUPERMODULE -- POSSIBLE.

 3          THEY WERE -- INTEL WAS BASICALLY GOING TO USE THE

 4   PATENTED PROPRIETARY TECHNOLOGY WHICH CAME FROM RADIANCE, AND

 5   THOSE WOULD BE THE KEY ENABLING FEATURES THAT WOULD ALLOW INTEL

 6   TO -- TO PURSUE THIS SUPERMODULE POSSIBILITY, AS THEY SAID.

 7          IT TURNED OUT THAT THEY WENT A DIFFERENT ROUTE WHEN

 8   WI-FI BECAME BIG, BUT AT THE TIME, MAY 2001, THIS IS WHY THEY

 9   PURCHASED LIGHTLOGIC.

10          AND THEN IF WE BRIEFLY GO TO PAGE 21, DAVID.

11          (EXHIBIT PUBLISHED TO JURY.)

12          MR. MacDONALD:  WORLD CLASS HIGH VOLUME

13   MANUFACTURING.  THAT WAS THE BUSINESS THAT INTEL WAS IN.  INTEL

14   IS A MANUFACTURING GIANT.  AND THEY SAW A TREMENDOUS POTENTIAL

15   WITH THIS BEST OF CLASS PROPRIETARY PATENT PENDING FIBER

16   ALIGNMENT OPTIC PACKAGING SOLUTION.

17          THERE'S SEVERAL MORE.  I'M -- I'M NOT GOING TO GO

18   THROUGH ALL THE PAGES WHERE THE PATENTS AND INTELLECTUAL

19   PROPERTY ARE BEING TOUTED.  AND WE'VE GONE THROUGH SOME.

20   YOU'VE SEEN SOME OF THAT IN THE TESTIMONY.

21          LET'S BRIEFLY GO TO 1095, DAVID, PLEASE.

22          (EXHIBIT PUBLISHED TO JURY.)

23          MR. MacDONALD:  AND THIS DOCUMENT IS AFTER THE

24   INTEL/LIGHTLOGIC ACQUISITION HAS CLOSED.  AND THIS IS ONE OF

25   THE EARLY DOCUMENTS OF THE NEW GROUP, THE O.P.D., THE OPTIC
```

1   PRODUCTS DIVISION OF INTEL, WHICH IS BASICALLY LIGHTLOGIC.

2            RETURN TO PAGE 6, DAVID, PLEASE.

3            (EXHIBIT PUBLISHED TO JURY.)

4            **MR. MacDONALD:**  IT SAYS "TECHNOLOGY OVERVIEW," AND

5   THE VERY NEXT PAGE ON THE TECHNOLOGY OVERVIEW IS SOMETHING THAT

6   WE'VE SEEN BEFORE IN THE LIGHTLOGIC DOCUMENTS AND VARIOUS OTHER

7   DOCUMENTS.  AND, AGAIN, YOU'LL SEE THE PATENTED MICROMECHANICAL

8   FLEXURE ALIGNMENT.  AND THIS WAS THE PLATFORM, THIS WAS THE

9   PLATFORM FOR BOTH THE TRANSPONDERS AND WHAT THEY THOUGHT WOULD

10  BE THE SUPERMODULE.

11           AND THEN WE GO TO THE TO THE NEXT PAGE.

12           (EXHIBIT PUBLISHED TO JURY.)

13           **MR. MacDONALD:**  TOUTING THE FLEXURES.  THE FLEXURE

14  IS WHAT ENABLES THE OPTICAL ALIGNMENT.

15           AND LET'S GO TO THE TO THE NEXT PAGE, DAVID.

16           (EXHIBIT PUBLISHED TO JURY.)

17           **MR. MacDONALD:**  AGAIN, TALKING ABOUT THE FLEXURE.

18           NOW EVEN THOUGH AT THIS TIME LIGHTLOGIC WAS IN THE

19  TRANSPONDER MARKET, THE BASIC BUILDING BLOCK WAS THIS MICRO

20  FLEXURE ALIGNMENT PRINCIPLE, AND THAT STEMMED AND DERIVED FROM

21  RADIANCE.

22           AND SO DESPITE -- DESPITE THESE CLAIMS THAT THE

23  RADIANCE FLEXURE HAD LITTLE SIGNIFICANCE BY THIS POINT, THEY

24  WERE STILL PROMOTING MR. SHUM'S DESIGNS.

25           SO DESPITE THE OVERWHELMING CONTEMPORANEOUS EVIDENCE

```
1    OF LIGHTLOGIC PATENTS AND RADIANCE TECHNOLOGY COVERED BY THESE

2    PATENTS WERE SUBSTANTIAL FACTORS TO THE TO THE INTEL

3    ACQUISITION, WE STILL SEE -- WE STILL HEAR INTEL WITNESSES,

4    INCLUDING MR. RICCI, CONTINUE TO DENY THE IMPORTANCE OF THESE

5    PATENTS.  THIS DEFIES THE DOCUMENTS, DEFIES COMMON SENSE.

6              AND I JUST WANT TO TALK BRIEFLY ABOUT MR. RICCI.  AS

7    YOU KNOW, MR. RICCI WAS THE EXECUTIVE, OVERSAW THE LIGHTLOGIC

8    DEAL.  IN INTEL PARLANCE, I THINK HE WAS KNOWN AS THE OWNER OR

9    SPONSOR OF THE DEAL.  HE TESTIFIED THAT INTEL DID DUE DILIGENCE

10   ON LIGHTLOGIC PATENTS AND THEIR OWNERSHIP AND SPECIFICALLY DID

11   DUE DILIGENCE ON THE PATENT ASSIGNMENTS.  WE HAVE THE

12   TESTIMONY, BUT WE DON'T NEED TO THROUGH IT.

13             AND THEN HE SPECIFICALLY TESTIFIED THAT THERE WAS A

14   DETAILED REVIEW BY -- BY INTEL'S LEGAL TEAM REGARDING THE

15   PATENTS AND THE PATENT ASSIGNMENTS.  BUT WHY WOULD THIS

16   DETAILED REVIEW BE IMPORTANT IF THE PATENTS WERE NOT AN

17   IMPORTANT PART OF THE DEAL OR NOT IMPORTANT AT ALL, IF ALL THEY

18   CLAIMED -- IF ALL THEY NEEDED WAS THE RIGHT TO USE?  IT'S NOT

19   NECESSARY TO DO THIS DUE DILIGENCE ON OWNERSHIP.  THAT'S

20   ANOTHER THING THAT THEY DID DUE DILIGENCE ON IS OWNERSHIP.

21   IT'S NOT NECESSARY IF ALL THEY NEEDED WAS A RIGHT TO USE, OR IF

22   THAT'S ALL THEY WANTED.

23             AND SO INTEL WITNESSES -- OTHER INTEL WITNESSES

24   TESTIFIED OTHERWISE, AND CONSISTENT WITH MR. RICCI THAT THERE

25   WERE THREE FACTORS.  IT'S THE CUSTOMER KNOW-HOW -- I'M SORRY --
```

```
 1   THE CUSTOMER TRACTION, WHICH I WAS JUST TALKING ABOUT EARLIER,

 2   BUT AGAIN DOESN'T SEEM LIKE THERE'S MUCH CUSTOMER TRACTION WITH

 3   THESE MINIMAL PERCENTAGES OF THE MARKET SHARE.

 4           HE ALSO TESTIFIED THAT THE PEOPLE AND MANAGEMENT

 5   TEAM WERE THE SECOND MOST IMPORTANT THING, REASON FOR THE DEAL.

 6   AND THE THIRD MOST IMPORTANT HE SAID WAS THE TECHNICAL

 7   KNOW-HOW.

 8           I MENTIONED THE MARKET SEGMENT SHARE FOR CUSTOMER

 9   TRACTION.  THERE'S ANOTHER -- THERE'S OTHER EVIDENCE THAT

10   SUGGESTED CUSTOMER TRACTION WAS NOT IMPORTANT AT LEAST AS OF

11   MARCH, APRIL, MAY 2001.

12           IF WE CAN GO TO 772, PAGE 36, DAVID.

13           772 IS THE BOARD BRIEFING BOOK, AND THIS IS UNDER

14   THE FINANCIALS OF LIGHTLOGIC.

15               (EXHIBIT PUBLISHED TO JURY.)

16       MR. MacDONALD:  AND THIS WAS, AGAIN, GIVEN TO THE TO

17   THE BOARD OF DIRECTORS.

18           FIRST SENTENCE, "LICORICE WAS FOUNDED IN 1998 AND

19   RECORDED THEIR FIRST REVENUE IN 2001."

20           HOW COULD THERE BE SIGNIFICANT CUSTOMER TRACTION IF

21   THEIR FIRST REVENUE IS BOOKED IN JANUARY 2001?

22           LET'S LOOK AT WHAT THEIR -- THEIR CIRCLE, THE RED

23   CIRCLE, WHAT THEIR PROFITS WERE.  WHAT THOSE PROFITS WERE FOR

24   THE QUARTER IMMEDIATELY PRECEDING THE INTEL ACQUISITION WAS

25   $49,000 WHICH REPRESENTED A NET PROFIT OF A LOSS OF $541,000.
```

CLOSING ARGUMENT \ MACDONALD

1    AND THIS IS THE QUARTER IMMEDIATELY PRECEDING THE LIGHTLOGIC

2    INTEL DEAL.  AND THEN I MENTIONED THE MARKET SEGMENT SHARE.

3            LET'S MOVE ON TO THE TO THE PEOPLE AND MANAGEMENT,

4    WHICH MR. RICCI CLAIMED WAS THE SECOND MOST IMPORTANT REASON

5    FOR THE DEAL.

6            IF THE PEOPLE AND MANAGEMENT WERE SUCH AN IMPORTANT

7    ASSET, WHY DID DELOITTE & TOUCHE -- AND YOU MAY RECALL THE

8    DELOITTE & TOUCHE REPORT, THIS IS A REPORT PREPARED BY INTEL --

9    VALUE THE COMPLETE WORK FORCE OF LIGHTLOGIC AT $2.4 MILLION?

10   I'LL TALK A LITTLE BIT MORE ABOUT THE DELOITTE REPORT VERY

11   SHORTLY.

12           AND IF -- AND IF THE MANAGEMENT WERE SUCH A VALUABLE

13   AND THE TEAM WERE SUCH A VALUABLE ASSET, WHY DID THREE OUT OF

14   THE TOP FOUR PEOPLE AT LIGHTLOGIC LEAVE WITHIN THREE TO SIX

15   MONTHS OF THE DEAL?

16           AND THOSE PEOPLE WERE GREG BALDRIDGE.  HE TESTIFIED

17   HE WAS ONLY THERE FOR A FEW MONTHS AFTER INTEL.  THERE WAS ALSO

18   MR. WEBJORN WHO ALSO TESTIFIED HE LEFT WITHIN A FEW MONTHS

19   AFTER THE INTEL DEAL.  AND THEN MR. MCGRAW, THE C.E.O., LEFT

20   JANUARY 2ND, 2002, ABOUT 6 MONTHS AFTER THE DEAL.  IT DOESN'T

21   SEEM LIKE THE PEOPLE AND MANAGEMENT WERE THAT IMPORTANT IF

22   INTEL WAS ALLOWING THESE PEOPLE TO -- TO LEAVE SO QUICKLY.

23           AND THEN THERE'S TECHNICAL KNOW-HOW.  AND HOW DO YOU

24   MEASURE TECHNICAL KNOW-HOW, ESPECIALLY WHEN YOU'RE A STARTUP

25   COMPANY?  IT'S MEASURED BY PATENTS AND OBTAINING PATENT

1    APPLICATIONS.

2              AS MR. STOCKHOLM, JOHN STOCKHOLM, HE'S THE VENTURE

3    CAPITALIST AT RIDGE VENTURES, TESTIFIED IT WAS IMPORTANT THAT A

4    STARTUP COMPANY REGULARLY FILED PATENT APPLICATIONS.  HE WANTED

5    TO SEE PATENT APPLICATIONS EVERY 18 MONTHS, IS WHAT HE

6    TESTIFIED TO.  OTHERWISE, A COMPETITOR COULD CREEP UP AND FILE

7    A LAWSUIT ON THE TECHNOLOGY THAT THAT STARTUP COMPANY WAS

8    DEVELOPING.

9              ANY VALUABLE KNOW-HOW BY LIGHTLOGIC WAS DERIVED FROM

10   RADIANCE.

11             AND MR. WEBJORN ALSO TESTIFIED THAT THE -- THAT THE

12   PROCESSES, THE NON-PATENTED KNOW-HOW, WERE ACTUALLY COVERED, IN

13   FACT, BY THE '724 PATENT.  THAT WAS A PROCESS PATENT.  AND YOU

14   JUST SIMPLY DON'T GET TO THE THE KNOW-HOW AT LIGHTLOGIC WITHOUT

15   STARTING OFF WITH THE RADIANCE TECHNOLOGY, SPECIFICALLY THE

16   FLEXURE.

17             NOW, MR. HEYLER, RANDY HEYLER, HE WAS ONE OF

18   DEFENDANTS' EXPERTS, HE TESTIFIED THAT THE VALUE WASN'T THE

19   PATENT OR PATENTED TECHNOLOGY BUT IT WAS THE AUTOMATION

20   PROCESS, THE KNOW-HOW.  BUT HE ESTIMATED THAT THE KNOW-HOW OR

21   THE PROCESS WOULD COST ONLY SEVERAL HUNDRED THOUSAND DOLLARS TO

22   DUPLICATE.

23             SO, AGAIN, IF THERE WAS SO MUCH VALUE IN THE

24   KNOW-HOW, YOU WOULD EXPECT THAT THERE WOULD BE MORE MONEY

25   ASSOCIATED WITH -- MORE VALUE ASSOCIATED WITH DUPLICATING THAT

1    KNOW-HOW.

2              I WANT TO SPEND JUST A FEW MOMENTS ON THE DELOITTE

3    REPORT THAT YOU'VE HEARD REFERENCED A FEW TIMES NEAR THE END OF

4    TRIAL.

5              LET'S GO TO 834, DAVID, PLEASE.

6              (EXHIBIT PUBLISHED TO JURY.)

7         **MR. MacDONALD:**  AS I MENTIONED, THIS REPORT WAS

8    PREPARED FOR INTEL ON AUGUST 6TH, 2001.

9              LET'S GO TO PAGE 2, DAVID, PLEASE.

10             (EXHIBIT PUBLISHED TO JURY.)

11        **MR. MacDONALD:**  THE PURPOSE AND SCOPE WAS DELOITTE

12   PREPARED AN INDEPENDENT ANALYSIS WITH RESPECT TO THE TO THE

13   FAIR VALUE OF CERTAIN INTANGIBLE ASSETS AS OF THE VALUATION

14   DATE.  THE PURPOSE OF THIS ENGAGEMENT IS TO ASSIST MANAGEMENT

15   WITH ITS ALLOCATION OF THE PURCHASE PRICE TO THE THE ASSETS

16   ACQUIRED ON A FAIR VALUE BASIS FOR FINANCIAL REPORTING

17   PURPOSES.

18             AND YOU SEE FAIR VALUE IS CAPITALIZED.

19             LET'S GO TO THE TO THE NEXT PAGE WHERE IT'S DEFINED.

20             (EXHIBIT DISPLAYED TO JURY.)

21        **MR. MacDONALD:**  FAIR VALUE IS DEFINED AS THE

22   PROPERTY WHICH CHANGED HANDS BETWEEN A WILLING BUYER AND A

23   WILLING SELLER, NEITHER BEING UNDER COMPULSION TO BUY OR SELL

24   AND BOTH HAVING KNOWLEDGE OF ALL RELEVANT FACTS AS OF THE

25   APPLICABLE VALUATION DATE.

1          THIS ESSENTIALLY MEANS THAT IF THINGS LIKE

2    INTELLECTUAL CAPITAL, THE WORK FORCE WERE SO IMPORTANT, THAT

3    WOULD BE CONSIDERED BECAUSE THE WILLING BUYER AND THE WILLING

4    SELLER WOULD HAVE KNOWLEDGE OF ALL THE RELEVANT FACTS.  BUT

5    INTEL AND THE DEFENDANTS WANT TO YOU DISREGARD THE DELOITTE

6    REPORT EVEN THOUGH IT WAS INTEL THAT RETAINED DELOITTE TO

7    CONDUCT THIS VALUATION.

8          AND WHY IS INTEL RUNNING AWAY FROM THIS DELOITTE

9    REPORT?  IT'S BECAUSE IT UNDERMINES WHAT THEY CLAIM IS THE TRUE

10   VALUE OR THE IMPORTANT VALUE DRIVERS OF THE INTEL/LIGHTLOGIC

11   DEAL.

12          I MEAN, YOU -- AS I MENTIONED, YOU'VE HEARD A LOT OF

13   WITNESSES TESTIFY ABOUT HOW IMPORTANT THE TEAM AND THE

14   MANAGEMENT WERE.

15          BUT IF WE GO TO PAGE 40 OF THE DELOITTE REPORT,

16   DAVID, PLEASE.

17               (EXHIBIT PUBLISHED TO JURY.)

18          **MR. MacDONALD:**  IT'S -- THIS IS THE ASSEMBLED WORK

19   FORCE.  IT REPRESENTS ALL 82 EMPLOYEES.  DELOITTE RECOGNIZES

20   THAT THEY'RE A SKILLED -- THIS IS A SKILLED ASSEMBLED WORK

21   FORCE.  IT SAYS IT TWICE IN THE FIRST PARAGRAPH.  FIRST TWO

22   SENTENCES TALK ABOUT THE SKILLED WORK FORCE.  IT UNDERSTOOD

23   THAT THIS WAS -- THAT THERE WERE EMPLOYEES THAT WERE DEEMED

24   CRITICAL.

25          IF YOU GO DOWN TO THE TO THE BOTTOM OF THE SECOND

1    PARAGRAPH.  THEY UNDERSTOOD THAT THE WORK FORCE HAD UNIQUE

2    TALENTS, AND YET THEY VALUED IT AT $2.3 MILLION BASED ON THIS

3    COST TO REPLACE, A REPLACEMENT COST APPROACH.

4            NOW, YOU'VE HEARD DEFENDANTS' COUNSEL TALKING ABOUT

5    THIS REPLACEMENT COST APPROACH BEING JUST HEADHUNTER FEES.

6            BUT IF WE GO TO TX83477, DAVID.

7            (EXHIBIT PUBLISHED TO JURY.)

8        MR. MacDONALD:  THIS IS WHERE THE BREAKDOWN OF HOW

9    THEY CAME UP WITH THE 2.3 MILLION.  AND IT'S NOT JUST

10   HEADHUNTER FEES.  IT'S ALSO -- THEY CONSIDERED NOT JUST

11   HEADHUNTER FEES, BUT THE ANNUAL SALARIES, THE ANNUAL OVERHEAD,

12   THE TRAINING.  YOU GO DOWN TO THE TO THE BOTTOM, IT'S THE

13   TRAINING AND RECRUITMENT AND ACQUISITION COSTS, NOT JUST

14   HEADHUNTER FEES.

15           AND YOU'LL NOTICE THAT THERE'S REALLY SMALL --

16   THERE'S FOOTNOTE -- THERE'S VARIOUS REFERENCES TO FOOTNOTE 1.

17   THERE'S ABOUT FIVE REFERENCES TO FOOTNOTE 1.

18           IF WE GO TO TO THE THE NEXT PAGE, WE SEE WHAT

19   FOOTNOTE 1 IS.

20           (EXHIBIT PUBLISHED TO JURY.)

21       MR. MacDONALD:  FOOTNOTE 1, THE SOURCE FOR THAT

22   INFORMATION WAS LIGHTLOGIC MANAGEMENT.  THE LIGHTLOGIC

23   MANAGEMENT HAD INPUT ON THIS -- THE VALUATION OF THE ASSEMBLED

24   WORK FORCE.

25       THE COURT:  OKAY.  I THINK WE'LL TAKE A RECESS,

1    THEN.

2              ALL RIGHT.  LET'S TAKE A RECESS FOR TEN MINUTES.

3              (RECESS TAKEN AT 10:50 A.M.)

4         (PROCEEDINGS RESUMED AT 11:02 A.M.))

5         **THE CLERK:**  REMAIN SEATED.  COURT'S IN SESSION.

6    COME TO ORDER.

7              (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

8    PRESENCE OF THE JURY:

9              **THE COURT:**  PLEASE GO AHEAD, COUNSEL.

10        **MR. MacDONALD:**  THANK YOU FOR YOUR PATIENCE.

11             WE WERE TALKING ABOUT THE DELOITTE REPORT.  AND I

12   WANTED TO EXPLAIN TO YOU NOW A FURTHER REASON WHY THE

13   DEFENDANTS ARE -- WANT YOU TO DISREGARD THE DELOITTE REPORT.

14   IT PROVIDES A VALUATION OF THE TRANSPONDER -- LIGHTLOGIC

15   TRANSPONDER TECHNOLOGY AT THE TIME OF THE DEAL.

16             AND THIS IS AT 7.5.1 OF THE DELOITTE REPORT UNDER

17   "DEVELOPED TECHNOLOGY."

18             (EXHIBIT PUBLISHED TO JURY.)

19        **MR. MacDONALD:**  AND IT SPECIFICALLY MAKES REFERENCE

20   TO THE TECHNOLOGICAL FEASIBILITY OF THE TRANSPONDERS THAT THEY

21   WERE SELLING TO CUSTOMERS, THE TWO-KILOMETER A GENERATION AND

22   THE 40-KILOMETER A GENERATION TRANSPONDERS.  IT NOTES, HOWEVER,

23   THAT --

24             IF WE GO TO THE NEXT PAGE.

25             (EXHIBIT PUBLISHED TO JURY.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          **MR. MacDONALD:**  -- THAT THE TRANSPONDERS IN THE

2    A GENERATION WEREN'T USING THE LIGHTLOGIC OPTICAL MODULES.

3    HOWEVER, THE B VERSION, AS SHOWN IN THE HIGHLIGHTED SECTION

4    WERE -- WERE GOING TO BE ESSENTIALLY THE SAME AS THE

5    A VERSIONS, EXCEPT THAT THE THIRD-PARTY OPTICAL MODULES WERE TO

6    BE REPLACED WITH THE LIGHTLOGIC COMPONENTS.

7          BUT THOSE COMPONENTS HAD NOT REACHED TECHNOLOGICAL

8    COMPLETION BY THE VALUATION DATE AND THEREFORE WERE NOT

9    MEASURED IN THIS $1.2 MILLION, WHICH IS THE VALUATION IF YOU

10   LOOK AT THE VERY LAST SENTENCE.  THE VALUATION OF THE

11   TRANSPONDER A GENERATION IS REASONABLY ESTIMATED AT

12   $1.2 MILLION.

13         THAT'S WHAT MR. REGAN, SHUM'S DAMAGES EXPERT,

14   CONSIDERED AND BACKED OUT OF THE $409 MILLION PURCHASE PRICE

15   ALLOCATION.  AND THAT IMPORTANTLY IS THE SAME FIGURE THAT

16   MR. NAPPER, BRIAN NAPPER, DEFENDANTS' DAMAGES EXPERT, AGREED

17   TO, ADMITTED THAT THE A GENERATION TRANSPONDER WAS WORTH

18   $1.2 MILLION.

19         AND SIGNIFICANTLY, THE B VERSION AND THE C VERSION,

20   AS I MENTIONED, WAS GOING TO CONTAIN THE LIGHTLOGIC OPTICAL

21   MODULES.

22         AND THERE'S -- THERE'S WE HAVE SOME SLIDES TO SHOW

23   YOU WHAT THOSE MODULES LOOKED LIKE.

24              (EXHIBIT PUBLISHED TO JURY.)

25         **MR. MacDONALD:**  THIS IS A COPY -- THIS IS A PICTURE

1    OF THE -- OF THE LIGHTLOGIC B GENERATION TRANSPONDER.  SEE THE

2    TWO LIGHTLOGIC OPTICAL MODULES.  AND IF YOU OPEN IT UP, THE

3    OPTICAL MODULE, YOU'LL SEE A FLEXURE.  THAT'S THE LIGHTLOGIC

4    TECHNOLOGY DERIVED FROM RADIANCE.

5              AND THERE'S A -- WE HAVE A PICTURE OF THE C VERSION

6    AS WELL.

7              DAVID?

8              (EXHIBIT PUBLISHED TO JURY.)

9              **MR. MacDONALD:**  C VERSION, LIGHTLOGIC OPTICAL

10   MODULES.  AGAIN, CONTAINING THE FLEXURE.

11             NOW, THIS IS WHAT IS NOT ACCOUNTED FOR SPECIFICALLY

12   BY THE DELOITTE REPORT.  INSTEAD, IT WAS ACCOUNTED INTO THE

13   $351 MILLION GOODWILL FIGURE BECAUSE IT HAD NOT REACHED

14   TECHNOLOGICAL FEASIBILITY AS OF THE VALUATION DATE.

15             AND THESE B AND C VERSION LIGHTLOGIC TRANSPONDERS,

16   THEY REPRESENTED -- YOU MAY RECALL THE TESTIMONY -- THEY

17   REPRESENTED SUBSTANTIAL COST SAVINGS, MANUFACTURING COST

18   SAVINGS.

19             WE HAVE SOME DOCUMENTS.  I THINK IT'S THE NEXT

20   DOCUMENT, THE NEXT SLIDE, DAVID.

21             (EXHIBIT PUBLISHED TO JURY.)

22             **MR. MacDONALD:**  THIS IS FROM ONE OF LIGHTLOGIC'S

23   DOCUMENTS, TX505.

24             IT SAYS "THE SECOND GENERATION B VERSION WOULD

25   REPRESENT SIGNIFICANT COST REDUCTION."  AND IT WOULD

 1   INCORPORATE THE LIGHTLOGIC OPTICAL MODULES.  SAME WITH THE C

 2   VERSION.

 3           AND I THINK WE GO TO THE NEXT SLIDE.

 4           WE'LL SEE EXACTLY HOW MUCH OF A COST REDUCTION IT

 5   IS.  NOW, YOU CAN'T SEE IT VERY WELL, BUT THE COLUMN VERSION

 6   AQ1, $8200 MANUFACTURING COST.  THE FAR RIGHT COLUMN, VERSION

 7   B, THE $3500.  AND I THINK A FEW OF WITNESSES ADMITTED THAT IT

 8   WOULD BE A $4700 COST SAVINGS, THE B VERSION COMPARED TO THE

 9   A VERSION, THE B VERSION HAVING THE LIGHTLOGIC OPTICAL MODULES,

10   THE A VERSION HAVING THE OFF-THE-SHELF MODULES.

11           OKAY.  LET'S GO BACK TO THE DAMAGES.  I JUST WANT TO

12   BRIEFLY, BRIEFLY GO BACK TO THE DAMAGES SLIDE.

13           DAVID, PLEASE.

14                (EXHIBIT PUBLISHED TO JURY.)

15       **MR. MacDONALD:**  AND WHAT I WANT TO DO HERE IS -- WE

16   TALKED ABOUT INTENTIONAL MISREPRESENTATION, TALKED ABOUT BREACH

17   OF CONTRACT, AND WE'VE BRIEFLY TALKED ABOUT UNJUST ENRICHMENT.

18   BUT I WANT TO GO BACK TO UNJUST ENRICHMENT VERY, VERY BRIEFLY.

19           ACCORDING TO DEFENDANTS' DAMAGES EXPERT, MR. NAPPER,

20   EVEN IF SHUM, MR. SHUM, PROVES HIS ENTIRE CASE, INVENTORSHIP,

21   FRAUD, BREACH OF CONTRACT, UNJUST ENRICHMENT, THE MOST THAT

22   SHUM COULD RECOVER IS 250,000 TO $500,000.

23           DAVID, DO YOU HAVE MR. NAPPER'S SUMMARY OF OPINION

24   SLIDE?

25                (EXHIBIT PUBLISHED TO JURY.)

1          **MR. MacDONALD:**  WELL, IN ANY EVENT, THIS IS -- THIS

2     IS HIS SUMMARY OF OPINIONS.  THIS IS ASSUMING THAT MR. SHUM

3     PROVES LIABILITY AND CAUSATION.  IT'S SOMEWHERE ON THE ORDER OF

4     250- TO $500,000.  AND MAYBE -- MAYBE MIGHT ADD THE BREACH OF

5     CONTRACT AND THE UNJUST ENRICHMENT.  AND THE FRAUD HE CLAIMS IS

6     ZERO.  AND DOES THAT SEEM FAIR?  ESPECIALLY GIVEN THE FACT THAT

7     MR. VERDIELL RECEIVED $58 MILLION FROM THE DEAL, LIGHTLOGIC

8     RECEIVED $409 MILLION FROM THE DEAL.

9          AND REMEMBER, MR. NAPPER IS ASSUMING THE BREACH AND

10    THE FRAUD AND UNJUST ENRICHMENT.  DOES IT MAKE SENSE THAT

11    MR. SHUM ONLY GETS THIS SUM OF MONEY, GIVEN THE FACT THAT

12    MR. BALDRIDGE, FOR EXAMPLE, MADE OVER $15 MILLION IN LESS THAN

13    15 MONTHS AT LIGHTLOGIC AND DIDN'T -- APPARENTLY DIDN'T DO MUCH

14    EXCEPT SIGN DOCUMENTS THAT HE NEVER READ.  WE SUBMIT THAT IT'S

15    NOT FAIR AND THAT OUR CALCULATION IS THE MOST FAIR APPROACH.

16          IF WE CAN GO BACK TO OUR DAMAGES -- SUMMARY DAMAGES

17    SLIDE.

18          (EXHIBIT PUBLISHED TO JURY.)

19          **MR. MacDONALD:**  NOW, AS I WAS DISCUSSING EARLIER,

20    THERE IS THIS DISPUTE ABOUT THE ASSEMBLED WORK FORCE AND THE

21    VALUE THAT THEY BROUGHT THE LIGHTLOGIC ASSEMBLED WORK FORCE.

22    INTEL'S DAMAGES EXPERT, MR. NAPPER, DISPUTED THAT VALUE, THE

23    $2.34 MILLION VALUE BUT DIDN'T COME UP WITH AN ALTERNATIVE

24    VALUE.

25          DAVID, GO TO THE NAPPER PIE CHART SLIDE, PLEASE.

 1              (EXHIBIT PUBLISHED TO JURY.)

 2         **MR. MacDONALD:**  NOW, FOR THE SAKE OF ARGUMENT, IF

 3    YOU DO FIND THAT LIGHTLOGIC'S WORK FORCE WAS WORTH MORE THAN

 4    2.34 MILLION, YOU, BASED ON THE EVIDENCE AND BASED ON A

 5    REASONED JUDGMENT, CAN SAY, "WELL, THE WORK FORCE IS WORTH MORE

 6    THAN THAT IF YOU INCLUDE OTHER THINGS."  AND YOU COULD SAY IT'S

 7    WORTH FIVE TIMES MORE IF YOU THINK IT'S BASED ON THE EVIDENCE.

 8    YOU CAN SAY IT'S WORTH TEN TIMES MORE.  YOU CAN SAY THE WORK

 9    FORCE IS WORTH 20 TIMES MORE.  AND THAT'S WHAT WE'VE TRIED TO

10    HIGHLIGHT WITH THIS LINE RIGHT HERE.  YOU CAN SAY IT'S WORTH

11    MORE.

12         YOU HAVE THE POWER TO DO THAT, TO -- TO BACK OUT

13    MORE THAN THE $2 MILLION FROM THE -- FROM THE $409 MILLION OR

14    FROM THE 347 RESIDUE THAT'S LEFT.

15         AND THAT LEADS ME TO AN IMPORTANT THING THAT I JUST

16    WANT TO REMIND YOU BEFORE I WRAP UP.  THE ARGUMENTS YOU HEAR

17    FROM ATTORNEYS ARE NOT EVIDENCE OF DAMAGES, AS YOU WILL HEAR

18    FROM THE COURT SHORTLY.  YOU DETERMINE THE CORRECT AWARD THAT

19    SHOULD GO TO MR. SHUM.  YOU CAN ACCEPT WHAT OUR SIDE PROPOSES.

20    YOU CAN ACCEPT WHAT THE DEFENDANTS PROPOSE, THOUGH WE HOPE

21    THAT'S NOT THE CASE, OR YOU CAN REACH AN AWARD EVEN THOUGH

22    NEITHER SIDE HAS PROPOSED IT.

23         AS YOU WILL HEAR FROM THE COURT, WHATEVER AWARD YOU

24    MAY COME UP WITH, IT MUST BE BASED ON YOUR REASONED JUDGMENT

25    APPLIED TO THE EVIDENCE THAT HAS BEEN ADMITTED DURING TRIAL.

 1    THAT IS THE ONLY LIMITATION YOU HAVE WITH RESPECT TO DAMAGES.

 2             IN CONCLUSION, I GO BACK TO WHERE I STARTED.  THERE

 3    IS AN IRRECONCILABLE DIFFERENCE BETWEEN WHAT THE DOCUMENTS

 4    CREATED AT THE TIME, NAMELY 1997 TO 2001, WHAT THOSE DOCUMENTS

 5    SAY VERSUS WHAT THE DEFENDANTS' WITNESSES CLAIM.

 6             DEFENDANTS' COUNSEL WILL ARGUE STRENUOUSLY IN THEIR

 7    CLOSING ARGUMENT THAT EVERY SINGLE ONE OF DEFENDANTS' WITNESSES

 8    TESTIFIED THAT THE PATENTS WERE NOT A SUBSTANTIAL FACTOR.

 9    THEIR CLOSING WILL UNDOUBTEDLY ARGUE THAT ALL THE VENTURE

10    CAPITALISTS AND INTEL KNEW THAT VERDIELL AND LIGHTLOGIC HAD A

11    SO-CALLED RIGHT TO USE, BUT LET'S NOT FORGET WHAT THE DOCUMENTS

12    ACTUALLY PROVIDE.

13             WE HAVE THE POL THAT SAYS EQUAL RIGHTS.  BUT THEN

14    YOU COMPARE THAT TO SOME OF THE ACTIONS, THE FILING OF PATENT

15    APPLICATIONS AND THE FILING OF PATENT ASSIGNMENTS THAT CLAIM

16    SOLE AND EXCLUSIVE RIGHTS, THE SEPTEMBER 1998 LETTER FROM

17    MR. VERDIELL TO HIS AGENT, MR. MAREK ALBOSZTA, TALKING ABOUT

18    ENTHUSIASTICALLY WRITING "HOW THE PATENT GOT US FUNDED," BUT

19    NOW MR. VERDIELL AND SOME OF DEFENDANTS' WITNESSES SAY THAT THE

20    PATENT APPLICATIONS WERE NOT IMPORTANT TO FUNDING.

21             WE TALKED ABOUT THE PATENT ASSIGNMENTS.  IT'S NOT

22    JUST THE RIGHT TO USE.  THEY WERE CLAIMING ENTIRE RIGHT, TITLE,

23    AND INTEREST.  TALKED ABOUT THE IP SECURITY AGREEMENT, THE ONE

24    THAT I DISCUSSED WITH MR. BALDRIDGE, HOW THERE WAS A

25    $15 MILLION LOAN BASED ON THESE SIX PATENT APPLICATIONS.  HE --

1    SIX APPLICATIONS.  HE DENIES IT, HOWEVER, BASED ON HIS REAL

2    WORLD VERSUS WHAT'S IN THE DOCUMENTS DICHOTOMY.

3              ALL OF THE INTEL DUE DILIGENCE DOCUMENTS TOUTING THE

4    PATENTED TECHNOLOGY, THE INTEL BOARD OF BRIEFING BOOK WHICH I

5    HAD TO QUICKLY GO THROUGH, BUT THERE ARE MANY OTHER PAGES

6    REFERENCING THE PATENTED TECHNOLOGY, THE PATENTS AND THE

7    IMPORTANCE OF THE PATENTS.  THE DELOITTE REPORT WHICH HAD THE

8    $2.4 MILLION VALUE ON THE WORK FORCE WHICH NOW DEFENDANTS ARE

9    RUNNING AWAY FROM.

10             THEIR EXPLANATIONS FOR SOME OF THESE JUST DEFY

11   COMMON SENSE AND DEFY WHAT THESE DOCUMENTS ACTUALLY SAY.  FOR

12   MR. BALDRIDGE AND HIS PALS, THE DOCUMENTS AREN'T IMPORTANT.

13   FOR HIM THERE'S A BIG DIFFERENCE BETWEEN WHAT GOES ON IN THE

14   REAL WORLD AND WHAT LEGAL DOCUMENTS SAY.

15             WHEN I PRESSED THEM WITH A LEGAL DOCUMENT THAT

16   CONTRADICTED HIS TESTIMONY, WHAT WAS MR. BALDRIDGE'S REPEATED

17   REFRAIN?  HE GOES, "YEAH" --

18             (EXHIBIT PUBLISHED TO JURY.)

19        **MR. MacDONALD:**  -- "BUT SEE AGAIN, THIS IS REAL

20   WORLD VERSUS THE LEGAL WORLD."

21             BUT I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT IN

22   THIS COURTROOM, WE ARE IN THE LEGAL WORLD.  WE MUST ADHERE TO

23   WHAT THE LEGAL WORDS SAY, WHERE MORE BROADLY I WOULD FURTHER

24   SUBMIT THAT THE DOCUMENTS ARE THE REAL WORLD WITH REAL WORLD

25   AND LEGAL WORLD SIGNIFICANCE.

1          WHEN MR. VERDIELL CLAIMS SOLE AND EXCLUSIVE RIGHTS

2     TO THE ENTIRE RIGHT, TITLE, AND INTEREST OF THE RADIANCE

3     PATENT -- INVENTIONS, IN ALL OF THE PATENT ASSIGNMENTS FILED IN

4     THE UNITED STATES PATENT OFFICE, HE WAS, IN THE REAL WORLD,

5     ATTEMPTING TO CONVEY SOLE AND EXCLUSIVE RIGHTS TO THE ENTIRE

6     RIGHT, TITLE, AND INTEREST TO MR. SHUM'S INTERESTS IN THE

7     INVENTIONS.  WE CAN'T LET HIM NOW SAY, "WELL, ALL I REALLY

8     CONVEYED WAS SOMETHING ELSE, JUST A RIGHT TO USE."

9          WHEN INTEL AND LIGHTLOGIC WITNESSES SAID THAT, "WE

10    DIDN'T CARE ABOUT THE PATENTS," THEN THAT'S WHY THERE ARE

11    DOCUMENTS REPLETE WITH REFERENCES THROUGHOUT THAT MENTION OR

12    THAT TOUT THE PATENTS AND THE PATENTED TECHNOLOGY AS BEING THE

13    KEY COMPETITIVE ADVANTAGES.

14          THIS IS ESPECIALLY TRUE WHEN YOU LOOK AT INTEL'S DUE

15    DILIGENCE DOCUMENTS, INCLUDING THE BOARD OF BRIEFING BOOK THAT

16    WE DISCUSSED EARLIER.

17          IMAGINE IF MR. SHUM CLAIMED IN THIS COURTROOM THAT

18    HIS DOCUMENTS DIDN'T MATTER BECAUSE HE REALLY MEANT SOMETHING

19    ELSE DIFFERENT IN THE REAL WORLD, TO BORROW MR. SHUM'S (SIC)

20    OFTEN USED PHRASE.  DEFENDANTS' COUNSEL WOULD HAVE A FIELD DAY

21    ON MR. SHUM.  BY THAT SAME TOKEN, IT'S UNFAIR TO LET DEFENDANTS

22    CLAIM ONE THING WHEN THE DOCUMENTS AT THE TIME REVEAL SOMETHING

23    ELSE.

24          THROUGHOUT THE ALMOST SEVEN YEARS OF THIS

25    LITIGATION, AND THE 11 YEARS THAT HAVE PASSED SINCE

1    MR. VERDIELL IMPROPERLY DIRECTED THE ABANDONMENT OF THE PATENT

2    APPLICATION -- SHUM'S PATENT APPLICATION, MR. SHUM HAS BEEN

3    DEPRIVED OF THE RECOGNITION AND COMPENSATION FOR HIS VALUABLE

4    INVENTIONS DONE AT RADIANCE, WHICH HE DID WITHOUT A PAYCHECK.

5         WE ASK YOU TO AWARD A FAIR AND REASONABLE

6    COMPENSATION FOR HIS INVENTIONS.  AND THROUGH OUR UNJUST

7    ENRICHMENT CLAIM, WE ASK THAT YOU AWARD AN AMOUNT OF MONEY THAT

8    IS EQUIVALENT TO THE AMOUNT OF MONEY BY WHICH MR. VERDIELL AND

9    LIGHTLOGIC WERE UNJUSTLY ENRICHED IN THE $409 MILLION DEAL WITH

10   INTEL.

11        THANK YOU VERY MUCH FOR YOUR COURTESY AND FOR THE

12   PRIVILEGE OF ADDRESSING YOU TODAY.

13        THANK YOU, YOUR HONOR.

14        **THE COURT:**  COUNSEL, SHOULD WE TAKE SOME TIME TO GET

15   SET UP OR WHAT DO YOU NEED TO DO?

16        **MR. TAYLOR:**  IF WE COULD HAVE FIVE MINUTES, YOUR

17   HONOR.

18        **THE COURT:**  YEAH, WE'LL GET THE COURTROOM SET UP.

19   LET'S TAKE ABOUT FIVE MINUTES.  AND SO WE'LL CALL YOU BACK IN

20   WHEN WE'RE READY.

21        (RECESS TAKEN AT 11:15 A.M.)

22        (PROCEEDINGS RESUMED AT 11:22 A.M.)

23        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

24   PRESENCE OF THE JURY:)

25        **THE COURT:**  COUNSEL, PLEASE GO AHEAD.

1          **MR. TAYLOR:**  THANK YOU, YOUR HONOR.

2                       **CLOSING ARGUMENT**

3          **MR. TAYLOR:**  LADIES AND GENTLEMEN, I TOO WOULD LIKE

4    TO START ON BEHALF OF THE DEFENDANTS THANKING YOU VERY MUCH FOR

5    YOUR TIME AND YOUR ATTENTION AND THE TIME AND ATTENTION I KNOW

6    THAT YOU'LL CONTINUE TO GIVE THIS MATTER AS YOU DELIBERATE TO

7    REACH A RESOLUTION.

8               THIS WILL BE OUR LAST TIME TO SPEAK WITH YOU, SO

9    I'LL TAKE ADVANTAGE OF IT AND TRY TO SPEAK WITH YOU FOR JUST A

10   LITTLE WHILE LONGER AND ASK YOU TO LISTEN CAREFULLY, BECAUSE

11   I'M GOING THE TRY TO HIGHLIGHT AS MUCH AS I CAN THE EVIDENCE

12   THAT I THINK IS KEY IN THIS CASE, AND AT THE SAME TIME, THE

13   LAW, THE JURY INSTRUCTIONS THAT THE JUDGE WILL BE GIVING YOU TO

14   HELP YOU DECIDE HOW TO DECIDE THIS CASE IN ACCORDANCE WITH THE

15   LAW.  AND I KNOW YOU WILL.

16              BUT BEFORE I GET INTO SOME OF MR. SHUM'S CLAIMS AND

17   SOME OF THE KEY EVIDENCE ON THOSE CLAIMS, I WANT TO TALK WITH

18   YOU ABOUT A DOCUMENT -- ACTUALLY TWO DOCUMENTS THAT I THINK ARE

19   THE MOST IMPORTANT DOCUMENTS IN THE CASE AND THAT HAVE NOT YET

20   BEEN MENTIONED BY MR. SHUM'S COUNSEL.

21              THE FIRST OF THOSE DOCUMENTS IS WHAT YOU'VE SEEN AND

22   HEARD ABOUT AS THE PLAN OF LIQUIDATION.  AND WHAT'S IMPORTANT

23   ABOUT THE PLAN OF LIQUIDATION IS WHAT IT WAS INTENDED TO

24   ACCOMPLISH, BECAUSE WHAT IT WAS INTENDED TO ACCOMPLISH WAS THAT

25   WE ALL NOT BE HERE TODAY, THAT THESE TWO GENTLEMEN COULD SPLIT,

1     THEY COULD GO THEIR SEPARATE WAYS, THEY COULD PURSUE THE ENTIRE

2     BUSINESS OF RADIANCE, THEY COULD PATENT, THEY COULD COMPETE AND

3     THAT THEY WOULD DO -- ONE THING THEY WOULD AGREE NEVER TO DO IS

4     COME BACK AGAINST THE OTHER AND TRY TO HOLD THE OTHER LIABLE OR

5     GET PROFITS OF THE OTHER IF THE OTHER WAS SUCCESSFUL.

6             AND LET'S SEE WHAT MR. SHUM HIMSELF SAID ABOUT THE

7     PLAN OF LIQUIDATION AT -- THIS WAS A HOTLY NEGOTIATED DOCUMENT.

8     MR. SHUM WAS REPRESENTED BY TWO LAWYERS.  MR. VERDIELL HAD A

9     LAWYER.  THE PEOPLE HAD ADVISORS.  AND IN THE NEGOTIATIONS,

10    MR. SHUM EXPRESSED IT QUITE WELL WHEN HE SAID, "FIRST OF ALL, I

11    WANT US TO BE FOREVER FREE FROM EACH OTHER."  THAT'S MR. SHUM'S

12    WORDS.  AND HE SAID, IN ANOTHER EXCHANGE, "IT," MEANING THIS

13    AGREEMENT, "GUARANTEES YOU THAT I CANNOT LAY CLAIM TO ANY

14    FUTURE BENEFIT YOU MAY GET," I.E., FUNDING.  AND THAT, LADIES

15    AND GENTLEMEN, RESULTED IN AN ACTUAL AGREEMENT THAT WAS SIGNED

16    BY BOTH MEN.

17            IF WE CAN SEE THE FIRST PAGE.

18              (EXHIBIT PUBLISHED TO JURY.)

19        **MR. TAYLOR:**  YOU'VE SEEN THIS IN VARIOUS FORMS.  AND

20    IT'S THE PLAN OF LIQUIDATION IN THE CASE AND IS A CRITICALLY

21    IMPORTANT DOCUMENT FOR YOU TO -- TO TAKE A CHANCE TO REVIEW.

22            BUT LOOK RIGHT AT THE FIRST PAGE WHEN IT SAYS THAT

23    "FRANK SHUM," THE HIGHLIGHTED SECTION, "AND JEAN-MARC VERDIELL

24    HAVE APPROVED THE PLAN AS THE CORPORATION'S SHAREHOLDERS AND

25    HAVE AGREED TO BE INDIVIDUALLY BOUND BY THIS CLAIM."  THAT'S

```
 1    WHAT MR. SHUM AGREED TO.  THAT'S WHAT DR. VERDIELL AGREED TO.
 2              MORE IMPORTANTLY -- AND THERE ARE TWO PROVISIONS IN
 3    THE PLAN OF LIQUIDATION THAT ARE CRITICALLY IMPORTANT, AND
 4    THEY'RE NOT LONG, BUT THE FIRST ONE'S QUITE CLEAR, "BUSINESS
 5    ACTIVITIES OF OFFICERS AND DIRECTORS.  SHUM AND VERDIELL
 6    ACKNOWLEDGE AND AGREE THAT AFTER THE APPROVAL OF THIS PLAN,
 7    EACH OF THEM SHALL BE ENTITLED" -- NOW HERE'S THE -- "WITHOUT
 8    LIABILITY OR DUTY TO ACCOUNT TO THE CORPORATION OR TO THE OTHER
 9    TO PURSUE ANY AND ALL SUCH OTHER BUSINESS ACTIVITIES AS THEY
10    SHALL DESIRE," NO LIMITATION, ANY AND ALL, EVEN IF THE
11    ACTIVITIES ARE IN COMPETITION WITH THE BUSINESS OF THE
12    CORPORATION, WHICH IS RADIANCE, EVEN IF YOU'RE DOING THE SAME
13    THING RADIANCE IS DOING AND EVEN IF THEY TAKE OR ATTEMPT TO
14    TAKE A BUSINESS OPPORTUNITY -- YOU TAKE A RADIANCE BUSINESS
15    OPPORTUNITY FOR YOURSELF THAT THE CORPORATION COULD HAVE
16    PURSUED.
17              IT'S COMPLETELY OKAY TO USE THE FLEXURE, SELL THE
18    FLEXURE, TALK ABOUT THE FLEXURE, DBC, IT'S COMPLETELY OKAY.
19    TWO GENTLEMEN ARE REACHING AN AGREEMENT, "LET'S GO.  WE CAN'T
20    GET ALONG, SO LET'S SEPARATE AND LET'S BE FREE OF EACH OTHER
21    AND LET'S BOTH GIVE IT A SHOT AND SEE WHAT WE CAN DO."
22              THERE'S THE OTHER PROVISION THAT HAS TO DO WITH
23    EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT, WHICH IS ALSO IMPORTANT.
24    THERE'S NOTHING IN THIS AGREEMENT ABOUT 50/50 OWNERSHIP OR
25    CO-OWNERSHIP.  THERE'S ONE PROVISION ABOUT HOW INTELLECTUAL
```

```
1    PROPERTY IS GOING TO BE HANDLED, AND IT MAKES PERFECT SENSE,

2    BECAUSE THEY EACH WANTED TO PURSUE THE RADIANCE BUSINESS

3    OPPORTUNITY.  THEY'RE EACH GOING TO HAVE EQUAL RIGHTS TO

4    INDEPENDENTLY EXPLOIT THE INTELLECTUAL PROPERTY.  THAT'S

5    100 PERCENT OF THE INTELLECTUAL PROPERTY DEVELOPED BY THE

6    CORPORATION.

7            THAT'S THE DEAL.  AND THAT'S THE DEAL THAT MR. SHUM

8    AGREED TO.  AND THE KEY IS THAT IT'S NOT JUST THAT IT WAS AN

9    AGREEMENT BETWEEN THE PEOPLE.  WE HAD BROUGHT THIS AGREEMENT TO

10   THIS CASE AND WE'VE ASKED THIS -- THAT THIS AGREEMENT BE MADE

11   AN IMPORTANT PART OF THE CASE.  AND THE COURT, IN ITS JURY

12   INSTRUCTIONS THAT YOU'LL BE GIVEN LATER, HAS ACTUALLY CONSTRUED

13   IT, LOOKED AT THE PLAN AND ACTUALLY CONSTRUED ITS TERMS.

14           LET'S JUST GO TO PAGE 1 OF JURY INSTRUCTIONS, IF WE

15   CAN.

16           (EXHIBIT PUBLISHED TO JURY.)

17       MR. TAYLOR:  YOU WILL, LADIES AND GENTLEMEN, BE

18   GIVEN THESE AND HAVE AN OPPORTUNITY TO REVIEW THESE AND THE

19   JUDGE WILL INSTRUCT YOU WITH REGARD TO THESE AFTER WE'RE

20   FINISHED HERE, THE LAWYERS ARE FINISHED.

21           BUT THEY SAY RIGHT AT THE TOP THAT, "LADIES AND

22   GENTLEMEN, NOW THAT YOU'VE HEARD ALL THE EVIDENCE, IT'S MY DUTY

23   TO INSTRUCT YOU ON THE LAW WHICH APPLIES TO THE CASE."  AND

24   THERE ON THE -- IF YOU LOOK DOWN HERE AT THE SECOND PARAGRAPH,

25   IT SAYS, "IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE
```

 1    EVIDENCE IN THE CASE, AND TO THOSE FACTS YOU MUST APPLY THE LAW

 2    AS I GIVE IT TO YOU."

 3            AND LATER IN THE DOCUMENT, ON PAGE 2, AND YOU'LL

 4    HAVE A CHANCE TO REVIEW THIS, AND IT IS THE CRITICALLY

 5    IMPORTANT DOCUMENT IN THIS CASE, THIS JURY INSTRUCTION DOCUMENT

 6    IS EXTREMELY HELPFUL AND EXTREMELY IMPORTANT TO ALL THE

 7    PARTIES.  IT SAYS AT THE TOP THAT, "THIS IS A CIVIL CASE AND IN

 8    SUCH CASES, THE PARTY WHO SAYS THAT CERTAIN FACTS EXIST IN

 9    SUPPORT OF A CLAIM MUST ACTUALLY PROVE THOSE FACTS."

10            THEN IT TALKS ABOUT THE DIFFERENT BURDENS OF PROOF

11    WHICH WE'LL GO INTO LATER, BUT THE BURDEN OF PROOF, ONE IS A

12    PREPONDERANCE, THE OTHER IS CLEAR AND CONVINCING, BUT THE KEY

13    THING IS IT SAYS --

14            IF WE CAN GO DOWN, JEFF, TO THE BOTTOM LINE OF THIS.

15                    (EXHIBIT PUBLISHED TO JURY.)

16        **MR. TAYLOR:**  IT SAYS, "IF A PARTY FAILS TO MEET THE

17    BURDEN OF PROOF ON A PARTICULAR ISSUE" -- AND ALL THE BURDEN

18    HERE IS ON MR. SHUM -- "IF A PARTY FAILS TO MEET THE BURDEN OF

19    PROOF ASSIGNED ON A PARTICULAR ISSUE, THE VERDICT MUST BE FOR

20    THE OTHER SIDE."

21            SO HERE'S THE TEMPLATE.  YOU KNOW THE FACTS, YOU'VE

22    LISTENED TO ALL THE EVIDENCE AND SEEN THE WITNESSES.  THE JUDGE

23    IS GOING TO GIVE YOU THE LAW.  AND THEN YOU CAN DECIDE AND HELP

24    RESOLVE THIS FOR THE PARTIES.

25            BUT THIS PLAN OF LIQUIDATION IS CRITICAL, AND I WANT

1    TO SHOW YOU WHAT THE COURT HAS SAID OR THE JURY INSTRUCTIONS

2    SAY ABOUT THE PLAN OF LIQUIDATION AND WHAT THE TERMS PROVIDE.

3           AND IF WE COULD GO, JEFF, TO --

4             (EXHIBIT PUBLISHED TO JURY.)

5          **MR. TAYLOR:**  THANK YOU VERY MUCH.  YOU'RE AHEAD OF

6    ME.

7           THE COURT SAYS IN THE INSTRUCTIONS, AND THIS IS ON

8    PAGE 15, "I'VE ALREADY DETERMINED THAT THE PLAN OF LIQUIDATION

9    IS A VALID, ENFORCEABLE CONTRACT BETWEEN SHUM AND VERDIELL.

10    YOUR TASK IS TO EVALUATE WHETHER VERDIELL'S ACTIONS CONSTITUTE

11    A BREACH OF THE PLAN OF LIQUIDATION, NOT TO DETERMINE WHETHER

12    IT EXISTS.  IT'S VALID AND IT'S ENFORCEABLE.  IT'S A REAL

13    DEAL."

14           NEXT THE COURT SAYS --

15           COULD WE, JEFF, GO TO THE PARAGRAPH THAT BEGINS

16    "WHENEVER."

17           THE COURT'S EXPLAINING IN THESE INSTRUCTIONS THAT

18    WHENEVER IT'S NECESSARY TO INTERPRET THE MEANING OF THE

19    CONTRACT, THAT'S DONE BY THE JUDGE AND THAT THE JUDGE HAS DONE

20    IT HERE.  NOW THE JUDGE IS GOING TO INTERPRET THOSE TWO

21    PROVISIONS THAT I JUST SHOWED YOU.  SO WE ALL HAVE AN

22    UNDERSTANDING OF WHAT THEY MEAN AND HOW THEY APPLY TO THIS

23    CASE.

24           SO COULD WE HAVE THE PARAGRAPH THAT BEGINS WITH

25    "FIRST."

1      (EXHIBIT PUBLISHED TO JURY.)

2          **MR. TAYLOR:**  "FIRST I'VE INTERPRETED THE SECTION OF

3   THE PLAN OF LIQUIDATION ENTITLED 'BUSINESS ACTIVITIES OF

4   OFFICERS AND DIRECTORS.'"  THAT'S ONE WE JUST SAW.

5          "THIS PROVISION ELIMINATES ANY LIABILITY BETWEEN

6   SHUM AND VERDIELL BASED ON THE CONDUCT OF BUSINESS ACTIVITIES

7   BY SHUM OR VERDIELL IN ANY COMMERCIAL EXPLOITATION OF RADIANCE

8   TECHNOLOGIES AND ALLOWS THEM TO COMPETE WITH EACH OTHER WITHOUT

9   NOTICE."

10         THEY DON'T HAVE TO TELL EACH OTHER WHAT THEY'RE

11  DOING.  THERE'S NO OBLIGATION TO DO THAT.  AND THERE WAS NO

12  ACCOUNTING AS TO PROFITS, NO SHARING OF PROFITS.  IT WAS AN

13  AGREEMENT THAT MADE COMPLETE SENSE.

14         "LET'S BOTH GO -- MAYBE WE'LL BOTH BE WINNERS, BUT

15  WE'LL BOTH GO OUT AND SEE WHAT WE CAN DO WITH THE RADIANCE

16  TECHNOLOGY BECAUSE WE SURE AS HECK CAN'T GET ALONG WITH EACH

17  OTHER AND WE BOTH THINK WE CAN DO SOMETHING GREAT WITH IT."

18         SO THIS WAS THE PROVISION.

19         IT SAYS -- GOES ON TO SAY, "THIS PROVISION ALSO

20  ELIMINATES ANY LIABILITY BETWEEN SHUM AND VERDIELL BASED SOLELY

21  ON WHETHER EITHER PARTY OBTAINING A LAWFUL PATENT RELATED TO

22  THE PROPERTY DEVELOPED BY RADIANCE."  YOU CAN PATENT.  IT'S

23  OKAY.  NOT ONLY THAT, THERE'S NO LIABILITY, NO LIABILITY

24  WHATSOEVER IF YOU OBTAIN A LAWFUL PATENT ON YOUR TECHNOLOGY.

25  THAT'S ONE PROVISION.

1            THEN THE COURT WENT ON TO INTERPRET THAT OTHER

2    PROVISION.  AND THE OTHER PROVISION IN THIS AGREEMENT --

3            THIS WILL BE ON PAGE 16 AT THE TOP.

4            (EXHIBIT PUBLISHED TO JURY.)

5            **MR. TAYLOR:**  "SECOND, I'VE INTERPRETED THE SECTION

6    OF THE PLAN OF LIQUIDATION ENTITLED 'DISTRIBUTION OF PROPERTY.'

7    THIS SECTION PROVIDES THAT VERDIELL AND SHUM SHALL HAVE EQUAL

8    RIGHTS TO INDEPENDENTLY EXPLOIT THE INTELLECTUAL PROPERTY

9    DEVELOPED BY RADIANCE."  WE SAW THAT.  "THIS PROVISION MEANS

10   THAT SHUM AND VERDIELL ARE ENTITLED TO LAWFULLY PATENT ANY OF

11   THEIR OWN INVENTIONS CONTAINED IN THE INTELLECTUAL PROPERTY

12   WHICH HAD PREVIOUSLY BEEN THE PROPERTY OF RADIANCE."

13           YOU'RE ENTITLED TO LAWFULLY PATENT.  NOW, LAWFULLY

14   PATENT, IF WE WANT TO SEE WHAT "LAWFULLY PATENT" MEANS --

15           COULD WE TURN JEFF, TO THE -- ALSO ON PAGE 16, THE

16   SENTENCE THAT BEGINS "IF AN ACTUAL COINVENTOR."  LET'S ACTUALLY

17   PICK THE WHOLE PARAGRAPH THAT SAYS "A PATENT ISSUED TO AN

18   ACTUAL INVENTOR."

19           (EXHIBIT PUBLISHED TO JURY.)

20           **MR. TAYLOR:**  "A PATENT ISSUED TO THE ACTUAL INVENTOR

21   IS A LAWFUL PATENT."

22           SO IF YOU'RE THE ACTUAL INVENTOR, IT'S JUST LAWFUL,

23   DEAD BANG.  AND LOOK AT THIS.  "IF AN ACTUAL

24   INVENTOR/COINVENTOR IS NOT NAMED AND THE OMISSION IS INTENDED

25   TO DECEIVE THE PTO," THAT'S THE PATENT AND TRADEMARK OFFICE,

1    "THE PATENT'S INVALID."

2          BUT HERE, "IF AN ACTUAL COINVENTOR HAS NOT BEEN

3    NAMED BUT THE OMISSION WAS MADE WITHOUT ANY INTENT TO DECEIVE

4    THE PATENT AND TRADEMARK OFFICE, THE PATENT CAN BE CORRECTED TO

5    BE A LAWFUL PATENT."

6          AND WE HEARD MR. SHUM'S COUNSEL SAY THERE IS NO

7    DAMAGES, THERE'S NO MONEY REWARD FOR DOING THAT.  THERE'S NO

8    MONEY ASSOCIATED WITH THAT.

9          SO ONE OF OUR ISSUES AND ONE OF THE ISSUES THAT WE

10   ARE RAISING WITH YOU, LADIES AND GENTLEMEN, IS WE THINK THAT

11   MR. SHUM, UNDER THE CONSTRUCTION OF THE PLAN OF LIQUIDATION

12   THAT YOU SEE, HAS PROMISED THAT HE WOULD NOT DO WHAT HE'S DONE

13   HERE TODAY AND BRING THIS LAWSUIT.  AND WE'RE -- WE THINK HE

14   PROMISED.

15         AND WE WANT TO ASK YOU TO HELP US ENFORCE THIS

16   PROMISE THAT HE MADE WITH DR. VERDIELL, AND THAT THIS LAWSUIT,

17   WHICH WAS FILED SOME FOUR, FIVE YEARS AFTER DR. VERDIELL SIGNED

18   THIS AGREEMENT WITH MR. SHUM WAS A VALID DEAL AND AN

19   ENFORCEABLE DEAL AND ONE WE WOULD ASK YOU TO ENFORCE AGAINST

20   HIM BY REJECTING ALL OF HIS CLAIMS BECAUSE HE AGREED THAT HE

21   WOULD NOT DO WHAT HE'S DOING HERE TODAY.

22         MAYBE BECAUSE MR. SHUM UNDERSTANDS HOW IMPORTANT AND

23   WHAT PROBLEMATIC THE PLAN OF LIQUIDATION IS FOR HIS ABILITY TO

24   BRING THE CASE, HE'S MADE OTHER CLAIMS, WHICH I'D LIKE TO

25   ADDRESS AND HELP YOU RESOLVE, BUT ONE OF THE CLAIMS HE'S MADE

1    IS THAT HE WAS LED TO ENTER INTO THIS PLAN OF LIQUIDATION BY AN

2    INTENTIONAL MISREPRESENTATION BY DR. VERDIELL.  AND -- AND --

3    AND THAT INTENTIONAL MISREPRESENTATION IS ALLEGED TO BE A FALSE

4    STATEMENT.  AND THE COURT DEFINES EXACTLY WHAT THAT ALLEGED

5    MISREPRESENTATION IS IN ITS INSTRUCTIONS AT PAGE 11 AND 12.

6             AND IT SAYS ON PAGE 11, I BELIEVE --

7             (EXHIBIT PUBLISHED TO JURY.)

8        **MR. TAYLOR:**  -- IN THE SECOND PARAGRAPH, "SHUM

9    CLAIMS THAT VERDIELL MADE A FALSE REPRESENTATION THAT HARMED

10   HIM."  THIS IS IMPORTANT.  "THE FALSE REPRESENTATION CLAIMED IS

11   THAT VERDIELL STATED TO SHUM THAT THE PATENT APPLICATION

12   LISTING SHUM AS THE INVENTOR WAS INVALID AND HAD TO BE

13   WITHDRAWN.  SHUM ALSO CLAIMS THAT THE STATEMENT WAS MADE BY

14   MAREK ALBOSZTA."

15            THE COURT GOES ON IN THESE INSTRUCTIONS TO MAKE VERY

16   CLEAR THAT ALL OF THE ALLEGATIONS WE HEARD AND ALL THE EVIDENCE

17   YOU HEARD ABOUT PEOPLE NOT DISCLOSING THINGS TO EACH OTHER, NOT

18   DISCLOSING WHAT THEY WERE UP TO BEFORE THE PLAN OF LIQUIDATION,

19   NOT DISCLOSING SOMETHING ABOUT STARTING THE CORPORATION OR

20   PREPARING A PATENT APPLICATION OR HAVING CONVERSATIONS WITH

21   INVESTORS IS NOT THE BASIS OF A CLAIM HERE.  THERE'S NO DUTY

22   BETWEEN THE TWO GENTLEMEN HERE TO DISCLOSE ANYTHING TO EACH

23   OTHER WHEN THEY'RE PREPARING TO COMPETE, AND THAT'S EXPRESSLY

24   STATED IN THE COURT'S INSTRUCTIONS ON PAGE 12.

25            (EXHIBIT PUBLISHED TO JURY.)

1           **MR. TAYLOR:**   AND ON PAGE 12 IT SAYS IN THE PARAGRAPH

2     STARTING "LIABILITY," "LIABILITY FOR MISREPRESENTATION CAN BE

3     BASED ONLY ON A STATEMENT MADE BY VERDIELL OR AT HIS

4     DIRECTION."  AND HERE'S THE KEY SENTENCE, "IT IS NOT BASED ON

5     THE FACT THAT VERDIELL DID NOT DISCLOSE SOMETHING TO SHUM."

6           SO WE ARE FOCUSED ON ONE STATEMENT.  WE'RE FOCUSED

7     ON THE ONE STATEMENT IN THIS CLAIM THAT MR. VERDIELL ALLEGEDLY

8     FALSELY STATED TO MR. SHUM THAT THE PATENT APPLICATION LISTING

9     MR. SHUM AS THE INVENTOR WAS INVALID AND HAD TO BE WITHDRAWN.

10          NOW, WE SAW FROM THE JURY INSTRUCTIONS, IF YOU'VE

11    LEFT OFF A COINVENTOR, THEN THE PATENT IS INVALID UNLESS IT'S

12    EITHER CORRECTED OR IT'S WITHDRAWN AND REFILED.  AND THE

13    DIFFERENCE IS WHETHER THE PATENT APPLICATION WAS FILED WITH

14    DECEPTIVE INTENT.

15          SO STEP ONE WAS WHETHER SOMETHING HAD TO HAPPEN WITH

16    THE PATENT APPLICATION.  IN OTHER WORDS, WAS SOMEONE LEFT OFF,

17    WAS SOMEONE OMITTED FROM THE PATENT APPLICATION HAS BEEN

18    ANSWERED FOR US BECAUSE IT HAS.  IT WAS FILED ONLY IN

19    MR. SHUM'S NAME.  AND WE KNOW NOW THAT DR. VERDIELL WAS AN

20    INVENTOR, AND WE KNOW FOR A COUPLE OF REASONS.  WE KNOW, ONE,

21    FROM THE EVIDENCE THAT WE PRESENTED THAT HE CONTRIBUTED TO

22    THESE INVENTIONS AND WE SAY HE SOLELY INVENTED THE INVENTIONS

23    THAT ARE PATENTED, AND NOT EVERYTHING AT RADIANCE, BUT THE

24    STUFF IN THE PATENT WE SAY IS SOLELY DR. VERDIELL'S.

25          BUT MR. SHUM -- AND HERE'S ANOTHER KEY POINT FOR ALL

1    OF YOU TO CONSIDER -- MR. SHUM HAS NOW CONCEDED THAT

2    DR. VERDIELL IS A COINVENTOR.  HE'S CLAIMING ONLY

3    CO-INVENTORSHIP HERE.  THE OTHER INVENTOR ON ALL OF THESE

4    PATENTS, ACCORDING TO MR. SHUM, IS DR. VERDIELL.  SO

5    DR. VERDIELL HAS (SIC) OMITTED.  HE'S OFF THE PATENT.  AND THE

6    ONLY QUESTION THIS CLAIM RAISES IS WHETHER -- TWO QUESTIONS,

7    REALLY, WHETHER -- THAT THE -- HE WAS LEFT OFF FOR DECEPTIVE

8    PURPOSES OR NOT, BECAUSE IF HE WAS LEFT OFF FOR DECEPTIVE

9    PURPOSES, THAT STATEMENT IS TRUE, IT'S NOT FALSE.

10             BUT THE OTHER KEY ISSUE --

11             AND, JEFF, IF WE CAN LOOK AT THE JURY INSTRUCTION

12   AND THE REQUIREMENTS TO FIND A MISREPRESENTATION, I THINK IT

13   WILL BE HELPFUL.  I'M SORRY.  WE'RE LOOKING AT PAGE 11 AND 12,

14   BOTTOM OF 11 AND TOP OF 12.

15             (EXHIBIT PUBLISHED TO JURY.)

16        **MR. TAYLOR:**  SO AT THE BOTTOM OF THE PAGE, IT

17   SAYS --

18             THANK YOU, JEFF.

19             -- "TO ESTABLISH THIS CLAIM" -- AND WE'RE TALKING

20   ABOUT THIS INTENTIONAL MISREPRESENTATION CLAIM -- "SHUM MUST

21   PROVE ALL OF THE FOLLOWING."

22             AND REMEMBER WHAT WE TALKED ABOUT BURDEN OF PROOF,

23   AND YOU HAVE TO PROVE, SUBMIT AND PRESENT EVIDENCE THAT WILL

24   ESTABLISH, IF YOU DON'T, THEN YOU LOSE OR THAT THE DECISION

25   GOES TO THE DEFENDANTS.  HE HAS TO PROVE ALL OF THESE ISSUES.

1    AND IF WE LOOK AT NO. 2, HE HAS TO PROVE THAT

2    VERDIELL'S REPRESENTATION WAS FALSE.  WELL, IF IT WAS REALLY A

3    PATENT APPLICATION THAT MR. SHUM FILED WITH DECEPTIVE INTENT

4    LEAVING DR. VERDIELL OFF BECAUSE THEY HAD CONCERNS ABOUT SDL,

5    THAT'S DECEPTIVE.  WE CAN STOP RIGHT THERE.  THIS WAS NOT -- IF

6    THE STATEMENT WAS MADE BY DR. VERDIELL, IT WAS NOT FALSE, IT

7    WAS TRUE.

8    BUT THEN WE HAVE ADDITIONAL REQUIREMENTS.  WE HAVE

9    THE REQUIREMENT THAT DR. VERDIELL KNEW THE REPRESENTATION WAS

10   FALSE.  THAT'S NO. 3.

11   NO. 4, THAT DR. VERDIELL INTENDED THAT SHUM RELY ON

12   IT.

13   NO. 5, THAT SHUM REASONABLY RELIED ON IT.

14   NO. 6, THAT SHUM WAS HARMED.

15   AND NO. 7, THAT SHUM'S RELIANCE ON VERDIELL'S

16   REPRESENTATION WAS A SUBSTANTIAL FACTOR.

17   AND, LADIES AND GENTLEMEN, I WOULD SUBMIT ON THIS

18   ISSUE, WE HAVE VERDIELL'S TESTIMONY THAT MR. ALBOSZTA, THE

19   PATENT AGENT, TOLD HIM THAT -- MR. SHUM AS WELL -- THAT

20   MR. ALBOSZTA FELT IT WAS HIS, THE PATENT AGENT'S, DUTY BECAUSE

21   HE THOUGHT IT WAS DECEPTIVE TO WITHDRAW THE PATENT.

22   I -- THERE'S NO EVIDENCE THAT DR. VERDIELL KNEW ONE

23   WAY OR THE OTHER WHAT TO DO.  HE WAS OMITTED.  SOMETHING HAD TO

24   HAPPEN.  BUT THERE'S NO EVIDENCE THAT DR. VERDIELL UNDERSTOOD

25   OR INTENDED THIS TO BE FALSE OR EVEN KNEW WHETHER WITHDRAWAL OR

1    CORRECTION, OR WHATEVER IT WAS, WAS IN ANY WAY A TRUE OR FALSE

2    STATEMENT.

3            AND HE WAS RELYING ON THE EVIDENCE, I SUGGEST, TO

4    ENTIRELY ON WHAT MR. ALBOSZTA TOLD HIM.  AND HIS CONCLUSION

5    REALLY, DR. VERDIELL'S CONCLUSION WAS ALBOSZTA'S CONCLUSION.

6            BUT MORE THAN THAT, WE SUBMIT IT WAS FLAT-OUT

7    CORRECT.  IF YOU LOOK WHAT WAS GOING ON -- AND YOU'VE HEARD THE

8    EVIDENCE -- THERE WAS A GRAVE CONCERN ABOUT SDL.

9            SO WE'LL START JUST WITH THE EMAIL FROM MR. SHUM'S

10   SISTER OR TO MR. SHUM -- FROM MR. SHUM TO HIS SISTER TALKING

11   ABOUT DON SCIFRES, THE CEO OF SDL.  AND YOU'VE SEEN THIS

12   BEFORE, BUT HERE IS THE -- PRIVATELY TALKING TO HIS SISTER

13   ABOUT HER MEETING WITH SCIFRES.  AND LOOK AT THE LAST THING,

14   "SDL COULD GIVE US PROBLEMS."

15           LET'S LOOK AT THE NEXT EXHIBIT WHICH IS MR. SHUM TO

16   MR. VERDIELL.

17               (EXHIBIT PUBLISHED TO JURY.)

18       **MR. TAYLOR:**  HERE WE HAVE MR. SHUM, IN DECEMBER,

19   COMMUNICATING WITH MR. VERDIELL, AND HE'S DEAD BANG SAYING, "WE

20   HAVE SDL PROBLEMS."  HE'S SAYING, "IF WE START SAYING THINGS

21   ARE INVENTED BEFORE RADIANCE EXISTED, THEN POSSIBLY SUCH THINGS

22   AS OWNED BY SDL AND NEITHER OF US CAN USE THEM.  THAT WOULD BE

23   A LOSE/LOSE SITUATION AND WHY WOULD I EVEN WANT THE POTENTIAL

24   FOR SUCH A DISASTROUS SITUATION TO ARISE."

25           YOU'VE ALSO HEARD MR. SHUM TESTIFY THAT HE

 1    CONSIDERED AT ONE POINT, KNOWING THAT DR. VERDIELL HAD NOT TOLD

 2    SDL ABOUT THIS INVENTION, THERE'S TESTIMONY THAT MR. SHUM

 3    THOUGHT ABOUT COERCING DR. VERDIELL, WHEN THEY WERE

 4    NEGOTIATING, BY ACTUALLY THREATENING HIM TO GO TO SDL AND

 5    EXPOSE HIM AND TELL SDL AND THAT MR. SHUM USED THAT OR

 6    CONSIDERED USING THAT TO GET LEVERAGE.

 7              AND THEN I THINK WE HAVE JENKIN RICHARD WHO CAME

 8    HERE AS A THIRD-PARTY WITNESS CALLED BY MR. SHUM TESTIFYING TO

 9    EXACTLY WHAT HE UNDERSTOOD AS A PERSON WHO WAS SHARING SPACE

10    WITH DR. VERDIELL AND -- NOT SPACE, BUT SHARING THE SAME

11    BUILDING WITH THEM.  HE SAYS BASED ON HIS CONVERSATIONS WITH

12    VERDIELL ABOUT HIS CONCERNS AT SDL, THAT HE UNDERSTOOD SHUM'S

13    NAME WAS ON THE PATENT -- THAT ONLY SHUM'S NAME WAS ON THE

14    PATENT APPLICATION BECAUSE OF THE CONCERN ABOUT SDL.  THAT'S

15    DECEPTIVE INTENT.  THAT MEANS THE PATENT APPLICATION HAS TO BE

16    WITHDRAWN.

17              AND THE OTHER PART OF THIS THAT'S IMPORTANT IS EVEN

18    IF THE STATEMENT ISN'T TRUE, IT'S STILL -- AS YOU SAW IN THAT

19    OTHER -- MR. SHUM HAS TO PROVE TO YOU THAT HE REASONABLY RELIED

20    ON IT, AND I THINK IT'S CLEAR HE CANNOT HAVE REASONABLY RELIED

21    ON WHAT DR. VERDIELL TOLD HIM ABOUT WHAT TO DO ABOUT THE PATENT

22    APPLICATION.

23              FIRST OF ALL, HE WOULD HAVE KNOWN -- IF MR. SHUM

24    BELIEVED, AS HE TESTIFIED HE DID, HE BELIEVED BACK THEN HE WAS

25    THE SOLE INVENTOR, HE HAD INVENTED EVERYTHING, SO IF HE THINKS

 1   HE'S THE SOLE INVENTOR AND DR. VERDIELL COMES UP TO HIM AND

 2   SAYS, "YOU'RE NOT.  I AM," NO ONE KNOWS THE ANSWER TO THAT

 3   BETTER THAN MR. SHUM.  HE KNOWS WHETHER HE'S THE SOLE INVENTOR

 4   OR NOT.

 5          IF MR. -- IF DR. VERDIELL COMES TO HIM AND SAYS,

 6   "NO, YOU'RE NOT.  I AM," MR. SHUM'S REACTION WOULD BE, "NO,

 7   YOU'RE NOT."  OR, "YOU'RE LYING," ONE OR THE OTHER.  BUT HE'S

 8   CERTAINLY NOT GOING TO BE RELYING ON DR. VERDIELL TO GIVE HIM

 9   ADVICE, PARTICULARLY WHEN MR. SHUM IS REPRESENTED BY LAWYERS IN

10   THE TRANSACTION.

11          AND WE'VE SEEN EVIDENCE THAT -- WHERE THE LAWYERS

12   WERE EXISTING IN THE TRANSACTION AND THAT THEY WERE WORKING ON

13   THE TRANSACTION.  BUT WE'VE ALSO SEEN EVIDENCE FROM MR. SHUM

14   WHERE HE SAID WHEN DR. -- THIS IS THIS TRIAL -- WHEN

15   DR. VERDIELL CAME TO HIM, "WHEN HE TOLD ME THIS, I DIDN'T

16   BELIEVE HIM."

17          COULD WE SEE THAT TESTIMONY?

18          (EXHIBIT PUBLISHED TO JURY.)

19          **MR. TAYLOR:**  "YOU DID NOT BELIEVE DR. VERDIELL WHEN

20   HE TOLD YOU HE WAS AN INVENTOR ON THE RADIANCE PATENT

21   APPLICATION, CORRECT?

22          "I DID NOT."

23          THERE IS NO WAY MR. SHUM CAN BRING A CLAIM BEFORE

24   YOU, LADIES AND GENTLEMEN, SAYING THAT HE REASONABLY RELIED ON

25   A STATEMENT THAT HE DIDN'T BELIEVE.  AND THAT'S WHAT THE

 1  EVIDENCE IN THIS CASE SHOWS.

 2          AND THAT'S NOT ALL.  THERE'S MORE EVIDENCE THAN

 3  THAT, BECAUSE LET'S GO TALK ABOUT EXACTLY, YOU KNOW, WHAT --

 4  WHAT SOME OF THE LAWYERS' TESTIMONY IS WHO WERE INVOLVED.

 5          JOHN GORMAN CAME HERE, AND YOU'LL NOTE -- JOHN

 6  GORMAN CAME HERE AND WAS ATTACKED AS BEING MR. VERDIELL'S

 7  LAWYER AND A FRIEND OF MR. VERDIELL AND THEREFORE NOT BEING

 8  TRUTHFUL.  AND MR. GORMAN, I THINK, SAID REALLY CANDIDLY HE

 9  JUST WAS HERE TO TELL THE TRUTH.  BUT MORE IMPORTANTLY, FOR

10  EVERY MEETING MR. GORMAN TESTIFIED ABOUT, THERE WERE TWO OTHER

11  LAWYERS PRESENT, AND THEY WERE MR. SHUM'S LAWYERS.  THEY COULD

12  BE CALLED.  IF THEY DISAGREED, IF WHAT MR. GORMAN WAS SAYING

13  UNTRUTHFUL, UNRELIABLE, THOSE LAWYERS, MR. SHUM COULD HAVE

14  CALLED THEM TO REFUTE IT.

15          BUT MR. GORMAN SAID THERE WERE TWO, YOU KNOW, VERY

16  IMPORTANT THINGS ABOUT THIS.  HE SAID THERE WERE MEETINGS.  AND

17  AT THIS MEETING, THERE WAS A DISCUSSION ABOUT SPECIFICALLY

18  WITHDRAW.  IF THE ALLEGEDLY FALSE REPRESENTATION HAS TO DO WITH

19  "I DIDN'T KNOW I HAD TO WITHDRAW," IT'S BEING DISCUSSED WITH

20  MR. SHUM AND MR. SHUM'S LAWYERS FROM A VERY LARGE FIRM,

21  COMPETENT, INTELLECTUAL PROPERTY COUNSEL.

22          ALL EVERYBODY IS DISCUSSING IT.  AND HE'S -- AND THE

23  QUESTION IS ASKED, "AT ANY POINT, DID ANY OF THE LAWYERS OF

24  MR. SHUM SAY THE APPLICATION DID NOT NEED TO BE WITHDRAWN?"

25  THE ANSWER IS "NO" -- "DID EITHER OF THE LAWYERS FOR MR. SHUM

1   AT ANY POINT SAY THE APPLICATION DID NOT NEED TO BE WITHDRAWN?

2          "NO.

3          "DID MR. SHUM AT THE MEETING EVER SAY THE

4   APPLICATION DID NOT NEED TO BE WITHDRAWN?

5          "NO."

6          SO WHAT WE HAVE IS A SITUATION WHERE MR. SHUM, IF

7   HE'S RELYING ON ANYBODY, AND I THINK THE TRUTH OF IT IS, IS

8   THAT HE KNEW IT WAS FILED WITH DECEPTIVE INTENT AND KNEW IT HAD

9   TO BE WITHDRAWN, EVERY FACT LEADS TO THAT.  BUT EVEN IF HE

10  DIDN'T AND YOU'RE LOOKING TO SEE WHETHER HE REASONABLY RELIED

11  ON DR. VERDIELL FOR THIS ALLEGED MISREPRESENTATION, I THINK THE

12  CLEAREST EVIDENCE OF ALL IS WHO PUT THE WORD "WITHDRAWAL" IN

13  THE COMMUNICATIONS BETWEEN THE TWO OF THEM.

14          AND IF CAN WE SEE THE ONE DEMONSTRATIVE WE PREPARED.

15          (EXHIBIT PUBLISHED TO JURY.)

16          **MR. TAYLOR:**  WHEN THEY WERE DOING THE BUYOUT

17  PROPOSALS, JOHN GORMAN SENT THE LETTER OR THE PROPOSAL THAT'S

18  OVER TO THE LEFT, TX238, AND HE, IN HIS LETTER, SAID, "THIS

19  PATENT APPLICATION, SOMETHING'S GOT TO HAPPEN TO IT SO LET'S

20  RESUBMIT IT."

21          WHEN THAT PROPOSAL CAME BACK AND IT WAS REVISED BY

22  MR. SHUM'S LAWYERS, THEY'RE THE ONES WHO ADDED THE TERM THAT

23  MR. SHUM NOW SAYS WAS A FALSE STATEMENT BY MR. VERDIELL, THAT

24  THE PATENT APPLICATION SHOULD BE WITHDRAWN.

25          AND WE WILL SUBMIT TO YOUR HONOR -- WE WOULD SUBMIT

1  TO YOU, LADIES AND GENTLEMEN, THAT THE EVIDENCE ABSOLUTELY DOES

2  NOT SUPPORT THIS CLAIM.  THIS CASE IS GOVERNED BY THE PLAN OF

3  LIQUIDATION, THE AGREEMENT THAT THESE TWO GENTLEMEN ENTERED

4  INTO THAT SAID THEY WOULD NEVER DO THIS TO EACH OTHER.

5          THERE'S ANOTHER CLAIM IN THE CASE I'D LIKE TO

6  ADDRESS, AND THAT IS THAT DR. VERDIELL WAS IN SOME MANNER

7  UNJUSTLY ENRICHED AND THAT HE WAS UNJUSTLY ENRICHED, THE THEORY

8  GOES, BECAUSE HE FAILED TO DISCLOSE MR. SHUM'S RIGHTS UNDER THE

9  PLAN OF LIQUIDATION, THAT INVESTORS THAT HE WAS DEALING WITH

10 WERE MISLED AND THAT THEY BELIEVED HE HAD EXCLUSIVE RIGHTS AND

11 THAT THOSE INVESTORS WOULD NOT HAVE INVESTED ONE DOLLAR IN

12 LIGHTLOGIC OR DR. VERDIELL IF THEY HAD KNOWN ABOUT MR. SHUM OR

13 IF THEY HAD KNOWN ABOUT MR. SHUM'S RIGHTS, THAT THAT'S HOW MUCH

14 THEY CARED ABOUT HAVING EXCLUSIVITY.  EXCLUSIVITY BEING THE

15 THING THAT MATTERED TO THEM MOST IS "WE COULD KEEP ANYBODY IN

16 THE WORLD FROM EVER USING ANY OF OUR TECHNOLOGY."

17          AND COULD WE HAVE THE DEMONSTRATIVE OF THE WITNESSES

18 WE CALLED.

19          (EXHIBIT PUBLISHED TO JURY.)

20          **MR. TAYLOR:**  THESE WITNESSES, EVERY SINGLE ONE OF

21 THESE WITNESSES, WITH THE EXCEPTION OF MR. SIVAKUMAR WHO CAME

22 HERE FROM NEW DELHI AND IS RUNNING A HUGE PART OF INTEL IN THAT

23 PART OF THE WORLD, EVERY ONE OF THESE WITNESSES CAME

24 VOLUNTARILY.  NONE OF THESE WITNESSES HAS ANYTHING TO GAIN FROM

25 TESTIFYING.  THEY HAVE NO RELATIONSHIP WITH INTEL.  AND THEY

 1   HAVE NO REASON TO TELL ANYTHING OTHER THAN THE TRUTH.  AND THEY

 2   HAVE A LOT OF REASON TO WANT TO TELL THE TRUTH IN A CASE LIKE

 3   THIS WHERE SOMEONE IS SAYING THAT THEY KNOW WHY THESE GENTLEMEN

 4   AND THEIR COMPANIES INVESTED.

 5           AND THEY CAME HERE, AND EACH AND EVERY ONE OF THEM

 6   SAID, EVERY SINGLE WITNESS SAID, THAT THEY KNEW ABOUT MR. SHUM,

 7   THEY KNEW ABOUT THE PLAN OF LIQUIDATION, THEY KNEW ABOUT THEIR

 8   RIGHTS, THEY DIDN'T CARE ABOUT EXCLUSIVITY, AND THAT THEY WOULD

 9   HAVE INVESTED WHETHER THERE WAS EXCLUSIVITY OR NOT.  FOR A

10   SMALL COMPANY TO HAVE EXCLUSIVITY SO YOU'RE GOING TO SUE PEOPLE

11   AND BLOCK PEOPLE FROM DOING THAT, NONE OF THEM SAID THAT WAS

12   INTERESTING OR APPEALING TO THEM, AND THAT'S NOT WHY THEY

13   INVESTED.

14           SO LET'S LOOK AT THE JURY INSTRUCTION FOR THIS

15   UNJUST ENRICHMENT CLAIM BECAUSE IT'S GOING TO BE A VERY

16   IMPORTANT ONE FOR YOU TO FOCUS ON AND -- AND WE NEED TO FOCUS

17   ON IT FOR A MINUTE TOGETHER.

18                   (EXHIBIT PUBLISHED TO JURY.)

19           **MR. TAYLOR:**  UNJUST ENRICHMENT, AND I'LL START WITH

20   THE PHRASE THAT SAYS, "IN ORDER TO ESTABLISH A CLAIM FOR UNJUST

21   ENRICHMENT, SHUM MUST PROVE THE FOLLOWING CLAIMS, THAT THE

22   DEFENDANT RECEIVED A BENEFIT."

23           I'D LIKE TO FOCUS ON THE SECOND AND THIRD ITEMS,

24   "THE BENEFIT MUST BE RECEIVED AT THE EXPENSE OF SHUM."  AND

25   THAT MEANS HE MUST PROVE HE HAS A LAWFUL CLAIM FOR THE BENEFIT,

 1  THAT HE HAS A LAWFUL CLAIM TO THE MONEY THAT DR. VERDIELL

 2  EARNED AND MADE AND WAS ABLE TO -- WITH A LOT OF OTHER PEOPLE

 3  AT LIGHTLOGIC.

 4          SECONDLY, MR. SHUM HAS TO PROVE THAT THE RETENTION

 5  OF BENEFIT IS UNJUST.  AND IF YOU READ A LITTLE FURTHER, WHAT

 6  THAT MEANS -- WELL, IT GOES ON TO SAY, "THE FACT A PARTY

 7  OBTAINS A BENEFIT IS NOT IN AND OF ITSELF SUFFICIENT TO MAKE A

 8  FINDING OF UNJUST ENRICHMENT.  THE PARTY RECEIVING THE BENEFIT

 9  IS LIABLE ONLY IF HE'S ENGAGED IN WRONGFUL CONDUCT WHICH HAS

10  CAUSED HIS RECEIPT OF THE BENEFIT."

11          AND WHEN YOU LOOK AT THE FACTS OF THIS CASE, WHEN

12  YOU LOOK AT THE FACTS OF THIS CASE, WHAT YOU SEE IS THAT THE

13  PLAN OF LIQUIDATION PLAYS A BIGGER ROLE THAN WE WOULD THINK,

14  BECAUSE IF YOU FIND THAT THE PLAN OF LIQUIDATION CONTROLLED THE

15  RIGHTS OF THE PARTIES WITH RESPECT TO HOW THEY'RE TO BEHAVE

16  AFTER THEY LEAVE RADIANCE AND HOW THEY DEAL WITH INTELLECTUAL

17  PROPERTY, THERE'S NO UNJUST ENRICHMENT CLAIM AT ALL.

18          AND YOU SEE THAT IN THE COURT'S INSTRUCTIONS AT

19  PAGE 20 --

20          THE FIRST PARAGRAPH, JEFF.

21          (EXHIBIT PUBLISHED TO JURY.)

22          **MR. TAYLOR:**  WE SEE, "YOU MAY NOT MAKE A FINDING" --

23  THIS SECOND FULL -- FIRST FULL PARAGRAPH -- "YOU MAY NOT MAKE A

24  FINDING OF UNJUST ENRICHMENT IF YOU FIND THAT AN EXPRESS

25  BINDING AGREEMENT EXISTED THAT DEFINED THE PARTIES' RIGHTS WITH

1    RELATION TO THE BENEFIT."

2              ACCOUNTING FOR PROFITS IS THE BENEFIT.  WE SUBMIT --

3    AND THE REASON FOR SUCH A PROVISION IS EASY AND OBVIOUS.  YOU

4    CAN'T HAVE TWO SETS OF RULES.  IF YOU REACH AN AGREEMENT AND

5    YOU HAVE TERMS THAT DICTATE EXACTLY WHAT YOU CAN DO AND WHAT

6    YOU CAN'T DO, THE LAW CAN'T COME IN AND UNDO THOSE TERMS.  THE

7    AGREEMENT STANDS.

8              SO WE SUBMIT, LADIES AND GENTLEMEN, THAT BECAUSE THE

9    PLAN OF LIQUIDATION CLEARLY GOVERNS WHAT THESE GENTLEMEN CAN DO

10   WITH RESPECT TO INTELLECTUAL PROPERTY AND WHAT THEY CAN DO WITH

11   RESPECT TO THE PROFIT SHARING, THAT THERE IS NO UNJUST

12   ENRICHMENT CLAIM IN THIS ALL -- AT ALL, AND THAT YOU CAN STOP

13   RIGHT THERE.

14             THE BIGGER ISSUE, THOUGH, I GUESS, IS EVEN IF WE GO

15   BEYOND THAT AND YOU DON'T THINK THAT THE EVIDENCE THAT'S BEEN

16   INTRODUCED THAT MR. SHUM CAN DEMONSTRATE IN ANY WAY THAT --

17   THAT DR. VERDIELL WAS UNJUSTLY ENRICHED -- AND I WANT TO TAKE A

18   MOMENT HERE JUST TO SHOW YOU AGAIN WHAT DR. VERDIELL DID WITH

19   RESPECT TO HIS, WHAT WAS HIS CONDUCT ONCE RADIANCE ENDED AND

20   LIGHTLOGIC BEGAN.

21             HE FILED A PATENT -- AND THE COURT'S INSTRUCTIONS

22   TELL YOU HE WAS ABSOLUTELY ENTITLED TO FILE A PATENT, NOTHING

23   WRONG WITH THAT.  BUT WHAT'S MORE IMPORTANT IS HOW HE DID IT

24   AND HOW METICULOUSLY HE TRIED TO SEPARATE WHAT HE DID AND WHAT

25   MR. SHUM DID.

 1          NOW I'D LIKE TO SHOW YOU THE EXHIBIT THAT WE -- LET

 2   ME GIVE YOU THE NUMBER, TRIAL EXHIBIT 3783 --

 3          THANK YOU, JEFF.

 4          (EXHIBIT PUBLISHED TO JURY.)

 5          **MR. TAYLOR:**  -- WHICH IS A CRITICALLY IMPORTANT

 6   EXHIBIT, BECAUSE IT SHOWS WHAT DR. VERDIELL IS DOING AND HOW

 7   HE'S CONDUCTING HIMSELF.  THIS IS GOING TO STEM OVER TO HOW HE

 8   DEALS WITH INVESTORS AND HOW HE DEALS WITH OTHER PEOPLE.  BUT

 9   HE IS GOING THROUGH THIS APPLICATION METICULOUSLY AND REMOVING

10   EVERYTHING YOU SEE IN RED BECAUSE HE EITHER KNOWS OR THINKS IT

11   IS FRANK SHUM'S, AND HE DOESN'T WANT TO PATENT FRANK SHUM'S.

12          WHAT'S BEING REMOVED, WHEN YOU LOOK AT THIS,

13   REMEMBER THE MICRO LENSES WITH THE LIP, THAT IS FRANK SHUM'S

14   INVENTION, THAT'S NOT DR. VERDIELL'S, AND HE'S REMOVING IT.

15   HE'S NOT CLAIMING IT AS HIS.  HE WANTS TO BE AS CAREFUL AS HE

16   CAN JUST TO PATENT HIS OWN -- AND THAT'S HIS TESTIMONY, JUST TO

17   PATENT HIS OWN INVENTIONS.  AND THAT'S WHAT HE DID.

18          AND YOU HAVE TO ASK YOURSELVES, IF SOMEONE IS GOING

19   TO GO STEAL SOMEONE'S IDEAS OR DOING SOMETHING THAT'S WRONGFUL,

20   THEY WOULDN'T GO TO THAT MUCH TROUBLE, THEY'D JUST TAKE IT AND

21   REFILE IT.  IT'S NOT A COPYCAT.  AND WE HEAR THIS OVER AND

22   OVER.  IT'S NOT A COPYCAT APPLICATION.  I'M SORRY, IT'S NOT.

23   IT'S AN APPLICATION THAT CONTAINS ONLY DR. VERDIELL'S IDEAS.

24          SO NOW WE LOOK AT WHAT HAPPENED WITH THE INVESTMENT

25   BECAUSE THE CLAIM IS THESE INVESTORS DID NOT KNOW ABOUT

1    MR. SHUM, THAT THEY CARED ABOUT MR. SHUM AND THAT --

2    EXCLUSIVITY, AND THAT THEY WOULDN'T HAVE INVESTED ONE DOLLAR.

3              AND YOU START WITH MR. STOCKHOLM.  AND MR. STOCKHOLM

4    CAME HERE AND HE EXPLAINED TO YOU WHY IT IS THAT HIS FIRM

5    INVESTED IN LIGHTLOGIC.

6              AND THEN WE HAVE MR. GRAHAM COME.  AND MR. GRAHAM

7    TOLD YOU WHY HE INVESTED IN LIGHTLOGIC, AND THEY TALKED ABOUT

8    PEOPLE LIKE JOHN MCGRAW AND THEY TALKED ABOUT PEOPLE LIKE

9    MR. BALDRIDGE AND TOM MADER.  AND THEY TALKED ABOUT THE TEAM

10   THAT HAD BEEN BUILT AND HOW THAT'S WHY THAT THEY INVESTED.

11             TOM MADER CAME AND TALKED ABOUT QUALITY ENGINEERING

12   TEAM THAT WAS REALLY ASTONISHING, HE THOUGHT, AND THEY DID

13   AMAZING THINGS.  THAT'S WHAT EXCITED PEOPLE.  AND THEY ACTUALLY

14   TOOK THAT COMPANY, AS YOU'VE ALL HEARD NOW MANY TIMES, AND TOOK

15   THE COMPANY AND SHIFTED IT FROM THE LITTLE OPTICAL MODULE THAT

16   DR. VERDIELL WAS TRYING TO CREATE AND WENT, "WE HAVE TO SHIFT

17   THE COMPANY TO TRANSPONDERS.  THAT'S THE MARKET OPPORTUNITY.

18   OUR PRODUCT IS NO LONGER THE RADIANCE, EARLY LIGHTLOGIC OPTICS.

19   IT'S A WHOLE DIFFERENT PRODUCT."

20             AND WHAT THEY DID WAS THIS.

21             (EXHIBIT PUBLISHED TO JURY.)

22        MR. TAYLOR:  AND THIS TOOK A TREMENDOUS AMOUNT OF

23   WORK.  AND AS YOU KNOW, THESE OPTICAL MODULES IN THE EARLY

24   PRODUCTS, THE ONES THAT WERE BEING SOLD AT THE TIME THAT INTEL

25   ACQUIRED LIGHTLOGIC, WERE -- WERE NOT LIGHTLOGIC PARTS.  THEY

 1   WERE ORTEL PARTS, OR SOME THIRD-PARTY OFF-THE-SHELF PARTS.  SO

 2   THAT WHAT WAS BEING SOLD -- BECAUSE THEY COULDN'T GET THE

 3   OPTICAL MODULE TO PASS QUALIFICATION, WHAT WAS BEING SOLD WAS A

 4   TRANSPONDER THAT CISCO AND OTHER COMPANIES DESPERATELY WANTED

 5   AND THEY DIDN'T CARE WHAT OPTICAL MODULE WAS IN IT AS LONG AS

 6   IT WORKED.

 7          SO BY APRIL, WHAT WE HAD WAS -- AND YOU HEARD ABOUT

 8   THIS, APRIL WE HAD MR. MADER HAD ACTUALLY CREATED THIS

 9   PROTOTYPE.  AND THIS IS WHAT THEY TOOK TO THAT OFC CONFERENCE,

10   AND THIS IS WHAT CISCO SAW.  THIS IS WHAT GOT EVERYBODY ALL

11   EXCITED.  AND THERE'S NO RADIANCE TECHNOLOGY IN THIS.  BUT THIS

12   WAS AN ENORMOUS ACCOMPLISHMENT FOR THE COMPANY AND A WHOLE NEW

13   DIRECTION FOR THEM.

14          THAT THEN LED TO WHAT YOU'VE SEEN AS THE -- I'M JUST

15   GOING -- OPENED UP.  THIS IS WHAT LED TO THAT TRANSPONDER A.

16   THIS IS THE ACTUAL PHYSICAL PART WE KEEP SEEING THE PHOTOGRAPH

17   OF THAT HAS THE ORTEL OPTICS IN IT, AND THIS WAS THE PRODUCT

18   THAT THEY ACTUALLY SOLD, AND THAT THEY ACTUALLY SOLD TO

19   CUSTOMERS, AND CUSTOMERS LIKE CISCO THAT GOT INVESTORS EXCITED,

20   THAT GOT INTEL EXCITED, AND THAT'S WHY PEOPLE INVESTED.

21          BUT WE WANTED -- AND IT WAS CRITICAL -- TO HAVE

22   EVERYBODY COME HERE AND EXPLAIN TO YOU WHY THEY INVESTED RATHER

23   THAN HAVING SOMEONE SAY FOR YOU WHY THEY INVESTED.

24          SO LET'S SEE.  WE HEARD -- AND ALSO IT'S IMPORTANT

25   TO LOOK AT THE DOCUMENTS.  WE SEE DOCUMENTS IN THIS CASE AND --

1    AND YOU JUST SAW SOME OF THEM THIS MORNING, WHERE THEY'RE

2    DOCUMENTS ABOUT WHAT INTEL'S SAYING ABOUT A PRODUCT THAT'S ON

3    PAGE 26 OF A LONG PRESENTATION.  AND I'LL SHOW YOU SOME, YOU'LL

4    LOOK AT SOME OF THESE.

5            UP ON THE FIRST PAGES, THEY TALK ABOUT THINGS ABOUT

6    WHAT THE MARKET'S LIKE, WHAT THE OPPORTUNITY'S LIKE, WHAT THE

7    PRODUCT IS LIKE AND ALL OF THAT.  THEY DON'T TALK ABOUT ANY

8    INTELLECTUAL PROPERTY AT ALL UNTIL THE VERY BACK.

9            MORE IMPORTANTLY, UNDER THE COURT'S INSTRUCTIONS

10   UNDER THE PLAN OF LIQUIDATION, THEY CAN TALK ABOUT FLEXURE ALL

11   THEY WANT, THEY'RE SUPPOSED TO USE THE FLEXURE.  THAT'S THE

12   PROVISION THEY HAVE.  THEY CAN TALK ABOUT DBC IF THEY WANT,

13   ALTHOUGH THEY NEVER USED IT --

14           THEY CAN TALK ABOUT PATENTS ALL THEY WANT.  IT'S

15   THE -- BUT THE KEY THING IS DID THE INVESTORS INVEST BECAUSE OF

16   ANYTHING HAVING TO DO WITH PATENTS OR EXCLUSIVITY, AND THE

17   ANSWER IS NO.

18           AND WE LOOKED AT THE INVESTORS' DOCUMENTS --

19           IF WE CAN SEE THAT BRUCE GRAHAM E-FLASH DOCUMENT.

20           (EXHIBIT PUBLISHED TO JURY.)

21       **MR. TAYLOR:**  SO HERE'S A DOCUMENT FROM AN INVESTOR.

22   IF THE ISSUE IS WHY DID THE INVESTORS INVEST, THAT WAS THE KEY

23   ISSUE.  HERE IS HOW WE GET AN ANSWER TO THAT.  WE SEE THEM

24   SAYING THAT THE LASER PACKAGING OPPORTUNITY IS LARGE.

25   LIGHTLOGIC'S DESIGN IS FLEXIBLE AND SCALABLE.  AND THEN LOOK AT

1    THE SENTENCE BELOW THAT, "LIGHTLOGIC'S ADVANTAGE IS NOT

2    PRIMARY -- PRIMARILY PATENTS BUT PROCESS KNOW-HOW BASED ON THE

3    TEAM'S TELECOM LASER EXPERIENCE," AND SO ON AND SO FORTH.  NOT

4    PRIMARILY PATENTS.

5            AND THEN THEY GO ON TO TALK ABOUT MARC VERDIELL, WHO

6    IS AN IMPORTANT PERSON TO KNOW ABOUT IF YOU WERE GOING TO MAKE

7    AN INVESTMENT.

8            THIS MEMO FROM AN ACTUAL INVESTOR WOULD DIRECTLY

9    CONTRADICT ANY SUGGESTION THAT WHAT THEY'RE INVESTING IN

10   LIGHTLOGIC FOR IS FOR PATENTS.  THEY'RE INVESTING FOR THE OTHER

11   THINGS THAT ARE MENTIONED IN THAT MEMO.

12           SAME THING WE SAW FROM CHRIS SCHAEPE AND LIGHT --

13   LET ME JUST WALK THROUGH IT, IF I CAN, WHAT THE INVESTORS SAY

14   BECAUSE NONE OF WHAT THEY DID WAS AT MR. SHUM'S EXPENSE.  THEY

15   ALL KNEW ABOUT MR. SHUM.

16           IF WE COULD SEE MR. STOCKHOLM'S TESTIMONY.

17               (EXHIBIT PUBLISHED TO JURY.)

18       **MR. TAYLOR:**  MR. STOCKHOLM TESTIFIED THAT HE KNEW

19   ABOUT MR. SHUM.  HE'D BEEN TOLD ABOUT MR. SHUM.  SO THE VERY

20   FIRST PREMISE OF THIS UNJUST ENRICHMENT THEORY, THAT IT'S AT

21   THE EXPENSE OF MR. SHUM, FALLS AWAY FOR SERIES A LEAD INVESTOR

22   JOHN STOCKHOLM.

23           AND BY THE WAY, THE OTHER MAIN INVESTOR IN SERIES A

24   WAS A GENTLEMAN NAMED DAVID HUBER, YOU HEARD ABOUT, WHO KNEW

25   SHUM AND VERDIELL WAY BACK WHEN, WAY BACK IN THE RADIANCE TIME

 1   FRAME.  IN FACT, HE KNEW DR. VERDIELL AT SDL.  AND HE SAT WITH

 2   THEM.  HE'S THE GENTLEMAN WHO OFFERED THEM A MILLION DOLLARS TO

 3   INVEST FOR STOCK IN A COMPANY, AND MR. SHUM SAID NO, IT WASN'T

 4   ENOUGH.

 5           BUT HE'S THE GENTLEMAN, BECAUSE HE KNEW

 6   DR. VERDIELL, HE BELIEVED IN THEM AND HE TRUSTED HIM.  HE

 7   ACTUALLY CAME TO THE TWO OF THEM WHEN THEY WERE AT RADIANCE AND

 8   SAID, "I'D LIKE TO INVEST IN YOUR COMPANY."  DIDN'T HAPPEN.

 9   MR. SHUM SAID NO.  BUT HE WAS IN THIS ROUND AND HE KNEW

10   EVERYTHING ABOUT MR. SHUM AND HOW THEY SPLIT AND THEIR

11   DIFFICULTIES AND EVERYTHING ELSE.

12           WE ALSO HAD GREG BALDRIDGE COME TO TESTIFY, ANOTHER

13   THIRD-PARTY WITNESS, NOTHING AT STAKE IN THIS CASE.  "DID YOU

14   KNOW ABOUT RADIANCE?"  YES, HE DID.  AND HE TESTIFIES.

15           WE DID THE SAME THING WITH BRUCE GRAHAM.

16           (EXHIBIT PUBLISHED TO JURY.)

17      **MR. TAYLOR:**  WOULD YOU SAY -- HE SAYS THAT HE'S

18   TALKING SPECIFICALLY ABOUT "THEY," MEANING FRANK AND JEAN-MARC,

19   BOTH HAVE RIGHTS TO USE.

20           AND MORE IMPORTANTLY WHAT ALL THESE GENTLEMEN ARE

21   SAYING IS THEY KNEW THAT AND THEY DIDN'T CARE, IT DIDN'T MATTER

22   IN TERMS OF BEING CONCERNED ABOUT NOT INVESTING.

23           WE HAD ALSO CHRIS SCHAEPE.

24           (EXHIBIT PUBLISHED TO JURY.)

25      **MR. TAYLOR:**  HE ASKED WHETHER EXCLUSIVELY -- HE WAS

1    ASKED WHETHER EXCLUSIVE RIGHTS TO TECHNOLOGY ARE IMPORTANT IN

2    ANY SENSE.  HE SAID NO.

3           ALL OF THESE ROUNDS OF FINANCING HAD DISCLOSURE

4    DOCUMENTS, AND YOU'VE SEEN THOSE.

5           AND IF WE CAN SEE JUST THE SERIES A DISCLOSURE

6    DOCUMENT, JEFF.

7              (EXHIBIT PUBLISHED TO JURY.)

8           MR. TAYLOR:  ALL THESE ROUNDS OF FINANCING HAD THE

9    SAME WRITTEN DISCLOSURE.  IT COMES TOWARDS THE END OF THE DEAL,

10   EVERYONE'S ALREADY HAD CONVERSATIONS WITH VERDIELL ABOUT SHUM,

11   THE PLAINTIFF, BUT THERE'S AN EXPRESS DISCLOSURE THAT'S MADE

12   THAT DISCLOSES EACH ROUND, A, B, AND C, STOCKHOLM, GRAHAM AND

13   SCHAEPE, THAT RADIANCE EXISTS, THAT MR. SHUM'S THERE -- THERE

14   IT IS.

15             (EXHIBIT PUBLISHED TO JURY.)

16          MR. TAYLOR:  -- THAT MR. SHUM IS THERE AND THAT THEY

17   HAVE EQUAL RIGHTS, EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT.  NOT

18   WITHSTANDING THAT, THEY ALL INVEST, AND THEY ALL SAY THAT EQUAL

19   RIGHTS IS FINE WITH THEM.  THEY DON'T NEED EXCLUSIVE RIGHTS.

20   WE HAVE TESTIMONY TO THAT EFFECT IN THE RECORD FROM ALL OF THE

21   PEOPLE THAT YOU SAW.  IN FACT, EVERY SINGLE PERSON --

22             IF WE CAN SEE THAT SLIDE AGAIN.

23               (EXHIBIT PUBLISHED TO JURY.)

24          MR. TAYLOR:  EVERY SINGLE PERSON THAT WE CALLED AS A

25   WITNESS, AS A THIRD-PARTY WITNESS IN THIS CASE ABOUT WHY THEY

1    INVESTED --

2                    (EXHIBIT PUBLISHED TO JURY.)

3           **MR. TAYLOR:** -- INCLUDING MR. SIVAKUMAR WHO

4    TESTIFIED ABOUT WHY INTEL WAS IN, AND MR. RICCI, ALL OF THESE

5    PEOPLE SAY THAT THEY INVESTED WITHOUT ANY REGARD TO EXCLUSIVITY

6    AND NOT CARING ABOUT WHETHER EXCLUSIVITY EXISTED OR NOT.

7           **THE COURT:** COUNSEL, I THINK WE'LL BREAK IN NOW FOR

8    THE NOON RECESS. PLEASE BE BACK AT 1:00 O'CLOCK.

9           **MR. TAYLOR:** THANK YOU.

10          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

11   PRESENCE OF THE JURY:)

12          **THE COURT:** OKAY. BACK AT 1:00 O'CLOCK. AND AS FAR

13   AS I CAN SEE, AT THIS STAGE, DEFENDANT HAS USED ABOUT 40

14   MINUTES AND THE PLAINTIFF HAS USED AN HOUR AND 50 MINUTES.

15          **MR. KIRSCH:** I THINK THAT'S RIGHT.

16          **THE COURT:** OKAY. ALL RIGHT.

17          (RECESS TAKEN AT 12:00 P.M.)

18          (PROCEEDINGS RESUMED AT 1:01 P.M.)

19          **THE CLERK:** REMAIN SEATED. COURT IS IN SESSION.

20   COME TO ORDER.

21          (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

22   PRESENCE OF THE JURY:)

23          **THE COURT:** COUNSEL. PLEASE GO AHEAD.

24          **MR. TAYLOR:** THANK YOU, YOUR HONOR.

25          SO, LADIES AND GENTLEMEN, BEFORE THE LUNCH BREAK, I

 1   WAS TALKING ABOUT THE FACTS AND THE EVIDENCE THAT'S BEFORE YOU,

 2   AND PARTICULARLY IN THE FORM OF THE INVESTOR WITNESSES WHO

 3   APPEARED, AND I ACTUALLY THINK I MISSPOKE, BECAUSE I THINK TWO

 4   OF THE INVESTOR WITNESSES WERE ACTUALLY -- OR WITNESSES,

 5   THIRD-PARTY WITNESSES, WERE CALLED BY MR. SHUM.  MR. BALDRIDGE

 6   AND MR. RICCI WERE ACTUALLY HIS WITNESSES, OR HE CALLED THEM.

 7            BUT THEY ALL SAID THE SAME THING -- AND WE'LL SPEAK

 8   ABOUT MR. RICCI IN A MOMENT WHEN WE TALK ABOUT INTEL -- BUT

 9   THEY ALL SAID THE SAME THING WHICH WAS THAT PATENTS AND PATENT

10   EXCLUSIVITY WAS NOT IMPORTANT TO THEM.

11            WE ALSO CALLED MR. TIMMINS, THE VENTURE CAPITAL

12   EXPERT, JUST TO TAKE ADVANTAGE OF HIS EXPERIENCE ACROSS MANY,

13   MANY DIFFERENT DEALS AND MANY DIFFERENT FIRMS AND VENTURE

14   CAPITAL GROUPS, AND HE TOO SAID THAT IN HIS EXPERIENCE, IN ALL

15   OF HIS EXPERIENCE, THAT HE HAD NOT SEEN A SITUATION WHERE

16   EXCLUSIVITY IN PATENTS WAS CRITICAL TO VENTURE CAPITALISTS

17   GENERALLY IN THESE KINDS OF DEALS.

18            SO THE QUESTION IS WHEN WE'RE TRYING TO LOOK AT THE

19   EVIDENCE AND APPLY IT TO THE LAW AS THE JUDGE INSTRUCTS YOU,

20   WHAT ARE THE FACTS THAT WE NEED TO RESPOND TO THAT MR. SHUM

21   PRESENTED.

22            AND MR. SHUM'S EVIDENCE THAT EXCLUSIVITY WAS IN SOME

23   MANNER IMPORTANT IS A LETTER THAT DR. VERDIELL WROTE TO HIS

24   PATENT AGENT CONGRATULATING HIM ON A DRAFT APPLICATION, TRYING,

25   I THINK PRETTY OBVIOUSLY, TO PAT HIM ON THE BACK AND ENCOURAGE

1    HIM TO CONTINUE DOING A GOOD JOB.  AND -- AND THAT'S -- THAT'S

2    THEIR EVIDENCE.

3            AND THE INVESTORS WERE INTERESTED IN EXCLUSIVITY.

4    AND MR. TIMMINS EXPLAINED THAT AS A FIRST-TIME ENTREPRENEUR,

5    THAT IT'S QUITE FREQUENT THAT DR. VERDIELL AND OTHERS WOULD

6    REALLY HAVE NO CLUE AS TO WHY INVESTORS INVEST, AND THAT THE

7    BEST WAY TO FIND THAT OUT IS TO ACTUALLY SPEAK WITH THEM.

8            THE OTHER PIECE OF EVIDENCE THAT WE HAVE SEEN OVER

9    AND OVER AGAIN ARE THE ASSIGNMENTS.  SO I SHOULD ADDRESS THE

10   ASSIGNMENT DOCUMENTS.

11           FIRST OF ALL, WITH RESPECT TO THE ASSIGNMENTS, THERE

12   IS NO EVIDENCE IN THIS CASE AT ALL THAT ANY INVESTOR OR INTEL,

13   WHEN WE GET TO INTEL, MADE ANY PORTION OF THEIR DECISION TO

14   INVEST OR TO ACQUIRE BASED ON AN ASSIGNMENT.  THERE'S NO

15   EVIDENCE THAT THE VENTURE CAPITALISTS ACTUALLY LOOKED OR SAW OR

16   STUDIED IN ANY WAY THE ASSIGNMENTS, AND ALL OF THEIR TESTIMONY

17   IS THAT THE ASSIGNMENTS DON'T MATTER.

18           MR. BALDRIDGE CAME IN AND TESTIFIED THAT -- AND

19   ACCURATELY -- YOU CAN ONLY ASSIGN WHAT YOU HAVE, IN ANY EVENT.

20   SO EVERY WITNESS WHO CAME BEFORE YOU HAS TESTIFIED THAT

21   WHATEVER THAT DOCUMENT SAID, HOWEVER THAT LANGUAGE READS, IT

22   HAD NO IMPACT ON THEIR DECISION WHATSOEVER.

23           BUT THERE'S SOMETHING THAT'S EQUALLY IMPORTANT AND

24   THIS GOES BACK TO APPLYING THE LAW TO THESE FACTS, BECAUSE IN

25   THE INSTRUCTIONS THAT YOU'LL BE GIVEN --

1          IF WE CAN GO TO ANOTHER PORTION OF THEM AND

2     SPECIFICALLY TO PAGE 17, JEFF.

3               (EXHIBIT PUBLISHED TO JURY.)

4          **MR. TAYLOR:**  -- YOU'LL SEE IN THE INSTRUCTIONS ON

5     PAGE 17 AT THE VERY BOTTOM OF THE MAIN PARAGRAPH --

6               RIGHT THERE, JEFF, THANK YOU.

7               (EXHIBIT PUBLISHED TO JURY.)

8          **MR. TAYLOR:**  -- THAT THE COURT IS INTERPRETING THE

9     PLAN OF LIQUIDATION AGAIN AS NOT TRANSFERRING OWNERSHIP RIGHTS

10    TO EITHER SHUM OR VERDIELL AS TO ANY FUTURE PATENTS ISSUED ON

11    INTELLECTUAL PROPERTY, BUT THAT BOTH SHUM AND VERDIELL CAN

12    BECOME THE OWNER OF ANY LAWFUL PATENT ISSUED TO THEM AS AN

13    INVENTOR.

14         THE PLAN OF LIQUIDATION DOES NOT PREVENT

15    DR. VERDIELL FROM PATENTING, IT DOES NOT PREVENT DR. VERDIELL

16    FROM FILING AN ASSIGNMENT, AND THAT DOES NOT PREVENT

17    DR. VERDIELL FROM BEING AN OWNER OF THE PATENT THAT'S FILED

18    AFTER RADIANCE.  HE CAN BECOME THE OWNER OF ANY LAWFUL PATENT.

19          AND ALL HIS ASSIGNMENT SAYS IS THAT HE IS THE OWNER

20    OR THAT HE'S TRANSFERRING TO GET TO HIS EMPLOYER -- AND BY THE

21    WAY, THIS IS THE KIND OF TRANSFER THAT IF YOU DON'T MAKE YOUR

22    EMPLOYER, YOU KNOW, TAKE SOME ACTION AGAINST YOU, BECAUSE

23    YOU'RE OBLIGATED TO MOVE ALL YOUR ASSIGNMENTS TO YOUR EMPLOYER,

24    BUT THIS -- THIS PARTICULAR PROVISION PROVIDES THAT

25    DR. VERDIELL CAN BE THE OWNER.

1    AND ALL HE EVER INTENDED OR DID TRANSFER TITLE TO

2    WAS TITLE TO THE INVENTIONS IN THE PATENT APPLICATION.  IT

3    DIDN'T DO ANYTHING TO IMPACT MR. SHUM'S RIGHTS.  AND YOU'LL SEE

4    IN THE COURT'S INSTRUCTIONS THAT A PERSON CAN BE AN OWNER OF

5    PATENT RIGHTS WITHOUT NECESSARILY BEING LISTED ON THE PATENT.

6    THERE'S ANOTHER PROVISION IN THE COURT'S

7    INSTRUCTIONS THAT'S EQUALLY IMPORTANT, AND IT HAS TO DO WITH

8    WHAT IF.  WHAT IF MR. SHUM WERE TO PERSUADE YOU THAT HE'S A

9    COINVENTOR ON ONE OF THESE PATENTS AND THEN HE'D BE A CO-OWNER

10   AND WHAT ARE HIS RIGHTS TO SHARE IN DR. VERDIELL'S PROCEEDS

11   THEN.

12   AND IF WE CAN GO TO PAGE 16, JEFF.

13   (EXHIBIT PUBLISHED TO JURY.)

14   **MR. TAYLOR:**  THE VERY LAST PARAGRAPH SAYS, "UNDER

15   THE PATENT LAW" -- SO THIS IS LIKE SEPARATE AND APART FROM THE

16   PLAN OF LIQUIDATION.  THE PLAN OF LIQUIDATION STANDS OVER HERE.

17   HERE'S WHAT THE PATENT LAW SAYS.

18   "UNDER THE PATENT LAW, EACH COINVENTOR WHO IS A

19   CO-OWNER BECAUSE OF THAT," BECAUSE THEY'RE A COINVENTOR, "CAN

20   USE OR SELL HIS OWN RIGHTS IN THE PATENT WITHOUT THE PERMISSION

21   OF THE COINVENTOR AND WITHOUT HAVING TO SHARE THE PROFITS WITH

22   THE COINVENTORS."  THAT'S PATENT LAW.

23   SO WHETHER THE PLAN OF LIQUIDATION STATES IT OR

24   WHETHER PATENT LAW SAYS IT, UNDER EITHER CIRCUMSTANCE, MR. SHUM

25   HAS ABSOLUTELY NO RIGHTS TO BE SHARING IN THE PROCEEDS THAT

```
 1   DR. VERDIELL WAS ABLE TO GAIN FROM HAVING PURSUED THE RADIANCE

 2   BUSINESS OPPORTUNITY.

 3           AND WE WOULD SUBMIT THAT THE PATENTS -- THE PATENTS

 4   WERE JUST IDEAS THAT WERE FORMED IN 1997.  THE PATENTS HAD

 5   VIRTUALLY NO VALUE UNLESS SOMEONE LIKE DR. VERDIELL AND HIS

 6   TEAM ARE WILLING TO TAKE THEM TO THE NEXT STEP AND THE NEXT

 7   STEP AND THE NEXT STEP.  THEY'RE JUST IDEAS THAT WERE OF VERY

 8   LITTLE VALUE AT ALL.

 9           BUT IN ANY EVENT, HE'S UNDER NO OBLIGATION UNDER

10   PATENT LAW TO DO IT.  THAT'S IN THE INSTRUCTIONS THAT WILL BE

11   GIVEN TO YOU, AND THE INSTRUCTIONS THAT I'M SURE YOU WILL

12   FOLLOW AND ARE OBLIGATED TO DO SO.

13           SO THAT'S WHERE WE ARE ON ASSIGNMENTS.  AND

14   DR. VERDIELL MADE IT CLEAR WHEN HE WAS TESTIFYING THAT HE DID

15   THIS FOR EVERY PATENT THAT HE EVER DID, AND THAT ALL HE WAS

16   TRYING TO DO WAS GET HIS RIGHTS DOWN TO HIS CORPORATION.

17           THE OTHER THING THAT'S INTERESTING ABOUT THE

18   ASSIGNMENTS IS THEY APPARENTLY DID NOT PREVENT MR. SHUM IN ANY

19   WAY FROM TRYING TO SELL HIS RIGHTS, BECAUSE THE ASSIGNMENTS

20   WERE ON FILE WHEN MR. SHUM WENT TO GIGA AND WENT TO -- AND

21   ASKED THEM WHETHER -- GIGABIT, I MEAN -- AND ASKED THEM WHETHER

22   THEY WOULD BE INTERESTED IN BUYING HIS RIGHTS.  AND ALL THE

23   ASSIGNMENTS OR MANY OF THE ASSIGNMENTS THAT HE WAS TALKING

24   ABOUT WERE ON FILE AND IT DIDN'T PREVENT HIM AT ALL.

25           THERE'S ANOTHER INTERESTING ISSUE.  NOR DID THE
```

1  ASSIGNMENTS PREVENT HIM IN ANY WAY AT THE EARLIER TIME WHEN HE

2  WAS JUST SPLITTING WITH DR. VERDIELL AND TRYING TO START HIS

3  BUSINESS, TALKING TO THE TWO VENTURE CAPITALISTS THAT HE SPOKE

4  TO, BECAUSE WHEN HE WAS SPEAKING TO THOSE VENTURE CAPITALISTS,

5  NOT A SINGLE ASSIGNMENT HAD YET BEEN FILED.

6        SO THE ASSIGNMENTS DIDN'T HAVE ANYTHING TO DO WITH

7  HIS INABILITY TO SUCCEED AT THE FRONT END, AND THEY DIDN'T HAVE

8  ANYTHING TO DO WITH HIS ABILITY TO AT LEAST TRY TO SELL HIS

9  RIGHTS AT THE BACK END.

10       AND WE HEARD NOTHING FROM MR. JENKIN THAT THEY

11  THOUGHT THE ASSIGNMENTS WERE AN ISSUE, THAT THEY WEREN'T

12  GOING -- INTERESTED IN BUYING MR. SHUM'S RIGHTS BECAUSE OF THE

13  ASSIGNMENTS.  HE SAID, "WE AREN'T INTERESTED IN BUYING

14  MR. SHUM'S RIGHTS," BECAUSE THOSE WERE RIGHTS JUST TO IDEAS

15  THAT BY THEN WERE FOUR YEARS OLD OR THREE YEARS OLD AND SOMEONE

16  HAD ALREADY INVESTED A LOT OF MONEY TO MAKE THE IDEAS BETTER,

17  TO BUILD ON THEM AND MAKE THEM VERY VALUABLE, AND THEY DIDN'T

18  WANT TO DO AT GIGABIT JUST A ME-TOO COMPANY THAT WOULD COST

19  THEM, YOU KNOW, 20 TO $30 MILLION IN INVESTMENT MONEY JUST TO

20  GET TO THE POINT WHERE DR. VERDIELL AND HIS TEAM HAD ALREADY

21  TAKEN IT.

22       SO THAT'S WHERE WE ARE.

23       NOW, THE OTHER EVIDENCE -- IF YOU COULD CALL IT

24  THAT -- THAT MR. SHUM POINTS TO IS THE FACT THAT THERE ARE --

25  IF YOU GO THROUGH EVERY BUSINESS PLAN, WE TALKED ABOUT BRIEFLY

CLOSING ARGUMENT \ TAYLOR

1   BEFORE, OR EVERY REPORT, YOU WILL FIND SOMEWHERE IN IT A

2   REFERENCE TO INTELLECTUAL PROPERTY AND SOMEWHERE IN IT A

3   REFERENCE TO PATENT.

4           BUT YOU WILL NOT FIND, TWO THINGS, YOU WILL NOT FIND

5   ANY REFERENCE TO EXCLUSIVITY WHICH IS WHAT THE WHOLE CASE IS

6   ABOUT, IS WHETHER DR. VERDIELL IS TELLING PEOPLE HE HAS THE

7   ONLY ONE WITH ANY RIGHTS AND HE'S CLAIMING VALUE FOR

8   EXCLUSIVITY.

9           THE OTHER THING YOU WON'T FIND IS ANY STATEMENT

10  THAT'S COMING FROM AN INVESTOR SAYING THAT.  THESE ARE JUST

11  STATEMENTS FROM THE COMPANY.  AND ON MOST OF THESE REPORTS --

12  AND I WOULD REALLY ENCOURAGE YOU JUST TO PICK AND ACTUALLY LOOK

13  AT ONE OF THE REPORTS THAT WE -- ONE OF THE DIFFICULTIES OF

14  HAVING THE SCREEN, IT'S VERY CONVENIENT, IS YOU NEVER KNOW HOW

15  DEEP DOWN IN THE DOCUMENT OR WHAT THE WHOLE DOCUMENT LOOKS LIKE

16  WHEN YOU ACTUALLY PICK IT UP.

17          SO WHEN IN THE JURY ROOM, YOU CAN ASK FOR EXHIBITS,

18  AND THIS IS, FOR EXAMPLE, TX, THAT'S OUR TRIAL EXHIBIT NUMBER,

19  0750.  THIS IS LICORICE DAM II REPORT, MARCH 8, 2001.  AND THIS

20  WAS THE VERY FINAL REPORT BEFORE INTEL PULLED THE TRIGGER AND

21  MADE THE DECISION, AND YOU'LL SEE THAT NOWHERE IN THIS REPORT

22  IS THERE ANY MENTION OF PATENTED TECHNOLOGY, EXCLUSIVITY, OR

23  ANYTHING LIKE THAT.  THERE'S NO MENTION AT ALL.  IT WASN'T

24  SIGNIFICANT.

25          IN SOME OF THE OTHER DOCUMENTS THAT WE'VE SEEN,

CLOSING ARGUMENT \ TAYLOR

```
 1    YOU'LL FIND IT, BUT IT MAY BE ON PAGE 16 OR 17 OR DOWN IN THE

 2    DOCUMENT.  IT'S NOT THE KEY THRUST OF THE DOCUMENT, BUT IT IS

 3    DESCRIPTIVE.  THERE'S INTELLECTUAL PROPERTY, THERE ARE PATENTS

 4    AND THERE'S ABSOLUTELY, UNDER THE COURT'S INSTRUCTIONS AND

 5    UNDER THE PLAN OF LIQUIDATION, NOTHING WRONG WITH HAVING

 6    PATENTS AND NOTHING WRONG WITH USING A FLEXURE AND NOTHING

 7    WRONG WITH BEING PROUD OF THE FLEXURE, AND SO TOO COULD

 8    MR. SHUM HAVE DONE THE SAME THING WITH HIS BUSINESS PLANS.

 9              EXCUSE ME.

10              THE OTHER ISSUE THAT'S COME UP WHICH IS QUITE

11    SIMILAR IS -- IS -- IS INTEL AND WHY DID INTEL ACQUIRE

12    LIGHTLOGIC, AND LET ME JUST ADDRESS THAT BRIEFLY.

13              I THINK THE EVIDENCE IS CLEAR, THE FACTS THAT WE

14    PRESENTED YOU WITH, THAT IN MARCH 2001, INTEL, WHICH WAS UNABLE

15    TO SELL TO CISCO, REALLY WAS TRYING TO FIGURE OUT WHAT THEY

16    COULD DO TO EXPAND THEIR OWN CAPABILITY IN THE OPTOELECTRONICS

17    SECTOR AND WHAT THEY COULD DO TO RECAPTURE THEIR RELATIONSHIP

18    AND SALES RELATIONSHIP WITH CISCO, AND THERE WAS LIGHTLOGIC

19    WHICH WAS DOING BUSINESS WITH CISCO AND WAS A POTENTIAL

20    ACQUISITION TARGET.  SO FOR A LOT OF MONEY, THEY DID PAY

21    $409 MILLION FOR LIGHTLOGIC, THEY ACQUIRED LIGHTLOGIC.

22              BUT THE QUESTION BEFORE US AND THE QUESTION BEFORE

23    YOU IS THE SAME ONE WITH THE INVESTORS.  WHAT EVIDENCE IS THERE

24    THAT INTEL DID THIS TO GET PATENTS OR TO GET PATENT EXCLUSIVITY

25    OR HOW THAT WAS IMPORTANT TO INTEL TO IN SOME MANNER GET FROM
```

1   DR. VERDIELL PATENT EXCLUSIVITY.  AND ALL OF THIS IS BASED ON

2   THE ASSUMPTION THAT DR. VERDIELL IN SOME MANNER CONCEALED FROM

3   INTEL MR. SHUM'S EXISTENCE, CONCEALED FROM INTEL THE EXISTENCE

4   OF THE PLAN OF LIQUIDATION AND THAT INTEL THOUGHT IT WAS

5   IMPORTANT.

6            AND THE FACTS THAT WE PRESENTED, AND WE SUBMIT THE

7   ONLY FACTS ARE THAT EACH ONE OF THOSE THINGS IS SIMPLY UNTRUE.

8   MR. SHUM HAS NOT SUSTAINED HIS BURDEN TO SHOW ANY OF THOSE ARE

9   TRUE FOR PURPOSES OF HIS UNJUST ENRICHMENT.

10           WE SAW, FOR EXAMPLE, MR. SIVAKUMAR COME HERE AND

11  TESTIFY THAT HE WAS PERSONALLY AWARE OF VERDIELL'S PRIOR WORK

12  WITH SHUM AND THE PLAN OF LIQUIDATION, AND THAT HE WAS ALSO

13  TALKED ABOUT AND TALKED US THROUGH THE DISCLOSURE THAT WAS MADE

14  TO INTEL.

15           AND IF WE COULD SEE THAT DISCLOSURE.

16           (EXHIBIT PUBLISHED TO JURY.)

17           **MR. TAYLOR:**  SIMILAR TO THE DISCLOSURES THAT WERE

18  MADE TO SERIES A, B, AND C, SLIGHTLY DIFFERENT.  HERE WE HAVE

19  DR. VERDIELL AND LIGHTLOGIC AFFIRMATIVELY TELLING, FAR BE IT

20  FROM EXCLUSIVITY, THEY'RE AFFIRMATIVELY TELLING INTEL THAT THEY

21  FOUNDED -- SHUM AND VERDIELL FOUNDED THE COMPANY RADIANCE, THAT

22  RADIANCE DESIGN HAS A PLAN OF LIQUIDATION THAT WAS APPROVED BY

23  THE BOARD OF DIRECTORS AND THEY WERE GIVEN EQUAL RIGHTS TO

24  INDEPENDENTLY EXPLOIT.

25           WHEN THEY IDENTIFY THE INTELLECTUAL PROPERTY THAT

1    WAS IDENTIFIED BY RADIANCE, THEY IDENTIFY AS INCLUDED, NOT

2    LIMITED TO, AS INCLUDING THE ONE PATENT THAT HAD ISSUED AT THAT

3    TIME.

4            IT'S ABOUT AS GOOD A DISCLOSURE AS YOU CAN MAKE AS

5    TO THE FACT THAT FRANK SHUM EXISTS, THAT RADIANCE EXISTED, THAT

6    THERE'S A PLAN OF LIQUIDATION OUT THERE AND THAT SOMEONE ELSE

7    HAS RIGHTS TO EXPLOIT THIS TECHNOLOGY.

8            AND THAT'S IN THE OFFICIAL DEAL DOCUMENTS FOR THIS

9    DEAL.  AND THE SUGGESTION THAT INTEL IN SOME MANNER WAS FOOLED

10   OR DIDN'T KNOW THAT MR. SHUM HAD RIGHTS WITH THIS KIND OF

11   INFORMATION IN THESE DOCUMENTS OR THAT THEY WERE IN SOME MANNER

12   FOOLED BY THE ASSIGNMENTS, THAT THE ASSIGNMENTS WOULD HAVE IN

13   SOME MANNER CONVINCED THEM THAT THIS WAS NOT TRUE, THERE'S JUST

14   NO EVIDENCE, LADIES AND GENTLEMEN, TO SUPPORT THAT.

15           ALSO, WE SAW -- EXCUSE ME -- LET'S LOOK AT WHAT

16   MR. SIVAKUMAR SAID BECAUSE I THINK IT'S HELPFUL TO REMEMBER.

17              (EXHIBIT PUBLISHED TO JURY.)

18           **MR. TAYLOR:**  HE SAID QUITE DIRECTLY THAT INTEL DOES

19   NOT WORRY ABOUT EXCLUSIVE RIGHTS.  AND HE TESTIFIED QUITE

20   DIRECTLY AS TO -- ABOUT THAT.  SO, TOO, DID MR. RICCI WHO WAS

21   ALSO INVOLVED IN THE DEAL.

22           AND HE TOLD US VERY DIRECTLY WHEN HE WAS HERE AND

23   TOOK THE STAND THAT EXCLUSIVITY SIMPLY WAS NOT IMPORTANT.  WHAT

24   WAS IMPORTANT TO HIM WERE THESE THREE FACTORS, CUSTOMER

25   TRACTION, GOOD SENIOR MANAGEMENT, AND TECHNICAL KNOW-HOW.  AND

1    HE ALSO TESTIFIED THAT -- DIRECTLY ON EXCLUSIVITY, "WOULD IT

2    MATTER IN A DEAL LIKE THIS WHETHER OR NOT INTEL HAD EXCLUSIVE

3    RIGHTS TO THE TECHNOLOGY?"

4            MR. RICCI SAYS, "IT WOULD NOT HAVE BEEN AN ISSUE

5    THAT INTEL HAD EXCLUSIVE RIGHTS, NO."

6            THERE'S NO EVIDENCE, DOCUMENTS, WITNESSES, ANYTHING

7    THAT INTEL WAS FOOLED OR THAT INTEL BELIEVED THAT IT WAS

8    GETTING EXCLUSIVE RIGHTS OR THAT EXCLUSIVE RIGHTS WERE

9    IMPORTANT.

10           AND AS A PHILOSOPHICAL OR BUSINESS STRATEGY MATTER,

11   MR. SIVAKUMAR EXPLAINED THAT INTEL IS REALLY NOT INTERESTED IN

12   EXCLUSIVITY.  THEY'RE INVOLVED IN MANY PATENT POOLS AND THEIR

13   BASIC ATTITUDE AND APPROACH IS, IS THAT THEY WANT TO ACQUIRE

14   COMPANIES, AND THE WAY THEY CONDUCT THEIR OWN BUSINESS IS TO

15   TRY TO WIN BY DEVELOPING PRODUCTS AND BETTER PRODUCTS RATHER

16   THAN TRYING TO SUE PEOPLE AND/OR EXCLUDE PEOPLE FROM

17   PARTICIPATING IN THEIR PARTICULAR FIELD OR AREAS.

18           SO LET'S LOOK AGAIN AT THE JURY INSTRUCTION ON

19   PAGE 19 FOR UNJUST ENRICHMENT.

20           (EXHIBIT PUBLISHED TO JURY.)

21           **MR. TAYLOR:**  AND JUST REVIEW THE ELEMENTS THAT YOU

22   WILL HAVE TO ADDRESS WHEN YOU DECIDE THIS CASE WITH RESPECT TO

23   WHETHER THERE'S BEEN ANY UNJUST ENRICHMENT.

24           AND LADIES AND GENTLEMEN, AGAIN, FOCUSING ON THE

25   NUMBERS 2 AND 3, I THINK IT -- THE EVIDENCE IN THIS CASE

1    DEMONSTRATES THAT THERE WAS NO BENEFIT THAT WAS RECEIVED BY

2    DR. VERDIELL AT THE EXPENSE OF MR. SHUM.  MR. SHUM WASN'T

3    IMPACTED ONE WAY OR THE OTHER BY ANYTHING THAT DR. VERDIELL

4    DID.  AND HE HAD NO -- UNDER THE PLAN OF LIQUIDATION, UNDER THE

5    PATENT LAWS THAT THE JUDGE HAS -- ARE IN THE JUDGE'S LEGAL

6    INSTRUCTIONS, HE HAS NO LAWFUL CLAIM.

7              JEFF, IF WE COULD HIGHLIGHT THAT.

8              HE MUST PROVE HE HAS A LAWFUL CLAIM FOR THE BENEFIT.

9    HE DOESN'T.  HE DOESN'T HAVE IT UNDER THE PLAN OF LIQUIDATION

10   AND HE DOESN'T HAVE IT EVEN IF HE'S A COINVENTOR ON ONE OF THE

11   PATENTS, BECAUSE THAT PROVISION OF THE PATENT LAW PROVIDES THAT

12   A COINVENTOR HAS NO RIGHTS TO SHARE IN THE PROCEEDS OF ANOTHER.

13             THE OTHER PROVISION IS THAT THE BENEFIT MUST BE

14   UNJUST, AND WE WENT OVER THAT BEFORE, AND WHETHER THE CONDUCT

15   BY DR. VERDIELL --

16             AND JEFF, IF YOU CAN HIGHLIGHT THAT DOWN FOR

17   WRONGFUL CONDUCT PROVISION.

18             (EXHIBIT PUBLISHED TO JURY.)

19        **MR. TAYLOR:**  IS THERE ANYTHING THAT DR. VERDIELL DID

20   BASED ON THE EVIDENCE, THE FACTS THAT HAVE BEEN PRESENTED TO

21   YOU IN TERMS OF MAKING LIGHTLOGIC SUCCESSFUL THAT WAS WRONG.

22   AND THE ANSWER IS "NO."  THERE'S NOTHING THAT WOULD SUPPORT HIM

23   HAVING TO TURN OVER TO MR. SHUM PARTICULARLY THE KINDS OF

24   AMOUNTS OF MONEY MR. SHUM'S ASKING FOR IN THIS CASE.

25             HE COMES BEFORE US AND HE ASKS FOR $170 MILLION,

 1   MORE THAN THREE TIMES WHAT DR. VERDIELL GOT.  IT'S NOT

 2   JUSTIFIED.  BUT MOSTLY IT'S NOT JUSTIFIED BECAUSE LEGALLY, EVEN

 3   BEFORE YOU EVEN GET TO WHETHER A CLAIM EXISTS, MR. SHUM HAS NOT

 4   PROVED THAT HE HAS A LAWFUL CLAIM TO ANY PORTION OF THAT

 5   BENEFIT OR THAT DR. VERDIELL DID ANYTHING WRONG.

 6           SO WE WOULD SUBMIT THAT ON THE CLAIM OF UNJUST

 7   ENRICHMENT, EVEN IF MR. SHUM WERE FOUND BY YOU TO BE A

 8   COINVENTOR, HE WOULD HAVE NO RIGHT TO RECOVER UNJUST ENRICHMENT

 9   OF ANY OF THE PROCEEDS THAT DR. VERDIELL OR LIGHTLOGIC

10   RECEIVED.

11           I THINK IT'S IMPORTANT WHEN WE LOOK AT THE LAW AND

12   WHETHER SOMETHING'S AT THE EXPENSE OF MR. SHUM OR WHETHER

13   MR. SHUM IS HARMED BY SOME ACTIVITY THAT MR. VERDIELL

14   UNDERTOOK, THAT WE LOOK TOGETHER AT WHAT THE EVIDENCE WAS OR IS

15   WITH RESPECT TO WHAT MR. SHUM DID AFTER THE PLAN OF LIQUIDATION

16   WAS SIGNED.  AND WE KNOW THAT MR. SHUM TOOK A DIFFERENT COURSE,

17   BUT IT'S RELEVANT WHEN HE COMES TO THIS COURT AND SUGGESTS THAT

18   HE WAS GREATLY HARMED OR THAT HE'S ENTITLED TO RECEIVE PROCEEDS

19   OF MONEY THAT DR. VERDIELL AND HIS TEAM MADE.

20           SO HIS CLAIM IN THIS CASE, AMONG OTHERS, IS FOR

21   BREACH OF CONTRACT AND FOR BREACH OF THE PLAN OF LIQUIDATION

22   FOR HAVING FILED, YOU KNOW, PATENT APPLICATIONS.

23           AND -- AND -- AND WE WOULD SUBMIT THAT GIVEN THE

24   PLAN OF LIQUIDATION, AND GIVEN THE JURY INSTRUCTIONS FOR THE

25   BREACH OF CONTRACT CLAIM, MR. SHUM HAS NOT PRESENTED EVIDENCE

1    OF THAT.

2                NOW, JEFF, IF WE COULD LOOK AT THE JURY INSTRUCTIONS

3    ON PAGES 14 AND 15 FOR BREACH OF CONTRACT.

4                (EXHIBIT PUBLISHED TO JURY.)

5          **MR. TAYLOR:**  AGAIN, LADIES AND GENTLEMEN, APPLYING

6    THE LAW TO THESE FACTS, WE HAVE TO LOOK AGAIN AT ITEMS -- ON

7    THIS ONE, ITEMS 3 AND 4.  MR. SHUM MUST PROVE ALL OF THE ITEMS

8    THAT ARE LISTED IN THE INSTRUCTION, 1 THROUGH 4.  BUT ON ITEM

9    NO. 3, HE MUST PROVE THAT VERDIELL FAILED TO DO SOMETHING THAT

10   THE CONTRACT -- AND NOW WE'RE TALKING ABOUT THE PLAN OF

11   LIQUIDATION -- FAILED TO DO SOMETHING THAT THE CONTRACT

12   REQUIRED HIM TO DO OR THAT THE CONTRACT PROHIBITED HIM FROM

13   DOING.

14                THE PLAN OF LIQUIDATION IS TRIAL EXHIBIT 298.  I

15   WOULD ASK EACH OF YOU TO LOOK AT IT.  AND WHEN YOU LOOK AT IT,

16   YOU WILL SEE THE PROVISIONS THAT WE DISCUSSED EARLIER THAT GIVE

17   BOTH GENTLEMEN THE RIGHT TO ENGAGE IN ANY BUSINESS ACTIVITIES

18   THAT THEY MAY WISH AND TO INDEPENDENTLY AND EQUALLY EXPLOIT THE

19   IP.

20                THERE'S NOTHING IN THAT CONTRACT THAT REGULATES HOW

21   YOU COMMUNICATE WITH OTHER PEOPLE, WHAT YOU SHOULD DO WITH

22   ASSIGNMENTS.  YOU'LL ALSO SEE EMAIL EVIDENCE WHERE MR. SHUM

23   BOASTS THAT HE'S A VERY DETAIL-ORIENTED PERSON.  HE WAS

24   REPRESENTED BY TWO LAWYERS.  IF THIS PLAN OF LIQUIDATION WAS

25   INTENDED TO PROHIBIT AND REGULATE CONDUCT IN ANY FINITE KIND OF

1    WAY AS TO EXACTLY HOW PEOPLE -- THEN IT WOULD HAVE SAID SO AND

2    SHOULD HAVE SAID SO.  BUT THERE'S NOT A SINGLE PROVISION IN

3    THAT CONTRACT THAT DR. VERDIELL VIOLATED OR BREACHED, NOT A

4    SINGLE ONE.

5             MORE IMPORTANTLY, AND WHAT WE'RE GOING TO BE TALKING

6    ABOUT HERE FOR A MINUTE, THERE'S NO EVIDENCE THAT MR. SHUM WAS

7    HARMED BY ANYTHING DR. VERDIELL DID WITH RESPECT TO HIS PATENTS

8    OR NOT, AND -- AND -- AND -- OR WITH RESPECT TO THE

9    ASSIGNMENTS.

10            AND WHY IS THAT?  WELL, LET'S LOOK.  I MEAN, WHAT WE

11   KNOW IS THAT MR. SHUM FORMED HIS OWN COMPANY, AND THAT HE'S

12   TESTIFIED THAT HIS EFFORTS WITH THIS COMPANY, WHICH WAS

13   LUMINANCE, WERE NOT AFFECTED IN ANY WAY BY WHAT DR. VERDIELL

14   DID OR WHAT LIGHTLOGIC DID.

15            CAN WE HAVE THAT SLIDE, JEFF.

16            (EXHIBIT PUBLISHED TO JURY.)

17       **MR. TAYLOR:**  YOU'VE SEEN THIS TESTIMONY BEFORE, BUT

18   THIS IS WHERE MR. SHUM IS SPEAKING TO THE QUESTION OF HARM.

19   THIS IS -- THIS IS THE EVIDENCE.  THESE ARE THE FACTS.  AND

20   THIS IS MR. SHUM SAYING HE WAS NOT HARMED.  THAT'S THE EVIDENCE

21   THAT'S BEFORE YOU ON THAT ELEMENT WITH RESPECT TO THIS ISSUE.

22            HE TESTIFIES THAT HE MET, AT MOST, WITH TWO VENTURE

23   CAPITALISTS, AND ONE OF THEM TOLD HIM IT WOULD BE VERY

24   DIFFICULT TO GET $2 MILLION BUT THAT MAYBE THIS INDIVIDUAL

25   WOULD BE WILLING TO GIVE HIM 30 OR $50 MILLION TO GET HIM

1    STARTED.  AND MR. SHUM TESTIFIED HE DIDN'T PURSUE IT, WHICH IS

2    HIS CHOICE AND HIS ALTERNATIVE.  BUT THAT WAS HIS CHOICE.  THAT

3    WAS NOT SOMETHING THAT DR. VERDIELL AFFECTED --

4              AND WE'VE SEEN EVIDENCE THAT MR. SHUM, FOR HIS OWN

5    REASONS, MADE A DECISION IN EARLY 1998 SIMPLY NOT TO PURSUE THE

6    TECHNOLOGY AND NOT TO PURSUE ANOTHER STARTUP OPPORTUNITY.  AND

7    I MEAN IT, THAT'S COMPLETELY FINE.  BUT IT'S A DIFFERENT

8    CHOICE, AND IT'S A CHOICE THAT HE MADE VOLUNTARILY.  IT'S NOT

9    IMPACTED IN ANY WAY BY WHAT DR. VERDIELL WAS DOING OR ANYONE

10   ELSE.

11             AND MR. TIMMINS TESTIFIED THAT THAT KIND OF AN

12   EFFORT, MEETING WITH ONLY A COUPLE OF VENTURE CAPITALISTS, IS

13   OKAY BUT IT'S NOT WHAT YOU'D EXPECT FROM SOMEONE WHO REALLY

14   WANTS TO TRY TO PURSUE BUSINESS.

15             AND WE HAVE COMMUNICATIONS FROM MR. SHUM ABOUT WHY

16   HE THINKS HIS BUSINESS FAILED AND WHETHER IT HAD ANYTHING AT

17   ALL TO DO WITH DR. VERDIELL OR WHETHER IT HAD ANYTHING AT ALL

18   TO DO FOR PURPOSES OF THIS CASE WITH EXCLUSIVITY.

19             COULD WE SEE THAT EMAIL.

20                  (EXHIBIT PUBLISHED TO JURY.)

21        **MR. TAYLOR:**  THIS IS AN EMAIL MESSAGE FROM MR. SHUM

22   TO HIS SISTER ELLA, AND HE'S REPORTING TO HER THAT HE HAS

23   DECIDED THAT IT DOES NOT MAKE SENSE TO EXECUTE HIS BUSINESS

24   PLAN IN ITS CURRENT FORM.  IT'S RELEVANT THAT THIS IS JUST

25   THREE MONTHS AFTER THE PLAN OF LIQUIDATION, AND HE'S DECIDED

1   HERE THAT HIS BUSINESS PLAN ISN'T GOING TO WORK.  AND HE HAS

2   EXPLANATIONS.

3            "THE MAIN REASONS ARE THAT I FOUND OUT AT OFC THERE

4   ARE MORE PEOPLE MAKING 980 PUMPS THAN I REALIZED AND MY FIRST

5   PRODUCT IS STILL 1.5 YEARS AWAY.  ALSO TWO KEY COMPONENTS ARE

6   NOT WITHIN MY CONTROL, THE 980 CHIP AND THE MICROLENS.  I DON'T

7   BELIEVE I HAVE A UNIQUE ENOUGH PRODUCT OR TECHNOLOGY --

8   ADVANTAGE," EXCUSE ME -- "TO JUSTIFY THE RISK."

9            IT IS A RISK.  IT WAS A HUGE RISK THAT DR. VERDIELL

10  TOOK.

11           "ANOTHER PROBLEM IS THAT I DON'T HAVE CONTROL OF THE

12  CHIP SUPPLY, AND MY LAST CORRESPONDENCE WITH UNIPHASE SEEMED TO

13  INDICATE THAT THEY MAY BE RELUCTANT TO SELL CHIPS.  SO I HAVE A

14  COUPLE OF OPTIONS."

15           HE CONSIDERED HIS OPTIONS.  AND AS WE KNOW, HE

16  ULTIMATELY DECIDED TO TAKE A JOB AS AN ENGINEER AT DITECH.

17  AND -- AND -- AND -- AND THAT'S WHAT THE DR. -- EXCUSE ME --

18  THAT'S WHAT MR. SHUM WAS SAYING ABOUT HIS OWN ABILITY TO START

19  A BUSINESS.  IT JUST WAS DIFFICULT.  HE WASN'T ABLE TO DO IT.

20  AND HE TESTIFIED HERE THAT HE REALLY DIDN'T KNOW AND UNDERSTAND

21  ALL ABOUT THE CUSTOMERS AND WHAT HE NEEDED TO KNOW ABOUT THE

22  MARKETS AND THE NEEDS OF THE MARKET.

23           WE ALSO HAD MR. GORMAN TESTIFY THAT HE SAW MR. SHUM,

24  AND MR. SHUM JUST TOLD HIM CANDIDLY THAT HE WAS NOT REALLY

25  INTERESTED IN STARTING A COMPANY AND ACTUALLY WANTED TO GET OUT

1    OF THE STARTUP RACE.

2              AND WHAT WE SEE IS THAT MR. SHUM --

3              AND WE CAN HAVE THE NEXT EMAIL.

4              (EXHIBIT PUBLISHED TO JURY.)

5         **MR. TAYLOR:**  -- TALKING ABOUT HIS DITECH JOB.

6              THIS IS IN JUNE SO THIS IS THREE MONTHS LATER, A

7    LITTLE MORE THAN THREE MONTHS LATER.  HE'S AT DITECH AND HE'S

8    QUITE HAPPY WITH WHAT HE'S DOING.  "IT'S A GOOD ENVIRONMENT, I

9    LIKE THE PEOPLE, AND I HAVE GOOD, WELL-DEFINED PACKAGING

10   PROJECT TO WORK ON.  ALSO, IT IS ALMOST DEFINITE THE COMPANY

11   WILL GO PUBLIC IN ONE YEAR SO MY STOCK OPTION IS QUITE

12   VALUABLE."

13             AND THEN HE GOES ON TO SAY DITECH IS WILLING TO GIVE

14   HIM FLEXIBILITY ON OTHER THINGS AND THAT WAS VALUABLE TO HIM

15   AND THAT WAS HIS CHOICE.

16             AND HE COULD HAVE MADE THE OTHER CHOICE.  HE COULD

17   HAVE MADE THE CHOICE THAT DR. VERDIELL MADE TO TAKE A HUGE RISK

18   AND A LOT OF SACRIFICE AND GO FOR A LONG TIME WITHOUT MONEY TO

19   SEE IF YOU COULD CREATE A COMPANY.  BUT THE TWO GENTLEMEN TOOK

20   DIFFERENT ROUTES, AND MR. SHUM WAS NOT HARMED BY WHAT

21   DR. VERDIELL DID.  MR. SHUM SIMPLY MADE THE DECISION THAT HE

22   WAS GOING TO NOT DEVELOP THE TECHNOLOGY.

23             AND ONE OF THE REASONS I GO THROUGH THAT IS -- IS --

24   IS -- AND I MENTIONED THE GIGABIT SITUATION AS WELL, IS THERE'S

25   NOT ANY EVIDENCE AGAIN THAT THERE'S ANYTHING ABOUT ASSIGNMENTS,

 1   EXCLUSIVITY OR ANYTHING THAT IMPACTED HIS DECISION.

 2              AND IN THAT GIGABIT TRANSACTION WHEN MR. SHUM, IN

 3   2001, AFTER THE INTEL ACQUISITION, MR. SHUM WAS INTERESTED IN

 4   SELLING HIS RIGHTS AND WE SAW THAT THE PRICE THAT HE WAS

 5   LOOKING FOR, FOR HIS RIGHTS WITH GIGABIT WAS SOMEWHERE BETWEEN

 6   250,000 AND $500,000, THERE WAS NOTHING IN THE -- IN THE --

 7   WHAT MR. RICHARD SAID ABOUT THAT TRANSACTION THAT HAD ANYTHING

 8   TO DO WITH EXCLUSIVE RIGHTS OR MR. VERDIELL'S RIGHTS OR

 9   MR. SHUM'S INABILITY TO SELL HIS RIGHTS.  THEY JUST DECIDED AS

10   A BUSINESS MATTER THE RIGHTS WEREN'T WORTH PURSUING BECAUSE

11   DR. VERDIELL HAD DONE SO MUCH WITH IT AND DONE SO MUCH HARD

12   WORK WITH IT.

13              I'D LIKE TO ADDRESS AN ISSUE HAVING TO DO WITH

14   MR. SHUM'S EXPERTS, BECAUSE IT ALSO RELATES -- AND I DO THINK

15   THE TWO MOST IMPORTANT DOCUMENTS OF THE CASE ARE THE PLAN OF

16   LIQUIDATION AND THE JURY INSTRUCTIONS, SO HERE'S ANOTHER JURY

17   INSTRUCTION.  IT HAS TO DO WITH THE EXPERTS, AND IT HAS TO DO

18   WITH THE BACK-AND-FORTH THAT YOU SAW IN THE COURTROOM WITH THE

19   EXPERTS MAKING CERTAIN ASSUMPTIONS ABOUT THINGS AND WHAT THAT

20   MEANS AND HOW IT WORKS AND WHAT IT IS.

21              SO I'D LIKE TO SHOW YOU A JURY INSTRUCTION, IF I

22   COULD, ON PAGE 6 OF THE COURT'S JURY INSTRUCTIONS, AND THEN

23   TALK WITH YOU A LITTLE BIT ABOUT HOW MR. SHUM'S EXPERTS AND

24   PARTICULARLY MR. REGAN CONDUCTED HIS WORK IN THIS CASE.

25              (EXHIBIT PUBLISHED TO JURY.)

1      **MR. TAYLOR:**  SO ON PAGE 6, IT SAYS, "THE LAW ALLOWS

2   EXPERT WITNESSES TO ANSWER HYPOTHETICAL QUESTIONS.  THESE ARE

3   QUESTIONS IN WHICH THE WITNESS IS ASKED TO ASSUME THE TRUTH OF

4   A SET OF FACTS OR THE STATE OF THE LAW AND TO GIVE AN OPINION

5   BASED ON THOSE ASSUMPTIONS."  FAIR ENOUGH.  "ANY WEIGHT TO BE

6   GIVEN THIS EVIDENCE DEPENDS ON WHETHER OR NOT THE ASSUMPTIONS

7   ARE TRUE, AND IT IS FOR YOU TO DECIDE WHETHER OR NOT YOU

8   BELIEVE THE ASSUMPTIONS ARE TRUE."

9           SO THEY CAME TO COURT AND THEY EXPLAINED WHAT THEIR

10   ASSUMPTIONS WERE, AND NOW IT WILL BE YOUR TASK TO DETERMINE

11   WHETHER OR NOT THE ASSUMPTIONS ARE TRUE, BUT I'D LIKE, IF I

12   COULD, TO REVIEW WHAT THEY ASSUMED.

13           THEY ASSUMED THAT MR. SHUM WAS HARMED BY NOT BEING

14   NAMED ON THE PATENTS.  THEY ASSUMED THAT THE INVESTORS AND

15   INTEL DID NOT KNOW ABOUT MR. SHUM.  THEY ASSUMED THAT THE

16   INVESTORS AND INTEL WANTED EXCLUSIVITY.  AND THEY ALSO ASSUMED

17   THAT IF MR. SHUM HAD BEEN NAMED ON THE PATENTS, THE INVESTORS

18   IN INTEL WOULD HAVE GONE TO HIM AND BOUGHT HIM OUT SO THEY

19   COULD HAVE HAD EXCLUSIVE RIGHTS.  AND THAT'S WHAT THEY ASSUMED.

20           AND THE KEY, I THINK, TO THE EVIDENCE THAT WAS

21   PRESENTED IN THIS CASE IS THAT THERE'S NO EVIDENCE TO SUPPORT

22   THOSE ASSUMPTIONS, THAT THIS INSTRUCTION COMES DIRECTLY INTO

23   PLAY, THAT MR. SHUM'S EXPERTS, THEY MADE CERTAIN ASSUMPTIONS,

24   CAME UP WITH HUGE NUMBERS, BUT THERE WAS NOTHING THAT WAS

25   INTRODUCED AND EVIDENCE BEFORE YOU HAVE TO SUGGEST THAT THOSE

1    ASSUMPTIONS WERE TRUE.  SAME EVIDENCE WE'VE JUST PRODUCED.  IN

2    FACT, THE EVIDENCE IS JUST THE OPPOSITE.

3              CHANGE OF SUBJECTS.

4              INVENTORSHIP.  TWO THINGS ABOUT INVENTORSHIP.

5              FIRST OF ALL, IT'S NOT A MONEY DAMAGES CLAIM.  WHAT

6    YOU GET IF YOU PREVAIL ON AN INVENTORSHIP CLAIM IS YOU GET YOUR

7    NAME ADDED TO THE PATENT.  THAT'S IT.  COUNSEL AGREE.  SO

8    THAT'S THE KIND OF CLAIM IT IS.

9              THE OTHER THING THAT'S INTERESTING ABOUT

10   INVENTORSHIP IS IT IS A SPECIALIZED AREA OF LAW, PATENT LAW,

11   AND THERE ARE SPECIAL RULES AND SPECIAL LEGAL REQUIREMENTS FOR

12   WHAT IT TAKES TO GET YOURSELF ADDED TO A PATENT.

13             AND THERE'S GOOD REASON FOR THAT.  I MEAN, OTHERWISE

14   WE HAVE SITUATIONS WHERE PEOPLE WOULD JUST COME IN AND SAY,

15   "HEY, I'VE GOT A DRAWING.  I'M AN INVENTOR.  PUT ME ON YOUR

16   PATENT."

17             SO I'D LIKE TO REVIEW WITH YOU, AND THEN WE'LL TALK

18   BRIEFLY ABOUT WHAT THE INVENTORSHIP EVIDENCE IS AS AGAINST THIS

19   LAW, BUT IT'S NOT -- IT WOULD BE MOST USEFUL, I THINK, FOR YOU

20   TO SEE THE LAW FIRST AND THEN UNDERSTAND HOW THIS EVIDENCE

21   STACKS UP TO IT.

22             SO IF WE COULD SEE THE JURY INSTRUCTIONS AT PAGE --

23   STARTING AT PAGE 8, JEFF, THAT'D BE GREAT.

24             (EXHIBIT PUBLISHED TO JURY.)

25             **MR. TAYLOR:**  SO WE SEE HERE THE COURT INSTRUCTING

1    YOU ON THE LAW OF INVENTORSHIP AND IDENTIFYING THE PATENTS THAT

2    ARE AT ISSUE, THE SIX PATENTS AT ISSUE.

3              IF WE COULD SCROLL DOWN FURTHER, JEFF.

4              IT IDENTIFIES THE -- JEAN-MARC VERDIELL, BUT THEN IT

5    SAYS SOMETHING IMPORTANT.  IT SAYS, "AFTER A PATENT HAS BEEN

6    ISSUED, THE LAW PRESUMES THAT IT NAMES THE CORRECT INVENTORS."

7    THAT'S OUR STARTING POINT IN THIS CASE.

8              "IT'S THEREFORE NECESSARY FOR A PERSON WHO CLAIMS TO

9    BE A COINVENTOR AND SEEKS TO CHANGE THE INVENTORS NAMED ON THE

10   PATENTS TO PROVE THE FACT OF CO-INVENTORSHIP BY CLEAR AND

11   CONVINCING EVIDENCE."

12             YOU'LL SEE WHEN YOU SEE THE REST OF THE INSTRUCTION,

13   THAT'S A HIGHER STANDARD.  THERE ARE TWO STANDARDS.  THERE'S

14   PREPONDERANCE OF THE EVIDENCE, WHICH IS MORE LIKELY THAN NOT,

15   AND THERE'S CLEARLY CONVINCING, WHICH MEANS HIGHLY PROBABLE.

16   SO THERE'S A PRESUMPTION THAT THE NAMED INVENTOR, DR. VERDIELL

17   IN THIS CASE, IS THE INVENTOR AND MR. SHUM HAS TO OVERCOME THAT

18   WITH CLEAR AND CONVINCING EVIDENCE.

19             BUT IN ADDITION TO THAT, THERE ARE OTHER

20   REQUIREMENTS FOR AN INVENTOR, AND THE EVIDENCE OF THIS CASE

21   NEEDS TO BE VIEWED IN THE PERSPECTIVE OF WHAT THE LAW IS WITH

22   RESPECT TO INVENTORSHIP.  SO LET ME TURN --

23             JEFF, COULD YOU GO TO THE NEXT PAGE.

24             IF WE GO DOWN TO THE LAST -- IT SAYS -- EXACTLY

25   WHERE YOU ARE.

1          (EXHIBIT PUBLISHED TO JURY.)

2          **MR. TAYLOR:**   THERE'S A PORTION OF THE COURT'S

3   INSTRUCTIONS THAT ARE VERY CLEAR ABOUT WHAT IT TAKES TO BE A

4   COINVENTOR, AND IT'S NOT NECESSARY THAT YOU MAKE A SIGNIFICANT

5   CONTRIBUTION TO THE CONCEPTION OF EVERY CLAIM OF THE PATENTS.

6   BUT IT IS NECESSARY THAT A PERSON MAKE A SIGNIFICANT

7   CONTRIBUTION TO THE CONCEPTION OF WHAT ONE -- AT LEAST ONE

8   CLAIM OF THE PATENT.

9          AND THEN IT GOES ON AT THE TOP --

10          JEFF, IF YOU COULD, ON THE SAME PAGE, GO UP.

11   THERE'S A DEFINITION OF "CONCEPTION" WHICH IS CRITICALLY

12   IMPORTANT IN THE CASE, SAME PAGE, PAGE 9, AND THE TOP LINE

13   THERE'S THE WORD "CONCEPTION" IN THE MIDDLE OF THE LINE.  TOP,

14   THERE YOU GO.

15          (EXHIBIT PUBLISHED TO JURY.)

16          **MR. TAYLOR:**   "'CONCEPTION' MEANS THE FORMATION IN

17   THE MIND OF THE INVENTOR," THIS WOULD BE MR. SHUM IN THIS CASE,

18   "FORMATION IN THE MIND OF THE INVENTOR OF A DEFINITE AND

19   PERMANENT IDEA OF THE COMPLETE AND OPERATIVE INVENTION."

20          SO, SO FAR WHAT WE SEE, MR. SHUM HAS GOT TO, BY

21   CLEAR AND CONVINCING EVIDENCE, DEMONSTRATE THAT HE HAD

22   CONCEPTION OF A DEFINITE AND PERMANENT IDEA OF A COMPLETE AND

23   OPERATIVE INVENTION OF ONE PART OF THE INVENTION IN THE PATENT.

24          THERE'S ANOTHER -- AND BECAUSE THESE ARE IMPORTANT,

25   I WANT TO GO THROUGH THEM CAREFULLY.  IF YOU GO TO THE BOTTOM

1    OF PAGE 9, THE JURY INSTRUCTIONS GO ON TO EXPLAIN THAT "A

2    PERSON WHO DOES" -- GET THIS UP, ALL OF IT.

3                    (EXHIBIT PUBLISHED TO JURY.)

4              **MR. TAYLOR:**  "A PERSON WHO DOES NO MORE THAN HELP

5    WITH EXPERIMENTATION BY CARRYING OUT THE ACTUAL INVENTOR'S

6    INSTRUCTIONS OR BY EXPLAINING THE IDEA OF ACTUAL INVENTOR OR

7    STATE OF ART IS NOT A COINVENTOR."

8              YOU HAVE TO CONCEIVE OF AN IDEA.  YOU CAN'T JUST

9    HELP.  YOU CAN'T JUST BE THERE.  COUNSEL TALKS ABOUT WORKING

10   TOGETHER.  WORKING TOGETHER DOESN'T DO IT.  YOU HAVE TO

11   ACTUALLY HAVE CONCEIVED OF SOMETHING THAT'S INVENTED.  AND

12   THAT'S CLAIMED IN THE PATENT.  YOU CAN CONCEIVE OF SOMETHING

13   THAT'S INVENTED THAT'S NOT IN THE PATENT, AND THAT'S GREAT, BUT

14   IT DOESN'T MAKE YOU A COINVENTOR OF THAT PARTICULAR PATENT

15   APPLICATION.

16             AND THEN FINALLY, LET ME SHOW YOU ONE OTHER

17   PROVISION, AND THAT HAS TO DO WITH WHAT KIND OF EVIDENCE

18   MR. SHUM HAS TO COME TO THIS COURT WITH IN THIS SPECIALIZED

19   AREA OF PATENT LAW.

20             AND IT STATES IN THE FIRST FULL PARAGRAPH, "THE LAW

21   OF INVENTORSHIP HOLDS THAT THE UNCORROBORATED TESTIMONY OF A

22   PERSON WHO CLAIMS TO BE AN INVENTOR," LIKE MR. SHUM, "IS NOT

23   SUFFICIENT IN AND OF ITSELF TO PROVE THE FACT OF

24   CO-INVENTORSHIP."  IN OTHER WORDS, YOU CAN'T JUST COME TO COURT

25   AND SAY "I'M AN INVENTOR," WITH JUST YOUR OWN TESTIMONY.

1        "IT IS THEREFORE NECESSARY THAT IN ORDER TO USE THE

2   TESTIMONY OF A CLAIMED COINVENTOR TO PROVE THE FACT OF

3   CO-INVENTORSHIP, IT MUST BE CORROBORATED BY INDEPENDENT

4   EVIDENCE."  SO YOU HAVE TO HAVE INDEPENDENT CORROBORATING

5   EVIDENCE BEFORE YOUR TESTIMONY IS EVEN RELEVANT.

6        AND THEN WE GO DOWN TO THE -- THIS INSTRUCTION

7   EXPLAINS WHAT CORROBORATION IS.  "IT MAY BE PROVIDED BY

8   INDEPENDENT EVIDENCE FROM DOCUMENTS OR OTHER CIRCUMSTANCES OR

9   BY THE TESTIMONY OF OTHER PERSONS," AND IT GOES ON TO SAY, "ANY

10  DOCUMENT WHICH IS UNDATED OR NOT WITNESSED BY ANOTHER PERSON IS

11  TO BE GIVEN MINIMAL VALUE IN CORROBORATING CONCEPTION."  WHICH

12  IS SIGNIFICANT WHEN YOUR BURDEN IS THAT YOU HAVE TO, BY A CLEAR

13  AND CONVINCING STANDARD, OVERCOME A PRESUMPTION THAT THE NAMED

14  INVENTOR IS CORRECT.

15        THERE'S ONE OTHER THING I WANT TO MENTION HERE.

16  WE'VE GONE WITH THIS CASE TALKING SO MUCH ABOUT DR. VERDIELL'S

17  PATENTS.  MR. SHUM, AT ANY TIME AFTER THE PLAN OF LIQUIDATION,

18  OR TODAY, AT ANY TIME COULD HAVE FILED A PATENT APPLICATION.

19  THERE'S NOTHING THAT WOULD PREVENT IT.  THE COURT'S

20  INTERPRETATION OF THE PLAN OF LIQUIDATION AND THE PLAN OF

21  LIQUIDATION TERMS ON THEIR OWN CLEARLY SAY THAT YOU CAN FILE A

22  PATENT.

23        SO IF HE BELIEVED HE WAS AN INVENTOR AND WANTED TO

24  PATENT HIS INVENTION, EVEN IF HE BELIEVED HE INVENTED THE SAME

25  THING THAT DR. VERDIELL DID, THEY BOTH COULD HAVE FILED PATENTS

1    AND IT WOULD HAVE BEEN SORTED OUT AT THE PATENT OFFICE IN A

2    SEPARATE PROCEEDING.  THERE'S NOTHING PREVENTING HIM, IF HE

3    THOUGHT HE WAS THE INVENTOR AND IF HE WANTED A PATENT AND HE

4    WANTED THE RIGHTS THAT A PATENT WOULD GIVE HIM, NOTHING THAT

5    PREVENTED HIM FROM FILING A PATENT.

6            SO THAT'S THE BACKGROUND.  THOSE ARE THE SPECIAL

7    RULES, AND YOU'LL SEE THESE IN THE JURY INSTRUCTIONS THAT YOU

8    HAVE TO APPLY WHEN YOU'RE LOOKING AT THE EVIDENCE OF

9    INVENTORSHIP, AND IT GIVES YOU SOME CONTEXT FOR ALL THE STUFF

10   WE'VE TALKED ABOUT, ABOUT CTE CONSTRAINTS AND FLEXURE AND SO ON

11   AND SO FORTH.

12           SO LET'S JUST RUN THROUGH QUICKLY, IF WE COULD, THE

13   DBC INVENTION AND THE EVIDENCE WITH THAT.  AND SPECIFICALLY NOW

14   I'M TALKING ABOUT, WE CALL THEM STEP OR DBC, BUT IT REALLY

15   IS -- AND WE'VE SEEN WHAT'S NEW, AND DR. KOCH CAME IN, AND I

16   THINK IT'S HELPFUL IN TRYING TO IDENTIFY WHAT'S ACTUALLY

17   INVENTED, WHAT'S ACTUALLY NEW IN THE PATENT APPLICATION DBC.

18           AND HE SAID, "WHAT'S NEW IS THAT BOND THAT ALLOWS

19   YOU TO HAVE THE CTE OF THE SUBSTRATE CONSTRAIN THE CTE OF THE

20   METAL LAYER SUCH THAT IT ACTUALLY INHERITS THE CTE, THAT

21   INCREDIBLY STRONG BOND."

22           SO EVERYTHING ELSE IN THAT ENTIRE CLAIM FOR THE

23   DIRECT-BONDED COPPER WAS PRIOR ART.  THE PACKAGES LOOKED LIKE

24   THAT FOR YEARS AND YEARS.  BUT THAT FEATURE WAS DIFFERENT AND

25   UNIQUE.

1        AND DR. VERDIELL'S GIVEN US ALL CLEAR TESTIMONY

2   ABOUT HIS CONCEPTION MOMENT, AND THAT CAME AT THE ECTC

3   CONFERENCE WHEN HE, FIRST TIME, DISCOVERED THAT THERE WAS

4   SOMETHING THAT HAD THAT KIND OF BOND SO THAT THE COPPER

5   WOULDN'T MOVE IF IT GOT REALLY HOT.

6        SO WE CAN LOOK AGAIN JUST QUICKLY AT THESE

7   CONTEMPORANEOUS HANDWRITTEN NOTES, BUT WITH A VIEW TOWARDS

8   THIS.  DR. VERDIELL DOESN'T HAVE TO PROVE HE'S AN INVENTOR,

9   MR. SHUM DOES.  BUT DR. VERDIELL HAPPENS TO HAVE HANDWRITTEN

10  NOTES THAT ARE CONTEMPORANEOUSLY MADE IN HIS OWN HANDWRITING.

11  AND IF YOU REMEMBER MR. SHUM'S EXPERT, PROFESSOR KNOX, THAT'S

12  WHAT HE SAID WAS IMPORTANT, NOTES THAT ARE MADE THAT

13  DEMONSTRATE CONCEPTION AT THE TIME IN YOUR OWN HANDWRITING AND

14  THAT SHOW WHAT THIS INVENTION IS.  AND WE HAVE -- NOT ONLY DO

15  WE HAVE THE NOTES, BUT WE ALSO HAVE THE DRAWING.

16        IF WE COULD SEE IT, JEFF.

17            (EXHIBIT PUBLISHED TO JURY.)

18        **MR. TAYLOR:**  AND DR. VERDIELL ON THE PLANE ON THE

19  WAY BACK ACTUALLY DREW A PACKAGE, A NEW PACKAGE THAT WOULD HAVE

20  HIS -- HIS CONCEPT AND HIS INVENTION OF THIS DIRECT-BONDED

21  COPPER KIND OF MATERIAL IN A PACKAGE, AND THERE WE SEE IT.

22            (EXHIBIT PUBLISHED TO JURY.)

23        **MR. TAYLOR:**  SO THOSE ARE DR. VERDIELL'S ABSOLUTELY

24  CONTEMPORANEOUS EUREKA MOMENT KIND OF NOTES.

25        NOW, MR. SHUM'S TESTIMONY IS THAT THE ONLY ELEMENT

 1   IN THE STEP OR DBC PATENTS THAT WAS NEW TO HIM IS THE VERY ONE

 2   WE IDENTIFIED, THE VERY SAME ONE, BECAUSE HE'D SEEN EVERYTHING

 3   ELSE BEFORE, AND SO PROFESSOR KNOX SAID THE SAME THING.  SO

 4   WE'RE DOWN TO THAT ONE ITEM.

 5            AND THEN WE HAVE THE QUESTION OF, OKAY, WHAT IS

 6   CONCEPTION EVIDENCE, AND CAN A PROPOSAL -- THAT'S WHAT

 7   DR. KNOX -- CAN A PROPOSAL OR LATER PATENT APPLICATION BE

 8   CONCEPTION EVIDENCE, AND IS IT IN THIS CASE.

 9            AND, LADIES AND GENTLEMEN, I WOULD SUBMIT THAT

10   BECAUSE THESE TWO MEN WERE CONCERNED ABOUT SDL, WHAT WE SEE IS

11   A SITUATION WHERE DR. VERDIELL COMES BACK FROM ECTC EXCITED, HE

12   HAS HIS INVENTION AND HIS IDEA, AND IT ENDS UP IN PROPOSAL AND

13   IT ENDS UP IN AN ARMY PROPOSAL THAT WE'VE SEEN, AND THEN IT

14   BECOMES A PATENT.

15            BUT THE QUESTION IS WHOSE IDEA WAS IT AND HOW DID IT

16   GET IN THERE?  AND THAT'S BEST ANSWERED BY, FIRST OF ALL,

17   LOOKING AT A TIME LINE, IF WE COULD, BECAUSE WHAT WE KNOW FROM

18   THE EVIDENCE IS THAT THE ACADIAN PREPROPOSAL CONTAINED NOTHING

19   OF THIS DIRECT-BONDED COPPER OR SPECIAL SUBSTRATE BONDING.

20            IN FACT, WHAT IT CONTAINED WAS DR. VERDIELL'S --

21   THIS IS ACTUALLY DR. VERDIELL'S IDEAS FROM WHEN -- PRIOR TO

22   ACADIAN COMBINED WITH -- AND THIS IS IMPORTANT -- COMBINED WITH

23   MR. SHUM'S LENSING IDEA.  THE LENS WITH THE LIP WAS PART OF

24   THIS, WAS PART OF THE ACADIAN PROPOSAL.  SO --

25            DO WE HAVE BOROSILICATE THERE, JEFF, OR SILICON

1    SILICATE?

2              IT HAD TWO OF MR. -- DR. VERDIELL'S IDEAS, THIS

3    INCREDIBLY SMALL PACKAGE THAT WE -- I PASSED AROUND THAT'S

4    ACTUALLY SILICA ON SILICON THAT DR. VERDIELL CREATED WHEN HE

5    WAS AT SDL.  THAT WAS IN THE ACADIAN PROPOSAL --

6              AND THEN THE BOROSILICATE.

7              (EXHIBIT PUBLISHED TO JURY.)

8         **MR. TAYLOR:**  AND SO WAS THE BOROSILICATE AS PART OF

9    THE -- THE ACADIAN PROPOSAL.  IN ADDITION TO THIS, MR. SHUM'S

10   LENS WAS.

11             SO FIRST OF ALL, WHEN MR. SHUM SAYS THAT RADIANCE

12   WAS HIS IDEA AND HIS PROPOSAL, ACTUALLY IT WAS MOSTLY

13   DR. VERDIELL'S IDEAS COMING FROM WHAT HE DID AT SDL WITH

14   MR. SHUM'S LENS.  AND MR. SHUM HAS TESTIFIED THAT HIS LENS

15   BECAME COMMERCIALLY AVAILABLE FAIRLY SOON AFTER THIS TIME

16   PERIOD.

17             SO THE QUESTION BEFORE US IS, IS THIS EVIDENCE OF

18   THE -- YOU KNOW, THE PROPOSAL IS EVIDENCE OF MR. SHUM'S

19   INVENTION OR NOT.  AND WE SEE HOW THE EVIDENCE GETS -- OR HOW

20   THIS CONCEPTION GETS IN THE PROPOSALS WHEN WE LOOK AT THE DRAFT

21   THAT HAS MR. SHUM'S QUESTION TO DR. VERDIELL.

22             AND HE SAYS IN THIS DRAFT -- AND BY THE WAY, YOU CAN

23   SEE THAT THIS IS NOW SET UP TO BE A SILICA ON SILICON PACKAGE.

24   BUT IN THIS WE SEE MR. SHUM SAYING, "CAN YOU ELABORATE HERE

25   PERHAPS ON YOUR COPPER ON BEO SUBSTRATE?"

1          CAN WE GO BACK TO ECTC NOTES, JEFF.

2              (EXHIBIT PUBLISHED TO JURY.)

3          **MR. TAYLOR:**  AND WHAT WE SEE, IF WE LOOK CAREFULLY

4     AT THE ECTC NOTES, IS WE SEE THE REFERENCE TO BEO WHICH IS THE

5     PARTICULAR MATERIAL THAT YOU CAN MAKE A SUBSTRATE OUT OF, AND

6     WE SEE MULTIPLE REFERENCES TO COPPER.

7              SO THIS IS THE COPPER ON BEO SUBSTRATE THAT MR. SHUM

8     IS DESCRIBING AS "YOUR," AS DR. VERDIELL'S.  AND IT DOES GET

9     INCORPORATED.  IN RESPONSE TO THAT QUESTION, IT GETS

10    INCORPORATED INTO AN ARMY PROPOSAL.

11             CAN WE SEE THAT, JEFF.

12             (EXHIBIT PUBLISHED TO JURY.)

13         **MR. TANGRI:**  AND THERE YOU SEE IT.  AND IT GETS

14    DUMPED.  AND IT'S A HUGE IMPACT ON THE BUSINESS BECAUSE FROM

15    THIS POINT FORWARD, THEY ACTUALLY -- DR. VERDIELL DECIDES NOT

16    TO PURSUE SILICA ON SILICATE AND NOT TO PURSUE THE BOROSILICATE

17    PIVOT THAT HE WAS WORKING ON, BUT TO PURSUE THE DBC BUT THE DBC

18    WITH MR. SHUM'S LENS STILL.  SO THESE PROPOSALS, AS THEY MARCH

19    FORWARD, INCLUDE MR. SHUM'S LENS AND THIS INVENTION FROM ECTC.

20             AND ONE OF THE THINGS THAT'S IMPORTANT TO UNDERSTAND

21    IS WHEN DR. VERDIELL GOT TO THE CORNER WHERE HE AND MR. SHUM

22    WERE NOT GETTING ALONG AND THEY WERE SPLITTING, IT CAME TIME IN

23    THE RADIANCE PATENT APPLICATION, ONCE IT WAS WITHDRAWN, TO

24    BREAK IT APART.  SO JUST TO SHOW YOU FROM THAT REDLINE

25    APPLICATION, AND PLEASE LOOK AT THIS.

1          COULD WE HAVE A COUPLE OF THE FIGURES.

2               (EXHIBIT PUBLISHED TO JURY.)

3          **MR. TAYLOR:**  THIS IS WHAT DR. VERDIELL DID.  HE TOOK

4     MR. SHUM'S LENS THAT HAS THE RED "X" THROUGH IT AND REMOVED IT

5     BECAUSE THAT WAS HIS INVENTION.  WE'VE SEEN THAT IN THE RECORDS

6     OF INVENTION THAT MR. SHUM DID AT SDL.  AND HE REMOVED IT AND

7     HE REPLACED IT WITH STANDARD FLAT-BOTTOM LENS.  SO THAT THE

8     PATENT THAT'S BEFORE YOU, THE PATENT THAT WE LOOK AT AND CALL

9     THE STEP PATENT, THE DBC PATENT IS THAT REDLINE -- IS THE

10    RESULT OF THE REDLINE PROCESS AND HAS NO LENS IN IT WHATSOEVER.

11         AND IT WAS INTENDED BY DR. VERDIELL JUST TO BE

12    LIMITED TO WHAT HE INVENTED AND REMOVE EVERYTHING FROM

13    MR. SHUM.  AND THAT'S WHY YOU SEE ON EXHIBIT 254, YOU'LL SEE

14    THOSE NOTES, "FRANK'S CONTRIBUTION, TAKE OUT."  "FRANK'S

15    CONTRIBUTION, TAKE OUT."

16         IT'S ALSO INTERESTING ON THESE CONCEPTION ISSUES

17    WHERE THE BURDEN OF PROOF IS ON MR. SHUM THAT HE DOESN'T --

18    WHEN HE TESTIFIED, HE DOESN'T HAVE A MOMENT WHERE HE CONCEIVED

19    OF IT, CAN'T REALLY EXPLAIN WHERE HE WAS OR HOW IT HAPPENED OR

20    WHAT HAPPENED.  AND I'M SURE THAT DOESN'T HAPPEN EVERY TIME YOU

21    HAVE AN INVENTION, BUT IT MUST HAPPEN SOMETIMES, AND IN THIS

22    PARTICULAR SITUATION, DR. VERDIELL DOES HAVE IT.

23         SO IN TERMS OF DETERMINING WHO CAME UP WITH THIS

24    IDEA AND WHO INVENTED IT, GIVEN THE BURDEN, GIVEN THE

25    REQUIREMENTS OF THE SPECIAL RULES OF PATENT LAW AS IN THESE

1    INSTRUCTIONS, WE WOULD SUBMIT THAT -- THAT -- THAT -- THAT --

2    THAT MR. SHUM HAS NOT MET HIS BURDEN.

3         NOW, PROFESSOR KNOX CAME TO COURT, AND WHAT

4    PROFESSOR KNOX DID WAS INTERESTING, BUT I WOULD SUBMIT TO YOU

5    NOT PARTICULARLY HELPFUL.  IN FACT, A LITTLE BIT MISLEADING.

6         CAN WE HAVE --

7         (EXHIBIT PUBLISHED TO JURY.)

8         **MR. TAYLOR:**  WHAT PROFESSOR KNOX DID -- AND I'M

9    TAKING THIS CLAIM 1 OF THIS DBC OR STEP PATENT, AND HE SAID HE

10   HAD 6,000 PAGES OF DOCUMENTS IN A BIG PILE AND HE WAS GOING

11   THROUGH THE DOCUMENTS AND HE WAS TAKING ELEMENTS.  SO HE TOOK

12   THE FIRST ELEMENT OF CLAIM 1, WHICH IS A LITTLE HARD TO READ,

13   BUT IT SAYS, "AN OPTOELECTRONIC ASSEMBLY COMPRISING," SO

14   THAT'S -- AND THEN HE GOES AND LOOKS FOR EVIDENCE FROM FRANK

15   SHUM.

16        AND HE FINDS AN SBR (SIC) PROPOSAL AND HE FINDS A

17   SHUM APPLICATION, PATENT APPLICATION.  AND HE DOES IT AGAIN, HE

18   GOES ALL THE WAY DOWN AND HE DOES IT AGAIN.

19        THERE'S EVIDENCE IN THE CASE FROM MR. SHUM,

20   DR. KNOX, DR. KOCH, DR. VERDIELL THAT THOSE TWO THINGS ARE NOT

21   INVENTIVE AT ALL.  SO THERE'S NO REASON TO BE LOOKING FOR

22   EVIDENCE FROM MR. SHUM TO TRY TO DEMONSTRATE CONCEPTION UNLESS

23   YOU'RE JUST TRYING TO MAKE A BIGGER PILE OF DOCUMENTS.

24        AND THE KEY THING WAS WHEN YOU'RE LOOKING FOR

25   CONCEPTION, SO BOTH SIDES ARE LOOKING AT DATES.  BECAUSE IT'S

1  TRUE THAT MR. SHUM HAD TO REFER TO PROPOSALS THAT HE WAS

2  INVOLVED IN AFTER ECTC, BUT YOU'VE GOT TO LOOK AT WHAT -- WHEN

3  THESE IDEAS COME UP TO SEE ACTUALLY WHO CONCEIVED THEM.

4         THE OTHER THING I WOULD MENTION IS THAT FAR FROM

5  HAVING AN INDEPENDENT WITNESS TO CORROBORATE MR. SHUM'S CLAIM

6  THAT HE INVENTED THIS PARTICULAR INVENTION IN THIS PATENT, AND

7  WE HAD TWO WITNESSES SAY TO THE CONTRARY.

8         JENKIN RICHARD CAME IN AND TESTIFIED ABOUT THE

9  CONCERN THAT HE HEARD THE TWO GENTLEMEN EXPRESSING ABOUT SDL

10  AND THAT HE UNDERSTOOD THAT THE PATENT HAD BEEN FILED ONLY IN

11  SHUM'S NAME BECAUSE OF SDL AND THAT WAS THE PROBLEM.

12         AND THEN WE HAD JOHN GORMAN COME AND SAY HE WAS

13  SITTING IN MEETINGS WITH MR. SHUM AND HIS LAWYERS AND THEY WERE

14  TALKING SPECIFICALLY ABOUT THE FACT THAT THE APPLICATION HAD

15  MR. VERDIELL'S DBC IDEA AND SOME LENSING IDEA IN IT FROM

16  MR. SHUM.  AND AGAIN, THERE ARE OTHER LAWYERS REPRESENTING

17  MR. SHUM WHO EASILY COULD HAVE COME TO TESTIFY, BUT THAT WASN'T

18  THE CASE.

19         SO WE DON'T THINK MR. SHUM HAS MET HIS BURDEN IN

20  DEMONSTRATING IN ANY WAY THAT HE CONTRIBUTED ANYTHING TO THE

21  INVENTION OF THE DBC PATENT.  AND, IN EFFECT, HE HAS TRIED TO

22  TAKE ADVANTAGE OF THE FACT THAT THERE WAS AN SDL PROBLEM AND

23  THAT HIS NAME ALONE APPEARED ON SOME DOCUMENTS AND EVEN THE

24  PATENT APPLICATION.  THEY FIXED THAT.  DR. VERDIELL WENT BACK

25  TO SDL AND TALKED TO THEM ABOUT IT.

 1          BUT IT IS A SITUATION WHERE MR. SHUM, IN OUR VIEW,

 2   IS TRYING TO SIMPLY TAKE ADVANTAGE OF THE FACT THAT THOSE

 3   DOCUMENTS IN HIS NAME ONLY TO AVOID SDL SCRUTINY AND

 4   DR. VERDIELL'S IDEAS.  DR. VERDIELL TRIED TO SEPARATE THEM,

 5   MR. SHUM HAS NOT.

 6          TALK ABOUT THE FLEXURE JUST BRIEFLY.  WE HAVE TO GO

 7   THROUGH THE SAME PROCESS WITH THE FLEXURE AND FIGURE OUT WHAT'S

 8   NEW ABOUT THE FLEXURE, AND WE KNOW THAT THE FLEXURE --

 9          IF WE COULD LOOK AT CLAIM 1 OF THE '950.

10          (EXHIBIT PUBLISHED TO JURY.)

11      **MR. TAYLOR:**  THE FLEXURE HAS AT THE VERY BOTTOM AT

12   LEAST TWO LEGS, A BRIDGE, AND A PAIR OF SPRING REGIONS.  AND

13   HERE AGAIN, WE HAVE DR. VERDIELL WITH PRETTY SPECIFIC EUREKA

14   MOMENTS OF CONCEPTION.  THE BIG ONE IS WITH THE SPIDER WHICH IS

15   HERE (INDICATING), WITH LES DUMAN, AND THAT WAS THE BIG MOMENT.

16   AND LES DUMAN CAME HERE AND TESTIFIED ABOUT THE MOMENT, AND

17   TESTIFIED ABOUT -- I THINK WE HAVE SOME SLIDES OF JUST TWO

18   QUICK SLIPS OF HIS TESTIMONY.

19          (EXHIBIT PUBLISHED TO JURY.)

20      **MR. TAYLOR:**  AND HE'S TALKING ABOUT CONCEPTION.  AND

21   HE SAYS, "MY PERCEPTION OF HOW THE LEGS ON THE SPIDER FIRST

22   BECAME INCORPORATED INTO THE PRODUCT THAT THEY WERE PURSUING

23   WAS WHEN MARC VERDIELL BEGAN PLAYING THIS PART," AND HE'S

24   TALKING ABOUT THAT ONE, WHICH HAS LEGS.

25          PRIOR TO THIS TIME, MR. SHUM HAD CREATED SOME CAD

1    DRAWINGS, FLAT, PLANAR.  THE FIRST THING WE SEE WITH ANY KIND

2    OF VERTICALITY THAT PUSHES UP AND DOWN HAPPENS AFTER THIS

3    MEETING WITH LES DUMAN.

4            AND WHEN COUNSEL PUTS SOME SLIDES UP THAT TALK ABOUT

5    MR. SHUM'S CAD DRAWINGS AND IT SAYS MAY 12TH TO SEPTEMBER, SOME

6    OTHER DATE, "THIS ARE MR. SHUM'S CAD DRAWING," IT'S NOT

7    PARTICULARLY HELPFUL, BECAUSE COUNSEL KNOWS AND WE KNOW THAT

8    THE LES DUMAN MEETING HAPPENED SOMETIME DURING THE WEEK OF

9    MAY 18TH, AND THAT THE FIRST CAD DRAWINGS APPEAR AFTER THAT

10   WEEK.  AND IT'S PRETTY CLEAR THAT THE CAD DRAWINGS WHICH ARE

11   PREPARED IN ORDER TO ORDER PARTS, BECAUSE WE SEE THOSE CAD

12   DRAWINGS GOING TO MR. DUMAN SO HE CAN MAKE PARTS, THOSE CAD

13   DRAWINGS WERE MADE AFTER THE INVENTION WAS CONCEIVED.

14           WHEN WE LOOK AT THE EVIDENCE THAT MR. SHUM TENDERS,

15   HE BRINGS, OF COURSE, HIS RECORD OF INVENTION OF MARCH 17 OF

16   1997, WHICH WE THINK IS --

17           IF WE COULD HAVE THAT UP, JEFF.

18           ACTUALLY LET ME GO BACK AND LET'S -- I FORGOT ONE

19   PIECE.  WE ALSO HAVE MR. VERDIELL'S DRAWING OF APRIL 17 WHICH

20   PRECEDES THE DUMAN MEETING.

21           COULD WE JUST DO THE SIDE-BY-SIDE THAT SHOWS THIS

22   DRAWING.

23           WHICH IS, BY THE WAY, EVERYONE WOULD AGREE ON THE

24   DRAWING ON THE LEFT BECAUSE IT'S SIGNED ON BOTH SIDES AND IT'S

25   SIGNED BY DR. VERDIELL AND WITNESSED AND UNDERSTOOD BY

1    MR. SHUM, IS ABSOLUTELY UNEQUIVOCALLY A RECORD OF INVENTION.

2            AND LOOK HOW SIMILAR THESE ARE.  A RECORD OF

3    INVENTION TO WHAT THE FIGURE IN THE PATENT ITSELF IS COMBINED

4    WITH THE SPIDER, IT'S PRETTY CLEAR IF THAT'S MR. VERDIELL --

5    EXCUSE ME -- DR. VERDIELL'S INVENTION ON THE LEFT, THAT IT'S

6    ALSO HIS INVENTION ON THE RIGHT.

7            AND IF WE CAN LOOK AT MR. SHUM'S RECORD OF

8    INVENTION, HIS DEVICE IS QUITE DIFFERENT.  IT'S NOT LIKE THE

9    SPIDER.  IT'S A PIVOT, IT'S FLAT.  AND WE HAD DR. LEE COME IN

10   HERE TO ACTUALLY COMPARE THIS FLEXURE TO THE FLEXURES THAT HAVE

11   LEGS ON IT.

12           CAN WE HAVE A QUICK ANIMATION.

13                (EXHIBIT PUBLISHED TO JURY.)

14           **MR. TAYLOR:**  AND HERE YOU SEE IT.  AND YOU DON'T

15   HAVE TO BE AN ENGINEER TO SEE THAT THESE THINGS LOOK DIFFERENT,

16   ACT DIFFERENTLY, BEHAVE DIFFERENTLY, AND THE INVENTION ON THE

17   RIGHT, MR. SHUM'S INVENTION, IT'S JUST A DIFFERENT INVENTION.

18   IT'S NOT THE SAME INVENTION AS THE ONE -- IT DOES NOT HAVE

19   LEGS.  IT DOES NOT FUNCTION THE SAME WAY.  AND THE ONE -- THE

20   FLEXURE ON THE LEFT WITH THE LEGS DOES NOT HAVE A PIVOT POINT.

21           SO THE OTHER EVIDENCE MR. SHUM SUBMITS TO SAY HE'S

22   AN INVENTOR OF WHAT WE SEE ON THE LEFT ARE THOSE

23   CALCULATIONS --

24           COULD WE HAVE THE CALCULATIONS UP FOR A MOMENT.

25                (EXHIBIT PUBLISHED TO JURY.)

1        **MR. TAYLOR:**  THE CALCULATIONS THAT MR. -- EXCUSE ME,

2    DR. KOCH AND DR. LEE EXPLAINED TO US ARE PIVOT CALCULATIONS.

3    THEY COULDN'T BE CLEARER THAT THAT'S WHAT THEY ARE.  AND

4    DR. LEE'S TESTIMONY WAS CLEAR I THINK ALSO THAT THERE'S JUST

5    NOT -- IN MR. SHUM'S INVENTION, THERE'S -- THERE'S NOT THE SAME

6    KIND OF MOVEMENT THAT THERE IS IN THE VERDIELL, AND THAT

7    MR. SHUM'S IS A PIVOT, AND THAT HE CANNOT FIND A PIVOT IN THE

8    FOUR-LEGGED FLEXURE THAT DR. VERDIELL INVENTED UNDER HIS OWN

9    PATENTS.

10            I WANT TO TALK ABOUT ONE DOCUMENT IF I CAN FIND IT.

11            THERE'S ONE PIECE OF EVIDENCE THAT MR. SHUM SUBMITS,

12    IT'S EXHIBIT TX1408IT'S A DRAWING THAT'S WRITTEN -- AND ALMOST

13    ON THE LAST PAGE OF "PRECISION METALS JOINING SEMINAR."  AND

14    IT'S DRAWN LIKE THIS (INDICATING), AND YOU'VE SEEN IT UP ON THE

15    SCREEN AND YOU CAN LOOK AT IT IN THE JURY ROOM.

16            I SHOW YOU IT THIS WAY TO SHOW YOU, FIRST OF ALL,

17    IT'S IN THE MANUAL, IT'S IN THE BACK OF MANUAL, BUT MOST

18    IMPORTANTLY, THIS IS A DOCUMENT THAT IS UNSIGNED, UNDATED.

19    IT'S EXACTLY WHAT THE JURY INSTRUCTIONS SAY IS ENTITLED TO

20    MINIMAL CONSIDERATION AS CORROBORATING EVIDENCE.  EXACTLY WHAT

21    THE JURY INSTRUCTIONS DESCRIBE, AS OPPOSED TO DR. VERDIELL'S

22    SIGNED RECORD OF INVENTION --

23            (EXHIBIT PUBLISHED TO JURY.)

24        **MR. TAYLOR:**  -- OF APRIL 17, 1997.

25            OKAY.  LET ME TALK WITH YOU BRIEFLY ABOUT DAMAGES,

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    IF I CAN.

2            WE BELIEVE, YOU KNOW, STRONGLY, VERY STRONGLY THAT

3    NONE OF THE DEFENDANTS HAVE DONE ANYTHING WHATSOEVER WRONG AND

4    MR. SHUM'S NOT ENTITLED TO GET ANY MONEY.

5            IN FACT, EVERYTHING, AS I SAID AT THE OUTSET, THAT

6    DR. VERDIELL DID WAS GOVERNED BY THE PLAN OF LIQUIDATION,

7    THAT -- THE AGREEMENT THAT THESE TWO GENTLEMEN ENTERED INTO AND

8    AGREED TO, AND THAT MR. SHUM HAS NOT SUFFERED ANY DAMAGE OR ANY

9    HARM AS A RESULT OF WHAT DR. VERDIELL DID.

10            AND THAT DR. VERDIELL HAD THE ABSOLUTE RIGHTS TO DO

11    EVERYTHING HE DID, START A BUSINESS, HIRE PEOPLE, BRAG ABOUT

12    THE FLEXURE, PUT IT IN HIS BUSINESS PLAN.  THAT'S EXACTLY WHAT

13    THE PLAN OF LIQUIDATION ALLOWED HIM TO DO.  AND THAT THE ONLY

14    WAY MR. SHUM COULD POSSIBLY RECOVER ANY MONEY HERE WOULD BE IF

15    HE COULD SHOW THAT DR. VERDIELL WOULD NOT HAVE ATTRACTED ANY

16    INVESTORS UNLESS HE HAD CLAIMED SOME SORT OF EXCLUSIVITY.

17            AND THE ONLY EVIDENCE WE HAVE HERE OF THAT -- EXCUSE

18    ME -- THERE'S NO EVIDENCE OF THAT.  THE ONLY TESTIMONY WE HAVE

19    IS OF EXPERTS WHO MAKE ASSUMPTIONS, ASSUMPTIONS THAT NO ONE

20    WOULD HAVE INVESTED A NICKEL IN LIGHTLOGIC WITH NO FACTS TO

21    SUPPORT IT, BECAUSE PEOPLE DID INVEST NICKELS, AND LOTS OF

22    NICKELS, AND THEY KNEW NOTHING ABOUT EXCLUSIVITY.

23            THE SECOND ASSUMPTION, THOUGH, I WANT TO ADDRESS IS

24    WHEN THEY TALK ABOUT SOMEHOW MR. SHUM AND DR. VERDIELL WERE

25    50/50 OWNERS, THAT SOMETHING ABOUT THE PLAN OF LIQUIDATION OR

1    SOMETHING ABOUT THEIR DEALINGS MADE THEM 50/50 OWNERS SO THINGS

2    SHOULD BE SPLIT 50/50.

3            AND I'D LIKE TO LOOK AGAIN AT THE JURY INSTRUCTIONS,

4    PAGE 17, JEFF.

5            (EXHIBIT PUBLISHED TO JURY.)

6        **MR. TAYLOR:**  PAGE 17, WHICH WE'VE LOOKED AT BEFORE,

7    SAYS THAT EITHER DR. VERDIELL --

8            RIGHT, RIGHT WHERE YOU WERE, JEFF, AT THE BOTTOM.

9            (EXHIBIT PUBLISHED TO JURY.)

10       **MR. TAYLOR:**  BOTH DR. VERDIELL AND MR. SHUM CAN

11   BECOME THE OWNER OF A LEGAL PATENT.  IT DOESN'T SAY ANYTHING

12   ABOUT THEIR SHARING.  AND WE'VE SEEN THE PATENT LAW THAT SAYS

13   THAT THEY HAVE NO DUTY TO ACCOUNT TO EACH OTHER OR SHARE IN

14   PROFITS.

15           SO THERE'S NO BASIS -- IF THERE'S NO DUTY TO

16   ACCOUNT, IF THERE'S NO SHARING, IF THERE'S NO SHARING UNDER THE

17   PLAN OF LIQUIDATION, THERE'S NO BASIS FOR 50/50.  AND YOU'LL

18   READ THE COURT'S INSTRUCTIONS TO SAY WHAT THE PLAN OF

19   LIQUIDATION DOES, IT DOESN'T TALK ABOUT OWNERSHIP.  THE PLAN OF

20   LIQUIDATION TALKS ABOUT INDEPENDENT AND EQUAL RIGHTS TO

21   EXPLOIT.

22           LET'S TALK FOR A MOMENT ABOUT BREACH OF CONTRACT

23   DAMAGES.  THE JURY INSTRUCTIONS SAY AT PAGE 17 AND 18 THAT

24   MR. SHUM MUST BE COMPENSATED IF YOU WERE TO FIND A BREACH OF

25   THE PLAN OF LIQUIDATION, WHICH WE BELIEVE YOU SHOULD NOT.  HE

```
1    WOULD BE -- HAVE TO BE COMPENSATED BY BEING PUT IN AS GOOD A

2    POSITION AS HE WOULD HAVE BEEN IF VERDIELL HAD PERFORMED, AND

3    THAT'S ON PAGES 17 AND 18 OF THE JURY INSTRUCTIONS.

4              (EXHIBIT PUBLISHED TO JURY.)

5         MR. TAYLOR:  "IF YOU DECIDE" -- THIS IS THE

6    MIDDLE -- "IF YOU DECIDE THAT SHUM HAS PROVED HIS CLAIM AGAINST

7    VERDIELL FOR BREACH OF CONTRACT, YOU ALSO MUST DECIDE HOW MUCH

8    MONEY WILL REASONABLY COMPENSATE SHUM FOR THE HARM OF THE

9    BREACH.  THIS COMPENSATION IS CALLED DAMAGES.  THE PURPOSE OF

10   SUCH DAMAGES IS TO PUT SHUM IN AS GOOD A POSITION AS HE WOULD

11   HAVE BEEN IF VERDIELL HAD PERFORMED HIS PROMISES."

12             HERE'S THE KEY TO THIS.  WHAT ARE THE FACTS ABOUT

13   WHAT MR. SHUM'S SITUATION WOULD HAVE BEEN.  THE FACTS ARE IT

14   HAD ABSOLUTELY NOTHING -- NOTHING VERDIELL DID HAD ANYTHING TO

15   DO WITH MR. SHUM'S INABILITY TO GET HIS BUSINESS STARTED.

16   NOTHING ABOUT THE ASSIGNMENTS DID.  NOTHING AT ALL DID.  AND

17   THAT MR. SHUM WOULD BE IN EXACTLY THE SAME POSITION THAT HE IS

18   NOW WHETHER OR NOT MR. VERDIELL HAD DONE ANYTHING.

19             MR. VERDIELL'S ACTIONS SIMPLY DID NOT HARM MR. SHUM,

20   AND IF MR. VERDIELL HAD INCLUDED MR. SHUM ON THE PATENTS OR

21   DONE ANYTHING DIFFERENT, THERE'S NO EVIDENCE IN THIS CASE TO

22   SUGGEST THAT MR. SHUM WOULD BE IN A DIFFERENT POSITION.

23             AND THE ONLY WAY MR. SHUM HAS BEEN ABLE TO COME UP

24   WITH A DAMAGE CLAIM ON THIS -- A DAMAGE CASE ON THIS CLAIM OR

25   ANY TESTIMONY IS, AGAIN, BY HIS EXPERTS WHO'VE MADE ASSUMPTIONS
```

 1   ABOUT EXCLUSIVE RIGHTS.

 2            LET ME TALK AGAIN FOR JUST A MINUTE OR TWO ABOUT

 3   UNJUST ENRICHMENT, IF I CAN, AND THIS IS ON PAGE 20, AND

 4   THERE'S A VERY IMPORTANT -- OF THE JURY INSTRUCTIONS.  THERE'S

 5   A VERY, VERY IMPORTANT PIECE OF THE JURY INSTRUCTIONS ON UNJUST

 6   ENRICHMENT.

 7            "IF YOU SHOULD FIND," AND WE DON'T THINK YOU SHOULD,

 8   "IF YOU SHOULD FIND THAT THERE'S ANY BASIS FOR UNJUST

 9   ENRICHMENT" -- AND REMEMBER, IF THE PLAN OF LIQUIDATION

10   CONTROLS THE RIGHTS OF THESE GENTLEMEN, THERE'S NO UNJUST

11   ENRICHMENT.  IF MR. VERDIELL DIDN'T ACT WRONGFULLY, NO UNJUST

12   ENRICHMENT.  IF MR. VERDIELL -- IF THE BENEFIT WAS NOT AT THE

13   EXPENSE OF MR. SHUM, NO UNJUST ENRICHMENT.

14            SO THERE -- BUT IF -- JUST SO YOU UNDERSTAND WHAT

15   THE DAMAGES PROVISION IS, AND YOU UNDERSTAND WHAT KIND OF

16   HONESTLY MISLEADING TESTIMONY YOU HEARD FROM MR. SHUM'S

17   EXPERTS, LET'S LOOK AT -- LET'S LOOK AT THIS INSTRUCTION.

18            "IF YOU FIND THAT SHUM HAS PROVEN HIS UNJUST

19   ENRICHMENT CLAIM AGAINST VERDIELL, YOU MUST DETERMINE THE

20   AMOUNT OF ANY BENEFIT THAT VERDIELL RECEIVED THAT IS PROPERLY

21   ATTRIBUTABLE TO HIS WRONGFUL CONDUCT."

22            SO WE KNOW FROM THE PLAN OF LIQUIDATION THAT

23   DR. VERDIELL HAS THE RIGHT TO USE ALL OF THE INTELLECTUAL

24   PROPERTY OF RADIANCE.  HE HAS A RIGHT TO START A BUSINESS.  HE

25   HAS A RIGHT TO DO EVERYTHING HE DID AT LIGHTLOGIC.  HE HAS A

 1  RIGHT TO PATENT.

 2          SO WHAT IS PROPERLY ATTRIBUTABLE TO THE WRONGFUL

 3  CONDUCT?  THE ALLEGED WRONGFUL CONDUCT IS CLAIMING FALSE

 4  EXCLUSIVITY, IS DOING EVERYTHING HE DID BUT IN SOME MANNER

 5  TELLING INVESTORS, WHICH DIDN'T HAPPEN, OR TELLING INTEL WHICH

 6  DIDN'T HAPPEN, BUT ASSUME IT DID, TELLING THEM THAT THERE'S

 7  SOME ADDITIONAL LEVEL OF VALUE, SOME INCREMENTAL VALUE, BECAUSE

 8  INSTEAD OF BEING ONE OF TWO PEOPLE WHO CAN DO THIS, NOW YOU'RE

 9  ONE OF ONE.

10          AND WHAT MR. SHUM'S EXPERTS CAME IN AND DID WAS NOT

11  MEASURE THAT.  THAT'S EXCLUSIVITY.  AND THEY BOTH TESTIFIED --

12  AND WE'LL TAKE -- I GUESS LET'S JUST LOOK AT MR. REGAN'S

13  TESTIMONY THAT HE DID NOT MEASURE THAT ONE THING THAT YOU COULD

14  RECOVER UNDER UNJUST ENRICHMENT.

15          (EXHIBIT PUBLISHED TO JURY.)

16          **MR. TAYLOR:**  HE TOOK EVERYTHING, THE WHOLE

17  ENCHILADA, ALL THE LIGHTLOGIC IP, ALL THE LIGHTLOGIC VALUE, ALL

18  THE RIGHT TO USE, THE ENTIRE VALUE OF THE PLAN OF LIQUIDATION

19  IS INCORPORATED IN WHAT HE DID.

20          SO HE SAYS -- AND THE QUESTION WAS, "AND CAN YOU

21  TELL THE JURY WHAT YOU'VE DONE TO CALCULATE THE VALUE OF HAVING

22  THE EXCLUSIVE RIGHTS TO THE DBC IDEA FROM RADIANCE?

23          "I HAVEN'T.  WHAT I'VE DONE IS VALUED THE PATENTED

24  TECHNOLOGY THAT WAS WITHIN THE RADIANCE PORTFOLIO.

25          "SO YOU DON'T HAVE A SPECIFIC NUMBER?

```
 1              "NO.

 2              "CAN YOU GIVE THE JURY A NUMBER?  HAVE YOU DONE A

 3    CALCULATION OF WHAT VALUE WOULD BE FOR DR. VERDIELL TO BE ABLE

 4    TO PREVENT SOMEBODY FROM USING THE FLEXURE IN 1997?"

 5              THAT'S THE ISSUE.  THAT'S THE ONLY ISSUE ON UNJUST

 6    ENRICHMENT.  PROPERLY ATTRIBUTABLE.

 7              HIS ANSWER, HE TESTIFIED HERE, "THAT'S NOT BEEN PART

 8    OF MY ASSIGNMENT."

 9              SO NOTHING THAT HE DID WOULD BE RELEVANT TO UNJUST

10    ENRICHMENT BECAUSE HE HAS TO DO JUST THIS, JUST WHAT HE SAID

11    THAT HE DID NOT DO, AND IT WAS NOT PART OF HIS ASSIGNMENT.

12              I WANTED TO MENTION JUST ONE THING BECAUSE IT KEEPS

13    COMING UP, AND I THINK IT WOULD BE USEFUL THAT THIS DELOITTE

14    REPORT, WHICH IS TRIAL EXHIBIT 834, MR. NAPPER TESTIFIED THAT

15    THIS IS ABSOLUTELY -- THIS IS FOR OTHER PURPOSES, ABSOLUTELY

16    IRRELEVANT TO THE PURPOSE OF TRYING TO VALUE EXCLUSIVITY, WHICH

17    IS THE ISSUE IN THIS CASE, AND DREW TO OUR ATTENTION THE FACT

18    THAT THIS DOCUMENT HAS ON THE FIRST PAGE OF IT FROM

19    DELOITTE & TOUCHE THAT THE VALUATION OPINION SHOULD NOT BE USED

20    FOR ANY OTHER PURPOSE OR DISTRIBUTED TO THIRD PARTIES WITHOUT

21    THEIR PERMISSION.  IT HAS A VERY SPECIFIC REGULATORY TAX KIND

22    OF PURPOSE.

23              IN ADDITION, THE -- THE PROVISION THAT WE KEEP

24    ARGUING ABOUT, TALKING ABOUT IS WHETHER OR NOT THIS

25    $2.4 MILLION, WHICH WAS KEY OUT OF THE DELOITTE REPORT, FOR THE
```

 1    WAY MR. REGAN TRIED TO VALUE THE WHOLE COMPANY RATHER THAN

 2    ANYTHING THAT WAS PART OF WHAT DR. VERDIELL HAD AN ABSOLUTE

 3    COMPLETE AND LEGITIMATE RIGHT TO DO AND USE, WAS THE PROVISIONS

 4    THAT HAD TO DO WITH HOW THE WORK FORCE WAS VALUED.

 5           AND I JUST -- THE WORK FORCE, WHEN YOU -- IF YOU

 6    SHOULD LOOK AT THIS, FEEL IT'S NECESSARY, THE WORK FORCE,

 7    IT'S -- COULD NOT BE MORE EXPLICIT HERE THAT IT SAYS THE VALUE,

 8    THE TRAINED AND ASSEMBLED LIGHTLOGIC WORK FORCE WAS VALUED BY

 9    USING A REPLACEMENT COST APPROACH.

10           WE KNOW HOW VALUABLE THE WORK FORCE WAS AS AN ASSET

11    TO INTEL.  WE SEE IT IN THE DAM II REPORT, THIS VERY REPORT

12    RIGHT HERE WHICH IS TRIAL EXHIBIT 750.

13                 (EXHIBIT PUBLISHED TO JURY.)

14         **MR. TAYLOR:**  WHEN WE SEE THAT ONE OF TERMS IN THE

15    DEAL --

16           NEXT PAGE.

17                 (EXHIBIT PUBLISHED TO JURY.)

18         **MR. TAYLOR:**  -- IS IN ORDER FOR THIS DEAL TO GO

19    FORWARD, THE TOP EIGHT KEY EMPLOYEES, TWO OF THE NEXT FOUR KEY

20    EMPLOYEES, AND 90 PERCENT OF THE REST HAD TO ACCEPT OR NO DEAL.

21           SO THAT'S -- THAT'S MCGRAW, THAT'S BALDRIDGE, THAT'S

22    WISEMAN, THAT'S VERDIELL, THAT'S MADER, THAT'S WEBJORN, ALL OF

23    THESE PEOPLE HAVE TO ACCEPT THIS DEAL, AT LEAST 90 PERCENT OF

24    THEM HAVE TO ACCEPT IT, BECAUSE THEY ARE SO VALUABLE TO THE --

25    SO THE NOTION THAT IN SOME MANNER THE $2.4 MILLION IS GOING TO

1   VALUE THE KNOW-HOW, THE VALUE OF THIS WORK FORCE --

2              AND DO WE HAVE THE ORG CHART, JEFF?

3              (EXHIBIT PUBLISHED TO JURY.)

4        **MR. TAYLOR:**  -- OF THIS GROUP OF PEOPLE, WHEN THE

5   DELOITTE REPORT SPECIFICALLY SAYS REPLACEMENT COST AND TALKS

6   ABOUT HEADHUNTING, TRAINING, AND RECRUITING, IT'S JUST -- IT'S

7   NOT HELPFUL TO HAVE AN EXPERT COME INTO COURT AND TAKE THAT

8   KIND OF A POSITION ON THAT REPORT IN THE FACE OF WHAT THE

9   REPORT ITSELF SAYS.

10             THIS IS THE JUST AN EXAMPLE OF WHERE WE WERE --

11  WHERE LIGHTLOGIC WAS -- IN 2000.

12             IF -- THE QUESTION IS IF YOU WERE TO FIND -- AND WE

13  THINK YOU SHOULD NOT -- BUT IF YOU SHOULD FIND THAT THERE'S

14  SOME AMOUNT OF MONEY THAT SHOULD BE AWARDED TO MR. SHUM FOR HIS

15  RIGHTS IN THE RADIANCE IP, THE QUESTION'S WHAT WOULD THAT BE.

16  AND I WANTED TO ADDRESS IT, AND I THINK MR. NAPPER DOES.

17             THE WAY TO VALUE THE RADIANCE IP BETWEEN THESE TWO

18  MEN WOULD BE TO VALUE THE RADIANCE IP BACK RIGHT WHEN THEY

19  SPLIT, CLOSE AS YOU COULD, THE CLOSEST POINT IN TIME YOU COULD

20  FIND TO WHEN THE RADIANCE IP WAS IN ITS CONDITION WHEN THEY

21  SPLIT.  BECAUSE IF THEY WERE 50/50 OWNERS OF RADIANCE AND EACH

22  HAD A HALF OF THAT IP, HOW MUCH WAS THAT IP WORTH?  NOTHING HAD

23  BEEN DONE WITH IT.  NO WORKING PROTOTYPES HAD BEEN BUILT BY

24  THAT TIME USING THE FLEXURE.  THEY HAD NO CUSTOMERS.  THEY HAD

25  NO PRODUCT.  THEY REALLY HAD NOTHING.  AND THEY WEREN'T REALLY

1    WORKING TOGETHER OR SPEAKING OR DOING ANYTHING.

2              AND OUT OF THE THOSE DISCUSSIONS CAME AN AGREED-UPON

3    PRICE FOR HALF OF THE IP.  AND THAT PRICE WAS $250,000.  AND

4    ACTUALLY, THAT'S $250,000 FOR MORE THAN THE IP.  THAT'S FOR

5    ALL -- HALF -- ALL YOUR STOCK.  SO THAT MR. SHUM WOULD SELL ALL

6    OF HIS STOCK TO DR. VERDIELL FOR 250,000.  AND IF THAT DIDN'T

7    HAPPEN, THEN DR. VERDIELL WOULD SELL HIS TO MR. SHUM.

8              THE REASON WE KNOW THAT THE 250 WAS HIGH, THAT IF

9    YOU'RE JUST VALUING INTELLECTUAL PROPERTY, WHICH IS WHAT THIS

10   CASE IS ABOUT, IS THAT SAME PROPOSAL THAT MR. SHUM SENDS BACK

11   ACTUALLY HAS A PROVISION IN IT THAT, "IF WE DON'T COMPLETE THIS

12   TRANSACTION, IF SOMEHOW IT DOESN'T HAPPEN, WE'RE GOING TO

13   DISSOLVE AND WE CAN THEN AUCTION FOR THE INTELLECTUAL PROPERTY

14   WITH EACH SIDE OFFERING 10 PERCENT MORE THAN THE OTHER SIDE.

15   AND THAT'S HOW WE'LL DECIDE WHO OWNS THE IP."  AND THAT'S GOT

16   TO BE LESS THAN 250 OR SOMEONE WOULD JUST BUY THE OTHER PERSON

17   OUT AT THE $250,000.

18             SO IN 1997, NOVEMBER, VERY CLOSE TO WHEN THEY

19   WERE -- WHEN THE PLAN OF LIQUIDATION WAS BEING NEGOTIATED AND

20   EXECUTED, THE VALUE OF HALF OF THE COMPANY WAS $250,000.

21             THE OTHER DATA POINT WE HAVE, IF YOU'RE TRYING -- IF

22   ONE'S TRYING THE DETERMINE THE VALUE OF MR. SHUM'S HALF OF THE

23   RADIANCE IP, IS TO LOOK AT THE GIGABIT TRANSACTION.  WHEN HE

24   WENT TO SELL HIS RIGHTS AND TRIED TO SELL HIS RIGHTS TO GIGABIT

25   AND WAS ASKED HOW MUCH, AND BY GOING BACK AND FORTH A LITTLE

```
 1   BIT, JENKIN RICHARDS -- THEY CAME UP WITH A NUMBER AND IT WAS

 2   HUNDREDS OF THOUSANDS OF DOLLARS BUT LESS THAN $500,000.  THAT

 3   WAS THE PRICE IN 1997, THAT WAS THE PRICE IN 2001 FOR HALF OF

 4   MR. SHUM'S RIGHTS AND INCLUDED INTELLECTUAL PROPERTY.

 5            SO THOSE NUMBERS, RATHER THAN THE NUMBERS THAT COME

 6   TO US BASED ON THESE ASSUMPTIONS AND RELYING ON THESE KINDS OF

 7   DOCUMENTS THAT FOR -- FOR PURPOSES THAT IS COMPLETELY

 8   INCONSISTENT WITH THE PURPOSE FOR WHICH THEY'RE PREPARED, WE

 9   SUGGEST IF YOU WERE TO CONSIDER AWARDING DAMAGES, THOSE ARE THE

10   NUMBERS AND THE ONLY NUMBERS THAT YOU SHOULD CONSIDER.

11            IT'S ALSO INTERESTING TO REALIZE THAT IF YOU THINK

12   ABOUT WHAT DAMAGE WOULD HAVE HAPPENED IF THERE'D BEEN NO, LET'S

13   SAY MISREPRESENTATION, IF YOU WERE TO FIND THAT, AND YOU THINK

14   WHAT WOULD HAVE HAPPENED TO THESE TWO GENTLEMEN IF WE'RE TRYING

15   TO FIGURE OUT HOW TO PUT SOMEONE BACK IN THE POSITION THEY

16   WOULD HAVE BEEN, THESE TWO GENTLEMEN WOULD NOT HAVE DONE

17   BUSINESS TOGETHER.  THEY WOULD HAVE DISSOLVED.  THEY WOULD HAVE

18   SPLIT.  THERE WOULD NOT HAVE BEEN A SITUATION WHERE THEY WOULD

19   HAVE STAYED TOGETHER AND THIS RADIANCE TECHNOLOGY WOULD HAVE

20   GONE FORWARD WITH THE TWO OF THEM IN IT.  AND -- AND -- IT

21   JUST -- IT WOULD NOT.

22            SO THE HARM TO BE COMPENSATED FOR WOULD BE NOTHING

23   MORE, WE THINK, UNDER ANY CIRCUMSTANCE THAN THE $250,000.

24            I HAVE JUST A FEW MINUTES LEFT AND I'D LIKE TO TALK

25   WITH YOU ABOUT THE THIRD MOST IMPORTANT DOCUMENT IN THE CASE
```

1   WHICH IS THE VERDICT FORM, AND THE COURT WILL BE GIVING YOU A

2   VERDICT FORM IN THIS CASE, AND THERE'S A SECTION ON IT FOR EACH

3   OF THE CAUSES OF ACTION.

4              AND I'D LIKE TO TELL YOU BRIEFLY -- WE'LL SHOW IT TO

5   YOU FIRST OF ALL AND THEN TELL YOU BRIEFLY WHAT I THINK THE KEY

6   EVIDENCE IS ON THAT, JUST IN SUMMARY SLIDES, NOT MAKING YOU

7   WALK THROUGH IT ALL AGAIN BUT JUST ON SUMMARY SLIDES.

8              SO IF WE HAVE THE FIRST -- THIS IS THE VERDICT FORM

9   THAT YOU WILL BE GIVEN AND ASKED TO COMPLETE AND IT STARTS WITH

10  THESE INVENTORSHIP CLAIMS WHICH AS YOU KNOW ARE CLAIMS THAT

11  DON'T HAVE A MONETARY COMPONENT ATTACHED TO THEM BUT HAVE THE

12  POTENTIAL FOR CORRECTION --

13             (EXHIBIT PUBLISHED TO JURY.)

14     **MR. TAYLOR:**  -- IF YOU FIND THAT MR. SHUM HAS

15  SUSTAINED ALL OF THE LEVELS OF BURDEN AND PROOF THAT HE HAS ON

16  THE PATENT LAWS WITH RESPECT TO INVENTORSHIP.

17             THE SUMMARY EVIDENCE THAT WE CAN -- I CAN SUGGEST TO

18  YOU FOR INVENTORSHIP, TAKING FIRST DBC, IS AS FOLLOWS:  AND I

19  WON'T WALK THROUGH ALL OF THIS, BUT I'LL HIT SOME OF THE

20  HIGHLIGHTS.

21             CERTAINLY THE PATENTS WOULD BE LISTED FIRST BECAUSE

22  MR. -- EXCUSE ME, DR. VERDIELL IS PRESUMED TO BE THE INVENTOR

23  JUST BY VIRTUE OF THOSE PATENTS.  THEN WE HAVE THE REDLINED

24  PATENT APPLICATION, WHICH CLEARLY SHOWS THAT DR. VERDIELL'S

25  TRYING TO SEPARATE OUT HIS OWN INVENTIONS.  THEN WE HAVE THE

1    CONCEPTION EVIDENCE.  WE HAVE TESTIMONY FROM JENKIN RICHARD,

2    JOHN GORMAN.  WE HAVE EMAILS.

3              THIRD BULLET FROM THE BOTTOM.

4              WE HAVE EMAILS FROM MR. SHUM IN DECEMBER 1997

5    ACKNOWLEDGING THAT VERDIELL MAY PATENT THE DBC.  TRIAL

6    EXHIBIT 281, A KEY EXHIBIT WHERE HE ACKNOWLEDGES THAT

7    VERDIELL'S GOING TO PATENT THE DBC BECAUSE HE KNOWS IT'S

8    VERDIELL'S INVENTION.  AND THE OTHER DOCUMENTS ON THAT SLIDE.

9              WE DID THE SAME THING FOR FLEXURE JUST TO TRY TO

10   SUMMARIZE THE KEY EVIDENCE FOR FLEXURE, DOING ESSENTIALLY THE

11   SAME THING AGAIN, IDENTIFYING THE PATENTS FIRST.

12             (EXHIBIT PUBLISHED TO JURY.)

13         **MR. TAYLOR:**  THEN IDENTIFYING THE TWO PIECES OF

14   VERDIELL CONCEPTION EVIDENCE, THE SPIDER, AND THE RECORD OF

15   INVENTION.  AND THEN MR. DUMAN'S TESTIMONY, OF COURSE.  AND

16   THEN THE FACT THAT THE CAD DRAWINGS JUST HAVE TO BE LOOKED AT

17   IN TERMS OF DATE.  AND THERE'S NOT A SINGLE ONE WITH LEGS THAT

18   COMES BEFORE THE SPIDER MEETING.

19             AND THEN THE NOTION THAT IF THERE'S A PIVOT AND

20   WHETHER THERE'S A PIVOT OF ANY OF THE PATENTS, THE ANSWER IS

21   NO.  DR. LEE TESTIFIED, DR. KOCH TESTIFIED, AND MR. WEBJORN

22   TESTIFIED THAT THERE IS NO CLAIM IN ANY OF THESE PATENTS FOR

23   MR. SHUM'S PIVOT THAT IS NOT INCLUDED, THAT THEY'RE TRYING AND

24   WERE CLAIMING SOMETHING VERY DIFFERENT FROM THAT.  SO WE PUT

25   THAT IN AS WELL.

1    THE NEXT CLAIM ON THE JURY -- ON THE VERDICT FORM IS

2    BREACH OF CONTRACT.

3         (EXHIBIT PUBLISHED TO JURY.)

4         **MR. TAYLOR:**  AND HERE'S WHAT THAT LOOKS LIKE.

5         BREACH OF CONTRACT, STRAIGHTFORWARD, YES, NO, AND

6    THEN A DOLLAR AMOUNT.

7         HERE'S THE EVIDENCE.

8         FIRST OF ALL, NO BREACH OF CONTRACT -- EXCUSE ME.  I

9    MISSPOKE.

10        THE ENTIRE -- THE END OF THE -- SESSION.  THE NEXT

11   ON THE VERDICT FORM, THERE WE GO, THE SECOND ITEM IS INDEED

12   INTENTIONAL MISREPRESENTATION.

13        (EXHIBIT PUBLISHED TO JURY.)

14        **MR. TAYLOR:**  SO DID WE SHOW INTENTIONAL MISREP,

15   JEFF?  OR DID I THROW YOU COMPLETELY OFF?  THANK YOU.

16        WELL, LET ME TALK YOU THROUGH.

17        (EXHIBIT PUBLISHED TO JURY.)

18        **MR. TAYLOR:**  SO THERE WE GO.  SO HERE'S THE

19   INTENTIONAL MISREPRESENTATION FORM -- PORTION OF THE VERDICT

20   FORM, AND THEN HERE'S THE EVIDENCE.

21        (EXHIBIT PUBLISHED TO JURY.)

22        **MR. TAYLOR:**  AND WE BROKE THIS DOWN INTO THREE

23   DIFFERENT PIECES.  FIRST, THERE'S EVIDENCE ABOUT THERE NOT

24   BEING A FALSE STATEMENT BECAUSE DR. VERDIELL IS AN INVENTOR.

25   AND ALSO HE WAS DELIBERATELY LEFT OFF THE APPLICATION DUE TO

1    CONCERNS ABOUT SDL.

2              WE HAVE ADMISSIONS OF THIS.  WE HAVE EMAIL

3    COMMUNICATIONS BETWEEN THE TWO GENTLEMEN.  WE HAVE TESTIMONY

4    REGARDING THEIR SENSITIVITY ABOUT SDL.  AND WE HAVE EMAILS THAT

5    REFLECT THAT.  AND WE HAVE JENKIN RICHARDS TESTIMONY WHERE HE

6    SAID HE UNDERSTOOD THAT DR. VERDIELL WAS LEFT OFF THAT PATENT

7    APPLICATION BECAUSE THERE WAS CONCERN ABOUT SDL.

8              WE ALSO HAVE A SLIDE FOR THE REASONABLE RELIANCE

9    COMPONENT.  THERE'S A FURTHER REQUIREMENT, AS WE TALKED ABOUT,

10   ABOUT THERE BEING A SHOWING OF REASONABLE RELIANCE.  AND AMONG

11   HERE, THE KEY DOCUMENTS WOULD BE TX247 AND 238 THAT SHOW

12   MR. SHUM'S OWN LAWYERS ADDED THIS TERM "WITHDRAW," AND THAT

13   RATHER THAN INSTEAD OF RELYING ON ANYTHING FROM DR. VERDIELL

14   WITH WHOM HE WAS NOT GETTING ALONG, BY THE WAY, HE WAS RELYING

15   ON HIS LAWYERS TO MAKE THIS DECISION AND THAT IT WAS THE

16   CORRECT DECISION AND THE ONLY ONE TO MAKE SINCE DR. VERDIELL

17   WAS A COINVENTOR AND THE APPLICATION HAD BEEN FILED TO DECEIVE.

18   THAT'S THE REMAINDER OF THE EVIDENCE FOR THAT.

19             AND THEN WE ALSO HAVE A SLIDE FOR THE NO-DETRIMENTAL

20   RELIANCE ON VERDIELL'S STATEMENT.  AND PRIMARILY THIS CONSISTS

21   OF TESTIMONY FROM MR. SHUM ABOUT THE FACT THAT HE WAS NOT

22   RELYING AND TESTIMONY THAT HE WAS -- DID NOT BELIEVE

23   DR. VERDIELL WHEN HE TOLD HIM THAT THE PATENT APPLICATION --

24   THAT HE WAS A COINVENTOR IN THE PATENT APPLICATION.

25             NOW GO BACK, IF YOU WOULD, JEFF, TO THE INTENTIONAL

 1  MISREPRESENTATION VERDICT FORM.

 2            THE MOST IMPORTANT PART OF THIS VERDICT FORM IS HOW

 3  WE THINK UNDER THE LAW AND THE EVIDENCE OF THIS CASE IT SHOULD

 4  BE COMPLETED.  AND THE ANSWER TO THAT QUESTION AS TO BOTH

 5  VERDIELL AND LIGHTLOGIC IS THAT YOUR ANSWER SHOULD BE "NO" TO

 6  QUESTION 7.

 7            COULD WE SEE THE NEXT PORTION OF THE VERDICT FORM.

 8            (EXHIBIT PUBLISHED TO JURY.)

 9       **MR. TAYLOR:**  BREACH OF CONTRACT, SAME FORMAT FOR THE

10  VERDICT FORM AND HERE'S THE EVIDENCE.

11            (EXHIBIT PUBLISHED TO JURY.)

12       **MR. TAYLOR:**  THE PLAN OF LIQUIDATION, FIRST OF ALL,

13  THE MOST IMPORTANT DOCUMENT TO THIS CLAIM AND THE JURY

14  INSTRUCTIONS, EQUALLY IMPORTANT, AND THEN THE EVIDENCE THAT

15  WE -- SOME OF THE EVIDENCE ABOUT SHUM'S DECISION SIMPLY TO

16  ABANDON HIS EXPLOITATION EFFORTS SO THAT THERE WOULD BE NO

17  HARM, INCLUDING HIS ADMISSION THAT VERDIELL'S CONDUCT AND

18  LIGHTLOGIC'S CONDUCT DID NOTHING TO AFFECT IT.

19            NEXT, AND THEN WE GO BACK TO THAT.  WE SHOULD

20  ALSO --

21            (EXHIBIT PUBLISHED TO JURY.)

22       **MR. TAYLOR:**  -- EXPLAIN HOW THIS ONE WE THINK WOULD

23  BE COMPLETED, JEFF, BECAUSE WE BELIEVE THE ANSWER TO THIS

24  PARTICULARLY GIVEN THE PROVISIONS IS A "NO."

25            AND THEN, LADIES AND GENTLEMEN, FINALLY UNJUST

1   ENRICHMENT, SAME FORMAT.

2            (EXHIBIT PUBLISHED TO JURY.)

3        **MR. TAYLOR:**  AND HERE'S THE EVIDENCE FOR THAT.

4            (EXHIBIT PUBLISHED TO JURY.)

5        **MR. TAYLOR:**  NO UNJUST ENRICHMENT BECAUSE ALL OF

6   THESE PEOPLE WHO CAME TO TESTIFY ABOUT WHAT THEY WERE THINKING

7   ABOUT WHEN THEY WERE INVESTING IN LIGHTLOGIC AND KNOWING OF

8   SHUM'S RIGHTS AND HAVING NO PARTICULAR INTEREST WHATSOEVER IN

9   EXCLUSIVE RIGHTS.

10            AND -- AND WE HAVE ONE MORE UNJUST -- TWO MORE

11   UNJUST ENRICHMENT SLIDES, SUMMARY SLIDES.  THIS IS FOR INTEL.

12            (EXHIBIT PUBLISHED TO JURY.)

13        **MR. TAYLOR:**  THAT'S THE COMPANY DISCLOSURE DOCUMENT

14   TOGETHER WITH THE TESTIMONY.  KEY WITNESSES ARE MR. RICCI AND

15   MR. SIVAKUMAR.

16            AND WHAT -- THE LAST SLIDE.

17            (EXHIBIT PUBLISHED TO JURY.)

18        **MR. TAYLOR:**  SHUM'S ADMISSIONS AND, IN PARTICULAR,

19   THE -- ON ASSIGNMENTS THE TESTIMONY WE GOT FROM GREG BALDRIDGE,

20   OR WE ALL HEARD FROM GREG BALDRIDGE AND JENKIN RICHARDS AND

21   SHUM'S EFFORTS TO TRY AND SELL HIS RIGHTS TO GIGABIT.

22            IF WE GO BACK TO THE VERDICT FORM, WE THINK THESE

23   QUESTIONS, TOO, UNDER THE EVIDENCE AND THE LAW MUST BE ANSWERED

24   "NO."

25            (EXHIBIT PUBLISHED TO JURY.)

1      **MR. TAYLOR:**  MY TIME WITH YOU IS NOW UP, AND I

2    WANTED TO SAY THIS.  I WANTED TO SAY WHETHER OR NOT YOU END UP

3    BELIEVING THAT MR. SHUM SHOULD BE NAMED AS A COINVENTOR ON ANY

4    OF THE EVIDENCE THAT YOU SEE, THE REMEDY FOR THAT IS SIMPLY AND

5    SOLELY CORRECTION.

6            IF YOU SHOULD CONCLUDE -- IF MR. SHUM IS NOT A

7    COINVENTOR, THEN DR. VERDIELL IS THE SOLE OWNER OF THESE

8    PATENTS, AND THE JUDGE'S INSTRUCTIONS SAY WITH THE PLAN OF

9    LIQUIDATION BEING ENFORCEABLE, THERE'S NO LIABILITY FOR

10   DR. VERDIELL.

11           AND EVEN IF YOU CONCLUDE UNDER THE COURT'S

12   INSTRUCTIONS THAT MR. SHUM IS A COINVENTOR, HE WAS NOT HARMED

13   BY BEING LEFT OFF THE PATENT BY ANY ASSIGNMENT OR ANYTHING ELSE

14   THAT WAS HAPPENING BECAUSE HE HAD NO RIGHT TO SHARE IN THE

15   PROCEEDS, WHETHER UNDER THE PLAN OF LIQUIDATION OR WHETHER

16   UNDER THE PATENT LAW.

17           THE PATENT LAW IN THESE INSTRUCTIONS MAKES CLEAR, IF

18   YOU'RE LEFT OFF AND YOU GET ADDED BACK, YOU MAY BE A CO-OWNER

19   BUT YOU STILL DON'T HAVE A RIGHT TO SHARE WITH EACH OTHER AS A

20   CO-OWNER.

21           YOU'VE HEARD TESTIMONY THAT MR. SHUM DECIDED TO

22   PURSUE HIS BUSINESS BEFORE A SINGLE ASSIGNMENT WAS ISSUED, SO

23   THAT THERE'S NO IMPACT THE ASSIGNMENTS HAD ON HIS DECISION TO

24   BEGIN AND STOP HIS BUSINESS BECAUSE HE DID BOTH BEFORE THE

25   FIRST ASSIGNMENT WAS IN.

1         AND THEN HE DECIDED NOT TO PURSUE STARTUPS AND TO

2    TAKE A JOB AS AN ENGINEER.  SO HE'S IN THE SAME POSITION TODAY

3    AS HE WAS WHEN THE PLAN OF LIQUIDATION WAS EXECUTED, SAME

4    RIGHTS, SAME OPPORTUNITIES.

5         ALL ANYONE REALLY WANTED TO DO IN THIS CASE AFTER

6    THE PLAN OF LIQUIDATION WAS SEE WHETHER DR. VERDIELL AND HIS

7    TEAM OF TALENTED, DEDICATED AND COMMITTED ENGINEERS COULD BE

8    SUCCESSFUL, TO WHETHER HE COULD TAKE THE RIGHT THAT HE HAD

9    UNDER THE PLAN OF LIQUIDATION, BUILD A BUSINESS, TO USE THE

10   RADIANCE TECHNOLOGY FROM THE PLAN OF LIQUIDATION AND SEE IF HE

11   COULD BE SUCCESSFUL.  THE ODDS WERE GREATLY AGAINST HIM.

12        THE ONE THING HE KNEW, THE ONE THING HE RELIED ON,

13   THE ONE THING ALL THE INVESTORS SAID THEY WERE CLEAR ON WAS

14   THAT MR. SHUM WOULD NEVER BE ABLE TO COME BACK IF HE WERE

15   SUCCESSFUL AND MAKE CLAIMS FOR HIS PROFITS, AND HE WOULD NOT BE

16   ABLE TO DO THAT AGAINST MR. SHUM.  THAT'S WHAT THE PLAN OF

17   LIQUIDATION PROVIDES.  THAT'S WHAT THE PLAN OF LIQUIDATION

18   PROVIDES UNDER THE COURT'S INSTRUCTIONS.  MR. SHUM HAS NOT BEEN

19   HARMED.

20        WE WOULD ASK YOU, LADIES AND GENTLEMEN TO RETURN A

21   VERDICT IN THIS CASE IN FAVOR OF THE DEFENDANTS.

22        I WANT TO THANK YOU VERY MUCH FOR YOUR TIME AND

23   ATTENTION AND -- AND PATIENCE, AND ON BEHALF OF MR. VERDIELL

24   AND ALSO LIGHTLOGIC.

25        I DO WANT TO SAY THAT YOU WILL NOT SEE AND DO NOT

```
 1   SEE INTEL ON THESE VERDICT FORMS BECAUSE INTEL HAS BEEN

 2   DISMISSED FROM THIS CASE.  SO THIS NOW IS A CASE JUST INVOLVING

 3   DR. VERDIELL AND LIGHTLOGIC.

 4              LADIES AND GENTLEMEN, THANK YOU VERY MUCH.

 5         THE COURT:  WE'LL TAKE THE RECESS NOW FOR ABOUT TEN

 6   MINUTES.

 7              (RECESS TAKEN AT 2:20 P.M.)

 8         (PROCEEDINGS RESUMED AT 2:34 P.M.)

 9         THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

10   COME TO ORDER.

11              (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE

12   PRESENCE OF THE JURY:)

13         THE COURT:  PLEASE GO AHEAD, COUNSEL.

14         MR. KIRSCH:  THANK YOU, YOUR HONOR.

15              REBUTTAL CLOSING ARGUMENT

16         MR. KIRSCH:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

17   I JUST HAVE TEN MINUTES OF MY ALLOTTED TIME LEFT TO RESPOND TO

18   MR. TAYLOR'S MANY ARGUMENTS, SO I'LL TRY TO HIT THE HIGH

19   POINTS.

20              WE AGREE WITH DEFENDANTS' COUNSEL THAT THE JURY

21   INSTRUCTIONS ARE CRITICALLY IMPORTANT.  YOU SHOULD READ THEM

22   AND YOU SHOULD APPLY THEM.  AND IF YOU DO, MR. SHUM SHOULD

23   PREVAIL.

24              ONE OF THE KEY ISSUES, I BELIEVE -- THE FIRST ONE

25   THAT DEFENDANTS' COUNSEL FOCUSED ON -- IS THEY CLAIM THAT THE
```

1   EQUAL RIGHTS PROVISION UNDER THE POL, IF YOU READ THE JURY

2   INSTRUCTIONS, PROVIDES MR. SHUM WITH NO CLAIM -- NO CLAIM IN

3   THIS CASE.  BUT THAT COMPLETELY READS OUT THE ENTIRE PREMISE OF

4   MR. SHUM'S CLAIM.  IT'S THE PREMISE THAT I BEGAN WITH THIS

5   MORNING, THAT WHAT MR. VERDIELL DID WAS KNOWINGLY TAKE THE FULL

6   INVENTORSHIP RIGHTS, THE FULL RIGHTS THAT MR. SHUM AND

7   MR. VERDIELL HAD TOGETHER, AND FILE PATENTS AND ASSIGNMENTS ON

8   THEM AND TAKE THOSE RIGHTS AND TURN THOSE INTO A VALUABLE,

9   VALUABLE COMPANY.

10          THE -- THE EQUAL RIGHTS PROVISION OF THE POL DOES

11  NOT SAY -- I'LL CORRECT THAT.  IT SAYS THAT IT DOES NOT PREVENT

12  THE LAWFUL PATENTING.  BUT WHAT WE'RE TALKING ABOUT IS -- WHAT

13  MR. VERDIELL IS ACCUSED OF IN THIS CASE IS AN UNLAWFUL PATENT,

14  AN UNLAWFUL ASSIGNMENT, AND THAT'S THE ESSENCE OF THIS CASE.

15          WITH REGARD TO UNJUST ENRICHMENT, DEFENDANTS'

16  COUNSEL MAKES THE POINT THAT IF AN EXPRESS BINDING AGREEMENT

17  LIKE THE POL EXISTED AND DEFINED THE PARTIES' RIGHTS WITH

18  RELATION TO A BENEFIT, THEN THERE CAN BE NO UNJUST ENRICHMENT.

19          THE POL IS AN AGREEMENT BETWEEN MR. SHUM AND

20  MR. VERDIELL.  LIGHTLOGIC IS NOT A PARTY TO THAT AGREEMENT.

21  THERE IS NO POSSIBLE WAY THAT THE POL COULD PROHIBIT UNJUST

22  ENRICHMENT AGAINST LIGHTLOGIC.

23          MOREOVER, THE POL SAYS NOTHING ABOUT WHAT THOSE

24  UNLAWFUL BENEFITS THAT WOULD -- THAT MR. VERDIELL WOULD ARRIVE

25  AT IF HE DID DO WHAT HE'S ACCUSED OF IN THIS CASE AND DO WHAT

1   THE EVIDENCE SHOWS, FILING UNLAWFUL PATENTS, AND GO OFF IN 2001

2   AND OBTAIN HUNDREDS OF MILLIONS OF DOLLARS FROM INTEL IN

3   SUBSTANTIAL PART BECAUSE OF THOSE UNLAWFUL PATENTS.  IT DOES

4   NOT DEFINE THOSE RIGHTS.  SO THERE IS AN UNJUST ENRICHMENT

5   CLAIM AGAINST MR. VERDIELL AS WELL.

6           LATER IN HIS PRESENTATION, DEFENDANTS' COUNSEL

7   FOCUSED ON THE DAMAGES ISSUES WITH REGARD TO THIS CASE AND

8   PERSISTED IN SAYING MR. SHUM WASN'T DAMAGED AND FOCUSED ON WHAT

9   WAS HAPPENING IN 1997 AND 1998.  I WANT TO REITERATE WHAT

10  MR. MACDONALD SAID THIS MORNING.  THE UNJUST ENRICHMENT CLAIM

11  DOES NOT FOCUS ON DAMAGE TO MR. SHUM.  IT FOCUSES ON THE UNJUST

12  BENEFIT FOR DEFENDANTS IN 2001.

13          SO MR. -- THE PREMISE OF OUR DAMAGE CLAIM, THE

14  UNJUST ENRICHMENT CLAIM, AS MR. REGAN LAID OUT, IS THAT

15  LIGHTLOGIC NEVER WOULD HAVE BEEN SOLD FOR $409 MILLION.  THE

16  PATENTS WERE A SUBSTANTIAL FACTOR IN THE DEAL.  IT'S IN INTEL'S

17  DOCUMENTS.  IT'S IN LIGHTLOGIC DOCUMENTS.  IT'S -- IT IS IN

18  THE -- ESPECIALLY LAID OUT IN THE TAX AND REGULATORY DOCUMENT

19  THAT INTEL NOW TRIES TO RUN AND HIDE FROM.

20          THAT'S A PURCHASE PRICE ALLOCATION PREPARED FOR TAX

21  AND REGULATORY PURPOSES.  CAN YOU IMAGINE IF ANY OF US TRIED TO

22  FILE SOMETHING WITH THE GOVERNMENT FOR TAX AND REGULATORY

23  PURPOSES AND THEN CAME INTO COURT AND SAID YOU CAN COMPLETELY

24  IGNORE THAT?  THAT IS THE ONE DOCUMENT IN THIS CASE THAT

25  ANALYZES THE SALE, THE INTEL/LIGHTLOGIC SALE.  INTEL PAID FOR

1    IT.  INTEL DID IT.  LIGHTLOGIC WAS INVOLVED IN IT.  THE NUMBERS

2    IN THERE REVEAL THAT THE INTELLECTUAL PROPERTY, THE PATENTS,

3    WERE WORTH HUNDREDS OF MILLIONS OF DOLLARS.

4            DEFENDANTS ALSO SAID THAT THE EVIDENCE THAT THE

5    INVESTORS WERE INTERESTED IN EXCLUSIVITY -- WERE NOT (SIC)

6    INTERESTED IN EXCLUSIVITY IS NONEXISTENT.  IT CAME RIGHT FROM

7    MR. VERDIELL'S TESTIMONY, AS I BEGAN THIS MORNING.  IT ALSO IS

8    IN THE ASSIGNMENTS.  IF YOU TAKE A LOOK AT TRIAL EXHIBIT 16

9    THROUGH 23, IF YOU WANT TO LOOK AT ONE, LOOK AT THE 2003

10   ASSIGNMENT WHERE LIGHTLOGIC AND INTEL BOTH SAID THEY HAD THE

11   SOLE AND EXCLUSIVE RIGHTS TO FOUR PATENTS AT ISSUE.  IN 2003.

12   WHY DID THEY DO THAT IF THEY'RE NOT IMPORTANT?

13           WITH REGARD TO THE INVENTORSHIP ISSUES, ON THE

14   FLEXURE FIRST, I'D JUST LIKE TO SAY THAT DEFENDANTS CONTINUE TO

15   TRY TO TAKE THE 4/17 DRAWING, THAT ONE DRAWING, COMPARED TO THE

16   MOUNTAIN OF EVIDENCE THAT MR. SHUM HAS.  AND CONTRARY TO WHAT

17   THEIR EXPERT SAID, WHICH IS IT DOESN'T CONTAIN ALL THE ELEMENTS

18   OF ALL THE CLAIMS, DOESN'T CONTAIN SPRING REGIONS, DOESN'T

19   CONTAIN THE TOOL, DOESN'T SHOW THE PROCESSES OF THE '724, THAT

20   THAT TOGETHER WITH THE LES DUMAN MEETING -- AND MR. DUMAN

21   DIDN'T REMEMBER WHEN THAT OCCURRED OR ANY DETAILS.  HE WAS

22   COMMINGLING MEETINGS, ACCORDING TO HIM, WHERE ALL THAT CAME OUT

23   OF A MEETING WAS MR. VERDIELL PRESSING DOWN ON A SPIDER AND

24   REALIZING THAT THE LEGS SPREAD APART, SOMETHING ANY ELEMENTARY

25   SCHOOL OR PRESCHOOL STUDENT WOULD PROBABLY UNDERSTAND BY

1    LOOKING AT -- AT THE SPIDER.

2           HE CLAIMED THAT IS THE BASIS FOR ALL OF THE CLAIMS

3    OF ALL OF THE FLEXURE INVENTIONS AND YOU CAN IGNORE ALL OF THE

4    OTHER SUBSTANTIAL EVIDENCE WHICH DEMONSTRATES THAT

5    MR. VERDIELL -- EXCUSE ME -- THAT MR. SHUM BEGAN THE INVENTIVE

6    PROCESS ON THE FLEXURE ON MARCH -- WITH THE MARCH 17TH ROI AND

7    OVER THE NEXT SEVERAL MONTHS THROUGH ALL HIS WORK IN THE CAD

8    DRAWINGS AND THE PROTOTYPE DEVELOPED MANY OF THE ELEMENTS OF

9    THE FLEXURE.  IT'S CLEAR AND CONVINCING EVIDENCE.

10          WITH REGARD TO THE STEP PATENTS, SIMILARLY, THERE'S

11   CLAIMS IN THE STEP PATENTS, FOR INSTANCE, CLAIM 4 THAT LISTS

12   COPPER PLATING AND COPPER CLAD, AND ALL THOSE COPPER MATERIALS,

13   HAD NOTHING TO DO WITH DBC AND THE ETC (SIC) INVENTIONS.  WHERE

14   DID IT COME FROM?  THE ONLY EVIDENCE IS IT CAME FROM MR. SHUM.

15   MR. VERDIELL HAD NOTHING TO DO WITH IT.

16          THAT ALONE GIVES MR. SHUM CO-OWNERSHIP OF THOSE

17   INVENTIONS.  AND I'D JUST LIKE TO BRIEFLY BRING UP ONE

18   DOCUMENT, ACTUALLY TWO.

19          CO -- 27-1.

20          (EXHIBIT PUBLISHED TO JURY.)

21        **MR. KIRSCH:**  WITH REGARD TO THE '567 PATENT, THE

22   FLAT-BOTTOM LENS, "FRANK'S CONTRIBUTION, TAKE OUT."  THAT'S

23   WHAT MR. VERDIELL SAID.  FRANK'S CROSSED OUT.  HE WANTED TO

24   TAKE THAT OUT.  IN FACT, MR. TAYLOR REFERENCED THIS A FEW

25   MINUTES AGO.

1              BUT WHAT HAPPENED?

2              GO TO THE NEXT SLIDE, PLEASE, DAVID?

3              (EXHIBIT PUBLISHED TO JURY.)

4         **MR. KIRSCH:**  FRANK'S CONTRIBUTION WAS NOT TAKEN OUT.

5    IN CLAIM 6 OF THE '567, THE FLAT-BOTTOM LENS THAT WAS IN THE

6    PREACADIAN PROPOSAL AND THAT MR. VERDIELL ADMITTED AT TRIAL

7    MR. SHUM WROTE IS STILL IN THAT PATENT, AND THAT IS ENOUGH TO

8    GIVE MR. SHUM CO-INVENTORSHIP.

9              I ALSO THINK THE EVIDENCE IS OVERWHELMING THAT

10   MR. SHUM WAS INVOLVED IN THE OTHER DETAILS OF THE STEP AND

11   THE -- OR THE DBC.  THE ONLY EVIDENCE THAT MR. VERDIELL HAS

12   NOW -- THE WAY THAT HE PRECLUDES MR. SHUM FROM ANY INVENTORSHIP

13   IS BY SAYING WE WERE ALL AFRAID OF SDL.

14             BUT IN THIS COURT, MR. VERDIELL SAID THERE WAS NO

15   DEFENDABLE LOGIC.  THAT'S WHAT HE TESTIFIED TO.  NO DEFENDABLE

16   LOGIC TO HIS SDL EXCUSE.  AND THERE ISN'T.  MR. SHUM WASN'T

17   AFRAID OF SDL.  HE WAS ON THE -- ALL THE PROPOSALS.  HE WAS ON

18   THE PRE-ACADIAN PROPOSAL.  HE WASN'T AFRAID.  HIS NAME WAS OUT

19   THERE.  HE DIDN'T THINK THERE WAS ANY SDL ISSUE.

20             FINALLY, I'D LIKE TO THANK YOU FOR THE ATTENTION AND

21   DEDICATION YOU'VE GIVEN TO THIS CASE FOR OVER A MONTH.  WE ASK

22   THAT YOU CAREFULLY CONSIDER ALL THE EVIDENCE, YOU CAREFULLY

23   CONSIDER THE JURY INSTRUCTIONS AS WELL, AND RECOGNIZE THAT

24   MR. SHUM MADE SIGNIFICANT CONTRIBUTIONS TO RADIANCE AND

25   LIGHTLOGIC'S INTELLECTUAL PROPERTY, WHICH WAS A SIGNIFI- -- A

1   SUBSTANTIAL FACTOR IN THE INTEL/LIGHTLOGIC MERGER.

2            WE ASK THAT YOU RETURN A FAIR VERDICT.

3            THANK YOU VERY MUCH.

4            **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, NOW

5   THAT YOU HAVE HEARD ALL THE EVIDENCE, IT IS MY DUTY TO INSTRUCT

6   YOU ON THE LAW WHICH APPLIES TO THIS CASE.  NOW, THESE

7   INSTRUCTIONS WILL BE IN THREE PARTS.  FIRST, INSTRUCTIONS ON

8   GENERAL RULES THAT DEFINE AND CONTROL THE JURY'S DUTIES;

9   SECOND, INSTRUCTIONS THAT STATE THE RULES OF LAW YOU MUST

10  APPLY; AND, THIRD, SOME RULES FOR YOUR DELIBERATIONS.

11           NOW, A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

12  IN THE JURY ROOM FOR YOU TO CONSULT IF YOU FIND IT NECESSARY.

13           NOW, IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

14  EVIDENCE IN THE CASE.  AND TO THESE FACTS, YOU MUST APPLY THE

15  LAW AS I GIVE IT TO YOU.  YOU MUST FOLLOW THE LAW, WHETHER YOU

16  AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY

17  PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.

18  THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

19  BEFORE YOU AND ACCORDING TO THE LAW.

20           IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

21  THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

22  EQUALLY IMPORTANT.  AND YOU MUST NOT READ INTO THESE

23  INSTRUCTIONS OR INTO ANYTHING I MAY HAVE SAID OR DONE ANY

24  SUGGESTION AS TO WHAT VERDICT YOU SHOULD RETURN.  THAT IS A

25  MATTER ENTIRELY FOR YOU TO DECIDE.

1          NOW, THIS IS A CIVIL CASE, AND IN SUCH CASES, THE

2     PARTY WHO SAYS THAT CERTAIN FACTS EXIST IN SUPPORT OF A CLAIM

3     MUST ACTUALLY PROVE THOSE FACTS.  THE QUALITY OR QUANTITY OF

4     EVIDENCE NECESSARY TO PROVE THE FACTS IS KNOWN AS THE BURDEN OF

5     PROOF.  TWO DIFFERENT STANDARDS OF BURDEN OF PROOF ARE

6     TYPICALLY UTILIZED IN CIVIL LAWSUITS.  ONE IS CALLED

7     PREPONDERANCE OF THE EVIDENCE, AND THE OTHER HEAVIER BURDEN IS

8     CALLED CLEAR AND CONVINCING EVIDENCE.

9          NOW THIS LAWSUIT INVOLVES BOTH STANDARDS.  TO HELP

10    YOU UNDERSTAND THESE STANDARDS BETTER, I'LL BEGIN WITH THE

11    LOWER STANDARD PROOF.  WHEN A PARTY HAS THE BURDEN OF PROOF ON

12    ANY CLAIM BY A PREPONDERANCE OF THE EVIDENCE, IT MEANS THAT YOU

13    MUST BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OR AFFIRMATIVE

14    DEFENSE IS MORE PROBABLY TRUE THAN NOT TRUE.

15         WHEN A PARTY HAS THE BURDEN TO PROVE A CLAIM BY

16    CLEAR AND CONVINCING EVIDENCE, IT MEANS YOU MUST BE PERSUADED

17    BY THE EVIDENCE THAT IT IS HIGHLY PROBABLE THAT THE CLAIM IS

18    TRUE.  THE CLEAR AND CONVINCING EVIDENCE STANDARD IS A HEAVIER

19    BURDEN THAN THE PREPONDERANCE OF THE EVIDENCE STANDARD.

20         YOU ARE TO BASE YOUR DECISION ON ALL OF THE EVIDENCE

21    REGARDLESS OF WHICH PARTY PRESENTED IT.  NOW, IF A PARTY FAILS

22    TO MEET THE BURDEN ASSIGNED ON A PARTICULAR ISSUE, THE VERDICT

23    MUST BE FOR THE OTHER SIDE ON THAT ISSUE.

24         YOU WILL BE TOLD WHICH PARTY BEARS THE BURDEN OF

25    PROOF BY A PREPONDERANCE OF THE EVIDENCE OR BY CLEAR AND

1    CONVINCING EVIDENCE FOR EACH OF THE ISSUES IN THIS CASE.

2                NOW, THE EVIDENCE FROM WHICH YOU ARE TO DECIDE WHAT

3    THE FACTS ARE CONSISTS OF ONE, THE SWORN TESTIMONY OF THE

4    WITNESSES BOTH ON DIRECT AND CROSS-EXAMINATION REGARDLESS OF

5    WHO CALLED THE WITNESS; TWO, THE EXHIBITS WHICH HAVE BEEN

6    RECEIVED INTO EVIDENCE; AND, THREE, ANY FACTS TO WHICH ALL THE

7    LAWYERS HAVE AGREED OR STIPULATED.

8                NOW, IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY

9    THE TESTIMONY AND THE EXHIBITS RECEIVED INTO EVIDENCE.  THIS

10   MEANS THAT YOU MAY NOT CONSIDER OR SPECULATE ABOUT ANYTHING

11   THAT HAS NOT BEEN ADMITTED INTO EVIDENCE.

12               ADDITIONALLY, CERTAIN THINGS ARE NOT EVIDENCE AND

13   YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.  LET

14   ME LIST THEM FOR YOU.

15               ONE, ARGUMENTS AND STATEMENTS BY THE LAWYERS ARE NOT

16   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID

17   IN THEIR OPENING STATEMENTS, THEIR CLOSING ARGUMENTS, OR AT

18   OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT

19   IT IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER

20   FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM

21   CONTROLS.

22               TWO, QUESTIONS BY THE ATTORNEYS ARE NOT EVIDENCE.

23   THE ANSWERS STATED BY THE WITNESSES ARE EVIDENCE, AND THE

24   QUESTIONS SERVE ONLY TO GIVE THE ANSWERS MEANING.

25               THREE, OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

REBUTTAL CLOSING ARGUMENT \ KIRSCH

1    ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

2    BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

3    YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S

4    RULING ON IT.

5            FOUR, TESTIMONY THAT YOU -- THAT -- TESTIMONY THAT

6    HAS BEEN EXCLUDED OR STRICKEN OR THAT YOU HAVE BEEN INSTRUCTED

7    TO DISREGARD IS NOT EVIDENCE AND MUST NOT BE CONSIDERED.  IN

8    ADDITION, IF -- IF TESTIMONY OR EXHIBITS HAVE BEEN RECEIVED

9    ONLY FOR A LIMITED PURPOSE, YOU MUST FOLLOW THE LIMITING

10   INSTRUCTIONS THAT I HAVE GIVEN.

11           FIVE, ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE

12   COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE

13   THE CASE SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.

14           NOW, THERE ARE TWO KINDS OF EVIDENCE, DIRECT AND

15   CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH

16   AS THE TESTIMONY OF AN EYEWITNESS AS TO WHAT THAT -- WHAT THAT

17   WITNESS SAW OR HEARD OR DID.

18           CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT

19   IS, PROOF OF ONE OR MORE FACTS FROM WHICH YOU COULD INFER THAT

20   ANOTHER FACT EXISTS, EVEN THOUGH IT HAS NOT BEEN PROVED

21   DIRECTLY.

22           THE WORD "INFER" OR THE EXPRESSION "TO DRAW AN

23   INFERENCE" MEANS TO FIND THAT A FACT EXISTS BASED ON PROOF OF

24   ANOTHER FACT.  FOR EXAMPLE, IF YOU SEE WATER ON THE STREET

25   OUTSIDE YOUR WINDOW, YOU CAN INFER THAT IT HAS RAINED.  IN

 1  OTHER WORDS, THE FACT OF RAIN IS AN INFERENCE THAT CAN BE DRAWN

 2  FROM THE FACT THAT WATER IS ON THE STREET.

 3          HOWEVER, AN INFERENCE MAY BE DRAWN ONLY IF IT IS

 4  REASONABLE AND LOGICAL, NOT IF IT IS SPECULATIVE.  FOR EXAMPLE,

 5  OTHER FACTS MAY EXPLAIN THE PRESENCE OF WATER ON THE STREET

 6  EVEN THOUGH IT HAS NOT RAINED.  THEREFORE IN DECIDING WHETHER

 7  TO DRAW AN INFERENCE, YOU MUST LOOK AT AND CONSIDER ALL THE

 8  FACTS IN THE LIGHT OF REASON AND COMMON SENSE AND EXPERIENCE.

 9  AFTER YOU'VE DONE THAT, THE QUESTION WHETHER TO DRAW A

10  PARTICULAR INFERENCE IS FOR YOU TO DECIDE.

11          YOU MAY CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

12  EVIDENCE IN DECIDING THE CASE, AND THE LAW PERMITS YOU TO GIVE

13  EQUAL WEIGHT TO BOTH.  BUT IT IS FOR YOU TO DECIDE HOW MUCH

14  WEIGHT TO GIVE ANY EVIDENCE.

15          NOW, IN DECIDING WHAT THE FACTS ARE, YOU MUST

16  CONSIDER ALL THE EVIDENCE.  AND IN DECIDING THE FACTS IN THIS

17  CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND

18  WHICH TESTIMONY NOT TO BELIEVE.

19          YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

20  IT OR NONE OF IT.  IN CONSIDERING THE TESTIMONY OF ANY WITNESS,

21  YOU MAY TAKE INTO ACCOUNT, ONE, THE OPPORTUNITY AND ABILITY OF

22  THE WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

23  TWO, THE WITNESS' MEMORY; THREE, THE WITNESS' MANNER WHILE

24  TESTIFYING; FOUR, THE WITNESS' INTEREST IN THE OUTCOME OF THE

25  CASE AND ANY BIAS OR PREJUDICE; FIVE, WHETHER OTHER EVIDENCE

 1    CONTRADICTED THE WITNESS' TESTIMONY; SIX, THE REASONABLENESS OF

 2    THE WITNESS TESTIMONY IN LIGHT OF ALL THE EVIDENCE; AND, SEVEN,

 3    ANY OTHER FACTS THAT BEAR ON BELIEVABILITY.

 4              THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

 5    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

 6              NOW, YOU HAVE HEARD TESTIMONY FROM PERSONS WHO,

 7    BECAUSE OF EDUCATION OR EXPERIENCE, ARE PERMITTED TO STATE

 8    OPINIONS AND THE REASONS FOR THOSE OPINIONS.  OPINION TESTIMONY

 9    SHOULD BE JUDGED JUST LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT

10    IT OR REJECT IT AND GIVE IT AS MUCH WEIGHT AS YOU THINK IT

11    DESERVES CONSIDERING THE WITNESS' EDUCATION AND EXPERIENCE,

12    REASONS GIVEN FOR THE OPINION, AND ALL THE OTHER EVIDENCE IN

13    THE CASE.

14              NOW, THE LAW ALLOWS EXPERT WITNESSES TO ANSWER

15    HYPOTHETICAL QUESTIONS.  THESE ARE QUESTIONS IN WHICH THE

16    WITNESS IS ASKED TO ASSUME THE TRUTH OF A SET OF FACTS OR THE

17    STATE OF THE LAW AND TO GIVE AN OPINION BASED ON THOSE

18    ASSUMPTIONS.  ANY WEIGHT TO BE GIVEN THIS EVIDENCE DEPENDS ON

19    WHETHER OR NOT THE ASSUMPTIONS ARE TRUE.  AND IT IS FOR YOU TO

20    DECIDE WHETHER OR NOT YOU BELIEVE THE ASSUMPTIONS ARE TRUE.

21              NOW, CERTAIN CHARTS AND SUMMARIES HAVE BEEN RECEIVED

22    INTO EVIDENCE TO ILLUSTRATE FACTS BROUGHT OUT IN THE TESTIMONY

23    OF SOME WITNESSES.  CHARTS AND SUMMARIES ARE ONLY AS GOOD AS

24    THE UNDERLYING EVIDENCE THAT SUPPORTS THEM.  YOU SHOULD,

25    THEREFORE, GIVE THEM ONLY SUCH WEIGHT AS YOU THINK THE

1    UNDERLYING EVIDENCE DESERVES.

2            NOW, UNDER THE LAW, A CORPORATION IS CONSIDERED TO

3    BE A PERSON.  IT CAN ONLY ACT THROUGH ITS EMPLOYEES, AGENTS,

4    DIRECTORS, OR OFFICERS.  NOW, ALL PARTIES ARE EQUAL BEFORE THE

5    LAW, AND A CORPORATION IS ENTITLED TO THE SAME FAIR AND

6    CONSCIENTIOUS CONSIDERATION BY YOU AS ANY OTHER PARTY.

7            LET ME NOW INSTRUCT YOU ON THE APPLICABLE LAW YOU

8    ARE TO USE IN DECIDING THIS CASE.

9            FIRST INSTRUCT YOU ON THE LAW OF INVENTORSHIP.

10   PLAINTIFF FRANK SHUM CONTENDS THAT HE IS A COINVENTOR OF SIX

11   PATENTS INVOLVED IN THIS CASE AND THAT THOSE PATENTS SHOULD BE

12   AMENDED TO SHOW THAT HE IS A COINVENTOR OF A CLAIM OR CLAIMS IN

13   EACH PATENT.

14           THE PATENTS AT ISSUE ARE TWO PATENTS, THE '567 AND

15   THE '268, WHICH HAVE BEEN DESCRIBED AS THE STEP PATENTS OR THE

16   DIRECT-BONDED COPPER, DBC, PATENTS; AND FOUR PATENTS, THE '950,

17   '724, '427, AND '6,726, WHICH HAVE BEEN DESCRIBED AS THE

18   FLEXURE PATENTS.

19           THE DEFENDANT JEAN-MARC VERDIELL IS NAMED AS THE

20   SOLE INVENTOR ON FIVE OF THE PATENTS AND IS NAMED AS COINVENTOR

21   ALONG WITH FOUR OTHER PERSONS ON THE '427 PATENT.

22           NOW, AFTER A PATENT HAS BEEN ISSUED, THE LAW

23   PRESUMES THAT IT NAMES THE CORRECT INVENTORS.  IT IS,

24   THEREFORE, NECESSARY FOR A PERSON WHO CLAIMS TO BE A COINVENTOR

25   AND SEEKS TO CHANGE THE INVENTORS NAMED ON THE PATENT TO PROVE

1  THE FACT OF CO-INVENTORSHIP BY CLEAR AND CONVINCING EVIDENCE.

2          TO BE AN INVENTOR, A PERSON MUST MAKE A SIGNIFICANT

3  CONTRIBUTION TO THE CONCEPTION OF ONE OR MORE OF THE INVENTIONS

4  CLAIMED IN THE PATENT.  CONCEPTION MEANS THE FORMATION IN THE

5  MIND OF THE INVENTOR OF A DEFINITE AND PERMANENT IDEA OF THE

6  COMPLETE AND OPERATIVE INVENTION.

7          NOW, THE INVENTOR MUST ALSO MAKE A DISCLOSURE OF THE

8  INVENTION WHICH IS SUFFICIENT TO ENABLE A PERSON OF ORDINARY

9  SKILL IN THE ART OF THE INVENTION TO MAKE THE INVENTION OR

10  REDUCE IT TO PRACTICE.

11          A PERSON OF ORDINARY SKILL IN THE ART IS A

12  HYPOTHETICAL PERSON WHO POSSESSES A LEVEL OF KNOWLEDGE IN THE

13  RELEVANT FIELD OF ART WHICH HAS BEEN GAINED BY EDUCATION OR

14  EXPERIENCE AND WHICH ENABLES THE PERSON TO UNDERSTAND THE TYPES

15  OF PROBLEMS ENCOUNTERED IN THAT FIELD.

16          NOW, AN INVENTION IS REDUCED TO PRACTICE WHEN IT IS

17  SUFFICIENTLY DEVELOPED TO SHOW THAT IT WOULD WORK FOR ITS

18  INTENDED PURPOSE.

19          NOW, MORE THAN ONE PERSON MAY BE AN INVENTOR OF A

20  PATENT.  A PATENT MAY CONTAIN INDEPENDENT OR DEPENDENT CLAIMS.

21  AN INDEPENDENT CLAIM STANDS ALONE.  A DEPENDENT CLAIM DOES NOT

22  STAND ALONE AND RELATES TO ONE OR MORE OTHER CLAIMS.  A

23  DEPENDENT CLAIM INCORPORATES WHATEVER THE OTHER REFERENCED

24  CLAIM OR CLAIMS SAY.

25          TO BE A COINVENTOR, IT IS NOT NECESSARY THAT A

1    PERSON MAKE A SIGNIFICANT CONTRIBUTION TO THE CONCEPTION OF

2    EVERY CLAIM OF A PATENT, BUT IT IS NECESSARY THAT A PERSON MAKE

3    A SIGNIFICANT CONTRIBUTION TO THE CONCEPTION OF AT LEAST ONE OF

4    THE CLAIMS OF THE PATENT.

5              NOW, A PERSON WHO DOES NO MORE THAN HELP WITH

6    EXPERIMENTATION BY CARRYING OUT THE ACTUAL INVENTOR'S

7    INSTRUCTIONS OR BY EXPLAINING THE IDEAS OF THE ACTUAL INVENTOR

8    OR THE STATE OF THE ART IS NOT A COINVENTOR.

9              NOW, THE LAW OF INVENTORSHIP ALSO HOLDS THAT THE

10   UNCORROBORATED TESTIMONY OF A PERSON WHO CLAIMS TO BE AN

11   INVENTOR IS NOT SUFFICIENT IN AND OF ITSELF TO PROVE THE FACT

12   OF CO-INVENTORSHIP.  IT IS, THEREFORE, NECESSARY THAT IN ORDER

13   TO USE THE TESTIMONY OF A CLAIMED COINVENTOR TO PROVE THE FACT

14   OF CO-INVENTORSHIP, IT MUST BE CORROBORATED BY INDEPENDENT

15   EVIDENCE.  THAT CORROBORATION MAY BE PROVIDED BY INDEPENDENT

16   EVIDENCE FROM DOCUMENTS OR OTHER CIRCUMSTANCES OR BY THE

17   TESTIMONY OF OTHER PERSONS.

18             NOW, ANY DOCUMENT WHICH IS UNDATED OR NOT WITNESSED

19   BY ANOTHER PERSON IS TO BE GIVEN MINIMAL VALUE IN CORROBORATING

20   CONCEPTION.

21             IN ORDER TO CORRECT THE INVENTORSHIP OF ANY OF THE

22   ISSUED PATENTS IN THIS CASE, SHUM MUST PROVE THE FOLLOWING

23   THINGS:  ONE, THAT HE CONCEIVED IN WHOLE OR PART THE INVENTIONS

24   STATED IN ONE OR MORE OF THE CLAIMS OF THE PATENT; AND, TWO,

25   THAT HE DISCLOSED THE CONCEPTION RELATED TO THE INVENTION AT OR

1    ABOUT THE SAME TIME THAT IT WAS MADE.

2              WHENEVER IT IS NECESSARY TO INTERPRET THE MEANING OF

3    ANY TERM OF THE PATENT, THE LAW DIRECTS THAT THE INTERPRETATION

4    MUST BE DONE BY THE JUDGE.  PURSUANT TO THIS RESPONSIBILITY, I

5    HAVE INTERPRETED THE MEANING OF THE TERM "LEGS."  WHENEVER THAT

6    TERM IS USED IN ANY CLAIM IN ANY OF THE PATENTS IN THIS CASE,

7    IT MEANS "AN APPENDAGE TO THE BODY OF THE FLEXURE WHICH EXTENDS

8    DOWNWARD SUPPORTING THE FLEXURE ABOVE IT."

9              IF YOU CONSIDER THE TERM "LEGS" AS PART OF YOUR

10   DELIBERATIONS IN THIS CASE, YOU ARE TO ACCEPT AND USE THE TERM

11   AS I HAVE INTERPRETED IT.

12             NEXT, LET ME INSTRUCT YOU ON THE ELEMENTS OF

13   INTENTIONAL MISREPRESENTATION.

14             SHUM MAKES THIS CLAIM AGAINST BOTH VERDIELL AND

15   LIGHTLOGIC.  SHUM CLAIMS THAT VERDIELL MADE A FALSE

16   REPRESENTATION THAT HARMED HIM.  THE FALSE REPRESENTATION

17   CLAIMED IS THAT VERDIELL STATED TO SHUM THAT THE PATENT

18   APPLICATION LISTING SHUM AS THE INVENTOR WAS INVALID AND HAD TO

19   BE WITHDRAWN.  SHUM ALSO CLAIMS THAT THIS STATEMENT WAS MADE BY

20   MAREK ALBOSZTA AND THAT ALBOSZTA WAS SPEAKING AT THE DIRECTION

21   OF VERDIELL WHEN HE MADE THE STATEMENT.

22             TO ESTABLISH THIS CLAIM, SHUM MUST PROVE ALL OF THE

23   FOLLOWING:  ONE, THAT VERDIELL REPRESENTED TO SHUM THAT AN

24   IMPORTANT FACT WAS TRUE; TWO, THAT VERDIELL'S REPRESENTATION

25   WAS FALSE; THREE, THAT VERDIELL KNEW THAT THE REPRESENTATION

REBUTTAL CLOSING ARGUMENT \ KIRSCH

1   WAS FALSE WHEN HE MADE IT OR THAT HE MADE THE REPRESENTATION

2   RECKLESSLY AND WITHOUT REGARD FOR ITS TRUTH; FOUR, THAT

3   VERDIELL INTENDED THAT SHUM RELY ON THE REPRESENTATION; FIVE,

4   THAT SHUM REASONABLY RELIED ON VERDIELL'S REPRESENTATION; SIX,

5   THAT SHUM WAS HARMED; AND, SEVEN, THAT SHUM'S RELIANCE ON

6   VERDIELL'S REPRESENTATION WAS A SUBSTANTIAL FACTOR IN CAUSING

7   HIS HARM.

8           WELL, A FACT IS IMPORTANT IF IT WOULD INFLUENCE A

9   REASONABLE PERSON'S JUDGMENT OR CONDUCT.  A FACT IS ALSO

10  IMPORTANT IF THE PERSON WHO REPRESENTS IT KNOWS THAT THE PERSON

11  TO WHOM THE REPRESENTATION IS MADE IS LIKELY TO BE INFLUENCED

12  BY IT, EVEN IF A REASONABLE PERSON WOULD NOT.

13          NOW, LIABILITY FOR MISREPRESENTATION CAN BE BASED

14  ONLY ON A STATEMENT MADE BY VERDIELL OR AT HIS DIRECTION.  IT

15  IS NOT TO BE BASED ON THE FACT THAT VERDIELL DID NOT DISCLOSE

16  SOMETHING TO SHUM.

17          SHUM RELIED ON VERDIELL'S ALLEGED MISREPRESENTATIONS

18  IF THEY CAUSED HIM TO AGREE TO THE PLAN OF LIQUIDATION AND

19  DISSOLUTION OF RADIANCE AND IF IT IS PROBABLY TRUE THAT HE

20  WOULD NOT HAVE DONE SO WITHOUT SUCH MISREPRESENTATIONS.

21          IT IS NOT NECESSARY FOR A MISREPRESENTATION TO BE

22  THE ONLY REASON FOR SHUM'S CONDUCT.

23          IT IS ENOUGH IF A MISREPRESENTATION SUBSTANTIALLY

24  INFLUENCED SHUM'S CHOICE, EVEN IF IT WAS NOT THE ONLY REASON

25  FOR HIS CHOICE.

1          IF YOU DECIDE THAT SHUM HAS PROVED HIS CLAIM AGAINST

2     VERDIELL OR LIGHTLOGIC, YOU ALSO MUST DECIDE HOW MUCH MONEY

3     WILL REASONABLY COMPENSATE SHUM FOR THE HARM.  THIS

4     COMPENSATION IS CALLED DAMAGES.

5          THE AMOUNT OF DAMAGES MUST INCLUDE AN AWARD FOR EACH

6     ITEM OF HARM THAT WAS CAUSED BY VERDIELL OR LIGHTLOGIC'S

7     WRONGFUL CONDUCT, EVEN IN THE PARTICULAR HARM COULD NOT HAVE

8     BEEN ANTICIPATED.

9          NOW, AN ACT CAUSES HARM IF IT IS A SUBSTANTIAL

10    FACTOR IN BRINGING ABOUT THE HARM.

11         A SUBSTANTIAL FACTOR IN CAUSING HARM IS A FACTOR

12    THAT A REASONABLE PERSON WOULD CONSIDER TO HAVE CONTRIBUTED TO

13    THE HARM.  IT MUST BE MORE THAN A REMOTE OR TRIVIAL FACTOR.  IT

14    DOES NOT HAVE TO BE THE ONLY CAUSE OF HARM.

15         CONDUCT IS NOT A SUBSTANTIAL FACTOR IN CAUSING HARM

16    IF THE SAME HARM WOULD HAVE OCCURRED WITHOUT THAT CONDUCT.

17         NOW, SHUM DOES NOT HAVE TO PROVE THE EXACT AMOUNT OF

18    DAMAGES THAT WILL PROVIDE REASONABLE COMPENSATION FOR THE HARM;

19    HOWEVER, YOU MUST NOT SPECULATE OR GUESS IN AWARDING DAMAGES.

20         NOW, THE ARGUMENTS OF THE ATTORNEYS ARE NOT EVIDENCE

21    OF DAMAGES.  YOUR AWARD MUST BE BASED ON YOUR REASONED JUDGMENT

22    APPLIED TO THE TESTIMONY OF THE WITNESSES AND THE -- THE OTHER

23    EVIDENCE THAT HAS BEEN ADMITTED DURING TRIAL.

24         SHUM CLAIMS THAT HE WAS HARMED BY AN INTENTIONAL

25    MISREPRESENTATION BY VERDIELL.  SHUM ALSO CLAIMS THAT

1  LIGHTLOGIC IS RESPONSIBLE FOR THE HARM BECAUSE VERDIELL WAS

2  ACTING AS LIGHTLOGIC'S AGENT WHEN THE INTENTIONAL

3  MISREPRESENTATION IS ALLEGED TO HAVE OCCURRED.

4          THE INTENT OR KNOWLEDGE OF THE CORPORATION CAN BE

5  BASED ON THE INTENT OR KNOWLEDGE OF ITS OFFICERS OR AGENTS WHEN

6  THEY ACT WITHIN THE SCOPE OF THEIR EMPLOYMENT.  IF YOU FIND

7  THAT VERDIELL MADE AN INTENTIONAL MISREPRESENTATION THAT HARMED

8  SHUM, THEN YOU MUST DECIDE WHETHER LIGHTLOGIC IS ALSO

9  RESPONSIBLE FOR THE HARM.  LIGHTLOGIC IS RESPONSIBLE IF SHUM

10  PROVES BOTH OF THE FOLLOWING:  ONE, THAT VERDIELL WAS ACTING AS

11  LIGHTLOGIC'S AGENT WHEN THE INTENTIONAL MISREPRESENTATION

12  OCCURRED; AND, TWO, THAT VERDIELL WAS ACTING WITHIN THE SCOPE

13  OF HIS AGENCY TO LIGHTLOGIC WHEN HE MADE THE INTENTIONAL

14  MISREPRESENTATIONS.

15          NEXT, I'LL INSTRUCT YOU ON THE LAW REGARDING BREACH

16  OF CONTRACT.  TO RECOVER DAMAGES FROM VERDIELL FOR BREACH OF

17  CONTRACT, SHUM MUST PROVE ALL OF THE FOLLOWING BY A

18  PREPONDERANCE OF THE EVIDENCE:  ONE, THAT SHUM AND VERDIELL

19  ENTERED INTO A CONTRACT; TWO, THAT SHUM DID ALL OR

20  SUBSTANTIALLY ALL OF THE SIGNIFICANT THINGS THAT THE CONTRACT

21  REQUIRED HIM TO DO; THREE, THAT VERDIELL FAILED TO DO SOMETHING

22  THAT THE CONTRACT REQUIRED HIM TO DO OR DID SOMETHING THAT THE

23  CONTRACT PROHIBITED HIM FROM DOING; AND, FOUR, THAT SHUM WAS

24  HARMED BY THAT CONDUCT.

25          NOW, I HAVE ALREADY DETERMINED THAT THE PLAN OF

 1    LIQUIDATION IS A VALID, ENFORCEABLE CONTRACT BETWEEN SHUM AND

 2    VERDIELL.  YOUR TASK IS TO EVALUATE WHETHER VERDIELL'S ACTIONS

 3    CONSTITUTE A BREACH OF THE PLAN OF LIQUIDATION, NOT TO

 4    DETERMINE WHETHER A CONTRACT EXISTS.

 5          WHENEVER IT IS NECESSARY TO INTERPRET THE MEANING OF

 6    A CONTRACT, THE LAW DIRECTS THAT THE INTERPRETATION MUST BE

 7    DONE BY THE JUDGE.  PURSUANT TO THIS RESPONSIBILITY, I HAVE

 8    INTERPRETED SOME OF THE PROVISIONS IN THE PLAN OF LIQUIDATION.

 9          FIRST, I HAVE INTERPRETED THE SECTION OF THE PLAN OF

10    LIQUIDATION ENTITLED "BUSINESS ACTIVITIES OF OFFICERS AND

11    DIRECTORS."

12          THIS PROVISION ELIMINATES ANY LIABILITY BETWEEN SHUM

13    AND VERDIELL BASED UPON THE CONDUCT OF BUSINESS ACTIVITIES BY

14    SHUM OR VERDIELL IN ANY COMMERCIAL EXPLOITATION OF RADIANCE

15    TECHNOLOGIES AND ALLOWS THEM TO COMPETE WITH EACH OTHER WITHOUT

16    NOTICE TO EACH OTHER OR ANY ACCOUNTING AS TO PROFITS.  THIS

17    PROVISION ALSO ELIMINATES ANY LIABILITY BETWEEN SHUM AND

18    VERDIELL BASED SOLELY ON EITHER PARTY OBTAINING A LAWFUL PATENT

19    RELATED TO THE PROPERTY DEVELOPED BY RADIANCE.

20          NOW, SECOND, I HAVE INTERPRETED THE SECTION OF THE

21    PLAN OF LIQUIDATION ENTITLED "DISTRIBUTION OF PROPERTY."  NOW,

22    THIS SECTION PROVIDES THAT VERDIELL AND SHUM SHALL HAVE EQUAL

23    RIGHTS TO INDEPENDENTLY EXPLOIT THE INTELLECTUAL PROPERTY

24    DEVELOPED BY RADIANCE.  THIS PROVISION MEANS THAT SHUM AND

25    VERDIELL WERE ENTITLED TO LAWFULLY PATENT ANY OF THEIR OWN

1   INVENTIONS CONTAINED IN THE INTELLECTUAL PROPERTY, WHICH HAD

2   PREVIOUSLY BEEN THE PROPERTY OF RADIANCE.

3           NOW, A PATENT ISSUED TO THE ACTUAL INVENTOR IS A

4   LAWFUL PATENT.  IF AN ACTUAL COINVENTOR IS NOT NAMED AND THE

5   OMISSION IS INTENDED TO DECEIVE THE PTO, THE PATENT IS INVALID

6   AND UNLAWFUL.  IF AN ACTUAL COINVENTOR HAS NOT BEEN NAMED BUT

7   THE OMISSION WAS MADE WITHOUT ANY -- WITHOUT ANY INTENT TO

8   DECEIVE THE PTO, THE PATENT CAN BE CORRECTED TO BE A LAWFUL

9   PATENT.

10          IF IT APPEARS THAT A PATENT APPLICATION HAS BEEN

11  FILED AND IT DOES NOT NAME AN ACTUAL COINVENTOR AND THAT THE

12  OMISSION WAS MADE WITH AN INTENT TO DECEIVE THE PTO, THE

13  APPLICATION MUST BE WITHDRAWN.

14          NOW, PATENT INVENTORSHIP AND PATENT OWNERSHIP ARE

15  SEPARATE ISSUES.

16          THE NAMED INVENTOR AND ANY NAMED COINVENTORS ARE

17  CONSIDERED TO BE OWNERS OF THE PATENT AS A MATTER OF LAW.

18          UNDER THE PATENT LAW, EACH COINVENTOR WHO IS A

19  CO-OWNER BECAUSE OF THAT CAN USE OR SELL HIS OWN RIGHTS IN THE

20  PATENT WITHOUT THE PERMISSION OF OTHER COINVENTORS AND WITHOUT

21  HAVING TO SHARE PROFITS WITH THE OTHER COINVENTORS.

22          NOW, OTHER -- OTHER PERSONS MAY ALSO BE OWNERS OF A

23  PATENT UNDER THIS APPLICABLE PROPERTY LAWS.  IN THIS CASE, BOTH

24  SHUM AND VERDIELL HAD AGREEMENTS WITH THE COMPANY RADIANCE THAT

25  ANY INTELLECTUAL PROPERTY THEY DEVELOPED WHEN THEY WORKED FOR

1   RADIANCE AND WHICH WAS RELATED TO THE BUSINESS OF RADIANCE WAS

2   THE PROPERTY OF RADIANCE.

3          AT THE TIME RADIANCE WAS DISSOLVED, IT OWNED ALL THE

4   INTELLECTUAL PROPERTY INCLUDING ANY INVENTIONS WHICH HAD BEEN

5   DEVELOPED BY SHUM OR VERDIELL DURING THEIR WORK FOR THE

6   COMPANY.

7          RADIANCE DID NOT OWN ANY PATENTS AS IT DID NOT HAVE

8   ANY PATENT APPLICATIONS ON FILE AND NO PATENTS ON ITS

9   INTELLECTUAL PROPERTY HAD EVER BEEN ISSUED.

10          THE ONLY SECTION IN THE RADIANCE PLAN OF LIQUIDATION

11  THAT DEALS WITH THE DISTRIBUTION OF ITS INTELLECTUAL PROPERTY

12  IS THE SECTION ON EQUAL RIGHTS TO INDEPENDENTLY EXPLOIT.  THIS

13  PROVISION MEANS THAT THE PLAN OF LIQUIDATION DOES NOT TRANSFER

14  OWNERSHIP RIGHTS TO EITHER SHUM OR VERDIELL AS TO ANY FUTURE

15  PATENTS ISSUED ON THE INTELLECTUAL PROPERTY BUT THAT BOTH SHUM

16  AND VERDIELL CAN BECOME THE OWNER OF ANY LAWFUL PATENT ISSUED

17  TO THEM AS AN INVENTOR.

18          NOW, IF YOU CONSIDER THESE PROVISIONS OF THE PLAN OF

19  LIQUIDATION AS PART OF YOUR DELIBERATIONS IN THIS CASE, YOU ARE

20  TO ACCEPT AND USE THE PROVISIONS AS I HAVE INTERPRETED THEM.

21          NOW, IF YOU DECIDE THAT SHUM HAS PROVED HIS CLAIM

22  AGAINST VERDIELL FOR BREACH OF CONTRACT, YOU MUST ALSO DECIDE

23  HOW MUCH MONEY WILL REASONABLY COMPENSATE SHUM FOR THE HARM

24  CAUSED BY THE BREACH.  THIS COMPENSATION IS CALLED DAMAGES, AND

25  THE PURPOSE OF SUCH DAMAGES IS TO PUT SHUM IN AS GOOD A

 1  POSITION AS HE WOULD HAVE BEEN IF VERDIELL HAD PERFORMED AS

 2  PROMISED.

 3         NOW, AN ACT CAUSES HARM IF IT IS A SUBSTANTIAL

 4  FACTOR IN BRINGING ABOUT THE HARM.  SUBSTANTIAL FACTOR IN

 5  CAUSING HARM IS A FACTOR THAT A REASONABLE PERSON WOULD

 6  CONSIDER TO HAVE CONTRIBUTED TO THE HARM.  IT MAY BE MORE THAN

 7  A -- IT MUST BE MORE THAN A REMOTE OR TRIVIAL FACTOR.  IT DOES

 8  NOT HAVE TO BE THE ONLY CAUSE OF THE HARM.  CONDUCT IS NOT A

 9  SUBSTANTIAL FACTOR IN CAUSING HARM IF THE SAME HARM WOULD HAVE

10  OCCURRED WITHOUT THAT CONDUCT.

11         TO RECOVER DAMAGES FOR ANY HARM, SHUM MUST PROVE,

12  ONE, THAT THE HARM WAS LIKELY TO ARISE IN THE ORDINARY COURSE

13  OF EVENTS FROM THE BREACH OF THE CONTRACT; OR, TWO, THAT WHEN

14  THE CONTRACT WAS MADE, BOTH PARTIES COULD HAVE REASONABLY

15  FORESEEN THE HARM AS THE PROBABLE RESULT OF THE BREACH.

16         NOW, SHUM MUST ALSO PROVE THE AMOUNT OF HIS DAMAGES

17  ACCORDING TO THE FOLLOWING INSTRUCTIONS.  HE DOES NOT HAVE TO

18  PROVE THE EXACT AMOUNT OF DAMAGES, BUT YOU MUST NOT SPECULATE

19  OR GUESS IN AWARDING DAMAGES.  IN CALCULATING THE AMOUNT OF

20  DAMAGES FOR BREACH OF CONTRACT, DO NOT TAKE INTO ACCOUNT ANY

21  AMOUNT THAT YOU ALREADY INCLUDED IN DETERMINING DAMAGES, IF

22  ANY, FOR SHUM'S CLAIM FOR INTENTIONAL MISREPRESENTATION OR

23  UNJUST ENRICHMENT.

24         FINALLY, LET ME INSTRUCT YOU ON THE LAW OF UNJUST

25  ENRICHMENT.  UNJUST ENRICHMENT OCCURS WHEN A PARTY UNJUSTLY

1    RECEIVES A BENEFIT AT THE EXPENSE OF ANOTHER.  SHUM ASSERTS

2    CLAIMS FOR UNJUST ENRICHMENT AGAINST VERDIELL AND LIGHTLOGIC.

3    SHUM MUST PROVE UNJUST ENRICHMENT BY A PREPONDERANCE OF THE

4    EVIDENCE.

5                IN ORDER TO ESTABLISH A CLAIM FOR UNJUST ENRICHMENT,

6    SHUM MUST PROVE THE FOLLOWING THINGS:  ONE, THE DEFENDANT

7    RECEIVED A BENEFIT.  A BENEFIT IS ANY TYPE OF PECUNIARY OR

8    ECONOMIC ADVANTAGE TO CONFER A BENEFIT.  IT IS NOT NECESSARY

9    THAT MONEY BE PAID DIRECTLY TO THE RECIPIENT BY THE PARTY

10   CLAIMING UNJUST ENRICHMENT.

11               TWO, THE BENEFIT MUST BE RECEIVED AT THE EXPENSE OF

12   SHUM.  THIS MEANS THAT SHUM MUST PROVE THAT HE HAS A LAWFUL

13   CLAIM TO THE BENEFIT.

14               THREE, RETENTION OF THE BENEFIT IS UNJUST.  THE FACT

15   THAT A PARTY OBTAINS A BENEFIT IS NOT OF ITSELF SUFFICIENT TO

16   MAKE A FINDING OF UNJUST ENRICHMENT.  THE PARTY RECEIVING THE

17   BENEFIT IS LIABLE ONLY IF HE HAS ENGAGED IN WRONGFUL CONDUCT

18   WHICH HAS CAUSED HIS RECEIPT OF THE BENEFIT AND IF THE

19   CIRCUMSTANCES ARE SUCH THAT AS BETWEEN THE TWO PARTIES, IT IS

20   UNJUST FOR THE BENEFITED PARTY TO RETAIN THE BENEFIT.

21               IN LIGHTLOGIC'S CASE, THIS REQUIRES PROOF THAT THE

22   WRONGFUL CONDUCT WAS ENGAGED IN BY AN AGENT OF LIGHTLOGIC WHO

23   WAS ACTING WITH THE SCOPE OF HIS AGENCY TO LIGHTLOGIC WHEN THE

24   WRONGFUL CONDUCT OCCURRED.

25               NOW, YOU MAY NOT MAKE A FINDING OF UNJUST ENRICHMENT

REBUTTAL CLOSING ARGUMENT \ KIRSCH

1   IF YOU FIND THAT AN EXPRESS BINDING AGREEMENT EXISTED AND

2   DEFINED THE PARTIES' RIGHTS WITH RELATION TO THE BENEFIT.

3         IF YOU FIND THAT SHUM HAS PROVEN HIS UNJUST

4   ENRICHMENT CLAIM AGAINST VERDIELL, YOU MUST DETERMINE THE

5   AMOUNT OF ANY BENEFIT THAT VERDIELL RECEIVED THAT IS PROPERLY

6   ATTRIBUTABLE TO HIS WRONGFUL CONDUCT.  LIKEWISE, IF YOU FIND

7   THAT SHUM HAS PROVEN HIS UNJUST ENRICHMENT AGAINST -- HIS

8   UNJUST ENRICHMENT CLAIM AGAINST LIGHTLOGIC, YOU MUST DETERMINE

9   THE AMOUNT OF ANY BENEFIT THAT LIGHTLOGIC RECEIVED THAT IS

10  PROPERLY ATTRIBUTABLE TO WRONGFUL CONDUCT BY ITS AGENTS.

11        IN CALCULATING THE AMOUNT OF ANY UNJUST ENRICHMENT,

12  DO NOT TAKE INTO ACCOUNT ANY AMOUNT THAT YOU ALREADY INCLUDED

13  IN DETERMINING DAMAGES, IF ANY, FOR SHUM'S CLAIM FOR

14  INTENTIONAL MISREPRESENTATION OR BREACH OF CONTRACT.

15        IN CALCULATING THE AMOUNT OF ANY UNJUST ENRICHMENT

16  TO LIGHTLOGIC, DO NOT INCLUDE ANY AMOUNTS THAT YOU ALREADY

17  INCLUDED IN DETERMINING THE AMOUNT OF VERDIELL'S UNJUST

18  ENRICHMENT, IF ANY.

19        LET ME SAY A FEW WORDS ABOUT YOUR DELIBERATIONS.

20  FIRST, KEEP IN MIND THAT ANY -- FIRST, KEEP IN MIND THAT

21  NOTHING I HAVE SAID IN THESE INSTRUCTIONS IS INTENDED TO

22  SUGGEST TO YOU IN ANY WAY WHAT I THINK YOUR VERDICT SHOULD BE.

23  THAT'S ENTIRELY FOR YOU TO DECIDE.

24        NOW, YOUR VERDICT MUST REPRESENT THE CONSIDERED

25  JUDGMENT OF EACH JUROR.  IN ORDER TO RETURN A VERDICT, IT IS

 1 NECESSARY THAT EACH JUROR AGREE.  THE LAW REQUIRES THAT ANY

 2 VERDICT YOU RETURN MUST BE UNANIMOUS.

 3          NOW, DEPENDING UPON THE VERDICT YOU RETURN, YOU MAY

 4 BE REQUIRED TO CONSIDER ANOTHER PHASE TO THIS TRIAL.

 5          WHEN YOU RETIRE, IT IS YOUR DUTY TO DISCUSS THE CASE

 6 WITH YOUR FELLOW JURORS FOR THE PURPOSE OF REACHING AGREEMENT

 7 IF YOU CAN DO SO.  EACH OF YOU MUST DECIDE THE CASE FOR

 8 YOURSELF.  BUT YOU SHOULD DO SO ONLY AFTER CONSIDERING ALL THE

 9 EVIDENCE, LISTENING TO THE VIEWS OF YOUR FELLOW JURORS, AND

10 DISCUSSING IT FULLY WITH THE OTHER JURORS.  DO NOT BE AFRAID TO

11 CHANGE YOUR MIND OR CHANGE YOUR OPINION IF THE DISCUSSION

12 PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

13 SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.  IT IS IMPORTANT

14 THAT YOU REACH YOUR VERDICT IF YOU CAN DO SO CONSCIENTIOUSLY.

15 HOWEVER, DO NOT SURRENDER AN HONEST CONVICTION AS TO THE WEIGHT

16 AND EFFECT OF THE EVIDENCE SIMPLY TO ARRIVE AT A VERDICT.

17          REMEMBER ALSO THAT YOUR VERDICT MUST BE BASED SOLELY

18 ON THE EVIDENCE IN THE CASE AND THE LAW AS THE COURT HAS GIVEN

19 IT TO YOU, NOT ON ANYTHING ELSE.  THE OPENING STATEMENTS,

20 CLOSING STATEMENTS OR OTHER STATEMENTS OR ARGUMENTS OF THE

21 COUNSEL ARE NOT EVIDENCE, AND IF YOUR RECOLLECTION DIFFERS FROM

22 THE WAY COUNSEL HAVE STATED IT, THEN YOUR RECOLLECTION

23 CONTROLS.

24          NOW, SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.

25 REMEMBER THAT NOTES ARE ONLY FOR THE PERSONAL USE OF THE PERSON

1    WHO TOOK THEM.  THEY'RE NOT TO BE READ OR GIVEN TO OTHERS.

2                    AND IT'S VERY IMPORTANT THAT YOU NOT COMMUNICATE

3    WITH ANYONE OUTSIDE THE JURY ROOM ABOUT YOUR DELIBERATIONS OR

4    ABOUT ANYTHING TOUCHING THIS CASE.  THERE'S ONLY ONE EXCEPTION

5    TO THIS RULE.  IF IT BECOMES NECESSARY DURING YOUR

6    DELIBERATIONS TO COMMUNICATE WITH THE COURT, YOU MAY SEND A

7    NOTE THROUGH THE COURTROOM DEPUTY SIGNED BY YOUR FOREPERSON OR

8    BY ONE OR MORE MEMBERS OF THE JURY.

9                    NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO

10   COMMUNICATE WITH THE COURT EXCEPT BY A SIGNED WRITING AND THE

11   COURT WILL NEVER COMMUNICATE WITH ANY MEMBER OF THE JURY ON ANY

12   SUBJECT TOUCHING THE MERITS OF THE CASE OTHER THAN IN WRITING

13   OR ORALLY HERE IN OPEN COURT.

14                   IF YOU SEND ANY NOTES TO THE COURT, DO NOT DISCLOSE

15   ANYTHING ABOUT YOUR DELIBERATIONS.  SPECIFICALLY DO NOT

16   DISCLOSE TO ANYONE, NOT EVEN TO THE COURT, HOW THE JURY STANDS

17   NUMERICALLY OR OTHERWISE ON THE QUESTIONS BEFORE YOU UNTIL

18   AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR YOU HAVE BEEN

19   DISCHARGED.

20                   WHEN YOU RETIRE TO THE JURY ROOM, YOU'LL SELECT ONE

21   OF YOUR MEMBERS TO ACT AS YOUR FOREPERSON.  THAT PERSON WILL

22   PRESIDE OVER YOUR DELIBERATIONS AND WILL SPEAK FOR YOU HERE IN

23   COURT.

24                   LET ME READ TO YOU THE VERDICT FORMS WHICH YOU ARE

25   TO USE IN YOUR DELIBERATIONS.  THESE FORMS ASK YOU TO MAKE

1    FINDINGS ON ALL THE ISSUES THAT I'VE JUST DISCUSSED WITH YOU.

2         NOW, THE VERDICT FORM STARTS WITH A SECTION ON THE

3    ISSUE OF INVENTORSHIP.  AND IT ASKS YOU TO CONSIDER EACH ONE OF

4    THE PATENTS THAT ARE A PART OF THIS CASE.  LET ME DESCRIBE THE

5    FIRST ONE.

6         THE FIRST ONE IS AS TO U.S. PATENT NO. 5,577,567

7    (SIC), THE STEP OR DBC PATENT.  AND IT READS, WE THE JURY FIND

8    THAT PLAINTIFF FRANK SHUM HAS PROVEN BY CLEAR AND CONVINCING

9    EVIDENCE THAT HE IS A COINVENTOR OF THE FOLLOWING CLAIMS OF

10   U.S. PATENT NO. 5,977,567:  CLAIM 1, AND THERE'S -- YOU FILL IN

11   "YES" OR "NO."  AND THEN CLAIM 6, "YES" OR "NO."  AND THEN

12   THERE'S FOUR OTHER CLAIMS FOR YOU TO DECIDE UPON AS TO THAT

13   PATENT.

14        THERE ARE SIMILAR FORMS FOR EACH OF THE OTHER

15   PATENTS, THE -- THE '268 PATENT, AND THERE ARE FOUR CLAIMS

16   THERE FOR YOU TO DECIDE UPON.

17        AND THEN THERE IS U.S. PATENT NO. 6,207,950, WHICH

18   IS A FLEXURE PATENT.  AND THERE, AGAIN, YOU'RE ASKED TO MAKE A

19   DECISION AS TO EACH CLAIM THAT IS LISTED IN THE VERDICT FORM.

20   THERE ARE FOUR CLAIMS THAT ARE LISTED THERE, AND YOU'RE TO

21   REACH A DECISION ON EACH ONE OF THOSE CLAIMS AND ANSWER IT AS

22   "YES" OR "NO."

23        SAME THING IS TRUE OF THE FLEXURE PATENT, THE '726

24   FLEXURE PATENT, AND ALSO AS TO THE '724 FLEXURE PATENT, AND.

25   FINALLY, THE 6 -- THE '6,726 FLEXURE PATENT, FOUR FLEXURE

1    PATENTS, YOU'RE TO MAKE A DECISION AS TO EACH OF THE LISTED

2    CLAIMS ON EACH ONE OF THOSE PATENTS.

3          THEN THERE'S ALSO A FORM WITH REFERENCE TO CLAIM OF

4    INTENTIONAL MISREPRESENTATION.  AND THAT CLAIM READS AS

5    FOLLOWS: "WE THE JURY FIND THAT SHUM HAS PROVEN BY A

6    PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS JEAN-MARC

7    VERDIELL AND LIGHTLOGIC COMMITTED INTENTIONAL

8    MISREPRESENTATION."  THEN YOU'RE ASKED TO MAKE A DECISION AS TO

9    EACH OF THOSE DEFENDANTS AND ANSWER IT, VERDIELL, "YES" OR

10   "NO," LIGHTLOGIC, "YES" OR "NO."

11         THEN IF YOU ANSWER "YES" TO THAT EITHER DEFENDANT IN

12   THOSE QUESTIONS, YOU'RE TO ANSWER QUESTION 9, WHICH SAYS, "WE,

13   THE JURY, FIND THAT THE AMOUNT OF DAMAGES SHUM SUFFERED AS A

14   RESULT OF MISREPRESENTATION IS" AND THEN FILL IN A DOLLAR

15   FIGURE.

16         THERE'S ALSO A FORM FOR BREACH OF CONTRACT, WHICH IS

17   SIMILAR AND IT ASKS YOU TO FIND WHETHER OR NOT VERDIELL

18   BREACHED THE PLAN OF LIQUIDATION.  AND ANSWER THAT QUESTION

19   "YES" OR "NO."  AND IF YOU ANSWER "YES," DECIDE UPON THE

20   DAMAGES.

21         AND THERE'S ALSO A FORM FOR THE UNJUST ENRICHMENT.

22   LET ME READ THAT TO YOU.  "WE, THE JURY, FIND THAT SHUM HAS

23   PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS,

24   VERDIELL AND LIGHTLOGIC, WERE UNJUSTLY ENRICHED AT SHUM'S

25   EXPENSE."  YOU'RE TO ANSWER AS TO EACH DEFENDANT, VERDIELL,

1    "YES" OR "NO," LIGHTLOGIC, "YES" OR "NO."  AND THEN IF YOU

2    ANSWERED "YES" AS TO EITHER OF THOSE DEFENDANTS, YOU ARE TO

3    ANSWER THE LAST QUESTION, WHICH SAYS, "WE, THE JURY, FIND THAT

4    THE AMOUNT OF THE BENEFIT WHICH HAS BEEN UNJUSTLY RETAINED BY

5    THE DEFENDANT" IS AND FILL IN A -- AN AMOUNT FOR EITHER

6    VERDIELL OR FOR LIGHTLOGIC.

7            ALL RIGHT.  YOU CAN NOW RETIRE TO THE DELIVERY

8    ROOM -- DELIBERATION ROOM, THE JURY ROOM, TO BEGIN YOUR

9    DELIBERATIONS.  AND AFTER YOU'VE REACHED A UNANIMOUS AGREEMENT

10   ON A VERDICT, YOUR FOREPERSON IS TO FILL IN THE FORM THAT HAS

11   BEEN GIVEN TO YOU, SIGN AND DATE IT AND ADVISE THE COURTROOM

12   DEPUTY THAT YOU'RE READY TO RETURN TO THE COURTROOM.

13           SO YOU MAY NOW BEGIN YOUR DELIBERATIONS.  THANK YOU.

14           (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

15   PRESENCE OF THE JURY:)

16           **THE COURT:**  OKAY.  NOW, WE DON'T REQUIRE JURIES TO

17   JUST STAY THERE UNTIL THEY REACH A VERDICT.

18                   (LAUGHTER.)

19           **THE COURT:**  WHAT'S SO FUNNY?  I USED TO DO THAT ALL

20   THE TIME.  THEY USED TO GO OUT AND THEY DON'T GO HOME AGAIN

21   UNTIL THEY REACH A VERDICT.  IF THEY HAVE TO STAY OVERNIGHT,

22   THEY'RE SEQUESTERED.  ALL RIGHT.  BUT WE DON'T DO THAT ANYMORE.

23   AND SO THEY CAN GO HOME TONIGHT IF THEY DON'T REACH A VERDICT

24   TODAY.

25           NOW, WE LEAVE THAT UP TO THEM GENERALLY TO MAKE UP

1    THEIR OWN TIME, AND THEY'LL GIVE US A DESCRIPTION OF HOW THEY

2    DECIDED UPON THAT.  GENERALLY, THEY'LL USE THE SAME TIME FRAME

3    THAT WE -- EVERYBODY'S, YOU KNOW, ALREADY USED TO.  AND WE

4    COULD EXPECT THEM TO DELIBERATE BETWEEN 9:00 AND 4:00.

5             AND THEY ALSO DELIBERATE ON FRIDAYS.  I MEAN,

6    FRIDAY'S NOT AN OFF DAY FOR DELIBERATION.  THEY CAN STAY IN

7    THERE AND DO THAT WHILE WE'RE OUT HERE IN COURT, SO IF THEY'RE

8    STILL DELIBERATING ON FRIDAY, WE ANTICIPATE THEY WILL.  NOT ON

9    THE WEEKEND.  SO -- BUT WE'LL -- AS I SAID, WE'LL LEAVE THAT UP

10   TO THEM.

11            NOW, I WOULD LIKE YOUR AGREEMENT THAT WE WILL NOT

12   NEED TO BRING THE JURY BACK INTO THE JURY ROOM (SIC) EVERY TIME

13   THEY WANT TO GO ON A RECESS AND THAT WE'LL SIMPLY INFORM YOU OF

14   WHAT THEY TELL US WHEN THEY DO THAT OR WHEN THEY GO HOME AT

15   NIGHT.

16            SO I GUESS YOU'LL AGREE TO THAT.  AND SO WE'LL LET

17   YOU KNOW WHAT THEY REPORT TO US AS THEIR SCHEDULE AND WHAT'S

18   GOING TO HAPPEN.

19            ALL RIGHT.  NOW, IT IS NOT TOTALLY UNUSUAL THAT THEY

20   ASK QUESTIONS.  AND IF THE JURY ASKS A QUESTION, AS I SAID IN

21   HERE, THEY'LL WRITE IT OUT AND THEY'LL SEND IT IN.  NOW, IF

22   THEY SEND IN A QUESTION, WE'LL GET TOGETHER AND WE'LL DECIDE

23   UPON -- THAT IS, I WILL DECIDE UPON, GIVEN YOUR INPUT INTO MY

24   DECISION, BUT I'LL DECIDE UPON WHAT THE ANSWER IS.  AND WE'LL

25   WRITE IT OUT AND SEND IT BACK TO THEM IN WRITTEN FORM.  AND

1   THEN YOU'LL SEE WHAT THAT IS.

2            ALL RIGHT.  NOW, YOU DON'T NEED TO STAY HERE IN THE

3   COURTROOM, BUT YOU NEED TO BE AVAILABLE SO WE CAN GET YOU ON A

4   RELATIVELY FORESHORTENED BASIS.  SO LET FRANCES KNOW HOW WE'RE

5   GOING TO BE ABLE TO GET HOLD OF YOU.  AND THAT MEANS NOBODY

6   GOES HOME.  YOU GOT TO FIGURE OUT SOME WAY WHERE WE GET HOLD OF

7   YOU AND GET YOU HERE WITHIN A RELATIVELY SHORT PERIOD OF TIME.

8   I DON'T WANT YOU OVER THERE IN SAN FRANCISCO AND THEN DRIVING

9   OVER HERE.  SO EVERYBODY HAS TO BE AROUND AND AVAILABLE FOR

10  THEM.

11           NOW, THEY WILL UNDOUBTEDLY BE ASKING FOR EXHIBITS

12  AND I TAKE IT THAT EVERYBODY HAS GONE THROUGH THIS AND THE --

13  THE ONLY THING WE NEED TO KNOW IS THAT THERE'S AN AGREEMENT AS

14  TO WHAT IS IN EVIDENCE AND THEN WE'LL SEND IT IN TO THEM IF

15  THEY ASK FOR IT.

16           BUT HAS EVERYBODY -- ARE YOU SATISFIED THAT THERE'S

17  NO QUESTION WHAT'S IN EVIDENCE?  OKAY.  WE'LL LEAVE THAT UP TO

18  FRANCES, BUT WE'LL LET YOU KNOW WHAT THEY ASK FOR.  BUT WE'LL

19  SEND IT IN IF IT'S IN EVIDENCE.

20           **MR. TANGRI:**  THERE IS ONE OUTSTANDING QUESTION ON

21  THAT, YOUR HONOR, WHICH IS THE DOCUMENT THAT THEY TALKED ABOUT

22  YESTERDAY AND --

23           **THE COURT:**  THE BOOK.

24           **MR. TANGRI:**  YEAH, THE BOOK.  WE'VE PREPARED AN

25  EXHIBIT CONSISTING OF THE PORTIONS OF THE BOOK WHICH THE

 1   WITNESS REFERRED TO IN HIS TRIAL TESTIMONY.

 2          **THE COURT:**  OKAY.

 3          **MR. TANGRI:**  AND SO THAT'S WHAT WE THINK OUGHT TO BE

 4   THE APPROPRIATE THING.

 5          **MR. JANSEN:**  I HAVEN'T SEEN THAT, BUT --

 6              (SIMULTANEOUS COLLOQUY.)

 7          **MR. JANSEN:**  WE ACTUALLY TALKED WITH THE COUNSEL

 8   YESTERDAY ABOUT -- THEY'RE DESIGNATING VIRTUALLY THE ENTIRE

 9   BOOK, WHY NOT JUST PUT THE WHOLE BOOK THERE.  THE BOOK CAN BE

10   HERE -- IF THE JURY WANTS TO LOOK AT IT, THEY CAN HAVE THE

11   WHOLE BOOK.

12          **THE COURT:**  THE BOOK'S IN EVIDENCE, BUT IN TERMS OF

13   WHAT WE'LL SEND IN TO THEM IS WE'LL SEND IN THE FRONT PAGE AND

14   THEN WE'LL SEND IN THOSE THINGS THAT HAVE BEEN REFERRED TO IN

15   THE TESTIMONY THAT SHOULD -- THE EXHIBIT -- THAT'S WHAT THE

16   EXHIBIT SHOULD BE.

17          **MR. TANGRI:**  THAT IS WHAT THE EXHIBIT IS.

18          **MR. JANSEN:**  I DISAGREE, YOUR HONOR.  THEY'VE

19   DONE -- THEY'VE ATTACHED THREE CHAPTERS THAT WERE REFERRED TO

20   IN PASSING BY THE -- THE CHAPTER ON INTELLECTUAL PROPERTY DUE

21   DILIGENCE, THEY ONLY ATTACHED TWO PAGES WHICH I ASKED THE

22   WITNESSES ABOUT, SO I THINK IT'S REALLY NOT IN CONTEXT --

23          **THE COURT:**  WELL SEE, THEN THAT'S WHAT I --

24              (SIMULTANEOUS COLLOQUY.)

25          **THE COURT:**  DOESN'T SURPRISE ME THAT YOU DON'T

1    AGREE.

2              **MR. JANSEN:**  I THINK WE JUST PUT THE BOOK IN FOR

3    CONTEXT.

4              **THE COURT:**  WELL, I DON'T KNOW.  THE BOOK DOESN'T --

5    THE WHOLE BOOK DOESN'T GO IN.  WE DON'T WANT TO SEND IN A BOOK

6    THAT IS SIMPLY BECAUSE IT'S A BOOK.  THEY OUGHT TO KNOW WHAT IT

7    IS, AND THEY -- THEY OUGHT TO BE ABLE, THEN, TO LOOK AT THOSE

8    THINGS THAT HAVE BEEN REFERRED TO IN THE TESTIMONY.

9              **MR. JANSEN:**  I HAVE --

10             **THE COURT:**  NO MORE.

11             **MR. TANGRI:**  AND LET ME BE CLEAR ABOUT HOW THIS WAS

12   ASSEMBLED SINCE COUNSEL MADE A REMARK ABOUT IT.  THEY SENT US A

13   SELECTION OF PAGES THAT THEY SAID THEY WANTED TO PROFFER.  WE

14   ADDED TO THAT TWO OTHER SECTIONS OF THE BOOK TO WHICH THE

15   WITNESS HAD REFERRED IN HIS TESTIMONY.  WE DIDN'T TAKE ANYTHING

16   OUT OF WHAT THEY ADDED US -- WHAT THEY SENT US.

17             **MR. JANSEN:**  I WAS TAKING YOUR COMMENTS LITERALLY,

18   YOUR HONOR, JUST TO PUT IN THE PAGES I ACTUALLY HAD READ TO THE

19   WITNESS AND PUT ON THE SCREEN.

20             **THE COURT:**  THAT'S WHAT WE SHOULD BE DOING.

21             **MR. JANSEN:**  IT'S JUST THREE PAGES.

22             **THE COURT:**  THE SECTIONS REFERRED TO.  AND THAT

23   INCLUDES IN THIS DEFINITION, THINGS THAT THEY HAD NEVER SEEN.

24             **MR. TANGRI:**  WELL, YOUR HONOR, JUST -- THE CONCERN

25   IS THIS COUNSEL CROSS-EXAMINED THE WITNESS ABOUT A PAGE OR TWO.

 1   AND THE WITNESS, IN GIVING HIS ANSWER, SAID I WILL NOTE THAT

 2   THIS SECTION ON LEGAL DUE DILIGENCE, WHICH INCLUDES THE VERY

 3   SMALL PIECE --

 4          **THE COURT:** OKAY.  SO THE WHOLE SECTION.

 5               (SIMULTANEOUS COLLOQUY.)

 6          **THE COURT:** ALL RIGHT.  SO --

 7          **MR. TANGRI:** -- MUCH LARGER SECTIONS THAT DEAL WITH

 8   MANAGEMENT DUE DILIGENCE --

 9          **THE COURT:** NO, YOU'RE CONVINCING ME JUST PUT THE

10   WHOLE BOOK IN.

11          **MR. TANGRI:** THAT FINE, YOUR HONOR.

12          **MR. JANSEN:** I THINK WE SHOULD DO THAT.

13          **THE COURT:** WHY GET INTO A PROBLEM.  I DON'T THINK

14   THEY'RE GOING TO GO THERE AND READ THE BOOK.

15          **MR. TANGRI:** I DON'T THINK SO EITHER, BUT I --

16          **THE COURT:** OKAY.  WELL, THEY --

17          **MR. JANSEN:** IT WAS REFERRED TO.

18          **THE COURT:** THE ORDER OF THE COURT WILL BE, THEN,

19   THE BOOK GOES IN.  JUST TAKE THE ACTUAL BOOK AND WE'LL PUT THAT

20   IN AS EXHIBIT, AND IT WILL GO IN IF THEY REQUEST IT.

21          **MR. JANSEN:** IT'S EXHIBIT 1208 THAT WAS REFERRED

22   TO -- THIS IS THE BOOK I ACTUALLY HANDED UP TO THE WITNESS ON

23   THE STAND, VERY SAME COPY.

24          **THE COURT:** AND THEN TOMORROW, MAYBE IN THE

25   AFTERNOON, WE'LL GET A QUESTION "WE'VE READ PAGE 457 OF THE

1    BOOK, AND IT SEEMS TO SAY SO AND SO.  DOES THAT MEAN..." --

2          OKAY.  IF THAT'S WHAT WE'RE GOING TO DO, THAT'S WHAT

3    WE'LL DO.  ALL RIGHT?  THEN -- THEN STICK AROUND AND WE'LL LET

4    YOU KNOW AS SOON AS WE GET ANY INFORMATION FROM THEM AS TO WHAT

5    THEY HAVE DECIDED UPON THEIR SCHEDULE.  OKAY?

6          **MR. KIRSCH:**  THANK YOU.

7          **MR. JANSEN:**  THANK YOU.

8          **MR. TANGRI:**  THANK YOU.

9              (JURY DELIBERATING.)

10             (RECESS TAKEN AT 3:26 P.M.)

11             (JURY RECESSED AT 4:00 P.M.; TO RESUME ON THURSDAY,

12   DECEMBER 18, 2008 AT 9:00 A.M.)

13                  --OOO--

14

15

16

17

18

19

20

21

22

23

24

25

REBUTTAL CLOSING ARGUMENT \ KIRSCH

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL, ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, DECEMBER 18, 2008