UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE D. LOWELL JENSEN, JUDGE

| | | |
|---|---|---|
| FRANK T. SHUM, | ) | |
| | ) | ***ORIGINAL*** |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 02-3262 DLJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| JEAN-MARC VERDIELL AND | ) | PAGES 1 – 53 |
| LIGHTLOGIC, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | FRIDAY, AUGUST 15, 2008 |

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:         TOWNSEND AND TOWNSEND AND CREW LLP
                       TWO EMBARCADERO CENTER, EIGHTH FLOOR
                       SAN FRANCISCO, CALIFORNIA  94111
               BY:  PAUL F. KIRSCH,
                    ROBERT A. MCFARLANE, ATTORNEYS AT LAW


FOR DEFENDANT:         TAYLOR & CO. LAW OFFICES
                       ONE FERRY BUILDING SUITE 355
                       SAN FRANCISCO, CALIFORNIA  94111
               BY:  JAYESH S. HINES-SHAH, ATTORNEY AT LAW

                       KEKER & VAN NEST
                       710 SANSOME STREET
                       SAN FRANCISCO, CALIFORNIA  94111-1704
               BY:  RAGESH K. TANGRI, ATTORNEY AT LAW


REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258

```
 1  FRIDAY, AUGUST 15, 2008                          2:02 P.M.

 2                    P R O C E E D I N G S

 3           THE CLERK:  CALLING CIVIL ACTION 02-3262, FRANK SHUM

 4  VERSUS INTEL LIGHTLOGIC AND VERDIELL.

 5           COUNSEL, PLEASE COME FORWARD AND STATE YOUR

 6  APPEARANCES.

 7           MR. MCFARLANE:  GOOD AFTERNOON, YOUR HONOR.  ROBERT

 8  MCFARLANE OF TOWNSEND AND TOWNSEND AND CREW FOR THE PLAINTIFF.

 9  AND WITH ME, PAUL KIRSCH.

10           MR. TANGRI:  GOOD AFTERNOON, YOUR HONOR.  RAGESH

11  TANGRI FROM KEKER & VAN NEST FOR THE DEFENDANTS.  AND WITH ME

12  IS JAY HINES-SHAH FROM TAYLOR & COMPANY LAW OFFICE.

13           THE COURT:  REMAIN ON YOUR FEET.  GO AHEAD,

14  MR. MCFARLANE.

15           MR. MCFARLANE:  THANK YOU, YOUR HONOR.  FIRST, I'D

16  LIKE TO THANK THE COURT FOR ALLOWING THE PARTIES THE

17  OPPORTUNITY TO APPEAR BEFORE YOU THIS AFTERNOON FOR THE CLAIM

18  CONSTRUCTION HEARINGS.  THE SOLE ISSUE THAT WE'LL BE ADDRESSING

19  TODAY IS THE MEANING OF THE CLAIM TERM "LEGS" THAT'S USED IN

20  THE FOUR FLEXURE PATENTS THAT ARE AT ISSUE IN THIS SUIT.

21           AND IF I MAY, YOUR HONOR, I'VE PREPARED SOME SLIDES,

22  AND I CAN GIVE YOU A HARD COPY OF THOSE.

23           MR. MCFARLANE:  THANK YOU.

24           AND ALSO HAVE A COPY FOR OPPOSING COUNSEL.

25           MR. TANGRI:  THANKS.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

```
 1                    (PAUSE IN THE PROCEEDINGS.)

 2          MR. MCFARLANE:  OKAY.  YOUR HONOR, THE PLAINTIFF AND

 3   DEFENDANTS HAVE BOTH PROPOSED QUITE DIVERGING CONSTRUCTIONS OF

 4   THE TERM "LEG."  PLAINTIFF'S PROPOSED CONSTRUCTION IS SIMPLY

 5   "AN APPENDAGE OF THE FLEXURE THAT SUPPORTS THE FLEXURE."  AND

 6   THE DEFENDANTS HAVE ADDED TO THAT TO PROPOSE "AN APPENDAGE TO

 7   THE BODY OF THE FLEXURE WHICH EXTENDS DOWNWARD SUPPORTING THE

 8   STRUCTURE ABOVE IT."

 9          AND SO THE DISPUTE IS WHETHER THE TERM "LEG" IS

10   LIMITED STRICTLY TO EXTENSIONS THAT GO DOWNWARD FROM THE BODY

11   OF THE FLEXURE AND SUPPORT A STRUCTURE ABOVE IT.

12          NOW, APPLYING THE PRINCIPLES SET FORTH IN THE

13   EN BANC FEDERAL CIRCUIT CASE PHILLIPS THAT CAME DOWN AFTER THE

14   PREVIOUS CLAIM CONSTRUCTION, WE SEE THAT DEFENDANTS' LEG --

15   DEFENDANTS' REQUEST TO IMPOSE THESE ADDITIONAL RESTRICTIONS ON

16   THE CLAIM TERM SHOULD BE REJECTED FOR SEVERAL REASONS.  AND

17   WE'VE OUTLINED NUMEROUS REASONS IN OUR BRIEF, BUT I'D LIKE TO

18   FOCUS ON ONLY A FEW THIS AFTERNOON.

19          THE FIRST THING I'D LIKE TO FOCUS ON IS COMPELLING

20   INTRINSIC EVIDENCE, SOME OF IT RAISED IN THE DEFENDANTS'

21   BRIEFS, THAT CLEARLY DEMONSTRATE THAT THE TERM "LEG" SHOULD NOT

22   BE SO LIMITED.  AND THE SECOND THING I WOULD LIKE TO FOCUS ON

23   IS THAT DEFENDANTS' PROPOSED CONSTRUCTION FLATLY CONTRADICTS

24   THE FILE HISTORIES OF THE '950, THE '6,726 AND THE '724 PATENT.

25   AND, AGAIN, THOSE FILE HISTORIES ARE ALL INTRINSIC RECORD UNDER
```

 1  THE PHILLIPS CASE.

 2             AND, THIRD, I'D LIKE TO SPECIFICALLY ADDRESS AN

 3  INCORRECT ARGUMENT IN THE DEFENDANTS' BRIEF THAT INDICATES THAT

 4  THE '724 PATENT FILE HISTORY CONTROLS THE MEANING OF THE TERM

 5  "LEG" ACROSS ALL FLEXURE PATENTS.  AND THE REASON THAT ARGUMENT

 6  IS WRONG UNDER CONTROLLING FEDERAL CIRCUIT PRECEDENT IS THAT

 7  THE '724 PATENT IS NOT FORMALLY RELATED TO THE OTHER FLEXURE

 8  PATENTS.

 9             SO THE FIRST THING I'D LIKE TO LOOK AT WITH THE

10  COURT IS THE FILE HISTORY OF THE '724 PATENT, WHICH WE'VE

11  BRIEFED IN OUR PAPERS.

12             **THE COURT:**  IF I COULD, WHEN YOU SAID THAT, YOU SAY

13  '724 DOES NOT CONTROL OTHER PATENTS.

14             **MR. MCFARLANE:**  THAT'S CORRECT.

15             **THE COURT:**  EVEN THE PATENT THAT IT'S FILED --

16             **MR. MCFARLANE:**  IT WAS FILED THE SAME DAY, YOUR

17  HONOR, AS THE APPLICATION THAT LED TO THE '950 PATENT.

18  HOWEVER, THE '750 (SIC) PATENT WAS NEVER FORMALLY JOINED TO

19  THOSE PATENTS AS A CONTINUATION, THE CONTINUATION PART OF A

20  DIVISIONAL.  AND SO UNDER THE FEDERAL CIRCUIT CASE GOLDENBERG,

21  WHICH I WILL DISCUSS IN A MOMENT, THAT FILE HISTORY OF THE '724

22  PATENT DOES NOT CONTROL THE CLAIM CONSTRUCTION IN THE OTHER

23  PATENTS.

24             **THE COURT:**  WHEN WE DO CLAIMS CONSTRUCTION AND USE

25  THIS TERM "LEGS," IF "LEGS" APPEARS IN MORE THAN ONE CLAIM OF

1   THE PATENT, DOES IT HAVE TO HAVE THE SAME CONSTRUCTION IN EVERY

2   CLAIM?

3           **MR. MCFARLANE:**  MOST LIKELY, YES.  AND THE ARGUMENT

4   HERE IS WHETHER THE CLAIM TERM ITSELF "LEG" IS INTRINSICALLY

5   LIMITED TO THE STRUCTURE THAT DEFENDANTS ASK IT BE LIMITED TO

6   OR WHETHER IT INCLUDES BOTH DOWNWARD EXTENDING LEGS -- PLANAR

7   STRUCTURES OR STRUCTURES IN WHICH THE LEGS EXTEND UPWARD FROM

8   THE BODY.  AND THE INTRINSIC EVIDENCE THAT I'LL GO THROUGH

9   SUPPORTS THAT BROADER MEANING.

10          **THE COURT:**  ARE THERE SITUATIONS WHERE IF YOU HAVE

11  CLAIM CONSTRUCTION OF A TERM LIKE "LEGS" AND IT'S USED IN MORE

12  THAN ONE PATENT, UNDER WHAT CIRCUMSTANCES DOES IT HAVE TO BE

13  THE SAME IN EACH PATENT?

14          **MR. MCFARLANE:**  IF THE FILE HISTORIES ARE DIFFERENT

15  IN EACH PATENT, THEN THAT WOULD, UNDER -- UNDER CERTAIN

16  CIRCUMSTANCES, I THINK, SUPPORT HAVE HAVING A DIFFERENT CLAIM

17  CONSTRUCTION FROM PATENT TO PATENT.  HOWEVER --

18          **THE COURT:**  ARE YOU SAYING THERE SHOULD BE DIFFERENT

19  CLAIM CONSTRUCTIONS HERE FOR THESE FOUR PATENTS?

20          **MR. MCFARLANE:**  NO, YOUR HONOR.  WE BELIEVE THAT IN

21  EACH PATENT, INCLUDING THE '724 PATENT, THAT THE BROADER CLAIM

22  CONSTRUCTION IS APPROPRIATE.

23          **THE COURT:**  OKAY.

24          **MR. MCFARLANE:**  AND AS WE'VE SAID IN OUR BRIEF,

25  THERE ARE APPENDAGES IDENTIFIED DURING THE PROSECUTION OF THE

1  '724 PATENT THAT THE EXAMINER IDENTIFIED AS LEGS THAT WERE

2  HORIZONTAL IN NATURE.  THEY WERE NOT DOWNWARD EXTENDING FROM

3  THE BODY.

4          I'LL PUT BRIEFLY ON THE SCREEN HERE THE FIGURE THAT

5  WE HAVE IN OUR BRIEF FROM THE '724 FILE HISTORY WHERE THE

6  FIGURE SHOWS APPENDAGES IDENTIFIED AS LEGS.

7          **THE COURT:**  THIS IS A FIGURE THAT WASN'T IN THE

8  PATENT THEMSELVES BUT WAS PART OF THE INTRINSIC -- OR WHAT IS

9  IT?

10          **MR. MCFARLANET:**  CORRECT, YOUR HONOR.  THIS IS PART

11  OF THE FILE HISTORY.  THE EXAMINER CITED THIS PATENT DURING THE

12  PROSECUTION.

13          AND UNDER PHILLIPS, BECAUSE HE CITED IT, BECAUSE IT

14  WAS DISCUSSED IN THE PROSECUTION HISTORY, IT BECOMES PART OF

15  THE INTRINSIC --

16          **THE COURT:**  WELL, IT MAY BE PART OF THE RECORD, BUT

17  THAT'S DIFFERENT THAN SAYING IT CONTROLS IT.

18          **MR. MCFARLANE:**  YES, SIR.  IT'S PART OF THE FILE

19  HISTORY.  SO UNDER PHILLIPS, YOU LOOK TO THE INTRINSIC

20  RECORD --

21          **THE COURT:**  RIGHT.

22          **MR. MCFARLANE:**  -- WHICH IS THE SPECIFICATION -- THE

23  CLAIMS, THE SPECIFICATIONS, AND THE PROSECUTION HISTORY.

24          **THE COURT:**  OKAY.

25          **MR. MCFARLANE:**  AND SO THIS IS PART OF THE

1    PROSECUTION HISTORY OF THE '724 PATENT.

2              AND ALSO IN OUR BRIEF, WE LOOK AT ANOTHER FIGURE

3    THAT'S AGAIN IN THE SAME CITED SHIMAOKA REFERENCE CITED DURING

4    THE '724.  THE EXAMINER IN THIS CASE IDENTIFIED FOUR DIFFERENT

5    STRUCTURES AS LEGS, AND YOU CAN SEE THEM ON THE FIGURE THERE.

6    ONE IS DOWNWARD EXTENDING.  TWO EXTEND OUTWARDS.  AND ONE

7    EXTENDS UPWARDS.  AND SO HERE IN THIS -- IN THIS REFERENCE THAT

8    THE EXAMINER REVIEWED, THE TERM "LEG" WAS NOT RESTRICTED AS THE

9    DEFENDANTS REQUEST.

10             NOW, I'D ALSO LIKE TO LOOK AT THE INTRINSIC RECORD

11   FROM THE '950 PATENT.  AT DEFENDANTS' BRIEF AT PAGE 9, THEY

12   REFER TO AN H-SHAPED STRUCTURE THAT'S REFERENCED IN THE FILE

13   HISTORY OF THE '950 PATENT, AND IT'S ALSO REFERENCED IN THE

14   FILE HISTORY OF THE '6,726 PATENT.

15             THE REFERENCE COMES FROM A BELENKIY PATENT.  AND FOR

16   COMPLETENESS, YOUR HONOR, I'VE ATTACHED A COPY TO THE BINDER I

17   GAVE YOU.

18             AND IT'S UNITED STATES PATENT 5,553,180.

19             AND IN THIS, THE FIGURE THAT IS OF INTEREST IS

20   FIGURE 2 FROM THE BELENKIY PATENT, WHICH SHOWS THE H-SHAPED

21   STRUCTURE THAT DEFENDANTS HAVE TALKED ABOUT.  AND IN REJECTING

22   SOME OF THE CLAIMS AT ISSUE, THE EXAMINER SPECIFICALLY FOUND

23   THAT THE HORIZONTAL STRUCTURES THAT ARE LABELED 34 IN THIS

24   FIGURE WERE LEGS.  AND THEY'RE PLANAR IN THAT FIGURE.  AND SO

25   THE EXAMINER --

1          **THE COURT:**  DOES THE FIGURE HAVE THAT LITTLE

2     IDENTIFYING THING THAT SAYS IDENTIFY --

3          **MR. MCFARLANE:**  I'VE ADDED THAT TO --

4          **THE COURT:**  THAT'S NOT IN THE PATENT.  THAT'S ADDED

5     TO --

6          **MR. MCFARLANE:**  YES, THAT IS -- THAT IS, YOUR HONOR.

7     THE DESCRIPTION IN THE PATENT -- THIS IS FROM THE

8     SPECIFICATION, AND THIS PART -- AND THIS IS THE PART THAT THE

9     PATENT EXAMINER RELIED ON IN HIS DISCUSSIONS WITH MR. VERDIELL,

10    SAYS THE H-SHAPED CONFIGURATION OF THE BODY DEFINES TWO PAIRS

11    OF LEG PORTIONS 34 JOINED BY BRIDGE PORTION 36.

12          AND SO THE EXAMINER CITED THAT DURING THE

13    PROSECUTION AND FOUND THAT THE HORIZONTAL EXTENDING PLANAR

14    FEATURES OF THIS WERE, IN FACT, LEGS.

15          AND SO THAT ARGUMENT --

16          **THE COURT:**  WITH THE ONE THAT IT RIGHT ANGLES WITH

17    SO -- IT'S NOT PLANAR WITH 36.

18          **MR. MCFARLANE:**  36 IS THE BRIDGE.

19          **THE COURT:**  I KNOW, BUT THAT'S PART OF THE FLEXURE.

20          **MR. MCFARLANE:**  YES.  YES.

21          **THE COURT:**  ALL RIGHT.

22          **MR. MCFARLANE:**  AND SO YOU CAN SEE IN THE -- IN THE

23    FIGURE THE WAY THAT THIS H-SHAPED BODY IS USED IN THE PRIOR ART

24    DEVICE, THERE'S TWO OPTICAL CABLE DEVICES THAT ARE LINED UP

25    THROUGH IT.  AND THEN THE TOP LEGS AND THE BOTTOM LEGS HOLD

1    THAT FEATURE TOGETHER.

2              AND NOW IN FACING THIS REJECTION, VERDIELL COULD

3    HAVE ARGUED EASILY THAT THE STRUCTURES SHOWN IN FIGURE 2 WERE

4    NOT LEGS BECAUSE HIS -- THE LEGS IN HIS INVENTION WERE DOWNWARD

5    EXTENDING, SUPPORTING A BODY ABOVE IT.  BUT VERDIELL DID NOT

6    MAKE THAT ARGUMENT.

7              VERDIELL DISTINGUISHED THAT REFERENCE.  AT FIRST, HE

8    SUMMARIZED THE EXAMINER'S REJECTION, RECOGNIZED THAT THE

9    EXAMINER BELIEVED THAT BELENKIY DOES SHOW THE FLEXURE IN AN

10   H-SHAPED STRUCTURE AND BODY.  AND THEN THE H-SHAPED BODY

11   REFERRED TO BY THE EXAMINER IS A STRUCTURE THAT'S DESIGNED TO

12   HOLD A PAIR OF CONNECTORS IN PLACE WITH RESPECT TO EACH OTHER.

13   AND HE GOES ON.

14             AND NOWHERE IN HIS ARGUMENT IS ANYTHING ABOUT

15   DOWNWARD EXTENDING LEGS OR ANYTHING ABOUT LEGS HAVING TO

16   SUPPORT A BODY ABOVE THIS.  HE RECOGNIZED THAT THE HORIZONTAL

17   PLANAR LEGS IN FIGURE 2 WERE, IN FACT, LEGS, AS HE UNDERSTOOD

18   IT.

19             THIS SAME --

20        **THE COURT:**  ARE YOU SAYING THE LEGS ARE PART OF A

21   FLEXURE THAT IS ATTACHED TO AN OPTICAL ELEMENT IN THE PATENT?

22   MEAN, IN THE PATENTS AT ISSUE, THE -- ALL THE LEGS ARE ATTACHED

23   TO FLEXURE THAT IS ATTACHED TO A OPTICAL ELEMENT.

24        **MR. MCFARLANE:**  YES, YOUR HONOR.

25        **THE COURT:**  HE'S SAYING THIS ONE IS NOT?

1              **MR. MCFARLANE:**  RIGHT.  HE DISTINGUISHED THIS

2       FLEXURE BASED ON WHAT IT WAS CONNECTED TO, NOT BASED ON --

3              **THE COURT:**  OKAY.

4              **MR. MCFARLANE:**  -- THE GEOMETRIC SHAPE OF THE LEGS,

5       WHETHER THEY WENT UP, WHETHER THEY WENT DOWN.

6              **THE COURT:**  ALL RIGHT.

7              **MR. MCFARLANE:**  AND THIS SAME REFERENCE WAS CITED

8       ONCE AGAIN IN THE -- IN THE '6,726 FILE HISTORY.  AND SO ONCE

9       AGAIN, IN THIS CASE, THE APPLICANT REPRODUCED THE CLAIM, AGAIN

10      SHOWING THE LEG WITH TWO LEGS, A BRIDGE, AND A PAIR OF SPRING

11      REGIONS.  AND IN A VERY, VERY SIMILAR ARGUMENT, HE RECOGNIZED

12      THE EXAMINER HAD MADE THE SAME ARGUMENT, AGAIN RECOGNIZING THE

13      EXAMINER BELIEVED THAT THE BELENKIY REFERENCE DOES INCLUDE THE

14      FLEXURE BECAUSE IT HAS THE H SHAPE.  AND THEN HE MADE ALMOST

15      WORD FOR WORD THE SAME DISTINCTION ONCE AGAIN BASED ON WHAT THE

16      FLEXURE WAS ATTACHED TO, NOT THE GEOMETRIC ORIENTATION OF THE

17      LEGS.

18              SO HERE, AGAIN, THE APPLICANT ACCEPTED THAT THESE

19      HORIZONTAL PLANAR STRUCTURES WERE, IN FACT, LEGS AND

20      DISTINGUISHED IT ON OTHER GROUNDS.  AND SO NOTHING IN THE '950

21      OR THE '6,726 FILE HISTORY SUPPORTS THE NARROW CONSTRUCTION

22      THAT THE DEFENDANTS SEEK.

23              SO THE NEXT ISSUE I WOULD LIKE TO TOUCH ON IS THE

24      DEFENDANTS' ARGUMENTS RELYING ON THE FILE HISTORY FROM THE '724

25      PATENT.  AND IF YOUR HONOR RECALLS, THE '724 PATENT IS THE ONE

 1   PATENT THAT WAS AMENDED DURING PROSECUTION TO ADD THE "LEGS

 2   SPREADING APART" LANGUAGE.

 3          SO TO UNDERSTAND THIS ARGUMENT, I'VE PUT UP A FAMILY

 4   TREE.  AND IF THE COURT IS LOOKING AT THE HARD COPIES, IT'S ON

 5   PAGE 12 OF THE PRESENTATION.  NOW THE DEFENDANTS STATE IN THEIR

 6   BRIEF AT PAGE 3 THAT THE '950 AND THE '724 PATENTS STEM FROM

 7   THE SAME PARENT APPLICATION AND, ACCORDINGLY, THE PROSECUTION

 8   HISTORIES OF THE TWO PATENTS ARE RELEVANT TO UNDERSTANDING THE

 9   TERM "LEGS" ACROSS BOTH PATENTS.

10          NOW, IF YOU LOOK AT THE ARRANGEMENTS OF HOW THE

11   PATENTS CAME ABOUT, THE APPLICATION THAT RESULTED IN THE '950

12   PATENT WAS FILED ON MARCH 27TH OF 2001.  AND THEN THE

13   APPLICATION THAT BECAME THE '427 PATENT WAS FILED AS A

14   CONTINUATION IN PART OF THE '950 PATENT.

15          AND, AGAIN, THE '6,726 PATENT RESULTED FROM AN

16   APPLICATION THAT RESULTED IN A DIVISIONAL OF THE '950 PATENT.

17   NOW, THE '724 PATENT WAS FILED THE SAME DAY AS THE APPLICATION

18   THAT LED TO THE '950 PATENT, BUT IT WAS FILED AS A SEPARATE

19   PATENT APPLICATION.  IT WAS NOT FORMALLY RELATED AS A

20   CONTINUATION OR A CONTINUATION IN PART OR ANOTHER WAY.

21          AND SO THE QUESTION IS, CAN YOU RELY ON THE

22   NARROWING AMENDMENTS MADE IN THE '724 TO RESTRICT THE OTHER

23   CLAIMS AND -- THE CLAIMS IN THE UNRELATED PATENTS.  AND THE

24   FEDERAL CIRCUIT HAS ANSWERED THAT QUESTION NO.

25          IN A CASE THAT'S ON ALL FOUR'S WITH OUR CASE -- AND

```
 1   I DIRECT THE COURT TO GOLDENBERG VS. DAY, AND IT'S 373 F.3D

 2   1158 --

 3              THE COURT:  NOW, IF YOU LOOK AT THESE PATENTS, '950,

 4   9 -- AND '724, FOR EXAMPLE, THEY EACH HAVE SEVEN FIGURES.  AND

 5   IN EACH INSTANCE, THE FIGURES ARE IDENTICAL.

 6              DOES THAT HAVE ANY SIGNIFICANCE?

 7              MR. MCFARLANE:  UNDER THIS PRECEDENT IT DOES NOT,

 8   YOUR HONOR, BECAUSE IT'S A QUESTION OF WHAT THE INTRINSIC

 9   RECORD REFLECTS.

10              THE COURT:  WELL, THE INTRINSIC RECORD INCLUDES THE

11   FIGURES, OBVIOUSLY.

12              MR. MCFARLANE:  IT INCLUDES THE FIGURES OF BOTH

13   PATENTS.

14              THE COURT:  RIGHT.

15              MR. MCFARLANE:  THE QUESTION IS HOW -- WHAT DO THOSE

16   FIGURES -- WHAT DO THOSE PATENT APPLICATIONS PUT THE PUBLIC ON

17   NOTICE OF?

18              THE COURT:  THEY'RE EXACTLY THE SAME IN BOTH

19   PATENTS.

20              MR. MCFARLANE:  IF SOMEBODY IS LOOKING AT THE '950

21   PATENT TO SEE IF THEY INFRINGE, WHAT MUST THEY LOOK AT?  MUST

22   THEY LOOK --

23              THE WITNESS:  AT LEAST THEY LOOK AT THE FIGURES --

24              (SIMULTANEOUS COLLOQUY.)

25              MR. MCFARLANE:  -- '950 PATENT AND ITS CHILDREN
```

```
1    PATENTS, THE CONTINUATIONS IN PART.

2              BUT LOOKING AT THE '950 PATENT, A MEMBER OF THE

3    PUBLIC WOULD NOT AUTOMATICALLY KNOW THAT THE '724 PATENT IS A

4    RELATED PATENT BECAUSE IT'S NOT LISTED.

5              THE COURT:  WELL, YOU CAN LOOK AT THE FIGURES, AND

6    THEY'RE EXACTLY THE SAME FIGURES IN BOTH PATENTS.

7              MR. MCFARLANE:  THAT'S CORRECT, YOUR HONOR.  AND THE

8    POINT I'D LIKE TO MAKE IS THE ARGUMENTS BASED ON THE FILE

9    HISTORY, THE STATEMENTS MADE BY THE APPLICANT --

10             THE COURT:  ALL RIGHT.

11             MR. MCFARLANE:  -- AND THEN IN THE '724 PATENT

12   DURING PROSECUTION, SPECIFIC CLAIM AMENDMENTS WERE MADE ADDING

13   THIS LANGUAGE, "THE LEGS MUST SPREAD APART."

14             THE COURT:  RIGHT.

15             MR. MCFARLANE:  AND SO THAT LANGUAGE DOES NOT APPEAR

16   IN THE FIGURES, DOES NOT APPEAR IN THE -- IN THE TEXT OF THE

17   '950 IN THE OTHER CLAIMS.

18             THE COURT:  OBVIOUSLY, CAN'T --

19             MR. MCFARLANE:  PARDON, YOUR HONOR?

20             THE COURT:  IT CAN'T APPEAR IN THE FIGURES.  THE

21   LANGUAGE CAN'T APPEAR IN FIGURES.  I GOT THAT.  YEAH.  OKAY.

22             MR. MCFARLANE:  AND SO IN THE GOLDENBERG CASE, THE

23   FEDERAL CIRCUIT LOOKED AT A VERY SIMILAR CASE TO OURS.  THE

24   PATENT APPLICANT FILED TWO VERY SIMILAR PATENT APPLICATIONS THE

25   SAME DAY.  THEY EVEN HAD CONSECUTIVE SERIAL NUMBERS.  ONE WAS
```

1    THE 126,261 PATENT, AND THE OTHER WAS THE 126,262 PATENT.

2              AND THEN IN THIS, THERE WERE FOUR PATENT

3    APPLICATIONS AT ISSUE:  BASED ON THE '261 PATENT, ANOTHER

4    CONTINUATION IN PART APPLICATION WAS FILED THAT RESULTED IN THE

5    '559 PATENT.  AND THEN BASED ON THE '262 APPLICATION, AN

6    ADDITIONAL CONTINUATION IN PART APPLICATION WAS FILED THAT

7    RESULTED IN THE '744 PATENT.

8              AND THE FEDERAL CIRCUIT WAS ASKED WHETHER OR NOT THE

9    FILE HISTORY OF THE '744 PATENT, INCLUDING ITS PREVIOUS

10   APPLICATION COULD BE CONSIDERED IN CONSTRUING THE TERMS OF THE

11   '559 PATENT.  AND THE FEDERAL CIRCUIT SAID NO.

12             THE FEDERAL CIRCUIT SAID -- IN THE ABSENCE OF AN

13   INCORPORATION INTO THE INTRINSIC EVIDENCE, THIS COURT'S

14   PRECEDENT TAKES A NARROW VIEW ON WHETHER A RELATED PATENT OR

15   PROSECUTION HISTORY IS AVAILABLE TO CONSTRUE THE CLAIMS OF A

16   PATENT AT ISSUE AND DRAWS A DISTINCT LINE BETWEEN PATENTS THAT

17   HAVE A FAMILIAL RELATIONSHIP AND THOSE THAT DO NOT.

18             AND THE COURT CONCLUDED THAT THE '261 AND THE '262

19   APPLICATIONS WERE FILED SEPARATELY AND, THEREFORE, LACKED THE

20   FORMAL RELATIONSHIP NECESSARY FOR FREE LICENSE TO USE THE

21   CONTENTS OF THE '744 PATENT AND ITS PROSECUTION HISTORY WHEN

22   CONSTRUING THE CLAIMS OF THE '559 PATENT.  AND SO THAT'S

23   EXACTLY THE CASE HERE.

24             THE '724 PATENT WAS FILED WITH A SIMILAR

25   APPLICATION, BUT IT WAS NEVER FORMALLY RELATED TO THE OTHER

1   PATENTS.  AND SO UNDER THE GOLDENBERG CASE, THE AMENDMENTS

2   MADE, THE STATEMENTS MADE DURING -- IN ITS PROSECUTION HISTORY

3   DO NOT CONTROL THE SCOPE OF THE TERM "LEG" IN THE OTHER

4   PATENTS.

5            AND NOW JUST LOOKING AT THE '724 PATENT ITSELF, THE

6   FILE HISTORY AND THE CLAIMS THEMSELVES OF THE '724 PATENT DO

7   NOT SUPPORT A NARROW READING OF THE TERM "LEG" EITHER.

8            DURING A PROSECUTION HISTORY, THE PATENT EXAMINER

9   REJECTED SEVERAL CLAIMS.  AND THOSE CLAIMS WERE AMENDED WITH

10  THE LANGUAGE "TO APPLY PRESSURE ON TOP OF THE FLEXURE" AND

11  CLAIM 7 IS ONE OF THOSE.  "USING A REMOVABLE POSITIONING TOOL

12  TO CAUSE THE AT LEAST TWO LEGS TO SPREAD FURTHER APART."

13           AND SO THE ADDITION OF THAT LANGUAGE TO CLAIM 7 BUT

14  NOT TO CLAIM 5 TELLS US SEVERAL THINGS.

15           NOW, CLAIM 5 ISSUED WITHOUT THAT LANGUAGE.

16       **THE COURT:**  CLAIM 5 WASN'T PART OF THE -- EXAMINER

17  DIDN'T OBJECT TO THAT.

18       **MR. MCFARLANE:**  HE DID NOT REJECT IT, CORRECT.

19       **THE COURT:**  YEAH, ALL RIGHT.  SO THEY AMENDED

20  THOSE -- REJECTED AND DIDN'T AMEND THE ONE THAT HE DIDN'T

21  REJECT.

22       **MR. MCFARLANE:**  CORRECT, YOUR HONOR.

23       **THE COURT:**  THAT'S A GOOD IDEA, WOULDN'T YOU SAY?

24       OKAY.

25       **MR. MCFARLANE:**  AND SO IN LOOKING AT THAT LANGUAGE,

1    IF "LEGS" INHERENTLY WERE POSITIONED SO THEY MOVED ON --

2    EXTENDED DOWNWARD FROM THE BODY, IF THEY INHERENTLY MOVED

3    OUTWARD WHEN PRESSED UPON, THAT LANGUAGE WOULD NOT HAVE BEEN

4    NECESSARY IN CLAIM 7.

5                LOOKING AT CLAIM 5, THE LANGUAGE IS NOT THERE, SO

6    UNDER THE DOCTRINE OF CLAIM CONSTRUCTION KNOWN AS CLAIM

7    DIFFERENTIATION, UNDER THE ANALYSIS OF THE CLAIMS, IT TRIES TO

8    GIVE EACH PHRASE IN THE CLAIM MEANING.  CLAIM 5 DOES NOT HAVE

9    THAT LANGUAGE, AND SO CLAIM 5 DOES NOT REQUIRE THE LEGS OF THE

10   FLEXURE TO SPREAD APART WHEN PRESSED DOWN.

11              **THE COURT:**  AND THE OTHER CLAIMS DO?

12              **MR. MCFARLANE:**  THE OTHER INDEPENDENT CLAIMS OF '724

13   DO, YES, YOUR HONOR.

14              **THE COURT:**  OKAY.  NOW, HOW DO YOU FIGURE THAT OUT?

15   THEN YOU WOULD PROPOSE THERE'D BE TWO DIFFERENT DEFINITIONS FOR

16   "LEGS"?

17              **MR. MCFARLANE:**  I WOULD NOT, YOUR HONOR.  WHAT WE

18   ARE PROPOSING IS THE TERM "LEG" IS UNRESTRICTED INHERENTLY.

19   WHEN USED IN CLAIM 7, CLAIM 7 IS A NARROWER CLAIM AND SO THE

20   ADDITIONAL LANGUAGE WAS PLACED IN CLAIM 7 TO REQUIRE THAT.

21              SO IF YOU LOOK AT CLAIM 7, TO INFRINGE CLAIM 7, YOU

22   WOULD HAVE TO HAVE A FLEXURE THAT WHEN YOU PRESS DOWN ON IT,

23   THE LEGS SPREAD APART.

24              **THE COURT:**  RIGHT.

25              **MR. MCFARLANE:**  IF YOU DIDN'T HAVE THAT, YOU WOULD

```
 1    BE MISSING AN ELEMENT OF CLAIM 7.

 2                THE COURT:   CLAIM 1, 7, 10, 11 AND 12.

 3                MR. MCFARLANE:   CORRECT.

 4                THE COURT:   AND IN 5, YOU DON'T.

 5                MR. MCFARLANE:   IN 5, YOU DON'T.  YOU WOULD INFRINGE

 6    CLAIM 5 WITH A FLEXURE WITH LEGS EXTENDING HORIZONTALLY OR

 7    UPWARD, WHETHER OR NOT THE LEGS SPREAD FURTHER APART WHEN

 8    PRESSED DOWN.  CLAIM 5 HAS A DIFFERENT AND BROADER SCOPE THAN

 9    CLAIM 7.

10                THE COURT:   THEN YOU WOULDN'T -- IF YOU HAD A DEVICE

11    THAT WAS SUPPOSEDLY INFRINGING, DIDN'T SPREAD OUT, THAT -- THAT

12    WOULD INFRINGE 1, 7, 10, 11, AND 12 BUT NOT 5.

13                MR. MCFARLANE:   I'M SORRY, YOUR HONOR.  IF IT DID

14    SPREAD OUT OR DID NOT?

15                THE COURT:   IT DID.

16                MR. MCFARLANE:   OKAY.  IF --

17                THE COURT:   LET'S SAY YOU HAD SOMETHING THAT WHEN

18    YOU APPLIED PRESSURE TO THE TOP, THE LEGS AND THE FLEXURE

19    SPREAD OUT.  THEN THAT'S WHAT IT SAYS IN 1, 7, 10, 11, 12.  SO

20    IF YOU HAD A DEVICE THAT DID THAT, IT WOULD VIOLATE THAT.  I

21    MEAN, IT WOULD INFRINGE IT.

22                MR. MCFARLANE:   YES, IF THEY SPREAD APART, THEY

23    WOULD CLAIM --

24                THE COURT:   BUT WOULD IT ALSO INFRINGE 5?

25                MR. MCFARLANE:   YES, IT WOULD.  BECAUSE 5 WOULD NOT
```

1    BE SO LIMITED.  IN CLAIM 5, YOU WOULD SIMPLY HAVE YOU APPLY

2    PRESSURE TO A FLEXURE SO THAT AN OPTICAL AXIS OF THE OPTICAL

3    FIBER IS IN OPTICAL ALIGNMENT.

4             **THE COURT:**  HOW DOES IT WORK?  I GUESS I CAN'T

5    FIGURE OUT.  IF YOU APPLY PRESSURE, WHAT'S THE PURPOSE OF THE

6    PRESSURE?

7             **MR. MCFARLANE:**  THE PRESSURE WOULD BE TO MOVE THE

8    FLEXURE IN A VERTICAL DIRECTION.

9             **THE WITNESS:**  BUT HOW WOULD IT MOVE?

10            **MR. MCFARLANE:**  IT WOULD MOVE -- IT COULD START --

11   THE ISSUE, I THINK, IS THE VERTICALITY OF IT.  MUST THE FLEXURE

12   START OFF -- IN THE SPECIFICATION OF THE '950 PATENT, IT TALKS

13   ABOUT STARTING WITH A FLAT PIECE OF METAL AND THEN STAMPING IT.

14   SO IF YOU HAVE --

15            **THE COURT:**  STAMPING IT SO THAT YOU HAVE LEGS --

16            **MR. MCFARLANE:**  RIGHT.

17            AND SO NOTHING IN CLAIM 5 REQUIRES THAT YOU STAMP IT

18   SO THAT THE LEGS INITIALLY SPREAD DOWNWARD.

19            **THE COURT:**  -- JUST HAVE A PIECE OF FLAT METAL.

20            **MR. MCFARLANE:**  YOU COULD HAVE A PIECE OF FLAT

21   METAL --

22            (SIMULTANEOUS COLLOQUY.)

23            **THE COURT:**  -- ON THE PIECE OF METAL, AND THEN YOU

24   PRESS -- WHAT DOES THE PRESSING DO?

25            **MR. MCFARLANE:**  THE PRESSING WOULD PRESS IT DOWN.

1    YOU HAVE SPRING REGIONS THAT ARE FLEXIBLE.

2              **THE COURT:**  PUSHES THE SUBSTRATE DOWN, TOO, THAT

3    IT'S ON.  IF IT'S ATTACHED -- IF IT'S LAYING ON THE SUBSTRATE

4    AND YOU PUSH IT DOWN, YOU PUSH BOTH OF THEM DOWN.

5              **MR. MCFARLANE:**  I ACTUALLY HAVE A FIGURE THAT I

6    THINK WOULD HELP DEMONSTRATE THIS, YOUR HONOR.

7              **THE COURT:**  YEAH.

8              **MR. MCFARLANE:**  THIS IS NOT A FIGURE FROM THE

9    PATENT.  THIS IS A FIGURE THAT WE HAVE PREPARED.

10             IF YOU LOOK AT CLAIM 1 OF THE '950 PATENT AND CLAIM

11   21 OF THE -- OR I'M SORRY -- CLAIM 20 OF THE '950 PATENT, MOST

12   OF THE FIGURES IN THE PATENTS, YOUR HONOR, SHOW THIS FIRST

13   OPTICAL ELEMENT RESTING ON A RAISED PLATFORM.

14             **THE COURT:**  DO THAT AGAIN.  RIGHT THERE.  OKAY.

15   THAT'S THE DIODE OR WHATEVER?

16             **MR. MCFARLANE:**  RIGHT.  IT'S DESCRIBED AS A LASER

17   DIODE, AND I THINK, YOUR HONOR, IF YOU WOULD LOOK AT FIGURE 3A

18   IN THE -- IN THE '950 PATENT, YOU WOULD SEE THAT RESTING ON A

19   RAISED PLATFORM.

20             **THE COURT:**  YEAH.  OKAY.

21             **MR. MCFARLANE:**  AND SO IN CLAIM 1 OF THE '950

22   PATENT, YOU HAVE THE SUBSTRATE FLOOR THAT YOUR HONOR REFERRED

23   TO.

24             **THE COURT:**  RIGHT.

25             **MR. MCFARLANE:**  AND THEN YOU HAVE THE FIRST OPTICAL

1   ELEMENT.

2            NOW, IN CLAIM 2 OF THE '950 PATENT, THE -- IT'S A

3   DEPENDENT CLAIM THAT SPECIFIES THAT THE FIRST OPTICAL ELEMENT

4   IS ON A RAISED PLATFORM.  BUT IN CLAIM 1, AND THEN ITS

5   DEPENDENT CLAIM 20 OF THE '950 PATENT, THAT OPTICAL ELEMENT

6   NEED NOT BE ON A RAISED PLATFORM SO IT CAN BE MOUNTED DIRECTLY

7   ON THE SUBSTRATE.

8            **THE COURT:**  LIKE THIS?

9            **MR. MCFARLANE:**  AND THEN IN CLAIM 1, YOU ALSO HAVE

10  THE -- THE FIRST OPTICAL ELEMENT AND THEN THE SECOND OPTICAL

11  ELEMENT, WHICH IS THE CABLE, THEY OPERATE THE OPTICAL FIBER.

12           **THE COURT:**  RIGHT.

13           **MR. MCFARLANE:**  AND THEN THE FLEXURE.  AND THE

14  FLEXURE HAS THE BODY, THE SPRING REGIONS, AND THE LEGS.

15           **THE COURT:**  RIGHT.

16           **MR. MCFARLANE:**  AND THEN IN CLAIM 20, IT

17  SPECIFICALLY ADDS A FRAME AND SPECIFIES THAT THE LEGS OF THE

18  FLEXURE REST ON THE FRAME.  AND SO THAT'S WHAT WE'VE SHOWN

19  HERE.  HERE'S THE FRAME.  SO IF YOU HAVE A FRAME, THE LEGS

20  RESTING ON THE SURFACE OF THE FRAME, THE FLEXURE, BEFORE YOU

21  PUT PRESSURE ON IT, WOULD BE ABOVE THE SURFACE.  ASSUME IT WAS

22  FLAT, YOU WOULD HAVE THE SECOND OPTICAL ELEMENT, THE CABLE --

23           **THE COURT:**  IS THE FIBER ATTACHED TO THE FLEXURE?

24           **MR. MCFARLANE:**  YES.

25           **THE COURT:**  SO IT'S NOT ON THE SUBSTRATE.

```
 1              MR. MCFARLANE:  NO, IT IS NOT.

 2              AND THEN SO AS YOU WOULD PRESS DOWN ON THIS FLEXURE

 3   IN THIS EXAMPLE, YOU WOULD ALMOST HAVE TO PRESS THE FLEXURE

 4   BODY SO IT WAS BELOW THE LIP OF THE FRAME TO ALIGN IT WITH

 5   THE LASER DIODE --

 6                   (SIMULTANEOUS COLLOQUY.)

 7              THE COURT:  -- FRAME 'CAUSE THE BOTTOM OF THE FRAME

 8   IS THE SUBSTRATE.  SO IT CAN'T LINE UP WITH THE SUBSTRATE

 9   UNLESS IT'S ON THE TOP OF THE -- OF THE SUBSTRATE.

10              WELL, IT CAN'T LINE ON --

11                   (SIMULTANEOUS COLLOQUY.)

12              THE COURT:  FIBER CAN'T LINE UP WITH THE DIODE

13   UNLESS THEY'RE BOTH ON THE SUBSTRATE.

14              MR. MCFARLANE:  THE -- IN THIS EXAMPLE, AND THIS IS

15   THE WAY IT'S SHOWN, THE FIBER IS MOUNTED TO THE PERFORMANCE OF

16   THE FLEXURE.

17              THE COURT:  ALL RIGHT.

18              MR. MCFARLANE:  THE FLEXURE IS RESTING ON THE TOP OF

19   THE FRAME, AND SO IT'S KIND OF -- IT'S A THREE-DIMENSIONAL

20   OBJECT.  SO THE TOP OF THE FRAME WOULD BE, YOU KNOW, SAY --

21              THE COURT:  ALL RIGHT.

22              MR. MCFARLANE:  -- UP HERE, AND THEN YOU HAVE TO

23   ALIGN IT WITH THE FIRST OPTICAL ELEMENT THAT'S ON THE SURFACE

24   OF THE SUBSTRATE.

25              THE COURT:  SO YOU GET AN ALIGNMENT BEFORE YOU GET
```

1   TO THE POINT WHERE YOU'RE BELOW THE SUBSTRATE.

2           **MR. MCFARLANE:**  YOU'RE NOT BELOW THE SUBSTRATE, YOUR

3   HONOR, YOU'RE CORRECT, BUT YOU'RE --

4           **THE COURT:**  TOP SURFACE OF THE FRAME.  YOU'RE NOT

5   BELOW THE BOTTOM SURFACE OF THE FRAME.

6           **MR. MCFARLANE:**  CORRECT.  BUT THE FLEXURE LEGS IN

7   CLAIM 20 OF '950 PATENT ARE ATTACHED TO THE TOP SURFACE OF THE

8   FRAME.  THEY'RE NOT ATTACHED DIRECTLY TO THE SUBSTRATE.

9           **THE COURT:**  YEAH, BUT THAT MEANS THEY HAVE TO BE

10  ATTACHED IN SUCH A WAY THAT YOU CAN BEND IT AND IT FLEXES AND

11  IT'S -- SO THAT YOU CAN CHANGE ITS VERTICAL AXIS BY PUSHING?

12          **MR. MCFARLANE:**  YES, YOUR HONOR.

13          **THE COURT:**  ALL RIGHT.  BUT WHEN YOU PUSH ON IT, YOU

14  CAN'T PUSH IT BELOW THE BOTTOM OF THE FRAME TO MAKE THE

15  ASSIGNMENT OR IT WON'T ALIGN.

16          **MR. MCFARLANE:**  THE BOTTOM OF THE FRAME, YOUR HONOR?

17  NOT THE --

18          **THE COURT:**  WELL, YOU SEE --

19          **MR. MCFARLANE:**  -- LOWER BOTTOM OF THE FRAME,

20  CORRECT, BECAUSE THE LOWER BOTTOM OF THE FRAME IS ON THE

21  SUBSTRATE.

22          **THE COURT:**  RIGHT.

23          **MR. MCFARLANE:**  BUT YOU PUSH IT BELOW THE TOP OF THE

24  FRAME WHERE THE LEGS ARE RESTING --

25          **THE COURT:**  OKAY.

1        **MR. MCFARLANE:**  -- AND SO THEN AT THE END OF THE

2    DAY, YOU HAVE THE FLEXURE'S LEGS ON THE -- RESTING ON THE TOP

3    OF THE FRAME.  BUT THEN YOU'VE HAD TO PRESS THE BODY OF THE

4    FLEXURE BELOW THAT PLANE, BELOW THE POINT WHERE THE LEGS WILL

5    BE ATTACHED TO THE FRAME.  SO THEN THE LEGS GO FROM THE --

6    THE --

7        **THE COURT:**  GO FROM THE SPRING REGION, WHATEVER IT

8    IS, UP.  AND THEY DON'T HAVE ANYTHING TO DO WITH THE VERTICAL

9    ALIGNMENT.

10        **MR. MCFARLANE:**  THEY HOLD THE VERTICAL ALIGNMENT

11    BECAUSE THEN YOU WOULD ATTACH THE LEGS TO THE FRAME AND HOLD

12    THE FRAME -- HOLD THE LEGS TO THE FRAME SO THAT'S THE WAY THAT

13    THE ASSIGNMENT IS HELD.  AND SO THE SPRING REGIONS FLEX AND

14    ALLOW YOU TO APPLY THAT VERTICAL DECLINE AS YOU APPLY PRESSURE

15    TO ACHIEVE THE ALIGNMENT.

16        **THE COURT:**  WELL, I GUESS IT -- SO THE LEGS -- THEY

17    SPREAD OUT FROM THE SPRING REGION AND THE PIECES THAT SPREAD

18    OUT IS ATTACHED TO THE TOP OF THE FRAME.  AND THEN THE SPRING

19    REGION IS SUPPOSED TO BE FLEXIBLE SO YOU PUSH IT DOWN AND IT

20    CHANGES VERTICAL ALIGNMENT.

21        **MR. MCFARLANE:**  RIGHT.

22        BUT IN THIS CASE, WHERE I BELIEVE THE -- IF THE

23    LEGS -- I BELIEVE THIS WAS IN SOME OF THE ARGUMENTS OF -- IN

24    THE PAPERS -- IF THE LEGS ARE INCLINED DOWN FROM THE BODY OF

25    THE FLEXURE --

1      **THE COURT:**  RIGHT.

2      **MR. MCFARLANE:**  -- YOU APPLY --

3      **THE COURT:**  RIGHT.

4           (SIMULTANEOUS COLLOQUY.)

5      **THE COURT:**  AND, IN FACT, THAT'S WHAT IT SHOWS IN

6  EVERY ONE OF THE FIGURES IN EVERY ONE OF THE PATENTS.

7      **MR. MCFARLANE:**  AND IN THIS EXAMPLE, WHICH IS

8  COVERED BY THE CLAIMS, WHERE YOU ACTUALLY HAVE THE ALIGNMENT

9  DOWNWARD, AND THE LEGS --

10      **THE COURT:**  WELL, HOW IS THIS COVERED BY THE CLAIMS?

11      **MR. MCFARLANE:**  WELL, IF YOU LOOK AT CLAIM 1, IF YOU

12  GO THROUGH THE ELEMENTS OF CLAIM 1 --

13      **THE COURT:**  CLAIM 1 OF THE '950.

14      **MR. MCFARLANE:**  OF THE '950 PATENT.

15      **THE COURT:**  OKAY.

16      **MR. MCFARLANE:**  CLAIM 1 SAYS AN OPTOELECTRONIC

17  PACKAGE, AND THE FIRST ELEMENT IS A SUBSTRATE HAVING A FLOOR.

18  AND SO THEN THIS WOULD HAVE THE FLOOR.  AND THEN THE SECOND

19  ELEMENT OF CLAIM 1 WOULD BE A FIRST OPTICAL ELEMENT COUPLED TO

20  THE SUBSTRATE.  AND SO IN THIS DRAWING, WE HAVE THE OPTICAL

21  ELEMENT 1 COUPLED TO THE SUBSTRATE; AND THEN A SECOND OPTICAL

22  ELEMENT, WHICH WOULD BE THE OPTICAL FIBER ATTACHED TO THE

23  FLEXURE; A FLEXURE COUPLED TO THE SECOND OPTICAL ELEMENT; AND

24  THEN IN CLAIM 1, IT'S TO THE SUBSTRATE.  TO MAINTAIN THE SECOND

25  OPTICAL ELEMENT IN OPTICAL ALIGNMENT WITH THE FIRST OPTICAL

1   ELEMENT WHEREIN -- AND I'LL COME BACK IN JUST A MOMENT TO

2   THE -- WHERE THE FLEXURE IS ATTACHED -- WHERE THE FLEXURE

3   COMPRISES AT LEAST TWO LEGS, WHICH WE HAVE THERE; HAS SPRING

4   REGIONS AND A BRIDGE.

5          AND SO IN CLAIM 1, THOSE ARE THE ONLY ELEMENTS.

6          CLAIM 20 OF THE '750 PATENT, IS A DEPENDENT CLAIM

7   FROM CLAIM 1 FURTHER COMPRISING A FRAME ATTACHED TO THE

8   SUBSTRATE.

9          **THE COURT:**  EXCUSE ME.  CLAIM 20?

10         **MR. MCFARLANE:**  20.

11         **THE COURT:**  OF '950?

12         **MR. MCFARLANE:**  LET'S SEE.

13          (PAUSE IN THE PROCEEDINGS.)

14         **MR. MCFARLANE:**  I BEG YOUR PARDON, YOUR HONOR.  IT

15  IS CLAIM 21.

16          AND CLAIM 21 IS AN OPTOELECTRONIC PACKAGE DEFINED IN

17  CLAIM 1 FURTHER COMPRISING A FRAME ATTACHED TO THE SUBSTRATE

18  WHEREIN LEGS OF THE FLEXURE ARE ATTACHED TO THE FRAME.

19         **THE COURT:**  OKAY.

20         **MR. MCFARLANE:**  AND SO THAT'S WHAT THIS ILLUSTRATION

21  SHOWS.  SO YOU HAVE THE LEGS OF THE FLEXURE ATTACHED TO THE TOP

22  OF THE FRAME, AND THEN YOU WOULD -- WITH THE --

23         **THE COURT:**  SO THE LEGS HAVE NOTHING TO DO WITH

24  THE -- THEY DON'T MOVE.  THE LEGS ARE JUST PERMANENTLY AFFIXED

25  AND THEY DON'T ACTUALLY AFFECT THE VERTICAL ALIGNMENT OTHER

| | |
|---|---|
| 1 | THAN THEY HOLD THE OTHER PARTS OF THE FLEXURE ONTO THE SAME |
| 2 | POSITION. |
| 3 | **MR. MCFARLANE:**  THEY WOULD -- FOR EXAMPLE, IF THE -- |
| 4 | IF THE LEGS WERE UP, FOR EXAMPLE, TO BEGIN WITH, YOU PRESS DOWN |
| 5 | ON THEM -- |
| 6 | **THE COURT:**  YOU DON'T PRESS ON THE LEGS.  YOU PRESS |
| 7 | ON -- |
| 8 | (SIMULTANEOUS COLLOQUY.) |
| 9 | **MR. MCFARLANE:**  -- BODY, BUT THEN THAT DOWNWARD |
| 10 | MOVEMENT JUST AS -- JUST AS -- |
| 11 | **THE COURT:**  THOUGHT THE LEGS WERE ATTACHED TO THE |
| 12 | FRAME. |
| 13 | **MR. MCFARLANE:**  THEY ARE WELDED TO THE FRAME AT THE |
| 14 | END OF THE PROCESS, AND THAT'S HOW THE ALIGNMENT IS MAINTAINED. |
| 15 | **THE COURT:**  YOU MEAN, THEY'RE NOT ATTACHED TO THE |
| 16 | FRAME BEFORE YOU ACHIEVE THE ALIGNMENT? |
| 17 | **MR. MCFARLANE:**  THAT'S CORRECT. |
| 18 | **THE COURT:**  OH. |
| 19 | **MR. MCFARLANE:**  AND SO JUST AS IF THE LEGS START IN |
| 20 | A DOWNWARD EXTENDING DIRECTION -- |
| 21 | **THE COURT:**  WHEN YOU PRESS IT, WHAT IS IN CONTACT |
| 22 | WITH THE FRAME? |
| 23 | **MR. MCFARLANE:**  THE LEGS ARE RESTING ON THE FRAME. |
| 24 | **THE COURT:**  OKAY. |
| 25 | **MR. MCFARLANE:**  AND THEN -- |

1          **THE COURT:**  PUSH IT DOWN TO GET TO ALIGNMENT, AND

2     THEN YOU WELD THE LEGS.

3          **MR. MCFARLANE:**  CORRECT.

4          **THE COURT:**  OKAY.

5          **MR. MCFARLANE:**  AND IF THEY STARTED EXTENDING FROM

6     THE BODY OF THE FLEXURE UPWARD, THEY WOULD ACTUALLY MOVE CLOSER

7     TOGETHER AS THE FLEXURE WAS PUSHED DOWN, EXACTLY THE OPPOSITE

8     OF THEM SPREADING APART AS THEY WOULD IN THE CERTAIN CLAIMS OF

9     THE '724 PATENT THAT HAVE THAT LIMITATION.

10          OKAY.  AND THAT'S THE INTRINSIC EVIDENCE I WANTED

11     TO -- TO DRAW TO THE COURT'S ATTENTION, BUT I WOULD --

12          **THE COURT:**  I JUST WONDERED.  OKAY.  IF YOU WENT

13     BACK TO THAT.

14          **MR. MCFARLANE:**  YES, YOUR HONOR?

15          **THE COURT:**  COULD YOU HAVE HORIZONTAL ALIGNMENT IN

16     THAT, OR HOW DID -- HOW DOES THAT WORK?

17          **MR. MCFARLANE:**  HORIZONTAL ALIGNMENTS MEANING MOVING

18     THE FLEXURE SIDE TO SIDE?  SURE.

19          **THE COURT:**  ON THE --

20          **MR. MCFARLANE:**  SURE.  YOU WOULD MOVE THE FLEXURE

21     BACK AND FORTH.  THE LEGS ARE RESTING ON THE FRAME.

22          **THE COURT:**  RIGHT.

23          **MR. MCFARLANE:**  SO THEN YOU WOULD JUST WELD THEM AT

24     WHATEVER HORIZONTAL --

25          **THE COURT:**  AND THEN YOU WELD THEM, AND THEN YOU TRY

1    TO DO VERTICALITY AND WELD THEM AGAIN?

2            **MR. MCFARLANE:**  NO, YOU WOULD NOT -- YOU WOULD NOT

3    WELD THEM PRIOR TO MOVING THEM HORIZONTALLY.  THAT WOULD BE THE

4    LAST STEP, TO WELD THEM IN PLACE.

5            **THE COURT:**  WELL, HOW DO THEY STAY IN THE SAME

6    ALIGNMENT WHEN YOU'RE DOING THE VERTICALITY MOVEMENT?  YOU JUST

7    ASSUME IT DOES?

8            **MR. MCFARLANE:**  I BELIEVE THAT TO BE THE CASE, YOUR

9    HONOR.  IT -- BUT I THINK THE POINT WITH THAT QUESTION IS IT

10   WOULD BEHAVE THE SAME WAY WHETHER THE LEGS WERE DOWNWARD OR

11   UPWARD.

12           **THE COURT:**  OKAY.

13           **MR. MCFARLANE:**  AND IN TERMS OF CONSTRUING THE

14   GEOMETRIC LIMITATION ON "LEG," THAT WOULDN'T FAVOR ONE

15   CONSTRUCTION OVER THE OTHER.

16           **THE COURT:**  OKAY.

17           **MR. MCFARLANE:**  MAY I PROCEED?

18           **THE COURT:**  YEAH.  GO AHEAD.

19           **MR. MCFARLANE:**  THAT'S THE LAST OF THE INTRINSIC

20   EVIDENCE I WANTED TO GO OVER.  BUT I WOULD LIKE TO JUST BRIEFLY

21   TOUCH ON THE DICTIONARY DEFINITIONS.  AND I WOULD LIKE TO POINT

22   OUT THAT IN DEFENDANTS' CLAIM CONSTRUCTION PAPERS, THEY'VE

23   SUBMITTED THREE DICTIONARIES.  AND EACH OF THESE DICTIONARIES

24   CONTAIN A DEFINITION THAT DOES NOT IMPOSE THE SAME RESTRICTION

25   THAT THEY WOULD APPLY TO "LEG."

1          THE AMERICAN HERITAGE DICTIONARY, THE THIRD

2     DEFINITION IS "ONE OF THE BRANCHES OF A FORKED OR JOINTED

3     OBJECT."

4          WEBSTER'S NEW WORLD, "ANY OF THE BRANCHES OF A

5     FORKED OR JOINTED OBJECT."

6          RANDOM HOUSE, WEBSTER'S UNABRIDGED, ONE OF THE SIDES

7     OF A FORKED OBJECT IS A COMPASS OR PAIR OF DIVIDERS, SO EVEN

8     THE DICTIONARIES THAT DEFENDANTS HAVE SUBMITTED WITH THEIR

9     CLAIM CONSTRUCTION BRIEF HAVE DICTIONARY DEFINITIONS WHERE THE

10    ORDINARY MEANING OF "LEG" DOES NOT IMPOSE A RESTRICTION ON LEG

11    THAT IS RELATED TO THE GEOMETRIC ORIENTATION.

12         **THE COURT:**  YOU THINK THIS IS -- A BRANCH IS THE

13    ORDINARY DEFINITION OF A LEG.

14         **MR. MCFARLANE:**  I THINK THAT IN -- YES, WE DO

15    BELIEVE THAT.  I THINK THAT WAS THE FIRST --

16         **THE COURT:**  THAT'S THE FIRST THING YOU THINK OF WHEN

17    YOU THINK OF "LEG"; YOU THINK THAT IT'S A BRANCH?

18         **MR. MCFARLANE:**  UM-HMM.

19         **THE COURT:**  EVEN WITH CYD CHARISSE?

20         **MR. MCFARLANE:**  SHE HAD LEGS.  BRANCHES.

21         AND SO THE DISPUTE HERE IS WHETHER OR NOT A LEG IS

22    RESTRICTED BY A CERTAIN GEOMETRIC ORIENTATION.  AND I'D LIKE TO

23    MAKE ONE POINT.  THERE'S BEEN A LOT OF DISCUSSION IN THE CASE

24    BY THE DEFENDANTS REGARDING SOMETHING CALLED A SPIDER THAT THEY

25    ALLEGE IS RELEVANT TO THE CONCEPTION OF THE INVENTION.

1      **THE COURT:**  YES.

2          **MR. MCFARLANE:**  AND SO EVEN THINKING OF A SPIDER, IF

3  A SPIDER IS STANDING ON A TABLE, ITS BODY WILL BE ABOVE THE

4  LEGS WITH LEGS EXTENDING DOWN BELOW.  BUT THEN IF A SPIDER

5  STANDS ON A WALL, ITS LEGS WILL BE ADJACENT TO THE BODY.  AND

6  IF A SPIDER STANDS ON THE CEILING, ITS LEGS WILL BE EXTENDING

7  UPWARD FROM ITS BODY SUPPORTING THE BODY BELOW IT, AND SO

8  WHETHER OR NOT A SPIDER HAS LEGS IS NOT DETERMINED BY WHAT THE

9  GEOMETRIC ORIENTATION IS.  AND THERE'S MUCH DISCUSSION IN THE

10 PATENTS OF THE ROBUST NATURE OF THESE DEVICES.  AND EVEN THE

11 DEVICES THEMSELVES DON'T ALWAYS RETAIN A CERTAIN GEOMETRIC

12 ORIENTATION.

13         AND I THINK REVIEWING THE INTRINSIC EVIDENCE IN ALL

14 THE PATENTS AND THE EXTRINSIC EVIDENCE IN THE FORM OF ORDINARY

15 DICTIONARY DEFINITIONS --

16     **THE COURT:**  DO THAT ONE AGAIN, THE -- THE GEOMETRIC

17 ORIENTATION.  OBVIOUSLY IF YOU HAVE LEGS LIKE THE SPIDER, AND

18 YOU TURN IT -- IT'S ON THE WALL OR IT'S ON THE CEILING, IT'S

19 STILL A SPIDER AND IT STILL HAS LEGS, AND THE LEGS STILL

20 PROJECT OUTWARD FROM THE BODY.

21         BUT YOU'RE SAYING IT'S -- IT'S ONLY -- YOU CAN ONLY

22 SAY IT'S BELOW THE BODY WHEN YOU HAVE IT LINED UP WITH THE LEGS

23 BELOW IT AND ON THE TABLE.  SO IT STILL HAS LEGS AND THEY STILL

24 DO PROJECT DOWN, BUT IT CHANGES WHEN THE BODY CHANGES.

25 THAT'S -- THAT'S JUST PART OF THE -- WHEN YOU CHANGE ANYTHING.

1          **MR. MCFARLANE:**  RIGHT.

2          **THE COURT:**  OKAY.

3          **MR. MCFARLANE:**  AND SO WHEN WITH THE FLEXURE, YOU

4    HAVE A FLEXURE BODY WITH THESE APPENDAGES THAT ARE REFERRED TO

5    AS LEGS.

6          **THE COURT:**  UH-HUH.

7          **MR. MCFARLANE:**  THEY CAN EXTEND DOWNWARD FROM THE

8    BODY.  THEY CAN EXTEND OUTWARD FROM THE BODY, AS THEY DID IN

9    THE PRIOR ART REFERENCES THAT WERE CITED DURING THE PROSECUTION

10   HISTORY OR AS THE COMMON-SENSE SPIDER ANALOGY, OR THEY CAN

11   EXTEND UPWARD FROM THE BODY.  IT STILL HAS LEGS, STILL HAS

12   APPENDAGES CALLED LEGS THAT SUPPORT THE BODY.  THAT'S THE

13   REASON.

14         **THE COURT:**  HOW DOES IT DO IN YOUR EXAMPLE OF 1 AND

15   21?  DO THE LEGS SUPPORT THE FLEXURE?

16         **MR. MCFARLANE:**  YES.  THEY ARE -- THE WAY THAT THE

17   LEGS WOULD SUPPORT THE FLEXURE IS YOU HAVE THE -- THE BODY

18   THAT'S EXTENDED BETWEEN THE FRAMES, AND THEN THE BODY IS

19   ATTACHED TO THE LEGS BY THE SPRING REGIONS.  AND THEN SO THE

20   LEGS SUPPORT THE SPRING REGION -- THE BODY OF THE FLEXURE IN

21   THAT POSITION.  AND THEN YOU WOULD WELD -- IN THIS CASE, YOU

22   WOULD WELD THE LEGS TO THE TOP OF THE FRAME TO HOLD THAT

23   ALIGNMENT.

24         **THE COURT:**  BUT THEY SUPPORT IT IN THE SENSE THAT

25   THEY -- THEY KEEP IT IN A PLANE WHERE IT GOES ACROSS THE -- THE

1    FIBEROPTIC.

2              **MR. MCFARLANE:**  THEY SUPPORT IT TO KEEP IT IN

3    POSITION JUST AS THE LEGS WOULD EXTEND DOWNWARD.  THEY WOULD

4    SUPPORT THE BODY, APPLIED PRESSURE TO THE FLEXURE BODY UNTIL IT

5    REACHED THE POSITION YOU WANTED IT, AND THEN YOU WOULD WELD THE

6    LEGS IN PLACE.

7              **THE COURT:**  THEY'RE NOT SUPPORTING THE BODY AT THE

8    TIME YOU WELD IT.  I DON'T --

9              **MR. MCFARLANE:**  I BELIEVE -- I BELIEVE IT WOULD BE,

10   YOUR HONOR, BECAUSE IT IS THERE, AND THEN THE LEGS ARE WELDED

11   IN PLACE AND THEN THEY SUPPORT THE BODY IN THE DESIRED

12   POSITION.

13             **THE COURT:**  OKAY.  OKAY.  GO AHEAD.

14             **MR. MCFARLANE:**  THE LAST POINT I WOULD JUST LIKE TO

15   MAKE IS REVIEWING THE EXTRINSIC EVIDENCE THAT WE PRESENTED IN

16   OUR BRIEF AND THEN TODAY.  WITH THE SOLE EXCEPTION OF THE

17   CLAIMS THAT ARE SPECIFICALLY AMENDED IN THE '724 PATENT DURING

18   ITS PROSECUTION HISTORY, THE TERM "LEG" IS NOT EXPRESSLY

19   LIMITED TO A STRUCTURE THAT EXTENDS DOWNWARD FROM THE BODY.

20             THE INTRINSIC RECORD THAT WE'VE TALKED ABOUT TODAY

21   ALWAYS HAS AN IMPORTANT RAMIFICATION FOR THE SUMMARY JUDGMENT

22   MOTION THAT'S CURRENTLY BEFORE THE COURT.  THE DEFENDANTS HAVE

23   ARGUED STRENUOUSLY AT TIMES THAT MR. VERDIELL EXPERIENCED AN

24   "AH HA" MOMENT WHEN HE PURPORTEDLY DETERMINED FOR HIMSELF THAT

25   WHEN YOU PRESS DOWN ON A FLEXURE, YOU COULD CAUSE THE DOWNWARD

1    LEGS TO EXTEND AND SPREAD APART.

2              I THINK IT'S STRIKING THAT IN THE PROSECUTION

3    HISTORY, THE IDEA OF THE LEGS EXTENDING DOWNWARD AND SPREADING

4    APART, IT'S NOT IN THE ORIGINAL CLAIM LANGUAGE.  IT WAS NOT

5    AMENDED -- IT WAS NOT ADDED UNTIL THE AMENDMENTS IN THE '724

6    PATENT, YEARS AFTER THE ORIGINAL APPLICATIONS, AND WAS ADDED

7    SPECIFICALLY TO ADDRESS THE EXAMINER'S REJECTION.

8              IF THIS WERE TRULY A FUNDAMENTAL ASPECT OF THE

9    INVENTION, AS DEFENDANTS HAVE ARGUED AT TIMES, THEN YOU WOULD

10   EXPECT IT TO BE RECITED PROMINENTLY IN THE CLAIMS AS THEY WERE

11   FILED IN ALL OF THE PATENTS.  IT WOULD NOT HAVE BEEN ADDED AS

12   MERELY AN AFTERTHOUGHT IN RESPONSE TO AN EXAMINER'S REJECTION.

13             AND SO, YOUR HONOR, UNLESS THE COURT HAS FURTHER

14   QUESTIONS --

15             **THE COURT:**  THAT'S FINE.

16             **MR. MCFARLANE:**  THANK YOU.

17             **THE COURT:**  GOOD.  THANK YOU.

18                  (PAUSE IN THE PROCEEDINGS.)

19             **THE COURT:**  PLEASE GO AHEAD.

20             **MR. TANGRI:**  YOUR HONOR, RAGESH TANGRI FROM KEKER &

21   VAN NEST FOR THE DEFENDANTS.  FIRST AND FOREMOST, THE COURT'S

22   BEEN THROUGH THIS BEFORE, I KNOW, AND HAS READ THE BRIEFS AND

23   HEARD A LOT OF PRESENTATIONS SO IF YOU HAD ANY QUESTIONS YOU

24   WOULD --

25             **THE COURT:**  AS A PART OF YOUR PRESENTATION, I WOULD

1    ASSUME THAT YOU'LL ANSWER THE QUESTION I HAVE AS TO HOW DO YOU

2    ANSWER THE ARGUMENTS THAT HAVE JUST BEEN MADE IN TERMS OF

3    SPECIFICALLY THE -- THE A -- WELL, THE ONE WHERE IT'S

4    UPSIDE-DOWN.

5              **MR. TANGRI:**  RIGHT.

6              **THE COURT:**  AND ALSO HOW ABOUT THE REJECTION?  WHY

7    ISN'T IT IN THE ORIGINAL PATENT IF IT IS AN "AH HA" OF THE

8    PATENT.

9              **MR. TANGRI:**  VERY WELL.

10             LET ME START WITH THE ONE THAT'S UPSIDE-DOWN, AND IT

11   REALLY IS UPSIDE-DOWN.  THAT FIGURE -- AND MR. MCFARLANE SAID

12   THIS VERY CANDIDLY -- IS NOWHERE IN THE PATENT, NOR IS THE

13   PROCESS THAT IS -- THAT HE'S TRYING TO DESCRIBE THAT APPLIES TO

14   THAT FIGURE ANYWHERE IN THE PATENT.

15             ALL OF THE FIGURES THAT ARE IN THE PATENT SHOW

16   FLEXURE THAT HAS VERTICALITY, AND IT SHOWS SOMETHING PUSHING.

17             **THE COURT:**  THAT'S ONE OF THOSE SORTS OF THINGS YOU

18   DON'T HAVE TO HAVE A FIGURE THAT SHOWS WHAT IS DESCRIBED IN THE

19   CLAIMS, AND HE'S SAYING IT'S IN THE CLAIMS.  IF YOU READ '950,

20   1, AND 21, THEN YOU DRAW THAT, AND THAT'S WHAT IS SHOWN BY

21   THESE CLAIMS.

22             **MR. TANGRI:**  AND WHAT IS -- AND WE SUBMIT THAT IS

23   NOT WHAT IS SHOWN BY THOSE CLAIMS.  FOR ONE THING, WHAT IS

24   DESCRIBED IN THE PATENT -- AND IT IS DESCRIBED -- AND THIS IS

25   VERY IMPORTANT -- NOT JUST IN THE CLAIMS BUT IN THE

1    SPECIFICATION IS THE PRECISE NOTION OF PRESSING DOWN UPON A

2    VERTICAL FLEXURE --

3            **THE COURT:**  BUT PRESS DOWN --

4            **MR. TANGRI:**  -- CAUSING THE LEGS --

5            **THE COURT:**  HE'S PRESSING DOWN -- ON 20 -- I MEAN, 1

6    AND 21, HE'S PRESSING DOWN ON THE BRIDGE AND IT GOES DOWN TO

7    ACHIEVE VERTICAL ALIGNMENT.  SO WHY ISN'T THAT -- JUST BECAUSE

8    THE LEGS ARE POINTING UPWARDS, WHY ISN'T THAT CONSISTENT WITH

9    PRESSING DOWN ANYWAY?

10           **MR. TANGRI:**  COUPLE REASONS.  ONE, IN THE PATENT,

11   BOTH IN THE CLAIMS OF THE '724 BUT ALSO IN THE SPEC OF '950, IN

12   THE SPECIFICATION OF THE '950 AT COLUMN 7, LINES 50 TO 55, IT

13   DESCRIBES PRESSING DOWN AND HAVING THE LEGS SPREAD FURTHER

14   APART.

15           NOW, IN THAT UPSIDE-DOWN DEMONSTRATION, WHEN YOU

16   PRESS DOWN, THE LEGS WILL COME -- IF YOU START OUT LIKE THIS

17   AND YOU PRESS DOWN, THE LEGS ARE COMING TOGETHER, THEY ARE NOT

18   COMING APART.

19           **THE COURT:**  RIGHT.  RIGHT.

20           **MR. TANGRI:**  THEY ARE COMING TOGETHER.  SO THAT

21   DIRECTLY CONTRADICTS THE DESCRIPTION IN THE SPECIFICATION.

22           YOUR HONOR ALSO HAD THE QUESTION ABOUT HORIZONTAL

23   ALIGNMENT?

24           **THE COURT:**  NO.  WELL, I DID IN TERMS -- 'CAUSE I

25   WANTED TO SEE -- SEEMS AS THOUGH IF YOU'RE GOING TO HAVE THIS

1    THING WORK, IT'S GOING TO HAVE TO DO A HORIZONTAL ALIGNMENT AND

2    VERTICAL ALIGNMENT.

3                    **MR. TANGRI:**  YES.

4                    **THE COURT:**  SO HOW WOULD YOU DO IT WITH THE EXAMPLE

5    THAT WAS GIVEN?

6                    **MR. TANGRI:**  AND THE SPEC, IN FACT, SAYS YOU HAVE TO

7    DO HORIZONTAL AND VERTICAL ALIGNMENT.  AND WITH A VERTICAL ONE,

8    YOU CAN ALIGN IT HORIZONTALLY AND THEN PRESS IT DOWN, OR YOU

9    CAN PRESS IT DOWN AND THEN ALIGN IT HORIZONTALLY.

10                   WITH THIS ONE, IF YOU START -- IF YOU COULD SEE FROM

11   THE WAY THE LEGS WORK, YOU ASKED DO YOU WELD THE LEGS FIRST AND

12   HE SAID NO.  ONCE YOU START PRESSING DOWN, IT'S GOING TO SLIDE

13   AROUND IN A BOWL THAT'S BEEN CREATED.  AND THE HORIZONTAL

14   ALIGNMENT AND THE VERTICAL ALIGNMENT ARE NOT GOING TO BE

15   STABLE.

16                   THAT'S -- FROM THE WAY THAT THING IS DESCRIBED, YOU

17   PRESS DOWN, IT'S GOING TO SLIDE ONE WAY OR THE OTHER AND NOT

18   ALLOW FOR BOTH OF THOSE ALIGNMENTS TO OCCUR AND --

19                   **THE COURT:**  WELL, IT WILL, AS LONG AS THE LEGS STAY

20   ON THE FRAME.

21                   **MR. TANGRI:**  BUT THEY'LL BE STAYING ON THE -- IN

22   ALL -- JUST FROM LOOKING AT IT, IT'S NOT A STABLE CONSTRUCTION.

23   IT'S UPSIDE-DOWN.  IT'S GOING TO BE SLIDING AROUND LIKE PUTTING

24   A PIECE OF --

25                   **THE COURT:**  WELL, IT WOULD HAVE TO SLIDE SO THAT THE

```
1    LEG MOVES IN OR OUT OF THE AREA BETWEEN THE SIDE OF THE FRAME.

2             MR. TANGRI:  RIGHT.

3             THE COURT:  AND -- BUT -- WHY CAN'T YOU SAY THAT YOU

4    HAVE A DEVICE THAT HOLDS THE -- FROM THE TOP THAT IS CAPABLE OF

5    MOVING IT THERE AND THEN STOPPING AND PRESSING DOWN?

6             MR. TANGRI:  THERE'S NO SUCH -- THE DEVICE IS

7    DESCRIBED AS ONE THAT PUTS JUST DOWNWARD PRESSURE, NOT THAT

8    HOLDS IT LATERALLY.  IT PUTS DOWNWARD PRESSURE OR MOVES IT

9    LATERALLY.

10            THE COURT:  WELL, BUT COULDN'T YOU HAVE SOMETHING

11   THAT DOES DO THAT?  YOU HAVE A DEVICE THAT HOOKS UP TO THE

12   BRIDGE AND THAT IS CAPABLE OF HORIZONTAL MOVEMENT AND THE

13   VERTICAL MOVEMENT.

14            MR. TANGRI:  WELL, THAT'S CERTAINLY NOTHING THAT IS

15   DESCRIBED.  AND GIVEN THE STRUCTURE OF THE THING, THAT DEVICE

16   WOULD HAVE TO REACH UNDERNEATH AND GRAB IT IN ORDER TO

17   MAINTAIN --

18            THE COURT:  OH, I KNOW.  IT WOULD HAVE TO HAVE HOLES

19   IN IT, JUST LIKE THE ONE IN THE -- THEY DESCRIBED AS COMING

20   FROM UP ON TOP.  THE HOLES GO IN, AND THEY GET INTO THE BRIDGE,

21   AND THEY'RE NOW ATTACHED TO THE BRIDGE.  AND THEN YOU CAN MOVE

22   IT HORIZONTALLY, AND THEN YOU PRESS IT DOWN.

23            MR. TANGRI:  AND WHAT I'M TRYING TO DRIVE AT -- AND

24   THIS IS KIND OF TRICKY, 'CAUSE WE DIDN'T HAVE THIS DIAGRAM

25   BEFORE TODAY -- WAS IF YOU HAVE A THING LIKE THIS --
```

1      **THE COURT:**  RIGHT.

2      **MR. TANGRI:**  -- AND YOU MOVE IT HORIZONTALLY, IT'S

3  GOING TO ROLL.

4      **THE COURT:**  YEAH, WELL, IT'S GOING TO CHANGE THE

5  AMOUNT OF EACH LEG.  ONE WILL HAVE MORE ON THE FRAME, AND ONE

6  WILL HAVE LESS.

7      **MR. TANGRI:**  AND BY DOING THAT, IT'S GOING TO CHANGE

8  THE ELEVATION OF IT.  WHEN IT ROLLS, IT'S GOING TO --

9      **THE COURT:**  WELL, WHEN YOU'RE TRYING TO GET IT LINED

10  UP HORIZONTALLY SO THAT ONCE YOU GET IT THERE, YOU STAY, AND

11  THEN YOU PRESS IT DOWN.

12      **MR. TANGRI:**  WELL, BUT THEN IF YOU PRESS IT DOWN,

13  IT'S LIKELY TO ROLL AS WELL, FAR MORE SO THAN -- THAN THE TOP

14  DEMONSTRATION.

15      **THE COURT:**  OKAY.

16      **MR. TANGRI:**  IN ANY EVENT, THAT -- THAT -- THAT IS

17  ONE -- ONE ANSWER TO IT.  THE OTHER THING THAT I DO WANT TO

18  STRESS AND THIS IS IN RESPONSE -- YOU ASKED ABOUT HIS ARGUMENT

19  ABOUT WHY ISN'T THE DOWNWARD PRESSURE AND SPREADING APART

20  DESCRIBED IN THE -- IN THE PATENT IN THE CLAIMS.

21      IT IS DESCRIBED IN THE SPECIFICATION.  AND IN THE

22  SPECIFICATION OF '950, NOT JUST THE '724.  AND AS YOUR HONOR IS

23  WELL AWARE, WHEN PEOPLE DRAFT THESE CLAIMS, THEY DON'T TRY TO

24  DRAFT THEM NECESSARILY TO CAPTURE THE MOST NARROW THING -- "AH

25  HA" MOMENT POSSIBLE.

```
 1                THE COURT:  -- WANT A CATCH WHERE ONE THAT'S NOT --

 2                MR. TANGRI:  EXACTLY.

 3                THE COURT:  YOU WANT TO CATCH THINGS THAT YOU DON'T

 4     EVEN LOOK AT.

 5                THE QUESTION IS WHEN YOU SAY IT PRESSES DOWN, IT

 6     SPREADS APART.  THAT'S TRUE, AND IT'S IN THE -- THE CLAIM

 7     LANGUAGE, AND IT'S IN THE SPECIFICATIONS, BUT IT'S NOT IN CLAIM

 8     5 OF '724.

 9                MR. TANGRI:  THAT'S RIGHT.

10                    (SIMULTANEOUS COLLOQUY.)

11                THE COURT:  JUST SAYS "PRESS."  PRESSURE.

12                MR. TANGRI:  RIGHT.  AND THAT'S THE CLAIM

13     DIFFERENTIATION ARGUMENT, YOUR HONOR, AND THAT IS IN THEIR

14     BRIEF, AND I WOULD LIKE TO ADDRESS THAT.

15                THE COURT:  OKAY.

16                MR. TANGRI:  CLAIM DIFFERENTIATION IS A DOCTRINE

17     THAT APPLIES WHEN A DIFFERENT STRUCTURE IS DESCRIBED IN TWO

18     DIFFERENT CLAIMS.

19                AND AS YOUR HONOR ASKED AT THE OUTSET OF A -- OF THE

20     ARGUMENT OF THE PLAINTIFF'S COUNSEL, IS THE FLEXURE THE SAME

21     ACROSS ALL OF THE CLAIMS?  AND I BELIEVE THEY SAID YES AND I

22     HOPE THEY SAID YES BECAUSE NOTHING IN THE CLAIMS DESCRIBES A

23     DIFFERENT STRUCTURE FOR THE FLEXURE IN ANY OF THE CLAIMS.

24                IT IS NOT THE CASE THAT ONE CLAIM SAYS "A FLEXURE

25     WITH DOWNWARD EXTENDING LEGS" AND ANOTHER CLAIM SAYS "A FLEXURE
```

```
1    WITH LEGS."

2              ALL OF THE CLAIMS SAY "A FLEXURE WITH LEGS."  AND WE

3    ARE LEFT TO CONSTRUE WHAT DOES "LEGS" MEAN.  AND WE SUBMIT

4    AND -- PREVIOUSLY FOUND THAT LEGS MEANS SOMETHING THAT EXTENDS

5    DOWNWARDS.

6              NOW, ONE WAY WE KNOW THAT IS BOTH THE CLAIMS AND THE

7    SPECIFICATION DESCRIBE THAT YOU CAN TAKE THIS FLEXURE, PUSH

8    DOWN ON IT, AND HAVE THE LEGS -- YOU CAN ACHIEVE VERTICAL AND

9    HAVE THE LEGS SPREAD FURTHER APART.

10             THE COURT:  RIGHT.

11             MR. TANGRI:  SOME OF THE CLAIMS REQUIRE YOU TO DO

12   THAT.

13                  (SIMULTANEOUS COLLOQUY.)

14             THE COURT:  THAT'S WHAT -- I GUESS I DON'T GET THAT,

15   IS THAT YOU HAD -- CLAIM 5 WAS IN THE SAME LANGUAGE AS IT IS

16   NOW, APPARENTLY, WHEN HE FIRST PUT IT IN.  AND CLAIM 1,

17   HOWEVER, AND 7 AND 10, 11, 12, WHATEVER IT IS, THEIR LANGUAGE

18   WAS BASICALLY THE SAME AS 5.

19             MR. TANGRI:  UM-HMM.

20             THE COURT:  AND THEN THEY SAID, "OKAY.  LET'S CHANGE

21   ALL THIS."  WELL, THEY CHANGED IT IN EVERYTHING EXCEPT 5, AND

22   NOW -- BUT 5 IS LEFT ALONE.  BUT YOU'RE SAYING THAT 5 IS THE

23   SAME AS 1, 7, 11, AND 12 IN TERMS OF WHAT PRESSURE DOES.

24             MR. TANGRI:  YES.

25             THE COURT:  SO HE'S SAYING, WELL, THAT MEANS THAT
```

1    IT'S INHERENT.  SO YOU DON'T NEED THE LANGUAGE OF PRESSURE SO

2    THAT THAT DOESN'T SEEM TO WORK OUT, BECAUSE WHY WOULD THE

3    PATENT EXAMINER ASK FOR THE LANGUAGE IF YOU DON'T NEED IT.

4              **MR. TANGRI:**  WELL, ONE UNFORTUNATE OR FORTUNATE

5    THING ABOUT THESE CASES IS YOU CAN'T DEPOSE THE PATENT EXAMINER

6    TO FIND OUT WHY HE REJECTED ONE AND NOT THE OTHER.

7              WHAT WE KNOW IS EVERYONE AGREES THE SAME STRUCTURE

8    IS PRESENT IN -- FOR THE FLEXURE IN THE LEGS IN ALL OF THE

9    CLAIMS.

10             **THE COURT:**  ALL RIGHT.  WELL, THEY'RE SAYING, WELL,

11   YOU COULD USE THE SAME STRUCTURE BUT YOU COULD TURN IT

12   UPSIDE-DOWN.

13             **MR. TANGRI:**  AND I -- MY RESPONSE TO THAT, YOUR

14   HONOR, IS THAT IS AN ARGUMENT THAT ONLY A, YOU KNOW -- SORT OF

15   LIKE SAYING IF YOU TURN CYD CHARISSE UPSIDE-DOWN, WOULD SHE NOT

16   HAVE LEGS OR WOULD --

17                   (SIMULTANEOUS COLLOQUY.)

18             **THE COURT:**  -- SUPPORTING HER IF SHE WAS STANDING ON

19   HER HEAD.

20             **MR. TANGRI:**  RIGHT.  EXACTLY.  SO IT SEEMS TO ME

21   THAT IF SOMETHING IN ITS NATURAL STATE, ITS UNFLEXED STATE, THE

22   STATE IN WHICH IT'S DEPICTED IN ALL OF THE FIGURES AND

23   DESCRIBED IS -- HAS LEGS THAT EXTEND DOWNWARDS, THEN THE LEGS

24   EXTEND DOWNWARDS.

25             THIS -- THE CLAIM DIFFERENTIATION PIECE, JUST TO TRY

```
 1   TO FINISH THAT UP, IS THAT WE CAN INFER FROM THE BEHAVIOR

 2   THAT'S DESCRIBED IN THOSE CLAIMS AND THIS FACT THAT THE

 3   FLEXURES WITH LEGS ARE VERTICAL.

 4         THE COURT:  SO WHAT WE'RE SAYING IS WHEN YOU READ

 5   CLAIM 5, WHEN YOU READ "PRESSURE," THEN YOU READ PRESSURE THAT

 6   HAS THE EFFECT OF CHANGING THE LEGS AND CHANGING VERTICAL

 7   ALIGNMENT, EVEN THOUGH IT DOESN'T SAY IT THERE.

 8         MR. TANGRI:  OR WE CAN SAY IF WE HAD A CLAIM IN

 9   THESE PATENTS THAT DESCRIBED A FLEXURE WITH LEGS AND MADE NO

10   REFERENCE TO PRESSURE, NONE AT ALL.  BUT THERE WAS NO REASON TO

11   BELIEVE THAT THERE WAS A DIFFERENT FLEXURE AND LEGS IN THAT

12   CLAIM THAN THE OTHER CLAIMS, WHICH EVERYONE AGREES YOU SHOULD

13   CONSTRUE THE SAME THING SAME WAY.

14         THE COURT:  YOUR ANSWER IS THAT WE DON'T KNOW WHY

15   PTO EXAMINERS DO WHAT THEY DO.

16         MR. TANGRI:  BUT --

17         THE COURT:  BECAUSE THIS ONE -- THE EXAMINER THEN

18   SAID, "I REJECTED IT," AND SOMEHOW OR OTHER DIDN'T SAY THAT

19   ABOUT 5, AND SO YOU LEFT 5 ALONE, AND IT DIDN'T GET CHANGED,

20   AND IT STILL WENT THROUGH.

21         MR. TANGRI:  BUT IF IT'S THE SAME DEVICE, WHICH

22   EVERYONE SEEMS TO AGREE THAT IT IS --

23         THE COURT:  WHICH MEANS YOU DIDN'T NEED THE LANGUAGE

24   IN THE FIRST PLACE.

25         MR. TANGRI:  BUT THE FACT THAT IT'S THERE, BOTH IN
```

```
 1    THE CLAIMS AND THE SPEC, DOES TELL THE READER WHAT THE DEVICE

 2    IS CAPABLE OF DOING.  AND IF YOU KNOW WHAT IT'S CAPABLE OF

 3    DOING, YOU KNOW HOW IT HAS TO BE SHAPED.

 4              JUST A FEW OTHER COMMENTS, YOUR HONOR, ON THE --

 5    SOME OF THE THINGS THAT WERE CONTAINED IN THEIR BRIEF AND IN

 6    THE PRESENTATION.

 7              THE -- THE DICTIONARIES THAT THEY -- THE DICTIONARY

 8    THAT THEY CITED IN THEIR BRIEF -- THE FIRST DICTIONARY THAT

 9    THEY RELIED ON HAD THIS "FORKED OR JOINTED OBJECT" --

10              THE COURT:  RIGHT.

11              MR. TANGRI:  -- LANGUAGE.  AND THEY POINTED TO THE

12    FACT THAT SOME OF OUR DICTIONARIES DO, TOO.  BOTH THE

13    DICTIONARY THAT THEY CITED IN THEIR BRIEF FOR THE "FORKED AND

14    JOINTED OBJECT" LANGUAGE, AND ONE OF THE ONES THEY CITE IN OURS

15    TALK ABOUT AS AN EXAMPLE OR THE EXAMPLE OF THIS FORKED OR

16    JOINTED OBJECT BEING THE LEGS OF A COMPASS?

17              THE COURT:  WELL, THAT WAS ONE OF THEM.

18              MR. TANGRI:  AND IN THEIR -- THE FIRST DICTIONARY

19    THEY CITE THAT -- CONTEMPORANEOUS DICTIONARY THEY CITE, THAT IS

20    THE ONLY EXAMPLE GIVEN, THE LEGS OF A COMPASS.  AND THE LEGS OF

21    A COMPASS, YOUR HONOR, ARE VERTICAL.

22              THE COURT:  YEAH.

23              MR. TANGRI:  THIS IS A COMPASS -- GEOMETRY CLASS,

24    YOU DRAW A CIRCLE WITH IT.  THOSE ARE VERTICAL LEGS.

25              THE COURT:  RIGHT.
```

```
 1              MR. TANGRI:  SO I'M NOT QUITE SURE WHY SAYING THE

 2   LEGS OF A FORKED OR JOINTED OBJECT WHEN THE EXAMPLE THE

 3   DICTIONARY GIVES IS A COMPASS --

 4              THE COURT:  IT'S DIFFERENT BECAUSE IT HAS DOWNWARD

 5   SUPPORTING LEGS.

 6              MR. TANGRI:  RIGHT.

 7              THE COURT:  OKAY.

 8              OKAY.  ALL RIGHT.

 9              MR. TANGRI:  UNLESS YOU HAVE ANY OTHER QUESTIONS --

10              THE COURT:  NO, THAT'S FINE.  THANK YOU VERY MUCH.

11              I FORGOT TO ASK YOU A QUESTION, MR. MCFARLANE, IF I

12   COULD.

13              MR. McFARLANE:  YES, YOUR HONOR?

14              THE COURT:  ONE OF THE POINTS THAT WAS MADE SORT OF

15   IS THAT IF YOU LOOK AT ALL THE FIGURES IN ALL THESE PATENTS,

16   THEY ALL HAVE DOWNWARD SUPPORTING LEGS.

17              NOW, IF YOU READ THE SPECIFICATIONS, IS THERE A

18   SPECIFICATION THAT DESCRIBES ALL THIS?  IS THERE ANYTHING THAT

19   SUPPORTS THE NOTION THAT THEY DON'T HAVE DOWNWARD LEGS THAT

20   SUPPORT THE BODY OR THE FLEXURE?

21              MR. McFARLANE:  YES, THERE IS, YOUR HONOR.

22              THE COURT:  WHAT IS IT?

23              MR. McFARLANE:  LET ME GRAB MY NOTEBOOK FOR THE PIN

24   CITE.

25              (PAUSE IN THE PROCEEDINGS.)
```

```
 1              MR. McFARLANE:  AND I WOULD FIRST -- BEFORE I LOOK

 2    AT THE LANGUAGE IN THE SPECIFICATION, YOUR HONOR, WITH THE --

 3    ONE OF THE FIGURES IN MR. KNOX'S EXPERT DECLARATION SHOWS A

 4    FIGURE THAT WE BELIEVE SHOWS THE BODY OF THE FLEXURE EXTENDING

 5    BELOW THE LEGS OF THE FLEXURE.

 6              IN HIS DECLARATION -- AND I DON'T HAVE IT ON THE

 7    SCREEN HERE TODAY, BUT IN HIS DECLARATION, IT WAS A -- AN

 8    EMBODIMENT WHERE THE LEGS OF THE FLEXURE, AFTER THE PRESSURE IS

 9    APPLIED TO THE FLEXURE, ACTUALLY ARE ABOVE THE BODY OF THE

10    FLEXURE, AND THAT'S SHOWN WITH THE RED LINE THERE.  SO WE

11    BELIEVE ACTUALLY THE FIGURES OF THE PATENTS DO SHOW THE --

12              THE COURT:  WELL, WHERE'S THAT?  I MEAN, THERE'S A

13    FIGURES IN THE PATENT THAT DOES THAT?

14              MR. McFARLANE:  YES.  IT'S --

15              THE COURT:  WHICH ONE?

16              MR. McFARLANE:  IT'S -- I BEG YOUR PARDON, YOUR

17    HONOR, WHILE I GET THAT CITE.

18              THE COURT:  OKAY.

19                   (PAUSE IN THE PROCEEDINGS.)

20              MR. McFARLANE:  IT'S FIGURE 5B, YOUR HONOR, OF THE

21    '950 PATENT.  AND IN PARAGRAPH 7 OF MR. KNOX'S --

22              THE COURT:  WAIT A MINUTE.

23                   (PAUSE IN THE PROCEEDINGS.)

24              THE COURT:  OKAY.

25              MR. McFARLANE:  AND WE'VE SHOWN THAT IN --
```

1          **THE COURT:**  WELL, FIGURE 5 OF THE '950 PATENT.

2          **MR. McFARLANE:**  5B.  AND IT'S A FOUR-LEGGED FLEXURE.

3          **THE COURT:**  RIGHT.

4          **MR. McFARLANE:**  AND IF YOU DRAW A RED LINE FROM THE

5     TOP PLANAR SURFACE OF THE FRAME ON WHICH THE LEGS SIT, THE BODY

6     OF THE FLEXURE AND THE SECOND OPTICAL ELEMENT, THE FIBEROPTIC,

7     ARE BELOW THAT PLANER SURFACE.

8          AND SO WE BELIEVE IN THAT FIGURE, IT'S ACTUALLY

9     SHOWN CONTRARY TO THE DEFENDANTS' PROPOSED DEFINITION.

10          AND I WOULD ADD, AS YOUR HONOR LOOKS AT THAT

11    PICTURE, WHEN I SPOKE OF CLAIM 1 AND CLAIM 20 A MOMENT AGO,

12    THOSE TWO CLAIMS DON'T HAVE THE RAISED PLATFORM THAT'S SHOWN IN

13    FIGURES 5B OR THE LENS.  THE LENS IS ADDED BY DEPENDENT CLAIM

14    10.

15          AND SO WITHOUT THOSE TWO ELEMENTS, YOU WOULD HAVE TO

16    PRESS THE FLEXURE EVEN LOWER IN THAT PICTURE TO ACHIEVE

17    ALIGNMENT, SO THERE WOULD BE NO QUESTION THAT THE BODY OF THE

18    FLEXURE WAS BELOW THE PLANAR SURFACE OF THE FRAME ON WHICH THE

19    LEGS ARE RESTING.

20          **THE COURT:**  WELL, IN 5A, THAT SHOWS THE SAME THING,

21    THAT IS, THE TWO-LEGGED FLEXURE.

22          **MR. McFARLANE:**  YES.

23          **THE COURT:**  WHEN IT'S JUST SITTING THERE LIKE NOW,

24    THE LEGS ARE BELOW THE BODY, THE BRIDGE.  IS THAT IT?

25          LEGS 26 AND 27, 74 AND 73, AND THEY'RE BELOW 50 --

```
1   WHAT IS IT?  I GUESS IT'S -- IS IT 70, IS THE -- IS THE BRIDGE

2   ITSELF?

3              MR. McFARLANE:  YEAH, I BELIEVE 70 -- AND THAT --

4   YOU KNOW, TO US, I BELIEVE THAT -- I AGREE WITH YOUR HONOR WITH

5   THAT --

6              THE COURT:  NOW, YOU PUSH IT DOWN, AND THE LEGS

7   SPREAD OUT AND IT GOES DOWN, AND YOU MAY BE ABLE TO PUSH IT

8   DOWN SO IT EVEN GETS DOWN -- WHEN YOU PUT IT ON THIS FRAME, IT

9   GETS DOWN TO THAT IT'S BELOW THE LEGS.  AND --

10             MR. McFARLANE:  AND AT THAT POINT, YOU WOULD BE

11  PRESSING DOWN ON THE LEGS, WOULD DRAW CLOSER TOGETHER.

12             THE COURT:  RIGHT.  AND SO WHEN IT GOT DOWN TO THE

13  POINT WHERE IT REACHES THE VERTICAL ALIGNMENT, THEN IT COULD BE

14  BELOW -- THE LEGS COULD BE SAID TO BE ABOVE THE BRIDGE INSTEAD

15  OF BELOW.

16             MR. McFARLANE:  CORRECT, YOUR HONOR.

17             THE COURT:  AND IS THAT INCONSISTENT WITH THE

18  DEFINITION THAT SAYS THE LEGS ARE BELOW IN SUPPORT 'CAUSE THE

19  LEGS ARE BELOW IN SUPPORT, BUT WHEN YOU PRESS THEM, THEY GO

20  DOWN.  AND IT GOES DOWN, AND IT'S STILL SUPPORTING, BUT IT

21  REACHES THE POINT WHERE IT'S BELOW.

22             MR. McFARLANE:  THE BODY OF THE FLEXURE --

23                  (SIMULTANEOUS COLLOQUY.)

24             THE COURT:  -- BELOW.

25             MR. McFARLANE:  AND SO --
```

1      **THE COURT:**  IT'S SUPPORTING IT, BUT IT'S NOW BELOW

2   THE LEGS RATHER THAN ABOVE.

3      **MR. McFARLANE:**  RIGHT.  AND SO IN THAT SITUATION,

4   THE LEGS WOULD BE APPENDAGES OF THE FLEXURES THAT ARE UPWARD

5   EXTENDED SUPPORTING THE BODY OF THE FLEXURE BELOW IT.  SO IT

6   WOULD BE THE EXACT OPPOSITE OF DEFENDANTS' PROPOSED

7   CONSTRUCTION.

8      **THE COURT:**  IT WOULD BE BOTH.  IT STARTS OUT WITH

9   THE BELOW, BUT WHEN YOU PRESS IT AND IT GETS DOWN, IT GOES

10  BELOW (SIC).

11     **MR. McFARLANE:**  IN THAT FIGURE, FIGURE 5A, YES, THAT

12  WOULD PROBABLY BE TRUE.

13     **THE COURT:**  THAT'S TRUE.  ALL THE FIGURES IN THE

14  PATENTS HAVE THAT SAME KIND OF NOTION THAT IS THERE.  ALTHOUGH

15  SOME OF THEM YOU COULDN'T GET BELOW THE FRAME BECAUSE IT -- I

16  MEAN, SOME OF THEM, THE LEGS SIT ON THE SUBSTRATE.

17     **MR. McFARLANE:**  CORRECT.

18     **THE COURT:**  SO THE BRIDGE CAN'T GO BELOW THE

19  SUBSTRATE.

20     **MR. McFARLANE:**  IN --

21     **THE COURT:**  HERE IF THEY SIT ON THE FRAME, YOU

22  CAN'T.

23     **MR. McFARLANE:**  YES.

24     **THE COURT:**  OKAY.  ALL RIGHT.

25     **MR. McFARLANE:**  AND THEN THERE IS ALSO LANGUAGE IN

1    THE SPECIFICATION THAT WE'VE CITED IN OUR BRIEF, PARTICULARLY

2    AT PAGES 20 AND 21 OF OUR CLAIM CONSTRUCTION BRIEF, AND WE HAVE

3    A BLOCK QUOTE THERE, THE '950 PATENT, COLUMN 3, LINES 51 TO 56

4    SPECIFICALLY.  AND THERE ARE -- THERE WERE EMBODIMENTS, BOTH IN

5    THE SPECIFICATION OF THE PATENTS AND IN THE CLAIMS --

6              **THE COURT:**  OKAY.

7              **MR. McFARLANE:**  -- WHERE THAT IS CONTEMPLATED.

8              **THE COURT:**  OKAY.  OKAY.

9              OKAY.  THANK YOU.

10             AND NOW LET ME ASK MR. TANGRI.  ISN'T THAT POINT

11   CORRECT, IS THAT IF YOU DO HAVE AN EMBODIMENT WHERE YOU HAVE A

12   FRAME ON TOP OF THE SUBSTRATE AND YOU PRESS ON THE -- ON THE

13   BRIDGE, YOU CAN ARRIVE AT A POSITION WHERE THE LEGS ARE ABOVE

14   THE BRIDGE WHEN YOU -- YOU REACH YOUR VERTICAL LINE?

15             **MR. TANGRI:**  YOUR HONOR, I THINK IN THEORY, YOU

16   COULD PRESS THE THING DOWN THAT FAR.  NOTHING IN THE PATENT

17   DESCRIBES DOING THAT.

18             **THE COURT:**  WELL, IT SHOWS THE ABILITY TO DO THAT.

19   AND IT SHOWS THAT YOU CAN -- THE FRAME IS SUCH AND THE LEGS ARE

20   SUCH THAT YOU CAN START OUT WHERE IT'S ABOVE, BUT IN ORDER TO

21   REACH VERTICAL ALIGNMENT, YOU MAY HAVE TO GO DOWN BELOW THE TOP

22   PART OF THE FRAME WHERE THE LEGS REST.

23             **MR. TANGRI:**  AND -- AND NOTHING -- I'M JUST SAYING

24   THAT NOTHING IN THE PATENT, YOUR HONOR, SUGGESTS THAT YOU WILL

25   HAVE TO GO BELOW THE LEVEL OF THE FRAME TO DO THAT.  AND THE

1    DESCRIPTION OF --

2              **THE COURT:**  NOTHING SAYS IT WOULDN'T BE.

3              **MR. TANGRI:**  WELL, THE ONLY -- I WOULD POINT OUT IS

4    THE DESCRIPTION OF THE WELDING TECHNIQUES THAT ARE IN THE

5    PATENT.

6              **THE COURT:**  YEAH.

7              **MR. TANGRI:**  WELDING THIS BENT LEG TO THE SURFACE IS

8    ONE THING.

9              **THE COURT:**  RIGHT.

10             **MR. TANGRI:**  WELDING THIS LITTLE ANGLE LIKE THAT IS

11   A VERY DIFFERENT THING.  SO THAT'S WHAT -- YOU WOULD BE WELDING

12   SOMETHING LITERALLY ON TO AN EDGE LIKE THAT, AND THAT IS NOT

13   A -- AT LEAST IN A PRACTICAL --

14             **THE COURT:**  WELL, YOU COULD HAVE A HOLE IN IT.

15   'CAUSE THEY SHOW YOU HAVE THE SLOTS OR WHATEVER THEY CALL THEM,

16   AND YOU WELD THROUGH THE SLOTS, OR YOU WELD THE SLOTS TO THE

17   SURFACE.

18             **MR. TANGRI:**  BUT THE SLOTS, YOUR HONOR, DON'T --

19   THEY DON'T HOLD THE THING INTO THE SURFACE.  THE SLOTS WOULD BE

20   ORIENTED THIS WAY.  IT WOULDN'T HELP.  YOU'D STILL TRYING TO BE

21   WELDING SOMETHING TO A --

22             **THE COURT:**  WELL, BUT YOU COULD GO THROUGH THE SIDE.

23   YOU COULD HAVE THE WELD GO ACROSS TILL IT HITS THE LEG AND THE

24   FRAME.  DOESN'T WORK THAT WELL, BUT --

25             **MR. TANGRI:**  YES, YOUR HONOR.  THAT'S --

1           THANK YOU.

2           **THE COURT:**  ALL RIGHT.  I THINK THAT'S GOOD ENOUGH.

3    I THINK THAT'S --

4           ALL RIGHT.  WE'LL TAKE THIS UNDER SUBMISSION, AND

5    THEN WE'LL SEE WHERE WE ARE.

6           **MR. McFARLANE:**  THANK YOU, YOUR HONOR.

7           **THE COURT:**  THANK YOU.

8           OH, ONE THING, THERE WAS -- ON THE OTHER ONES, THE

9    CLAIMS WHERE YOU AGREED UPON THE CONSTRUCTION, YOU HAD A LITTLE

10   DISAGREEMENT IN TERMS OF WHETHER WE'RE GOING TO TELL THE JURY

11   ABOUT THAT.  THIS IS WAY TOO EARLY FOR THAT.  I MEAN, JURY

12   INSTRUCTIONS ARE REALLY AFTER YOU PUT THE CASE ON.  I MEAN, YOU

13   HAVE TO KNOW EXACTLY WHERE YOU'RE GOING TO GO BEFORE.

14          BUT THIS IS THE KIND OF AN EXAMPLE WHERE YOU MAY OR

15   MAY NOT WANT TO TELL THE JURY ABOUT THIS BECAUSE IT MAY OR MAY

16   NOT BE A SUBJECT MATTER THAT'S BEEN COVERED IN THE TRIAL.  SO I

17   DON'T THINK YOU CAN DECIDE IN ADVANCE WHICH OF THOSE CLAIM

18   CONSTRUCTIONS YOU TELL THE JURY ABOUT UNTIL AFTER YOU'VE HAD

19   THE TRIAL, AND THEN WHEN YOU HAVE A -- THE POINT WHERE YOU

20   REACH THERE, THEN YOU SAY TO YOURSELVES, SHOULD THE JURY GET

21   THIS ONE?  SAY YES OR NO.

22          SO THOSE ARE JUST AVAILABLE IF YOU NEED THEM, BUT I

23   DON'T THINK WE NEED TO DECIDE WHAT WOULD BE EXPLAINED TO THE

24   JURY UNTIL WE GET TO THE POINT WHERE WE KNOW WHETHER OR NOT

25   IT'S SOMETHING THAT WOULD HELP THEM.  OKAY?

1          **MR. McFARLANE:**  WE WOULD AGREE, YOUR HONOR.  THANK

2     YOU.

3          **MR. TANGRI:**  YOUR HONOR, I THINK -- OUR ONLY COMMENT

4     ON THAT IS THAT IT MAY BE THAT AT THE PRETRIAL CONFERENCE, WE

5     MAY SUGGEST THAT AT LEAST SOME OF THOSE TERMS WOULD BE PART OF

6     A PREINSTRUCTION.  BUT WE CAN CERTAINLY VISIT THAT THEN.  WE

7     DON'T NEED TO VISIT IT NOW.

8          **THE COURT:**  YEAH, WELL, THAT -- OKAY.  OKAY.

9          YEAH, WE CAN DO THAT.

10          OKAY.  THANK YOU.

11          **MR. TANGRI:**  THANK YOU.

12          (PROCEEDINGS WERE CONCLUDED AT 3:07 P.M.)

13                          --OOO--

14

15

16

17

18

19

20

21

22

23

24

25

1

2

### CERTIFICATE OF REPORTER

4          I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED

5   STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

6   THAT THE FOREGOING PROCEEDINGS IN C02-3262DLJ, SHUM V. INTEL,

7   ET AL. AND RELATED CROSS-ACTIONS, WERE REPORTED BY ME, A

8   CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED

9   UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A

10  FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY

11  ME AT THE TIME OF FILING.

12          THE VALIDITY OF THE REPORTER'S CERTIFICATION

13  OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR

14  REMOVAL FROM THE COURT FILE.

15

16  _____

17        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

18          MONDAY, SEPTEMBER 22, 2008

19

20

21

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*